IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

**JERRY A. BRABAZON**
**individually and on behalf**
**of all others similarly situated,**

                                                    Case No. 10-C-0714

                          Plaintiff,

        vs.

**AURORA  HEALTH CARE, INC.**

                          Defendant.

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR CONDITIONAL CLASS CERTIFICATION AND COURT FACILITATED NOTICE

        The named Plaintiff and opt-in Plaintiffs, on their own behalf and on behalf

of approximately 225 similarly situated security officers, seek conditional class

certification pursuant to 29 U.S.C. § 216(b). Because the Plaintiff at this early stage

brings forth more than sufficient evidence that the Named Plaintiff and the

putative class members are similarly situated, he respectfully requests that this

motion be granted and that notice be sent to the putative class members.


## INTRODUCTION

        Defendant, Aurora Healthcare, Inc. ("Aurora"), maintains a policy whereby it

automatically deducts one-half hour meal period from every security officer's pay for

every shift he or she works, if the shift is six hours or more. Despite these

deductions, Aurora requires these security guards to remain on duty during these

unpaid meal periods. Aurora's common policy of taking pay deductions from

security officers who are required to remain on duty during their meal breaks violates the overtime and minimum wage requirements of Wisconsin law and the Fair Labor Standards Act ("FLSA"). Because each of the approximately 225 putative class members were subject to this common policy, the Plaintiff and opt-in Plaintiffs respectfully request that the Collective Class be conditionally certified and that notice be sent to the eligible class members.

## RELEVANT FACTS

## I.   AURORA HEALTHCARE, INC.

Aurora provides health care through its facilities in Wisconsin and Illinois. (Exhibit 1 to Affidavit of Attorney William Parsons in Support of Motion for Conditional Class Certification and Court-Facilitated Notice ("Parsons Aff."), Fed. R. Civ. P. 30(b)(6) Deposition Transcript of Corporate Representative Michal R. Cummings ("Cummings Depo.") at 24:21-23.) Aurora operates fifteen (15) health care facilities in locations in Southern Wisconsin and Northern Illinois and employs security officers at each of these facilities. (Id. At 29:21-22.)

Aurora currently employs 142 full-time security officers (also referred to as "loss prevention" officers), and approximately 20 part time security officers, at these fifteen (15) locations. (Id. At 32:22-25; 33:1-4.) Each of these security officers is subject to a uniform automatic meal break deduction policy described in greater detail below. (Id. At 134:4-7.)

## II. AURORA SECURITY OFFICERS.

Aurora security officers provide a variety of services to Aurora in order to accomplish its goal to "ensure … a safe and secure environment for [its] patients to receive health care and for [its] caregivers to deliver health care …" (Id. at 66:8-11.) Aurora values uniformity in manner that it provides security services throughout the Aurora system. (Id. at 55:12-15.) In order to promote uniformity, every Aurora security officer is subject to training to meet Aurora's policies. (Id. at 50:24-25; 51:1-13.) Every Aurora security officer is trained and completes certification courses related to how to perform important aspects of their job, such as dealing with aggressive behavior and self defense. (Id. at 57:21-25; 58:1-9.) Further, during their new hire orientation, Aurora trains all of its security officers on its uniform meal break policy. (Id. at 61:18-25, 62:1-3.)

The services performed by security officers include both responding to difficult, disruptive or "emergent" situations, such as disturbances between patients, visitors and staff; as well as providing routine security services, such as providing directions, opening doors, handling valuables, finding lost cars, etc. (Id. at 67:7-25, 68:1-21.) More specifically, these services are described by Aurora security officers as follows: patrolling the building and surrounding parking lots; responding to emergency situations; responding to calls to restrain unruly patients; ensuring the building doors are locked; responding to calls to assist hospital patients and visitors; responding to central supply requests when equipment is needed on a particular floor; responding to maintenance calls; responding to calls for "patient

standby" when a patient is intoxicated or needs supervision; assisting in the transport of patients to other floors or departments when necessary; and providing any and all safety and security services that are required. (Declaration of Lucas Binter ("Binter Dec."), ¶5; Declaration of Jerry Brabazon ("Brabazon Dec."), ¶5; Declaration of Michael Emmerich ("Emmerich Dec."), ¶4; Declaration of Steven Lang ("Lang Dec."), ¶5; Declaration of Pat Lowery ("Lowery Dec."), ¶5; Declaration of Frank Smith ("Smith Dec."), ¶5; Declaration of Steve Slutsky ("Slutsky Dec."), ¶5; Declaration of Lonnie Ward ("Ward Dec."), ¶4; Declaration of Edward Welniak ("Welniak Dec."), ¶4; Declaration of Tammy Witt ("Witt Dec."), ¶5.)

Aurora security officers track the amount of time that they work in a uniform manner. Each Aurora location is equipped with a time clock, referred to as a "Kronos machine," through which security officers swipe their photo identification cards when they enter and exit the building at the beginning and end of each shift. (Cummings Depo. at 128:5-14.) Security officers are paid based on the amount of time recorded in the Kronos system. (Exhibit 1 to Parsons Aff., Fed. R. Civ. P. 30(b)(6) Deposition Transcript of Corporate Representative Rita Kopf ("Kopf Depo.") at 10:18-22.) The Kronos system is programmed such that it automatically records that each employee is to be paid for one half an hour less than the total time recorded on the Kronos system (if their shift exceeds six hours). (Id. at 133:9-25; 134:1-6.) This automatic deduction applies to all of Aurora's security officers. (Id.)

### A. Aurora Security Officers Must Monitor and Respond to Communication Devices at all Times During Their Shift, including During Their Unpaid Meal Period.

In order to perform the essential functions of his job as an Aurora security officer, Aurora issues each security officer one or more communication devices at the beginning of his shift. (Cummings Depo. at 98:17-21.) The primary communication devices are two-way radios and pagers.[1] (Cummings Depo at 98:23-25.) Aurora security officers use these communication devices to efficiently respond to both emergency and non-emergency situations. (Id. at 107:11-15; Binter Dec., ¶8; Brabazon Dec., ¶7; Emmerich Dec., ¶6; Lang Dec., ¶7; Lowery Dec., ¶7; Smith Dec., ¶7; Slutsky Dec., ¶7; Ward Dec., ¶6; Welniak Dec., ¶6; Witt Dec., ¶7).

Aurora expects that its security officers will keep these communication devices on and monitor them throughout their entire shift, including during their unpaid meal period. (Id. at 108:17-25; 109:1-16; Binter Dec., ¶9; Brabazon Dec., ¶8; Emmerich Dec., ¶6; Lang Dec., ¶8; Lowery Dec., ¶7; Smith Dec., ¶8; Slutsky Dec., ¶8; Ward Dec., ¶6; Welniak Dec., ¶6; Witt Dec., ¶8). Security officers are not permitted to turn off these devices during their unpaid meal periods and must be ready and available to react to emergency calls even during their unpaid meal periods. (Cummings Depo. at 87:20-25, 88:1-3). All of Aurora's security officers are uniformly required to continuously monitor their communication devices throughout their shifts. (Id. at 88:9-12.) Beyond that, security officers are subject to discipline if they fail to respond to an emergency call during their unpaid meal

---

[1] At those remote locations where radio reception may be poor, security officers are also assigned a cellular phone. (Cummings Depo at 99:2-9.)

period. (Cummings Depo. at 109:9-11; Binter Dec., ¶10; Brabazon Dec., ¶10; Emmerich Dec., ¶8; Lang Dec., ¶10; Smith Dec., ¶9; Slutsky Dec., ¶10; Welniak Dec., ¶9; Witt Dec., ¶9.) Aurora security guards must respond to emergency calls **immediately**. (Cummings Depo at 109:12-15).

Security officers commonly are interrupted during their unpaid meal periods by emergency and non-emergency calls. (Binter Dec., ¶11; Brabazon Dec., ¶8; Emmerich Dec., ¶8; Lang Dec., ¶11; Lowery Dec., ¶10; Smith Dec., ¶10; Slutsky Dec., ¶11; Ward Dec., ¶9; Welniak Dec., ¶10; Witt Dec., ¶10.) Because security officers are required to monitor their communication devices during their meal periods, and to be ready and available to respond to emergencies, they are typically unable to leave the Aurora facility during their unpaid meal period. (Binter Dec., ¶9; Brabazon Dec., ¶12; Emmerich Dec., ¶9; Lang Dec., ¶12; Lowery Dec., ¶12; Smith Dec., ¶11; Slutsky Dec., ¶12; Ward Dec., ¶11; Welniak Dec., ¶11; Witt Dec., ¶11.) This is so because Aurora requires that its security officers are able to **immediately** respond to certain emergencies, which could not be accomplished if a security officer had left the premises or was outside of radio contact. (Cummings Depo at 109:12-15.)

B. <u>Aurora Automatically Deducts Thirty (30) Minutes from all Security Officers' Pay During On-Duty Meal Periods.</u>

Aurora maintains a policy whereby a thirty (30) minute meal period deductions is automatically taken from every security officer's pay for every shift he works of six hours or more. (Cummings Depo. at 133:25; 134:1-6; Exhibit 1 to

6

Parsons Aff., Fed. R. Civ. P. 30(b)(6) Deposition Transcript of Corporate

Representative Mark A. Rountree ("Rountree Depo.") at 34:22-25; 35:1-3.)[2]

Aurora has disclosed the time and payroll records for each of the 222

members of the putative collective class, which confirms that Aurora uniformly took

this meal break deduction across the entire class. (Cummings Depo. at 136:4-6.) The

following table is an illustration of how the payroll records for the members of the

putative class appear:

| EE NO. | Date | Name | Day Of Week | Tm In | Tm Out | Rnd Time | Actv | Prod Hrs | Prod OT | Lnch Ded |
|---|---|---|---|---|---|---|---|---|---|---|
| 036712 | 12/24/2009 | BRABAZON, JERRY A. | THURSDAY | 2258 | 0731 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 12/28/2009 | BRABAZON, JERRY A. | MONDAY | 2257 | 0731 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 12/29/2009 | BRABAZON, JERRY A. | TUESDAY | 2257 | 0732 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 12/30/2009 | BRABAZON, JERRY A. | WEDNESDAY | 2257 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 12/31/2009 | BRABAZON, JERRY A. | THURSDAY | 2257 | 0732 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/4/2010 | BRABAZON, JERRY A. | MONDAY | 2257 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/5/2010 | BRABAZON, JERRY A. | TUESDAY | 2257 | 0731 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/6/2010 | BRABAZON, JERRY A. | WEDNESDAY | 2257 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/7/2010 | BRABAZON, JERRY A. | THURSDAY | 2056 | 0730 | 10.00 | | 10.00 | 0.00 | 0.50 |
| 036712 | 1/11/2010 | BRABAZON, JERRY A. | MONDAY | 2258 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/12/2010 | BRABAZON, JERRY A. | TUESDAY | 2257 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/13/2010 | BRABAZON, JERRY A. | WEDNESDAY | 2257 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/14/2010 | BRABAZON, JERRY A. | THURSDAY | 1800 | 1900 | 1.00 | A-INS | 1.00 | 0.00 | 0.00 |
| 036712 | 1/14/2010 | BRABAZON, JERRY A. | THURSDAY | 2255 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/18/2010 | BRABAZON, JERRY A. | MONDAY | 2257 | 0731 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/19/2010 | BRABAZON, JERRY A. | TUESDAY | 2257 | 0731 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/20/2010 | BRABAZON, JERRY A. | WEDNESDAY | 2257 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/21/2010 | BRABAZON, JERRY A. | THURSDAY | 2257 | 0732 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/25/2010 | BRABAZON, JERRY A. | MONDAY | 2257 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/26/2010 | BRABAZON, JERRY A. | TUESDAY | 2257 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/27/2010 | BRABAZON, JERRY A. | WEDNESDAY | 2257 | 0731 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 1/28/2010 | BRABAZON, JERRY A. | THURSDAY | 2257 | 0732 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 2/1/2010 | BRABAZON, JERRY A. | MONDAY | 2258 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 2/2/2010 | BRABAZON, JERRY A. | TUESDAY | 2257 | 0731 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 2/3/2010 | BRABAZON, JERRY A. | WEDNESDAY | 2258 | 0731 | 8.00 | | 8.00 | 0.00 | 0.50 |
| 036712 | 2/4/2010 | BRABAZON, JERRY A. | THURSDAY | 2258 | 0730 | 8.00 | | 8.00 | 0.00 | 0.50 |

(Exhibit 2 to Parsons Aff., Excerpted Portion of Defendant's Discovery Record AUR-

JB 171-1106 Response to RFP No. 6 – Active Security Officers 8 20 07_10 4 10.xls).

---

[2] In practice, each security officer is typically scheduled to be at work for an 8.5 hour shift, however, they are only paid for 8 hours of work. (Binter Dec., ¶6; Brabazon Dec., ¶6; Emmerich Dec., ¶5; Lang Dec., ¶6; Lowery Dec., ¶6; Smith Dec., ¶6; Slutsky Dec., ¶6; Ward Dec., ¶5; Welniak Dec., ¶5; Witt Dec., ¶6.)

Aurora's payroll records confirm that for every shift over six hours that a security officer worked, Aurora deducted one-half hour for a meal period. Aurora's records show this automatic meal period deduction in the far right column as a "Lnch Ded."[3]

Aurora took this deduction regardless of the fact that its security officers are required to monitor communication devices and to be ready and available to respond to emergency (and some non-emergency) calls during their unpaid meal periods. (Cummings Depo at 91:16-25; 92:1-5; Binter Dec., ¶10; Brabazon Dec., ¶10; Emmerich Dec., ¶7; Lang Dec., ¶8; Lowery Dec., ¶9; Smith Dec., ¶9; Slutsky Dec., ¶10; Welniak Dec., ¶9; Witt Dec., ¶9).

Aurora monitors the use of paid lunch periods, that is, the affirmative act by an employee to "cancel" his unpaid lunch period, as a cost control measure. (Cummings Depo. at 140:7-18). Thus, the automatic deduction of one-half hour from each shift, unless the employee takes specific steps to get paid for the lunch break, is a means of reducing labor costs. Although Aurora did maintain a cumbersome procedure for "cancelling" unpaid lunches, and taking a paid lunch, this procedure was only available to a security officer when the security officer was required to actively respond to a situation and "come off" his meal period. (Cummings Depo at 89:17-25, 90:1-25).

Security officers were not permitted to claim a paid lunch merely for being required to remain on duty and to be ready and available to respond to emergency

---

[3] The half hour meal period deduction shown in the excerpted payroll records of the named Plaintiff (above) are nearly identical to the payroll records produced by Aurora for all members of the putative class. Parsons Aff., ¶3.

calls. (Binter Dec., ¶13; Brabazon Dec., ¶9; Emmerich Dec., ¶10; Lang Dec., ¶9; Lowery Dec., ¶8; Slutsky Dec., ¶9; Welniak Dec., ¶8.) Further, as for meal breaks during which a security officer did have to respond to an emergency or non-emergency situation, security officers were commonly discouraged by their supervisors, who had to approve paid breaks, from recording a paid meal period. (Binter Dec., ¶13; Brabazon Dec., ¶9; Emmerich Dec., ¶10; Lang Dec., ¶9; Lowery Dec., ¶8; Slutsky Dec., ¶9; Ward Dec., ¶7; Ward Dec., ¶7; Welniak Dec., ¶8.) Aurora closely monitored use of paid lunches to assure, in their view, that they were being used "appropriately," or if the reason for taking a paid break was "valid" or "necessary." (Cummings Depo. at 137:11-21; 140:7-18.) Aurora employed this monitoring as a cost control method. (Cummings Depo. at 140:7-18; 90:10-13.)

Finally, each of the 225 putative class members suffered an illegal wage deduction during every meal period of his employment with Aurora, as he was required to remain on duty and was unable to leave the Aurora location where he was employed. The fact that Aurora had a procedure by which an employee could, after the fact, request pay for a worked lunch break did not obviate the fact that the employee could not go off-premises for lunch because of the risk that he would be emergently summoned to take care of a problem. (Binter Dec., ¶9; Brabazon Dec., ¶12; Emmerich Dec., ¶9; Lang Dec., ¶12; Lowery Dec., ¶12; Smith Dec., ¶11; Slutsky Dec., ¶12; Ward Dec., ¶11; Welniak Dec., ¶11; Witt Dec., ¶11.)

9

**ARGUMENT**

## I.  THE PURPOSE OF CONDITIONAL CLASS CERTIFICATION AND JUDICIAL NOTICE.

The Plaintiff seeks to conditionally certify this action as a collective action for the purpose of discovery and also seeks Court-facilitated notice to all Aurora security officers in Wisconsin pursuant to the FLSA, 29 U.S.C. § 216(b).

The FLSA specifically contemplates plaintiffs pursuing their claims collectively, stating that "[a]n action ... may be maintained against an employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and on behalf of themselves and other employees similarly situated." Id. In Hoffman-La Roche v. Sperling, 493 U.S. 165 (1989), the United States Supreme Court identified the main benefits of a collective action under the FLSA:

> A collective action allows ... plaintiffs the advantage of lower individual costs to vindicate rights by pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged ... activity.

Id. at 169-70.

Three important features define an FLSA collective action. First, in order to participate in a collective action, an employee must "opt-in," meaning the employee must consent in writing to join the lawsuit and that consent must be filed with the court. Hoffman-La Roche, 493 U.S. at 168; DeKeyser v. Thyssenkrupp Waupaca, Inc., 2008 WL 5263750, *2 (E.D. Wis. 2008, Griesbach, J.)[4]

---

[4] All unpublished cases are attached as Exhibit 3 to Parsons Aff.

10

Second, the statute of limitations continues to run on each employee's claim until he files his individual opt-in form with the court. DeKeyser, 2008 WL 5263750, at *5. See also Houston v. URS Corp., 591 F. Supp. 2d 827, 831 (E.D. Va. 2008) (Because the statute of limitations continues to run on unnamed class members' claims until they opt into FLSA collective action, objectives to be served through collective action justify conditional certification of a class of putative plaintiffs early in the proceeding, typically before any significant discovery, upon initial showing that members of the class are similarly situated.) Judicial notice promotes the remedial purpose of Section 216(b) by preventing the erosion of claims due to the FLSA's statute of limitations.

Finally, to serve the "broad remedial purpose" of the FLSA, courts commonly order notice to potentially similarly-situated employees, in order to inform them of this opportunity to "opt into" the case. Hoffman-La Roche, 493 U.S. at 173. Because of the "opt-in" requirement, "a representative plaintiff must be able to inform other individuals who may have similar claims that they may join the suit." Austin v. CUNA Mutual Insurance Society, 232 F.R.D. 601, 605 (W.D. Wis. 2006, Crabb, J.) Authorization of notice serves the broad, remedial purpose of the FLSA and comports with the court's interest in managing the docket. Id., citing Hoffman-La Roche, 493 U.S. at 172-4.

In light of these three important features, court-supervised notice is a preferred method of managing the notification process for several reasons: it avoids multiplicity of duplicative suits; it allows the court to set deadlines to advance the

11

dispositions of an action; and it protects plaintiffs' claims from expiring under the statute of limitations. Hoffman-La Roche, 493 U.S. at 171-3.

## II. THE STANDARD FOR CONDITIONAL CLASS CERTIFICATION.

### A. The Eastern District of Wisconsin Has Adopted the Two-Step Approach to Class Certification Under 29 U.S.C. § 216(b).

The Eastern District of Wisconsin evaluates conditional certification under the FLSA as a two-step process. Williams v. Cargill Meat Solutions Corp., 2010 WL 2643405 (E.D. Wis. 2010, Adelman, J.), DeKeyser, 2008 WL 5263750, at *2. Under the first step, "[t]he requirements of conditional certification are lenient because approval simply allows plaintiffs to provide notice to other potential class members so that they may make an informed decision whether to join the case. Witteman v. Wisconsin Bell, Inc., 2010 WL 446033, *7 (W.D. Wis., Feb. 2, 2010, Crabb, J.) In order to grant conditional certification, "[t]he court must determine whether the plaintiff has demonstrated a **reasonable basis** for believing that she is similarly situated to potential class members." DeKeyser, 2008 WL 5263750, at *2 (emphasis added, internal quotations omitted). At this first stage, with modest factual support, the "plaintiff need only show that he and potential class members are victims of a common, unlawful policy or practice." Williams, 2010 WL 2643405 at *2. Courts throughout the country have applied a similar lenient standard under the first step of the conditional certification process. See Poreda v. Boise Cascade, L.L.C., 532 F. Supp.2d 234, 239 (D. Mass. 2008) ("Employee can meet standard for preliminary certification of FLSA collective action by making modest factual showing or asserting substantial allegations that putative class members were together the

12

victims of a single decision, policy or plan that violated the law"); <u>Castillo v. P & R</u> <u>Enterprises, Inc.</u>, 517 F. Supp.2d 440, 444 (D.D.C. 2007) (In order for a District court to certify a conditional class under the FLSA, plaintiffs must first make a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law which initially fulfills the statutory requirement that putative class members be similarly situated to plaintiffs […].").

Courts should not consider arguments regarding the merits of the plaintiffs' claims when making this determination. <u>Epenscheid v. Directsat USA, LLC</u>, 2010 WL 2330309, *5 (W.D. Wis. June 7, 2010, Crabb, J.); <u>Sjoblom v. Charter</u> <u>Communications, Inc.</u>, 571 F.Supp.2d 961, 967 (W.D. Wis. 2008, Crabb, J.). At the first stage, "[t]he court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations. Indeed, a court should not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be similarly situated." <u>Barrus v. Dick's Sporting</u> <u>Good, Inc.</u>, 465 F.Supp.2d 224, 230 (W.D.N.Y. 2006); <u>see also</u> <u>Lynch v. United</u> <u>Services Auto. Ass'n</u>, 491 F.Supp 2d 375, 368 (S.D.N.Y. 2007) (internal quotes omitted); <u>Trezvant v. Fidelity Employer Services Corp.</u>, 434 F.Supp.2d 40, 43 (D.Mass. 2006); <u>Scott v. Heartland Home Finance Inc.</u>, 2006 WL 1209813, *3 (N.D. Ga. 2006); <u>Kalish v. High Tech Institute, Inc.</u>, 2005 WL 1073645, *2 (D. Minn. 2005). "The focus […] is not on whether there has been an actual violation of law but rather on **whether the proposed plaintiffs are similarly situated [...] with respect to**

13

their allegations that the law has been violated." Young v. Cooper Cameron Corp., 229 F.R.D. 50, 54 (S.D.N.Y.2005). See also Gayle v. U.S., 85 Fed.Ct. 72 (2008). The court relies on the complaint and any sworn statements submitted by the plaintiffs in determining whether the plaintiffs have met their burden. Sjoblom, 571 F.Supp.2d at 967 (internal citations omitted).

The plaintiff's burden is not heavy and may be met by a small number of sworn statements. See, e.g., Prentice v. Fund for Public Interest Research, 2007 WL 2729187, *2 (N.D. Cal Sept. 18, 2007) (three declarations); DeAsencio v. Tyson Foods, Inc., 130 F. Supp.2d 660, 663 (E.D. Pa. 2001) (four affidavits); Camper v. Home Quality Mgmt., Inc., 200 F.R.D. 516, 529 (D. Md. 2000) (four declarations); Guzman v. Varco Intern., Inc., 2002 WL 32639237, *3 (S.D. Tex. 2002) (three statements); Williams v. Long, 585 F. Supp.2d 679, 685 (D. Md. 2008) (two declarations); Kelly v. Bluegreen Corp., 256 F.R.D. 626, 631 (W.D. Wis. 2009) (five declarations).

Conditional certification is warranted in this case because the evidence proffered by the Plaintiff exceeds what is required under the first stage analysis and because Court-facilitated notice will serve the remedial purpose of the FLSA.

## III. THE NAMED PLAINTIFF AND THE PUTATIVE CLASS MEMBERS WERE VICTIMS OF A COMMON UNLAWFUL POLICY AND PRACTICE.

At the first stage of the § 216(b) certification analysis, the plaintiff must only show that there is a reasonable basis for believing he is similarly situated to potential class members. Williams, 2010 WL 2643405 at *2. See also Sharpe v. APAC Customer Service, Inc., 2010 WL 135168, *7 (Jan. 11, 2010, Crabb, J.)

14

(requiring only that there is some factual nexus that connects her to other potential plaintiffs as victims of an unlawful practice). Because the Named Plaintiff is able to make this modest factual showing, he requests that conditional certification be granted and that notice be sent to the putative class members.

A.  **Courts in Wisconsin and Throughout the Country Have Conditionally Certified Classes under Identical Automatic Deduction Policies.**

Courts in this and many other jurisdictions have regularly conditionally certified cases involving similar unlawful meal break deduction policies.

In a recent case, the United State District Court for the Western District of Pennsylvania conditionally certified a class of some 30,000 non-exempt employees based on their allegations of meal break violations under the FLSA. Camesi v. University of Pittsburgh Medical Center, 2009 WL 1361265, *1 (W.D.Pa., 2009). Coincidentally, the defendant in that case, the University of Pittsburgh Medical Center, used the same timekeeping system as Aurora, the Kronos system. Like Aurora, the defendant in the Camesi case programmed its Kronos system to automatically take a meal break deduction from every employee's pay for every shift of five or more hours worked, unless the employee actively "cancelled" the break. Id. at *2. The court was highly critical of this auto deduction policy:

> Similarly, UPMC's written policies arguably shift the burden from Defendants to their employees to ensure that non-qualifying meal breaks are not deducted from their pay. See discussion supra ("employee[s'] time record[s are] set up to automatically deduct a 30 minute meal period after 5 hours worked," and "it is the employee's responsibility to make sure the automatic lunch deduction is cancelled" as appropriate). The law is clear that it is the employer's responsibility, not its employees', to ensure

15

> compensation for work suffered or permitted. See Chao v.
> Gotham Registry, Inc., 514 F.3d 280, 288 (2d Cir.2008) …

Id. at *4. Ultimately, the court conditionally certified the class, holding that "[i]rrespective of whether or not UPMC's 'employee cancellation' policy ultimately is consistent with the FLSA, defendants' arguable attempt to shift statutory responsibilities to their workers constitutes an 'employer policy' susceptible to challenge at this stage in the proceedings." Id.

The Camesi court is not the first court to conditionally certify a class based on the Kronos system's automatic deduction policy. In Barrus v. Dick's Sporting Goods, Inc., the United States District Court for the Western District of New York conditionally certified a class of employees subject to an automatic meal break deduction policy. 465 F.Supp.2d 224, 230 (W.D.N.Y., 2006). There the court conditionally certified the class based on the affidavit testimony of five individuals alleging that the defendant maintained policy, plan or practice of condoning, accepting or encouraging managers and employees to illegally reduce compensation for time spent working. Id. The court rejected defendant's arguments that individual determinations regarding why breaks were missed precluded conditional certification, stating that such arguments put the "cart before the horse." Id. at 231. The court, citing a case from the Northern District of Illinois, goes on to state that:

> Perhaps the investigation and analysis required to
> determine whether particular options are similarly
> situated, so as to fairly proceed to judgment in a collective
> action, ultimately will prove to be sufficiently unwieldy or
> cumbersome that a collective action will not be
> appropriate in some or any form. But that does not, under

> relevant caselaw, mean that notice may not fairly issue
> under the more lenient step one FLSA analysis.

Id., citing Gambo v. Lucent Technologies, Inc., 2005 WL 3542485, *6 (N.D.Ill.

Dec. 22, 2005). In addition to these cases, an action currently pending before this

court has been conditionally certified, in part, based on allegation of an illegal meal

deduction policy. Williams, 2010 WL 2643405.

The Plaintiff in the instant case similarly alleges that Aurora's automatic

meal deduction policy violates the FLSA, as it fails to compensate the putative class

members for the time they spend on duty during these unpaid meal periods.

Because the Plaintiff has brought forth substantial evidence of this policy and

practice, including the deposition testimony of Aurora's corporate representatives,

and the declaration testimony of the class members, he requests that the case be

conditionally certified and notice sent to the putative class members.

### B. Aurora's Meal Period Policy as Alleged Violates the Fair Labor Standards Act.

Aurora's automatic deduction policy, as alleged, violates federal wage and

hour laws. As a general rule, the FLSA requires covered employers to pay

employees at least federal minimum wages for all hours worked. 29 U.S.C. § 206. If

a non-exempt employee works more than forty (40) hours per week the employer

must pay the employee at a rate of 1.5 times the employee's regular hourly rate.

29 U.S.C. § 207. In either case, **all compensable work hours must be paid.** Aurora's

policy that security officers are available, reachable and able to immediately

17

respond to emergency situations resulted in officers working through meal periods. Such time is compensable as defined by both Wisconsin and federal law.

### 1. On-Duty Meal Periods Are Compensable under Wisconsin Law.

The law on compensable work time in Wisconsin is clear:

> An employer must pay all employees for "on duty" meal periods. Such periods are to be counted as work time. **An "on duty" meal period is one where the employer does not provide at least 30 minutes free from work. Any meal period where the employee is not free to leave the premises of the employer will also be considered an "on duty" meal period.**

Wis. Admin. Code DWD § 272.04(1)(c).

The Wisconsin Administrative Code interprets work as hours spent in "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer's business." Wis. Admin. Code DWD §272.12(1)(a)(1). Employees are not required to be paid for bona fide meal periods, which are thirty (30) minutes or more of time free from duty. Wis. Admin. Code DWD §272.12(2)(c)(2). However, "[t]he employee **is not relieved if they are required to perform any duties, whether active or inactive, while eating."** Id. Further, where an employee is required to spend his or her lunch hour on the employer's premises, actively or inactively engaged in the performance of duties primarily for the benefit of the employer, that time is compensable under Wisconsin state law. Wis. Admin. Code DWD § 272.04(1)(c).

The Plaintiff has presented ample evidence to support his claim that security officers are required to be on duty at all times, yet they are not paid for the full

18

number of hours they are performing work. Security officers are generally unable to leave the premises during their meal periods due to Aurora's requirement that they respond immediately to emergency calls. Aurora's policy, combined with directives from supervisors, make it impossible for officers to leave for an uninterrupted thirty (30) minute meal period. In that respect, even if an officer could leave the Aurora premises during their meal period, they would remain on duty as they are required to monitor and be ready and available to immediately respond to emergency calls. Further, because supervisors review and scrutinize security officers' time worked and often discipline or threaten to discipline officers who attempt to be paid for on-duty lunches, security officers are unable to avail themselves of Aurora's meal "cancelation" procedures even for breaks during which they have to perform active work duties.

Aurora security officers are required to be available at all times to respond to calls during their entire shift. Security officers are frequently interrupted during meal breaks and required to respond to such calls. The only way officers can be prepared and available to respond to calls is if they constantly monitor and actively listen to the communication devices they are required to carry at all times while on duty. Security officers are never be free from monitoring these devices or they would be unable to perform their required job duties. The very nature of these security officer's jobs – to provide safety and security for hospital visitors and patients at all times – means officers are working 8.5 hours of compensable time. Nevertheless, under Aurora's policy, they are only paid for 8 hours of that

compensable time. These facts, as alleged, demonstrate a violation of Wisconsin state law.

Plaintiff recognizes that alleged state law violations do not, on their own, provide grounds for conditionally certifying a class under the FLSA. Nevertheless, in this case, a finding of a state law violation has the effect of a finding of a violation of the FLSA as well. For purposes of illustration, a full-time security officer at Aurora is currently compensated for 40 hours of work a week, or eight hours a shift. If his unpaid meal periods are also compensable work hours, he has now worked 42.5 hours a week (including five unpaid meal periods of 30 minutes each). Of course, he has not been paid overtime wages, or one and one half time his regular rate, for the hours of work over 40 a week. This is a violation of the FLSA. 29 U.S.C. § 207(a)(1). Thus, for purposes of conditional certification, Plaintiff's state law allegations demonstrate that conditional certification is merited in this case.

### 2. On-Duty Meal Periods Are Compensable under the Fair Labor Standards Act.

If an employer provides a meal break, then Federal law requires that the break be duty free; otherwise, the employee must be compensated for the time worked. The Department of Labor ("DOL") has promulgated a regulation defining bona fide meal periods for which no compensation is owed:

> Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. **The employee is not relieved if he is required to perform any**

Case 2:10-cv-00714-JPS   Filed 01/18/11   Page 20 of 25   Document 34

**duties, whether active or inactive, while eating.** 29 C.F.R.
§ 785.19(a).

If the meal period is not "bona fide," then the time is compensable. Under federal law, whether a meal period is "bona fide" is determined by whether an employee is engaged in "work." Whether an employee is "working" depends on whether an employee is engaged in activity that is predominantly for the employer's benefit.

The Plaintiff has alleged that security officers are engaged in activity that is predominantly for Aurora's benefit at all times. It is in Aurora's interest to maintain security and safety at each Aurora location and it employs security officers at each facility to that end. Being ready and available to respond immediately as needed is the very essence of the purpose of the security officers' employment. The Plaintiff has presented substantial evidence demonstrating the benefits Aurora gains by enforcing a policy that requires around-the-clock monitoring of communication devices by officers. Where security officers are required to be available at all times, they are engaged in an activity that predominantly benefits the employer and any meal period is not "bona fide" and is therefore compensable.

3. **The Named Plaintiff and the Putative Class Members Were Commonly Subject to Aurora's Unlawful Automatic Meal Period Deduction Policy.**

Under both state and federal labor laws, employees must be compensated for on-duty work. Here, Plaintiff alleges that security officers in all Aurora locations are required to carry and monitor communication devices at all times. Plaintiff

21

further alleges that security officers are required to monitor these communication devices, and to be ready and available to respond to calls at all times. According to Plaintiff's supporting declarations, security officers are never "off duty" because the policy never allows a security officer to be unavailable and take a 30 minute, uninterrupted meal break. Failure to comply with the policy has and may result in disciplinary action. As the attached declarations and the deposition testimony of Aurora's corporate representatives make clear, the promulgated and enforced policy is consistent throughout the Aurora system.

As a result of Aurora's automatic half an hour deduction, security officers at all Aurora locations, who are on duty for 8.5 hours per shift, work 42.5 hours per week and are not paid minimum wage and/or overtime wages by Aurora for the hours worked in excess of forty (40) per workweek. The facts as alleged clearly establish that the Named Plaintiff and the putative class members are victims of a common policy which denies them payment for the half hour meal break deducted from every shift. Because the Named Plaintiff has made the modest factual showing that a nexus exists between himself and the putative class members and, that they were uniformly victims of a pay practice which denied them pay for overtime and minimum wage pay for on duty meal periods, he requests that conditional certification be granted for the security officer class.

## IV. THIS CASE IS APPROPRIATE FOR JUDICIAL NOTICE.

In <u>Hoffman-La Roche</u>, 493 U.S. at 165, the United States Supreme Court established that judicial notice to a putative class in a FLSA collective action is

Case 2:10-cv-00714-JPS   Filed 01/18/11   Page 22 of 25   Document 34

proper in "appropriate cases[.]" The Supreme Court determined that district courts have discretion to begin their involvement early – at the point of the initial notice of the lawsuit – because court authorization of notice serves the legitimate goal of avoiding duplicative suits and setting cut-off dates to expedite disposition of the action. Id. at 169-72. This Court has found that the district court has both the power and the duty to oversee collective actions generally as well as the notice process in particular. Williams, 2010 WL 2643405, at *2 (citing Hoffman-La Roche, 493 U.S. at 170-171).

Plaintiff's Proposed Notice of Pendency of Lawsuit is timely, accurate, and informative. See, Hoffman-La Roche, 493 U.S. at 172. It is carefully crafted to mirror notices other courts approved in similar FLSA cases. (See Parsons Aff., Ex. 4.) Further, notice to all Aurora Security Officers with claims within the 3-year statute of limitations is warranted in this case. The FLSA allows plaintiffs to collect damages within a 2-year statute of limitations, or, if they can show that defendant's violation of the FLSA was "willful" – meaning the "employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute," – the FLSA allows plaintiffs to collect damages within the 3-year statute of limitations. McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). A properly plead allegation of a willful violation, upon making the similarly situated showing, entitles the Plaintiff to send notice to potentially similarly-situated employees within the 3-year statute of limitations. See, e.g., Albanil v. Coast 2 Coast, 2008 WL 4937565 (S.D. Tex., Nov. 17, 2008); Ruggles v. WellPoint, Inc., 591 F.Supp.2d 150

23

(N.D.N.Y. 2008); <u>Harrington v. Educ. Mgmt. Corp.</u>, 2002 WL 1343753, at *2

(S.D.N.Y. June 19, 2002); <u>Jacobsen v. Stop & Shop Supermarket Co.</u>, 2003 WL

21136308, at *4 (S.D.N.Y. May 15, 2003). Plaintiff has alleged willful conduct by

Defendant and will be seeking three years of damages. Therefore, notice to all those

who worked for Aurora as security officers within the past three years in Wisconsin

is appropriate.

<u>CONCLUSION</u>

The Plaintiff and the opt-in plaintiffs were all employed by Defendant as

security officers in Wisconsin. All opt-in plaintiffs performed the same duties for

Defendant. All security officers were denied overtime or minimum wage payments

for on-duty meal periods subject to Defendant's common policy and practice. The

Plaintiff and opt-in plaintiffs have clearly established that they are similarly

situated for the purpose of conditional certification and notice, and respectfully

request that their motion be granted.

Dated: January 18, 2011.

**HAWKS QUINDEL, S.C.**
*Attorneys for Plaintiffs*


By:      */s/ William E. Parsons*
        William E. Parsons, State Bar No. 1048594
        Email: wparsons@hq-law.com
        David C. Zoeller, State Bar No. 1052017
        Email: dzoeller@hq-law.com
        222 W. Washington Avenue, Suite 450
        Post Office Box 2155
        Madison, Wisconsin 53701-2155
        Telephone: 608 257-0040

Lynn M. Novotnak, State Bar No. 1005688
Email: lnovotnak@hq-law.com
Summer H. Murshid, State Bar No. 1075404
Email: smurshid@hq-law.com
700 W. Michigan, Suite 500
Post Office Box 442
Milwaukee, Wisconsin 53201
Telephone: 414-271-8650