EXHIBIT 1 to Affidavit of Attorney William E. Parsons in
Support of Motion for Conditional Class Certification and
Court Facilitated Notice

**Deposition of**: Michael R. Cummings

**Date**: December 6, 2010
**Case**: Jerry A. Brabazon v. Aurora Health Care, Inc.

**Printed On**: December 10, 2010

Brandé A. Browne, RPR, CRR
P.O. Box 5254
Madison, WI  53705-0254

Phone      (608) 833-0392
Fax        (608) 833-0682
Toll Free (888) 892-0392
www.fortherecordmadison.com

**E-MAIL** – **office@fortherecordmadison.com**



FOR THE Record INC.

Excellence in Court Reporting

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
_____

JERRY A. BRABAZON, individually,
and on behalf of all others
similarly situated,

      Plaintiff,

  v.                Case No. 2:10-CV-00714

AURORA HEALTH CARE, INC.,

      Defendant.
_____

DEPOSITION

MICHAEL R. CUMMINGS

Milwaukee, Wisconsin

December 6, 2010

Brandé A. Browne, RPR, CRR

Registered Professional Reporter

## Page 2

I N D E X

| Witness | Pages |
|---|---|
| MICHAEL R. CUMMINGS | |
| Examination by Mr. Parsons | 5 |
| Examination by Mr. Scullen | 143 |

E X H I B I T S

| No. | Description | Identified |
|---|---|---|
| 1 | Notice of deposition | 14 |
| 2 | Organizational charts | 30 |
| 3 | Security officer job description | 92 |
| 4 | Excerpts from 2007 ACT tracks | 111 |
| 5 | AUR-JB 075448 and 077352 | 115 |
| 5A | AUR-JB 071007 and 075447 | 115 |
| 5B | AUR-JB 068194 and 071006 | 115 |
| 5C | AUR-JB 067390 and 068193 | 115 |
| 5D | AUR-JB 065205 and 067389 | 115 |
| 5E | AUR-JB 064973 and 065204 | 115 |
| 5F | AUR-JB 064490 and 064972 | 115 |
| 5G | AUR-JB 062884 and 064489 | 115 |
| 5H | AUR-JB 008057 and 012067 | 115 |
| 5I | AUR-JB 007365 and 008056 | 115 |
| 5J | AUR-JB 007365 and 008056 | 115 |
| 5K | AUR-JB 043956 and 046652 | 115 |
| 5L | AUR-JB 041706 and 043955 | 115 |

## Page 3

E X H I B I T S (Continued)

| No. | Description | Identified |
|---|---|---|
| 5M | AUR-JB 003797 and 007364 | 115 |
| 5N | AUR-JB 037214 and 041705 | 115 |
| 5O | AUR-JB 034299 and 037213 | 115 |
| 5P | AUR-JB 012068 and 013742 | 115 |
| 5Q | AUR-JB 013743-013744 and 014255-014257 | 115 |
| 5R | AUR-JB 014258-014259 and 016408 | 115 |
| 5S | AUR-JB 016409 and 024183 | 115 |
| 5T | AUR-JB 024184 and 028304 | 115 |
| 5U | AUR-JB 028305 and 030066 | 115 |
| 5V | AUR-JB 030067-030068 and 033723 | 115 |
| 5W | AUR-JB 033724 and 034298 | 115 |
| 6 | Employee handbook | 121 |
| 7 | Loss prevention policies and procedures | 122 |
| 8 | Nonexempt and exempt employee policy | 123 |
| 9 | Payroll policy | 125 |
| 10 | Table of contents for system policy manual | 125 |
| 11 | AUR-JB 046655-046670 | 126 |
| 12 | Kronos Practices document | 134 |

(The original exhibits were attached to the original transcript and copies were provided to counsel)

(The original deposition transcript was filed with Attorney William E. Parsons)

## Page 4

1    DEPOSITION of MICHAEL R. CUMMINGS, a witness
2 of lawful age, taken on behalf of the Plaintiff,
3 wherein Jerry A. Brabazon is Plaintiff, and Aurora
4 Health Care, Inc. is Defendant, pending in the
5 United States District Court for the Eastern
6 District of Wisconsin, pursuant to notice, before
7 Brandé A. Browne, a Registered Professional Reporter
8 and Notary Public in and for the State of Wisconsin,
9 at the offices of Quarles & Brady, LLP, Attorneys at
10 Law, 411 East Wisconsin Avenue, Suite 2040, City of
11 Milwaukee, County of Milwaukee, and State of
12 Wisconsin, on the 6th day of December 2010,
13 commencing at 9:23 in the forenoon.

A P P E A R A N C E S

WILLIAM E. PARSONS and DAVID C. ZOELLER, Attorneys,
for HAWKS QUINDEL, S.C., Attorneys at Law,
    222 West Washington Avenue, Suite 450, Madison,
    Wisconsin 53701-2155, appearing on behalf of
    the Plaintiff.
SUMMER H. CARLISLE and LYNN M. NOVOTNAK, Attorneys,
for HAWKS QUINDEL, S.C., Attorneys at Law,
    700 West Michigan, Suite 500, Milwaukee,
    Wisconsin 53201-0442, appearing on behalf of
    the Plaintiff.
SEAN M. SCULLEN, Attorney,
for QUARLES & BRADY, LLP, Attorneys at Law,
    411 East Wisconsin Avenue, Suite 2040,
    Milwaukee, Wisconsin 53202-4426, appearing on
    behalf of the Defendant.
Also present: Dawn E. Faucett

## Page 5

1        MICHAEL R. CUMMINGS,
2    called as a witness, being first duly sworn,
3    testified on oath as follows:
4
5        EXAMINATION
6 By Mr. Parsons:
7 Q  Good morning, Mr. Cummings.
8 A  Good morning.
9 Q  My name is Bill Parsons, and I'll be taking the
10    30(b)6 deposition of Aurora today, and you're one
11    of the witnesses that has been designated to
12    testify.  Have you ever been deposed before?
13 A  I have.
14 Q  Can you tell me what type of case it was that you
15    were deposed?
16 A  Four times.  Three of them were as an expert
17    witness in security negligent cases, and one case
18    related to Aurora.
19 Q  What was the case related to Aurora about?
20 A  I don't remember the specifics.  It was one of our
21    staff named Robert Solie had brought a case
22    against Aurora some years ago, and I remember
23    being deposed on that.
24 Q  And when was the last time that you were deposed?
25 A  October of this year.

2 (Pages 2 to 5)

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392
Case 2:10-cv-00714-JPS  Filed 01/18/11  Page 3 of 74  Document 35-1

Electronically signed by Brande A. Browne (101-025-478-3970)                    b11bccc0-d5da-478f-9098-4698964a4d12

1  Q  What was that related to?
2  A  That was related to a negligent security case.
3  Q  And this is one of the cases in which you were
4     testifying on behalf of -- or as an expert
5     witness?
6  A  Correct.
7  Q  Who were you testifying on behalf of?
8  A  Laureate, it's a medical center, medical complex,
9     in Tulsa, Oklahoma.
10 Q  What areas were you providing expert witness on?
11 A  The case related to this particular organization
12    being sued civilly for negligent security, and I
13    did an assessment, and it was my opinion that
14    their security wasn't negligent, and so I was
15    deposed in that case.
16 Q  Did you provide any kind of an expert report or
17    anything like that?
18 A  Nothing in writing, no.
19 Q  What court was that case brought in?
20 A  I don't know the exact jurisdiction.  I know it
21    was deposed in Tulsa, Oklahoma.
22 Q  Did you have legal counsel for your work in that
23    case?
24 A  I did.
25 Q  Who was that?

1  A  Barkley Law Firm.
2  Q  And where are they located?
3  A  In Tulsa.
4  Q  Can you spell Barkley for me?
5  A  B-a-r-k-l-e-y.
6  Q  Have you ever been convicted of a crime before?
7  A  No.
8  Q  I'm going to go over some ground rules.  It will
9     probably sound familiar from your deposition in
10    October.  As we're taking testimony today, the
11    court reporter can only take down one of us at a
12    time, so I will try not to speak over you if you
13    will do the same for me.  If you don't understand
14    a question that I'm asking, please let me know,
15    and I'll try to phrase it in a way that you do
16    understand.  If you answer a question that I ask,
17    I'm going to assume you understood what I meant;
18    is that fair?
19 A  It is.
20 Q  Just as you were giving testimony before, we need
21    oral answers as opposed to head nods or uh-huhs so
22    that we know the record is clear as far as what
23    you're testifying to; is that fair?
24 A  It is.
25 Q  Can I get your full name for the record?

1  A  Michael Ray Cummings.
2  Q  And your date of birth?
3  A  4/1/52.
4  Q  Can I get your home address?
5  A  212 West Davenport Street, Elkhorn,
6     Wisconsin 53121.
7  Q  How long have you lived at that address?
8  A  A little over three years.
9  Q  Can we talk about your education, starting with
10    your graduation from high school?
11 A  Graduated from Custer High School in Milwaukee in
12    1970, attended Marquette University, and graduated
13    from Marquette in 1974 with a bachelor's degree.
14    Somewhere in the early '90s, I did all my master's
15    coursework from Webster University with a dual
16    major in security management and human resources,
17    and just recently, after completing all the
18    coursework, just recently actually currently
19    enrolled in the Capstone course to get my
20    master's.
21 Q  Just a couple follow-ups on that.  You said
22    Marquette in '74 with a bachelor's degree?
23 A  Yes.
24 Q  What was the major that --
25 A  I had a double major in history and political

1     science.
2  Q  And then the master's program that you were in
3     with Webster University, that was completed when?
4  A  The coursework, probably the mid '90s.  I don't
5     really recall, and I moved and wasn't able to
6     drive down to Chicago readily, so I put it on
7     hold, and now they offer it online.
8  Q  That work is complete now, you said?
9  A  I'm enrolled for the final course.
10 Q  There was something about Keystone --
11 A  A Capstone, I just mean the final course, the
12    Capstone course, which basically is your large
13    project to complete the master's.
14 Q  Great.  You are currently employed by Aurora; is
15    that right?
16 A  Correct.
17 Q  And when did you start working for Aurora?
18 A  I was hired as the director of security for
19    Mount Sinai Medical Center just prior to
20    Mount Sinai joining with St. Luke's and
21    Good Samaritan to form Aurora, and that was in
22    July of 1987.
23 Q  And going backwards from that point, where did you
24    work prior to Mount Sinai?
25 A  For the previous six months, approximately, I had

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964a4d12

1    worked for Sak's Fifth Avenue as their manager of
2    loss prevention in Chicago.  Prior to that, for a
3    year and a half, I was the assistant director of
4    security at Mount Sinai, and prior to that, I
5    worked for Marshall Fields, both in Wisconsin and
6    in Chicago for 13 years.
7  Q  And that takes you basically back to the point in
8    time at which you graduated from Marquette?
9  A  Actually, I started with Fields in '73 when I was
10    in my senior year.
11  Q  You said you started with Mount Sinai July of
12    1987?
13  A  As the director, yes.
14  Q  Director of what?
15  A  Security.
16  Q  Prior to that, did you hold any positions with
17    Mount Sinai?
18  A  Yes, I had been the assistant director from
19    approximately March of 1985 until late fall of
20    '86.
21  Q  As the director of security with Mount Sinai, what
22    were your basic job duties?
23  A  Basically overseeing the security program for
24    Mount Sinai Medical Center, setting security
25    policy.  I did have operational responsibilities

1    as well for regular routine security functions,
2    guard staffing, policy development, those sorts of
3    things.
4  Q  And after Aurora -- you said Mount Sinai became a
5    part of the Aurora system about six months after
6    you became the director?
7  A  Somewhere around there, about October is actually
8    when it was formed.
9  Q  Did your job title change?
10  A  Yeah.  For about the first six months, the three
11    of us that had the top job, and the titles were
12    different for the three hospitals, all reported to
13    the same vice president.  And then sometime in
14    early 1988, a decision was made to merge the
15    department into a single department, and I was
16    appointed director to oversee the entire -- the
17    title initially was titled a little differently.
18    It was corporate manager of loss prevention, and
19    then later on it changed to director.
20  Q  When you say the whole thing, are you talking of
21    the whole Aurora system?
22  A  Correct.  At that time, it was just pretty much
23    the three hospitals.
24  Q  And then since then, many other facilities have
25    joined the Aurora system; is that right?

1  A  Correct.
2  Q  And after that initial change and the change in
3    which it became sort of a corporate-wide position,
4    have you -- has your position changed since then?
5  A  It has in scope and the responsibilities with the
6    various different types of delivery of health care
7    services that Aurora has done over the years.  My
8    job to provide security in those different
9    environments has changed.  I also approximately
10    became responsible for employee health and
11    wellness at Aurora as well.  So that was a
12    separate add-on.
13  Q  What does employee health and wellness encompass?
14  A  It's the department that takes care of a lot of
15    our employees, our caregivers, for their health
16    needs, manager the leave of absence process,
17    manages the preventative wellness things like flu
18    shots, the internal health situation for our
19    caregivers.
20  Q  My notes indicate that your current title is the
21    director of security and loss prevention for
22    Aurora; is that correct?
23  A  Yeah, or it's director of loss prevention
24    services.  It's mentioned both ways.
25  Q  And how long have you been in the position as it

1    has been titled one of those two ways?
2  A  I think 1989 is when the title from corporate
3    manager to director changed.
4  Q  And has the scope of that position changed since
5    1989?
6  A  Yes.  As indicated with all the different types of
7    ways that we deliver health care, it has changed
8    in terms of having to direct a security program
9    that provides security in those different formats.
10  Q  We'll go into this in a little bit more detail,
11    but just sort of as a thumbnail sketch of your
12    job, you are the head of security for the entire
13    Aurora system; is that a fair way to describe it?
14  A  It is.
15        (Exhibit No. 1 marked for
16        identification)
17  Q  I'll show you this.  Before I have you take a look
18    at that, just one follow-up question.  So you've
19    been the head of security for Aurora for at least
20    the period 2007 through present; is that correct?
21  A  That's correct.
22  Q  I'm showing you what has been marked as Exhibit 1
23    for today's deposition.  Have you seen this
24    document before?
25  A  Yes.

Electronically signed by Brande A. Browne (101-025-478-3970)                    b11bccc0-d5da-478f-9098-4698964a4d12

1  Q  And this is the notice for today's deposition.
2     Have you reviewed this document prior to today?
3  A  I don't recall.  I believe so.
4  Q  And as I understand things from your counsel, you
5     are going to be testifying as to topics numbers 2,
6     3, 6, and 9, as well as topic 1 as it relates to
7     the organizational structure of Aurora's security
8     officers; is that your understanding as well?
9  A  Yes, it is.
10 Q  And you understand that you've been designated by
11    Aurora as the person most qualified to discuss
12    those topic areas, correct?
13 A  Yes.
14 Q  Let's just start with topic area number 2, which
15    is the job duties and the number of Aurora
16    security officers during the period beginning
17    three years prior to the filing of the lawsuit to
18    the present day.  What qualifies you to testify as
19    to that topic area?
20 A  I'm responsible for establishing the budget for
21    this department, as well as for oversight, and so
22    in the budgetary process, I would request a
23    commensurate number of staff to do the job, and it
24    would need to be approved or not approved.
25 Q  And you're qualified to testify as to the job

1     duties of the security officers based on what?
2  A  My review and knowledge of their job descriptions,
3     as it's one of the department positions that
4     ultimately reports up to me.
5  Q  And topic area number 3 is Aurora's manner of
6     compensating its security officers during the
7     period beginning three years prior to the filing
8     of this lawsuit to the present day, including any
9     changes made to the manner of compensation during
10    that period.  Again, can you give me your
11    qualifications to testify to that topic area?
12 A  Somewhat the same.  I have responsibility for the
13    budget for the loss prevention department, and as
14    such, I need to be familiar with how our folks are
15    being compensated.
16 Q  And I keep using the term security officers.  Is
17    that the correct --
18 A  Yes.  We either use security or loss prevention
19    officers, either one.
20 Q  In terms of the compensation policy that Aurora
21    has for paying its security or loss prevention
22    officers, do you set that policy?
23 A  No.
24 Q  Who does that?
25 A  That is primarily a compensation department and

1     human resources and senior leadership decision in
2     terms of compensation policy.
3  Q  If there was one person that you could identify as
4     the person who would be most responsible for that,
5     who would that be?
6              MR. SCULLEN:  Can I just -- I'm
7        going to object as to vague.  I think asking
8        broadly what person sets the compensation, do
9        you mean for an individual, which aspects?
10       There may be different individuals involved
11       in setting compensation aspects.  I'm not
12       sure he's competent to testify to that.
13 Q  Do you understand my question?
14 A  I would ask you to repeat it.
15           (Question read)
16 A  Who is the that?
17 Q  The that would be setting the compensation policy
18    for security officers in the Aurora system?
19 A  I don't know that I could give a single name.
20 Q  If it was more than one person, who would the
21    people in that group be?
22             MR. SCULLEN:  I'm just going to
23       object as to vague with regard to, again, the
24       compensation policy.  I think you need to
25       break it down to be fair.

1              MR. PARSONS:  Fair enough.
2  Q  Let me try to ask it this way.  In terms of how
3     much security officers get paid throughout the
4     Aurora system, is that a corporate-wide decision
5     that a person makes or a group of people make?
6  A  So their hourly rate?
7  Q  Yes.
8  A  That would be assessed by the compensation
9     department, and then ultimately approved at a
10    higher level.
11 Q  Who's the head of the compensation department?
12 A  The manager of the compensation department is
13    Mark Roundtree.
14 Q  And Mr. Roundtree is the highest, as managers, the
15    highest-ranking person of the compensation
16    department?
17 A  Compensation specifically, he reports to the
18    director of compensation and benefits.
19 Q  And who is that?
20 A  Kathy Klobuchar.
21 Q  So moving on then to topic number 6, which is
22    Aurora's policies and practices regarding meal
23    periods, including the tracking and payment for
24    on-duty meal periods, the identity of any
25    individuals who participated in setting those

Electronically signed by Brande A. Browne (101-025-478-3970)                                        b11bccc0-d5da-478f-9098-4698964a4d12

1      policies, the materials or advice relied in
2      setting those policies, and any efforts taken by
3      Aurora to ensure that these policies remain in
4      compliance with Wisconsin and federal wage and
5      hour laws.
6   A  It is.
7   Q  That's a lot, so let's break that down.
8             MR. SCULLEN:  As a result, it's
9        also going to be covered by more than just
10       Mr. Cummings.  We've also identified
11       Ms. Faucett to testify with regard to aspects
12       of that.  In particular, as it relates to
13       other things other than security officers.
14            MR. PARSONS:  We'll just put on the
15       record then that Mr. Cummings will testify to
16       a portion of this, and there may be other
17       witnesses who testify as well.
18  Q  Breaking this down, Aurora's policies and
19      practices regarding meal periods including the
20      tracking and payment for on-duty meal periods;
21      what qualifies you to testify to that topic?
22  A  The fact that these officers report to me, and
23      again, they're a part of my budget which I'm
24      responsible for.
25  Q  Do you set the policy and practice regarding meal

1      periods for security officers?
2   A  I do not.
3   Q  Who does that?
4   A  The overall practice is set and is reflected in
5      our handbook in various policies not established
6      by me specifically.
7   Q  Who is the person or if there's more than one
8      person who has the ability to change those
9      policies and practices in the handbook that you
10     just referenced?
11  A  I don't know that I could give you, again, a
12     single name because of the complexity -- depending
13     on the level of the change, who would be
14     ultimately responsible for approving it based on
15     recommendations that would come from the
16     compensation department.
17  Q  In terms of the meal policies and practices as
18     they currently exist, who is in charge of those
19     policies?
20  A  By in charge, do you mean who manages and
21     publishes and who makes the decision?
22  Q  I mean more interested in who makes the decision.
23  A  Again, it would probably be multiple.  It would
24     be recommended by compensation and human resources,
25     and then ultimately, the policy is approved at a

1      higher level.
2   Q  So the departments that would be involved are the
3      compensation department, the human resources
4      department, and then ultimately those recommended
5      changes would have to be approved higher up?
6   A  Correct.
7   Q  And when you say higher up, what do you mean?
8   A  Depending on the nature of the change, it could be
9      the office of the president or some of those
10     senior leaders in the organization.  I'm not sure
11     who all has each of those decisions.
12  Q  The second sentence there reads, the identity of
13     any individuals who participated in setting those
14     policies.  Do you know who those individuals would
15     be?
16  A  Not by name.
17  Q  Do you know what departments those would be?
18  A  Again, it would be compensation, human resources,
19     and then ultimately senior leadership.
20  Q  And I'm assuming based on the comment from counsel
21     that you may not be the most competent person
22     today to testify on the identity of the
23     individuals setting those policies; is that
24     correct?
25  A  I would believe that's true.

1           (Discussion off the record)
2   Q  The next part of that sentence reads, the
3      materials or advice relied on in setting those
4      policies.  I'm assuming, again, that that would
5      not be an area that you're going to be testifying
6      on today; is that correct?
7   A  Correct.
8   Q  Then the last part is any efforts taken by Aurora
9      to ensure that these policies remain in compliance
10     with Wisconsin and federal wage and hour laws.  Do
11     you have any competency to testify on that
12     particular issue?
13  A  Just to the point that in my role reporting in the
14     human resources department overall that I have --
15     I'm aware that the human resources department
16     works very diligently to ensure that all of our
17     policies are in compliance with both state and
18     federal law.  I've been at meetings where that has
19     been an issue, so I'm aware of that.  To that
20     degree is what I could testify to.
21  Q  And you don't have any compliance responsibility
22     yourself personally, do you?
23  A  That's correct, I don't.
24  Q  Then topic area number 9 is Aurora's policy and
25     practice of reporting and recording work hours and

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964a4d12

1    overtime hours as those practices relate to
2    security officers during the period beginning
3    three years prior to the lawsuit to the present
4    day.  What qualifies you to testify as to that
5    issue?
6  A  Having responsibility for the loss prevention
7    department, it would be my responsibility to, as
8    best as I can, ensure that our security staff is
9    meeting the intent and the spirit of the policy
10    and any law relative to overtime or worked hours.
11  Q  Are you the person who would be responsible for
12    setting the policy and practices of Aurora's
13    security guards or officers in terms of reporting
14    and recording their work hours?
15  A  Are you talking about -- by recording, are you
16    talking about on the macro level where they get
17    paid, or are you talking about recording to the
18    point that I may set additional policy or
19    procedure within the department to make sure that
20    I'm understanding whatever overtime is occurring,
21    those sorts of things?
22  Q  Those are two good areas.  I'm interested in both.
23    On a macro level, let's start there.
24  A  And the question was whether I set the policy?
25  Q  Correct.

1  A  No, I don't set the policy on a macro level in
2    terms of how officers record their time to make
3    sure that they're paid appropriately.  That would
4    be elsewhere.
5  Q  And when you say elsewhere, that would be what
6    department?
7  A  Again, policies would probably be set between
8    payroll and human resources ultimately to make
9    sure it's compliant with the law.
10  Q  Then you mentioned a second area, which was beyond
11    the macro level?
12  A  Sure.  It would be my responsibility or I have
13    opportunity to put in additional, for lack of a
14    better term, controls or request reports that I
15    can see where overtime is being used, and that
16    people are accurately signing and getting paid for
17    the hours they're working, and that would control
18    the budget that I'm responsible for.
19  Q  And that function has things to do with your
20    managerial role in terms of making sure you have
21    proper staffing levels and nobody is working too
22    many hours of overtime, and things like that?
23  A  Correct.
24  Q  Then the last topic area that we mentioned was
25    topic area number 1, which is Aurora's

1    corporate-wide organizational structure during the
2    period of three years prior to the filing of the
3    lawsuit to present.  As I understand things from
4    your counsel, you are not the sole witness
5    designated to testify as to Aurora's
6    corporate-wide organizational structure, but that
7    you, but that you are going to be able to testify
8    as to the organizational structure of the security
9    or loss prevention department; is that correct?
10  A  That's correct.
11  Q  And again, what qualifies you to testify as to
12    this subject?
13  A  As the director of loss prevention, I'm
14    responsible to organize the department in such a
15    way to meet our mission and complete the work that
16    we're tasked to do.
17  Q  Those are all the questions I have for you on
18    Exhibit 1.
19        (Discussion off the record)
20  Q  In a large scale sense, what does Aurora do?
21  A  Aurora provides health care delivery in a number
22    of different formats, ways to the population of
23    basically eastern Wisconsin and southern Illinois.
24  Q  Did you say southern Illinois?
25  A  I mean, northern Illinois.  Thank you.

1  Q  That was my next question.  Aurora operates in
2    Wisconsin and Illinois; any other states?
3  A  No.
4  Q  If you know the answer to this question, as I
5    understand it, Aurora has a couple of different
6    corporate names that it operates under.  Do you
7    work for one particular corporate Aurora?  That's
8    a poor way to say that.  What's the precise name
9    of the company that you work for?
10  A  I think it's just Aurora Health Care.
11  Q  And that's Aurora Health Care, Incorporated?
12  A  Yes, Inc.
13  Q  Do you know of any other Aurora Health Care
14    corporate names or identities that it does
15    business as?
16  A  You're talking about our organization?
17  Q  Or outside of your organization.
18  A  So I don't know if you're referring to like the
19    for-profits part ventures, or the business entity
20    that we have with BayCare, which is co-owned with
21    physicians, if that's what you're referring to.
22  Q  That's helpful.  I think maybe I'll come back to
23    some of these questions with another witness.
24  A  Sure.
25  Q  In your role with security, how many Aurora

Electronically signed by Brande A. Browne (101-025-478-3970)                    b11bccc0-d5da-478f-9098-4698964a4d12

1    facilities are you responsible for managing the
2    security of?
3  A  Well, on one hand, I'm responsible for the
4    security at all of them.  We don't staff security
5    staff at all of them, however.  So we have
6    security staff based at all of our 24-hour medical
7    centers.  In one clinic, we have some security
8    staff part-time, our largest clinic in Sheboygan.
9    Those are the sites that we have in some of our
10   corporate buildings.  What we call the corporate
11   campus near St. Louis is provided directly by our
12   St. Luke's staff.  Technically, I have
13   responsibility for assisting security at all of
14   our sites.  We just don't necessarily have staff
15   at all of our sites.
16 Q  Understood.  What are the locations, let's start
17   with the 24-hour locations, where Aurora provides
18   security services?
19 A  Name them?
20 Q  Yes, please.
21 A  Our newest south market hospital is Summit.
22   We have Lakeland Medical Center.  We have
23   Burlington Hospital, medical center.  We have
24   Kenosha.  In the mid market, we have St. Luke's,
25   Aurora/St. Luke's Medical Center and St. Luke's

1    South Shore.
2  Q  What's the difference between those two locations?
3  A  I believe that they're the same entity from a
4    management standpoint, but they're just at two
5    physical different locations.
6  Q  And when you say St. Luke's, is that the
7    St. Luke's on 27th Street?
8  A  It is.
9  Q  And then the St. Luke's South Shore is where?
10 A  In Cudahy.  Aurora Sinai Medical Center, our
11   medical center in West Allis, in Hartford, our
12   facilities at Aurora Psychiatric Hospital and the
13   Zilber Hospice, which are on the same grounds.
14 Q  And where is that?
15 A  That's in Wauwatosa.
16 Q  So there's a psychiatric facility and the
17   Zilber Hospice?
18 A  Zilber, Z-i-l-b-e-r.
19 Q  And both of those are in West Allis?
20 A  Wauwatosa.  I said Hartford.  Moving up, the new
21   hospital that just opened in Grafton.  We have
22   Oshkosh, Sheboygan, Manitowoc, and BayCare in
23   Green Bay.  I think I've got them all.
24 Q  I have Elkhorn on my list?
25 A  That's Lakeland.  Elkhorn is the city it lives

1    in -- lives in, resides in.
2  Q  Go ahead.
3  A  The clinic that we provide minimal hours to is in
4    Sheboygan.  It's the main clinic in Sheboygan.
5  Q  What city is Summit in?
6  A  I believe it's in Summit.
7  Q  Approximately where in Wisconsin is Summit?
8  A  It's just off I-94 going west towards Madison,
9    probably about 15 miles from Milwaukee.
10         MR. SCULLEN:  You can see it on
11     your way home.
12 Q  So the list that I have then for the 24-hour
13   locations is 13; is that correct?
14 A  That's what we just said.  Did I miss any?  I
15   think it's more than that.  I think it's 15.
16 Q  Could you give me the number?  How many 24-hour
17   facilities does Aurora provide security for?
18         MR. SCULLEN:  Why don't you list
19     them.  I think he has testified on the record
20     14.
21 A  When I said 15, maybe I was thinking of the
22   clinic.
23 Q  Then in addition to these 14 locations that you've
24   identified, there's also the Sheboygan clinic.  Is
25   that one of the 24-hour facilities, or is that

1    something different?
2  A  No.  We just have security staff there a minimal
3    amount of hours in the evening, Monday through
4    Friday.  I think four hours in the evening I think
5    is how we're staffing it.
6  Q  You said something about the corporate offices,
7    that there's some security at those?
8  A  The security at what we call the corporate campus,
9    is the Ohio building in Forest Home, are serviced
10   by the St. Luke's staff because there's they're
11   just a block or so north of there.  Then the other
12   place that we do have some security coverage is
13   our family services offices on Highland Avenue.
14   We have a security officer there now that's
15   relatively new.  It's not 24-hour, though.
16 Q  Are there abbreviations for all of these
17   facilities?
18 A  Yes.
19 Q  Is there a document that lists all of the
20   facilities that Aurora provides security for and
21   with the abbreviations for each of those
22   locations?
23 A  I'm sure there is.
24 Q  What would it be if you were thinking of this
25   document?

Electronically signed by Brande A. Browne (101-025-478-3970)                    b11bccc0-d5da-478f-9098-4698964a4d12

1  A  It would probably be on our website, I would
2     think.  It certainly would be within our internal
3     documents relative to our nomenclature for all of
4     these sites.
5  Q  As far as internal documents because I'm doubting
6     that there would be abbreviations on the website,
7     what type of a document would that be?
8  A  It would be an organizational chart because that
9     was the first one that comes in mind.  Most of
10    them start with Aurora Medical Center, AMC, and
11    then the location in some way, shape, or form.
12        (Exhibit No. 2 marked for
13        identification)
14  Q  I've showed you what has been marked as Exhibit
15    No. 2.  At the bottom, it's labeled with a bates
16    stamp number AUR-JB 19, 20, 21, 22, 23, and 24; do
17    you see that?
18  A  Yes.
19  Q  Do you know what these documents are?
20  A  They are org charts of -- the first one is who I
21    report to, and the rest of them are org charts
22    related to parts of my department.
23  Q  Do any of these documents contain the
24    abbreviations or the listing of locations that you
25    were referencing before?

1  A  They don't appear to.
2  Q  Are you thinking of a different document when you
3     said perhaps the org charts would list the
4     abbreviations and locations?
5  A  I was thinking of a system-wide org chart that had
6     the names of the site administrators or that sort
7     of level.
8  Q  Have you seen that document, or are you just sort
9     of thinking of it?
10  A  I'm just thinking of it.  I'm not really big on
11    org charts.
12  Q  Have you seen a document that has the listing of
13    the locations and the abbreviations?
14        MR. SCULLEN:  I'm going to object
15    as to vague.  There may be abbreviations for
16    different purposes.  I don't think that he
17    has testified that he's aware of any
18    particular document.  If there are, it seems
19    to me that that's something -- you can
20    continue to ask him, but I think he has
21    testified he's not aware of any specific
22    document.  I'm not clear what abbreviations
23    you're talking about.  There may be
24    different, for instance, for payroll purposes
25    and other purposes.

1        MR. PARSONS:  That's fair enough.
2  Q  I'm just trying to be clear.  Let me break it up.
3     Have you seen a document that lists all of the
4     Aurora locations where Aurora provides security
5     services?
6  A  Not specifically that way other than my org chart,
7     which doesn't necessarily have the names of the
8     sites on it, but like this document just has the
9     responsibilities by area, and I could identify by
10    name which sites.
11  Q  When you say my org chart, what are you talking
12    about.
13  A  I'm talking about the organizational chart that
14    reflects the loss prevention services department.
15  Q  And so that is something different than Exhibit 2;
16    is that right?
17  A  Yes.  I have one just for my own purposes that
18    goes maybe a little deeper just so it's not
19    necessarily numbered, but it says officers below
20    it.  So it's just laid out a little different.
21    It's no different in terms of the information.
22  Q  Thank you.  That's what I wanted to know.  Do you
23    know how many security officers Aurora currently
24    employs?
25  A  For 2010, I budget for 142 FTEs.  Generally

1     speaking, we usually have approximately 20 more
2     actual bodies than FTEs because we have
3     part-timers and per diems.  So for budgetary
4     purposes, I know my FTEs, and we split up those
5     FTEs as needed on a site, and on a regional level,
6     to fit the needs of the department in terms of
7     staffing.
8  Q  Can you tell me what an FTE is?
9  A  Full-time equivalent or working 80 hours in a
10    two-week pay period.
11  Q  That's how Aurora defines its full-time equivalent
12    for security officers?
13  A  Correct.
14  Q  In terms of the 142 full-time equivalent
15    employees, can you give me a breakdown as to how
16    many of those work at the Burlington location?
17  A  Burlington would be, I believe -- that includes
18    leadership.  Are you talking about just officer
19    staff and uniform staff, which is officers and
20    sergeants, or are you talking about leadership?
21  Q  What do you mean by leadership?
22  A  Supervisors and above, supervisors and managers.
23  Q  Let's just talk about officers and sergeants
24    first.  Why don't you sort of break it down?  If I
25    say how many at Burlington, if you could tell me

Electronically signed by Brande A. Browne (101-025-478-3970)                                          b11bccc0-d5da-478f-9098-4698964a4d12

1      how many officers, how many sergeants, and then
2      how many supervisors.
3    A  So for Burlington, I believe it's 8.4 FTEs, and of
4      that 8.4, one would be a sergeant.  Then we have a
5      supervisor that is responsible for three hospitals
6      in the south region.  So if you want to call it a
7      third of an FTE, it would be his responsibility.
8    Q  What's that individual's name?
9    A  Jim Sagan, James Sagan.
10   Q  S-a-g-a-n?
11   A  Correct.
12   Q  Same question for the Lakeland facility?
13   A  The answer would be the same, 8.4, inclusive of
14     the sergeant, and then James Sagan also has
15     supervisory responsibility.
16   Q  Just so I understand your question, inclusive of
17     the sergeant, it's 7.4 officers and then one
18     sergeant?
19   A  Correct.
20   Q  Same question for West Allis?
21   A  I believe West Allis is approximately 22 FTEs,
22     inclusive of three sergeants.
23   Q  And the supervisor for -- is there a supervisor?
24   A  There is a supervisor specific to West Allis, and
25     her name is Verrita Hill.

1    Q  And then the St. Luke's facility on 27th Street?
2    A  My best guess, by guess I'm saying, except at
3      budget time, that's when you look at the exact
4      allocation, I'm thinking 30s, 34, 35 FTEs, and
5      that's also inclusive of three sergeants.
6    Q  And is there a supervisor for that facility?
7    A  There is, and his name is John Dobrzynski.
8    Q  And then the St. Luke's South Shore facility?
9    A  9.4, I believe.  We do switch people back and
10     forth between Luke's and South Shore from time to
11     time, 9.4, inclusive of a sergeant, and
12     John Dobrzynski also has supervisory
13     responsibility for that site.
14   Q  Same question for Hartford?
15   A  Hartford would be 8.4.  There is no sergeant.  The
16     supervisor is William Juedes.
17   Q  For the Sinai facility?
18   A  Approximately 30, and that would be inclusive
19     of three sergeants, and the supervisor is
20     Arthur Smith.
21   Q  And the Kenosha facility?
22   A  That would be 8.4, inclusive of one sergeant.
23   Q  And the supervisor?
24   A  That would be James Sagan.
25   Q  The Summit facility?

1    A  8.4, sergeant is Duane Hanson.
2    Q  Is that the supervisor or the sergeant?
3    A  That's the sergeant.  There's no supervisor on
4      that site.  The manager for the south market is
5      officed out of there.  He has kind of a dual role,
6      and his name is Clint Schaefer.  And I would like
7      to correct something.  I misspoke.  Both Elkhorn,
8      and yeah, Lakeland and Burlington, that would be
9      4.2, not 8.4.  We only have one officer there
10     seven by 24.
11   Q  Say that again.  So the Lakeland facility only has
12     one officer, not 8.4?
13   A  Correct, 4.2 would be it then.  I'm sorry.
14   Q  And Burlington has --
15   A  4.2.
16   Q  One officer?
17   A  Yes.
18   Q  When you're saying 4.2?
19   A  FTEs.
20   Q  When you're saying 4.2, that means at all times
21     during the 24-hour period, there is one officer?
22   A  Correct.
23   Q  And that's 4.2?  It's not 4.2 people at the same
24     time, it's total?
25   A  Total.

1    Q  And that sort of descriptive way is the way you've
2      been describing all of these facilities?
3    A  Correct.
4    Q  So that was Summit, and then the psych and Zilber,
5      does it make sense to put those two together in
6      terms of describing it?
7    A  Yes, it does.  Staffing is a little different.  We
8      don't have first shift staff on Zilber dedicated
9      to that particular building, but they're supported
10     by the Aurora psychiatric security staff, which is
11     on the grounds.  So it's a little different model.
12   Q  Can you describe it to me the easiest way?
13   A  Sure.  At Zilber we have one officer on duty,
14     basically second and third shift and weekends, and
15     then at the psychiatric facility, which is also on
16     the same grounds but a different set of buildings,
17     we have one person seven by 24.
18   Q  So that would be 4.2?
19   A  Correct, and then we have a supervisor that
20     oversees that whole complex.
21   Q  And who is that supervisor?
22   A  Christopher Kukec.
23   Q  Same question for the Grafton facility?
24   A  8.4, and that is inclusive of a sergeant named
25     Jeff Nicols, N-i-c-o-l-s.  And the supervisor

10 (Pages 34 to 37)

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392
Case 2:10-cv-00714-JPS   Filed 01/18/11   Page 11 of 74   Document 35-1

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964a4d12

1    right now, we have an interim supervisor named
2    Ian O'Connell.
3  Q  Same question for Oshkosh?
4  A  Oshkosh, 8.4, and the supervisor is Mike Brown.
5  Q  Same question for Manitowoc?
6  A  Manitowoc is 4.2.
7  Q  And then BayCare?
8  A  BayCare is 8.4.
9  Q  I'm sorry, who's the supervisor in Manitowoc?
10 A  Like Summit, there's not a supervisor at the
11    building.  Our regional or market manager
12    Bob Des Jarlais' office is that, so he has a dual
13    responsibility.
14 Q  And BayCare, is there a supervisor?
15 A  Yes, Ryan Phillips.
16 Q  The Sheboygan clinic, how many security officers?
17 A  We staff just four hours a day, Monday through
18    Friday, in the evening.
19 Q  The corporate facility, how much security there?
20 A  They're just serviced by the staff from
21    St. Luke's.  They don't have a dedicated, specific
22    allocation.
23 Q  Highland Avenue?
24 A  I believe it's one FTE.
25 Q  So 4.2?

1  A  No, just during the day, so Monday through Friday
2    is what we're doing now.
3  Q  Is there a document you have that lists all this
4    information for these facilities?
5  A  The only document I could think of would be when I
6    do my corporate allocation for budgetary purposes
7    and how many FTEs we have on the sites.  We do
8    that annually.
9  Q  Do you always do that at the same time of the
10    year?
11 A  Yes, generally.
12 Q  What time is that?
13 A  It's usually in the summer months, July, August,
14    we put our budgets together.
15 Q  So that recently was done this July or August of
16    2010?
17 A  Probably, yes.
18 Q  What would the name of that document be?
19 A  It would be corporate allocation worksheet or
20    corporate allocation designation, something along
21    those lines.  Finance department asks us to let
22    them know how we're allocating the corporate
23    resources out to the sites that we support.
24 Q  It's my understanding then you're the person who
25    is making that decision as far as how the

1    allocation is done?
2  A  Correct.
3  Q  All of these supervisors that we just talked about
4    for these various locations, do they all report
5    directly to you?
6  A  No.
7  Q  Are there some that report to an interim person
8    before it gets reported to you?
9  A  Correct.  The supervisors all report to one of
10    five managers, and then the managers report
11    directly to me.  I have one supervisor who reports
12    directly to me, a specialty area, safety.
13 Q  Who is that?
14 A  His name is John Bruce.  He doesn't have any
15    direct reports, so he doesn't work with officers
16    particularly, specifically, and then I have an
17    administrative assistant and five managers, and
18    then I have a manager for employee health that's
19    not part of loss prevention.  So those are my
20    direct reports.
21 Q  For purposes of today's deposition, I think I'm
22    going to focus on your security.  So you have five
23    direct reports who are managers who report to you
24    regarding security issues; is that right?
25 A  That's correct.

1  Q  I'm going to reference you to Exhibit 2 again.
2    Are those five individuals listed on any of these
3    organizational charts?
4  A  Yes, they're all on page 20 -- I mean, 20.
5  Q  And when I look at this, maybe you can help me
6    understand it, because I see four people on
7    that direct report line, Mary Doherty,
8    Robert Des Jarlais, James Moraza, and
9    Clint Schaefer.  Are all four of those your direct
10    report managers?
11 A  Mary is the employee health one.  The five direct
12    managers for loss prevention are the three you
13    mentioned, Robert Des Jarlais, Jim Moraza,
14    Clint Schaefer, and then just down a line,
15    Robert Solie and David Wood.  A G. David Wood is
16    listed here.
17 Q  And the other three individuals listed on here,
18    Mr. Bruce, Ms. Taylor, and Mr. Steffel, those
19    folks do not report directly to you?
20 A  John Bruce does and Carmen Taylor does.  Carmen is
21    my administrative assistant.  John is that safety
22    supervisor I mentioned.  John Steffel does not
23    report directly to me.  He reports to Dave Wood.
24 Q  Then is there a chart in this document that we're
25    looking at which describes who reports to the five

11 (Pages 38 to 41)

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392
Case 2:10-cv-00714-JPS  Filed 01/18/11  Page 12 of 74  Document 35-1

Electronically signed by Brande A. Browne (101-025-478-3970)                                                          b11bccc0-d5da-478f-9098-4698964a4d12

Page 42

1    managers that you just identified?
2    A   Yes, I think those are the subsequent pages here.
3        21 reports, when I say 21, that's the document
4        number on the bottom right, shows the three direct
5        reports that report to Bob Des Jarlais in the
6        north market area.
7    Q   And then so on for 22, 23, and 24?
8    A   That's correct.
9    Q   So who am I missing here?  I've got
10       Mr. Des Jarlais, Mr. Moraza, Mr. Schaefer,
11       Mr. Solie?
12   A   Mr. Wood is on the first one.  He only has one
13       direct report at this time.  It's
14       Jonathan Steffel.  He has a functional area of
15       technology.
16   Q   When we started talking about where Aurora does
17       business in, you had mentioned northern Illinois.
18       Are any of the facilities that we talked about
19       here, are any of those in northern Illinois?
20   A   No.
21   Q   What facilities does Aurora operate in northern
22       Illinois -- strike that.
23           Does Aurora offer or provide security for any
24       of its facilities in northern Illinois?
25   A   Not with any security officer presence.  We do so

Page 43

1        in a kind of consultive way through a supervisor
2        or manager if they had issues, that they would
3        need to do a consultation on it at this point.
4    Q   So if I understand that answer, you're saying
5        there are no officers who are paid by the hour who
6        work in Aurora's northern Illinois facilities?
7    A   That's true.
8    Q   There's an Aurora facility that I'm thinking of
9        that's on Highway 94 sort of near Johnson Creek?
10   A   Okay.
11   Q   Do you know what facility I'm talking about?
12   A   We're not talking about the Summit hospital, are
13       we?
14   Q   That's Summit.
15   A   That's pretty close to Johnson Creek.  That's the
16       one you can see from I-94.
17   Q   Thanks for bearing with me.  I think we've got
18       that figured out.  That's a fairly new facility;
19       is that right?
20   A   Correct.
21   Q   Does Aurora consider its principal office to be
22       the St. Luke's Center?
23   A   I don't know what you mean by principal office.
24   Q   You had used the term corporate office?
25   A   Our corporate headquarters, at least for the next

Page 44

1        two weeks yet, is on Montana Street.  We will be
2        moving to Virginia Street.  That is our corporate
3        headquarters.
4            (Recess taken)
5    Q   Mr. Cummings, just a couple of things I want to
6        clear up.  When we went through the list of
7        locations, and you were describing the number of
8        security officers employed at those locations, you
9        did so in terms of sort of a 4.2 or an 8.4
10       designation for a lot of those facilities; is that
11       right?
12   A   Yes.
13   Q   And I just want to sort of clear up exactly what
14       you mean by that.  When you say 4.2, what does
15       that mean?
16   A   That means we're staffing one person seven by 24
17       at the site.  So it may mean more people, because
18       we have part and full-time or even per diem to
19       make sure we have that staffing level, but we're
20       budgeting for the one person seven by 24.
21   Q   When you say seven by 24, just to be clear, what
22       does that mean?
23   A   One officer on duty seven days a week, 24 hours a
24       day.
25   Q   When you're talking then about the 8.4

Page 45

1        designation, what does that mean?
2    A   That means two people on duty seven days a week,
3        24 hours a day.
4    Q   Two people working at the same time?
5    A   Correct.
6    Q   When you're saying working, is it the same as
7        saying on duty?
8    A   Yes.
9    Q   We had talked about the 142 full-time equivalent
10       employees; you had also mentioned about 20
11       part-time employees?
12   A   It's 142 full-time equivalence, so to get that, we
13       will staff three part-time and per diem zero
14       assigned people that aren't on the books is a
15       specific number of hours guaranteed, and they fill
16       in and those sorts of things.  So on average,
17       we'll probably have 20 more bodies in the
18       department than we will have FTEs.
19   Q   How many total people, full-time equivalent,
20       part-time, per diem, all those folks, how many
21       security officers currently does Aurora employ?
22   A   I couldn't give you an exact number because we
23       have a number of open positions right now, but it
24       would be approximately 160 if we were fully
25       staffed with all the open recs that we have, if

12 (Pages 42 to 45)

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964a4d12

1      they were all filled.
2  Q  When we talk about the seven by 24 designation,
3      that means that Aurora has security officers on
4      duty 24 hours a day at those locations that were
5      identified as either 4.2 or 8.4?
6  A  The exceptions would be the Sheboygan clinic that
7      I mentioned, and the hospice doesn't have first
8      shift, and then the family service building on
9      Highland that just is there first shift Monday
10     through Friday.
11 Q  Those facilities for all the hours that officers
12     are there, they're always on duty, correct?
13 A  I'm not sure what you mean by on duty.
14 Q  What do you mean by on duty when you answered my
15     last couple of questions?
16 A  Well, the purpose of why we're here other than
17     their lunch breaks, they would be on duty, yes.
18 Q  We had talked about your five direct report
19     managers, and then a number of the supervisors at
20     these various locations who report to one of those
21     five managers.  At the end of the day, you're the
22     boss of the security department, right?
23 A  Correct.
24 Q  And by that I mean that you are ultimately
25     responsible for all of these folks who, in various

1      ways, report to you?
2  A  Correct.
3  Q  You had said that, give or take a few people,
4      Aurora currently employs about 160 security
5      officers, correct?
6  A  Correct.
7  Q  Can you go back historically and tell me what that
8      number would be in 2009 approximately?
9  A  Sure.  We were at 150.  We had 132 FTEs, give or
10     take a tenth either way, and so with the
11     additional 20 normally part-time and per diem, I
12     would say a good estimate would be about 150.
13 Q  And 2008?
14 A  2008 would be about 147.
15 Q  And 2007?
16 A  147.  Our FTEs were 127 for both of those years.
17 Q  And the increase from 147 up to 160 currently is
18     based on what?
19 A  The opening of the Summit hospital.  The opening
20     in Grafton added people.  My budget has stayed
21     relatively flat other than when we've opened new
22     facilities.  They usually account for additional
23     staffing.
24 Q  One thing I need to ask you about Exhibit No. 2
25     there, is that exhibit current?  Is that accurate

1      as of today?
2  A  I'd have to look at it.  There's probably a couple
3      of minor changes.  There's one thing that I
4      mentioned when I was going over.  Page 23, right
5      under James Sagan on the far left column,
6      Duane Hanson is showing as security officer.  He
7      was recently promoted to sergeant at our Summit
8      facility.
9  Q  So Mr. Sagan is now a --
10 A  No, he's still the supervisor.
11 Q  Mr. Hanson, is that --
12 A  Mr. Hanson is now the sergeant at our Summit site.
13     He reports to Clint Schaefer.
14 Q  Again, big picture, what's the difference between
15     a security officer and a sergeant?
16 A  I guess the best way I would describe it is a
17     sergeant is kind of a lead, doesn't have
18     supervisory responsibility, is an hourly employee,
19     doesn't hire, fire, formally discipline, those
20     sorts of things.  They're a working officer, but
21     they have a slightly accelerated lead position
22     where they make decisions in the absence of a
23     supervisor.
24 Q  But still are an hourly employee, correct?
25 A  Correct.  I don't think there are any changes that

1      I'm aware of here.  I don't see any other changes
2      since this was produced.
3  Q  And sergeants and officers are subject to the same
4      meal policy; is that correct?
5  A  That is correct.
6  Q  And the supervisor positions that we've talked
7      about, are those folks paid hourly or on a salary?
8  A  They're on a salary.  They're exempt.
9  Q  As a part of the documents that have been produced
10     in this case, we received a job description for
11     the security officers.  Is there a similar
12     document for a job description for the security
13     sergeants?
14 A  There is.
15 Q  And what's the exact title of that position?
16 A  I believe it is sergeant.
17 Q  And is there similarly a job description for the
18     supervisors?
19 A  There is.
20 Q  What is the title of that job?
21 A  It's basically supervisor.  Sometimes it will say
22     supervisor, and it will have the region or the
23     business line that they support, but it's
24     basically the same job description.
25 Q  And is there a job description for the managers

Electronically signed by Brande A. Browne (101-025-478-3970)                                         b11bccc0-d5da-478f-9098-4698964a4d12

1    that the supervisors report to?
2  A   There is.
3  Q   What is that job description called?
4  A   It's a job description for loss prevention
5    manager, and again, some of them will say their
6    specific mark or their region that they support,
7    and some will just say generically manager.
8  Q   Do you have a job description?
9  A   I do.
10  Q   And does that just say director of security and
11    loss prevention?
12  A   I believe it says director of loss prevention
13    services, but yes.
14  Q   Are Aurora's security officers trained?
15  A   They are.
16  Q   Who or what department is in charge of training
17    Aurora's security officers?
18  A   We're responsible for training our officers.
19  Q   When you say we're, what do you mean?
20  A   I mean the loss prevention services department.
21    We use some outside training from time to time to
22    augment, but we have a training policy, and we've
23    trained to that policy.
24  Q   Is the training uniform for all of Aurora security
25    officers?

1  A   It is on the big picture level.  Those things that
2    are common for all staff.  There will be
3    procedural elements that will be trained
4    differently from site to site depending on the
5    nature and the peculiarities of a specific site,
6    everything from which doors get opened at what
7    time to, you know, whether you do a cash run or
8    you don't do a cash run.  So those procedural
9    things will happen more on the on-the-job training
10    part of it and orientation to that particular
11    site.  Globally, officers are trained the same
12    overall to meet our policy, if that answers your
13    question.
14  Q   It does.  Thank you.  In terms of the big picture
15    training you were talking about, is there a
16    specific person within your department that's
17    responsible for that training?
18  A   It's a multitask.  There's not one individual that
19    is out there training every security officer.
20    Different leadership people have different
21    responsibilities.
22  Q   Can you tell me each of those people that are
23    responsible for training?
24  A   I think the primary responsibility for training
25    would fall with the supervisor.  They're the ones

1    that are the hiring -- they make the decisions on
2    hiring for the officers, and so they have primary
3    responsibility for, I guess I'll say, adhering to
4    the corporate policy on training.  Then we also
5    have the gentleman who is listed as the safety
6    supervisor, John Bruce, in the last year or so,
7    I've assigned him to help us kind of improve our
8    overall training by working on what we're calling
9    the academy of loss prevention, academy, to make
10    sure that we are capturing other opportunities for
11    training for officers and making sure we stay as
12    consistent as possible.
13  Q   Tell me about the academy.
14  A   It's something we're just in the process of
15    rolling out.  We hope to start it in 2011.  We're
16    working on it.  It would be making sure that -- it
17    will be a different format for assisting the
18    supervisors in training the officers to all of our
19    policies so they would come on and get kind of the
20    basics in a consistent, more timely manner if
21    there's glitches with that.  You know, because
22    with the number of officers we hire, with the
23    part-time and the per diem, we think we can do it
24    more efficiently, in a more formalized classroom
25    setting.  At least to start with, we're going to

1    try that.
2  Q   And you had mentioned some big picture training.
3    What do you mean by that?  What are the elements
4    of big picture training?
5  A   Well, one of the big picture training elements is
6    there's a professional organization that many of
7    us belong to.  It's called IAHSS, International
8    Association for Health Care Safety and Security,
9    and they offer an online or paper basic officer
10    training course for security officers, and for
11    years we've required that all of our officers pass
12    that test.  And what it does is it allows us to
13    have a common denominator of all of our officers
14    understanding the role of a security officer in
15    the health care environment.  So we've required it
16    for a number of years for officers to complete
17    that.  That's one of the basic things.
18  Q   All Aurora security officers are required to take
19    this test?
20  A   There were probably a handful, maybe four or five
21    now still existing with us that grandfathered out
22    of it when we first started it.
23  Q   And what, again, is the name of the test?
24  A   It's a basic officer certification.
25  Q   And who administers the test?

Electronically signed by Brande A. Browne (101-025-478-3970)                                                          b11bccc0-d5da-478f-9098-4698964ad12

1   A  It's administered through the professional
2     association I mentioned.  You can purchase tests,
3     and then I assign a test electronically to an
4     officer when he or she feels they're ready to take
5     it.  They do it online, and if they pass, great.
6     If they don't pass, they have to retake it until
7     they pass.
8   Q  And do you keep some sort of a chart or a file to
9     indicate what officers have taken the test and
10    passed it?
11   A  I do.
12   Q  What's the name of that document?
13   A  It's basic -- I believe it's basic certification
14    log, for lack of a better -- my administrative
15    assistant actually maintains it for me.
16   Q  What other things in terms of the big picture do
17    you make sure that all the officers do as part of
18    their training?
19   A  Well, parts of the training are specific to
20    security topics.  Obviously, they go through an
21    orientation and checklist, and this is the part
22    that's the responsibility of the supervisors, to
23    make sure all of our policies are covered with
24    them, that all of the -- that these understand our
25    mission statement, how our department supports the

1    mission, vision, values of Aurora, and then also
2    all the site-specific procedural elements that go
3    along with that.
4   Q  Is there like a packet of materials?  You said an
5    orientation checklist, is that a document that the
6    supervisors go through to make sure they cover all
7    the topics?
8   A  Correct.  It's their responsibility to do that on
9    the site level, and that's the part that we're
10    going to try to see if we can standardize a little
11    differently going forward in 2011.
12   Q  Right, because uniformity is important in terms of
13    how your security officers deliver their service,
14    right?
15   A  Correct.
16   Q  The orientation checklist, are there -- I'm just
17    trying to sort of picture this idea, is there a
18    group of topics that are general for all officers
19    that is provided from your office or someone in
20    your office?
21   A  Not at this time.  We had tried that at one point,
22    and then had one of our managers be the
23    responsible person for -- say, for example, all of
24    our policies.  From a centralized standpoint, it
25    wasn't real efficient from a one-on-one

1    standpoint.  So we again pushed that back out to
2    the supervisors' responsibility.  So each of them
3    have developed tools to make sure that happens at
4    the site level.
5   Q  How do you know that all the supervisors are going
6    over all the topics that you want to be covered as
7    part of training?
8   A  They don't supply me with a specific document of
9    that.  That would be captured probably to some
10    degree in their annual evaluation, their new
11    evaluation, the 90-day evaluation, that they went
12    through these things.
13   Q  Are those standard evaluation forms that go to
14    your office?
15   A  Yes, I read every evaluation of all the staff
16    every year.
17   Q  And those evaluation forms were developed by who?
18   A  Those are system-wide evaluation forms that are
19    used for all of our caregivers.
20   Q  In addition to security officers?
21   A  Correct, everybody goes through the process.
22   Q  And that's a policy in terms of, you know, what
23    the forms look like, when the reviews happen,
24    that's set on a system-wide basis by somebody
25    other than you?

1   A  Correct.  In that formal -- it will capture all of
2    the Aurora-required training, which goes above and
3    beyond the security training, like various
4    compliance training and corporate training.  There
5    are departmental check boxes where you can add
6    things that are departmentally-required.  So that
7    will capture making sure that the officers receive
8    their training.  That would be a checklist, and I
9    would be able to see that the officers were
10    getting their training.  Because if they didn't
11    complete it, it would increase their potential for
12    a merit increase, for one thing.
13   Q  Right.  So I'm trying to sort of put in my basket
14    all the things that are part of a security
15    officer's training.  They go through an
16    orientation.  They take a test.  They are given
17    instructions as to site-specific information from
18    a supervisor?
19   A  Correct.
20   Q  What else is part of the training?
21   A  One of the training aspects is management of
22    aggressive behavior and defense arrest tactics.
23    We call them MOEB and DAAT.  That training all
24    officers go through.  Initially, it's a two-day
25    training, and basically teaches officers how to

15 (Pages 54 to 57)

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392
Case 2:10-cv-00714-JPS   Filed 01/18/11   Page 16 of 74   Document 35-1

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964a4d12

1    recognize situations that may be escalating that
2    become violent and how to deescalate.  And if they
3    can't deescalate and it becomes physical, how to
4    appropriately and safely defend themselves, take
5    somebody into custody, those sorts of things.
6    Every officer goes through initially that two-day
7    training, and then goes through a one-day
8    recertification on an annual basis, so that's part
9    of our training curriculum as well.
10   Q  Is that training done in-house, or is that
11   provided by an external provider?
12   A  It's done in-house by three gentlemen who have
13   been certified through this particular program
14   externally.
15   Q  And the certification, the name of that
16   certification is what?
17   A  Management of aggressive behavior and defense and
18   arrest tactics.  It's two things that are
19   combined.
20   Q  And what is the organization that provides that
21   certification?
22   A  Management of Aggressive Behavior is the name of
23   the company as well as the program, and we send
24   individuals to become certified trainers so we can
25   do it cost-effectively in-house.

1    Q  So every security officer that works for Aurora,
2    other than the three people who are the trainers,
3    everyone has been certified and trained by one of
4    these three trainers?
5    A  All officers and sergeants unless they're so new
6    that they haven't gone through the program yet.
7    Q  What are the names of the three folks who have the
8    certification?
9    A  Jim Moraza, one of our managers, Joe Jonas, and
10   Dennis Hafeman, H-a-f-e-m-a-n.  Joe Jonas is
11   listed as a supervisor here, and Dennis Hafeman is
12   an officer.
13   Q  So there's these two certifications that we talked
14   about.  What else is part of the training?
15   A  We have a lot of different training that happens
16   at the site level and sometimes at the regional
17   level.  We'll have occasional regional or market
18   meetings where we bring all the officers together
19   for a given day, once or twice a year, depending
20   on the region, and during that day of training,
21   there will be a lot of training components to
22   that.  We try to bring outside speakers in, so we
23   have training on an active shooter with various
24   police agencies.  We have had outside trainers
25   come in and do interview and interrogation.

1    Again, those were for specific people in the
2    department.  So we have a multitude of different
3    training opportunities.  Sometimes a professional
4    association in the area, ASIS International, for
5    example, their chapter, our local chapter, will
6    put on training opportunities, and we'll send
7    officers to that.  Not all officers would go.  It
8    would be based on an expressed interest and the
9    number of dollars we have available to give
10   additional training.  Those are the types of
11   additional training we'll do for the staff to
12   augment the basic things that everybody goes
13   through.
14   Q  Anything else on that list of basic things that
15   everybody goes through?
16   A  Not that I can think right now.
17   Q  Is there a document that lists all the basic
18   things that everyone must go through?
19   A  It would be captured in our policy.
20   Q  Which policy?
21   A  I don't remember the number.
22   Q  Do you know the name of it?
23   A  Training.
24   Q  Very good.
25   A  It's a department policy called training.

1    Q  Are the officers trained in terms of using the
2    Kronos system or the time clocks that Aurora uses?
3    A  Yes.
4    Q  Is that part of the orientation?
5    A  That would be part of the orientation and initial
6    training with the supervisor, or it could even be
7    the sergeant on that level teaching how to Kronos
8    in.
9    Q  And that's done the same system-wide for Aurora in
10   terms of how the Kronos system is used?
11   A  Correct.
12   Q  And the supervisor or the sergeant is providing
13   that training, but it's done the way Aurora does
14   it system-wide; is that correct?
15   A  That's correct.
16   Q  And then are the officers similarly trained on how
17   the meal break policy works?
18   A  Yes, in that that's one of those things that would
19   be covered by the supervisor for all sites, to
20   make sure that they understand both that, and that
21   is also part of our larger information is given
22   out like in the employee handbook.  So when they
23   are first hired, they get the employee handbook,
24   and they acknowledge that.  And some of these
25   things that are not specifically departmental

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964a4d12

1     policies are also covered in the handbook.  There
2     are policies that they have access to and some of
3     which are covered during new employee orientation.
4  Q  What other materials do they get besides the
5     employee handbook?
6  A  By materials?
7  Q  Written materials.
8  A  It's kind of vague in terms of lots of materials.
9  Q  What I'm asking is when Aurora hires a security
10    officer, what are the general, written materials
11    that they receive as part of their new hire
12    process?
13 A  Well, by receive, they'll get the departmental
14    policies.  They won't actually get their own copy
15    of it.  It will be covered with them.  That's
16    what's noted in the checklist, and it will be
17    checked off, and they will be advised in terms of
18    whether it's hardcopy or online, where it's
19    available, for them to reference if they forget.
20    What's important is to give them the initial, I
21    believe, the initial explanation and training and
22    then make sure that they know if they have
23    questions, they can ask a sergeant or a
24    supervisor, or that they have access to the policy
25    so they can check themselves if they have any

1     misunderstanding or they don't remember something.
2  Q  And the departmental policies are policies that
3     your office issues?
4  A  Correct.
5  Q  And those are uniform throughout the Aurora
6     system?
7  A  Correct.
8  Q  Including the meal break policy?
9  A  We don't have a specific policy on the meal break.
10    That's really covered by the overall Aurora.  We
11    reinforce, again, through training, through
12    education, we reinforce that here's the policy and
13    here's how we expect you to fulfill it.
14 Q  So if I'm understanding you, your department has
15    adopted the overall Aurora meal break policy?
16 A  Correct.
17 Q  And that's a uniform policy for all security
18    officers as well as other employees?
19 A  Correct.
20 Q  Who's in charge of enforcing all the departmental
21    policies?
22 A  Well, I think it's a shared responsibility on the
23    site level.  I guess I look at it a little bit
24    incrementally.  Depending on the nature of the
25    policy and what the infraction or deviation might

1     be.  It could be a sergeant saying -- a general
2     counseling correction or you forgot to do this or
3     something.  Then the supervisor has responsibility
4     for, I guess, more of enforcing since they're
5     exempt and they're supervisors, and they can
6     formally discipline, do those sorts of things, and
7     then ultimately, it could be a manager or myself
8     getting involved if it became that significant
9     with us.  Repeated violations of policy or
10    policies that require serious discipline, I
11    usually want to know those and would kind of
12    approve those and work with my HR colleagues to
13    make sure that we're being consistent and all
14    those sorts of things.
15 Q  Does your department have a, for lack of a better
16    way to say it, a policy for enforcing its policies
17    in terms of discipline?
18 A  Not specifically a policy, but I think within the
19    job description you asked about earlier, the
20    supervisor would have it in the job description
21    for overseeing the charges that are assigned to
22    him or her.
23 Q  As a big picture issue, it's important that the
24    department enforces its policies in a uniform
25    manner, correct?

1  A  Yes.
2  Q  Why is that?
3  A  We want to be consistent from a fairness
4     standpoint and also if a policy was written,
5     especially one that we're talking about today,
6     there are laws or regulations that are part of
7     that policy, and we want to make sure that we're
8     being consistent.
9  Q  Have we talked about Arthur Smith yet this
10    morning?
11 A  Only that I identified him as a supervisor.
12 Q  I don't think we've talked about Dwight Morgan.
13 A  Dwight Morgan is my boss.  He's the vice president
14    of human resources.
15 Q  And do you report to anyone else other than
16    Mr. Morgan?
17 A  No, just directly to Mr. Morgan.
18 Q  Do you know who Mr. Morgan reports to?
19 A  Currently, I believe he might report to the
20    president, Dr. Turkal, because his boss, the
21    senior vice president of human resources retired
22    in July, and her position has not been filled yet.
23    So he's acting in that interim role while the
24    search is being conducted.
25 Q  Is there anyone higher in Aurora's overall

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964a4d12

1    organizational chart than the president?
2  A  No.
3  Q  Does the president report to a board of directors?
4  A  I believe so.
5       (Recess taken)
6  Q  Mr. Cummings, why does Aurora employ security
7     guards?
8  A  To ensure as best we can that we have a safe and
9     secure environment for our patients to receive
10    health care and for our caregivers to deliver
11    health care would be the short answer.
12 Q  And I think we already talked about this, but just
13    to make sure, all of Aurora security officers are
14    paid by the hour; is that correct?
15 A  Yes.
16 Q  And all of Aurora's sergeants are also paid by the
17    hour?
18 A  That's correct.
19 Q  Can you tell me about the basic job duties of an
20    Aurora security guard?
21 A  Sure.  We provide probably over, and when I say
22    we, I'm talking about the department generically,
23    probably provide over 200 different services that
24    we track.  So their responsibility is to be
25    available to provide those services in addition to

1     one of them being routine patrol and observe and
2     report, anything that would be contrary to the
3     safety of the organization or the people in it.
4  Q  And just trying to sort of break down some of
5     these 200 functions into groups; is there an easy
6     way to do that?
7  A  Yeah, I could probably give you some basic
8     categories.  Some of them are report writing.  We
9     do report writing in the specific types of
10    situations that occur that we'd help document,
11    document incidents and to a degree investigate
12    them and try to solve them, if you will, or call
13    outside resources to assist us as needed.  So
14    there's a whole group of things that we do under
15    the report-writing category.  Responding to, I'll
16    just call them difficult situations, could be
17    tense situations between a combination of people.
18    If you want to call it disruptive situations,
19    could be between patients, visitors, staff, to
20    help calm a situation, diffuse it, as I indicated
21    from MOEB and DAAT training.  There's an awful lot
22    of routine services that we do for patients --
23    break it up by patients, by visitors, and staff,
24    and sometimes they overlap for the same service
25    such as provide direction, open doors, handle and

1     store valuables, respond to door openings,
2     valuables, property return, lost and found,
3     auto-related services we provide, such as finding
4     lost cars, relocating cars.  We used to jump-start
5     cars, but we don't do too much of that anymore.
6     So there's a whole auto-related series of those.
7     Certainly, we have huge responsibility for
8     response to emergent situations at our facilities.
9     Our department has designated rules in all of the
10    emergency situations, which are normally captured
11    in what we call a flip chart, which have different
12    codes or conditions that could be anything from
13    severe weather to tornado to fire to bomb threat.
14        So the security department, because of the
15    nature of our work, responds to and has a
16    designated role in all of those emergency
17    responses.  Sometimes it's facilitating things
18    like Flight For Life.  We have rules for ensuring
19    access to services, so parking, managing parking,
20    controlling parking, and vehicle traffic from time
21    to time.  Those are some broad categories.
22 Q  It is a big job?
23 A  It is.
24 Q  In terms of the reporting category, does Aurora
25    use standardized reports for its officers to fill

1     out?
2  A  Yes.  We use an electronic reporting, and we've
3     been using that for about six or seven years, I
4     believe.
5  Q  And what does that mean?
6  A  It's called IRMS.  It's the name of it that we
7     purchased from an outside vendor, and it stands
8     for Incident Report Management System.  Our
9     officers, when they are required to write a report
10    per policy, they log into the IRMS system, and
11    they write the report.  It's an electronic
12    software version, so it can be archived and
13    stored, and it can be viewed by department
14    leadership.
15 Q  Is this something that they're trained on, the
16    security officers are trained on, in terms of how
17    to use the IRMS system?
18 A  Right, that would be part of their initial
19    on-the-job training.
20 Q  And the IRMS system, you said they login; how do
21    they do that?
22 A  They have a password and a login ID that would
23    allow them access to write a report and review
24    reports up to the level that they're authorized.
25    So there's an officer level, there's a sergeant

Electronically signed by Brande A. Browne (101-025-478-3970)                                                b11bccc0-d5da-478f-9098-4698964a4d12

1    level, there's a supervisor level.  Each of them
2    are password protected to the point of -- so if I
3    write a very sensitive report, they couldn't see
4    it, but I can see theirs.
5  Q  And this is something that's done on a computer;
6    is that right?
7  A  Correct.
8  Q  Does each officer have a computer that's issued by
9    Aurora?
10  A  They have access to a computer.  They don't have
11    their own computer.  They have a departmental
12    computer that they would have access to that has
13    that particular software loaded on it.
14  Q  And the actual software, does Aurora use one set
15    of the IRMS software for the entire company?
16  A  Correct.
17  Q  And you have the ability to read the IRMS reports
18    from any sergeant, officer, manager, supervisor?
19  A  I do.
20  Q  And then the chain of command dictates what level
21    of clearance, so to, the various employees might
22    have?
23  A  Correct.
24  Q  Other than the IRMS reports, are there any other
25    standard reports that the officers use?

1  A  It's not a report so much, but it's an activity
2    log.  I mean, it's a report of sorts.  It can be
3    used to generate reports.  It's what they do on a
4    day-to-day basis that helps account for their
5    time, allows us to make sure that things are being
6    documented, and that we can then track how many
7    things various officers are doing at what site so
8    that we can see if the level of activity or the
9    business, if you will, is increasing to the point
10    that we need to use more security officers.  So
11    it's a productivity tool as well.
12  Q  And all of the officers fill out the activity
13    logs; is that right?
14  A  They are filled out by the site.  We leave the
15    supervisor -- sometimes a supervisor will have
16    somebody in a dispatch center that as an officer
17    does a task, will login that the officer did a
18    door opening, started at 4:02, finished at 4:15.
19    So we'll get a mark, and the time will be
20    documented how that officer was doing that.  And
21    sometimes they'll do it in realtime, where the
22    sites will have -- Sinai and St. Luke's will have
23    multiple officers, the dispatch center person will
24    be able to do that in realtime.  Sometimes what
25    they'll do is document it in addition on an

1    activity blotter, a log of some sort, and that can
2    get transposed later.  So they accomplish it in
3    different ways depending on the staffing level and
4    how busy they are.
5  Q  Since we're on this subject, I'm not going to mark
6    these as exhibits yet, but just so I understand
7    what we're looking at, when you say activity log
8    or daily blotter, are these the documents that
9    you're talking about?
10  A  Yes, they are.
11        MR. SCULLEN:  Will you identify
12    them by the bates label?
13        MR. PARSONS:  Sure.
14  Q  This is a large packet of documents that has the
15    number 075448 on the front.  We also received some
16    documents that start with a bates stamp number
17    77621.  Do you know what those are?
18  A  They look like they are for some random officers.
19    I don't know if they're all officers for a
20    specific time.  This one says starting on
21    October 7th of 2007, shows the activity of
22    specific officers did -- various specific
23    functions that they accomplished that would have
24    been put into the ACT track.  This looks like it's
25    an ACT track printout of those types of activities

1    we talked about earlier.  So I see a valuable
2    handling, a valuable pickup, a couple of those.  I
3    see an auto service, jump-start.  I see a special
4    project, ILSM, which stands for interim life
5    safety, which means we were doing a fire watch.
6    So this document, series of pages you gave me,
7    appears to be an ACT track -- example of some
8    ACT track activity.
9  Q  Just so I understand, are the ACT tracks and
10    activity logs, are those two documents somehow
11    connected in terms of the information they're
12    providing?
13  A  Yes, they should be in connected in as much as
14    the blotter activity should end up captured in
15    ACT track.  ACT track is more high tech, if you
16    will.  It's electronic.  I can run reports or have
17    my administrator, who is Dave Wood, one of my
18    managers, I'll have him run reports for me from
19    time to time in terms of tell me how many various
20    types of activities were done by shift, by site,
21    by officer, if we're looking to break it down to
22    see how we're using our time.
23  Q  Thanks.  So the activity logs that you were just
24    telling me about, you said each site completes the
25    activity logs, and it might vary from site to site

Electronically signed by Brande A. Browne (101-025-478-3970)                                                  b11bccc0-d5da-478f-9098-4698964a4d12

1    in terms of who's actually filling it out, but
2    each site produces an activity log?
3  A  Yes.
4  Q  Any other standardized reports other than the
5    activity logs?
6  A  Just by reports, just what would be captured in
7    Kronos for payroll for purposes of what we're
8    talking about here.
9  Q  Do the officers fill out any reports related to
10    checking out equipment, or things like that?
11  A  Oftentimes those are captured on the activity log.
12    We leave it up to the officer.  If there's only
13    one officer working, we know he has got the radio.
14    For the purposes of SAR sites where we have maybe
15    as many as six officers working the same shift,
16    that site may just do a little differently and
17    make sure that we all know.  Everybody who's
18    looking at the blotter knows who's on duty, who
19    had what radio, what beat assignment, and that's
20    more in the area where we have multiple officers
21    working the same shift.
22  Q  Would there be a report where the officers would
23    write down that they were taking a meal break?
24  A  It would normally be in the activity blotter.
25    They should be calling in and saying I'm going on

1    lunch now.
2  Q  Who would they call in to?
3  A  Presuming it's a site that there's more than one
4    person, then they would call into whoever the
5    dispatcher would be or their partner, if there's
6    two people working.  If they're working alone, it
7    would usually be whoever is dispatching, it could
8    be the switchboard in some cases.  Whoever takes
9    the call for the security officer and dispatches a
10    call and calls them for assignments.
11  Q  In terms of when that call comes in, either to
12    dispatch or switchboard, is there then a notation
13    made at the switchboard or dispatch level in terms
14    of Officer X is off-duty for lunch or something
15    like that?
16  A  My expectation, it would be in the activity
17    blotter, I'm not sure what switchboard does.  I'm
18    not sure if switchboard just does something
19    informal to it as it relates to them knowing that
20    the officer is at lunch, or if they keep a record
21    of that.  In our blotter, we would keep that as
22    part of our permanent record.
23  Q  Who would know that?
24  A  That meaning which case?
25  Q  I'm sorry.  Who would know what the switchboard or

1    the dispatch does in terms of marking down whether
2    an officer is taking a lunch break?
3  A  Well, I would say that for us putting it down, if
4    it's a dispatcher, that would be my expectation.
5    I just don't know if the switchboard at those
6    sites where the switchboard does the dispatching
7    when there's only one officer, I'm not sure how
8    they document that, if they do that in realtime,
9    or if they just keep it off to the side so they
10    know that officer X is at lunch.
11  Q  So would it be fair to say for all the sites that
12    have dispatch, an officer going off duty for a
13    meal break should at least be reported in the
14    activity log?
15  A  Yes.
16  Q  And for the sites where it's being handled, but
17    where that type of information is being processed
18    by the switchboard, you're not sure who -- I'm
19    sorry, you're not sure how that information would
20    be recorded, if it's recorded at all?
21  A  That would be true.
22  Q  Do you know who would know that -- who would be
23    the person who would know how the switchboard
24    handles meal break information for security
25    officers?

1  A  I wouldn't be able to point you to a specific
2    person.
3  Q  Would that be a site by site?
4  A  Could be, yes.
5  Q  The next group of topics that you talked about
6    were security officers responding to difficult
7    situations, I think is how you said it.  Does
8    Aurora have company-wide policies in terms of how
9    its security officers should respond to these
10    difficult situations?
11  A  Within the department policy guidelines, we have a
12    couple of departmental policies that would touch
13    on that depending on what the nature -- where the
14    call was coming from.  So for example, we have a
15    policy that was specific to dealing with problems
16    from the human resources department.  So if you
17    had a candidate or something going on there that
18    was related to that -- related to a disruptive
19    situation.  So I don't believe that there's an
20    overall policy that says this is how you always
21    respond to a disruptive situation in terms of like
22    saying, for example, some individual departments
23    have a code that they'll call us and say --
24    they'll use a code word or code phrase to say
25    they're having problems so as not to tip off the

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964a4d12

1    person that might be disruptive, but that can vary
2    from site to site and department to department
3    depending on the nature and the frequency of those
4    things at that specific site.
5  Q  But in terms of how you want the officers to
6    actually respond to situations, that's -- you're
7    hoping for, you know, sort of uniform methods of
8    responding to things; is that right?
9  A  Are you talking by severity or just in general
10   that we expect them to respond and do things
11   generically, like try to diffuse the situation,
12   get information, get it resolved as peacefully as
13   possible?
14  Q  The latter.
15  A  Yeah, that would be captured to some degree in the
16   on-site training that they would get, and to some
17   degree, in the policy that would be covered by our
18   training policy, under the management of
19   aggressive behavior and defense and arrest tactics
20   to use reasonable -- say, for example, the
21   co-concept of reasonable force when you get there,
22   making sure that you're trying to resolve a
23   situation first and not escalate it, if that's
24   answering your question.
25  Q  In general, there's a general protocol that you

1    would like the officers to all follow for certain
2    difficult situations?
3  A  Correct.
4  Q  One of the things that I'm not sure if you
5    mentioned as part of a job duty was providing
6    supplies to various portions of the facilities; is
7    that a duty of the security officers?
8  A  It can be from site to site, depending on how well
9    that site is staffed. Our security officers, as
10   we are talking about a seven by 24 department,
11   that from time to time, we will be requested to
12   assist with things like, in some cases but not
13   very regularly, doing morgue runs, where we will
14   actually help facilitate taking out a body to the
15   morgue because they don't have anybody for the
16   lab. Sometimes it's a matter of picking up
17   supplies from central supply. It's locked and
18   there's nobody there and maybe they need something
19   in the emergency department and they're
20   short-staffed, they'll ask loss prevention to
21   go and pick it up. Could be going to medical
22   records and getting a medical record after hours
23   if there's nobody that staffs medical records. So
24   that is pretty dependent or can vary from site to
25   site depending on what the staffing is for those

1    specialty departments and how often that happens.
2  Q  So in general, security officers play a fill-in
3    role from time to time to help get things done at
4    these facilities?
5  A  That's accurate.
6  Q  What's a patient standby call?
7  A  Patient standby is a call where the patient either
8    has generally shown to be disruptive, threatening,
9    belligerent, or there's a fear that they may or
10   that there is a Chapter 51 hold on the person, and
11   we're requested to stand by to make sure they
12   don't leave when it has risen to the level that
13   legally they can't leave because they're hold
14   harmless. They have been deemed by the police or
15   a physician that they're a threat to themselves or
16   somebody else. So we can be called, we being loss
17   prevention, can be called in any of those
18   situations, and it varies in severity to do a
19   standby. Sometimes a patient has just been
20   somewhat disruptive and verbally abusive, and
21   maybe they apparently are over the limit in
22   alcohol, and the staff may fear for their safety
23   and want to keep the person controlled. So we'll
24   be called to stand by and try to monitor behavior
25   and take appropriate action as needed.

1  Q  Who issues a standby call?
2  A  It could be any department, but mostly, mostly,
3    I'd probably say, 90 percent of ours are in the
4    emergency department.
5  Q  And how is that standby call communicated to the
6    security officer?
7  A  Well, depending on the site, it could go to the
8    switchboard if that's where the dispatch gets
9    monitored. An officer could get paged. An
10   officer could get called on their radio. The
11   emergency department would call the dispatch
12   center if we have a dispatch center and say we
13   need a standby in ED Room 4, for example, and then
14   an officer would then be either dispatched in
15   whatever way that site does that.
16  Q  What's an officer supposed to do when he or she
17   receives a standby call?
18  A  Respond, and generally try to get some information
19   so we know what the severity is, what the
20   expectations of us are. So we know whether this
21   is a Chapter 51, and we can legally, physically
22   detain them, and if it's not a Chapter 51, we know
23   that we can't legally, physically detain them.
24   But we want to just monitor their behavior, so
25   they're not abusive. Perhaps it's a potential

Electronically signed by Brande A. Browne (101-025-478-3970)        b11bccc0-d5da-478f-9098-4698964a4d12

1    suicide where you're keeping an eye on them so
2    that they don't try to harm themselves.  So one of
3    the first things we would expect our officers to
4    do is to try to gain some information so they know
5    to what degree we need to and can take physical
6    action against that person, depending on what they
7    do.
8  Q  Is there a policy or a departmental policy as far
9    as responding to standby calls?
10  A  Not a specific policy in how to respond to
11    standbys.
12  Q  Is there a general expectation that the officers
13    will respond to the standby call?
14  A  Sure.
15  Q  How do the officers know that?
16  A  Through the general training that they would
17    receive on the site, that they would know that
18    standbys are pretty commonplace in all medical
19    centers throughout the country, and ours is no
20    different.  It's a very regular and routine
21    service that hospital security personnel do.
22  Q  Do you know, outside of Aurora, is this a function
23    that security officers at other medical facilities
24    typically provide?
25  A  Yes.

1  Q  How do you know that?
2  A  Well, through my professional associations, I have
3    dealings with a lot of people that have similar
4    roles that I do, and we talk about that.  That's
5    one of the most common challenges in our part of
6    the business right now is the prevalence of
7    standby requests and the number of officer hours
8    that that entails and chews up.  So it's one of
9    those common things in the industry.
10  Q  Does Aurora have an expectation in terms of how
11    quickly the officers will respond to these calls?
12  A  Well, in the absence of anything -- any additional
13    information, the expectation that they would
14    respond as soon as practical.  If they were in the
15    middle of doing something -- unless they were
16    engaged in a duty or task that was also high
17    profile or of significance such as responding to
18    an emergency situation, a fire situation, or they
19    were tied up in a helicopter landing where the
20    safety of other folks would possibly be impacted
21    negatively if they left.  So a lot of the calls
22    that our officers respond to, really it's a matter
23    of understanding what the call is about and
24    prioritizing.
25  Q  How do they know how to prioritize the calls?

1  A  Part of it would be from the caller themselves,
2    and if they're not clear about the expectation,
3    when possible -- presuming that the call comes to
4    a switchboard -- to a central monitoring station,
5    one of our officers, and somebody says I need
6    security in the emergency department for a
7    standby, my expectation would be the officer who's
8    taking that call, before they dispatch, would ask
9    a couple basic questions, is this urgent, is it
10    emergent, what room are they in.  So when they're
11    dispatching, then they would have an opportunity
12    to help prioritize, you know, whether this is a
13    stat call or this is a get there as soon as you
14    can, but there's not a fight going on type thing.
15  Q  Is there a general list that Aurora has in terms
16    of, you know, respond to fire, respond to
17    emergency, respond to nonemergency in terms of an
18    order?
19  A  Well, no, there's not a specific list.  It's
20    inherent in the business and what we do.  So we
21    know that things that are on those code charts,
22    those emergent situations, that we would know that
23    if a call comes in where it, it appears by the
24    request for service that it could be
25    life-threatening or a situation that could cause

1    harm to an individual, basically those would be
2    handled as a priority, but there's not a list that
3    ranks them per se.
4  Q  In general, would it be fair to say that the
5    officers are expected to respond to the most
6    urgent call first and then prioritize from there?
7  A  Correct.
8  Q  In terms of a time expectation for the response,
9    let's talk about a patient's standby call, is
10    there a time expectation in terms of how quickly
11    the officer needs to respond?
12  A  Not really.  So we don't say that you have to
13    respond in 30 seconds or four minutes because
14    that's really not feasible.  There's so many
15    variables.  A person can be on the other side of a
16    very large campus, and they're the only one that
17    can respond because other officers, presuming
18    there are other officers on duty, are tied up in
19    other higher priority things.  So a site as large
20    as St. Luke's or Aurora Sinai could take three or
21    four minutes or several minutes at least for the
22    officer to respond depending on where they are at
23    the time.  So there's not a specific time frame
24    that's designated.  It's just as soon as possible
25    and practical, depending on all the other factors

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964ad412

1    that are going on.
2  Q  You mentioned that the first thing you wanted the
3     officers to do before responding is to ask a
4     couple of follow-up questions?
5  A  If it's not clear by the original call that helps
6     them to determine that, or if there's nothing
7     competing.  So for example, if an officer is
8     available and he or she is not assigned to
9     anything at this point in time, and a call came in
10    for a standby, and it didn't sound frantic or
11    whatever, then they would be dispatched because
12    they're not in competition.  It's more
13    important -- it's most important when an officer
14    is already assigned to something else, and they
15    have to be reassigned to then make that priority.
16    So getting information there is probably even more
17    crucial.
18 Q  Is it important for dispatch or the switchboard to
19    know that the officer received the message?
20 A  It would depend on the nature of the call.
21    There's usually an acknowledgment component to
22    that.
23 Q  Is that a standardized policy in terms of
24    acknowledging calls?
25 A  Policy or procedure, I think it's just kind of

1     understood, and for the purposes of what we're
2     here for, that if the person is on a lunch, and
3     they're the only officer on, or even if they're
4     not the only officer on, if they're getting a
5     call, and they have taken -- they have taken the
6     action to notify the central monitoring station or
7     the switchboard that they're on lunch, which in my
8     opinion would mean that they only respond to
9     emergency-type calls, it wouldn't be necessary for
10    them to necessarily respond -- to acknowledge a
11    nonemergency call during that time.
12 Q  My understanding based on what you just said is
13    that it's your expectation that even while the
14    officer is on lunch, that he or she will be
15    monitoring their communication device; is that
16    correct?
17 A  I don't know.  By monitoring --
18 Q  Let me ask it another way, would he or she turn
19    the device off?
20 A  My expectation would be that they would not turn
21    it off if that was the device to which they were
22    going to receive emergent calls.  So for example,
23    if an officer had a pager and a radio, and the
24    radio was used for everything, and the pager could
25    be used just for emergent, I would have no problem

1     with them turning the radio off so they don't have
2     to acknowledge or hear those, as long as they
3     would be able to get an emergent call by pager.
4  Q  Is that a policy?
5  A  It's not a policy.  It's an expectation based on
6     the fact that when they're at lunch, that they're
7     not required to take routine calls.  They're only
8     required to respond to emergent calls.
9  Q  Do you know if that expectation is implemented on
10    a system-wide basis?
11 A  To the best of my knowledge, it is, yes.  I'm very
12    consistent about communicating that.
13 Q  How have you communicated that in the past?
14 A  I've done it in some of my newsletters.  I write a
15    newsletter occasionally.  It used to be monthly,
16    sometimes it's quarterly, sometimes it's every
17    other month, depends on how much information we
18    have.  In that newsletter, I'll cover various
19    topics.  I'll welcome people to the department.  I
20    know that there have been times in the newsletter
21    going back 10, 12 years, for sure, the ones that I
22    was able to produce for this situation, that --
23    and that newsletter goes to every officer.  It
24    doesn't just go to the supervisor.  So we've
25    addressed the fact of what the expectations are

1     from my level, and I know that I've seen documents
2     from managers and supervisors when they've covered
3     this topic in site-specific or regional meetings,
4     and I've never seen it not consistently
5     communicated what our expectation is.
6  Q  You said that you had produced these newsletters.
7     What did you mean by that?
8  A  I provided them to human resources as part of the
9     documentation for this case.
10 Q  As part of the lawsuit?
11 A  Yes.  The newsletters in which newsletters I
12    addressed this specific topic.
13        (Discussion off the record)
14 Q  You were talking about that it was communicated
15    through some newsletters.  Any other methods of
16    communicating this in writing?
17 A  I've seen e-mails, and I don't know if they were
18    memos, depending on how far back we go, but I've
19    seen correspondence, electronic and hardcopy
20    correspondence from supervisors and managers to
21    the staff consistently over years addressing this
22    topic about our expectation of officers being
23    entitled to, and sergeants, hourly employees,
24    being entitled to a 30-minute, uninterrupted meal
25    break.  And if there's an emergent situation, if

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964a4d12

1    they have to come off of their lunch hour, that
2    they either need to be paid for the entire lunch
3    hour, or they can start it up and take a full
4    30-minute, interrupted lunch hour.  And that's if
5    they come off emergently, or even if they come
6    off, in my opinion, that wasn't necessary, but if
7    they do come off of work, they will be paid for
8    it.  Those are the things we try to monitor to
9    make sure that we're not impacting the officer's
10   ability to have that 30-minute lunch hour, and
11   that we're not unnecessarily wasting budgetary
12   dollars for people coming off when they shouldn't
13   be interrupted.  So there's a two-fold reason.  In
14   addition to the overall things, that it's policy
15   and law.
16   Q  How do they know whether they should or shouldn't
17      come off their break?
18   A  Well, there's some discretion.  Obviously, if
19      there's a condition, which was a fire situation,
20      we'd expect that they'd come off.  If there was a
21      patient valuable, and the patient was going to be
22      leaving and being discharged in the next half-hour
23      and they wanted their valuables returned to them
24      that we're holding, their ring, their watch, and
25      there was flexibility in that, then it wouldn't be

1       an emergent situation.  And if it was a disruptive
2       person, we consider that pretty much emergent.
3       Even if it was not normally an emergent situation,
4       that they could use discretion.  So if the only
5       officer there, a patient is waiting to be
6       discharged, my expectation is that they wouldn't
7       make a patient wait a half-hour, if we didn't get
8       notification ahead of time.  So my expectation
9       would be from a service standpoint is to go ahead
10      and come off your lunch hour, make that decision,
11      do the valuable return, go back to your lunch, and
12      again start over, or if you don't get a chance to,
13      then you get paid for it.  So there are some that
14      are pretty obvious, either way, there's some
15      discretion that they have.
16   Q  It would be pretty bad if a security officer
17      ignored a fire call, for example, during his or
18      her lunch period?
19   A  Yes.
20   Q  Why is that?
21   A  Because as I noted, in every one of our
22      emergency-type situations, fire being one of them,
23      our department has very specific responsibilities
24      in terms of ensuring the safety of patients,
25      employees, and visitors.  So for them not to

1       respond to that would be unacceptable.
2    Q  And respond fairly quickly, I'm assuming, as well?
3       I mean, if you responded 30 minutes later, that
4       would be bad?
5    A  Correct.
6            (Exhibit No. 3 marked for
7             identification)
8    Q  Mr. Cummings, I'm showing you what has been marked
9       as Exhibit 3 to today's deposition.  Have you seen
10      this document before?
11   A  Yes.
12   Q  What is this?
13   A  This is the security officer job description.
14   Q  And it has -- this document has a date on it of
15      May 1992 in the top right spot; do you see that?
16   A  Yes.
17   Q  Is this the current security officer description?
18   A  Well, if you notice two lines below that, it says
19      revised January 2007.  I believe this is the most
20      current one at this time, even though I'm in the
21      process of revising it right now.
22   Q  It says revised by Chris Miezin.  Who is
23      Chris Miezin?
24   A  She works in the compensation department.  She's
25      the compensation specialist that is assigned to my

1       department for developing and/or modifying our job
2       descriptions.
3    Q  And then there's a label below that or an item
4       below that that says DOC# 6074-var.doc; do you see
5       that?
6    A  Yes.
7    Q  What is that?
8    A  I'm not sure.  I know that 6074 is the sergeant
9       job description.  I'm not sure what the indication
10      of the var.doc means.  Unless they're saying it's
11      a variation of that document because it's very
12      similar in nature.
13   Q  Do you know how this particular identifying
14      document number was attached to this document?
15   A  Which identifying number?
16   Q  The 6074-var.doc.
17   A  I don't.
18   Q  Does Aurora have a document management software
19      that it uses that might attach a document number
20      like this, or is this assigned?
21   A  I don't know.  I'm not sure how they do that in
22      the compensation department.
23   Q  When you put together documents for your
24      department, are they assigned document numbers?
25   A  It depends.  I create lots of different documents.

Electronically signed by Brande A. Browne (101-025-478-3970)                                     b11bccc0-d5da-478f-9098-4698964a4d12

1     So some of them have numbers, some of them don't.
2     Some of them are assigned by -- if it's creating a
3     Word document, I'll label it something.  If it's
4     items or an ACT track thing, it's assigned a
5     specific number, case number, if you will, under
6     the item system.  So there's lots of ways,
7     depending on the document in terms of how
8     documents become identified or named.
9  Q  Does your department use any kind of a document
10    management software?
11 A  Not other than the IRMS and ACT track that we've
12    talked about.
13 Q  In general, you save the Word document to an
14    Aurora server?
15 A  Correct.
16 Q  And when that's done, that doesn't attach a
17    document number to it other than the name that
18    you've named that document?
19 A  As far as I know, yes.  Unless there's something
20    behind the scenes that I'm not aware of.
21 Q  Exhibit No. 3 here, this describes the purpose,
22    relationship, functions, know-how, and mental and
23    physical requirements of a security officer?
24 A  Correct.
25 Q  Are there any other documents that would provide a

1     description of the job duties of an Aurora
2     security officer other than this document?
3  A  Those that would be captured, I guess, in all the
4     many documents that we kind of referred to
5     previously here today, like the training documents
6     and the procedural documents that are at the site,
7     within the department.  Those all kind of make up
8     the body of the specifics of what an officer does
9     and how they do it, and this is kind of the
10    overview of the essential functions in a more
11    global manner.
12 Q  And these are the essential functions for all
13    Aurora security officers?
14 A  Correct.
15 Q  Are Aurora security officers issued any equipment
16    as part of their job?
17 A  Yes, they are.
18 Q  What equipment are they issued?
19 A  I'll break it up into two different types.  The
20    first type we call -- under the uniform policy, we
21    have a uniform policy, okay, so under there,
22    they'll talk about two different types of
23    equipment.  We'll give them things like coats,
24    duty belts, hats, apparel that is -- although it's
25    apparel, we don't consider that uniform.  Uniform

1     is just slacks, shirt, tie.  So one category of
2     equipment that we issue to each officer are things
3     like that, the coats.  Things that they
4     specifically wear, they don't share.  Then there's
5     other equipment they're issued after they go
6     through the commensurate training.  Through MOEB
7     and DAAT, once they're certified, they will be
8     issued handcuffs, batons, and pepper spray.  They
9     also are issued other leather accessories.
10        They're issued equipment on a day-to-day
11    basis as they do their jobs.  As they come in,
12    they pick up a radio, a pager, communication
13    things.  They may pick up a flashlight if they
14    need it.  There's equipment that is issued just
15    for their shift.  There's equipment that are
16    issued to them that they use exclusively, and then
17    there's equipment that are issued to them after
18    they go through specific training.  Generally,
19    those are kind of the categories of equipment.
20 Q  I appreciate you breaking that into categories.
21    That's helpful.  So when we're talking about the
22    uniforms that are issued for Aurora security
23    officers, is every officer wearing basically the
24    same uniform?
25 A  They are.

1  Q  Why do you do that?
2  A  Couple of reasons.  One is that we want to have a
3     consistent look.  We've chosen a uniform that we
4     feel provides a good image, and we want to make
5     sure that from site to site we are readily
6     identifiable by individuals who may need our
7     services, whether it's something as simple as a
8     way finding, or something more complex as an
9     emergent situation.  We also want to have
10    consistent uniform because we cross-train our
11    officers between sites from time to time, and we
12    don't want to confuse the people.  So wherever
13    they work, we want them to look the same.
14 Q  What kind of cross-training do you do?
15 A  It would be the basic training to the
16    site-specific things, depending on geography.  So
17    to get maximum use of the officers, especially
18    part-time officers, who may geographically live
19    halfway between Burlington and Lakeland, we'll
20    cross-train them so that they can pick up extra
21    hours.  We can have greater flexibility in our
22    scheduling.  So all of the officers with the basic
23    training, the policies that are consistent and
24    uniform, they'll be cross-trained for individual,
25    specific things that happen at a given site.  Some

Electronically signed by Brande A. Browne (101-025-478-3970)                    b11bccc0-d5da-478f-9098-4698964a4d12

1        officers will be cross-trained at numerous sites.
2        Some will only have their base and not be
3        cross-trained anywhere else.
4     Q   The cross-training we were just talking about,
5        that's done on a site-to-site basis by a
6        supervisor to bring the officer up to speed as to
7        the specific policies of that site?
8     A   Sure.  Supervisors and sergeants would have a role
9        in that because oftentimes the officer already has
10       a basic understanding of the overall policy.  So
11       it's a matter of understanding on this shift,
12       that's when we door openings.  Here are some
13       specific things like we talked about before that
14       we do, medical records runs, anything that might
15       be unique to learning the facility as well as
16       learning the physical layout of the facility.
17    Q   You had talked about communication devices that
18       were issued to an officer.  From what you were
19       saying, it sounded like you were saying those were
20       issued when they show up for their shift on site.
21       It's not something they take home with them.
22    A   Correct.
23    Q   And I think you had said pagers, walkie-talkies,
24       any other communication devices?
25    A   Those are primarily the two that we would use.

1     Q   And does --
2     A   There are a couple sites, I'm sorry, that have had
3        cell phones because of the size of the facility
4        and the fact that the officer works alone, and
5        they're out in the Hinterland, and they're afraid
6        that they might not get a radio call or whatever.
7        So a couple of our sites have assigned cell phones
8        too, that's departmental, that they would use only
9        when they're on site.
10    Q   Those are not personal cell phones?
11    A   Correct.
12    Q   How are the officers issued the pagers,
13       walkie-talkies, or in some cases cell phones?
14    A   When they came on duty, they would pick up
15       whatever device or devices that they're site has
16       deemed they need to have with them to be able to
17       receive calls for that particular shift.
18    Q   Is there a form they fill out for checking them
19       out or anything like that?
20    A   Oftentimes, that would be reflected on the
21       activity blotter that we talked about earlier.
22    Q   And is the officer required to carry whatever
23       communication device at all times?
24    A   That would be my expectation.  They would have
25       whatever their site deemed was appropriate for

1        them to have.  They would have it with them for
2        the entire shift.
3     Q   And that includes, of course, the meal break
4        period as well?
5     A   Correct.
6     Q   Are the officers trained on how to use these
7        communication devices?
8     A   Yes, they are.
9     Q   And who does that training?
10    A   Again, that would be the supervisor or the
11       sergeant, depending on the level of complexity of
12       training needed.
13    Q   Are there written policies in terms of the
14       communication device?
15    A   Not that I can think.  There's not a specific
16       policy that says communication devices.  The radio
17       are captured in the equipment policy, I believe,
18       uniform/equipment policy which we talk about that
19       those are tools that they use.  They are trained
20       to a degree in that IAHSS class that I indicated
21       that has a chapter on communication, I believe,
22       and radio use, the etiquette of radio use, the
23       importance of radio use, the importance of
24       maintaining contact for security officers covered
25       in that document.

1     Q   I'm sorry, what document?
2     A   The IAHSS training manual that we have all
3        officers go through.
4     Q   And that manual, does Aurora have a copy of that
5        manual, or do you have access to a copy of that
6        manual?
7     A   Sure.  Those are distributed to all the sites.
8        When new officers come on, they may need to study
9        for it.  They can study.  We also have a couple
10       backup copies in our office.
11    Q   And just bear with me, I'm sorry.  That's the
12       manual that is used for the test that you talked
13       about that they take on the computer?
14    A   Yes.
15    Q   Do you have access to a copy of that test?
16    A   No.  We don't have copies.  Even when it was a
17       paper test, either myself or another senior member
18       of IAHSS, if you had that level of membership,
19       would proctor the paper test, but with the
20       understanding that you couldn't copy or maintain
21       any questions, to maintain the integrity of the
22       test.  So there are no copies of the test outside
23       of IAHSS.
24    Q   The third type of equipment that you talked about
25       is equipment that's issued after an officer is

26  (Pages 98 to 101)

Electronically signed by Brande A. Browne (101-025-478-3970)                                    b11bccc0-d5da-478f-9098-4698964a4d12

1   certified or qualified to carry that type of
2   equipment, correct?
3   A   Correct.
4   Q   And how does Aurora determine when an officer is
5   qualified to carry that type of equipment?
6   A   One of the three trainers that I named earlier
7   will put officers through the training for that
8   two-day class of management of aggressive behavior
9   and DAAT, defense and arrest tactics.  At the end
10  of that class, they test the proficiency of
11  whether or not they feel these officers understand
12  both how to use it and the rules of use of force,
13  and if they feel comfortable, they will certify,
14  and then they will be given that equipment.
15  Q   You talked about handcuffs, and what other
16  equipment?
17  A   Pepper spray, OC spray, and baton, a collapsible
18  baton.
19  Q   Is the baton and the pepper spray basically the
20  two strongest pieces of equipment in terms of the
21  force of the officers?  Terrible way to ask it,
22  but do you know what I mean?
23  A   Yes.  In terms of the lethality, you know, yes,
24  those are the more serious -- more serious pieces
25  of equipment they carry.

1   Q   Officers aren't allowed to carry firearms in any
2   way, are they?
3   A   No, they are not.
4   Q   Is that a policy?
5   A   Yes, it's covered in -- not so much.  It is
6   covered in our department policy.  It's also
7   covered by the Aurora policy about no guns in the
8   workplace.
9   Q   Going back to the communication devices, what type
10  of information is communicated over those devices?
11  A   Well, for the radio, it's generally a two-way type
12  of communication.  It would be either the dispatch
13  center, another officer radio to radio at sites
14  where you have multiple officers working
15  simultaneously, or it could be the switchboard.
16  So that's a realtime, two-way conversation.
17  Obviously, cell phones, our cell phones, they
18  would be able to receive or send a call, make a
19  call.  And pagers are pretty static, where they
20  would need to receive a page either numeric, to
21  call a number, or possibly the pager set up for a
22  text message.
23  Q   And what kind of information is the officer
24  getting over the communication device?
25  A   Could be any type.  Could be a request to take an

1   assignment, could be informational, could be
2   information.  Could be specific to that officer,
3   requesting that you do a valuable return to
4   Room 104, or it could be something generic that
5   goes out to multiple officers, or even to a single
6   officer such as we have a report of a lost child,
7   here's the description, keep your eye out for
8   them.  All they would need to do is acknowledge
9   that.
10  Q   Are the communication devices the main way in
11  which the security officers understand their tasks
12  for the particular workday?
13  A   I wouldn't say the overall tasks, but there are
14  specific assignment in a given moment.  So their
15  overall tasks are -- they may get more
16  information.  There may be a specific task that
17  they're asked to do during the briefing, for
18  example.  So during the briefing when they come
19  in, somebody may say we have a priority task to do
20  extra parking lot patrols or whatever.  So they
21  could get that in that format, or they could get
22  it in realtime as something that happened.
23  Q   So a typical day in the life of a security
24  officer, he or she shows up for their shift, they
25  get a briefing on things that are going on in the

1   facilities, and then they also get certain
2   assignments over the communication devices that
3   they're expected to respond to?
4   A   Correct.
5   Q   In addition to any sort of ongoing general job
6   duties that they might have?
7   A   Right.  Some officers have specific assignments
8   that they work on.  Some are responsible for
9   checking fire extinguishers.  So they may have
10  specific tasks that they work on in the course of
11  the day that is somewhat self-directed.
12  Q   And the security officer basically couldn't do
13  their job without the briefing at the start of the
14  shift so that they would know circumstances that
15  were going on that day?
16  A   I wouldn't say they couldn't do their job.  I
17  don't know if they would be effective if they
18  weren't getting the information they were provided
19  at the beginning of their shift.
20  Q   And they couldn't do their job without the
21  communication devices to find out what's urgent
22  and what's going on at the facility?
23  A   Again, I would think not that they couldn't do
24  their job, but they couldn't do it very
25  efficiently if they weren't able to be

Electronically signed by Brande A. Browne (101-025-478-3970)                                    b11bccc0-d5da-478f-9098-4698964a4d12

Page 106

1    communicated to in realtime assignments, yes.
2  Q  Right.  It would be very inefficient if you had to
3    sort of pass through word of mouth that there was
4    a fire and that had to get to the security officer
5    without some sort of electronic communication
6    device?
7  A  Yes, with the exception some of our code
8    situations would go overhead announcement, but
9    that's presuming the officer was in a position to
10   hear them.
11 Q  The communication that is going over these
12   devices, who is receiving that information?
13   Obviously the officer that has the device.  Is
14   anybody else receiving it?
15 A  If there are multiple officers on, they're each
16   carrying a radio.  They'll all hear the same
17   transmission.  So for example, at Sinai and Luke's
18   and to a lesser degree, West Allis, where we have
19   multiple officers working, the dispatcher can put
20   out a message to a specific officer giving him or
21   her an assignment would be heard by other officers
22   carrying that radio so that they're not dedicated
23   to one officer, or it could be a group
24   notification such as a lost child.  They'd all
25   hear simultaneously.

Page 107

1  Q  And other than the officers, whether it's the one
2    officer on duty or if there's two officers on
3    duty, would anyone else receive that message?
4  A  Only ancillary if they happened to be to the
5    vicinity where the radio went off and they heard
6    it, but not by intent.
7  Q  Are you, in your capacity, are you listening to
8    all messages at all facilities?
9  A  I hear no messages.  I don't have a radio that
10   gives me that level of detail.
11 Q  One of the purposes for the officers carrying
12   these communication devices is to be able to, I
13   think you said, efficiently respond to situations;
14   is that fair?
15 A  Yes, its.
16 Q  Monitoring the communication over these devices is
17   a necessary function of the security officer's
18   job, correct?
19 A  Can you repeat that?
20 Q  The security officer monitoring the communication
21   device, that's a necessary function of his or her
22   job, right?
23 A  When not on lunch.  Unless it's an emergent call,
24   so I will qualify that.
25 Q  But they would to monitor it in order to know

Page 108

1    whether it was an emergent call, correct?
2  A  They'd have to monitor it if it wasn't a static
3    device like a cell phone or a pager.  Otherwise,
4    they shouldn't be getting it, but yes.  More often
5    than not, the officer is carrying a radio, so he
6    would need to monitor it or be able to hear it.
7  Q  But they'd also have to monitor a pager as well as
8    to make sure that he or she wasn't receiving a
9    page?
10 A  Yes, right.  They'd need to be able to hear it.
11   So the volume would have to be on, that sort of
12   thing, yes.
13 Q  And being able to respond to emergency situations
14   is also a necessary function of the Aurora
15   security officer's job, correct?
16 A  Absolutely.
17 Q  Is there ever a point in a Aurora security
18   officer's shift where he or she would be allowed
19   to be out of communication?
20 A  Would you define out of communication?  Being able
21   to hear?
22 Q  That's a good way to say it.  I would also say
23   where there would be no way for anyone in Aurora
24   to communicate with that officer?
25 A  The expectation is that if they're -- the only

Page 109

1    time that would we're talking about is if they're
2    on their lunch hour, they would need to be able to
3    monitor a call.  So other than that, there's not a
4    time limit.
5  Q  And the officer would be expected to react to the
6    call, an emergency call, even if he or she were on
7    a meal break?
8  A  Correct.
9  Q  Failing to do so could result in discipline,
10   correct?
11 A  It could.
12 Q  And I think I had asked this, but they're expected
13   to react immediately to an emergency call, even if
14   on a meal break?
15 A  Yes.  If it's a true emergency, yes, definitely.
16      (Recess taken)
17 Q  Continuing the deposition of Mr. Cummings here.
18   Mr. Cummings, this morning, you had mentioned flip
19   charts.  What are flip charts?
20 A  They're documents that are posted around all of
21   the medical centers that have basic emergency
22   response protocols for any caregiver that's in the
23   hospital.  If they're color-coded, right now we
24   use color-code systems, so red is fire, and yellow
25   is bomb threat.  So flip charts are those kinds of

Electronically signed by Brande A. Browne (101-025-478-3970)   b11bccc0-d5da-478f-9098-4698964a4d12

Page 110

1    things that, I think I used those in terms of
2    these are the emergent-type situations that one
3    would expect a security officer to have as a
4    priority call.
5  Q  And you've used the word or the term caregiver,
6    and I've seen that on some of documents.  What is
7    a caregiver?
8  A  It's basically our term for employee.
9  Q  So any employee of Aurora is a caregiver?
10 A  Correct.
11 Q  And are the flip charts specifically for the
12    security officers, or are they for all employees?
13 A  They're for all employees.  That's the general
14    response that explains what it is, and what basic
15    precautions or response people need to take and
16    then each department that has a designated role in
17    responding to those situations, and I guess
18    further training on those specifics.
19 Q  Are the flip charts, are they specific to the
20    facilities themselves, or are they more of a
21    general?
22 A  They're fairly general, except they will be
23    modified if one of the conditions that's covered
24    isn't applicable.  For example, we have a
25    condition pink, which is a theft of an infant.  So

Page 111

1    if we have medical centers that don't have an
2    infant or a newborn area, then that would be
3    immaterial.
4  Q  So certain things are omitted if they don't apply?
5  A  Correct.
6  Q  I think I might have heard you say the security
7    officers are trained on these flip charts?
8  A  Correct.
9  Q  Who does that training?
10 A  Again, that would be part of the supervisory
11    responsible training to make sure that they
12    individually know what their role is in each of
13    those conditions.
14        (Exhibit Nos. 4 through 5W marked for
15          identification)
16 Q  I am going to show you what has been marked as
17    Exhibit 4.  These are the documents starting with
18    bates stamp AUR-JB and then the number 77621.  You
19    had looked at these previously?
20 A  Okay.
21 Q  You've had a chance to take a look at these
22    documents?
23 A  Yes.
24 Q  I'll tell you what I did here.  This is an excerpt
25    from what we called ACT tracks that I received as

Page 112

1    part of the production in this case.  These are
2    some of the ACT tracks from 2007, and I think
3    what we're looking at here is roughly the
4    first 10 pages or so of a report that started on
5    October 7th, 2007.
6  A  Okay.
7  Q  What I want to know about this type of document is
8    basically what is this, where does it come from,
9    who creates it, and so on?  So do you know how
10    this document is created?
11 A  This is that electronic activity tracking.  This
12    is the paper printout.  They had electronic
13    activity tracking software that we use.  So this
14    would reflect individual calls that a specific
15    officer was assigned to.  It indicates the start
16    time that they did it, that they received the
17    call, when they arrived, when they completed it,
18    and the total number of minutes, and then officer
19    response time in minutes.  If it was not an
20    immediate, then there would be a number there.  If
21    they immediately acknowledged and went on the
22    call, there was a zero.  And this is, again,
23    electronically captured at each site, and then we
24    are able to use this for a number of reasons,
25    including to see where we're spending our time,

Page 113

1    how much -- being able to quantify, for example,
2    how much time do we spend of officer time, opening
3    doors for people, or doing valuable handling so we
4    can kind of get an idea of the value of the
5    services we perform, where we're spending the most
6    time from a productivity standpoint.
7  Q  A managerial tool for you to use to make sure that
8    things are being done efficiently?
9  A  Yeah, efficiently, and just so we can see where
10    we're spending our time.  Efficiency would be is
11    if we had a number of times where we were seeing
12    the terrible responses because people were waiting
13    long periods of time.  So from that perspective,
14    efficiency, yes.
15 Q  You had said these are the reports that we had
16    talked about earlier.  Are these a reflection of
17    those IRMS reports?
18 A  No, these are just the activity.  IRMS is the
19    actual case report that an officer would write if
20    they were doing a follow-up to a specific event.
21    These are routine matters like a door opening or a
22    patient valuable.
23 Q  How is the information being entered into the
24    system in terms of a door opening?  How does that
25    get into this report?

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392
Case 2:10-cv-00714-JPS  Filed 01/18/11  Page 30 of 74  Document 35-1

Electronically signed by Brande A. Browne (101-025-478-3970)                                      b11bccc0-d5da-478f-9098-4698964a4d12

1 A At the site, the dispatcher would enter in that he
2 dispatched Officer Smith for a door opening at
3 15:20. Here it's Officer Botticelli. He arrived
4 at 15:20, which means he got it right away. That
5 took him until 15:34 to complete that, and that
6 would be entered into the computer that's provided
7 to the officers as one of the software tools.
8 Q And that's being done by the dispatcher, you said?
9 A It could be the dispatcher. At the sites where
10 the officers work by themselves, they could keep
11 track of it in a blotter or a notebook, and then
12 come back and data enter it as the time permitted
13 throughout the shift or at the end of the shift.
14 Q And this system, it's an Aurora system-wide system
15 that keeps track of that; is that right?
16 A Correct.
17 Q And the software that's being used by the
18 dispatcher or the security officer, whoever it may
19 be, it's the same type of software that they're
20 using to enter this information?
21 A Correct.
22 Q Are the officers trained on how to do that?
23 A Yes, they are.
24 Q By who?
25 A Primarily -- well, the supervisor has the primary

1 responsibility, but oftentimes it would be the
2 sergeant or even another officer would show
3 another officer how to use the software.
4 Q Would an officer put down a lunch break in this
5 particular computer system?
6 A No, because it wasn't an activity they were
7 assigned to do.
8 Q Those are all the questions I have for you on
9 Exhibit 4. I'm going to show you what has been
10 marked as Exhibit 5, which has many sub parts.
11 I think it goes from 5, 5A, and then the last one
12 is 5W. I'm just going to show you this document.
13     MR. SCULLEN: I marked the first
14 one as 5A, of course.
15     MR. PARSONS: I'm sorry, Sean.
16     (Discussion off the record.)
17 Q Going back on the record. Mr. Cummings, in front
18 of you I have what has been marked as Exhibit 5
19 and then Exhibit 5A through 5W. Can you tell me
20 what these documents are, in general?
21 A Sure. In general, these are daily activity
22 blotters for random dates for a number of our
23 different sites that are used by the loss
24 prevention staff to track activity.
25 Q And just so I understand the relationship between

1 Exhibit 5 and Exhibit 4, everything that's in
2 Exhibit 5 -- I'm sorry. Everything that's in
3 Exhibit 4 should in some way be on Exhibit 5 as
4 well; is that correct?
5 A That would be my expectation.
6 Q But not everything that's on Exhibit 5 would make
7 it's way into Exhibit 4?
8 A Correct.
9 Q What are some of the extra items that are listed
10 on Exhibit 5 that are not in Exhibit 4?
11 A Well, some of them, like on the very first one,
12 Exhibit 5, it has the valuables, some specifics in
13 the valuables audits, which valuables envelopes
14 were there, and that they were still there at the
15 beginning of the shift. The money in the cash
16 envelopes were confirmed. There's more detail
17 here, which officers are working on that shift,
18 and what radio and key number that they were given
19 for that shift. That is not activity. That is
20 more informational, so that wouldn't be on there.
21 Without going through every single line item, the
22 only things that I would think that wouldn't be on
23 here is if it wasn't necessarily an assignment,
24 but maybe something more informational than an
25 assignment.

1 Q Is that what these blotters are used for is
2 information?
3 A Well, it's a combination. It's for the
4 information of -- we have a way of tracking back.
5 So for example, we know on first shift, on
6 Saturday, September 1st, which valuable envelopes
7 were there, who checked them in, and that they
8 were confirmed that we had all that property in
9 our possession and they were accounted for. So
10 that would be informational. Then the other pages
11 of it show the documentation of what actually ends
12 up in the ACT track, which are officer
13 assignments.
14 Q So just, you know, as a big picture issue, the ACT
15 track is showing officer assignments, and that's
16 Exhibit 4, and then Exhibit 5, which is the
17 blotters, is showing assignments, but then also
18 informational pieces that are not assignments,
19 such as what money is there in the security
20 envelopes and things like that?
21 A That would be accurate.
22 Q And who is reviewing these blotter reports?
23 A The sergeant or supervisor could review them, or
24 if they've assigned an officer to make sure that
25 everything from these are in the ACT track report,

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964a4d12

1    that officer might review them.  So it could be a
2    number of people that would review these.  I would
3    very rarely review these routine documents unless
4    it was a specific issue I'd have to look at, like
5    a theft or a missing patient valuable.
6  Q  You would be more likely to review the ACT track
7    reports in Exhibit 4 because those are more
8    managerial reports?
9  A  That would be accurate.
10 Q  And is there any information on these daily
11   blotters about lunch breaks that officers would
12   take?
13 A  My expectation would be that they would put that
14   in the daily blotter if somebody went to lunch,
15   but that wouldn't be an assignment.  So that
16   wouldn't necessarily be in the ACT track.
17 Q  If you took a minute, could you find me an
18   example of where there's a note about a lunch in
19   Exhibit 5?
20        (Discussion off the record)
21 A  For example, the second page of Exhibit 5 --
22 Q  That has a bate stamp number of 77352 at the
23   bottom?
24 A  Correct.  The first two indications up there where
25   it says officer number 706 and officer 113 were at

1    lunch at a specific time.
2  Q  Thank you.  Just to clarify a conversation that we
3    had off the record, in general terms, what these
4    items are are the first and last pages of the
5    various activity logs that were produced as part
6    of the case, and those are stapled together first
7    and last.  And so for example, Exhibit 5A is an
8    activity log that we put together from the
9    documents produced starting with bates stamp
10   number 71007 and going all the way to 75447.  So
11   these are not full copies of the activity logs,
12   but rather excerpts of various documents.
13       What it appears to me, in reviewing these
14   documents, is it appears that the same basic
15   information from various facilities is captured on
16   these reports, but each facility might have a
17   different style of the report.  Does that make
18   sense?
19 A  It does, and that's probably accurate.  Each of
20   them can develop an activity log that works for
21   them in terms of how much additional information
22   they're trying to capture and what makes sense for
23   them in terms of managing the data.
24 Q  But the general idea is that all the security
25   officers in Aurora in some way or another fill out

1    an activity log during their shift?
2  A  Correct.  An activity log is filled out for each
3    shift.  It could be done by one officer or it
4    could be done by combination of officers to
5    accomplish that.
6  Q  Or a dispatcher?
7  A  Or a dispatcher.
8  Q  I think you said this, but let me just make sure.
9    Is it your expectation that every time an officer
10   would take a lunch, that that would be recorded on
11   these daily activity blotters?
12 A  My expectation would be because it would be good
13   to note, you know, for it to be documented.  If in
14   the case where an officer is working all by
15   themselves for the shift, if they didn't put it
16   in, I guess it wouldn't be as crucial only because
17   it's not telling somebody else that they're not
18   available then.  However they handled that, by
19   calling the switchboard or whatever, might not be
20   as important.  That could be then captured in the
21   Kronos if they didn't have a lunch.  Otherwise, it
22   would be presumed that they would have had a
23   lunch.
24 Q  That's all the questions that I have for you for
25   Exhibit 5.

1        (Exhibit No. 6 marked for
2              identification)
3  Q  Mr. Cummings, I'm showing you what has been marked
4    as Exhibit 6.  Do you know what this document is?
5  A  Yes.
6  Q  What is it?
7  A  It's a paper copy of the employee handbook, dated
8    June 29th, 2009.
9  Q  Is this the most current version of that document?
10 A  To the best of my knowledge, it is, yes.
11 Q  Is this an employee handbook for just security
12   officers, or is this for all Aurora caregivers or
13   something else?
14 A  Well, the handbook is for all caregivers, but I
15   notice that part of the pages in the back is the
16   policy manual specific for my department.  So
17   there's a combination of documents here.
18 Q  Can you help me break this up then?
19 A  Sure.  It appears that up to the number on the
20   bottom right up to 000072 is the employee
21   handbook, which is for all employees.  And the
22   document that starts 73 and beyond is either my
23   policy --
24 Q  Might be more than one.
25 A  Yeah, more department-related policies and

Electronically signed by Brande A. Browne (101-025-478-3970)

1  procedures, yes.
2  Q  So am I correct then that starting with 73 at the
3     bottom and going all the way to 170, those are all
4     policies specific to the security officer
5     department?
6  A  Policies or procedures, yes.
7        (Discussion off the record)
8        (Exhibit No. 7 marked for
9         identification)
10 Q  So Exhibit 6 is the employee handbook for all
11    Aurora caregivers; is that correct?
12 A  Correct.
13 Q  And then Exhibit 7 is -- do you know what
14    Exhibit 7 is?
15 A  It is policies and procedures specific to my
16    department.
17 Q  Are the training materials that we talked about
18    earlier today, are those contained in Exhibit 7?
19 A  The training policy should be in there.
20        MR. SCULLEN:  Go to 83.
21 A  Yes, starting with 000083 is the training.
22 Q  Those are all the questions I have on those
23    documents for now.
24        (Exhibit No. 8 marked for
25         identification)

1  Q  Showing you what has been marked as Exhibit 8, do
2     you know what this document is?
3  A  Yes.
4  Q  What is it?
5  A  It's the Aurora policy on nonexempt and exempt
6     employees.
7  Q  Is this policy part of Exhibit 6 or Exhibit 7?
8  A  I don't believe it's part of either of those.
9     It's a policy that's Aurora-wide, not specific to
10    my department.  So it wouldn't be in 7, and it's
11    supportive of 6 as part of the employee handbook,
12    but it's not part of the employee handbook.
13 Q  Do you know where this document comes from?  It's
14    labeled policy number 176, so I'm assuming there's
15    at least 176 policies somewhere?
16 A  Yes.
17 Q  Where is that?
18 A  Well, there's a full Aurora administrative policy
19    manual that covers at least 176 different topics,
20    and it's available electronically, and many
21    departments probably have printed copies as well.
22 Q  So there's the employee handbook, there's the
23    specific security officer policies and procedures,
24    and then there's an Aurora policy manual; there's
25    at least those three different documents?

1  A  That's correct.
2  Q  I'm noting, if you turn to the second page of
3     Exhibit 8, which is bates stamped 77359, item
4     number 5 says meal periods must be at least 30
5     minutes in length; do you see that?
6  A  Yes.
7  Q  This appears to be a meal period policy,
8     and there's meal period policies elsewhere in
9     Exhibits 6 and 7, I believe.  Can you sort of
10    explain to me which one of these policies was in
11    effect, or is there a single policy?
12 A  It's the same policy -- it's the same guidelines
13    or expectations, it's just in several places.
14    Maybe for emphasis I know I put it in our policy
15    to make sure that officers get it as part of our
16    policy, but our policy would be subservient to the
17    Aurora policy.  They are not different.  They're
18    just reiterative.
19 Q  That was my question.  If they were different, the
20    one that would govern is the official Aurora
21    policy; is that right?
22 A  That's correct.
23 Q  That's all I have for you on 8.
24        (Exhibit No. 9 marked for
25         identification)

1  Q  Then showing you what has been marked as
2     Exhibit 9; do you know what this is?
3  A  It's a policy from the same manual titled payroll
4     policy, number 77.
5  Q  And again, this is part of the Aurora
6     administrative manual or policy manual?
7  A  Correct.
8  Q  That's all I had on that.
9        (Exhibit No. 10 marked for
10        identification)
11 Q  Showing you what has been marked as Exhibit 10, do
12    you know what this is?
13 A  This looks like the table of contents for our
14    system policy manual, which is clinical and
15    administrative.
16 Q  If I understand things correctly then, Exhibits 8
17    and 9 would both be a part of the full document
18    that Exhibit 10 is the table of contents for?
19 A  Yes.
20        (Exhibit No. 11 marked for
21         identification)
22 Q  Showing you what has been marked as Exhibit 11, do
23    you know what this is?  I'm sorry, this may be
24    more than one document as well.  I'm not sure.
25 A  It seems to be.  It's a combination of one looks

Electronically signed by Brande A. Browne (101-025-478-3970)

b11bccc0-d5da-478f-9098-4698964a4d12

1    like a page from the policy manual -- not the
2    policy manual, employee handbook on rest and meal
3    periods.  And then I think some of these are the
4    copies of the same or similar documents to those
5    in -- there's a couple documents here that look
6    like they were part of the packet that I've
7    already seen that were my department's policies.
8    And then I see a document in here that I don't
9    recall, may or may not have been in that, which is
10   a new officer checklist, which would be used for
11   training, or to make sure officers are trained in
12   all these different, various tasks.
13   Q  Where do all these documents -- who authored all
14      these various documents; if you know?
15   A  Combination of people.  Some of these -- the
16      handbook is handled through human resources.  Some
17      of these documents were authored by me.  Others
18      were authored by site or regional leadership that
19      just support procedurally how they handle these
20      things.  So for example, the last one starting
21      46659 is the -- I'm not sure I can determine just
22      by looking at which site authored the specific way
23      for tracking the tasks that the officers were
24      being trained on because it doesn't have a header
25      on it.

1    Q  Ultimately, there's a number of meal period
2       policies that are contained in here.  Are these
3       all subservient to the policy contained in the
4       Aurora policy manual?
5    A  Yes, and just a distinction, I see a procedure,
6       not necessarily a policy, which is slightly
7       different.
8    Q  What's the distinction in your mind?
9    A  The distinction is policy is more kind of a thou
10      shalt, and a procedure is more of how you
11      accomplish it.
12   Q  Thank you.  Let's talk about Kronos.  What is
13      Kronos?
14   A  Kronos is our automated time and attendance
15      system.
16   Q  And who uses Kronos at Aurora?
17   A  To some degree, all caregivers could use Kronos.
18   Q  Can you walk me through how Kronos works?
19   A  I'm not a subject matter expert on payroll
20      systems, but from a layman's standpoint, it's for
21      hourly employees.  It allows their ID badge to be
22      used for swiping when they arrive and when they
23      leave, and when they start and stop working on a
24      specific time, so that they can automatically have
25      their hours calculated for pay.  And Kronos is

1    also used by exempt employees through either an
2    editing function through the software or a
3    phone-in option to account for when they're going
4    to be taking paid time off or vacation time off.
5    Q  So you would use Kronos for those functions?
6    A  I would.
7    Q  In terms of the security officers, you said they
8       swipe in with a photo ID; is that right?
9    A  Yes.  We have an ID card that has a photo ID.  It
10      acts as Kronos card, access card, as well as, in
11      some sites, a debit card.
12   Q  The photo IDs that are issued, are those the same
13      IDs issued system-wide?
14   A  Yes.
15   Q  When is an officer issued his or her photo ID?
16   A  Usually on the very first day of hire, the
17      starting date.  Not the starting date, but when
18      they start, the very first day.
19   Q  According to policies and procedures, when do they
20      swipe into the Kronos machine?
21   A  When they start their shift or when they end their
22      shift or if they leave during their shift where
23      it's not paid time.  If they're leaving the
24      building.
25   Q  When are security officers instructed that they

1    have started their shift?
2    A  They start getting paid from when they Kronos it,
3       when they swipe in.
4    Q  I understand that.  What I'm asking is when are
5       they supposed to do that?
6    A  I believe there's a set number of minutes they
7       shouldn't be swiping in.  They should swipe as
8       close as possible to their scheduled start time,
9       but they're probably given a minute or two leeway.
10   Q  Are there any activities that the officers are
11      supposed to do before they swipe in?
12   A  No.
13   Q  So the first thing they do when they get to the
14      building is swipe in?
15   A  Correct.
16   Q  And that's the last thing they do when they leave
17      at the end of their shift?
18   A  Correct.
19   Q  Are they instructed as to how to do that?
20   A  Yes.
21   Q  And how is that done?
22   A  I believe that's covered, to some degree, in new
23      employee orientation.  Plus, if they have any
24      questions, their supervisor or sergeant or even
25      another officer could direct them.  It's pretty

Electronically signed by Brande A. Browne (101-025-478-3970)                    b11bccc0-d5da-478f-9098-4698964a4d12

Page 130

1      simple.
2   Q   We've talked about new employee orientation a
3      couple of times.  Is that done just for security
4      officers?
5   A   No, it's done for all new hires.
6   Q   And Aurora uses one Kronos system for the entire
7      organization; is that right?
8   A   That's my understanding.  I think Aurora Advanced,
9      which is one of our newer affiliates, wasn't on it
10      initially.  I believe they're on it now.
11   Q   Have you ever seen a report generated by Kronos?
12   A   Not that I can recall.
13          (Discussion off the record)
14   Q   You had mentioned that if an employee leaves
15      during his or her shift, that they would swipe out
16      on the Kronos system; is that right?
17   A   That's the expectation, yes.
18   Q   And then swipe back in when they return to work?
19   A   Correct.
20   Q   Do you know if there is a report that would show
21      those ins and outs?
22   A   That would be part of the Kronos report system.
23   Q   And you haven't seen those reports, right?
24   A   Not that I can recall.
25   Q   As a part of your job in managing the security

Page 131

1      officers, how do you keep track as to how many
2      hours are being worked at the various facilities?
3   A   One of the tools that I can use is a label
4      distribution report.  I can pull up biweekly that
5      shows all the officers, how many hours they worked
6      in the last pay period, whether they were regular
7      hours, overtime hours, those sorts of things.  It
8      gives me an idea of how much overtime we're
9      running.  If it's over what we budgeted for, you
10      know, overtime is always a concern.
11   Q   Where does that report come from?
12   A   From the HRIS system, human resources information
13      system.  I'm not sure exactly where it resides.
14   Q   That's some sort of filtered data that's coming to
15      you that has been produced by another department?
16   A   Well, yeah, it has been, I guess, produced by
17      another department would be accurate based on the
18      information that goes through Kronos.  I'm not
19      sure whether it's payroll, to what degree payroll
20      owns it or human resources owns it.
21   Q   When it gets to you, does it show up
22      electronically?
23   A   Yes, I get it electronically.
24   Q   And when you look at it, is it an Excel
25      spreadsheet or is it a different form?

Page 132

1   A   It's just a report.  It's nothing that I can
2      manipulate or change.  It's just kind of a static
3      report that I can read.  For the two-week pay
4      period, by site, by job category, by officer or a
5      staff person, could be sergeant, on how many hours
6      they were paid for, what their overtime is for the
7      pay period, the date.  Those sorts of things help
8      me control the budget.
9   Q   So when you get it, it's macro, and it's not a
10      Word document, it's not an Excel spreadsheet.
11      What type of a document is it when you're looking
12      at it electronically?
13   A   It's kind of a spreadsheet, but I don't know that
14      it's Excel necessarily.
15   Q   It's certainly nothing that you have the ability
16      to change?
17   A   Correct.
18   Q   Do you have to login to a system in order to get
19      access to that report?
20   A   Yes.
21   Q   What system are you logging in to?
22   A   I'm logging in to the I-Connect and there's
23      various applications that managers can use, and
24      it's under web management reporting.  And there's
25      a number of different reports I can get, and

Page 133

1      that's one of them.
2   Q   Is one of the reports you can look at through the
3      I-Manage system a report that will tell you
4      whether employees were asking for credit back on
5      lunches that they worked through?
6   A   No.
7   Q   Is there such a report anywhere in the system?
8   A   Not to my knowledge.
9   Q   Is it your understanding that the Kronos system is
10      used for running payroll for security officers?
11   A   Yes.
12   Q   Do you know who programmed the Kronos system?
13   A   I don't.
14   Q   Is your understanding the same as mine, that for
15      every eight and a half hour shift that a security
16      officer works, that a half-hour meal break is
17      automatically deducted from their time?
18   A   I thought it was eight, but it could be eight and
19      a half, but there is an automatic deduction for
20      lunch period.  I know the policy says for after
21      six hours.
22   Q   And you don't know who programmed that into the
23      system?
24   A   I do not.
25   Q   The half-hour deduction is a uniform policy that

34 (Pages 130 to 133)

Electronically signed by Brande A. Browne (101-025-478-3970)                                        b11bccc0-d5da-478f-9098-4698964a4d12

Page 134

1     all Aurora security guards are subject to,
2     correct?
3   A  Could you repeat that?
4   Q  The automatic half-hour deduction, all the
5     security officers are subject to that?
6   A  Yeah.  Given the number of hours, correct.
7   Q  My understanding is you are not going to be
8     testifying about FLSA or State of Wisconsin wage
9     and hour compliance issues; is that right?
10  A  Correct.
11         (Exhibit No. 12 marked for
12          identification)
13  Q  I'm showing you what has been marked as
14     Exhibit 12.  Do you know what this is?
15  A  It looks like it's a Kronos Practices document,
16     outlining practices for caregivers that work out
17     of the Aurora Medical Center in Oshkosh.
18  Q  Is there a document that's similar to this for all
19     Aurora facilities?
20  A  I'm not aware either way.
21  Q  Do you know who created this document?
22  A  I don't.
23  Q  Do you have any idea who would know that?
24  A  Since it's for all caregivers, it would be
25     speculative, but I would imagine somebody in human

Page 135

1     resources might know who created it if they
2     didn't.
3   Q  And you know that this is from Oshkosh because it
4     says For AMCO Caregivers?  Is the O a designation
5     for Oshkosh?
6   A  Yes, it is.
7   Q  Thank you.  Do you know who has the ability to
8     make changes to the information collected by the
9     Kronos system?
10  A  You mean to edit individuals?  There are probably
11     a number.  I know people up your chain within your
12     department can make those changes.  So a
13     supervisor could change an officer's, a manager
14     can change those below, I could change those below
15     me.  Then obviously some in payroll could make an
16     adjustment.  Someone in -- some human resources
17     could make an adjustment.
18  Q  So an officer would not have the ability to make a
19     change to his own Kronos information without the
20     approval of at least a supervisor?  I'm sorry,
21     without at least approval of the sergeant?
22  A  You mean follow the policy or make changes after
23     the fact?
24  Q  Make changes after the fact.
25  A  I don't believe that an officer can go after the

Page 136

1     fact, like a day after, and make a change without
2     some sort of an approval process by one up or
3     higher.
4   Q  Let's talk about your understanding of the Aurora
5     meal break policy for security officers.  If
6     everything goes according to how it should on a
7     daily basis, how does an Aurora security officer
8     take a lunch break?
9   A  Could you repeat it?
10  Q  Just a lunch break, what do they do?
11  A  Well, depending if they're working alone,
12     obviously, there's self-directed decisions that
13     they have to make.  If they're working with a
14     number of officers -- for example, if you have a
15     sergeant that's working with a number of officers,
16     one of the sergeant's responsibilities would be to
17     either assign or coordinate a lunch hour so that
18     they're don't overlapped, everybody is not gone at
19     the same time.
20         Other than that, if there's just two officers
21     working to coordinate between the two officers,
22     usually, unless it's something significant that we
23     anticipate is going to happen, a supervisor,
24     somebody would say We don't want you taking any
25     lunch hours between this time and this time, we

Page 137

1     have something going on.  It would be pretty much
2     self-directed in terms of when it was a normal
3     lunch hour period and business -- or the calls
4     would allow for it.
5   Q  Sort of the flip side of that, on days when
6     officers aren't allowed to take a lunch break or
7     they're interrupted during their lunch break,
8     what's the policy for getting credit back for that
9     time?  Strike that, not the policy, but what's the
10     practical steps that they have to take to do that?
11  A  They could go in and Kronos that they had no
12     lunch.  They're supposed to advise their
13     leadership as to why to make sure that we're using
14     it appropriately, but if they get called off their
15     lunch and don't take it for whatever reason or if
16     they forgot to do that, it's an automatic
17     deduction, they could advise a sergeant,
18     supervisor, somebody that an adjustment needs to
19     be made because their lunch hour was interrupted,
20     and they forgot to go in and make the adjustment
21     in realtime.
22  Q  So if they make the adjustment in realtime, what
23     happens next?
24         MR. SCULLEN:  Object as to vague.
25  A  Yeah, that day or at the end of the pay period?

35 (Pages 134 to 137)

Electronically signed by Brande A. Browne (101-025-478-3970)                                              b11bccc0-d5da-478f-9098-4698964a4d12

Page 138

1   Q   Maybe I misunderstood your answer.  It sounded
2       like you were describing two different ways that
3       this could happen.  One would be in realtime, the
4       day they were interrupted, and one was some time
5       subsequent to that day; did I understand that?
6   A   Yeah.  If an officer is at their lunch and it gets
7       interrupted and they should alter it so that they
8       can start their lunch over or get paid if they
9       didn't take a lunch, they can do that themselves
10      on that day.  If they forgot to do it, then they
11      would need to advise their supervisor or somebody
12      to make that Kronos edit to say two days ago you
13      didn't get lunch because you got called off, and
14      you forgot to make the adjustment.
15  Q   If an officer is interrupted during their lunch,
16      later in the shift is unable to make up that time,
17      they can make a self-edit to the Kronos system?
18  A   That's my understanding, yes.
19  Q   Does anything else have to happen in order for
20      that to be approved?
21  A   Well, at the end of the pay period, the supervisor
22      somewhere above approves the Kronos to make sure
23      that these are accurate.  So yeah, there's an
24      approval process that happens after the fact, but
25      it's more approved to send a message to payroll,

Page 139

1       Yeah, this is all accurate, go ahead and pay it,
2       and that everybody signed it for the times they're
3       supposed to if they forgot to sign out their
4       Kronos for paid time off or vacation or something.
5       But from the standpoint of a lunch hour, if it's
6       after the fact, there's no real approval needed.
7       In fact, it's not ever canceled.  You didn't get a
8       lunch, you get paid for it.  So using the word
9       approval, I just wanted to distinguish between
10      approval of the fact that if an officer didn't get
11      lunch, they get paid for it, period, or if they
12      got interrupted and didn't get back to take a full
13      lunch hour.
14          So the other approval is just letting payroll
15      know that somebody has looked this all over, and
16      to the best of their ability and knowledge, this
17      looks accurate so they can close it out and pay
18      everybody.
19  Q   What types of things are the sergeants or
20      supervisors reviewing in terms of reviewing for
21      accuracy?
22  A   To make sure somebody didn't forget to swipe out
23      at the end of the day.  So otherwise, somebody
24      swiped in at 7:00, left kind of in a hurry,
25      forgot, never swiped out at 3:30, they'd need to

Page 140

1       get back to that officer and say What time did you
2       leave?  You never Kronos'd out, and then they can
3       edit adjustment because the officer can't go in
4       and do it after the fact themselves.
5   Q   What types of things are they reviewing in terms
6       of these canceled lunches?
7   A   Well, they would be looking to see if there was a
8       valid reason for it.  Not that they wouldn't still
9       get paid, but whether was it necessary from the
10      standpoint of, you know, that we want you to take
11      your lunch hour.  So are you necessarily getting
12      your lunch hour interrupted?  What are other
13      options?  Certainly from a cost control
14      standpoint, we don't want to be incurring
15      additional cost for the organization because
16      they're not getting their lunch hour.  So there's
17      a number of reasons of what they would be looking
18      for.
19  Q   Do the supervisors or sergeants then follow up
20      with the officers to talk to them about why they
21      were not taking a lunch?
22  A   Yeah, especially if there was a pattern.  If there
23      was one missed lunch occasionally, maybe the
24      supervisor wouldn't necessarily follow up if they
25      had firsthand knowledge that on Wednesday it was a

Page 141

1       crazy, crazy day, and they noticed that the
2       officer didn't have a lunch on Wednesday.  There
3       might be no reason to follow up if it would have
4       been just normal day or there were three days that
5       particular week, and none of them were known by
6       the supervisor to be very busy, and yet an officer
7       had no lunch three times, I would expect they
8       would follow up and say What's going on?  How come
9       you're not getting your lunch in?
10          (Recess taken)
11  Q   Mike, we're just about done.  Can you walk me
12      through for a security officer that wants to do
13      one of those auto corrections for not being able
14      to take a lunch during a particular day, can you
15      walk me through what they physically have to do in
16      order to make that happen?
17  A   I can't.
18  Q   Who could?
19  A   Probably anybody other than -- a supervisor could.
20      I only have one direct -- out of all of my direct
21      reports, only one of them is hourly, and she's so
22      meticulous, I don't think I had to correct
23      anything.  I have the luxury, when I correct or
24      approve Kronos at the end of a two-week pay
25      period, I have all exempt people, so I couldn't

36  (Pages 138 to 141)

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.   /   MADISON, WISCONSIN   /   (608) 833-0392
Case 2:10-cv-00714-JPS   Filed 01/18/11   Page 37 of 74   Document 35-1

Electronically signed by Brande A. Browne (101-025-478-3970)                                    b11bccc0-d5da-478f-9098-4698964a4d12

Page 142

1  actually tell you the physical steps they go
2  through.
3          (Discussion off the record)
4  Q  So what I'm asking is from a physical standpoint
5  for the officer to swipe the card with the system
6  and all of that, what do they do to mark a no
7  lunch?
8  A  If they never got a lunch as opposed to got
9  interrupted, I believe they would have to tell
10 their supervisor, who would have to override it.
11 I don't know if they can physically do it
12 themselves.  They may be able to.  I really am
13 ignorant on that physical thing of how they do it.
14 If they swiped out to go to lunch because let's
15 say they were going off site, which is the only
16 time they would have to do that, when leaving the
17 premises, and then they got called and came back,
18 then they would again have to go -- they would
19 swipe back in that they were back in, but then
20 they would to have it adjusted to show that they
21 should be paid for that block that was not a
22 complete 30 minutes, if that answers your
23 question.  I just don't know the physical things
24 that they do other than swiping.
25 Q  That's really what my question was.  So if you

Page 143

1  don't know, you don't know.
2          MR. SCULLEN:  The payroll person
3      and/or Dawn -- they physically cancel when
4      they swipe out at the end of the day.
5          MR. PARSONS:  That's all we have
6      for you.
7
8          EXAMINATION
9  By Mr. Scullen:
10 Q  Mike, I believe you testified earlier that you had
11 responsibility for all loss prevention or security
12 officers within Aurora Health and any of its
13 affiliates or subsidiaries.  Are there any
14 affiliates or subsidiaries which fall outside your
15 purview?
16 A  Yes, in terms of the staff.  The Aurora Advanced
17 facilities that joined us in 2008, they have their
18 own small number of security officers and/or
19 contract staff.  When I said that I have
20 responsibility for all of Aurora and to respond to
21 the facilities, we can assist them from time to
22 time if they need it, but that's very rare.  So
23 that small number of individuals, I have no
24 contact or responsibility for.
25 Q  I have a question about Exhibit 5.  You testified

Page 144

1  that your expectation would be that security
2  officers would note when they went on lunch.  Is
3  that true regardless of whether they remained on
4  the premises or not?
5  A  It wouldn't be so dependent on whether they
6  remained on premises, as it was if they were
7  working alone and they needed to make sure that
8  others knew that they were gone at that time,
9  especially the dispatcher, if there's multiple
10 officers.  Certainly if they were off premises, I
11 would expect that they would be logged in so we
12 would know that.
13         MR. SCULLEN:  I don't have anything
14     further.
15         MR. PARSONS:  No follow-up.
16     (Adjourning at 2:00 p.m.)
17
18
19
20
21
22
23
24
25

Page 145

1  STATE OF WISCONSIN )
                       ) ss.
2  COUNTY OF DANE     )
3      I, BRANDÉ A. BROWNE, a Registered Professional
4  Reporter and Notary Public duly commissioned and
5  qualified in and for the State of Wisconsin, do
6  hereby certify that pursuant to notice, there came
7  before me on the 6th day of December 2010, at 9:23 in
8  the forenoon, at the offices of Quarles & Brady, LLP,
9  Attorneys at Law, 411 East Wisconsin Avenue, Suite
10 2040, the City of Milwaukee, County of Milwaukee, and
11 State of Wisconsin, the following named person, to
12 wit: MICHAEL R. CUMMINGS, who was by me duly sworn
13 to testify to the truth and nothing but the truth of
14 his knowledge touching and concerning the matters in
15 controversy in this cause; that he was thereupon
16 carefully examined upon his oath and his examination
17 reduced to typewriting with computer-aided
18 transcription; that the deposition is a true record
19 of the testimony given by the witness; and that
20 reading and signing was not waived.
21     I further certify that I am neither
22 attorney or counsel for, nor related to or employed
23 by any of the parties to the action in which this
24 deposition is taken and further that I am not a
25 relative or employee of any attorney or counsel

37 (Pages 142 to 145)

Electronically signed by Brande A. Browne (101-025-478-3970)                                    b11bccc0-d5da-478f-9098-4698964ad12

Page 146

1  employed by the parties hereto or financially
2  interested in the action.
3       In witness whereof I have hereunto set my
4  hand and affixed my notarial seal this 10th day of
5  December 201
6
7
        Notary Public, State of Wisconsin
8       Registered Professional Reporter
9  My commission expires
   April 21, 2013
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

38 (Page 146)

Electronically signed by Brande A. Browne (101-025-478-3970)                    b11bccc0-d5da-478f-9098-4698964a4d12

**Deposition of:** Rita C. Klopf

**Date**: December 6, 2010
**Case**: Jerry A. Brabazon v. Aurora Health Care, Inc.

**Printed On**: December 10, 2010

Brandé A. Browne, RPR, CRR
P.O. Box 5254
Madison, WI  53705-0254

Phone      (608) 833-0392
Fax        (608) 833-0682
Toll Free (888) 892-0392
www.fortherecordmadison.com

E-MAIL – office@fortherecordmadison.com



F O R     T H E
Record INC.

Excellence in Court Reporting

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
_____

JERRY A. BRABAZON, individually,
and on behalf of all others
similarly situated,

      Plaintiff,

  v.                 Case No. 2:10-CV-00714

AURORA HEALTH CARE, INC.,

      Defendant.
_____

DEPOSITION

RITA C. KLOPF

Milwaukee, Wisconsin

December 6, 2010

Brandé A. Browne, RPR, CRR

Registered Professional Reporter

Electronically signed by Brande A. Browne (101-025-478-3970)        32daaa9d-7a04-49d4-9dcf-2e3790e65145

Page 2

1            I N D E X
2    Witness                        Pages
3    RITA C. KLOPF
4        Examination by Mr. Parsons           4
5
6
7            E X H I B I T S
8    No.   Description             Identified
9
10   20    Aurora active security officers'    16
           logins and logouts
11
12   21    Aurora current security officers'   23
           logins and logouts
13   22    Aurora terminated security officers'  27
           logins and logouts
14
15   23    AUR-JB 1-6                28
16   24    Pay information for security officers  28
17   25    Pay information for security officers  29
18   26    Punch detail reports            30
19   27    Loss prevention officers document   31
20
21   (The original exhibits were attached to the original
22    transcript and copies were provided to counsel)
23
24
25   (The original deposition transcript was filed with
         Attorney William E. Parsons)

Page 3

1        DEPOSITION of RITA C. KLOPF, a witness
2    of lawful age, taken on behalf of the Plaintiff,
3    wherein Jerry A. Brabazon is Plaintiff, and Aurora
4    Health Care, Inc. is Defendant, pending in the
5    United States District Court for the Eastern
6    District of Wisconsin, pursuant to notice, before
7    Brandé A. Browne, a Registered Professional Reporter
8    and Notary Public in and for the State of Wisconsin,
9    at the offices of Quarles & Brady, LLP, Attorneys at
10   Law, 411 East Wisconsin Avenue, Suite 2040, City of
11   Milwaukee, County of Milwaukee, and State of
12   Wisconsin, on the 6th day of December 2010,
13   commencing at 4:10 in the afternoon.
14
15          A P P E A R A N C E S
16   WILLIAM E. PARSONS and DAVID C. ZOELLER, Attorneys,
     for HAWKS QUINDEL, S.C., Attorneys at Law,
17       222 West Washington Avenue, Suite 450, Madison,
         Wisconsin 53701-2155, appearing on behalf of
18       the Plaintiff.
19   SUMMER H. CARLISLE and LYNN M. NOVOTNAK, Attorneys,
     for HAWKS QUINDEL, S.C., Attorneys at Law,
20       700 West Michigan, Suite 500, Milwaukee,
         Wisconsin 53201-0442, appearing on behalf of
21       the Plaintiff.
22   SEAN M. SCULLEN, Attorney,
     for QUARLES & BRADY, LLP, Attorneys at Law,
23       411 East Wisconsin Avenue, Suite 2040,
         Milwaukee, Wisconsin 53202-4426, appearing on
24       behalf of the Defendant.
25   Also present:  Dawn E. Faucett

Page 4

1            RITA C. KLOPF,
2    called as a witness, being first duly sworn,
3    testified on oath as follows:
4
5            EXAMINATION
6    By Mr. Parsons:
7    Q   Good afternoon, Ms. Klopf.
8    A   Yes.
9    Q   My name is Bill Parsons.  I'll be taking your part
10       of the 30(b)6 deposition today.  Have you ever
11       been deposed before?
12   A   I was once about 15 years ago.
13   Q   What was that related to?
14   A   It was for a car accident.
15   Q   General ground rules for depositions probably the
16       same as they were back then.  The court reporter
17       can only take down one person's testimony at a
18       time.  So I'll try not to speak over you if you'll
19       do the same for me.
20   A   Okay.
21   Q   When I ask you a question, if you answer, I'm
22       going to assume you understood what I meant.
23   A   Okay.
24   Q   If you don't, please ask me to clarify, and I'll
25       be happy to do that; is that fair?

Page 5

1    A   Yes.
2    Q   The other rule is that the court reporter can only
3        take down verbal answers from you or from me,
4        questions from me.  So I'll ask no head nods or
5        uh-huh.  If you would please just speak the answer
6        that you intend to give.
7    A   Okay.
8    Q   Thank you.  Would you please give your full name
9        for the record?
10   A   My name is Rita C. Klopf.
11   Q   And what's your date of birth?
12   A   5/13/53.
13   Q   Where do you live?
14   A   I live in Pewaukee.
15   Q   Can you give me your home address?
16   A   W283 N2187 Beach Road.
17   Q   Thank you.  Can you give me your educational
18       background going back to high school?
19   A   Graduated from Cudahy Senior High School.
20   Q   What year?
21   A   1971.
22   Q   Did you obtain additional education beyond your
23       high school education?
24   A   Yes, I did.  I went to night school and received
25       an associate's degree in supervision and

2 (Pages 2 to 5)

Electronically signed by Brande A. Browne (101-025-478-3970)                    32daaa9d-7a04-49d4-9dcf-2e3790e65145

Page 6

1    management from MATC.
2  Q  What year was that?
3  A  I think I finished it in 1996.
4  Q  And any additional formal education beyond the
5     associate's degree?
6  A  No.
7  Q  Do you have any certifications?
8  A  No.
9  Q  Do you have any licenses?
10  A  No.
11  Q  You're currently employed with Aurora; is that
12     correct?
13  A  Yes, it is.
14  Q  And your job title is the manager of payroll
15     systems?
16  A  Correct.
17  Q  How long have you been in that particular job
18     title?
19  A  I've been a manager since May of 2005.
20  Q  And what was the role that you were in -- I'm
21     sorry, did you work for Aurora prior to that?
22  A  Yes, I did.
23  Q  What was the role you were in prior to that?
24  A  Previous to that, I was the payroll coordinator.
25  Q  For about how long?

Page 7

1  A  I started that in October of '95.
2  Q  When did you start working for Aurora altogether?
3  A  I started working for Aurora in October of '95.  I
4     previously had been working for Trinity Hospital,
5     which became St. Luke's South Shore, through an
6     affiliation.
7  Q  In your entire career, how many years of
8     experience would you say you have with payroll
9     work?
10  A  With payroll, I started in 1971 at Trinity, and I
11     started with an IS background, and we used to
12     process the payroll for Trinity.  And then we
13     automated using Kronos, I believe, in 1983, and I
14     was the point person for that automation, so I
15     pretty well coordinated that.
16  Q  It's the same Kronos system that Aurora uses now?
17  A  It's the same company, but it's different releases
18     of software running on different platforms.
19  Q  Can you tell me your job duties as the manager of
20     payroll systems?
21  A  As the manager of payroll systems, I oversee to
22     make sure that our 30,500 plus employees, the
23     automated portion of Kronos time and attendance.
24     We have a web entry, out time entry or input of
25     nonproductive hours, to make sure that it's all

Page 8

1     operational, more or less a database administrator
2     to make sure everything is in sync.  The hours are
3     interfaced properly.  I do support on our HRIS
4     system mainframe to make sure that the system is
5     paying people properly.  So I take it from the
6     front end of the time entry to make sure it's
7     interfaced correctly, to make sure it's posted
8     properly, and to make sure our caregivers are paid
9     appropriately.
10  Q  Today, I'm going to show you what has been
11     previously marked as Exhibit 1.  It's right on
12     top.  Wonderful.  Have you seen this document
13     before?
14  A  I saw parts of it.  Yes, I have seen this.
15  Q  Certain people from Aurora have been designated to
16     testify as to certain topics on this list.  Do you
17     know which items you're going to be testifying to?
18  A  Probably 3 and 4.  I would say 3 and 4 would be
19     the areas.
20  Q  Let's talk about topic area number 4, which is
21     Aurora's payroll system.  What qualifies you to
22     testify as to that particular topic?
23  A  In the payroll department, I probably have the
24     best knowledge of how everything works together
25     with the interfacing of the hours, how the pay

Page 9

1     practices are administered through the HRIS
2     system, shift differentials, weekend premiums, as
3     to how the system actually pays the employees
4     based on what we interface, so I would probably
5     have the best experience.  I'm the person people
6     go to when they can't quite figure something out.
7     So I'm the resource.
8  Q  You are the person I want to talk to.  Does Aurora
9     process its payroll internally, or does it
10     contract with a third party?
11  A  Internally.
12  Q  And it has done that for at least the last three
13     or four years?
14  A  Yes.
15  Q  Who is the person at Aurora who's responsible for
16     processing the payroll?
17  A  It's a hard answer.  There's no one person.  We
18     basically -- we'll call it to say the payroll is
19     complete.  All the hours are interfaced.  We will
20     then call the IS department operations, and they
21     will start the job process of running it.  So it
22     would be probably the lead in the department is
23     usually the person to make that call, you know.
24  Q  Who's currently the lead?
25  A  Rose Kitzerow, K-i-t-z-e-r-o-w.

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392
Case 2:10-cv-00714-JPS  Filed 01/18/11  Page 43 of 74  Document 35-1

Electronically signed by Brande A. Browne (101-025-478-3970)                    32daaa9d-7a04-49d4-9dcf-2e3790e65145

1  Q  Does Ms. Kitzerow report to you?
2  A  Laterally.  She reports to Mari van Lieshout, who
3     is the manager of the payroll department.
4  Q  Is that who you report to?
5  A  No, I do not.
6  Q  Who do you report to?
7  A  Tom Ewing.
8  Q  Who's Tom Ewing?
9  A  He's the vice president of financial operations.
10 Q  Who reports to you?
11 A  No one specifically.  I don't have -- I cross -- I
12    don't have a person who reports directly up to me.
13    It's more or less across responsibility.  So the
14    entire payroll staff would report to me, kind of a
15    matrix.
16 Q  As you would report to them?
17 A  Yes.
18 Q  Kronos is the system that Aurora uses to keep
19    track of hours, and that information is what turns
20    into the basis of how people are paid; is that
21    right?
22 A  Correct.
23 Q  How is the Kronos information captured?
24 A  We have three methods of capturing the data.  One
25    method is through badge readers, where the

1     employee will take their badge, based on the
2     barcode on the back of the badge, will swipe in,
3     swipe out, indicated department transfers, if
4     that's applicable, a canceled meal if they did not
5     get their lunch.  Those are to be done on the
6     site.  We also have a telephone system that
7     employees can use if they're at a site that
8     doesn't have a badge reader or they have forgotten
9     their badge, or maybe it's inconvenient on the
10    other side of the building, so they can use the
11    telephone system to login and logout.
12       During the last three years, we did have two
13    different methods on the phone system.  We had a
14    conversion, I believe, in December of '08, that we
15    converted to a different phone system, but it was
16    basically the same thing.  You could do exactly
17    the same.
18 Q  All of those records, whether you're swiping in
19    with a card or calling in on the phone, that's all
20    going into the Kronos system, and if I wanted a
21    report that gave me all that information, I can
22    get it, right?
23 A  Correct.
24 Q  Are you the person who can tell me how to do that?
25 A  You couldn't get it, but I would probably get it

1     for you.  I'm not going to let you in there.
2  Q  Is there an intermediary program between Kronos
3     and Aurora's ability to process payroll?
4  A  No.  We have interface files that will take the
5     data summarized by the pay period by different pay
6     codes.  That information will go directly to the
7     HRIS system.  We run a validity check to make sure
8     there's no bad labor levels.  Anything that is
9     real outstanding, someone's time has not been
10    interfaced at all, it will check those sorts of
11    things.  But it goes directly from Kronos right
12    over to the HRIS system.
13 Q  You weren't here, but we previously talked a
14    little bit about the HRIS system.  We've got
15    Kronos records, and then there's, I'm assuming,
16    some sort of payroll records; is that correct?
17 A  Correct.
18 Q  What format are payroll records kept in?
19 A  There are copies of the payroll records as to like
20    pay statement information, basically a payroll
21    register, that we keep on microfiche for the very
22    old things.  We have online microfiche.  It's an
23    optical file that you can go in and query and pull
24    off data.  I also have access to some of the pay
25    information in database files for some history.

1  Q  In terms of the security officers that Aurora has
2     employed for the last three years, would their
3     payroll information be on microfiche or would it
4     be in Excel format?
5  A  The payroll information is on microfiche.  Some of
6     the data is on -- in a database file that that
7     information could be queried against.
8  Q  How long does Aurora preserve its payroll
9     documents?
10 A  We have access to the data back seven years, I
11    believe.  I believe it's seven years.
12 Q  You just mentioned a database.  What's the name of
13    that database?
14 A  It's part of our HRIS system.  It is not like an
15    Oracle database or anything like that.  Our HRIS
16    system is homegrown, written.  The database does
17    not have a name.  It's not like it's an Oracle
18    database.
19 Q  Are you using the term database and HRIS
20    interchangeably?
21 A  Yes.  The database of different history files make
22    up our HRIS system.
23 Q  What information is kept in the database in terms
24    of payroll information, and how far back is it
25    kept?

Electronically signed by Brande A. Browne (101-025-478-3970)                                    32daaa9d-7a04-49d4-9dcf-2e3790e65145

1  A  It depends on the piece of data.  Some of the job
2     history that people are in, that is kept -- I've
3     seen up to 10 years of job history as we migrated
4     through upgrades.  So if you were going to find
5     out what job someone was in 10 years ago, I could
6     tell you what their position was.  But to get back
7     to pay statement, payroll registers, that goes
8     back -- we usually keep those files seven years.
9  Q  One of the questions we've had today about the
10    Kronos system is if an employee is -- a security
11    officer, if a security officer wants to indicate
12    on the Kronos system that he or she did not take a
13    lunch that day or was unable to take an
14    uninterrupted lunch, do you know physically how
15    that person would do that?
16 A  Yes, I do.
17 Q  Can you explain that to me?
18 A  There's three different ways that an employee can
19    indicate that they did not get their lunch for the
20    day.  The first, they can do at the badge reader
21    on the way out the door.  Before they exit out,
22    before they logout for the day, there's a function
23    key at the badge reader, F1 on the older style
24    badge readers.  It's indicated as a canceled meal.
25    They press the function key, swipe their badge

1     once to cancel their meal.  They swipe out a
2     second time to logout for the day.
3  Q  And the Kronos system is set up to automatically
4     deduct a half-hour for lunch unless something like
5     that occurred?
6  A  Correct.  The second way that the employee could
7     have indicated would have been over the telephone.
8     They could have indicated a clock code saying that
9     they have canceled their meal.  It's a clock code
10    zero.  By doing a clock code zero, pound, pound,
11    and then a clock code 1 following that, that will
12    cancel their meal and log them out for the day.
13    The third way that a caregiver could indicate that
14    they did not get their meal, if they forgot to do
15    it at the clock or when they were reviewing their
16    Kronos, we've given caregivers the opportunity --
17    no, the function to review their time records
18    right on I-Connect.
19       They could communicate to their manager
20    through an edit login the department, or some
21    method of communication between the employee and
22    the editor indicating that they were not able to
23    get their half-hour lunch for the day.
24 Q  And Kronos can create a report that would indicate
25    the days that employees worked and when they

1     canceled lunch?
2  A  Correct.
3  Q  What's the name of the phone system you were
4     talking about?
5  A  The phone system is TTE.  That is the current
6     phone system.  It is a product that we purchased
7     from Kronos, I'd say, about three years ago.
8     Sometimes it's referred to as IVR.  That was the
9     old one.
10 Q  Is IVR able to produce records?
11 A  The records are all strictly in Kronos.  In
12    Kronos, it's stored.
13 Q  I have a bunch of spreadsheets that I received as
14    part of document production here.
15 A  Do you?
16 Q  I think you're the person to tell me about them.
17       (Exhibit No. 20 marked for
18       identification)
19 Q  I'm showing you, Ms. Klopf, what has been marked
20    on the back, the very last page on the back as
21    Exhibit 20.
22       MR. SCULLEN:  You want to identify
23    the bates range?
24       MR. PARSONS:  Yeah, the bates range
25    is 1107 and then consecutively until 1113 and

1     then an out of sequence page labeled 2184 at
2     the end.
3  Q  Do you know what this document is?
4  A  Yes.
5  Q  What is this?
6  A  This is a list of all of the log ins and log outs
7     for the various employees.  So I took a list of
8     employees, produced all of their time
9     transactions.  These would have been transactions
10    entered at the badge reader or over the phone.
11 Q  Do you know who generated this for document
12    production?
13 A  I did.
14 Q  And who instructed you to do that?
15 A  I received the request from Dawn Faucett.
16 Q  And if I'm looking at this, Exhibit 20, at the top
17    it says Aurora Active Security Officers, 8/20/07
18    to 10/4/2010.  What does that mean?  What people
19    were on this list?
20 A  This is a list of the security guards.  I received
21    a list of all of the security guards from Dawn, a
22    list of active and terminated security guards, and
23    I provided the list of all the clock entries for
24    these people for that time period.
25 Q  So the folks on this spreadsheet were actively

Electronically signed by Brande A. Browne (101-025-478-3970)                    32daaa9d-7a04-49d4-9dcf-2e3790e65145

1    employed by Aurora as of October 4th, 2010; is
2    that right?
3  A  Yes.
4  Q  And there's a bunch of columns in here.  I know
5    what most of them mean, but let me just make sure.
6    The second column from the left is called time,
7    and on the first for Lewis L. Adams, it has 6:56
8    and then below that 15:31?
9  A  Right.
10 Q  What are those two --
11 A  Those are two time transactions that I received
12   from Lewis.  It's saying that on September 15th,
13   2009, I have a login at 6:56 and then I have
14   another login at 15:31.
15 Q  Login or logout?
16 A  There is no difference to the employee whether it
17   is a login or logout.  It is the sequence that
18   they are received.  So if the 6:56 was received
19   before the 15:31, it sequentially posts these
20   records.
21 Q  So it looks like based on this, Mr. Lewis clocked
22   in 6:56 in the morning and presumably clocked out
23   at 3:31 in the afternoon on that date?
24 A  Correct.
25 Q  And that would have been recorded based on him --

1  A  Swiping at a badge reader.
2  Q  Got it.  If you go over a little bit further,
3    there's a column that says employee number, and
4    I'm assuming that we're looking at Mr. Lewis's
5    employee number?
6  A  Correct.
7  Q  And then there's clock.  What is that telling us?
8  A  That is a designation of clock that he has used.
9    This one at 6:56 is in the lower level of site 40
10   near telecommunications.  The one at 15:31 was
11   first floor by the emergency room.  If you look --
12   I'm trying to see if I can find one with a phone
13   number on it.
14 Q  If it was a phone number, what would it look like?
15 A  It would look like a phone number, area code.
16   Page 1112, under Michael Adams, see how that
17   transaction came from 414-219-2000.  That is a
18   telephone number that was --
19 Q  And that does not have a time associated with it;
20   is that --
21 A  Right.  The reason it does not is because of the
22   type column.  The type A indicates a login or a
23   logout.  This is a type I.  A type I is a time
24   transaction.  That would be like PTO scheduled,
25   PTO unscheduled.  We all our caregivers to post

1    their PTO time over the phone, at the badge
2    readers, and through the I-Connect system also.
3  Q  Is there a document that has a list of all the
4    different types?
5  A  There is a document I used for my Kronos class
6    that I give to my editors to explain these codes
7    to them.  It's nothing in the policy or anything
8    like that.  There is one other type, and that is
9    on 2184.
10 Q  Okay.
11 A  There's a type G, which indicates to me that the
12   employee has canceled their meal, and that
13   indicates that this employee -- you'll see the
14   IVR 1, 2, and 3.  That means that they are using
15   the phone system and they are using a tie line
16   from that site.  A tie line would be a direct dial
17   so they don't have to do like a seven-digit
18   telephone number.  They'd do like a code 88 and
19   then the extension, and that's why it has the
20   designation of IVR 1, 2, or 3.
21 Q  There's a column that says org area.  What does
22   that mean?
23 A  That is just the organization in the area of the
24   caregiver.  It just tells me what department
25   they're in.  This is the security department.

1    That's what a 5056002 is.
2  Q  Looking at 2184, that you had just pointed out,
3    James Leranth, the one from November 11th, 2009
4    with a G, which you're saying means canceled
5    lunch.  In the column to the far right, it says
6    number canceled lunch.  What does that mean?
7  A  I believe Nicci, who was preparing these documents
8    matched them to the punch detail to say this was
9    number 48 on this employee.  This is like a
10   cross-referenced number.
11 Q  What does that mean, number 48 on that employee?
12 A  From what Nicci told me, it is saying that if you
13   look at the detail for the employee, it has a
14   number next to it, and this is the number of the
15   canceled.  It's kind of like -- it's a tag.
16 Q  Am I understanding right that based on your review
17   of Mr. Leranth's records, this is telling us that
18   this is the 48th canceled lunch?
19 A  I cannot say that.  All I can say is that Nicci
20   used this number on her report to match.  So I
21   would have to look at the report for Leranth.
22 Q  Who's Nicci?
23 A  She is the administrative assistant.
24 Q  She's the administrative assistant that does some
25   work for you?

Electronically signed by Brande A. Browne (101-025-478-3970)                    32daaa9d-7a04-49d4-9dcf-2e3790e65145

1   A   For human resources.
2   Q   Do you know who Nicci reports to?
3   A   Dawn, I believe.
4   Q   Do you know what Nicci's last name is?
5   A   Hall.
6   Q   H-a-l-l?
7   A   H-a-l-l, and I believe it's N-i-c-c-i.
8   Q   Nicci ran a report.  Do you know what that report
9       is?
10  A   It is the detail.
11  Q   I have a bunch of reports.  Maybe you can find it
12      in there.
13  A   I don't know if she has it.
14          (Recess taken)
15  Q   Is it okay if I call you Rita?
16  A   Yes.
17  Q   Rita, I had asked you to take a look at some of
18      the spreadsheets that I had brought today.  Are
19      any of those the report that Dawn ran -- I'm
20      sorry, not Dawn, that Nicci produced that you were
21      referencing?
22  A   These are most of the reports that I had produced
23      for Nicci.  The -- I did not give this 48 to
24      Nicci.  She must have been counting because it
25      says number of canceled lunches.  I do not know if

1       it was per person, per everyone or what, but I did
2       not give that to her.
3   Q   But Nicci would know why she did that?
4   A   Correct.
5           (Recess taken)
6           (Exhibit No. 21 marked for
7            identification)
8   Q   Showing you what has been marked as Exhibit 21,
9       Rita, do you know what this is?
10  A   This is the detail of every day for the employee
11      with their logins and logouts.  This showed you
12      the source -- Exhibit 20 showed you the source of
13      the punch.  This is how it ultimately resides on
14      the Kronos record.  So this is what we pay from.
15  Q   And this record is, this Exhibit 21 that we're
16      looking at, is this something that came straight
17      from Kronos, or were things done to it to change
18      the report?
19  A   This was straight from Kronos.
20  Q   And you were able to produce this?
21  A   Yes.
22  Q   And was that just a matter of sort of running this
23      report?
24  A   I had to create a Crystal report.
25  Q   What does that mean?

1   A   Crystal report is the software that we use to
2       access the Kronos database and pull data elements.
3       So I was looking for a specific group of employees
4       with a specific time range.  And these are all of
5       the details of hours that were paid to the
6       employees for worked time.
7   Q   I'm looking at Exhibit 21, and on the first
8       page of that, page number 171, there's a line for
9       Lewis L. Adams again from September 15th of '09.
10      It says time in 6:56, time out 15:31, and then it
11      says RND time.  I'm assuming that means round
12      time?
13  A   Correct.
14  Q   Do you know what the rounding program is that
15      Aurora uses?
16  A   We use the parameters within Kronos to round
17      employees to the tenth of an hour.
18  Q   Is it up and down?
19  A   Yes.
20  Q   And it's rounded -- can you tell me how it works?
21  A   We have a five-minute window for an employee
22      before and after every 15 minutes out of the day.
23      If the employee comes in within five minutes
24      before like an hour or five minutes after, we will
25      round both ways to the 7:00 point and pay the

1       employee.  Then every six minutes, they work, they
2       will get paid a tenth of an hour because our HRIS
3       system can only pay in tenths.
4   Q   And going further right in the columns there,
5       there's a column that says ACTV, do you know what
6       that means?
7   A   That is for activity.  That would be used if the
8       employee had inservice time, orientation.  It
9       would be a code that we used -- I do not see
10      anything in the example.  It is just a different
11      way of coding the worked hours.
12  Q   Just for the record to be clear, this is an
13      excerpt of a larger spreadsheet that was produced?
14  A   Correct.
15  Q   The next column says PROD hours, is that
16      productive hours?
17  A   Correct.
18  Q   And I'm noticing that it looks like Mr. Adams here
19      has a time in and a time out that's roughly eight
20      and a half hours, but the productive hours says
21      eight, and then there's a lunch deduction for .5;
22      do you know what that's all about?
23  A   That is an automatic half-hour lunch deduction that
24      is taken when an employee works beyond 6.1 hours.
25  Q   And that is automatically done by Kronos?

Electronically signed by Brande A. Browne (101-025-478-3970)                    32daaa9d-7a04-49d4-9dcf-2e3790e65145

1  A  Correct.
2  Q  Do you know who programmed Kronos to do that?
3  A  That was done when we first automated.  That was
4     done by the team.  We have some consultants
5     working with us.  I work with them, and it's part
6     of the parameters.
7  Q  Do you know if Aurora took that automatic
8     deduction before it used the Kronos system?
9  A  I don't know for sure.
10 Q  Do you know when it was that Aurora implemented
11    the Kronos system?
12 A  We began -- we started some of our facilities late
13    spring of '96.
14 Q  Are any of the members who were part of that
15    transition team other than you still employed by
16    Aurora?
17 A  Yes, there's still people around.
18 Q  Can you name the ones you remember?
19 A  Mary van Lieshout.  She's the other manager for
20    payroll.  I know Carol Hadley, she was from
21    benefits.  Kathy Klobuchar, she was the vice
22    president.  I don't know if she was vice president
23    at the time of compensation.  You know, I don't
24    know everyone who was on that team, but those are
25    some of the names.  I know they have been around

1     for quite a while.
2  Q  I'm going to show you what I think is the sort of
3     counterpart to Exhibit 21.
4        (Exhibit No. 22 marked for
5        identification)
6  Q  This is Exhibit 22.  I'm sorry that this is so
7     small when I printed it.  Do you know what
8     Exhibit 22 is?
9  A  This is the same report, but for the terminated
10    security officers.
11 Q  Same information that --
12 A  Same information that we had in Exhibit 21.
13 Q  Is there a report from Kronos that shows the
14    punches that would have been done during a shift?
15    Would that have been captured on Exhibit 20?
16 A  Yes.  Exhibit 20 would include all punches for
17    these employees.
18 Q  So it wouldn't matter if they punched in, then
19    punched out to leave the facility and then came
20    back?
21 A  Right.  If they had logged out for any reason, it
22    would have been -- anything that I have in the
23    file is in this report.
24        (Exhibit No. 23 marked for
25        identification)

1  Q  Rita, I'm showing you what has been marked as
2     Exhibit 23 on the back.  This has Aurora bates
3     stamped numbers 1 through 6.  Do you know what
4     this document is?
5  A  I did not produce this document.
6  Q  Have you ever seen this document before?
7  A  No, I have not.
8        (Discussion off the record)
9        (Exhibit No. 24 marked for
10       identification)
11 Q  Rita, showing you what has been marked as
12    Exhibit 24, do you know what this document is?
13 A  Yes, it is.  I do.
14 Q  Can you tell me what this is?
15 A  I was asked to provide the pay information for all
16    of the security officers.  Rather than going out
17    to microfiche and printing out reams and reams of
18    paper, I was asked to provide it in an Excel
19    format.  I was able to access the database back to
20    2007 of the pay code entries.  This is the pay
21    statement information, what we had paid the
22    caregivers, how much per hour, what shift it was
23    on, the pay code that was paid.
24       (Exhibit No. 25 marked for
25       identification)

1  Q  Showing you what has been marked now as
2     Exhibit 25, and I'm going to tell you that
3     Exhibit 24 is just the first page of that
4     spreadsheet, and Exhibit 25, I decided to print
5     out a bunch of pages, for some reason, of a
6     different spreadsheet.  If I put these two
7     documents together, it looks like I have pay
8     information for Aurora security officers covering
9     the entire statutory period from August 20th, 2007
10    all the way until October 9th of 2010; am I
11    understanding that correctly?
12 A  Correct.  It is in two separate files because of
13    the way the data is stored.
14 Q  But nonetheless, it is putting these together is
15    complete and accurate?
16 A  Yes.
17 Q  And these two documents cover both terminated and
18    current security officers, correct?
19 A  Correct.
20 Q  If I wanted to combine the information that is
21    captured on Exhibits 24 and 25, which is the pay
22    information for the security officers, with the
23    automatic lunch deductions that have been taken,
24    the half-hour each day for those security
25    officers, is there a report that exists or could a

Electronically signed by Brande A. Browne (101-025-478-3970)                    32daaa9d-7a04-49d4-9dcf-2e3790e65145

1    report be created which would calculate the amount
2    of money that that would -- those lunch deductions
3    is worth?
4 A  I don't have anything that I could do to
5    cross-reference between the Kronos to say against
6    the master file.
7 Q  So just to understand your answer, I know that
8    such a report doesn't exist, but you could not
9    create such a report without -- I mean, without
10   actually doing some calculations?
11 A  I can't answer whether I would be able to do it or
12   not because of the way the data is stored.
13 Q  If there was anybody at Aurora that could do it,
14   are you that person?
15 A  I would be the one that would have to do it.
16         MR. SCULLEN: And that is her
17     answer to say no, it cannot be done.
18 A  I don't know how I would do it because of the way
19   the data is stored.
20 Q  Sure.
21      (Exhibit No. 26 marked for
22      identification)
23 Q  Rita, showing you what has been marked as
24   Exhibit 26, do you know what this is?
25 A  This is the punch detail reports. I'm sorry, the

1    punch source reports for the terminated security
2    officers.
3 Q  So this is --
4 A  This is exactly the same as Exhibit 20. It's just
5    one is active, one is terminated.
6 Q  20 and 26 go together?
7 A  Go together, same report, same detail.
8      (Exhibit No. 27 marked for
9      identification)
10 Q  Rita, showing you what has been marked as
11   Exhibit 27, do you know what this is?
12 A  I did not produce this report.
13 Q  And so do you know if this is something that Dawn
14   produced?
15 A  I would expect -- I don't know.
16 Q  Fair enough.
17      (Recess taken)
18         MR. PARSONS: That was all the
19    questions we have for Rita. I have a couple
20    more questions for Dawn.
21      (Adjourning at 4:57 p.m.)
22
23
24
25

1  STATE OF WISCONSIN )
2              ) ss.
2  COUNTY OF DANE   )
3   I, BRANDÉ A. BROWNE, a Registered Professional
4  Reporter and Notary Public duly commissioned and
5  qualified in and for the State of Wisconsin, do
6  hereby certify that pursuant to notice, there came
7  before me on the 6th day of December 2010, at 4:10 in
8  the afternoon, at Quarles & Brady, LLP, Attorneys at
9  Law, 411 East Wisconsin Avenue, Suite 2040, the City
10  of Milwaukee, County of Milwaukee, and State of
11  Wisconsin, the following named person, to wit:
12  RITA C. KLOPF, who was by me duly sworn to testify to
13  the truth and nothing but the truth of his knowledge
14  touching and concerning the matters in controversy in
15  this cause; that he was thereupon carefully examined
16  upon his oath and his examination reduced to
17  typewriting with computer-aided transcription; that
18  the deposition is a true record of the testimony
19  given by the witness; and that reading and signing
20  was not waived.
21     I further certify that I am neither
22  attorney or counsel for, nor related to or employed
23  by any of the parties to the action in which this
24  deposition is taken and further that I am not a
25  relative or employee of any attorney or counsel

1  employed by the parties hereto or financially
2  interested in the action.
3     In witness whereof I have hereunto set my
4  hand and affixed my notarial seal this 10th day of
5  December 2010.
6
7
8         Notary Public, State of Wisconsin
8         Registered Professional Reporter
9  My commission expires
9  April 21, 2013
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Electronically signed by Brande A. Browne (101-025-478-3970)        32daaa9d-7a04-49d4-9dcf-2e3790e65145

**Deposition of**: Mark A. Rountree

**Date**: December 20, 2010
**Case**: Jerry A. Brabazon v. Aurora Health Care, Inc.

**Printed On**: December 23, 2010

Brandé A. Browne, RPR, CRR
P.O. Box 5254
Madison, WI  53705-0254

Phone      (608) 833-0392
Fax        (608) 833-0682
Toll Free (888) 892-0392
www.fortherecordmadison.com

**E-MAIL** – **office@fortherecordmadison.com**



FOR THE

Record
INC.

Excellence in Court Reporting

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

———————————————————————————————————————

JERRY A. BRABAZON, individually,
and on behalf of all others
similarly situated,

      Plaintiff,

   v.                   Case No. 2:10-CV-00714

AURORA HEALTH CARE, INC.,

      Defendant.

———————————————————————————————————————

DEPOSITION

MARK A. ROUNTREE

Milwaukee, Wisconsin

December 20, 2010

Brandé A. Browne, RPR, CRR

Registered Professional Reporter

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC. / MADISON, WISCONSIN / (608) 833-0392

Electronically signed by Brande A. Browne (101-025-478-3970)                55122a5b-1535-4b68-9002-8f1eeefc14f9

**Page 2**

1         I N D E X
2   Witness                             Pages
3   MARK A. ROUNTREE
4        Examination by Mr. Parsons          4
5        Examination by Mr. Scullen         87
6
7         E X H I B I T S
8   No.   Description            Identified
9   28    Policy on Policies            39
10  29    Set of Aurora policies        50
11  30    Meal and rest period policy   52
12  31    Operational procedures - Manitowoc    54
13  32    Operational procedures - Sheboygan    54
14  33    Operational procedures - BayCare      54
15  34    Pay and hours, rest and meal periods  55
16  35    Lunch breaks document         56
17  36    Management bulletin           56
18  37    Memo from Dave Wood           60
19  38    Dual opinion letter           81
20  39    Dual opinion letter           81
21  40    Work week/meal and rest periods   84
22
23      (The original exhibits were attached to the original
        transcript and copies were provided to counsel)
24
        (The original deposition transcript was filed with
25          Attorney William E. Parsons)

**Page 3**

1         DEPOSITION of MARK A. ROUNTREE, a witness
2   of lawful age, taken on behalf of the Plaintiff,
3   wherein Jerry A. Brabazon is Plaintiff, and Aurora
4   Health Care, Inc. is Defendant, pending in the
5   United States District Court for the Eastern
6   District of Wisconsin, pursuant to notice, before
7   Brandé A. Browne, a Registered Professional Reporter
8   and Notary Public in and for the State of Wisconsin,
9   at the offices of Quarles & Brady, LLP, Attorneys at
10  Law, 411 East Wisconsin Avenue, Suite 2040, City of
11  Milwaukee, County of Milwaukee, and State of
12  Wisconsin, on the 20th day of December 2010,
13  commencing at 9:40 in the forenoon.
14
15
16        A P P E A R A N C E S
17
18  WILLIAM E. PARSONS and DAVID C. ZOELLER, Attorneys,
    for HAWKS QUINDEL, S.C., Attorneys at Law,
19      222 West Washington Avenue, Suite 450, Madison,
        Wisconsin 53701-2155, appearing on behalf of
20      the Plaintiff.
21
    SEAN M. SCULLEN, Attorney,
22  for QUARLES & BRADY, LLP, Attorneys at Law,
        411 East Wisconsin Avenue, Suite 2040,
23      Milwaukee, Wisconsin 53202-4426, appearing on
        behalf of the Defendant.
24
25  Also present:  Dawn E. Faucett

**Page 4**

1         MARK A. ROUNTREE,
2     called as a witness, being first duly sworn,
3     testified on oath as follows:
4
5         EXAMINATION
6   By Mr. Parsons:
7   Q   Good morning, Mr. Rountree.
8   A   Hi, how are you.
9   Q   My name is Bill Parsons.  I'll be taking your
10      deposition this morning.  This is the continued
11      30(b)6 deposition of Aurora to discuss certain
12      issues related to the policies and practices
13      regarding Aurora's meal breaks, so I'll be asking
14      you questions on those issues.  Before we get
15      started, can I get your full name for the record.
16  A   It's Mark A. Rountree, and it's without a D on the
17      last name.
18  Q   And your date of birth?
19  A   9/25/64.
20  Q   And your home address?
21  A   3718 South 157th Street in New Berlin, Wisconsin.
22  Q   Have you ever been deposed before?
23  A   No.
24  Q   I'm going to go over a few ground rules for
25      today's deposition.  The court reporter can only

**Page 5**

1       take down the testimony of one of us talking at
2       the same time.  So I'll try not to speak over you
3       if you'll do the same.  Additionally, the court
4       reporter can only take down verbal answers.  So
5       I'll ask that if you're answering question, a yes
6       or a no instead of a head nod or a shake.  If I
7       ask a question and you give an answer, I'm going
8       to assume you understood what I asked.  So if you
9       don't understand what I ask, please ask me to
10      clarify, and we'll try to get to a point where we
11      understand each other; is that fair?
12  A   Yes.
13  Q   Can you give me your educational history, starting
14      with high school?
15  A   I graduated high school in 1983 in Oklahoma,
16      attended college for four years, have a degree in
17      chemistry and mathematics.
18  Q   From what institution was that from?
19  A   Northeastern State University.  It's in Oklahoma.
20  Q   What year did you graduate?
21  A   1987.
22  Q   Any additional education after your degree from
23      Northeastern?
24  A   Not as far as college.  I do have
25      certification-type education around compensation,

2 (Pages 2 to 5)

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392
Case 2:10-cv-00714-JPS   Filed 01/18/11   Page 52 of 74   Document 35-1

Electronically signed by Brande A. Browne (101-025-478-3970)                          55122a5b-1535-4b68-9002-8f1eeefc14f9

1    which is a certified compensation professional,
2    and then from HR, the senior human resource
3    professional.
4  Q  And those two certifications, what institutions or
5    bodies issue those?
6  A  The certified compensation professional comes from
7    an organization called World At Work.  It used to
8    formerly be called the American Compensation
9    Association.  They changed their name a few years
10   back.  It's the primary group that -- it's the
11   primary organization that compensation people
12   belong to around the world.
13 Q  For how long have you been certified through that
14   organization?
15 A  I don't know the exact date, but at least 10
16   years.
17 Q  And that certification remains current?
18 A  Yes.
19 Q  What do you need to do to keep that certification
20   current?
21 A  There's two ways.  You can take the tests, there's
22   nine tests, you can take the tests over to remain
23   certified.  The easiest way is through continuing
24   education credits.  So they require us -- they
25   have certain rules around what education -- what

1    qualifies, and then you submit that, it's a two or
2    three-year period, you submit that to them, and
3    they either approve it for renewal or don't.  If
4    they don't, then you have to go back and take the
5    test over.
6  Q  You mentioned a second certification?
7  A  Yeah, that's more general.  It's from SHRM,
8    Society for Human Resource Management.  It's about
9    the same.  I've had that for about 10 years as
10   well.  It's the same process.  You can either test
11   or you can do continuing education credits, and
12   they specify what counts or doesn't count for
13   that.
14 Q  And that certification is current as well?
15 A  Yes.
16 Q  Any other education or certifications or
17   professional programs that you're involved in?
18 A  No.
19 Q  Can you give me your work history, dating back to
20   your first job out of college?
21 A  Well, the first job out of college, wow, I
22   actually was in ROTC during college, so I went
23   directly into the Army from college for four
24   years.
25 Q  So that covered '87 to '91 approximately?

1  A  Yes.  In '91, I left the Army and worked for
2    Pfizer Pharmaceuticals for a short period of time,
3    selling pharmaceuticals.  And then after that, I
4    moved back to Oklahoma and worked for a small
5    company, Oklahoma Southern Transportation, until
6    '96, and then I went to work for Muskogee Regional
7    Medical Center, which is a hospital, as a
8    compensation analyst.
9  Q  What year was that?
10 A  1996.
11 Q  What year did you start with Aurora then?
12 A  2002, I believe.  Yeah, 2002.
13 Q  So from '96 to 2002, you were employed by -- what
14   was the name of that?
15 A  From '96 to 2001, I was employed by Muskogee
16   Regional Medical Center, and then I was at
17   Johnson Controls from 2000 to 2002.
18 Q  And then Aurora after Johnson --
19 A  Then Aurora after that, correct.
20 Q  What was your position with Johnson Controls?
21 A  A lead compensation analyst.
22 Q  What were the duties of that job?
23 A  The main duties focused around managing the
24   compensation for the corporate office, as well as
25   all the incentives, stock option projects, the

1    performance reviews annually for that group.  The
2    incentives and stock options was for the
3    worldwide, for the executives was the main part of
4    the job.
5  Q  Who did you report to in that job?
6  A  Shad Hubbard, S-h-a-d, Shad.
7  Q  Is Shad a man?
8  A  Yes.
9  Q  What position was Shad in?
10 A  At the time, he was the manager of corporate
11   compensation.
12 Q  And prior to that, when you worked for Muskogee,
13   what was your job title there?
14 A  Compensation analyst.
15 Q  And what were the job duties associated with that?
16 A  The main job was to review the positions of the
17   organization, help set the budget every year for
18   the compensation budget, to grade jobs out from
19   how we're going to pay them, whether a job would
20   be exempt or nonexempt, and then mainly project
21   work around compensation.
22 Q  You mentioned grading, whether they would be
23   exempt or nonexempt.  So part of your job with
24   Muskogee at least involved wage and hour
25   compliance; is that right?

Electronically signed by Brande A. Browne (101-025-478-3970)                    55122a5b-1535-4b68-9002-8f1eeefc14f9

Page 10

1    A   Yes.
2    Q   Did your job with Johnson Controls also involve --
3    A   To a certain degree.  At the corporate office, the
4        vast majority of the employees were exempt because
5        it was executives and accountants, IT people,
6        those type of things.  So to a lesser degree, it
7        did, but it was there too as well.
8    Q   Did any of your other jobs prior to Muskogee
9        involve wage and hour compliance work?
10   A   No.
11   Q   Can you tell me about your wage and hour
12       compliance work experience with Muskogee in a
13       little more detail?
14   A   What it was mainly around, we had templates where
15       you would -- if a job came in, we'd review that
16       job as relation to a checklist to determine
17       whether it would qualify to be exempt or
18       nonexempt.
19   Q   And you didn't put together the checklist; is that
20       right?
21   A   I might have modified them, but they were there
22       when I first started.
23   Q   How would -- strike that.  What would lead you to
24       want to modify one of the checklists?
25   A   The flow mainly with those, that they just didn't

Page 11

1        flow the way we would go through the process.
2    Q   So you weren't modifying them to change standards
3        based on --
4    A   No.
5    Q   -- legal analysis or anything like that?
6    A   No.  They were very standard, common checklists
7        used by a lot of organizations.
8    Q   And you did very little wage and hour compliance
9        work with Johnson Controls; is that a fair
10       assessment?
11   A   That would be correct.
12   Q   Let's talk about your employment with Aurora.  You
13       said you started in 2002; is that right?
14   A   Correct.
15   Q   And what position were you hired into?
16   A   The manager of compensation.
17   Q   And tell me about the job duties associated with
18       that.
19   A   The main role was to manage the day-to-day
20       compensation function of our medical centers and
21       clinics.  Most of that revolved around job
22       evaluation, restructures of the organizations,
23       determining if jobs were exempt or nonexempt,
24       interpreting policy, that type of stuff.
25   Q   What do you mean by interpreting policy?

Page 12

1    A   If there were written policies that related to
2        compensation, the HR -- the HR people in the field
3        are at the sites, or even the managers would call
4        and say I have this situation.  What's the best
5        way to handle it.
6    Q   In terms of your wage and hour compliance work in
7        your position as the manager of compensation, can
8        you tell me about that job function?
9    A   That job function as the manager when I started,
10       was related to interpreting the policies that
11       exist that were on wage and hour, because that
12       would have been until late 2003.  So it was only
13       about a year and a half to two years at the most.
14       So it would be interpreting what was already in
15       existence at the time, and then utilizing -- we
16       actually utilized a software package to determine
17       whether jobs were exempt or nonexempt.
18   Q   What software package was that?
19   A   It's in the box.  I can't think of the name of the
20       exact company.  It's ComplyWare, maybe.
21           (Discussion off the record)
22   Q   I'm showing you what has not been marked for
23       today, but which is a software box that says
24       ComplyWare, FLSA on the front.  Is this the
25       software that you were just referring to?

Page 13

1    A   That is correct, yes.
2    Q   How did you use the software to determine whether
3        or not someone was exempt?
4    A   The software contains templates built into it.  It
5        asks you questions, and you provide answers to
6        those questions.  As you're working through it,
7        there's also the ability to toggle back in the
8        regulations text if you need to.  Your question
9        that you answer prompts another question, and then
10       it walks you all the way through, and at the end
11       of this process, it tells you, from the software's
12       perspective, whether it believes the job to be
13       exempt or nonexempt based on how you answer those
14       questions.
15   Q   So the way the software works is you're inputting
16       facts about the job duties and descriptions, and
17       then getting an opinion from the software as to
18       whether the person is exempt or nonexempt; is that
19       fair?
20   A   Correct, yes.
21   Q   And approximately how often would you determine
22       whether or not a position was exempt or not using
23       the ComplyWare software?
24   A   Well, the compensation analysts within the
25       department use it the most.  I would guess it's

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392

Electronically signed by Brande A. Browne (101-025-478-3970)                                      55122a5b-1535-4b68-9002-8f1eeefc14f9

1    just a few times a week at most.  A lot of the
2    jobs are, they come through, are revisions of
3    existing jobs, whether they're a rad tech, an
4    R.N., those type of roles.  They're just very
5    consistent.  And we treat some jobs as
6    nonexempt -- we treat almost all the jobs as
7    nonexempt even if they could qualify for exempt
8    based on the market.
9    Q  I think you said compensation technician?
10   A  Compensation analyst.
11   Q  And is that a position that was subordinate to you
12      as a manager of compensation?
13   A  Yes.
14   Q  So were you actually entering the information in,
15      or were people entering it in for you?
16   A  Well, some of them I entered it in if I was
17      dealing with the job or the request.  But if a
18      request came to them, they would be doing it
19      themselves.
20   Q  After your position as the manager of
21      compensation, what was the next position that you
22      held with Aurora?
23   A  Director of compensation.
24   Q  And is that your current position?
25   A  Yes.

1    individual?
2    A  Those three, yes, report to the manager of
3       compensation.
4    Q  And who is that?
5    A  That's Shannon Grall.
6    Q  And does Ms. Grall report to you?
7    A  Yes.
8    Q  So at some point fairly early on in your
9       employment with Aurora, you were promoted to the
10      director of compensation.  Can you tell me what
11      that job is all about, and how it differs from the
12      manager of compensation?
13   A  It's similar to the manager with a few exceptions.
14      It does more around the strategy and the policy
15      development for the organization.  It also has
16      responsibility for the executive comp and the
17      incentive programs within Aurora, where the
18      manager is more day-to-day, working with more
19      routine issues that come up or requests.  The
20      director's job is more around, again, more
21      strategy, long-term planning, the budgeting for
22      the year, determining how Aurora is going to pay
23      people going into the following year.
24   Q  More of a big picture position?
25   A  It's a much bigger picture position.

1    Q  Is that a promotion?
2    A  Yes.
3    Q  When did that promotion take place?
4    A  I don't remember the exact date, but it was
5       somewhere in 2002, late 2002, I believe.
6    Q  What month was it approximately that you started
7       with Aurora?
8    A  May.
9    Q  So this occurred maybe less than a year into your
10      job with Aurora?
11   A  I can't remember the exact dates, 2002.  It could
12      have been 2003.  I don't remember the exact date.
13   Q  You were talking about the compensation analyst.
14      Do you know approximately how many compensation
15      analysts Aurora currently employs?
16   A  We currently have four.  We have three and one
17      opening.
18   Q  And those analysts, do they all work out of the
19      same office?
20   A  Yes.
21   Q  Which office is that?
22   A  It's the business center office on -- I don't know
23      what with street is it on.  Forest Home, I guess,
24      would be the main road.
25   Q  Do all of those analysts report to the same

1    Q  As director of compensation, who do you report to?
2    A  Kathy Klobuchar.
3    Q  What's Ms. Klobuchar's title?
4    A  She's the vice president of compensation benefits
5       and HR systems.
6    Q  And who does she report to?
7    A  She would report -- well, right now she's
8       reporting to Dwight Morgan as he's the interim
9       head of HR for the whole organization.  There's a
10      search going on for that position.
11   Q  As I understand it, Mr. Morgan reports to the
12      president of Aurora or maybe the CEO?
13   A  Yeah.  President and CEO of Aurora, correct.
14   Q  And that's one person, president and CEO is one
15      title?
16   A  Yes.
17   Q  So between you and the CEO of Aurora, there's two
18      people, and then a direct report to the CEO?
19   A  Correct.
20   Q  And how many people report to you?
21   A  Total, there is -- directly?
22   Q  Yes.
23   A  Three.
24   Q  And who are those individuals?
25   A  That would be Chris Miezin.

Electronically signed by Brande A. Browne (101-025-478-3970)                                    55122a5b-1535-4b68-9002-8f1eeefc14f9

Page 18

1  Q  Is Chris a man or a woman?
2  A  Man.  I'm sorry, woman.
3  Q  So there's Chris Miezin, and what's Ms. Miezin's
4     position?
5  A  She's the compensation analyst for projects.
6  Q  Was she one of the three compensation analysts
7     that you just mentioned before?
8  A  No, she's in addition to that.
9  Q  And then in addition to Ms. Miezin?
10  A  Joyce Ballet, B-a-l-l-e-t, I believe.
11  Q  And what does Ms. Ballet do?
12  A  She's a senior compensation analyst.
13  Q  And the third person?
14  A  Jill Metrusias.
15  Q  What does Ms. Metrusias do?
16  A  She's a compensation analyst, but she handles all
17     of our survey participation and loading into our
18     electronic database.  She's part-time.
19  Q  And the manager of compensation, your former
20     position, that position does not report
21     directly --
22  A  I'm sorry, that one as well.  Shannon does as
23     well.
24  Q  And Shannon, as the manager of compensation, was
25     she the person that replaced you in that role, or

Page 19

1     were there other people in between her?
2  A  There was another person in between her,
3     Steve Schroeder.
4  Q  And Mr. Schroeder is the person who replaced you
5     when you were in that position?
6  A  Yes.
7  Q  How long was he in that role?
8  A  I don't know for sure, but close to two years, and
9     then he moved into our employment area as manager
10     of employment.
11  Q  He is still with Aurora?
12  A  No, he has since left.
13  Q  So he took another position with Aurora and then
14     subsequently left?
15  A  Yes.
16  Q  Do you know if he's still in the state of
17     Wisconsin?
18  A  Yes.  He's at Wisconsin Lutheran College.  He's
19     the head of HR there.
20  Q  So I think we had four people that reported to
21     you, Chris Miezin, Joyce Ballet, Jill Metrusias,
22     and Shannon?
23  A  Grall, G-r-a-l-l.
24  Q  Anyone else that directly reports to you?
25  A  No.

Page 20

1  Q  I'm going to show you what was previously marked
2     at the first part of this 30(b)6 deposition as
3     Exhibit 1.  Have you seen this document before?
4  A  Yes.
5  Q  This is the 30(b)6 deposition --
6          MR. SCULLEN:  Let me just clarify
7     for the record.  I actually showed him the
8     updated deposition notice.  I assume it
9     hasn't changed in relevant part, but I
10     thought I would just clarify for the record
11     so that he isn't confused.  If there is a
12     change, you should point it out.
13          MR. PARSONS:  I will state on the
14     record that in relevant part, the document is
15     not changed.
16  Q  If I could have you turn to the second page of
17     that, Mr. Rountree.  Do you understand that you've
18     been designated as the person most competent to
19     testify for Aurora as to topic number 6?
20  A  Yes.
21  Q  Let's just go through that and talk about that a
22     little bit.  The first sentence there says that
23     you're competent to testify as to Aurora's
24     policies and practices regarding meal periods,
25     including the tracking and payment for on-duty

Page 21

1     meal periods.  Can you tell me what your
2     qualifications are to testify as to that topic?
3  A  The meal periods policy is part of our functional
4     area.  It's our responsibility to maintain and
5     revise that policy as needed.  Qualification-wise
6     would be the organizations that we belong to or
7     that I belong to provide a large amount of
8     educational materials related to wage and hour.
9     They maintain significant databases around pretty
10     much all those topics.  We use the Department of
11     Labor website, the Department of Workforce
12     Development.  The certifications that we've talked
13     about earlier were also contained in the
14     regulatory sections in those as well.
15          As well as we use -- we have a lot of HR
16     consulting companies that we work with that
17     provide updates as changes come out, the e-mail,
18     they provide webinars, been to seminars, both with
19     Quarles & Brady and Foley, on wage and hour
20     updates and regulations.
21  Q  And you said that it's -- you might have said it's
22     your department or your job that's responsible for
23     maintaining and revising the meal break policies;
24     is that right?
25  A  That would be correct, yes.

6 (Pages 18 to 21)

Electronically signed by Brande A. Browne (101-025-478-3970)                                55122a5b-1535-4b68-9002-8f1eeefc14f9

1   Q   Do you work with any other -- strike that.  Are
2       you the person who has the final say in revising
3       the meal break policy, or are there other
4       individuals that you need to get clearance from in
5       order to do so?
6   A   As far as the drafting policy that would come out
7       of our area, it would then go to my boss Kathy for
8       review and then eventually to the head of HR to
9       review and decide whether it can be approved and
10      put into the policy manual, or if it even needs
11      further review with the administrative team before
12      it goes into the policy manual.
13  Q   So it would be reviewed by Kathy and then
14      eventually by Dwight Morgan before a final
15      decision is made; is that right?
16  A   Final approval, yes.  Minimally, that would be the
17      two people that would look at it.  If the policy
18      relates to other departments, they would also be
19      asked to give feedback on that as well.
20  Q   And I'm assuming there might be a review by the
21      legal department or something like that as well?
22  A   Yes.
23  Q   So the next sentence of this topic is the identity
24      of any individuals who participated in setting
25      those policies, meaning the meal break policies.

1       What makes you competent to testify as to that
2       area?
3   A   Well, the policies that I have, you know, dealt
4       with and revised or created myself, I would know
5       who has seen those and provided input to them.
6       Other policies I would not know directly who's
7       involved.
8   Q   I just concerned with the meal break policy.  So
9       in terms of the current status of that policy and
10      any changes that had been made to that policy, you
11      know the individuals who were involved in making
12      those decisions?
13  A   I'm not sure.  I mean, prior to my arriving at
14      Aurora, no.  Anything that happened since I've
15      been in the role that I've changed, I would.
16  Q   So any changes that have been made to the meal
17      policy from 2002 to present or at least since
18      you've been in the role of director of
19      compensation to present, you know the individuals
20      who were involved in making those decisions?
21  A   I'm not 100 percent sure on all the changes on the
22      meal break policy.
23  Q   What parts are you unsure about?
24  A   It was modified in '04.  It's a very basic policy,
25      very straightforward.  We're trying to find out

1       now -- I don't recall what we modified in '04.  It
2       could have been just minor wording changes.  Since
3       it's such a direct policy, there isn't much we
4       could have changed related to how it functions and
5       operates.  We need to clarify what we changed
6       during that '04.  I don't recall, but it was
7       updated in '04.
8   Q   When it was changed in '04, were you involved in
9       the change?
10  A   I don't recall.  That's why I need to see what was
11      changed to make sure.
12  Q   I understand what you're saying.  So it was
13      changed in '04.  You may or may not have been
14      involved in that, but you're looking into that; is
15      that right?
16  A   Correct.
17  Q   If the policy was changed in '04, who else besides
18      you would have possibly been involved in that
19      change?
20  A   It could have been Kathy at the time.  It could
21      have been Laurie Mahoney, our former head of HR
22      for the system.  It could have been -- I don't
23      know if Dawn's department, not necessarily her.
24      At the time, there was a Diane Eckstrand in the
25      role kind as a VP of corporate HR that might have

1       changed something as well.
2   Q   Since 2004, has the policy been changed?
3   A   No, it has not.
4   Q   So in your tenure as the director of compensation,
5       the policy has only been changed once?
6   A   Correct.
7   Q   The next portion of this topic says the materials
8       or advice relied on in setting those policies,
9       again, meaning meal break policy.  If the policy
10      was only changed in 2004, and you're not sure if
11      you were involved in that, are you able to testify
12      as to what advice or what was relied on in making
13      that change?
14  A   Not with that particular policy, no.
15          MR. SCULLEN:  Let me just clarify
16      for the record.  To the extent you're
17      questioning him about the system policy
18      titled meal and break period, there are other
19      system policies that address meal and break
20      periods that may have been reviewed more
21      recently.  So you might want to just clarify
22      your question with him in that regard.
23  Q   Mr. Rountree, you had mentioned that your
24      department or position was in charge of
25      maintaining and revising the Aurora meal break

Electronically signed by Brande A. Browne (101-025-478-3970)                                    55122a5b-1535-4b68-9002-8f1eeefc14f9

Page 26

1    policy.  What policy did you mean by that?
2    A  Well, it's the policy specifically titled work
3    week and meal periods, I believe is what it's
4    called.  There are a few other policies that we
5    have that have been more recently created and
6    revised that also refer to meal periods.
7    Actually, with a little more detail than that
8    policy does.
9    Q  Are you talking about Aurora system policy
10   number 34, work week and meal and rest periods?
11   A  Yes, correct.
12   Q  You said there were other policies that deal with
13   meal breaks.  What other policies are you talking
14   about?
15   A  There's a policy titled nonexempt and exempt
16   employee policy that deals with in more detail as
17   to the meal periods than the actual work week and
18   meal period policy does.
19   Q  And that's nonexempt and exempt employee policy,
20   which is policy 176?
21   A  Yes.
22   Q  Any other policies that you were referring to?
23   A  The payroll policy has a short blurb in it about
24   the meal periods as well; more in relation to how
25   it's handled in payroll, but it still is mentioned

Page 27

1    in there as well.
2    Q  And that's Aurora system policy number 77, the
3    payroll policy?
4    A  Yes.
5    Q  Any other policies?
6    A  Not that I'm aware of.
7    Q  The three policies we just talked about,
8    policy 34, policy 77, and policy 176, were there
9    any changes to those policies other than the
10   change in 2004 that you discussed in your tenure
11   as the director of compensation?
12   A  Yes.  I believe the payroll policy has been
13   updated as well.  That section was not necessarily
14   updated.  It was more the payroll processing
15   pieces of that policy.  We also created and have
16   revised the nonexempt/exempt policy since 2004.
17   Q  Have any of those policies been modified as it
18   pertains to the portions of those policies that
19   deal with meal breaks?
20   A  Yes.
21   Q  Which ones?
22   A  The nonexempt and exempt employee policy.
23   Q  And were you involved in that change to the
24   policy?
25   A  Yes.

Page 28

1    Q  What was your role in that change?
2    A  I drafted the policy when it was initially put
3    into place.
4    Q  Any other modifications to the meal break policy
5    or meal break portions of these other policies
6    that we were just discussing, other than the
7    change in 2004 and the change that you just
8    mentioned for the exempt/nonexempt employee
9    policy?
10   A  No.
11   Q  And you're competent to testify as to the change
12   to the exempt/nonexempt employee policy because
13   you're the person who drafted the changed
14   language?
15   A  Correct.  There was extensive research done right
16   after the regulations from the FLSA federal
17   standpoint changed in '04.  We did extensive
18   research around how that impacted Aurora, and what
19   we needed to create in that policy from a safe
20   harbor standpoint, which is mainly on the exempt
21   side.  But we also took that opportunity to
22   document in more detail how nonexempt employees
23   should be handled as well just so that the
24   managers and HR could understand what our
25   direction was and how we needed to comply with

Page 29

1    both the federal and state regulations.
2    Q  And you were involved in that project?
3    A  Yes.
4    Q  Who else was involved with that with you?
5    A  I'm trying to think back.  It was mainly done,
6    again, by the compensation department, which was,
7    at the time, just me.  There were different people
8    who would have reviewed it just from a -- not say
9    content as much as, you know, are the paragraphs
10   right, you know, structure of that nature,
11   spelling.  You know, we would have gone through
12   many renditions with other people to read it from
13   that perspective just to make sure we didn't have
14   typos and those types of things in it.
15   Q  Who was involved in it other than you whose
16   function in that process was to make sure that the
17   meal break language in there was in compliance
18   with state and federal laws?
19   A  We would have -- it would have been reviewed by
20   Kathy.  I don't know that -- from the standpoint
21   that it would have been to ensure compliance, but
22   she would have reviewed it.  It was reviewed by
23   several of the HR vice presidents in the system.
24   Q  Do you remember who?
25   A  At the time, that would have been Diane Eckstrand,

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392
Case 2:10-cv-00714-JPS   Filed 01/18/11   Page 58 of 74   Document 35-1

Electronically signed by Brande A. Browne (101-025-478-3970)                                    55122a5b-1535-4b68-9002-8f1eeefc14f9

1    Peter Platten, who's no longer with the company,
2    Gene Krauklis, Dwight Morgan, and Gwen Baumel.
3  Q  Do you know how long Kathy has been with Aurora?
4  A  Approximately 20 years.
5  Q  Do you know how long she has been in her current
6    position?
7  A  I think 20 years she has been the head of comp and
8    benefits.
9  Q  What about Dwight Morgan, how long has he been
10   with Aurora?
11 A  I believe the same amount.  Maybe a little bit
12   longer.  He came to Aurora when St. Luke's and I
13   believe it was Sinai-Samaritan at the time merged.
14   He was the HR person at Sinai=Samaritan.
15 Q  And was that like 1993 or so?
16 A  I don't know for sure when that was.
17 Q  How long has Mr. Morgan been in his current
18   position?
19 A  In the interim role?
20 Q  How long has he been in the interim role?
21 A  Laurie left in July, so since July of 2010.
22 Q  Prior to that, what position was he in?
23 A  He was the vice president of basically human
24   resource operations, and that changed in 2009.
25   All the site-based VPs reported up to him.

1  Q  And so then the last topic that I wanted to ask
2    you about, or make sure that you're competent to
3    testify on, is the efforts taken by Aurora to
4    ensure that it's meal break policies remain in
5    compliance with the Wisconsin and federal wage and
6    hour laws.  Is that one of your job duties?
7  A  Yes, that would be correct.
8  Q  And who do you report to on that issue?
9  A  I'm sorry, clarify what --
10 Q  Let me ask that a different way.  Are you the
11   ultimate person at Aurora who's responsible for
12   the meal break policy's compliance with Wisconsin
13   wage and hour laws?
14 A  I don't know that I would be the ultimate person.
15   I believe that would go up through higher levels
16   than me.  It's my responsibility to review the
17   policies periodically and make sure that they stay
18   in compliance with both the federal and state
19   regulations.
20 Q  And when you're doing that review, who do you
21   report your opinions to?
22 A  If there's no change, we wouldn't report anything.
23   If there's a change, we would go through the
24   revision process and send that up for approval so
25   that the policy actually gets updated in our

1    system policy manuals.
2  Q  And when you say the revision process, how does
3    that process start?
4  A  We would review the policy.  If we found there
5    were things that needed to change, we would draft
6    those changes, and once we had agreement from
7    various sources, such as we would use the various
8    resources to make sure that the compliance, if
9    there was a major change, is correct, and we would
10   have probably a legal review of that as well.  And
11   once everyone is in agreement that it says what it
12   says, and the intent is in agreement with what the
13   law states, there's a form that's filled out
14   that's attached to the policy that says here's
15   what we're changing and why.  That's then sent up
16   to Dwight's office basically.
17     They review that, and if the policy -- they
18   make a determination there whether they just
19   approve it at that level and it gets published, or
20   if it needs to go to the administrative leadership
21   for review.  Most of these policies don't go to
22   that level.
23 Q  But in terms of making sure that the meal break
24   policy is in compliance with Wisconsin and federal
25   wage and hour laws, you can tell me everything

1    Aurora does to make sure that that happens?
2  A  I don't know if I could tell you everything, but I
3    could tell you a lot of things that Aurora does.
4  Q  What couldn't you tell me?
5        MR. SCULLEN:  You want him to tell
6      you what he doesn't know?  I'm not sure
7      that's a very fair question.
8  Q  Is there a part of the process that you know about
9    that you can't tell me about?
10 A  No.
11 Q  That's fair enough.
12     (Discussion off the record)
13 Q  Again, the topics that we just discussed in topic
14   number 6 in the deposition notice, you are the
15   person at Aurora who's most knowledgeable of these
16   issues; is that right?
17 A  That's correct, yes.
18 Q  Let's talk about Aurora's meal break policy, and
19   I'm going to start off by asking some questions
20   about the policy in general, but also as it
21   applies to Aurora's security officers or loss
22   prevention officers.  Can you tell me, in general,
23   what is Aurora's meal break policy as it relates
24   to its security officers?
25 A  Aurora's policy on meal breaks basically states,

9 (Pages 30 to 33)

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392
Case 2:10-cv-00714-JPS  Filed 01/18/11  Page 59 of 74  Document 35-1

Electronically signed by Brande A. Browne (101-025-478-3970)                    55122a5b-1535-4b68-9002-8f1eeefc14f9

Page 34

1    and in practice, we want employees to take a
2    30-minute uninterrupted lunch if they work more
3    than six hours in a day.  We want them to try to
4    take that away from the department so people won't
5    come up and ask them business or work-related
6    questions that would require them to either cancel
7    the lunch or start it over.
8  Q  And Aurora's policy for paying its security
9     officers for their lunch breaks is what?
10 A  It would be the same as all other employees.  They
11    would take the 30-minute uninterrupted lunch
12    break, and they would not be paid for that 30
13    minutes.  If they were interrupted for some
14    reason, then they would either be directed to
15    cancel their lunch, or depending on how much the
16    interruption was, they could start it over and get
17    another 30 minutes after that of continuous time
18    off.
19 Q  But in the absence of taking positive action to
20    cancel the lunch, Aurora's policy is to
21    automatically deduct a half-hour?
22 A  Yes, correct.  For any employee who works over six
23    hours, Aurora's policy is to automatically deduct
24    30 minutes for their lunch, and then employees are
25    instructed if they don't take the lunch, to cancel

Page 35

1    it.
2  Q  And this policy of automatically deducting 30
3     minutes for each six-hour shift, you said?
4  A  Anything over six hours, yes.
5  Q  How long has that policy been in effect?
6  A  To my knowledge, longer than I've been there, in
7     the eight and half years that I've been there.  I
8     don't know the exact time it was put into place.
9  Q  If I wanted to figure out how long that policy was
10    in effect, what would I do?
11 A  I believe we would have to -- payroll might have
12    records as to when it was put into place because
13    it's a Kronos programming method that they use to
14    do that.  So there may be records in payroll that
15    would state when that was in place, or Rita Klopf
16    in payroll might know the exact date it was put
17    in.
18 Q  I've asked her.  She doesn't know.
19        MR. SCULLEN:  There's a point
20    which -- you've got some broad leeway, but
21    you know from her testimony, it has been in
22    play since 1996.  I hate to object to
23    relevance.  At some point, it gets a little
24    bit far afield.
25        MR. PARSONS:  I don't think it's

Page 36

1    irrelevant to find out how that decision was
2    made to automatically deduct a half-hour.  I
3    think that might be fairly relevant.
4        MR. SCULLEN:  I guess we could
5    maybe agree to disagree.  Since we know it's
6    in place and it has been, I don't think
7    you're alleging that the simple fact of
8    having an automatic deduction is illegal.
9        MR. PARSONS:  No, it certainly
10   isn't.
11       MR. ZOELLER:  Any reasonableness is
12   going to depend on what happened at the time
13   the policy was implemented.  I don't think it
14   matters how far back in time that was.
15       MR. SCULLEN:  Well, I would
16   disagree to the extent that there's no
17   legality of the automatic deduction, and he
18   would testify that, you know, the policies
19   and practices have been reviewed.  You know,
20   the relevant time is his review of these
21   policies in 2008.  So I don't think we have
22   to historically go back and say what decision
23   was made 20 years ago.  Certainly, it's well
24   outside the statutory limitation period, and
25   he has testified that he has reviewed these

Page 37

1    policies and practices as recently as 2008.
2        MR. PARSONS:  I think that's fair
3    as long as we can get an understanding as to
4    what was reviewed in 2008.  We'll find out.
5  Q  I'm assuming then in terms of who would have been
6     involved in making -- forming Aurora's policy
7     to automatically deduct a half-hour from its
8     employees for working more than six hours, you do
9     not know who was involved in that decision?
10 A  I do not know.  A policy change of that nature
11    would require significant involvement.  It would
12    have to be communicated to each employee.
13 Q  For all we know, the policies never change, it
14    might have been Aurora's policy since the start of
15    the company, which was automatically --
16 A  Yeah, which I believe it was '85.  It could have
17    been there all along.
18       MR. SCULLEN:  In my recollection,
19    in Rita's deposition testimony, I thought she
20    testified that that was the case, that when
21    there was the initial merger, that that was
22    in place.
23       MR. ZOELLER:  I think there was a
24    suggestion made that there may have been.  I
25    don't think she was confidently able to

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392
Case 2:10-cv-00714-JPS  Filed 01/18/11  Page 60 of 74  Document 35-1

Electronically signed by Brande A. Browne (101-025-478-3970)                55122a5b-1535-4b68-9002-8f1eeefc14f9

Page 38

1    testify that that might have been the case.
2         MR. PARSONS: My recollection was
3    there may have been a change when the Kronos
4    system was put in place around '93, but
5    again, she didn't know for sure.
6  Q  In terms of the meal break policy that we just
7    talked about, who at Aurora has the authority to
8    change that policy?
9  A  I would say, you know, my department can suggest
10   changes. Once they're approved, I would say at
11   that point it would be whoever is the head of HR
12   for the organization.
13 Q  And currently, who is that?
14 A  Dwight Morgan.
15 Q  And is there a formal process by which changes to
16   the meal break policy would take place?
17 A  Yes.
18 Q  Can you describe that process?
19 A  Well, if there was a need to make a change to the
20   policy, again, my department would review it. We
21   would make the edits, get receiving input from the
22   departments that it affects, which would be HR and
23   payroll. Once we have agreement that it says what
24   we want it to say, we have legal confirmation that
25   it is within the bounds of the law, we would send

Page 39

1    that up for approval through Dwight's office.
2    There's a formal process that's a form that's
3    basically you describe what you're changing and
4    why that goes with that.
5  Q  What's the name of that form?
6  A  It's in a policy called policy on policies.
7         (Discussion off the record)
8         (Exhibit No. 28 marked for
9          identification)
10 Q  Mr. Rountree, I'm showing you what has been marked
11   as Exhibit 28 for today's deposition. This is a
12   document that says Policy on Policies, which is
13   policy number 112; do you see that?
14 A  Yes.
15 Q  Was this the document you were just referring to
16   in discussing the process by which Aurora can
17   modify its policies?
18 A  Yes.
19 Q  And can you walk me through the process as it's
20   laid out in this policy?
21 A  The policy on policies refers to every policy that
22   Aurora has, but it's related to how I would use
23   it. Again, the functional area is the owner of
24   the policy, the functional area such as work week
25   and meal periods would be compensation. It would

Page 40

1    then get reviewed by -- well, we would draft it
2    from the technical aspect as it relates to
3    compensation, and then that content would be
4    reviewed against lots of resources that we have
5    available to us. Legal counsel would probably
6    review it as well, depending on which policy it
7    is. That's when it goes -- there's a form
8    attached to the policy, it gets filled out, and
9    then it's sent up for final approval to actually
10   get put into the official policy manual.
11 Q  And when you talk about a form, there's a form
12   that's three pages into this exhibit that says
13   policy data form?
14 A  Yes, that's correct.
15 Q  And that's a two-page document; is that right?
16 A  Yes.
17 Q  And this is the form you were talking about
18   earlier as well where you'd indicate what the
19   change is?
20 A  Yes. And it could be a new policy as well. I
21   mean, sometimes it's revisions to current ones,
22   but it could be a new policy, it doesn't exist
23   today, that would go through the same process.
24 Q  Got it. Thank you. Those are all the questions I
25   have on Exhibit 28 then. When we were taking the

Page 41

1    first part of this deposition, Ms. Faucett was
2    testifying as to a number of policies that Aurora
3    has that relate to the meal break policy, and what
4    I'd like to do is just sort of understand the
5    significance and maybe the sort of priority order
6    of these policies. I'm going to show you what has
7    been marked previously as Exhibit 10. Do you know
8    what this document is?
9  A  The table of contents to our system policy manual.
10 Q  And the system policy manual is what?
11 A  It's the overriding policies that the different
12   organizations within Aurora, and thus, their
13   departments, would function, the policies that
14   they would follow.
15 Q  These are policies that apply to Aurora on a
16   system-wide basis?
17 A  Correct, across all entities of Aurora.
18 Q  And all other Aurora policies and procedures,
19   whatever is in place, has to comply with the
20   policies that are contained in here; is that a
21   fair way to say it?
22 A  Yes, they should follow those policies.
23 Q  And then I'm going to show you what was previously
24   marked as Exhibits 8, 9, and 13 from this
25   deposition. Do you know what these documents are?

11 (Pages 38 to 41)

Electronically signed by Brande A. Browne (101-025-478-3970)                              55122a5b-1535-4b68-9002-8f1eeefc14f9

1   A   Yes.
2   Q   Can you tell me about them?
3   A   One document is the work week meal and rest period
4       policy.  One is the payroll policy, and one is the
5       nonexempt and exempt employee policy.
6   Q   As I understand things from your testimony and
7       Ms. Faucett's testimony previously, these are the
8       only policies in the Aurora system policy manual
9       that have to do with Aurora's meal and break
10      policy; is that fair?
11  A   Yes, that would be correct.
12  Q   The main policy, I'm assuming.  Dealing with this
13      is policy number 34, which is Exhibit 16, the work
14      week meal and rest periods policy; is that fair?
15  A   Yes.
16  Q   And in looking at that, I'm looking at Section 2,
17      meal periods, and that has six sections, A, B, C,
18      D, E, and F; do you see that?
19  A   Yes.
20  Q   And these six sections of the meal period policy
21      apply to all Aurora employees; is that right?
22  A   That is correct.
23  Q   And looking specifically at policy or Section D of
24      that policy, which talks about instances where an
25      employee does not have an uninterrupted 30-minute

1       meal period, that says that this is supposed to be
2       considered working time, and it must be
3       specifically authorized by a responsible manager
4       and supervisor, and once that approval is granted,
5       the employee must cancel the meal through the
6       automatic time and attendance system at the end of
7       their shift; did I summarize that correctly?
8   A   That's correct.
9   Q   And that's the policy for all Aurora employees?
10  A   Correct.
11  Q   And in terms of the -- I'm looking now at Exhibit
12      No. 8, which is the nonexempt and exempt employee
13      policy.
14  A   Okay.
15  Q   Again, same thing, this policy applies to all
16      Aurora employees across the board?
17  A   Yes.
18  Q   And Aurora classifies its security officers across
19      the board as nonexempt employees, correct?
20  A   Correct.
21  Q   And so anytime that a security officer works more
22      than 40 hours in a week, that time would be paid
23      at time and a half?
24  A   Correct.
25  Q   On the nonexempt and exempt employee policy,

1       there's a section, which is Section 3F5, which is
2       entitled meal periods must be at least 30 minutes
3       in length, and this section here, Section 5, A, B,
4       C, D, and E, is this the only portion of the
5       nonexempt and exempt employee policy that deals
6       with meal breaks?
7   A   Yes.  There is a small section, it just refers to
8       it in number 6 below as well.
9   Q   Anything else other than Section 3F5 and 6 in this
10      policy that deals with meal breaks?
11          MR. SCULLEN:  Why don't you take
12      the time to go through it unless you know.
13  A   Section G8 also refers to it, and Section H3.  I
14      believe that is it.
15  Q   Then turning your attention to Exhibit No. 9,
16      which is the payroll policy, can you tell me what
17      portions of that policy deal with meal breaks?
18  A   They refer to it under the purpose, under A, just
19      by policy number and name.  They're just saying
20      this policy refers to other policies.  It's also
21      under B2, it talks about the work week section,
22      and then under --
23  Q   And when you say -- it's actually not B2; it's
24      just Section 2.
25  A   Section 2, correct, and under Section 9, it refers

1       to meal periods as well.
2   Q   And all of these policies that we were just
3       talking about, the work week policy, the nonexempt
4       and exempt employee policy and the payroll policy,
5       all of these policies can be read together to
6       describe Aurora's meal break policy, which you
7       described earlier; is that fair?
8   A   That's correct.  The payroll policy will have less
9       detail than the other two.
10  Q   We'll talk about those a little bit more in
11      detail, but for now I'd like to show you what was
12      marked previously as Exhibit 6 to this deposition.
13      Do you know what this document is?
14  A   That's the employee handbook.
15  Q   Again, similarly to the policies that we just
16      talked about, this employee handbook applies to
17      all Aurora employees; is that right?
18  A   Yes.
19  Q   And there's sections in the employee handbook, I'm
20      sure, which discuss the meal break policy?
21  A   Correct.
22  Q   And those sections would be in compliance with the
23      Aurora system policies?
24  A   Yes, they would.
25  Q   The document that I'm showing you or that I've

Electronically signed by Brande A. Browne (101-025-478-3970)                                    55122a5b-1535-4b68-9002-8f1eeefc14f9

1    shown you as Exhibit 6 has a date on the front
2    cover of June 29th, 2009. Do you know what that
3    date means?
4  A  I believe it's the date that it was last updated.
5  Q  And so is it safe to assume that this is the
6    current Aurora employee handbook?
7  A  Yes, to my knowledge, it is.
8  Q  Prior to the June 29th, 2009 update, do you know
9    when it was updated prior to that?
10 A  No, I do not.
11 Q  Was it updated during your employment with Aurora?
12 A  I believe it has been updated. I don't know the
13   exact date that it would have been.
14 Q  Do you know if the meal break language contained
15   in the employee handbook was updated during your
16   employment with Aurora?
17 A  Not that I'm aware of.
18 Q  We were just talking about how the automatic
19   half-hour deduction policy for meal breaks applies
20   to all Aurora nonexempt employees. Do you know
21   approximately how many nonexempt employees Aurora
22   currently employs?
23 A  Roughly, I would say 18 to 20,000. I don't know
24   the exact number.
25 Q  And in terms of how many of those are security

1    officers, is somewhere between 200 and 250 a fair
2    approximation?
3  A  Yes, I would have said around 200.
4  Q  I'm going to jump back and have you look at
5    Exhibit No. 13 again, which is the work week meal
6    and rest period policy. Up at the top in the
7    left-hand corner, under policy number 34, it says
8    effective 1/85, do you know what that means?
9  A  That means the date that it was first put into
10   place.
11 Q  And historically, is that the inception of Aurora
12   as a company, that date?
13 A  I don't know for sure. I believe it's close.
14 Q  And then below that, it says revisions, 6/95, 5/04
15   and 9/04; what do those dates mean?
16 A  Those are dates that something in the policy was
17   updated. It could simply be a sentence being
18   reworded to a misspelling. It could be for any
19   reason.
20 Q  Does Aurora keep historical versions of its
21   policies?
22 A  Yes, I believe so.
23 Q  So if I wanted to see the version prior to 9 of
24   '04 of the work and meal rest period policy, it
25   would be possible to see that?

1  A  I don't know if there is a retention period for
2    them. Policy on policies has a retention period
3    in it. I just don't know how far back they keep
4    those.
5  Q  If you looked at the policy on policies, would
6    that help you, which is Exhibit 28?
7  A  Yes. On 2A, it refers to the administrative
8    department should be retained for a minimum of
9    five years. It's possible that after five years
10   that some of these may be gone.
11 Q  Who would be the person at Aurora who would best
12   know how to find the historical versions of the
13   policies that we've just been talking about?
14 A  I would -- probably the administrative assistant
15   for our head of HR.
16 Q  So that would be Dwight Morgan's administrative
17   assistant?
18 A  No, because he's the interim. It would be the
19   open position's administrative assistant.
20 Q  Do you know who that person is?
21 A  It used to be Andrea Williams. She has a new
22   name, Andrea Voleride, I believe. Don't ask me
23   how to spell it.
24 Q  Do you know how long she has been in that
25   position?

1  A  She was Dwight's assistant when I came to Aurora.
2    Sometime between when I started and now, she moved
3    over to be the assistant for the VP, the senior VP
4    of HR when that assistant retired.
5  Q  At a minimum, the historical versions of these
6    documents are kept for five years. They might be
7    kept longer, and who is the person in charge of
8    keeping the historical versions?
9  A  To my knowledge, it would be, the current position
10   would be Andrea Voleride.
11 Q  And she would do that at the request of the head
12   of HR?
13 A  Correct.
14 Q  Then the same question regarding Exhibit 6. I'm
15   sorry, Exhibit 6 is the handbook. Does Aurora
16   have a policy in terms of how long they keep
17   historical versions of handbooks?
18 A  I'm not aware of one.
19 Q  And that's not covered by the policy on policies?
20 A  I'm not sure if it applies to that or not.
21 Q  In terms of making a change to the employee
22   handbook, as it relates only to the meal and rest
23   break policy, the portion of the handbook that
24   discusses that policy, who are the people who have
25   the authority to do that?

13 (Pages 46 to 49)

Electronically signed by Brande A. Browne (101-025-478-3970)                                55122a5b-1535-4b68-9002-8f1eeefc14f9

1  A  Well, the handbook should follow what the
2     published policies are.  So if there was a change
3     to the meal and work week policy, we would need to
4     also update the handbook to match that.
5  Q  And who would do that?
6  A  Once it was approved, we would talk to who the
7     person managing the handbook, which I believe
8     right now is Shannon Christenson, and we would
9     work with her to get that a update made.
10        (Exhibit No. 29 marked for
11         identification)
12  Q  Mr. Rountree, I've shown you what has been marked
13     today as Exhibit 29.  Do you know what this
14     document is?
15  A  No, I don't.
16  Q  What it appears to me to be is a set of Aurora
17     policies that apply to its corporate loss
18     prevention services.  I've got policy 1, and then
19     if you thumb through this, the last policy that I
20     see is, I think, policy 29, which is like three
21     pages from the end; do you see that?
22  A  Yes.
23  Q  You don't know anything about this document?
24  A  No.
25  Q  For Aurora, in terms of providing additional

1     policies to its loss prevention services folks,
2     who would be responsible for that?
3  A  I believe it would be the head of loss prevention.
4  Q  And that's Mr. Cummings?
5  A  Correct, Mike Cummings.
6  Q  Would Mr. Cummings, to your knowledge, draft these
7     policies?
8  A  I don't know for sure.
9        (Discussion off the record)
10  Q  Mr. Rountree, having a chance to take a little bit
11     of a closer look at the document, did it become
12     more familiar to you in any way?
13  A  No.
14  Q  Is there a person or department at Aurora in its
15     human resources department that's responsible for
16     providing policies like this to the loss
17     prevention department?
18  A  Not that I'm aware of, no.
19  Q  I'm not sure if there is, but if there was
20     language in this document that had to do with the
21     meal break policy, it would have to be in
22     compliance with the policies and the system
23     policies; is that right?
24  A  Yes, that would be correct.
25        (Exhibit No. 30 marked for

1        identification)
2  Q  Mr. Rountree, I'm showing you what has been marked
3     as Exhibit 30.  Do you know what this document is?
4  A  No, I do not.
5        (Discussion off the record)
6  Q  I've shown you what has been marked as Exhibit 30,
7     which is a document that's titled Aurora Health
8     Care Loss Prevention Services, Meal and Rest
9     Periods.  You have not seen this document?
10  A  No, I have not.
11  Q  This document, which appears to provide a meal and
12     rest period policy for Aurora's loss prevention
13     officers, this policy would have to be in
14     compliance with Aurora's system-wide policies; is
15     that right?
16  A  That is correct.
17  Q  Who's responsible for making sure that that would
18     be, in fact, in compliance with Aurora's
19     system-wide policies?
20  A  If the leadership of the department are going to
21     write policies which have more detail in them as
22     to how they operationalize the policy.  That would
23     be their responsibility for ensuring it's in
24     compliance.
25  Q  That was one of my questions.  This policy is more

1     of a -- certain departments are allowed in Aurora
2     to describe in more detail how they're going to
3     follow Aurora's system-wide policies?
4  A  Correct, how they're going to make it work for
5     their department.
6  Q  So it's called -- I guess it's not called
7     anything.  This might be considered a procedure in
8     terms of how you're going to do something?
9  A  Yes.
10  Q  And Aurora allows various departments to do that,
11     but then also various facilities to have
12     facility-specific rules, procedures to be in
13     compliance with overall policies?
14  A  Yes.
15        (Recess taken)
16        (Exhibit Nos. 31 through 33 marked for
17         identification)
18  Q  Mr. Rountree, I've put in front of you what now
19     has been marked as Exhibits 31, 32, and 33 for
20     today's deposition.  Have you seen any of these
21     documents?
22  A  I have seen them for the first time Friday.  I
23     have not seen them in detail before that.
24  Q  I'm assuming that when you say you saw them
25     Friday, that it was as part of your preparations

Electronically signed by Brande A. Browne (101-025-478-3970)                    55122a5b-1535-4b68-9002-8f1eeefc14f9

1    for this deposition?
2  A  Correct.
3  Q  And I don't want to know anything about your
4     conversations with your attorney as part of that
5     preparation, but you had not seen them prior to
6     Friday?
7  A  Correct.
8  Q  Do you know what they are, having had a chance to
9     take a look at them now or on Friday?
10  A  They are the operational procedures of each of the
11     security departments, how they handle meal and
12     rest periods within their facility.
13  Q  So big picture, Exhibit 30, do you know what that
14     document is as it compares to Exhibits 31, 32, and
15     33?
16  A  It appears to be the overall -- well, it's the
17     same type of policy.  I don't know exactly if this
18     is the broader policy of the loss prevention
19     department, or if it's just another facility's.
20  Q  And did you see this document on Friday?
21  A  Yes.
22  Q  Had you seen it prior to then?
23  A  No, I had not.
24  Q  We are done with all of those.
25         (Exhibit No. 34 marked for

1         identification)
2  Q  Showing you what has been marked as Exhibit 34,
3     have you seen this document before?
4  A  Yes.
5  Q  What is it?
6  A  Well, it is the page out of the employee handbook
7     that refers to rest and meal periods and pay and
8     hours.
9  Q  So 34 is a part of the employee handbook, which is
10     Exhibit 6?
11  A  Correct.
12  Q  Do you know who drafted this language?
13  A  In the last revision, I reviewed it myself.  So I
14     probably reworded it potentially, but I would have
15     to go back and look and see.
16  Q  And when you did the revision, this is the
17     revision that occurred in 2009?
18  A  Correct.
19  Q  And when that revision was done in your work on
20     this, you were rewording this for what purpose?
21  A  Well, if it was.  I would actually have to go back
22     and see if we actually did and change it.  If we
23     did, we would have reworded it.  The regulation
24     hasn't changed or the requirements.  We may have
25     just changed the wording.  I would need to check

1     that.  Because I do recall changing the employee
2     handbook in various places as it pertains to our
3     area.
4  Q  But you're not sure if this language had been
5     changed?
6  A  No, I'm not positive.
7  Q  If it had been changed, you would have been the
8     person who would have done the revision?
9  A  Correct.
10         (Exhibit No. 35 marked for
11         identification)
12  Q  Showing you what has been marked as Exhibit 35, do
13     you know what this is?
14  A  No, I don't.
15  Q  Have you ever seen the document before?
16  A  I may have seen it Friday in the papers that I was
17     looking through, but not before that.
18         (Exhibit No. 36 marked for
19         identification)
20  Q  Showing you what has been marked as Exhibit 36, do
21     you know what this document is?
22  A  This is an article that was put out through our
23     management bulletin to leaders.
24  Q  When was the first time that you saw this
25     document?

1  A  I recall it coming to in February through the
2     management bulletin.
3  Q  The management bulletin, can you explain to me how
4     you receive that information?
5  A  The management bulletin is like an electronic
6     newsletter that topics are compiled and sent to
7     our communications department.  They publish it
8     online basically, and then there is an e-mail that
9     gets sent out that says here is the management
10     bulletin, and when you click into it, you're
11     actually going into our kind of a web page of all
12     these different articles that you can read.
13  Q  And this particular article, is it your
14     understanding that it was someone at Aurora that
15     drafted this?
16  A  Yes.
17  Q  Do you have any idea of who that would have been?
18  A  I don't know.
19  Q  Do you know who received this other than you?
20  A  Every person who is considered a manager and above
21     would get the management bulletin, which is
22     roughly 900 people.
23  Q  And then I'm assuming there's probably a lot of
24     management bulletins that go out?
25  A  I believe they go out twice a month every other

Electronically signed by Brande A. Browne (101-025-478-3970)          55122a5b-1535-4b68-9002-8f1eeefc14f9

Page 58

1    Friday, I believe.  Maybe once a month, but I
2    believe it's twice a month.  They recently changed
3    some of the ways they do things.
4  Q  Do you recall why you received this particular
5    bulletin, or do you know why Aurora issued this
6    particular bulletin?
7  A  No.  We do issue these type of bulletins from time
8    to time just to remind leaders that they need to
9    be aware of this.  There has been several that
10   have come out recently on other topics, just as a
11   reminder to watch what we're doing and make sure
12   we're not doing things we shouldn't be.
13  Q  And this particular bulletin has to do with
14   interrupted meal breaks; is that right?
15  A  Yes.
16  Q  And what action, if any, did you take when you
17   received this bulletin?
18  A  In this case, none because it's just stating what
19   our policies already state.
20  Q  And so you saw this more as a reminder to managers
21   sort of on the ground floor to make sure that they
22   were complying with what the policy is already
23   stating?
24  A  Correct.
25  Q  Would Mike Cummings have received this?

Page 59

1  A  Through the management bulletin, yes.
2  Q  Because he's management or above?
3  A  Correct.
4  Q  Did Mike Cummings ever talk to you about this?
5  A  No.
6  Q  Did anyone at Aurora ever talk to you about this
7    particular bulletin?
8  A  No.  You know, it is possible, and I don't know
9    the specifics, but sometimes these do come to me
10   for feedback before they go out.  I don't recall
11   this one, but it is possible.
12  Q  If that were the case, how is that usually -- is
13   that sent to you as sort of a draft in an e-mail
14   or something like that?
15  A  Yes.
16  Q  So if we look back at your e-mails around January
17   or February of this year, if there was anything in
18   there on this bulletin, it would be probably
19   somewhere around then?
20  A  Somewhere in that area, obviously before, in the
21   weeks leading up to the 19th.
22  Q  We would hope so.  When this bulletin went out,
23   you didn't take any action to ensure that Aurora's
24   departments were complying with the policies; is
25   that right?

Page 60

1  A  That's correct.
2         (Exhibit No. 37 marked for
3          identification)
4  Q  Showing you what has been marked as Exhibit 37,
5    have you seen this document before?
6  A  No, I have not.
7  Q  Even on Friday?
8  A  No, I have not.
9  Q  It appears to be a memo from Dave Wood to all
10   south region security officers having to do with
11   guidelines for lunch breaks.  When memos like this
12   are issued, does Aurora have a policy in terms of
13   somebody from HR reviewing it to make sure it's in
14   compliance with the particular law or rules or
15   regulations that it applies to?
16  A  I'm not aware of any policy around.
17  Q  So is it possible that Dave Wood could have just
18   issued this memo on his own without anyone
19   reviewing it?
20  A  It's possible.  I do note that Mike was copied on
21   it, so I would assume that he reviewed it ahead of
22   time with Dave.
23  Q  But you don't know for sure?
24  A  I don't know for sure.
25  Q  What's Aurora's system-wide policy to make sure

Page 61

1    that its particular departments are in compliance
2    with wage and hour laws?
3  A  There are, in addition to the policy manuals, the
4    policies being online for the managers and
5    directors and whoever to have access to.  In
6    addition to that, there are guidelines -- I
7    wouldn't say guidelines.  There had been training
8    sessions, and I believe they were called brown bag
9    lunches, and they talked specifically about some
10   of these subjects where managers could attend
11   those and learn more about that.  Also, the
12   managers in HR encouraged to ask -- like in Dave's
13   case, he would ask his HR person, is this in
14   compliance, if he had questions, or they would
15   come to the compensation department for
16   interpretation.
17  Q  What do you mean by Dave's HR person?
18  A  Dave Wood, I don't know exactly where he -- each
19   manager has someone in human resources responsible
20   to support them.  In Dave's case, since it's
21   saying south region security officers, I'm
22   assuming that he is in the south, and then
23   Gene Krauklis and his HR leadership and staff
24   would be responsible for supporting them.  So if
25   Dave had questions relating to that, he would go

16 (Pages 58 to 61)

Electronically signed by Brande A. Browne (101-025-478-3970)                    55122a5b-1535-4b68-9002-8f1eeefc14f9

1     to Gene or one of the HR directors for
2     clarification.
3   Q  And ultimately, I think you testified your
4     department is responsible for compliance -- that
5     Aurora is in compliance with wage and hour laws as
6     it relates to meal breaks; is that right?
7   A  Correct.
8         (Question read)
9   Q  Let me ask that the way that I meant to ask that,
10    which was your department is the department at
11    Aurora that's responsible for wage and hour law
12    compliance; is that correct?
13  A  We are responsible to set the policy that the
14    leadership is to follow.
15  Q  When I say compliance, do you know what I mean?
16  A  No, if you could clarify.
17  Q  When I say compliance, I understand that there is
18    a policy.  I'm asking who is responsible at Aurora
19    for making sure that that policy is being
20    followed?
21  A  Specifically referring to the meal break policy?
22  Q  Meal break policy.
23  A  I believe it would have to rely on the payroll
24    department from a day-to-day review of the records
25    of the employees.  My department would not see

1     actual clock-in, clock-outs of employees, whether
2     they got their lunch or didn't.  The manager
3     ultimately of the department is the only one that
4     would know that.
5   Q  And who is responsible for making sure that the
6     manager is following the rules?
7   A  It would be their leader.
8   Q  And where does the buck stop?
9   A  I would assume it would be stop with our CEO.  I
10    mean, obviously, he's not going to get in the
11    day-to-day details of people clocking in or
12    clocking out.
13  Q  What is the highest-ranking person that Aurora has
14    specifically tasked with making sure that it's
15    meal break policy is being complied with?
16  A  I don't know specifically if we've tasked anyone
17    at that level that I'm aware of.
18  Q  Is there anyone that would know better than you on
19    that issue?
20  A  I don't believe so.  I mean, other than the head
21    of HR.
22  Q  And that person is, again?
23  A  On an interim basis, would be Dwight.
24        (Discussion off the record)
25  Q  Let's talk about Aurora's compliance program or

1     what steps Aurora takes to make sure that it's
2     meal break policies is in compliance with federal
3     and state wage and hour laws.  As I understand
4     your testimony, it is your department that is
5     charged with that task; is that right?
6   A  Yes.
7   Q  What person in your department is ultimately
8     responsible for that task?
9   A  That would be me.
10  Q  As the head of the department?
11  A  Correct.
12  Q  And other people in the department also work on
13    that issue?
14  A  Correct.
15  Q  Why don't you tell me everything that your
16    department does in order to make sure that it's
17    meal break policy is in compliance with state and
18    federal laws?
19  A  We review the state and federal laws.  We ensure
20    that our policies that we publish out to the
21    leadership are in compliance with both the federal
22    and state regulations.  We provide communication
23    when the policy changes or when a new policy goes
24    into place to the leadership on those policies and
25    what they should be doing with it.  We answer

1     questions if the HR or the managers have questions
2     regarding specific employee situations.  We answer
3     those questions for them and give them advice on
4     what they should or shouldn't be doing in relation
5     to that.  It's also managed electronically through
6     our time and attendance system where the employee
7     has the ability if they were interrupted during a
8     meal, that they can go to the clock and push a
9     couple of function keys and cancel that meal and
10    be paid for the 30 minutes that was automatically
11    deducted, or they can tell their supervisor and it
12    can be done that way, either through the
13    supervisor or a time editor.
14  Q  You mentioned a lot of things that you do.  One
15    thing you said is you review the law.  Tell me
16    about that.
17  A  We, we being the department, the compensation
18    department members, have access to libraries of
19    legal information.  Some of the stuff we brought
20    today were things that we printed off of the
21    various websites.  Some were courses, some of them
22    were books that were in compliance with wage and
23    hour regulations.  We spend a lot of time
24    researching if there are changes that occur as to
25    what we need to do to make sure that we are in

Electronically signed by Brande A. Browne (101-025-478-3970)                                        55122a5b-1535-4b68-9002-8f1eeefc14f9

Page 66

1   compliance with those changes. That could be --
2   whether it could be the associations we belong to
3   that have the databases of information that we
4   use. It could be our HR consulting firms we use
5   for various projects. They allow us to have
6   access to their database as well. We often use
7   the Department of Labor and the Department of
8   Workforce Development websites as well. The
9   opinion letter that the Department of Labor, we
10  monitor those to see if there's anything relevant
11  to what we do in compensation.
12  Q  As it relates to Aurora's meal break policy, what
13     specific laws has Aurora reviewed in the last --
14     well, since your taking over the position of
15     director of compensation?
16  A  Specifically, we looked at both the federal and
17     state regulations around the Fair Labor Standards
18     Act, and I don't recall the exact quote for the
19     state law. But we reviewed those when there were
20     changes to the act in 2004 at the federal level,
21     and we ended up creating a policy for exempt and
22     nonexempt employees out of that change that
23     occurred at the federal level.
24  Q  And other than 2004, have you reviewed the federal
25     and state law at any other time with regard to the

Page 67

1      meal break policy?
2   A  Not unless there was something to initiate the
3      review. In other words, we received a notice from
4      the Department of Labor or from a -- we get a lot
5      of information coming in from organizations that
6      say these changes are out there. If there is a
7      change, this is what you need to do. In this
8      case, to my knowledge, there have been no changes
9      to the meal or break periods at either the federal
10     or state level.
11  Q  Was the meal and break period policy reviewed in
12     2004?
13  A  Yes.
14  Q  Tell me about that review process.
15  A  When the federal law changed, which was mainly the
16     exemption status changes that occurred in late
17     '04, we looked at all of our wage and hour
18     policies that existed just to make sure everything
19     was still in line with the regulations.
20  Q  Tell me about that. What did you do to make sure
21     it was in line?
22  A  Well, we went to both the Department of Labor and
23     the workforce development websites to find out
24     what they were saying about the law. There was a
25     significant amount of information provided from

Page 68

1   various sources around the changes to the federal
2   level law in '04, whether it came from Foley,
3   Quarles, some came from the associations that we
4   belong to, World at Work, SHRM, Society for Human
5   Resource Management, and then the consulting firms
6   that we deal with on a regular basis, Mercer,
7   Hewitt, Towers -- would have been Towers Perrin
8   then, but it's Towers Watson after they merged.
9   From those organizations around what the changes
10  were, and we used that information to ensure that
11  the wage and hour policies that we had were in
12  compliance.
13  Q  All of that that you just listed, all of those
14     sources of information, how much of that had to do
15     with meal break?
16  A  Very little because most of it had to do with
17     exemption changes in the laws, other than the
18     Department of Labor website itself and the
19     workforce development had those pieces in it.
20  Q  So limiting your answer then just to the meal
21     break policy, what information was reviewed in
22     2004 specifically related to Aurora's meal break
23     policy?
24  A  It would have been the Department of Labor
25     website, the workforce development, and we also

Page 69

1      had update sessions with Foley and Quarles & Brady
2      around changes that included meal break periods
3      within those.
4   Q  Related to the Department of Labor, what
5      information did you find on their website
6      regarding meal break policies?
7   A  Just their guidance around how meal periods should
8      be handled. I mean, obviously, it's like most
9      websites, it had each section broken out, and we
10     went through those to make sure we were in
11     compliance. As we created the nonexempt and
12     exempt employee policy, we put pieces in there of
13     things that we felt were important for the leaders
14     to know, in addition to the exemption changes that
15     were occurring in '04.
16  Q  And in 2004, after you had done the review of the
17     Department of Labor, the information on the
18     Department of Labor's website, did you feel that
19     Aurora's policy needed to be changed in any way as
20     it related to the meal break policy?
21  A  No, I did not.
22  Q  Same question then with the review you did at the
23     Department of Workforce Development's website, was
24     there any information that you learned on that
25     website that made you think that Aurora's meal

18 (Pages 66 to 69)

Electronically signed by Brande A. Browne (101-025-478-3970)                                    55122a5b-1535-4b68-9002-8f1eeefc14f9

Page 70

1    break policy needed to be changed in any way?
2  A  No.
3  Q  Can you describe for me the differences between
4    your understanding of the federal meal break law
5    and the State of Wisconsin's meal break law?
6  A  The main difference that I recall is the timing.
7    The federal law really only requires 20 minutes,
8    while the state law requires 30, a 30-minute
9    uninterrupted break.
10  Q  Any other differences that you can --
11  A  Not that I can recall.
12  Q  Is there something that would help you recall your
13    understanding?
14  A  No, not without re-looking at it again.
15  Q  So if you took another look at the materials from
16    the websites, you might remember some more things?
17  A  Correct, yes.
18  Q  Other than the review that was done in 2004, since
19    you've been in your position as the director of
20    compensation, has Aurora reviewed it's meal break
21    policy at all?
22  A  Not since that time frame, no.
23  Q  And you had mentioned some meetings with
24    Foley & Lardner and Quarles & Brady as sources of
25    information about the meal --

Page 71

1  A  Like seminars.  There are periodic, formal
2    seminar-type briefings that they provided.
3  Q  This was not, you know, a personal -- strike all
4    that.  The information that was provided, was that
5    provided in the context of legal advice that was
6    being given specific to Aurora, or was this a
7    seminar where other corporations or entities could
8    attend?
9  A  It was a seminar with other entities attending.
10  Q  The materials or the information that you learned
11    during these seminars, how much of that was
12    devoted to the meal break period, meal break laws
13    and regulations?
14  A  I don't know if I could determine how much.  I
15    mean, it was in line with all the other
16    information that we were receiving from every
17    source related to meal periods.  It was just
18    another resource that was used.  It wasn't -- I
19    don't know how much of it would have been
20    percentage-wise versus the rest of what we found
21    at the time.
22  Q  And the information that you received from these
23    legal seminars, nothing from those seminars made
24    you believe that Aurora needed to change its meal
25    break policy?

Page 72

1  A  No.
2  Q  You listed some other sources of information that
3    you received around the 2004 time period.  Did any
4    of that information cause you to believe that
5    Aurora needed to change its meal break policy?
6  A  No, it did not.
7  Q  And Aurora did not change its meal break policy in
8    2004?
9  A  No, we did not.
10  Q  So Aurora's current meal break policy has been in
11    place at least since 2002?
12  A  Correct.
13  Q  In terms of making sure that the policy is being
14    complied with on a system-wide basis, can you tell
15    me what Aurora does to do that?
16  A  We publish the policies, and we do things like the
17    management bulletin update to remind managers of
18    what they have to do with the meal and break
19    policy, or any policy, for that matter.  I believe
20    I stated HR does internal training within their
21    site on various topics.  Some of it is regulation.
22    Some of it may be other HR-related topics.
23  Q  Those are those brown bag lunches?
24  A  Yeah, I call them that.  They may call them
25    something different, but it's just internal

Page 73

1    training to their site, as well as the information
2    we have available online to the managers.
3  Q  Other than providing information, either by
4    publishing, issuing bulletins, doing training,
5    what does Aurora do to make sure that the policy
6    is, in fact, being followed?
7  A  I don't know any further than that.
8  Q  Does Aurora ever do any kind of an audit of its
9    meal break policy to make sure that it is being
10    followed?
11  A  I'm not aware of one that has been done.
12  Q  And your department doesn't review the procedures
13    that we talked about earlier as Exhibits 30
14    through 33?
15  A  No, we do not.
16  Q  And your department doesn't review memorandums
17    that are issued by individuals in the loss
18    prevention department with regards to meal breaks?
19  A  Not unless we're asked to review them.  There have
20    been many questions over the years around
21    compliance with, you know, various wage and hour
22    compliance that leaders do ask.  If they don't
23    understand it or don't know, they do come to us,
24    or they go to their HR person who comes to us and
25    asks for clarification.

19 (Pages 70 to 73)

Electronically signed by Brande A. Browne (101-025-478-3970)                                      55122a5b-1535-4b68-9002-8f1eeefc14f9

1  Q  What questions do you recall being asked of you or
2     your department regarding Aurora's meal break
3     policy from managers?
4  A  There have been questions over the years from
5     people who have had to carry a pager, let's say,
6     over lunch, as to whether that was compensable or
7     not.
8  Q  And who answered that question?
9  A  I believe I talked to the HR person about it.
10 Q  Do you recall who the HR person was that asked you
11    that question?
12 A  It was someone out of our south market.  I don't
13    recall.
14 Q  In the loss prevention department?
15 A  No, it was the HR director down there.
16 Q  And this person was -- I'm assuming, an HR person
17    didn't have to carry a pager?
18 A  No, no, no.  They were asking about employees.  A
19    lot of this stuff probably came about when the
20    change -- when we published the regulation -- not
21    the regulation, the policy for -- original policy
22    for nonexempt and exempt.  People had a lot of
23    questions around it and wanted clarification.
24 Q  So you specifically recall a question about an
25    employee who had to carry a pager.  What other

1     questions do you recall?
2  A  We get questions around -- we've had people ask,
3     when on I'm on-call, why do I not get my regular
4     rate of pay versus a premium to carry a pager
5     versus having to --
6        MR. SCULLEN:  Let me just strike as
7     nonresponsive.  I think his question was
8     about meal break periods.
9  Q  And that was my question.  I'm assuming that
10    answer didn't have to do with somebody on a meal
11    break?
12 A  No, not at all.
13 Q  What other questions do you recall being asked
14    about employees on Aurora's meal break policies?
15 A  Just the extent if an employee returns to work
16    less than 30 minutes, do we really have to pay
17    them, and our answer has always been we absolutely
18    have to pay them for that time.
19 Q  And you were talking about the employee who had to
20    carry a pager; was that over a meal period?
21 A  I believe it was.
22 Q  And your answer to that question was what?
23 A  It was not compensable.  We would consider it like
24    our on-call employees.  That is not compensable
25    time because they are still free to go wherever

1     they want and do whatever they want within their
2     unpaid lunch period.  This was just in case it was
3     an emergency or they needed them back right away.
4     Most employees don't carry pagers at lunch.
5  Q  The employee that was carrying a pager in this
6     instance, was it a security officer or another
7     employee?
8  A  I don't recall.  I don't even know if we got to
9     that detail.
10 Q  Any other questions that you can recall being
11    asked of you about Aurora's meal break policy?
12 A  No.
13 Q  So that's two questions; is that right?
14 A  Yes.
15 Q  There's a number of documents that you brought
16    with you today for today's deposition.  Are these
17    all the documents in your possession that you are
18    relying on in terms of making sure that Aurora's
19    meal break policy is in compliance with the
20    federal and state laws?
21 A  Everything in hardcopy.
22 Q  What isn't here today?
23 A  The Department of Labor website, the Department of
24    Workforce Development website, the World at Work
25    website and tools, the SHRM, or Society For Human

1     Resource Management, website and tools, Mercer
2     website, Hewitt's website, Towers Watson's
3     website.  In the past, we don't currently
4     subscribe to it because of budget cuts, but we
5     have used the BNAs, compensation and benefits
6     library.  We did have it at the time, but not
7     currently.
8  Q  What I'm going to do, just so the record is clear,
9     is I'm going to read the titles of these into the
10    record just so we don't lose track of these.  I've
11    got a binder that's titled Fair Labor Standards
12    Act (FLSA), changes effective August of 2004.
13    It's a white binder.  I've got a book by
14    R. Brian Dixon, titled the Federal Wage and Hour
15    Laws.  I've got another book titled FLSA
16    Compliance and Overview for the HR Professional,
17    and that looks like it's published by World at
18    Work.  I've got a Quarles & Brady, looks like the
19    outline to a seminar from August 23rd, 2004
20    presented by Michael Aldana and Sean Scullen.  Did
21    you attend this seminar?
22 A  Yes.
23 Q  I've got another outline from Quarles & Brady,
24    March 18th, 2008, Wage/Hour Issues:  Outside Traps
25    and Inside Tips, presented by Michael Aldana and

Electronically signed by Brande A. Browne (101-025-478-3970)                    55122a5b-1535-4b68-9002-8f1eeefc14f9

1      James Chelino.  Did you attend that seminar?
2   A  Yes, I did.
3   Q  I've got a Foley & Lardner seminar from May 9th
4      through the 10th, 2002, called Employment Law
5      Seminar for Johnson Controls, Human Resources.
6      Did you attend that seminar?
7   A  Yes.
8   Q  And that was in your position at Johnson Controls?
9   A  Correct.
10  Q  I've got a black binder that says ACA on the
11     front.  Can you tell me what this is?
12  A  That's the actual module from the certification
13     course.
14  Q  Certification for?
15  A  The certified compensation professional related to
16     wage and hour regulations.
17  Q  And these materials, have you received these over
18     a number of years, or are these historical
19     documents?
20  A  That is historical.  That was the actual module
21     from the course itself at the time.
22  Q  When does this date from?
23  A  I don't know exactly when I took that one.  I took
24     them over a three-year period.  There should be a
25     date down at the bottom of the book, I believe.

1      This one says 1999.
2   Q  Does that seem about right?
3   A  Yeah.
4   Q  There is a number of documents in the binder, but
5      then there is also some documents in the folder of
6      the document as well, the binder.  Then we've got
7      a June 30th, 2004 survey of HR practices, and this
8      looks like it was put on by Mercer?
9   A  Yes.  That could have been a webinar.  I don't
10     know for sure which one it was.
11  Q  Did you either attend in person, or did you attend
12     the webinar?
13  A  It would have been a webinar.  I don't recall if
14     it was just reference materials that they had or
15     if it was a webinar.  I don't recall which one
16     this one was.
17  Q  If it wasn't a webinar, you said it might just be
18     materials?
19  A  Yeah, it might be something they provided as kind
20     of a compilation of data that they gave out to
21     their clients.
22  Q  So something they might have mailed this to you
23     and said Here's something, take a look at it?
24  A  Correct.
25  Q  I've got another presentation, looks like, from

1      Foley called Class Action Defense, Counseling
2      Problem Prevention.  It says copyright 2004 from
3      Foley.  Do you know what this document is?
4   A  It's another seminar that I attended at Foley.
5   Q  Probably in about 2004?
6   A  '04, '05.
7   Q  It looks like it was put on by Bernard Bobber and
8      Patrick Toft?
9   A  Yes.
10  Q  And then I've got a white binder called Exemption
11     Tests and Practice from World at Work; what's
12     this?
13  A  This is a course that they offered to help you
14     work through the exemption tests.  It doesn't have
15     anything in it related outside of the exemption
16     testing element.
17  Q  Nothing to do with meal breaks?
18  A  Nothing at all.
19  Q  And then got the ComplyWare FLSA software, this
20     says included updated 2004, fair play rules.
21     Anything in here on the meal break periods?
22  A  Only to the extent that the actual regulations are
23     part of the text.  It's not intended for that, but
24     it is available in there, in text.
25              MR. SCULLEN:  I would just note for

1      the record too that I believe there were two
2      dual opinion letters that were part of that
3      group.
4              (Exhibit No. 38 marked for
5              identification)
6   Q  Showing you what is marked as Exhibit 38, do you
7      know what this is?
8   A  It's a dual opinion letter that I had printed off
9      sometime in '08 or after and had saved to my FLSA
10     library online.
11  Q  And what's your FLSA library online?
12  A  Just where we save documents.  A lot of the online
13     stuff, if we find a letter or a briefing or
14     something, we'll save it for future use.
15  Q  Have you brought all the documents in your library
16     online that relate to meal break compliance?
17  A  Yes.
18  Q  And did you review this letter, the opinion
19     letter, from the Department of Labor?
20  A  I do recall looking through it.  I couldn't tell
21     you the exact content of it.
22  Q  Do you recall approximately when you would have
23     reviewed it?
24  A  I'm not for sure.  I just know we go out
25     periodically and look for opinion letters that are

Electronically signed by Brande A. Browne (101-025-478-3970)                    55122a5b-1535-4b68-9002-8f1eeefc14f9

Page 82

1    related to wage and hour and we keep those.  Not
2    necessarily for any reason that we needed to other
3    than it's reference material that we have.
4  Q   When you reviewed this, did you take any action
5    regarding Aurora's meal break policy?
6  A   No, we did not.
7           (Exhibit No. 39 marked for
8            identification)
9  Q   Showing you what has been marked as Exhibit 39,
10   can you tell me what this document is?
11  A   It's, again, a dual opinion letter related to meal
12   breaks.
13  Q   And at some point you reviewed this document?
14  A   Yes.  This one specifically deals with the
15   question of automatic meal deductions.
16  Q   And after reading this document, you took no
17   action in terms of modifying Aurora's meal break
18   policy?
19  A   No, we found ours to be in compliance.
20  Q   When you reviewed this, did you take any other
21   actions other than just simply reviewing the
22   letter?
23  A   None.
24  Q   So when you say you determined you were in
25   compliance, you read this, you knew what the

Page 83

1    policy was, and you --
2  A   From that standpoint, yes.
3  Q   Didn't speak with anybody else at Aurora about it?
4  A   No.
5  Q   Is there anyone else at Aurora who should have
6    been reviewing these types of Department of Labor
7    opinions and making sure that Aurora's policy was
8    in compliance?
9  A   Not that I'm aware of, no.
10  Q   I'm going to show you what was previously marked
11   as Exhibit 12 for this deposition.  It's a
12   document called Kronos Practices for AMCO
13   Caregivers, January 2010.  Do you know what this
14   document is?
15  A   Yes, I saw it this morning.
16  Q   Prior to this morning, had you seen this document?
17  A   No, I had not.
18  Q   If I understand things from Mr. Cummings'
19   testimony, I believe, this is an Aurora's policy
20   that applies to Oshkosh facilities; that's what
21   the O stands for in AMCO?
22  A   Yes.
23  Q   Do you know who would have drafted this policy?
24  A   I don't know for sure.  It should be someone in
25   the human resource department.

Page 84

1  Q   If you look at the second page of the document, at
2    the very bottom on the left-hand side, there's
3    what looks like a computer directory, looks like O
4    drive and HR 91/policies AMCO; do you know what
5    all that means?
6  A   It looks like a shared drive on our O, O using the
7    shared directory that the HR department has --
8    everyone in their HR department has access to.
9    It's specifically to Oshkosh, though.
10  Q   Any way from looking at this document to figure
11   out who would have drafted it?
12  A   No.
13           (Recess taken)
14           (Exhibit No. 40 marked for
15            identification)
16  Q   Showing you what has been marked as Exhibit 40,
17   Mr. Rountree, do you know what this document is?
18  A   Yes.  This is the work week and rest periods
19   document, and it has the change form attached to
20   it for the changes that occurred.
21  Q   And the change form, you're looking at the last
22   page of this document?
23  A   Correct.
24  Q   What can you tell me about the change form, what
25   does it tell us?

Page 85

1  A   We made a change roughly in '04 around how we were
2    on an eight and 80 payment of overtime.  We went
3    to purely over 40 for all of our caregivers at
4    that time, and that this was to change the
5    language in this policy to reflect time and a half
6    paid over 40 versus eight and 80.
7  Q   That change was made at what time?
8  A   The change here says 5 of '04.
9  Q   So if you look at the front page of that document,
10   this is the 5 of '04 revision?
11  A   I would assume so based on the proposed effective
12   date.
13  Q   And do you know what the change is related to the
14   9 of '04?
15  A   I do not.
16  Q   And this document doesn't tell us anything about
17   the 9 of '04 change; is that right?
18  A   Not that I'm aware of.
19  Q   Can I ask how you obtained this?
20  A   We got it from Andrea, the person I mentioned,
21   Andrea Voleride, I think is how you pronounce it.
22   She went back in her archives and found it.
23  Q   Very good.  Have you told me at today's deposition
24   everything that Aurora does to ensure that its
25   meal break policy is being complied with in the

22 (Pages 82 to 85)

Electronically signed by Brande A. Browne (101-025-478-3970)                    55122a5b-1535-4b68-9002-8f1eeefc14f9

1    loss prevention department?
2    A   Yes, everything to my knowledge.
3    Q   And your department is the only department in
4       charge of ensuring that the loss prevention
5       department follows Aurora's meal break policy; is
6       that right?
7    A   Ultimately, yes.  Again, I would say that the
8       leadership of the department and at each site HR
9       people have a role in that as well.
10   Q   From a human resources perspective, your
11      department is the only department in charge of
12      ensuring that the loss prevention department
13      complies with the meal and lunch break policy; is
14      that right?
15               MR. SCULLEN:  Objection,
16          mischaracterizes his testimony and asked and
17          answered.
18               MR. PARSONS:  Can't be both.
19               MR. SCULLEN:  Sure, it can.  You
20          asked the question already, and you also, in
21          the course of asking your question,
22          mischaracterized his prior testimony.
23               MR. PARSONS:  I wasn't purporting
24          to characterize his testimony at all.  I was
25          just asking a question.

1          (Question read)
2               MR. SCULLEN:  You can answer.
3    A   I would say no on that because while we set the
4       policy, and we ensure -- we try to ensure people
5       follow it, we're not the people at the ground
6       level in that department or at that site from an
7       HR perspective.  I would say the HR department at
8       that site would have responsibility as well as the
9       comp department for ensuring that they're
10      following the meal and rest period policy.
11   Q   The HR departments on site, do they report to you?
12   A   They do not.
13               MR. PARSONS:  That's all the
14          questions I have for now.
15
16          EXAMINATION
17   By Mr. Scullen:
18   Q   With regard to the exempt and nonexempt policy,
19      which is Exhibit 8, just to clarify, when was that
20      created?
21   A   It was originally created, we created it in '07,
22      June of '07.
23   Q   And the revision -- it notes that there was a
24      revision in February of 2008?
25   A   Yes.

1    Q   Did that revision relate to the meal and break
2       period at all?
3    A   No, it did not.
4    Q   With regard to the policy on policies, which I
5       believe is Exhibit 28, do all revisions to
6       policies, do you know, do they necessarily get
7       reflected in a change of policy form consistent
8       with Exhibit 28?
9    A   To my knowledge, they would because that's how
10      they get put on.  There's only one control point
11      to put them online.
12   Q   Is that true for if there was a spelling error in
13      a policy, would that change be reflected on the
14      policy data form?
15   A   It should be.  I can't say that there were
16      policies that were sent over and said this word
17      was changed without that change form being done.
18      To my knowledge, that's what they request.
19   Q   You were asked about training.  Are you familiar
20      with HR training for leaders?
21   A   Yes.
22   Q   Is that different than the brown bag training you
23      testified to?
24   A   There is specific training as part of leadership
25      development that has different orientations in it

1    from HR orientation, benefits, those type of
2    things.
3    Q   Does it cover the meal and break policy?
4    A   I'm not for sure.
5               MR. SCULLEN:  That's all I have.
6               MR. PARSONS:  I don't think I have
7          anything else.
8          (Adjourning at 12:16 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Electronically signed by Brande A. Browne (101-025-478-3970)                    55122a5b-1535-4b68-9002-8f1eeefc14f9

Page 90

```
1   STATE OF WISCONSIN )
                        ) ss.
2   COUNTY OF DANE    )
3     I, BRANDÉ A. BROWNE, a Registered Professional
4   Reporter and Notary Public duly commissioned and
5   qualified in and for the State of Wisconsin, do
6   hereby certify that pursuant to notice, there came
7   before me on the 20th day of December 2010, at 9:40
8   in the forenoon, at Quarles & Brady, LLP, Attorneys
9   at Law, 411 East Wisconsin Avenue, Suite 2040, the
10  City of Milwaukee, County of Milwaukee, and State of
11  Wisconsin, the following named person, to wit:
12  MARK A. ROUNTREE, who was by me duly sworn to testify
13  to the truth and nothing but the truth of his
14  knowledge touching and concerning the matters in
15  controversy in this cause; that he was thereupon
16  carefully examined upon his oath and his examination
17  reduced to typewriting with computer-aided
18  transcription; that the deposition is a true record
19  of the testimony given by the witness; and that
20  reading and signing was not waived.
21        I further certify that I am neither
22  attorney or counsel for, nor related to or employed
23  by any of the parties to the action in which this
24  deposition is taken and further that I am not a
25  relative or employee of any attorney or counsel
```

Page 91

```
1   employed by the parties hereto or financially
2   interested in the action.
3         In witness whereof I have hereunto set my
4   hand and affixed my notarial seal this 22nd day of
5   December 2010.
6
7
          Notary Public, State of Wisconsin
8         Registered Professional Reporter
9   My commission expires
    April 21, 2013
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

WWW.FORTHERECORDMADISON.COM
FOR THE RECORD, INC.  /  MADISON, WISCONSIN  /  (608) 833-0392

Electronically signed by Brande A. Browne (101-025-478-3970)                    55122a5b-1535-4b68-9002-8f1eeefc14f9