IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

JERRY A. BRABAZON
individually and on behalf
of all others similarly situated,

                Plaintiff,

vs.

AURORA  HEALTH CARE, INC.

                Defendant.

Civil Action No. 710
Case No:  10-C-0714
Jury Trial Demanded

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR
RULE 23 CLASS CERTIFICATION**

## INTRODUCTION

This case is particularly well suited for class treatment as Brabazon and the putative class members would individually be without the effective strength to bring their claims given the relatively small amount of damages each putative class member has sustained. Jerry Brabazon commenced this action on his own behalf and on behalf of all other Aurora security officers who are or have been subject to Aurora's unlawful meal period deduction policy. Brabazon has challenged Aurora's policy of automatically deducting one half hour from each employee's daily pay for an alleged off-duty meal period. Aurora uniformly requires that the putative class members carry and monitor communication devices and immediately respond to emergency calls during their unpaid meal periods. This policy effectively prohibits the putative class from leaving Aurora's premises and fails to provide them with one half hour in which they are free from work.

Based on these common facts, Brabazon has alleged that Aurora's meal period deduction policy violates Wis. Admin. DWD §§ 272.04 and 272.12, as well as the federal Fair Labor

Standards Act , 29 U.S.C. §201 et seq. ("FLSA"). The legality of Aurora's uniform automatic meal period deduction policy under Wisconsin law is a question common to the class, which predominates over any individual issue. Moreover, the putative class meets all other requirements of Fed. R. Civ. P. 23(a) and (b). As such, Brabazon requests that the Rule 23 class of Aurora security officers be certified.

## FACTUAL BACKGROUND

### I. SECURITY OFFICERS MUST IMMEDIATELY RESPOND TO EMERGENCY CALLS DURING THEIR UNPAID MEAL PERIODS

Aurora relies on its security officer in order to provide a safe and secure environment for its patients, staff and visitors. (Dkt. 35, Exhibit 1 to Parsons' Affidavit in Support of Plaintiff's Motion for Conditional Class Certification and Judicial Notice, Deposition Transcript of Aurora's Corporate Representative Michael Cummings (Cummings Depo.) at 66:8-11.) Aurora security officers perform a variety of duties during the course of each shift in order to accomplish this objective for Aurora. Security officers' duties are divided into two categories – mandatory patrolling of grounds ("rounds") and responding to calls for assistance. (See Parsons' Affidavit in Support Plaintiff's Motion for Rule 23 Class Certification (Parsons' Aff.) ¶ 11, Exhibit 1 Deposition Transcript of Jerry Brabazon (Brabazon Depo.) at 38:17-20; Exhibit 2 to Parsons' Aff., Deposition Transcript of Lisa Schultz (Schultz Depo.) at 53:13-25; 54:1-17; Exhibit 3 to Parsons' Aff., Deposition Transcript of Eric Snowden (Snowden Depo.) at 30:16-21; Exhibit 4 to Parsons' Aff., Deposition Transcript of Patrick Lowery (Lowery Depo.) at 16: 1-25; 17:1-15; Exhibit 5 to Parsons' Aff., Deposition Transcript[1] of Kyle Stoxen (Stoxen Depo.) at 11:15-25; 12:1-25.)  Calls for assistance are placed to one of three communication devices, which Aurora

---

[1] Kyle Stoxen was deposed one day prior to the filing of this brief on March 31, 2011.  As a result, Plaintiff relies on a "rough draft" transcript of Mr. Stoxen's deposition testimony and will supply the court the finalized final transcript upon receipt.

assigns to its security officers – a cellular phone, a pager, or a two-way radio.[2] (Brabazon Depo. at 50:9-21; Schultz Depo. at 40:10-19; Snowden Depo. at 17: 6-10; Slutsky Depo. at 27:4-10; Lowery Depo. at 19:13-17; Stoxen Depo. at 18:21-25; 19:1-2.)

In order to provide services, Aurora expects that its security officers will keep all of their communication devices on and monitor them throughout their entire shifts, including during their half hour unpaid meal periods. (Cummings Depo. at 108:17-25; 109:1-16; Dkt. 23, Binter Dec., ¶ 9; Dkt. 24, Brabazon Dec., ¶ 8; Dkt. 25, Emmerich Dec., ¶ 6; Dkt. 26, Lang Dec., ¶ 8; Dkt. 27, Lowery Dec., ¶7; Dkt. 28, Smith Dec., ¶ 8; Dkt. 29, Slutsky Dec., ¶ 8; Dkt. 30, Ward Dec., ¶ 6; Dkt. 30, Welniak Dec., ¶ 6; Dkt. 32, Witt Dec., ¶ 8; Brabazon Depo. at 97:7-9, 21-25; 98:1-2 Schultz Depo. at 62:8-13; 66:9-20; 71:4-8; 126:12-25; Lowery Depo. at 87:11-17; Snowden Depo. at 120:12-17.) Aurora's policy requires that security officers be ready and available to immediately respond to emergency calls at all times, including during their unpaid meal periods. (Cummings Depo. at 87:20-25, 88:1-3, Brabazon Depo. at 131:25; 132: 1-6; Schultz Depo. at 67:5-8; 71:4-8; 81:25; 82:1-9; Snowden Depo. at 49:2-21; 117:10-19; 119:17-22; Lowery Depo. at 37:7-10; 60: 7-9; Stoxen Depo. at 49:6-14; 50:15.)

Security officers are not permitted to ignore any calls for assistance, even during unpaid meal periods.[3] (Cummings Depo. at 88:9-12; Dkt. 23, Binter Dec., ¶ 11; Dkt. 24, Brabazon Dec.,

---

[2] In order to perform the essential functions of his job as an Aurora security officer, Aurora issues each security officer one or more communication devices at the beginning of his shift. (Cummings Depo. at 98:17-21.) The primary communication devices are two-way radios and pagers. (Cummings Depo at 98:23-25.) Aurora security officers use these communication devices to efficiently respond to both emergency and non-emergency situations. (Id. at 107:11-15; Dkt. 23, Binter Dec., ¶ 8; Dkt. 24, Brabazon Dec., ¶ 7; Dkt. 25, Emmerich Dec., ¶6; Dkt. 26, Lang Dec., ¶7; Dkt. 27, Lowery Dec., ¶ 7;Dkt. 28, Smith Dec., ¶ 7; Dkt. 29, Slutsky Dec., ¶ 7; Dkt. 30, Ward Dec., ¶6; Dkt. 31, Welniak Dec., ¶ 6; Dkt. 32, Witt Dec., ¶ 7.)

[3] Depending on the nature of the call and the duty they are performing at the time of that call, security officers are permitted to prioritize one call for assistance over another. (Brabazon Depo. at 112:18-24; Schultz Depo. at 45:19-25; 46:1-13; Lowery Depo. at 22:13-19; Snowden Depo. at 47:18-21; Slutsky Depo. at 31:1-14.)

3

¶ 8; Dkt. 25, Emmerich Dec., ¶ 8; Dkt. 26, Lang Dec., ¶ 11; Dkt. 27, Lowery Dec., ¶ 10; Dkt. 28, Smith Dec., ¶ 10; Dkt. 29, Slutsky Dec., ¶ 11; Dkt. 30, Ward Dec., ¶ 9; Dkt. 31, Welniak Dec., ¶ 10; Dkt 32, Witt Dec., ¶ 10, Brabazon Depo. at 130:3-5, Schultz Depo. at 140:9-17; Snowden Depo. at 48:1-25; Lowery Depo. at 83: 3-13; Stoxen Depo. at 20:5-20.) Aurora security officers are responsible for responding to threats of violence to patients, visitors, and staff members. A delayed response to a violent threat could potentially cause unnecessary injury to patients, visitors, and/or staff members. Thus, it is imperative that security officers respond immediately to these calls. (Schultz Depo. at 70:2-11; 71:23-25; 72:1-6; Lowery Depo. at 37:16-25; Snowden Depo. at 67:7-19.)

Because calls often come via pager and the nature of the call is not immediately obvious, security officers must, at the very least, place a phone call to determine what the need is and whether it requires immediate assistance or can be handled upon completion of another duty. (Brabazon Depo. at 114: 7-11; 127:9-14; Schultz Depo. at 140: 9-17; Lowery Depo. at 83:3-13.) Such responses are required, even during officers unpaid meal periods. (Id.) Aurora's own policy documents instruct officers to "determine if immediate service is required or if it can wait until the meal period is completed. This can be determined in part by calling the requesting unit." (Exhibit 9 to Lowery Depo., at pg. 4.) Even calls that do not involve immediate danger to patients or staff frequently are urgent enough to require swift response times and result in interrupted lunches. (Brabazon Depo. at 113:6-24; Schultz Depo. at 141:16-25; 142:1-25; Lowery Depo. at 39:19-25; 40: 1-7; Soxten Depo. at 37:12-25; 38:1-11.) Officers could also be subject to discipline if they do not respond to urgent, though non-emergency, calls. (Brabazon Depo. 133:1-6.)

4

Significantly, in most Aurora facilities the communication devices carried by on duty officers are primarily monitored by those on duty officers. (Schultz Depo. at 42:8-25; 43:1-9; Lowery Depo. at 41:17-22; Slutsky Depo. at 26:18-24; Stoxen Depo. at 33:16-25; 34:1-25; 35:10-20.) In other words, if a call is placed or a page is sent, the on duty officer(s) may be the **only** person designated to respond to the call. (Id.) As the only person who can respond, officers must therefore monitor their communication devices at all times in order to respond if and when necessary at a moment's notice to any and all calls for assistance and to ensure the safety of the individuals in the facility where he is assigned.

## II. AURORA'S IMMEDIATE-RESPONSE REQUIREMENT EFFECTIVELY PREVENTS OFFICERS FROM LEAVING THE PREMISES DURING UNPAID MEAL PERIODS

Based on testimony of Aurora's corporate representatives, Brabazon, and the class members, Aurora requires officers to be able to respond immediately to emergency and urgent calls for assistance. (Cummings Depo. 109:12-15; Brabazon Depo. at 131:25; 132:1-5; Schultz Depo. at 71:4-8; 72:7-11; Snowden Depo. at 117:20-25; 118:1-3; Lowery Depo. at 60:10-15; Stoxen Depo. at 40:23-25; 41:1-4.) Further, security officers are subject to discipline if they do not immediately respond and react to emergency situations. (Cummings Depo. at 109:9-11; Dkt. 23 Binter Dec., ¶ 10; Dkt. 24, Brabazon Dec., ¶ 10; Dkt. 25, Emmerich Dec., ¶ 8; Dkt. 26, Lang Dec., ¶ 10; Dkt. 28, Smith Dec., ¶ 9; Dkt. 29 Slutsky Dec., ¶ 10; Dkt. 31 Welniak Dec., ¶ 9; Dkt. 32, Witt Dec., ¶ 9; Brabazon Depo. at 87:9-16;  132:1-13; 132:17-25;  133:1-6; Stoxen Depo. at 40:23-25; 41:1-4; 69:1-25; 70:1-6; 70:23-25; 71:1-25). As a result, officers commonly are unable to leave the Aurora facility during their unpaid meal period because they would be unable to **immediately** respond to emergency calls if they were off the premises or was outside of radio contact. (Dkt. 23, Binter Dec., ¶ 9; Skt. 24, Brabazon Dec., ¶ 12; Dkt. 25, Emmerich Dec., ¶ 9;

5

Dkt. 26 Lang Dec., ¶12; Dkt. 27, Lowery Dec., ¶ 12; Dkt. 28, Smith Dec., ¶ 11; Dkt. 29, Slutsky Dec., ¶12; Dkt. 30, Ward Dec., ¶11; Dkt. 31, Welniak Dec., ¶ 11; Dkt. 32, Witt Dec., ¶ 11; ; Cummings Depo at 109:12-15; Brabazon Depo. at 132:17-25; 131:25; Schultz Depo. at 117:4-6.)

To be clear, Aurora does not maintain a written policy that explicitly prohibits security officers from leaving the premises during their meal periods.[4] In practice, however, Aurora security officers are unable to do so without potentially subjecting themselves to discipline. (Cummings Depo. at 109:9-11; Dkt. 23, Binter Dec., ¶ 10; Dkt, 24, Brabazon Dec., ¶ 10; Dkt. 25, Emmerich Dec., ¶ 8; Dkt. 26, Lang Dec., ¶ 10; Dkt. 28, Smith Dec., ¶ 9; Dkt. 29, Slutsky Dec., ¶10; Dkt. 31, Welniak Dec., ¶ 9; Dkt. 32, Witt Dec., ¶ 9, Brabazon Depo. at 132:17-25; 133:1-6;  Stoxen Depo. at 40:23-25; 41:1-4.)  This is so because security officers are not relieved of their duty to respond immediately to emergency calls if they were to leave the premises. (Brabazon Depo. at 131:19-25; 132:1-6; Schultz Depo. at 72:7-11; Lowery Depo. at 60: 7-9, 15-19; Snowden Depo. at 133:12-20; Stoxen Depo. at 41:1-4.)

The fact that Aurora Security officers cannot leave the Aurora facility where they work during their unpaid meal period is supported by their testimony as well as Aurora's time clock records. Aurora's corporate representative testified that if a security officer leaves the premises during a meal period, he or she is required to punch out on the time clock upon exiting the building and to punch back in upon returning. (Cummings Depo. at 130:14-22.) Aurora has produced the complete time clock records for Brabazon and members of the putative class, which reflect punch data for each meal period where an employee punched the clock and left the building. (See Parsons' Aff. ¶ 11, Exhibit 6, Time Records of Brabazon and Opt-In Plaintiffs

---

[4] In fact, some officers were advised that they were theoretically "permitted" to leave the premises for meal periods; however, these same officers were explicitly told they could not leave or turn off communication devices if they left the premises. (Brabazon Depo. at 100:10-17; Lowery Depo. at 87: 11-17.)

6

(Time Records)). Those records confirm that for the approximately 460 shifts worked by Brabazon during the applicable two-year statute of limitations, Brabazon never punched out mid-shift to leave the building during a meal period.[5] Id. This is consistent with Brabazon's deposition testimony, and the declaration he previously submitted. (Brabazon Dec. ¶ 12; Brabazon Depo. at 87:9-11.) Similarly, a review of each of the opt-in Plaintiffs' time records reveals that each of the opt-in Plaintiffs (Lucas Binter, Michael Emmerich, Patrick Lowery, Lonnie Ward, Steve Slutsky, and Tammy Witt)[6] also remained on-site at Aurora during each of the approximately 992 shifts worked by this group during the two year statutory period. Id. Aurora's time records for the Opt-in Plaintiffs are consistent with their deposition testimony and the declarations which they each submitted and confirm that did not leave the facility during their unpaid meal periods. (Dkt. 23, Binter Dec., ¶ 9; Dkt. 23, Brabazon Dec., ¶12; Dkt. 26, Lang Dec., ¶12; Dkt. 27, Lowery Dec., ¶12; Dkt. 28, Smith Dec., ¶ 11; Dkt. 29, Slutsky Dec., ¶12; Dkt. 30, Ward Dec., ¶11; Dkt. 31, Welniak Dec., ¶11; Dkt. 32, Witt Dec., ¶11; Brabazon Depo. at 87:9-11; Snowden Depo. at 52:21-23; Stoxen Depo. at 40:23-25; 49:2; Slutsky Depo. at141:16-22.)

Aurora concedes that security officers are required to adhere to the requirements that they constantly monitor communication devices and respond immediately to emergencies (Cummings Depo. at 86:24-25; 87:1-22.) Brabazon and the putative class members have confirmed this fact. (Brabazon Depo. at 78:13-14; 97:3-9; Schultz Depo. at 62:8-13; 66:6--20; 71:3-8; Snowden

---

[5] In order to determine how many shifts the opt-in plaintiffs worked during the statutory period and how often these security officers left the premises, plaintiff's counsel reviewed the time records produced by Aurora during the discovery process. Plaintiff's counsel removed any duplicate time punch entries. Plaintiff's counsel also deleted any entries showing no time worked. After removing these entries, plaintiff's counsel then calculated the length of time between punches in order to determine whether any of the opt-in plaintiffs left the premises for a thirty-minute meal period. These calculations have been attached as exhibit 6 to the Affidavit of Attorney Parsons.
[6] Aurora has not produced the time records for opt-in Plaintiffs Eric Snowden and Edward Welnik, therefore Plaintiff's counsel was unable to compile the data for these individuals.

7

Depo. at 86:6-25; 119:17-22; Slutzsky Depo. at 87:7-15; 88:8-11; Lowery Depo at 87:11-17.)

Despite Aurora's explicit requirement that officers monitor their communication devices and be

immediately available during meal periods, Aurora admits that it automatically deducts a thirty

(30) minute meal period from every security officer's pay for every shift he or she works of six

or more hours. (Cummings Depo. at 24:21-23; 133:25; 134:1-6; Fed. R. Civ. P. 30(b)(6); Dkt.

35, Deposition Transcript of Corporate Representative Mark A. Rountree ("Rountree Depo.") at

34:22-25; 35:1-3.)[7]

## ARGUMENT

## I. BRABAZON HAS ALLEGED THAT AURORA'S POLICY UNIFORMLY VIOLATES WISCONSIN LAW

Brabazon alleges that Aurora's unpaid meal period policy violates Wisconsin law for two

reasons. First, Aurora's security officers effectively are unable to leave the premises due to the

requirement that they be able to immediately respond to emergencies during their unpaid meal

period. Second, because Aurora's security officers are required to monitor their communication

devices at all times, including during their meal periods, they never are free from work for one

half hour during their unpaid meal periods. Brabazon alleges that for both of these reasons

Aurora must compensate its security officers for their unpaid meal periods and, in failing to do

so, Aurora has violated Wisconsin law.

A motion for class certification does not reach the merits of liability against the

defendant, but rather focuses on the standards set for the Fed. R. Civ. P. 23. Courts should not

consider the merits of the plaintiff's case in deciding whether the case can be maintained as a

---

[7] In practice, each security officer is typically scheduled to be at work for an 8.5 hour shift, however, they are only paid for 8 hours of work. (Binter Dec., ¶6; Brabazon Dec., ¶6; Emmerich Dec., ¶5; Lang Dec., ¶6; Lowery Dec., ¶6; Smith Dec., ¶6; Slutsky Dec., ¶6; Ward Dec., ¶5; Welniak Dec., ¶5; Witt Dec., ¶6.)

8

class action. <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 177-78 (1974). Courts may look past the pleadings in order to determine whether a plaintiff's case meets the technical requirements of Rule 23, but a motion for class certification is not the appropriate place to resolve substantive issues of liability unless they overlap with issues raised by Rule 23(a) and Rule 23(b). <u>See</u> <u>Szabo v. Bridgeport Machines, Inc.</u>, 249 F.3d 672, 677 (7th Cir. 2001). However, it is significant that the plaintiff has made allegations that the class was commonly subjected to an illegal practice.

Employers must pay employees for "on duty meal periods" which are counted as "work time." Wis. Admin. Code DWD § 272.04(1)(c). An "on duty" meal period is defined as one where the employee is not free to leave the premises of the employer. <u>Id</u>. Aurora's requirement that its security officers respond immediately to emergencies effectively prohibited security officers from leaving the premises during unpaid meal periods. In fact, Aurora's records reveal that its security officers almost never left the premises during their unpaid meal periods. These facts are common to all putative class members and support granting class certification.

Further, an employee also is considered "on duty" if the employer does not provide at least one half hour free from work. <u>Id.</u> The employee must be compensated unless he has been "completely relieved from duty for the purpose of eating regular meals." Wis. Admin. Code DWD § 272.12(2)(c)(2). The employee is not relieved if she is required to perform <u>any</u> duties, whether active or inactive, while eating. <u>Id.</u> (emphasis added).

Brabazon has alleged that Aurora violated Wisconsin law by failing to compensate its security officers for time spent "on duty" engaged in "work." Aurora requires that its security officers carry and monitor their communication devices at all times so that they are immediately able to respond to calls for assistance. Security officers are required to immediately respond to emergencies at all times during their shift, including their unpaid meal period. Because these

9

officers are the only individuals monitoring said devices, they are the only individuals that can respond to the various calls for assistance that are received. Indeed, time spent monitoring communication devices and responding to calls for assistance clearly constitutes work under Wisconsin law. Officers are never free from physical and/or mental exertion while performing duties for Aurora. Even if officers are not actively and "physically" engaged in responding to a call, they are required to monitor their devices, inquire as to whether a call is in fact an emergency or not, be ready to respond to emergencies and do so immediately if necessary. These facts also are common to all putative class members and support granting class certification.

## II. PLAINTIFF HAS MET THE FED. R. CIV. P. 23 STANDARDS FOR CLASS CERTIFICATION

The facts support class certification pursuant to Fed. R. Civ. P. 23. The trial court has the sound discretion to determine whether to certify a class action. Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982); Keele v. Wexler, 149 F.3d 589, 592 (7th Cir. 1998); Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 596 (7th Cir. 1993). Class certification under Rule 23 requires a two-step analysis. Rosario v. Livaditis, 963 F.2d 1013, 1017 (7th Cir. 1992); Temme v. Bemis Co. Inc., 2009 WL 1505120, *2 (E.D.Wis. 2009)[8]; Bzdawka v. Milwaukee Cnty., 238 F.R.D. 469, 472 (E.D.Wis. 2006).

First, the class must satisfy the requirements of Rule 23(a), and second, the class must satisfy one of the three subdivisions of Rule 23(b). Fed. R. Civ. P. Rule 23. This Court has also recognized two additional implicit requirements for Rule 23 class certification, including standing and a clearly defined class. Id. Because the implicit and explicit requirements of Rule 23 are met in this case, class certification should be granted.

---

[8] All unreported cases have been attached as exhibit 8 to the Affidavit of William Parsons.

10

### A. The Implicit Requirements of Fed. R. Civ. P. 23 are Met Because the Class Representative Has Standing and is a Member of the Precise, Objective and Ascertainable Class

This Court has identified two threshold requirements for class certification, both of which are met in this case. Bzdawka, 238 FRD at 472. First, the named class representatives must have standing in that he is a member of the class he proposes to represent. Id. Second, the definition of the proposed class must be "precise, objective, and presently ascertainable." Alliance to End Repression v. Rochford, 565 F.2d 975, 977-79 (7th Cir. 1977); See also Bzdawka, 238 F.R.D. at 472.

The Named Plaintiff and class representative, Jerry Brabazon, has standing in this matter. Brabazon worked for Aurora from March 2006 through October 2010. (Dkt. 24, Brabazon Dec., ¶ 2; Brabazon Depo. at 32:5-25, 33:1-2). Aurora employed Brabazon as a security officer and paid him on an hourly basis. (Dkt. 24, Brabazon Dec. ¶ 4.) As a security officer for Aurora, Brabazon was required to remain on duty during his unpaid meal period. (Brabazon Depo. at 97: 1-9; 87: 9-17.) Brabazon was interrupted and required to perform work duties for Aurora during his unpaid meal period. (Dkt. 24, Brabazon Dec., ¶ 8, Brabazon Depo. at 101:17-25.)

Like all members of the putative class, Brabazon was subject to Aurora's automatic half hour pay deduction policy, despite the fact that he was not free from work at any time during his meal period. (Dkt. 24, Brabazon Dec., ¶ 8, Brabazon Depo. at 97:3-4; 100:10-17.) Brabazon was also subject to a common policy requiring security officers to respond immediately to emergency calls, which effectively prohibits security officers from leaving the facility during their unpaid meal period. (Dkt. 24, Brabazon Dec., ¶ 8, Brabazon Depo. at 131:25 -132:1-6.) Because Brabazon was subject to the common policies and practices at issue in this case, he falls squarely within the class definition and, therefore, has standing to sue on behalf of the class.

11

Further, under this Court's implicit requirements, the class definition must be ascertainable such that it creates a class consisting of all individuals who, by virtue of defendants' policy, are likely to be subjected to the illegal conduct. Alliance to End Repression, 565 F.2d at 576 (finding that classes created by defendants' conduct do not suffer from any definiteness problem). Id. at 978. The proposed definition for the Rule 23 class is as follows:

> All persons who have been or are employed by Aurora and were denied regular or overtime wages for on-duty meal periods at any time within the two years prior to the commencement of this lawsuit to the present.

(Dkt. 19, Plaintiff's First Amended Collective and Class Action Complaint, at ¶¶ 9)

The proposed Rule 23 class definition is similar to the definition of the class in Plaintiff's Motion for Conditional Class Certification with the exception of the applicable statutory period. (Dkt. 19, Plaintiff's First Amended Collective and Class Action Complaint, at ¶¶ 8, 9). Aurora was able to identify the individuals who fell within the collective class definition, and to provide the Plaintiff with the identity of those individuals. (Parsons' Aff. ¶ 3). The proposed Rule 23 class is equally ascertainable and in fact, Aurora has provided Plaintiffs with all information necessary to ascertain the identity of the class members and send them notice, if authorized by this Court.[9]

Further, the class of Aurora security officers is objective and precise. The class definition is based on Aurora's method of compensation, dates of employment, and the job titles held by the class members. None of these factors are subjective, but rather are the precise type of factors implicitly required by Rule 23. The implicit requirements of Rule 23 are met because Brabazon

---

[9] For purposes of identifying potential class members, the only difference between the proposed Rule 23 class and the collective class is the statutory period.

has standing to represent the proposed Rule 23 class and the proposed class is objective, precise and ascertainable.

### B. The Plaintiff Has Satisfied the Fed. R. Civ. P. 23(a) Requirements

The Fed. R. Civ. P. 23(a) requirements have been met in this case. Under Rule 23(a), class certification is appropriate when: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The class claims in this case meet all of these requirements.

### i. The Class Members Are So Numerous That Joinder Is Impossible

Class certification is appropriate when, as in this case, the number of members in the proposed class is so large as to make joinder "impracticable." Fed. R. Civ. P. 23(a)(1); Carnegie v. Household Int'l, Inc., 376 F. 3d 656, 663-64 (7th Cir. 2004). To be impracticable, joinder need not be impossible but only difficult or inconvenient. Great Neck Capital Appreciation Investment Partnership, L.P. v. Pricewaterhouse Coopers, L.L.P., 212 F.R.D. 400, 406 (E.D.Wis. 2002)(citing Adver. Specialty Nat'l Ass'n v. FTC, 238 F.2d 108, 119 (1st Cir.1956)). In general, for classes numbering at least 40 members, joinder is considered impracticable. Blarek v. Encore Receivable Management, Inc., 244 F.R.D. 525, 527 (E.D.Wis. 2007)(citing Swanson v. American Consumer Industries, 415 F.2d 1326, 1333 (7th Cir. 1969)); Clark v. Ford Motor Co., 220 F.R.D. 568, 578 (E.D.Wis. 2004).

During the course of discovery, Plaintiff's counsel requested information on the identity, addresses, and employment dates of hourly paid security officers employed by Aurora during the relevant statutory period. (Parsons' Aff. ¶ 2). In response to said request, Aurora produced a list

13

of 238 individuals.[10] Exactly 200 of those individuals fall within the statutory period for the proposed Rule 23 class. This number of putative class members is sufficient to establish numerosity as joinder of the 200 putative class members would be impracticable in light of judicial resources. Further, the financial burdens of individualized litigation outweigh the potential rewards for litigants. For these reasons, the proposed class meets numerosity requirements of Rule 23(a)(1).

### ii.     There are Questions of Law or Fact Are Common to the Class

Second, Rule 23(a) requires a finding that there are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). Generally, the presence of a single common legal or factual question is sufficient. Clark, 220 F.R.D. at 579 (stating that the commonality requirement is not demanding because it may be satisfied by a single common issue). Rule 23(a)(2) looks to whether the defendant's conduct is common to class members, rather than to whether the result of the conduct is uniform among class members. Bzdawka, 238 F.R.D. at 475 (citing Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992)). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." Rosaria, 963 F.2d at 1018.

Brabazon and other putative class members have several issues of law and fact in common. Common issues of law include, but are not limited to:

> Whether Aurora violated the requirements of Wis. Stat. § 104.02 and Wis. Admin. Code § DWD 272.03 by failing to pay  wages to Brabazon and members of the putative class;

---

[10] Aurora initially produced a list of 225 individuals who fit the class definition and had claims within the statutory three-year period. Of those 225, 189 had claims with the relevant two-year statutory period for a Wisconsin claim. Later, Aurora produced a list of thirteen (13) Aurora Advance clinic security guards also employed by Aurora and subject to the same automatic deduction policies. Eleven (11) of these individuals fall within the two year statutory period for a Wisconsin law claim. As such, of the total of 238 security officers with potential claims during the three year period, exactly 200 officers also have claims within the two year statutory period.

14

Whether Aurora violated the requirements of Wis. Code. § DWD 272.04(1) by failing to pay Brabazon and members of the putative class for on-duty meal periods;

Whether Aurora violated the requirements of Wis. Admin. Code § DWD § 272.12(1) by failing to pay Brabazon and putative class members for time spent in "physical or mental exertion" as required by and primarily for the benefit of the employer; and

Whether Aurora violated the requirements of Wis. Admin. Code § DWD § 272.12(2) by failing to pay Brabazon and putative class members for meal periods which did not constitute bona fide meal periods.

Issues of fact common to the class include, but are not limited to:

Whether Aurora's policies effectively prohibited Brabazon and the putative class members from leaving the premises of the employer during 30-minute meal periods;

Whether Aurora failed to provide class members with a full, uninterrupted half hour meal period;

Whether Aurora failed to pay Brabazon and the putative class members for interrupted 30-minute meal periods.

"The test or standard for meeting the Rule 23(a)(2) prerequisite is qualitative rather than quantitative; that is, there need be only a single issue common to all members of the class. Therefore, this requirement is easily met in most cases." Alba Conte & Herbert Newberg, Newberg on Class Actions, § 3:10 at 272 (4th ed. 2002). Furthermore, "a finding of commonality is not precluded by the possibility that the proof required to demonstrate injury might be highly individualized." In re Sumitomo Copper Litig. v. Credit Lyonnais Rouse Ltd., 262 F.3d 134, 141 (2d Cir. 2001). Here, the commonality requirement has been met because the claims of all proposed class members derive from the same policies and procedures, and are based on the same legal theories.

15

It is undisputed that Aurora's security officers all were subject to the same automatic half hour deduction policy. Aurora admits that security officers uniformly were required to carry and monitor communication devices and immediately respond to emergencies, regardless of whether they were taking a meal period at the time. Moreover, Aurora's immediate-response policy effectively prohibited its security officers from leaving the premises during their unpaid meal periods. These facts give rise to the common legal question of whether Aurora's unpaid meal policy complied with Wisconsin law. As such, the commonality requirement of Fed. R Civ. P. 23(a) has been met.

### iii. The Claim Of The Representative Party Is Typical Of The Claims Of The Class

Brabazon's claims are typical of the putative class as he was subjected to Aurora's policy of automatically deducting a half hour meal period from his wages for every shift he worked despite the fact that he 1) was required to remain on duty during these unpaid meal periods and 2) effectively was prohibited from leaving the Aurora facility where he worked during his unpaid meal periods.

The Fed. R. Civ. P. 23(a)(3) typicality standard has been articulated as follows:

> "[Typicality] primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large. A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."

Blarek, 244 F.R.D. at 528 (citing De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983)). Moreover, "[t]he typicality requirement may be satisfied even if there are factual distinctions between claims of the named plaintiffs and those of other

class members. Thus, similarity of legal theory may control even in the face of differences of fact." Id.

Courts determine typicality based on a defendant's actions, not on the possible particularized defenses against certain individual class members. Wagner v. NutraSweet Co., 95 F.3d 527 (7th Cir. 1996). Since the claims need only to share the same essential characteristics and need not be identical, the typicality requirement is not highly demanding. Clarke, 220 F.R.D. at 579.

Aurora unequivocally admits that it maintains a uniform policy, under which its security officers must immediately respond to emergency calls at any time during their shift, including during their uncompensated meal periods. (Cummings Depo at 87:20-25, 88:1-3; 109:9-15.) Brabazon's claims arise from Aurora's policy and practices, which effectuate that requirement. Security officers, including Brabazon, are required to monitor their communications devices during meal periods and are required to immediately to respond to emergencies. This policy makes it impossible for officers to leave for an uninterrupted thirty (30) minute meal period. Despite this, half an hour of wages are deducted from Brabazon and the putative class member's wages for every shift they work of six hours or more. Because the putative class members were subject to the same policies and procedures as Brabazon, his claims are typical to those of the putative class.

### iv. The Class Representatives Will Fairly And Adequately Protect The Interests Of The Class

In determining whether a plaintiff will provide adequate representation, courts consider the adequacy of the class representative and of class counsel. Retired Chicago Police Ass'n., 7 F.3d at 596. The court must ensure that, "there is no inconsistency between the named parties

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 17 of 29   Document 49

and the class they represent." Blarek, 244 F.R.D. at 529 (citing Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)). Additionally, class counsel must be qualified to conduct the litigation. Id.

Brabazon is an adequate representative of the class because he suffered the same injuries as the putative class members. As previously illustrated, Aurora required Brabazon to carry his communication devices during his half hour unpaid meal period and to be ready and available to immediately respond to emergency calls that came over these communication devices. (Dkt. 24, Brabazon Dec. ¶ 8; Brabazon Depo. at 97: 3-9; 87: 9-24; 97:21-25.) Thus, Brabazon, like all putative class members, was denied compensation for his on duty meal periods as a result of Aurora's automatic deduction policy. There is no divergence of interests between the proposed class representative and the interest of the class as a whole. Brabazon is prepared to prosecute this suit on behalf of the class.

Further, Plaintiff's counsel should be appointed class counsel pursuant to Rule 23(g). Plaintiff's counsel is experienced in complex wage and hour litigation and has served as class counsel in numerous actions before Wisconsin courts. (Parsons' Aff. ¶¶ 4-5). Each of the four attorneys representing the class has the depth and breadth of experience necessary to adequately represent the class in this matter. (Parsons' Aff. ¶¶ 6-9). The class representative is fully qualified and committed to full prosecution of this case on behalf of the class and plaintiff's counsel will fairly and adequately represent the class.

### C. THE PLAINTIFF HAS SATISFIED THE FED. R. CIV. P. 23(b)(3) REQUIREMENTS

In addition to satisfying the prerequisites to class certification under Fed. R. Civ. P. 23(a), the potential class must also satisfy at least one provision of Fed. R. Civ. P. 23(b). Blarek, 244

18

F.R.D. at 530 (citing Rosario, 963 F.2d at 1017). Where plaintiffs are seeking monetary damages rather than solely injunctive relief, the class certification inquiry focuses on Fed. R. Civ. P. 23(b)(3). Subsection (b)(3) requires that plaintiffs show "questions of law or fact common to members of the class predominate over any questions affecting only individual members" and "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

The Supreme Court of the United States has held that a class should be certified when "a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchem, 521 U.S. at 615, 117 S.Ct. 2231 (citing Fed. R. Civ. P. 23 Advisory Committee Notes); see also Mejdrech v. Met-Coil Systems Corp., 319 F.3d 910, 911 (7th Cir.2003)("[C]lass action treatment is appropriate and permitted by Rule 23 when the judicial economy from consolidation of separate claims outweighs any concern with possible inaccuracies from their being lumped together in a single proceeding for decision by a single judge or jury.")

i.      **Questions of Law Or Fact Common To The Entire Class Predominate Over Individual Issues**

To meet the predominance requirement of Fed. R. Civ. P. 23(b)(3), the common question(s) need not be dispositive of the entire action. 7AA Wright, Miller & Kane, Federal Practice and Procedure, § 1778 (3d ed. 2008). A "single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions." Blihovde v. St. Croix County, Wis., 219 F.R.D. 607 (W.D. Wis. 2003)(citing Newburg & Conte, Newberg on Class Actions § 4.25, at 4-84 (3d ed.1992)). The basic question

19

is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623.

Issues of law and fact in the present case are common to the entire class and these issues predominate over any individualized inquires. Brabazon, on behalf of the putative class, challenges a policy that uniformly required Aurora security officers to remain on duty and rendered the officers effectively unable to leave the Aurora premises during unpaid meal periods. The validity of this common policy under Wisconsin law, as it applies to the entire class, predominates over any potential individual issues.

When a class challenges uniform policies, the validity of those policies predominate over individual issues, and class certification is appropriate. Blihovde, 219 F.R.D. at 620. Courts in Wisconsin and throughout the country have found that, where a uniform meal period policy is challenged, the issue of the legality of that policy predominates over any individual issues affecting class member.

In one such case, Kasten v. Saint-Gobain Perf. Plastics Corp., the court examined the predominance standard as it applied to a meal and rest break challenge under Wisconsin law. 556 F. Supp.2d 941(W.D. Wis. 2008). In Kasten, the plaintiffs challenged the validity of a policy whereby the Kronos time system automatically deducted half an hour from each employee's daily wages for a meal period, despite the fact that these employee were required to don and doff protective clothing during these unpaid meal periods. Id. at 949-950. The central legal question concerning the meal period class in Kasten was whether the donning and doffing of clothing during meal periods was "work" within the meaning of Wis. Admin Code § 272.12(1). Id. at 952. The court held that the legal issue of whether the donning and doffing activities were "work" predominated over any potential individual variances in time spent donning and doffing.

20

Id. at 961. Quoting Blihovde, the court held that where the validly of a policy is in question, the validly of that policy predominates over individual issues. Id. at 961 (citing Blihovde, 219 F.R.D. at 620).

The Kasten decision is consistent with rulings throughout the country, which have found in similar cases that common issues related to the legality of the policy predominate over individual inquire. See e.g. Eldred v. Comforce Corp, 2010 WL 812698 at *19 (N.D.N.Y. Mar. 2, 2010) (in regards to an employer's unauthorized wage deductions, "[t]he predominant question raised [was] whether such a policy existed, and not whether any individual suffered its consequences on a particular job"); Mendez v. Radec Corp., 232 F.R.D. 78, 91-94 (W.D.N.Y. 2005)(questions relating to an employer's automatic meal deduction policy predominated and satisfied the Rule 23(b)(3) requirements; individualized damage issues, such as "whether a particular class member had spent the bulk of his lunch break working, had traveled to an out-of-town job site during normal working hours, etc." are not bases for finding predominance requirements not met); Kurihara v. Best Buy Co., Inc., 2007 WL 2501698, at *7-8 (N.D. Cal. Aug. 30, 2007) (the predominant question in a case involving off-the-clock inspections was "whether [the employer's] policy result[ed] in unlawful undercompensation;" class certification is not defeated by unresolved legal and factual issues surrounding the nature and implementation of the policy itself); Whiteway v. FedEx Kinko's Office & Print Servs., 2006 WL 2642528, at *4, 11 (N.D. Cal. Sept. 14, 2006) (questions of law and fact regarding whether managers at various locations had been misclassified as exempt predominated even though class potentially possessed varying characteristics with respect to damages).

In this case, as discussed in Section I, supra, Wisconsin law requires that employees be compensated for meal periods during which they are not free from work for at least one half

21

hour, or where they are not free to leave the employer's premises during their meal period. Wis. Admin. § DWD 272.04(1)(c); Wis. Admin § DWD 272.12(2)(c)(2). An employee is not relieved of duty during a meal period if they are required to perform any duties, whether active or inactive, while eating. Wis. Admin. § DWD 272.12(2)(c)(2).

Brabzon alleges Aurora's uniform meal period deduction policy runs afoul of these provisions of Wisconsin's administrative code for two reasons. First, the putative class members were not completely relieved of duty during their meal periods as they had to carry and monitor electronic communication devices and be ready and available to respond immediately to emergency situations. Second, the practical implication of Aurora's requirement that security officers be ready and available to respond immediately to emergency calls was that, in order to perform their job duties as required by Aurora, they were unable to leave the Aurora facility during their unpaid meal period. The existence of these policies and their consistent implementation is supported by Defendant's own time clock data and the unrebutted testimony of the Named and opt-in Plaintiffs.

Further, whether these meal period policies, as applied to the class, violate Wisconsin law are questions which are established through generalized common proof and, because those answers determine liability, the common questions predominate over individual issues. See Arreola v. Godinez, 546 F.3d 788, 801 (7th Cir. 2008)(Need for individual damages determinations does not, by itself, preclude finding that class action is maintainable on predominance and superiority grounds.) See also Allen v. Int'l Truck & Engine Corp., 358 F.3d 469, 472 (7th Cir.2004);. Keele v. Wexler, 149 F.3d 589, 594 (7th Cir. 1998)(Factual variations among class members' grievances do not defeat a class action.)

22

In this case, much of the common proof regarding the factual basis of the class members' claims already has been established. For example, Aurora's corporate representative has confirmed uniform treatment of all putative class members under Aurora's policies. (Cummings Depo. at 133:25; 134:1-6.) These policies, in practice, disallowed Brabazon and the putative class members from leaving the Aurora facility during their meal periods. This is so because Aurora required that its security officers be ready to immediately respond to emergency situations during unpaid meal periods. A security officer could not immediately respond if he left the premises because he would first need to return to his job site before responding.

Security officers understood that they would be subject to discipline if they failed to immediately respond to an emergency. For example, security officers were required to contact the security alarm company if an alarm went off inadvertently. This needed to be accomplished within three minutes of the alarm first sounding. (Stoxen Depo at 69:13-20.) If the security officer failed to contact the security alarm company within those three minutes a fire crew would be dispatched to Aurora and Aurora would be charged for this service. Id. Security officers were told that there would be serious repercussions if they failed in their duty to call the security alarm company.(Stoxen Depo at 70:1-6.)

The fact that Aurora's security officers could not actually leave the premises has also been confirmed through both the testimony of the putative class members and Aurora's time records. (Brabazon Depo. at 87:9-17;  133: 7-16; Schultz Depo. at; Snowden Depo. at 52:20-22; 126:19-24; Slutsky Depo. at 51:2-5; Time Records).

As described above, the time records of the 9 opt-in Plaintiffs confirm that these security officers remained at their worksite throughout their unpaid lunch. Every time an Aurora security officer left the premises during his shift, he was required to punch the time clock to record his

absence. (Cumming Depo at 130:14-22; Brabazon Depo at 95:5-10; Snowden Depo. at 84: 17-21; Lowery Depo. at 60: 15-19.) These records were captured "Kronos" reports which have been produced to Plaintiff's counsel. Brabazon's time records confirm his testimony and show no indication that he ever left the facility during his lunch period. (Time Records; Brabazon Depo. 87:9-11.) This is consistent with the time records and testimony of the other individuals who have already joined this action, which reveal that security officers uniformly and consistently remain on the premises throughout their shifts and during their unpaid meal periods in order to be able to immediately respond to emergency calls. (Brabazon Depo. at 87:9-11; Snowden Depo. at 117:4-8; Lowery Depo. at 60:3-9; Time Records).

The predominance requirement is met in this case because Brabazon challenges the legality of Aurora's uniform meal and rest break policy under Wisconsin law. Whether the Aurora's policy, in practice, indeed violates Wisconsin law is the central issue to this case and is one that can be answered through common proof.

### ii.     A Class Action Is Superior To Other Methods Available For Fair And Efficient Adjudication

A class action is vastly superior to other methods available for adjudication of the present dispute. Rule 23(b)(3)'s dominant purpose is "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents to court at all." Amchem, 521 U.S. at 591. In evaluating this requirement under Rule 23(b)(3)(B), courts consider the following: (1) the interest of class members in controlling the prosecution of their own claims; (2) the existence of other pending litigation related to the same controversy; (3) the desirability of concentrating the claims in one forum; and (4) the difficulty of managing the class. Fed. R. Civ. P. 23(b)(3).

As demonstrated above, the central factual and legal questions in this case can, and should, be resolved for all members of the class in a single adjudication. The superiority requirement of Rule 23(b)(3) asks whether it makes sense to resolve any non-common, non-predominant issues together with the common predominant issues in one class action. It makes sense to do so in this case because the resolution of any remaining questions, even if they involve individualized questions with respect to damages, are easily manageable and do not defeat the efficiencies gained by resolving the core common questions on a representative basis.

A class action is superior to alternative methods of adjudication because the alternative would involve hundreds of relatively small individual actions. Such actions would duplicate this proceeding and amount to a colossal waste of resources for all parties and this Court. It would be absurd to have so many separate actions concurrently resolving the same questions, which more efficiently could be resolved in the present case. Additionally, resolving the present issues in one action would avoid the possibility of "conflicting legal and factual findings by a panoply of juries." In re Farmers Ins. Exchange Claims Representatives' Overtime Pay Litigation, 2003 WL 23669376, at *6 (D.OR 2003). The four factors enumerated in Rule 23(b)(3) for analyzing whether a class action will be superior to individual actions also favor certification of all the issues in this action.

The first factor considered is the interest of each member in "individually controlling the prosecution or defense of separate actions." Fed.R.Civ.P. 23(b)(3)(A). In cases such as this, where an employer's wage and hour policy affects a large number of workers and the individual damages are relatively low, individual actions are highly unlikely to occur. Such actions are cost-prohibitive because the litigation costs will likely far outweigh the potential individual recovery. Further, many of the workers may not be aware that they may be entitled to additional

25

compensation. Finally, individual employees may choose not to bring individual actions out of fear of retaliation.[11]

The second factor is "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." Fed.R.Civ.P. 23(b)(3)(B). Here, no putative class member has filed a rival action.

The third factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). This forum is clearly appropriate as all the alleged violations occurred within this Court's jurisdiction.

The fourth factor is "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D). Denial of class certification for management reasons is disfavored and "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable should be the exception rather than the rule." In re Visa Check/Mastermoney Antitrust Litigation, 280 F.3d 124, 140 (2d Cir. 2001); see In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig., 78 F.R.D. 622, 628 (D. Wash. 1978).

This is particularly true here where the only remaining issues would relate to damages and would be easily managed in the context of a class action. Indeed, other circuits have explicitly recognized that individual questions with respect to damages do not defeat class action treatment. In re Visa Check, 280 F.3d at 139. In addition, courts have routinely rejected arguments concerning the unmanageability of "individualized" defenses in the context of "off

---

[11] See, e.g., Frazier v. Southeastern Pennsylvania Transp. Authority, 123 F.R.D. 195, 196 (E.D.Pa.,1988); Simmons v. City of Kan., 129 F.R.D. 178, 180 (D. Kan. 1989) (certification minimizes likelihood of retaliation against members of class); Ste. Marie v. Eastern R.R. Ass'n, 72 F.R.D. 443, 449 (S.D.N.Y. 1976) (risks entailed in suing one's employer are such that the few should be permitted to speak for others when they are otherwise fully qualified).

the- clock" claims citing the use of representative testimony. See, e.g., Falcon v. Starbucks Corp., 580 F. Supp. 2d 528, 540 (S.D. Tex. 2008).[12]

Furthermore, there are numerous management tools available to this Court that would enable it to adeptly deal with any management concerns with respect to damages. See In re Visa Check, 280 F.3d at 140 (e.g., bifurcating liability and damage trials with the same or different juries; appointing a magistrate judge or special master to preside over individual damages proceedings; decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; creating subclasses; or altering or amending the class); Robinson v. Metro- North Commuter R.R. Co., 267 F.3d 147, 168 (2d Cir. 2001), quoting Edward F. Sherman, Class Actions and Duplicative Litigation, 62 IND. L.J. 507, 516 (1987) ("'[a] class action should not be found unmanageable without [first] exploring the procedural devices available for bringing it in line. These include subclassing and trial of subclass issues separately, bifurcating liability and damages, ... [and] appointing a special master for difficult evidentiary matters'"). A class action is superior in this case because the main issues can be determined on a representative basis and any individual issues are easily manageable.[13]

---

[12] Courts have allowed the use of representative testimony in cases involving allegations of unpaid overtime. See, e.g., Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946); Schultz v. Capital Intern. Sec., Inc. 466 F.3d 298, 310 (4th Cir.2006); Grochowski v. Phoenix Constr., 318 F.3d 80, 88 (2d Cir.2003) ("[N]ot all employees need testify in order to prove FLSA violations or recoup back-wages"); Reich v. Gateway Press, 13 F.3d 685, 701-02 (3d Cir.1994) ("Courts commonly allow representative employees to prove violations with respect to all employees."); Brennan v. General Motors Acceptance Corp., 482 F.2d 825, 829 (5th Cir.1973) (allowing representative testimony in a case involving unpaid overtime); Thiebes v. Wal-Mart Stores, Inc., 2004 WL 1688544, at *1 (D.Or. July 26, 2004); National Electro-Coatings, Inc. v. Brock, No. C86-2188, 1988 WL 125784, at *8 (N.D.Ohio July 13, 1988) ("Courts have consistently allowed, or even required, a small number of employees to testify to establish a pattern of violations for a larger number of workers."); see also The Fair Labor Standards Act 1333 (Ellen C. Kearns et al., eds.1999) (noting that it is "well settled" that "not all affected employees must testify in order to prove violations or to recoup back wages. Rather, in most cases, employees and the Secretary may rely on representative testimony").

[13] The superiority requirement is not defeated by the existence of a conditional certification under Rule 216(b) of the FLSA which is inclusive of some of the same putative class members. In Ervin v. Os Restaurant Services, Inc., the

27

## III. THE PLAINTIFF'S PROPOSED FORM AND MANNER OF SERVICE OF NOTICE ARE APPROPRIATE

For any class certified under Fed. R. Civ. P. 23(b), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Fed. R. Civ. P. 23(c)(2)(B).

The Plaintiff proposes that, should the court deem the instant action proper for class certification, Plaintiff will send, by first class mail, the notice attached as Exhibit 7 to the affidavit of Attorney Parsons filed in support of this motion. The Plaintiff has fashioned his notice on notices approved in similar cases, and believes its substance is consistent with the requirements of Fed. R. Civ. P. 23(c)(2)(B). Said notice identifies the nature of this action, the definition of the class certified, the class claims and defenses, that class members may enter an appearance through an attorney, that the court will exclude from the class any member who requests exclusion, the time and manner for requesting exclusion; and the binding effect of a class judgment on members under Rule 23(c)(3).

## CONCLUSION

Because the Brabazon challenges the legitimacy of a policy which uniformly impacted members of the putative class, the legality of that policy predominates over any individual issues in this case. Further, as the individual claims of the putative class members are small and these individuals may otherwise be unable to pursue their claims, a class action is a superior mechanism in this case. Because Brabazon has met this and the remaining Fed. R. Civ. P. 23 requirements, he requests that the putative class be certified and he named case class representative.

---

Seventh Circuit stated explicitly that "[n]othing we find suggests that the FLSA is not amenable to state-law claims for related relief in the same federal proceeding." 632 F.3d 971-, 2011 WL 135708 (7th Cir. 2011).

Dated: April  1, 2011


**HAWKS QUINDEL, S.C.**


By:    */s/ William E. Parsons*
    William E. Parsons, State Bar No. 1048594
    Email: wparsons@hq-law.com
    David C. Zoeller, State Bar No. 1052017
    Email: dzoeller@hq-law.com
    Post Office Box 2155
    Madison, Wisconsin 53701-2155
    Telephone: 608 257-0040
    Lynn Novotnak, State Bar No. 1005688
    Email: lnovotnak@hq-law.com
    Summer H. Murshid, State Bar No. 1075404
    Email: scarlisle@hq-law.com
    700 W. Michigan, Suite 500
    PO Box 442
    Milwaukee, WI 53201
    Telephone: 414-271-8650