IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

JERRY A. BRABAZON
individually and on behalf
of all others similarly situated,

Case No. 10-C-0714

        Plaintiff,

    vs.

AURORA  HEALTH CARE, INC.

        Defendant.

## AFFIDAVIT OF ATTORNEY WILLIAM E. PARSONS IN SUPPORT OF PLAINTIFF'S MEMORANDUM IN SUPPORT OF RULE 23 CLASS CERTIFICATION

STATE OF WISCONSIN )
                  ) ss:
COUNTY OF DANE    )

    The undersigned, William E. Parsons, being duly sworn on oath, states as follows:

    1.    I am an attorney licensed to practice law in the State of Wisconsin and am co-counsel for the Plaintiff, Jerry A. Brabazon, in the above-captioned action.

    2.    During the course of discovery, Plaintiff's counsel requested information on the identity, addresses, and employment dates of hourly paid security officers employed by Aurora during the relevant statutory period.

    3.    Aurora identified the individuals who fell within the collective class definition and provided Plaintiff's counsel with the identity of those individuals.

4.     Hawks Quindel, S.C. is a 16-attorney law firm with offices in Madison, Wisconsin and Milwaukee, Wisconsin. Hawks Quindel, S.C. has focused its practice on representing employees and labor unions in employment and labor law disputes since its formation more than 25 years ago.

5.     Hawks Quindel, S.C. has handled multiple wage and hour claims under Wisconsin law and the federal Fair Labor Standards Act. Hawks Quindel has been certified as class counsel on number cases in the Western District of Wisconsin and currently serves as class counsel on <u>Wilcox et al. v. Alternative Entertainment, Inc., et al.</u>, Case No. 3:09-cv-659 (W.D. Wis. 2009).

6.     Attorney Lynn M. Novotnak is shareholder at Hawks Quindel, S.C. with over 30 years of litigation experience. Attorney Novotnak practices primarily in employment law, and has litigated numerous matters before this Court.

7.     Attorney David C. Zoeller is an associate at Hawks Quindel, S.C. and has represented plaintiffs in class action and collective action wage and hour claims in the District of Minnesota, the Northern and Southern Districts of California, the District of Oklahoma, the Eastern District of Tennessee, and the Western District of Wisconsin. Attorney Zoeller currently serves as class counsel on <u>Wilcox et al. v. Alternative Entertainment, Inc., et al.</u>, Case No. 3:09-cv-659 (W.D. Wis. 2009).

8.     Attorney Summer H. Murshid is an associate at Hawks Quindel, S.C. and has worked as an associate on labor, employment, and wage and hour cases

within the state, including class action and collective action claims in the Western District of Wisconsin.

9.      I am a shareholder at Hawks Quindel, S.C. and have practiced in front of this Court, as well as the Western District of Wisconsin, in many employment law disputes, including multiple class action wage and hour cases. I have served as class counsel in multiple wage and hour class actions certified under Fed. R. Civ. P. 23, and currently serve as class counsel in <u>Wilcox et al. v. Alternative Entertainment, Inc., et al.</u>, Case No. 3:09-cv-659 (W.D. Wis. 2009).

10. In order to determine how many shifts the opt-in plaintiffs worked during the statutory period and how often these security officers left the premises, plaintiff's counsel reviewed the time records produced by Aurora during the discovery process. Plaintiff's counsel removed any duplicate time punch entries. Plaintiff's counsel also deleted any entries showing no time worked. After removing these entries, plaintiff's counsel then calculated the length of time between punches in order to determine whether any of the opt-in plaintiffs left the premises for a thirty-minute meal period.

11.     Attached to this affidavit are true and correct copies of the following:

- **Exhibit 1:** Transcript of the March 21, 2011 Deposition of Jerry Brabazon
- **Exhibit 2:** Transcript of the March 23, 2011 Deposition of Lisa Schultz
- **Exhibit 3:** Transcript of the March 28, 2011 Deposition of Eric Snowden
- **Exhibit 4:** Transcript of the March 22, 2011 Deposition of Patrick Lowery
- **Exhibit 5:** Transcript of the March 31, 2001 Deposition of Kyle Stoxen (transcript not currently available – will be submitted as soon as it is received by Plaintiff's counsel)

- **Exhibit 6:** Time Records of Brabazon and Opt-In Plaintiffs, which calculate the number of times these security officers left Aurora's premises for a 30 minute meal period.

- **Exhibit 7:** Plaintiff's Proposed Notice of Class Action Lawsuit

- **Exhibit 8:** True and correct copies of the following unpublished opinions cited in Plaintiff's Motion for Rule 23 Certification:

  - Temme v. Bemis Co. Inc., 2009 WL 1505120, *2 (E.D.Wis. 2009)
  - Eldred v. Comforce Corp, 2010 WL 812698 (N.D.N.Y. Mar. 2, 2010)
  - Kurihara v. Best Buy Co., Inc., 2007 WL 2501698, at *7-8 (N.D. Cal. Aug. 30, 2007)
  - Whiteway v. FedEx Kinko's Office & Print Servs., Civ. Action No. C 05-2320, 2006 WL 2642528, at *4, 11 (N.D. Cal. Sept. 14, 2006)
  - In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig., Civ. Action No. MDL 1439, 2003 WL 23669376, at *6 (D. Or. May 19, 2003)
  - Ervin v. Os Restaurant Services, Inc., 2011 WL 135708 (7th Cir. 2011).
  - Thiebes v. Wal-Mart Stores, Inc., 2004 WL 1688544, at *1 (D.Or. July 26, 2004);
  - National Electro-Coatings, Inc. v. Brock, No. C86-2188, 1988 WL 125784, at *8 (N.D.Ohio July 13, 1988)

- **Exhibit 9**: Table of Authorities

12. This affidavit is submitted in support of Plaintiff's Motion for Rule 23 Class Certification, as well as its Memorandum in Support of Motion for Rule 23 Class Certification.

Dated April 1, 2011

                                    /s/ William E. Parsons
                         William E. Parsons, State Bar No. 1048594
                         Email: wparsons@hq-law.com

Subscribed and sworn to before me
this 1st day of April 2011.

       /s/ Dawn Marie Mulcahy
Dawn Marie Mulcahy
Notary Public, Dane County
My Commission Expires: 06/12/2011

Exhibit 1

Deposition Transcript of Jerry A. Brabazon

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------

JERRY A. BRABAZON, individually
and on behalf of all others
similarly situated,

       Plaintiff,

      vs.           Case No. 10-C-714

AURORA HEALTH CARE, INC.,

       Defendant.

--------------------------------------------------------

Deposition of JERRY A. BRABAZON

Monday, March 21st, 2011

1:34 p.m.

at

QUARLES & BRADY LLP
411 East Wisconsin Avenue
Milwaukee, Wisconsin

Reported by Loretta L. Stoeckmann, RPR

1          Deposition of JERRY A. BRABAZON, a witness

2    in the above-entitled action, taken at the instance of

3    the Defendant, pursuant to the Federal Rules of Civil

4    Procedure, pursuant to Notice, before Loretta L.

5    Stoeckmann, RPR and Notary Public in and for the State

6    of Wisconsin, at QUARLES & BRADY LLP, 411 East

7    Wisconsin Avenue, Milwaukee, Wisconsin, on the 21st day

8    of March, 2011, commencing at 1:34 p.m. and concluding

9    at 6:03 p.m.

10   A P P E A R A N C E S:

11              HAWKS QUINDEL, S.C., by
                   Ms. Summer H. Murshid
12                 222 East Erie Street, Suite 210
                   P.O. Box 442
13                 Milwaukee, Wisconsin 53201
                   Appeared on behalf of the Plaintiff.
14
                QUARLES & BRADY LLP, by
15                 Mr. Sean M. Scullen
                   Mr. Christopher L. Nickels
16                 411 East Wisconsin Avenue, Suite 2040
                   Milwaukee, Wisconsin 53202
17                 Appeared on behalf of the Defendant.

18

19

20

21

22

23

24

25

1                        E X A M I N A T I O N

2

    BY MR. SCULLEN                                    4
3   BY MS. MURSHID                                  126
    BY MR. SCULLEN                                  134
4   BY MS. MURSHID                                  137
    BY MR. SCULLEN                                  138
5   BY MS. MURSHID                                  141
    BY MR. SCULLEN                                  142

6

7

                         E X H I B I T S
8

    EXHIBIT NO.                        PAGE IDENTIFIED
9

    No. 1  Jerry Brabazon's activity logs . . . . . 62
10  No. 2  Employee Handbook . . . . . . . . . . . 79
    No. 3  Work Week/Meal & Rest Periods . . . . . 80
11  No. 4  Nonexempt and Exempt Employee Policy . . 81
    No. 5  Michael Cummings' newsletters . . . . . 83
12  No. 6  Jerry Brabazon's payroll report . . . .101
    No. 7  Declaration of Jerry Brabazon . . . . .120

13

14            (Original exhibits attached to original
        transcript.  Copies of exhibits attached to
15      copies of transcripts.)

16

17

18

19

20

21

22

23

24

25

```
 1              TRANSCRIPT OF PROCEEDINGS
 2              JERRY A. BRABAZON, called as a witness
 3      herein, having been first duly sworn on oath, was
 4      examined and testified as follows:
 5                      EXAMINATION
 6  BY MR. SCULLEN:
 7  Q   Can you state and spell your name for the record,
 8      please?
 9  A   Jerry Brabazon, B-R-A-B-A-Z-O-N.
10  Q   And that's J-E-R-R-Y?
11  A   Correct.
12  Q   Okay.  Have you been deposed before?
13  A   Yes.
14  Q   Okay.  When -- was that more than once?
15  A   Yes.
16  Q   All right.  How many times?
17  A   Oh, probably five or six.
18  Q   All right.  When was your last deposition?
19  A   Oh, probably a long time ago.  Fifteen years or
20      so, probably.
21  Q   Okay.  Were those all in the same context, or was
22      it --
23  A   No.
24  Q   Okay.  What was your last -- what were you deposed
25      for, the last --
```

1  A    It was a personal injury.  I was working at the
2       Americana Resort.  I was a security director
3       there, and there was an injury case, so I was
4       deposed on that.
5  Q    I'm sorry, what was the name of the resort?
6  A    Americana.  It's Grand Geneva now.  It was Playboy
7       Resort --
8  Q    Yep.
9  A    -- then it was purchased by Americana.
10 Q    And what was the deposition before that?
11 A    Most of them were personal injuries, personal
12      injury cases.
13 Q    All right.  And were you being always -- in every
14      case being deposed in your role as --
15 A    Security director, yes.
16 Q    All for the Americana?
17 A    There were some for Playboy.
18 Q    All right.  Any depositions where you were the
19      party pursuing the lawsuit?
20 A    No.
21 Q    Okay.  So as you may recall from your distant
22      deposition experience, in terms of the deposition
23      I'm going ask you some questions today regarding
24      the basis of your lawsuit against Aurora.  Your
25      answers are under oath.  Obviously what you say

1       can be used against you later in a court.

2                       The purpose here is just I'm going

3       to ask you questions.  If you don't understand any

4       of my questions, be sure to clarify.  Tell me you

5       don't understand or that you need some

6       clarification.  If you need to correct an answer,

7       you know, let me know.

8                       Obviously, if at any point you need

9       to take a break, let us know.  We'll take a break.

10      I would just ask that you not do so in the middle

11      of a pending question.

12                      If you answer a question without

13      telling me that you don't understand it, I'm going

14      to assume that you understood it.  Try to give

15      verbal responses so that the court reporter can

16      record your answer.  It's hard for her to record

17      nods --

18   A  Yes.

19   Q  -- or mm-hmm, mm-mmm --

20   A  Okay.

21   Q  -- so -- if I don't tell you, she certainly

22      probably will.

23   A  Okay.

24   Q  Is there any reason, such as medications or drugs

25      of any kind, that would prevent you from being

1    able to understand and answer my questions?

2  A  No.

3  Q  Okay.  Did you review any documents in preparation

4    for your deposition today?

5  A  No.

6  Q  Did you communicate with anyone in preparation for

7    your deposition today, other than your attorneys?

8  A  No.

9  Q  Did you make any notes in preparation for your

10    deposition?

11  A  No.

12  Q  Other than your attorneys, have you communicated

13    with anyone else about this lawsuit?

14  A  I've spoken with Aurora employees, security

15    employees that are, I believe, involved in this

16    lawsuit.

17  Q  Okay.  And who are those employees that you've

18    spoken with?

19  A  Pat Lowery -- there's nothing specific in that

20    discussion.  We were just talking about, I guess

21    he scheduled -- or he scheduled this morning, but

22    he's been rescheduled.  We didn't discuss any

23    specifics regarding anything.  It was very brief

24    phone conversation.

25  Q  Just one conversation with Mr. Lowery?

1  A    Yeah.  He had phoned me and asked if I was

2       scheduled for a deposition.  And I said, "Yeah, on

3       this day."  He goes, "Oh, me too."  And he was in

4       the morning.  I said, "I'm not till one o'clock,

5       and it was subsequently changed to 1:30."  But he

6       was working, I think, and that was about the gist

7       of the discussion.

8  Q    And you and Mr. Lowery previously worked together?

9  A    Yes.

10  Q    Okay.  Anyone other than Mr. Lowery?

11  A    No.

12  Q    And just so I'm clear, I'm asking about anyone

13       else that you've had communications with of any

14       kind.

15  A    Recently?

16  Q    Well, at any point about this lawsuit.

17  A    I've spoken with Lisa about it, Schultz.

18  Q    Okay.

19  A    We've discussed it.  I've discussed it with

20       Jim May.  I've discussed it -- I'm trying to think

21       of who else might have -- Kyle -- I forgot his

22       last name.  He's in --

23  Q    Stoxton?

24  A    -- at Lakeland, yeah.  I mean, it was very brief,

25       because he wasn't really up on anything.  He was

1       fairly new at the time.  We discussed it.

2       Basically, it was me giving my view, my point on

3       the entire, you know, no-break thing.

4                      I'm trying to think of anybody

5       else.  I may have discussed it with

6       Ellen Bruenning a little bit.  She was a sergeant.

7       She was recently terminated at Lakeland.  That's

8       all I can think of right now that I've spoke --

9       because I haven't really seen many people.

10  Q   Okay.  Lisa, have you had more than one

11      conversation or communication with her?

12  A   No, I haven't communicated with her, probably in

13      two or three months, actually.  This was when I

14      was still working there, and she was still working

15      there also.

16  Q   Okay.  But about -- so I'm asking you just about

17      your communications with the individuals that you

18      listed about this lawsuit.  Did you have more than

19      one communication with her about this lawsuit?

20  A   We discussed it at, like, a shift change or

21      something like that if we saw each other.  I mean,

22      not all the time, but we probably talked about it

23      a few times, yes.

24  Q   And what do you recall about your discussions with

25      her?

| | | |
|---|---|---|
| 1 | A | That she was in agreement with me, and that she |
| 2 | | was willing to come on board, if that's what you |
| 3 | | want to call it, and be a participant. |
| 4 | Q | All right. Since -- what -- well, let me ask |
| 5 | | this. When was the last communication you had |
| 6 | | with Lisa? |
| 7 | A | Like I say, I would guess two to three months ago. |
| 8 | | I haven't spoken with her in at least that long. |
| 9 | Q | Have you had any written communications or |
| 10 | | electronic communications with her? |
| 11 | A | No. Well, I -- let me correct that. I've sent |
| 12 | | her some jokes on email, but nothing pertinent to |
| 13 | | this. |
| 14 | Q | Okay. |
| 15 | A | It was just, strictly just forwarding some humor. |
| 16 | Q | Okay. And what about Jamie? |
| 17 | A | Jamie? |
| 18 | Q | I think the second person you indicated you had |
| 19 | | had -- |
| 20 | A | Oh, Jim. Jim. That was Jim May. |
| 21 | Q | Jim? Jim May? |
| 22 | A | Yeah, I haven't spoken with him about it in at |
| 23 | | least -- he went on -- I'm trying -- he went on |
| 24 | | vacation -- he called me actually. At least a |
| 25 | | month. He -- maybe six weeks. He telephoned me. |

1    I was in my car, we discussed it a little bit, and

2    he said he was going on vacation for a couple

3    weeks and just kind of said "good luck," and that

4    was about it.

5  Q  Okay.  When you say you "discussed it a little

6    bit," what did you discuss?

7  A  Just some of my viewpoints, the merits, and some

8    of his viewpoints as to things that had transpired

9    that -- whether this was a valid, you know,

10   situation or not.

11 Q  Okay.  And what were your viewpoints, and what was

12   his response?

13 A  My viewpoint said it wasn't a valid situation, or

14   whatever you want to call it, to the fact I had

15   been involved in a couple things like this before

16   with previous employers.

17            One with, I believe it was

18   Americana.  It was either Playboy or Americana,

19   where, as security people there, we worked a

20   straight eight hours.  And another department

21   complained, "Why is security working a straight

22   eight?  We have to work eight and a half."

23            So there was some discussion.  The

24   personnel director contacted the State of

25   Wisconsin.  We had a meeting, and we just left it

1      at, let's get a hold of state and get a

2      determination on it.  And the personnel director

3      got a hold of the State of Wisconsin, and their

4      determination was that since we were, or had

5      communication devices, were available for a call

6      at all times, that if they wanted us to work the

7      eight and a half hours, they had to pay us a half

8      hour.  So things stayed straight eight-hour

9      shifts.

10                  Then I was a correctional officer

11     for the Walworth County Sheriff's Department, and

12     it came up again.  It was a sheriff or

13     undersheriff, I believe, had looked into us

14     working -- we were again straight eight hours,

15     just like the deputies were.

16                  And it came up that they might want

17     us to work eight and a half hours, so that went to

18     Walworth County personnel, who I believe contacted

19     the state -- I don't think they made their own

20     determination.

21                  And they came back saying

22     essentially the same thing.  That whether we were

23     on break or not at the jail, we still had the

24     communications devices with us, we were available

25     for a call if something happened, so if we worked

1    a half hour, they had to pay it.  And again, they

2    left us at the straight eight hours.  They didn't

3    change the policy.

4  Q  Okay.  And that was the nature of the information

5    that you shared with Jim?

6  A  Yes.

7  Q  All right.  And what did he say in response?

8  A  He agreed, because he said that when he -- when

9    Aurora originally took over Burlington Hospital, I

10   believe Jim was still sergeant there then, and he

11   had brought it up to them, because when Aurora

12   took it over, they apparently changed policy.

13                  Prior to Aurora taking over

14   Burlington Hospital, the security people were on a

15   straight eight hours.  And then when Aurora took

16   it over, and I believe Jim said they were on --

17   still on a straight eight hours for a while, but

18   then Aurora changed it to eight and a half.  And

19   he said he'd questioned that when it happened, and

20   he was basically told, "This is what it is."  And

21   he didn't pursue it anymore after that.

22  Q  And you weren't employed there at the time,

23    correct?

24  A  No.

25  Q  Okay.  Any other communications with Jim May?

1   A   No.

2   Q   Was it just that one conversation that you had

3       with him?

4   A   We had -- prior to this -- we had talked about it

5       prior to any law, you know, me seeing Summer and

6       signing up, we discussed it several times.

7   Q   Okay.

8   A   But since the lawsuit was initiated, I believe

9       that was the only time we've talked about it.

10  Q   All right.  And in your prior discussions,

11      anything different in substance from what you just

12      described?

13  A   No.

14  Q   What about -- the next person you indicated you

15      had had communications with was Kyle Stoxton?

16  A   Right.

17  Q   Okay.  How many communications did you have with

18      him?

19  A   I would think maybe one.  And that would have been

20      -- wow.  Prior to my going on family leave, so

21      that would have been prior to July of 2010.  Kyle

22      was fairly new, and it was just a shift change,

23      kind of talking about stuff, and it came up.

24              And it was very generic, very --

25      not real specific, just that I disagreed with the

1    current policy, basically was what it was.  And

2    brief.  I mean, it wasn't in-depth, half-hour

3    discussion or anything.  It was maybe two minutes

4    or something like that that I recall.  It was just

5    a, yeah, this is my opinion, and that was it.

6    Kyle was pretty new, and so there wasn't much to

7    add to that.

8  Q  Okay.  And that's your only communication with him

9    that you recall --

10 A  Yes.

11 Q  -- about this lawsuit?

12 A  Yes.

13 Q  All right.  And no communications other than the

14   oral communications you've already testified to

15   with regard to either May or Mr. Stoxton?

16 A  Yes.

17 Q  Okay.  What about your communications with

18   Ms. Bruenning?

19 A  We discussed it numerous times.  The first time I

20   recall discussing it with Ms. Bruenning was when I

21   was hired.  She was a sergeant at Lakeland

22   Hospital in Elkhorn, and it was probably my second

23   or third day working there.  While in training I

24   asked, "What's this half-hour lunch thing?"  And

25   she said we have to work eight and a half hours,

1    and dah, dah, dah, dah, dah, and -- I don't mean
2    to make that hard for you.
3                   And I -- we discussed it a little
4    bit.  I had explained a little bit about my prior
5    experiences, and her response was, "I believe
6    there's an exception for health care."  And I
7    didn't pursue it.  I didn't do much, because
8    obviously I just started there, and I wasn't going
9    to be getting in some kind of contentious
10   discussion with the boss while I'm in training on
11   my second or third day there.
12                   So I just kind of left it at that.
13   I was a little skeptical of her answer, but I
14   wasn't going to debate the point.  I know over the
15   years that I was there, we discussed it on
16   numerous occasions.
17 Q   And did her position ever change or --
18 A   No.
19 Q   We'll come back to some of your discussions with
20   Ms. Bruenning.  Anyone else that you have
21   discussed the issues in this lawsuit with?
22 A   Me and my brother, Larry.  Nobody springing to
23   mind other than him.  I mean, we've just sat
24   around talking and discussed it.
25 Q   And when you -- you were referring to one -- your

```
 1        brother's name is Larry?

 2     A  Larry, yes.

 3     Q  Okay.

 4     A  His last name is Uglow.  It's different than mine.

 5        U-G-L-O-W.

 6     Q  And does he have any firsthand knowledge about the

 7        issues in this lawsuit --

 8     A  No.

 9     Q  -- or were you just advising him that you had

10        become involved?

11     A  That I'd done it, I'd proceeded with it.

12     Q  I take it he's not employed by Aurora?

13     A  No.

14     Q  Okay.  And never has been?

15     A  No.

16     Q  Okay.  Do you have any written communications with

17        anyone about this lawsuit, whether it be in an

18        electronic format, an email?

19     A  Any communication I had I forwarded to Summer.

20     Q  Okay.  If you would, could you state your date of

21        birth?

22     A  April 1st, 1954.

23     Q  And what's your present address?

24     A  218 Lewis, L-E-W-I-S, Street, Apartment 3, in

25        Elkhorn, 53121.
```

1   Q   With regard to your education, if you could give
2       me your educational background beginning with high
3       school?
4   A   Burlington High School.  I was a graduate in 1972.
5       I had no -- I've had various courses for college
6       credits.  A lot of, like, in-service things, which
7       counted toward credit.  No formal -- I didn't
8       attend any formal college or tech school.
9   Q   And were the courses that you took primarily in
10      one area, or were they varied?
11  A   Most of them were employment-related.  When I was
12      at Playboy and Americana, we did the injury
13      investigations, per -- to guests or visitors.  So
14      we had some classes on risk management and that
15      type of thing.
16                  The only class I had that was kind
17      of out of that venue was just on a whim; I kind of
18      took a creative marketing and writing class at
19      Gateway Tech in Elkhorn.
20  Q   So let's talk a little bit about your job history.
21      If you would, walk me through your employment
22      history, beginning with your first job after high
23      school.
24  A   Okay.
25  Q   If you can?

1    A    Sure.  I believe that was at Regal China.  It was

2         a production job, factory job in Antioch,

3         Illinois.

4                        After that was Burlington Brass

5         Works, another production job in Burlington,

6         Wisconsin.

7                        Then there was Bardon, B-A-R-D-O-N,

8         Rubber Company in Union Grove, Wisconsin.  Another

9         production job.

10                       Then some friends and I quit our

11        jobs and took off for Florida.  A friend of ours

12        was a construction foreman down there.  And we hit

13        by Atlanta, and it came over the radio that

14        Florida was having the largest construction layoff

15        in history.  So our friend got laid off, too.  We

16        all quit our jobs and kind of looked at each other

17        and thought, "What the hell?"  So we went down

18        there for a month and just hung out and came back.

19                       And that's when I was looking for a

20        job, and I just happened to be driving by the

21        Playboy Resort, and I thought I'll stop in.  So I

22        stopped there and applied and got hired as a gate

23        attendant.

24   Q    What year was that?

25   A    1975, I believe -- or '76.  Let me correct that.

1    I believe it was '76.

2  Q  Why don't you walk me through the progression of

3     positions you held at the Playboy Club and its

4     successors?

5  A  I started as a gate attendant, which was basically

6     working the gate with the arm, and you log in

7     trucks --

8  Q  Right.

9  A  -- in and out and that type of thing.  Then I was

10    moved part-time up into the hotel, just to

11    mainly -- there's that bar called the Bunny Hutch.

12    So I was moved up there to check IDs, and I still

13    worked the gate.

14                    I was the first person without

15    military, police or college or police background

16    that they had ever allowed to work up there, or

17    that's what I was told.

18                    Then I went from there to a

19    full-time officer in the hotel.  And worked my way

20    up from there to director of security.

21 Q  When did you become a full-time officer?

22 A  Boy, I was probably there a year -- I'm trying --

23    maybe a year before I became full-time officer.

24    It might have been a little shorter time period.

25 Q  Okay.  And then how long until you became the

```
 1        director of security?

 2   A    Probably -- trying put it together here.  Six or

 3        seven years maybe.

 4   Q    So roughly '83, '84?

 5   A    Yeah.

 6   Q    And how long did you hold the position of director

 7        of security?

 8   A    I held it with Playboy for, it was about three

 9        months, and then Playboy sold to Americana

10        Resorts.  And they did a big interview and kept me

11        on as director of security also.  I was there for

12        a total of 15 years.

13   Q    And where did you go after that job ended?

14   A    After that, I went to -- I worked, actually

15        part-time as doing investigating with a friend of

16        mine who had an investigative company in Milwaukee

17        here.  He worked pretty exclusively for Alvin

18        Eisenberg's law firm.  And I mainly took witness

19        statements, did some process service.  That was

20        pretty much it for that.  I did that for a little

21        while.

22                     Then after that I got hired on at

23        the Walworth County Jail as a correctional

24        officer.  And I did that for about --

25   Q    And what year would that have been?
```

```
 1   A    Ninety -- let's see.  I'll figure it out by my
 2        son's age.  It would have been about 13 years ago.
 3        That would have been in ninety --
 4   Q    '99?
 5   A    In there somewhere.
 6   Q    Okay.
 7   A    Mid to late '90s.  I was there a little over four
 8        years, and then my partner and I had had a
 9        child -- we were together about 11 years -- he's
10        special needs.  And we split up, and she -- he has
11        a lot of issues.  Pretty disabled, behavioral
12        issues, pretty -- kind of aggressive stuff.
13                    So I took him as a single dad, and
14        I attempted to get help to care for him so I could
15        still work, but I couldn't.  I worked with the
16        county, any agency I could find.  I couldn't get
17        it.  So then I resigned from the sheriff's
18        department to basically raise him.
19                    Shortly after I resigned from the
20        sheriff's department, I did get a part-time job at
21        Lake Lawn Resort doing security two, three times a
22        week on third shift.  And I also was managing the
23        apartment building we lived in to get the rent
24        break.  And I picked up another job doing process
25        service for Southeast Wisconsin Process Service,
```

1    which I still am doing that part-time.

2              And then in about '96, or -- no,

3    wait.  What am I thinking of here?  Because I had

4    him for almost ten years, and I did that for about

5    nine years till he was 19.  When I did place him

6    in a group home, then I got hired by Aurora.  And

7    that was, I believe 2006.

8  Q  March 23rd of 2007, would that --

9  A  Okay.  Sounds good.

10 Q  Is that --

11 A  Yes, yes.

12 Q  Is there any reason to think that's --

13 A  No, that's probably correct.

14 Q  So let's go back to your experience at the Playboy

15    Club and its successor, the Americana.  As a

16    security -- when you were a full-time security

17    officer, were you working a -- did you have a paid

18    lunch break in that role?

19 A  No.  It was just a -- you worked a straight

20    eight-hour shift.

21 Q  With no break?

22 A  Correct.  You ate when you could, basically.

23 Q  I assume as director of security, you were

24    management?

25 A  Yes.

1  Q   All right.  And -- but you oversaw the security
2      officers?
3  A   Yes.
4  Q   All right.  And at all times during your -- during
5      the period that you held the director of security
6      position, was that policy unchanged?
7  A   It never changed, no.
8  Q   Okay.  What about when you were working at the
9      Walworth County Jail?  What was the meal break
10     policy there?
11 A   It was you worked a straight eight hours, you got
12     a break -- I mean, we did get a break for lunch to
13     eat, so we could leave your work area.  There are
14     various work areas in jail.  You could leave your
15     work area, go to the lunch room.  So we were given
16     a break, 30 minutes.  But it was -- again, we
17     weren't, like, docked.  We still got paid a
18     straight eight hours.
19 Q   So you were paid for the break?
20 A   Yes.
21 Q   Okay.  Then you testified the role that you
22     held -- I think you testified, and correct me if
23     I'm wrong, but there was a period of roughly nine
24     years where you were working sort of various
25     part-time jobs?

1    A    Correct.

2    Q    I believe you testified that one of those was as a

3         part-time security officer, and I didn't catch

4         where that was.

5    A    Lake Lawn Lodge in Delavan.

6    Q    All right.  And what was the break policy at Lake

7         Lawn?

8    A    It was the same as Playboy and the jail.  It was a

9         straight eight hours.  There was no deduction for

10        meals.

11   Q    All right.  Have we talked about all of the

12        security officer positions that you have held?

13   A    Yes.

14   Q    Okay.  And so prior -- is it my understanding that

15        prior to Aurora, you never received an unpaid meal

16        break?

17   A    Correct.

18   Q    At least in your hourly roles?

19   A    Yes.

20   Q    All right.  So let's talk about your hiring by

21        Aurora.  What role were you hired into at Aurora?

22   A    At first I was hired as part-time.  I believe it

23        was what would be referred to as a .3, which maybe

24        would be three shifts a week.

25   Q    And how long were you in that role?

1  A   Boy, my best guess is about six months before I

2      was elevated to a .5, which made me benefit

3      eligible.

4  Q   And then how long were you .5?

5  A   That was probably at least a year, and then I

6      transferred to Burlington Memorial Hospital,

7      because they had a full-time opening which made

8      the benefits a little more affordable, and also

9      you accrue PTO time faster if you were full-time.

10     So I took that position.

11             I was waiting for -- because I live

12     two miles from Lakeland Hospital, so I was waiting

13     for the third shift guy at Lakeland, Bob Meyer, to

14     retire.  He kept saying every year he was going to

15     retire, and I was sliding in full-time there, and

16     then he kept putting it off.  So I was at

17     Burlington for about a year.  In a full-time basis

18     then.

19 Q   Following which you then transferred to Lakeland?

20 A   Back to Lakeland, yes.

21 Q   Okay.  And you remained at Lakeland through the

22     remainder of your employment --

23 A   Yes.

24 Q   -- with Aurora?

25 A   Yes.

1  Q  Okay.  So if I understand correctly, other than
2     the one year when you transferred to Burlington on
3     a -- for the first time that you were on a --
4     employed on a full-time basis, at all other times
5     you were employed at the Lakeland facility?
6  A  Yes.
7  Q  When you were first hired in the .3 position, what
8     shift were you working?
9  A  I believe it was third shift.  I would work -- I
10    mean, I would pick up other shifts as -- if I
11    could.
12 Q  Okay.
13 A  But generally it was scheduled third shift.
14 Q  All right.  And what hours are third shift?
15 A  11 p.m. to 7:30 a.m.
16 Q  And what are the hours of first and second shift?
17 A  First shift is 7 a.m. to 3:30 p.m.  Second shift
18    is 3 p.m. to 11:30 p.m.
19 Q  All right.  And did those shift times ever change
20    throughout your employment with Aurora?
21 A  Burlington was different, because in Burlington,
22    you worked two 12-hour shifts and two eight-hour
23    shifts.  There was day shift, basically it was
24    7 a.m. to 7:30 p.m.  Second shift was 7 p.m. to
25    7:30 a.m.  And then you worked two eight-hour

1    shifts.  So you basically work -- get your 40

2    hours in in four days rather than five days.

3                    That was just a preference of the

4    sergeant there, Jim May.  He got that installed

5    there, because the majority of the officers were

6    agreeable to it.

7  Q  And does that mean that there was more than one

8    person on most shifts at Burlington?

9  A  No.  It was single-person shifts, the same as

10    Lakeland.

11  Q  So I'm trying -- help me understand if, according

12    to your testimony, at Burlington, there was a day

13    shift from seven to --

14  A  7 a.m. to 7:30 p.m.

15  Q  All right.  And then the night shift would have

16    been?

17  A  It was 7 p.m. to 7:30 a.m.

18  Q  And then there were?

19  A  Then you would do two eight-hour shifts after

20    that.  And those were the same as Lakeland.  The

21    eight-hour shifts were 7 a.m., 3:30 p.m.,

22    3 p.m. --

23  Q  Those follow the schedule of the first, second and

24    third shift at Lakeland?

25  A  Correct.

1   Q   And so when you were at Burlington, you would work

2       in a given week, typically two of the

3       12-and-a-half-hour shifts?

4   A   Yes.  And two of the eight-and-a-half-hour shifts.

5   Q   Do you remember -- so if I have the timing

6       correct, it was -- am I correct that you spent six

7       months as a .3?

8   A   I'm estimating that.

9   Q   Okay.

10  A   I'm not sure on that.

11  Q   All right.  Roughly, that's your best

12      estimation --

13  A   Yes.

14  Q   -- recollection?

15  A   Yes.

16  Q   Then you were -- you spend a year in the -- as .5?

17  A   .5.  Again, that's my best recollection, yes.

18  Q   Okay.  And then another year at Burlington?

19  A   As full-time, yeah.

20  Q   So how long were you at Lakeland on the third --

21      on the third shift?

22  A   I came back there full-time, I believe it was

23      maybe a year.  I'd have to look up dates.  I --

24      which I don't have available to me.  I'd have to

25      go out to personnel and actually get dates.

1   Q   A year ago today roughly is what you're thinking?
2       Would -- March of 2010, would have been when you
3       returned to Lakeland?
4   A   No, it was before that.  Because I left on family
5       leave in July of 2010, so it was probably a year
6       prior to that.  Probably -- would have been
7       July 2009, possibly.  Again, it's a best guess.
8   Q   Okay.  Throughout the period that you were
9       employed by Aurora, who were -- who did you report
10      to?
11  A   Ellen Bruenning was the sergeant at Lakeland
12      Hospital, and Jim May was a sergeant at Burlington
13      Hospital.
14  Q   All right.  So for the one-year period or roughly
15      thereabouts that you were at Burlington, it was
16      Jim May.  And otherwise for the entire period of
17      your employment, it was Ms. Bruenning?
18  A   Yes.
19  Q   And to whom did they report?
20  A   To Jim Sagan, S-A-G-A-N.  He was our south region
21      supervisor.
22  Q   And what does the south region consist of?
23  A   It was Kenosha facilities, Burlington facilities,
24      Elkhorn facilities, I'm trying to think if there
25      was anything else in there.  I don't think West

1       Allis was south region.  The new Summit is south

2       region.  The new hospital in Summit is considered

3       south region.  I believe that's it.

4  Q   All right.  And Summit was only opened recently,

5       correct?

6  A   Correct.

7  Q   Do you recall the date?

8  A   It was, I believe around a year ago.  Maybe not

9       that -- yeah, it's probably a year ago.

10  Q   Which facilities are part of the -- when you refer

11      to the Kenosha facilities, what are you referring

12      to?

13  A   The Aurora Kenosha on Highway 50.  They've got a

14      big center/clinic/hospital, it's set-up there.

15      And the pharmacies and clinics and anything Aurora

16      was -- that was in there was Aurora south region.

17  Q   Okay.  Burlington, similarly the hospital/clinics,

18      when you're referring to the Burlington

19      facilities --

20  A   Right.

21  Q   -- what are you referring to?

22  A   The pharmacies, the clinics.  The clinic in

23      Burlington is actually attached to the hospital.

24      And Elkhorn, the same thing.  All the Aurora

25      facilities are considered to be in the south

1      region.

2  Q   Okay.  Where is Lakeland?

3  A   Lakeland is on Highway NN in Elkhorn.

4  Q   And your employment with Aurora ended, correct?

5  A   Yes.

6  Q   All right.  When was your last day of employment?

7  A   I believe it was September 25th, 2010.

8  Q   And why did it end?

9  A   I took family leave.  My son was in a group home.

10     It didn't work out.  There was some bad situations

11     there, and I -- I couldn't leave him there

12     anymore, so I made arrangements to -- I tried to

13     find another place, but I couldn't.  So I brought

14     him home, and I went on family leave from Aurora,

15     which would have -- they were very accommodating

16     with that, but it was evident that it wasn't going

17     to happen -- I wasn't going to get care, get a

18     decent place for him, so I wound up actually

19     resigning.

20  Q   Okay.  Do you have any reason to dispute that your

21     termination date was technically October 7th of

22     2010?

23  A   Oh, no.  It may have been.

24  Q   Okay.

25  A   September -- maybe that was an insurance thing.

1       That may be why that date's stuck in my head.

2       That very well could be October 7th.

3   Q   Okay.  And are you currently working?

4   A   Yes.

5   Q   And where are you currently employed?

6   A   I'm employed at -- the acronym is IRIS, I-R-I-S.

7       I'm actually paid by the State of Wisconsin to

8       provide supportive home care for my son.

9                   And I also do process service

10      part-time for the Southeast Wisconsin Process

11      Service out of Waukesha.

12  Q   Okay.  Any other current employment?

13  A   No.

14  Q   When you're employed as a security officer at

15      Aurora, were your duties significantly different

16      at, for instance, Lakeland versus Burlington?

17  A   The only major difference was at Lakeland

18      Hospital, we would do what is called a patient

19      standby.  If the police brought in what was

20      referred to as an ED, which would be an emergency

21      detention, or a PC, protective custody, very often

22      they were under the influence of alcohol, drugs,

23      or whatever, weren't very manageable.  And not all

24      the time, but the vast majority of the time we

25      would have to basically watch them until human

1    services secured placement at a treatment facility

2    for them.

3                         At Burlington we didn't have to do

4    that.  At Burlington, the police stayed with the

5    subject they brought in until he was shipped out.

6    I believe there are three Aurora facilities that

7    do it the way Lakeland had to do it, because we

8    were constantly complaining about it, because we

9    could be there for hours on end, and we could have

10   multiple people to watch at the same time.

11   Especially in the summer with Alpine Valley and

12   everything, it could be crazy.

13                        And you could spend an entire

14   shift, which I did on several occasions,

15   babysitting these people, basically is what you're

16   doing.  Some of them were -- there were a lot of

17   different conditions.  A lot of them were -- had

18   to be strapped down.

19                        And the -- no facilities other than

20   maybe Mendota would accept these people until they

21   were not having to be secured to be able to manage

22   them.  So a lot of times they had to stay at

23   Lakeland for hours until they were manageable.

24                        And then we would -- depending on

25   the individual, there were various ways you could

1    do it.  You could usually remove one restraint

2    just to show a little trust, and then kind of

3    another one, you know, maybe a hand, then a leg,

4    and just try and take it slow, generally.  And by

5    then they were usually coming back down from

6    whatever they were on or whatever issue was

7    bothering them.

8                   Some of the very, very psychotic

9    ones never did.  A lot of times they were sedated,

10   and then they were shipped up to Mendota, still

11   had to be restrained.

12                  But that was the only huge

13   difference between the two facilities.  A smaller

14   difference would have been meals that we would

15   deliver to patients.  Burlington had, I think

16   they're like Healthy Choice TV dinners on the

17   floor.

18                  So if a patient -- a lot of times a

19   patient would come in the ER, and they may be

20   there for several hours before they're actually

21   admitted.  And when they got to the floor, if they

22   could, they were hungry, they wanted something to

23   eat -- or OB or whoever.

24                  And a good portion of the time

25   Burlington had these things they could just

1      microwave and heat up and take them to the
2      patients.  At Lakeland they didn't do that.  They
3      did pre-make dinners at Lakeland's cafeteria, keep
4      them in a cooler, and we could go get them and
5      deliver them.  A lot of times they didn't have
6      enough, so we wound up making sandwiches or
7      whatever for the patient in Elkhorn.  Only a
8      couple times in Burlington I had to do that.
9                     But that was also a difference,
10     where the floors could actually do something in
11     Burlington where they didn't have the option at
12     Lakeland to do it.
13                     That was a thing we always
14     questioned, too, was why don't we -- here's two
15     hospitals nine miles apart.  Why don't we have
16     some conformity in procedures here?
17                     But Lakeland never would change.
18     They wouldn't do it.  Other than that, Lakeland
19     was busier than Burlington overall, I think.  Just
20     in overall calls, probably.  For me, anyway.
21  Q  All right.  And at times you will refer to -- I
22     assume when you refer to Elkhorn, you're referring
23     interchangeably to Lakeland?
24  A  Lakeland Hospital, yes.
25  Q  I'm not sure that I asked you, when you were

1    initially at a .3, I believe you testified you

2    worked during that period on the third shift --

3  A  Fridays --

4  Q  -- plus additional shifts --

5  A  Yes.

6  Q  -- that you would pick up?

7  A  Yes.

8  Q  I'm sorry, I interrupted.  Were you going to say

9    it was more regular than that?

10  A  No.  I believe my regular nights were

11    Friday/Saturday night.  I kind of took third

12    shifts nights off.  And then if I picked up

13    anything extra, it could be another shift, but my

14    steady shifts, if you want to call them that,

15    would be the -- would have been at that time the

16    Friday and Saturday night third shifts.

17  Q  All right.  And when you picked up additional

18    shifts, were those typically on third shifts also?

19  A  They could be any shift.

20  Q  Okay.  What about when you moved to that -- a .5

21    FTE role?

22  A  That was a lot of third shifts.  Again, some other

23    shifts.  It would vary.

24  Q  What about when you moved to the position at

25    Burlington?

1   A   Burlington, I worked -- my scheduled shifts were

2        Sunday and Monday, the day shift, 7 a.m. to

3        7:30 p.m.  And then on Tuesday and Wednesday, I

4        worked just the eight-hour second shift, 3 p.m. to

5        11:30 p.m.

6   Q   And then I believe you've already testified that

7        the reason you moved back to Lakeland was to move

8        to the third shift?

9   A   Yes.

10  Q   Okay.  So you've already testified as to the

11       differences, the significant differences, between

12       Lakeland and Burlington.  If you would, can you

13       walk me through a typical day in terms of what

14       were all of the tasks or activities that you were

15       expected to perform as a security officer at

16       Aurora?

17  A   Making general rounds and just keeping an eye out

18       for any safety or security hazards for visitors,

19       patients or staff.  Responding to any calls at all

20       you would get.

21             We got calls from unruly people,

22       constantly called the ER for, as I explained

23       before, the emergency detention/protective

24       custodies.  There may be distraught family members

25       from people getting brought into the ER, maybe a

1    car accident or something out in the lobby where

2    they're insisting I want to come back, and we have

3    to go out and kind of tone them down and explain

4    that the people had to be assessed and as soon as

5    we could someone would be out, but some of those

6    got a little frantic.

7              On third shift, I would -- well, in

8    all shifts we would deliver meals if needed.

9    Mainly second and third.  Day shift was much more

10   staffed with -- from the other departments than

11   second and third, so it was mainly night shifts

12   that were delivering meals.

13             There was an area of the hospital

14   called "central supply," which has all the

15   equipment in it that they may need on any floor.

16   If they needed anything, they would call us, page

17   us usually, text page us.  And we would have to go

18   to central supply.  Central supply left at, I

19   believe, five, 5:30 p.m. at Lakeland.  Burlington,

20   they stayed a little longer.  At Lakeland, they

21   would leave about five, 5:30 p.m.  And from that

22   point on it was security's responsibility to get

23   supplies for the floors, whatever they would need.

24   Anything from pumps to catheters to anything --

25   whatever they need.  We would have to do that.

1          Again, deliver meals.  We would

2     have to do -- especially on third shift, there was

3     no maintenance or housekeeping.  So I would have

4     to -- I would get a call for maintenance and/or

5     housekeeping calls.  If I could fix it, I'd fix

6     it.  If I couldn't, I'd page maintenance.  They

7     always had somebody on call.

8          We would assist -- a lot of times a

9     patient would pull up, leave their car in the

10    circle drive and come in, and they're having chest

11    pain or something.  They'd call us to go park the

12    car.  We jump started cars for employees and

13    guests, visitors, patients, whatever, when need

14    be.  We had a jump kit in the office we'd take out

15    and jump cars.

16          Let's see.  Called to floors for a

17    lot of unruly situations where there'd be patients

18    maybe detoxing or something, and they'd get out of

19    hand.  Or maybe elderly patients, dementia, that

20    type of thing, that would maybe be a little -- a

21    little out of hand where we'd have to show up and

22    try to resolve the situation.

23          Or the nurses were afraid that they

24    couldn't handle it.  Either maybe the person was a

25    big person, strong person, or just violent,

1       because small people can be violent, too.  Or
2       they'd start throwing things out of the room, and
3       we'd get called up to do that.
4                       We would assist -- now, especially
5       my last year at Lakeland, there was also a big
6       renovation going on, and there were two shifts of
7       construction, Berghammer Construction was a
8       general contractor.  A lot of the work that they
9       did was interior.  I believe Medicaid, the State,
10      made Lakeland do this stuff.  They had to install
11      sprinklers, do fire caulking.  They did some
12      cosmetic things, but a lot of it was internal
13      work.
14                      But this outfit was there for over
15      a year, and they ran two ten-hour shifts.  So
16      their late shift would get done around two in the
17      morning.  And they had subcontractors working for
18      them also.  And most of the time they would have
19      painters, electricians, that kind of thing coming
20      in at -- between 3:30, four in the morning.  We'd
21      have to take in keys and issue keys to them.
22                      That was kind of an exception, but
23      it was for over a year that we had to do that
24      on -- all shifts had to deal with that.  First,
25      second and third shift had to deal with that.

1       They were reasonably consistent as

2    to times they'd come in and leave, but not always.

3    There might be stragglers that were doing

4    something that they had to get done so they

5    stayed.  We did have a drop box they could drop

6    keys in at the night if we weren't in the office,

7    but we got a ton of calls from them about --

8    because they didn't have access to all areas where

9    there may be key padlocks, like, OR or OB or

10   different area, where we would have to admit them

11   to that area to do their work.

12       Or they would call us and say we

13   have to do this, you know, can we do this now, or

14   is this bad, should we wait and, you know, that

15   kind of thing.  And we would have to meet them,

16   whatever area, and determine if it was a plausible

17   thing to do at that time or not.  But it was a lot

18   of activity, a lot of activity.

19   Q   Anything else that you can think of?

20   A   We handled, like, lost and found, investigations

21   regarding missing property theft, vandalism.  And

22   that's about all I can think of right now.

23   Q   Let me ask you in a little further detail about

24   some of those activities.  General rounds involved

25   what?

1    A    Going through all areas of the hospital.  Just

2         kind of checking things out, seeing what's going

3         on, you know, talking to people, how's it going

4         and, you know, you need something while I'm here?

5         I did that a lot to try to avoid getting paged

6         later.

7                        And it was just kind of general

8         rounds.  Just kind of checking -- we'd lock the

9         doors at night, obviously, to where at Lakeland

10        there was only one entrance left open after 8 p.m.

11        All the entrances we locked, so you could leave,

12        but you couldn't come in.

13   Q    And I assume some of that is -- the purpose of

14        that is just so people are aware that there's a

15        security -- visible security presence?

16   A    Yes.

17   Q    And when you say "general rounds," would that also

18        -- at times would that be both inside the facility

19        as well as driving around the parking lot?

20   A    Yes.  Lakeland and Burlington both had buildings

21        outside the hospital.  Boiler buildings, ground

22        maintenance building.  Burlington had a corporate

23        office building and an apartment building, which

24        had some offices and some apartments, which we

25        would have to periodically go out and check.

1   Q   Okay.  How often?

2   A   It kind of depended on the shift.  You tried to do

3       it three, four times a shift.  The outbuildings.

4       The in-hospital rounds, I mean, personally, I

5       tried to kind of stay constant as far as just

6       moving around.

7   Q   The delivery of meals, did you say that was

8       primarily at Lakeland?

9   A   More so at Lakeland than at Burlington, yes.

10  Q   And how frequent was that on a per-shift basis?

11  A   Oh, usually at Lakeland, I probably got on an

12      average, two to three meal calls a shift.  At

13      Burlington, I would guess six to eight calls in a

14      week maybe.  Maybe a little more.  That's just my

15      recollection right now.

16  Q   You mentioned that you would get calls for

17      maintenance or housekeeping.  What type of

18      housekeeping calls would you get?

19  A   They needed supplies, cleaning supplies.  The

20      floors might, for whatever reason, there was an

21      accident or bodily fluids or something.  They may

22      need mops and buckets, or somebody just spilled

23      something, coffee, whatever, and it needed to be

24      cleaned up.

25              Mainly housekeeping was equipment.

1       Sometimes I would do the actual cleanup, depending

2       on -- because if a floor is real busy and that

3       kind of stuff.  If they were packed, obviously

4       they couldn't spare a nurse or an aide to do it,

5       so I just did it.

6   Q   And were there times when the nurses or aides

7       would go and get the supplies themselves?

8   A   No.  They couldn't get into housekeeping.  We had

9       to -- my -- on third shift it was the charge nurse

10      and security were the only ones who had access to

11      most of the hospital.

12  Q   So the charge nurse had access to the supplies?

13  A   Correct.

14  Q   And just so I understand, is it your testimony

15      that only the security officers would ever

16      retrieve supplies on third shift?

17  A   From inside housekeeping, yes.  We were -- the

18      charge nurse would.  Some charge nurses did on

19      occasion.  If we were tied up in ER or something,

20      the charge nurse might go down and do it if they

21      were available.  Otherwise they just had to wait

22      until we were freed up and would do it.

23  Q   Lost and found involved what?

24  A   We would log in the property.  If something was

25      left in a room, or if a patient called in and

1    said, "Hey, I think I left this there, will you go

2    up to the floor and check?"  And we would do a

3    report and file so if it did turn up, we could

4    contact them.

5  Q  Where -- was the lost and found property kept in a

6    particular area?

7  A  Yes.  It was kept in the security office.

8  Q  At both facilities?

9  A  Yes.  Well, actually no.  At Lakeland we did move

10   it to a storage bin which was in a secured area in

11   the basement.  It wasn't too far from our office,

12   but it was not actually in our office.

13 Q  So when you would first arrive for work on any

14   given day, what would you do?  How would you

15   determine the sequence of your activities for the

16   day?

17 A  I'd get a quick briefing from the officer I was

18   relieving.  We had a green log book there that we

19   were supposed to review, which would -- if there

20   were any significant items that we should be

21   watching for, or be aware of, they're supposed to

22   be logged in that log book.

23 Q  Is that what's referred to as the activity log?

24 A  No.  The activity log, I believe, was the log we

25   actually handwrote the shift's events down.  And

1        then we would enter them in the computer on what's

2        called ActTrack.

3   Q    So what was the green book?

4   A    I just call it the security log -- security log

5        book is all that I ever knew it was referred to

6        as.

7   Q    And was there one at both Lakeland and Burlington?

8   A    Yes.  They were green, fairly large book, with

9        lined paper that you'd make entries in and read

10       entries from.

11  Q    What was the difference between the entries you

12       would make in that book versus the activity logs?

13  A    Some of them may be -- maybe a suspicious vehicle

14       that you might want to have the other officers

15       keep an eye out for.  You may have a problem

16       patient in a room that had the possibility of

17       causing problems.  There may be an issue where

18       there's a patient in the hospital, maybe a

19       domestic thing where the spouse was not to come

20       and visit the person.  Things of that nature.

21  Q    Okay.  And so the purpose was to advise the person

22       coming on the next shift as to things to --

23  A    To maybe pay a little extra attention to.

24  Q    Okay.  But that green log book was not logging

25       your activities during the prior shift?

1   A   No.  That was more of just a information exchange

2       for things you may want to pay extra attention to.

3   Q   Okay.  So you started to testify that when you

4       came into work, you would first both have some

5       sort of debriefing with the officer who was coming

6       off the prior shift as well as review the green

7       log book?

8   A   Yes.

9   Q   Then how would you determine what activities you

10      were going to perform that day?

11  A   By the information that was given me.  Now,

12      generally, like, on a night shift if there's much

13      of anything going on, it's going to be in ER the

14      majority of the time, so I -- personally, I kind

15      of head up there first and just say, "Hey, how's

16      it going?  Is anything going on?"  That type of

17      thing, make sure things are good there.

18                  Then depending on -- I didn't have

19      a set routine, go to this floor first or that

20      floor first or go outside first.  I always tried

21      to vary it.  I would kind of set out on rounds and

22      just kind of make sure things that were locked --

23      were supposed to be locked were locked, that type

24      of thing.  Meeting rooms, we had to lock those,

25      too.  And just make sure things -- my usually

1        first thing was to make sure everything that was

2        supposed to be secured was secured.

3    Q   Okay.  So largely you set your own schedule?

4    A   Yes.

5    Q   Throughout the shift?

6    A   Yes.

7    Q   When you first arrived for work, did you check in

8        at a particular location?

9    A   Just in the security office.

10   Q   All right.  And is -- would you punch in for work?

11   A   Yes.

12   Q   How -- how would you do that?

13   A   There were time clocks by one -- by the - that

14       would be the No. 1, 2, 3, 4, 5 and 6 elevators,

15       there were time clocks.  And on the first floor in

16       the basement -- our office was in the basement.

17       We were on the first floor for a while due to the

18       construction, went back to the basement.  But

19       there were time clocks fairly close to our office.

20   Q   And how -- how did the time clocks work?  Were you

21       punching a time card?  Were you swiping a card?

22   A   We were swiping our employee IDs.  You could punch

23       in on the phone also, punch in or out.

24   Q   Okay.  Did you typically swipe your card?

25   A   I swiped my card.

1  Q   All right.  And is that -- do you know the name of
2      the timekeeping system?  Kronos?
3  A   Kronos, yes.
4  Q   Now, did you wear a uniform?
5  A   Yes.
6  Q   All right.  And did you change into your uniform
7      at work or at home?
8  A   At home.
9  Q   Okay.  Did you carry any equipment?
10 A   I didn't carry much.  A lot of officers, we were
11     -- it was available to us to carry -- we did have
12     to carry the radio, cell phone and pager.  Those
13     are mandatory.  It was available, officers, you
14     could carry a baton, pepper spray, handcuffs, if
15     you so desired.
16 Q   And you said that you had to carry the -- a radio,
17     cell phone and pager.  Did you have to carry all
18     three?
19 A   Yes.
20 Q   And was that true of both facilities?
21 A   Yes.
22 Q   And would you pick those up when you started your
23     shift?
24 A   Yes.
25 Q   And would you sign them out, or was there some

1        sort of procedure for obtaining the device?

2   A   No.

3   Q   Describe for me what each of the -- describe for

4        me the pager, the cell phone and the radio.

5   A   The pager was a pager you'd -- basic pager.  You

6        could receive text messages on it, which is the

7        way we got from the hospital personnel, most of

8        them did.  It wasn't real often we'd get a --

9        although we did get them to just call our

10       extension.  Generally they could put on there, we

11       need a SCD pump for room 235, or we need a meal

12       for ER Room No. 7.  They could text that in there.

13  Q   Okay.  And were all of the pagers linked to the

14       same number?

15  A   Yes.  Well, the security pager was, yeah.

16  Q   And who would -- or who had the ability to send

17       you pages?

18  A   Any employee in the facility.  And actually

19       employees outside the facility could page us, too.

20  Q   Who outside the facility would have paged you?

21  A   Usually other employees from another hospital or

22       something.  Maybe a -- they may call and ask you

23       to pick up a shift at another hospital or

24       something, just to page you to get you to call

25       them.  You know, when you get a chance, give me a

1    call in Burlington, that kind of thing.

2  Q  So for personal reasons?

3  A  It was work, because they wanted you to cover a

4    shift.  Like, maybe the sergeant at Burlington

5    might page me at Lakeland, you know, when you get

6    a chance, give me a call.

7  Q  So it wasn't co-employees, it wasn't other

8    security officers paging you to see if you could

9    cover a shift?

10  A  Yes.

11  Q  Yes, that did happen or no, it wasn't?

12  A  Yeah, sometimes they would -- we would page each

13    other to just -- like, if I called -- if I was

14    working in Elkhorn, I called Burlington office and

15    nobody answered, most of the time I would just

16    page -- we didn't always have the cell phone.

17    That was, like, in maybe the last two years I was

18    there.  Initially it was the radio and the pager.

19    They added the cell phone later.  And then we

20    called more on the cell phones to each other.

21    Obviously it was easier.  But we didn't have the

22    cell phone the entire time I was there.

23  Q  Okay.  You did have the pager the entire time you

24    were there?

25  A  The pager and radio the entire time, yes.

1 Q And the pager didn't change significantly?

2 A No.

3 Q But you said that once the cell phone was put in

4 use, the pager -- the use of the pager decreased?

5 A No, only by officers. Like officer to officer.

6 If I wanted to get a hold of Burlington officer,

7 I'd use the cell phone rather than just paging

8 them.

9 Q Okay. The use of the pager by others didn't

10 decrease?

11 A No.

12 Q And where did you carry the pager? Did you clip

13 it to your belt? Did you --

14 A I had it in my shirt pocket.

15 Q Okay.

16 A Or the pager I clipped to my belt, the cell phone

17 I had in the shirt pocket, and the radio I had on

18 my belt also.

19 Q All right. Let's talk about the radio for a

20 second. Was it -- is it a two-way radio?

21 A Yes.

22 Q Who had other handsets?

23 A Emergency room admitting had a handset.

24 Maintenance had a handset. I think the actual ER,

25 there was one in there also.

1  Q   I think you already -- you said emergency --

2  A   Admitting.  That would be the outer office that

3      does the initial admitting, paperwork, insurance

4      type of thing.  And then there was one in ER, and

5      security and maintenance had radios.

6  Q   Did you say security and maintenance?

7  A   Maintenance, yes.

8  Q   Okay.  So on third shift there would not have been

9      anyone else in security, correct?

10 A   Correct.

11 Q   All right.  Same is true of maintenance?

12 A   Yeah, there was nobody in maintenance on third

13     shift.

14 Q   Well, and in fact, if I understand your testimony

15     correctly, at least at these two facilities there

16     would never have been anyone else in security?

17 A   No.  There were always single officer shifts at

18     both facilities.

19 Q   All right.  During what shifts was there someone

20     in maintenance?

21 A   First and second shift.

22 Q   And then I assume there was always someone in

23     emergency admitting as well as the --

24 A   24 hours.

25 Q   -- as well as the ER room?

1  A    Yes.

2  Q    Okay.

3        MS. MURSHID:  Sean, can we take a break

4        for a second?

5        MR. SCULLEN:  Absolutely.

6        (A recess was taken from 2:40 p.m. to

7        2:50 p.m.)

8  BY MR. SCULLEN:

9  Q    So we were talking about the two-way radio, and I

10       think for third shift we identified that the

11       emergency room and the ER would have the other

12       handset --

13 A    Correct.

14 Q    -- the only people that had the other handset?

15 A    Yes.

16 Q    The cell phone, you said, was brought into use

17       several years ago?

18 A    About two years before I left.

19 Q    Okay.  So did you have it at Lakeland or not?

20 A    Yeah, Lakeland, yeah.  Both hospitals we had cell

21       phones.

22 Q    And do you recall, was it brought in during the

23       period that you were working at Lakeland, or was

24       it there when you first arrived?

25 A    It wasn't when I first arrived.

1    Q    Okay.

2    A    It was -- I don't remember if we first got it when

3        I was at Burlington, or we first got it when I

4        went back to Lakeland. I don't recall when that

5        came into play.

6    Q    Okay. Do you recall what the reason was that --

7        the reason for the implementation of the cell

8        phone?

9    A    They said it was to make it on a -- if need be,

10       easier to contact us. If we needed cell phone to

11       call out for help or whatever, we would have it.

12       We all carried our own cell phones anyway, but

13       that was basically it.

14    Q    Well, that was going to be my next question. I

15       mean, did you have, throughout the time you were a

16       security guard, did you have your own --

17    A    Yes.

18    Q    -- cell phone?

19    A    Yes.

20    Q    And did you use it at times to contact people in

21       response to a page or --

22    A    Yes.

23    Q    In terms of your experience, I assume that when

24       you -- did Sergeant Bruenning work -- she would

25       work some of the straight shifts, is that correct?

1  A  Yes.

2  Q  Where she would be the only security officer on?

3  A  Yes.

4  Q  So there wouldn't be a sergeant like her plus a

5     security --

6  A  No.

7  Q  -- officer underneath her?

8  A  No.

9  Q  You previously testified that you ultimately,

10    since -- particularly since you were the only

11    security officer on duty when you worked at either

12    Lakeland or Burlington, would largely determine

13    what activities you performed throughout the day.

14    Was the manner in which you performed your

15    activities then completely determined by being

16    responsive to requests that you received or

17    situations that arose throughout the day?

18 A  Could you clarify that a little bit?

19          MS. MURSHID:  I'm going to object to

20    form, yeah.

21 BY MR. SCULLEN:

22 Q  Let me see if I can clarify it.  First of all, was

23    there a set list of activities that you were

24    expected to perform on a particular shift?

25 A  Yes, to, like I say, check for secured doors.

1      Many -- when you could during a shift, basically

2      check the entire facility for safety, security

3      issues, that kind of thing.

4  Q   That would be making rounds?

5  A   Yes.

6  Q   And would checking for secured doors be considered

7      part of making rounds?

8  A   Yes.

9  Q   Okay.

10  A   Basically that was it.  I mean, it was -- we were

11      encouraged to make contact with the other

12      employees on your rounds, just to kind of develop

13      that camaraderie and -- it wasn't, like, written

14      down.  It was just a kind of thing that was in our

15      training that if a good officer trained you, they

16      kind of taught you to do that.  Because it helped

17      you.  I mean, it gave you a little better

18      understanding of each floor and their issues and

19      their concerns and their needs.

20  Q   Okay.  And then back to my original -- original,

21      perhaps poorly-worded question.  Then beyond those

22      duties, were the activities you performed in

23      response to requests for assistance or situations

24      that arose?

25  A   Yes.

1  Q    You testified previously that at times you would

2       get, for instance, requests for assistance with

3       supplies or meals that had to be delivered?

4  A    Yes.

5  Q    And did you have authority to prioritize those

6       requests?

7  A    Yes.

8  Q    Were there ever requests that you rejected?

9  A    I don't know that I rejected any.  I might

10      postpone some.

11 Q    Okay.  What type of requests did you postpone?

12 A    Meal or supply request or maybe escort an employee

13      request, if I was tied up in ER possibly or on a

14      floor with an unruly patient where I was unable to

15      leave.  If they did make a request, I would tell

16      them I'm doing this.  As soon as I can, I can

17      fulfill your request.

18 Q    So certain requests could be fulfilled within a

19      certain period of time and were non-emergency

20      requests, is that correct?

21 A    Yes.

22 Q    Were you ever disciplined for postponing a -- an

23      activity?

24 A    No.

25 Q    Did you document or record the activities that you

1     performed throughout the day?

2  A   Yes.

3  Q   And in what form did you document those

4     activities?

5  A   We would write it down in our activity log, and

6     then a specific activity would be entered on the

7     ActTrack in the computer.

8  Q   Did you only record the activities on the logs, or

9     did you also input the same information into the,

10    quote, unquote, ActTrack?

11  A   The same information that I would have on the

12    log -- well, I'm just trying to think.  No,

13    because on the written log, the activity log, I

14    may put "rounds" and then "two hours."  I would

15    not put that on ActTrack.

16            If I did a specific function, like

17    delivered a meal, disorderly patient, jumped a

18    car, guarded Flight For Life -- that was another

19    duty we had to do -- that would go on ActTrack.

20  Q   And you would input it?

21  A   Yes.

22  Q   All right.  Did anyone other than security

23    officers input information into ActTrack?

24  A   The sergeants had access to -- I couldn't access

25    somebody else's ActTrack.  The sergeants had

1       authority to get into people's ActTracks and

2       examine them.  And Kronos also.  They could adjust

3       times if need be.  They had access to that also.

4  Q    Okay.  What was your understanding about the

5       difference in the manner in which you were

6       supposed to record activities on the activity

7       logs, for instance, versus ActTrack?

8  A    ActTrack was for an actual specific function you

9       did, rather than a generic, like, an entry.  My

10      personal entry, if I just, like, made the rounds,

11      I would just write "rounds," and then write the

12      time.  Or "patrol property" or "checked

13      outbuildings" and write the time.  That I would

14      not enter on ActTrack.

15               Any specific thing I did, as I

16      stated before, deliver a meal, equipment, patient

17      assist, anything like that, that would go into

18      ActTrack.

19  Q   Would your activity logs then reflect all of your

20      activities throughout a shift?

21  A   Yes.

22  Q   Did you record whether you took a meal period?

23  A   No.

24  Q   Were you ever advised to do so?

25  A   No.

1  Q    And why didn't you?

2  A    I didn't see the point in it.  There's really no

3       reason to enter it.

4  Q    And that's because you understood it to be

5       recording your work activities?

6  A    Yes.

7                (Exhibit No. 1 was marked for

8       identification.)

9  BY MR. SCULLEN:

10 Q    I'm showing you what's been marked as Exhibit 1,

11      which is a document Bates labeled Aurora JB068367.

12               MR. NICKELS:  It's a random.

13 BY MR. SCULLEN:

14 Q    It is random.  068368, 0629273, 272, 069028,

15      069750, 070173, 070174, 070489, 070697 and 070698.

16      Can you identify what's been marked as Exhibit 1?

17 A    These are activity logs that, we would do it

18      during our shift.

19 Q    All right.  And if we look at the first page of

20      Exhibit 1, for instance, it's dated November 30th

21      of 2007.  About a little past halfway through the

22      page at 2300 hours, it says "activity" and then

23      "Officer Brabazon"?

24 A    Yes.

25 Q    Is that your handwriting?

```
 1   A   Yes.

 2   Q   Okay.  And did you always fill out activity logs

 3       yourself?

 4   A   Yes.

 5   Q   So if you would, for each of those -- for each of

 6       these on which you have made entries, can you walk

 7       me through the activities that you've recorded and

 8       what they refer to?

 9   A   Sure.  On the 2300 to 2310, I have the office

10       entry.  That was basically a quick shift briefing,

11       check that log book I spoke about before, the

12       security log book with specific entries rather

13       than daily activities in it, and usually check my

14       email if I had time.

15                  2315 to 23 -- or to 0045, there's a

16       patient standby, a protective custody was brought

17       into the emergency room, so I had to standby for

18       that.

19                  0100, 0115, a delivery.  These

20       codes are for the type of delivery, whether it be

21       equipment or food or, you know, Flight For Life

22       type of thing.  Somehow that was scratched out, so

23       I'm not sure what was there.

24   Q   The redaction, I'll just --

25   A   It looks like an --
```

1  Q    It's a patient.

2  A    -- equipment delivery to ER or something.

3  Q    Let me ask you about that.  I believe that there

4       was a patient name that would have been reflected

5       there?

6  A    Oh, that could be.

7            MS. MURSHID:  It's a redaction.

8            MR. SCULLEN:  Yeah, it's a redaction.

9            MS. MURSHID:  To protect.

10           THE WITNESS:  Okay.  So I made a

11      delivery, it appears, from the bottom I can see

12      ER.  I must have delivered some equipment to ER.

13               0120, 0135, I delivered an SCD pump

14      to be used in room 443.  0140 to 02 -- bad

15      penmanship there.  It looks about 235, that was

16      rounds, basically just going around the hospital,

17      checking doors and everything, checking my areas.

18               0240, 0255, I delivered an

19      isolation cabinet to room 239, it looks like.

20               0300, 0325, again, rounds outside,

21      that meaning parking lot.  The annex building was

22      outside where there were offices in, and the power

23      plant was also outside for Lakeland Hospital.

24               0330 to 0340, pharmacy.  We would

25      get -- I would open the pharmacy for the charge

1    nurse, Robert.  He had to get a drug that was not

2    available on the floor to administer to a patient.

3    Robert was one of the charge nurses.

4              And if you go to the next page,

5    0415, 0430, delivery.  Another isolation cabinet

6    to room 240.

7              0455 to 0505, that was going around

8    the hospital opening all the doors, turning on

9    lights for all the areas.  And that was a daily --

10   daily activity.

11             0510 to 0525, I delivered adult

12   briefs to the second floor, to medical floor.

13             0530, 0630, rounds throughout the

14   hospital.

15             0630, 0700 rounds throughout -- out

16   in the parking lots.

17   BY MR. SCULLEN:

18   Q   Okay.  Before we leave this day, are any of

19       these -- obviously, other than the rounds, I

20       assume for the other activities you received some

21       request for assistance?

22   A   Yes.

23   Q   Were any of those requests what you would term

24       "emergency requests"?

25   A   To the best of my -- judging from these, judging

 1       to the best of my recollection, no.

 2    Q  Okay.  And so again, these would fall into the

 3       category that you previously testified to that you

 4       had the ability within your discretion to

 5       prioritize?

 6    A  Yes.  Most of the time, yes.

 7    Q  Okay.  And postpone as you saw fit?

 8    A  Yes.

 9    Q  Okay.  So if we move then to the third page of

10       Exhibit 1, beginning, I think about three-quarters

11       of the way down, can you similarly walk through

12       what the activities are?

13    A  Sure.  2300, 2315, a shift change in the office.

14       Again a briefing, read the book, I might have

15       checked my email.

16                   2315, 0155, a patient standby in

17       the emergency room.  That was an emergency

18       detention which is what ED is.  TGE stands for

19       Town of Geneva.  That's the department that

20       brought the party in, the patient.

21                   0200, 0215, delivery.  I didn't

22       list the piece of equipment, but it was delivered

23       to OB.  Third floor it would have been.

24                   0220, 0315, rounds throughout the

25       hospital.

1        0335, 0355, lab assist Town of

2    Geneva with a blood draw.  Sometimes on

3    intoxicated drivers or something like that, they

4    would come in, and for whatever reason, the police

5    were allowed to do a mandatory blood draw

6    regardless of the wishes of the arrestee, and

7    sometimes they didn't cooperate, so I would assist

8    in physically restraining the party to draw the

9    blood.

10        0400, 0435, rounds outside lots,

11    annex, plant.

12        0440 -- 440, I'm guessing that is,

13    to 545, rounds throughout the hospital.

14        0540, 0555, receiving office.  They

15    delivered laundry, and the guy probably couldn't

16    get in.  I probably had to admit him into the

17    receiving area.

18        0600, 0700, rounds throughout the

19    hospital.

20 Q    Okay.  The next day begins, I believe, June 26th

21    of 2000?

22 A    Okay.  2300, 2320, again in the office, shift

23    change.

24        2320, 2350, sleep lab.  Oh, they

25    misplaced a patient.  I believe I located her in

1    ER.  23 --

2  Q  Well, they -- was it a patient, or was it an

3     employee?

4  A  Oh, no, it was an employee for the tech.

5  Q  Yeah.

6  A  Tech had gone down to ER sick and didn't tell

7     anybody, but everybody is going holy -- tech's

8     gone.  So you're correct on that.

9  Q  Only slightly better than losing a patient?

10 A  Well, we did the other, too, but I won't elaborate

11    on that.

12               2350 to 0050, rounds throughout the

13    hospital.

14               0050 to 0130, emergency room.

15    Called to assist with resistive blood draw again.

16               0135, 0215, rounds outside.

17               0215, 0400, rounds in the hospital.

18               0405, 0440, outside rounds again.

19               0450, 0505, delivery of an ISO-CART

20    to room 282.

21               0530, 0545, delivery of AV

22    equipment to meeting room D.  And that was another

23    activity we were required to do, was deliver AV

24    equipment in the morning to set up the meeting

25    rooms that required AV equipment.

```
 1                   0545 to 0700, double rounds.
 2   Q   Okay.  The next day which begins on the next page
 3       for June 8th of 2009.
 4   A   Could I make one correction --
 5   Q   Yeah.
 6   A   -- about what we've already spoke of?  I mean, you
 7       did ask if any of them were emergency-type things.
 8       The PCs and EDs, we did have to get to right away
 9       when they called us up there.  And the assisting
10       with police officers with the blood draws or
11       resistive patients were something you had to drop
12       what you were doing and get there.
13   Q   Okay.
14   A   And equipment, I wouldn't list on here.  Sometimes
15       equipment was urgently needed.  I generally did
16       not list that on here.  Just listed that I did it.
17   Q   Okay.  And as you're going through these, there
18       are, so far on most of the days, there are -- you
19       would agree there are long periods, typically more
20       than two hours at a stretch where you were doing
21       rounds?
22   A   Yes.
23   Q   And I assume if you didn't respond to another
24       activity or note another activity, that during
25       that period, you didn't get a call to perform
```

1    another activity?

2  A  Correct.

3  Q  Okay.  Because presumably, if you were simply

4     doing rounds, if you got a call, you would have

5     responded to the call, even a non-emergent call --

6  A  Right.

7  Q  -- typically?  Is that correct?

8  A  Yes.

9  Q  All right.

10 A  Did you want me to continue on the next --

11 Q  Yes, please.

12 A  2300 to 2330 in the office, again, shift change.

13                2330, 0115, rounds.  I didn't list

14     what it was.  Probably hospital if I didn't list

15     that.

16                0115 to 0130, delivery.  Masks, it

17     looks like for second floor, probably for an

18     isolation patient.

19                0135, 0215, patrol outside.

20                0215, 0230, delivery.  Meal to room

21     240.

22                0230, 0435, rounds/office.  That

23     means I did rounds and probably spent time in the

24     office, maybe checking my email or whatever, doing

25     that.

1          0435, 0505, patrol outside.

2          0505, 0520, nuke med.  Third shift

3     in the morning we would get a delivery from

4     nuclear medicine, some radioactive materials.

5     We'd have to let them in what's called the hot

6     room to drop the stuff off, because nobody else

7     could get in there.  At that time of the day it

8     was just us.

9          0520, 0600, rounds.

10          0600, 0630, office.  I put

11     "continues keys," which would have meant I was

12     issuing keys to the contractors.

13          0630, 0700, office.  Probably doing

14     my ActTrack and that type of thing.

15   Q    Okay.  And on this day when you refer to from 430

16        to 505, patrol, is that the same thing as rounds,

17        just outside?

18   A    Just outside, yes.

19   Q    Okay.

20   A    The following day, it says the 13th at the top of

21        this page.

22   Q    August 13th?

23   A    August 13th.

24   Q    2009?

25   A    Correct.  2300, 2330, office again.  Shift change.

1                    2345 to 0015, annex and plant,
2       checking them both.
3                    0025, 0040, delivery.  Meal to
4       emergency room, room 9.
5                    0040, 0140, rounds throughout the
6       hospital.
7                    0140, 0155, delivery.  Cot to room
8       282.  We delivered cots if, a lot of times for
9       pediatric patients, which we didn't have a lot of,
10      but so family could stay in their room.  And then
11      we had these fold-down cots that a family member
12      could stay in a room with a patient.  We would
13      have to get those also.
14                   0155, 0210, isolation cabinet, room
15      256.
16                   0215, 0225, valuables.  That means
17      a patient was admitted, had some valuables, either
18      cash, jewelry, watches, whatever.  And we would
19      take those -- that was another function of ours,
20      which I forgot to say before.  We would take those
21      and seal them up and lock them in a lock drawer in
22      our office and log them in a special book and also
23      log them on ActTrack, so they'd be logged in when
24      we took them in.  There was a plastic bag.
25      Patient would sign it, we would sign it.  A lot of

1    times a nurse would sign it as a witness, because

2    the patients just didn't feel comfortable with the

3    valuables in their room.

4                    0235, 0250, delivered a meal to

5    room 462.

6                    0300, 0315, delivery SCD pumps to

7    rooms 278 and 279.

8                    0350, 0400 office.  Issue

9    contractor keys.

10                   0400, 0510, rounds.  Again, opening

11   doors and stuff.

12                   0510, 0545, patrol outside.

13                   0545, 0700, rounds outside the

14   hospital.

15   Q   The next day, February 4th of 2010.

16   A   Where am I?  Okay.

17                   2300, 2330 in the office, shift

18   change.

19                   2335 to 005, emergency room.

20   Q   Which means what?

21   A   I probably was just monitoring something.

22   Q   Okay.

23   A   It wasn't anything worth -- turned out to be

24   nothing worth entering.  Sometimes they would just

25   come have me stand around, because someone was a

1    little on the fence as far as behaviors go.  If

2    there was nothing I had to do, I didn't make an

3    issue of it -- or note of it.

4                    005, 0050, patrol outside.

5                    0050, 0220, rounds.  And we were

6    also required to do, on a monthly basis, checks of

7    all firefighting equipment in the hotel or -- in

8    the hotel -- in the hospital.  All fire

9    extinguishers, fire hoses, make sure everything

10   was up-to-date and nothing had been discharged or

11   needed service.

12                    0025, 0030, patrol outside.

13                    0030, 0450, rounds.  And I

14   continued ISLM, which is checking the fire

15   equipment that generally, you do it when you got a

16   chance.  Usually would be like a two, sometimes

17   three-shift procedure.  I forget, we had 200-some

18   extinguishers in the building and stuff.  Plus the

19   outbuildings, you had to check those.  And the

20   vehicles had fire equipment.  We had to check

21   those also.

22                    0450 to 0500, doors.

23                    0510, 0525, nuke med again.  A

24   delivery to the hot room.

25                    0525, 0600, rounds and issue keys.

1   That means I was doing rounds, also got called to
2   issue keys to contractors.
3                   0600, 0615, receiving dock
4   delivery.  Something was delivered in the
5   receiving dock, and they couldn't get in so I had
6   to admit them.
7                   0615, 0630, delivery.  SCD pump to
8   room 280.
9                   0630, 0700, in the office doing my
10  reports and issuing keys to the contractors again.
11 Q  And you may have already said this, but what is an
12     SCD pump?
13 A  It's a pump of -- generally they use it on
14     surgical or patients that need blood pressure
15     elevated that they got stockings that go on the
16     legs, and there's a pump that inflates.  The
17     stockings increase pressure, which can control
18     your blood pressure, raise your blood pressure.  I
19     believe that's what it's for.  That was my
20     impression anyway.
21 Q  The next day is May 25th of 2010?
22 A  May 23rd?
23 Q  Twenty-third, yes.
24 A  2300, 2330, again shift change.
25                  2330, 2350, annex.  I went over and

1    checked the annex.  23 -- they did, if I can add,

2    I don't know when this move took place, but they

3    moved a lot of personnel offices and things to the

4    annex building, which was not in the hospital

5    building, it was adjacent to it.  So we did have

6    to do much more thorough checks of that when they

7    moved those offices over there, because there was

8    obviously sensitive equipment in there.

9   Q    At Lakeland?

10  A    At Lakeland, yes.

11  Q    Okay.

12  A    0250, 0020, I'm not sure what I wrote here.

13  Q    Look like something, something, basement?

14  A    Basement, yeah.  I'm not sure what I did.

15  Q    Okay.

16  A    Sorry.  0025, 0040, Emergency Room No. 7,

17       combative patient.  I had to assist.  And he wound

18       up going to jail.

19              0040, 0155, emergency room, Room 7

20       and 11.  We got two going at the same time.  Looks

21       like a PC and an ED, which I had to observe.

22              0200, 0315, rounds.  Again, fire

23       checks.  Still doing that.  Zero -- or doing it

24       again.

25              0315, 0405, another patient

1    standby.  Emergency room 7, PC, protective

2    custody.

3                      0405, 0415, delivery.  Isolation

4    cart to room 276.

5                      0415, 0445, another -- oh,

6    continued patient standby from the previous

7    patient standby entry.

8                      0450 to 0500, open doors, turned on

9    lights.

10                     0500, 0545, rounds and continued

11   fire inspection.

12                     0545, 0700, rounds and office

13   issuing keys.

14                     That's it for me.

15   Q    All right.  So this is a representative sample of

16        the types of activity logs that you would fill

17        out?

18   A    Yes.

19   Q    And is it in your mind reflective of the -- is it

20        an accurate sampling of what you did on a

21        day-to-day basis?

22   A    It's reasonable.  It's -- I mean, some days were,

23        like, crazy, and some were actually slower.  It's

24        hard to describe an average shift.  I mean, it

25        really is.  This would be close to it.  I would

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 83 of 867   Document 49-1

1       concede that, yeah.

2    Q   Okay.

3               MR. SCULLEN:  Can you give us a -- take

4       a short break?

5               MS. MURSHID:  You bet.

6               (A recess was taken from 3:22 p.m. to

7       3:30 p.m.)

8    BY MR. SCULLEN:

9    Q   All right.  Let's talk about Aurora's policy

10      regarding lunch breaks.  What was your

11      understanding of Aurora's meal period break policy

12      as it applied to you as a security officer?

13   A   We had to work the half hour unpaid as a lunch

14      time.

15   Q   Okay.  Did you understand that you were expected

16      to take a lunch break?

17              MS. MURSHID:  Object to form.  You can

18      answer, Jerry.

19              THE WITNESS:  No.

20   BY MR. SCULLEN:

21   Q   So was it your testimony that you never received

22      any communication that -- either orally or in

23      writing, that indicated that you were supposed to

24      take 30 minutes as a lunch break or a meal period?

25   A   We could.  It was called a meal break period, so

1      the option was there.

2   Q  Did you understand that an automatic deduction was

3      made in light of that expectation?

4   A  Yes.

5   Q  And you further understood that Aurora's

6      expectation was that if you were unable to take

7      that 30-minute meal period, that you had the

8      ability to cancel the unpaid lunch period?

9   A  That was -- yes.

10  Q  Are you familiar with the employee handbook?

11  A  Yes.

12               (Exhibit No. 2 was marked for

13      identification.)

14  BY MR. SCULLEN:

15  Q  I'm showing you what's been marked as Exhibit 2.

16      Do you recognize Exhibit 2 as the rest and meal

17      period policy from the employee handbook?

18  A  Yes.

19  Q  All right.  You were provided a copy, or you were

20      provided a -- strike that.  The employee handbook

21      is maintained electronically, correct?

22  A  Yes.

23  Q  Okay.  At the outset of your employment, you

24      signed an acknowledgment that you had received or

25      have -- had received access to the employee

1       handbook, correct?

2   A   Yes, correct.

3   Q   When did you first review the rest and meal period

4       policy in the handbook?

5   A   I believe my first day of employment, training

6       with Sergeant Bruenning.

7   Q   Okay.  Now, this -- Exhibit 2 is dated June 29th

8       of 2009.  Do you have any reason to believe that

9       this rest and meal period, at least as reflected

10      in Exhibit 2, has remained unchanged throughout

11      your period of employment?

12  A   It looks the same as far as I can tell.

13  Q   And the policy advises that if you're working at

14      least six hours and unable to take an

15      uninterrupted 30-minute lunch period, you're

16      supposed to notify your supervisor and have the

17      meal period canceled?

18  A   Yes.

19  Q   You also had the ability to manually cancel your

20      lunch period, correct?

21  A   Yes.

22                  (Exhibit No. 3 was marked for

23      identification.)

24  BY MR. SCULLEN:

25  Q   I'm showing you what's been marked as Exhibit 3.

1      Are you familiar with Exhibit 3?

2   A   It doesn't -- I don't recall it, to be honest with

3       you.  This first one I recall; this one I don't.

4   Q   Okay.  Does that mean you may have seen it --

5   A   Yes.

6   Q   -- but you don't recall?

7   A   Yes.

8   Q   Okay.  And are you familiar with the

9       Administrative Manual?

10  A   Yes.

11  Q   Okay.  And that, like the handbook, is a manual

12      that's kept online and available to employees?

13  A   Yes.

14              MR. SCULLEN:  Sorry.  Gotta take another

15      quick break.  I'll be right back.

16              (A recess was taken from 3:37 p.m. to

17      3:46 p.m.)

18              (Mr. Nickels exited.)

19              (Exhibit No. 4 was marked for

20      identification.)

21  BY MR. SCULLEN:

22  Q   I believe we're on Exhibit 4, which is another

23      policy from Aurora's Administrative Manual, and I

24      guess I would direct your attention to the second

25      page, beginning at section 5, which addresses meal

1     periods.

2              (Mr. Nickels entered.)

3  BY MR. SCULLEN:

4  Q   You've had a chance to review?

5  A   Yeah.

6  Q   All right.  Same question, have you reviewed this

7     policy previously?

8  A   I believe I have, yes.

9  Q   Okay.  And would that have been sometime either at

10    the beginning of or during the period of your

11    employment?

12  A   Yes.

13  Q   And combined, do the statements and the three

14    policies that I've asked you about, reflect your

15    understanding with regard to Aurora's policies

16    concerning meal periods as applied to you as a

17    security officer?

18  A   Yes.

19           (Exhibit No. 5 was marked for

20    identification.)

21  BY MR. SCULLEN:

22  Q   Are you familiar with Mike Cummings' role at

23    Aurora?

24  A   Yes.

25  Q   All right.  Who is Mike Cummings?

1  A   He's the corporate director of security.

2  Q   And did he hold that position throughout your

3      employment with Aurora?

4  A   Yes.

5  Q   And from time to time as a security officer did

6      you receive newsletters from Mr. Cummings?

7  A   Yes.

8  Q   I've marked as an exhibit, three of Mr. Cummings'

9      newsletter, dated January/February of 2003,

10     March/April/May of 2005, and January of 2010.

11     Let's take them one at a time.  Have you seen the

12     January/February 2003 -- oh, I'm sorry, I gave you

13     the wrong -- here, why don't we mark this one.

14              (Exhibit No. 5 was re-marked for

15     identification.)

16 BY MR. SCULLEN:

17 Q   Okay.  So asking you about the first newsletter,

18     the newsletter from January to February of 2003.

19     On the second page of that there is a section of

20     the newsletter titled "Interrupted Lunch Question

21     Raised."  Give you a second to review that.

22 A   Okay.

23 Q   Okay.  Have you seen that newsletter previously?

24 A   No.

25 Q   Okay.  Have you seen that communication in a form

1       other than in this newsletter?

2    A  No.

3    Q  Okay.  Was the information regarding the

4       interrupted lunch question raised here ever

5       provided you during your employment, either orally

6       or in writing?

7    A  Could you repeat that?

8    Q  Sure.  Was the information contained in the

9       newsletter that you just reviewed, provided to you

10      either orally or in some other writing during your

11      employment with Aurora?

12   A  Contained in these policies.

13   Q  It's essentially the same thing contained in the

14      policies, correct?

15   A  Yes, yes.

16   Q  All right.  And so it reflects, even though you

17      didn't receive this particular newsletter, it's

18      consistent with your understanding --

19   A  Yes.

20              MS. MURSHID:  Object to form.

21              MR. SCULLEN:  -- of Aurora's policy?

22      Correct?

23              MS. MURSHID:  I objected to form.  You

24      can answer.

25              THE WITNESS:  Yes.

```
 1              MS. MURSHID:  And can we just stipulate
 2      this was before he started work?
 3              MR. SCULLEN:  Yep.
 4              MS. MURSHID:  Okay.
 5  BY MR. SCULLEN:
 6  Q   All right.  Let's go then to the January -- the
 7      last newsletter, which was dated January/February
 8      of 2010, and that's beginning Bates labeled
 9      147911.
10              And if you go to the last page of
11      that newsletter, which is the last page of the
12      exhibit, there's a -- the last portion is the
13      "Reminder On No Lunch Policy"?
14  A   Yes.
15  Q   Do you recall receiving this newsletter?
16  A   I don't recall receiving this specifically.  I
17      just don't remember.
18  Q   All right.  So it's possible you did?
19  A   Yes.
20  Q   All right.  You've had a chance to review the
21      information provided under the section entitled,
22      "Reminder On No Lunch Policy"?
23  A   Yes.
24  Q   All right.  And regardless of whether you
25      specifically recall receiving this newsletter,
```

1      having reviewed that section, nothing in there is

2      inconsistent with your understanding of Aurora's

3      policy as applied to you when you were a security

4      officer, correct?

5  A   No.

6  Q   Other than what I've asked you about, are you

7      aware of any other policies or practices

8      concerning meal breaks that are contrary to what's

9      set forth in the policies that I've just asked you

10     about?

11 A   No.

12 Q   Okay.  So let's talk about meal periods that you

13     may have taken when you were employed.  When you

14     were going to take a meal period, did you tell

15     anyone that you were going on break?

16 A   No.

17 Q   Were you ever advised during your employment that

18     you should notify anyone that you were going on a

19     break?

20 A   No.

21 Q   Did you in any way record or document times that

22     you took a lunch break?

23 A   No.

24 Q   Or any meal period?

25 A   No.

1  Q  All right.  And if I -- I'm trying to be
2     consistent in saying "meal period."  You know, at
3     two in the morning, I don't know if you call it a
4     lunch period, so assume I mean a meal period.
5  A  Okay.
6  Q  There were times when you did take meal periods,
7     correct?
8  A  Yes.
9  Q  All right.  Did you ever take meal periods off the
10    premises?
11 A  No.
12 Q  All right.  Why not?
13 A  I didn't feel it was safe.  Staff didn't want me
14    to go.  Especially on third shift.  There was a
15    huge problem if something serious happened and I
16    wasn't there.  I just didn't see the risk if
17    something would happen and it went bad.
18                  I want to word this properly and
19    not try to sound mean or anything.  I just felt
20    that the blame for something, if it did go bad,
21    would come down on me.  I didn't want to risk my
22    position to drive two miles to my place to get a,
23    whatever, soda or something.  I just didn't think
24    it was worth the risk to do that.
25 Q  Did anyone in management ever tell you you

1     couldn't leave the premises?

2  A  No.

3  Q  Are you aware that other security officers left

4     the premises during meal periods?

5  A  No.

6  Q  "No", meaning, "No, you're not aware of whether

7     they did or not"?

8  A  I'm not aware of any that did.

9  Q  You personally weren't there working with other

10    security officers during the same shift, correct?

11 A  No.

12 Q  You don't have any firsthand knowledge of whether

13    they did or did not, correct?

14 A  Correct.

15 Q  Did you typically bring your own lunch -- meal

16    with you?

17 A  Yes.

18 Q  All right.  Was there a cafeteria at both Lakeland

19    and Burlington?

20 A  Yes.

21 Q  Is that where you would typically take your meal

22    period?

23 A  In the office -- depends on -- well, usually in

24    the office regardless of shift.  I usually ate in

25    the office.  The cafeteria was closed at, I think

1   around seven or 8 p.m.

2  Q  You previously said that although management

3     didn't tell you that you couldn't leave, that

4     staff didn't want you to go?

5  A  Correct.

6  Q  All right.  Tell me what the basis for that belief

7     was?

8  A  Just a safety issue.

9  Q  Okay.  Am I correct in understanding from that

10    response that no one told you specifically, but it

11    was, again, your sense that they preferred --

12 A  Yes.

13 Q  -- to have you there?

14 A  The only one specifically that told me they did

15    not want me to leave would be the personnel

16    director at Burlington Hospital, Kelly Nelson.

17 Q  And when was that?

18 A  2008.

19 Q  And what was the context of that discussion?

20 A  We'd had a meeting, a security meeting, and -- at

21    Lakeland.  I was at Burlington at the time, and I

22    had called Sergeant Bruenning at Lakeland, Jim

23    Sagan and Jim Moraza -- Jim Moraza was Jim Sagan's

24    supervisor -- were going to attend this meeting.

25    And I called Sergeant Bruenning and asked if I

1      could specifically attend this meeting to ask

2      about this meal period stuff, and she said yes.

3                So I came, and we had the

4      discussion.  I wasn't pleased with any results of

5      the discussion, so the next business day following

6      that meeting, which I believe was August 2008, I

7      went to see Kelly Nelson and -- who was director

8      personnel of Burlington.

9                I had a copy of the statute that

10     the state had sent me regarding meal breaks with

11     me, and I sat down, and I started to tell her what

12     was going on.  And I said I have a copy with it

13     right here, and the first thing out of her mouth

14     was, "I'm familiar with the statute, and I agree

15     with you, and I do not want you guys leaving the

16     property, because we don't feel safe if something

17     goes down here and you're not available."

18  Q   Did you report that discussion to anyone?

19  A   I told Jim May, our sergeant, what Kelly had said.

20     Jim had discussed it with her, too.

21  Q   And what was Jim's response?

22  A   He agreed with her.  I mean, he understood her

23     viewpoint.

24  Q   Discuss it with anyone other than Jim May?

25  A   Probably the other officers.  I don't recall

```
 1          specifically that I said something to anybody.  I
 2          more than likely did.
 3    Q     Was Kelly Nelson still employed when you left
 4          Aurora -- at Aurora?
 5    A     I believe she might be at the Kenosha facility.
 6          That's what I -- I've been told that.  I don't
 7          know if she was.  I think she -- I was told she
 8          transferred from Burlington to Kenosha.
 9    Q     I guess I'm confused a little bit about that
10          comment, because in the context, it would seem to
11          me if she was saying she preferred that you
12          stayed, I would understand the implication to be
13          that you could leave, otherwise why would there be
14          an issue?
15    A     Yes.
16    Q     Okay.  So she was saying she understood you could
17          leave?
18    A     Yes.
19    Q     Okay.  She wasn't telling you you couldn't leave?
20    A     Correct.
21    Q     All right.  What she was saying was, "I would
22          prefer that you get paid for it and be required to
23          stay on site"?
24    A     Yes.
25    Q     All right.  Any other communications with anyone
```

1    else about that issue?

2  A  There were continual communications with Kelly

3     then for the next couple months about that for

4     updates as to --

5  Q  About whether there was going to be some change in

6     the policy?

7  A  Yeah.  She said she'd forward it to her

8     supervisors, and I would stop in weekly, and say,

9     "Hear any news?"  And get an update.

10 Q  Okay.  And so these conversations or

11    communications were in the context of whether

12    Aurora was going to change its policy that you

13    receive an unpaid meal break where you could leave

14    versus paying you the straight-out eight hours --

15 A  Yes.

16 Q  -- where you would be required to remain on site?

17 A  Yes.

18 Q  Okay.  And ultimately it was determined that no

19    policy change was going to be made in that regard?

20 A  I assume that.  I was never told.  I was never

21    given an answer either way, an opinion from

22    Aurora.  I was never -- never sent any type of

23    communication, verbal or written, regarding a

24    decision.

25                    My last meeting with Kelly, I

1    walked in and said -- this had been after about
2    eight weeks.  I walked in and said, "Have you
3    heard anything yet?  The Supreme Court does things
4    faster than this."  That's exactly what I said.
5    And she looked up, and she was kind of flustered,
6    because she evidently hadn't been told stuff
7    either.  And she said, "Well, evidently you're not
8    a priority."  So I said, "Okay."  I walked out,
9    and I didn't pursue it after that.
10  Q  What was the date, though, of that conversation,
11     roughly?
12  A  That would have been about two months after the
13     August meeting, so I would think sometime in
14     October.
15  Q  Of 2008?
16  A  Yes.
17  Q  But you certainly knew that you continued from
18     that period on to be subject to the existing rule,
19     which was you were subject to an automatic meal
20     period --
21  A  Yes.
22  Q  -- deduction, correct?
23  A  Yes.
24  Q  So you understood that although you may not have
25     gotten an explicit response, the policy wasn't

1     changed?

2  A   Correct.

3  Q   Okay.  Do you smoke?

4  A   Yes.

5  Q   Okay.  What's Aurora's policy with regard to

6     whether you're allowed to smoke on premises?

7  A   It's a smoke-free campus.

8  Q   All right.  Did you at any time smoke while you

9     were working?

10  A   No.

11  Q   So at no time during your employment from 2007 to

12     2010, did you ever have a cigarette during the

13     period that you were employed by Aurora --

14  A   Correct.

15  Q   -- while you were working?

16  A   Correct.

17  Q   Are you aware of other guards who are smokers?

18         MS. MURSHID:  Objection.  Relevance.

19     You can answer.

20         MR. SCULLEN:  You can answer.

21         THE WITNESS:  One that was there --

22     Steve Slutsky was.  I don't recall any others.

23  BY MR. SCULLEN:

24  Q   And do you know whether Steve smoked during

25     periods where he was working?

 1   A     I don't know.

 2                 MS. MURSHID:  Objection.  Relevance.

 3                 THE WITNESS:  I don't know.

 4   BY MR. SCULLEN:

 5   Q     Are you required to punch out during lunch

 6         periods -- or were you required to punch out

 7         during lunch periods?

 8   A     Only if you left the premises.

 9   Q     Okay.  Did you ever punch out?

10   A     No.

11   Q     I assume that during your meal periods you ate

12         food?

13   A     Yes.

14   Q     Okay.  What other things did you do during your --

15         during your lunch breaks?

16   A     Might read the paper.  Usually take a newspaper

17         in.  I don't know, maybe go through emails.

18         Nothing exciting.

19   Q     Was there a TV in the security office?

20   A     No.

21   Q     Did you ever talk to any -- make any personal

22         calls at -- during your lunch breaks?

23   A     Probably.

24   Q     Okay.

25   A     Not on third shift.

1   Q   I figured as much.  Or if you did, you wouldn't be
2       talking to those people much?
3   A   That's correct.
4   Q   Probably again, less likely on third shift, but
5       would you talk to other employees?
6   A   Yes.
7   Q   About personal -- have personal conversations?
8   A   Generally, yeah.
9   Q   You reference that at times you would read the
10      newspaper.  Did you ever bring books or magazines
11      to review during your break periods?
12  A   I never took a book in.  I probably took a
13      magazine on occasion.
14  Q   What about listening to the radio or music during
15      your break periods?
16  A   Yeah, we could do that.
17  Q   Was there a radio in the --
18  A   Yes.
19  Q   -- security office?
20  A   Yes.
21  Q   And you did that on your breaks on occasion?
22  A   Occasionally, yeah.
23  Q   Anything else that you can think of that you did
24      on your breaks that I haven't covered?
25  A   No.

1  Q   What's the basis of your contention that you're

2      entitled to pay for all of your lunch periods?

3  A   It's my feeling that we're -- we're not

4      unavailable for a call.  We have three devices on

5      us.  We can be called by anybody in the building.

6      There isn't a central dispatch that I can call and

7      say, "Hold my calls, I'm taking a break."  Anybody

8      can call us at any time on any of the devices.

9      Usually, pager, if we do get contacted.

10                     I kind of equate it to police

11     departments.  They all work a straight eight-hour

12     shift, because they're available for a call.  It's

13     the fact that we are available to be called away,

14     that we can't just put our feet up and go 30

15     minutes, because that might end 30 seconds right

16     after you do it.

17                     And that's generally the ruling --

18     or the opinions I got at the other employers when

19     this thing came up, too, was that if -- because I

20     had asked at a meeting, when they said I can leave

21     the property, I said, "Okay.  I can take my radio,

22     cell phone, pager, set it on a desk, get in the

23     car and drive away for 30 minutes?"  And they

24     said, "No."  And I said, "Well, then I'm still

25     available for a call."  That's kind of the crux of

1    my thing.  They said, "You have to take your stuff
2    with you."

3                    And I asked questions and either
4    got non-answers or nonsensical answers, in my
5    opinion.  And just kind of got blown off.  Never
6    -- it wasn't -- nobody was up front and just said,
7    "Hey, this is our thing, take it or leave it."  I
8    mean, if they would have said we disagree with
9    you, great.  At least you're telling me something.

10                   But I kept bringing it up on
11   occasion with the supervisory people and kept
12   getting, just snow jobs.  And then I thought when
13   I went to Kelly Nelson, well, now we gotta get it
14   settled, because it's going up the corporate
15   ladder, and I'm getting reports from her about
16   where it is, and who's got it, and I still never
17   got anything.

18                   But it's just my contention that we
19   were available for a call.  We just couldn't sit
20   like a housekeeper and go put a bucket in the
21   closet, go to cafeteria, and she knows she's not
22   going to get bothered for that half hour.  And I'm
23   not contending that every single day you're not
24   going to get bothered.  I mean, there could be a
25   rare emergency where you'll have to go, but it's

1       such a continual basis here that I just think that

2       they're not in compliance with the code.

3   Q   All right.  So let me ask you a couple of

4       questions about that.  If I understand your

5       position, it's that the reason you believe your

6       meal breaks were compensable is because you were

7       required to possibly -- because of having to carry

8       the pager, phone and/or radio, you were in a

9       position where you possibly had to respond to a

10      call?

11  A   Yes.

12  Q   Regardless of whether you were actually

13      interrupted?

14  A   Yes.

15              MS. MURSHID:  And I'll just object to

16      any call for legal conclusion here.

17  BY MR. SCULLEN:

18  Q   And, in fact, you would agree that on many shifts,

19      there were times when you did cancel your lunches,

20      correct?

21  A   Yes.  Well, let me correct that.  I didn't

22      actually cancel them on Kronos.  I did some, not

23      all.

24  Q   Well, let's come back to that. I want to ask you

25      about the meeting you alluded to earlier.  You

1      testified that there was a meeting where -- there

2      was this discussion about you were told you could

3      leave, but you had to take the -- the premises --

4      but you had to take the cell phone, pager and/or

5      cell phone with you.  When was that meeting?

6    A   That was August of '08.

7    Q   And the question you posed was?

8    A   We were discussing this --

9    Q   Yeah.

10   A   -- whole matter, and they said, "You can leave the

11      property for your uninterrupted half-hour break.

12      And I said, "Okay.  Fine.  I can take my

13      communication devices, set them on the desk, and

14      leave the building, and have my break?"  And

15      Jim Sagan said, "No, you have to take them with

16      you."  And I said, "Well, then I'm still available

17      for a call."

18   Q   And that's the basis for your contention as to the

19      compensability of your meal periods?

20              MS. MURSHID:  Object to legal

21      conclusion.

22              MR. SCULLEN:  Correct?

23              THE WITNESS:  Yes.

24   BY MR. SCULLEN:

25   Q   All right.  Let's talk about the lunches you

1    canceled.

2              (Exhibit No. 6 was marked for

3    identification.)

4  BY MR. SCULLEN:

5  Q    All right.  I'm showing you what's been marked as

6       Exhibit 6.  Have you had a chance to review

7       Exhibit 6?

8  A    Yes.

9  Q    Okay.  Exhibit 6 is a payroll report.  And in the

10      last column, CL, reflects days on which during

11      your employment with Aurora, that you clocked out

12      for an interrupted lunch.  Does this appear -- do

13      you have any reason to dispute that this is an

14      accurate record of those days in which you

15      canceled your lunch?

16 A    No.

17 Q    Are there days in which you had an interrupted

18      lunch that you did not clock out and that thus are

19      not reflected on Exhibit 6?

20 A    Yes.

21 Q    Which dates are those?

22 A    I couldn't recall.  There -- there were several.

23      Between the two facilities, Sergeant Bruenning was

24      much more stringent on giving people static about

25      taking a no break.  In Burlington, Sergeant May

1   was a lot more lax with it.

2  Q  Well, certainly the periods in 2010, would have

3     been dates, for instance, that you would have been

4     reporting to Sergeant Bruenning, correct?

5  A  Yes.

6  Q  Okay.  And yet you still canceled your lunch,

7     correct?

8  A  Yes.

9  Q  Okay.  So what would be the reason that you would

10    cancel certain lunches but not others?

11 A  Get -- there were too many, you got static about

12    it.  You get questioned.  Not threatened -- that's

13    a little bit of a strong term, but there could be

14    repercussions, I guess, if you took too many.

15 Q  Okay.  Were you ever subject to repercussions?

16 A  No.

17 Q  Were you ever questioned by Sergeant Bruenning

18    about days in which you canceled your lunch?

19 A  Yes.

20 Q  All right.  Which days were those?

21 A  I don't specifically recall.

22 Q  How many?

23 A  Probably, we discussed it, I would guess five, six

24    times.

25 Q  Over what period of time -- around what dates?

1  A  Various dates.  I couldn't recall anything

2     specific on that --

3  Q  Well, do you --

4  A  -- as far as a date.

5  Q  Well, do you mean for the entire period from 2007

6     through the end of your employment?

7  A  I think probably five or six times from when I

8     returned to Lakeland from Burlington.

9  Q  On any of those dates -- well, let me ask this.

10    When she questioned you, what was your response as

11    to why you had canceled?

12 A  I said, "I got called, and I completed the call.

13    It was during my lunch, and I punched no break."

14 Q  Okay.  And was your canceled lunch ever reversed

15    on those occasions?

16 A  No.

17 Q  On dates when you were questioned about your

18    interrupted lunch break, is it because your -- do

19    you know whether -- did Ms. -- did Sergeant

20    Bruenning tell you that it was because there was

21    nothing that appeared to her on her activity log

22    that would have precluded you from taking an

23    uninterrupted lunch break?

24 A  No.  Usually, she -- if she relieved me, I would

25    tell her I'm taking no break because such and such

1          happened.

2    Q    Okay.  So you would volunteer that information to

3          her?

4    A    Yes.  If she relieved me.  She may not be there.

5          Then I just punched no break.

6    Q    And how many of the five to six times that you

7          discussed that was it an occasion where you were

8          relieving her -- or I'm sorry, she relieved you?

9    A    I would think at least four of them.

10   Q    Okay.  So on four of the five or six times, she

11         wasn't questioning you, you were volunteering to

12         her why you had canceled your lunch, is that

13         correct?

14              MS. MURSHID:  Object to form.

15              THE WITNESS:  Well, I was explaining

16         before she questioned me, I guess you could call

17         it.

18   BY MR. SCULLEN:

19   Q    As you sit here today, do you have any

20         recollection of the number of days that you claim

21         your meal period was canceled but that you didn't

22         record it as canceled?

23   A    No.

24   Q    All right.  You didn't document that anywhere?

25   A    No.

1  Q    It wouldn't be reflected in your activity logs?

2  A    No.  It may be reflected in some of the Burlington

3       logs.  I believe on some of the Burlington logs on

4       the written activity log, not in the ActTrack, I

5       did put "no break" by whatever call I was

6       interrupted with.

7  Q    Okay.  But those would have been days,

8       particularly at Burlington, that you likely would

9       have canceled your lunch, correct?

10  A    Yes.  I would have punched no break, just --

11  Q    Right.  I'm asking about documentation of dates

12       where you claim your break was interrupted but you

13       didn't cancel your lunch?

14  A    No.

15  Q    Was there a specific point at which you stopped

16       canceling your lunches?

17  A    Probably shortly after I returned to Lakeland from

18       Burlington.  I just kind of gave up on arguing

19       about it.  It just wasn't worth the aggravation.

20       There were some that I would take, and a couple

21       times Ellen said, "Take it," but on a consistent

22       basis, no.

23  Q    Well, let's go back to your -- let's go to the

24       payroll records, which are Exhibit 6.  Again,

25       throughout 2010, you periodically canceled your

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 111 of 867   Document 49-1

1      lunch, correct, if we look at February 7th,

2      February -- all the way up to almost your last day

3      of employment, February 20th --

4                  MS. MURSHID:  Wait, sorry, Sean, where

5      are you?

6                  MR. SCULLEN:  I'm looking at dates

7      beginning February 7th of 2010, a lunch was

8      canceled, February 20th of 2010.

9                  MS. MURSHID:  Okay.

10                  MR. SCULLEN:  Exhibit 6.

11                  MS. MURSHID:  Bottom page is 248?

12                  MR. SCULLEN:  Yeah.  And then

13      April 15th, May 12th, July 4th.

14  BY MR. SCULLEN:

15  Q    So it wasn't necessarily just your return to

16      Lakeland, correct?

17  A    I returned to Lakeland for --

18  Q    That -- the fact that you returned to Lakeland

19      didn't mean that you stopped canceling your

20      lunches, correct?

21  A    I cut back on canceling my lunches when I returned

22      to Lakeland.

23  Q    Is there any way at this point that you would be

24      able to go back and tell which dates in particular

25      you had an interrupted lunch?

```
 1   A    No.

 2   Q    And again, on many dates you had an uninterrupted

 3        lunch, correct?

 4   A    Yes.

 5   Q    And just to be clear, by "uninterrupted," I mean

 6        even lunch periods where you received no --

 7        particularly on third shift, where you received no

 8        call on the pager, phone or radio, correct?

 9   A    Yes.

10   Q    And I want to be sure I understand your testimony

11        about the reason that you stopped canceling your

12        lunches frequently.  Was the reason because of

13        your dissatisfaction with the fact that Aurora

14        hadn't changed its policy?

15   A    No.

16   Q    Okay.  What -- what was the reason?

17   A    That Sergeant Bruenning was a lot more likely to

18        give you static about taking no breaks and make a

19        huge issue out of it as opposed to Sergeant May in

20        Burlington.

21   Q    Okay.  But you testified that, at most, she asked

22        you about it once or twice?

23                  MS. MURSHID:  Objection.

24                  MR. SCULLEN:  Correct?

25                  MS. MURSHID:  Mischaracterization of the
```

1    testimony.

2                    THE WITNESS:  I --

3    BY MR. SCULLEN:

4    Q    I'm not trying to mischaracterize your testimony.

5         You testified earlier that you had five or six

6         conversations with her about the fact that you had

7         a break?

8    A    Yes.

9    Q    You testified that on four of those occasions,

10        four to five of those occasions, you were the one

11        that initiated that conversation by proactively

12        telling her as you were changing shifts that you

13        had canceled your lunch and the reason why?

14   A    Correct.  I had to.  I just couldn't get up and

15        walk out and say I'm taking a break and walk out

16        the door.  I had to justify why I did it.

17   Q    Okay.  And it's your testimony that the one or two

18        times she questioned you about why you needed to

19        take a break is the reason that you decided not to

20        record breaks that you believe were interrupted?

21   A    No.  There were other discussions with things said

22        and things said with other officers, and I just

23        didn't want to stir the pot and make a big -- kind

24        of make it a detriment to the department to

25        everybody because I was going to be a -- what

1    would you call it?  Troublemaker, if you want to

2    use that term.  I don't know if that's proper, but

3    that's the only one that comes to mind now.

4              There were instances with other

5    officers that she got into it with, and I just

6    didn't want to keep throwing gas on the fire, if

7    you want to let me use that analogy.

8  Q  Who were the other officers?

9  A  Just about everybody that worked for her.

10  Q  And what was your understanding of the issues that

11    arose between Ms. Bruenning and those other

12    officers?

13  A  It was basically the same from any officer, that

14    they were going to take a no break, she gave them

15    a lot of static about it, sometimes denied it, may

16    have taken it away.  I can't recall a specific

17    instance of that, but I recall having

18    conversations with people, and it just was getting

19    worse.  And the entire situation was getting

20    worse, and I didn't see a point in aggravating the

21    situation with, you know, my -- my issue with her

22    either, so --

23  Q  All of that information was received by you from

24    the officers themselves?

25  A  Yes.

1  Q    Okay.  You didn't have any personal knowledge of
2       what Ms. Bruenning had done with them other than
3       what they told you?
4  A    She -- again, I can't recall a specific thing.
5       She occasionally would say something like,
6       "So-and-so tried pulling a fast one, getting a no
7       break.  I told him no" -- or, "I took it away,"
8       because she reviewed the Kronos time every day.
9       She couldn't -- I don't know if she just took it
10      or told the officer and took it.  I don't know how
11      that worked, but she made a couple comments, too.
12      Again, I can't tell you what day it was, but there
13      was discussion about that.
14 Q    Do you think it was unreasonable for Aurora's
15      management to question why people couldn't --
16      hadn't taken a break if, for instance, their
17      activity log showed long periods where they
18      weren't interrupted?
19 A    No.
20 Q    Then why do you -- do you think Ms. Bruenning's
21      questions, either to you or others, were
22      inappropriate?
23 A    Occasionally, they just seemed impractical.
24 Q    Well, do you know what those other officers'
25      activity record showed on the dates she questioned

1    them?

2  A    No.

3  Q    And if they, in fact, showed long periods where

4       the officer wasn't interrupted, you would agree

5       that it wasn't unreasonable for her to ask why

6       they had taken an uninterrupted lunch?

7              MS. MURSHID:  Object to form and

8       speculation.

9              THE WITNESS:  No.

10  BY MR. SCULLEN:

11  Q    Did you assume that their activity logs reflected

12       a reason that would have justified them taking a

13       -- or canceling their lunch?

14  A    Yes.

15  Q    But again, you didn't personally review them?

16  A    No.

17              MR. SCULLEN:  Is this a good time for a

18       five-minute break?

19              MS. MURSHID:  Mm-hmm.

20              (A recess was taken from 4:37 p.m. to

21       4:53 p.m.)

22  BY MR. SCULLEN:

23  Q    What were you expected to do if communication was

24       directed to you while you were taking your lunch

25       break?

1    A    To evaluate the communication and decide what to

2         do then, basically.

3    Q    Okay.  And meaning in some cases, for instance, if

4         there was an altercation, that would be an

5         emergency situation?

6    A    Yes.

7    Q    Okay.  In other cases, where it's not emergency,

8         you could decide, as you discussed earlier, to

9         prioritize it and put it off until your lunch

10        break was finished?

11             MS. MURSHID:  Objection.

12        Mischaracterization of the testimony.

13             THE WITNESS:  Yes.

14   BY MR. SCULLEN:

15   Q    That doesn't mischaracterize your testimony,

16        correct?

17   A    I'm not sure.

18   Q    Okay.  Well, I don't want to mischaracterize your

19        testimony, so I understood you testified earlier

20        that you had the ability to prioritize calls,

21        correct?

22   A    Yes.

23   Q    Depending on the nature of the call?

24   A    Yes.

25   Q    So if you received a call during your lunch period

1      on one of the various communication devices that

2      was non-emergent, you had the ability in your

3      discretion to prioritize that and decide to put it

4      off until after your lunch break, correct?

5  A   If that was possible, yes.

6  Q   Okay.  How do you distinguish between emergency

7      and non-emergency requests?

8  A   Emergency is a little -- kind of self-explanatory,

9      but I think urgency of some request is another

10     word to use.  They may need a piece of medical

11     equipment soon.  I mean, the guy's not a code, but

12     we need it fairly quickly.  This person was in ER

13     for five hours before getting up here; he's

14     starving.

15              Then do you want to -- do I want to

16     tell that person on that nurse floor, you're

17     waiting 30 minutes, you're not getting it?  Or do

18     I want to service the patient, basically, and make

19     him comfortable?

20              That's kind of a lot of

21     prioritizing in that.  Not just whether it's a

22     life-and-death, knock-down, drag-out fight, or

23     something to make the patient comfortable.  Those

24     have to be prioritized also.

25  Q   Okay.  Although, if it were 25 minutes into your

1    break, then it might only mean waiting another

2    five minutes, correct?

3  A  Correct.

4  Q  And that might factor into your determination as

5    to when you would do it, correct?

6  A  Yes.

7  Q  And were there situations when you determined that

8    a call was not urgent and that you thus didn't

9    respond until after your meal break was over?

10 A  I would discuss it with the person who called, and

11    say, "I'm eating, do you need it right away?"

12 Q  Okay.  And there were times when they said, "No"?

13 A  Yes.

14 Q  All right.  And you waited then until after your

15    meal period --

16 A  Correct.

17 Q  -- was over?

18 A  Yes.

19 Q  Okay.  Try to just -- I know you're -- the court

20    reporter will appreciate it if we don't talk over

21    each other.

22 A  Okay.  I'm sorry.

23 Q  I know it's a natural inclination.  No problem.

24                    You also had, in the event of an

25    urgent situation that interrupted your lunch, you

1      also had the ability to restart your lunch period,

2      correct?

3  A   Yes.  I didn't know that until -- I didn't recall

4      ever being told that to restart a lunch period.  I

5      had never heard of that until later.

6  Q   Approximately when?

7  A   Oh, boy.  I think possibly when I was made aware

8      of it, an email from Jim May, that if your lunch

9      break gets interrupted you can restart it, which

10     would have been 2010.  I don't recall when the

11     email was issued.

12 Q   Could it have been prior to 2010?

13 A   I don't believe so.

14 Q   What types of tasks have you chosen not to

15     interrupt your meal period for, to perform?

16 A   Again, it's dependent on the urgency of the

17     request, not the request specifically, generally,

18     unless it's an emergency.  Because anything we do

19     may be -- may not be an urgent thing they need

20     right now.

21             They may need it -- the person's

22     going to surgery in an hour, can we get an SCG

23     pump.  Well, obviously you have time to do it.

24     You don't have to drop everything and do it right

25     now.

1           The person is a diabetic, they need

2    some items out of the kitchen, their blood sugar

3    is low.  That you gotta, kinda go do.  Because

4    there's limited access to the kitchen, especially

5    at night also.

6 Q  Were there occasions when you restarted your lunch

7    period due to an interruption?

8 A  No.

9 Q  In terms of the process for canceling your lunch,

10    you were able to do that yourself in Kronos,

11    correct?

12 A  Yes.

13 Q  How did you do that?

14 A  You would swipe and then punch a number -- I

15    forgot the number -- and then swipe the card

16    again, and it would reflect no break.

17 Q  And you testified earlier that in addition to

18    swiping, you were also able to record time over

19    the phone system?

20 A  Correct.

21 Q  Did the phone system also allow you to cancel

22    lunch periods?

23 A  Yes, it did.  I didn't use it, so I couldn't tell

24    you the exact procedure to cancel the lunch using

25    the phone --

1  Q  All right.

2  A  -- but I believe it was possible.

3  Q  When you canceled lunch, did you always use the
4     swipe method that you described?

5  A  Yes.

6  Q  And then were you also able to tell your
7     supervisor, and they could manually cancel a
8     lunch?  Do you know?

9  A  I may have done that.  I'm just trying to
10    remember.  I don't recall a specific instance when
11    I did that.

12 Q  And I guess my initial question was just whether
13    you were aware that that was a possible way to
14    cancel your lunch?

15 A  Oh, yes.

16 Q  Okay.  And you may or may not have utilized that
17    method?

18 A  I don't know if I did or not.

19 Q  And when you -- you testified, I believe, that the
20    most frequent method, if not the exclusive method
21    that you used was canceling the lunch yourself
22    through the Kronos timecard swipe process that you
23    described?

24 A  Yes.

25 Q  And you were able to do that without super --

1    supervisor -- a supervisor's authorization,
2    correct?
3  A  Yes.
4  Q  Did you ever complain to anyone that you felt you
5    were being discouraged from canceling your lunch?
6  A  Yes.
7  Q  To whom?
8  A  Fellow officers.
9  Q  Do you remember which officers?
10 A  I think Pat Lowery, probably; Steve Slutsky; Bob
11    Meyer, possibly.  Possibly -- there could have
12    been more.  I'm just reaching here.
13 Q  All right.  And when did those discussions take
14    place?
15 A  Just over the years.
16 Q  Well, I thought you testified earlier that you
17    felt that it was primarily Ms. Bruenning and
18    primarily when you returned to Lakeland, which
19    would have been sometime in 2010, that you felt
20    that you were being discouraged?
21 A  Yes.
22 Q  Okay.  So were those discussions primarily during
23    that period?
24 A  No.  Steve Slutsky and Bob Meyer would have been
25    earlier when I first started, probably -- not when

```
 1        I first started but shortly after that.
 2    Q   Did you ever complain to anyone in management?
 3    A   I believe I discussed it with Kelly Nelson when I
 4        spoke with her regarding that, the whole matter.
 5    Q   What did you --
 6    A   No, no, no, I couldn't have, no.  Because that
 7        would have been too early.  I didn't at Lakeland.
 8        I don't remember if I discussed Ellen with Kelly
 9        when I brought that up at Burlington.  I honestly
10        don't recall that.
11    Q   Was there any supervisor, other than
12        Ms. Bruenning, who -- or sergeant, who you believe
13        discouraged you or anyone else from canceling
14        their lunches?
15    A   Well, it seemed to come down -- the pressure
16        seemed to come down on Ellen from above, so
17        supervisors above her.
18    Q   Well, are you speculating?
19    A   Nobody directly -- yes.  Nobody directly told me.
20    Q   Okay.  And nobody told you where that pressure was
21        coming -- what was motivating Ms. Bruenning?
22    A   Yes.
23    Q   So you're purely speculating?  You don't --
24    A   Yes.
25    Q   -- have any independent knowledge of why she took
```

1        the action she did?

2    A   Yes.

3    Q   All right.  But no other sergeants or supervisors

4        that you're aware of, other than Ms. Bruenning?

5    A   No.

6    Q   I just want to clarify one thing about your

7        earlier testimony.  My understanding of the

8        two-way radio is that it is, as it suggests, two

9        ways.  So there's a radio, and then there's one

10       person on the other end.  And since you were the

11       only security guard, the only time that the radio

12       would be active is if someone was calling you?

13   A   Yes.

14   Q   What was the percentage of time that someone would

15       contact you via pager versus the two-way radio or

16       the phone?

17   A   It was probably 70 percent pager, and radio and

18       phone, I would guess almost split the difference.

19              (Exhibit No. 7 was marked for

20       identification.)

21   BY MR. SCULLEN:

22   Q   I'm showing you what's been marked as Exhibit 7.

23       Do you recall filing a declaration in this matter.

24   A   Yes.

25   Q   Okay.  That's your signature on the last page of

1      Exhibit 7?

2  A   Yes.

3  Q   Did you draft this document?

4  A   Yes.

5  Q   Okay.  So you were the one who wrote this out in

6      its initial form?

7  A   Yes.

8  Q   All right.  So let's turn to the second page,

9      paragraph 8.  When you say you were "required to

10     remain on duty," what did you mean?

11 A   That I was available for a call.

12 Q   All right.  Let's look at paragraph 9.  You

13     acknowledge that the Kronos system had a procedure

14     for recording a paid lunch.  And then you state,

15     "I rarely followed this procedure."  Is that an

16     accurate statement, if you compare that statement

17     against your payroll records, which are Exhibit 6?

18 A   Yes.

19 Q   Let's look at your payroll records.  Let's start

20     with September 29th.

21             MS. MURSHID:  Bottom 244?

22             MR. SCULLEN:  Correct.

23 BY MR. SCULLEN:

24 Q   You canceled the lunch on the 28th, the 29th,

25     October 6th, October 8th, October 13th and

1       October 19th.  November 3rd --

2                 MS. MURSHID:  I think --

3   BY MR. SCULLEN:

4   Q   -- November 5th, November 9th, November 12th,

5       November 16th.  I mean, we can go on.  If you look

6       just at these dates, is that in your mind, rarely

7       using the system to cancel your lunch periods?

8   A   Overall, yes.

9   Q   So during this period, you would admit you didn't

10      rarely use it, you used it frequently, correct?

11  A   Correct.  During that period, yes.

12  Q   So certain periods during your employment you

13      frequently canceled your lunch?

14  A   Yes.

15  Q   Now, the next sentence says, I was aware that my

16      supervisors discouraged taking paid meal breaks,

17      and recall discussing this with Sergeant Ellen

18      Bruenning.  And then you state that taking a paid

19      meal period required approval from the same

20      supervisor.

21                In fact, we just discussed,

22      however, that you were able to take a paid break

23      and cancel it, even if you didn't have her

24      approval, correct?

25  A   No, because she could dispute it when she checked

1   the Kronos whenever she came into work.

2 Q Well, but you didn't have to get pre-approval to

3   cancel your lunch period, correct?

4 A Oh, no.  No.

5 Q Okay.  All you're saying is, there was in your

6   mind a possibility she could reverse the

7   cancelation?

8 A Yes.

9 Q She never did that in your case, correct?

10 A Not that I -- no, correct.

11 Q The next sentence states, "My supervisor would

12   review my time either daily or weekly and question

13   if I ever tried to take a paid lunch."  That's not

14   an accurate statement, correct?

15 A If she wasn't present when I did it, she could

16   question it.

17 Q But that's not what this says.  You're talking

18   about a hypothetical.  This says that every time

19   that you tried to take a break, she questioned

20   you.  That's not accurate, correct?

21 A No, correct.

22 Q It's not correct?

23 A That's not correct.

24 Q Your next sentence says, "Because I was required

25   to be on duty during every meal period during my

1    employment, my supervisor would have had to grant

2    approval for every shift that I worked.  I do not

3    believe that approval would have been given."

4                    Well, that's only true if your

5    theory that you were entitled to pay simply

6    because you had to possibly respond to a pager was

7    accurate, correct?

8                    MS. MURSHID:  Objection.  Calls for a

9    legal conclusion.

10                    THE WITNESS:  Correct.

11   BY MR. SCULLEN:

12   Q    In other words, we've already discussed -- I think

13        we've -- you've agreed earlier that you're not

14        claiming that on every meal period you were

15        interrupted?

16   A    Correct.

17   Q    And in fact, your testimony is there were many

18        meal periods where you were never interrupted,

19        correct?

20   A    Correct.

21   Q    And to the extent there were any that were

22        interrupted, that you didn't cancel, you can't

23        recall specifically how many meal periods there

24        were?

25   A    No.

1  Q   Nor on what dates?

2  A   No.

3  Q   Nor any specific circumstances related to those

4      meal periods?

5  A   No.

6  Q   In paragraph 10, I just want to confirm my

7      understanding that the -- to the extent that you

8      state, "I was never provided 30 minutes free from

9      work," that's based on your contention that merely

10     carrying the pager, cell phone and/or walkie

11     talkie precluded you from being free from work,

12     correct?

13 A   Correct.

14 Q   Paragraph 11, again, I think this is the same

15     issue we've talked about now several times.  You

16     can't recall specifically how many times or on

17     what dates you were allegedly interrupted, or if

18     you were to the extent that you didn't cancel

19     those lunch periods, correct?

20 A   Correct.

21 Q   And with regard to No. 12, I believe we previously

22     discussed that, in fact, you understood you were

23     entitled to -- or you were able to leave Aurora's

24     facility, but you chose not to do so, correct?

25              MS. MURSHID:  Object to form.

1              THE WITNESS:  Correct.

2    BY MR. SCULLEN:

3    Q    And specifically, the second sentence in the

4         declaration is not accurate in that it's not true

5         that you were only permitted to leave if there

6         were sufficient other officers on duty, because

7         you were always the only officer on duty, correct?

8    A    Correct.

9    Q    Is there anything else that we haven't discussed

10        that you believe supports your claims?

11   A    No.

12              MR. SCULLEN:  All right.  I think I'm

13        done, so let me just take a minute.

14              MS. MURSHID:  Sure.  And then I'm going

15        to have a few, so --

16              MR. SCULLEN:  Sure.  Why don't we go off

17        the record for a second.

18              (A discussion was held off the record.)

19              MR. SCULLEN:  Let's go back on the

20        record and reflect that Exhibit 5 consists of

21        Bates labeled Nos. 147906, and 07, as well as

22        147911 and 12 and 13 and 14.

23              (A recess was taken from 5:20 p.m. to

24        5:28 p.m.)

25              MR. SCULLEN:  I don't have anything

1    further.

2                    EXAMINATION

3    BY MS. MURSHID:

4    Q    Jerry, you testified that you got a text sometimes

5         on your pager, and sometimes it was a phone

6         number, but sometimes it was a text, is that

7         correct?

8    A    Yes.

9    Q    Okay.  And could you respond to any of those

10        requests with your pager?  Could you text back?

11   A    No.

12   Q    So if you got a page, what did you have to do?

13   A    I had to telephone wherever the text originated,

14        the floor or person.

15   Q    And was there a response time within which you

16        needed to get back to them?

17   A    I generally did it as soon as I could.

18   Q    Why did you do it as soon as you could?

19   A    Just to service.  I mean, it's -- out of courtesy

20        to the employee and to the patient.

21   Q    Is there a policy -- does Aurora have a policy on

22        when you need to be able to respond to requests?

23   A    No.

24   Q    No policy at all?

25   A    No.

1  Q  Did your response to a request differ depending on

2      what device was used?

3  A  No.

4  Q  No?  Do you understand what I'm asking?

5  A  Yes.

6  Q  Okay.  So if you got a phone call -- I mean,

7      obviously if you got a phone call, that would be

8      different if you got a text on your pager, right?

9  A  Yes.

10  Q  So you could immediately talk to the person?

11  A  Yes.  If -- yeah, it would differ -- the text

12      would be delayed, obviously, because I had to read

13      the text and then respond --

14  Q  Okay.

15  A  -- whereas a phone call, radio, cell phone, I

16      could respond verbally immediately to whatever the

17      request was.

18  Q  You testified a little bit about prioritizing

19      different requests, and I'm wondering if you can

20      explain what you meant by prioritizing.  Did you

21      mean prioritizing based on other calls that you

22      were getting, or prioritizing based on what you

23      had to do throughout the day?

24          MR. SCULLEN:  Objection.  Leading.

25

BY MS. MURSHID:

Q    Okay.  What did you mean by prioritizing?

A    It could mean, I could be a couple calls behind
     and had to prioritize which call would need
     attention first.  Prioritizing to me also meant,
     what was the nature of it?  Was it a diabetic that
     needed some food to get the blood sugar back up?
     Was it, somebody's going into surgery, and they'll
     need the SCD pump when they get out, which
     obviously was something I could wait for.  It was
     basically, a -- to keep employees and patients
     happy.  To make things run smoother, basically.

Q    And did you understand that to be part of your
     role as a security officer?

A    Yes.

Q    If you weren't otherwise engaged on another call,
     did you have a reason to postpone a request?

A    Generally, no.

Q    They -- in Exhibit 1, there's activity locations
     that are listed.  I'm wondering if completing any
     of the things that you have listed on this
     activity log, if any of those are optional duties
     or things that don't have to be completed?

A    It's hard to say, because I didn't log the
     necessity of the call.  I mean, I just logged that

```
 1        I delivered an item.  I just don't recall the
 2        circumstance of it.
 3   Q    But could you have chosen not to do any of those
 4        things?
 5   A    No.
 6   Q    Let's look at Exhibit 2, which is the employee
 7        handbook policy.  There's this policy that is
 8        written on rest and meal periods.  Is the way that
 9        this policy was written, is that how it was
10        implemented for you?
11   A    Yes.
12   Q    Okay.  So you notified your supervisor not every
13        time that you took an -- no break?
14   A    Correct.
15   Q    Okay.  I'm not sure I understand my own question
16        there.  Let me rephrase that for you.  Thirty
17        minutes was automatically deducted from your lunch
18        every day, correct?
19   A    Yes.
20   Q    Unless you punched "no lunch"?
21   A    Correct.
22   Q    And this says, "You must notify your supervisor
23        and have your meal period canceled"?
24   A    Correct.
25   Q    So as I understand your testimony, and correct me
```

1       if I'm wrong, that could mean one of two things.

2       You canceled it yourself?

3    A   Correct.

4    Q   Or your supervisor would cancel it?

5    A   Correct.

6    Q   But if you canceled it yourself, did somebody

7        always review that time?

8    A   Yes.

9    Q   Every week?

10   A   Yes.

11   Q   You referenced a conversation that you had with

12       some supervisors in August of 2008, I believe?

13   A   Yes.

14   Q   And I think you testified that somebody told you

15       you could leave the premises?

16   A   Yes.

17   Q   Who was that?

18   A   Jim Sagan, our south region supervisor.

19   Q   And how did you respond to that when he told you

20       that?

21   A   I said to him, "Then I can take our radio, cell

22       phone, pager, put them on the desk, get in my car

23       and go for 30 minutes?"  And he said "No, you have

24       to take the devices with you."

25   Q   And what if there was an emergency?

1  A  Then we had to return --

2  Q  Okay.

3  A  -- to the property campus, whatever you want to

4     call it, hospital.

5  Q  Immediately?

6  A  Yes.

7  Q  Is it practical to think that you could go and

8     have lunch, say at Denny's or something, and be

9     able to respond to an emergency?

10 A  No.

11 Q  Is that part of the reason you didn't ever leave

12    the premises?

13 A  Yes.

14 Q  Did you have to respond to every call you got at

15    some point during your shift?

16 A  Yes.

17 Q  What would have happened if you didn't respond to

18    an emergency call?

19           MR. SCULLEN:  Objection.  Speculation.

20           THE WITNESS:  I would have --

21 BY MS. MURSHID:

22 Q  You can answer.

23 A  I would have been subject to disciplinary action.

24 Q  Did you ever not respond to an emergency call?

25 A  No.

1  Q    What would have happened if you failed to
2       respond -- I think you made a distinction between
3       urgent and emergency.  What happened if you
4       wouldn't have responded to an urgent situation?
5  A    Same thing.  I still could have been subject to
6       disciplinary action.
7  Q    What do you believe your role as a security
8       officer is in the Aurora organization?
9  A    To facilitate safety of the patients, employees,
10      visitors.  Keep the peace, obviously, being
11      security.  And patient comfort.
12 Q    And in order to do that, you had to be on the
13      premises?
14 A    Yes.
15 Q    And you had to be available?
16 A    Yes.
17                MR. SCULLEN:  Objection.  Leading.
18                MS. MURSHID:  Can I just take one
19      minute?
20                MR. SCULLEN:  Sure.
21                (A recess was taken from 5:39 p.m. to
22      5:44 p.m.)
23 BY MS. MURSHID:
24 Q    So nobody told you that you had to do things in a
25      particular order during the day, is that right?

1            MR. SCULLEN:   Objection.   Leading.

2    BY MS. MURSHID:

3    Q    Did anybody tell you that you had to do anything

4         in a particular order?

5    A    No.

6    Q    So sometimes would you do rounds first?

7    A    Yes.

8    Q    Based on what calls you had?

9    A    Yes.

10   Q    Did the fact that you set your own schedule change

11        the fact that you had to require -- you had to

12        respond to every call?

13   A    No.

14   Q    How did you define "interrupted" again?

15   A    How did I define "interrupted"?

16   Q    I think you testified about it before.  I don't

17        want to mischaracterize.  Do you remember what you

18        said?

19   A    I'm trying to remember.  Interrupted as my break

20        interrupted?

21   Q    Right.

22   A    Getting a call and having to perform a duty during

23        my break.

24   Q    Were you always available to take calls?

25   A    Yes.

1          MS. MURSHID:  I have nothing else for

2     now.

3                    EXAMINATION

4  BY MR. SCULLEN:

5  Q    The Lakeland facility -- and I'm hoping you can

6       help me understand -- you touched on briefly at

7       the beginning of your testimony about -- is it

8       called Lakeland Hospital?

9  A    It's -- right now it's called Aurora Lakeland

10      Medical Center.

11 Q    Medical Center?

12 A    Yes.

13 Q    Okay.  What other facilities as part of Lakeland

14      -- when you refer to -- we talked about the south

15      region, and then within the south region there are

16      various groups of, sort of entities.  I think you

17      testified in particular that you worked at both

18      Burlington and then Lakeland.  Is there any other

19      physical location for the Lakeland facility, other

20      than the Aurora Lakeland Medical Center?

21 A    No.

22 Q    Okay.  That's one contained campus?

23 A    Yes.

24 Q    All right.  How far from the Lakeland campus is

25      the nearest food outlet?

1   A    About a hair over two miles, because it's two

2          miles to my apartment, and the next restaurant is

3          a couple blocks up.

4   Q    What about Burlington?

5   A    It's one to two miles, depending on what you're

6          looking for.

7   Q    All right.  And is the Burlington Medical Center

8          the only physical facility?

9   A    Yes.

10  Q    What about the clinics?

11  A    The clinic is attached to the hospital in

12         Burlington.

13  Q    Okay.  What about in Lakeland?

14  A    Lakeland, they have a clinic -- Aurora does have a

15         clinic in Elkhorn on Highway 67.

16  Q    Okay.  And did you ever have any duties at the

17         clinic?

18  A    No.

19  Q    You were never called to the clinic?

20  A    No.

21  Q    All right.  Other than the clinic, any other

22         physical facilities in Lakeland?

23  A    No.

24  Q    Now, you were asked about the meeting at which it

25         was discussed that you were free to leave the

1    premises.  Regardless of whether you were subject

2    to recall, the most, based on a 30-minute lunch

3    period, that you could have gone would have been

4    somewhere where you could have returned within 15

5    minutes, correct?

6  A   Yes.  It was about -- to my apartment was about

7    four minutes, if I went there.

8  Q   And you were told by Aurora management that you

9    were free to go, for instance, to your apartment,

10   so long as you took your pager and returned in the

11   event that you were paged for an emergency,

12   correct?

13 A   Yes.

14 Q   And as part of that communication, again, going

15   back to my hypothetical, essentially, you were

16   told that you could go up to a maximum -- I

17   suppose you could have driven however long it

18   would have taken you to get 15 minutes away,

19   because you would have had to have returned by the

20   end of the 30-minute period, correct?

21 A   Yes.

22           MR. SCULLEN:  I don't have anything

23   further.

24           THE WITNESS:  Okay.

25           MS. MURSHID:  Wait.  Hold on.

```
 1                        EXAMINATION
 2   BY MS. MURSHID:
 3   Q    I'm going to let you out of here by six, Jerry, I
 4        promise.  In your experience, has there been an
 5        emergency that happened that transpired quicker
 6        than four minutes?
 7   A    Yes.
 8   Q    Is there a policy on who you're supposed to
 9        notify, or what you're supposed to do if you leave
10        the premises?
11   A    No.  Well, there was one in here, I think.
12   Q    One -- like one of the exhibits, you're
13        referencing?
14   A    Correct.
15   Q    But you hadn't seen that before?
16   A    No.  And I -- at our 2008 meeting, I was given
17        three different answers, so I --
18   Q    What answers?
19   A    Sergeant Bruenning, Jim Sagan and Jim Sagan's
20        supervisor, Jim Moraza, were at this meeting that
21        I requested to go to to address this.  And I
22        believe Sergeant Bruenning said, "I'd notify
23        maintenance if you leave;" Jim Sagan said, "Notify
24        the charge nurse;" and I believe Jim Moraza said,
25        "Notify the emergency room unit coordinator."
```

1   Q    So you didn't know what you were supposed to do?

2   A    No.

3   Q    So you just stayed?

4   A    Yes.

5                MS. MURSHID:  That's all.

6                          EXAMINATION

7   BY MR. SCULLEN:

8   Q    Well, I -- let me clarify that.  You earlier

9        testified that the reason you didn't go was

10       because you personally felt the need to stay in

11       the event of an emergency.

12                     Are you now testifying that the

13       reason you didn't leave is because you were

14       confused as to who to notify?

15               MS. MURSHID:  I'm going to object as to

16       form and mischaracterization.

17               THE WITNESS:  No.

18  BY MR. SCULLEN:

19  Q    Okay.  The reason you didn't leave is -- wasn't

20       because you were confused as to who to notify,

21       correct?

22  A    I had decided not to even deal with that.

23  Q    Okay.  So you never sought clarification as to who

24       you were supposed to notify?

25  A    I did when I spoke with Kelly Nelson.

1    Q    And what did she say?

2    A    She was -- that was part of what was supposed to

3         be discovered as she went up to the command staff

4         line, whatever you want to call it.

5    Q    Okay.  And did you ever ask her in follow-up,

6         what's the determination as to who I should

7         notify?

8    A    No.

9    Q    And I suppose to cover all your bases if you

10        wanted to leave, you could have notified all

11        three, correct?

12   A    Well, the ones that were there.

13   Q    Well, if they're not there --

14   A    I suppose if --

15   Q    -- you can't notify them, right?

16   A    -- they're not there -- correct.

17   Q    You wouldn't have expected Aurora would have

18        wanted you to notify people who weren't there,

19        right?

20   A    That's correct.

21   Q    And, in fact, on third shift the maintenance

22        supervisor wouldn't have been there anyway,

23        correct?

24   A    Correct.

25   Q    So then would have been notifying the charge

```
 1      nurse, and the -- and did you say the admitting
 2      nurse were the two other people?
 3   A  The emergency room unit coordinator.
 4   Q  And the charge nurse?
 5   A  Yes.
 6   Q  Okay.  And you could have done that?
 7   A  Yes.
 8              MR. SCULLEN:  Nothing further.
 9                    EXAMINATION
10  BY MS. MURSHID:
11   Q  Wait.  Did you ever talk to the charge nurse or
12      the ER nurse about notifying them?
13   A  Yes.
14   Q  And what did they say?
15   A  I spoke with the charge nurse and asked if he was
16      aware of this, that they would assume duties if I
17      left on third shift, and he said he had no
18      knowledge of that.  It hadn't been discussed with
19      him.  He'd be happy to help me out, he said, but
20      if he had duties -- the charge nurse is, in
21      essence, in charge of the hospital at night.
22                    They have a lot of stuff to do,
23      and -- patient admittings, transferring patients,
24      moving patients, whatever.  He said he'd be happy
25      to help me out if he was available, but he had not
```

1    been informed of any policy regarding me leaving

2    and him taking my calls.

3  Q  Did you have any other conversation?

4  A  No.

5  Q  Was it possible for you to leave?

6  A  Yes.

7  Q  But you never did?

8  A  Correct.

9            MS. MURSHID:  Nothing further.

10                     EXAMINATION

11  BY MR. SCULLEN:

12  Q  Who was the charge nurse that you spoke with?

13  A  Jim, and I'm trying to remember his last name.

14    I'm sure he's still working there.  He's the only

15    male -- well, there's two male charge nurses at

16    night.  Either Robert or Jim, and I don't think

17    Robert even does anymore.  I can't -- I just

18    cannot think of Jim's last name.  He's got

19    glasses, mustache, goatee.  I can't think of the

20    last name.  In time, when I leave here I'll

21    probably think of it.  I just can't now.

22  Q  Okay.  I want to be sure I close out this

23    question, because I think I've asked you a couple

24    times anything else you recall about this

25    discussion; every time you get asked a question by

1     your counsel there's something else that you seem

2     to recall.

3                    Any other -- anything else about

4     the substance of your conversations with the

5     supervisors in 2008, that you recall as you sit

6     here, that you haven't already testified to?

7  A  We discussed their lack of policy on certain

8     things regarding this, and they just didn't have

9     an answer.  One example I gave was, if I go to the

10    cafeteria and get seven or eight bucks' worth of

11    food on my tray, and I go sit down, I'm gonna eat,

12    and I get interrupted, and I have to go, do I get

13    reimbursed?  Do I get another tray?  Does it just

14    get tossed, and I'm out of luck?  That was one

15    thing, they had no answer to that.

16                   They had several answers to who I'm

17    going to notify if I'm going to leave.  I asked if

18    there was any procedural criteria that defined an

19    emergency or interpretation, and there was none

20    there.  Basically, that's what I recall from the

21    meeting, was just a lot of "I don't know" kind of

22    stuff.

23 Q  And who else -- who was present at that meeting?

24 A  Sergeant Bruenning, Ellen Bruenning.  South area

25    supervisor Jim Sagan.  Jim Sagan's boss, direct

1    supervisor, I don't recall his title, Jim Moraza.

2    Joel, and I forgot his last name, was there,

3    security officer.  I'm not sure if Mike Emmerich,

4    another security officer, was there.  Either Kyle

5    or Luke, one of those two was there.  I don't

6    think both of them attended that.

7  Q  Other security officers?

8  A  Security officers, yes.  I don't recall which one

9    it was.  I think that was it.

10 Q  Okay.  Mike Cummings wasn't present?

11 A  No.

12 Q  And how did the meeting end?

13 A  Kind of contentiously, actually.  Mr. Sagan got

14   kind of upset and said to me, "This was a policy

15   when you were hired.  Why didn't -- why are you

16   yelling about it now?"  And I just replied, "That

17   doesn't make it correct, and I'm just asking for

18   answers."  And then he said, "Meeting's over," and

19   that was it.

20 Q  Was there any promise to get back to you about the

21   issues you had raised?

22 A  No.

23 Q  How many discussions did you have with Kelly about

24   the issue?

25 A  Six to eight discussions.  I stopped in once a

1      week, usually on Mondays when I was on day shift,

2      I would stop in her office and just ask her what

3      she heard.  But there was a week here or there

4      maybe she was gone or something like that.  So I

5      think the total time span may have been about

6      eight weeks, but I probably stopped in -- probably

7      specifically spoke to her about six times.

8    Q  And that was all after this meeting?

9    A  Yes.

10   Q  And she told you, in addition to what you've

11     already testified to, that, what?  She told you

12     she was waiting for answers to those issues or --

13   A  Yes.  One time she told me that it had just gone

14     up to corporate --

15   Q  Yeah.

16   A  -- human resources.  Then another time she told me

17     it was at corporate legal.  Then she told me

18     corporate legal was looking into a possible

19     conflict regarding wage and hour laws.  Then she

20     said corporate legal was interviewing

21     Mike Cummings, and those are the responses I

22     recall.

23   Q  Okay.  What was your last discussion with her

24     about this issue?

25   A  The last discussion is when I walked in, and I

1    made a -- just a comment that the Supreme Court

2    makes decisions faster than this is going.  And

3    then she just looked up and said, "Evidently

4    you're not a priority."  And that was my last

5    inquiry into the matter.

6  Q  And that would have been in 2008?

7  A  Yes.

8  Q  The discussion with the charge nurse occurred

9    when?  During this period?

10 A  Oh, boy.  It had to be after I returned to

11   Lakeland in that period there, but I can't nail it

12   down much more than that.

13 Q  Well, I thought you returned to Lakeland

14   significantly after this meeting in 2008?

15 A  Yes.

16 Q  Is that -- okay.  Why did it come up a year and a

17   half later after you say the issue had been, by

18   this point, dead, you'd received no response?  Why

19   would you raise it with the charge nurse a year

20   and a half later?

21 A  It was just in conversation.  I mean, I have no

22   idea why it came up, but it had to be at Lakeland,

23   because Jim did not work at Burlington.

24 Q  And you don't remember the context of the

25   conversation?

1    A    No.

2    Q    Or what the impetus of the conversation was?

3    A    No.  I don't know if it was just casual and

4         talking about breaks, talking about things in

5         general.  I just don't recall.  I just recall that

6         he had stated he was not made aware of any policy

7         of -- of them taking our calls if we go.

8    Q    And what, if any, impact did that have on you?

9    A    Really none.

10             MR. SCULLEN:  Okay.  I don't have

11        anything further.

12             MS. MURSHID:  I'm good.

13             (Deposition concluded at 6:03 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1      STATE OF WISCONSIN )
                          ) SS:
2      MILWAUKEE COUNTY   )

3              I, Loretta Stoeckmann, RPR and Notary

4      Public in and for the State of Wisconsin, do

5      hereby certify that the preceding deposition was

6      recorded by me and reduced to writing under my

7      personal direction.

8              I further certify that said deposition

9      was taken at QUARLES & BRADY LLP, 411 East

10     Wisconsin Avenue, Milwaukee, Wisconsin, on the

11     21st day of March, 2011, commencing at 1:34 p.m.

12             I further certify that I am not a

13     relative or employee or attorney or counsel of

14     any of the parties, or a relative or employee of

15     such attorney or counsel, or financially

16     interested, directly or indirectly, in this

17     action.

18             In witness whereof, I have hereunto set

19     my hand and affixed my seal of office on this

20         day of                       , 2011.

21

22                    _____

23                    LORETTA STOECKMANN, RPR
                      Notary Public

24     My commission expires August 18th, 2013.

25
```

Exhibit 2

Deposition Transcript of Lisa Schultz

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF WISCONSIN
    ---------------------------------------------------------
 3
    JERRY A. BRABAZON, individually
 4  and on behalf of all others
    similarly situated,
 5
                    Plaintiff,
 6
                    vs.                 Case No. 10-C-714
 7
    AURORA HEALTH CARE, INC.,
 8
                    Defendant.
 9
    ---------------------------------------------------------
10

11

12               Deposition of LISA SCHULTZ

13              Wednesday, March 23rd, 2011

14
                       3:58 p.m.
15
                          at
16
                  QUARLES & BRADY LLP
17              411 East Wisconsin Avenue
                  Milwaukee, Wisconsin
18

19

20

21

22

23

24

25        Reported by Loretta L. Stoeckmann, RPR
```

1                    Deposition of LISA SCHULTZ, a witness in

2     the above-entitled action, taken at the instance of the

3     Defendant, pursuant to the Federal Rules of Civil

4     Procedure, pursuant to Notice, before Loretta L.

5     Stoeckmann, RPR and Notary Public in and for the State

6     of Wisconsin, at QUARLES & BRADY LLP, 411 East

7     Wisconsin Avenue, Milwaukee, Wisconsin, on the 23rd day

8     of March, 2011, commencing at 3:58 p.m. and concluding

9     at 7:11 p.m.

10    A P P E A R A N C E S:

11                    HAWKS QUINDEL, S.C., by
                       Ms. Lynn M. Novotnak
12                     222 East Erie Street, Suite 210
                       P.O. Box 442
13                     Milwaukee, Wisconsin 53201
                       Appeared on behalf of the Plaintiff.
14
                       QUARLES & BRADY LLP, by
15                     Mr. Christopher L. Nickels
                       411 East Wisconsin Avenue, Suite 2040
16                     Milwaukee, Wisconsin 53202
                       Appeared on behalf of the Defendant.
17

18

19

20

21

22

23

24

25

```
 1              E X A M I N A T I O N

 2
     BY MR. NICKELS                                    4
 3   BY MS. NOVOTNAK                                 140
     BY MR. NICKELS                                  144
 4

 5
                  E X H I B I T S
 6
     EXHIBIT NO.                          PAGE IDENTIFIED
 7
     No. 18  Lisa Schultz's activity log . . . . . . 49
 8   No. 19  Lisa Schultz's payroll report . . . . .112
     No. 20  Page from Lakeland  . . . . . . . . . .138
 9           Orientation/Training binder

10              (Original exhibits attached to original
        transcript.  Copies of exhibits attached to
11      copies of transcripts.)

12

13     P R E V I O U S L Y   M A R K E D   E X H I B I T S

14   EXHIBIT NO.                          PAGE IDENTIFIED

15   Jerry A. Brabazon

16   No. 2  Employee Handbook  . . . . . . . . . . 72
     No. 3  Work Week/Meal & Rest Periods  . . . . 75
17   No. 4  Nonexempt and Exempt Employee Policy . 78
     No. 5  Michael Cummings' newsletters  . . . . 78
18
     Patrick R. Lowery
19
     No. 9  Aurora Lakeland Medical Center Loss  . .134
20           Prevention Services Orientation/Training

21              (Original previously marked exhibits
        attached to original corresponding transcripts.
22      Copies of exhibits attached to copies of
        transcripts.)
23

24

25
```

```
 1                  TRANSCRIPT OF PROCEEDINGS
 2                  LISA SCHULTZ, called as a witness
 3          herein, having been first duly sworn on oath, was
 4          examined and testified as follows:
 5                         EXAMINATION
 6   BY MR. NICKELS:
 7   Q    Hi there, Lisa.  My name is Chris Nickels.  I
 8        introduced myself off the record.  I'll be taking
 9        your deposition today.  Could you just state your
10        name for the record?
11   A    Lisa Ann Schultz.
12   Q    And are you known by any other names, maiden name,
13        anything like that?
14   A    No.
15   Q    Okay.  Have you ever been deposed before?
16   A    No.
17   Q    Okay.  Have you ever been a party to a lawsuit?
18   A    When I was little, my mom -- I got in a car
19        accident.  I don't know if that counts.
20   Q    Okay.
21   A    But I think I was named in that.  I don't know if
22        that counts.
23   Q    But you didn't participate in any depositions as
24        part of that lawsuit?
25   A    I don't remember.  I was eight.  I don't think so,
```

```
 1        but I couldn't tell you for sure.  I was eight, so
 2        I don't know.
 3   Q    Okay.  Well, I'll just run over some of the ground
 4        rules for depositions.  Basically, I'm here to ask
 5        you some questions in order to learn the basis of
 6        your lawsuit against Aurora Health Care.  Your
 7        answers are under oath.  It's the same sort of
 8        oath you take in a court of law.  What you say
 9        today, it must be truthful.  Could be later used
10        in court.
11                  My purpose here is simply to get
12        the facts.  If you don't understand a question,
13        tell me, and I'll rephrase the question.  If you
14        answer the question, I'm going to assume that you
15        understood what I was asking.
16                  You'll need to give a verbal
17        response, because for the court reporter, she has
18        to write down yes or no, so --
19   A    Okay.
20   Q    -- nodding can't be recorded.
21                  If you need a break at any time,
22        let me know, and we can take a break.  The only
23        thing I ask is that if a question's pending, just
24        answer the question before we take the break.
25   A    Okay.
```

```
 1   Q    Is there any reason such as medication or drugs or
 2        anything that you've taken today that would
 3        prevent you from being able to understand and
 4        answer my questions?
 5   A    No.
 6   Q    Okay.  Did you review any documents in preparation
 7        for your deposition today?
 8   A    Just the emails that I faxed to them before.  That
 9        was last week.  Nothing today at all.
10   Q    Okay.  And you provided a handful of documents to
11        your counsel, is that what you're referring to?
12   A    Yeah.  I faxed them.
13   Q    Okay.  Did you communicate with anyone other than
14        your attorneys in preparation for your deposition
15        today?
16   A    Not in preparation, but I've talked about it to
17        other people before I came.  Not, you know, I
18        don't know --
19   Q    Who -- who have you talked to?
20   A    I've talked to Pat and Kyle and --
21   Q    And when you say "Pat and Kyle" --
22   A    Pat Lowery, Kyle Stoxton.  They work with me at
23        Lakeland.  In the past I've talked about it with
24        Jim May.  Yesterday, and I think earlier this
25        week, Dave Wood was talking to me about it.  But I
```

```
 1        mean, I've -- my fiancé and my mom.  I don't know.
 2        Jerry.  I couldn't honestly tell you how many
 3        people that we've -- I've talked to about this.
 4   Q    Okay.  Do you recall the most recent time you had
 5        a conversation with anybody about this lawsuit?
 6   A    It was yesterday.
 7   Q    With who?
 8   A    With Dave Wood.
 9   Q    Okay.
10   A    When I -- I started working at the corporate
11        offices.  I just got transferred up there.  And
12        Friday we had an employee meeting, and he began
13        talking about our lunches.
14                  And he told me since I'm going to
15        be working nights, you know, St. Luke's will be
16        able to take over my duties while I'm on lunch at
17        corporate.  And he's like, "So it won't be like
18        you punching out 'no lunch' down in south region."
19        And I'm like, "What are you talking about?"
20                  MS. NOVOTNAK:  Let me remind the
21        witness, you need to wait for a question to be on
22        the table.
23                  THE WITNESS:  Oh, I'm sorry.
24                  MS. NOVOTNAK:  That's okay.  That's
25        okay.  It's real common.
```

```
 1   BY MR. NICKELS:
 2   Q    It's okay.  Just -- you were talking about your
 3        conversation with Dave Wood yesterday, and he --
 4        you said that he made some references to lunches,
 5        so could you just tell me about those references?
 6   A    He did not have a clear understanding of how we do
 7        lunches, and how we take lunches in the south
 8        region.  And he didn't understand why officers
 9        that work at multiple sites are going in on this
10        lawsuit because there's multiple officers to, you
11        know, relieve from break.
12                   And then I explained to him,
13        because I've worked these multiple-officer sites,
14        and I know usually there's one person at the CMS
15        station, which they can't leave; they're a
16        stationary position.
17                   And then there's the patrol
18        officer.  When the patrol officer takes their
19        lunch, if there's a call that comes in they get
20        called off their lunch to go handle that call,
21        because that second officer can't leave.
22   Q    Okay.  And we'll get into all of that, those
23        questions in depth, so we'll just return to these
24        -- the substance of the communications that you
25        had with other people.
```

```
 1                    MS. NOVOTNAK:  Yeah, I apologize.  I
 2        thought she was describing a meeting from last
 3        week that --
 4                    THE WITNESS:  Well, that's what we were
 5        talking about was the conversation we had on
 6        Friday, so I didn't know -- I was just referencing
 7        back.
 8   BY MR. NICKELS:
 9   Q    Sure.  We'll just get back to some background
10        stuff and jump into those types of questions.
11        What is your date of birth?
12   A    June 2nd, '89.
13   Q    And what's your present address?
14   A    8140 195th Avenue, No. 9, Bristol, Wisconsin.
15   Q    Okay.
16   A    53104.
17   Q    And tell me about your educational background,
18        beginning with high school.
19   A    I graduated Badger High School in 2007.  It's in
20        Lake Geneva.  I went to UW-Milwaukee for a
21        semester.  Took a year off of school, and then
22        started going back to Gateway Technical College.
23        I received my associate's degree in criminal
24        justice in May, and then I graduated the police
25        academy in December.
```

1  Q   And is the police academy part of that technical

2      college?

3  A   Yeah, it was at Gateway, too, but it was separate

4      from the degree.

5  Q   Okay.  So you have a technical degree from

6      Gateway, and then you have a separate police --

7  A   It's a Law Enforcement Standard Board

8      certification.

9  Q   Okay.  Any other certifications or anything?

10 A   CPR.  I don't know if that counts.  First

11     responder.

12 Q   Sure.

13 A   But nothing out -- really, outside of that.

14 Q   Okay.  And you didn't -- you didn't return to --

15     back to UW-Milwaukee?

16 A   No, sir.

17 Q   One semester, you said?

18 A   Yeah.

19 Q   Okay.  So let's talk about your employment

20     history, starting with your first job after high

21     school.  Who was it for, or when were you hired?

22 A   After high school -- I'm trying to think.  I don't

23     know the exact dates, but I believe I was still

24     working at Culver's when I graduated high school.

25     I worked there for five years.

```
 1                      And then I -- I started selling
 2      cars at Kunes' Country Ford in Delavan, Wisconsin.
 3      And then when I was working there, that's when I
 4      started -- enrolled back into school, and I
 5      couldn't work the hours they required me.
 6                      So I left there, and then started
 7      working at Target doing assets protection.  And
 8      then that -- while I was working at Target, I got
 9      hired at Aurora part-time.  And I was working both
10      Target and Aurora, and then at Target they took
11      out my position because of economy cuts.
12   Q  Okay.
13   A  So then I just stayed at Aurora.
14   Q  When did you leave Culver's?  And month and year
15      is fine.
16   A  I say I -- I don't remember the exact, without
17      looking at my résumé.
18   Q  Yeah.
19   A  If I had to take a ballpark guess, I would say
20      maybe August of '08, maybe.  That -- I don't know
21      for sure.
22   Q  Okay.
23   A  And then I was at Kunes for only a couple months.
24   Q  And did you start Kunes around that approximate
25      August of '08 time?
```

1    A    No.  I started earlier.  I was still employed at
2         Culver's.  I believe -- again, I'm not 100 percent
3         positive on this.  I believe maybe Kunes was March
4         of '08, April, maybe.
5    Q    Okay.
6    A    And then I started at -- and then that's when I
7         left Kunes, I believe, at the same time I left
8         Culver's in August -- in '08.
9    Q    So you would have left Kunes around August of '08?
10   A    Yeah.  And then that's when I started working at
11        Target, I believe was August.  And then I got
12        hired at Aurora in March -- March, I believe, of
13        '09.  And then they took out my position at Target
14        in May, I believe.
15   Q    Of 2009?
16   A    Yes.  Again, I'm not 100 percent sure on those
17        months.  I just kind of guess, ballpark.
18   Q    That's fine.  Did -- were you working in a
19        security-guard-related position in Culver's?
20   A    No.
21   Q    Kunes?
22   A    No.
23   Q    Target?
24   A    Yes.
25   Q    So let's talk about -- what was your title there?

1  A   I was a TPS, which is a Target Protection
2      Specialist.  I was uniformed assets protection.
3  Q   Okay.  And what were the general job
4      responsibilities?
5  A   We did inventory on high-theft items, watched
6      video surveillance, patrol apprehensions, you
7      know, went through empty packages and, you know,
8      deterred theft.
9  Q   What -- what type of shift did you work there,
10     first, second, third?
11 A   It kind of -- it was -- it was kind of between
12     first and second shift.
13 Q   Okay.
14 A   It wasn't -- I was only part-time there.
15 Q   Okay.
16 A   So I believe I only worked around 20 hours a week.
17 Q   Okay.
18 A   And it was -- I don't remember the exact times,
19     but maybe from like eleven to seven, somewhere
20     around there.  It was like a mid-shift.
21 Q   And were your -- how long -- you worked part-time,
22     but how long were the shifts themselves, usually?
23 A   Usually anywhere between, I would say six and
24     eight hours.
25 Q   Did you have lunch breaks?

```
 1   A    I did.
 2   Q    Okay.  Do you know were they paid or unpaid lunch
 3        breaks?
 4   A    They were unpaid.
 5   Q    And how long were they?
 6   A    Thirty minutes.
 7   Q    Okay.  Would you have to punch out?
 8   A    Yes.
 9   Q    Okay.
10   A    Yes.
11   Q    Did you carry any sort of communication device in
12        your role at Target, like --
13   A    I did.  I had a radio.  I did take it to lunch
14        with me, but it got turned off when I was at
15        lunch.
16   Q    Okay.  So you carried the radio the whole shift?
17   A    Yes.
18   Q    And you turned the radio off at lunch?
19   A    Yes.
20   Q    Okay.  So you were hired in, you said March of
21        2009?
22   A    Yes.
23   Q    Okay.  And what -- have you worked at -- have you
24        worked at more than one location?
25   A    I am currently trained at five.
```

```
 1   Q    Okay.  So let's start with the first location --
 2   A    Okay.
 3   Q    -- and sort of walk our way through it.
 4   A    Okay.
 5   Q    Where was the first location -- Aurora location
 6        that you worked?
 7   A    Aurora Memorial Hospital of Burlington in
 8        Burlington, Wisconsin.
 9   Q    Okay.  Do you still work at Burlington?
10   A    That is not my home site --
11   Q    Okay.
12   A    -- but I just got transferred last week, so I do
13        still go to the south region to pick up hours.  So
14        if they needed coverage and they asked me to help,
15        I would.
16   Q    Was it your home site up until last week?
17   A    Yes.
18   Q    Okay.
19   A    Well, my technical transfer date was the 27th, but
20        they were short-staffed, so they kept me in the
21        south region, and then they pulled me up last
22        week.  So my technical on-the-record transfer date
23        was the 27th up here.
24   Q    Okay.  What other -- just list for me what other
25        locations you're -- you've worked at.
```

```
 1   A    Aurora Lakeland Medical Center in Elkhorn,
 2        Wisconsin; Aurora Memorial Hospital of Kenosha,
 3        which is in Kenosha; West Allis Memorial; and the
 4        corporate office on Virginia Street in Milwaukee.
 5   Q    And you said that you're trained to work at these
 6        different locations?
 7   A    Yes, sir.
 8   Q    Okay.  Let's start with Burlington.
 9   A    Okay.
10   Q    What shifts did you typically work there?
11   A    I was assigned 7 p.m. to 7 a.m. on Fridays and
12        Saturdays every week.  So 48 hours a pay period.
13        And then I worked, you know, I'd pick up shifts
14        here and there, but those --
15   Q    Is that third shift?
16   A    Yes.
17   Q    Okay.
18   A    But those were my assigned hours.
19   Q    And how many hours did you say you were typically
20        working a week?
21   A    I was assigned 24 hours a week, but with the
22        exception of last summer and last semester when I
23        was going through the academy, almost every week I
24        put in full-time hours.
25   Q    And you did that through hours that you were
```

```
 1        scheduled or through picking up shifts?
 2   A    Picking up shifts.  And I just remembered, I
 3        forgot I worked at Six Flags over the summer.  I'm
 4        sorry.  That just reminded me.  I'm like, oh,
 5        yeah, I worked at Six Flags.  I worked security
 6        there, too.
 7   Q    No problem.
 8   A    Sorry.
 9   Q    How long were you at Six Flags for?
10   A    I believe I was hired around March, and then I was
11        there until the end of August.  And I was
12        full-time there.
13   Q    And that was in 2010?
14   A    Yes.
15   Q    Did you carry a communication device?
16   A    Yes, radio.
17   Q    And did you have a lunch break?
18   A    I did have a lunch break.
19   Q    And was the lunch break paid or unpaid?
20   A    Unpaid.
21   Q    And what did you do with your radio during your
22        lunch break?
23   A    It stayed on, but when we went to lunch, we called
24        dispatch and told them that we were going on
25        lunch.  So if there was a call, they would call a
```

```
 1        different area of the park to respond to wherever
 2        the location was.
 3   Q    So there was more than one person -- you said you
 4        were in a security officer role?
 5   A    Yes.
 6   Q    There was more than one security officer?
 7   A    There was numerous of us.  At least a good handful
 8        at any given time.
 9   Q    Was there ever situations where you were on lunch
10        at Six Flags, and you needed to respond to a
11        request?
12   A    There is one that pops to my mind that I can
13        remember for sure, and it was a full-on brawl
14        fight that involved like ten people.  So they
15        asked all officers to respond to that.
16   Q    Sure.  Do you know whether you were compensated
17        for that lunch?
18   A    I took -- began my lunch over again at the end.
19   Q    Okay.  Going back to Burlington.
20   A    Okay.  Sorry.
21   Q    It's all right.  So you were scheduled to work
22        about 20 hours a week, but you were picking up
23        shifts, so you were approaching 40 hours a week on
24        average?
25   A    Yeah.  I was assigned 24 hours a week, and then I
```

1       would pick up hours periodically between -- at

2       that time, the four sites I was trained at.

3  Q   Who were your supervisors at -- who was your

4       direct supervisor at Burlington?

5  A   Jim May.

6  Q   And how much communication did you have with

7       Jim May?

8  A   He is the one that trained me, so I had that, and

9       then I had shift change -- a half-hour shift

10      change with him every Friday.  And then if I

11      helped pick out a shift here or there, I'd have

12      shift change with him, but I worked by myself.

13  Q   Do you know who Jim May reported to?

14  A   Yeah.  Jim Sagan.

15  Q   How much -- what was the frequency of interaction

16      you had with Jim Sagan?

17  A   In person or email or phone or just any

18      communication in general?

19  Q   We'll do them each.  Yeah, any communication in

20      general, so we can start with in person.

21  A   In person at that time I didn't see Jim Sagan very

22      often, just because I worked weekends and nights,

23      and Jim Sagan had off both of those times.  Every

24      once in a while when I worked a first shift or a

25      second shift he may pop in, you know, and I'd see

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 174 of 867   Document 49-1

```
 1         him for maybe a half hour to an hour here and
 2         there, but it wasn't very frequent.
 3                         Now, emails, I got emails from him
 4         quite often.  You know, just communications
 5         throughout the department.
 6    Q    And those were emails that were directed to you
 7         and other security officers?
 8    A    Other -- yeah, and then there, I mean, there were
 9         some that were specific towards me.
10    Q    Okay.  Do you know who Jim Sagan reported to?
11    A    Yes.  Halfway through, it was Jim Moraza, and then
12         after Jim went to -- Jim Moraza -- I know, there's
13         so many Jims.  After Jim Moraza went to Metro, it
14         was Clint Schaeffer.
15    Q    When did the switch from Moraza to Schaeffer
16         happen?
17    A    I couldn't tell you exactly.  I'd say Clint has
18         been with us a little over a year, so it was about
19         halfway through my employment.
20    Q    Okay.  Did -- what was your level of interaction
21         with Jim Moraza?
22    A    I met him maybe twice at training for, like, DAAT
23         and MOAB.
24    Q    DAAT and MOAB, being acronyms for different
25         training programs?
```

1   A   Yeah.  DAAT stands for Defense And Arrest Tactics.

2       And then MOAB is Management Of Aggressive Behavior

3       training.  Jim Moraza used to run that until he, I

4       think he had a heart attack, and someone else is

5       doing it now.

6   Q   But other than that you didn't have much

7       interaction with Jim?

8   A   No.

9   Q   How about Clint Schaeffer?  How much interaction

10      did you have with him?

11  A   I had more interaction with him when I was still

12      in the south region.  Especially with the past

13      three months, because I had been working at

14      Lakeland a lot.  They were really short-staffed

15      and needed my help.  So I was on first shift, over

16      full-time, working numerous overtime hours.

17              Clint would pop in, you know, maybe

18      three times a month, and sometimes he was there

19      the entire day.  Other days he was there for a

20      half hour that he had in the office, and then he'd

21      go for an interview, and then he'd leave.

22  Q   Okay.  Do you know who Jim Moraza or

23      Clint Schaeffer reported to?

24  A   I believe it's Dave Wood, and if it's not Dave,

25      then it's directly to Mike Cummings.  I know that

```
 1         they involve Dave Wood a lot --
 2    Q    Okay.
 3    A    -- but I don't know in the chain of command if
 4         Dave is in the same level as Clint or not.
 5    Q    Okay.
 6    A    Because Dave is technically a manager, and so is
 7         Clint, but I know above both of them is
 8         Mike Cummings.
 9    Q    And who is Mike Cummings?
10    A    Mike Cummings is the director of security.  He is
11         the highest you can go in our department.
12    Q    Okay.  Was there ever a time at Burlington when
13         you were scheduled for full-time hours as opposed
14         to picking up hours?
15    A    Well, they -- they'd call me and say, "Hey, can
16         you work?  We're short-staffed" or, "This person
17         is sick, this person needs the day off," but
18         assign -- I don't know if -- if I would say
19         assigned, but --
20    Q    How does the scheduling work?  Is there a schedule
21         that comes out in -- a week in advance, and then
22         people's names are on it?
23    A    Our schedules are set.  We're -- when we're hired,
24         we're assigned certain hours.  So I am assigned
25         every week -- I was assigned every week, Friday
```

```
 1        and Saturday, 7 p.m. to 7 a.m.  All the
 2        full-timers were assigned the same hours every
 3        week through the entire calendar year.
 4                      So when they put in PTO requests,
 5        like paid time off, then they would obviously need
 6        to be off for that week.  And then if Jim knew I
 7        was available, he would pop me in the schedule for
 8        those days.
 9    Q   Okay.
10    A   So I guess -- I don't know if you would call that
11        technically being assigned those hours, because,
12        you know, I don't know.
13    Q   So is there a -- is there a distinction between a
14        security officer that's considered full-time and a
15        security officer that's considered part-time?
16    A   What do you mean by, "Is there a difference?"  I
17        don't --
18    Q   Like in the average and regular numbers of hours
19        that they're scheduled?
20    A   Well, the full-timers are scheduled 40 hours a
21        week, and the part-timers are scheduled under 40
22        hours a week.
23    Q   Okay.
24    A   I mean, they're assigned those hours.
25    Q   And you're one of the part-timers?
```

WWW.GRAMANNREPORTING.COM • 414.272.7878

*Innovation - Expertise - Integrity*

**GRAMANN**
REPORTING

```
 1   A    Not anymore.
 2   Q    Okay.
 3   A    I am full-time now.
 4   Q    Okay.  So when did that change happen?
 5   A    When I got transferred up to corporate on -- my
 6        technical transfer date was the 27th, and that's
 7        when payroll put me in as full-time.
 8   Q    Okay.  So you were -- you were considered a
 9        part-timer until February 27th of this year?
10   A    Yes.
11   Q    But you testified that you picked up a lot of
12        shifts?
13   A    Yes.
14   Q    And that in picking up a lot of those shifts,
15        often you would work upwards of 40 hours?
16   A    Yeah, and way over.
17   Q    And over 40 hours?
18   A    Yes.
19   Q    Okay.  Let's just talk about the shifts that you
20        -- your typical experience with Lakeland.
21   A    Okay.
22   Q    When did you -- when did you start working there,
23        or what was the frequency of your working there?
24   A    I don't remember the exact month that I got
25        trained there.  It was maybe a couple months after
```

```
 1      I'd started working at Aurora.  It was shortly --
 2      shortly after Jerry got transferred from
 3      Burlington to Lakeland, because he's the one that
 4      trained me at Lakeland.
 5                  I -- Jerry had up to -- over
 6      200-something hours' worth of PTO, and he would
 7      take Sundays off.  And I would work his third
 8      shift on Sunday, and that's kind of how I started
 9      working there.  So then I was working Friday,
10      Saturday and Sunday.  And then, you know, I'd pick
11      up a second shift here, a first shift there,
12      whenever they needed help.
13                  And then on a more frequent basis,
14      it was starting in December, the sergeant who is,
15      like, the direct supervisor of Lakeland, went on
16      medical leave.  And then I was working over
17      full-time hours to accommodate her being gone.
18      And then her medical leave got extended for
19      another, like, six weeks or somewhere around
20      there.  And then -- then she decided to pursue
21      career interests outside of Aurora, is what I
22      believe the email said.
23                  And then I was there -- and that's
24      why they had to postpone my transfer, because they
25      were that short-staffed that they needed to keep
```

```
 1        me in south region.
 2   Q    In your answer you said you were trained by Jerry.
 3        Are you referring to Jerry Brabazon?
 4   A    Yes.
 5   Q    Okay.  And I'm not sure if I caught, but what's
 6        your guess or estimate of, like, the month and
 7        date when you got trained at Lakeland?
 8   A    You know, I -- I don't really feel comfortable
 9        answering this question, because I don't know the
10        exact month.  If I had to guess, I would say maybe
11        August of '09, maybe.  I honestly couldn't tell
12        you truthfully what the -- I don't remember.
13   Q    Okay.  And were you then -- after you got trained
14        at Lakeland, were you getting scheduled shifts at
15        Lakeland?
16   A    For -- Jerry would put in PTO time, and he, you
17        know, asked, "Oh, would you mind working my
18        Sundays?"  And I said, "Yeah, you know, I wouldn't
19        mind."
20   Q    Okay.
21   A    And then he sent Ellen an email, Ellen being the
22        supervisor at the time at Lakeland, and she would
23        just put me on the schedule for it.
24   Q    Okay.  So were you primarily covering people's
25        shifts?
```

1   A   Yes.

2   Q   As opposed to being scheduled for a regular slot?

3   A   I -- yeah, I didn't have any technical assigned

4       hours at Lakeland.

5   Q   And while you were working at Lakeland, you were

6       continuing to having your assigned hours at

7       Burlington?

8   A   Yes.

9   Q   Okay.  And the shifts -- the typical shifts that

10      you were filling in at Lakeland were which?  Third

11      shift, second shift?

12  A   With -- yeah.  Mainly third shift with the

13      exception of the past couple months.  Since, you

14      know, the end of December, I was on first shift

15      for almost, like, every day.  Maybe having one --

16      one day off a week if I was lucky.

17  Q   Okay.  Are you still covering shifts at Lakeland?

18  A   I haven't picked up any -- wait, nope, I take that

19      back.  I'm working Saturday night third shift at

20      Lakeland.

21  Q   So you're still picking up shifts at Lakeland?

22  A   Mm-hmm.

23  Q   But you don't have a regularly scheduled shift

24      there?

25  A   No.

1    Q    You mentioned your supervisor Ellen at Lakeland?

2    A    Mm-hmm.

3    Q    Is that Ellen --

4    A    Ellen Bruenning --

5    Q    -- Bruenning?

6    A    -- yes.

7    Q    Okay.  And was she the only supervisor -- well,

8         first of all, what was her title?

9    A    She was a sergeant, same as Jim May.

10   Q    Did you work for any other sergeants at Lakeland?

11   A    There was only one sergeant assigned to Lakeland,

12        one to Burlington, and one to Kenosha.

13   Q    And do you know who Ellen reported to?

14   A    Jim Sagan.  And then it goes up the same way as --

15   Q    As Jim?

16   A    -- Jim May, yeah.

17   Q    Okay.  So how much -- what was your level of

18        interaction with Ellen Bruenning?

19   A    When I worked third shift, I would have shift

20        change with her in the morning, because she came

21        in at first shift most times.  And then when I'd

22        pick up shifts here and there, you know, if I'd

23        pick up a second shift, I'd see her on shift

24        change then.  But if I worked a first shift, I

25        didn't see her, because it was her that I was

```
 1          covering for.
 2   Q    And your understanding was that she was your
 3          sergeant on shifts that you worked at Lakeland?
 4   A    Yes.  If I had any kind of something I needed to
 5          report to a sergeant, it was her.  It was not
 6          Jim May.
 7   Q    Okay.  And that would -- the same would go for --
 8          with respect to Burlington, would be Jim May?
 9   A    Jim May.  And then Kenosha would be to their
10          sergeant that was directly there, and so on and so
11          forth with all the sites.
12                        And then, I mean, there are -- West
13          Allis has three sergeants.  The bigger sites that
14          have more officers working have more sergeants.
15   Q    Let's do the next facility you mentioned.
16          Memorial Kenosha, is that right?
17   A    Kenosha, yeah.
18   Q    Okay.  So when did you get -- when did you first
19          start working at Kenosha?
20   A    I believe I got trained maybe a month or two
21          before Lakeland at Kenosha.
22   Q    So this would have been at some point in 2009,
23          maybe the late summer?
24   A    Yes.
25   Q    Who trained you?
```

```
 1   A    James.  James Willis.

 2   Q    What is James Willis's title?

 3   A    He's just a security officer.

 4   Q    Okay.

 5   A    I had a little bit of training with Mary Lynn, who

 6        was the sergeant there.

 7   Q    Did you ever get regularly scheduled for shifts at

 8        Memorial -- at Kenosha?

 9   A    No.  Just picked up as needed.

10   Q    Okay.  And what -- what was the typical shift you

11        picked up, if you can say?

12   A    Usually it was a second shift.  I picked up more

13        shifts when I was first trained there.  Then after

14        I got trained at Lakeland, there was so many hours

15        between Burlington and Lakeland, it was just

16        easier for me to stay between those two than keep

17        bouncing over to Kenosha.

18   Q    So you would say you picked up less shifts at

19        Kenosha than you had at Lakeland?

20   A    Yeah, I don't believe I've actually picked up a

21        shift at Kenosha since '09, since the end of '09.

22   Q    So it's been a while?

23   A    It's been a while, yeah.

24   Q    Which of these facilities is closest to where you

25        live?
```

```
 1   A    Kenosha.
 2   Q    Did you move in the last -- since 2009, or were
 3        you living at the Bristol address the whole time
 4        you were employed by Aurora?
 5   A    No.  I -- when I first got hired at Aurora, I was
 6        living with my mom, and she lives in technically
 7        Pell Lake, but it's got a Genoa City mailing
 8        address.  And then I moved out and got my own
 9        apartment, summer of '09, maybe, I think.  I
10        believe summer of '09.
11   Q    Is that the Bristol address?
12   A    No.  That was in Burlington at the time.  It was
13        maybe a mile down the road from the hospital, so I
14        was really close.  I could walk there if I wanted
15        to.
16                    And then -- and then I moved in
17        with my -- at the time my boyfriend, and then we
18        lived in an apartment two blocks away from --
19        like, almost two blocks from where we live now.
20   Q    Okay.
21   A    So when I moved in we had too much stuff to fit in
22        that one little apartment.  We needed to move
23        somewhere bigger.
24   Q    Who was your -- for the shifts that you worked at
25        Kenosha, who was the sergeant?
```

```
 1   A    There was -- I didn't work with Mary Lynn.  She
 2        was on first shift usually, so if I had something
 3        that I needed to report to a, quote, sergeant, I
 4        would either send her an email, or if it was
 5        something that, you know, I felt needed to be
 6        addressed at that moment, I would go to whoever
 7        was superior of me at that site, which would be
 8        James, because he would be the officer in charge.
 9        He -- James or Murphy or whoever was the primary
10        person that worked at Kenosha, I would respond to
11        them.
12   Q    And Mary Lynn's last name?
13   A    It was Donnelly (phonetic), but she got married,
14        and I think it's, like, Winchel now.  I don't know
15        for 100 percent fact what her new married name is.
16   Q    And then you said James.  Were you saying
17        James Willis?
18   A    James Willis, yeah.
19   Q    So you were saying that you were essentially
20        reporting to the security officer who was working
21        most frequently?
22   A    Yeah, who was assigned hours at Kenosha --
23   Q    He was assigned hours.
24   A    -- because we weren't -- Kenosha isn't a
25        single-officer site.  So if I picked up hours
```

1   there, I was working with someone who regularly

2   worked there.

3 Q How many officers are typically -- are on a shift

4   at any one time?

5 A Two or three.

6 Q Okay.  Is there more during the day or at night?

7 A I believe, but I'm not 100 percent positive,

8   because I haven't studied their schedule in a

9   while.  I believe there's three on second shift,

10   and, you know, maybe two or three on first or

11   third.  Sometimes when I worked a third shift

12   there, there would be three of us.  Sometimes

13   there would be two.

14 Q Was there typically not scheduled only one

15   supervisor -- security officer?

16 A Rephrase that.  I'm sorry.

17 Q Sure.  Do you ever recall there being only one

18   security officer scheduled on a shift at Kenosha?

19 A No.  They can't work with less than two.  Their --

20   their minimum number of officers per shift is two.

21 Q And do you know why that is?

22 A Because they have a central monitoring station

23   that requires 24-hour access that someone needs to

24   be sitting there, that if there was a call, this

25   person cannot leave.  They have to stay there.

```
 1        They monitor alarms and doors and cameras, and,
 2        you know, the alarms mainly.
 3   Q    So one -- one officer is always working in that
 4        monitoring station?
 5   A    Yes.
 6   Q    And then one officer is doing rounds and
 7        responding to typical calls?
 8   A    Yeah, I believe they do -- I think -- I believe
 9        they do a rotation like we do at West Allis.  It's
10        every two hours.  So the one hour will be in the
11        CMS station for two hours, and then they'll flip,
12        and the patrol officer becomes the CMS officer and
13        then -- and so on.
14   Q    And what does CMS stand for?
15   A    Central Monitoring Station.
16   Q    Okay.  West Allis.
17   A    West Allis.  Okay.
18   Q    When did you get trained at West Allis?
19   A    Again, I couldn't tell you specific.  I would
20        guess maybe early time of 2010, the beginning
21        months, but I don't know 100 percent fact, I don't
22        remember.
23   Q    Do you remember who trained you?
24   A    Michael Lopata (phonetic), Jeffrey Krueger, and
25        Greg Wagner, who is the third shift sergeant at
```

```
 1       West Allis.
 2   Q   And what was the sergeant's name?
 3   A   Greg, I believe it's Wagner.
 4   Q   Okay.  Was there any other sergeants that worked
 5       at West Allis that you were aware of?
 6   A   Yes.
 7   Q   Who were they?
 8   A   Mike Middlemas, he was second shift sergeant.  And
 9       then at that time it was Ian Campbell (phonetic).
10       I believe Ian is now a supervisor for Grafton, I
11       think.
12   Q   Okay.  Who was the supervisor that -- that
13       security officers reported to at West Allis?
14   A   Before the sergeant or after -- who did the
15       sergeants report to?
16   Q   Who did the sergeants report to?
17   A   Verita Hill.
18   Q   Okay.  And do you know, did Verita Hill report up
19       a similar chain as we talked about?
20   A   Jim Moraza.
21   Q   Okay.  And just getting back to Kenosha, who
22       did -- who was --
23   A   Mary Lynn?
24   Q   Yeah.
25   A   She reported to Jim Sagan.
```

1   Q    So Jim Sagan was the supervisor --

2   A    For south region.

3   Q    Okay.

4   A    So he report -- all the sergeants of the -- the

5        supervisors of the sites or the sergeants reported

6        to the one south region supervisor --

7   Q    Okay.

8   A    -- who was Jim Sagan.

9   Q    And that's including Lakeland, Burlington --

10   A    Burlington --

11   Q    -- Kenosha?

12   A    -- and Kenosha.  I believe --

13   Q    Okay.  Gotcha.

14   A    -- now, technically Summit is in the south region,

15        but I don't believe that they report to him.

16   Q    Okay.

17   A    Because it's kind of in its own little world over

18        wherever Summit is.  It's not close to us.

19   Q    Are you currently working any other jobs besides

20        Aurora?

21   A    Not at this moment, no.

22   Q    Okay.  So I want to talk about a typical day, or a

23        typical shift for you.

24   A    Are you going to be site-specific?

25   Q    It's a bit more challenging, because there's a

```
 1        number of sites.
 2   A    I was going to say, because they're all different,
 3        so --
 4   Q    I think it's important that when we have this
 5        conversation, that we try to make sure we're
 6        talking about --
 7   A    Site-specific.
 8   Q    -- yeah, because -- because, you know, you do have
 9        the experience at the different sites, so we want
10        to make sure that when we go back and read the
11        record, we know what site --
12   A    Okay.
13   Q    -- you're talking about.  Would you say that the
14        most shifts you've had were at Burlington --
15   A    Yes.
16   Q    -- in your career with Aurora?
17   A    Yes.
18   Q    Can you walk me through a typical shift at
19        Burlington?
20   A    At seven o'clock -- I mean, these were my assigned
21        hours --
22   Q    Yeah.
23   A    -- so we'll go with that.
24   Q    Let's do that.
25   A    Seven o'clock, I would come in for shift change
```

1       with Jim -- Jim May.

2   Q   A.m. or p.m.?

3   A   What was that?

4   Q   I'm sorry, a.m. or p.m.?

5   A   P.m., seven at night.  We would have shift change

6       till roughly 7:30.  Every once in a while Jim

7       would leave early if, you know, he had a busy day

8       or whatnot.

9                    And then I would read my emails

10      and, you know, go through phone calls and read

11      what was in the pass-on log that other officers

12      had wrote during the week and try to get a good

13      understanding of what happened during the week if

14      I wasn't there.

15                   Then I would lock up the doors at

16      eight o'clock, make sure clinic court was locked

17      up, and, you know, walk around, do a patrol of the

18      hospital, checking on the units, and letting them

19      know that I was there; if they needed anything

20      they could call, and making sure that doors were

21      locked that were supposed to be locked and just --

22  Q   Okay.

23  A   -- patrolling.

24  Q   Let's sort of break it down.  You said one of the

25      things you typically did was read emails --

1    A    Mm-hmm.

2    Q    -- when you showed up?  On what computer?

3    A    On my work computer in the office.

4    Q    Okay.  And where is it located?

5    A    Our office at Burlington is in the basement.

6    Q    And that's the security officer office?

7    A    Yeah.  It's our security office for whatever

8         officer is working.

9    Q    And officers had access to that computer to check

10        their emails?

11   A    Excuse me.  Yeah, we all had a different login

12        that, you know, we'd sign on, and it would

13        recognize that it was us.

14   Q    Would -- did -- through that computer did you have

15        access to internet?

16   A    Yes.

17   Q    Okay.  And then you said that you checked the log

18        -- did you say that?

19   A    Yeah.  We had a pass-on log.  It was a book that

20        has numbered pages on it, so, you know, if one was

21        ripped out, it would -- it would be noticed.

22                   If, you know, there was a

23        suspicious person, or, you know, they needed

24        patrolling of a certain area more frequently, just

25        to give a few examples, they would write that in

```
 1        the pass-on log, and you'd, you know, read it when
 2        you came in to see, you know.
 3                    There was one time there -- I
 4        believe Tony put in the pass-on log that
 5        prescription pads were going missing in the
 6        clinic, or, you know, their belongings were going
 7        missing in the clinic, do extra rounds in the
 8        clinic.  So, you know, I would go in there and do
 9        extra rounds on the clinic side.
10   Q    So it was a way for security officers to
11        communicate to shifts coming after them --
12   A    Yeah, that they didn't see, yeah.
13   Q    -- sort of what was going on?  At Burlington, did
14        you -- were you asked to carry a communication
15        device?
16   A    We were asked to carry three communication
17        devices.  We had a on-call pager --
18   Q    Mm-hmm.
19   A    -- on-call cell phone, radio, and then keys.
20   Q    Keys?
21   A    Yes.  I guess that's not really a communication
22        device, but that was the other piece of equipment
23        that we had to carry.
24   Q    Sure, sure.  And you carried all three of these
25        devices, the pager, cell phone and radio --
```

```
 1   A    Yes.

 2   Q    -- during your entire shift --

 3   A    Yes.

 4   Q    -- at Burlington?  What type of radio was it that

 5        you carried?

 6   A    It was a Motorola radio.  Just a -- similar to

 7        what police use.

 8   Q    Are you familiar with the term "two-way radio"?

 9   A    Yes, and yeah, that's a two-way radio.

10   Q    So it would just go back and forth between you and

11        whoever else was carrying the receptive radio?

12   A    There -- yes, but there's more radios that are

13        programmed to the same repeater that can hop on

14        that channel.  If there was an internal disaster

15        or something where I needed to hand out -- we have

16        a bulk of radios that go out, and they can all

17        communicate with each other.

18   Q    Okay.

19   A    We have a repeater in the hospital that all the

20        radios are connected to.

21   Q    So how many, to your knowledge, typically at

22        Burlington, how many people are carrying radios

23        that you would be able to communicate with?

24   A    They don't technically carry them.  There is one

25        stationed in the admitting -- ER admitting area.
```

```
 1        If they needed us quickly, they would call us on
 2        there.  I know that there is one in the OB labor
 3        and delivery nurse's station.  And then there is
 4        also one in main registration.
 5   Q    So individuals in any of those three areas had
 6        access to a radio that they could call you on?
 7   A    Mm-hmm.
 8   Q    Are you aware of any other people or areas that
 9        had access to a radio they could call you on at
10        Burlington?
11   A    Not that I know of, no.  Not where people would
12        have free access to those radios, no.  I believe
13        that those are the only ones when I work that are
14        in operation.
15   Q    Did -- did individuals communicating over the
16        radio network -- were all the communications
17        directed to or from you?
18   A    Yes.
19   Q    So there wasn't communications between these other
20        groups?
21   A    No.
22   Q    That didn't involve you?
23   A    No.
24   Q    Okay.
25   A    Whenever someone called on the radio, it was
```

```
 1        directly to get a hold of us or us to directly get
 2        a hold of them.
 3   Q    So there wasn't, like, background chatter or
 4        conversations that were being held that you
 5        weren't a part of?
 6   A    Yeah.
 7   Q    Okay.
 8   A    Yeah, every time the radio came on, it was for me,
 9        or I was talking to.
10   Q    I wanted to ask, do you swipe in, do you punch in
11        at work?
12   A    Yes.
13   Q    Using your --
14   A    My badge.  I just -- the Kronos machine, swoop
15        (phonetic noise), and just swipes me in, punch me
16        out.
17   Q    Sure.  And the communication devices that you were
18        asked to carry at Burlington, you turned them in
19        at the end of the day?
20   A    At the end of my shift they go to the officer that
21        is relieving me.
22   Q    Would you ever carry them outside of your shift?
23   A    Accidentally?
24   Q    Well --
25   A    Yes, I've done that a couple times, but not --
```

1   Q    You weren't asked to?

2   A    No.

3   Q    Okay.

4   A    I'd get out to my car, oh, I still have this, and

5        I'd have to run back inside.  But not asked to

6        carry, no.

7   Q    Why don't you tell me a little bit about how you

8        get your first assignment or activity or task and

9        then sort of how that goes on over the course of

10       the day.  You show up, you look at the book, and

11       correct me if I'm wrong, there's a 30 minute --

12       usually 30-minute overlap between you and the

13       preceding officer?

14  A    Usually, yes.

15  Q    Okay.  So how would you know what to do first?

16  A    Well, in security, we really don't, I guess, know

17       what to do first.  Stuff just kind of comes to us,

18       with the exception of, you know, unlocking and

19       locking doors that we're assigned to do at a

20       specific time.

21  Q    Okay.

22  A    We get called to do things or paged, you know, we

23       need help lifting a patient in ER; there's a

24       combative patient in ER; we need help restraining

25       someone in ICU; can you get a box lunch for, you

| | | |
|---|---|---|
| 1 | | know, on the second floor?  So they call us, you |
| 2 | | know, can you deliver -- can you get us something |
| 3 | | from central services, like, some kind of |
| 4 | | equipment that they need.  I mean -- |
| 5 | Q | So those requests were just coming in? |
| 6 | A | Yes. |
| 7 | Q | And then you had sort of background tasks that you |
| 8 | | were also responsible for? |
| 9 | A | Yeah, maintaining patrol and just general |
| 10 | | security. |
| 11 | Q | Were you able to, if someone asked you to do |
| 12 | | anything, were you able to ever say, "No, I don't |
| 13 | | want to do that"? |
| 14 | | MS. NOVOTNAK:  I'm going to object to |
| 15 | | vagueness.  You can go ahead and answer. |
| 16 | | THE WITNESS:  Okay.  What was the |
| 17 | | question?  I'm sorry. |
| 18 | BY MR. NICKELS: | |
| 19 | Q | It was if someone, an individual you worked with, |
| 20 | | ever asked you to perform a task, were you able to |
| 21 | | say, "No, I don't want to perform that task"? |
| 22 | A | It wouldn't be, "No, I don't want to perform that |
| 23 | | task."  If I was doing something that was of |
| 24 | | higher importance, I would say, "I am unable to do |
| 25 | | that at this time.  You can either try to handle |

```
 1          it yourself or, you know, once I'm done dealing
 2          with this, then I can come help you with that."
 3                    I mean, obviously if there's a
 4          combative patient in ER, I'm not going to leave
 5          that to go unlock a door for someone.  You have to
 6          understand what takes priority over what.
 7   Q     So -- so determining that priority was based, in
 8          part, on your judgment?
 9   A     Yes.
10   Q     And the nature of the request?
11   A     Yes.
12   Q     And you had some discretion in determining the
13          priority of tackling these -- the assignment?
14   A     Yes.
15   Q     We're still on Burlington.
16   A     Okay.
17   Q     Did you document your activities -- the activities
18          that you performed over the course of a day --
19   A     Yes.
20   Q     -- in written form?
21   A     Yes.
22   Q     And what forms -- what written forms did you do
23          that in?
24   A     It was on our daily activity log, which then, if
25          it was trackable, got tracked -- it got entered
```

1          into ActTrack.

2    Q    Okay.  So tell me first about ActTrack.  And what

3          sort of tasks did you put in there?

4    A    ActTrack is a system that goes throughout, I

5          believe the Aurora network, whatever security

6          department has to have access to this system.

7    Q    Okay.

8    A    You know, if you had to do an escort, there's

9          specific numbers that say that that is what that

10         activity was, and it gives a specific location.

11         And you type in the location and what time, when

12         to when, you know, and then who it involved.  You

13         know, myself, I'd put my employee ID number in the

14         system, and it would generate that.  It would

15         recognize it was me, and then it would put the --

16         I would put the time that I performed that task,

17         what time I was called, and then when I was

18         completed.

19   Q    When it was completed?

20   A    Yes.

21   Q    And then you said you already -- you also filled

22         out activity logs?

23   A    Yep, which is a summarization of the ActTrack.  I

24         would fill out the log first to know which

25         ActTrack entries I needed to enter into the

```
 1        computer.
 2   Q    How was the -- how were they different?
 3   A    The daily activity log is paper form, the ActTrack
 4        is computer.  So the supervisor -- like, if Jim
 5        Sagan wanted to see all the trackable activity
 6        that I did in a day, he could run that report from
 7        his office.  He wouldn't have to physically come
 8        to the site to look at my report, my log.
 9   Q    What about differences in, like, the sorts of
10        information that you were putting into them?  Were
11        you -- were you putting the exact same information
12        into both, or were there differences?
13   A    There was some things that were on those logs that
14        were not entered into ActTrack, and that's solely
15        because there was no general category to enter
16        them into ActTrack.
17   Q    Okay.
18                (A discussion was held off the record.)
19                (Exhibit No. 18 was marked for
20        identification.)
21   BY MR. NICKELS:
22   Q    I'll give you a chance to just take a look at
23        this, but I've handed you what we've marked as
24        Exhibit 18.
25   A    Mm-hmm.
```

1   Q   When you've had a chance to look at it, can you

2       just tell me generally what these are?

3   A   These are my few random activity logs from, I

4       believe '09.  And I got a couple of the other

5       shift officers' activity on there, too, but

6       they're mainly mine.

7   Q   Random would be a good term.

8   A   Yeah, they're just kind of all over the place

9       there a little bit.

10  Q   They're supposed to just be a sort of random

11      sample --

12  A   Okay.

13  Q   -- of random days.

14  A   Yeah.

15  Q   Did you -- okay.  So we see that your name is,

16      shows up a lot, and --

17  A   Yep.

18  Q   -- is this your handwriting?

19  A   Yes, it is.

20  Q   Okay.  So you were filling these out yourself?

21  A   Yep.

22  Q   Okay.  So let's just sort of walk through quickly

23      what the information that's -- that you captured

24      in these activity logs is.  So we're looking at

25      the first page, which on the bottom right-hand

1      corner is marked AURJB067725.  Why don't you just

2      sort of walk me through one of your shifts here.

3  A   On the first page, it's, you know, saying from

4      seven to 7:30, I -- pretty much that would just be

5      shift change with Jim May.  I don't remember -- I

6      don't recall, or -- well, actually it would be

7      Tony that day, because it was a weekend.  So I had

8      shift change with Tony.

9              Then I had -- I got called to -- at

10     7:30 to 7:40, I got called to unlock the OR for

11     Dr. Parrsad.  Usually when they call us to unlock

12     the OR, it's because they need new scrubs; the

13     scrubs that they were wearing were soiled or got

14     dirty with some patient something or other on it.

15  Q   Okay.

16  A   Then from 7:40 to eight, I was doing rounds or in

17     the office checking emails.

18              And then from eight to 8:30, I was

19     locking up the doors that needed to be locked for

20     that night, locking up clinic court, walking

21     around, pulling on doors, making sure that certain

22     doors that should be locked were locked.

23  Q   Okay.

24  A   Then it says from 8:30 to 2245, which I believe is

25     10:45 -- I'm not very good at military time

| | | |
|---|---|---|
| 1 | | without looking at it.  Rounds and office.  And |
| 2 | | then in my comment section, I unlocked a GI door |
| 3 | | for Peggy.  Peggy is a house supervisor. |
| 4 | Q | And GI door is? |
| 5 | A | Gastral-something.  It's -- |
| 6 | Q | Okay.  Fair enough. |
| 7 | A | I don't know what the -- it's just where they do |
| 8 | | scopes and colonoscopies and stuff like that.  She |
| 9 | | maybe had to get equipment for a patient that they |
| 10 | | didn't have on the floor, so that's probably -- I |
| 11 | | had to unlock probably their supply room there. |
| 12 | Q | Okay. |
| 13 | A | 10:45 to eleven, did escorts by the main entrance. |
| 14 | Q | And what are escorts? |
| 15 | A | Helping people go to their car at night if they |
| 16 | | weren't comfortable in walking by themselves out |
| 17 | | in the dark.  Or if they called, which usually I |
| 18 | | never got a call to go out to bring someone in. |
| 19 | | It was usually to bring someone in out to their |
| 20 | | car. |
| 21 | | And then the same thing goes for |
| 22 | | the next line, which was from eleven to 11:45. |
| 23 | | That was at the back employee parking lot -- |
| 24 | Q | Okay. |
| 25 | A | -- in helping employees out to their cars. |

1    Q    And then the rest of the shift, it says either

2         rounds/office or unlocks?

3    A    Unlocks, yep.

4    Q    Okay.  Do you want to turn the page to the next

5         page, which is 067706?  So this is dated May 30th

6         at the top?

7    A    Okay.

8    Q    Do you want to just, you know, briefly walk us

9         through one of these shifts or this shift?

10   A    You know, I did my lock-up at eight to 8:30.  And

11        then it says from ten to 10:20, I was in a patient

12        assist.

13   Q    And what's a patient assist?

14   A    That can either be helping lift a patient, helping

15        move a patient from one unit to another.  I

16        believe 01 -- I don't remember if it's 01 or 03.

17        I believe that's, you know, helping take one

18        patient to another unit.

19   Q    And when you say 01 or 03, what are you referring

20        to?

21   A    To the subcategory in the -- it's got numbers --

22   Q    Yep.

23   A    -- that's associated with the ActTrack.  And then

24        14 would be the category for patient assist.  And

25        then it's got a subcategory that would specify

1          what kind of patient assist it was.

2    Q    So is it safe to say that the information that --

3          where you're plugging in the category and

4          subcategory with numbers, that's -- that would

5          line up with the information you're putting into

6          ActTrack?

7    A    Yes.

8    Q    Okay.  And then what about, like, where it says

9          "rounds, office," there's no category or

10         subcategory?

11   A    Nope.  That would not be entered into ActTrack.

12   Q    And what are you doing during rounds or office?

13   A    Just general patrols of the facility, internal and

14         external rounds.  You know, checking doors --

15   Q    Okay.

16   A    -- making sure someone's not somewhere they

17         shouldn't be.

18   Q    Okay.  So would that sort of be like what we

19         talked about earlier, one of the background tasks?

20   A    Yeah.

21   Q    And when you're doing rounds, that means you're

22         not being asked to do anything else at that time?

23   A    Well, those are my duties that I have to do

24         throughout -- like, throughout my entire shift.

25         So I'm not being asked, but they are expected of

1      me to be done.

2   Q   It's one of your responsibilities?

3   A   Yes.

4   Q   Okay.  But it's not a -- it's not a situation

5       where someone specifically asked you to do

6       something?

7   A   Not on a call.  Not like someone called and said,

8       "Lisa, you need to do a round" --

9   Q   Sure.

10  A   -- "of this."

11  Q   Okay.  Would you say that you're interrupted

12      during that time while you're doing a round?

13  A   Yeah.

14  Q   What's that?

15  A   Yes.

16  Q   And what are you interrupted by?

17  A   All different kinds of calls.  If we're referring

18      to this page, specifically, you know, at ten

19      o'clock I was interrupted with my rounds to do

20      those patient assists.  And, you know, in between,

21      if there's only a couple minutes in between the

22      one call to the next, I don't just, you know, do

23      rounds and office for that ten minutes, because it

24      just takes up another line.

25  Q   So you can see where -- what you're saying -- what

```
 1      you're testifying is you can see where you're
 2      interrupted on your rounds, because you put that
 3      into your activity log?
 4   A  Yes.
 5   Q  Okay.  But the period of time, whether it's short
 6      or long, while you're actually doing the rounds
 7      itself, is a period of time when you're not
 8      interrupted?
 9   A  Yes.
10   Q  And then when you are, with a request or whatever,
11      you'll see that that shows up?
12   A  Yes.
13   Q  Okay.  Do you want to just page through the other
14      ones.  Just let me know if you think that -- if
15      you think that this is, you know, general sample,
16      or if you see anything unusual.
17   A  These are -- these are kind of old.  I mean, they
18      were from '09 --
19   Q  Yeah.
20   A  -- so --
21   Q  So this was during your first year?
22   A  Yeah.  Yes.  Sorry, I shouldn't say "yeah."
23   Q  Could you tell whether you took a lunch on any of
24      these days, based on just looking at these
25      activity logs?
```

```
1    A    When I first started working here, I didn't put
2         specifically "no lunch" in the comment section.
3         It was after I received emails threatening
4         discipline that Jim May told me I need to document
5         when I was interrupted on here with "no lunch."
6    Q    Okay.
7    A    But I wasn't -- I didn't think I had to.  No one
8         told me when I was training --
9    Q    Sure, sure.
10   A    -- so I didn't know.
11   Q    And you weren't documenting when you took a
12        lunch --
13   A    No.
14   Q    -- on these?  And you weren't documenting when, at
15        least at that time, when a lunch was interrupted?
16        But you said you've changed that?  You now have --
17   A    Yeah.
18   Q    -- changed that?
19   A    Yes.
20   Q    So now, if we looked at -- suppose we looked at a
21        more recent activity log, and you had an
22        interrupted lunch, it would say that on there?
23   A    Most times, yes.
24   Q    Okay.
25   A    Every once in a while if I just get interrupted
```

1      for a couple minutes, I just don't write it in

2      there, because I just come right back to it.  I

3      mean, I can't say for 100 percent time that every

4      single time I've been interrupted I wrote it down.

5   Q  Sure, sure.  But you --

6   A  I'm more frequent with it.

7   Q  -- tried to make it your practice --

8   A  Yes.

9   Q  -- that you were writing "interrupted lunch" where

10     that happened?

11  A  Yes.

12  Q  Okay.  If we looked at a more recent activity log,

13     would it say when you had uninterrupted lunches?

14     Would it say you had -- when you just took a lunch

15     and you weren't otherwise called off?

16  A  No.

17  Q  So you -- there was never any tracking of

18     uninterrupted lunches?

19  A  No.

20  Q  Okay.  How do you determine when you're going to

21     take your meal break?

22  A  When I'm hungry.  It's usually --

23  Q  That's a good answer.

24  A  Realistically, it's usually when I'm hungry.  I

25     don't ever have a set time.  Now, if, you know, I

```
 1        am hungry, and I'm doing something that, you know,
 2        there's a combative patient in ER, I can't leave
 3        to take my lunch.
 4                    Would I like to take my lunch then?
 5        Yeah, because I'm hungry, you know, I want to eat.
 6        But, you know, it's the priority thing.  What's
 7        more important?  Me dealing with this patient that
 8        could potentially hurt one of my fellow employees,
 9        or me eating lunch?
10   Q    Yeah.
11   A    You know, so -- but usually it's when I'm hungry,
12        or on a busy night, when I have a chance.
13   Q    Okay.  And you're the person making that
14        determination?
15   A    Yes.
16   Q    You're not told by someone?
17   A    By this time I have to take a lunch?  No.
18   Q    And especially, I would imagine, and when you're
19        working by yourself, there's not anyone -- there's
20        no supervisor on shift?
21   A    No.
22   Q    So let's just sort of go back.  And what we were
23        talking about is sort of a typical shift, and we
24        were talking about a typical shift at Burlington.
25   A    Okay.
```

```
 1   Q    Now, there's a number of other places you had
 2        experience with, so let's -- you know, maybe we
 3        can avoid going through the whole set of questions
 4        by just sort of drawing out some of the
 5        differences between Burlington and some of the
 6        other facilities.
 7   A    Okay.
 8   Q    So the other facility that we talked about was
 9        Lakeland.  Previously we talked about the shifts
10        that you were working there.  Any differences
11        between when you show up?
12   A    Most times when I worked at Lakeland I would come
13        in at eleven when I was working third shift.  And
14        then if I was working a first shift, like in the
15        past couple months when I had been working there,
16        I would come in at seven.
17   Q    Okay.  You would swipe in to Kronos?
18   A    Mm-hmm.
19   Q    Were you asked to carry communication devices at
20        Lakeland?
21   A    Yes.
22   Q    And which devices?
23   A    While I was working, yes.  Not outside of work.
24   Q    Yeah.
25   A    Same devices as at Burlington.  Cell phone, pager,
```

1          radio and keys.

2     Q    And that was a single-person shift?

3     A    Yes.

4     Q    Okay.  Which is similar to Burlington?

5     A    Yeah, Lakeland and Burlington are very similar in

6          their activities and what a nightly routine or

7          daily routine looks like.  They're very

8          comparable.

9     Q    Okay.  So did you keep activity logs at

10         Burlington?

11    A    These were Burlington's.

12    Q    Oh, these were Burlington's?

13    A    And yes, I did keep them at Lakeland.  I knew what

14         you were asking.

15    Q    Yeah.  Okay.  So the documents that we looked at

16         that were marked as Exhibit 18 were --

17    A    These are Burlington's.

18    Q    -- Burlington, and if you had ones at Lakeland it

19         would be similar?

20    A    They're a little bit similar.  I can tell these

21         are Burlington's because Lakeland has a separate

22         column in the middle between time started and time

23         completed.

24    Q    Gotcha.

25    A    So I would know that it was theirs.

1   Q    But you were otherwise doing similar tasks?

2   A    Yes.

3   Q    Rounds, etc. --

4   A    Yep.

5   Q    -- then answering or responding to activities as

6        they came up?

7   A    Yeah.  A typical night or day at Burlington is

8        very comparable or similar to a typical night or

9        day at Lakeland.

10  Q    Okay.  Let's talk about Kenosha for the shifts

11       that you've worked there.  Any differences in when

12       you first showed up, swiping in, getting your

13       original assignment?

14  A    Depend on what shift I worked.  Like I say, I

15       believe I usually worked second shift there when I

16       did.  I haven't worked there in a while.

17                  The way that their system is

18       different from Burlington and Lakeland is because

19       they have at least two officers working a shift.

20       And depending on who was working, you know, the

21       one -- one officer would take the central

22       monitoring station first, and then they would sit

23       in there for roughly two hours.

24                  And then the other officer would do

25       rounds, patrols, lock-ups and, you know, general

```
 1        calls for service.  If a call came through the
 2        central monitoring station, that officer would
 3        call the patrol officer and tell them, you know,
 4        you need to go here for this reason.  After
 5        roughly about two hours, they would switch and so
 6        on.
 7   Q    Yep.
 8   A    And while you were the patrol officer, that is
 9        when you took your lunch, but you needed to keep
10        your radio on, because if there was a call for
11        service, that -- the central monitoring station
12        officer could not leave that station, so you had
13        to respond --
14   Q    Okay.
15   A    -- to it.  So it's very similar to Burlington and
16        Lakeland, just, you know, you had to do the
17        central monitoring station as well.
18   Q    And had you done both patrol officer duties and
19        central monitoring station duties during your
20        shifts at Kenosha?
21   A    Yes.
22   Q    Okay.  So let's just talk a little bit more about
23        the radios or other communication devices at
24        Kenosha.  Was it -- was it when you showed up, did
25        you grab just a radio?  Did you grab more than a
```

```
 1         radio?  Example, pager, cell phone?
 2    A    I don't remember, to be completely honest with
 3         you.  I know that I had a radio for sure, and I
 4         believe there was a pager, but I don't remember.
 5         And Kenosha, I don't think has a cell phone,
 6         because they have a 24-hour central monitoring
 7         station, that if you needed to get a hold of an
 8         officer on duty, you called that station, and
 9         someone answered.  It wasn't like, how if people
10         called our office at Burlington, and we may be in
11         there, or we may not answer.
12    Q    Yeah.
13    A    You know, we didn't need a cell phone at Kenosha,
14         because there was always someone to answer that
15         call.
16    Q    In the CMS?
17    A    Yes.
18    Q    Okay.  And how was -- were the radios the same,
19         two-way radios?
20    A    Yes.  I don't know if they were the same brand,
21         but they worked in the same concept of how they do
22         at Lakeland and Burlington.
23    Q    And was it -- so if someone was making a request
24         over the radio network, would both officers hear
25         it?
```

```
 1   A    Yes.
 2   Q    And was it -- was it one officer's responsibility
 3        primarily to handle the call, or to determine who
 4        handles the call?
 5   A    It would be whoever was patrol officer at that
 6        time that the call came in who would handle it.
 7   Q    So they would be the -- they would be -- if a call
 8        came in and both the patrol officer and the CMS
 9        hear that call, the patrol officer knows that
10        they're supposed to be the person who responds to
11        the call?
12   A    They're expected to be that person to respond to
13        that call.
14   Q    Okay.
15   A    Because the officer at the CMS station cannot
16        leave for any reason.  They can't leave.
17   Q    Gotcha.  And what is -- what, again, is the
18        officer in the CMS station doing?
19   A    They are monitoring cameras, C-Cure, which is a
20        door alarming system, but there's also, you know,
21        other alarms that come on there, like a burglar
22        alarm, motion alarm.
23             And they monitor, you know, all the
24        Kenosha-area stuff.  I know that they monitor some
25        of Burlington's alarms, and some of Burlington's
```

```
 1        alarms go up to St. Luke's.  So I don't really
 2        know what all facilities they monitor at that
 3        specific spot, but I know that there's a lot of
 4        them.
 5    Q   And they need to be in that room?
 6    A   Yeah.  Because if someone broke into a pharmacy,
 7        that would come up on that.
 8    Q   They would see that?
 9    A   Yeah.
10    Q   And then what would they do about it?
11    A   They would acknowledge the alarm and call the
12        appropriate -- excuse me, the appropriate people
13        to respond to that, whether it be the manager of
14        the pharmacy or the police or whoever was on their
15        contact call list.
16    Q   Okay.  And then sort of walk me through how -- how
17        the officers would take a lunch in that two-person
18        set-up?
19    A   When you were the patrol officer, you took your
20        lunch when you were that position, not at central
21        monitoring station.  Because if -- at central
22        monitoring station, you have to continuously
23        monitor these alarms, monitor these cameras.
24    Q   So you never -- no one -- officers who were in the
25        CMS did not take lunch while they were in the CMS?
```

1  A     They have, if they didn't get a chance to take it
2        during the patrol position.
3  Q     Okay.
4  A     And, you know, if they're hungry, and they didn't
5        get to take it while it was their turn, you know,
6        and they want to eat, you kind of work while you
7        eat.
8  Q     Okay.
9  A     And that's pretty much how we adapt down in the
10       south region, is you work when you -- if you need
11       to while you eat.
12 Q     Yeah.  So in a normal situation where the patrol
13       officer was taking -- taking their lunch, what
14       would -- what would that officer do with their
15       radio?
16 A     They would have -- they are required to keep it
17       on.
18 Q     Okay.
19 A     Because if a call for service came in, they needed
20       to respond to that.
21 Q     And did -- did -- in your experience, would you --
22       if you're taking lunch as the patrol officer,
23       would you communicate to anyone, either the CMS or
24       anyone else, I'm taking my lunch?
25 A     You do, occasionally, yeah.  Sometimes, you know,

```
 1        if -- you don't, but most times you would
 2        communicate to the central monitoring station
 3        itself that, you know, I'm -- hey, I'm going on
 4        lunch, don't call me unless you need me kind of
 5        thing.  Because if it's something that, you know,
 6        they get a call in that can wait till after your
 7        lunch, they will, but generally the calls that
 8        they get need to be acknowledged immediately.
 9   Q    Okay.  And on that same question, just going back
10        to some of the other facilities, the one-person
11        facilities, Lakeland and Burlington, would you
12        radio to anyone that you're taking a lunch?
13   A    I have.  Not on a regular basis.  If I was really
14        busy that night and actually wanted not -- people
15        to try not to call me where I, you know, have
16        finally found ten minutes where I can eat, and I
17        told them, you know, I'm taking my lunch now,
18        don't call me unless you need me, I have.
19                  But generally, if I'm just eating
20        my lunch, I wouldn't tell them, because I would
21        have to either call every single unit, or walk
22        around to every single unit, because, I mean,
23        there's numerous units in the hospital that are
24        open.  It's not just the ones that have radios.
25                  The ones that don't have radios
```

```
 1      have computers that page me, have phones that page
 2      me, or have phones that can reach my department
 3      cell phone.  And even if I do tell every single
 4      person in that unit, or in the hospital at a unit,
 5      there's always one nurse that's in the room when I
 6      tell them.  And they come back, oh, I need this
 7      from security, and they page me after I told
 8      everyone else that I was on lunch.
 9                  So from experience, I've learned it
10      doesn't matter if you tell them that you're on
11      lunch, because someone who didn't hear the memo
12      still calls you.  So it's just -- I don't know.
13      It just -- it's frustrating.  You know, I go
14      through and tell everyone -- go through the
15      trouble, walk around, tell everyone, I'm going on
16      lunch, I'm going on lunch, and then it's the one
17      person that's in the room that comes back, and oh,
18      I need a box lunch, or I need this equipment for
19      this patient, and I'm going to call security while
20      I'm on my lunch.  It's frustrating.
21                  MS. NOVOTNAK:  When you say "in the
22      room," do you mean patient room?
23                  THE WITNESS:  Yes.  They're in a patient
24      room or in the bathroom or -- not in the nurse's
25      station when I tell them I'm going on lunch.
```

```
 1  BY MR. NICKELS:
 2  Q    How many different areas would you -- if you were
 3       doing that, telling them you're going on lunch,
 4       how many different areas would you tell that to?
 5  A    What hospital?
 6  Q    Burlington.
 7  A    One, two, three, four, five -- five-ish.
 8  Q    And some of them had radios, but some of them did
 9       not, you said?
10  A    Yes.  At the -- or I should say roughly after
11       nine o'clock, the main admitting did not have --
12       or there was no one there, so that radio was just
13       kind of there, and there was no one to touch that
14       radio.
15  Q    Okay.
16  A    But in ER admitting and OB, there are people in
17       that unit that have access to that radio
18       throughout my entire shift.  But I would say a --
19       primarily the numbers of calls I got in,
20       90 percent of them were pager.  So it was the
21       computer that everyone had our pager number that
22       every single person in the entire facility had
23       access to a computer to be able to page us.
24  Q    Okay.
25  A    The radios were more kind of for an emergency
```

```
 1        response.
 2   Q    Okay.  If there was a combative patient, you know,
 3        they'd call on the radio because it's, you know,
 4        that many less steps to get a hold of me.  That's
 5        why the two most important units have that radio,
 6        as in ER and OB.  If there was an infant abduction
 7        or something and they needed me to respond, like,
 8        now or five minutes ago, then they'd call me on
 9        that.  And that's when I, like, run to wherever
10        they called from.  Because I know if they call me
11        on that, it's usually for something important.
12                   MR. NICKELS:  Okay.  Maybe now would be
13        a good time to take a little break?
14                   MS. NOVOTNAK:  Sure.
15                   (A recess was taken from 5:17 p.m. to
16        5:25 p.m.)
17   BY MR. NICKELS:
18   Q    Okay.  Let's just sort of talk generally.  Lisa,
19        you know, why don't you describe in your own words
20        for me your basis for being a plaintiff in this
21        lawsuit?
22   A    I feel, you know, reading the law, that if -- if I
23        am getting an unpaid lunch, I should be able to do
24        almost anything I want during that time.  It is my
25        time.  I am not getting paid for that time.  If I
```

```
 1        want to sleep during my lunch, I should be able to
 2        do so.
 3                        At Aurora, if they catch us
 4        sleeping, we get fired.  We are required to remain
 5        on call for the duration of our lunch period,
 6        which means we have to carry our cell phone, our
 7        keys, our pager, and our radio, and be available
 8        to that facility at moment's notice.
 9   Q    Okay.
10   A    You know, I feel I should be getting paid for my
11        lunch.  I am on call for my lunch.  There is no
12        one to relieve me of my duties while I'm on lunch.
13        I should be getting paid for that.
14   Q    Okay.  Were you issued a employee handbook when
15        you started working with Aurora?
16   A    Not at Burlington, no.  There is an officer
17        resource's manual that I believe the full-times at
18        Lakeland got issued, but I do not recall -- I may
19        be wrong.  I do not recall getting a handbook.
20   Q    What -- what is your understanding of Aurora's
21        meal break policy as it applies to security
22        officers?
23   A    My understanding is that we are allowed to leave
24        if we choose to do so, but we have to be able to
25        respond within, you know, such a period of time if
```

```
 1        -- if I'm on lunch, and I go to McDonald's that is
 2        15 minutes away, and there is a combative patient,
 3        my response time isn't going -- they're going to
 4        send emails to my boss saying, "She wasn't here
 5        when we needed her," you know.  And then I get
 6        reprimanded for that.
 7                    So, I mean, my understanding is
 8        we're allowed to leave if we want, but we have to
 9        carry all of our equipment with us, and we have to
10        be able to respond to those calls within a timely
11        manner back to that facility.
12   Q    When you say "allowed to leave," you mean the
13        premises you're working at?
14   A    Yes.
15   Q    Let's take a look at the document that was
16        previously marked as Exhibit 2.
17                    (A discussion was held off the record.)
18                    THE WITNESS:  This is online.
19   BY MR. NICKELS:
20   Q    Have you seen this before?
21   A    I believe this is what I printed off that came
22        from online.  This was part of Aurora's general
23        policies.
24   Q    Okay.
25   A    I don't believe I was given a printed copy of
```

```
 1        this.  This is online and accessible to any Aurora
 2        employee.
 3   Q    Including yourself?
 4   A    Yes.  I think this is what I faxed.  I don't
 5        remember the exact wording, but I believe that I
 6        faxed this in the papers that I sent.  Not this
 7        front page, but this page.
 8   Q    I think you did, too.
 9   A    Yeah, is that why you're showing it to me?
10   Q    Just looking at the second page, that's Bates
11        marked 000041, the third paragraph, you want to
12        just read that to yourself?
13   A    (Witness complies.)  Okay.
14   Q    And is that similar to your understanding of
15        Aurora's general rest and meal period policy?
16   A    For department-specific?
17   Q    For security officers, just the language that's in
18        paragraph 3?
19   A    In -- we don't have a policy in security on meals.
20        I've been threatened with discipline following
21        this.
22   Q    What -- what part of it did you follow that you
23        were threatened with discipline with?
24   A    It says, "If you were working at least six hours
25        and are unable to take an uninterrupted 30-minute
```

1        meal period, you must notify your supervisor and

2        have your meal period canceled in order to be

3        paid."

4                        When I was trained, Jim May told me

5        if I was interrupted from my lunch, you know, in

6        the beginning, to punch out "no lunch" on the

7        Kronos machine.  And he said, you know, he

8        monitors our Kronos and would notify that, and

9        that would be it, and that would be the

10       notification.

11    Q   Mm-hmm.

12    A   Now, when I got emails for canceling my lunch

13       period, they -- Jim May then said that if I'm

14       taking my lunch and it gets interrupted or

15       temporarily delayed for a call for service, that I

16       need to restart my lunch over and still not get

17       paid for my lunch.

18                        So generally what I do now to avoid

19       getting threatened with discipline, if my -- my

20       lunch has to be canceled two or three times before

21       I'll punch out "no lunch."

22    Q   And what do you mean when you say that?

23    A   My lunch -- when I'm eating my lunch during that

24       half-hour time, I would have to be called two or

25       three separate times during that time for me to

1      punch out "no lunch" to get paid for my lunch.

2   Q   Okay.  Are you familiar with Aurora's

3       Administrative Manual?

4   A   Not by you just saying "Administrative Manual."

5       Maybe if I see in the contents what's inside, I

6       might be able to.

7   Q   Sure.  Let me show you what was previously marked

8       as Exhibit 3.  And tell me if you're familiar with

9       this document?

10  A   No, I am not familiar with this.  If, you know,

11      maybe in the beginning of my employment, maybe I

12      saw it, but not anytime recently.  I don't recall

13      seeing this.

14  Q   Okay.

15  A   Yeah, I don't remember seeing this.

16  Q   Looking at the point 2, it says "meal periods"?

17  A   Mm-hmm.

18  Q   And then it goes down to A, B, C, then D?

19  A   Yep.

20  Q   Why don't you read that to yourself, and tell me

21      if that's your understanding of Aurora's meal

22      break policy.

23  A   It's -- pretty much says what this says here.  You

24      know, these -- the way it's worded to me sounds

25      like they're saying, you know, your supervisor

1    that's working the shift with you.  I don't have a

2    supervisor that works with me, you know, and from

3    my understanding, we are, like, the only

4    department that doesn't get paid for our lunch.

5                    There is one radiologist working a

6    shift.  She gets paid for her lunch, and she has

7    the same kind of guidelines that we do.  You know,

8    there's only one of them.  They carry a pager, and

9    they are expected to respond during their lunch as

10   the same as we, and they get paid for their lunch.

11   So -- but, I mean, this pretty much says the same

12   thing this says.

13 Q  And it says in the second sentence, it says --

14   well, from the beginning it says, "If employees do

15   not have an uninterrupted 30-minute meal period

16   because they are subject to resume working in less

17   than a half hour, such meal periods shall be

18   considered time worked"?

19 A  Yep.

20 Q  Do you agree with that?

21 A  Yes and no.  Now, employees that don't -- that can

22   leave their department -- example, nurses, if, you

23   know, they want to leave for a half hour and their

24   CNA or another nurse can handle their calls while

25   they're on their lunch, and they're not expected

```
 1        to respond, you know, then this pertains to them,
 2        I believe.
 3   Q    Mm-hmm.
 4   A    But now, if they have to carry equipment that
 5        makes them accessible to their unit, and they're
 6        on, quote, on call for their lunch, they should be
 7        getting paid.  And I believe almost every
 8        department in, at least Burlington, gets paid for
 9        their lunch.
10   Q    Let's -- let's -- and let's try to keep it to your
11        experiences --
12   A    Okay.
13   Q    -- in your role as a security officer.  So this
14        says where employee does not have an uninterrupted
15        -- "does not have an uninterrupted 30-minute meal
16        period because they are subject to resume working,
17        such meal periods shall be considered time
18        worked."
19   A    Mm-hmm.
20   Q    So that says if your shift is -- if you're
21        interrupted during your shift, then that meal
22        period is considered time worked.  Do you agree
23        with that?
24   A    From what this says, yes.
25   Q    Okay.  Take a look at another document, which was
```

```
 1        previously marked as Exhibit 4.  This is also from
 2        Aurora -- Aurora's Administrative Manual, titled
 3        "Nonexempt and Exempt Employee Policy."  Are you
 4        familiar with this document?
 5   A    I do not remember reading this.  Maybe -- I may
 6        have seen it in the beginning of my employment,
 7        but not anytime recently.  I don't remember seeing
 8        this document ever.
 9   Q    Okay.  Do you know whether you had access to
10        Aurora's Administrative Manual or not?
11   A    If I did, I wouldn't know where to go to get it.
12   Q    Okay.
13   A    All I know is how to get this here, this employee
14        handbook that was this exhibit.
15   Q    Marked as Exhibit 2?
16   A    Yeah.
17   Q    Okay.
18   A    That exhibit, that one.
19   Q    Sounds good.  I'm going to show you a document
20        that was previously marked as Exhibit 5.
21   A    It's a newsletter.
22   Q    What's your understanding of newsletters issued by
23        Michael Cummings?  Have you received these --
24        let's not talk about these specifically, but
25        generally?
```

1    A    Yeah.  Yes, I have received them.  I haven't
2         received one in a while, because they don't come
3         out very often, maybe a couple times a year.  I
4         don't know if this is the one I sent -- I did send
5         one of these when I faxed the information, and I
6         had a part highlighted on it, but I can't recall
7         if this was it or not.
8    Q    So there's two -- there's two newsletters that are
9         part of this exhibit.  The first one is dated
10        January/February 2003, which is --
11   A    Before I started.
12   Q    -- well before you started.  Do you know whether
13        you've seen this document before?
14   A    I have not seen this first one, no.
15   Q    Okay.  And then the second is dated January 2010?
16   A    Then, yes, I've seen this one, and it's probably
17        the one that I sent, if I could -- "Reminder on no
18        lunch policy," yeah.
19   Q    You provided a similar document?
20   A    I -- yes.
21   Q    So take a look at that.  You're reading the
22        section titled "Reminder on no lunch policy"?
23   A    Yes.
24   Q    And it's on page 147914?
25   A    Yeah.

WWW.GRAMANNREPORTING.COM • 414.272.7878
**GRAMANN**
*Innovation · Expertise · Integrity*  REPORTING

```
 1   Q    Why don't you read that, and tell me if that's
 2        your understanding of Aurora's policy or not.
 3   A    (Witness complies.)  Kind of.  It's -- I mean,
 4        what they say and what they write is different.
 5   Q    So what -- what's different about what they say or
 6        what they write --
 7   A    Jim May --
 8   Q    -- here?
 9   A    -- always said, you know, if you're taking your
10        lunch and it's just temporarily delayed, I believe
11        is what he put in the email, you know, it is
12        temporarily delayed for a call for service, you're
13        just to start your lunch over.
14                  Now, what this is saying, the --
15        referring to the document that we were just
16        talking about, it's saying if I'm interrupted one
17        time, I am to punch out "no lunch."  But I've been
18        threatened with discipline doing that.
19   Q    Okay.
20   A    When, you know, they're saying in the paragraph,
21        "Other staff who work at single-officer sites
22        should advise switchboard to hold routine calls
23        for the lunch period," we don't have a switchboard
24        at single-officer sites, and I think that Metro is
25        different.  The Metro region and Aurora is
```

```
1        different.  They have a switchboard that, you
2        know, can send them to calls.  We don't.  The --
3    Q   Which facility is that, that you were just
4        referring to?
5    A   That has a switchboard?
6    Q   Yeah.
7    A   West Allis has one.
8    Q   And you've worked at West Allis?
9    A   Yes.  Lakeland and Burlington, I know that they
10       have like, technically a switchboard, which is
11       their operator, but they don't -- they just
12       forward calls to other, you know, people.
13                   Like, if I call the main number, I
14       need to talk to, you know, this patient in the
15       ICU, you know, they would forward you to the ICU.
16       The switchboard is different in Metro than it is
17       in south region.  So there is no one to hold,
18       quote, hold my calls in south region.
19   Q   But there is someone to hold calls at West Allis,
20       Metro?
21   A   Granted that the calls came through the
22       switchboard.  Now, if they were received through
23       the central monitoring station, you know, they can
24       call -- they can say, you know, well the officer
25       is on lunch, if it's a non-emergency call, but if
```

1      it's an emergency call, that officer is still

2      expected to respond, or if it's a call that can't

3      wait until that officer is off of lunch.

4                     For example, if a nurse needs some

5      kind of equipment for a patient that's sick, we're

6      not going to say, "Oh, sorry, we're on lunch.  We

7      can't get that for that patient."  Because that

8      doesn't support Aurora's philosophy on, you know,

9      that the patient, you know, deserves the best.

10     And for me to say, "Sorry, I can't help you until

11     I'm off of my lunch," does not support that

12     philosophy.

13                     And I don't believe that.  I don't

14     think someone who is sick in the hospital should

15     have to wait until I'm done eating my lunch to

16     help them.

17  Q  Would you consider that an emergency situation?

18  A  In my opinion, yes, because that patient needs

19     something that I can give to them.  I would expect

20     the same in return.  You know, it -- I don't know

21     how else to say it.  It's just the way I was

22     raised, the way I was taught, you know, being

23     work -- being asked to do something --

24                     You know, if it's someone that, oh,

25     I need you to unlock this door, no big hurry, you

```
1        know, I just need to put some paperwork in there.
2        Okay.  Fine.  I'll wait till after my lunch to do
3        that.  I'm on my lunch, you know, when I'm done
4        I'll come find you, and I can do that for you.
5                       But if they are specifically
6        saying, "I need this IV tubing for this patient,"
7        maybe that IV tubing is critical to that patient.
8        Maybe they need that medicine that needs to get
9        in -- and if something happened to that patient,
10       and it could have been prevented by me responding
11       to that --
12    Q  Sure.
13    A  -- immediately, that's just something morally I
14       couldn't live with.
15    Q  Sure.  So you just described situations -- there
16       are situations where the requests will wait -- can
17       wait till the end of your lunch period?
18    A  Yeah.
19    Q  And there's situations where you feel the request
20       cannot wait till the end of your lunch period?
21    A  Yes.
22    Q  Okay.  And would you group those into emergency
23       and non-emergency in your mind?
24    A  Sure.  We can -- we can say that.
25    Q  Okay.  So there's certain situations where you're
```

```
 1        interrupting your lunch, and certain situations
 2        where you're not interrupting your lunch.  I just
 3        want to get back to this document that you were
 4        reading here, which is Exhibit 5?
 5                 MS. NOVOTNAK:  Yeah.
 6                 THE WITNESS:  Yes.
 7   BY MR. NICKELS:
 8   Q    Yeah.  And if you look at the last sentence on
 9        page 147914, it says, "If a lunch period is
10        interrupted for an emergency call, the officer
11        should begin a new lunch period when available.
12        And if a 30-minute period is not taken, the time
13        recording system should be programmed as no
14        lunch."  How is that inconsistent with what you
15        said Jim May was telling you about restarting your
16        lunch?
17   A    Well, let me reread this again, because the way
18        that it reads to me is agreeing with what Jim May
19        says.
20                     If a lunch period is interrupted
21        for an emergency call, the officer should begin a
22        new lunch period so that -- you know, start
23        over -- available.  And if a 30-minute period is
24        not taken, the time recording system should be
25        programmed as no lunch.  So when I read that, it
```

```
 1        agrees with what Jim May says, saying, you know,
 2        you're to start your lunch period over, and then
 3        if that 30 minutes is -- is uninterrupted -- or
 4        interrupted, then you punch out "no lunch."
 5        That's how I translate that.  And I don't know if
 6        I'm just reading it wrong, but that's how --
 7   Q    So there's -- there's -- your understanding is
 8        that there is a restart your lunch policy?
 9   A    Pretty much, yeah.
10   Q    And Jim --
11   A    Unwritten restart your lunch policy.
12   Q    But we're reading it right here, right?  In this
13        newsletter, at least?
14   A    Yes.
15   Q    And it's -- Jim -- there's a lot of Jims.
16   A    I know, it's confusing -- Jim May.
17   Q    Jim May had said this, and Mike Cummings is saying
18        this, and it's that if your lunch is interrupted,
19        you're supposed to try to take -- to restart that
20        lunch?
21   A    Yes.
22   Q    You would agree that that's your understanding --
23   A    Yes.
24   Q    -- of the lunch policy?
25   A    Yes.
```

1   Q    Okay.  Do you know whether there's, like, a time

2         limit if you're five minutes into it, or if you're

3         25 minutes into it?  Is there a difference --

4   A    In my --

5   Q    -- in your --

6   A    -- opinion, yes.  Because if I am on my lunch, and

7         if I heat something up, and I am stuck outside

8         with Flight for an hour and a half, I'm punching

9         out "no lunch," because whatever I made is going

10        to taste like crap, and I'm probably not going to

11        eat it.

12                You know, so then I'm going to

13        punch out "no lunch" right away.  If it's, you

14        know, I need to deliver something to a patient,

15        and it takes me ten minutes, I'll restart it.  And

16        then if it does it again or one or two times after

17        that, then I'll punch out "no lunch."

18  Q    Okay.

19  A    But, I mean, in my opinion, yes, if it's something

20        that requires a duration of time that is expected

21        of me that I cannot return, then I will punch out

22        "no lunch," like, with the first time.  Because me

23        coming back, I'm probably not going to eat my

24        lunch anyway, because it's --

25  Q    So to you it depends on the nature of the -- and

```
 1        length of the interruption?
 2   A    Yes.
 3   Q    So let's talk about -- well, actually, I had a few
 4        more questions on this.
 5   A    Okay.
 6   Q    So I just want to make sure you did say there's --
 7        has there been situations where your lunch was
 8        interrupted, and then you restarted the lunch
 9        later in the shift?
10   A    More occasions than not, if I would punch out "no
11        lunch," that was that -- that was the reason.
12   Q    I don't think I -- I don't think I followed your
13        answer there.  So just -- let's sort of isolate
14        it.  If we're talking about restarts.
15   A    Okay.
16   Q    So you're trying to take a lunch; it gets
17        interrupted.  Has there been situations where
18        you've restarted your lunch?
19   A    Yes, numerous times.
20   Q    And then in some of those situations, has there
21        been times where the restarted -- where you were
22        able to take a -- then take a 30-minute lunch --
23   A    Uninterrupted --
24   Q    -- in full?
25   A    -- yes.
```

1    Q    Yes, okay.  So that has happened sometimes?

2    A    Yes.

3    Q    And then there's times where you try to restart

4         your lunch, and then it gets interrupted again?

5    A    Yes.

6    Q    And then did you testify that it's your practice

7         to, at that point you'll say "no lunch" -- you'll

8         cancel your lunch in Kronos?

9    A    Depending on the call that was received.  You

10        know, if it was something that required me 15 more

11        minutes of my time, you know, when -- or if I was

12        almost done eating my lunch, I won't punch out "no

13        lunch," because I was almost done.  And what am I

14        going to do for another half hour, you know?

15                  But if it was something where I had

16        just started eating my lunch again, five or ten

17        minutes into my break, example, and then I get

18        called away again.  And then I -- then it just

19        comes to me not being able to eat my lunch again.

20        You know, if it's towards the end of my lunch,

21        I'll just say whatever, and I'll just not punch

22        out "no lunch."  But if, you know, if it's the

23        second or third time that I get called again, then

24        I'm going to punch out "no lunch."

25    Q    Okay.  How do you determine whether to interrupt

1          your lunch in order to perform a task?

2     A    Just on, you know, what's the word I want to --

3          that I'm looking for -- that determines if it can

4          wait until after my lunch or not.  It's just my

5          perception if that can wait.  And more times than

6          not, it can't wait until after my lunch.

7     Q    More times than not it cannot wait?

8     A    Yep.  Which means most times when I get a call, I

9          perform them when they're received and not after

10         my lunch.

11    Q    Okay.  What sorts of tasks do you interrupt -- do

12         you decide are going to interrupt your lunch?

13    A    If a unit calls me, they need help lifting a

14         patient, or they need help moving a patient, they

15         need help now.  They don't need help 30 minutes

16         from now when I'm off my lunch.

17    Q    Okay.

18    A    You know, working at the smaller sites, there's

19         not very much staff that's working, and they call

20         us because they need help, because there's no one

21         else to help them.

22                        You know, and that goes with, you

23         know, the supplies that may be needed for a

24         patient.  If they call me, I need this supply for

25         this patient, they don't always tell me, you know,

```
 1        if it's an emergency or not.  You know, if it's
 2        some kind of IV tubing, I'm going to assume that
 3        that patient needs that tubing and that's why
 4        they're calling me, because they need it now.
 5                    Unless, you know, it's like a
 6        toothbrush or something.  You know, we don't get
 7        called for that, but that's just an example.
 8   Q    Sure.
 9   A    If it was some kind of equipment like that then I
10        would say, "You know, I'm on my lunch right now.
11        I will get that as soon as I am done."  But it's
12        the stuff that needs to be done now, the moving
13        patients, lifting patients, combative patients,
14        escorts, someone needs to -- a visitor needs to
15        know how to get up here to see their dying family
16        member.  You know, that can't wait, and there's no
17        one else to do it in the shifts that I work.
18   Q    So -- so in your opinion, would you consider those
19        emergency situations?
20   A    Yes, I would.
21   Q    Okay.  But there's also situations you've just
22        said where you don't interrupt your lunch?
23   A    Not very often, but there is times, yes.
24   Q    Those situations have existed?
25   A    Yes.
```

1   Q   Okay.  Just so we make sure we're on the same

2       page, what is your understanding of the --

3       Aurora's 30-minute automatic lunch deduction?

4   A   If I work over six hours, the Kronos machine just

5       takes 30 minutes of my time out, and it -- if I

6       worked 12 hours, it schedules me for 11 and a

7       half.

8   Q   Unless you cancel your lunch?

9   A   Unless I -- yes, unless I cancel my lunch.

10  Q   And you have -- have you ever canceled your lunch

11      in Kronos before?

12  A   Yes.

13  Q   How frequently would you say that you have

14      canceled your lunch in Kronos?

15  A   I used to cancel it more often before I got

16      threatened with discipline, but now maybe once,

17      twice, maybe a month, if that.  That's on very

18      rare occasions.

19  Q   So tell me about what you mean when you say you

20      were "threatened with discipline."  Who threatened

21      you with discipline?

22  A   Jim Sagan sent me emails saying, you know, if you

23      keep -- because -- all right.  Let me clarify.

24      When I was hired, my assigned shifts were from

25      seven -- or 7 p.m. to 7 a.m.  It did not say

WWW.GRAMANNREPORTING.COM · 414.272.7878

**G**
**GRAMANN**
REPORTING
*Innovation · Expertise · Integrity*

```
 1        7:30 a.m.  I was told when I started in my
 2        training that those were my hours to be worked,
 3        7 p.m. to 7 a.m.  Now, sometime after I had
 4        started -- oh, you need to stay till 7:30 a.m.
 5        Okay.  So I would stay till 7:30 a.m.  Now, those
 6        emails that Jim's saying is I shortened shifts
 7        because of uncanceled -- or because of canceled
 8        lunch breaks, when I was not assigned till
 9        7:30 a.m.  So technically, I am not shortening my
10        shifts when I wasn't assigned to that time period.
11   Q    Well, what do you mean when you say you weren't
12        assigned to it?  How did it show up in the
13        schedule?
14   A    Job posting when I applied, it says the hours that
15        you apply for.  We work the same hours, generally,
16        every week.
17   Q    Yeah.
18   A    The same hours, same people work.  And in the
19        schedule, it generates as 7 p.m. to 7 a.m., not
20        7:30.  It says till 7 a.m., and that was --
21   Q    And that's in the -- what schedule?  The schedule
22        that tells you what shifts you're supposed to
23        work?
24   A    Yes, at Burlington.
25   Q    Okay.
```

1   A   Now, when -- I've noticed on their postings now,

2       when they post job positions on the internet, it

3       says, you know, eleven to 7:30 now.  But when I

4       was hired, it didn't say that.  It said till

5       7 a.m.  It did not say till 7:30.

6   Q   And what do the schedules say now?  Do they say

7       till 7:30, or do they say till seven?

8   A   I'm not assigned those hours anymore.  I accepted

9       a new position at corporate, and my assigned hours

10      for corporate is eleven to 7:30.  So it says third

11      for third shift, but those are the third shift

12      hours from seven -- or eleven to 7:30 in the

13      morning.  Eleven at night to 7:30 in the morning.

14  Q   You're not aware of -- I mean, you said you just

15      switched in late February, so prior -- to

16      corporate in late February.  So prior to that you

17      don't recall what your scheduled shifts said?

18      Whether they said --

19  A   The schedule said 7 p.m. to 7 a.m. at Burlington.

20      They said seven.

21  Q   And does it still say that today?

22  A   No, because I'm not assigned those hours anymore.

23      So it does not say my name, but the old

24      schedules -- we have all the schedules, past

25      schedules, and they would still say that.

```
 1   Q      So --
 2   A      I have emails with those schedules.
 3   Q      -- to the best of your recollection, your most
 4          recently scheduled shift at Burlington, what would
 5          it have said?  This would have been in February of
 6          this year, right?
 7   A      No.  It would have been the end of December.
 8   Q      Okay.
 9   A      Because in December until just last week, I was at
10          Lakeland.  And my technical transfer date in the
11          computer system said late February, the 27th, but
12          I was still at Lakeland until last week, because
13          they needed help down there.  So I still stayed
14          down there.  So my last shift at Burlington was at
15          the end of December, and it would say 7 p.m. to
16          7 a.m., not 7:30.
17   Q      And that was at Lakeland, you said?
18   A      Burlington.
19   Q      Okay.  And what did the schedule at Lakeland say?
20   A      All different hours.  We were -- we're so
21          short-staffed there, you know?  Some days I was
22          scheduled first shift, and it was expected that I
23          would -- it just said one on the schedule.  And
24          it's expected that your first shift schedule is
25          from 7 a.m. to 3:30 p.m.
```

```
 1                        Now, the rule at Lakeland is if you
 2        work a 12-hour shift, you work a strict 12-hour
 3        shift, and don't stay for that extra half hour
 4        during shift change.  So, for example, if I worked
 5        7 a.m. to 7 p.m., I left at 7 p.m., not 7:30.
 6   Q    At Lakeland?
 7   A    At Lakeland.
 8   Q    But if it was an eight-hour shift?
 9   A    I was expected to stay that half hour, yes.
10   Q    And do you now understand what the purpose of that
11        half hour was?
12   A    Shift change.  But at the one-officer sites, you
13        know, this happened.  It takes two seconds for me
14        to tell them what is important for them to know,
15        you know.
16                        Say there -- for example, we had a
17        guy that came into the ER numerous times through
18        my time there.  He's very, very, very combative.
19        It is important for that officer to know that he
20        is still in that facility and know exactly where
21        that location of that individual is so he can
22        respond at a faster time than saying, oh, what
23        room is he in?  Oh, he was moved from here to
24        here?  No, you need to know where that person is.
25        You know, and it's important for me to tell him
```

1          that.

2                    But it only takes me two minutes,

3          if that, to say, hey, this person here -- they

4          know who he is, because he comes in on a regular

5          basis -- this person's here.  He's in this room.

6          He's done this since I've been here.  Patrol that

7          area more often.  Two minutes.

8    Q    At some point you did come to understand that the

9          shifts were scheduled from -- for eight and a half

10         hours?

11   A    After I got those emails, yes.

12   Q    When did you get these emails?

13   A    Middle of '09.  I don't know the exact date.  I

14         don't remember, but I --

15   Q    Would that have been shortly after you started

16         working?

17   A    Couple -- maybe a couple months after, yes.  Is

18         that right?  Ballpark area.

19   Q    Middle of -- yeah, well, yeah.  You said you

20         started in --

21   A    March, end of --

22   Q    Yeah, March.

23   A    -- like middle of March, so it might have been a

24         couple months after.  Maybe the last one was

25         towards the end.  I don't recall exactly.

WWW.GRAMANNREPORTING.COM • 414.272.7878
*Innovation · Expertise · Integrity*
**GRAMANN**
REPORTING

```
 1   Q    So what was -- what was this -- these emails were
 2        from Jim Sagan?
 3   A    Some of them were from Jim May.  Some were from
 4        Jim Sagan.
 5   Q    And they were saying that you can't shorten your
 6        lunch hour -- I'm sorry, you can't shorten your
 7        shift?
 8   A    Shorten the shift due to unpaid meal periods.
 9   Q    Okay.
10   A    And, like I said, when I was hired, the
11        understanding of the job posting was that my
12        assigned hours were from 7 p.m. to 7 a.m., not
13        7:30.
14   Q    Was there anyone else that you felt was
15        discouraging you from canceling your lunch?
16   A    It was Jim Sagan, primarily.
17   Q    And he is the supervisor for the south region?
18   A    Yes.  He is who my direct supervisor reports to at
19        that -- at Burlington would been -- my direct
20        supervisor would have been Jim May.  Jim May would
21        have responded or reported to Jim Sagan.
22   Q    Okay.  And you said you got emails from Jim Sagan
23        and some from Jim May?
24   A    Yes.
25   Q    But no one -- you don't feel that anyone else was
```

1   discouraging you from taking -- from canceling
2   your lunch in the Kronos system besides those two
3   individuals?
4   A   No.  Because I didn't, you know, talk to anyone
5   else.  The higher up in command, we don't talk to
6   them unless it's a dire emergency that needs their
7   attention immediately.
8   Q   Aside from the emails that said that you're not
9   supposed to cancel your lunch to shorten your
10  shift, was there anything else that you felt was
11  discouraging you from canceling your lunch hour?
12  A   Just being told by Jim May, you know, you can't
13  cancel your shift every day, or being told by Jim
14  Sagan, you can't cancel your lunch every day or
15  whatever.  You can't -- being told that directly,
16  and then being followed by emails, it's -- it's
17  intimidating when you first start somewhere, you
18  know.  And it's -- I just started, and I was being
19  told to do this, and I can't do this, and okay,
20  and that's, you know, that's what I followed.
21  Q   So after you came to understand that the shift --
22  that some of these shifts were scheduled for eight
23  and a half hours and that you weren't supposed to
24  cancel a lunch to shorten your shift, are there
25  situations -- first of all, you -- you did come to

1     understand that at some point?

2  A   Yes.

3  Q   Okay.  Were there situations where you were

4     canceling your lunch because your lunch was

5     interrupted?

6  A   Yes.

7  Q   And that you -- and in those situations, did you

8     -- you canceled your lunch, correct?

9  A   Sometimes yes, sometimes no.

10 Q   Okay.

11 A   I've -- you know, once Jim May told me I needed to

12    start noting when my lunches were interrupted on

13    that activity daily log, I did that.  But if you

14    corresponded those logs with the dates and my

15    Kronos with the dates; if I put "no lunch" on

16    that, it would not say "no lunch" every time in my

17    Kronos.

18 Q   Did you feel that that was an unfair question?

19 A   What do you mean?

20 Q   When Jim May -- you testified that Jim May told

21    you to note in the activity logs when you had to

22    cancel a lunch.

23 A   Yes.

24 Q   Did you feel that that was an unfair task for him

25    to ask you to do?

1  A    No.  Because Jim May agrees with us and feels that
2       we should be getting paid for our lunch, and
3       Jim May looks out for us.
4  Q    Okay.  When you cancel your lunch, do you get paid
5       for your lunch?
6  A    When I punch out "no lunch" on the Kronos machine,
7       yes.
8  Q    Okay.  So you would agree that in those
9       situations, you're being compensated for your
10      interrupted lunch?
11 A    Not every time, because not every time have I
12      punched out "no lunch."  Like I said earlier, if
13      it was just, you know, a temporarily -- temporary
14      call, if I'm on lunch and, oh, you know, this --
15      this patient needs that IV tubing, I would just go
16      run, get the IV tubing, take it up, and come back,
17      and then, you know, just finish my lunch.  And
18      then I wouldn't punch out "no lunch."
19 Q    But you could have restarted your lunch?
20 A    Per this policy, yes.  Per the emails and contact
21      I've gotten from my supervisors, no.
22 Q    Well, what you said is that what you were told is
23      if your lunch is interrupted you're supposed to
24      restart it?
25 A    Yes, restart it.

1    Q    And that's what the newsletter says.  So in that
2         example where you're running up to get an IV and
3         then you came back, why wouldn't you restart your
4         lunch?
5    A    Well, I did restart my lunch, but I wasn't being
6         compensated for it.  I wasn't being paid.  Just
7         because I restart it doesn't mean I'm getting
8         paid.
9    Q    Sure.  I understand that.  But you're restarting
10        your 30-minute lunch period?
11   A    Yes.
12   Q    Okay.  And then were you able to eat your lunch
13        for those 30 minutes?
14   A    For -- I would need a specific example, but if
15        generally, if I, you know, didn't punch out "no
16        lunch," and I didn't get interrupted maybe one or
17        two more times -- because there's been times where
18        I've been interrupted twice where I haven't
19        punched out "no lunch," because it would generally
20        be two of those same kind of calls.  And then by
21        that time I'm almost done with my lunch anyway,
22        and me taking a 30-minute lunch, what am I going
23        to do?  Twiddle my thumbs, you know, when I could
24        be working?
25   Q    So in those situations you wouldn't choose to

```
 1        restart for a third time or whatever?
 2   A    No.  I -- there's no point.  My lunch is -- maybe
 3        has one or two bites left.
 4   Q    Would you cancel your lunch in Kronos in those
 5        situations?
 6   A    Not every time, no.
 7   Q    Why would you do it in some situations but not in
 8        others?
 9   A    Some situations require my attention in a longer
10        duration than others, you know.  Me helping move a
11        patient may take 15, 20 minutes if we're waiting
12        for, you know, other people to come up, or if
13        something happens when we're moving him and, oh,
14        now we need to roll the patient to get the sheets
15        underneath, and it's just -- it's a base-by-base
16        time.  It changes.  No two calls I go to are the
17        same.
18   Q    But in a situation where you're -- you attempted
19        to take a lunch, and then it got interrupted, and
20        then you attempted to finish your -- take your,
21        you know, restart your lunch and it gets
22        interrupted, why wouldn't you cancel your lunch in
23        Kronos?
24   A    Because then it would be a frequent, like, two or
25        three times weekly if I was working full-time
```

```
 1        hours that I would be canceling my lunch.  And
 2        when I started doing that is when I got threatened
 3        with discipline, so it's just -- I would rather
 4        just not be compensated for my lunch and not get
 5        in trouble.
 6   Q    But the example that we're talking about is not --
 7        this is not an effort to shorten a shift, right?
 8        You would agree that's a different situation?
 9   A    Yes.
10   Q    Okay.  So setting that aside, shortening shifts
11        and trying to leave on the hour, we're talking
12        about situations where your lunch is interrupted
13        to do something that you consider an emergency or
14        that needs to be done?
15   A    Mm-hmm.
16   Q    You -- you're aware that there's a policy that
17        allows you to cancel your lunches?
18              MS. NOVOTNAK:  Objection.  Asked and
19        answered.  You can go ahead.
20              THE WITNESS:  I am aware that there is a
21        policy, but like I said earlier, what the policy
22        says, and what I am being told by management in my
23        department contradict each other.
24   BY MR. NICKELS:
25   Q    So what else were you being told by management in
```

1      your department?

2                  MS. NOVOTNAK:  Same objection.  Go

3      ahead.

4                  THE WITNESS:  Like what Jim May said,

5      you know, if your lunch is temporarily delayed for

6      a call of service, start your lunch over.  Okay.

7      But it doesn't say how many times I'm supposed to

8      do that before I punch out "no lunch."

9  BY MR. NICKELS:

10  Q    Did you ever ask him?

11  A    I don't think there's a written rule, you know, I

12       did ask him previously, well, how many times?

13       It's, you know, base-by-base basis -- case-by-case

14       basis.

15  Q    Did you ever say, "Jim, if I have to interrupt my

16       lunch twice, do I have to try to restart it a

17       third time?  Is there a set number of

18       interruption, you know, attempts?"

19  A    I don't recall.  I may have.  I don't remember

20       every conversation I've ever had.

21  Q    But you don't recall whether you asked that

22       question?

23  A    I couldn't honestly tell you, no.

24  Q    Aside from the situation you described where you

25       were told to not cancel your lunch in order to

```
 1        shorten a shift, were there situations where you
 2        canceled your lunch in Kronos and someone
 3        commented on it?
 4   A    The frequency of me doing it, yes.  Jim May and
 5        Jim Sagan both commented on it.  Say you can't
 6        cancel your lunch that often, and I just -- I
 7        don't think it's Jim May.  I think Jim May just
 8        says it so Jim Sagan doesn't have to, you know,
 9        because as my direct supervisor, it's his job,
10        whether he agrees with it or not, you know.  It's
11        his job to tell me what to do.  He's my
12        supervisor.
13                   You know, if Jim Sagan is always
14        telling me everything, that kind of defeats the
15        purpose of having a direct supervisor, you know.
16        That supervisor should communicate with that
17        supervisor, and my supervisor should communicate
18        to me.
19   Q    Sure.  But what -- what were they saying?
20        Frequency, you cited as one thing.  Is there
21        anything else they were saying?
22   A    Just, you know, they just said, you can't -- why
23        are you punching out "no lunch" this many times?
24        And it -- just what I've come to know is my job is
25        how -- that's how I could do it without getting
```

```
 1        yelled at or getting emails, so that's how I did
 2        it.
 3   Q    What did you say in response to those questions?
 4   A    I just, you know, whatever they'd -- and I'd say,
 5        "Okay, I won't do it."  And, you know, it's
 6        probably about it.  That's all I would, you
 7        know -- what do I say?
 8                       I have in my activity that I was
 9        busy the entire night of my shift, and, you know,
10        didn't have any time in between to take my lunch.
11        Those are the days that you don't write "no
12        lunch," because you didn't even get the chance to
13        take it the first time, you know.
14                       And I've had those shifts where you
15        don't sit down the entire length of your shift,
16        because, you know, there's chapter patients that
17        come and chapter 51 -- mentally-disabled patients
18        who try to commit suicide.  They're in the
19        hospital for five hours, and they require
20        one-on-one -- one-on-one contact.  Someone needs
21        to be with that patient.  And since we're so
22        short-staffed, we're usually the ones that are
23        stuck sitting there.
24   Q    So --
25   A    You know, so there has been times where I haven't
```

```
 1        even gotten a chance to take a lunch to punch out
 2        "no lunch," because I haven't even gotten to take
 3        the first one.
 4   Q    Well, you just described a situation where you --
 5        you said you worked all shift without taking a
 6        lunch.  In that situation would you code "no
 7        lunch"?
 8   A    I would have to look at my Kronos sheet.
 9        Sometimes I would -- if I had to say, I probably
10        would, yes, punch out "no lunch."  And then
11        they'll say, "Well, why didn't you take a lunch
12        that day?"  Well, they don't look at my activity
13        to see what I do in a shift.
14   Q    Do you think that that's a fair question for your
15        supervisor to ask you why you canceled your lunch?
16   A    I think if they looked at my activity and could
17        see, you know, why I didn't take a lunch, then,
18        yes, I do think it's an unfair question, because
19        then they're questioning my judgment.
20                   But now if it's a day where I maybe
21        had one or two calls the entire shift, which has
22        happened, and I punch out "no lunch," then yeah,
23        they have the right and the authority to ask why I
24        punched out "no lunch."
25   Q    But -- so in certain situations they have the
```

| | | |
|---|---|---|
| 1 | | authority to ask you why you punched out your |
| 2 | | lunch, but certain situations they don't? |
| 3 | A | Well, I guess technically they can ask me whatever |
| 4 | | they want.  They're my boss.  But in my opinion, |
| 5 | | yeah. |
| 6 | Q | So they wouldn't necessarily know how busy you |
| 7 | | were, and if they asked you that question, |
| 8 | | wouldn't that be an opportunity for you to say, "I |
| 9 | | was really busy, and I had to do all these things, |
| 10 | | and that prevented me from taking a lunch, and |
| 11 | | that's why I canceled no lunch -- canceled my |
| 12 | | lunch"? |
| 13 | A | Yeah, but, you know, Jim May is at the site where |
| 14 | | all my activity logs are, and Jim Sagan has access |
| 15 | | to ActTrack that has all of my trackable |
| 16 | | activities in ActTrack. |
| 17 | | So, you know, for them to go out of |
| 18 | | their way to contact me when I'm trying to sleep |
| 19 | | to be ready for work, it just, you know what I'm |
| 20 | | -- I work nights usually -- primarily, when I |
| 21 | | usually work, I work nights.  For them to call me |
| 22 | | and wake me up at home to ask me, "Why did you |
| 23 | | cancel your lunch," when they can look and not |
| 24 | | inconvenience me when I'm not at work. |
| 25 | Q | So you -- you could have provided an explanation? |

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 263 of 867   Document 49-1

1    A    And I have.

2    Q    And in situations you have?

3    A    Yes.

4    Q    But you didn't like doing that?

5    A    In some cases I don't feel I should have to,

6         because like I said, my activity log speaks for

7         itself.  They can see that, you know, there was

8         only 20 minutes in between each time where I

9         wouldn't even had a chance, and even if I could

10        have technically taken my lunch at that time, I

11        still have other duties that I'm responsible to

12        do.  And that includes patrolling the hospital.

13   Q    Let's take a look at your activity logs.  We had

14        the sample that we marked as Exhibit 1.

15                  (Reporter interruption.)

16                  MR. NICKELS:  I'm sorry, it wasn't

17        Exhibit 1.

18                  MS. NOVOTNAK:  18.

19                  THE WITNESS:  18.

20   BY MR. NICKELS:

21   Q    So again, this isn't every single activity log,

22        but you testified that these are activity logs

23        that represent the typical shift that you worked

24        at Burlington?

25   A    Yes.

WWW.GRAMANNREPORTING.COM · 414.272.7878

GRAMANN
REPORTING
Innovation · Expertise · Integrity

```
 1                    MS. NOVOTNAK:  I'm going to object to
 2        the characterization.  I don't know that she did
 3        testify that they were typical, but you can go
 4        ahead and answer.
 5                    THE WITNESS:  Okay.
 6   BY MR. NICKELS:
 7   Q    Would you agree that these activity logs we looked
 8        at earlier are a typical representation of a
 9        shift?
10   A    Generally, yeah.
11   Q    So if I was your supervisor, what would I look at
12        to tell that you were unable to take a lunch?
13   A    You know, you would -- but these logs aren't the
14        logs that I'm talking about.  The ones that I was
15        so busy the entire shift that I didn't even get a
16        chance to take a lunch.
17                    Now, if it was one of those logs,
18        almost every single one of the categories and
19        subcategories would be filled with numbers.  There
20        would be very few dashes where I couldn't log
21        something.
22   Q    So you're saying that one could look at these
23        activity logs and tell that you were too busy?
24   A    Yes.  Because I would be able to do it for anyone
25        else in the security department.  I could look at
```

```
1       their log and see what they did throughout a shift
2       and know if they were too busy or not to even be
3       able to take a lunch.
4  Q    And you think that your supervisors should have
5       done that instead of asking you?
6                  MS. NOVOTNAK:  Objection.  Asked and
7       answered.  Go ahead.
8                  THE WITNESS:  Yeah.  I -- most cases,
9       yes, I would say that.  Because if I'm punching
10      out "no lunch," there is a reason.  And now after
11      Jim May told me, I write "no lunch" on my activity
12      logs; I put it in the comments section in Kronos.
13      It says why I didn't take a lunch.  It says "no
14      lunch" on here.  It says "no lunch" in the Kronos.
15 BY MR. NICKELS:
16 Q    And in those situations have you -- in those
17      examples have you been questioned about why you
18      took a lunch when it said "no lunch" on your
19      activity log?
20 A    I can't recall.  I don't remember if every time
21      they've said something to me about it if it was
22      before I started doing that, before Jim May told
23      me, or if it was after.  I couldn't honestly tell
24      you.
25                 (A discussion was held off the record.)
```

1            (Exhibit No. 19 was marked for

2        identification.)

3    BY MR. NICKELS:

4    Q    So I've handed you what's been marked as Exhibit

5        19, and I'll represent to you that this is a

6        record of your --

7    A    Kronos.

8    Q    -- Kronos entries.

9    A    Mm-hmm.

10   Q    And it looks like it begins March 16th, 2009 --

11   A    Yep.

12   Q    -- which is when you started, and it goes up to

13       October 1st, 2010.  Have you ever seen this

14       document before?

15   A    No, I have not.

16   Q    Okay.  If you look at the column on the far right

17       titled "CL" --

18   A    That means that I canceled lunch?

19   Q    Yeah.

20   A    I know what -- it's -- something similar shows up

21       on the computer screen, but I've never seen this

22       specific document.

23   Q    So if you just peruse this and you look at the

24       dates, the shifts and then the CL column, do you

25       have any reason to believe that this would be an

1           inaccurate document?

2    A     No.

3    Q     Looking at this document, would you say that you

4          frequently canceled your lunch?

5    A     Yes.

6    Q     And do you have -- and would you agree that in

7          each of those situations where the lunch was

8          canceled, that you were compensated for that

9          half-hour period, right?

10   A     Yes.  For the ones that were canceled, yes.

11   Q     For the ones where the Y shows up in the CL

12         column?

13   A     Yes.

14   Q     So there's no situation where -- you're not aware

15         of any situation where you would have punched "no

16         lunch," and then you weren't paid?

17   A     No.

18   Q     Okay.

19   A     I know that I was paid every time I punched "no

20         lunch."

21   Q     You don't happen to know how many times you've

22         canceled your lunch?

23   A     I have no idea.

24   Q     We'd have to sit -- go through and just count the

25         Ys?

```
1    A    And count, and then this doesn't even go through
2         the duration of my employment, so even if we did
3         count them it wouldn't be an accurate number as to
4         how long I've been here.
5    Q    It goes up to shortly after the lawsuit was filed,
6         but --
7    A    Yeah.
8    Q    Which on this, it goes up to October of 2010?
9    A    Yes.
10              MR. NICKELS:  Yeah.  Okay.  Can we take
11        a little break?
12              MS. NOVOTNAK:  Sure.
13              (A recess was taken from 6:25 p.m. to
14        6:31 p.m.)
15   BY MR. NICKELS:
16   Q    We can go back on the record.  In situations where
17        you do take a lunch, where do you typically take
18        your lunch?
19   A    In my office, typically.
20   Q    And when you said "your office," what do you mean?
21   A    The security office at the site that I am working
22        at.
23   Q    Okay.  And what sorts of things do you do on your
24        lunch break?  For example, do you eat lunch?
25   A    Yes, I eat lunch.
```

1    Q    Is there a TV in this breakroom?

2    A    It's not a breakroom.

3    Q    I'm sorry, the security office?

4    A    In Burlington's there is a TV, but it's for a

5         camera that doesn't work.  So it's not -- it

6         doesn't have cable on it.  I, periodically for my

7         lunches, I'll bring a movie in or, like, a season

8         of a TV series and watch an episode while I'm on

9         lunch so I have something to look at other than

10        the wall while I'm eating.

11   Q    Do you ever talk with other employees?

12   A    Not very often.  Every -- if I work a first shift,

13        every once in a while I may eat lunch in the

14        cafeteria, but it's not very often, so more times

15        than not I would say no.

16   Q    Read magazines, books or newspapers?

17   A    Yeah.

18   Q    You've done those on occasion?

19   A    Yes.

20   Q    Talk on the phone?

21   A    Yes.

22   Q    Is there a computer -- I think you testified

23        earlier there was a computer at least in

24        Burlington in the security office?

25   A    There's a computer in every security office.

1  Q    And does that -- that computer, do you check your
2       email on that computer?
3  A    I do.
4  Q    Do you do it during lunch?
5  A    My Aurora email, no.
6  Q    Personal email?
7  A    Personal email, yes.  I bring in, actually my
8       personal laptop, which I listen to music in that,
9       and I check my personal email more times than not
10      on my personal laptop.
11 Q    Okay.  Listen to music?
12 A    I listen to music my entire shift if I'm in the
13      office.  It's on the duration of my shift, and if
14      I'm in the office, I listen to it.
15 Q    Okay.  Now, you said that you'll frequently take
16      your lunch in the security office.  You're not
17      required to take your lunch in the security
18      office?
19 A    No.
20 Q    Okay.  In fact, you testified earlier that you're
21      allowed to leave if you choose?
22 A    As in the premises?
23 Q    Well, first of all, the office?
24 A    Yes, I can leave the office.
25 Q    And you're allowed to leave the premises?

| | | |
|---|---|---|
| 1 | A | Technically, yes. |
| 2 | Q | And you had made some qualifications based on you |
| 3 | | would have to carry your equipment? |
| 4 | A | And remain on call for the duration of my lunch. |
| 5 | | And that is regardless if I left the premises or |
| 6 | | not. |
| 7 | Q | So -- so it's -- would you agree that there are |
| 8 | | lunch periods that are interrupted -- are |
| 9 | | uninterrupted? |
| 10 | A | Yes. |
| 11 | Q | Okay.  Not every single period is an interrupted |
| 12 | | lunch period? |
| 13 | A | Correct. |
| 14 | Q | How often would you say your lunch is interrupted? |
| 15 | A | More often than not. |
| 16 | Q | More often than not.  And you testified earlier |
| 17 | | that you'll receive calls and there are certain |
| 18 | | calls that you'll, based on your experience or |
| 19 | | based on communicating with the person who's |
| 20 | | asking the call, you'll say, "Can it wait till |
| 21 | | after your lunch?" |
| 22 | A | Yes. |
| 23 | Q | Now, are you calling that an interrupted lunch? |
| 24 | A | No. |
| 25 | Q | And that's not something you will -- |

```
 1   A    But technically it should, because I'm
 2        interrupting my lunch to talk to that person, or
 3        to pick up this pager and read what it's saying,
 4        that's technically interrupting my lunch.  But
 5        when I say something has been interrupting my
 6        lunch, that is not included.
 7   Q    You're not meaning that?
 8   A    No.
 9   Q    You're meaning where you have to actually get
10        up --
11   A    Get up and do something.
12   Q    -- and do something?
13   A    Yes.
14   Q    Okay.  And at the risk of asking and answering a
15        question, I just want to make sure that I have all
16        the basis for why you feel your supervisors have
17        discouraged you from using Aurora's lunch
18        cancelation policy, okay?
19   A    Mm-hmm.
20   Q    You testified that one situation was where you
21        were told not to do it to shorten your shift?
22   A    Mm-hmm.
23   Q    And then --
24             MS. NOVOTNAK:  Is that yes?  You have to
25        use words.
```

```
 1                    THE WITNESS:  Yes, sorry.
 2                    MS. NOVOTNAK:  That's okay.
 3    BY MR. NICKELS:
 4    Q    And then you testified that another -- other
 5         situations were your supervisor was questioning
 6         you about why you canceled your lunch?
 7    A    Yes.
 8    Q    Okay.  Is there any other examples or situations
 9         you considered were discouraging that were based
10         on communications from your supervisors to you
11         about canceling lunches?
12    A    About budget, you know, if we can't --
13    Q    So what's that?
14    A    If we cancel our lunches, a lot of the times it's
15         overtime, and then that's money taken out of the
16         budget for the year that could be -- I mean,
17         they've never directly told me, "You can't take
18         your lunch because it's going into our budget,"
19         but it has been mentioned in conversations
20         casually as, like, a non-approach way to say it,
21         but it's never been directly told that I could not
22         take my lunch because of the budget, but it has
23         been implied.
24    Q    And how was it implied?  Let's start with who?
25    A    Couple months ago I was having a conversation with
```

```
1         Jim Sagan, and he was -- I can't remember the
2         exact extent of what we talked about, but I
3         remember specifically he said, well -- we were
4         talking about a camera system or something at
5         Lakeland, and he's like, "Oh, well, we don't have
6         it in the budget because, you know, people are
7         canceling their lunches."  And it was, in my
8         opinion, implied to me.
9    Q    That you shouldn't cancel your lunch?
10   A    Yeah, because it's frowned upon.
11   Q    Any other communications that that's based on --
12        that your belief is based on?
13   A    No -- not that I can recall off the top of my
14        head.
15   Q    Any other examples where you feel you were
16        discouraged from using the lunch cancelation
17        policy, other than the ones we just went through?
18   A    Being told by other employees, you know, that it's
19        -- they don't like when you punch out "no lunch."
20        I've been told that by numerous people.  Jim May,
21        Jerry Brabazon -- I can't ever say his last name
22        right.
23   Q    Brabazon?
24   A    Brabazon.  Joel Jokowski (phonetic), who doesn't
25        work there anymore.  I mean, just a whole bunch of
```

```
 1        people at all different sites.  It's not
 2        site-specific.
 3   Q    And that was conversations you had with other
 4        employees?
 5   A    Yes.
 6   Q    Any other conversations with sergeants or
 7        supervisors?
 8   A    I think the, you know, I did have conversations
 9        with, like I said, Dave Wood.  I said earlier that
10        this was just a recent conversation.
11   Q    Yep.
12   A    And I think it's -- it's either a
13        misunderstanding, miscommunication, or they're
14        acting dumb to what is actually going on.  Because
15        in my conversation with Dave Wood, he said, "Well,
16        I was under the impression that you guys canceled
17        lunch every day, because you are a single-officer
18        site, and there was no one to relieve you of your
19        lunch.
20                      And I'm, like, "What are you
21        talking about?  That is not what happens."  And
22        then he -- that's when he said, "Oh, we'll talk
23        about this later."  And then he said, "Well, I
24        don't understand why the multiple-officer sites
25        are saying this."  And then, you know, I tried to
```

```
 1        describe it to him.  And at the end of that
 2        conversation, he said, you know, "Well, I have a
 3        better understanding of this and maybe this whole
 4        lawsuit could have been avoided if the management
 5        staff was under the same understanding that we
 6        had."
 7    Q   Which was?
 8    A   Which was, we don't have anyone to relieve us of
 9        our duties.  We're on call for our lunch.  We
10        should get paid for our lunch.  You know, I can't
11        technically ever have 30 minutes free from work,
12        because I am still waiting for, you know, expected
13        to answer this equipment.  I'm expected to
14        respond.
15    Q   And when you say that you can't technically have
16        30 minutes free from work, you're including even
17        situations where you actually did have 30 minutes
18        free from work, but you're saying, because you
19        have a radio, or because -- the potential to get
20        called exists --
21    A   Yes.
22    Q   -- that you'd feel, what?
23    A   I feel, you know, like I said earlier, I should be
24        able to sleep.  If I'm not getting paid for my
25        lunch, that is my time.  I should be able to do
```

```
 1        what I want on my time.  If I choose to sleep for
 2        that half hour, that should be my choice.  I am
 3        not working, I'm not getting paid for that time,
 4        but yet if a management staff would walk in and
 5        see me sleeping, I would get terminated for
 6        sleeping on the job.
 7   Q    Okay.  We're almost done.  I realized when we were
 8        sort of running through some of the differences
 9        between some of the facilities --
10   A    You didn't go back to West Allis.
11   Q    -- we didn't talk about West Allis.
12   A    I knew that.
13   Q    Yeah.  So --
14   A    You want me to explain West Allis.
15   Q    Explain West Allis, and it was -- we were talking
16        about sort of when you show up, how many officers
17        are on shift, what sorts of devices you have to
18        carry.
19   A    At West Allis, I don't know if they have a pager.
20        I don't remember.  But I know that we have a
21        radio, and we don't have a cell phone there,
22        because they have this 24-hour, 7-days-a-week
23        central monitoring station.  So if a unit needs
24        something, they call that station.  The officer in
25        that station dispatches other officers to respond.
```

```
 1        Now, West Allis has a minimum, absolute minimum,
 2        of two officers working.  It has the same concept
 3        as Kenosha does.
 4   Q    And let's just sort of make sure we're on the same
 5        page.  That same concept is, one is in the CMS --
 6   A    And one is --
 7   Q    -- right, and one is on patrol?
 8   A    -- patrol.
 9   Q    And they rotate?
10   A    Yes.
11   Q    Okay.
12   A    Usually in a two-hour duration.
13   Q    Okay.
14   A    Now, generally, there is three officers that work
15        generally at West Allis.  And that's because they
16        have a exterior patrol officer that is another
17        position.  They have another squad car that they
18        drive, patrol the perimeter, they patrol the
19        parking structures.  They do all that kind of --
20   Q    So there's a second patrol officer?
21   A    Yes, which is an exterior patrol that they
22        drive --
23   Q    Outside?
24   A    -- the squad, yes --
25   Q    Okay.
```

```
 1   A     -- or walk or whatever they want to do.
 2   Q     Okay.  And what's the -- you said there's no
 3         pager?
 4   A     I do not recall there being a pager there, but I
 5         could be wrong.
 6   Q     And there's no cell phone?
 7   A     Nope, because of the 24-hour CMS.
 8   Q     And what's the radio?
 9   A     The radio is the same two-way radio, if you want
10         to call it, that Burlington, Lakeland and Kenosha
11         has, where the radios are on the same repeater.
12   Q     And how is a lunch typically taken -- strike that.
13         When do you typically take lunch?  When you're on
14         patrol, or when you're on CMS?
15   A     Not on CMS.  Generally, the lunch you take is when
16         you're on interior patrol.  Now, there are times
17         at West Allis where the exterior patrol officer
18         can get called in, but if they're all the way on
19         the top of the, you know, like the fifth floor of
20         the parking structure and it's a combative
21         patient, they're not going to wait for them to go
22         all the way around, you know, the parking
23         structure for them to come all the way inside to
24         run to the ER to deal with a combative patient.
25                         So, I mean, and there's off-site
```

1      places that the exterior patrol officer needs to
2      patrol, so, you know, when they get interrupted
3      there, sometimes the exterior patrol is -- it's
4      not feasible for that person to respond.  It would
5      be more better -- it would be better for the
6      interior patrol officer who's on lunch to respond
7      to that situation because it needs to be handled
8      now.
9   Q  Is it safe to say that the officers at West Allis
10     make an effort to try to cover the officer who's
11     on their lunch?
12  A  I would say yes, but the person that's on their
13     lunch still needs to remain on call.  They have to
14     keep their radio on.  They can't turn it off.
15  Q  They have their radio with them?
16  A  Yes.
17  Q  And they have to hear it?
18  A  Yes.  And they have to hear what calls are coming
19     in, because even if, you know, the exterior patrol
20     officer says, you know, "I can take that call,
21     don't worry about it," and, you know, the
22     interior, okay, you know, I can finish my lunch,
23     if it's something that gets out of hand, I need
24     help, oh, sorry, you gotta wait till the end of my
25     lunch -- no, you go.

1  Q   And that would be what you consider a emergency
2      situation?
3  A   Yeah.
4  Q   And that would be a situation where you would
5      interrupt your lunch?
6  A   Oh, yeah, absolutely.
7  Q   And would that be a situation where you would
8      cancel your lunch in Kronos?
9  A   I honestly don't remember if I've ever punched out
10     "no lunch" at West Allis.  I don't work there
11     enough.
12 Q   But -- so you can't specifically recall?
13 A   No.
14 Q   But in that hypothetical that you were using --
15 A   Would I?  It depends on if it took me, you know,
16     if it was, like, a ten-minute call for service,
17     you know, I might do what I do at Burlington and
18     just restart my lunch, but if it was something
19     that took a long duration in time, then I would
20     probably cancel my lunch.
21 Q   And you would get paid for that lunch cancelation?
22 A   Yes.
23 Q   Had you -- you don't recall if you've ever
24     actually canceled a lunch at West Allis?
25 A   I don't remember, no.  I would have to see the --

```
 1         the jobs, because, I mean, these aren't
 2         site-specific.
 3    Q    I don't think it has a site.
 4    A    Uh-uh.  It's just got general.
 5    Q    So do you recall whether you've ever been
 6         questioned by a supervisor for why you canceled a
 7         lunch?
 8    A    At West Allis?
 9    Q    At West Allis.
10    A    No, I never have, because they don't monitor my
11         Kronos.  Only my direct supervisors have access to
12         this as in my Kronos punch-in, punch-out times.
13    Q    Well, wouldn't the supervisor at whatever site
14         have access to it?
15    A    No.
16    Q    So the supervisors at West Allis wouldn't be able
17         to see your Kronos, because you only work there
18         occasionally?
19    A    It goes by site.  Now, my supervisor Jim May at
20         the time -- like, when I was still in -- when
21         Burlington was still my home site, Jim May could
22         access my Kronos, and so could Jim Sagan.
23    Q    Anywhere?
24    A    Anywhere.  And I believe Ellen and Mary Lynn could
25         also access it, because south region.
```

```
 1   Q     Had you ever been questioned by your supervisor
 2         for canceling a shift that was at a facility
 3         different from what they supervised?
 4   A     No.  No.
 5   Q     Had you ever been questioned by anyone other than
 6         Jim Sagan or Jim May?
 7   A     Ellen may have questioned about it, but, you know,
 8         it may have just been in person, and it may have
 9         been only one or two times.  I can't recall
10         exactly, but --
11   Q     She may have?
12   A     She may have, yeah.
13   Q     But you don't specifically recall?
14   A     No.
15   Q     And you don't recall the basis for her question?
16   A     No.
17   Q     If she did, in fact, question you?
18   A     No, because I haven't seen Ellen in a long time --
19         like, and actually had a conversation with her.
20         But see now when I work -- I'm -- technically work
21         at the corporate office, Jim May and Jim Sagan
22         can't access my Kronos.  My direct supervisor and
23         his supervisor can only access it.
24                   So when I come down to Burlington
25         or Lakeland to work a shift, Jim May and Jim Sagan
```

```
 1         can't see my punch-in times and punch-out.  They
 2         can see that I was scheduled --
 3    Q    Sure.
 4    A    -- that shift, but they can't see this.
 5    Q    And then where -- the corporate that you work at
 6         now, just talk real briefly about that.  That's --
 7         where is that located?
 8    A    750 West Virginia Street.
 9    Q    In?
10    A    Milwaukee.  It's right next to The Tannery.
11    Q    And you're a security officer there?
12    A    Yes.
13    Q    And is the nature of your shifts different from
14         the natures of the shifts that you were doing at
15         these other facilities?
16    A    Yes.  It is completely different.  I'm not
17         technically in my primary role yet, because I'm
18         still on first shift.
19    Q    Okay.
20    A    But when I work nights, my assigned hours are from
21         11 p.m. to 7:30 a.m., and I am a central
22         monitoring station at corporate.  I monitor all
23         the off-site clinics, pharmacies, alarms.  I
24         monitor the cameras at corporate, and, you know, I
25         dispatch people accordingly to those alarms.
```

1  Q    Okay.  So do you get a lunch break at this

2       facility, corporate?

3  A    The shift that I am on now, I get a 30-minute

4       uninterrupted lunch.  I can sit in the cafeteria

5       and not carry a radio and not be interrupted for

6       30 minutes on the shift I'm on right now.

7  Q    Okay.

8  A    On nights, from my understanding, what I've been

9       told -- I have not worked the shift yet, so I

10      can't tell you for 100 percent fact -- but what I

11      have been told is when I need to take my lunch, I

12      can call St. Luke's and have their central

13      monitoring station monitor the alarms for the half

14      hour that I am on lunch --

15 Q    Okay.

16 A    -- during that time.

17 Q    Do you know how many security officers are

18      employed in corporate in positions like yours?  If

19      you don't know, or you --

20 A    No, I can.  There's -- there's two different

21      positions, but they kind of rotate time back and

22      forth.  So on first and second shift there's two

23      people there, and on nights it's just me.  So

24      there is, including full-time and part-time, there

25      is eight.

1    Q    And that's just at this corporate facility?

2    A    Yes.

3    Q    Okay.  And -- you said St. Luke's has a similar

4         monitoring role --

5    A    They current --

6    Q    -- for its security officers?

7    A    Yes.  They -- well, they have their CMS station

8         like West Allis and Kenosha has, but there's no

9         regularity between the information that's being

10        entered into these alarms and how they're being

11        responded to.  And that's why this -- these

12        positions at the corporate office were made,

13        because there needs to be a general response to

14        the alarms.

15                   And the officers at St. Luke's

16        don't do it enough to know the procedure to do it.

17        So they're pulling their off-site clinics and

18        pharmacies to the corporate office to be monitored

19        instead of St. Luke's.

20   Q    And you said in this position that you're

21        currently in, you're able to take a lunch break,

22        and you're able to turn off your radio?

23   A    We don't have a radio there.

24   Q    Okay.

25   A    Now, from my understanding when I go to nights, we

```
1         have a department cell phone that we carry there.
2         My understanding is when I -- if I call
3         St. Luke's, you know, to say, "Hey, I'm going to
4         lunch for 30 minutes" if someone calls me on that
5         phone, I'm expected to respond to it.
6    Q    But you haven't worked that shift yet?
7    A    I have not worked that shift yet.
8    Q    Okay.  So just -- would you agree that in this
9         present shift, it's -- it's not causing the same
10        sort of concern that you have that you're
11        describing that forms the basis for your lawsuit?
12   A    Correct.  The position I am in, I -- that I'm
13        working right now, is completely different from
14        the hospitals.  It's in a completely different
15        setting.  It's a corporate office building.
16   Q    Okay.  And your title is security officer?
17   A    Or dispatch.  Security officer and dispatch.  I do
18        both.
19   Q    And you're still within the loss prevention group?
20   A    Yep, we're considered a corporate department, so
21        we kind of are all one general loop together.
22   Q    Okay.  And you still ultimately report to
23        Mike Cummings, right?
24   A    He's the highest, yes.  He is the person in loss
25        prevention at Aurora.  He's --
```

1  Q    Even in this role --

2  A    Yes.

3  Q    -- that you're currently in?

4  A    He is, quote, the man, in loss prevention.

5  Q    Okay.  Almost done.

6  A    Yay.

7  Q    I just wanted to show you a document that was

8       previously marked as Exhibit 9.

9  A    That's the officer -- that's in the officer

10      resource binder at Lakeland.

11 Q    Are you familiar with this document?

12 A    I am.  Not this specific one, but it's a copy of

13      one that I know.

14 Q    Yeah.  And page 4 --

15 A    Four.

16 Q    -- of this document talks about lunch -- well,

17      first of all, just tell us, for the record real

18      quickly, what your understanding of this document

19      is.

20 A    This document was made by Ellen Bruenning, who was

21      the sergeant at Aurora Lakeland Medical Center.

22      She has this put in an officer resource binder at

23      Lakeland Medical Center.  It's a binder that if

24      you have a question about something, you reference

25      back to, to kind of, you know, guide you if you

```
 1          can't figure it out for yourself, you don't know.
 2    Q    Okay.
 3    A    It's generally for new hire people who don't
 4          really know --
 5    Q    And is there similar --
 6                  (Reporter interruption.)
 7                  THE WITNESS:  Don't really know what's
 8          expected of them, you know, just brand new people
 9          to Aurora.
10   BY MR. NICKELS:
11    Q    It says it's an orientation and training?
12    A    Yep.
13    Q    And you would agree with that?
14    A    Yep.
15    Q    Do other -- do the other facilities have this, or
16          is this just a Lakeland thing?
17    A    This is a Lakeland thing.
18    Q    Okay.  So if you just take a look at page 4,
19          there's a paragraph on lunch.  Let's just sort of
20          run through this and just see if you -- if it
21          conforms with your understanding of policy.
22    A    Okay.
23    Q    Do you agree with the first sentence?  "Officers
24          are allotted a 30-minute unpaid lunch break."
25    A    Do I agree with it?
```

1  Q    Is it --

2  A    It's standard procedure, yes.

3  Q    Okay.  Second paragraph -- I'm sorry, second

4       sentence says, "If service calls are received, the

5       officer should determine if immediate service is

6       required or if it can wait until the meal break is

7       completed."

8  A    Yes.

9  Q    I believe you previously testified that you do

10      that?

11 A    Yes.

12 Q    Third sentence says, "This can be determined in

13      part by calling the requesting unit."  Is that one

14      way to do it?

15 A    That's one way, if it's a page.

16 Q    Call them back?

17 A    You know, if they just page an extension, like,

18      2323, which is the OB unit, you don't know what

19      they want.  You have to call, and say, "You

20      paged?"

21 Q    The next sentence says, "If it is determined to be

22      a priority call," which you testified that you

23      make that determination?

24 A    Yep.

25 Q    "You are allowed to punch F1 when clocking out at

```
 1        the end of the day."
 2   A    Yep, which is what says in the regular policy, but
 3        it contradicts what --
 4   Q    So just finishing out, it said, "This will pay you
 5        for your missed break time"?
 6   A    Yep.
 7   Q    And, "Breaks and missed breaks should be
 8        documented in the activity daily log"?
 9   A    Yep.
10   Q    So this conforms with the other policies we looked
11        at?
12   A    Yes.
13   Q    But you feel that it doesn't conform with the
14        practice, because why?
15   A    Because of what we're told and, you know, in the
16        newsletter that you gave, what Mike Cummings says.
17   Q    Which, what does he say?
18   A    It said in the -- in Exhibit 5 on the last page,
19        page -- where it says 147914, if a lunch period is
20        interrupted for an emergency call, the officer
21        should begin a new period when available, and if a
22        30-minute period is not taken that time is --
23        system should be programmed as no lunch.  So it's
24        saying here to restart it.
25   Q    That's the restart aspect of the policy, right?
```

```
 1   A    Yeah, and I don't -- you know, it contradicts
 2        itself.
 3   Q    And -- and your problem with the restart policy is
 4        that it's -- you don't know how many times to
 5        restart?
 6   A    Yeah.  We don't know how many times to restart.
 7        And I think the biggest question in this entire
 8        lawsuit is, is do we -- should we get paid for our
 9        lunch if we're on call?  I think if they can
10        determine that it would solve the entire lawsuit.
11        It's just, if we're on call and we're expected to
12        carry these items, should we get paid for it or
13        not?
14                    And I believe I should get paid for
15        it, because I'm still working.  I'm still carrying
16        this equipment.  Like I said, I can't take a nap
17        if I want to for 30 minutes.
18   Q    Even in situations where you don't receive any
19        actual calls?
20   A    Yes.
21   Q    Is there -- oh, I just wanted to mark this as an
22        exhibit, the next available exhibit.
23                    (Exhibit No. 20 was marked for
24        identification.)
25
```

```
 1   BY MR. NICKELS:
 2   Q    I'm just handing you what's been marked as Exhibit
 3        20.  This is a document that you --
 4   A    I sent in.
 5   Q    -- produced to us?
 6   A    Yep.  I made a copy of what Pat had given in
 7        Exhibit 9.  This was a copy out of the officer
 8        resource manual or binder at Aurora Lakeland
 9        Medical Center when I was working there.  I did
10        not know that that binder existed until, you know,
11        December or January, when I just happened to
12        stumble upon it one day.  No one ever told me
13        about that until I was working there.
14   Q    And this document is Bates marked Schultz 000009.
15        And is that your -- did you write your name on
16        top?
17   A    After I made a copy, I printed my name on the top
18        with my employee ID number so they -- so when I
19        faxed it, they would know specifically that I sent
20        this.  Because I know Pat had received this
21        manual, and that he was sending copies of this
22        manual in.
23   Q    So you wrote your name on there very recently when
24        you sent this to your counsel?
25   A    It was the day or the day before that I had faxed
```

```
1        it to my counsel.
2              MR. NICKELS:  Okay.  I have no further
3        questions.
4              MS. NOVOTNAK:  I have just a couple
5        questions.
6              THE WITNESS:  Okay.
7                    EXAMINATION
8    BY MS. NOVOTNAK:
9    Q   When you in a shift get a page or a call or radio
10       call, do you have the discretion not to
11       acknowledge that page or call or radio
12       transmission at all?
13   A   No.  I am expected to at least inform the person
14       sending that page that I am on my lunch and that I
15       will handle that after my lunch.  If I don't, they
16       will continue to page time and time and time until
17       I respond.
18   Q   Okay.  Do you record every single page, radio
19       transmission or -- and call on the activity logs?
20   A   No.
21   Q   Are there calls -- are there calls that you don't
22       record on the activity log -- telephone calls?
23   A   Oh, telephone phone calls -- no, I don't record
24       phone conversations.
25   Q   Are there pages that you receive during a shift
```

```
 1        that you don't necessarily record on the activity
 2        log?
 3   A    Yes.  I don't record every page that I receive.
 4   Q    Okay.  You were asked in regard to Exhibit 3 --
 5        let's look at Exhibit 3.  What is your
 6        understanding of the policy that says that meal --
 7        canceled meal periods have to be approved by a
 8        supervisor?
 9   A    They were never, you know, told to us that we
10        needed to contact our supervisor to say, "Hey, my
11        lunch got interrupted."  I don't think my
12        supervisors would appreciate if I called them at
13        3 a.m. to say, you know, my lunch got interrupted.
14        They -- when I got hired, they never said we
15        needed to tell a supervisor.
16   Q    Okay.  You testified about your definition of
17        emergency, what constitutes an emergency.  If
18        you're paged to get a meal for a patient, is that
19        something you would do right away even to
20        interrupt a lunch?
21   A    I guess, you know, emergency isn't the best word.
22        I think priority would be a better word.  And, you
23        know, more times than not, I would probably get a
24        lunch for a patient, you know.  The duration of
25        time when a patient comes in the ER could be
```

```
 1         hours.  And I know what it's like not to be able
 2         to eat.  And, you know, for me to put my lunch on
 3         hold for five or ten minutes to get someone a
 4         lunch -- maybe they're diabetic.  Maybe there's a
 5         reason that they need that lunch, you know.
 6    Q    So you would interrupt your lunch?
 7    A    Yes.
 8    Q    Okay.  What about to unlock a door where somebody
 9         is waiting to get into an area?
10    A    Yes, because, like, specific examples, you know
11         the house supervisor, they may need to get into a
12         unit that's locked to get a piece of equipment
13         that a patient needs.
14    Q    Okay.  Would you interrupt your lunch to walk
15         someone to a garage who needed to get to or from a
16         garage?
17    A    Like to their car or something?
18    Q    Yes.
19    A    Absolutely -- that's my job.  That's what I get
20         paid to do is to protect people.  And if they feel
21         unsafe walking in the dark by themselves, I'm not
22         going to tell them, "I'm sorry, I'm eating my
23         lunch.  You have to walk out and fear for your
24         safety."  You know, that's not part of my -- I am
25         expected to respond to that.
```

```
1   Q    Okay.  If you -- I believe you might have alluded
2        to this, but if you're eating your lunch and you
3        -- it's before the end of the 30-minute period,
4        but you've finished actually eating your lunch and
5        you're interrupted, do you then resume another
6        30-minute period after that?
7   A    No, not generally.  If I'm done with my lunch, you
8        know, what else am I going to do for another half
9        hour.
10  Q    So if you haven't finished your full 30-minute
11       period and you're interrupted, do you then -- but
12       you've finished your lunch -- your eating, do you
13       then punch out "no lunch"?
14  A    Generally, no.
15  Q    Okay.  When you say "restart your lunch," are you
16       -- I want to make sure we're all on the same page
17       that that means you start another uninterrupted
18       30-minute period.  Is that your understanding of
19       restarting?
20  A    Yes.
21  Q    Okay.  Do your supervisors, Jim May and Jim Sagan,
22       do they have access to your activity logs?
23  A    Yes.
24  Q    Do they have access to the computer program where
25       you log?
```

1    A    The ActTrack, yes.

2    Q    Okay.  So they have as much access to those

3         documents or programs as to your Kronos?

4    A    Yes.  Jim Sagan doesn't have as much physical

5         access to the daily activity logs, just because

6         he's at another site and those are handwritten.

7         If he wanted them, all he would have to do is ask

8         Jim May to fax them, or Jim Sagan to go over to

9         Burlington, like he does on almost a daily basis,

10        to just look at them.

11   Q    Does he have -- do both of them have as much

12        access to your computer logs as they do to the

13        Kronos logs, to your knowledge?

14   A    Computer logs, like --

15   Q    Like ActTrack.

16   A    Yes, they have full access to that.  They can read

17        -- they can print reports and everything on that.

18               MS. NOVOTNAK:  Okay.  I don't have any

19        other questions.

20               MR. NICKELS:  I just have a few just on

21        those.

22                         EXAMINATION

23   BY MR. NICKELS:

24   Q    With regard to your activity logs, your counsel

25        asked you if they reflect whether you're receiving

1    communications from your phone, is that correct?

2  A  Mm-hmm.

3  Q  Is it accurate to say that the activity logs only

4    reflect the tasks that you actually perform?

5  A  The trackable tasks.  You know, every so often I'm

6    requested to do something that isn't covered in

7    one of those categories or subcategories.  And

8    then, you know, I may or may not write it in the

9    comment section of the daily activity log.

10 Q  But would you write it as an activity?

11 A  Not all the time, no.

12 Q  Okay.  But in situations where you used your

13    discretion to prioritize a certain request is not

14    something you need to deal with now and that you'd

15    put off to the end of your lunch, that wouldn't be

16    captured in the activity logs?

17 A  I'm sorry, can you repeat it?

18 Q  In situations where someone asks you to do

19    something, but you, in your discretion, determine

20    that that's not something that needs to be done

21    now, and you'll do it at the end of your lunch,

22    that choice wouldn't be reflected in your activity

23    logs?

24 A  Generally, no.

25 Q  But then when you actually do the task, if you do

```
 1        it later, that would then be reflected?
 2   A    In -- yes.
 3   Q    At that time?
 4   A    Yes.
 5   Q    Okay.  Second question.  You looked at Exhibit 3,
 6        and your counsel asked you whether you need
 7        supervisor approval --
 8   A    Mm-hmm.
 9   Q    -- to cancel.  You did testify earlier that you
10        understood that -- or you believe that they were
11        reviewing your Kronos records and --
12   A    They -- yeah, they do it on, from my understanding
13        on a daily basis, they review my Kronos, to see if
14        I punched in and when I punched out.  Because if I
15        forgot to punch out, you know, I could be working
16        for 80 hours before -- and I could be technically
17        getting paid for that.  So they monitor to check
18        to make sure that I've punched in and punched out.
19   Q    So -- and so they were also checking days where
20        you would have canceled "no lunch"?
21   A    Yes.
22   Q    So if you didn't hear anything from them, is it
23        possible that that was -- that they had reviewed
24        your records and --
25   A    It's possible that they didn't look at it.  I
```

| | | |
|---|---|---|
| 1 | | mean, I don't know how often they look. |
| 2 | Q | I mean, you didn't necessarily understand this to |
| 3 | | mean that you had to -- every time you punched "no |
| 4 | | lunch" you had to go tell them why? |
| 5 | A | I didn't -- I wasn't under that understanding, no. |
| 6 | | I didn't. |
| 7 | Q | And you knew that they were looking at your |
| 8 | | records? |
| 9 | A | Yeah, I knew that they can look, and I knew that |
| 10 | | they could see, and then I knew that they had |
| 11 | | access to my activity logs and my ActTrack. |
| 12 | Q | Yeah.  So in situations where they made no comment |
| 13 | | then, they may have been approving your "no |
| 14 | | lunch"? |
| 15 | A | They may have, yes.  I would assume by the end of |
| 16 | | the pay period if I didn't hear anything that they |
| 17 | | didn't have a problem with it, you know, because |
| 18 | | obviously it's too late to go back and change it. |
| 19 | | If they had a problem with it, they would say |
| 20 | | something to me before the pay period ended where |
| 21 | | they would be able to edit it. |
| 22 | Q | And we looked at your Kronos activity logs, and we |
| 23 | | saw that there was a number of situations where |
| 24 | | you canceled your lunch, right? |
| 25 | A | Yes. |

1    Q    You weren't questioned every time, were you?

2    A    Not every time, no.

3                    MR. NICKELS:  Okay.  I have no further

4         questions.

5                    MS. NOVOTNAK:  I think we're done.

6                    (Deposition concluded at 7:11 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1        STATE OF WISCONSIN )
                            ) SS:
2        MILWAUKEE COUNTY   )

3                I, Loretta Stoeckmann, RPR and Notary

4        Public in and for the State of Wisconsin, do

5        hereby certify that the preceding deposition was

6        recorded by me and reduced to writing under my

7        personal direction.

8                I further certify that said deposition

9        was taken at QUARLES & BRADY LLP, 411 East

10       Wisconsin Avenue, Milwaukee, Wisconsin, on the

11       23rd day of March, 2011, commencing at 3:58 p.m.

12               I further certify that I am not a

13       relative or employee or attorney or counsel of

14       any of the parties, or a relative or employee of

15       such attorney or counsel, or financially

16       interested, directly or indirectly, in this

17       action.

18               In witness whereof, I have hereunto set

19       my hand and affixed my seal of office on this

20       25th day of March, 2011.

21

22                      _____
                        LORETTA STOECKMANN, RPR
23                      Notary Public

24   My commission expires August 18th, 2013.

25
```

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 304 of 867   Document 49-1

**0**

**000009 (1)**
139:14
**000041 (1)**
73:11
**01 (3)**
52:16,16,19
**03 (2)**
52:16,19
**067706 (1)**
52:5
**08 (5)**
11:20,25;12:4,8,9
**09 (9)**
12:13;26:11;30:21,21;
31:9,10;49:4;55:18;
96:13

**1**

**1 (2)**
109:14,17
**10:20 (1)**
52:11
**10:45 (2)**
50:25;51:13
**100 (7)**
12:2,16;32:15;33:7;
34:21;57:3;131:10
**11 (2)**
91:6;130:21
**11:45 (1)**
51:22
**12 (1)**
91:6
**12-hour (2)**
95:2,2
**14 (1)**
52:24
**147914 (3)**
79:24;84:9;137:19
**15 (3)**
72:2;88:10;102:11
**16th (1)**
112:10
**18 (5)**
48:19,24;60:16;
109:18,19
**19 (2)**
112:1,5
**195th (1)**
9:14
**1st (1)**
112:13

**2**

**2 (3)**
72:16;75:16;78:15
**20 (6)**
13:16;18:22;102:11;
109:8;138:23;139:3
**2003 (1)**

79:10
**2007 (1)**
9:19
**2009 (5)**
12:15;14:21;29:22;
31:2;112:10
**200-something (1)**
25:6
**2010 (5)**
17:13;34:20;79:15;
112:13;114:8
**2245 (1)**
50:24
**2323 (1)**
136:18
**24 (2)**
16:21;18:25
**24-hour (4)**
33:23;63:6;123:22;
125:7
**25 (1)**
86:3
**27th (5)**
15:19,23;24:6,9;94:11
**2nd (1)**
9:12

**3**

**3 (6)**
73:18;75:8;141:4,5,
13;146:5
**3:30 (1)**
94:25
**30 (11)**
44:11;85:3;89:15;
91:5;101:13;122:11,16,
17;131:6;133:4;138:17
**30-minute (17)**
44:12;73:25;76:15;
77:15;84:12,23;87:22;
91:3;101:10,22;131:3;
135:24;137:22;143:3,6,
10,18
**30th (1)**
52:5

**4**

**4 (3)**
78:1;134:14;135:18
**40 (5)**
18:23;23:20,21;24:15,
17
**48 (1)**
16:12

**5**

**5 (3)**
78:20;84:4;137:18
**5:17 (1)**
70:15
**5:25 (1)**
70:16

**51 (1)**
106:17
**53104 (1)**
9:16

**6**

**6:25 (1)**
114:13
**6:31 (1)**
114:14

**7**

**7 (22)**
16:11,11;23:1,1;
91:25;25;92:3,3,19,19,
20;93:5,19,19;94:15,16,
25;95:5,5,5;97:12,12
**7:11 (1)**
148:6
**7:30 (18)**
38:6;50:4,10;92:1,4,5,
9,20;93:3,5,7,10,12,13;
94:16;95:5;97:13;
130:21
**7:40 (2)**
50:10,16
**750 (1)**
130:8
**7-days-a-week (1)**
123:22

**8**

**8:30 (3)**
50:18,24;52:10
**80 (1)**
146:16
**8140 (1)**
9:14
**89 (1)**
9:12

**9**

**9 (3)**
9:14;134:8;139:7
**90 (1)**
69:20

**A**

**abduction (1)**
70:6
**able (24)**
6:3;7:16;41:23;45:11,
12,20;69:23;70:23;71:1,
24;72:10;75:6;87:22;
88:19;101:12;110:24;
111:3;122:24,25;
128:16;132:21,22;
142:1;147:21
**above (1)**
22:7

**absolute (1)**
124:1
**absolutely (2)**
127:6;142:19
**academy (3)**
9:25;10:1;16:23
**accepted (1)**
93:8
**access (24)**
33:23;39:9,15;42:6,9,
12;47:6;69:17,23;78:9;
108:14;128:11,14,22,25;
129:22,23;143:22,24;
144:2,5,12,16;147:11
**accessible (2)**
73:1;77:5
**accident (1)**
4:19
**Accidentally (1)**
43:23
**accommodate (1)**
25:17
**accordingly (1)**
130:25
**accurate (2)**
114:3;145:3
**acknowledge (2)**
65:11;140:11
**acknowledged (1)**
67:8
**acronyms (1)**
20:24
**acting (1)**
121:14
**activities (5)**
46:17,17;60:6;61:5;
108:16
**activity (42)**
44:8;46:24;47:10,22;
48:3,5;49:3,5,24;55:3,
25;56:21;57:12;60:9;
99:13,21;106:8;107:12,
16;108:14;109:6,13,21,
22;110:7,23;111:11,19;
137:8;140:19,22;141:1;
143:22;144:5,24;145:3,
9,10,16,22;147:11,22
**ActTrack (16)**
47:1,2,4,23,25;48:3,
14,16;52:23;53:6,11;
108:15,16;144:1,15;
147:11
**actual (1)**
138:19
**actually (14)**
30:20;50:6;55:6;
67:14;87:3;116:7;118:9;
121:14;122:17;127:24;
129:19;143:4;145:4,25
**adapt (1)**
66:9
**address (4)**
9:13;31:3,8,11
**addressed (1)**
32:6

**Administrative (4)**
75:3,4;78:2,10
**admitting (1)**
41:25,25;69:11,16
**advance (1)**
22:21
**advise (1)**
80:22
**again (13)**
12:2,16;18:18;34:19;
64:17;84:17;86:16;88:4,
16,18,19,23;109:21
**against (1)**
5:6
**Aggressive (1)**
21:2
**ago (2)**
70:8;119:25
**agree (12)**
76:20;77:22;85:22;
100:8;103:8;110:7;
113:6;117:7;133:8;
135:13,23,25
**agreeing (1)**
84:18
**agrees (3)**
85:1;100:1;105:10
**ahead (5)**
45:15;103:19;104:3;
110:4;111:7
**alarm (3)**
64:22,22;65:11
**alarming (1)**
64:20
**alarms (11)**
34:1,2;64:21,25;65:1,
23;130:23,25;131:13;
132:10,14
**Allis (27)**
16:3;29:13;34:9,16,
17,18;35:1,5,13;81:7,8,
19;123:10,11,14,15,19;
124:1,15;125:17;126:9;
127:10,24;128:8,9,16;
132:8
**allotted (1)**
135:24
**allowed (6)**
71:23;72:8,12;116:21,
25;136:25
**allows (1)**
103:17
**alluded (1)**
143:1
**almost (12)**
16:23;27:15;31:19;
70:24;77:7;88:12,13;
101:21;110:18;123:7;
134:5;144:9
**always (6)**
34:3;63:14;68:5;80:9;
89:25;105:13
**Ann (1)**
4:11
**answered (3)**

63:9;103:19;111:7
**anymore (4)**
  24:1;93:8,22;120:25
**apartment (3)**
  31:9,18,22
**apologize (1)**
  9:1
**applied (1)**
  92:14
**applies (1)**
  71:21
**apply (1)**
  92:15
**appreciate (1)**
  141:12
**apprehensions (1)**
  13:6
**approaching (1)**
  18:23
**appropriate (2)**
  65:12,12
**approval (1)**
  146:7
**approved (1)**
  141:7
**approving (1)**
  147:13
**approximate (1)**
  11:24
**April (1)**
  12:4
**area (6)**
  18:1;39:24;41:25;
  96:7,18;142:9
**areas (4)**
  42:5,8;69:2,4
**around (11)**
  11:24;12:9;13:16,20;
  17:10;25:19;38:17;
  50:21;67:22;68:15;
  125:22
**Arrest (1)**
  21:1
**Aside (3)**
  98:8;103:10;104:24
**aspect (1)**
  137:25
**assets (2)**
  11:7;13:2
**assign (1)**
  22:18
**assigned (27)**
  16:11,18,21;18:25;
  22:19,24,24,25;23:2,11,
  24;27:3,6;28:11;32:22,
  23;37:20;44:19;91:24;
  92:8,10,12;93:8,9,22;
  97:12;130:20
**assignment (3)**
  44:8;46:13;61:13
**assist (4)**
  52:12,13,24;53:1
**assists (1)**
  54:20
**associated (1)**

52:23
**associate's (1)**
  9:23
**assume (3)**
  5:14;90:2;147:15
**attack (1)**
  21:4
**attempted (2)**
  102:18,20
**attempts (1)**
  104:18
**attention (2)**
  98:7;102:9
**attorneys (1)**
  6:14
**August (7)**
  11:20,25;12:8,9,11;
  17:11;26:11
**AURJB067725 (1)**
  50:1
**Aurora (26)**
  5:6;11:9,10,13;12:12;
  15:5,7;16:1,2;25:1,21;
  31:4,5;36:20;37:16;
  47:5;71:3,15;73:1;78:2;
  80:25;116:5;133:25;
  134:21;135:9;139:8
**Aurora's (11)**
  71:20;72:22;73:15;
  75:2,21;78:2,10;80:2;
  82:8;91:3;118:17
**authority (2)**
  107:23;108:1
**automatic (1)**
  91:3
**available (6)**
  23:7;71:7;84:11,23;
  137:21;138:22
**Avenue (1)**
  9:14
**average (2)**
  18:24;23:18
**avoid (2)**
  59:3;74:18
**avoided (1)**
  122:4
**aware (6)**
  35:5;42:8;93:14;
  103:16,20;113:14
**away (5)**
  31:18;72:2;86:13;
  88:18;141:19

**B**

**back (28)**
  9:7,9,22;10:15;11:4;
  18:19;27:19;35:21;
  37:10;41:10;44:5;51:23;
  57:2;58:22;67:9;68:6,
  17;72:11;84:3;86:23;
  100:16;101:3;114:16;
  123:10;131:21;134:25;
  136:16;147:18
**background (5)**

9:9,17;43:3;45:7;
  53:19
**badge (1)**
  43:14
**Badger (1)**
  9:19
**ballpark (3)**
  11:19;12:17;96:18
**base-by-base (2)**
  102:15;104:13
**based (8)**
  46:7;55:24;117:2,18,
  19;119:9;120:11,12
**basement (1)**
  39:5
**Basically (1)**
  5:4
**basis (12)**
  5:5;25:13;67:13;
  70:20;96:5;104:13,14;
  118:16;129:15;133:11;
  144:9;146:13
**Bates (3)**
  73:10;139:14
**bathroom (1)**
  68:24
**becomes (1)**
  34:12
**began (2)**
  7:12;18:18
**begin (3)**
  84:11,21;137:21
**beginning (6)**
  9:18;34:20;74:6;
  75:11;76:14;78:6
**begins (1)**
  112:10
**Behavior (1)**
  21:2
**belief (1)**
  120:12
**belongings (1)**
  40:6
**besides (2)**
  36:19;98:2
**best (3)**
  82:9;94:3;141:21
**better (4)**
  122:3;126:5,5;141:22
**big (1)**
  82:25
**bigger (2)**
  29:13;31:23
**biggest (1)**
  138:7
**binder (5)**
  134:10,22,23;139:8,10
**birth (1)**
  9:11
**bit (6)**
  30:5;36:25;44:7;49:9;
  60:20;62:22
**bites (1)**
  102:3
**blocks (2)**

31:18,19
**Board (1)**
  10:7
**book (2)**
  39:19;44:10
**books (1)**
  115:16
**boss (2)**
  72:4;108:4
**both (10)**
  11:9;19:23;22:7;
  48:12;62:18;63:24;64:8;
  105:5;133:18;144:11
**bottom (1)**
  49:25
**bouncing (1)**
  30:17
**box (2)**
  44:25;68:18
**boyfriend (1)**
  31:17
**Brabazon (4)**
  26:3;120:21,23,24
**brand (2)**
  63:20;135:8
**brawl (1)**
  18:13
**break (21)**
  5:21,22,24;8:11;
  17:17,18,19,22;38:24;
  57:21;70:13;71:21;
  75:22;88:17;114:11,24;
  131:1;132:21;135:24;
  136:6;137:5
**breakroom (2)**
  115:1,2
**breaks (5)**
  13:25;14:3;92:8;
  137:7,7
**briefly (1)**
  52:8;130:6
**bring (4)**
  51:18,19;115:7;116:7
**Bristol (3)**
  9:14;31:3,11
**broke (1)**
  65:6
**Bruenning (4)**
  28:4,5,18;134:20
**budget (5)**
  119:12,16,18,22;120:6
**building (1)**
  133:15
**bulk (1)**
  41:16
**bunch (1)**
  120:25
**burglar (1)**
  64:21
**Burlington (54)**
  15:7,8,9;16:8;18:19;
  19:4;22:12;25:3;27:7;
  28:12;29:8;30:15;31:12;
  36:9,10;37:14,19;39:5;
  40:13;41:4,22;42:10;

43:18;46:15;58:24;59:5,
  25;60:4,5,10,18;61:7,18;
  62:15;63:10,22;67:11;
  69:6;71:16;77:8;81:9;
  92:24;93:19;94:4,14,18;
  97:19;109:24;115:24;
  125:10;127:17;128:21;
  129:24;144:9
**Burlington's (7)**
  60:11,12,17,21;64:25,
  25;115:4
**busy (9)**
  38:7;58:12;67:14;
  106:9;108:6;9;110:15,
  23;111:2

---

**C**

**cable (1)**
  115:6
**cafeteria (2)**
  115:14;131:4
**calendar (1)**
  23:3
**call (78)**
  8:19,20;17:25,25;
  22:15;23:10;33:24;
  38:20;42:1,6,9;45:1;
  50:11;51:18;54:7,22;
  62:1,3,10;63:15;64:3,4,
  6,7,9,11,13;65:11,15;
  66:19;67:4,6,15,18,21;
  68:19;70:3,8,10;71:5,11;
  74:15;77:6;80:12;81:13,
  24,25;82:1,2;84:10,21;
  88:9;89:8,19,24;100:14;
  104:6;108:21;117:4,20;
  122:9;123:24;125:10;
  126:13,20;127:16;
  131:12;133:2;136:16,19,
  22;137:20;138:9,11;
  140:9,10,11,19
**called (21)**
  4:2;8:20;17:23;42:25;
  44:22;47:17;50:9,10;
  51:17;54:7;57:15;63:8,
  10;70:10;74:24;88:18,
  23;90:7;122:20;125:18;
  141:12
**calling (3)**
  90:4;117:23;136:13
**calls (29)**
  34:7;38:10;54:17;
  62:1;67:7;68:12;69:19;
  72:10;76:24;80:22;81:2,
  12,18,19,21;89:13;
  101:20;102:16;107:21;
  117:17,18;126:18;
  133:4;136:4;138:19;
  140:21,21,22,23
**came (14)**
  6:17;28:20;40:2;43:8;
  61:6;62:1;64:6,8;66:19;
  72:21;81:21;95:17;
  98:21;101:3

camera (2)
115:5;120:4
cameras (4)
34:1;64:19;65:23;
130:24
Campbell (1)
35:9
can (62)
5:22;18:12;19:20;
22:11,15;30:11;37:18;
41:13,16;44:25;45:2,2,
15,25;46:2;49:1;52:14;
54:25;55:1;59:3;60:20;
67:6,16;68:2;76:21,24;
81:2,23,24;82:19;83:4,
16,24,24;89:3,5;95:21;
103:19;108:3,23;109:7;
110:3;114:10,16;
116:24;117:20;120:13;
125:18;126:20,22;
129:23;130:2;131:4,12,
20;136:6,12;138:9;
144:16,17;145:17;147:9
cancel (21)
88:8;91:8,9,15;98:9,
13,14,24;99:22;100:4;
102:4,22;103:17;
104:25;105:6;108:23;
119:14;120:9;127:8,20;
146:9
cancelation (3)
118:18;120:16;127:21
canceled (22)
74:2,20;91:10,14;
92:7;99:8;105:2;107:15;
108:11,11;112:18;113:4,
8,10,22;119:6;121:16;
127:24;128:6;141:7;
146:20;147:24
canceling (9)
74:12;97:15;98:1,11;
99:4;103:1;119:11;
120:7;129:2
captured (2)
49:23;145:16
car (6)
4:18;44:4;51:15,20;
124:17;142:17
Care (1)
5:6
career (2)
25:21;37:16
carried (3)
14:16;40:24;41:5
carry (19)
14:11;17:15;40:14,16,
23;41:24;43:18,22;44:6;
59:19;71:6;72:9;76:8;
77:4;117:3;123:18;
131:5;133:1;138:12
carrying (3)
41:11,22;138:15
cars (2)
11:2;51:25
case-by-case (1)

104:13
cases (2)
109:5;111:8
casually (1)
119:20
catch (1)
71:3
categories (2)
110:18;145:7
category (4)
48:15;52:24;53:3,9
caught (1)
26:5
causing (1)
133:9
C-Cure (1)
64:19
cell (11)
40:19,25;59:25;63:1,
5,13;68:3;71:6;123:21;
125:6;133:1
Center (4)
16:1;134:21,23;139:9
central (16)
33:22;34:15;45:3;
61:21;62:2,11,17,19;
63:6;65:20,21;67:2;
81:23;123:23;130:21;
131:12
certain (9)
22:24;39:24;50:21;
83:25;84:1;107:25;
108:2;117:17;145:13
certification (1)
10:8
certifications (1)
10:9
chain (2)
22:3;35:19
challenging (1)
36:25
chance (8)
48:22;49:1;58:12;
66:1;106:12;107:1;
109:9;110:16
change (13)
19:9,10,12;24:4;
28:20,24;37:25;38:5;
50:5,8;95:4,12;147:18
changed (2)
56:16,18
changes (1)
102:16
channel (1)
41:14
chapter (2)
106:16,17
characterization (1)
110:2
charge (1)
32:8
chatter (1)
43:3
check (4)
39:9;116:1,9;146:17

checked (1)
39:17
checking (4)
38:18;50:17;53:14;
146:19
choice (2)
123:2;145:22
choose (4)
71:24;101:25;116:21;
123:1
Chris (1)
4:7
cited (1)
105:20
City (1)
31:7
CL (3)
112:17,24;113:11
clarify (1)
91:23
clear (1)
8:6
clinic (6)
38:16;40:6,7,8,9;
50:20
clinics (2)
130:23;132:17
Clint (7)
20:14,17;21:9,17,23;
22:4,7
clocking (1)
136:25
close (2)
31:14;36:18
closest (1)
30:24
CMS (16)
8:14;34:11,12,14;
63:16;64:8,15,18;65:25,
25;66:23;124:5;125:7,
14,15;132:7
CNA (1)
76:24
code (1)
107:6
College (2)
9:22;10:2
colonoscopies (1)
51:8
column (4)
60:22;112:16,24;
113:12
combative (9)
44:24;46:4;58:2;70:2;
72:2;90:13;95:18;
125:20,24
comfortable (2)
26:8;51:16
coming (4)
40:11;45:5;86:23;
126:18
command (2)
22:3;98:5
comment (4)
51:2;56:2;145:9;

147:12
commented (2)
105:3,5
comments (1)
111:12
commit (1)
106:18
common (1)
7:25
communicate (8)
6:13;40:11;41:17,23;
66:23;67:2;105:16,17
communicating (2)
42:15;117:19
communication (14)
14:11;17:15;19:6,18,
19;40:14,16,21;43:17;
59:19;62:23
communications (7)
8:24;20:4;42:16,19;
119:10;120:11;145:1
comparable (2)
60:8;61:8
compensated (5)
18:16;100:9;101:6;
103:4;113:8
completed (4)
47:18,19;60:23;136:7
completely (4)
63:2;130:16;133:13,
14
complies (2)
73:13;80:3
computer (18)
39:2,3,9,14;48:1,4;
69:21,23;94:11;112:21;
115:22,23,25;116:1,2;
143:24;144:12,14
computers (1)
68:1
concept (3)
63:21;124:2,5
concern (1)
133:10
concluded (1)
148:6
conform (1)
137:13
conforms (2)
135:21;137:10
confusing (1)
85:16
connected (1)
41:20
consider (4)
82:17;90:18;103:13;
127:1
considered (8)
23:14,15;24:8;76:18;
77:17,22;119:9;133:20
constitutes (1)
141:17
contact (5)
65:15;100:20;106:20;
108:18;141:10

contents (1)
75:5
continue (1)
140:16
continuing (1)
27:6
continuously (1)
65:22
contradict (1)
103:23
contradicts (2)
137:3;138:1
conversation (10)
7:5;8:3;9:5;37:5;
104:20;119:25;121:10,
15;122:2;129:19
conversations (6)
43:4;119:19;121:3,6,
8;140:24
copies (1)
139:21
copy (5)
72:25;134:12;139:6,7,
17
corner (1)
50:1
corporate (18)
7:10,17;16:4;24:5;
93:9,10,16;129:21;
130:5,22,24;132:1,18;
132:1,12,18;133:15,20
corresponded (1)
99:14
counsel (5)
6:11;139:24;140:1;
144:24;146:6
count (3)
113:24;114:1,3
Country (1)
11:2
counts (3)
4:19,22;10:10
couple (14)
11:23;24:25;27:13;
43:25;49:4;54:21;57:1;
59:15;79:3;96:17,17,24;
119:25;140:4
course (2)
44:9;46:18
court (5)
5:8,10,17;38:16;50:20
cover (1)
126:10
coverage (1)
15:14
covered (1)
145:6
covering (3)
26:24;27:17;29:1
CPR (1)
10:10
crap (1)
86:10
criminal (1)
9:23

**critical (1)**
83:7
**Culver's (5)**
10:24;11:14;12:2,8,19
**Cummings (8)**
21:25;22:8,9,10;
78:23;85:17;133:23;
137:16
**current (1)**
132:5
**currently (4)**
14:25;36:19;132:21;
134:3
**cuts (1)**
11:11

**D**

**DAAT (3)**
20:22,24;21:1
**daily (9)**
46:24;48:3;60:7;
99:13;137:8;144:5,9;
145:9;146:13
**dark (2)**
51:17;142:21
**dashes (1)**
110:20
**date (7)**
9:11;15:19,22;24:6;
26:7;94:10;96:13
**dated (3)**
52:5;79:9,15
**dates (4)**
10:23;99:14,15;
112:24
**Dave (10)**
6:25;7:8;8:3;21:24,24;
22:1,4,6;121:9,15
**day (23)**
21:19;22:17;27:15,16;
33:6;36:22;38:7;43:19;
44:10;46:18;48:6;50:7;
61:7;9;98:13,14;107:12,
20;121:17;137:1;
139:12,25,25
**days (7)**
21:19;23:8;49:13;
55:24;94:21;106:11;
146:19
**deal (2)**
125:24;145:14
**dealing (2)**
46:1;58:7
**December (7)**
9:25;25:14;27:14;
94:7,9,15;139:11
**decide (1)**
89:12
**decided (1)**
25:20
**deduction (1)**
91:3
**defeats (1)**
105:14

**Defense (1)**
21:1
**definition (1)**
141:16
**degree (3)**
9:23;10:4,5
**Delavan (1)**
11:2
**delayed (4)**
74:15;80:10,12;104:5
**deliver (2)**
45:2;86:14
**delivery (1)**
42:3
**department (12)**
20:5;22:11;47:6;68:2;
76:4,22;77:8;103:23;
104:1;110:25;133:1,20
**department-specific (1)**
73:16
**Depend (1)**
61:14
**depending (2)**
61:20;88:9
**depends (2)**
86:25;127:15
**deposed (1)**
4:15
**deposition (4)**
4:9;6:7,14;148:6
**depositions (2)**
4:23;5:4
**depth (1)**
8:23
**describe (2)**
70:19;122:1
**described (3)**
83:15;104:24;107:4
**describing (2)**
9:2;133:11
**deserves (1)**
82:9
**determination (2)**
58:14;136:23
**determine (6)**
57:20;64:3;88:25;
136:5;138:10;145:19
**determined (2)**
136:12,21
**determines (1)**
89:3
**determining (2)**
46:7,12
**deterred (1)**
13:8
**device (4)**
14:11;17:15;40:15,22
**devices (8)**
40:17,25;43:17;59:19,
22,25;62:23;123:17
**diabetic (1)**
142:4
**difference (2)**
23:16;86:3
**differences (6)**

48:9,12;59:5,10;
61:11;123:8
**different (25)**
16:6;18:1;20:24;37:2,
9;39:11;48:2;54:17;
61:18;69:2,4;80:4,5,25;
81:1,16;94:20;103:8;
121:1;129:3;130:13,16;
131:20;133:13,14
**dire (1)**
98:6
**direct (8)**
19:4;25:15;97:18,19;
105:9,15;128:11;129:22
**directed (2)**
20:6;42:17
**directly (7)**
21:25;29:10;43:1,1;
98:15;119:17,21
**director (1)**
22:10
**dirty (1)**
50:14
**disaster (1)**
41:14
**discipline (9)**
56:4;73:20,23;74:19;
80:18;91:16,20,21;103:3
**discouraged (2)**
118:17;120:16
**discouraging (4)**
97:15;98:1,11;119:9
**discretion (4)**
46:12;140:10;145:13,
19
**discussion (3)**
48:18;72:17;111:25
**dispatch (4)**
17:24;130:25;133:17,
17
**dispatches (1)**
123:25
**distinction (1)**
23:13
**document (23)**
46:17;56:4;72:15;
75:9;77:25;78:4,8,19;
79:13,19;80:15;84:3;
112:14,22;113:1,3;
134:7,11,16,18,20;
139:3,14
**documented (1)**
137:8
**documenting (2)**
56:11,14
**documents (4)**
6:6,10;60:15;144:3
**done (20)**
43:25;46:1;54:1;
62:18;82:15;83:3;88:12,
13;90:11,12;96:6;
101:21;103:14;111:5;
115:18;123:7;134:5;
143:7;145:20;148:5
**Donnelly (1)**

32:13
**door (6)**
46:5;51:2,4;64:20;
82:25;142:8
**doors (8)**
34:1;38:15,20;44:19;
50:19,21,22;53:14
**down (11)**
5:18;7:18;31:13;
38:24;57:4;66:9;75:18;
94:13,14;106:15;129:24
**Dr (1)**
50:11
**drawing (1)**
59:4
**drive (2)**
124:18,22
**drugs (1)**
6:1
**due (1)**
97:8
**duly (1)**
4:3
**dumb (1)**
121:14
**duration (9)**
71:5;86:20;102:10;
114:2;116:13;117:4;
124:12;127:19;141:24
**during (20)**
17:21;33:6;38:12,13;
41:2;53:12;54:12;55:21;
62:19;66:2;70:24;71:1;
74:23,25;76:9;77:21;
95:4;116:4;131:16;
140:25
**duties (7)**
7:16;53:23;62:18,19;
71:12;109:11;122:9
**duty (1)**
63:8
**dying (1)**
90:15

**E**

**earlier (12)**
6:24;12:1;53:19;
100:12;103:21;110:8;
115:23;116:20;117:16;
121:9;122:23;146:9
**early (2)**
34:20;38:7
**easier (1)**
30:16
**eat (3)**
58:5;66:6,7,11;67:16;
86:11,23;88:19;101:12;
114:24,25;115:13;142:2
**eating (11)**
58:9;67:19;74:23;
82:15;88:12,16;115:10;
142:22;143:2,4,12
**economy (1)**
11:11

**edit (1)**
147:21
**educational (1)**
9:17
**effort (2)**
103:7;126:10
**eight (10)**
4:25;5:1;13:24;38:16;
50:16,18;52:10;96:9;
98:22;131:25
**eight-hour (1)**
95:8
**either (7)**
32:4;45:25;52:1,14;
66:23;67:21;121:12
**eleven (8)**
13:19;51:13,22;59:13;
93:3,10,12,13
**Elkhorn (1)**
16:1
**Ellen (11)**
26:21,21;28:1,3,4,13,
18;128:24;129:7,18;
134:20
**else (16)**
21:4;41:11;53:22;
66:24;68:8;82:21;89:21;
90:17;97:14,25;98:5,10;
103:25;105:21;110:25;
143:8
**email (10)**
19:17;25:22;26:21;
32:4;80:11;116:2,5,6,7,9
**emails (22)**
6:8;20:3,3,6;38:9,25;
39:10;50:17;56:3;72:4;
74:12;91:22;92:6;94:2;
96:11,12;97:1,22;98:8,
16;100:20;106:1
**emergency (15)**
69:25;82:1,17;83:22;
84:10,21;90:1,19;98:6;
103:13;127:1;137:20;
141:17,17,21
**employed (3)**
12:1;31:4;131:18
**employee (9)**
7:12;47:13;51:23;
71:14;73:2;77:14;78:3,
13;139:18
**employees (7)**
51:25;58:8;76:14,21;
115:11;120:18;121:4
**employment (5)**
10:19;20:19;75:11;
78:6;114:2
**empty (1)**
13:7
**end (20)**
17:11;18:18;27:14;
30:21;43:19,20;83:17,
20;88:20;94:7,15;96:21,
25;122:1;126:24;137:1;
143:3;145:15,21;147:15
**ended (1)**

147:20

**Enforcement (1)**
10:7

**enough (3)**
51:6;127:11;132:16

**enrolled (1)**
11:4

**enter (2)**
47:25;48:15

**entered (4)**
46:25;48:14;53:11;
132:10

**entire (13)**
21:19;23:3;41:2;
53:24;69:18,22;106:9,
15;107:21;110:15;
116:12;138:7,10

**entrance (1)**
51:13

**entries (2)**
47:25;112:8

**episode (1)**
115:8

**equipment (12)**
40:22;45:4;51:9;
68:18;72:9;77:4;82:5;
90:9;117:3;122:13;
138:16;142:12

**ER (10)**
41:25;44:23,24;46:4;
58:2;69:16;70:6;95:17;
125:24;141:25

**escort (1)**
47:8

**escorts (3)**
51:13,14;90:14

**Especially (2)**
21:12;58:18

**essentially (1)**
32:19

**estimate (1)**
26:6

**etc (1)**
61:3

**even (15)**
68:3;106:12;107:1,2;
109:9,9;110:15;111:2;
114:1,2;122:16;126:19;
134:1;138:18;141:19

**everyone (4)**
68:8,14,15;69:21

**exact (9)**
10:23;11:16;13:18;
24:24;26:10;48:11;73:5;
96:13;120:2

**exactly (4)**
20:17;95:20;96:25;
129:10

**EXAMINATION (3)**
4:5;140:7;144:22

**examined (1)**
4:4

**Example (11)**
63:1;76:22;82:4;
88:17;90:7;95:4,16;

101:2,14;103:6;114:24

**examples (5)**
39:25;111:17;119:8;
120:15;142:10

**exception (3)**
16:22;27:13;44:18

**Excuse (2)**
39:11;65:12

**Exempt (1)**
78:3

**Exhibit (26)**
48:19,24;60:16;72:16;
75:8;78:1,14,15,18,20;
79:9;84:4;109:14,17;
138:22,22,23;139:2,7;
141:4,5;146:5

**existed (2)**
90:24;139:10

**exists (1)**
122:20

**expect (1)**
82:19

**expected (16)**
53:25;64:12;76:9,25;
82:2;86:20;94:22,24;
95:9;122:12,13;133:5;
135:8;138:11;140:13;
142:25

**experience (6)**
24:20;37:9;59:2;
66:21;68:9;117:18

**experiences (1)**
77:11

**explain (2)**
123:14,15

**explained (1)**
8:12

**explanation (1)**
108:25

**extended (1)**
25:18

**extension (1)**
136:17

**extent (1)**
120:2

**exterior (6)**
124:16,21;125:17;
126:1,3,19

**external (1)**
53:14

**extra (3)**
40:7,9;95:3

**F**

**F1 (1)**
136:25

**facilities (8)**
30:24;59:6;65:2;
67:10,11;123:9;130:15;
135:15

**facility (11)**
29:15;53:13;59:8;
69:22;71:8;72:11;81:3;

95:20;129:2;131:2;
132:1

**fact (5)**
32:15;34:21;116:20;
129:17;131:10

**facts (1)**
5:12

**Fair (2)**
51:6;107:14

**familiar (6)**
41:8;75:2,8,10;78:4;
134:11

**family (1)**
90:15

**far (1)**
112:16

**faster (1)**
95:22

**fax (1)**
144:8

**faxed (7)**
6:8,12;73:4,6;79:5;
139:19,25

**fear (1)**
142:23

**feasible (1)**
126:4

**February (5)**
24:9;93:15,16;94:5,11

**feel (14)**
26:8;70:22;71:10;
83:19;97:25;99:18,24;
109:5;118:16;120:15;
122:22,23;137:13;
142:20

**feels (1)**
100:1

**fellow (1)**
58:8

**felt (3)**
32:5;97:14;98:10

**few (5)**
39:25;49:3;87:3;
110:20;144:20

**fiancé (1)**
7:1

**fifth (1)**
125:19

**fight (1)**
18:14

**figure (1)**
135:1

**filed (1)**
114:5

**fill (1)**
47:24

**filled (2)**
47:21;110:19

**filling (1)**
27:10;49:20

**finally (1)**
67:16

**find (1)**
83:4

**fine (3)**

11:15;12:18;83:2

**finish (3)**
100:17;102:20;126:22

**finished (3)**
143:4,10,12

**finishing (1)**
137:4

**fired (1)**
71:4

**first (46)**
4:3;10:10,20;13:10,
12;15:1,5;19:24;21:15;
25:11;27:14;28:8,21,24;
29:18;30:13;31:5;32:2;
33:10;44:8,15,17;47:2,
24;49:25;50:3;55:21;
56:1;59:14;61:12,22;
79:9,14;86:22;94:22,24;
98:17,25;106:13;107:3;
115:12;116:23;130:18;
131:22;134:17;135:23

**fit (1)**
31:21

**five (8)**
10:25;14:25;69:7;
70:8;86:2;88:16;106:19;
142:3

**five-ish (1)**
69:7

**Flags (4)**
17:3,5,9;18:10

**Flight (1)**
86:8

**flip (1)**
34:11

**floor (3)**
45:1;51:10;125:19

**follow (1)**
73:22

**followed (3)**
87:12;98:16,20

**following (1)**
73:20

**follows (1)**
4:4

**Ford (1)**
11:2

**forgot (2)**
17:3;146:15

**form (2)**
46:20;48:3

**forms (3)**
46:22,22;133:11

**forth (3)**
29:11;41:10;131:22

**forward (2)**
81:12,15

**found (1)**
67:16

**four (3)**
19:2;69:7;134:15

**free (4)**
42:12;122:11,16,18

**frequency (4)**
19:15;24:23;105:4,20

**frequent (1)**
20:2;25:13;57:6;
102:24

**frequently (5)**
32:21;39:24;91:13;
113:4;116:15

**Friday (5)**
7:12;9:6;19:10;22:25;
25:9

**Fridays (1)**
16:11

**front (1)**
73:7

**frowned (1)**
120:10

**frustrating (2)**
68:13,20

**full (3)**
87:24;143:10;144:16

**full-on (1)**
18:13

**full-time (10)**
16:24;17:12;21:16;
22:13;23:14;24:3,7;
25:17;102:25;131:24

**full-timers (2)**
23:2,20

**full-times (1)**
71:17

**further (2)**
140:2;148:3

**G**

**garage (2)**
142:15,16

**Gastral-something (1)**
51:5

**Gateway (3)**
9:22;10:3,6

**gave (1)**
137:16

**general (13)**
13:3;19:18,20;45:9;
48:15;53:13;55:15;
61:25;72:22;73:15;
128:4;132:13;133:21

**generally (17)**
49:2;67:7,19;70:18;
74:18;78:25;92:15;
101:15,19;110:10;
124:14,15;125:15;
135:3;143:7,14;145:24

**generate (1)**
47:14

**generates (1)**
92:19

**Geneva (1)**
9:20

**Genoa (1)**
31:7

**gets (7)**
74:14;76:6;77:8;
87:16;88:4;102:21;
126:23

GI (2)
51:2,4
given (3)
18:8;72:25;139:6
gives (1)
47:10
goes (10)
28:14;44:9;47:4;
51:21;75:18;89:22;
112:12;114:5,8;128:19
good (7)
18:7;38:12;49:7;
50:25;57:23;70:13;
78:19
Gotcha (1)
36:13;60:24;64:17
gotta (1)
126:24
grab (2)
62:25,25
graduated (3)
9:19,24;10:24
Grafton (1)
35:10
Granted (1)
81:21
Greg (2)
34:25;35:3
ground (1)
5:3
group (2)
83:22;133:19
groups (1)
42:20
guess (10)
11:19;12:17;23:10;
26:6,10;34:20;40:21;
44:16;108:3;141:21
guide (1)
134:25
guidelines (1)
76:7
guy (1)
95:17
guys (1)
121:16

## H

half (15)
20:1;21:20;76:17,23;
86:8;88:14;91:7;95:3,9,
11;96:9;98:23;123:2;
131:13;143:8
half-hour (3)
19:9;74:24;113:9
Halfway (2)
20:11,19
hand (2)
41:15;126:23
handbook (3)
71:14,19;78:14
handed (2)
48:23;112:4
handful (2)

6:10;18:7
handing (1)
139:2
handle (6)
8:20;45:25;64:3,6;
76:24;140:15
handled (1)
126:7
handles (1)
64:4
handwriting (1)
49:18
handwritten (1)
144:6
happen (3)
20:16;24:4;113:21
happened (7)
38:13;57:10;83:9;
88:1;95:13;107:22;
139:11
happens (2)
102:13;121:21
head (1)
120:14
Health (1)
5:6
hear (5)
63:24;64:9;68:11;
126:17,18;146:22;
147:16
heart (1)
21:4
heat (1)
86:7
held (4)
43:4;48:18;72:17;
111:25
help (16)
15:14;21:15;25:12;
44:23,24;46:2;82:10,16;
89:13,14,15,15,20,21;
94:13;126:24
helped (1)
19:11
Helping (6)
51:15,25;52:14,14,17;
102:10
herein (1)
4:3
Hey (5)
22:15;67:3;96:3;
133:3;141:10
Hi (1)
4:7
high (5)
9:18,19;10:20,22,24
higher (2)
45:24;98:5
highest (2)
22:11;133:24
highlighted (1)
79:6
high-theft (1)
13:5
Hill (2)

35:17,18
hire (1)
135:3
hired (11)
10:21;11:9;12:12;
14:20;17:10;22:23;31:5;
91:24;93:4;97:10;
141:14
history (1)
10:20
hold (9)
43:1,2;63:7;70:4;
80:22;81:17,18,19;142:3
home (4)
15:10,16;108:22;
128:21
honest (1)
63:2
honestly (5)
7:2;26:11;104:23;
111:23;127:9
hop (1)
41:13
Hospital (11)
15:7;16:2;31:13;
38:18;41:19;67:23;68:4;
69:5;82:14;106:19;
109:12
hospitals (1)
133:14
hour (17)
20:1,1;21:20;34:10;
76:17,23;86:8;88:14;
95:3,9,11;97:6;98:11;
103:11;123:2;131:14;
143:9
hours (58)
11:5;13:16,24;15:13;
16:12,18,19,21,24,25;
18:22,23,25;19:1;21:16;
22:13,14,24;23:2,11,18,
20,22,24,24;25:1,17;
25:17;27:4,6;30:14;
32:22,23,25;34:10,11;
37:21;61:23;62:5;73:24;
91:4,6;92:2,14,15,18;
93:8,9,12,22;94:20;
96:10;97:12;98:23;
103:1;106:19;130:20;
142:1;146:16
hours' (1)
25:6
house (2)
51:3;142:11
hungry (6)
57:22,24;58:1,5,11;
66:4
hurry (1)
82:25
hurt (1)
58:8
hypothetical (1)
127:14

## I

Ian (2)
35:9,10
ICU (3)
44:25;81:15,15
ID (2)
47:13;139:18
idea (1)
113:23
identification (3)
48:20;112:2;138:24
imagine (1)
58:18
immediate (1)
136:5
immediately (3)
67:8;83:13;98:7
implied (3)
119:23,24;120:8
importance (1)
45:24
important (7)
37:4;58:7;70:5,11;
95:14,19,25
impression (1)
121:16
inaccurate (1)
113:1
included (1)
118:6
includes (1)
109:12
including (4)
36:9;73:3;122:16;
131:24
inconsistent (1)
84:14
inconvenience (1)
108:24
individual (2)
45:19;95:21
individuals (3)
42:5,15;98:3
infant (1)
70:6
inform (1)
140:13
information (7)
48:10,11;49:23;53:2,
5;79:5;132:9
inside (3)
44:5;75:5;125:23
instead (2)
111:5;132:19
interaction (3)
19:15;20:20;21:7,9,
11;28:18
interests (1)
25:21
interior (3)
125:16;126:6,22
internal (2)
41:14;53:13

internet (2)
39:15;93:2
interrupt (9)
88:25;89:11,12;90:22;
104:15;127:5;141:20;
142:6,14
interrupted (42)
54:11,16,19;55:2,8;
56:5,15,22,25;57:4,9;
74:5,14;77:21;80:16;
84:10,20;85:4,18;87:8,
17;88:4;99:5,12;100:10,
23;101:16,18;102:19,22;
103:12;117:8,11,14,23;
126:2;131:5;137:20;
141:11,13;143:5,11
interrupting (5)
84:1,2;118:2,4,5
interruption (4)
87:1;104:18;109:15;
135:6
interview (1)
21:21
intimidating (1)
98:17
into (22)
8:22;9:10;11:4;47:1,
25;48:10,12,14,16;53:5,
11;55:3;65:6;83:22;
86:2,3;88:17;95:17;
119:18;132:10;142:9,11
introduced (1)
4:8
inventory (1)
13:5
involve (2)
22:1;42:22
involved (2)
18:14;47:12
isolate (1)
87:13
issued (3)
71:14,18;78:22
items (2)
13:5;138:12
IV (6)
83:6,7;90:2;100:15,
16;101:2

## J

James (8)
30:1,1,2;32:8,9,16,17,
18
January (2)
79:15;139:11
January/February (1)
79:10
Jeffrey (1)
34:24
Jerry (7)
7:2;25:2,5;26:2,3,16;
120:21
Jim (90)
6:24;19:5,7,13,14,16,

21,23;20:10,11,12,12,13,
21;21:3,7,22;23:6;28:9,
14,15,16;29:6,8,9;35:20,
25;36:1,8;38:1,1,6;48:4;
50:5;56:4;74:4,13;80:7;
84:15,18;85:1,10,15,16,
17;91:22;97:2,3,4,16,20,
20,21,22,23;98:12,13;
99:11,20,20;100:1,3;
104:4,15;105:4,5,7,7,8,
13;108:13,14;111:11,22;
120:1,20;128:19,21,22;
129:6,6,21,21,25,25;
143:21,21;144:4,8,8

**Jims (2)**
20:13;85:15

**Jim's (1)**
92:6

**job (10)**
10:20;13:3;92:14;
93:2;97:11;105:9,11,24;
123:6;142:19

**jobs (2)**
36:19;128:1

**Joel (1)**
120:24

**Jokowski (1)**
120:24

**judgment (2)**
46:8;107:19

**jump (1)**
9:10

**June (1)**
9:12

**justice (1)**
9:24

## K

**keep (9)**
25:25;30:16;60:9,13;
62:9;66:16;77:10;91:23;
126:14

**Kenosha (29)**
16:2,3;28:12;29:9,16,
17,19,21;30:8,17,19,21;
31:1,25;32:10,22,24;
33:18;35:21;36:11,12;
61:10;62:20,24;63:5,13;
124:3;125:10;132:8

**Kenosha-area (1)**
64:24

**kept (1)**
15:20

**keys (4)**
40:19,20;60:1;71:7

**kind (26)**
12:17;13:11,11;25:8;
29:4;36:17;44:17;45:3;
49:8;53:1;55:17;66:6;
67:4;69:13,25;76:7;
80:3;82:5;90:2,9;
101:20;105:14;124:19;
131:21;133:21;134:25

**kinds (1)**

54:17

**knew (7)**
23:6;60:13;123:12;
147:7,9,9,10

**knowledge (2)**
41:21;144:13

**known (1)**
4:12

**knows (1)**
64:9

**Kronos (31)**
43:14;59:17;74:7,8;
88:8;91:4,11,14;98:2;
99:15,17;100:6;102:4,
23;105:2;107:8;111:12,
14;112:7,8;127:8;
128:11,12,17,22;129:22;
144:3,13;146:11,13;
147:22

**Krueger (1)**
34:24

**Kunes (6)**
11:23,24;12:3,7,9,21

**Kunes' (1)**
11:2

**Kyle (3)**
6:20,21,22

## L

**labor (1)**
42:2

**Lake (2)**
9:20;31:7

**Lakeland (56)**
6:23;16:1;21:14;
24:20;25:3,4,15;26:7,14,
15,22;27:4,5,10,17,20,
21;28:1,10,11;29:3,21;
30:14,15,19;36:9;59:9,
12,20;60:5,13,18,21;
61:9,18;62:16;63:22;
67:11;71:18;81:9;94:10,
12,17,19;95:1,6,7;120:5;
125:10;129:25;134:10,
21,23;135:16,17;139:8

**language (1)**
73:17

**laptop (2)**
116:8,10

**last (16)**
6:9;9:2;15:12,16,21;
16:22,22;31:2;32:12;
84:8;94:9,12,14;96:24;
120:21;137:18

**late (5)**
29:23;93:15,16;94:11;
147:18

**later (4)**
5:9;87:9;121:23;146:1

**law (3)**
5:8;10:7;70:22

**lawsuit (11)**
4:17,24;5:6;7:5;8:10;
70:21;114:5;122:4;

133:11;138:8,10

**learn (1)**
5:5

**learned (1)**
68:9

**least (8)**
18:7;56:15;61:19;
73:24;77:8;85:13;
115:23;140:13

**leave (22)**
8:15,21;11:14;21:21;
25:16,18;33:25;38:7;
46:4;58:2;62:12;64:16,
16;71:23;72:8,12;76:22,
23;103:11;116:21,24,25

**left (7)**
11:6;12:7,7,9;95:5;
102:3;117:5

**length (2)**
87:1;106:15

**less (4)**
30:18;33:19;70:4;
76:16

**letting (1)**
38:18

**level (3)**
20:20;22:4;28:17

**lift (1)**
52:14

**lifting (3)**
44:23;89:13;90:13

**limit (1)**
86:2

**line (3)**
51:22;53:5;54:24

**LISA (5)**
4:2,7,11;54:8;70:18

**list (2)**
15:24;65:15

**listen (4)**
116:8,11,12,14

**little (11)**
4:18;20:18;30:5;
31:22;36:17;44:7;49:9;
60:20;62:22;70:13;
114:11

**live (3)**
30:25;31:19;83:14

**lived (1)**
31:18

**lives (1)**
31:6

**living (2)**
31:3,6

**located (2)**
39:4;130:7

**location (8)**
14:24;15:1,5,5;18:2;
47:10,11;95:21

**locations (2)**
15:25;16:6

**lock (1)**
38:15

**locked (7)**
38:16,21,21;50:19,22,

22;142:12

**locking (3)**
44:19;50:19,20

**lock-up (1)**
52:10

**lock-ups (1)**
61:25

**log (23)**
38:11;39:17,19;40:1,
4;46:24;47:24;48:3,8;
55:3;56:21;57:12;99:13;
109:6,21;110:20;111:1,
19;137:8;140:22;141:2;
143:25;145:9

**login (1)**
39:11

**logs (29)**
47:22;48:13;49:3,24;
55:25;60:9;99:14,21;
108:14;109:13,22;110:7,
13,14,17,23;111:12;
140:19;143:22;144:5,12,
13,14,24;145:3,16,23;
147:11,22

**long (8)**
13:21,22;14:5;17:9;
55:6;114:4;127:19;
129:18

**longer (1)**
102:9

**look (24)**
44:10;48:8,22;49:1;
72:15;77:25;79:21;84:8;
107:8,12;108:23;
109:13;110:11,22,25;
112:16,23;115:9;
135:18;141:5;144:10;
146:25;147:1,9

**looked (5)**
56:20,20;57:12;60:15;
107:16;110:7;137:10;
146:5;147:22

**looking (9)**
11:17;49:24;51:1;
55:24;73:10;75:16;89:3;
113:3;147:7

**looks (3)**
60:7;100:3;112:10

**loop (1)**
133:21

**Lopata (1)**
34:24

**loss (3)**
133:19,24;134:4

**lot (9)**
21:14;22:1;24:11,14;
49:16;51:23;65:3;85:15;
119:14

**Lowery (1)**
6:22

**lucky (1)**
27:16

**Luke's (7)**
7:15;65:1;131:12;
132:3,15,19;133:3

**lunch (308)**
7:16;8:19,20;13:25;
14:2,13,15,18;17:17,18,
19,22,23,25;18:9,17,18;
44:25;55:23;56:2,5,12,
15,22;57:9,14;58:3,4,9,
17;62:9;65:17,20,25;
66:13,22,24;67:4,7,12,
17,20;68:8,11,16,16,18,
20,25;69:3;70:23;71:1,5,
11,11,12;72:1;74:5,6,12,
14,16,17,20,21,23,23;
75:1,1;76:4,6,9,10,25;
77:6,9;79:18,22;80:10,
13,17,23;81:25;82:3,6,
11,15;83:2,3,17,20;84:1,
2,9,11,14,16,20,22,25;
85:2,4,8,11,16,18,20,24;
86:6,9,13,17,22,24;87:7,
8,11,16,18,22;88:4,7,8,
12,13,16,19,20,22,24;
89:1,4,6,10,12,16;90:10,
22;91:3,8,9,10,24;92:8;
97:6,15;98:2,9,11,14,24;
99:4,4,8,15,16,22;100:2,
4,5,6,10,12,14,17,18,19,
23;101:4,5,10,19,24;
102:2,4,19,21,22;
103:1,4,12;104:5,6,8,16,
25;105:2,6,23;106:10,
12;107:1,2,6,7,10,11,15,
17,22,24;108:2,10,11,12,
23;109:10;110:12,16;
111:3,10,11,13,14,14,18,
18;112:18;113:4,7,16,
20,22;114:17,18,24,24,
25;115:19,13;116:4,16,
17;117:4,8,12,14,21,23;
118:2,4,6,17;119:6,18,
22;120:9,16,19;121:17,
19;122:9,10,25;125:12,
13,15;126:6,6,11,13,22,
25;127:5,8,10,18,20,21,
24;128:7;131:1,4,11,14;
132:21;133:4;134:16;
135:19,24;137:19,23;
138:9;140:14,15;141:11,
13,20,24;142:2,4,5,6,14,
23;143:2,4,7,12,13,15;
145:15,21;146:20;147:4,
14,24

**lunch' (1)**
7:18

**lunches (12)**
7:13;8:4,7,7;57:13,18;
99:12;103:17;115:7;
119:11,14;120:7

**Lynn (5)**
30:5;32:1;35:23;
128:24

**Lynn's (1)**
32:12

## M

**machine (4)**
43:14;74:7;91:4;100:6
**magazines (1)**
115:16
**maiden (1)**
4:12
**mailing (1)**
31:7
**main (4)**
42:4;51:13;69:11;
81:13
**Mainly (3)**
27:12;34:2;49:6
**maintaining (1)**
45:9
**makes (1)**
77:5
**making (5)**
38:20;50:21;53:16;
58:13;63:23
**man (1)**
134:4
**Management (5)**
21:2;103:22,25;122:4;
123:4
**manager (2)**
22:6;65:13
**manner (1)**
72:11
**manual (8)**
71:17;75:3,4;78:2,10;
139:8,21,22
**many (18)**
7:2;16:19;20:13;
30:14;33:3;41:21,22;
69:2,4;70:4;104:7,12;
105:23;113:21;123:16;
131:17;138:4,6
**March (9)**
12:3,12,12;14:20;
17:10;96:21,22,23;
112:10
**mark (1)**
138:21
**marked (17)**
48:19,23;50:1;60:16;
72:16;73:11;75:7;78:1,
15,20;109:14;112:1,4;
134:8;138:23;139:2,14
**married (2)**
32:13,15
**Mary (5)**
30:5;32:1,12;35:23;
128:24
**matter (1)**
68:10
**May (67)**
6:24;9:24;12:14;19:5,
7,13,25;28:9,16;29:6,8,
9;38:1;50:5;52:5;56:4;
63:10,11;71:18;74:4,13;
78:5;80:7;84:15,18;
85:1,16,17;89:23;97:3,
20,20,23;98:12;99:11,
20,20;100:1,3;102:11;

104:4,19;105:4,7,7;
108:13;111:11,22;
115:13;120:20;128:19,
21;129:6,7,8,8,11,12,21,
25;142:11;143:21;
144:8;145:8,8;147:13,15
**maybe (38)**
11:20,20;12:3,4;
13:19;20:1,22;21:17;
24:25;26:10,11;27:15;
29:20,23;31:9,13;33:10;
34:20;51:9;59:2;70:12;
75:5,11,11;78:5;79:3;
83:7,8;91:16,17;96:17,
24;101:16;102:2;
107:20;122:3;142:4,4
**McDonald's (1)**
72:1
**meal (17)**
57:21;71:21;73:15;
74:1,2;75:16,21;76:15,
17;77:15,17,21;97:8;
136:6;141:6,7,18
**meals (1)**
73:19
**mean (31)**
7:1;20:8;23:16,24;
29:12;37:20;45:4;46:3;
55:17;57:3;67:22;68:22;
72:7,12;74:22;76:11;
80:3;86:19;91:19;92:11;
93:14;99:19;101:7;
114:20;119:16;120:25;
125:25;128:1;147:1,2,3
**meaning (2)**
118:7,9
**means (5)**
53:21;71:6;89:8;
112:18;143:17
**Medical (6)**
16:1;25:16,18;134:21,
23;139:9
**medication (1)**
6:1
**medicine (1)**
83:8
**meeting (2)**
7:12;9:2
**member (1)**
90:16
**memo (1)**
68:11
**Memorial (5)**
15:7;16:2,3;29:16;
30:8
**mentally-disabled (1)**
106:17
**mentioned (3)**
28:1;29:15;119:19
**met (1)**
20:22
**Metro (5)**
20:13;80:24,25;81:16,
20
**Michael (2)**

34:24;78:23
**middle (4)**
60:22;96:13,19,23
**Middlemas (1)**
35:8
**mid-shift (1)**
13:20
**might (4)**
75:6;96:23;127:17;
143:1
**Mike (8)**
21:25;22:8,9,10;35:8;
85:17;133:23;137:16
**mile (1)**
31:13
**military (1)**
50:25
**Milwaukee (2)**
16:4;130:10
**mind (4)**
18:12;26:17,19;83:23
**mine (1)**
49:6
**minimum (3)**
33:20;124:1,1
**minute (1)**
44:11
**minutes (27)**
14:6;54:21,23;57:1;
67:16;70:8;72:2;85:3;
86:2,3,15;88:11,17;
89:15;91:5;96:2,7;
101:13;102:11;109:8;
122:11,16,17;131:6;
133:4;138:17;142:3
**miscommunication (1)**
121:13
**missed (2)**
137:5,7
**missing (2)**
40:5,7
**misunderstanding (1)**
121:13
**Mm-hmm (17)**
27:22;28:2;39:1;
40:18;42:7;48:25;59:18;
74:11;75:17;77:3,19;
103:15;112:9;118:19,
22;145:2;146:8
**MOAB (3)**
20:23,24;21:2
**mom (3)**
4:18;7:1;31:6
**moment (2)**
32:6;36:21
**moment's (1)**
71:8
**money (1)**
119:15
**monitor (11)**
34:1;64:23,24;65:2,
23,23;128:10;130:22,24;
131:13;146:17
**monitored (1)**
132:18

**monitoring (18)**
33:22;34:4,15;61:22;
62:2,11,17,19;63:6;
64:19;65:21,22;67:2;
81:23;123:23;130:22;
131:13;132:4
**monitors (1)**
74:8
**month (7)**
11:14;21:18;24:24;
26:6,10;29:20;91:17
**months (10)**
11:23;12:17;21:13;
24:25;27:13;34:21;
59:15;96:17,24;119:25
**morally (1)**
83:13
**Moraza (8)**
20:11,12,13,15,21;
21:3,22;35:20
**more (33)**
14:24;18:3,6;21:11;
25:13;29:14,14;30:12;
33:6;36:25;39:24;41:12;
56:21;57:6,12;58:7;
62:22,25;69:25;87:4,10;
88:10;89:5,7;91:15;
96:7;101:17;115:14;
116:9;117:15,16;126:5;
141:23
**morning (3)**
28:20;93:13,13
**most (11)**
7:4;28:21;32:21;
37:14;56:23;59:12;67:1;
70:5;89:8;94:3;111:8
**motion (1)**
64:22
**Motorola (1)**
41:6
**move (4)**
31:2,22;52:15;102:10
**moved (4)**
31:8,16,21;95:23
**movie (1)**
115:7
**moving (3)**
89:14;90:12;102:13
**much (15)**
19:6,15;21:6,9;28:17;
31:21;50:4;66:9;75:23;
76:11;85:9;89:19;144:2,
4,11
**multiple (2)**
8:9,10
**multiple-officer (2)**
8:13;121:24
**Murphy (1)**
32:9
**music (3)**
116:8,11,12
**must (2)**
5:9;74:1
**myself (2)**
4:8;19:12;47:13

**N**

**name (12)**
4:7,10,12;32:12,15;
35:2;49:15;93:23;
120:21;139:15,17,23
**named (1)**
4:21
**names (2)**
4:12;22:22
**nap (1)**
138:16
**nature (3)**
46:10;86:25;130:13
**natures (1)**
130:14
**necessarily (3)**
108:6;141:1;147:2
**need (44)**
5:16,21;7:21;23:5;
44:23,24;45:4;50:12;
54:8;56:4;62:4;63:13;
65:5;66:10;67:4,8,18;
68:6,18,18;74:10;82:14;
82:25;83:1,6,8;86:14;
89:13,14,15,15,20,24;
90:4;92:4;95:24;101:14;
102:14;126:23;131:11;
142:5,11;145:14;146:6
**needed (27)**
15:14;18:10;21:15;
25:12,25;29:4;30:9;
31:22;32:3,5;38:19;
39:23;41:15;42:1;47:25;
50:19;62:9;63:7;66:19;
70:7;72:5;89:23;94:13;
99:11;141:10,15;142:15
**needs (20)**
22:17;33:23;82:4,18;
83:8;90:3,12,14,14;98:6;
100:15;103:14;106:20;
123:23;126:1,7,13;
132:13;142:13;145:20
**network (3)**
42:16;47:5;63:24
**new (8)**
32:15;50:12;84:11,22;
93:9;135:3,8;137:21
**newsletter (4)**
78:21;85:13;101:1;
137:16
**newsletters (2)**
78:22;79:8
**newspapers (1)**
115:16
**next (7)**
29:15;51:22;52:4;
54:22;130:10;136:21;
138:22
**NICKELS (27)**
4:6,7;8:1;9:8;45:18;
48:21;69:1;70:12,17;
72:19;84:7;103:24;
104:9;109:16,20;110:6;

111:15;112:3;114:10,
15;119:3;135:10;139:1;
140:2;144:20,23;148:3
**night (11)**
27:19;33:6;38:5;
50:20;51:15;58:12;61:7,
8;67:14;93:13;106:9
**nightly (1)**
60:6
**nights (8)**
7:15;19:22;108:20,21;
130:20;131:8,23;132:25
**nine (1)**
69:11
**nodding (1)**
5:20
**noise (1)**
43:15
**non-approach (1)**
119:20
**non-emergency (2)**
81:25;83:23
**Nonexempt (1)**
78:3
**nope (3)**
27:18;53:11;125:7
**normal (1)**
66:12
**note (1)**
99:21
**notice (1)**
71:8
**noticed (2)**
39:21;93:1
**notification (1)**
74:10
**notify (2)**
74:1,8
**noting (1)**
99:12
**NOVOTNAK (19)**
7:20,24;9:1;45:14;
68:21;70:14;84:5;
103:18;104:2;109:18;
110:1;111:6;114:12;
118:24;119:2;140:4,8;
144:18;148:5
**number (10)**
33:20;37:1;47:13;
59:1;69:21;81:13;
104:17;114:3;139:18;
147:23
**numbered (1)**
39:20
**numbers (6)**
23:18;47:9;52:21;
53:4;69:19;110:19
**numerous (6)**
18:7;21:16;67:23;
87:19;95:17;120:20
**nurse (3)**
68:5;76:24;82:4
**nurses (1)**
76:22
**nurse's (2)**

42:3;68:24

## O

**oath (3)**
4:3;5:7,8
**OB (4)**
42:2;69:16;70:6;
136:18
**object (2)**
45:14;110:1
**Objection (3)**
103:18;104:2;111:6
**obviously (3)**
23:5;46:3;147:18
**occasion (1)**
115:18
**occasionally (2)**
66:25;128:18
**occasions (2)**
87:10;91:18
**o'clock (5)**
37:20,25;38:16;54:19;
69:11
**October (2)**
112:13;114:8
**off (23)**
4:8;8:20;9:21;14:14,
18;19:23;22:17;23:5,6;
25:7;27:16;48:18;57:15;
72:17;21;82:3,11;89:16;
111:25;120:13;126:14;
132:22;145:15
**office (29)**
16:4;21:20;39:3,5,6,7;
48:7;50:17;51:1;53:9,
12;54:23;63:10;114:19,
20,21;115:3,24,25;
116:13,14,16,18,23,24;
129:21;132:12,18;
133:15
**officer (62)**
8:18,18,21;18:4,6;
23:14,15;30:3;32:8,20;
33:15,18;34:3,6,12,12;
39:6,8;43:20;44:13;
61:21,24;62:2,3,8,12,18;
63:8;64:5,8,9,15,18;
65:19;66:13,14,22;
71:16;77:13;81:24;82:1,
3;84:10,21;95:19;
123:24;124:16,20;
125:17;126:1,6,10,20;
130:11;133:16,17;134:9,
9,22;136:5;137:20;
139:7
**officers (26)**
8:8,10;18:15;20:7;
29:14;33:3,20;35:13;
38:11;39:9;40:10;61:19;
63:24;65:17,24;71:22;
73:17;123:16,25;124:2,
14;126:9;131:17;132:6,
15;135:23
**officer's (1)**

64:2
**officers' (1)**
49:5
**offices (1)**
7:11
**off-site (3)**
125:25;130:23;132:17
**often (15)**
19:22;20:4;24:15;
79:3;90:23;91:15;96:7;
105:6;115:12,14;117:14,
15,16;145:5;147:1
**old (2)**
55:17;93:23
**on-call (2)**
40:17,19
**once (7)**
19:24;38:6;46:1;
56:25;91:16;99:11;
115:13
**one (89)**
8:14;10:17;14:24;
18:3,6,12;19:8;23:25;
25:3;27:15,16;28:11,12,
12;31:22;33:4,14,17;
34:3,3,6,10;36:6;38:24;
39:20;40:3;41:24;42:2,
4;50:2;52:9,15,17;
53:19;54:2,22;56:7;
58:8;61:21,21;64:2;
65:24;68:5,16;69:7,12,
13;71:12;76:5,8;78:18;
79:2,4,5,9,14,16,17;
80:16;81:7,17;86:16;
89:20;90:17;94:3,23;
96:24;97:25;101:16;
102:3;105:20;107:3,21;
110:17,18,22;118:20;
121:18;124:5,6,7;129:9;
133:21;134:12,13;
136:13,15;139:12,12;
145:7
**one-officer (1)**
95:12
**one-on-one (1)**
106:20,20
**one-person (1)**
67:10
**ones (10)**
42:13;55:14;60:18;
67:24,25;106:22;
110:14;113:10,11;
120:17
**online (3)**
72:18,22;73:1
**only (19)**
5:22;11:23;13:14,16;
28:7,11;33:14,17;42:13;
54:21;76:3,8;96:2;
109:8;128:11,17;129:9,
23;145:3
**on-the-record (1)**
15:22
**open (1)**
67:24

**operation (1)**
42:14
**operator (1)**
81:11
**opinion (6)**
82:18;86:6,19;90:18;
108:4;120:8
**opportunity (1)**
108:8
**opposed (2)**
22:13;27:2
**order (4)**
5:5;74:2;89:1;104:25
**orientation (1)**
135:11
**original (1)**
61:13
**others (2)**
102:8,10
**otherwise (2)**
57:15;61:1
**out (64)**
7:18;10:13;11:11;
12:13;14:7;19:11;22:21;
31:8;39:21;41:15,16;
43:16;44:4;47:22,24;
49:20;51:16,18,19,25;
59:4;74:6;21;75:1;79:3;
80:17;85:4;86:9,13,17,
21;87:10;88:12,22,24;
91:5;100:3,6,12,18;
101:15,19;104:8;
105:23;107:1,10,22,24;
108:1,17;111:10;
119:15;120:19;126:23;
127:9;135:1;136:25;
137:4;139:7;142:23;
143:13;146:14,15,18
**outside (6)**
10:13;25:21;43:22;
59:23;86:7;124:23
**over (25)**
5:3;7:16;17:3;18:18;
20:18;21:15;24:16,17;
25:5,16;30:17;36:17;
42:15;44:9;46:6,18;
49:8;63:24;74:16;80:13;
84:23;85:2;91:4;104:6;
144:8
**overlap (1)**
44:12
**overtime (2)**
21:16;119:15
**own (3)**
31:8;36:17;70:19

## P

**packages (1)**
13:7
**pads (1)**
40:5
**page (30)**
49:25;50:3;52:4,5;
54:18;55:13;68:1,1,7;

69:23;73:7,7,10;79:24;
84:9;91:2;124:5;134:14;
135:18;136:15,17;
137:18,19;140:9,11,14,
16,18;141:3;143:16
**paged (3)**
44:22;136:20;141:18
**pager (13)**
40:17,25;59:25;63:1,
4;69:20,21;71:7;76:8;
118:3;123:19;125:3,4
**pages (2)**
39:20;140:25
**paid (29)**
14:2;17:19;23:5;
70:25;71:10,13;74:3,17;
75:1;76:4,6,10;77:7,8;
100:2,4;101:6,8;113:16,
19;122:10,24;123:3;
127:21;138:8,12,14;
142:20;146:17
**paper (1)**
48:3
**papers (1)**
73:6
**paperwork (1)**
83:1
**paragraph (5)**
73:11,18;80:20;
135:19;136:3
**park (1)**
18:1
**parking (4)**
51:23;124:19;125:20,
22
**Parrsad (1)**
50:11
**part (10)**
4:24;10:1;43:5;46:8;
72:22;73:22;79:6,9;
136:13;142:24
**participate (1)**
4:23
**part-time (5)**
11:9;13:14,21;23:15;
131:24
**part-timer (1)**
24:9
**part-timers (2)**
23:21,25
**party (1)**
4:17
**pass-on (4)**
38:11;39:19;40:1,4
**past (5)**
6:23;21:12;27:13;
59:15;93:24
**Pat (5)**
6:20,21,22;139:6,20
**patient (44)**
44:23,24;46:4;50:14;
51:9;52:11,13,14,15,18,
24;53:1;54:20;58:2,7;
68:19,22,23;70:2;72:2;
81:14;82:5,7,9,18;83:6,

7,9;86:14;89:14,14,24,
25;90:3;100:15;102:11,
14;106:21;125:21,24;
141:18,24,25;142:13
**patients (5)**
90:13,13,13;106:16,17
**patrol (32)**
8:17,18;13:6;34:12;
38:17;45:9;62:3,8,18;
64:5,8,9;65:19;66:2,12,
22;96:6;124:7,8,16,18,
18,20,21;125:14,16,17;
126:1,2,3,6,19
**patrolling (3)**
38:23;39:24;109:12
**patrols (2)**
53:13;61:25
**pay (4)**
16:12;137:4;147:16,
20
**payroll (1)**
24:7
**Peggy (2)**
51:3,3
**Pell (1)**
31:7
**pending (1)**
5:23
**people (23)**
6:17;7:3;8:25;18:14;
41:22;42:8,11;51:15;
63:9;65:12;67:14;69:16;
81:12;92:18;102:12;
120:6,20;121:1;130:25;
131:23;135:3,8;142:20
**people's (2)**
22:22;26:24
**per (3)**
33:20;100:20,20
**percent (8)**
12:2,16;32:15;33:7;
34:21;57:3;69:20;
131:10
**perception (1)**
89:5
**perform (6)**
45:20,21,22;89:1,9;
145:4
**performed (2)**
46:18;47:16
**perimeter (1)**
124:18
**period (36)**
16:12;55:5,7;71:5,25;
73:15;74:1,2,13;76:15;
77:16,22;80:23;83:17,
20;84:9,11,12,20,22,23;
85:2;92:10;101:10;
113:9;117:11,12;137:19,
21,22;143:3,6,11,18;
147:16,20
**periodically (2)**
19:1;115:6
**periods (6)**
75:16;76:17;77:17;

97:8;117:8;141:7
**person (25)**
8:14;18:3;19:17,20,
21;22:16,17;32:10;
33:25;39:23;58:13;
64:10,12;68:4,17;69:22;
95:24;96:3;117:19;
118:2;126:4,12;129:8;
133:24;140:13
**Personal (5)**
116:6,7,8,9,10
**person's (1)**
96:5
**pertains (1)**
77:1
**peruse (1)**
112:23
**pharmacies (2)**
130:23;132:18
**pharmacy (2)**
65:6,14
**philosophy (2)**
82:8,12
**phone (18)**
19:17;38:10;40:19,25;
59:25;63:1,5,13;68:3;
71:6;115:20;123:21;
125:6;133:1,5;140:23,
24;145:1
**phones (2)**
68:1,2
**phonetic (5)**
32:13;34:24;35:9;
43:15;120:24
**physical (1)**
144:4
**physically (1)**
48:7
**pick (8)**
15:13;16:13;19:1,11;
25:10;28:22,23;118:3
**picked (8)**
24:11;27:18;30:9,11,
12,18,20;32:25
**picking (6)**
17:1,2;18:22;22:14;
24:14;27:21
**piece (2)**
40:22;142:12
**place (1)**
49:8
**places (2)**
59:1;126:1
**plaintiff (1)**
70:20
**plugging (1)**
53:3
**pm (20)**
16:11;23:1;38:2,4,5;
70:15,16;91:25;92:3,19;
93:19;94:15,25;95:5,5;
97:12;114:13,14;
130:21;148:6
**point (6)**
29:22;75:16;88:7;

96:8;99:1;102:2
**police (5)**
9:24;10:1,6;41:7;
65:14
**policies (2)**
72:23;137:10
**policy (22)**
71:21;73:15,19;75:22;
78:3;79:18,22;80:2;
85:8,11,24;100:20;
103:16,21,21;118:18;
120:17;135:21;137:2,
25;138:3;141:6
**pop (3)**
19:25;21:17;23:7
**pops (1)**
18:12
**position (10)**
8:16;11:11;12:13,19;
65:20;66:2;93:9;124:17;
132:20;133:12
**positions (4)**
93:2;131:18,21;
132:12
**positive (2)**
12:3;33:7
**possible (2)**
146:23,25
**post (1)**
93:2
**posting (2)**
92:14;97:11
**postings (1)**
93:1
**postpone (1)**
25:24
**potential (1)**
122:19
**potentially (1)**
58:8
**practice (3)**
57:7;88:6;137:14
**preceding (1)**
44:13
**premises (4)**
72:13;116:22,25;
117:5
**preparation (3)**
6:6,14,16
**prescription (1)**
40:5
**present (2)**
9:13;133:9
**pretty (5)**
50:4;66:9;75:23;
76:11;85:9
**prevent (1)**
6:3
**prevented (2)**
83:10;108:10
**prevention (3)**
133:19,25;134:4
**Previously (8)**
59:9;72:16;75:7;78:1,
20;104:12;134:8;136:9

**primarily (5)**
26:24;64:3;69:19;
97:16;108:20
**primary (2)**
32:9;130:17
**print (1)**
144:17
**printed (3)**
72:21,25;139:17
**prior (2)**
93:15,16
**prioritize (1)**
145:13
**priority (6)**
46:6,7,13;58:6;
136:22;141:22
**probably (9)**
51:10,11;79:16;86:10,
23;106:6;107:9;127:20;
141:23
**problem (4)**
17:7;138:3;147:17,19
**procedure (2)**
132:16;136:2
**PROCEEDINGS (1)**
4:1
**produced (1)**
139:5
**program (1)**
143:24
**programmed (4)**
41:13;84:13,25;
137:23
**programs (2)**
20:25;144:3
**protect (1)**
142:20
**protection (3)**
11:7;13:1,2
**provided (3)**
6:10;79:19;108:25
**PTO (3)**
23:4;25:6;26:16
**pulled (1)**
15:21
**pulling (2)**
50:21;132:17
**punch (26)**
14:7;43:10,15;74:6,
21;75:1;80:17;85:4;
86:13,17,21;87:10;
88:12,21,24;100:6,18;
101:15;104:8;107:1,10,
22;120:19;136:25;
143:13;146:15
**punched (12)**
100:12;101:19;
107:24;108:1;113:15,
19;127:9;146:14,14,18,
18;147:3
**punch-in (2)**
128:12;130:1
**punching (4)**
7:18;86:8;105:23;
111:9

**punch-out (2)**
128:12;130:1
**purpose (3)**
5:11;95:10;105:15
**pursue (1)**
25:20
**put (19)**
16:24;23:4;24:7;
26:16,23;40:4;47:3,13,
15,16;52:5;56:1;80:11;
83:1;99:15;111:12;
134:22;142:2;145:15
**putting (3)**
48:10,11;53:5

## Q

**qualifications (1)**
117:2
**question's (1)**
5:23
**quickly (3)**
42:1;49:22;134:18
**quite (1)**
20:4
**quote (4)**
32:3;77:6;81:18;134:4

## R

**radio (44)**
14:13,16,18;17:16,21;
40:19,25;41:4,6,8,9,11;
42:6,9,16,25;43:8;60:1;
62:10,25;63:1,3,24;
66:15;67:12;69:12,14,
17;70:3,5;71:7;122:19;
123:21;125:8,9,9;
126:14,15;131:5;132:22,
23;140:9,11,18
**radiologist (1)**
76:5
**radios (13)**
41:12,16,20,22;42:12;
62:23;63:18,19;67:24,
25;69:8,25;125:11
**raised (1)**
82:22
**random (4)**
49:3,7,10,13
**rare (1)**
91:18
**rather (1)**
103:3
**reach (1)**
68:2
**read (12)**
37:10;38:9,10,25;
40:17;51:2;75:20;80:1;
84:25;115:16;118:3;
144:16
**reading (6)**
70:22;78:5;79:21;
84:4;85:6,12
**reads (1)**

84:18
**ready (1)**
108:19
**real (3)**
7:25;130:6;134:17
**Realistically (1)**
57:24
**realized (1)**
123:7
**really (11)**
10:13;21:14;26:8;
31:14;40:21;44:16;65:1;
67:13;108:9;135:4,7
**reason (7)**
6:1;62:4;64:16;87:11;
111:10;112:25;142:5
**recall (20)**
7:4;33:17;50:6;71:18,
19;75:12;79:6;93:17;
96:25;104:19,21;
111:20;120:13;125:4;
127:12,23;128:5;129:9,
13,15
**receive (4)**
117:17;138:18;
140:25;141:3
**received (10)**
9:23;56:3;78:23;79:1,
2;81:22;88:9;89:9;
136:4;139:20
**receiving (1)**
144:25
**recent (4)**
7:4;56:21;57:12;
121:10
**recently (4)**
75:12;78:7;94:4;
139:23
**receptive (1)**
41:11
**recess (2)**
70:15;114:13
**recognize (2)**
39:13;47:15
**recollection (1)**
94:3
**record (14)**
4:8,10;37:11;48:18;
72:17;111:25;112:6;
114:16;134:17;140:18,
22,23;141:1,3
**recorded (1)**
5:20
**recording (2)**
84:13,24
**records (3)**
146:11,24;147:8
**reference (1)**
134:24
**references (2)**
8:4,5
**referencing (1)**
9:6
**referring (6)**
6:11;26:3;52:19;

54:17;80:15;81:4
**reflect (2)**
144:25;145:4
**reflected (2)**
145:22;146:1
**regard (2)**
141:4;144:24
**regardless (1)**
117:5
**region (15)**
7:18;8:8;15:13,21;
21:12;26:1;36:2,6,14;
66:10;80:25;81:17,18;
97:17;128:25
**registration (1)**
42:4
**regular (5)**
23:18;27:2;67:13;
96:4;137:2
**regularity (1)**
132:9
**regularly (3)**
27:23;30:7;33:1
**relieve (4)**
8:11;71:12;121:18;
122:8
**relieving (1)**
43:21
**remain (3)**
71:4;117:4;126:13
**remember (24)**
4:25;11:16;13:18;
18:13;24:24;26:12;
34:22,23;50:5;52:16;
63:2,4;73:5;75:15;78:5,
7;96:14;104:19;111:20;
120:1,3;123:20;127:9,25
**remembered (1)**
17:2
**remind (1)**
7:20
**reminded (1)**
17:4
**Reminder (1)**
79:17,22
**repeat (1)**
145:17
**repeater (3)**
41:13,19;125:11
**rephrase (2)**
5:13;33:16
**report (10)**
29:5;32:3;35:15,16,
18;36:4,15;48:6,8;
133:22
**reported (8)**
19:13;20:10;21:23;
28:13;35:13,25;36:5;
97:21
**reporter (3)**
5:17;109:15;135:6
**reporting (1)**
32:20
**reports (2)**
97:18;144:17

**represent (2)**
109:23;112:5
**representation (1)**
110:8
**reprimanded (1)**
72:6
**request (6)**
18:11;46:10;55:10;
63:23;83:19;145:13
**requested (1)**
145:6
**requesting (1)**
136:13
**requests (3)**
23:4;45:5;83:16
**require (2)**
102:9;106:19
**required (6)**
11:5;66:16;71:4;
88:10;116:17;136:6
**requires (2)**
33:23;86:20
**reread (1)**
84:17
**resource (3)**
134:10,22;139:8
**resource's (1)**
71:17
**respect (1)**
29:8
**respond (22)**
18:1,10,15;32:10;
62:13;64:12;65:13;
66:20;70:7;71:25;72:10;
76:9;77:1;82:2;95:22;
122:14;123:25;126:4,6;
133:5;140:17;142:25
**responded (2)**
97:21;132:11
**responder (1)**
10:11
**responding (3)**
34:7;61:5;83:10
**responds (1)**
64:10
**response (5)**
5:17;70:1;72:3;106:3;
132:13
**responsibilities (2)**
13:4;54:2
**responsibility (1)**
64:2
**responsible (2)**
45:8;109:11
**rest (2)**
52:1;73:15
**restart (21)**
74:16;85:8,11,19;
86:15;88:3;100:24,25;
101:3,5,7;102:1,21;
104:16;127:18;137:24,
25;138:3,5,6;143:15
**restarted (1)**
87:8,18,21;100:19
**restarting (3)**

84:15;101:9;143:19
**restarts (1)**
87:14
**restraining (1)**
44:24
**resume (3)**
76:16;77:16;143:5
**résumé (1)**
11:17
**return (4)**
8:23;10:14;82:20;
86:21
**review (2)**
6:6;146:13
**reviewed (1)**
146:23
**reviewing (1)**
146:11
**right (23)**
18:21;29:16;57:2;
85:12,12;86:13;90:10;
91:23;94:6;96:18;103:7;
107:23;112:16;113:9;
120:22;124:7;130:10;
131:6;133:13,23;
137:25;141:19;147:24
**right-hand (1)**
49:25
**ripped (1)**
39:21
**risk (1)**
118:14
**road (1)**
31:13
**role (6)**
14:12;18:4;77:13;
130:17;132:4;134:1
**roll (1)**
102:14
**room (9)**
51:11;65:5;68:5,17,
22,22,24;95:23;96:5
**rotate (2)**
124:9;131:21
**rotation (1)**
34:9
**roughly (4)**
38:6;61:23;62:5;69:10
**round (2)**
54:8,12
**rounds (15)**
34:6;40:7,9;50:16;
51:1;53:9,12,14,21;
54:19,23;55:2,6;61:3,25
**rounds/office (1)**
52:2
**routine (3)**
60:6,7;80:22
**rule (2)**
95:1;104:11
**rules (1)**
5:4
**run (6)**
5:3;21:3;44:5;48:6;
70:9;100:16;125:24;

135:20
**running (2)**
101:2;123:8

## S

**safe (2)**
53:2;126:9
**safety (1)**
142:24
**Sagan (29)**
19:14,16,21,23;20:10;
28:14;35:25;36:1,8;
48:5;91:22;97:2,4,16,21,
22;98:14;105:5,8,13;
108:14;120:1;128:22;
129:6,21,25;143:21;
144:4,8
**same (34)**
5:7;12:7;22:4;23:2;
28:9,14;29:7;41:13;
48:11;51:21;59:25;
63:18,20,21;67:9;76:7,
10,11;82:20;91:1;92:15,
18,18;101:20;102:17;
104:2;122:5;124:2,4,5;
125:9,11;133:9;143:16
**sample (3)**
49:11;55:15;109:14
**Saturday (3)**
23:1;25:10;27:19
**Saturdays (1)**
16:12
**saw (2)**
75:12;147:23
**saying (24)**
32:16,19;50:3;54:25;
72:4;75:4,25;80:14,16,
20;83:6;85:1,17;91:22;
92:6;95:22;97:5;105:19,
21;110:22;118:3;
121:25;122:18;137:24
**Schaeffer (4)**
20:14,15;21:9,23
**schedule (12)**
22:20;23:7;26:23;
33:8;92:13,19,21,21;
93:19;94:19,23,24
**scheduled (18)**
17:1;18:21;22:13;
23:19,20,21;26:14;27:2,
23;30:7;33:14,18;93:17;
94:4,22;96:9;98:22;
130:2
**schedules (7)**
22:23;91:6;93:6,24,
24,25;94:2
**scheduling (1)**
22:20
**school (7)**
9:18,19,21;10:21,22,
24;11:4
**SCHULTZ (3)**
4:2,11;139:14
**scopes (1)**

51:8
**screen (1)**
112:21
**scrubs (2)**
50:12,13
**season (1)**
115:7
**second (21)**
8:21;13:10,12;19:25;
25:11;27:11;28:23;
30:12;33:9;35:8;45:1;
61:15;73:10;76:13;
79:15;88:23;124:20;
131:22;136:3,3;146:5
**seconds (1)**
95:13
**section (5)**
51:2;56:2;79:22;
111:12;145:9
**security (36)**
17:5;18:4,6;20:7;
22:10;23:14,15;30:3;
32:20;33:15,18;35:13;
39:6,7;40:10;44:16;
45:10;47:5;68:7,19;
71:21;73:17,19;77:13;
110:25;114:21;115:3,24,
25;116:16,17;130:11;
131:17;132:6;133:16,17
**security-guard-related (1)**
12:19
**seeing (3)**
75:13,15;78:7
**selling (1)**
11:1
**semester (3)**
9:21;10:17;16:22
**send (4)**
32:4;72:4;79:4;81:2
**sending (2)**
139:21;140:14
**sent (8)**
26:21;73:6;79:4,17;
91:22;139:4,19,24
**sentence (6)**
76:13;84:8;135:23;
136:4,12,21
**separate (4)**
10:3,6;60:21;74:25
**sergeant (13)**
25:14;28:9,11;29:3,5,
10;30:6;31:25;32:3;
34:25;35:8,14;134:21
**sergeants (9)**
28:10;29:13,14;35:4,
15,16;36:4,5;121:6
**sergeant's (1)**
35:2
**series (1)**
115:8
**service (9)**
62:1,11;66:19;74:15;
80:12;104:6;127:16;
136:4,5
**services (1)**

45:3
**set (4)**
22:23;57:25;59:3;
104:17
**setting (2)**
103:10;133:15
**set-up (1)**
65:18
**seven (10)**
13:19;37:20,25;38:5;
50:4;59:16;91:25;93:7,
12,20
**shall (2)**
76:17;77:17
**sheet (1)**
107:8
**sheets (1)**
102:14
**shift (111)**
13:9,12;14:16;16:15;
19:9,9,11,12,24,25;
21:15;25:8,11,11;27:11,
11,12,14,19,23;28:19,19,
21,23,23;30:10,12,
21;32:2;33:3,9,11,18,20;
34:25;35:8;36:23;37:18,
25;38:5;41:2;43:20,22;
49:5;50:5,8;52:1,9;
53:24;58:20,23,24;
59:13,14;60:2;61:14,15,
19;69:18;76:1,6;77:20,
21;87:9;93:11,11;94:4,
14,22,24;95:2,3,4,8,12;
97:7,8;98:10,13,21,24;
103:7;105:1;106:9,15;
107:5,13,21;109:23;
110:9,15;111:1;115:12;
116:12,13;118:21;
123:17;129:2,25;130:4,
18;131:3,6,9,22;133:6,7,
9;140:9,25
**shifts (41)**
13:22;16:10,13;17:1,
2;18:23;24:12,14,19;
26:14,25;27:9,9,17,21;
28:22;29:3;30:7,13,18;
31:24;37:14;40:11;50:2;
52:9;59:9;61:10;62:20;
90:17;91:24;92:6,10,22;
93:17;96:9;98:22;
103:10;106:14;112:24;
130:13,14
**short (1)**
55:5
**shorten (8)**
97:5,6,8;98:9,24;
103:7;105:1;118:21
**shortened (1)**
92:6
**shortening (2)**
92:9;103:10
**shortly (4)**
25:1,2;96:15;114:5
**short-staffed (6)**
15:20;21:14;22:16;

25:25;94:21;106:22
**show (7)**
44:10;59:11;75:7;
78:19;92:12;123:16;
134:7
**showed (3)**
39:2;61:12;62:24
**showing (1)**
73:9
**shows (4)**
49:16;55:11;112:20;
113:11
**sick (3)**
22:17;82:5,14
**side (1)**
40:9
**sign (1)**
39:12
**similar (14)**
35:19;41:6;60:4,5,19,
20;61:1,8;62:15;73:14;
79:19;112:20;132:3;
135:5
**simply (1)**
5:11
**single (9)**
57:4;67:21,22;68:3;
69:22;109:21;110:18;
117:11;140:18
**single-officer (4)**
32:25;80:21,24;
121:17
**single-person (1)**
60:2
**sit (4)**
61:22;106:15;113:24;
131:4
**site (14)**
15:10,16;32:7,25;
37:11;48:8;108:13;
114:21;121:18;128:3,13,
19,21;144:6
**sites (14)**
8:9,13;19:2;29:11,13;
36:5;37:1,9;80:21,24;
89:18;95:12;121:1,24
**site-specific (4)**
36:24;37:7;121:2;
128:2
**sitting (2)**
33:24;106:23
**situation (15)**
54:4;66:12;82:17;
102:18;103:8;104:24;
107:4,6;113:14,15;
118:20;126:7;127:2,4,7
**situations (36)**
18:9;83:15,16,19,25;
84:1;87:7,17,20;90:19,
21,24;98:25;99:3,7;
100:9;101:25;102:5,7,9;
103:12;105:1;107:25;
108:2;109:2;111:16;
113:7;114:16;119:5,8;
122:17;138:18;145:12,

18;147:12,23
**six (8)**
13:23;17:3,5,9;18:10;
25:19;73:24;91:4
**sleep (4)**
71:1;108:18;122:24;
123:1
**sleeping (3)**
71:4;123:5,6
**slot (1)**
27:2
**smaller (1)**
89:18
**soiled (1)**
50:13
**solely (1)**
48:14
**solve (1)**
138:10
**somebody (2)**
142:8
**someone (28)**
21:4;33:1,23;42:25;
44:25;45:11,19;46:5;
51:18,19;54:5,7;58:16;
63:9,14,23;65:6;68:11;
81:19;82:14,24;90:14;
105:2;106:20;133:4;
142:3,15;145:18
**someone's (1)**
53:16
**sometime (1)**
92:3
**sometimes (9)**
21:18;33:11,12;66:25;
88:1;99:9,9;107:9;126:3
**somewhere (5)**
13:19;25:19;31:23;
53:16;98:17
**soon (1)**
90:11
**sorry (18)**
7:23;17:4,8;18:20;
33:16;38:4;45:17;55:22;
82:6,10;97:6;109:16;
115:3;119:1;126:24;
136:3;142:22;145:17
**sort (23)**
5:7;14:11;15:3;38:24;
40:13;44:9;45:7;47:3;
49:10,22;50:2;53:18;
58:22,23;59:4;65:16;
70:18;87:13;123:8,16;
124:4;133:10;135:19
**sorts (4)**
48:9;89:11;114:23;
123:17
**sounds (2)**
75:24;78:19
**south (14)**
7:18;8:7;15:13,21;
21:12;26:1;36:2,6,14;
66:10;81:17,18;97:17;
128:25
**speaks (1)**

109:6
**Specialist (1)**
13:2
**specific (10)**
20:9;34:19;44:20;
47:9,10;65:3;101:14;
112:22;134:12;142:10
**specifically (9)**
54:5,18;56:2;78:24;
83:5;120:3;127:12;
129:13;139:19
**specify (1)**
52:25
**spot (1)**
65:3
**squad (2)**
124:17,24
**St (7)**
7:15;65:1;131:12;
132:3,15,19;133:3
**staff (4)**
80:21;89:19;122:5;
123:4
**stand (1)**
34:14
**Standard (2)**
10:7;136:2
**stands (1)**
21:1
**start (14)**
11:24;15:1;16:8;
19:20;24:22;29:19;
80:13;84:22;85:2;98:17;
99:12;104:6;119:24;
143:17
**started (24)**
7:10;9:22;11:1,4,6;
12:1,6,10;25:1,8;56:1;
60:22;71:15;79:11,12;
88:16;92:1,4;96:15,20;
98:18;103:2;111:22;
112:12
**starting (2)**
10:20;25:14
**state (1)**
4:9
**station (27)**
8:15;33:22;34:4,11,
15;42:3;61:22;62:2,11,
12,17,19;63:7,8;64:15,
18;65:21,22;67:2;68:25;
81:23;123:23,24,25;
130:22;131:13;132:7
**stationary (1)**
8:16
**stationed (1)**
41:25
**stay (6)**
30:16;33:25;92:4,5;
95:3,9
**stayed (3)**
11:13;17:23;94:13
**steps (1)**
70:4
**still (27)**

10:23;12:1;15:9,13;
21:11;27:17,21;44:4;
46:15;68:12;74:16;82:1;
93:21,25;94:12,13;
95:20;109:11;122:12;
126:13;128:20,21;
130:18;133:19,22;
138:15,15
**Stoxton (1)**
6:22
**Street (2)**
16:4;130:8
**strict (1)**
95:2
**strike (1)**
125:12
**structure (2)**
125:20,23
**structures (1)**
124:19
**stuck (2)**
86:7;106:23
**studied (1)**
33:8
**stuff (6)**
9:10;31:21;44:17;
51:8;64:24;90:12
**stumble (1)**
139:12
**subcategories (2)**
110:19;145:7
**subcategory (4)**
52:21,25;53:4,10
**subject (2)**
76:16;77:16
**substance (1)**
8:24
**suicide (1)**
106:18
**summarization (1)**
47:23
**summer (5)**
16:22;17:3;29:23;
31:9,10
**Summit (2)**
36:14,18
**Sunday (2)**
25:8,10
**Sundays (2)**
25:7;26:18
**superior (1)**
32:7
**supervised (1)**
129:3
**supervisor (39)**
19:4;25:15;26:22;
28:1,7;33:15;35:10,12;
36:1,6;48:4;51:3;58:20;
74:1;75:25;76:2;97:17,
18,20;105:9,12,15,16,17,
17;107:15;110:11;
119:5;128:6,13,19;
129:1,22,23;141:8,10,
15;142:11;146:7
**supervisors (11)**

19:3;36:5;100:21;
111:4;118:16;119:10;
121:7;128:11,16;
141:12;143:21
**supplies (1)**
89:23
**supply (2)**
51:11;89:24
**support (2)**
82:8,11
**suppose (1)**
56:20
**supposed (9)**
38:21;49:10;64:10;
85:19;92:22;98:9,23;
100:23;104:7
**sure (40)**
5:1;9:9;10:12;11:21;
12:16;18:13,16;26:5;
33:17;37:5,10;38:16,20;
40:24,24;43:17;50:21;
53:16;54:9;56:9,9;57:5,
5;63:3;70:14;75:7;
83:12,15,24;87:6;90:8;
91:1;101:9;105:19;
114:12;118:15;124:4;
130:3;143:16;146:18
**surveillance (1)**
13:6
**suspicious (1)**
39:23
**swipe (2)**
43:10;59:17
**swipes (1)**
43:15
**swiping (1)**
61:12
**switch (2)**
20:15;62:5
**switchboard (7)**
80:22,23;81:1,5,10,16,
22
**switched (1)**
93:15
**swoop (1)**
43:14
**sworn (1)**
4:3
**system (11)**
47:4,6,14;61:17;
64:20;84:13,24;94:11;
98:2;120:4;137:23

**T**

**table (1)**
7:22
**tackling (1)**
46:13
**Tactics (1)**
21:1
**talk (18)**
10:19;12:25;24:19;
36:22;61:10;62:22;
70:18;78:24;81:14;87:3;

98:4,5;115:11,20;118:2;
121:22;123:11;130:6
**talked (10)**
6:16,19,20,23;7:3;
35:19;53:19;59:8,9;
120:2
**talking (18)**
6:25;7:13,19;8:2;9:5;
37:6,13;43:9;58:23,24;
80:16;87:14;103:6,11;
110:14;120:4;121:21;
123:15
**talks (1)**
134:16
**Tannery (1)**
130:10
**Target (9)**
11:7,8,10,10;12:11,13,
23;13:1;14:12
**task (8)**
44:8;45:20,21,23;
47:16;89:1;99:24;
145:25
**tasks (7)**
45:7;47:3;53:19;61:1;
89:11;145:4,5
**taste (1)**
86:10
**taught (1)**
82:22
**Technical (8)**
9:22;10:1,5;15:19,22;
24:6;27:3;94:10
**technically (17)**
22:6;23:11;31:6;
36:14;41:24;81:10;92:9;
108:3;109:10;117:1;
118:1,4;122:11,15;
129:20;130:17;146:16
**telephone (2)**
140:22,23
**telling (3)**
69:3;84:15;105:14
**tells (1)**
92:22
**temporarily (5)**
74:15;80:10,12;
100:13;104:5
**temporary (1)**
100:13
**ten (8)**
18:14;52:11;54:18,23;
67:16;86:15;88:16;
142:3
**ten-minute (1)**
127:16
**term (2)**
41:8;49:7
**terminated (1)**
123:5
**testified (12)**
4:4;24:11;99:20;
109:22;115:22;116:20;
117:16;118:20;119:4;
136:9,22;141:16

**testify (3)**
88:6;110:3;146:9
**testifying (1)**
55:1
**theft (1)**
13:8
**theirs (1)**
60:25
**third (19)**
13:10;16:15;25:7;
27:10,12,19;28:19;
33:11,11;34:25;59:13;
73:11;88:23;93:10,11,
11;102:1;104:17;136:12
**Thirty (1)**
14:6
**thought (1)**
9:2
**threatened (8)**
73:20,23;74:19;80:18;
91:16,20,20;103:2
**threatening (1)**
56:3
**three (15)**
21:13,18;29:13;33:5,
9,10,12;40:16,24;42:5;
69:7;74:20,25;102:25;
124:14
**throughout (6)**
20:5;47:4;53:24,24;
69:18;111:1
**thumbs (1)**
101:23
**till (15)**
38:6;67:6;83:2,17,20;
92:4,5,8,20;93:4,5,7,7;
117:20;126:24
**timely (1)**
72:10
**times (38)**
13:18;19:23;21:18;
28:21;43:25;56:23;
59:12;67:1;74:20,25;
79:3;86:16;87:19,21;
88:3;89:5,7,8;90:23;
95:17;101:17,17;
102:25;104:7,12;
105:23;106:25;113:21;
115:14;116:9;119:14;
125:16;128:12;129:9;
130:1;138:4,6;141:23
**title (4)**
12:25;28:8;30:2;
133:16
**titled (3)**
78:2;79:22;112:17
**today (7)**
4:9;5:9;6:2,7,9,15;
93:21
**together (1)**
133:21
**told (31)**
7:14;17:24;56:4,8;
58:16;67:17;68:7;74:4;
92:1;98:12,13,15,19;

99:11,20;100:22;103:22,
25;104:25;111:11,22;
118:21;119:17,21;
120:18,20;131:9,11;
137:15;139:12;141:9
**Tony (3)**
40:4;50:7,8
**Took (12)**
9:21;11:10;12:13;
18:18;55:23;56:11;
57:14;62:9;65:19;
111:18;127:15,19
**toothbrush (1)**
90:6
**top (5)**
52:6;120:13;125:19;
139:16,17
**touch (1)**
69:13
**towards (2)**
20:9;88:20;96:25
**TPS (1)**
13:1
**trackable (4)**
46:25;48:5;108:15;
145:5
**tracked (1)**
46:25
**tracking (1)**
57:17
**trained (16)**
14:25;16:5;19:2,8;
24:25;25:4;26:2,7,13;
29:20,25;30:13,14;
34:18,23;74:4
**training (7)**
20:22,25;21:3;30:5;
56:8;92:2;135:11
**TRANSCRIPT (1)**
4:1
**transfer (5)**
15:19,22;24:6;25:24;
94:10
**transferred (2)**
7:11;15:12;24:5;25:2
**translate (1)**
85:5
**transmission (2)**
140:12,19
**tried (2)**
57:7;121:25
**trouble (2)**
68:15;103:5
**truthful (1)**
5:9
**truthfully (1)**
26:12
**try (10)**
37:5;38:12;45:25;
67:15;77:10;85:19;88:3;
104:16;106:18;126:10
**trying (4)**
10:22;87:16;103:11;
108:18
**tubing (6)**

83:6,7;90:2,3;100:15,
16
**turn (4)**
52:4;66:5;126:14;
132:22
**turned (3)**
14:14,18;43:18
**TV (3)**
115:1,4,8
**twice (4)**
20:22;91:17;101:18;
104:16
**Twiddle (1)**
101:23
**two (35)**
29:20;30:16;31:18,19;
33:5,10,13,19,20;34:10,
11;61:19,23;62:5;69:7;
70:5;74:20,24;79:8,8;
86:16;95:13;96:2,7;
98:2;101:17,20;102:3,
16,24;107:21;124:2;
129:9;131:20,22
**two-hour (1)**
124:12
**two-person (1)**
65:17
**two-way (4)**
41:8,9;63:19;125:9
**type (3)**
13:9;41:4;47:11
**types (1)**
9:10
**typical (14)**
24:20;27:9;30:10;
34:7;36:22,23;37:18;
58:23,24;61:7,8;109:23;
110:3,8
**typically (10)**
16:10,19;33:3,14;
38:25;41:21;114:17,19;
125:12,13

**U**

**Uh-uh (1)**
128:4
**ultimately (1)**
133:22
**unable (3)**
45:24;73:25;110:12
**uncanceled (1)**
92:7
**under (5)**
5:7;23:21;121:16;
122:5;147:5
**underneath (1)**
102:15
**understood (2)**
5:15;146:10
**unfair (3)**
99:18,24;107:18
**uniformed (1)**
13:2
**uninterrupted (11)**

57:13,18;73:25;76:15;
77:14,15;85:3;87:23;
117:9;131:4;143:17
**unit (13)**
52:15,18;67:21,22;
68:4,4;69:17;77:5;
89:13;123:23;136:13,
18;142:12
**units (3)**
38:18;67:23;70:5
**unless (7)**
67:4,18;90:5;91:8,9,9;
98:6
**unlock (6)**
46:5;50:10,11;51:11;
82:25;142:8
**unlocked (1)**
51:2
**unlocking (1)**
44:18
**unlocks (2)**
52:2,3
**unpaid (7)**
14:2,4;17:19,20;
70:23;97:8;135:24
**unsafe (1)**
142:21
**unusual (1)**
55:16
**Unwritten (1)**
85:11
**up (61)**
7:11;15:13,16,21,23;
16:13;17:1,2;18:22;
19:1;22:14;24:5,11,14;
25:5,11;27:18,21;28:14,
22,23;30:9,11,12,18,20;
32:25;35:18;38:15,17;
39:2;44:10;49:16;50:19,
20;53:5;54:24;55:11;
59:11;61:6,12;62:24;
65:1,7;86:7;90:15;
92:12;98:5;100:16;
101:2;102:12;108:22;
112:12,20;113:11;114:5,
8;118:3,10,11;123:16
**upon (2)**
120:10;139:12
**upwards (1)**
24:15
**use (2)**
41:7;118:25
**used (4)**
5:9;21:3;91:15;145:12
**Using (4)**
43:13;118:17;120:16;
127:14
**usually (19)**
8:14;13:22,23;30:12;
32:2;44:12,14;50:11;
51:17,19;57:22,24;
58:11;61:15;70:11;
106:22;108:20,21;
124:12
**UW-Milwaukee (2)**

9:20;10:15

**V**

**vagueness (1)**
45:15
**verbal (1)**
5:16
**Verita (2)**
35:17,18
**video (1)**
13:6
**Virginia (2)**
16:4;130:8
**visitor (1)**
90:14

**W**

**Wagner (2)**
34:25;35:3
**wait (18)**
7:21;27:18;67:6;82:3,
15;83:2,16,17,20;89:4,5,
6,7;90:16;117:20;
125:21;126:24;136:6
**waiting (3)**
102:11;122:12;142:9
**wake (1)**
108:22
**walk (14)**
15:3;31:14;37:18;
38:17;49:22;50:2;52:8;
65:16;67:21;68:15;
123:4;125:1;142:14,23
**walking (3)**
50:20;51:16;142:21
**wall (1)**
115:10
**watch (1)**
115:8
**watched (1)**
13:5
**way (16)**
15:3;24:16;28:14;
40:10;61:17;75:24;
82:21,22;84:17;108:18;
119:20;125:18,22,23;
136:14,15
**wearing (1)**
50:13
**week (27)**
6:9,25;9:3;13:16;
15:12,16,22;16:12,20,
21,23;18:22,23,25;
22:21,25,25;23:3,6,21,
22;27:16;38:12,13;
92:16;94:9,12
**weekend (1)**
50:7
**weekends (1)**
19:22
**weekly (1)**
102:25
**weeks (1)**

25:19
**weren't (11)**
32:24;43:5;44:1;
51:16;56:11,14;57:15;
92:11;98:23;113:16;
148:1
**West (28)**
16:3;29:12;34:9,16,
17,18;35:1,5,13;81:7,8,
19;123:10,11,14,15,19;
124:1,15;125:17;126:9;
127:10,24;128:8,9,16;
130:8;132:8
**whatnot (1)**
38:8
**what's (15)**
9:13;26:5;52:13;
54:14;58:6;75:5;78:22;
80:5;89:2;112:4;119:13;
125:2,8;135:7;139:2
**whenever (1)**
25:12;42:25
**wherever (3)**
18:1;36:18;70:9
**whole (5)**
14:16;31:3;59:3;
120:25;122:3
**who's (3)**
117:19;126:6,10
**Willis (3)**
30:1;32:17,18
**Willis's (1)**
30:2
**Winchel (1)**
32:14
**Wisconsin (4)**
9:14;11:2;15:8;16:2
**within (3)**
71:25;72:10;133:19
**without (4)**
11:16;51:1;105:25;
107:5
**witness (18)**
4:2;7:21,23;9:4;45:16;
68:23;72:18;73:13;80:3;
84:6;103:20;104:4;
109:19;110:5;111:8;
119:1;135:7;140:6
**Wood (7)**
6:25;7:8;8:3;21:24;
22:1;121:9,15
**word (3)**
89:2;141:21,22
**worded (1)**
75:24
**wording (1)**
73:5
**words (2)**
70:19;118:25
**work (49)**
6:22;8:9;11:5;13:9;
15:9;16:5,10;18:21;
22:16,20;24:15;25:7;
28:10;32:1;33:19;39:3;
42:13;43:11;59:23;66:6,

10;80:21;82:23;90:17;
91:4;92:15,18,23;95:2,2;
108:19,20,21,21,24;
115:5,12;120:25;122:11,
16,18;124:14;127:10;
128:17;129:20,20,25;
130:5,20
**worked (42)**
8:13;10:25;13:16,21;
14:23,24;15:6,25;16:13;
17:3,5,5;19:12,22,24;
28:19,24;29:3;31:24;
32:10;33:2,11;35:4;
45:19;59:12;61:11,14,
15,16;63:21;76:18;
77:18,22;81:8;91:6;
92:2;95:4;107:5;109:23;
131:9;133:6,7
**working (57)**
7:10,15;10:24;11:3,7,
8,9;12:10,18;16:20;
21:13,16;24:22,23;25:1,
9,9,16;26:17;27:5,19;
29:14,19;32:20;33:1;
34:3;36:19;39:8;56:1;
58:19;59:10,13,14,15,
23;61:19,20;71:15;
72:13;73:24;76:1,5,16;
77:16;89:18,19;96:16;
101:24;102:25;114:21;
123:3;124:2;133:13;
138:15;139:9,13;146:15
**works (1)**
76:2
**world (1)**
36:17
**worry (1)**
126:21
**worth (1)**
25:6
**write (10)**
5:18;39:25;57:1;80:4,
6;106:11;111:11;
139:15;145:8,10
**writing (1)**
57:9
**written (3)**
46:20,22;104:11
**wrong (4)**
44:11;71:19;85:6;
125:5
**wrote (3)**
38:12;57:4;139:23

**Y**

**Yay (1)**
134:6
**year (9)**
9:21;11:14;20:18;
23:3;24:9;55:21;79:3;
94:6;119:16
**years (1)**
10:25
**yelled (1)**

106:1
**Yep (20)**
  47:23;49:17,21;52:3,
  22;61:4;62:7;75:19;
  76:19;89:8;112:11;
  121:11;133:20;135:12,
  14;136:24;137:2,6,9;
  139:6
**Yesterday (3)**
  6:24;7:6;8:3
**Ys (1)**
  113:25

Exhibit 3

Deposition Transcript of Eric Snowden

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF WISCONSIN
     -------------------------------------------------------
 3
     JERRY A. BRABAZON, individually
 4   and on behalf of all others
     similarly situated,
 5
                    Plaintiff,
 6
                    vs.                  Case No. 10-C-714
 7
     AURORA HEALTH CARE, INC.,
 8
                    Defendant.
 9
     -------------------------------------------------------
10

11

12            Deposition of ERIC SNOWDEN

13             Monday, March 28th, 2011

14                   1:49 p.m.

15                      at

16
              QUARLES & BRADY LLP
17            411 East Wisconsin Avenue
                Milwaukee, Wisconsin
18

19

20

21

22

23

24

25        Reported by Loretta L. Stoeckmann, RPR
```

1                    Deposition of ERIC SNOWDEN, a witness in

2    the above-entitled action, taken at the instance of the

3    Defendant, pursuant to the Federal Rules of Civil

4    Procedure, pursuant to Notice, before Loretta L.

5    Stoeckmann, RPR and Notary Public in and for the State

6    of Wisconsin, at QUARLES & BRADY LLP, 411 East

7    Wisconsin Avenue, Milwaukee, Wisconsin, on the 28th day

8    of March, 2011, commencing at 1:49 p.m. and concluding

9    at 5:09 p.m.

10   A P P E A R A N C E S:

11              HAWKS QUINDEL, S.C., by
                  Ms. Lynn M. Novotnak
12                222 East Erie Street, Suite 210
                  P.O. Box 442
13                Milwaukee, Wisconsin 53201
                  Appeared on behalf of the Plaintiff.
14
                QUARLES & BRADY LLP, by
15                Mr. Sean M. Scullen
                  411 East Wisconsin Avenue, Suite 2040
16                Milwaukee, Wisconsin 53202
                  Appeared on behalf of the Defendant.
17

18

19

20

21

22

23

24

25

1                  E X A M I N A T I O N

2
BY MR. SCULLEN                                              4
3  BY MS. NOVOTNAK                                          116
BY MR. SCULLEN                                             125
4  BY MS. NOVOTNAK                                          132
BY MR. SCULLEN                                             133
5

6
                     E X H I B I T S
7
EXHIBIT NO.                              PAGE IDENTIFIED
8
No. 21  4/1/08 Officer Activity Log . . . . . . 20
9  No. 22  7/3/09 Officer Activity Log . . . . . . 26
No. 23  4/18/10 Officer Activity Log  . . . . . 35
10  No. 24  9/30/10 Officer Activity Log  . . . . . 44
No. 25  7/8/06 Email from Robert Solie to  . .103
11          Ivan Rojas attaching In The Matter Of

12              (Original exhibits attached to original
          transcript.  Copies of exhibits attached to
13          copies of transcripts.)

14

15
    P R E V I O U S L Y   M A R K E D   E X H I B I T S
16
EXHIBIT NO.                              PAGE IDENTIFIED
17
Jerry A. Brabazon
18
No. 2  Employee Handbook  . . . . . . . . . . . 56
19  No. 3  Work Week/Meal & Rest Periods  . . . . . 57
No. 4  Nonexempt and Exempt Employee Policy . . 58
20  No. 5  Michael Cummings' newsletters  . . . . . 62

21
              (Original previously marked exhibits
22          attached to original corresponding transcript.
          Copies of exhibits attached to copies of
23          transcripts.)

24

25

```
 1                    TRANSCRIPT OF PROCEEDINGS
 2                    ERIC SNOWDEN, called as a witness
 3         herein, having been first duly sworn on oath, was
 4         examined and testified as follows:
 5                         EXAMINATION
 6    BY MR. SCULLEN:
 7    Q    Can you state and spell your name for the record?
 8    A    Eric Snowden.  E-R-I-C, S-N-O-W-D-E-N.
 9    Q    Mr. Snowden, have you been deposed before?
10    A    No, sir.
11    Q    Okay.  Have you ever been a party to a lawsuit --
12    A    No, sir.
13    Q    -- other than this one?
14    A    No, sir.
15    Q    You have a current claim pending against Aurora
16         before the Equal Rights Division, is that correct?
17    A    No, sir.
18    Q    You haven't filed an employment discrimination --
19    A    Employment.
20    Q    -- claim?
21    A    I haven't filed EEOC.
22    Q    Right.  The Wisconsin Equal Rights Division?
23    A    Yes.
24    Q    Okay.  So the manner in which the deposition will
25         proceed today is that I'm going to ask you certain
```

1      questions.  Your answers are under oath.

2                    If at any time you can't understand

3      a question that I pose to you, just let me know,

4      and I'll try to rephrase it.  If you answer a

5      question, I will assume that you did understand

6      it.  Okay?

7  A   Okay.

8  Q   Please try to give verbal responses.  Try to avoid

9      the natural inclination some of us have to say

10     mm-hmm or mm-mmm or nod your head.  Yes or a no

11     answer, and I'll try to remind you if you don't do

12     that.  The court reporter needs those verbal

13     responses to record your answers.

14                   If at any time you need a break,

15     just let me know.  We'll take a series of breaks,

16     I anticipate, throughout your deposition.  No need

17     for you to feel uncomfortable.  I'll just ask that

18     you not take a break while there's a question

19     pending.

20                   Is there any reason such as

21     medications or drugs that you may have taken today

22     that will impair your ability to understand and

23     answer my questions?

24  A   No, sir.

25  Q   All right.  Any other questions concerning the

```
 1        procedure?
 2   A    No, sir.
 3   Q    All right.  Did you review any documents in
 4        preparation for your deposition today?
 5   A    No, sir.
 6   Q    All right.  Did you communicate with anyone other
 7        than your attorneys in preparation for your
 8        deposition?
 9   A    No, sir.
10   Q    Did you make any notes in preparation for your
11        deposition?
12   A    No, sir.
13   Q    Have you communicated with anyone other than your
14        attorneys about this lawsuit?
15   A    No, sir.
16   Q    You haven't talked to any co-workers about your
17        lawsuit?
18   A    No, sir.
19   Q    If you would, could you give me your date of
20        birth?
21   A    January 17th, 1979.
22   Q    And what is your present address?
23   A    7100 North Presidio Drive, Apartment E, Milwaukee,
24        Wisconsin, 53223.
25   Q    If you would, beginning with your high school,
```

```
 1        give me your educational background.
 2   A    I graduated from Washington High School.
 3   Q    What year was that?
 4   A    '97.
 5   Q    Okay.
 6   A    And I have an associate's degree in real estate
 7        brokerage.
 8   Q    Real estate brokerage?
 9   A    Yes.
10   Q    From what institution?
11   A    Milwaukee Area Technical College.
12   Q    And when did you acquire that degree?
13   A    2006.
14   Q    Any other formal education or training?
15   A    No, sir.
16   Q    Okay.  If you would, give me your job history
17        following high school.
18   A    Right when I graduated from high school, served in
19        the U.S. military, and then I worked for Aurora
20        Health Care.
21   Q    What date were you hired by Aurora?
22   A    March 2002.
23   Q    So from 1997 through March of 2002, you served in
24        the military?
25   A    I got a honorable discharge in '01, July of '01.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  And were you employed by anyone prior to |
| 2 | | Aurora, subsequent to your high school graduation? |
| 3 | A | No, sir. |
| 4 | Q | Okay.  What position were you hired into at |
| 5 | | Aurora? |
| 6 | A | Security officer. |
| 7 | Q | Was that at a particular location? |
| 8 | A | Aurora Sinai Medical Center. |
| 9 | Q | What -- did you work a particular shift? |
| 10 | A | Second shift. |
| 11 | Q | And what hours? |
| 12 | A | Three to 11:30. |
| 13 | Q | How many days per week? |
| 14 | A | Five days. |
| 15 | Q | Did those days alternate, or was it set days every |
| 16 | | week? |
| 17 | A | It was -- I believe in the beginning it was set |
| 18 | | days every week. |
| 19 | Q | And did that change at some point? |
| 20 | A | As I moved up the seniority rank it changed. |
| 21 | Q | Did you work second shift throughout your |
| 22 | | employment with Aurora? |
| 23 | A | I worked second shift for eight years and first |
| 24 | | shift for one year. |
| 25 | Q | When did you move to first shift? |

| | | |
|---|---|---|
| 1 | A | December '09. |
| 2 | Q | And what hours did you work on first shift? |
| 3 | A | Seven to 3:30. |
| 4 | Q | What days per week? |
| 5 | A | It was mixed.  I had every other weekend off, |
| 6 | | every other Wednesday and Friday off. |
| 7 | Q | Throughout your employment did you work at Aurora |
| 8 | | Sinai? |
| 9 | A | Yes, sir. |
| 10 | Q | What does Aurora Sinai consist of in terms of the |
| 11 | | physical location? |
| 12 | A | It's on -- between 12th and State and 12th and |
| 13 | | Kilbourn, in that vicinity. |
| 14 | Q | And when you say "Aurora Sinai," you're referring |
| 15 | | to the hospital at that location? |
| 16 | A | The hospital, yes. |
| 17 | Q | Okay.  Are there other facilities besides the |
| 18 | | hospital which are part of that location? |
| 19 | A | Not to my knowledge. |
| 20 | Q | All right.  So throughout your employment in |
| 21 | | security at Aurora, your duties were limited to |
| 22 | | the physical hospital location? |
| 23 | A | Yes.  Not unless I was mandated to float to |
| 24 | | another site. |
| 25 | Q | And would that typically be where you would work |

```
 1        an entire shift at a different site?
 2   A    If mandated, yes.
 3   Q    Well, I'm just trying to understand whether you
 4        would work part of a shift at Sinai and then part
 5        of a shift at a different site on the same shift?
 6   A    If need be.
 7   Q    So that happened on occasion?
 8   A    Yes.
 9   Q    How frequently?
10   A    It depends on if somebody called in or if another
11        site needed help within the metro region.
12   Q    What other facilities did you work at?
13   A    I worked at West Allis Memorial Hospital,
14        St. Luke's, and I worked at Aurora Psych.
15   Q    Aurora Psych?
16   A    Psychiatric Hospital.
17   Q    Okay.  How many -- for the period 2007 through
18        your -- the end of your employment with Aurora,
19        how many shifts did you work at west -- Aurora
20        West Allis?
21   A    I couldn't recall offhand, but I worked over there
22        quite frequently.
23   Q    More than 20 times?
24   A    Yes, more than 20 times.
25   Q    More than 40?
```

```
 1   A    I wouldn't say more than 40.  Probably between 20
 2        and 40.
 3   Q    Same question with regards to St. Luke's?
 4   A    St. Luke's, might be a little bit more.  More than
 5        40 for St. Luke's.
 6   Q    What about Aurora Psych?
 7   A    Only worked there once.
 8   Q    All right.  So if I understand your testimony, you
 9        worked at West Allis in the last three years of
10        your employment, somewhere between 20 to 40 times?
11   A    Yes.
12   Q    All right.  St. Luke's, more than 40 times?
13   A    Yes.
14   Q    And Aurora Psych, did you only work there one time
15        during your entire employment?
16   A    During my entire employment, one time.
17   Q    Okay.  And when was that, do you recall?
18   A    I know it was when I was on first shift.
19   Q    Okay.  So sometime in the last year of your
20        employment?
21   A    Yes.
22   Q    All right.  You testified that you were hired as a
23        security officer.  Is that the position you held
24        throughout your employment with Aurora?
25   A    Yes.
```

```
 1   Q    Okay.  Did you ever receive a promotion?
 2   A    I was promoted to security sergeant.
 3   Q    Okay.  And when was that?
 4   A    I believe it was around 2005.  I'm not sure the
 5        exact month.
 6   Q    All right.  How did your role change when you
 7        moved from a security officer to a security
 8        sergeant role?
 9   A    Basically I ran shift operations, more interaction
10        with the leadership team supervisors and managers.
11   Q    Did you schedule other officers?
12   A    Yes.
13   Q    All right.  So during the period from 2005 going
14        forward, who were your supervisors?
15   A    Darien Williams and Arthur Smith.
16   Q    What was Darien Williams' position?
17   A    Site supervisor.
18   Q    Was he part of loss prevention?
19   A    Yes.
20   Q    Okay.  And Arthur --
21   A    Smith.  He was a site supervisor, too.
22   Q    Both in loss prevention?
23   A    Yeah.
24   Q    And do you know who they reported to?
25   A    At the time they reported to Robert Solie.
```

```
 1                    (Reporter interruption.)
 2   BY MR. SCULLEN:
 3   Q    When you say "at the time," did that change at
 4        some point?
 5   A    Yes.
 6   Q    When did it change?
 7   A    I want to say about the end of '09.  Jim Moraza
 8        became the manager, and Solie took another
 9        management role within the department.
10   Q    Do you know what position he took?
11   A    Something to do with pharmacies.  He was over
12        pharmacies.
13   Q    Okay.  And do you know to whom Bob Solie reported?
14   A    Director Mike Cummings.
15                    (Reporter interruption.)
16   BY MR. SCULLEN:
17   Q    And what about Jim Moraza?
18   A    He reported to Mike Cummings as well.
19   Q    Okay.  Prior to 2005, to whom did you report?
20   A    Prior to 2005, I reported to Darien Williams.
21   Q    Was that true from 2002 through 2005?
22   A    Yes.
23   Q    And was -- when did Arthur Smith become a site
24        supervisor?
25   A    2005, 2006ish.  I don't know the exact date, but
```

```
 1        it was around that time.
 2   Q    Okay.  Prior to that was there only one site
 3        supervisor?
 4   A    It's always been one site supervisor, but I worked
 5        for two different ones while I was working there.
 6   Q    Okay.  When did Darien Williams -- did his
 7        employment end, or did he move to --
 8   A    His employment ended in, I believe 2005, 2006, and
 9        then Art Smith was promoted to the site
10        supervisor.
11   Q    What role did he hold prior to being promoted, do
12        you know?
13   A    Who was that?
14   Q    Art Smith.
15   A    He was over pharmacies.  He was the pharmacy
16        investigator.
17   Q    Okay.  How much interaction did you have,
18        beginning in 2005, and going forward, how much
19        interaction did you have with your supervisors?
20   A    Everyday activity.  My supervisor was stationed in
21        the same location as we were.
22   Q    And what shift did the supervisors work?
23   A    Pretty much all the times.  He worked first shift
24        sometimes.  Sometimes he would work over into
25        second.  Very rarely he would come in on third,
```

1          sometime if he had issues to address with the

2          shift, but mostly first and second shifts.

3     Q    And what about your -- your supervisor's

4          supervisor.   How much interaction?

5     A    Probably say once a week he might come down to the

6          site.

7     Q    And what would the -- when the site supervisors

8          were on duty, did they perform the same duties as

9          you and security officers perform?

10    A    Darien Williams did more, but Art Smith, he didn't

11         really do as many of the tasks as the officers

12         would do.   Darien was more hands-on.   He would be

13         more interactive.   Art Smith would more -- more

14         delegate more than usual as far as his supervisor

15         role.

16    Q    Okay.   And when the -- their supervisors, which I

17         assume you're referring to Bob Solie or

18         Jim Moraza, when they were on site, what were they

19         typically doing?

20    A    Usually if Solie came down it would be for

21         disciplinary action, or sometimes he would just

22         come in to check on the site, read the pass-on out

23         and check the schedule book.

24                    Same thing with Jim Moraza, if he

25         was coming to do disciplinary or coming down to

1      check on the site and see how things was running.

2   Q   And how much interaction did you have with

3      Mike Cummings?

4   A   Not that much with Mike Cummings.  Stuck to the

5      chain of command, would deal with the site

6      supervisors and then the managers and then the

7      director.

8   Q   So if you would, walk me through a typical day in

9      your role as a sergeant, which I understand began

10     sometime in 2005, through the end of your

11     employment, and tell me what types of tasks you

12     performed during a typical day?

13  A   We start the shift, we would do shift briefing,

14     review what the off-going shift had going on for

15     their shift.  Then we would go upstairs, get keys,

16     radios, give out positions, and then basically

17     just do the task of the day depending on what

18     positions we were in.

19  Q   Who would assign those tasks?

20  A   I would assign those tasks, or the shift would

21     pick at the briefing table what positions they

22     wanted to start off with.

23  Q   Did you say "or the shift would pick"?

24  A   Yes.

25  Q   How did you record your time worked?

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 336 of 867   Document 49-1

1   A      We punched Kronos.

2   Q      And was that through use of an ID badge?

3   A      Yes.

4   Q      That you would swipe?

5   A      Yes.

6   Q      Were you issued communication devices at the

7          beginning of your shift?

8   A      We would go get them from upstairs, radios.

9   Q      Any other type of device?

10  A      No.  Just radios.

11  Q      Okay.  No cell phone?

12  A      If you went off campus, yeah, you would get a cell

13         phone from dispatch.

14  Q      And the same thing with a pager?

15  A      Same thing with the pager.

16  Q      Okay.  But you only picked those up if you were

17         leaving the campus?

18  A      Only if you was leaving the campus you would use a

19         cell phone if you was working.

20  Q      What was the procedure for obtaining the radio?

21  A      Radio and keys, you would go upstairs, you would

22         get a key from the -- keyset from the -- from

23         inside the central monitoring station, you would

24         grab a radio, and you give those key and radio

25         numbers to the dispatcher.

1  Q  And did you retrieve the radios from the
2     dispatcher or not?
3  A  No.  They were in the central monitoring station
4     in the corner on the power docks.
5  Q  And where was the dispatcher located?
6  A  In the emergency room.
7  Q  And that's where you previously testified the cell
8     phone and pager were located?
9  A  Yep.
10  Q  Did you sign out the radios?
11  A  We didn't sign them out.  You would give your
12     number to the dispatcher; she would put it on the
13     daily log sheet.
14  Q  Which radio you had?
15  A  Yep.  If you had radio one, she would write radio
16     one, two, so on, so forth.  Same with the keys.
17  Q  What type of radio were they?  Are they two-way
18     radios?
19  A  Two-way radios.
20  Q  How did you carry the radio?  Was it on -- was it
21     clipped?
22  A  Either clipped, or you put it in -- in the holster
23     on your belt.
24  Q  You previously testified that there were a couple
25     of different methods by which assignments would be

```
 1        given out.  Either you as the sergeant would
 2        assign people certain tasks?
 3    A   Yes.
 4    Q   Or collectively as a group you would decide who
 5        was going to perform which tasks?
 6    A   Yes.
 7    Q   Did you document or record the activities that you
 8        performed?
 9    A   Yes.
10    Q   And how did you do that?
11    A   On our daily activity sheet.
12    Q   What type of information did you document?
13    A   Door openings, different routine procedures that
14        you perform for the job.
15    Q   Was there anything that you did that you didn't
16        document on the activity logs?
17    A   No.
18    Q   I have heard of something called an ActTrack.
19    A   Yes.
20    Q   What is that?
21    A   It's a data entry program where we log all the
22        assignments that we do for the day.
23    Q   And is that -- is the information that you record
24        in ActTrack different than what you record in the
25        activity log?
```

```
 1   A     No, it's basically the same thing.
 2               (Exhibit No. 21 was marked for
 3         identification.)
 4   BY MR. SCULLEN:
 5   Q     Showing you what's been marked as Exhibit 21.  Can
 6         you identify what Exhibit 21 is for the record?
 7   A     Loss Prevention Services Activity Blot.
 8   Q     Is this the activity log that you were -- is this
 9         an example of the activity log that you were
10         testifying to?
11   A     Yes, sir.
12   Q     And on the first page, which is Bates labeled
13         17071, does that indicate in the third column that
14         you worked second shift on that date, which is
15         April 1st of 2008?
16   A     Yes.
17   Q     Okay.  Now, for some reason you're the only one
18         that doesn't have -- well, no, you're not --
19         strike that.  You are one of the few people that
20         doesn't have a key and a radio next to your name.
21         Do you know why that's the case?
22   A     Because the dispatcher didn't write it.
23   Q     Is it possible that you weren't carrying a radio
24         that shift?
25   A     No.  The sergeants had their own key and radio
```

```
 1        that we stored down in our office.  It's the same
 2        key number and same radio every day.
 3   Q    So that's why -- since yours didn't change, it
 4        didn't need to be written down?
 5   A    It still needed to be written down, but whoever
 6        was in dispatch that day didn't write it down.
 7   Q    Okay.  And this first page would have been created
 8        by dispatch, is that correct?
 9   A    Yes.
10   Q    And does this indicate then that there were, for
11        instance, four officers, or three officers and you
12        as a sergeant on the second shift?
13   A    No.  It indicates just four officers working.
14   Q    Right, including -- including you, correct?
15   A    Yeah, yes.
16   Q    And it would suggest then that there were six
17        working on first shift?
18   A    Yes.
19   Q    And four on third shift?
20   A    Yes.
21   Q    Let's go to the second page.  Are you familiar
22        with this document?
23   A    Yes.
24   Q    What is it?
25   A    It's the rotation log.
```

```
 1   Q    And what does it -- what information does it
 2        reflect?
 3   A    Different positions people are going to take.
 4   Q    So what is 110?
 5   A    That's the code for an officer's number on that
 6        shift.
 7   Q    Which would relate to what?  That identifies a
 8        particular officer?
 9   A    Yes.
10   Q    And is that that officer's designated number
11        throughout their employment or just for that
12        shift?
13   A    Throughout their employment.
14   Q    Okay.  Do you know, for instance, who 110 refers
15        to?
16   A    Not offhand, I don't know.  That's first shift.
17   Q    Okay.  Now, nothing's written in for second shift.
18        I take it -- is this a log that the dispatcher
19        also creates?
20   A    Yes.
21   Q    Do you know why the second shift isn't filled in?
22   A    No, I do not.
23   Q    All right.  And CMS means what?
24   A    Central monitoring station.
25   Q    So this would suggest that between 7:15 and 9:15,
```

```
 1        employee No. 110 was assigned to the central
 2        monitoring station, is that correct?
 3   A    Yes.
 4   Q    And what is east?
 5   A    That's what -- the east side of the campus.
 6   Q    And officer -- the officer designated as 101 was
 7        assigned during that time period to the east side?
 8   A    Yes.
 9   Q    All right.  Traffic means what?
10   A    You get in a squad and drive around.
11   Q    I'm sorry?
12   A    In the squad, in the vehicle, and you ride around,
13        you do patrols on the campus.
14   Q    West, I take it, is the west side of the facility?
15   A    Yes.
16   Q    And ER support, it indicates two officers would be
17        assigned to support ER during that time period?
18   A    No.  One officer would be ER, and the support
19        officer is roaming.  They help whatever else that
20        they need to be done.
21   Q    Now, on some of them it says -- it appears a
22        written-in ER2.  Do you know what that would
23        reflect or refer to?
24   A    No, I don't.
25   Q    Okay.  Let's go to the next page.  This appears to
```

```
 1        be a log with start times, arrival times, end
 2        times, activities, officer, CAT is what?  C-A-T,
 3        the sixth column?
 4   A    Which column?
 5   Q    The sixth column over, CAT, C-A-T?
 6   A    That's the categories.
 7   Q    And what does that refer to?
 8   A    They have a sheet with the numbers of the
 9        activities on there, and that's the category you
10        log it up under, depending on what the type of
11        assignment it is.
12   Q    And SUB, is that just subcategory?
13   A    Yes.
14   Q    Who created these logs?
15   A    These log sheets?
16   Q    Right.
17   A    I believe they was made by Carmen Cicero-Taylor.
18        She had to approve all the forms for the
19        department.
20   Q    No.  Who wrote -- what I'm asking is who wrote in
21        the information on the sheet?
22   A    The dispatcher.
23   Q    You didn't record your own activities?
24   A    No, we didn't record our own activities.  The
25        dispatcher.
```

```
 1   Q    If you turn to the last page of the exhibit, which
 2        is the first time I see your name mentioned on the
 3        activity log.  And the first one, the first entry
 4        I see under your name is four down, and the
 5        activity location is "A315"?
 6   A    Yes.
 7   Q    Do you know what that refers to?
 8   A    That must be a door in the A building, 315.
 9                 (Reporter interruption.)
10   BY MR. SCULLEN:
11   Q    I'm sorry?
12   A    A door in the A building, 315.
13   Q    Meaning that you needed to open a door or --
14   A    Yes.
15   Q    And what about the next entry, which is "P301"?
16   A    That's "pob301."  That's in the professional
17        office building.
18   Q    And what activity would that have reflected?
19   A    A door opening.
20   Q    The next one down says "door opening."  The next
21        one down says "eviction"?
22   A    Yes.
23   Q    And what would that have referred to?
24   A    It would refer to two black males loitering in the
25        first floor's men's restroom.
```

1   Q    Okay.  And then the last entry I see is the one

2       that begins at 1857.  It says "escort"?

3   A    Yes.  That would be a escort to the fourth floor

4       lab.  Presumably they must have been picking up a

5       body.

6   Q    Okay.  Now, if there's no other activity recorded,

7       am I correct to assume that you would have been

8       performing rounds?

9   A    Yes.

10            (Exhibit No. 22 was marked for

11       identification.)

12  BY MR. SCULLEN:

13   Q    I'm showing you what's been marked as Exhibit 22.

14       This appears to be another set of similar

15       documents for July 3rd of 2009, is that correct?

16   A    Yes.

17   Q    Okay.  I didn't ask you with regard to Exhibit 21,

18       but could you explain, if you know, what the

19       information under "Valuable Audit By," what those

20       five digit numbers refer to?

21   A    Those refer to the valuable numbers in the -- in

22       the file cabinet in the central monitoring

23       station.

24   Q    Which means what?

25   A    Those are the numbers for the valuables that are

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 346 of 867   Document 49-1

```
 1        put in cabinets.
 2   Q    Okay.  So what is 67186?  Do you know?
 3   A    That's a valuable number.
 4   Q    What is a valuable?
 5   A    It's patients' property.
 6   Q    Okay.  So each of these entries is -- is something
 7        that was logged in as a patient valuable that was
 8        put in a cabinet?
 9   A    Yes.
10   Q    Okay.  And was one officer assigned that duty per
11        shift?
12   A    No.  Two officers.  The off-going officer and the
13        on-coming officer of the shift.
14   Q    And what does cash bags refer to?
15   A    Those are the cash bags that we picked up from the
16        cafeteria.
17   Q    And where did you deliver them?
18   A    We kept them in our central monitor station.
19   Q    Okay.  And what about bus tickets?
20   A    Bus tickets was the inventory number of how many
21        bus tickets we had on hand at the time.
22   Q    Are bus tickets something that were given out to
23        patients?
24   A    Yes.
25   Q    So if you go to the second to the last page of
```

1          Exhibit 22, again, the first entry I see here is

2          at 1726, and the activity says "D/O 3-South."

3          What does that refer to?

4     A    The door opening at 3-South supply closet.

5     Q    Okay.  The next entry is at 1814.  It says "D/O -

6          loading dock"?

7     A    Door opening for a funeral home, loading dock.

8     Q    And the next entry is at 1930.  It says -- is that

9          cash bag?

10    A    Yeah, that's basically picking up the cash bag

11         from the cafeteria when they close at 1930 hours.

12    Q    Okay.  And then the last entry is on the next page

13         at 2113 it begins, and the activity location says

14         "squad"?

15    A    Yes.

16    Q    And what does that refer to?

17    A    Vehicle off-site checks, patrolling.

18    Q    Meaning actually getting in a vehicle and driving

19         the vehicle around the site?

20    A    Yes.

21    Q    Okay.  And again, as with the other log, then the

22         times that during the shift where you don't have

23         activity entries, you would have been patrolling?

24    A    It depends.  I was running shift operations, so I

25         could have been doing schedules.  I could have

```
 1        been doing anything.
 2   Q    Well, that's why I'm asking you, Mr. Snowden.  You
 3        previously testified that you would have been
 4        patrolling, so what other things, other than
 5        patrolling, might you have been doing that would
 6        not be reflected in the activity logs?
 7   A    I could have been doing scheduling.  I could have
 8        been doing Kronos.  I could be doing shift
 9        operation, making sure my officers are doing what
10        they're supposed to do.  I could be doing case
11        reports.  There's numerous things I could be
12        doing.
13   Q    Okay.  Anything else that you can recall?  What
14        other things?
15   A    Not offhand.  Like I said, it's -- it's the shift
16        operation.  I don't have the shift operations for
17        a sergeant right in front of me, but you basically
18        run the whole shift operations for the whole
19        shift.
20   Q    Okay.  Anything else that you recall in the five
21        years or roughly, that you spent as a running
22        shift operations, other than scheduling, Kronos,
23        case reports, that you would have been doing?
24   A    I did property inventories for the valuables.  I
25        did -- like I said, I had case reports to write.
```

```
1          I had a lot of different things for shift
2          operations to do, and every day it changed.
3    Q     Okay.  Most of those, as I understand them, are in
4          the nature of paperwork?
5    A     Paperwork, making sure my officers are where
6          they're supposed to be, checking on standbys,
7          doing patrols, like I said, doing off-site checks,
8          doing on-site checks, checking doors, making sure
9          they're locked.  There's numerous details when
10         being a security officer.  Different things you
11         can do throughout the course of a shift.
12   Q     Okay.  Checking doors and off-site checks, that
13         would all be considered part of rounds, wouldn't
14         it?
15   A     No.
16   Q     No?  Then how would you define performing rounds?
17   A     Rounds, depending on what side of the building you
18         were on, it would be walking around, checking
19         patient floors, checking doors, touching bases
20         with the nurses on the floors, making sure
21         everything was okay.  Things of that nature.
22   Q     Okay.  When -- in terms of checking where the
23         officers were, what would that involve?
24         Contacting them on the radio and asking them where
25         they were, or --
```

```
 1   A    No.  Just sometimes, like, if you were at a ER
 2        post, making sure somebody is at the ER post.
 3        Walking by, if we have a suicidal standby,
 4        checking on the officer, making sure everything is
 5        going fine with the patient.  The officer, making
 6        sure the communication between the nurse and our
 7        staff is going good, to see how long is the
 8        patient going to be here, what time do we expect
 9        the patient to be transported to psych, what's the
10        diagnosis, things of that nature.
11   Q    What is an off-site check?
12   A    Off-site checks is where we check the clinics that
13        Aurora owns off-site.  We had the VNA Clinic, we
14        had Aurora Family Services, we had Mitchell
15        Clinic, Clarke Square, numerous sites that were in
16        our vicinity that we had to go check.  We had
17        clinics on 33rd and Wisconsin that we had to
18        check.  They just added a new one of late,
19        corporate office.  We have to do that check every
20        two hours.
21   Q    Okay.  And doing those, is performing off-site
22        checks something that you would have done every
23        shift?
24   A    Yes, we do it every shift.
25   Q    How far away is the furthest clinic?
```

1  A    I couldn't tell you, but there's some far clinics.

2       I would say our furthest clinic from Sinai would

3       be Midtown on 60th and Capitol.  Excuse me.

4  Q    So 60th and Capitol from Sinai is on what?

5  A    Twelfth and State.

6  Q    How long by car would it take you to travel

7       between those two facilities?

8  A    At least 20, 25 minutes.

9  Q    And is that assuming no traffic?

10  A    That might be, yeah, because it depends on what

11       route you take.  You can take numerous routes.

12       You can take Fond du Lac Avenue, you could take

13       35th Street all the way over to Capitol, then turn

14       left on Capitol.  It depends on which way the

15       officer took and if -- how familiar they were with

16       the city.

17  Q    Okay.  So it could take longer even than 25

18       minutes just to get between the two facilities?

19  A    Yes.

20  Q    And would performing the off-site checks, would --

21       were those clinics typically closed on second

22       shift?

23  A    Some were closed, some were open.  Like, Urgent

24       Care would be open on second shift.  And depending

25       on if they wanted us to stay down there and wait

```
 1        with them until they got off, then we would have
 2        to do a fixed post down there for sometimes 45
 3        minutes to an hour.  And then we would have to
 4        escort employees to their car.
 5   Q    Would you do -- would off-site checks involve
 6        patrolling the facility even if the facility --
 7   A    Yes.
 8   Q    -- was closed?
 9   A    Yes.
10   Q    And that would involve -- would you typically stay
11        in your car when you performed an off-site check
12        of the facility which was closed?
13   A    No.  You would get out, and you would still check
14        around.  We had numerous thefts at off-site
15        campuses, so we were told to step up our patrols
16        at off-site campuses, because VNA Clinic had
17        thousands of dollars worth of air conditioning
18        units stolen.  So when we had to go there, we
19        would have to do a physical walk-around of the
20        building to check and make sure everything was
21        intact.
22   Q    And where was the VNA Clinic?
23   A    On Fourth and Walnut.
24   Q    So in addition to the VNA Clinic and the Midtown
25        Clinic, what other clinics or facilities did you
```

```
 1        patrol off-site?
 2   A    At Aurora Sinai, we had one clinic on 33rd and
 3        Wisconsin.  I think that was a Family Care Clinic.
 4        Then we have Aurora Family Services.  That's on
 5        33rd and Highland.  We had the VNA Clinic.  We had
 6        Clarke Square.
 7   Q    Where is Clarke Square?
 8   A    Clarke Square is on 16th and National.  It was
 9        inside Pick 'n Save.
10   Q    Any others?
11   A    When I first started there we had one clinic way
12        out.  I think it was called Friendship Village.
13        That was out on 76th and Brown Deer Road.  We had
14        to respond to a couple of calls there.
15   Q    And at some point did you stop patrolling that
16        clinic?
17   A    After they sold the property we stopped
18        patrolling.
19   Q    And when was that?
20   A    I couldn't remember.  It was a while back, though.
21   Q    Prior to 2006?
22   A    I think it was prior to 2006, yeah.
23   Q    What does checking doors involve?
24   A    Checking clinic doors within the Aurora facility.
25        We had doctors and physicians who rented space
```

```
 1        inside the medical facility.  We had to walk
 2        around and check doors, make sure they weren't
 3        unlocked.  Because in the downtown area, we have a
 4        huge homeless population, and we would get a lot
 5        of homeless people coming in looking for places to
 6        hide and rest for the night.
 7   Q    And you said that's not part of rounds?
 8   A    That's part of rounds.
 9   Q    Okay.  So am I correct in understanding then with
10        regard to the activity logs, these, the activity
11        logs, would reflect calls that you received?
12   A    Yes.
13                  (Exhibit No. 23 was marked for
14        identification.)
15   BY MR. SCULLEN:
16   Q    I'm showing you what's been marked as Exhibit 23,
17        which are activity records for April 18th of 2010?
18   A    Mm-hmm.
19   Q    Yes?
20   A    Yes.
21   Q    Which indicate on that date you worked first
22        shift?
23   A    Yes.
24   Q    If you go to the second to the last page, the only
25        entries that I see for you in this record are at
```

1      1110, it reflects "ACE484"?

2  A   Yes.

3  Q   Do you know what that refers to?

4  A   Valuable return.

5  Q   Which means patient --

6  A   I'm returning the patient's valuable to room 484.

7  Q   Okay.  And at 1340 to 1300, activity location is

8      "10-7"?

9  A   Yes.

10 Q   What does that refer to?

11 A   That's lunch.

12           (Reporter interruption.)

13 BY MR. SCULLEN:

14 Q   Now, that entry wasn't on the prior dates.  Were

15     there sometimes that you -- your lunch was

16     recorded on the activity logs and other times it

17     wasn't?

18 A   Sometimes lunches were recorded, sometimes lunches

19     weren't, depending on how busy things were going.

20 Q   Okay.  Well, were there times that -- okay.  Who

21     made the decision as to whether to record the

22     lunch?

23 A   It depends on who was in dispatch.

24 Q   So it was really up to the dispatcher?

25 A   It's up to the dispatcher to record lunches.

```
 1   Q    Did you always call in your lunch to the
 2        dispatcher?
 3   A    Yes, I did.
 4   Q    And as far as you know, the only reason why a
 5        lunch might be recorded on the activity logs, was
 6        whether the dispatcher chose to record it or not?
 7   A    It depends on who was in the dispatcher at the
 8        time.
 9   Q    Different dispatchers handled the issue of
10        recording lunches differently?
11   A    Every officer handled the activity log.  It
12        depends on how that officer was in there and what
13        they did.  The phones might have been ringing,
14        they might have heard it over the radio, but they
15        never got a chance to log it.  It was -- central
16        monitoring station is numerous activities going on
17        at one time while you're in there.
18   Q    Okay.  I understood your testimony to be that the
19        dispatcher would have been in ER.  Is that
20        correct?
21   A    No, I did not say that.
22   Q    Okay.  Was the -- so who was -- where was the
23        dispatcher located?
24   A    The dispatcher station is located in the ER.
25   Q    Okay.
```

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 357 of 867   Document 49-1

1   A   That's inside of the emergency room, but the

2       dispatcher is inside a central monitoring station.

3   Q   Okay.  The dispatcher station is in the ER?

4   A   Yes.

5   Q   But the dispatcher themself -- the actual

6       dispatcher is in the central monitoring?

7   A   Yes.

8   Q   Then describe for me what the dispatcher station

9       is.

10  A   The dispatcher station is a unit with monitors

11      that you have to watch.  You have to monitor the

12      C-CURE alarm system, you have to listen to the

13      phones ring, you have to answer the phones.  It's

14      inside the emergency room with a two-way glass

15      that you can look out and see in the emergency

16      room in case there's disruptives going on or

17      anything like that, so then you can also dispatch

18      people to the ER when you need help.

19              So the ER -- the dispatcher is in

20      the ER, but he's not physically in ER.  The whole

21      dispatching unit is within -- built within ER.  So

22      we're overlooking the ER.  We can see outside our

23      window to see the emergency room.

24  Q   Okay.  Who is in that dispatching station?

25  A   The dispatcher.

1   Q    Okay.  Here's where I'm confused.  I understood

2        you to say that the dispatcher was located in the

3        central monitoring station, and you told me that

4        was not where the dispatch station was.

5   A    No, I didn't say that.  I said -- you try to catch

6        me up.

7   Q    No, I'm just trying to understand.  I'm not trying

8        to confuse you.  I just need you to explain it to

9        me.  Because I understood you to say that the -- I

10       understood you to say the dispatcher was somewhere

11       other than in the dispatch station.  So I need you

12       to explain to me again what the -- where the

13       dispatcher is -- here -- let me back up.

14                 Here's what I understood you to

15       say.  I understood you to say there's a dispatch

16       station in the ER, but that's not where the

17       dispatcher is; the dispatcher is in the central

18       monitoring station.  So if you could, help me

19       clear up that confusion on my part.

20   A    I already answered the question.

21   Q    Well, you need to answer it again.

22   A    I already told you.  The dispatch station is built

23       within the ER, so we're looking out over the ER.

24       It's part of the emergency room.

25   Q    Okay.  Is the dispatcher then inside the dispatch

```
 1        station?
 2   A    Yes, I already said that.
 3   Q    Okay.  And the dispatcher then is not in the
 4        central monitoring station, is that correct?
 5   A    CMS is the same thing.  It's the same name.
 6        You're confusing the titles.  They're the same
 7        thing.  Central monitoring station and dispatch
 8        are the same two things.  They're the same two
 9        entities.
10   Q    All right.
11   A    They're not different.  They're not apart.
12   Q    Okay.  So the -- when you refer to the dispatch
13        station, that's the same thing as the --
14   A    As the --
15   Q    -- central monitoring station?
16   A    -- central monitoring station, same thing.
17   Q    Okay.  Is that the place where you would, for
18        instance, when you were performing your sergeant
19        duties, like filling out reports, would you be
20        doing that in the central monitoring station, or
21        would you be doing that somewhere else, typically?
22   A    For sergeants, we had our own computer, but for
23        officers, if officers needed to do reports, they
24        had one computer to do it inside of the
25        dispatching center, central monitoring station,
```

```
 1          where they can do all the case reports in there.
 2                    We had an office downstairs in our
 3          loss prevention offices, where we had a computer
 4          where we can do reports and things of that nature
 5          within our office located with our administrative
 6          assistant and the supervisor's office, down in the
 7          lower level of the hospital.
 8    Q     Okay.  Let me ask this.  Was -- is the dispatcher
 9          a security officer, or is that -- was someone else
10          employed as a dispatcher?
11    A     It was a security officer.
12    Q     Okay.  And did that duty rotate between security
13          officers?
14    A     Yes.
15    Q     And did it rotate within the same shift, or was
16          one person always on dispatch for the entire
17          shift?
18    A     It depends on what the situation.  If a person is
19          on light duty, then that person has to do the
20          central monitoring station, because they can't --
21          they're on restriction, so they can't leave the
22          dispatching station, so they have to monitor the
23          dispatch.
24    Q     Okay.  And then in other -- at other times people
25          rotated the duty, is that correct?
```

1    A    Yes.

2    Q    How often was someone on light duty?

3    A    Well, before I left Aurora, I had an officer who

4         was on light duty, and that person was strictly

5         for the monitoring station dispatching duties,

6         because they had weight restrictions and things of

7         that nature where they couldn't walk around and

8         patrol, so they had to be in the dispatch center.

9    Q    Who was that individual?

10   A    That was Officer Bradley.

11   Q    And how long was Officer Bradley on light duty?

12   A    She was on light duty when I left, so I can't

13        recall how many months prior to that, but it was,

14        I think, two or three months before I left.

15   Q    In your role as a sergeant, did you review the

16        activity logs?

17   A    From time to time.  But mainly our site supervisor

18        would review the activity logs.

19   Q    Were you involved in training officers on how to

20        perform dispatch?

21   A    I was involved in it, and if we had a training

22        officer, Gary Lindenlaub, on my shift.

23   Q    What was your level of involvement?

24   A    My level of involvement was basically integrating

25        the officer into the shift, and I would tell which

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 362 of 867   Document 49-1

1    officers to help train on that day.  Say, for
2    instance, if a officer was new to my shift and I
3    needed him to get trained, I might put him with
4    one officer one day, and he would travel around
5    with that officer for the day, seeing what the
6    duties was.

7                    And then maybe another day I would
8    switch it.  And then we had training manuals that
9    we would give to the officers that they could read
10    to train up on policies and procedures.

11  Q   Okay.  And would the training officer then, or the
12    people with whom they trained, have been more
13    directly responsible for explaining, for instance,
14    how to explain the dispatch duty, or is that
15    something you would have discussed with trainees?

16  A   No, it would be on the person who was training
17    them for that day.  Because it was really not --
18    they didn't really per se have a training guide,
19    but we would train the officers based on the
20    duties for that shift when they would work with us
21    on the shift.

22  Q   Okay.  Did you ever train new employees on how to
23    perform the dispatch duty?

24  A   If they were with me that day, yes, I would.

25  Q   Okay.  What, if anything, did you explain to them

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 363 of 867   Document 49-1

```
 1        with regard to whether they were supposed to log
 2        lunch periods or not?
 3    A   That we were supposed to log everything.  It
 4        wasn't just lunch periods.  It was everything that
 5        was called into dispatch they were logging on it
 6        on the activity blot.
 7                   (Exhibit No. 24 was marked for
 8        identification.)
 9    BY MR. SCULLEN:
10    Q   I'm showing you what's been marked as Exhibit 24.
11        This is a series of activity records for
12        September 30th of 2010, correct?
13    A   Yes.
14    Q   And these reflect that you worked on first shift
15        on that date?
16    A   Yes, sir.
17    Q   And if we look at -- if we begin with the fourth
18        to last page, the first entry for you indicates
19        activity location east, and then the comments say
20        "posting."  What does that -- what activity does
21        that refer to?
22    A   Which page are you looking at?
23    Q   I'm in the one -- if you look at the bottom, it's
24        24019.  I'm looking at the third entry from the
25        bottom.
```

```
 1   A    That would be the east side.
 2   Q    And what was the activity?
 3   A    The activity would be A building, image lot, OHC
 4        building.
 5   Q    I'm sorry.  I don't understand what the activity
 6        was, though.  Just patrolling in that area or --
 7   A    They just are saying that I would be over on the
 8        east side of the campus for those two hours.
 9   Q    Okay.  And then at 9:48, what does that entry
10        refer to?
11   A    That's a door opening.  A val pick-up that I
12        picked up.
13   Q    I'm sorry, a what?
14   A    That was a val pick-up that I picked up.
15   Q    Val, meaning valuable?
16   A    Valuable, yes.
17   Q    And what about the entry at 1213?
18   A    That was -- I was in the ER dealing with a
19        combative patient, it looks like.  Or a combative
20        situation in triage A.
21   Q    What does "10/76" in the comments mean?
22   A    Probably a person was gone on arrival, or the
23        situation was already handled before I got there.
24   Q    And 1350, is that another valuable?
25   A    That's a door opening.
```

```
 1   Q    If you look at the other officers on first shift,
 2        were you the only sergeant on first shift -- on
 3        that first shift?
 4   A    Yes.
 5   Q    Okay.  Were there ever shifts where you were
 6        scheduled with another sergeant?
 7   A    It was rare, but if, depending on, say, for
 8        instance, second shift needed help and I stayed
 9        over, I might have to work with another sergeant
10        depending on the short staffing levels.
11   Q    How many officers were scheduled per shift on a
12        typical basis?
13   A    Depends on the staffing levels.  Each shift had
14        different staffing levels, because we had a lot of
15        vacancies.
16   Q    Vacancies in that, you mean in the officer ranks?
17   A    In the employment ranks for our department.  We
18        were down quite a few officers.  I believe three
19        or four officers when I left.
20   Q    Well, as I look at these samples, it indicates --
21        and I'm talking about Exhibits 21 through 24.  It
22        appears that no fewer than four officers were
23        scheduled on any given shift.  Is that --
24   A    Yes.  That's the minimum staffing levels.
25   Q    Okay.  And on certain shifts there were more?
```

```
1    A    Yes, sir.
2    Q    And it appears that -- was it common for there to
3         be more people scheduled on first shift?
4    A    At the time it was, because first shift had more
5         officers than second.
6    Q    Did you always call in to dispatch when you were
7         taking a lunch break?
8    A    Yes, sir.
9    Q    Were you aware, at least based on these
10        representative logs, that people performing
11        dispatch weren't always recording when officers
12        took lunches?
13   A    No, I was not, because I didn't check all these.
14        These are from a lot of different dates, so I
15        couldn't tell you.
16   Q    So your answer is, "No, you weren't aware"?
17   A    No.
18   Q    Okay.  In terms of the reports and other work that
19        you did, including rounds, did you have the
20        discretion to prioritize when to perform those
21        tasks?
22   A    Yes, I did.
23   Q    Were there certain tasks or activities which
24        required a -- which required different response
25        times?
```

| | | |
|---|---|---|
| 1 | A | I wouldn't say different response times.  It |
| 2 | | depends on what the call was or what was going on. |
| 3 | Q | Okay.  So the answer is yes, depending on what the |
| 4 | | call was, it might have a different response time |
| 5 | | than another call? |
| 6 | A | No, I wouldn't say that, because you have to look |
| 7 | | at what was going on at the time.  Because it |
| 8 | | could be three different things going on at one |
| 9 | | time, so each -- each task is going to have a |
| 10 | | different response time. |
| 11 | | You might have a code 4 going on on |
| 12 | | one floor.  You might have a combative going on on |
| 13 | | another floor.  And you might have a first |
| 14 | | response going on another floor.  So how do you |
| 15 | | discretion what response time is for what? |
| 16 | Q | Well, that's what I'm asking.  Did you have the |
| 17 | | ability to prioritize those tasks when you had |
| 18 | | multiple calls going on at a single time? |
| 19 | A | You just had to make your best judgment decision |
| 20 | | on whichever one you think needed to go to first, |
| 21 | | but it wasn't a prioritize.  You just responded to |
| 22 | | each call as you could. |
| 23 | Q | Okay.  Was that based on training that you |
| 24 | | received? |
| 25 | A | A little bit of training and just a little bit of |

```
 1        common sense, I guess.
 2   Q    Are certain assignments considered emergencies or
 3        certain calls considered emergencies?
 4   A    Yes.
 5   Q    What types of calls?
 6   A    Stat calls, 1017s where officer down or --
 7   Q    Is that what a 1017 is?
 8   A    Yes.  Officer needs assistance, say, for instance,
 9        you have a fight going on.  You have to respond to
10        that right away.  First responders you responded
11        to right away.  Those were overhead paged over the
12        loud system.  Code 4s were paged over the loud
13        system.
14   Q    What does a first responder mean?
15   A    First responder is basically either a patient or
16        visitor that has, like a, maybe like a slip and
17        fall, or somebody might have a heart attack or
18        something.  We would team up with ER and respond
19        to get those people over to the ER to get those
20        tended to immediately.  Like life and death
21        situations they were called.
22   Q    And how would that call go out?
23   A    The operator would overhead page it on the loud
24        speaker for the whole hospital to hear.
25   Q    And what would they say?  "First responder to" --
```

```
 1   A    Yeah, we say "first responder" like four times.
 2        They had a procedure they had to follow when they
 3        said.
 4   Q    So would -- they would say first responder to a
 5        certain location?
 6   A    Yep.  Yes, sir.
 7   Q    And then when those types of calls came out, did
 8        the security officers coordinate amongst
 9        themselves as to who was going to respond, or did
10        it depend on if it was in the area where the
11        officer was designated for that time period, they
12        would be expected to respond?
13   A    Everybody responded to first response calls.
14   Q    Everyone who was at the facility?
15   A    Everybody who was at the facility who was free.
16   Q    Okay.  So again, that would require your
17        discretion to decide whether you were doing
18        another task which occupied your time?
19   A    Yes.  Like if you were in the middle of breaking
20        up a fight, you couldn't leave to go to a first
21        response, but if you were available to go and it
22        wasn't a situation as serious as a first response,
23        then you respond to the first response.
24   Q    Okay.  Were you ever disciplined for failing to
25        properly prioritize which calls you were going to
```

1      respond to?

2  A    No.  I don't remember being disciplined for that.

3  Q    Okay.  Ever disciplined for not responding quickly

4      enough to a call?

5  A    No.

6  Q    During a typical shift, how many people are

7      communicating over the radio -- over the radios?

8  A    Everybody who got a radio.  Valet had radios, all

9      the officers had radios, the site supervisor had

10     radios, and the Allied Barton were department

11     people that had radios, and the U.S. Security

12     people had radios.

13 Q    Now, would you receive calls from all of those

14     people, or would you receive calls on your radio

15     only from dispatch?

16 A    From everybody.  I could hear everybody on the

17     radio.

18 Q    So you always heard every transmission that went

19     out on the radio on -- even if it was -- for

20     instance, if the dispatch was contacting one of

21     the other officers, you would hear that?

22 A    Yes, I would.

23 Q    How do you know if a radio communication is

24     directed towards you?

25 A    They would call you by your call number.

```
 1   Q    What was the frequency with which the radio would
 2        be in operation?  In other words, how frequently
 3        would there be chatter on the radio or
 4        transmissions?
 5   A    I couldn't tell you that.
 6   Q    It varied?
 7   A    It varied every day.
 8   Q    How do you determine when to take a lunch break?
 9   A    Everybody had different times they took lunches,
10        so depends on how much was going on and how many
11        staff you had on.  If you had more staff it was
12        easier to take a lunch.  If you had less staff it
13        was a little bit harder to take a lunch.
14   Q    If I understood your previous testimony correctly,
15        the only time you took a pager or a cell phone is
16        when you left the premises --
17   A    Yes.
18   Q    -- is that correct?
19   A    Yes.
20   Q    Okay.  Did you ever take the pager -- or strike
21        that.  Did you ever leave the premises to take
22        lunch?
23   A    No.
24   Q    Would you take then the pager or the cell phone
25        when you went to do off-site premises checks?
```

```
1    A    Yes.
2    Q    Would you take both or one or the other or --
3    A    Usually, we just took the cell phone.
4    Q    Were you ever called on the cell phone while you
5         were performing off-site checks?
6    A    Not really.  We could usually hear on the radio,
7         so cell phone was just a second form of
8         communication in case of emergency.  If we
9         couldn't hear, we would call on the cell phone to
10        dispatch to see what they were saying, if it came
11        through kind of staticky or unclear.
12   Q    You had the ability, if I understand correctly, to
13        determine when you would take your lunch break
14        during a shift?
15   A    Yeah.  It depends on what was going on, like I
16        said, or how many officers were working, so on, so
17        forth.  But if you wanted to take a lunch, then
18        you would call in, "I'm going on my 10-7."
19   Q    But no one else told you when you were going to
20        take a lunch, is that correct?
21   A    Not on my shift.
22   Q    Right.  I'm just asking about your shift.  And did
23        you tell other officers when they should take
24        their lunch or --
25   A    No.
```

```
 1   Q    They similarly decided when to take their lunch
 2        break, is that correct?
 3   A    Yeah, usually everybody took their lunch around
 4        the same time every day.
 5   Q    And does that mean they all took it within the
 6        same couple of hour period?
 7   A    It depends.  Some people like to eat lunch late,
 8        some people like to eat it early.  Because I had a
 9        diabetic on my shift.  He ate his lunch early.
10        Some people ate their lunches later on throughout
11        the course of the shift.  It depends on, I guess
12        if they ate breakfast or not.  They would call in
13        their lunch -- as long as nobody else was taking
14        lunch at the same time, they would call it in when
15        they could.
16   Q    Okay.  Well, that was my question, because I
17        thought you said everyone took it at the same
18        time, so it sounds to me what you're saying --
19   A    I never said they take it at the same time.
20   Q    Well, did you not say everyone took their lunch
21        around the same time?
22   A    Each person every day -- say, for instance, you
23        have a person who's diabetic --
24   Q    Okay.
25   A    -- he's going to take his lunch around eleven
```

```
 1        that -- the same time that day every day.
 2   Q    Not the same time as the other officers?
 3   A    Not the same time as the other officers.  Certain
 4        officers took their lunches at certain times.
 5   Q    So typically each individual would take their
 6        lunch at the same time?
 7   A    Around the same time every day if there wasn't
 8        nothing going on and we had the proper staffing
 9        and things of that nature.
10   Q    And that would be different than the times that
11        the other officers took their lunch, because you
12        didn't want the lunches to overlap, correct?
13   A    Yes.
14   Q    How would people know when others were on lunch in
15        order to coordinate when people took their breaks?
16   A    They would call in on the radio.
17   Q    And let's say you were on lunch already.  Would
18        the dispatcher tell them that somebody else was on
19        lunch and they needed to wait until that person
20        was off?
21   A    Yes.
22   Q    What's your understanding of Aurora's lunch break
23        policy as it applies to security officers?
24   A    For our department, our department, we usually
25        just took -- we took one lunch, and I know some
```

```
 1        shifts they did one 15, but it varied throughout
 2        the whole hospital, so -- housekeeping, they had
 3        two 15s and a 30, but we never got to take any
 4        really 15s.  We might take one 15 and a 30, but I
 5        never heard anybody call in two 15-minute breaks
 6        and a 30 on our shift.
 7   Q    Okay.  So you understood you were expected to take
 8        a 30-minute unpaid lunch break, is that correct?
 9   A    Yes, sir.
10            MR. SCULLEN:  Why don't we go off the
11        record for a second.
12            (A discussion was held off the record.)
13   BY MR. SCULLEN:
14   Q    I'm showing you what's been marked as Exhibit 2.
15        Have you seen Exhibit 2 before?
16   A    No, I haven't.
17   Q    All right.  Are you familiar with Aurora's
18        Employee Handbook?
19   A    Yes.
20   Q    And that is maintained online?
21   A    Yes.
22   Q    And you had access to it as an employee of Aurora?
23   A    Yes.
24   Q    And signed it -- at some point you had signed, I
25        believe an electronic acknowledgement of your
```

```
 1        receipt of the handbook, or access to it?
 2   A    Yeah.
 3   Q    Okay.  Have you reviewed the rest and meal period,
 4        which is page 2 of Exhibit 2, which is contained
 5        in the handbook?
 6   A    I never reviewed this one.
 7   Q    Okay.  Take a minute and review the rest and meal
 8        period, and then let me know once you've done so,
 9        please.
10   A    (Witness complies.)
11   Q    You've had a chance to review it?
12   A    Mm-hmm.
13   Q    Is that consistent with your understanding of
14        Aurora's meal period as it applied to you when you
15        were employed by Aurora?
16   A    Yes, sir.
17   Q    Showing you what's been marked as -- I'll just
18        write Exhibit 3, since the exhibits have been
19        previously marked -- and ask you are you familiar
20        with Aurora's Administrative Manual?
21   A    Yeah.
22   Q    Again, that's another policy manual that would
23        have been maintained online?
24   A    Mm-hmm.
25   Q    Yes?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay.  And to which you would have had access when |
| 3 | | you were employed by Aurora? |
| 4 | A | Yes. |
| 5 | Q | Okay.  If you would, review -- first of all, have |
| 6 | | you -- do you recall reviewing this portion of the |
| 7 | | Administrative Manual while you were employed by |
| 8 | | Aurora? |
| 9 | A | Yes, I do. |
| 10 | Q | Okay.  And is this consistent with your |
| 11 | | understanding of Aurora's policy as it relates to |
| 12 | | meal periods? |
| 13 | A | Yes. |
| 14 | Q | I'm showing you what's been previously marked as |
| 15 | | Exhibit 4, and direct your attention to the second |
| 16 | | page, Section 5, and ask you whether you recall |
| 17 | | reviewing the portion of this Administrative |
| 18 | | Manual when you were employed by Aurora? |
| 19 | A | I recall Policy 34, but I never seen this one. |
| 20 | Q | Okay.  And by "this one," for the record, you were |
| 21 | | referring to Exhibit 4? |
| 22 | A | Yes. |
| 23 | Q | Okay.  If you could, take a moment and review |
| 24 | | Section 5.  And once you have, let me know. |
| 25 | A | (Witness complies.)  Okay. |

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 378 of 867   Document 49-1

```
 1   Q     You've had a chance to review Section 5 --
 2   A     Yes.
 3   Q     -- regarding meal periods?
 4   A     Yes.
 5   Q     All right.  And is that consistent with your
 6         understanding of Aurora's policy as it relates to
 7         meal periods?
 8   A     This has some different verbiage in it from Policy
 9         34, but some of the points I do recall from the
10         one that I -- that I've seen is Policy 34.
11   Q     Okay.  And my question is having reviewed the
12         policy reflected in Section 5, is there anything
13         in that policy that's not consistent with your
14         understanding of Aurora's policy as it relates to
15         meal break periods as applied to you during your
16         employment with Aurora?
17   A     Could you repeat the question?
18   Q     Sure.  Having reviewed Section 5 regarding meal
19         periods, my question is, is there anything stated
20         in this policy that is inconsistent with your
21         understanding of Aurora's policy regarding meal
22         breaks as applied to you when you were employed at
23         Aurora?
24   A     Employees should eat before -- they should eat
25         meals outside their work area.
```

```
 1   Q    All right.  And what about that is inconsistent
 2        with your understanding of the policy as applied
 3        to you?
 4   A    I don't know, because we -- in our department, we
 5        ate our lunch in our work area downstairs.
 6   Q    Which was where?
 7   A    In our loss prevention office.
 8   Q    Okay.  Now, was that the office that you referred
 9        to that the sergeants had where you had your own
10        computer?
11   A    Yeah, in that area down there.
12   Q    Okay.  But you were free, for instance, to eat in
13        the cafeteria if you wanted to --
14   A    Yes.
15   Q    -- correct?
16   A    Yes, you could.
17   Q    So you weren't required to eat at your -- in your
18        work area --
19   A    No --
20   Q    -- correct?
21   A    -- no.
22   Q    Anything else?
23   A    Employees leaving the facility should notify the
24        supervisor.  This allows the supervisor to know
25        who is available in case of emergency.
```

```
 1   Q    Okay.
 2   A    We didn't leave the facility to go, and it's new
 3        to me that we had to notify our supervisor when we
 4        -- if we did have to leave.
 5   Q    But you understood that you were able to leave the
 6        facility, correct, for your lunch period?
 7   A    Yeah, if we swiped out.
 8   Q    Okay.  Did other employees -- did other officers
 9        notify you as the sergeant on duty if they were
10        leaving the facility?
11   A    Nobody left on my shift to go outside the
12        facility.
13   Q    Was anyone ever discouraged from doing so?
14   A    I wouldn't say discouraged, but, I mean, being
15        security, they liked us to eat lunch on the
16        premises in case something happened.  Because if
17        something happened we would have to respond to it.
18   Q    Okay.  So is your testimony that you believe they
19        liked you to, but you were able to leave if you
20        wanted to?
21   A    If you wanted to, yeah.
22   Q    In which case you would have had to swipe out
23        before you left the premises, is that --
24   A    I knew that we had to swipe, but I -- it's new to
25        me from reading this Policy 176, revised in '08,
```

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 381 of 867   Document 49-1

```
 1        that we had to notify our supervisors.  All I knew
 2        that we had to swipe out for our 30 minutes and
 3        swipe back in.  That's what I'm --
 4    Q   Okay.  So your understanding of the policy was
 5        different from what I had you review in you didn't
 6        think you had to notify anyone before you swiped
 7        out, correct?
 8    A   Yes.
 9    Q   Okay.  Showing you what's been marked as Exhibit
10        5, which consists of two newsletters.  The first
11        one dated January/February of 2003, the second
12        dated January/February of 2010.  Are you familiar
13        with these types of newsletters?
14    A   Yes.
15    Q   Okay.  And what are they?
16    A   These newsletters, the department would put out
17        every three months or so.
18    Q   And both appear to be issued by Mike Cummings?
19    A   Yes.
20    Q   And you previously testified he was the director
21        of loss prevention, is that correct?
22    A   Yes.
23    Q   Okay.  How do these come to you?  Is it by email?
24    A   They would be printed off and sometime put in our
25        mailbox, or sometime they would just be left on
```

```
 1        the briefing table, and we could read it if it's,
 2        like, sitting on the briefing table when we come
 3        into work.
 4   Q    Okay.  I ask you to look at the second page of
 5        Exhibit 5.  The section entitled "Interrupted
 6        Lunch Question Raised."  And I'll ask you to
 7        review that section, and let me know once you're
 8        finished.
 9   A    (Witness complies.)
10   Q    Do you recall reviewing that portion of this
11        newsletter when it was issued?
12   A    Yeah.  I remember when this came out.  It was a
13        hot -- it was a hot topic.
14   Q    Okay.  And is that consistent with your
15        understanding of what you were supposed to do in
16        the event that your lunch was interrupted?
17   A    Yeah.
18   Q    Were there times where your lunch was interrupted
19        and you restarted your lunch?
20   A    General practice, if our lunches got interrupted,
21        nine times out of ten we went back to work.
22        Because if our lunches got interrupted, it was
23        probably something serious, so we probably didn't
24        have a chance to resume our lunch.
25   Q    So if your lunch was interrupted, you're saying
```

```
 1        that on those occasions when it was interrupted,
 2        it would -- the activity would consume the
 3        remainder of your shift?
 4   A    Or it would probably need us -- our attention to
 5        where we wouldn't be able to get back to the
 6        lunch, yes.
 7   Q    What type of activities would last such a
 8        significant period of time that you would have
 9        been unable at any point for the remainder of your
10        shift to have another 30-minute break period?
11   A    Combative patients, numerous standbys, disruptive
12        visitors where you needed to, you know, have a
13        fixed post where you needed to standby to monitor
14        the situation.
15                  Sometimes we would get
16        gunshot-wound victims who come in.  You have a lot
17        of family members coming in, acting combative,
18        nurses fearing for their safety.  They want
19        security to standby.
20   Q    All of those types of activities would have been
21        recorded on the activity log, correct?
22   A    Yes, they should have been recorded on the
23        activity log.
24   Q    And when we looked at Exhibits 21 through 24,
25        which are examples of your activity logs during
```

```
 1        your last two to three years of employment, you
 2        didn't have any activities listed that lasted more
 3        than 30 minutes, correct?
 4   A    I don't know.  I didn't review all the activity
 5        blotters in detail like that.
 6   Q    Okay.  Well, do you want to look at these
 7        examples?
 8   A    I don't need to look at them -- they're examples.
 9        But these are just random logs out of numerous
10        logs that we have on file.  So these particular
11        days, yeah, they could have been events that
12        weren't no longer than 30 minutes, but that's not
13        to say it wasn't happening on other days.
14   Q    Okay.  But if I understand your testimony, if
15        there were other days where you had an interrupted
16        lunch, and it was an activity that lasted that
17        long, it would be reflected in the activity log,
18        correct?
19   A    Yes.
20   Q    Okay.  And to the extent your activity logs don't
21        reflect long periods where you were tied up in
22        activity, that would suggest conversely that you
23        were able to restart your lunch, correct?
24   A    For these days, yes.  For these days.
25   Q    I mean for other days like these that don't have
```

```
 1        any activities that are for a long period of time,
 2        we can assume that on those days if one of the
 3        activities listed interrupted a lunch, that unless
 4        the activity was for a substantial period of time,
 5        that you would have been able to restart your
 6        lunch on those days, correct?
 7   A    Yes, possibly.
 8   Q    I ask you to review the second newsletter, and ask
 9        you to turn to the end of the newsletter to the
10        section entitled "Reminder On No Lunch Policy,"
11        and let me know once you've had an opportunity to
12        review that.
13   A    (Witness complies.)  Okay.
14   Q    Do you recall receiving this newsletter and
15        reviewing that statement?
16   A    No, I don't, because I honestly stopped reading
17        newsletters long ago.
18   Q    Okay.  So you may or may not have reviewed this?
19   A    I didn't see that one.
20   Q    Okay.  Having reviewed it, is it consistent with
21        your understanding of Aurora's policy as it
22        applied to you?
23   A    It sounds good, but was it the actual practice, I
24        don't think so, no.
25   Q    And why was it not the actual practice?
```

```
 1   A    Because it was numerous officers at other sites
 2        complaining.  For example, St. Luke's South Shore,
 3        they ran with one officer.  The sergeant
 4        complained numerous times about not being able to
 5        take a full lunch, and the issue was never
 6        addressed, so I mean --
 7   Q    Well, I'm asking about you, not other people.
 8   A    Well, it happened sometimes, it didn't happen
 9        other times.  Because other times if we did punch
10        out a no lunch, we had to explain, write in the
11        matter of, why we didn't get a no lunch.  So
12        that's not consistent with Aurora policy to write
13        a matter of for "no lunch."  It just says it
14        should be coded out "no lunch."
15   Q    I'm sorry, I'm not following why that's not
16        consistent.
17   A    Because every department doesn't write a matter of
18        if they don't get a no lunch.
19   Q    I'm sorry.  Write a matter of?
20   A    Have to write a statement explaining why they
21        couldn't take a no lunch.
22   Q    Okay.  So when you were unable to take a lunch and
23        coded it as "no lunch," what were you required to
24        do?
25   A    We would have to write a matter of explaining why
```

1    we couldn't take a no lunch.

2  Q   And who did that go to?

3  A   That would go to our supervisor or at the time,

4      manager Robert Solie.

5  Q   And was that true throughout your employment?

6  A   Yes.

7  Q   And why did you think that was not consistent with

8      this policy?

9  A   Because a policy is for an entire hospital or

10     entire organization, but if one department is

11     writing explaining why they got no lunch and then

12     you have nurses who are in ER who can't take a

13     lunch and they can code out without having to

14     write a statement, that's not consistent with the

15     policy.

16 Q   Why is it not consistent?

17 A   Because if you couldn't -- if you couldn't punch

18     out a lunch, it says it should be coded, you

19     should notify your supervisor, and it should be

20     coded "no lunch."  Why should you have to go back

21     and write a statement explaining why you couldn't

22     punch out a no lunch?

23 Q   Why not?

24 A   Because that's not part of the policy.

25 Q   Well, you understood that the policy required

```
 1         supervisory approval, correct?
 2    A    Supervisory approval, if you tell the supervisor
 3         why you couldn't get a lunch, then why should you
 4         have to write a statement on top of that?
 5    Q    Well, isn't that the same thing?  How is it
 6         different?
 7    A    It's different because you have to physically
 8         write a physical verbiage statement when I could
 9         just talk to you, like me and you talking now, we
10         had a gunshot victim came in last night,
11         blah-zay-blah, I couldn't take a lunch.
12    Q    Okay.  So your concern or your objection to it was
13         the difference between having to orally report it
14         versus writing it, putting the reason in writing?
15    A    No.  It's -- it's consistency across the board.  I
16         mean, if every other department doesn't get
17         scrutinized for when they take lunches, why should
18         we get scrutinized when we take a no lunch?
19    Q    Okay.  And your point is what?
20    A    The policy says if you can't take a no lunch, it
21         should be coded "no lunch."
22    Q    Right.  But that doesn't say you shouldn't have to
23         explain why you didn't -- weren't able to take a
24         no lunch, correct?
25    A    It doesn't say it in the policy that you have to
```

```
 1        write a statement explaining why you have to take
 2        a no lunch.
 3   Q    But it doesn't say you don't have to, correct?
 4   A    No, it doesn't.
 5   Q    All right.  And you understood, based on what you
 6        were told, that the expectation was if you took a
 7        no lunch, that you needed to explain why you were
 8        unable to take a lunch, is that correct?
 9   A    Yes.  We had to write matter of.
10   Q    And you did cancel your lunch on occasion,
11        correct?
12   A    I canceled my lunch a couple times, but like I
13        said, I got scrutinized for it too much, so after
14        that, I stopped punching out "no lunch."  If I
15        couldn't take a no lunch, I would just forego it.
16   Q    Well, was your lunch ever denied?
17   A    It was denied a couple times.
18   Q    So your testimony as you sit here today is that
19        you canceled a lunch, and you were questioned
20        about it, and the cancelation was reversed?
21   A    Yes.
22   Q    All right.  When did that happen?
23   A    I don't know exactly when it happened, but I know
24        it was around the time when we were short-staffed,
25        overtime was getting out of hand, and the budget
```

WWW.GRAMANNREPORTING.COM • 414.272.7878

**G**
**GRAMANN**
REPORTING
*Innovation · Expertise · Integrity*

```
 1        -- we were over budget, so we caught a lot of flak
 2        and a lot of scrutiny for if we punched out "no
 3        lunch."
 4   Q    Okay.  When was that, though?  What year?
 5   A    I can't remember the year.  But I remember it was
 6        probably 2006, 2007.  Probably around the time
 7        they issued these newsletters.
 8   Q    Well, one was issued in 2003, and one was issued
 9        in 2010.
10   A    It was sometime in between there.  I worked there
11        for nine years.  A lot happened in those nine
12        years to remember exact date.
13   Q    Well, I'm not asking you an exact date.  You can't
14        remember a year, is that correct?
15   A    I said probably 2006, 2007.
16   Q    Do you recall the person that reversed the
17        cancelation?
18   A    Manager Solie.
19   Q    Anyone else ever reverse a cancelation?
20   A    No.  That was the only person who had a lot of
21        problems with people punching no lunches.
22   Q    And I understood your prior testimony -- strike
23        that.  When did John Moraza take over for
24        Bob Solie?
25   A    Solie just recently took over there last year.  I
```

1    would say the end of 2009, the same time I became

2    a sergeant -- I mean, first shift sergeant.

3  Q  Okay.  How many occasions was -- did you punch out

4    or did you cancel your lunch and the cancelation

5    was reversed?

6  A  I can't think offhand, but I know some of my

7    officers did.

8  Q  No, I'm asking about you.

9  A  Probably like two times.

10 Q  Were both times fairly close in proximity?

11 A  Yes.

12 Q  Okay.  So both would have been sometime, according

13   to you, your best recollection, sometime in the

14   2006 or 2007 time period?

15 A  Yes.

16 Q  Were there other times that you canceled your

17   lunch that it was not reversed?

18 A  No.  After that, I stopped canceling my lunch.

19 Q  On the times when you canceled it and it was

20   reversed, did you fill out a memo as you

21   previously described?

22 A  I recall typing, I believe a matter of for one of

23   the incidents, I did.

24           (Reporter interruption.)

25           THE WITNESS:  A matter of.  It's a

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 392 of 867   Document 49-1

```
 1        document that we had to type up.
 2   BY MR. SCULLEN:
 3   Q    And do you recall the reason that you had to
 4        cancel your lunch?
 5   A    I can't recall it, because most of the days are
 6        kind of similar, but it was really busy that day,
 7        and the whole shift -- the whole shift couldn't
 8        take a lunch, so we all swiped out "no lunch" that
 9        day.  And I guess when whoever was doing the
10        Kronos and reviewing the Kronos found out we
11        punched out no lunches, they made a big stink
12        about it.
13   Q    How do you know that?
14   A    Because we had to write matter of.
15   Q    I thought you said you had to do that every time
16        you punched out?
17   A    I said I had to do it that time, but like I said,
18        after that, after we started catching flak, I
19        stopped canceling my lunches.  Other officers did,
20        but I stopped because I didn't want to go through
21        the hassle of having to do a matter of every time
22        I took a no lunch.  That was me personally.
23   Q    Okay.  But just so I understand, is it your
24        testimony that every time an officer canceled a
25        lunch they had to write a matter of, or only on
```

```
 1        certain occasions when they were questioned?
 2   A    Well, Solie had made a policy he wanted matter ofs
 3        for no lunches.  It wasn't a policy.  It was
 4        basically communicated at one of our leadership
 5        meetings.
 6   Q    When was that?
 7   A    Like I said, I can't remember exactly, because we
 8        had leadership meetings all the time.  But it was
 9        communicated that if officers were to punch "no
10        lunch," they needed to write matter ofs,
11        explaining why they couldn't take a 30-minute
12        lunch on a shift.
13   Q    And was that instituted after the occasions in
14        2006 or 2007, where your canceled lunch was
15        reversed?
16   A    No.  I think that was issued before, because they
17        don't -- they didn't start canceling people's no
18        lunches until after they restarted writing the
19        matter ofs.  And if the matter ofs, I guess, were
20        not justified, then that's when they would reverse
21        the no lunches.
22   Q    You testified that someone made a stink.  So how
23        did you know -- how did you become aware that
24        someone, after reviewing the records, made a -- an
25        issue out of it?
```

```
 1   A    Because we had to do Kronos summary reports that
 2        we had to submit as sergeants, basically detailing
 3        the hours of the shift.  Say, for instance, if
 4        someone took eight hours of FMLA, we would have to
 5        report such-and-such officer took eight hours of
 6        FMLA, or such-and-such overtime was worked for
 7        this shift.  So we had to basically detail in a
 8        little, like an Excel sheet, telling how the
 9        breakdown of our hours on our shift went.
10   Q    Okay.
11   A    And they had us fill out time sheets as well.  So
12        the supervisors and the managers got these
13        reports, and they could see how many no lunches
14        were taken, how many everything was taken.  And if
15        they see that people were taking a whole bunch of
16        no lunches, then they start questioning why is
17        everybody taking no lunches?  So then that's when
18        it became a hot topic within the department about
19        officers taking no lunches.
20   Q    Okay.  And that's my question to you.  So was
21        there a time when someone came to you as a
22        sergeant and asked you that issue?
23   A    It was --
24                  MS. NOVOTNAK:  Object to vague --
25        vagueness.
```

```
 1              MR. SCULLEN:  You can go ahead.
 2              THE WITNESS:  Like I said -- what was
 3       the question again?
 4  BY MR. SCULLEN:
 5  Q    Well, my question was -- your testimony is that
 6       you canceled lunches on several occasions in 2006
 7       or '7, which were reversed.  You testified that
 8       the procedure in place was that you had to --
 9       already at that point when you canceled those
10       lunches, was that you had to write a memo.
11              But then you also testified that
12       there were, I believe you testified on the same
13       occasions, there were occasions where the entire
14       shift was so busy that nobody canceled lunches,
15       and that when I asked you about your testimony
16       that someone reviewing the Kronos records got
17       excited about or wanted to look into that issue,
18       you referred to the fact that you as a sergeant
19       had to do reports or summaries of the hours
20       worked, and you said it became an issue in the
21       department at that time.  And my question to you
22       is did -- did anyone address that issue with you
23       directly?
24  A    They was -- it was addressed with the whole
25       management team.  Sergeants, supervisors, managers
```

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 396 of 867   Document 49-1

```
 1        and directors, we would have, like, quarterly
 2        meetings.  And this was a issue that was brought
 3        up in one of the quarterly meetings.
 4   Q    Okay.  And so I would like you to describe for me
 5        what was discussed at that meeting.
 6   A    It was discussed that, I believe -- I don't know
 7        what the budget deficit, the black or the red --
 8        we were in the negative.  So they're looking for
 9        ways to cut back on the department budget, and
10        they say no lunches were starting to be a problem,
11        and they wanted justification on why people were
12        punching out no lunches.  So they said if people
13        are punching out no lunches, they need to write a
14        matter of explaining why they couldn't get a lunch
15        or so on and so forth.
16   Q    Okay.  Did you disagree with that decision?
17   A    At the time I wasn't really in argument, because
18        it was people from other sites who were having
19        this problem, like, sites that had one officer and
20        stuff.
21   Q    Right.
22   A    We had occasions where it happened at our site,
23        but I know a lot of my officers on my shift at
24        times, not to name any names, they were
25        frustrated, because if we were busy and we punched
```

```
 1        out a no lunch, they were wondering why they had
 2        to justify it, when a lot of other departments,
 3        they punched out "no lunch," and they never caught
 4        any flak when they punched out "no lunch."
 5   Q    Okay.  But if I understand your testimony
 6        correctly, at your facility, both you and your
 7        officers, there were a lot of occasions where you
 8        were able to take an uninterrupted lunch, is that
 9        correct?
10   A    Yes.  I mean, it didn't happen all the time.  I
11        mean, it happened sometimes, and sometimes you
12        punch out a no lunch.  Then, you know, you a
13        special case; you didn't get a lunch that day, you
14        punched out, you know, it should just go over
15        smooth.
16                   But that wasn't the case, because
17        it was a lot of days stuff wasn't going on.  You
18        might see few entries on a blotter.  Yeah, we got
19        lunches.  People weren't just punching out "no
20        lunch" just to be punching out "no lunch."  They
21        were punching out no lunches when they really
22        didn't get no lunch.
23   Q    And the frustration with you and the officers you
24        worked with was that they were being questioned
25        about those occasions when they were punching out
```

```
 1        their lunches?
 2   A    Yes.
 3   Q    Okay.  Now, were there officers who punched out
 4        their lunches -- are you aware of other officers
 5        who punched out their lunches whose lunches were
 6        reversed?
 7   A    I heard of incidents, and I know I had an incident
 8        when I wrote my matter of, because if -- it was up
 9        to the managers and supervisors to approve it.  We
10        have no power over Kronos to approve our Kronos --
11        managers and supervisors.  So managers and
12        supervisors, they can go in, and they can reverse
13        anything with the Kronos and put it however they
14        want it to be put.
15                   So if we wrote a matter of and the
16        justification wasn't up to par with what the
17        manager wanted, then he could easily take your "no
18        lunch" out of there no problem, because he had
19        Kronos power where he could go in and take that .5
20        out or whatever high or long the lunch was.
21   Q    Okay.  And my question to you is you've already
22        testified to the two instances in 2006 --
23   A    I believe it was 2006 or '7.  I'm not for sure,
24        but it was somewhere in that vicinity.
25   Q    Right.  And so now my question to you is, are you
```

```
 1        aware of other officers, who, like you, had their
 2        canceled lunches reversed by a manager or
 3        supervisor?
 4   A    Yes, I'm aware.
 5   Q    Okay.  Who and when?
 6   A    One officer in particular, Officer Nicolet, he's a
 7        veteran.  He was highly upset, because it was days
 8        we were busy, and we couldn't -- we couldn't get a
 9        lunch.  And he was the one who told me, because
10        he'd been working there for a lot longer than me.
11        He said, you know, we didn't get a lunch tonight,
12        so you can swipe, you know, "no lunch."  You gotta
13        do all these procedures, F1 on the Kronos clock
14        and everything.
15                    So we swiped out, and then it came
16        into question, why did we have to punch "no
17        lunch"?  I guess the manager, director, our
18        supervisor to, you know, whatever, had to write
19        matter ofs, explaining why they didn't get no
20        lunch.  So we wrote matter ofs, and then I guess
21        they went back, looked at the blotter or whatever,
22        and felt that it wasn't justified for us not to
23        get a no lunch, and they reversed it and said we
24        wasn't going to get paid for no lunch.
25   Q    And when was that?
```

```
 1   A     Like I said --

 2   Q     Was that the same date that you testified that

 3         happened to you?

 4   A     Yes, because --

 5   Q     Okay.

 6   A     -- our whole shifts -- the days was busy --

 7         usually, if you couldn't take a lunch, then nobody

 8         else on your shift could take a lunch either.  So

 9         most of the time it would be -- say, for instance,

10         we working with four; you got two standbys, that's

11         a fixed post; you got CMS, that's a fixed post.

12         That means you only got two officers floating.  If

13         you got a bunch of stuff going on and you at

14         minimum staffing, you might not get to punch out

15         "no lunch."

16                   So everybody has to punch out "no

17         lunch," because everybody on the shift didn't get

18         a lunch.  Then that comes into question when you

19         come around to do Kronos.  Manager's, oh, why you

20         all didn't take a lunch that day, why you all

21         didn't do this, why -- we were busy that day, we

22         couldn't take a lunch.  Oh, we want matter ofs on

23         why you guys couldn't take lunch.

24                   Okay.  We write a matter of, you

25         know, Solie, he has his own way of doing things.
```

```
 1        So if he didn't think it was justified for us to
 2        get a lunch, then he would wipe out the lunches,
 3        and there's nothing we could do about that.
 4   Q    Okay.  I've got that.  And you've testified now to
 5        two occasions in 2006 or '7, where that happened
 6        to you, and then that also happened to
 7        Officer Nicolet --
 8   A    Mm-hmm.
 9   Q    -- at the same -- on the same date or dates that
10        it happened to you?
11   A    Mm-hmm.
12   Q    Any other occasions that you're aware of?
13   A    No, because once we start encountering problems
14        with no lunches, we stopped doing it, because we
15        didn't want to go through the hassle.
16   Q    You previously testified that when you went on
17        break, you would notify the officer who was
18        working dispatch, correct?
19   A    Yes.
20   Q    Okay.  And is that something that -- and that was
21        the expectation that everyone, when they went on
22        their lunch break, would notify dispatch?
23   A    Yes, call in to dispatch.
24   Q    And would -- I assume that would be done over the
25        radio?
```

```
 1   A    Yes.  Sometimes the radio, or sometimes if you
 2        were down in the squad room, you would just call,
 3        I'm 10-7, mark me down for a lunch.
 4   Q    Okay.  So everyone else wouldn't necessarily know
 5        that you were on lunch break?
 6   A    They wouldn't know, but when you call your 10-7 in
 7        to the dispatcher, they say 107 is on their 10-7
 8        now.  You have to wait like 20 minutes, and then
 9        you can go on your 10-7.
10   Q    Okay.  You previously testified that you
11        frequently took your lunch break in the -- and I
12        don't want to misstate the -- was there a loss
13        prevention office?
14   A    It's a loss prevention office/breakroom.  They
15        have a TV down there, refrigerator, everything.
16        We can eat in that area, but you can also work in
17        that area, because they have computers down there
18        where you do case reports and stuff like that.
19   Q    Okay.  And you could also -- you previously
20        testified you weren't required to take your lunch
21        break in that office?
22   A    No, you didn't have to.
23   Q    Did you typically bring a lunch?
24   A    Either brought a lunch or leftovers from home or
25        ate in the cafeteria.
```

```
1   Q    Okay.  And your testimony was that you never left
2        the premises to go get food off premises --
3   A    No.
4   Q    -- is that correct?
5   A    No.
6   Q    Do you smoke, or did you smoke during your
7        employment with Aurora?
8   A    No.
9   Q    Did other officers with whom you worked smoke?
10  A    Yes.
11  Q    All right.  Aurora has a policy against smoking on
12       the premises, correct?
13  A    Yes.
14  Q    Would officers who smoked go off premises on their
15       break in order to smoke cigarettes?
16  A    Yes.
17  Q    You previously testified, I believe, but correct
18       me if I'm wrong, that you're only required to
19       punch out during lunch if you're leaving the
20       premises, correct?
21  A    Yes.
22  Q    While you're on your lunch breaks, obviously I
23       assume you ate food?
24  A    Yes.
25  Q    All right.  You said that there was a TV in the
```

```
 1        office?
 2   A    Yes.
 3   Q    Did you watch TV during your breaks?
 4   A    Yes.
 5   Q    Would there ever be other employees or officers in
 6        the office during your breaks?
 7   A    If they had to, like, type a case report or
 8        something, use the computer.  Because we had
 9        limited computers where you can do your case
10        reports and stuff like that.
11   Q    Did you ever bring personal reading materials?
12   A    I didn't, but other officers have brought books
13        and, you know, magazines and stuff that they could
14        read.
15   Q    Were there newspapers in the office area?
16   A    Yes.
17   Q    All right.  Did you read those during your breaks
18        at times?
19   A    Yes.
20   Q    Did you make personal calls during your breaks?
21   A    Yes.
22   Q    Was there a radio in the breakroom?
23   A    No.  We would have our radio on us at all times.
24   Q    No, I mean a stereo-type radio?
25   A    No, no, no.
```

1  Q    What other personal activities would you perform
2       during breaks?
3  A    I know some officers, they would get on the
4       computer, check their email, stuff like that.
5  Q    Did you have internet access?
6  A    Yes.
7  Q    All right.  And did you -- did you personally use
8       the internet at times?
9  A    Yes.
10 Q    Check your personal email?
11 A    No.  I checked my Aurora email.  They -- most
12      the -- all the other emails are blocked on the --
13      on our site.
14 Q    I'm sorry, I -- check your what email?
15 A    My Aurora part -- the intranet email.
16 Q    Aurora, okay.  Were you required to monitor your
17      radio during your break?
18 A    Yes.
19 Q    Were you able to turn it off during your break?
20 A    No.
21 Q    Is the amount of chatter on the radio the same or
22      different during your lunch break as when you're
23      not on break?
24 A    It's the same.  It's normal throughout the whole
25      day.

Q Okay. So from your earlier testimony then, I assume there were periods when there was no radio communications during your break?
A Yes.
Q How often during your break would there be radio chatter?
A It would be a lot of radio chatter, because Aurora lunch time, the hospital would be busy. I mean, during the day we would have first responders all over the buildings. We had a lot of hostile clinics within the department, so we had to constantly monitor that.
Because, like I say, if you got four people, and I'm upstairs on the second floor, and I'm in a situation with a boyfriend who's coming in and you have two baby daddies who think they the father of a baby and they're about to fight, I need backup. I can't go into that situation by myself.
You have to come off your lunch, and you gotta help that -- another officer in need. So you have to monitor that radio to make sure you can go up there and assist that officer.
Q Let me ask this. If you were on lunch and a first responder called one out, would you necessarily

```
1         have to stop your lunch?
2   A     No, not necessarily.  If you got six officers
3         working, then you -- you listen to the radio, and
4         you will hear 101 responding, 112 responding.  You
5         hear such-and-such responding, but if you don't
6         have anybody to respond to a first response,
7         security, our job is to be one of the first people
8         on the scene.  You have to come off your lunch and
9         respond to that.
10  Q     Is dispatch expected to try to limit the calls
11        that are made to the people who are on lunch?  You
12        know, once you go on lunch, is dispatch then
13        instructed to redirect calls to the extent
14        possible to the remaining officers who are on
15        duty?
16  A     Yes.  Only if you're utterly needed, that's most
17        of the time when you would get called off lunch.
18        So if there were other officers, those calls would
19        go to the other -- say, for instance, I might be
20        east, and they get a call for west for a val
21        pick-up -- could you come back off the east side
22        and pick up the valuable pick-up?  Then that call
23        would go to another person, because you're on
24        lunch.  So it would be done like that.
25  Q     Okay.  And let's say the person -- my brain's not
```

```
 1        working quickly enough today, but if you were the
 2        person on east and the other person on west was,
 3        let's say 110, the dispatcher would say, "110, can
 4        you run over to east and do a valuable pick-up?"
 5   A    Yes.
 6                MR. SCULLEN:  Take a break?
 7                MS. NOVOTNAK:  Yeah.  That would be
 8        great.
 9                (A recess was taken from 3:56 p.m. to
10        4:10 p.m.)
11   BY MR. SCULLEN:
12   Q    Given that the dispatchers knew that you were on
13        lunch, what types of calls would have been
14        directed to you while you were on lunch?
15   A    It all depends on the staff and what you get.  If
16        there's four, and you have, like, two fixed posts,
17        and you have another person who is tied up with
18        something, then the call would be directed to
19        whoever was on lunch.
20   Q    Were there ever cases where you received a call on
21        lunch and advised that you would do it after your
22        lunch was over?
23   A    Yeah.  Some people -- some officers be like, nope,
24        I'm on lunch.  I'm not coming off my lunch to do
25        it.
```

1   Q   All right.  And did you ever do that?

2   A   No.  I never did that.

3   Q   But you had the ability to do that?

4   A   Yes.

5   Q   Are you able to recall how frequently your lunch

6       was interrupted to perform a task?

7   A   Like I said, it's rare, but it really all has to

8       do with staffing.  There's been times where I

9       don't, just for speaking on second shift behalf,

10      like, when I left, they were at five officers, and

11      overtime was through the roof; so you're running

12      with a minimum of four, and then if the ER calls

13      and states that they have a suicidal, you can't

14      turn that down.  You have to go watch the

15      patients.

16              Then you might get a call for

17      another suicidal, but they can't put the standbys

18      together so one officer can watch them, so bam,

19      there you go right there, three fixed posts.  So

20      then you're going to get called off lunch.  But

21      it's not frequent, but it does happen.

22  Q   Is there any way for you to -- first of all, did

23      you keep any record of what days those occurred?

24  A   Me personally?

25  Q   Right.

1  A   All the records that I have were thrown away when

2      I was terminated, so I wouldn't be able to access

3      any of that.  They cleaned out my office, cleaned

4      out my locker, so I have no records.

5  Q   What records -- were there any records that were

6      thrown away that would have reflected that?

7  A   Yes, I had records in my office, but when I came

8      in, I had a box with my stuff boxed up already and

9      everything that I had that, you know, emails,

10     everything.

11                  Because I had emails going back all

12     the way since the time that I was employed,

13     because that's the way I was taught to, you know,

14     record keep.  I had emails, different folders on

15     my email drives where I would have, you know,

16     schedules or emails from managers, important

17     emails like that, all that.  I don't have access

18     to any of that anymore.

19 Q   Okay.  Just because I'm confused, and maybe it's

20     me, but first of all, you said that there were

21     records which would reflect the days where you had

22     a lunch which was interrupted, is that correct or

23     not?

24 A   It should be -- it should be in the Kronos system.

25     That -- that's a permanent record, so that should

1       all be marked still in Kronos.

2   Q   That would be the days that you canceled, correct,

3       is that what you're referring to?

4   A   The days that I canceled lunch?

5   Q   Right.

6   A   I'm not understanding your question.

7   Q   Okay.  The question I'm asking is, are there any

8       documents or records which would reflect those

9       days that you claim your lunch was interrupted and

10      that you didn't get a 30-minute uninterrupted

11      lunch that's not reflected, for instance, in

12      Kronos by a canceled lunch?

13  A   If it's -- if it's on the blotter sheet, that's

14      the only records that we kept.

15  Q   Okay.  You didn't keep any other records

16      tallying --

17  A   No, no.

18  Q   -- tallying your lunches that you missed or that

19      were interrupted?

20  A   No.  I personally didn't, no.

21  Q   Did you train other officers on the lunch policy?

22  A   I trained them all with the policies were in the

23      book.  They had to read them for theirselves then.

24      Usually human resources trained them on that,

25      because they have about three employee

```
 1        orientations that they have to go through, and
 2        human resources took care of that part -- portion
 3        of it.
 4    Q   Okay.  Did you tell employees that they could
 5        cancel their lunches, or was that something that
 6        would have been handled in training?
 7    A   I never told any employees they could cancel their
 8        lunches.  Training-wise, that was all taken care
 9        in HR in orientation.  We didn't do any of that.
10        They touched on all that in orientation.  They
11        signed off on all that stuff over in orientation
12        with HR.
13    Q   Okay.  Did you ever discourage employees from
14        canceling their lunches?
15    A   No.  Never.
16    Q   Do you recall whether you canceled your lunch on
17        April 7th of 2008?
18    A   No, I don't.
19    Q   Is it possible that you canceled it and were paid
20        for it?
21    A   Yes, it's possible.
22    Q   That would have been after the time that you
23        previously testified to that you were questioned
24        about your lunches and they were reversed,
25        correct?
```

```
1    A    Yes.
2    Q    Did you -- the occasions where your lunch was
3         canceled, did you discuss that issue with
4         Bob Solie on behalf of yourself or the other
5         employees who were impacted?
6    A    Yes.  It was a hot topic.  It was a topic at the
7         leadership meetings.
8    Q    Okay.  And what did you discuss?
9    A    We discussed that why should we have to write
10        matter ofs, because sometimes he would come to our
11        briefings, and if we had any issues or
12        discussions, you know, with management then, you
13        know, it'd just be an open discussion at the
14        briefing table, and everybody would field
15        questions out to the manager as to why do we have
16        to do that, so --
17   Q    And now I'm not asking you about the issue of
18        having to explain why you didn't have a lunch.
19        I'm asking you about those occasions where you
20        claim that you did explain why you canceled your
21        lunch and that was reversed.  Did you -- do you
22        remember having any communications with Bob Solie
23        or anyone else about that?
24   A    First of all, you gotta know Bob Solie.  When
25        Bob Solie makes a decision, it's pretty much it's
```

```
 1        his way or the highway, so it's not really that
 2        much room open for discussion.  If he made a
 3        management decision, he never -- he was never one
 4        of the type of managers who would go back on a
 5        decision he made.  He would go with it.  So the
 6        discussions that you had with him or any of the
 7        other management, people would get frustrated,
 8        because the only thing that would get back was
 9        political answers.
10                   So some people wouldn't even
11        bother.  I wouldn't bother because me and Solie
12        had so many arguments.  He wouldn't say, okay, I'm
13        not going to give you -- I'm going to give you
14        your lunches, because you're complaining to me.
15        If he made that decision, he was going to stick
16        with it, and he was going to stick with it all the
17        way to the end.  That's just his personality.
18   Q    I'm not sure that really answered my question.
19        Did you have any -- if I understand your
20        testimony, his decision to reverse the canceled
21        lunch, was that based solely on what you
22        communicated in the memo, or did you have any
23        discussion with him other than what he --
24   A    Only the memo.  If he said that -- if he felt like
25        it wasn't justified, then that's what it was.  It
```

1      wasn't no explanation back, well, this is why I'm

2      denying it.  It's just, okay, I don't feel it's

3      justified.  It's denied.

4   Q  Okay.  There was no explanation as to why?

5   A  No.

6   Q  No instruction as to what you should do in future

7      instances?

8   A  If in future instances, they might say next time

9      you need to restart that lunch, or you need to do

10     that.  But it sounds good in theory, but if

11     there's a lot of stuff going on, how can you

12     restart a lunch if you still having to work

13     throughout the course of the night?

14  Q  Well, you're sort of switching between very

15     general statements.  I'm asking whether you recall

16     any specific response from Bob Solie on the issue

17     of the two occasions where you testified that he

18     reversed the cancelation of your lunch?

19  A  No, I really don't.

20  Q  Okay.  You testified, when I asked you about the

21     discussions that were had in management meetings

22     concerning the -- a break period, you testified

23     that the discussions centered around the issue of

24     having to write the memo.  Were there any other

25     discussions, for instance, around the issue of

```
 1        whether people weren't really able to take a break
 2        on those occasions when they were canceling their
 3        lunches, or was it limited to the issue of the
 4        concern about having to write out the explanation
 5        for the reason for having canceled the lunch?
 6   A    I don't understand that question.
 7   Q    Well, you previously testified that there was a
 8        meeting amongst supervisors around this time, and
 9        I understood your testimony to be that the
10        discussion mostly centered around the concern
11        about having to write out the explanation for the
12        reason for having canceled the lunch?
13   A    Yeah.  It was a discussion around that, because
14        like I said, it was some hot issues going on at
15        St. Luke's South Shore.  I was -- I remember that
16        meeting, because mostly I wasn't involved in the
17        discussion.  I was more or less hearing about it.
18                   It was another sergeant there who
19        was complaining about, for instance, how can she
20        take a lunch when she's getting paged and paged
21        and paged and this and that, and they said they
22        wanted us to explain.  It was, like, if you want
23        us to explain, why would you want us to explain
24        when it's already a policy saying that if we can
25        punch out "no lunch," then why do we have to
```

```
1        explain it?  Because officers are getting
2        frustrated of having to explain theirself when
3        there should be trust already instilled in the
4        officers that if they punched out a no lunch, then
5        they was punching out a legit no lunch, that
6        people weren't just taking advantage of the no
7        lunch policy.  They was punching out "no lunch"
8        for, you know, justified right reasons.
9                  So when they said that they had to
10       start explaining theirself, they thought that that
11       was a slap in the face to have to explain
12       theirself for a no lunch, when they should feel
13       trusted in order to say, okay, we had a busy
14       night, that's the reason I punched out a no lunch.
15  Q    Okay.  Who was the officer at South Shore?
16  A    Cheryl Bauers, she was the sergeant.  Because
17       St. Luke's South Shore ran on one officer.
18  Q    And what was the response from management?
19  A    Management basically had a philosophy of team, and
20       they wanted us to be a team.  So they felt like
21       the sergeants, the management and director, we all
22       had to be on the same page, period.  So if one of
23       us sergeants went out and communicated a different
24       message, then that means that we're not all on the
25       same team.
```

1              So basically, they just kept

2    reiterating the point that they should not take no

3    lunches unless they have to take no lunches.  And

4    what she was telling them is we only take no

5    lunches when there is no lunch.  And it was going

6    back and forth.  She's, like, I'm not going to

7    punch out "no lunch" unless it is a no lunch.  But

8    then Solie was, like, "Well, what kind of calls

9    are you getting that's making you not take a

10   lunch?"

11             But if you only one officer, and

12   you got two and three and four calls pending, and

13   the operator and the nurses from the floors is

14   calling you, saying, "We need this now, we need

15   that now."  You know, you kind of feel obligated,

16   because you're at the job, that you need to go and

17   you need to handle those calls.  And that's what

18   she was trying to reiterate to them, but they

19   wasn't understanding what she was saying, so

20   that's why it got frustrated, and it got real

21   heated.

22   Q   Okay.  And that was a different issue than applied

23       to your situation at Sinai where you had multiple

24       officers on duty, correct?

25   A   It wasn't different, because it was the same

```
 1      situation echoed around West Allis and at
 2      St. Luke's.  I mean, because they wanted to be
 3      consistent across the board.  They wanted
 4      everybody doing these matter ofs, but at the same
 5      time, each site had a different situation, but why
 6      should we have to justify if we going to punch out
 7      "no lunch"?  Obviously we punching out "no lunch"
 8      because we got a legitimate reason.
 9                  So that's what she was trying to
10      clarify, and some other sergeants reiterated the
11      same point.  But when we left the meeting, they
12      wanted everybody to be on the same page and go out
13      and spread the same message to the officers.  They
14      didn't want to have anybody going out, spreading a
15      different message.
16   Q  And that message was?
17   A  The message was, is they needed to justify a
18      reason, but they needed to justify a reason for
19      the lunches.  And like I said, we had justified
20      reasons, but they didn't want -- basically, they
21      didn't want nobody taking no lunches, period.
22      That's what the bottom line was from management.
23      No "no lunches," period.
24   Q  Did they -- did management acknowledge during
25      those meetings that there were occasions when
```

WWW.GRAMANNREPORTING.COM • 414.272.7878

GRAMANN
*Innovation · Expertise · Integrity*     REPORTING

1      people justifiably would not get a lunch?

2  A   No.

3  Q   So your testimony is that during those meetings

4      they told you that there was no occasion when

5      someone should punch out a lunch?

6  A   That's -- that's the theory they were standing on

7      that day at the meeting.  They didn't want nobody

8      punching out no lunches period.

9  Q   Well, there's a difference between not wanting

10     people to punch out lunches and recognizing that

11     there are occasions when people won't be able to

12     take a lunch, right?

13 A   Solie said, "There is no reason for any officer to

14     punch out 'no lunch.'"  That's what he said, end

15     of quote.

16 Q   Who else was at that meeting?

17 A   The other managers.

18 Q   Who are?

19 A   The managers for West Allis, the managers for

20     St. Luke's, the current sergeants at the time.

21     The sergeant ranks have changed, so --

22 Q   Do you know the managers by name?

23 A   Dobrazinski was the manager for St. Luke's.

24     Verita Hill was the manager for West Allis.  Then

25     you have all the managers from the north region

1    that come down, and I don't know none of them.

2    But my supervisor there, Art Smith.  Director Mike

3    Cummings was there.  Dave Woods.  The management

4    team.

5  Q   Where did the meeting take place?

6  A   I don't know where that particular one took place

7    offhand, but we rotated the meetings between

8    sites.

9  Q   And your best recollection as to the date that

10    that meeting took place?

11  A   Got me on that one.  I couldn't tell you a date.

12    But we had quarterly -- we had quarterly

13    management meetings like every three months.

14  Q   Would this have been as -- sometime in the 2006,

15    2007 time frame?

16  A   It would be --

17  Q   Sooner?

18  A   Yeah, probably around there.  Around the time, I

19    guess, like I said, when the no lunches was -- was

20    a issue or a hot topic.

21  Q   Were there written communications that followed

22    that meeting related to the no lunch?

23  A   It should have been -- they usually do a

24    management, like, they do the management notes

25    afterwards.  Sometimes they would send them out,

```
 1        sometimes they wouldn't.  It depends.
 2   Q    What other -- do you remember the names of any of
 3        the other managers who were there?  Dobrazinski?
 4   A    Dobrazinski was from St. Luke's.  Verita Hill was
 5        the manager for West Allis, and my site supervisor
 6        was there.
 7   Q    And that's Art Smith?
 8   A    Art Smith.  The other supervisors from up north
 9        region, I can't remember their names, because we
10        only seen them every once in a blue moon.  They
11        would come down from, like, Green Bay, Sheboygan,
12        those areas.
13   Q    What about any other -- do you recall specifically
14        any other supervisors that were there?
15   A    Those are the supervisors.
16   Q    I'm sorry, any of the sergeants?
17   A    I mean, the managers, Jim Moraza was there,
18        Dave Woods was there, Robert Solie was there,
19        John Bruce was there.  Those are managers that I
20        remember that was there.  Supervisors were Verita,
21        Dobrazinski and Art.
22   Q    What about other sergeants that you recall?
23   A    Who were sergeants at the time?  Scott Myren, but
24        he's not here anymore.  Jim Baronowski,
25        Jennifer Wagner, all those sergeants that are just
```

1    like me.  They're all terminated.  They're not

2    there anymore.

3              (Reporter interruption.)

4              (Exhibit No. 25 was marked for

5    identification.)

6  BY MR. SCULLEN:

7  Q    I'm showing you what's been marked as Exhibit 25,

8       which is a two-page document.  If you would, once

9       you've finished reviewing it, let me know.

10 A    (Witness complies.)

11 Q    Do you recall receiving Exhibit 25?

12 A    I remember the issue, yes.

13 Q    All right.  What was the issue?

14 A    I don't know what was -- if he was working at

15      Sinai at the time or Hartford, but we were running

16      a short staff, and he was working doubles, so --

17      but I don't know the extent about him not punching

18      out "no lunch."  I just know that Solie had sent

19      this email.  I don't even know why I was CC'd on

20      the email, because this was a issue between Denny,

21      Solie and Robert Solie -- and, I mean, Ivan.

22 Q    Do -- what is the second page?  What is the

23      attachment?  Do you know?

24 A    That's the matter of.

25 Q    Okay.  That's an example of the matter of --

```
 1   A     Yep.

 2   Q     -- that you previously testified to?

 3   A     Yep.  And these are -- are examples of what

 4         Mr. Solie would have us type up.  Like I said,

 5         Solie was stern with his -- with this no lunch

 6         stuff, and he didn't want nobody punching "no

 7         lunch," period.

 8                     I don't know what arrangement Ivan

 9         had with Denny and them, but, like I said, he

10         probably -- it was probably for travel or

11         something, because if he came from Hartford,

12         Hartford is a 30 to 45-minute drive from Hartford

13         to Aurora Sinai.  So I don't know if it was for

14         mileage or what, but this is a matter of that he

15         would have had to type to explain to him why he

16         punched out a no lunch.

17   Q     Okay.  Do you think Mr. Solie's response is

18         unreasonable in any respect?

19   A     No, not in this situation.

20   Q     Okay.  And this doesn't reflect a prohibition

21         against canceling any lunches, correct?

22   A     Well, like I said, it depends on the circumstance.

23         This circumstance, I don't know the full details

24         of what it was, but like I said, I know -- I know

25         for a fact if you working at another site, you
```

```
 1        usually don't punch out if you're going in between
 2        sites, so -- but I don't know why he punched out
 3        "no lunch."  I don't -- I can't justify that,
 4        so --
 5   Q    Right.  But here Mr. Solie is saying -- he's
 6        explaining the policy regarding canceling lunches,
 7        correct?
 8   A    Mm-hmm.
 9   Q    And what he's saying is you're expected to take a
10        30-minute unpaid lunch break for each six hours
11        worked, correct?
12   A    Mm-hmm.
13   Q    And the exception would be if you have to respond
14        to an emergency situation and you can't take a
15        30-minute uninterrupted break later in the shift?
16   A    Mm-hmm.
17   Q    And he's saying if that happens, you are -- you
18        should cancel your lunch, correct?
19   A    Yes.
20   Q    Okay.  And you would agree that that's a
21        reasonable position to take?
22   A    Yeah.  In this circumstance, yes.
23   Q    You previously testified that you also worked
24        shifts at other facilities, including West Allis
25        and St. Luke's and Aurora Psych.  Let me ask you
```

1       about West Allis.  Were the procedures with regard

2       to no lunches any different at West Allis than

3       they were at Sinai?

4   A   No.

5   Q   How many officers per shift at West Allis?

6   A   If I told you, I would be lying to you, because

7       their -- I would say their minimum is two, but

8       sometimes they work with three.  But nine times

9       out of ten, they're running with two officers per

10      shift.

11  Q   And was there similarly someone working dispatch?

12  A   Yep.  So you have one officer floating, and --

13      now, that was a site where no lunches occurred a

14      lot, because they had a lot of standbys, and

15      that's two fixed posts right there.  So that was a

16      situation where you had a lot of complaints about

17      people getting wrote about no lunches because that

18      was a common sense thing right there.

19                  If -- you knew that they couldn't

20      take lunches, because West Allis ER, they call for

21      standbys like crazy.  They call for courtesy

22      standbys.  And they were always running with two

23      officers, first, second and third shift.  And then

24      when people called in, we would have to send

25      people from our site to go over and cover.

1  Q    And were you aware of whether people canceled

2       their lunches on those occasions at West Allis?

3  A    I'm not sure, because West Allis isn't my home

4       site.  I would just go over there.  But I know --

5       I know -- I heard some -- you know, you hear stuff

6       through the grapevine, but I know there was some

7       rumblings, because they were running with two

8       officers, and basically if they had dispatch and

9       they got a standby, it was basically no lunches

10      for nobody.  Because suicidal standbys can run

11      eight hours, 16 hours, 24 hours.  Some standbys

12      can last weeks at a time.

13 Q    And am I understanding correctly that when you

14      went to West Allis, it was typically, you would be

15      an additional person who would be going over there

16      to the regularly scheduled?

17 A    No.  Most of the times you would go because

18      somebody called in.

19 Q    Okay.  So you would be, in that situation, one of

20      those two officers?

21 A    Yes.

22 Q    All right.  And did that ever happen to you at

23      West Allis where you --

24 A    Yes.  It happened to me a couple of times.  It

25      happened frequently, because we used to go over

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 428 of 867   Document 49-1

```
 1         there on second shift to cover.  And then they
 2         would want us to actually stay over and help
 3         third, but each officer is obligated to take care
 4         of their own site.  So if another officer, say,
 5         for instance, called in on third, then the two
 6         officers that -- the one officer that was, their
 7         home base was West Allis, would usually have to
 8         stay over to work another shift.  So it would be
 9         influxes with those types of issues as well.
10    Q    All right.  Were there any occasions where you
11         personally were working at West Allis where you
12         were unable to take a lunch but didn't cancel your
13         lunch, that you recall?
14    A    I can't recall, but it probably happened.  Like I
15         said, I just -- I always try to be a team player,
16         because it's been times I haven't taken a lunch,
17         and I didn't punch, but, you know, it was just me
18         being a team player.  But like I said, you had
19         plenty of instances, and, I mean, it happened so
20         frequently where you were working so much short
21         staff that it became routine.  It became routine.
22         So I had got used to it after a while, because it
23         was happening so frequently.
24    Q    At West Allis?
25    A    Just at other sites.  I floated to a lot of other
```

```
 1          sites.  I floated to Luke's a lot.
 2   Q    Okay.  Let me stop you, because I want you to be
 3          very precise.
 4   A    Okay.
 5   Q    Asking you now only about West Allis.  Were there
 6          occasions where you recall that you were unable to
 7          take a lunch, but did not cancel your lunch?
 8   A    Yes.
 9   Q    All right.  What dates were those?
10   A    I don't know the dates.
11   Q    Okay.  How many times?
12   A    I don't know how many times.  Like I said, I went
13          over to West Allis a lot.  I went over to --
14   Q    Well, I'm not asking how many times you went over.
15          I'm asking how many times it happened?
16   A    I couldn't tell you.  I would have to look at the
17          sheets, because we floated.  We had a mandatory
18          overtime sheet, and if your name was on the list,
19          you had to float to another site.  I can't give
20          you precise dates.
21   Q    Okay.  Would looking at the sheet necessarily tell
22          you whether you had to work through your lunch?
23   A    Yeah, you could see, because it would state on
24          there if you were sitting on a standby or not, or
25          if you were in dispatch or not.
```

```
 1   Q     Okay.  And if it didn't state one of those, then
 2         the assumption would be you received your
 3         uninterrupted lunch?
 4   A     The assumption would be that you got your lunch.
 5   Q     Okay.  Same question with regard to St. Luke's.
 6         Was the procedure any different there with regard
 7         to no lunches?
 8   A     I would say, yeah, because St. Luke's, they run by
 9         their own set of rules, so I would have to say,
10         yeah, because I remember plenty of times going
11         over to St. Luke's, getting stuck on a standby and
12         not getting relieved to even take a lunch.
13                    Because if you went to another
14         site, nine times out of ten, you were going
15         somewhere -- because you didn't know the site,
16         like, you didn't know dispatch and stuff like that
17         and you didn't know the lock-ups sometimes, so
18         they would put you in an area where they can most
19         use you.
20                    Everybody knows how to do a
21         standby, so the common rule was if you floated and
22         another site had a standby, then the person coming
23         in from the other site would sit on a standby.
24   Q     How many officers were typically scheduled per
25         shift at St. Luke's?
```

www.GramannReporting.com · 414.272.7878

**GRAMANN** REPORTING

*Innovation · Expertise · Integrity*

```
 1   A    St. Luke's, it varies.  Sometimes they work with
 2        three, sometimes they work with four.
 3   Q    And did they have a similar practice with someone
 4        on dispatch?
 5   A    Yeah.  Dispatch is always manned.
 6   Q    And there were times where you recall that you
 7        worked through your lunch?
 8   A    Yes.
 9   Q    But didn't cancel your lunch?
10   A    Yes.
11   Q    And the reason you didn't cancel your lunch on
12        those occasions?
13   A    Because I was sitting on a standby.
14   Q    Right.  But why didn't you cancel your lunch?
15   A    Because I didn't want to go through the hassle of
16        having to explain.
17   Q    Was it your belief that if you had canceled your
18        lunch on those occasions and explained that you
19        were on a standby the entire time and couldn't
20        take a lunch, that it would be reversed, or you
21        don't know?
22   A    I don't know, but I didn't want to go through it,
23        because I felt like I shouldn't have to go through
24        it any time if I punched a no lunch.  If I'm a
25        sergeant and I'm a part of leadership team, you
```

WWW.GRAMANNREPORTING.COM • 414.272.7878

**G**
**GRAMANN**
REPORTING
*Innovation·Expertise·Integrity*

1    should trust me.

2  Q   And what about Aurora Psych?  Well, let me ask, on
3      what occasions did that occur?

4  A   Where?  At Luke's?

5  Q   At Luke's.

6  A   Mostly when I was working second shift.

7  Q   Do you recall specific dates?

8  A   I don't recall specific dates, but Luke's had a
9      lot of people who were out on FMLA.  They had like
10     three or four officers, and in the summertime --
11     it would happen a lot in the summer times, because
12     a lot of people would be on vacation, and then you
13     would have a lot of call-ins.  So if our site was
14     above minimum, we would have to send somebody over
15     there to help out.

16 Q   And similar to your prior testimony, would the way
17     to determine dates that that may have happened be
18     by looking at your activity logs?

19 A   Yes.

20 Q   All right.

21 A   It should be on our pass-on logs when we get
22     re-deployed to other sites.

23 Q   All right.  So similar to your prior testimony, if
24     your log showed a -- an activity that, like a
25     standby that took a significant period of time,

```
 1        that might be an occasion when you didn't get a
 2        lunch, and in the absence of any activity
 3        reflected in the log, we can assume you had an
 4        uninterrupted lunch?
 5   A    Yes.
 6   Q    Same question with regard to Aurora Psych.  I
 7        believe you testified that you worked there once?
 8   A    Only one time.
 9   Q    And that was sometime in the last year of your
10        employment?
11   A    Yes.
12   Q    When was your -- what was your date of
13        termination?
14   A    February 24th, 2011.
15   Q    Okay.  Was the practice with regard to lunch
16        breaks any different at Aurora Psych?
17   A    I really couldn't tell you, because they was
18        another site they ran with one officer as well, so
19        I guess depending on how busy they were, I guess
20        -- I guess it would depend on if they had somebody
21        acting up in one of the psych wards or something.
22                    I only worked there one time, and
23        that's because they desperately needed me, and I
24        went over there, and I worked.
25   Q    And do you recall whether you took a lunch break?
```

```
 1   A    I took a lunch break.  It was kind of slow that
 2        day, and I was able to take a lunch break.
 3   Q    Okay.  So you got an uninterrupted lunch break?
 4   A    Yes, yes.
 5   Q    You testified earlier, I believe, that you
 6        understood that you could leave the premises but
 7        chose not to.  Given that you had a maximum -- you
 8        understood that your maximum expected lunch break
 9        was 30 minutes, correct?
10   A    Yes, yes.
11   Q    Was it thus your understanding that you could
12        leave the premises and go up to a distance of what
13        would take you 15 minutes?  Because you had to be
14        back within 15?
15   A    My understanding is if you punched out and, say,
16        for instance, you took a lunch at twelve, you
17        needed to punch back in at 12:30.
18   Q    Okay.  And I'm asking in terms of response time,
19        right?  If you went on lunch and you took your
20        cell phone or pager, am I correct in understanding
21        that you could go up to 15 minutes' distance away,
22        because you had to be back within 15 minutes?
23   A    No.  The understanding was you had a 30-minute
24        break.  If you punched out at 12:01, you better be
25        punched back in at 12:31.  You had 30 minutes,
```

```
 1        period.
 2   Q    Okay.  But you previously testified that if you
 3        did punch out and left the premises, you had to
 4        then carry a cell phone or a pager, is that
 5        correct?
 6   A    No, I didn't say that.
 7   Q    Okay.
 8   A    Because if you punched out, you didn't take a cell
 9        phone.
10   Q    You didn't have to take the cell phone or pager?
11   A    No.  Only if you were on the clock and you were
12        doing off-site patrols.
13   Q    So you had the ability to punch out for your lunch
14        periods, and if you did punch out for that
15        30-minute period, then you didn't have to carry
16        the cell phone or pager with you?
17   A    No.
18   Q    No, you didn't have to carry it with you?
19   A    No, you did not.
20              MR. SCULLEN:  All right.  I don't have
21        anything further.
22                    EXAMINATION
23   BY MS. NOVOTNAK:
24   Q    I have a couple clarification questions.
25        Mr. Snowden, when you punched out on lunch -- if
```

```
 1        you punched out on lunch, would you have to carry
 2        your radio with you?
 3   A    Yes.
 4   Q    Okay.  So you've testified, I think, that you
 5        never left the premises --
 6   A    No.
 7   Q    -- for lunch, is that right?
 8   A    No, I didn't.
 9   Q    And why was that?
10   A    Because, like I said, it's already more -- you
11        know, you still have to respond to calls if
12        needed, so -- like, if I punched out on a lunch,
13        and I was still on the grounds, and I heard
14        something coming over the radio, I would still --
15        I would respond to it, but I never punched out for
16        lunches.  I usually would eat my lunch in the
17        squad room in the breakroom in the lower level, so
18        if something did happen, I could be, you know,
19        readily available to respond.
20   Q    What are -- what are your thoughts about what it
21        means to be readily available?  I mean, how --
22        what do you think is a good response time on
23        something that calls -- that sounds fairly urgent?
24   A    Like, if it's a fire or something, you want to be
25        there within, like, at least a minute's time.
```

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | A minute to two minutes, I would say, would be |
| 3 | | reasonable. |
| 4 | Q | If you did punch out and left the premises, was |
| 5 | | there any rule that you -- or policy that you were |
| 6 | | aware of, that required you to be within radio |
| 7 | | frequency? |
| 8 | A | No. |
| 9 | Q | Okay.  But if you took your radio and you were |
| 10 | | supposed to be available, how far could you go? |
| 11 | A | There -- there was no set limitation -- the |
| 12 | | radios, you could hear them pretty far, because |
| 13 | | when we responded to off-site clinics, like, say, |
| 14 | | for instance, if I went to Fourth and Walnut, I |
| 15 | | could still hear the radio, and I could still |
| 16 | | respond on the radio, so -- and then, like, |
| 17 | | clinics on Wisconsin. |
| 18 | | Like, if I went to 33rd and |
| 19 | | Wisconsin, I could still hear the radio while I'm |
| 20 | | in the squad, so -- and then if I went to Highland |
| 21 | | or if I went to Family Service, I could still here |
| 22 | | the radio.  So if you heard a distress call, you |
| 23 | | could still get back in a reasonable time, |
| 24 | | depending on how traffic was and things of that |
| 25 | | nature. |

```
 1   Q    Okay.  Look at Exhibit 4, which is in front of
 2        you, in the second page, which you looked at
 3        before.
 4   A    Exhibit 24?
 5   Q    4.
 6   A    4?
 7   Q    Yeah, I don't think -- I think it's previously
 8        marked, so it's just -- doesn't have an exhibit
 9        sticker on it.  In Exhibit 4, you looked at
10        Section 5 on the second page --
11   A    Mm-hmm.
12   Q    -- meal periods.  Look at 5-C, and can you read
13        for the record out loud that first sentence?
14   A    "Employee must be completely relieved from work
15        duties for the entire meal period and must be free
16        to leave the facility."
17   Q    Were you completely relieved of work duties during
18        your lunch -- your lunch breaks?
19   A    No.
20   Q    Why not?  I mean, in what way were you not?
21   A    Because you still had your radio on, and you still
22        had to respond to calls if needed.
23   Q    Okay.  And how frequently did it happen that your
24        radio -- you received a radio call during your
25        lunch break?
```

```
 1   A    When I moved to first, it happened a lot.  It
 2        happened a lot on first, because first shift is
 3        more busy throughout the day.  I remember
 4        instances where we had -- we'd have first
 5        responders back-to-back where you had -- we had a
 6        person who had a heart attack on four, and then we
 7        had another -- another fallen patient over on the
 8        other side on four.  So it's like, if you knew
 9        that the staffing level couldn't accommodate those
10        calls and you knew you were on lunch, you would
11        respond off your lunch to go to those calls.
12   Q    When you called dispatch and told them you were on
13        lunch, did you still have to monitor the radio
14        chatter while you were at lunch?
15   A    Yes.
16   Q    Okay.  And did you do that?
17   A    Yeah.
18   Q    I want to talk -- ask you a little bit about in
19        the matter ofs, which is a term I've heard in
20        relation to police departments.  I don't know --
21   A    Yes.
22   Q    -- is it also a military term?
23   A    I think it's a law enforcement/military security.
24   Q    Okay.
25   A    It's something, I think, with criminal justice or
```

```
 1        something like that.
 2   Q    Okay.  What is an incident report?
 3   A    An incident report is basically a report
 4        documenting an incident.  Say, for instance, an
 5        incident to report can be as small as a slip and
 6        fall, or a incident report can be an assault.  An
 7        incident report can be an auto break-in.  An
 8        incident report can be, you know, a nurse gets
 9        struck, you know, on a patient floor.  It all
10        depends.  There's so many different types of
11        incidents that can occur.
12   Q    Is there a difference between an incident report
13        and an in the matter of?
14   A    Yes.  It's a slight difference, because in the
15        matter of is just document -- it's, like, a
16        summary of what's happening -- in a matter of
17        doesn't go into detail as much as it does a
18        incident report, but in the matter of, you could
19        consider a in a matter of, the narrative of an
20        incident report, if you want to put it like that.
21   Q    Is -- does -- is there anything that in an in the
22        matter of has to do with the officer's own
23        behavior as opposed to documenting an incident?
24   A    I would say, yeah, because in the matter of, we
25        have to write a lot of them.  If management wanted
```

```
 1        clarification on something, and they didn't want a
 2        incident report, then they would just make us
 3        write a in the matter of, and they would put it in
 4        our employee file.
 5   Q    Okay.  So in the matters of went into your
 6        personnel file?
 7   A    Yes.
 8   Q    And can you give me some other examples of what
 9        you might write -- why you might write a in the
10        matter of?
11   A    In the matter of, say, for instance, like, say,
12        for instance, a standby patient walks away while
13        you're watching him.  Per our policy, we're not
14        the actual care provider for the patient.  We're
15        just there to make sure they don't harm theirself
16        or anybody else.  And if that patient leaves -- we
17        can't hold them against their will.  They can
18        leave.  We would just notify the ER nurse.  Then
19        they can contact MPD, and we tell them what
20        direction of travel that they're traveling in.
21                    And then, say, for instance, if our
22        supervisor thought we could do more on that
23        incident and they want to scrutinize the incident,
24        then they make us write a in the matter of,
25        explaining how come we let that patient go, or
```

```
 1        what was the circumstances behind why we let that
 2        patient go.
 3   Q    Is there any sense in which that an in the matter
 4        of might lead to discipline?
 5   A    Yes.
 6   Q    And is that a general sense in relation to any in
 7        the matter of?
 8   A    No.  I've seen people get in disciplinary for in
 9        the matter of.
10   Q    And why did you perceive an in the -- being
11        required to write an in the matter of as an
12        adverse thing?
13   A    Because, just like I explained, it can be used
14        against you, and that's why a lot of the employees
15        didn't want to write in matter ofs, because it's
16        kind of like you setting a person up for Kronos
17        fraud if they can't justify why they punched out
18        "no lunch."
19                    And in the matter of is still in
20        your personnel file, so it can be used against you
21        in a later matter, and it's building a paper trail
22        against that person.  So a lot of officers would
23        get paranoid when they have to write in the matter
24        ofs, because they know in the matter ofs can be
25        used later on.  So why should we -- if we punched
```

1   a no lunch, why you just can't take our word that

2   we punched a no lunch, legitimate.  Now, in

3   certain situations, you know, like that, but the

4   same thing, in the matter ofs can be used against

5   you, so that's why people fear, like, in the

6   matter ofs.

7  Q   Okay.  When you got a call on the radio, did you

8      have discretion to just not respond at all?

9  A   You got discretion to, but like, say, for

10     instance, if a officer got injured on the job, and

11     you were on lunch, and you could have responded to

12     that call, then you would be questioned about

13     that, why you didn't come off your lunch, and why

14     you didn't respond to an incident.

15             Because if you heard a 1017 --

16     that's just like a cop.  If a cop is on lunch and

17     he hear a officer down, he's not going to just sit

18     there, I'm on my lunch break, I'm not going to

19     respond to an incident.  He's going to respond,

20     because that's his fellow co-worker.

21             And that's the way we looked at it,

22     because -- we just had an incident where two

23     officers got hurt on the second floor trying to

24     defend NICU unit.  And they both got injured, and

25     they had to miss time off the job, because we were

```
 1        running at minimum staffing.  So it's always been
 2        a written rule in security, and everybody knows
 3        this, that you always have your partner back,
 4        period.
 5                    So if you're on a lunch, you're not
 6        going to keep eating your lunch while you hear
 7        another officer in distress on the radio calling
 8        for help.  You're going to respond to that call.
 9   Q    If you didn't respond to that call, would you risk
10        discipline?
11   A    Yes, you would.
12                    MS. NOVOTNAK:  I don't have any other
13        questions.
14                        EXAMINATION
15   BY MR. SCULLEN:
16   Q    You were asked about taking your radio with you if
17        you left the premises.  You would agree that given
18        that you had a maximum of 30 minutes, if you left
19        the premises, you could go up to 15 minutes away,
20        given that you had to be back within 30 minutes
21        total, you could go a maximum of 15 minutes away
22        on your lunch period, correct?
23   A    I never said that. I said you had 30-minute lunch.
24        So whatever you did in your 30 minutes is what you
25        did.  It wasn't a requirement that you had 15 --
```

```
 1        you could have went 20 minutes, but you had 30
 2        minutes from the time you punched -- whatever that
 3        time said on the Kronos.  If I punched out at
 4        twelve, I have to punch back in at 12:30, 30
 5        minute, period.
 6   Q    Right.  Well, and that's what I'm asking --
 7        although, theoretically you couldn't have gone 20
 8        minutes away, because if you went 20 minutes away,
 9        you wouldn't have been able to get back within 30
10        minutes, correct?
11   A    Depends on how fast you drive.  You might make up
12        the minutes, so --
13   Q    Well, let's assume that under whatever
14        circumstances, you couldn't go away longer than it
15        would take you -- if you went away up to 15
16        minutes away, you had to respond within 15
17        minutes, correct, because you had -- you had a
18        maximum of 30 minutes?
19   A    In our department, our officers, loss prevention,
20        nobody punched out lunch, period.  Nobody.  Only
21        people who punched out were the people that went
22        to smoke, and that was it.  Because mostly
23        everybody in our department ate their lunch on
24        campus in the breakroom or in the cafeteria.
25   Q    Okay.  So people who punched out who were smoking
```

1      on lunch, could take up to 15 minutes to respond

2      if they were on lunch and punched out, correct?

3  A   Or they didn't have to respond at all, but like I

4      said, if somebody got hurt and you was available

5      to respond to that call, you had to give an answer

6      for why you didn't respond to that call.

7  Q   Okay.  And in that hypothetical, the people who

8      were punched out on lunch, presumably weren't

9      available, correct, and wouldn't be disciplined,

10     correct?

11  A   I don't know.

12  Q   All right.  Are you aware of anyone who was

13     punched out on lunch who failed to respond and was

14     disciplined?

15  A   Not to my knowledge.

16  Q   Is it your testimony that all in the matter ofs go

17     in the employee's personnel file?

18  A   It goes in our file, yes.  Our supervisor, when we

19     wrote in the matter ofs, he put them in our files.

20  Q   So your -- is it your testimony then that the in

21     the matter of documents that you created when you

22     canceled your lunch as you previously testified

23     are in your personnel file?

24  A   They should be.

25  Q   If they're not, does that mean your testimony may

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 447 of 867   Document 49-1

```
 1        be incorrect as to your assumption that they
 2        always go in employees' personnel files?
 3   A    No.  Because my supervisor was bad at filing
 4        paperwork, and I have plenty of people to testify
 5        to that.  So it may have made it in my file, or it
 6        may have made it in a pile of papers on his desk.
 7   Q    Okay.  So they weren't always -- you don't know
 8        that they were always filed in your -- in
 9        employees' personnel files?
10   A    I don't know for a fact, but I was told that when
11        you write a matter of, it goes in your employee
12        file.
13   Q    All right.  Who told you that?
14   A    My supervisor and management.  It's documentation.
15        That's why they had us write it, to document.
16        Just like they had coaching for improvements.  If
17        we did a coaching for improvement, it went in our
18        files as documentation.
19   Q    Well, but you could have documentation which
20        doesn't go in your personnel file, correct?
21   A    I guess, if they had another file to put it in.
22   Q    Okay.  And my question is who specifically told
23        you that in the matter ofs all go in an employee's
24        personnel file?
25   A    Our management did.
```

```
 1   Q    Who?

 2   A    Our management.

 3   Q    I know.  I'm asking you specifically.  What person

 4        told you that?

 5   A    I can't recall offhand, but management said when

 6        we do a matter ofs, those go in our file, because

 7        it's -- in security, documentation is key.  So if

 8        you document an incident, you're not just going to

 9        throw a matter of in the trash.  The in the matter

10        of is going to go in somebody's file.  I don't

11        know if it's going to go in a employee file, but

12        it's going to go in some security-related file

13        that's going to be able to be used and brought

14        back up in the future if needed.

15   Q    Okay.  So now your testimony is it may not go in

16        personnel files, correct?

17   A    It may not --

18   Q    Okay.

19   A    -- but it's going to go in some security file in

20        our department.

21   Q    But you don't know that, because you never were

22        responsible for filing in the matter ofs, correct?

23   A    I never -- I never was responsible for filing.

24   Q    Okay.  Did you ever review files that contained in

25        the matters of?
```

1    A    No, I did not.

2    Q    Okay.  What other -- other than canceled lunches

3         and incident reports regarding the hypothetical

4         you gave of a patient that you were supposed to be

5         watching walking off, what other examples are you

6         familiar with where employees were requested to

7         create in the matters of?

8    A    Perfect example.  I had a officer on a shift, her

9         husband was -- kept calling, harassing her on her

10        shift.  Our supervisor asked her to generate a in

11        the matter of to document the incident so he could

12        keep it on file.

13   Q    And you would agree that that's not anything that

14        could be used against the employee in a

15        disciplinary proceeding, correct?

16   A    No, but --

17   Q    Anything else?

18   A    It could be.  I mean, if her husband was calling,

19        harassing her job, it might come back on her

20        depending on what the situation is, because --

21   Q    Was that your understanding of why the supervisor

22        asked her to document it?

23   A    I don't know what the reason why, but he said he

24        wanted a in the matter of for the incident, so --

25   Q    So you don't know whether that's disciplinary --

WWW.GRAMANNREPORTING.COM • 414.272.7878

**GRAMANN**
REPORTING
*Innovation · Expertise · Integrity*

1   A    I don't know.

2   Q    -- or nondisciplinary?

3   A    I don't know.

4   Q    Any other situations?  Well, let me ask you this.

5         Did you believe in that situation that the reason

6         he asked her to document it was to create a record

7         of discipline for her?

8               MS. NOVOTNAK:  I'm going to object as to

9         calling for speculation.  You can go ahead and

10        answer.

11              THE WITNESS:  I don't know, because --

12         the employee had a lot of issues going on, so it

13         could have been used for documentation, because

14         her and her husband had a lot of problems going

15         on.  And at the time we were trying to build a

16         file up against her, so yes, it could have been.

17  BY MR. SCULLEN:

18   Q    Well, anything could happen, right?

19   A    Yeah, anything could, yeah.

20   Q    That wasn't my question.  Did you believe that the

21         reason he asked her to write the in the matter of,

22         was so he could create a disciplinary record?

23   A    No.

24   Q    Any other situations that you're aware of?

25   A    Not offhand, but I know in the matter ofs was used

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 451 of 867   Document 49-1

```
 1        frequently.  I can't think of another situation
 2        right off the top of my head now, but I mean, they
 3        were used.
 4   Q    And not always for disciplinary reasons?
 5   A    Not always for disciplinary.
 6   Q    And you're not sure where they were filed, if
 7        anywhere, correct, you don't have personal
 8        knowledge?
 9   A    I know they were filed, but I don't know for sure,
10        like you said, if they were filed in employee
11        files, but they were filed somewhere to keep a
12        paper trail.
13   Q    Well, you don't know, because you don't have any
14        personal knowledge, right?  Your testimony was you
15        don't have personal knowledge because you never --
16   A    I do have personal knowledge, because I kept
17        employee files.  For my shift, I have files of
18        Kronos sheets, all that, all the files for my
19        shift.
20                    I had a personnel file in my office
21        with each officer's information.  So if a matter
22        of was written, that would go in that person's
23        file inside of my office.  I had a officer file
24        for each and every individual officer on my shift.
25   Q    Okay.  And did you file -- did you personally file
```

1    in the matters of in the individual officer's

2    files when they canceled their lunches?

3  A  No, I didn't.  Those went to the supervisors and

4    above.

5  Q  All right.  And you don't know where, if anywhere,

6    those were filed?

7  A  No.

8           MR. SCULLEN:  I don't have anything

9    further.

10              EXAMINATION

11  BY MS. NOVOTNAK:

12  Q  You were asked questions about being punched out

13    and how far you could go for lunch.  If you were

14    punched out for lunch, was it possible for you to

15    be -- you, specifically, to be called back on an

16    emergency to the hospital or the facility?

17  A  Yes.

18  Q  Okay.  And what was your understanding about how

19    quickly you had to respond?

20  A  Get there as soon as possible.

21  Q  Okay.  If two officers got into an altercation,

22    would that be a situation in which it might be

23    appropriate to ask both to --

24  A  Yes.

25  Q  -- do an in the matter of?

```
 1   A    Yes.  As a matter of fact, I had an incident like
 2        that at St. Luke's, and both officers were
 3        required to write in the matter ofs, explaining
 4        both of their sides of the story.
 5              MS. NOVOTNAK:  Okay.  I don't have
 6        anything else.
 7                     EXAMINATION
 8   BY MR. SCULLEN:
 9   Q    Okay.  With regard to the question you were asked
10        about if you punched out and you were on lunch and
11        were called there as soon as possible, given that
12        if you were on lunch and punched out, that might
13        be up to 30 minutes, correct?
14   A    Yes.
15              MR. SCULLEN:  All right.  Nothing
16        further.
17              (Deposition concluded at 5:09 p.m.)
18
19
20
21
22
23
24
25
```

```
 1        STATE OF WISCONSIN )
                            ) SS:
 2        MILWAUKEE COUNTY   )

 3                I, Loretta Stoeckmann, RPR and Notary

 4        Public in and for the State of Wisconsin, do

 5        hereby certify that the preceding deposition was

 6        recorded by me and reduced to writing under my

 7        personal direction.

 8                I further certify that said deposition

 9        was taken at QUARLES & BRADY LLP, 411 East

10        Wisconsin Avenue, Suite 2040, Milwaukee,

11        Wisconsin, on the 28th day of March, 2011,

12        commencing at 1:49 p.m.

13                I further certify that I am not a

14        relative or employee or attorney or counsel of

15        any of the parties, or a relative or employee of

16        such attorney or counsel, or financially

17        interested, directly or indirectly, in this

18        action.

19                In witness whereof, I have hereunto set

20        my hand and affixed my seal of office on this

21        30th day of March, 2011.

22

23                          _____
                            LORETTA STOECKMANN, RPR
24                          Notary Public

25   My commission expires August 18th, 2013.
```

61:25
**17th (1)**
6:21
**1814 (1)**
28:5
**1857 (1)**
26:2
**18th (1)**
35:17
**1930 (2)**
28:8,11
**1979 (1)**
6:21
**1997 (1)**
7:23
**1st (1)**
20:15

## 0

**01 (2)**
7:25,25
**08 (1)**
61:25
**09 (2)**
9:1;13:7

## 1

**10/76 (1)**
45:21
**101 (2)**
23:6;88:4
**1017 (2)**
49:7;124:15
**1017s (1)**
49:6
**107 (1)**
83:7
**10-7 (6)**
36:8;53:18;83:3,6,7,9
**11:30 (1)**
8:12
**110 (5)**
22:4,14;23:1;89:3,3
**1110 (1)**
36:1
**112 (1)**
88:4
**12:01 (1)**
115:24
**12:30 (2)**
115:17;126:4
**12:31 (1)**
115:25
**1213 (1)**
45:17
**12th (2)**
9:12,12
**1300 (1)**
36:7
**1340 (1)**
36:7
**1350 (1)**
45:24
**15 (12)**
56:1,4;115:13,14,21,
22;125:19,21,25;126:15,
16;127:1
**15-minute (1)**
56:5
**15s (2)**
56:3,4
**16 (1)**
108:11
**16th (1)**
34:8
**17071 (1)**
20:13
**1726 (1)**
28:2
**176 (1)**

## 2

**2 (4)**
56:14,15;57:4,4
**20 (9)**
10:23,24;11:1,10;
32:8;83:8;126:1,7,8
**2002 (3)**
7:22,23;13:21
**2003 (2)**
62:11;71:8
**2005 (9)**
12:4,13;13:19,20,21,
25;14:8,18;16:10
**2006 (13)**
7:13;14:8;34:21,22;
71:6,15;72:14;74:14;
76:6;79:22,23;82:5;
102:14
**2006ish (1)**
13:25
**2007 (6)**
10:17;71:6,15;72:14;
74:14;102:15
**2008 (2)**
20:15;93:17
**2009 (2)**
26:15;72:1
**2010 (4)**
35:17;44:12;62:12;
71:9
**2011 (1)**
114:14
**21 (6)**
20:2,5,6;26:17;46:21;
64:24
**2113 (1)**
28:13
**22 (3)**
26:10,13;28:1
**23 (2)**
35:13,16
**24 (6)**
44:7,10;46:21;64:24;
108:11;119:4
**24019 (1)**
44:24

**24th (1)**
114:14
**25 (5)**
32:8,17;104:4,7,11

## 3

**3 (1)**
57:18
**3:30 (1)**
9:3
**3:56 (1)**
89:9
**30 (17)**
56:3,4,6;62:2;65:3,12;
105:12;115:9,25;125:18,
20,24;126:1,4,9,18;
134:13
**30-minute (9)**
56:8;64:10;74:11;
92:10;106:10,15;
115:23;116:15;125:23
**30th (1)**
44:12
**315 (2)**
25:8,12
**33rd (4)**
31:17;34:2,5;118:18
**34 (3)**
58:19;59:9,10
**35th (1)**
32:13
**3rd (1)**
26:15
**3-South (2)**
28:2,4

## 4

**4 (7)**
48:11;58:15,21;119:1,
5,6,9
**4:10 (1)**
89:10
**40 (6)**
10:25;11:1,2,5,10,12
**45 (1)**
33:2
**45-minute (1)**
105:12
**484 (1)**
36:6
**4s (1)**
49:12

## 5

**5 (9)**
58:16,24;59:1,12,18;
62:10;63:5;79:19;
119:10
**5:09 (1)**
134:17
**53223 (1)**
6:24

**5-C (1)**
119:12

## 6

**60th (2)**
32:3,4
**67186 (1)**
27:2

## 7

**7 (3)**
76:7;79:23;82:5
**7:15 (1)**
22:25
**7100 (1)**
6:23
**76th (1)**
34:13
**7th (1)**
93:17

## 9

**9:15 (1)**
22:25
**9:48 (1)**
45:9
**97 (1)**
7:4

## A

**A315 (1)**
25:5
**ability (5)**
5:22;48:17;53:12;
90:3;116:13
**able (16)**
61:5,19;64:5;65:23;
66:5;67:4;69:23;78:8;
86:19;90:5;91:2;97:1;
101:11;115:2;126:9;
129:13
**above (2)**
113:14;133:4
**absence (1)**
114:2
**access (6)**
56:22;57:1;58:2;86:5;
91:2,17
**accommodate (1)**
120:9
**according (1)**
72:12
**ACE484 (1)**
36:1
**acknowledge (1)**
100:24
**acknowledgement (1)**
56:25
**acquire (1)**
7:12
**across (2)**

69:15;100:3
**acting (2)**
64:17;114:21
**action (1)**
15:21
**activities (13)**
19:7;24:2,9,23,24;
37:16;47:23;64:7,20;
65:2;66:1,3;86:1
**activity (44)**
14:20;19:11,16,25;
20:7,8,9;25:3,5,18;26:6;
28:2,13,23;29:6;35:10,
10,17;36:7,16;37:5,11;
42:16,18;44:6,11,19,20;
45:2,3,5;64:2,21,23,25;
65:4,16,17,20,22;66:4;
113:18,24;114:2
**ActTrack (2)**
19:18,24
**actual (4)**
38:5;66:23,25;122:14
**actually (2)**
28:18;109:2
**added (1)**
31:18
**addition (1)**
33:24
**additional (1)**
108:15
**address (3)**
6:22;15:1;76:22
**addressed (2)**
67:6;76:24
**administrative (4)**
41:5;57:20;58:7,17
**advantage (1)**
98:6
**adverse (1)**
123:12
**advised (1)**
89:21
**afterwards (1)**
102:25
**again (7)**
28:1,21;39:12,21;
50:16;57:22;76:3
**against (10)**
4:15;84:11;105:21;
122:17;123:14,20,22;
124:4;130:14;131:16
**ago (1)**
66:17
**agree (3)**
106:20;125:17;130:13
**ahead (2)**
76:1;131:9
**air (1)**
33:17
**alarm (1)**
38:12
**Allied (1)**
51:10
**Allis (21)**
10:13,20;11:9;100:1;

101:19,24;103:5;
106:24;107:1,2,5,20;
108:2,3,14,23;109:7,11,
24;110:5,13
**allows (1)**
60:24
**altercation (1)**
133:21
**alternate (1)**
8:15
**although (1)**
126:7
**always (16)**
14:4;37:1;41:16;47:6,
11;51:18;107:22;
109:15;112:5;125:1,3;
128:2,7,8;132:4,5
**amongst (2)**
50:8;97:8
**amount (1)**
86:21
**answered (2)**
39:20;95:18
**anticipate (1)**
5:16
**anymore (3)**
91:18;103:24;104:2
**apart (1)**
40:11
**Apartment (1)**
6:23
**appear (1)**
62:18
**appears (5)**
23:21,25;26:14;46:22;
47:2
**applied (6)**
57:14;59:15,22;60:2;
66:22;99:22
**applies (1)**
55:23
**appropriate (1)**
133:23
**approval (2)**
69:1,2
**approve (3)**
24:18;79:9,10
**April (3)**
20:15;35:17;93:17
**Area (12)**
7:11;35:3;45:6;50:10;
59:25;60:5,11,18;83:16,
17;85:15;111:18
**areas (1)**
103:12
**argument (1)**
77:17
**arguments (1)**
95:12
**around (25)**
12:4;14:1;23:10,12;
28:19;30:18;33:14;35:2;
42:7;43:4;54:3,21,25;
55:7;70:24;71:6;81:19;
96:23,25;97:8,10,13;

100:1;102:18,18
**arrangement (1)**
105:8
**arrival (2)**
24:1;45:22
**Art (8)**
14:9,14;15:10,13;
102:2;103:7,8,21
**Arthur (3)**
12:15,20;13:23
**assault (1)**
121:6
**assign (3)**
16:19,20;19:2
**assigned (4)**
23:1,7,17;27:10
**assignment (1)**
24:11
**assignments (3)**
18:25;19:22;49:2
**assist (1)**
87:23
**assistance (1)**
49:8
**assistant (1)**
41:6
**associate's (1)**
7:6
**assume (9)**
5:5;15:17;26:7;66:2;
82:24;84:23;87:2;114:3;
126:13
**assuming (1)**
32:9
**assumption (3)**
111:2,4;128:1
**ate (7)**
54:9,10,12;60:5;
83:25;84:23;126:23
**attachment (1)**
104:23
**attack (2)**
49:17;120:6
**attention (2)**
58:15;64:4
**attorneys (2)**
6:7,14
**Audit (1)**
26:19
**Aurora (43)**
4:15;7:19,21;8:2,5,8,
22;9:7,10,14,21;10:14,
15,18,19;11:6,14,24;
31:13,14;34:2,4,24;42:3;
56:22;57:15;58:3,8,18;
59:16,23;67:12;84:7,11;
86:11,15,16;87:7;
105:13;106:25;113:2;
114:6,16
**Aurora's (9)**
55:22;56:17;57:14,20;
58:11;59:6,14,21;66:21
**auto (1)**
121:7
**available (7)**

50:21;60:25;117:19,
21;118:10;127:4,9
**Avenue (1)**
32:12
**avoid (1)**
5:8
**aware (11)**
47:9,16;74:23;79:4;
80:1,4;82:12;108:1;
118:6;127:12;131:24
**away (14)**
31:25;49:10,11;91:1,
6;115:21;122:12;
125:19,21;126:8,8,14,
15,16

# B

**baby (2)**
87:16,17
**back (26)**
34:20;39:13;62:3;
63:21;64:5;68:20;77:9;
80:21;88:21;91:11;95:4,
8;96:1;99:6;115:14,17,
22,25;118:23;125:3,20;
126:4,9;129:14;130:19;
133:15
**background (1)**
7:1
**back-to-back (1)**
120:5
**backup (1)**
87:18
**bad (1)**
128:3
**badge (1)**
17:2
**bag (2)**
28:9,10
**bags (2)**
27:14,15
**bam (1)**
90:18
**Baronowski (1)**
103:24
**Barton (1)**
51:10
**base (1)**
109:7
**based (5)**
43:19;47:9;48:23;
70:5;95:21
**bases (1)**
30:19
**Basically (16)**
12:9;16:16;20:1;
28:10;29:17;42:24;
49:15;74:4;75:2,7;
98:19;99:1;100:20;
108:8,9;121:3
**basis (1)**
46:12
**Bates (1)**
20:12

**Bauers (1)**
98:16
**Bay (1)**
103:11
**became (6)**
13:8;72:1;75:18;
76:20;109:21,21
**become (2)**
13:23;74:23
**began (1)**
16:9
**begin (1)**
44:17
**beginning (4)**
6:25;8:17;14:18;17:7
**begins (2)**
26:2;28:13
**behalf (2)**
90:9;94:4
**behavior (1)**
121:23
**behind (1)**
123:1
**belief (1)**
112:17
**belt (1)**
18:23
**besides (1)**
9:17
**best (3)**
48:19;72:13;102:9
**better (1)**
115:24
**big (1)**
73:11
**birth (1)**
6:20
**bit (5)**
11:4;48:25,25;52:13;
120:18
**black (2)**
25:24;77:7
**blah-zay-blah (1)**
69:11
**blocked (1)**
86:12
**Blot (2)**
20:7;44:6
**blotter (3)**
78:18;80:21;92:13
**blotters (1)**
65:5
**blue (1)**
103:10
**board (2)**
69:15;100:3
**Bob (8)**
13:13;15:17;71:24;
94:4,22,24,25;96:16
**body (1)**
26:5
**book (2)**
15:23;92:23
**books (1)**
85:12

**Bauers (1)**
98:16
**Both (10)**
12:22;53:2;62:18;
72:10,12;78:6;124:24;
133:23;134:2,4
**bother (2)**
95:11,11
**bottom (3)**
44:23,25;100:22
**box (1)**
91:8
**boxed (1)**
91:8
**boyfriend (1)**
87:15
**Bradley (2)**
42:10,11
**brain's (1)**
88:25
**break (35)**
5:14,18;47:7;52:8;
53:13;54:2;55:22;56:8;
59:15;64:10;82:17,22;
83:5,11,21;84:15;86:17,
19,22,23;87:3,5;89:6;
96:22;97:1;106:10,15;
114:25;115:1,2,3,8,24;
119:25;124:18
**breakdown (1)**
75:9
**breakfast (1)**
54:12
**break-in (1)**
121:7
**breaking (1)**
50:19
**breakroom (3)**
85:22;117:17;126:24
**breaks (12)**
5:15;55:15;56:5;
59:22;84:22;85:3,6,17,
20;86:2;114:16;119:18
**briefing (5)**
16:13;21;63:1,2;94:14
**briefings (1)**
94:11
**bring (2)**
83:23;85:11
**brokerage (2)**
7:7,8
**brought (4)**
77:2;83:24;85:12;
129:13
**Brown (1)**
34:13
**Bruce (1)**
103:19
**budget (4)**
70:25;71:1;77:7,9
**build (1)**
131:15
**building (8)**
25:8,12,17;30:17;
33:20;45:3,4;123:21
**buildings (1)**
87:10

**built (2)**
38:21;39:22
**bunch (2)**
75:15;81:13
**bus (4)**
27:19,20,21,22
**busy (11)**
36:19;73:6;76:14;
77:25;80:8;81:6,21;
87:8;98:13;114:19;
120:3

## C

**cabinet (2)**
26:22;27:8
**cabinets (1)**
27:1
**cafeteria (5)**
27:16;28:11;60:13;
83:25;126:24
**call (34)**
37:1;47:6;48:2,4,5,22;
49:22;51:4,25,25;53:9,
18;54:12,14;55:16;56:5;
82:23;83:2,6;88:20,22;
89:18,20;90:16;107:20,
21;118:22;119:24;
124:7,12;125:8,9;127:5,
6
**called (16)**
4:2;10:10;19:18;
34:12;44:5;49:21;53:4;
87:25;88:17;90:20;
107:24;108:18;109:5;
120:12;133:15;134:11
**calling (5)**
99:14;125:7;130:9,18;
131:9
**call-ins (1)**
113:13
**calls (25)**
34:14;35:11;48:18;
49:3,5,6;50:7,13,25;
51:13,14;85:20;88:10,
13,18;89:13;90:12;99:8,
12,17;117:11,23;119:22;
120:10,11
**came (9)**
15:20;50:7;53:10;
63:12;69:10;75:21;
80:15;91:7;105:11
**campus (7)**
17:12,17,18;23:5,13;
45:8;126:24
**campuses (2)**
33:15,16
**Can (45)**
4:7;20:5;29:13;30:11;
32:11,12;38:15,17,22;
41:1,4;66:2;68:13;76:1;
79:12,12;80:12;83:9,16,
16;85:9;87:23;89:3;
90:18;96:11;97:19,24;
108:10,12;111:18;

114:3;119:12;121:5,6,7,
8,11;122:8,17,19;
123:13,20,24;124:4;
131:9
**cancel (11)**
70:10;72:4;73:4;93:5,
7;106:18;109:12;110:7;
112:9,11,14
**cancelation (5)**
70:20;71:17,19;72:4;
96:18
**canceled (25)**
70:12,19;72:16,19;
73:24;74:14;76:6,9,14;
80:2;92:2,4,12;93:16,19;
94:3,20;95:20;97:5,12;
108:1;112:17;127:22;
130:2;133:2
**canceling (7)**
72:18;73:19;74:17;
93:14;97:2;105:21;
106:6
**Capitol (4)**
32:3,4,13,14
**car (3)**
32:6;33:4,11
**Care (7)**
7:20;32:24;34:3;93:2,
8;109:3;122:14
**Carmen (1)**
24:17
**carry (5)**
18:20;116:4,15,18;
117:1
**carrying (1)**
20:23
**case (5)**
20:21;29:10,23,25;
38:16;41:1;53:8;60:25;
61:16,22;78:13,16;
83:18;85:7,9
**cases (1)**
89:20
**cash (4)**
27:14,15;28:9,10
**CAT (2)**
24:2,5
**C-A-T (2)**
24:2,5
**catch (1)**
39:5
**catching (1)**
73:18
**categories (1)**
24:6
**category (1)**
24:9
**caught (2)**
71:1;78:3
**CC'd (1)**
104:19
**C-CURE (1)**
38:12
**cell (15)**
17:11,12,19;18:7;

52:15,24;53:3,4,7,9;
115:20;116:4,8,10,16
**Center (3)**
8:8;40:25;42:8
**centered (2)**
96:23;97:10
**central (18)**
17:23;18:3;22:24;
23:1;26:22;27:18;37:15;
38:2,6;39:3,17;40:4,7,
15,16,20,25;41:20
**certain (11)**
4:25;19:2;46:25;
47:23;49:2,3;50:5;55:3,
4;74:1;124:3
**chain (1)**
16:5
**chance (4)**
37:15;57:11;59:1;
63:24
**change (5)**
8:19;12:6;13:3,6;21:3
**changed (3)**
8:20;30:2;101:21
**chatter (5)**
52:3;86:21;87:6,7;
120:14
**check (16)**
15:22,23;16:1;31:11,
12,16,18,19;33:11,13,
20;35:2;47:13;86:4,10,
14
**checked (1)**
86:11
**checking (9)**
30:6,8,12,18,19,22;
31:4;34:23,24
**checks (10)**
28:17;30:7,8,12;
31:12,22;32:20;33:5;
52:25;53:5
**Cheryl (1)**
98:16
**chose (2)**
37:6;115:7
**Cicero-Taylor (1)**
24:17
**cigarettes (1)**
84:15
**circumstance (3)**
105:22,23;106:22
**circumstances (1)**
123:1;126:14
**city (1)**
32:16
**claim (4)**
4:15,20;92:9;94:20
**clarification (2)**
116:24;122:1
**clarify (1)**
100:10
**Clarke (4)**
31:15;34:6,7,8
**cleaned (2)**
91:3,3

**clear (1)**
39:19
**Clinic (14)**
31:13,15,25;32:2;
33:16,22,24,25;34:2,3,5,
11,16,24
**clinics (8)**
31:12,17;32:1,21;
33:25;87:11;118:13,17
**clipped (2)**
18:21,22
**clock (2)**
80:13;116:11
**close (2)**
28:11;72:10
**closed (4)**
32:21,23;33:8,12
**closet (1)**
28:4
**CMS (3)**
22:23;40:5;81:11
**coaching (2)**
128:16,17
**code (4)**
22:5;48:11;49:12;
68:13
**coded (5)**
67:14,23;68:18,20;
69:21
**collectively (1)**
19:4
**College (1)**
7:11
**column (4)**
20:13;24:3,4,5
**combative (5)**
45:19,19;48:12;64:11,
17
**coming (8)**
15:25,25;35:5;64:17;
87:16;89:24;111:22;
117:14
**command (1)**
16:5
**comments (2)**
44:19;45:21
**common (4)**
47:2;49:1;107:18;
111:21
**communicate (1)**
6:6
**communicated (5)**
6:13;74:4,9;95:22;
98:23
**communicating (1)**
51:7
**communication (4)**
17:6;31:6;51:23;53:8
**communications (3)**
87:3;94:22;102:21
**complained (1)**
67:4
**complaining (3)**
67:2;95:14;97:19
**complaints (1)**

107:16
**completely (2)**
119:14,17
**complies (5)**
57:10;58:25;63:9;
66:13;104:10
**computer (6)**
40:22,24;41:3;60:10;
85:8;86:4
**computers (2)**
83:17;85:9
**concern (3)**
69:12;97:4,10
**concerning (2)**
5:25;96:22
**concluded (1)**
134:17
**conditioning (1)**
33:17
**confuse (1)**
39:8
**confused (2)**
39:1;91:19
**confusing (1)**
40:6
**confusion (1)**
39:19
**consider (1)**
121:19
**considered (3)**
30:13;49:2,3
**consist (1)**
9:10
**consistency (1)**
69:15
**consistent (12)**
57:13;58:10;59:5,13;
63:14;66:20;67:12,16;
68:7,14,16;100:3
**consists (1)**
62:10
**constantly (1)**
87:12
**consume (1)**
64:2
**contact (1)**
122:19
**Contacting (2)**
30:24;51:20
**contained (2)**
57:4;129:24
**conversely (1)**
65:22
**coordinate (1)**
50:8;55:15
**cop (2)**
124:16,16
**corner (1)**
18:4
**corporate (1)**
31:19
**correctly (4)**
52:14;53:12;78:6;
108:13
**couple (7)**

18:24;34:14;54:6;
70:12,17;108:24;116:24
**course (3)**
30:11;54:11;96:13
**court (1)**
5:12
**courtesy (1)**
107:21
**cover (2)**
107:25;109:1
**co-worker (1)**
124:20
**co-workers (1)**
6:16
**crazy (1)**
107:21
**create (3)**
130:7;131:6,22
**created (3)**
21:7;24:14;127:21
**creates (1)**
22:19
**criminal (1)**
120:25
**Cummings (6)**
13:14,18;16:3,4;
62:18;102:3
**current (2)**
4:15;101:20
**cut (1)**
77:9

**D**

**D/0 (1)**
28:2
**D/O (1)**
28:5
**daddies (1)**
87:16
**daily (2)**
18:13;19:11
**Darien (6)**
12:15,16;13:20;14:6;
15:10,12
**data (1)**
19:21
**date (13)**
6:19;7:21;13:25;
20:14;35:21;44:15;
71:12,13;81:2;82:9;
102:9,11;114:12
**dated (2)**
62:11,12
**dates (9)**
36:14;47:14;82:9;
110:9,10,20;113:7,8,17
**Dave (2)**
102:3;103:18
**day (29)**
16:8,12,17;19:22;
21:2,6;30:2;43:1,4,5,7,
17,24;52:7;54:4,22;55:1,
1,7;73:6,9;78:13;81:20,
21;86:25;87:9;101:7;

115:2;120:3
**days (23)**
8:13,14,15,15,18;9:4;
65:11,13,15,24,24,25;
66:2,6;73:5;78:17;80:7;
81:6;90:23;91:21;92:2,
4,9
**deal (1)**
16:5
**dealing (1)**
45:18
**death (1)**
49:20
**December (1)**
9:1
**decide (2)**
19:4;50:17
**decided (1)**
54:1
**decision (8)**
36:21;48:19;77:16;
94:25;95:3,5,15,20
**Deer (1)**
34:13
**defend (1)**
124:24
**deficit (1)**
77:7
**define (1)**
30:16
**degree (2)**
7:6,12
**delegate (1)**
15:14
**deliver (1)**
27:17
**denied (3)**
70:16,17;96:3
**Denny (2)**
104:20;105:9
**denying (1)**
96:2
**department (18)**
13:9;24:19;46:17;
51:10;55:24,24;60:4;
62:16;67:17;68:10;
69:16;75:18;76:21;77:9;
87:11;126:19,23;129:20
**departments (2)**
78:2;120:20
**depend (2)**
50:10;114:20
**depending (11)**
16:17;24:10;30:17;
32:24;36:19;46:7,10;
48:3;114:19;118:24;
130:20
**depends (19)**
10:10;28:24;32:10,14;
36:23;37:7,12;41:18;
46:13;48:2;52:10;53:15;
54:7,11;89:15;103:1;
105:22;121:10;126:11
**deposed (1)**
4:9

**deposition (6)**
4:24;5:16;6:4,8,11;
134:17
**describe (2)**
38:8;77:4
**described (1)**
72:21
**designated (3)**
22:10;23:6;50:11
**desk (1)**
128:6
**desperately (1)**
114:23
**detail (3)**
65:5;75:7;121:17
**detailing (1)**
75:2
**details (2)**
30:9;105:23
**determine (3)**
52:8;53:13;113:17
**device (1)**
17:9
**devices (1)**
17:6
**diabetic (2)**
54:9,23
**diagnosis (1)**
31:10
**difference (4)**
69:13;101:9;121:12,
14
**different (35)**
10:1,5;14:5;18:25;
19:13,24;22:3;30:1,10;
37:9;40:11;46:14;47:14,
24;48:1,4,8,10;52:9;
55:10;59:8;62:5;69:6,7;
86:22;91:14;98:23;
99:22,25;100:5,15;
107:2;111:6;114:16;
121:10
**differently (1)**
37:10
**digit (1)**
26:20
**direct (1)**
58:15
**directed (3)**
51:24;89:14,18
**direction (1)**
122:20
**directly (2)**
43:13;76:23
**Director (6)**
13:14;16:7;62:20;
80:17;98:21;102:2
**directors (1)**
77:1
**disagree (1)**
77:16
**discharge (1)**
7:25
**disciplinary (8)**
15:21,25;123:8;

130:15,25;131:22;132:4,
5
**discipline (3)**
123:4;125:10;131:7
**disciplined (5)**
50:24;51:2,3;127:9,14
**discourage (1)**
93:13
**discouraged (2)**
61:13,14
**discretion (5)**
47:20;48:15;50:17;
124:8,9
**discrimination (1)**
4:18
**discuss (2)**
94:3,8
**discussed (4)**
43:15;77:5,6;94:9
**discussion (7)**
56:12;94:13;95:2,23;
97:10,13,17
**discussions (5)**
94:12;95:6;96:21,23,
25
**dispatch (36)**
17:13;21:6,8;36:23;
38:17;39:4,11,15,22,25;
40:7,12;41:16,23;42:8,
20;43:14,23;44:5;47:6,
11;51:15,20;53:10;
82:18,22,23;88:10,12;
107:11;108:8;110:25;
111:16;112:4,5;120:12
**dispatcher (36)**
17:25;18:2,5,12;
20:22;22:18;24:22,25;
36:24,25;37:2,6,7,19,23,
24;38:2,3,5,6,8,10,19,25;
39:2,10,13,17,17,25;
40:3;41:8,10;55:18;
83:7;89:3
**dispatchers (2)**
37:9;89:12
**dispatching (5)**
38:21,24;40:25;41:22;
42:5
**disruptive (1)**
64:11
**disruptives (1)**
38:16
**distance (2)**
115:12,21
**distress (2)**
118:22;125:7
**Division (2)**
4:16,22
**Dobrazinski (4)**
101:23;103:3,4,21
**dock (2)**
28:6,7
**docks (1)**
18:4
**doctors (1)**
34:25

130:15,25;131:22;132:4,
5
**document (12)**
19:7,12,16;21:22;
73:1;104:8;121:15;
128:15;129:8;130:11,
22;131:6
**documentation (5)**
128:14,18,19;129:7;
131:13
**documenting (2)**
121:4,23
**documents (4)**
6:3;26:15;92:8;127:21
**dollars (1)**
33:17
**done (6)**
23:20;31:22;57:8;
82:24;88:24
**Door (10)**
19:13;25:8,12,13,19,
20;28:4,7;47:45:11,25
**doors (6)**
30:8,12,19;34:23,24;
35:2
**doubles (1)**
104:16
**down (24)**
15:5,20,25;21:1,4,5,6;
25:4,20,21;32:25;33:2;
41:6;46:18;49:6;60:11;
83:2,3,15,17;90:14;
102:1;103:11;124:17
**downstairs (2)**
41:2;60:5
**downtown (1)**
35:3
**Drive (4)**
6:23;23:10;105:12;
126:11
**drives (1)**
91:15
**driving (1)**
28:18
**drugs (1)**
5:21
**du (1)**
32:12
**duly (1)**
4:3
**during (28)**
11:15,16;12:13;16:12;
23:7,17;28:22;51:6;
53:14;59:15;64:25;84:6,
19;85:3,6,17,20;86:2,17,
19,22;87:3,5,9;100:24;
101:3;119:17,24
**duties (8)**
9:21;15:8;40:19;42:5;
43:6,20;119:15,17
**duty (14)**
15:8;27:10;41:12,19,
25;42:2,4,11,12;43:14,
23;61:9;88:15;99:24

**E**

**earlier (2)**
87:1;115:5
**early (2)**
54:8,9
**easier (1)**
52:12
**easily (1)**
79:17
**east (10)**
23:4,5,7;44:19;45:1,8;
88:20,21;89:2,4
**eat (9)**
54:7,8;59:24,24;
60:12,17;61:15;83:16;
117:16
**eating (1)**
125:6
**echoed (1)**
100:1
**education (1)**
7:14
**educational (1)**
7:1
**EEOC (1)**
4:21
**eight (4)**
8:23;75:4,5;108:11
**Either (5)**
18:22;19:1;49:15;
81:8;83:24
**electronic (1)**
56:25
**eleven (1)**
54:25
**else (17)**
23:19;29:13,20;40:21;
41:9;53:19;54:13;55:18;
60:22;71:19;81:8;83:4;
94:23;101:16;122:16;
130:17;134:6
**email (9)**
62:23;86:4,10,11,14,
15;91:15;104:19,20
**emails (6)**
86:12;91:9,11,14,16,
17
**emergencies (2)**
49:2,3
**emergency (10)**
18:6;38:1,14,15,23;
39:24;53:8;60:25;
106:14;133:16
**employed (8)**
8:1;41:10;57:15;58:3,
7,18;59:22;91:12
**employee (12)**
23:1;56:18,22;92:25;
119:14;122:4;128:11;
129:11;130:14;131:12;
132:10,17
**employees (12)**
33:4;43:22;59:24;
60:23;61:8;85:5;93:4,7,
13;94:5;123:14;130:6
**employee's (2)**

127:17;128:23
**employees' (2)**
128:2,9
**employment (22)**
4:18,19;8:22;9:7,20;
10:18;11:10,15,16,20,
24;14:7,8;16:11;22:11,
13;46:17;59:16;65:1;
68:5;84:7;114:10
**encountering (1)**
82:13
**end (9)**
10:18;13:7;14:7;
16:10;24:1;66:9;72:1;
95:17;101:14
**ended (1)**
14:8
**enforcement/military (1)**
120:23
**enough (1)**
51:4;89:1
**entire (9)**
10:1;11:15,16;41:16;
68:9;10;76:13;112:19;
119:15
**entities (1)**
40:9
**entitled (2)**
63:5;66:10
**entries (4)**
27:6;28:23;35:25;
78:18
**entry (13)**
19:21;25:3,15;26:1;
28:1,5,8,12;36:14;44:18,
24;45:9,17
**Equal (2)**
4:16,22
**ER (24)**
23:16,17,18;31:1,2;
37:19,24;38:3,18,19,20,
20,21,22;39:16,23,23;
45:18;49:18,19;68:12;
90:12;107:20;122:18
**ER2 (1)**
23:22
**ERIC (2)**
4:2,8
**E-R-I-C (1)**
4:8
**escort (1)**
26:2,3;33:4
**estate (2)**
7:6,8
**even (6)**
32:17;33:6;51:19;
95:10;104:19;111:12
**event (1)**
63:16
**events (1)**
65:11
**Everybody (16)**
50:13,15;51:8,16,16;
52:9;54:3;75:17;81:16,
17;94:14;100:4,12;

111:20;125:2;126:23
**Everyday (1)**
14:20
**Everyone (5)**
50:14;54:17,20;82:21;
83:4
**eviction (1)**
25:21
**exact (4)**
12:5;13:25;71:12,13
**exactly (2)**
70:23;74:7
**EXAMINATION (4)**
4:5;116:22;125:14;
133:10;134:7
**examined (1)**
4:4
**example (4)**
20:9;67:2;104:25;
130:8
**examples (6)**
64:25;65:7,8;105:3;
122:8;130:5
**Excel (1)**
75:8
**exception (1)**
106:13
**excited (1)**
76:17
**Excuse (1)**
32:3
**Exhibit (27)**
20:2,5,6;25:1;26:10,
13,17;28:1;35:13,16;
44:7,10;56:14,15;57:4,
18;58:15,21;62:9;63:5;
104:4,7,11;119:1,4,8,9
**Exhibits (3)**
46:21;57:18;64:24
**expect (1)**
31:8
**expectation (2)**
70:6;82:21
**expected (5)**
50:12;56:7;88:10;
106:9;115:8
**explain (18)**
26:18;39:8,12;43:14,
25;67:10;69:23;70:7;
94:18,20;97:22,23,23;
98:1,2,11;105:15;112:16
**explained (2)**
112:18;123:13
**explaining (13)**
43:13;67:20,25;68:11,
21;70:1;74:11;77:14;
80:19;98:10;106:6;
122:25;134:3
**explanation (1)**
96:1,4;97:4,11
**extent (1)**
65:20;88:13;104:17

**F**

**F1 (1)**
80:13
**face (1)**
98:11
**facilities (6)**
9:17;10:12;32:7,18;
33:25;106:24
**facility (6)**
23:14;33:6,6,12;
34:24;35:1;50:14,15;
60:23;61:2,6,10,12;78:6;
119:16;133:16
**fact (4)**
76:18;105:25;128:10;
134:1
**failed (1)**
127:13
**failing (1)**
50:24
**fairly (1)**
72:10;117:23
**fall (2)**
49:17;121:6
**fallen (1)**
120:7
**familiar (6)**
21:21;32:15;56:17;
57:19;62:12;130:6
**Family (5)**
31:14;34:3,4;64:17;
118:21
**far (7)**
15:14;31:25;32:1;
37:4;118:10,12;133:13
**fast (1)**
126:11
**father (1)**
87:17
**fear (1)**
124:5
**fearing (1)**
64:18
**February (1)**
114:14
**feel (4)**
5:17;96:2;98:12;99:15
**fellow (1)**
124:20
**felt (4)**
80:22;95:24;98:20;
112:23
**few (3)**
20:19;46:18;78:18
**fewer (1)**
46:22
**field (1)**
94:14
**fight (3)**
49:9;50:20;87:18
**file (25)**
26:22;65:10;122:4,6;
123:20;127:17,18,23;
128:5,12,20,21,24;
129:6,10,11,12,19;
130:12;131:16;132:20,

23,23,25,25
**filed (8)**
4:18,21;128:8;132:6,
9,10,11;133:6
**files (11)**
127:19;128:2,9,18;
129:16,24;132:11,17,17,
18;133:2
**filing (3)**
128:3;129:22,23
**fill (2)**
72:20;75:11
**filled (1)**
22:21
**filling (1)**
40:19
**fine (1)**
31:5
**finished (2)**
63:8;104:9
**fire (1)**
117:24
**first (53)**
4:3;8:23,25;9:2;11:18;
14:23;15:2;20:12;21:7,
17;22:16;25:2,3,3,25;
28:1;34:11;35:21;44:14,
18;46:1,2,3;47:3,4;
48:13,20;49:10,14,15,
25;50:1,4,13,20,22,23;
58:5;62:10;72:2;87:9,
24;88:6,7;90:22;91:20;
94:24;107:23;119:13;
120:1,2,2,4
**Five (4)**
8:14;26:20;29:20;
90:10
**fixed (7)**
33:2;64:13;81:11,11;
89:16;90:19;107:15
**flak (3)**
71:1;73:18;78:4
**float (2)**
9:23;110:19
**floated (1)**
109:25;110:1,17;
111:21
**floating (2)**
81:12;107:12
**floor (7)**
26:3;48:12,13,14;
87:14;121:9;124:23
**floors (3)**
30:19,20;99:13
**floor's (1)**
25:25
**FMLA (3)**
75:4,6;113:9
**folders (1)**
91:14
**follow (1)**
50:2
**followed (1)**
102:21
**following (2)**

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 460 of 867   Document 49-1

7:17;67:15
**follows (1)**
4:4
**Fond (1)**
32:12
**food (2)**
84:2,23
**forego (1)**
70:15
**form (1)**
53:7
**formal (1)**
7:14
**forms (1)**
24:18
**forth (4)**
18:16;53:17;77:15;
99:6
**forward (2)**
12:14;14:18
**found (1)**
73:10
**four (16)**
21:11,13,19;25:4;
46:19,22;50:1;81:10;
87:14;89:16;90:12;
99:12;112:2;113:10;
120:6,8
**fourth (4)**
26:3;33:23;44:17;
118:14
**frame (1)**
102:15
**fraud (1)**
123:17
**free (3)**
50:15;60:12;119:15
**frequency (2)**
52:1;118:7
**frequent (1)**
90:21
**frequently (10)**
10:9,22;52:2;83:11;
90:5;108:25;109:20,23;
119:23;132:1
**Friday (1)**
9:6
**Friendship (1)**
34:12
**front (2)**
29:17;119:1
**frustrated (4)**
77:25;95:7;98:2;99:20
**frustration (1)**
78:23
**full (2)**
67:5;105:23
**funeral (1)**
28:7
**further (3)**
116:21;133:9;134:16
**furthest (2)**
31:25;32:2
**future (3)**
96:6,8;129:14

## G

**Gary (1)**
42:22
**gave (1)**
130:4
**General (3)**
63:20;96:15;123:6
**generate (1)**
130:10
**gets (1)**
121:8
**given (8)**
19:1;27:22;46:23;
89:12;115:7;125:17,20;
134:11
**glass (1)**
38:14
**goes (2)**
127:18;128:11
**good (4)**
31:7;66:23;96:10;
117:22
**gotta (3)**
80:12;87:21;94:24
**grab (1)**
17:24
**graduated (2)**
7:2,18
**graduation (1)**
8:2
**grapevine (1)**
108:6
**great (1)**
89:8
**Green (1)**
103:11
**grounds (1)**
117:13
**group (1)**
19:4
**guess (11)**
49:1;54:11;73:9;
74:19;80:17,20;102:19;
114:19,19,20;128:21
**guide (1)**
43:18
**gunshot (1)**
69:10
**gunshot-wound (1)**
64:16
**guys (1)**
81:23

## H

**hand (2)**
27:21;70:25
**Handbook (3)**
56:18;57:1,5
**handle (1)**
99:17
**handled (4)**
37:9,11;45:23;93:6

**hands-on (1)**
15:12
**happen (9)**
67:8;70:22;78:10;
90:21;108:22;113:11;
117:18;119:23;131:18
**happened (20)**
10:7;61:16,17;67:8;
70:23;71:11;77:22;
78:11;81:3;82:5,6,10;
108:24,25;109:14,19;
110:15;113:17;120:1,2
**happening (3)**
65:13;109:23;121:16
**happens (1)**
106:17
**harassing (2)**
130:9,19
**harder (1)**
52:13
**harm (1)**
122:15
**Hartford (4)**
104:15;105:11,12,12
**hassle (3)**
73:21;82:15;112:15
**head (2)**
5:10;132:2
**Health (1)**
7:20
**hear (13)**
49:24;51:16,21;53:6,
9;88:4,5;108:5;118:12,
15,19;124:17;125:6
**heard (10)**
19:18;37:14;51:18;
56:5;79:7;108:5;117:13;
118:22;120:19;124:15
**hearing (1)**
97:17
**heart (2)**
49:17;120:6
**heated (1)**
99:21
**held (2)**
11:23;56:12
**help (10)**
10:11;23:19;38:18;
39:18;43:1;46:8;87:21;
109:2;113:15;125:8
**herein (1)**
4:3
**Here's (2)**
39:1,14
**hide (1)**
35:6
**high (6)**
6:25;7:2,17,18;8:2;
79:20
**Highland (2)**
34:5;118:20
**highly (1)**
80:7
**highway (1)**
95:1

**Hill (2)**
101:24;103:4
**hired (3)**
7:21;8:4;11:22
**history (1)**
7:16
**hold (2)**
14:11;122:17
**holster (1)**
18:22
**home (4)**
28:7;83:24;108:3;
109:7
**homeless (2)**
35:4,5
**honestly (1)**
66:16
**honorable (1)**
7:25
**hospital (12)**
9:15,16,18,22;10:13,
16;41:7;49:24;56:2;
68:9;87:8;133:16
**hostile (1)**
87:10
**hot (6)**
63:13,13;75:18;94:6;
97:14;102:20
**hour (2)**
33:3;54:6
**hours (14)**
8:11;9:2;28:11;31:20;
45:8;75:3,4,5,9;76:19;
106:10;108:11,11,11
**housekeeping (1)**
56:2
**HR (2)**
93:9,12
**huge (1)**
35:4
**human (2)**
92:24;93:2
**hurt (2)**
124:23;127:4
**husband (3)**
130:9,18;131:14
**hypothetical (1)**
127:7;130:3

## I

**ID (1)**
17:2
**identification (5)**
20:3;26:11;35:14;
44:8;104:5
**identifies (1)**
22:7
**identify (1)**
20:6
**image (1)**
45:3
**immediately (1)**
49:20
**impacted (1)**

94:5
**impair (1)**
5:22
**important (1)**
91:16
**improvement (1)**
128:17
**improvements (1)**
128:16
**incident (23)**
79:7;121:2,3,4,5,6,7,8,
12,18,20,23;122:2,23,
23;124:14,19,22;129:8;
130:3,11,24;134:1
**incidents (3)**
72:23;79:7;121:11
**inclination (1)**
5:9
**including (4)**
21:14,14;47:19;
106:24
**inconsistent (2)**
59:20;60:1
**incorrect (1)**
128:1
**indicate (3)**
20:13;21:10;35:21
**indicates (3)**
21:13;23:16;44:18;
46:20
**individual (4)**
42:9;55:5;132:24;
133:1
**influxes (1)**
109:9
**information (6)**
19:12,23;22:1;24:21;
26:19;132:21
**injured (2)**
124:10,24
**inside (9)**
17:23;34:9;35:1;38:1,
2,14;39:25;40:24;
132:23
**instance (24)**
21:11;22:14;40:18;
43:2,13;46:8;49:8;
51:20;54:22;60:12;75:3;
81:9;88:19;92:11;96:25;
97:19;109:5;115:16;
118:14;121:4;122:11,12,
21;124:10
**instances (5)**
79:22;96:7,8;109:19;
120:4
**instilled (1)**
98:3
**instituted (1)**
74:13
**institution (1)**
7:10
**instructed (1)**
88:13
**instruction (1)**
96:6

**intact (1)**
33:21
**integrating (1)**
42:24
**interaction (5)**
12:9;14:17,19;15:4;
16:2
**interactive (1)**
15:13
**internet (2)**
86:5,8
**Interrupted (13)**
63:5,16,18,20,22,25;
64:1;65:15;66:3;90:6;
91:22;92:9,19
**interruption (6)**
13:1,15;25:9;36:12;
72:24;104:3
**into (12)**
8:4;14:24;42:25;44:5;
63:3;76:17;80:16;81:18;
87:18;121:17;122:5;
133:21
**intranet (1)**
86:15
**inventories (1)**
29:24
**inventory (1)**
27:20
**investigator (1)**
14:16
**involve (4)**
30:23;33:5,10;34:23
**involved (3)**
42:19,21;97:16
**involvement (2)**
42:23,24
**issue (19)**
37:9;67:5;74:25;
75:22;76:17,20,22;77:2;
94:3,17;96:16,23,25;
97:3;99:22;102:20;
104:12,13,20
**issued (7)**
17:6;62:18;63:11;
71:7,8,8;74:16
**issues (5)**
15:1;94:11;97:14;
109:9;131:12
**Ivan (2)**
104:21;105:8

## J

**January (1)**
6:21
**January/February (2)**
62:11,12
**Jennifer (1)**
103:25
**Jim (6)**
13:7,17;15:18,24;
103:17,24
**job (7)**
7:16;19:14;88:7;

99:16;124:10,25;130:19
**John (2)**
71:23;103:19
**judgment (1)**
48:19
**July (2)**
7:25;26:15
**justice (1)**
120:25
**justifiably (1)**
101:1
**justification (2)**
77:11;79:16
**justified (7)**
74:20;80:22;82:1;
95:25;96:3;98:8;100:19
**justify (6)**
78:2;100:6,17,18;
106:3;123:17

## K

**keep (6)**
90:23;91:14;92:15;
125:6;130:12;132:11
**kept (5)**
27:18;92:14;99:1;
130:9;132:16
**key (6)**
17:22,24;20:20,25;
21:2;129:7
**keys (3)**
16:15;17:21;18:16
**keyset (1)**
17:22
**Kilbourn (1)**
9:13
**kind (6)**
53:11;73:6;99:8,15;
115:1;123:16
**knew (6)**
61:24;62:1;89:12;
107:19;120:8,10
**knowledge (6)**
9:19;127:15;132:8,14,
15,16
**knows (2)**
111:20;125:2
**Kronos (19)**
17:1;29:8,22;73:10,
10;75:1;76:16;79:10,10,
13,19;80:13;81:19;
91:24;92:1,12;123:16;
126:3;132:18

## L

**lab (1)**
26:4
**labeled (1)**
20:12
**Lac (1)**
32:12
**last (14)**
11:9,19;25:1;26:1;

27:25;28:12;35:24;
44:18;64:7;65:1;69:10;
71:25;108:12;114:9
**lasted (2)**
65:2,16
**late (2)**
31:18;54:7
**later (4)**
54:10;106:15;123:21,
25
**law (1)**
120:23
**lawsuit (3)**
4:11;6:14,17
**lead (1)**
123:4
**leadership (5)**
12:10;74:4,8;94:7;
112:25
**least (3)**
32:8;47:9;117:25
**leave (11)**
41:21;50:20;52:21;
61:2,4,5,19;115:6,12;
119:16;122:18
**leaves (1)**
122:16
**leaving (5)**
17:17,18;60:23;61:10;
84:19
**left (17)**
32:14;42:3,12,14;
46:19;52:16;61:11,23;
62:25;84:1;90:10;
100:11;116:3;117:5;
118:4;125:17,18
**leftovers (1)**
83:24
**legit (1)**
98:5
**legitimate (2)**
100:8;124:2
**less (2)**
52:12;97:17
**level (5)**
41:7;42:23,24;117:17;
120:9
**levels (4)**
46:10,13,14,24
**life (1)**
49:20
**light (5)**
41:19;42:2,4,11,12
**liked (2)**
61:15,19
**limit (1)**
88:10
**limitation (1)**
118:11
**limited (3)**
9:21;85:9;97:3
**Lindenlaub (1)**
42:22
**line (1)**
100:22

**list (1)**
110:18
**listed (2)**
65:2;66:3
**listen (2)**
38:12;88:3
**little (6)**
11:4;48:25,25;52:13;
75:8;120:18
**loading (2)**
28:6,7
**located (6)**
18:5,8;37:23,24;39:2;
41:5
**location (11)**
8:7;9:11,15,18,22;
14:21;25:5;28:13;36:7;
44:19;50:5
**locked (1)**
30:9
**locker (1)**
91:4
**lock-ups (1)**
111:17
**log (21)**
18:13;19:21,25;20:8,
9;21:25;22:18;24:1,10,
15;25:3;28:21;37:11,15;
44:1,3;64:21,23;65:17;
113:24;114:3
**logged (1)**
27:7
**logging (1)**
44:5
**logs (16)**
19:16;24:14;29:6;
35:10,11;36:16;37:5;
42:16,18;47:10;64:25;
65:9,10,20;113:18,21
**loitering (1)**
25:24
**long (9)**
31:7;32:6;42:11;
54:13;65:17,21;66:1,17;
79:20
**longer (4)**
32:17;65:12;80:10;
126:14
**look (13)**
38:15;44:17,23;46:1,
20;48:6;63:4;65:6,8;
76:17;110:16;119:1,12
**looked (5)**
64:24;80:21;119:2,9;
124:21
**looking (7)**
35:5;39:23;44:22,24;
77:8;110:21;113:18
**looks (1)**
45:19
**loss (7)**
12:18,22;20:7;41:3;
60:7;62:21;83:12,14;
126:19
**lot (35)**

30:1;35:4;45:3;46:14;
47:14;64:16;71:1,2,11,
20;77:23;78:2,7,17;
80:10;87:7,10;96:11;
107:14,14,16;109:25;
110:1,13;113:9,11,12,
13;120:1,2;121:25;
123:14,22;131:12,14
**loud (4)**
49:12,12,23;119:13
**lower (2)**
41:7;117:17
**Luke's (23)**
10:14;11:3,4,5,12;
67:2;97:15;98:17;100:2;
101:20,23;103:4;
106:25;110:1;111:5,8,
11,25;112:1;113:4,5,8;
134:2
**lunch (247)**
36:11,15,22;37:1,5;
44:2,4;47:7;52:8,12,13,
22;53:13,17,20,24;54:1,
3,7,9,13,14,20,25;55:6,
11,14,17,19,22,25;56:8;
60:5;61:6,15;63:6,16,18,
19,24,25;64:4;65:16,23;
66:3,6,10;67:5,10,11,13,
14,18,21,22,23;68:1,11,
13,18,20,22;69:3,11,18,
20,21,24;70:2,7,8,10,12,
14,15,16,19;71:3;72:4,
17,18;73:4,8,8,22,25;
74:10,12,14;77:14;78:1,
3,4,8,12,13,20,20,22;
79:18,20;80:9,11,12,17,
20,23,24;81:7,8,15,17,
18,20,22,23;82:2,22;
83:3,5,11,20,23,24;
84:19,22;86:22;87:8,20,
24;88:1,8,11,12,17,24;
89:13,14,19,23,24,24,24;
90:5,20;91:22;92:4,9,11,
12,21;93:16;94:2,18,21;
95:21;96:9,12,18;97:5,
12,20,25;98:4,5,7,7,12,
14;99:5,7,7,10;100:7,7;
101:1,5,12;102:22;
104:18;105:7,16;
106:3,10,18;109:12,13,
16;110:7,7,22;111:3,4,
12;112:7,9,11,14,18,20,
24;114:2,4,15,25;115:1,
2,15,19;116:19;116:13,25;
117:1,7,12,16;119:18,
18,25;120:10,14;
123:18;124:1,2,11,13,
16,18;125:5,6,22,23;
126:20,23;127:1,2,8,13,
22;133:13,14;134:10,12
**lunch' (1)**
101:14
**lunches (2)**
36:18,18,25;37:10;
47:12;52:9;54:10;55:4,

12;63:20,22;69:17;
71:21;73:11,19;74:3,18,
21;75:13,16,17,19;76:6,
10,14;77:10,12,13;
78:19,21;79:1,4,5,5;
80:2;82:2,14;92:18;
93:5,8,14,24;95:14;97:3;
99:3,3,5;100:19,21,23;
101:8,10;102:19;
105:21;106:6;107:2,13,
17,20;108:2,9;111:7;
117:16;130:2;133:2

**lying (1)**
107:6

# M

**magazines (1)**
85:13
**mailbox (1)**
62:25
**mainly (1)**
42:17
**maintained (2)**
56:20;57:23
**makes (1)**
94:25
**making (8)**
29:9;30:5,8,20;31:2,4,
5;99:9
**males (1)**
25:24
**management (20)**
13:9;76:25;94:12;
95:3,7;96:21;98:18,19,
21;100:22,24;102:3,13,
24,24;121:25;128:14,25;
129:2,5
**manager (10)**
13:8;68:4;71:18;
79:17;80:2,17;94:15;
101:23,24;103:5
**managers (17)**
12:10;16:6;75:12;
76:25;79:9,11,11;91:16;
95:4;101:17,19,19,22,
25;103:3,17,19
**Manager's (1)**
81:19
**mandated (2)**
9:23;10:2
**mandatory (1)**
110:17
**manned (1)**
112:5
**manner (1)**
4:24
**Manual (4)**
57:20,22;58:7,18
**manuals (1)**
43:8
**many (21)**
8:13;10:17,19;15:11;
27:20;42:13;46:11;51:6;
52:10;53:16;72:3;75:13,

14;95:12;107:5;110:11,
12,14,15;111:24;121:10
**March (2)**
7:22,23
**mark (1)**
83:3
**marked (17)**
20:2,5;26:10,13;
35:13,16;44:7,10;56:14;
57:17,19;58:14;62:9;
92:1;104:4,7;119:8
**materials (1)**
85:11
**matter (67)**
67:11,13,17,19,25;
70:9;72:22,25;73:14,21,
25;74:2,10,19,19;77:14;
79:8,15;80:19,20;81:22,
24;94:10;100:4;104:24,
25;105:14;120:19;
121:13,15,16,18,19,22,
24;122:3,10,11,24;
123:3,7,9,11,15,19,21,
23,24;124:4,6;127:16,
19,21;128:11,23;129:6,
9,9,22;130:11,24;
131:21,25;132:21;
133:25;134:1,3
**matters (4)**
122:5;129:25;130:7;
133:1
**maximum (5)**
115:7,8;125:18,21;
126:18
**may (9)**
5:21;66:18,18;113:17;
127:25;128:5,6;129:15,
17
**maybe (3)**
43:7;49:16;91:19
**meal (11)**
57:3,7,14;58:12;59:3,
7,15,18,21;119:12,15
**meals (1)**
59:25
**mean (22)**
45:21;46:16;49:14;
54:5;61:14;65:25;67:6;
69:16;72:2;78:10,11;
85:24;87:8;100:2;
103:17;104:21;109:19;
117:21;119:20;127:25;
130:18;132:2
**Meaning (3)**
25:13;28:18;45:15
**means (7)**
22:23;23:9;26:24;
36:5;81:12;98:24;
117:21
**Medical (2)**
8:8;35:1
**medications (1)**
5:21
**meeting (9)**
77:5;97:8,16;100:11;

101:7,16;102:5,10,22
**meetings (10)**
74:5,8;77:2,3;94:7;
96:21;100:25;101:3;
102:7,13
**members (1)**
64:17
**memo (5)**
72:20;76:10;95:22,24;
96:24
**Memorial (1)**
10:13
**men's (1)**
25:25
**mentioned (1)**
25:2
**message (5)**
98:24;100:13,15,16,17
**methods (1)**
18:25
**metro (1)**
10:11
**middle (1)**
50:19
**Midtown (2)**
32:3;33:24
**might (28)**
11:4;15:5;29:5;32:10;
37:5,13,14;43:3;46:9;
48:4,11,12,13;49:17;
56:4;78:18;81:14;88:19;
90:16;96:8;114:2;129:9,
9;123:4;126:11;130:19;
133:22;134:12
**Mike (5)**
13:14,18;16:3,4;
62:18;102:2
**mileage (1)**
105:14
**military (3)**
7:19,24;120:22
**Milwaukee (2)**
6:23;7:11
**minimum (6)**
46:24;81:14;90:12;
107:7;113:14;125:1
**minute (3)**
57:7;118:2;126:5
**minutes (28)**
32:8,18;33:3;62:2;
65:3,12;83:8;115:9,13,
22,25;118:2;125:18,19,
20,21,24;126:1,2,8,8,10,
12,16,17,18;127:1;
134:13
**minute's (1)**
117:25
**minutes' (1)**
115:21
**miss (1)**
124:25
**missed (1)**
92:18
**misstate (1)**
83:12

**Mitchell (1)**
31:14
**mixed (1)**
9:5
**mm-hmm (10)**
5:10;35:18;57:12,24;
82:8,11;106:8,12,16;
119:11
**mm-mmm (1)**
5:10
**moment (1)**
58:23
**monitor (8)**
27:18;38:11;41:22;
64:13;86:16;87:12,22;
120:13
**monitoring (18)**
17:23;18:3;22:24;
23:2;26:22;37:16;38:2,
6;39:3,18;40:4,7,15,16,
20,25;41:20;42:5
**monitors (1)**
38:10
**month (1)**
12:5
**months (4)**
42:13,14;62:17;
102:13
**moon (1)**
103:10
**Moraza (6)**
13:7,17;15:18,24;
71:23;103:17
**More (24)**
10:23,24,25;11:1,4,4,
12;12:9;15:10,12,13,13,
13,14;43:12;46:25;47:3,
4;52:11;65:2;97:17;
117:10;120:3;122:22
**Most (7)**
30:3;73:5;81:9;86:11;
88:16;108:17;111:18
**mostly (5)**
15:2;97:10,16;113:6;
126:22
**move (2)**
8:25;14:7
**moved (3)**
8:20;12:7;120:1
**MPD (1)**
122:19
**much (12)**
14:17,18,23;15:4;
16:2,4;52:10;70:13;
94:25;95:2;109:20;
121:17
**multiple (2)**
48:18;99:23
**must (4)**
25:8;26:4;119:14,15
**Myren (1)**
103:23
**myself (1)**
87:19

# N

**name (8)**
4:7;20:20;25:2,4;40:5;
77:24;101:22;110:18
**names (3)**
77:24;103:2,9
**narrative (1)**
121:19
**National (1)**
34:8
**natural (1)**
5:9
**nature (7)**
30:4,21;31:10;41:4;
42:7;55:9;118:25
**necessarily (4)**
83:4;87:25;88:2;
110:21
**need (20)**
5:14,16;10:6;21:4;
23:20;38:18;39:8,11,21;
64:4;65:8;77:13;87:18,
22;96:9,9;99:14,14,16,
17
**needed (20)**
10:11;21:5;25:13;
40:23;43:3;46:8;48:20;
55:19;64:12,13;70:7;
74:10;88:16;100:17,18;
114:23;115:17;117:12;
119:22;129:14
**needs (2)**
5:12;49:8
**negative (1)**
77:8
**new (5)**
31:18;43:2,22;61:2,24
**newsletter (4)**
63:11;66:8,9,14
**newsletters (5)**
62:10,13,16;66:17;
71:7
**newspapers (1)**
85:15
**next (9)**
20:20;23:25;25:15,20,
20;28:5,8,12;96:8
**Nicolet (2)**
80:6;82:7
**NICU (1)**
124:24
**night (4)**
35:6;69:10;96:13;
98:14
**nine (5)**
63:21;71:11,11;107:8;
111:14
**nobody (10)**
54:13;61:11;76:14;
81:7;100:21;101:7;
105:6;108:10;126:20,20
**nod (1)**
5:10

nondisciplinary (1)
131:2
none (1)
102:1
nope (1)
89:23
normal (1)
86:24
North (3)
6:23;101:25;103:8
notes (2)
6:10;102:24
nothing's (1)
22:17
notify (9)
60:23;61:3,9;62:1,6;
68:19;82:17,22;122:18
NOVOTNAK (7)
75:24;89:7;116:23;
125:12;131:8;133:11;
134:5
number (7)
18:12;21:2;22:5,10;
27:3,20;51:25
numbers (5)
17:25;24:8;26:20,21,
25
numerous (10)
29:11;30:9;31:15;
32:11;33:14;37:16;
64:11;65:9;67:1,4
nurse (1)
31:6;121:8;122:18
nurses (4)
30:20;64:18;68:12;
99:13

**O**

oath (2)
4:3;5:1
Object (2)
75:24;131:8
objection (1)
69:12
obligated (2)
99:15;109:3
obtaining (1)
17:20
obviously (2)
84:22;100:7
occasion (4)
10:7;70:10;101:4;
114:1
occasions (24)
64:1;72:3;74:1,13;
76:6,13,13;77:22;78:7,
25;82:5,12;94:2,19;
96:17;97:2;100:25;
101:11;108:2;109:10;
110:6;112:12,18;113:3
occupied (1)
50:18
occur (2)
113:3;121:11

occurred (2)
90:23;107:13
off (24)
9:5,6;16:22;17:12;
33:1;55:20;56:10,12;
62:24;84:2,14;86:19;
87:20;88:8,17,21;89:24;
90:20;93:11;120:11;
124:13,25;130:5;132:2
off-going (2)
16:14;27:12
offhand (7)
10:21;22:16;29:15;
72:6;102:7;129:5;
131:25
office (17)
21:1;25:17;31:19;
41:2,5,6;60:7,8;83:13,
21;85:1,6,15;91:3,7;
132:20,23
office/breakroom (1)
83:14
officer (59)
8:6;11:23;12:7;22:8;
23:6,6,18,19;24:2;27:10,
12,13;30:10;31:4,5;
32:15;37:11,12;41:9,11;
42:3,10,11,22,25;43:2,4,
5,11;46:16;49:6,8;
50:11;67:3;73:24;75:5;
77:19;80:6,6;82:7,17;
87:21,23;90:18;98:15,
17;99:11;101:13;
107:12;109:3,4,6;
114:18;124:10,17;
125:7;130:8;132:23,24
officers (76)
12:11;15:9,11;21:11,
11,13;23:16;27:12;29:9;
30:5,23;40:23,23;41:13;
42:19;43:1,9,19;46:1,11,
18,19,22;47:5,11;50:8;
51:9,21;53:16,23;55:2,3,
4,11,23;61:8;67:1;72:7;
73:19;74:9;75:19;77:23;
78:7,23;79:3,4;80:1;
81:12;84:9,14;85:5,12;
86:3;88:2,14,18;89:23;
90:10;92:21;98:1,4;
99:24;100:13;107:5,9,
23;108:8,20;109:6;
111:24;113:10;123:22;
124:23;126:19;133:21;
134:2
officer's (5)
22:5,10;121:22;
132:21;133:1
offices (1)
41:3
off-site (17)
28:17;30:7,12;31:11,
12,13,21;32:20;33:5,11,
14,16;34:1;52:25;53:5;
116:12;118:13
ofs (22)

74:2,10,19,19;80:19,
20;81:22;94:10;100:4;
120:19;123:15,24,24;
124:4,6;127:16,19;
128:23;129:6,22;
131:25;134:3
often (2)
42:2;87:5
OHC (1)
45:3
once (11)
11:7;15:5;57:8;58:24;
63:7;66:11;82:13;88:12;
103:10;104:8;114:7
on-coming (1)
27:13
one (68)
4:13;8:24;11:14,16;
14:2,4;18:15,16;20:17,
19;23:18;25:3,20,21;
26:1;27:10;31:18;34:2,
11;37:17;40:24;41:16;
43:4,4,44;23:48,8,12,20;
51:20;53:2,19;55:25;
56:1,4;57:6;58:19,20;
59:10;62:11;66:2,19;
67:3;68:10;71:8,8;
72:22;74:4;77:3,19;
80:6,9;87:25;88:7;
90:18;95:3;98:17,22;
99:11;102:6,11;107:12;
108:19;109:6;111:1;
114:8,18,21,22
ones (1)
14:5
online (2)
56:20;57:23
Only (27)
11:7,14;14:2;17:16,
18;20:17;35:24;37:4;
46:2;51:15;52:15;71:20;
73:25;81:12;84:18;
88:16;92:14;95:8,24;
99:4,11;103:10;110:5;
114:8,22;116:11;126:20
on-site (1)
30:8
open (5)
25:13;32:23,24;94:13;
95:2
opening (6)
25:19,20;28:4,7;
45:11,25
openings (1)
19:13
operation (3)
29:9,16;52:2
operations (6)
12:9;28:24;29:16,18,
22;30:2
operator (2)
49:23;99:13
opportunity (1)
66:11
opposed (1)

121:23
orally (1)
69:13
order (3)
55:15;84:15;98:13
organization (1)
68:10
orientation (3)
93:9,10,11
orientations (1)
93:1
others (2)
34:10;55:14
out (113)
15:22;16:16;18:10,11;
19:1;27:22;33:13;34:12,
13;38:15;39:23;40:19;
49:22;50:7;51:19;61:7,
22;62:2,7,16;63:12,21;
65:9;67:10,14;68:13,18,
22;70:14,25;71:2;72:3,
20;73:8,10,11,16;74:25;
75:11;77:12,13;78:1,3,4,
12,14,19,20,21,25;79:3,
5,18,20;80:15;81:14,16;
82:2;84:19;87:25;91:3,
4;94:15;97:4,11,25;98:4,
5,7,14,23;99:7;100:6,7,
12,14;101:5,8,10,14;
102:25;104:18;105:16;
106:1,2;107:9;111:14;
113:9,15;115:15,24;
116:3,8,13,14,25;117:1,
12,15;118:4;119:13;
123:17;126:3,20,21,25;
127:2,8,13;133:12,14;
134:10,12
outside (3)
38:22;59:25;61:11
over (39)
10:21;13:11;14:15,24;
24:5;32:13;37:14;39:23;
45:7;46:9;49:11,12,19;
51:7,7;71:1,23,25;78:14;
79:10;82:24;87:10;89:4,
22;93:11;107:25;108:4,
15,25;109:2,8;110:13,
13,14;111:11;113:14;
114:24;117:14;120:7
overhead (2)
49:11,23
overlap (1)
55:12
overlooking (1)
38:22
overtime (4)
70:25;75:6;90:11;
110:18
own (9)
20:25;24:23,24;40:22;
60:9;81:25;109:4;111:9;
121:22
owns (1)
31:13

**P**

P301 (1)
25:15
page (19)
20:12;21:7,21;23:25;
25:1;27:25;28:12;35:24;
44:18,22;49:23;57:4;
58:16;63:4;98:22;
100:12;104:22;119:2,10
paged (5)
49:11,12;97:20,20,21
pager (10)
17:14,15;18:8;52:15,
20,24;115:20;116:4,10,
16
paid (2)
80:24;93:19
paper (2)
123:21;132:12
papers (1)
128:6
paperwork (3)
30:4,5;128:4
par (1)
79:16
paranoid (1)
123:23
part (13)
9:18;10:4,4;12:18;
30:13;35:7,8;39:19,24;
68:24;86:15;93:2;
112:25
particular (2)
8:7;9:22;8;65:10;80:6;
102:6
partner (1)
125:3
party (1)
4:11
pass-on (2)
15:22;113:21
patient (16)
27:7;30:19;31:5,8,9;
36:5;45:19;49:15;120:7;
121:9;122:12,14,16,25;
123:2;130:4
patients (3)
27:23;64:11;90:15
patient's (1)
36:6
patients' (1)
27:5
patrol (2)
34:1;42:8
patrolling (8)
28:17,23;29:4,5;33:6;
34:15,18;45:6
patrols (4)
23:13;30:7;33:15;
116:12
pending (3)
4:15;5:19;99:12
people (50)

19:2;20:19;22:3;35:5;
38:18;41:24;43:12;47:3,
10;49:19;51:6,11,12,14;
54:7,8,10;55:14,15;67:7;
71:21;75:15;77:11,12,
18;78:19;87:14;88:7,11;
89:23;95:7,10;97:1;
98:6;101:1,10,11;
107:17,24,25;108:1;
113:9,12;123:8;124:5;
126:21,21,25;127:7;
128:4
**people's (1)**
74:17
**per (9)**
8:13;9:4;27:10;43:18;
46:11;107:5,9;111:24;
122:13
**perceive (1)**
123:10
**Perfect (1)**
130:8
**perform (9)**
15:8,9;19:5,14;42:20;
43:23;47:20;86:1;90:6
**performed (3)**
16:12;19:8;33:11
**performing (7)**
26:8;30:16;31:21;
32:20;40:18;47:10;53:5
**period (29)**
10:17;12:13;23:7,17;
50:11;54:6;57:3,8,14;
61:6;64:8,10;66:1,4;
72:14;96:22;98:22;
100:21,23;101:8;105:7;
113:25;116:1,15;
119:15;125:4,22;126:5,
20
**periods (11)**
44:2,4;58:12;59:3,7,
15,19;65:21;87:2;
116:14;119:12
**permanent (1)**
91:25
**person (22)**
41:16,18,19;42:4;
43:16;45:22;54:22,23;
55:19;71:16,20;88:23,
25;89:2,2,17;108:15;
111:22;120:6;123:16,
22;129:3
**personal (8)**
85:11,20;86:1,10;
132:7,14,15,16
**personality (1)**
95:17
**personally (6)**
73:22;86:7;90:24;
92:20;109:11;132:25
**personnel (10)**
122:6;123:20;127:17,
23;128:2,9,20,24;
129:16;132:20
**person's (1)**

132:22
**pharmacies (3)**
13:11,12;14:15
**pharmacy (1)**
14:15
**philosophy (1)**
98:19
**phone (15)**
17:11,13,19;18:8;
52:15,24;53:3,4,7,9;
115:20;116:4,9,10,16
**phones (1)**
37:13;38:13,13
**physical (4)**
9:11,22;33:19;69:8
**physically (2)**
38:20;69:7
**physicians (1)**
34:25
**pick (4)**
16:21,23;34:9;88:22
**picked (4)**
17:16;27:15;45:12,14
**picking (2)**
26:4;28:10
**pick-up (5)**
45:11,14;88:21,22;
89:4
**pile (1)**
128:6
**place (5)**
40:17;76:8;102:5,6,10
**places (1)**
35:5
**player (2)**
109:15,18
**Please (2)**
5:8;57:9
**plenty (3)**
109:19;111:10;128:4
**pm (3)**
89:9,10;134:17
**pob301 (1)**
25:16
**point (9)**
8:19;13:4;34:15;
56:24;64:9;69:19;76:9;
99:2;100:11
**points (1)**
59:9
**police (1)**
120:20
**policies (2)**
43:10;92:22
**policy (34)**
55:23;57:22;58:11,19;
59:6,8,10,12,13,14,20,
21;60:2;61:25;62:4;
66:10,21;67:12;68:8,9,
15,24,25;69:20,25;74:2,
3;84:11;92:21;97:24;
98:7;106:6;118:5;
122:13
**political (1)**
95:9

**population (1)**
35:4
**portion (4)**
58:6,17;63:10;93:2
**pose (1)**
5:3
**position (5)**
8:4;11:23;12:16;
13:10;106:21
**positions (4)**
16:16,18,21;22:3
**possible (7)**
20:23;88:14;93:19,21;
133:14,20;134:11
**possibly (1)**
66:7
**post (6)**
31:2,2;33:2;64:13;
81:11,11
**posting (1)**
44:20
**posts (3)**
89:16;90:19;107:15
**power (3)**
18:4;79:10,19
**practice (5)**
63:20;66:23,25;112:3;
114:15
**precise (2)**
110:3,20
**premises (17)**
52:16,21,25;61:16,23;
84:2,2,12,14,20;115:6,
12;116:3;117:5;118:4;
125:17,19
**preparation (3)**
6:4,7,10
**present (1)**
6:22
**Presidio (1)**
6:23
**Presumably (2)**
26:4;127:8
**Pretty (3)**
14:23;94:25;118:12
**prevention (9)**
12:18,22;20:7;41:3;
60:7;62:21;83:13,14;
126:19
**previous (1)**
52:14
**previously (18)**
18:7;24;29:3;57:19;
58:14;62:20;72:21;
82:16;83:10,19;84:17;
93:23;97:7;105:2;
106:23;116:2;119:7;
127:22
**printed (1)**
62:24
**prior (12)**
8:1;13:19,20;14:2,11;
34:21,22;36:14;42:13;
71:22;113:16,23
**prioritize (4)**

47:20;48:17,21;50:25
**Probably (14)**
11:1;15:5;45:22;
63:23,23;64:4;71:6,6,15;
72:9;102:18;105:10,10;
109:14
**problem (3)**
77:10,19;79:18
**problems (3)**
71:21;82:13;131:14
**procedure (5)**
6:1;17:20;50:2;76:8;
111:6
**procedures (4)**
19:13;43:10;80:13;
107:1
**proceed (1)**
4:25
**proceeding (1)**
130:15
**PROCEEDINGS (1)**
4:1
**professional (1)**
25:16
**program (1)**
19:21
**prohibition (1)**
105:20
**promoted (3)**
12:2;14:9,11
**promotion (1)**
12:1
**proper (1)**
55:8
**properly (1)**
50:25
**property (3)**
27:5;29:24;34:17
**provider (1)**
122:14
**proximity (1)**
72:10
**Psych (10)**
10:14,15;11:6,14;
31:9;106:25;113:2;
114:6,16,21
**Psychiatric (1)**
10:16
**punch (24)**
67:9;68:17,22;72:3;
74:9;78:12;80:16;81:14,
16;84:19;97:25;99:7;
100:6;101:5,10,14;
106:1;109:17;115:17;
116:3,13,14;118:4;126:4
**punched (38)**
17:1;71:2;73:11,16;
77:25;78:3,4,14;79:3,5;
98:4,14;105:16;106:2;
112:24;115:15,24,25;
116:8,25;117:1,12,15;
123:17,25;124:2;126:2,
3,20,21,25;127:2,8,13;
133:12,14;134:10,12
**punching (14)**

70:14;71:21;77:12,13;
78:19,20,21,25;98:5,7;
100:7;101:8;104:17;
105:6
**put (15)**
18:12,22;27:1,8;43:3;
62:16,24;79:13,14;
90:17;111:18;121:20;
122:3;127:19;128:21
**putting (1)**
69:14

## Q

**quarterly (4)**
77:1,3;102:12,12
**quickly (3)**
51:3;89:1;133:19
**quite (2)**
10:22;46:18
**quote (1)**
101:15

## R

**radio (52)**
17:20,21,24,24;18:14,
15,15,17,20;20:20,23,
25;21:2;30:24;37:14;
51:7,8,14,17,19,23;52:1,
3;53:6;55:16;82:25;
83:1;85:22,23,24;86:17,
21;87:2,5,7,22;88:3;
117:2,14;118:6,9,15,16,
19,22;119:21,24,24;
120:13;124:7;125:7,16
**radios (14)**
16:16;17:8,10;18:1,
10,18,19;51:7,8,9,10,11,
12;118:12
**Raised (1)**
63:6
**ran (4)**
12:9;67:3;98:17;
114:18
**random (1)**
65:9
**rank (1)**
8:20
**ranks (3)**
46:16,17;101:21
**rare (2)**
46:7;90:7
**rarely (1)**
14:25
**read (7)**
15:22;43:9;63:1;
85:14,17;92:23;119:12
**readily (2)**
117:19,21
**reading (3)**
61:25;66:16;85:11
**real (3)**
7:6,8;99:20
**really (15)**

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 465 of 867   Document 49-1

15:11;36:24;43:17,18;
53:6;56:4;73:6;77:17;
78:21;90:7;95:1,18;
96:19;97:1;114:17
**reason (16)**
5:20;20:17;37:4;
69:14;73:3;97:5,12;
98:14;100:8,18,18;
101:13;112:11;130:23;
131:5,21
**reasonable (3)**
106:21;118:3,23
**reasons (3)**
98:8;100:20;132:4
**recall (29)**
10:21;11:17;29:13,20;
42:13;58:6,16,19;59:9;
63:10;66:14;71:16;
72:22;73:3,5;90:5;
93:16;96:15;103:13,22;
104:11;109:13,14;
110:6;112:6;113:7,8;
114:25;129:5
**receipt (1)**
57:1
**receive (3)**
12:1;51:13,14
**received (5)**
35:11;48:24;89:20;
111:2;119:24
**receiving (2)**
66:14;104:11
**recently (1)**
71:25
**recess (1)**
89:9
**recognizing (1)**
101:10
**recollection (2)**
72:13;102:9
**record (22)**
4:7;5:13;16:25;19:7,
23,24;20:6;24:23,24;
35:25;36:21,25;37:6;
56:11,12;58:20;90:23;
91:14,25;119:13;131:6,
22
**recorded (6)**
26:6;36:16,18;37:5;
64:21,22
**recording (2)**
37:10;47:11
**records (13)**
35:17;44:11;74:24;
76:16;91:1,4,5,5,7,21;
92:8,14,15
**red (1)**
77:7
**re-deployed (1)**
113:22
**redirect (1)**
88:13
**refer (12)**
23:23;24:7;25:24;
26:20,21;27:14;28:3,16;

36:10;40:12;44:21;
45:10
**referred (3)**
25:23;60:8;76:18
**referring (4)**
9:14;15:17;58:21;92:3
**refers (3)**
22:14;25:7;36:3
**reflect (8)**
22:2;23:23;35:11;
44:14;65:21;91:21;92:8;
105:20
**reflected (7)**
25:18;29:6;59:12;
65:17;91:6;92:11;114:3
**reflects (1)**
36:1
**refrigerator (1)**
83:15
**regard (9)**
26:17;35:10;44:1;
107:1;111:5,6;114:6,15;
134:9
**regarding (5)**
59:3,18,21;106:6;
130:3
**regards (1)**
11:3
**region (3)**
10:11;101:25;103:9
**regularly (1)**
108:16
**reiterate (1)**
99:18
**reiterated (1)**
100:10
**reiterating (1)**
99:2
**relate (1)**
22:7
**related (1)**
102:22
**relates (3)**
58:11;59:6,14
**relation (2)**
120:20;123:6
**relieved (3)**
111:12;119:14,17
**remainder (2)**
64:3,9
**remaining (1)**
88:14
**remember (16)**
34:20;51:2;63:12;
71:5,5,12,14;74:7;94:22;
97:15;103:2,9,20;
104:12;111:10;120:3
**remind (1)**
5:11
**Reminder (1)**
66:10
**rented (1)**
34:25
**repeat (1)**
59:17

**rephrase (1)**
5:4
**report (15)**
13:19;69:13;75:5;
85:7;121:2,3,3,5,6,7,8,
12,18,20;122:2
**reported (5)**
12:24,25;13:13,18,20
**reporter (7)**
5:12;13:1,15;25:9;
36:12;72:24;104:3
**reports (14)**
29:11,23,25;40:19,23;
41:1,4;47:18;75:1,13;
76:19;83:18;85:10;
130:3
**representative (1)**
47:10
**requested (1)**
130:6
**require (1)**
50:16
**required (11)**
47:24,24;60:17;67:23;
68:25;83:20;84:18;
86:16;118:6;123:11;
134:3
**requirement (1)**
125:25
**resources (2)**
92:24;93:2
**respect (1)**
105:18
**respond (30)**
34:14;49:9,18;50:9,
12,23;51:1;61:17;88:6,
9;106:13;117:11,15,19;
118:16;119:22;120:11;
124:8,14,19,19;125:8,9;
126:16;127:1,3,5,6,13;
133:19
**responded (5)**
48:21;49:10;50:13;
118:13;124:11
**responder (6)**
49:14,15,25;50:1,4;
87:25
**responders (3)**
49:10;87:9;120:5
**responding (4)**
51:3;88:4,4,5
**response (16)**
47:24;48:1,4,10,14,15;
50:13,21,22,23;88:6;
96:16;98:18;105:17;
115:18;117:22
**responses (2)**
5:8,13
**responsible (3)**
43:13;129:22,23
**rest (3)**
35:6;57:3,7
**restart (4)**
65:23;66:5;96:9,12
**restarted (2)**

63:19;74:18
**restriction (1)**
41:21
**restrictions (1)**
42:6
**restroom (1)**
25:25
**resume (1)**
63:24
**retrieve (1)**
18:1
**return (1)**
36:4
**returning (1)**
36:6
**reverse (4)**
71:19;74:20;79:12;
95:20
**reversed (14)**
70:20;71:16;72:5,17,
20;74:15;76:7;79:6;
80:2,23;93:24;94:21;
96:18;112:20
**review (15)**
6:3;16:14;42:15,18;
57:7,11;58:5,23;59:1;
62:5;63:7;65:4;66:8,12;
129:24
**reviewed (6)**
57:3,6;59:11,18;
66:18,20
**reviewing (8)**
58:6,17;63:10;66:15;
73:10;74:24;76:16;
104:9
**revised (1)**
61:25
**ride (1)**
23:12
**Right (59)**
4:22;5:25;6:3,6;7:18;
9:20;11:8,12,22;12:6,13;
21:14;22:23;23:9;24:16;
29:17;40:10;49:10,11;
53:22;56:17;59:5;60:1;
69:22;70:5,22;77:21;
79:25;84:11,25;85:17;
86:7;90:1,19,25;92:5;
98:8;101:12;104:13;
106:5;107:15,18;
108:22;109:10;110:9;
112:14;113:20,23;
115:19;116:20;117:7;
126:6;127:12;128:13;
131:18;132:2,14;133:5;
134:15
**Rights (2)**
4:16,22
**ring (1)**
38:13
**ringing (1)**
37:13
**risk (1)**
125:9
**Road (1)**

34:13
**roaming (1)**
23:19
**Robert (4)**
12:25;68:4;103:18;
104:21
**role (7)**
12:6,8;13:9;14:11;
15:15;16:9;42:15
**roof (1)**
90:11
**room (10)**
18:6;36:6;38:1,14,16,
23;39:24;83:2;95:2;
117:17
**rotate (2)**
41:12,15
**rotated (2)**
41:25;102:7
**rotation (1)**
21:25
**roughly (1)**
29:21
**rounds (7)**
26:8;30:13,16,17;
35:7,8;47:19
**route (1)**
32:11
**routes (1)**
32:11
**routine (3)**
19:13;109:21,21
**rule (3)**
111:21;118:5;125:2
**rules (1)**
111:9
**rumblings (1)**
108:7
**run (3)**
29:18;89:4;108:10;
111:8
**running (9)**
16:1;28:24;29:21;
90:11;104:15;107:9,22;
108:7;125:1

**S**

**safety (1)**
64:18
**same (48)**
10:5;11:3;14:21;15:8,
24;17:14,15;18:16;20:1;
21:1,2;40:5,5,6,8,8,13,
16;41:15;54:4,6,14,17,
19,21;55:1,2,3,6,7;69:5;
72:1;76:12;81:2;82:9,9;
86:21,24;98:22,25;
99:25;100:4,11,12,13;
111:5;114:6;124:4
**samples (1)**
46:20
**Save (1)**
34:9
**saying (10)**

45:7;53:10;54:18;
63:25;97:24;99:14,19;
106:5,9,17
scene (1)
88:8
schedule (2)
12:11;15:23
scheduled (6)
46:6,11,23;47:3;
108:16;111:24
schedules (2)
28:25;91:16
scheduling (2)
29:7,22
school (5)
6:25;7:2,17,18;8:2
Scott (1)
103:23
scrutinize (1)
122:23
scrutinized (3)
69:17,18;70:13
scrutiny (1)
71:2
SCULLEN (23)
4:6;13:2,16;20:4;
25:10;26:12;35:15;
36:13;44:9;56:10,13;
73:2;76:1,4;89:6,11;
104:6;116:20;125:15;
131:17;133:8;134:8,15
se (1)
43:18
Second (31)
8:10,21,23;14:25;
15:2;20:14;21:12,21;
22:17,21;27:25;32:21,
24;35:24;46:8;47:5;
53:7;56:11;58:15;62:11;
63:4;66:8;87:14;90:9;
104:22;107:23;109:1;
113:6;119:2,10;124:23
Section (9)
58:16,24;59:1,12,18;
63:5,7;66:10;119:10
Security (21)
8:6;9:21;11:23;12:2,7,
7;15:9;30:10;41:9,11,
12;50:8;51:11;55:23;
61:15;64:19;88:7;
120:23;125:2;129:7,19
security-related (1)
129:12
seeing (1)
43:5
send (3)
102:25;107:24;113:14
seniority (1)
8:20
sense (4)
49:1;107:18;123:3,6
sent (1)
104:18
sentence (1)
119:13

September (1)
44:12
sergeant (21)
12:2,8;16:9;19:1;
21:12;29:17;40:18;
42:15;46:2,6,9;61:9;
67:3;72:2,2;75:22;
76:18;97:18;98:16;
101:21;112:25
sergeants (13)
20:25;40:22;60:9;
75:2;76:25;98:21,23;
100:10;101:20;103:16,
22,23,25
series (2)
5:15;44:11
serious (2)
50:22;63:23
served (2)
7:18,23
Service (1)
118:21
Services (3)
20:7;31:14;34:4
set (5)
8:15,17;26:14;111:9;
118:11
setting (1)
123:16
Seven (1)
9:3
several (1)
76:6
Sheboygan (1)
103:11
sheet (8)
18:13;19:11;24:8,21;
75:8;92:13;110:18,21
sheets (4)
24:15;75:11;110:17;
132:18
shift (103)
8:9,10,21,23,24,25;
9:2;10:1,4,5,5;11:18;
12:9;14:22,23;15:2;
16:13,13,14,15,20,23;
17:7;20:14,24;21:12,17,
19;22:6,12,16,17,21;
27:11,13;28:22,24;29:8,
15,16,18,19,22;30:1,11;
31:23,24;32:22,24;
35:22;41:15,17;42:22,
25;43:2,20,21;44:14;
46:1,2,3,8,11,13,23;47:3,
4;51:6;53:14,21,22;54:9,
11;56:6;61:11;64:3,6,10;
72:2;73:7,7;74:12;75:3,
7,9;76:14;77:23;81:8,
17;90:9;106:15;107:5,
10,23;109:1,8;111:25;
113:6;120:2;130:8,10;
132:17,19,24
shifts (7)
10:19;15:2;46:5,25;
56:1;81:6;106:24

Shore (4)
67:2;97:15;98:15,17
short (3)
46:10;104:16;109:20
short-staffed (1)
70:24
showed (1)
113:24
Showing (9)
20:5;26:13;35:16;
44:10;56:14;57:17;
58:14;62:9;104:7
side (8)
23:5,7,14;30:17;45:1,
8;88:21;120:8
sides (1)
134:4
sign (2)
18:10,11
signed (3)
56:24,24;93:11
significant (2)
64:8;113:25
similar (5)
26:14;73:6;112:3;
113:16,23
similarly (2)
54:1;107:11
Sinai (12)
8:8;9:8,10,14;10:4;
32:2,4;34:2;99:23;
104:15;105:13;107:3
single (1)
48:18
sit (3)
70:18;111:23;124:17
site (35)
9:24;10:1,5,11;12:17,
21;13:23;14:2,4,9;15:6,
7,18,22;16:1,5;28:19;
42:17;51:9;77:22;86:13;
100:5;103:5;105:25;
107:13,25;108:4;109:4;
110:19;111:14,15,22,23;
113:13;114:18
sites (9)
31:15;67:1;77:18,19;
102:8;106:2;109:25;
110:1;113:22
sitting (3)
63:2;110:24;112:13
situation (18)
41:18;45:20,23;50:22;
64:14;87:15,19;99:23;
100:1,5;105:19;106:14;
107:16;108:19;130:20;
131:5;132:1;133:22
situations (4)
49:21;124:3;131:4,24
six (3)
21:16;88:2;106:10
sixth (2)
24:3,5
slap (1)
98:11

slight (1)
121:14
slip (2)
49:16;121:5
slow (1)
115:1
small (1)
121:5
Smith (10)
12:15,21;13:23;14:9,
14;15:10,13;102:2;
103:7,8
smoke (5)
84:6,6,9,15;126:22
smoked (1)
84:14
smoking (2)
84:11;126:25
smooth (1)
78:15
SNOWDEN (5)
4:2,8,9;29:2;116:25
S-N-O-W-D-E-N (1)
4:8
sold (1)
34:17
solely (1)
95:21
Solie (26)
12:25;13:8,13;15:17,
20;68:4;71:18,24,25;
74:2;81:25;94:4,22,24,
25;95:11;96:16;99:8;
101:13;103:18;104:18,
21,21;105:4,5;106:5
Solie's (1)
105:17
somebody (8)
10:10;31:2;49:17;
55:18;108:18;113:14;
114:20;127:4
somebody's (1)
129:10
someone (10)
41:9;42:2;74:22,24;
75:4,21;76:16;101:5;
107:11;112:3
sometime (10)
11:19;15:1;16:10;
62:24,25;71:10;72:12,
13;102:14;114:9
Sometimes (21)
14:24,24;15:21;31:1;
33:2;36:15,18;84:6:15;
67:8;78:11,11;83:1,1;
94:10;102:25;103:1;
107:8;111:17;112:1,2
somewhere (6)
11:10;39:10;40:21;
79:24;111:15;132:11
soon (2)
133:20;134:11
Sooner (1)
102:17
sorry (8)

23:11;25:11;45:5,13;
67:15,19;86:14;103:16
sort (1)
96:14
sounds (4)
54:18;66:23;96:10;
117:23
South (4)
67:2;97:15;98:15,17
space (1)
34:25
speaker (1)
49:24
speaking (1)
90:9
special (1)
78:13
specific (3)
96:16;113:7,8
specifically (2)
103:13;128:22;129:3;
133:15
speculation (1)
131:9
spell (1)
4:7
spent (1)
29:21
spread (1)
100:13
spreading (1)
100:14
squad (6)
23:10,12;28:14;83:2;
117:17;118:20
Square (4)
31:15;34:6,7,8
St (19)
10:14;11:3,4,5,12;
67:2;97:15;98:17;100:2;
101:20,23;103:4;
106:25;111:5,8,11,25;
112:1;134:2
staff (7)
31:7;52:11,11,12;
89:15;104:16;109:21
staffing (9)
46:10,13,14,24;55:8;
81:14;90:8;120:9;125:1
standby (13)
31:3;64:13,19;108:9;
110:24;111:11,21,22,23;
112:13,19;113:25;
122:12
standbys (9)
30:6;64:11;81:10;
90:17;107:14,21,22;
108:10,11
standing (1)
101:6
start (7)
16:13,22;24:1;74:17;
75:16;82:13;98:10
started (2)
34:11;73:18

**starting (1)**
77:10
**Stat (1)**
49:6
**state (5)**
4:7;9:12;32:5;110:23;
111:1
**stated (1)**
59:19
**statement (7)**
66:15;67:20;68:14,21;
69:4,8;70:1
**statements (1)**
96:15
**states (1)**
90:13
**staticky (1)**
53:11
**station (30)**
17:23;18:3;22:24;
23:2;26:23;27:18;37:16,
24;38:2,3,8,10,24;39:3,
4,11,16,18,22;40:1,4,7,
13,15,16,20,25;41:20,
22;42:5
**stationed (1)**
14:20
**stay (4)**
32:25;33:10;109:2,8
**stayed (1)**
46:8
**step (1)**
33:15
**stereo-type (1)**
85:24
**stern (1)**
105:5
**stick (2)**
95:15,16
**sticker (1)**
119:9
**still (16)**
21:5;33:13;92:1;
96:12;117:11,13,14;
118:15,15,19,21,23;
119:21,21;120:13;
123:19
**stink (2)**
73:11;74:22
**stolen (1)**
33:18
**stop (3)**
34:15;88:1;110:2
**stopped (7)**
34:17;66:16;70:14;
72:18;73:19,20;82:14
**stored (1)**
21:1
**story (1)**
134:4
**Street (1)**
32:13
**strictly (1)**
42:4
**strike (3)**

20:19;52:20;71:22
**struck (1)**
121:9
**Stuck (2)**
16:4;111:11
**stuff (13)**
77:20;78:17;81:13;
83:18;85:10,13;86:4;
91:8;93:11;96:11;105:6;
108:5;111:16
**SUB (1)**
24:12
**subcategory (1)**
24:12
**submit (1)**
75:2
**subsequent (1)**
8:2
**substantial (1)**
66:4
**such-and-such (3)**
75:5,6;88:5
**suggest (1)**
21:16;22:25;65:22
**suicidal (1)**
31:3;90:13,17;108:10
**summaries (1)**
76:19
**summary (2)**
75:1;121:16
**summer (1)**
113:11
**summertime (1)**
113:10
**supervisor (27)**
12:17,21;13:24;14:3,
4,10,20;15:4,14;42:17;
51:9;60:24,24;61:3;
68:3,19;69:2;80:3,18;
102:2;103:5;122:22;
127:18;128:3,14;130:10,
21
**supervisors (19)**
12:10,14;14:19,22;
15:7,16;16:6;62:1;
75:12;76:25;79:9,11,12;
97:8;103:8,14,15,20;
133:3
**supervisor's (2)**
15:3;41:6
**supervisory (2)**
69:1,2
**supply (1)**
28:4
**support (3)**
23:16,17,18
**supposed (7)**
29:10;30:6;44:1,3;
63:15;118:10;130:4
**sure (18)**
12:4;29:9;30:5,8,20;
31:2,4,6;33:20;35:2;
59:18;79:23;87:23;
95:18;108:3;122:15;
132:6,9

**swipe (6)**
17:4;61:22,24;62:2,3;
80:12
**swiped (4)**
61:7;62:6;73:8;80:15
**switch (1)**
43:8
**switching (1)**
96:14
**sworn (1)**
4:3
**system (4)**
38:12;49:12,13;91:24

---

# T

**table (4)**
16:21;63:1,2;94:14
**talk (2)**
69:9;120:18
**talked (1)**
6:16
**talking (2)**
46:21;69:9
**tallying (2)**
92:16,18
**task (4)**
16:17;48:9;50:18;90:6
**tasks (9)**
15:11;16:11,19,20;
19:2,5;47:21,23;48:17
**taught (1)**
91:13
**team (10)**
12:10;49:18;76:25;
98:19,20,25;102:4;
109:15,18;112:25
**Technical (1)**
7:11
**telling (2)**
75:8;99:4
**ten (3)**
63:21;107:9;111:14
**tended (1)**
49:20
**term (2)**
120:19,22
**terminated (2)**
91:2;104:1
**termination (1)**
114:13
**terms (4)**
9:10;30:22;47:18;
115:18
**testified (29)**
4:4;11:22;18:7,24;
29:3;62:20;74:22;76:7,
11,12;79:22;81:2;82:4,
16;83:10,20;84:17;
93:23;96:17,20,22;97:7;
105:2;106:23;114:7;
115:5;116:2;117:4;
127:22
**testify (1)**
128:4

**testifying (1)**
20:10
**testimony (23)**
11:8;37:18;52:14;
61:18;65:14;70:18;
71:22;73:24;76:5,15;
78:5;84:1;87:1;95:20;
97:9;101:3;113:16,23;
127:16,20,25;129:15;
132:14
**thefts (1)**
33:14
**theirself (4)**
98:2,10,12;122:15
**theirselves (1)**
92:23
**theoretically (1)**
126:7
**theory (2)**
96:10;101:6
**third (7)**
14:25;20:13;21:19;
44:24;107:23;109:3,5
**though (3)**
34:20;45:6;71:4
**thought (4)**
54:17;73:15;98:10;
122:22
**thoughts (1)**
117:20
**thousands (1)**
33:17
**Three (15)**
8:12;11:9;21:11;
42:14;46:18;48:8;62:17;
65:1;90:19;92:25;99:12;
102:13;107:8;112:2;
113:10
**throughout (14)**
5:16;8:21;9:7,20;
11:24;22:11,13;30:11;
54:10;56:1;68:5;86:24;
96:13;120:3
**throw (1)**
129:9
**thrown (2)**
91:1,6
**thus (1)**
115:11
**tickets (4)**
27:19,20,21,22
**tied (2)**
65:21;89:17
**times (46)**
10:23,24;11:10,12;
14:23;24:1,1,2;28:22;
36:16,20;41:24;47:25;
48:1;50:1;52:9;55:4,10;
63:18,21;67:4,9,9;70:12,
17;72:9,10,16,19;77:24;
85:18,23;86:8;90:8;
107:8;108:17,24;
109:16;110:11,12,14,15;
111:10,14;112:6;113:11
**titles (1)**

40:6
**today (5)**
4:25;5:21;6:4;70:18;
89:1
**together (1)**
90:18
**told (18)**
33:15;39:3,22;53:19;
70:6;80:9;93:7;101:4;
107:6;120:12;128:10,13,
22;129:4
**tonight (1)**
80:11
**took (31)**
13:8,10;32:15;47:12;
52:9,15;53:3;54:3,5,17,
20;55:4,11,15,25,25;
70:6;71:25;73:22;75:4,
5;83:11;93:2;102:6,10;
113:25;114:25;115:1,16,
19;118:9
**top (2)**
69:4;132:2
**topic (5)**
63:13;75:18;94:6,6;
102:20
**total (1)**
125:21
**touched (1)**
93:10
**touching (1)**
30:19
**towards (1)**
51:24
**Traffic (3)**
23:9;32:9;118:24
**trail (2)**
123:21;132:12
**train (5)**
43:1,10,19,22;92:21
**trained (4)**
43:13;92:22,24
**trainees (1)**
43:15
**training (10)**
7:14;42:19,21;43:8,
11,16,18;48:23,25;93:6
**Training-wise (1)**
93:8
**TRANSCRIPT (1)**
4:1
**transmission (1)**
51:18
**transmissions (1)**
52:4
**transported (1)**
31:9
**trash (1)**
129:9
**travel (4)**
32:6;43:4;105:10;
122:20
**traveling (1)**
122:20
**triage (1)**

45:20
**true (2)**
13:21;68:5
**trust (2)**
98:3;113:1
**trusted (1)**
98:13
**try (7)**
5:4,8,8,11;39:5;88:10;
109:15
**trying (7)**
10:3;39:7,7;99:18;
100:9;124:23;131:15
**turn (5)**
25:1;32:13;66:9;
86:19;90:14
**TV (3)**
83:15;84:25;85:3
**Twelfth (1)**
32:5
**twelve (2)**
115:16;126:4
**two (35)**
14:5;18:16;23:16;
25:24;27:12;31:20;32:7,
18;40:8,8;42:14;45:8;
56:3,5;62:10;65:1;72:9;
79:22;81:10,12;82:5;
87:16;89:16;96:17;
99:12;107:7,9,15,22;
108:7,20;109:5;118:2;
124:22;133:21
**two-page (1)**
104:8
**two-way (3)**
18:17,19;38:14
**type (10)**
17:9;18:17;19:12;
24:10;64:7;73:1;85:7;
95:4;105:4,15
**types (8)**
16:11;49:5;50:7;
62:13;64:20;89:13;
109:9;121:10
**typical (4)**
16:8,12;46:12;51:6
**typically (9)**
9:25;15:19;32:21;
33:10;40:21;55:5;83:23;
108:14;111:24
**typing (1)**
72:22

# U

**unable (5)**
64:9;67:22;70:8;
109:12;110:6
**unclear (1)**
53:11
**uncomfortable (1)**
5:17
**under (5)**
5:1;24:10;25:4;26:19;
126:13

**understood (15)**
37:18;39:1,9,10,14,15;
52:14;56:7;61:5;68:25;
70:5;71:22;97:9;115:6,8
**uninterrupted (6)**
78:8;92:10;106:15;
111:3;114:4;115:3
**unit (3)**
38:10,21;124:24
**units (1)**
33:18
**unless (4)**
9:23;66:3;99:3,7
**unlocked (1)**
35:3
**unpaid (2)**
56:8;106:10
**unreasonable (1)**
105:18
**up (39)**
8:20;17:16;24:10;
26:4;27:15;28:10;33:15;
36:24,25;39:6,13,19;
43:10;45:12,14;49:18;
50:20;65:21;73:1;77:3;
79:8,16;87:23;88:22;
89:17;91:8;103:8;105:4;
114:21;115:12,21;
123:16;125:19;126:11,
15;127:1;129:14;
131:16;134:13
**upset (1)**
80:7
**upstairs (4)**
16:15;17:8,21;87:14
**Urgent (2)**
32:23;117:23
**use (5)**
17:2,18;85:8;86:7;
111:19
**used (11)**
108:25;109:22;
123:13,20,25;124:4;
129:13;130:14;131:13,
25;132:3
**usual (1)**
15:14
**Usually (11)**
15:20;53:3,6;54:3;
55:24;81:7;92:24;
102:23;106:1;109:7;
117:16
**utterly (1)**
88:16

# V

**vacancies (2)**
46:15,16
**vacation (1)**
113:12
**vague (1)**
75:24
**vagueness (1)**
75:25

**val (4)**
45:11,14,15;88:20
**Valet (1)**
51:8
**Valuable (12)**
26:19,21;27:3,4,7;
36:4,6;45:15,16,24;
88:22;89:4
**valuables (2)**
26:25;29:24
**varied (3)**
52:6,7;56:1
**varies (1)**
112:1
**vehicle (3)**
23:12;28:17,18,19
**verbal (2)**
5:8,12
**verbiage (2)**
59:8;69:8
**Verita (3)**
101:24;103:4,20
**versus (1)**
69:14
**veteran (1)**
80:7
**vicinity (1)**
9:13;31:16;79:24
**victim (1)**
69:10
**victims (1)**
64:16
**Village (1)**
34:12
**visitor (1)**
49:16
**visitors (1)**
64:12
**VNA (5)**
31:13;33:16,22,24;
34:5

# W

**Wagner (1)**
103:25
**wait (3)**
32:25;55:19;83:8
**walk (3)**
16:8;35:1;42:7
**walk-around (1)**
33:19
**walking (3)**
30:18;31:3;130:5
**walks (1)**
122:12
**Walnut (2)**
33:23;118:14
**wards (1)**
114:21
**Washington (1)**
7:2
**watch (4)**
38:11;85:3;90:14,18
**watching (2)**

122:13;130:5
**way (12)**
32:13,14;34:11;81:25;
90:22;91:12,13;95:1,17;
113:16;119:20;124:21
**ways (1)**
77:9
**Wednesday (1)**
9:6
**week (5)**
8:13,16,18;9:4;15:5
**weekend (1)**
9:5
**weeks (1)**
108:12
**weight (1)**
42:6
**weren't (14)**
20:23;35:2;36:19;
47:11,16;60:17;65:12;
69:23;78:19;83:20;97:1;
98:6;127:8;128:7
**West (26)**
10:13,19,20;11:9;
23:14,14;88:20;89:2;
100:1;101:19,24;103:5;
106:24;107:1,2,5,20;
108:2,3,14,23;109:7,11,
24;110:5,13
**what's (12)**
20:5;26:13;31:9;
35:16;44:10;55:22;
56:14;57:17;58:14;62:9;
104:7;121:16
**whichever (1)**
48:20
**whole (11)**
29:18,18;38:20;49:24;
56:2;73:7,7;75:15;
76:24;81:6;86:24
**who's (2)**
54:23;87:15
**whose (1)**
79:5
**Williams (4)**
12:15;13:20;14:6;
15:10
**Williams' (1)**
12:16
**window (1)**
38:23
**wipe (1)**
82:2
**Wisconsin (6)**
4:22;6:24;31:17;34:3;
118:17,19
**within (18)**
10:11;13:9;34:24;
38:21,21;39:23;41:5,15;
54:5;75:18;87:11;
115:14,22;117:25;
118:6;125:20;126:9,16
**without (1)**
68:13
**witness (9)**

4:2;57:10;58:25;63:9;
66:13;72:25;76:2;
104:10;131:11
**wondering (1)**
78:1
**Woods (2)**
102:3;103:18
**word (1)**
124:1
**words (1)**
52:2
**work (28)**
8:9,21;9:2,7,25;10:4,
12,19;11:14;14:22,24;
43:20;46:9;47:18;59:25;
60:5,18;63:3,21;83:16;
96:12;107:8;109:8;
110:22;112:1,2;119:14,
17
**worked (24)**
7:19;8:23;10:13,14,
21;11:7,9;14:4,23;
16:25;20:14;35:21;
44:14;71:10;75:6;76:20;
78:24;84:9;106:11,23;
112:7;114:7,22,24
**working (17)**
14:5;17:19;21:13,17;
53:16;80:10;81:10;
82:18;88:3;89:1;104:14,
16;105:25;107:11;
109:11,20;113:6
**worth (1)**
33:17
**write (40)**
18:15;20:22;21:6;
29:25;57:18;67:10,12,
17,19,20,25;68:14,21;
69:4,8;70:1,9;73:14,25;
74:10;76:10;77:13;
80:18;81:24;94:9;96:24;
97:4,11;121:25;122:3,9,
9,24;123:11,15,23;
128:11,15;131:21;134:3
**writing (4)**
68:11;69:14,14;74:18
**written (6)**
21:4,5;22:17;102:21;
125:2;132:22
**written-in (1)**
23:22
**wrong (1)**
84:18
**wrote (7)**
24:20,20;79:8,15;
80:20;107:17;127:19

# Y

**year (8)**
7:3;8:24;11:19;71:4,5,
14,25;114:9
**years (6)**
8:23;11:9;29:21;65:1;
71:11,12

**Yep (6)**
 18:9,15;50:6;105:1,3;
 107:12

Exhibit 4

Deposition Transcript of Patrick R. Lowery

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------

JERRY A. BRABAZON, individually
and on behalf of all others
similarly situated,

        Plaintiff,

        vs.             Case No. 10-C-714

AURORA HEALTH CARE, INC.,

        Defendant.

--------------------------------------------------------

Deposition of PATRICK R. LOWERY

Tuesday, March 22nd, 2011

9:06 a.m.

at

QUARLES & BRADY LLP
411 East Wisconsin Avenue
Milwaukee, Wisconsin

Reported by Loretta L. Stoeckmann, RPR

1            Deposition of PATRICK R. LOWERY, a witness

2    in the above-entitled action, taken at the instance of

3    the Defendant, pursuant to the Federal Rules of Civil

4    Procedure, pursuant to Notice, before Loretta L.

5    Stoeckmann, RPR and Notary Public in and for the State

6    of Wisconsin, at QUARLES & BRADY LLP, 411 East

7    Wisconsin Avenue, Milwaukee, Wisconsin, on the 22nd day

8    of March, 2011, commencing at 9:06 a.m. and concluding

9    at 11:49 a.m.

10   A P P E A R A N C E S:

11                HAWKS QUINDEL, S.C., by
                      Ms. Lynn M. Novotnak
12                    222 East Erie Street, Suite 210
                      P.O. Box 442
13                    Milwaukee, Wisconsin 53201
                      Appeared on behalf of the Plaintiff.
14
                 QUARLES & BRADY LLP, by
15                    Mr. Sean M. Scullen
                      411 East Wisconsin Avenue, Suite 2040
16                    Milwaukee, Wisconsin 53202
                      Appeared on behalf of the Defendant.
17

18

19

20

21

22

23

24

25

1                    E X A M I N A T I O N

2

   BY MR. SCULLEN                                    4
3  BY MS. NOVOTNAK                                   81
   BY MR. SCULLEN                                    87
4  BY MS. NOVOTNAK                                   92
   BY MR. SCULLEN                                    92

5

6                      E X H I B I T S

7  EXHIBIT NO.                              PAGE IDENTIFIED

8  No. 8    Code of Federal Regulation 785.19 . . . .6
   No. 9    Aurora Lakeland Medical Center Loss   . .6
9           Prevention Services Orientation/Training
   No. 10   Patrick Lowery's activity log . . . . . 24
10 No. 11   7/12/10 Email from Ellen Bruenning to   66
            Patrick Lowery
11 No. 12   Declaration of Pat Lowery . . . . . . . 74

12

13              (Original exhibits attached to original
       transcript.  Copies of exhibits attached to
       copies of transcripts.)

14

15

16     P R E V I O U S L Y   M A R K E D   E X H I B I T S

17 EXHIBIT NO.                              PAGE IDENTIFIED

   Jerry A. Brabazon
18

   No. 2  Employee Handbook  . . . . . . . . . . . 45
19 No. 3  Work Week/Meal & Rest Periods  . . . . . 46
   No. 4  Nonexempt and Exempt Employee Policy . . 49
20 No. 5  Michael Cummings' newsletters  . . . . . 50

21              (Original previously marked exhibits
       attached to original corresponding transcript.
22     Copies of exhibits attached to copies of
       transcripts.)

23

24

25

```
 1                    TRANSCRIPT OF PROCEEDINGS
 2                    PATRICK R. LOWERY, called as a witness
 3         herein, having been first duly sworn on oath, was
 4         examined and testified as follows:
 5                             EXAMINATION
 6   BY MR. SCULLEN:
 7   Q    Can you state and spell your name for the record,
 8        please?
 9   A    Patrick R. Lowery, L-O-W-E-R-Y.
10   Q    And Mr. Lowery, have you been deposed before?
11   A    I'm sorry?
12   Q    Have you been deposed before?  Have you been in a
13        deposition before?
14   A    Yes, I have.
15   Q    Okay.  How many?
16   A    Somewhere between ten and 20.
17   Q    All right.  And what were the nature of the
18        previous --
19   A    Different court cases.  I'm a retired police
20        officer.
21   Q    And were those all in your capacity as a retired
22        police officer?
23   A    As a police officer --
24   Q    Or as --
25   A    -- when I was a police officer, yes.
```

1   Q   When was the last time you were deposed?

2   A   Oh, geez.  Ten, 15 years ago.

3   Q   Okay.  Well, as you may recall from -- although

4       it's been some time, I'm going to ask you some

5       questions.  I'll expect that you understand my

6       question if you answer.  If for some reason you

7       don't understand the question that I'm asking you,

8       please tell me, and I will try to rephrase it in a

9       way that's more understandable.

10                  Obviously your answers are under

11      oath.  You're giving sworn deposition testimony.

12      Please try to be sure that you give verbal

13      responses.

14  A   Okay.

15  Q   I'm sure I will try to point that out if you

16      don't, and I'm sure the court reporter will as

17      well.  Sometimes we fall into the habit of saying

18      mm-hmm, or mm-mmm or nodding our head.  Obviously

19      the court reporter has a difficult time recording

20      that.

21                  Obviously if you need a break at

22      any time, let me know.  We'll take, I assume,

23      several breaks throughout your deposition, but no

24      reason for you to feel uncomfortable.  I would

25      only ask that you not take a break while a

1       question is being posed.  So I'll just ask that

2       you finish an answer to any question before we

3       take a break.

4                  Is there any reason such as

5       medications or drugs that you may be taking that

6       you would be impaired from being able to

7       understand and answer my questions today?

8  A   No.

9  Q   Okay.  Did you review any documents in preparation

10      for your deposition today?

11  A   I looked at the papers I had, yes.

12  Q   Okay.  And what papers were those?

13  A   One was a federal government paper.  I'll show it

14      to you.  This spells out lunch breaks.

15  Q   Okay.  We'll make a copy of that and mark it as an

16      exhibit.

17  A   And also my Aurora Lakeland Medical Center Loss

18      Prevention Services Orientation and Training

19      pamphlet that was given to me when I was hired,

20      which was November of '09.  And there is a lunch

21      paragraph in there that's been highlighted.

22  Q   Okay.  Anything else that you reviewed?

23  A   I don't believe so.

24  Q   Are you comfortable if we mark these as exhibits,

25      and then I'll make you copies of these?  Or do --

1    A    That'd be fine.

2              MS. NOVOTNAK:  Let me interject.  I

3         believe that --

4              THE WITNESS:  Is there another one?

5              MS. NOVOTNAK:  -- you produced this to

6         David Zoeller, and he produced it, I believe, to

7         the --

8              THE WITNESS:  Okay.  Yeah, there is

9         another copy of an email that was sent to me from

10        my sergeant, reference a lunch break that I

11        punched "no lunch," that I had already given to

12        the attorneys.

13             MR. SCULLEN:  Okay.  Let's go off the

14        record for a second.

15             (A discussion was held off the record.)

16             (Exhibit Nos. 8 and 9 were marked for

17        identification.)

18   BY MR. SCULLEN:

19   Q    Any other documents that you reviewed --

20   A    No.

21   Q    -- in preparation for your deposition?  And I

22        would ask you just try to wait until I'm

23        finished --

24   A    Okay.  I'm sorry.

25   Q    -- asking the question.

```
 1   A   Yeah, she can't double --
 2   Q   That's right.  You know what I'm going to ask, but
 3       it'll be easier for both of us if you let me
 4       finish --
 5   A   Okay.
 6   Q   -- before you answer.  Did you communicate with
 7       anyone other than your attorneys in preparation
 8       for your deposition today?
 9   A   No.
10   Q   Did you make any notes in preparation for your
11       deposition?
12   A   Just what I've given you is what I've looked at.
13   Q   Okay.  Other than your attorneys, have you
14       communicated with anyone else about this lawsuit?
15   A   Just fellow workers.
16   Q   And who would those be?
17   A   Lisa Schultz, Jerry, who originated this --
18       Brabazon.  The general thing was, when is your
19       deposition?  Mine is on such and such a date.
20       Nothing really to do with the lunch breaks.
21   Q   Those were your sole communications with Lisa and
22       Jerry about this lawsuit?
23   A   Yes.
24   Q   Anyone else?
25   A   Mike Emmerich.
```

| | | |
|---|---|---|
| 1 | Q | That's another co-worker? |
| 2 | A | Yes. |
| 3 | Q | And what was the nature of your communications |
| 4 | | with -- |
| 5 | A | The same. |
| 6 | Q | Anyone else? |
| 7 | A | No. |
| 8 | Q | I just have some background questions.  Could you |
| 9 | | give your date of birth? |
| 10 | A | April 7th, 1951.  I will turn 60 this next April. |
| 11 | Q | Your present address? |
| 12 | A | 39069 North Browe School Road, B-R-O-W-E, Old Mill |
| 13 | | Creek, Illinois, 60083. |
| 14 | Q | If you would, provide your education beginning |
| 15 | | with high school through the present? |
| 16 | A | High school, Zion-Benton Township High School. |
| 17 | | Year and a half of college.  That was a junior |
| 18 | | college. |
| 19 | Q | Did you get a degree? |
| 20 | A | I did not.  Worked pretty much as a police officer |
| 21 | | for 18 years.  Went to Illinois State Police |
| 22 | | Academy for training and then continuing training |
| 23 | | throughout the years of different classes. |
| 24 | Q | Okay.  So no formal education other than the -- |
| 25 | | beyond high school, other than the junior college? |

```
 1   A    Correct.

 2   Q    Okay.  You started to tell me your job history.

 3        If you would, after high school, what was your job

 4        history?

 5   A    After the year and a half of college --

 6   Q    Right.

 7   A    -- I played two years professional baseball for

 8        Philadelphia Phillies.  I went from there into

 9        security, actually to a hospital in Waukegan.

10   Q    What was the name of the hospital?

11   A    St. Therese.

12   Q    What year was that?

13   A    1974, '75.  1975, I then went into law enforcement

14        with Lake County Sheriff's Office.

15   Q    And you held that position for how long?

16   A    Five years.  1980, I went to Zion Police

17        Department, Zion, Illinois, for ten years.  After

18        that -- you want me to keep going?

19   Q    Yep.

20   A    Okay.  After that I became a mechanic at the Zion

21        Nuclear Power Plant.  Worked there for just under

22        nine years.

23   Q    And after that?

24   A    They closed the plant, everybody lost their jobs.

25        I went back into law enforcement, worked for Park
```

1       City, Illinois, for approximately three years, two

2       and a half years.

3   Q   And after that?

4   A   Moved out to Colorado for, I believe 15, 16

5       months.  Had a couple jobs, maintenance.  And I

6       moved back to this area, worked at Tempel Farms

7       Security for about five years.

8   Q   What is Tempel Farms?

9   A   Tempel Farms is where they raise the white

10      stallions, Lipizzan stallions.  I worked security

11      for them.  And after that I went to Aurora.

12  Q   And when were you hired by Aurora?

13  A   November 2nd, 2009.

14  Q   And you were hired into your current position at

15      that time?

16  A   Yes.

17  Q   In any of your prior employment did you have

18      unpaid breaks?

19  A   No.

20  Q   What location -- or what job were you hired into

21      at Aurora?

22  A   Second shift, security officer, three to 11:30.

23      Full-time status.

24  Q   Was that at a particular location?

25  A   Aurora Lakeland Medical Center in Elkhorn,

 1      Wisconsin.

 2   Q  Is that the position you hold today?

 3   A  Yes.

 4   Q  All right.  And you've held that position

 5      throughout?

 6   A  Correct.

 7   Q  Your shift hasn't changed?

 8   A  Well, I've worked all kinds of shifts since I've

 9      been there, but that's my normal shift.

10   Q  Okay.  And when you say you've "worked all kinds

11      of shifts," that means you may have picked up

12      additional shifts?

13   A  Yes.  Worked 22 hours on February 7th when we had

14      the two foot of snow.  A lot of 12-hour shifts due

15      to manpower.

16   Q  Okay.  But again, those would be overtime on your

17      normal shift which is the second -- you're

18      regularly scheduled to work five days, three to

19      11:30?

20   A  Yes.  Always off on Thursday and Friday, but not

21      necessarily, due to overtime.

22   Q  Who was your -- tell me all of the people to whom

23      you have reported since you were hired.

24   A  Who I report to?

25   Q  Right.

```
 1   A    Sergeant Ellen Bruenning.

 2   Q    And was she there when you were hired?

 3   A    Yes.  James Sagan.

 4   Q    And his position?

 5   A    He is the south director of the hospital security.

 6        He -- he's pretty much -- his office is at Kenosha

 7        Hospital.  I'm not sure exactly what his title is,

 8        but he is the head of all the sergeants, next step

 9        up.

10   Q    Okay.

11   A    Head of him is Clint Schaeffer.  He works out of

12        the new hospital -- I can't think of the name of

13        it now.

14   Q    Summit?

15   A    Summit, you're correct.  And then ahead of him is

16        Mike Cummings, who is the CEO of the security

17        department.

18   Q    All right.  Any other sergeants or supervisors to

19        whom you've reported during --

20   A    No.

21   Q    -- your employment?

22   A    No.

23   Q    Ms. Bruenning is no longer employed by Aurora,

24        correct?

25   A    Correct.
```

1  Q   Has she been replaced?

2  A   Not yet.

3  Q   So who are you reporting to currently?

4  A   Jim May, who is a sergeant at Burlington, is

5      pretty much overseeing both hospitals now, but I

6      have never had to report to him.

7  Q   You've never had direct interaction on a reporting

8      basis?

9  A   Correct.  Matter of fact, today he's working day

10     shift at Lakeland, and I will be meeting him this

11     afternoon when I go to work.

12 Q   How much interaction did you have, or do you have

13     with Jim Sagan, Clint Schaeffer or Mike Cummings?

14 A   Not much.  Only when needed.

15 Q   Can you give me an estimate of -- is it monthly

16     that you have some interaction with them?  Is it

17     less frequently than that?

18 A   Maybe once or twice a month.

19 Q   And that -- would that be with all three, or is it

20     more frequent with Jim Sagan than Mike Cummings

21     or --

22 A   Pretty much Jim Sagan and occasionally Clint will

23     stop in, maybe once a month.  Never Mike Cummings.

24     I met Mike Cummings one time when I was first

25     hired and haven't seen him since.

1  Q   Are there regular staff meetings?

2  A   Yes.

3  Q   And would Jim Sagan and/or Clint Schaeffer attend

4      those?

5  A   Yes.

6  Q   And how frequently did those occur?

7  A   Approximately every six months.

8  Q   And would both Jim Sagan and Clint Schaeffer

9      typically --

10  A   One or both, yes -- sorry for the interruption.

11  Q   One or both would typically attend?

12  A   Correct.

13  Q   You said that you've picked up additional shifts.

14      Have you ever worked at other facilities?

15  A   No.

16  Q   Are you currently employed other than at Aurora?

17  A   No.

18  Q   If you would, walk me through in terms of your

19      typical day as a security officer on your job at

20      Aurora, and tell me the types of tasks that you

21      are typically responsible for or perform in a

22      normal day.

23  A   From 3:30 to 5:30, I generally check all the

24      floors.  Sometimes take calls to exchange beepers,

25      we do that.

 1                    Monthly, the fire extinguishers

 2        have to be checked throughout the hospital.  I

 3        generally help with that and/or do it myself.

 4        It's generally given to one officer, but because

 5        of all the part-timers, the full-timers have to

 6        step up and help them do that monthly.

 7                    After 5:30, central supply is

 8        closed.  We do 95 percent of the central supply to

 9        the floors when needed, different items.  The

10        cafeteria is closed at 7 p.m.  After seven, if

11        there's any lunch boxes or any food items that

12        need to be brought up to the floor, we take care

13        of that.

14                    At eight o'clock the hospital is

15        locked down.  That usually takes approximately 25

16        minutes.  Make sure everything's secure, lights

17        are turned off.  General, check the floors, make

18        sure everything's fine.

19                    If we get calls to come to the

20        floors to help assist with a patient, we do that.

21        We go to the emergency room quite a bit, because

22        it is the county seat.  Right across the street is

23        Walworth County Sheriff's Office, so they bring

24        all their people in that they bring into the ER

25        from intoxication to psych problems.  We assist

1      the officers standing by with those.

2                         Escort the employees and/or

3      patients out to their vehicles.  Answer all

4      alarms.  We have several duress alarms, one at

5      each admitting table.  Fire alarms.  Different

6      types of alarms that, like, low oxygen.

7                         And then when we're in the office,

8      we monitor our TVs.  We've got several cameras

9      around the hospital that we monitor.  We gather

10     valuables from patients and put it in our safe if

11     they have valuables and/or clothing to lock up.

12     We also do lost and found.

13                        What else?  That's just about

14     everything.  We're the person to go to when nobody

15     else can do it.

16  Q  Let me ask you a couple of questions about that.

17  A  Sure.

18  Q  When there is someone who is -- you said -- you

19     referenced that there may be times when you're

20     called down to assist with someone who's

21     intoxicated or a psych patient.  On those

22     occasions is there typically a police officer

23     there with the individual?

24  A  50 percent of the time, no.

25  Q  What determines whether there's a police officer

1       or not?

2    A  Depends if they're under arrest or not.  Generally

3       they're -- if they're a jail clearance, they're

4       brought in to be checked out by the staff, and

5       once they're cleared then they're taken to jail.

6                      Protective custody, they're checked

7       out by the staff, but human services from next

8       door comes over and puts them in a psych ward or

9       alcohol ward or one of the wards throughout

10      Wisconsin.

11                     Generally, the police officer

12      leaves, and we're pretty much stuck there with

13      them by ourselves until they're transported to

14      their facility.  Unless we see that they are

15      violent when they come in, and then we ask the

16      officer to stay.

17   Q  Okay.  And in those situations where you have a

18      nonviolent person who you're waiting for

19      transport, do you have to wait with them the

20      entire time, or are there times that if they're

21      secure, you will go perform other tasks?

22   A  Depends on how they're acting.  You know, if I

23      have to go lock up real fast, I will let a couple

24      people know that I'm leaving and going to lock up

25      the hospital and I'll be right back.  If they need

1    me, they've got my phone number, they can call me

2    direct -- security phone.

3  Q  You record your time -- or strike that.  How do

4    you record your time when you clock in and out?

5  A  It's called "Kronos."

6  Q  Okay.

7  A  The Kronos clock.  You take your card and swipe

8    it.

9  Q  An ID-type card?

10  A  Yes.

11  Q  And that records your times in and out?

12  A  Correct.

13  Q  Are you issued a radio, pager or cell phone at the

14    beginning of your shift?

15  A  All of the above.

16  Q  Okay.  You always carry all three?

17  A  Yes.

18  Q  Is there -- do you check out the devices?  Is

19    there a record, a log that you check them out, or

20    do you simply pick them up?

21  A  There's only one officer at this location.  When

22    we go in we have a turnover to let us know what's

23    going on throughout the hospital if we need to

24    know something important.  And we take the pager,

25    the phone and the radio.  If the radio's been used

1       for eight hours, we switch it out with the other

2       radio which is in the charger which is in our

3       office.

4   Q   Is there more than one pager or --

5   A   There is just one pager.

6   Q   How does that get charged?

7   A   It's battery operated.  If it gets low it'll let

8       us know.  We change the battery.

9   Q   What about the cell phone?

10  A   The cell phone has its charger.  We generally have

11      the charger next to our desk in the office, and we

12      charge it when we see it's low.

13  Q   Okay.  I take it the cell phone doesn't get much

14      use?

15  A   No.  I might use it once or twice a day -- per

16      shift, I should say.

17  Q   On what occasions do you typically use the cell

18      phone?

19  A   Incoming calls, generally.  The coroner calls us.

20      All the funeral homes call us.  Because we are the

21      county seat.  We have the morgue there, and we do

22      morgue escorts.  They let us know when they're

23      coming in with one, and we make sure the paperwork

24      is done properly, and the book is filled out,

25      which is up in the emergency room.  And then we

```
 1          escort them out, also, in and out.
 2    Q     What other times would you get calls?
 3    A     For cases up on the floors that the nurses and --
 4          or the secretaries at the desks on the second,
 5          third and fourth floor have that cell phone
 6          number, with the secretary in the emergency room.
 7          That's the quickest way to get a hold of us.
 8    Q     Quicker than a page?
 9    A     Sure.  It takes a minute or two to get a page to
10          go through.
11    Q     So do people call more frequently on the cell than
12          they would page you?
13    A     No.  Get more pages.  Generally, the pages are,
14          "Get items from CS and bring it up to us," or
15          "Bring us a lunch box for room such and such."
16    Q     How many calls per shift would you get from the
17          coroner or the morgue?  Is that fairly frequent?
18    A     It depends on the day.
19    Q     Is that something that happens every shift?
20    A     I would say more so on evening shifts than a day
21          shift, probably.
22    Q     But almost every shift you're getting a call from
23          the coroner?
24    A     My shift, I -- not -- I wouldn't say every day.  I
25          would say three to five times a week.
```

1  Q   Once per shift?

2  A   Yeah.  I never know how many, you know, people are

3      going to pass, either up on the floors and/or out

4      on the street.  I can't really tell you that, you

5      know?

6  Q   Does anyone assign you the tasks that you're to

7      perform on a daily basis?

8  A   No.

9  Q   Okay.  Is there anyone who has the authority to

10     give you specific activities or tasks in a

11     particular shift?

12 A   The nursing supervisor.  Depends on what it is.

13 Q   As I understand it from talking to Mr. Brabazon

14     yesterday, as a security officer, you largely have

15     wide discretion to determine what work you're

16     going to do and prioritize tasks subject to

17     prioritizing based on the needs of the urgency of

18     calls you may receive.  Is that accurate?

19 A   That's accurate.

20 Q   But aside from urgent calls, you're largely able

21     to dictate what activities you're going to be

22     performing during a given shift and in what order,

23     is that fair?

24 A   Yeah.

25 Q   Do you document or record the activities that you

1       perform?

2    A   Yes.

3    Q   And how do you do that?

4    A   There is a computer program that we go into, and

5        also on a piece of paper.

6    Q   What's the computer program?  ActTrack?

7    A   Yes, that's correct.  That's correct.

8                MS. NOVOTNAK:  I'm sorry, what is it?

9    BY MR. SCULLEN:

10   Q   ActTrack.

11   A   ActTrack, it's called, which tracks our

12       performance of whatever we do during the evening,

13       what times, and how long it takes.  And then the

14       paper's pretty much the same thing.

15   Q   That was going to be my next question.

16   A   The log.

17   Q   Okay.  The paper is called the activity log?

18   A   Yes.

19   Q   And so my next question was going to be what's the

20       difference between what you record in ActTrack

21       versus the activity log --

22   A   Pretty much nothing.

23   Q   -- or is there any?

24   A   No difference.

25   Q   So, for you --

1    A    You might be a little more elaborate on the

2         description of what you did, you know, in the

3         computer.

4    Q    Okay.

5              (Exhibit No. 10 was marked for

6         identification.)

7    BY MR. SCULLEN:

8    Q    I'm showing you what's been marked as Exhibit 10.

9         And Exhibit 10, would you agree, is a sample of

10        activity logs that you have completed -- or at

11        least on which you have made entries?

12   A    Yes.

13   Q    Why don't we walk through -- if you would, take me

14        through each of the days and explain to me what

15        the entries mean.

16   A    Okay.  Saturday 1/9 of '10.  Looks like 1500 hours

17        I started work.

18              1720 -- between 1500 and 1720

19        hours, I was doing office and doing rounds through

20        the hospital.

21              At 1720, I got a call to -- let's

22        see here.  Two beds.  Okay, yeah, to get two beds

23        for the emergency room.  So I went to the GI

24        clinic and took two of their beds, which was

25        closed at that time, and escorted the beds down to

1      the emergency room.

2                     At 20 -- eight o'clock, 2000 to

3      2020, I was on the main floor doing a lockdown on

4      the hospital, which is the time we lock the

5      hospital up for the evening, with the exception of

6      the emergency room.

7                     At 2020 to 2030, room 255 needed an

8      isolation cabinet.  I delivered that.

9                     At 2040 to 2050, room 274 needed a

10     lunch box, so I went to the cafeteria and signed

11     one of those out and took it to him.

12                    And then at -- let's see.  Yeah,

13     2050 to 2330, I did rounds and/or office.  And

14     that's it for that day.

15  Q  Okay.  Let me ask you a question about that.  What

16     did you do from 1730 to 2000?  If I'm saying that

17     military time correct.

18  A  Probably just rounds and office.

19  Q  Okay.

20  A  Yeah, if there's nothing written down for the

21     hours, then that's what was occurring at that

22     time, was rounds, office, and -- instead of

23     transporting something somewhere.

24  Q  Okay.  And so, for instance, that's a

25     two-and-a-half-hour period, right?

1   A   Correct.

2   Q   Okay.  And I assume that given that it's not

3       recorded here that that means you didn't receive

4       any calls during that period?

5   A   That is correct.

6   Q   Okay.  And the same would be true on other

7       instances where if we go to the end of this

8       activity log, the -- at least two-hour period --

9       my math just isn't -- with military time isn't

10      that great, but it looks to me to be two hours,

11      around there?

12  A   From 2050 to 2330?

13  Q   Yeah, right.

14  A   Correct.

15  Q   That similarly you didn't receive any calls during

16      that period?

17  A   Correct.

18  Q   And my understanding from your testimony is this

19      is the information, so, for instance, if we go to

20      the entry at 1720 to 1730, you would have entered

21      that activity in the ActTrack?

22  A   Yes.

23  Q   Okay.  Now, do you enter rounds in the ActTrack?

24  A   No.

25  Q   Okay.  So it's only when you're getting calls?

1   A   Correct.

2   Q   Okay.  All right.  So let's go to the next day.

3   A   March 24th, 2010.  1500 to 1710, I did rounds and

4       were in the office.

5                     1710 to 1720, a transport, which

6       was audiovisual.  I put it away.  Probably put it

7       out during day shift, and then I go and take it,

8       and we're responsible for the audiovisual

9       equipment, and we have a lock-up in the basement

10      that we put it in.

11                    1735 to 1800, there was a fire

12      watch that we had to do.

13  Q   What does that mean?

14  A   Check the floor that was under construction at the

15      time, and write it down as fire watch.

16  Q   Meaning literally --

17  A   We had a lot of --

18  Q   -- just checking to make sure it's --

19  A   -- we had a lot of construction going on, so --

20  Q   All right.  Well, and excuse me.  I mean, you're

21      literally just checking to make sure it's not on

22      fire, or what?

23  A   Yes, pretty much.

24  Q   Okay.

25  A   Which it was a requirement by the state --

1    Q    Okay.

2    A    -- that we had to log it, so -- let's see.

3                        2010 to 2030, I did the lockdown,

4         main floor.

5                        2100 to 2110, I did an escort to

6         sleep lab.  Somebody came into the hospital

7         apparently through the emergency room, from what I

8         see, because they come in after lockdown hours.

9         They had to come in through the emergency room.  I

10        escorted them up to the sleep lab, which is all

11        the way at the other end of the hospital.

12                        2200 to 2225, another fire watch

13        through the construction zones.

14                        2225 to 2330, I was on rounds and

15        in the office.

16   Q    Okay.  And consistent with your testimony from the

17        day before, if I read this correctly, the omission

18        of an entry from 1800 to 2010, means that during

19        that period you were doing something --

20   A    Doing rounds --

21   Q    -- either doing rounds or --

22   A    -- or in the office.

23   Q    With no calls?

24   A    Correct.

25   Q    Okay.  The next day.

```
 1   A    June 9th, 2010.  1500 to 1600, there was Flight
 2        For Life came in, I was called for that.  And they
 3        took a person from ER8, which is room 8 in the
 4        emergency room, to Rockford.  So I was tied up on
 5        the Flight For Life for one hour.
 6                        1600 to 1610, room 457, SANE room,
 7        which is a sexual assault.  I had to open it for
 8        Jenny, which is a SANE nurse.
 9                        1610 to 1620, I -- that is our
10        evidence room.  I had to either take or open it
11        for somebody.  It's blacked out.  I can't read
12        what's there.
13   Q    And just -- it's redacted for patient names,
14        just --
15   A    Okay.
16   Q    And let me ask, because you've testified to some
17        of these activities.  Let me ask you specifically
18        about some of them.  What is SCD?
19   A    Sequential socks.  They're --
20   Q    Compression hose type --
21   A    Well, T.E.D. hose are the regular stockings that
22        people put on their legs from their knees down.
23   Q    Okay.
24   A    The SCD is a air-operated motorized electric pump
25        that these socks or boots go over these people's
```

1      legs, lower legs, and the air pressure pressurizes

2      them to help shrink the legs or whatever.  That's

3      what the SCDs are.

4    Q    And what's a "Code 4 standby"?

5    A    Code 4 is in the emergency room you have somebody

6         that has heart problems and/or stops breathing,

7         and that's a Code 4.  We go to all the standbys

8         and all the codes just to help with human traffic

9         problems, if we have any with family or anything

10        else.

11   Q    Okay.  And on the next page there's references

12        to -- one entry for ten JELL-Os?

13   A    That would be a request from one of the floors to

14        go up to the cafeteria and -- oh, that's OB.

15        Okay.  Yeah, that would be to go get some JELL-O

16        for the mothers that are up on the OB floor.

17   Q    Okay.  And lunch box?

18   A    Lunch box is the same.  They put together lunch

19        boxes, and we have to grab one of the sandwiches

20        out of the cooler and put it in this lunch box to

21        take up to the floor to give to a person.

22   Q    Okay.  Let me ask about -- what is lockdown?

23   A    That's when I lock down the hospital at

24        eight o'clock at night with the exception of the

25        emergency room.

1  Q   All right.  And that happens every night at

2       eight o'clock?

3  A   Between -- yeah, between eight and 8:30.  I try to

4       get it at that time.  If I'm tied up on something

5       else it might be a little later.

6  Q   Okay.  So you have the discretion to decide -- how

7       -- what's the latest that you can perform the

8       lockdown?

9  A   I've been tied up till -- on some nights, I've

10      been tied up till ten, 10:30 at night before I

11      could lock it down.

12  Q  How long does the lockdown process take?

13  A  About 25 minutes, 20 to 25 minutes, if I go

14      through the complete scenario.  Check all the

15      doors, make sure they're locked; lights, turn them

16      off; lock all the outer doors leading into the

17      hospital.  I go next door, check the annex

18      building, turn off all the lights they leave on

19      after a day's work.  Make sure it's locked and

20      secured.  Check the boiler room house, make sure

21      everything's fine over there.  And there's an

22      outside garage also that we're supposed to check.

23  Q  Okay.  If we look at -- if you go to 2100, it

24      looks like you spent 25 minutes in the office, and

25      then you did the fire watch duty?

```
 1  A  Mm-hmm.
 2  Q  Again, I assume from your previous testimony that
 3     that wasn't a fire emergency.  You just decided,
 4     okay, at this point I've got this task to check
 5     off my list; I'm going to go now and do the fire
 6     watch?
 7  A  Right.
 8  Q  Okay.  And then what does the entry after that
 9     reflect?  Is that, again, back to the --
10  A  Rounds --
11  Q  -- rounds, office?
12  A  -- office, correct.
13  Q  And is the fire watch something that had to be
14     performed on this shift or not?
15  A  Yes.
16  Q  Okay.  And how long does -- did the fire watch
17     activity take?
18  A  Approximately 25 minutes to half hour.
19  Q  And it involves what?  Just --
20  A  Checking all the floors and all the outside
21     trailers and everything that were involved in the
22     construction of the hospital.
23  Q  Okay.  Well, let me -- so let me -- let's go back
24     to the lunch box entry.  You would get a call
25     saying you need to bring a lunch box, or that they
```

1        need lunch box supplies?

2    A   Depends on the call.  This one here, 2220 to 2230.

3    Q   Yeah.

4    A   They called -- they probably just paged me, that's

5        how they generally do that, because it's not an

6        emergency-type call.  On the pager, it would say

7        room 244 needs a lunch box, please.  I'd run

8        down -- walk down to the cafeteria, get a lunch

9        box, take it up to the secretary who would give it

10       to the nurse, and they'd give it to room 244.

11   Q   And were you the only one who would do something

12       like that, or if you were unavailable, would they

13       send somebody from their own department to do it?

14   A   They would get a hold of a nursing supervisor, who

15       might be able to go do it.

16   Q   Okay.

17   A   If I was tied up in emergency room or something, I

18       would call them up on the floor and tell them that

19       I was tied up, that they have to get the nursing

20       supervisor to get them one, or they would have to

21       wait until I was available.

22   Q   All right.  So let's look at the last day in the

23       example.  I think we can go to the last page.  The

24       first entry on the last page, I assume that means

25       rounds?

1  A   The 1630 to 1730?

2  Q   Correct.

3  A   Yes.

4  Q   And then in the comments you say "fire

5      extinguisher checks."

6  A   Okay.

7  Q   What does that reflect?

8  A   The normal monthly fire extinguishers that we're

9      checking.

10 Q   Okay.

11 A   While doing rounds I was checking the fire

12     extinguishers at that time.

13 Q   So that was something that you could prioritize to

14     do any time you were doing rounds during that

15     month?  I mean, that wasn't something that had to

16     be done on this shift, is that?

17 A   No, anytime within the month, yes.  They generally

18     like them done before the 15th of the month for

19     each month.

20 Q   Then the next rounds office entry you have "Fire

21     EX," which I assume means fire extinguisher.  Is

22     that just the same notation?

23 A   Yes.  Yeah, and the one before that where Bob

24     called, he's a maintenance mechanic, and he wanted

25     me to check the steam room, make sure everything

```
 1        was okay in there with the pressure gauges and
 2        stuff.  He called from home to check. So we're
 3        pretty much a jack of all trades.
 4   Q    And then down at 2110 to 2205, so it looks like
 5        there was -- by my math, 55 minutes then that
 6        during that period that you were performing
 7        rounds?
 8   A    Correct.
 9   Q    Okay.  And again, as with that entry and the one
10        before it that began at 2035, where you were
11        performing rounds for, I guess it was at 25
12        minutes?
13   A    Mm-hmm.
14   Q    Those were periods that once you got a call, then
15        you presumably got a call at 2100 hours --
16   A    Correct.
17   Q    -- is that right, for room 455, and then you
18        performed that activity?
19   A    Correct.
20   Q    You filled these out yourself, right?  This is
21        your handwriting?
22   A    Yes.
23   Q    Okay.  Did you record anywhere on -- I don't see
24        any on these logs, but did you record where you
25        took a meal break?
```

```
 1   A    No.
 2   Q    Okay.  Did you record on any of the logs or on
 3        ActTrack when you took meal breaks?
 4   A    I think I did a couple times, yes.
 5   Q    On the logs or on ActTrack or both?
 6   A    Act -- or on the logs.  I can't remember which
 7        ones.  Very seldom I do.
 8   Q    What?  Record when you take a meal break?
 9   A    Yes.  Generally, I eat when I can.
10   Q    Well, let me ask this.  Is this a fairly
11        representative sample of your typical day --
12        typical days for you?
13   A    Yeah.  On afternoon shift it's pretty much the
14        longer day than short ones, with a lot of other
15        stuff going on.  Instead of the shorter days here
16        like we have five or six lines --
17   Q    Well, by "here," just so -- you're referring to
18        the --
19   A    More calls.
20   Q    By "here," you were referring to -- you were
21        pointing to the entry for January 9th of 2010?
22   A    Yes.  It's generally more like June 9th, where you
23        fill out pretty much a full page instead of just
24        four or five lines, on afternoon shift.
25   Q    Although the first two entries are afternoon shift
```

```
 1      also, correct?  And they're only four or five
 2      lines?
 3  A   Yes.
 4  Q   Okay.  Were you the only security guard on -- or
 5      officer on duty during the shifts that you worked?
 6  A   Yes.
 7  Q   How quickly are you expected to respond to
 8      activities when you get a call for assistance of
 9      some kind?
10  A   Immediately.
11  Q   You do, however, prioritize tasks, right?  There's
12      sometimes you will get a call and tell them you
13      won't be able to do it at that time?
14  A   Depends on the call.
15  Q   So how do you prioritize activities?
16  A   Lunch boxes, central supply, are put on the back
17      burner for we need help restraining a patient
18      and/or come to the ER, we have a combative coming
19      in, or something that's more urgent where they
20      need a little bit of manpower.
21  Q   Okay.  The combative patient or someone coming in,
22      would those be what you would consider emergency
23      situations?
24  A   Well, more urgent than getting a lunch box for a
25      patient, yes.
```

1    Q    Okay.  Are there any situations that you would

2         consider emergency situations, or is it just a

3         matter of a spectrum of urgent, very urgent versus

4         less urgent in your mind?

5    A    Yes.  You know, if a hospital floor calls and

6         says, "We need your help up here right away," that

7         would take priority over a lunch box.

8    Q    Okay.  So --

9    A    And I'd have to weigh it once I got up there to

10        see how urgent it was to where -- if I needed to

11        call for more help.

12   Q    Fair enough.  Maybe the best way to ask it is for

13        you to lay out, in terms of priority from your

14        perspective, the issues that you typically would

15        have to respond to that are of the highest

16        urgency, going down the list to, I think you've

17        described -- there may be less urgent activities

18        that you get called on but, you know, lunch boxes

19        or supply?

20   A    I don't understand your question.

21   Q    Okay.  I'm asking you to -- of the activities that

22        you typically perform, rank them in terms of

23        urgency.  How you prioritize them in terms of --

24        of -- since you said there aren't really -- you

25        don't categorize them, as I understand it, as

```
 1        emergency situations versus non-emergency.  Using,
 2        what I understand to be your framework of there
 3        are urgent situations and non-urgent situations,
 4        I'm asking you to explain to me how you in your
 5        mind prioritize which activities fall where on
 6        that spectrum?
 7                   MS. NOVOTNAK:  I'm going to object to
 8        vagueness.  Are you asking him for examples?
 9                   MR. SCULLEN:  Not -- well, yes to the
10        extent I'm asking him to categorize the activities
11        that he performs on the spectrum that he's
12        described where some are urgent and that he would
13        respond to immediately, and there are others that
14        are less urgent that he can prioritize and put
15        off.
16                   THE WITNESS:  Fire alarms, calls by the
17        floors to have me come up ASAP.
18   BY MR. SCULLEN:
19   Q    And do those fall into a particular category?
20   A    Generally, it's a unruly patient.  Sometimes I've
21        had to go up and -- to the OB floor to handle
22        mother/father situations, family disputes, you
23        know.  I don't want my in-laws to see the baby, so
24        on, so forth.
25                   Then I say fire alarms.  All the
```

1        alarms that the hospital could get from duress to

2        fire.  Calls to the emergency room are generally

3        high on the priority list, because of the volume

4        of people and the problems that the emergency room

5        has.  Yeah, I prioritize all those higher than

6        getting a lunch box for somebody.  But generally,

7        it's done as soon as possible.

8    Q   Do you receive, or have you received training or

9        instruction as to how you're supposed to

10       prioritize different activities?

11   A   Just the law enforcement that I've had and

12       background that -- I don't think anybody can teach

13       you on which one to take first.

14   Q   Okay.  So Aurora expects you -- your understanding

15       is Aurora expects you to use your judgment?

16   A   Correct.

17   Q   Have you ever received training, instruction or

18       direction from Aurora as to how quickly you're

19       supposed to respond to different types of calls?

20   A   No.  Just immediate, if not -- you know, it

21       depends on the calls.  We don't -- I don't think

22       I've ever had any training, per se, by Aurora to

23       tell me how fast to go to a call.

24   Q   Okay.  And that's my question.  Or -- and not only

25       training, but any direction from supervisors or

```
 1      others?

 2   A  No.

 3   Q  Okay.

 4   A  Not that I can remember.

 5   Q  Have you ever been disciplined for not responding

 6      quickly enough?

 7   A  No.

 8   Q  And I take it from your testimony that the speed

 9      of your response is dictated, again, by the

10      circumstances of the particular situation?

11   A  Correct.

12              MR. SCULLEN:  Why don't we take a break

13      here.

14              (A recess was taken from 10:02 a.m. to

15      10:14 a.m.)

16   BY MR. SCULLEN:

17   Q  Let me ask you about some of the communication

18      devices.  The radio, is that a two-way radio?

19   A  Yes.

20   Q  Okay.  So that means there's only one other person

21      on the other end of the handset?

22   A  Correct.

23   Q  Okay.  How many other handsets are there in the

24      facility?

25   A  That could be turned on and used?
```

1    Q    Right.

2    A    Several.  I'm not sure how many.

3    Q    Okay.

4    A    In case of an emergency, there's a lot of them.

5    Q    Okay.  You only get calls, though -- in other

6         words, it's like a -- it acts like the pager or

7         the cell phone in that when someone contacts --

8         when someone uses it, they are contacting you

9         directly?  It's not as though there's -- it's not

10        like a police radio where that's constant chatter?

11   A    Correct.

12   Q    Okay.  And I'm not sure if I asked you this, but

13        how frequently -- what are the percentages of time

14        that people will contact you using the different

15        devices?  Do they typically contact you by pager?

16   A    Typically, yes.

17   Q    Okay.

18   A    The phone, maybe once or twice a day, the radio,

19        maybe once a day.

20   Q    And is there a type of call that will generate use

21        of the radio, or is it random that someone would

22        choose to page you versus use the radio?

23   A    The other radio is stationed in the emergency room

24        secretary's office, admitting.  She's the one with

25        control of that.  And if, per se, after hours if

1      somebody comes in with a delivery of some sort for

2      the hospital, they usually call us to either

3      escort them and/or take the -- whatever's

4      delivered and take to the proper area.

5  Q   Okay.  I maybe misunderstood your prior testimony,

6      then.  I thought you said there were radios

7      throughout the facility, but then I thought you

8      just said that the nurse --

9  A   No, they are on standby.  The radios -- the extra

10     radios are on standby in case of an emergency to

11     where we can hand them out to other people, yes.

12     But there's only two radios on, per se, per day.

13     And that's in the emergency room and on our belt.

14 Q   That was my question.  Okay.  So if someone wants

15     to contact you other than in an emergency

16     situation, if there are standbys where you are

17     going to put other radios into use, the two-way

18     radio is between you and is it -- did you say it

19     was the nurse in admitting?

20 A   The admitting secretary.

21 Q   Admitting secretary.  And --

22 A   Actually, the emergency room secretary -- the

23     admitting emergency room secretary.

24 Q   And then others throughout the facility have the

25     cell and pager numbers?

1   A   Correct.

2   Q   How many different people typically contact you

3       during a shift?  So, obviously sometimes the

4       emergency room admitting secretary does?

5   A   Correct.

6   Q   Who else would contact you?

7   A   The secretaries in the emergency room, second

8       floor, third floor and fourth floor.  That would

9       be mostly the pages.

10  Q   Is that three different people?

11  A   Yes.  They're all different people.  That'd be

12      four different people.  Of course the emergency

13      room, there's the admitting secretary, the ER

14      secretary in the emergency room, the second floor,

15      the third floor, fourth floor secretary is on the

16      nurses' stations.

17  Q   All right.  Anyone else?

18  A   Yeah, anybody that works at the hospital can get a

19      hold of us through the pager.

20  Q   Those are the people that would typically contact

21      you?

22  A   Typically, those are the ones that would call us.

23  Q   Do you utilize email as part of your job?

24  A   Yes.

25  Q   Do you ever have email communications with those

```
 1       individuals?
 2   A   Generally, it's just information that goes on
 3       throughout the hospital.  I typically don't email
 4       somebody unless it's reference a lot of different
 5       things.  It's not like your typical personal
 6       email.
 7   Q   What's your understanding of Aurora's meal period
 8       policy as it applies to you as a security officer?
 9   A   They want us to take a half hour for lunch every
10       day.  And we're there for eight and a half hours,
11       or how many hours we're there, they still -- they
12       always deduct a half hour automatically, the
13       Kronos clock does.  Unless we punch "no lunch."
14   Q   And how -- how do you -- how would you cancel a
15       lunch?
16   A   There's a button on the Kronos clock that says "no
17       lunch."  You would punch that no lunch, and swipe
18       your card, and then wait for the beep, and then
19       swipe your card again to punch out.
20   Q   Okay.
21   A   After your hours are done.
22   Q   Showing you what's been marked as Exhibit 2.  Are
23       you familiar with the employee handbook?
24   A   Yes.
25   Q   And the employee handbook is online, is that
```

1       correct?

2    A  Yes.

3    Q  All right.  And you signed an acknowledgment when

4       you first started working that -- acknowledging

5       your receipt of access to the employee handbook,

6       is that correct?

7    A  I believe so, yes.

8    Q  Okay.  And have you seen this rest and meal period

9       policy that's contained in the handbook?

10   A  Yes.

11   Q  And it's consistent with your understanding of

12      Aurora's policy related to meal breaks?

13   A  Mm-hmm.

14   Q  You need to say yes.

15   A  Yes, I'm sorry.

16   Q  No problem.  Showing you what's been marked

17      Exhibit 3.

18              MS. NOVOTNAK:  Can I ask a question?

19              MR. SCULLEN:  Sure.

20              MS. NOVOTNAK:  Is what you had marked as

21      Exhibit 9, the same in -- relevant part to Exhibit

22      2?  And I ask this because I don't know what we've

23      got in the record.  You've --

24              MR. SCULLEN:  Well, I'm going to ask him

25      about Exhibit 9.

```
 1                  MS. NOVOTNAK:  Okay.

 2   BY MR. SCULLEN:

 3   Q    So I'm showing you what's been marked as, I

 4        believe, Exhibit 3?

 5   A    Correct.

 6   Q    All right.  And are you familiar with what's

 7        referred to as Aurora Health Care's Administrative

 8        Manual?

 9   A    I don't believe I've read through it.

10   Q    Okay.  Have you read through portions of it?

11   A    I probably have, yes.

12   Q    All right.  You're familiar that, like the

13        employee handbook, it's a set of policies

14        maintained online?

15   A    Yes.

16   Q    To which you have access as an employee?

17   A    Yes.

18   Q    All right.  And obviously in the past at least,

19        you've accessed portions of it?

20   A    Yes.

21   Q    Have you previously reviewed this workweek meal

22        and rest period portion of the administrative

23        policy?

24   A    Not lately I haven't.

25   Q    Okay.  Does that mean it's possible you reviewed
```

1       it sometime earlier?

2    A  Months.  Months back, maybe, yes.

3    Q  Okay.

4    A  Okay.

5    Q  Have you had a chance to read through the meal

6       period portion of the policy?

7    A  Yes.

8    Q  And is that consistent with your understanding of

9       Aurora's meal period policy?

10   A  Somewhat.

11   Q  How is it different?

12   A  Well, it says here that you get uninterrupted 30

13      minutes, which is all well and good.  When you're

14      supposed to take that, I'm not sure when, but

15      typically I have to take mine in spurts, because

16      I'm always getting beeped or called or something

17      to interrupt my lunch.  And I have to sit at my

18      desk to do that.  I can't be totally relieved of

19      my duty to do that, so I don't know.

20   Q  Well, it says that if you don't get an

21      uninterrupted lunch, you can cancel your lunch,

22      correct?

23   A  You mean punch "no lunch"?

24   Q  Right.

25   A  Yeah, but then you hear it from everybody, so

1       that's why I don't.

2    Q  Okay.  But my question is you understand that

3       Aurora's policy is that if you don't get an

4       uninterrupted lunch, you can cancel your lunch,

5       correct?

6    A  Yes.

7    Q  And you've canceled your lunch in the past,

8       correct?

9    A  Twice since I've been there.

10   Q  Okay.  I ask you about Exhibit 4.  Again, this is

11      a portion of Aurora's Administrative Manual, which

12      contains a provision regarding meal periods on the

13      second page at Section 5?

14   A  Mm-hmm.

15   Q  Have you seen this policy before?

16   A  I don't remember it.

17   Q  Okay.  It's possible?

18   A  It's possible, yes.

19   Q  Okay.  I'd like you to review Section 5, and then

20      I have the same question for you, which is, is

21      this consistent with your understanding of

22      Aurora's meal period policy?

23              (A discussion was held off the record.)

24              THE WITNESS:  Okay.

25

1    BY MR. SCULLEN:

2    Q    You've reviewed Section 5?

3    A    Yes.

4    Q    All right.  And is that consistent with your

5         understanding of Aurora's policy?

6    A    Yes.

7    Q    Let me ask -- well, somebody's going to make some

8         copies of those, so I'll ask you about Exhibit 5.

9         Exhibit 5 consists of two newsletters.  The first

10        one is dated January/February of 2003.  The second

11        one is dated January to February of 2010.  First

12        of all, let me ask you generally, are you familiar

13        with these types of newsletters issued by

14        Mr. Cummings?

15   A    No.

16   Q    Okay.  You've never seen -- have you seen either

17        newsletter?

18   A    No.

19   Q    Have you ever heard of the newsletters?

20   A    I haven't, no.

21   Q    All right.  Do you review emails that you receive

22        regarding distributions from supervisors or

23        managers?

24   A    Yes.

25   Q    Okay.  If you had received this as an email, is it

1       the type of thing that you would have typically

2       reviewed or not?

3   A   Not.

4                   MS. NOVOTNAK:  Objection.  Calls for

5       speculation.  Go ahead.

6   BY MR. SCULLEN:

7   Q   So sometimes -- if you had something in your inbox

8       from Mike Cummings that said "loss prevention

9       news," you typically would not review that, is

10      that your testimony?

11  A   I believe the second part here I did see it,

12      because it has my name, and they reference me

13      joining the loss prevention team.  And I do

14      remember seeing that, and that was pretty much it.

15                  (Interruption.)

16                  (A discussion was held off the record.)

17  BY MR. SCULLEN:

18  Q   Okay.  So if I understand correctly, you did

19      receive the January and February newsletter from

20      2010?

21  A   I believe so, yes.

22  Q   Okay.  At the end of that, I'd like to direct your

23      attention to the provision titled "Reminder on no

24      lunch policy."

25  A   Mm-hmm.

1    Q    Do you recall --

2    A    Let me read it.

3    Q    Sure.

4    A    Well, this one comment in here about switchboard

5         hold all calls, routine calls, I have no idea of

6         any switchboard holding calls.  It's not the

7         switchboard that stops calls from your pager, your

8         radio or your telephone.  So I don't understand

9         that, but --

10   Q    But you could notify the nurses, correct?  You

11        could notify the secretaries who typically call

12        you?

13   A    Oh, I could sit there for a half hour and call

14        everybody and tell them I'm going to lunch break.

15   Q    Right.

16   A    But it would take probably about a half hour to

17        contact everybody that gives me calls.

18   Q    It would take a half hour to contact --

19   A    Probably.

20   Q    -- the four people?

21   A    Well, the nursing supervisor and anybody else

22        that's working in the hospital, I just might as

23        well go over the intercom and say, "Hey, I'm

24        taking my lunch break.  Leave me alone."

25   Q    Yeah, except that you testified --

1    A    That's not just the four people that call me.

2    Q    I understand that.  But you testified earlier that

3         typically those are the four people that call you.

4         I mean, that would cover the vast majority of the

5         calls you receive, correct?

6    A    Correct, correct.

7    Q    And realistically, it wouldn't take you a half

8         hour to contact those four people?

9    A    No.  Five minutes, maybe.

10   Q    My initial question was whether you had received

11        and reviewed this previously?

12   A    I did not.

13   Q    Okay.

14   A    I had received it, yes, but I did not look at that

15        paragraph before.

16   Q    I'd like you to look at -- review the first

17        newsletter and ask you -- obviously, you didn't

18        receive it at the time it was originally

19        distributed, because you weren't employed in 2003.

20        Have you seen this newsletter since?

21   A    Not since you showed it to me.

22   Q    Okay.  If you would turn to the second page,

23        there's a provision or portion titled "Interrupted

24        Lunch Question Raised."

25   A    Mm-hmm.

1    Q    I ask you to review that.

2    A    Okay.  (Witness complies.)  Okay.

3    Q    Is that consistent with your understanding

4         regarding Aurora's expectation?

5    A    Yes.

6              MR. SCULLEN:  Did she bring the

7         copies -- I'm sorry, can we go off the record for

8         a second?

9              (A discussion was held off the record.)

10   BY MR. SCULLEN:

11   Q    While we're waiting, let me ask you this.  Who is

12        Mary Lynn Winchel?

13   A    I'm not sure.  I believe she's a sergeant at

14        Kenosha.

15   Q    And that -- but that's not someone to whom you --

16        with whom you've had contact?

17   A    I've never met -- never met her.

18              (A discussion was held off the record.)

19   BY MR. SCULLEN:

20   Q    All right.  I'm showing you what's been marked

21        Exhibit 9.

22   A    So you're keeping the original?

23   Q    Well, I can give it back to you.  It doesn't --

24   A    Okay.  That's fine.

25   Q    What is Exhibit 9?

1  A    It is Aurora Lakeland Medical Center's Loss

2       Prevention Service Orientation and Training

3       pamphlet.

4  Q    All right.  And on page 4 there's a provision

5       regarding lunch?

6  A    Correct.

7  Q    And is this your understanding of the procedure

8       you were supposed to follow at Lakeland regarding

9       your lunch periods?

10  A    Yes.

11  Q    Okay.  You didn't follow this procedure, however,

12       correct?

13  A    Meaning?

14  Q    Well, for instance, it tells you that breaks as

15       well as missed breaks need to be documented in the

16       daily activity log.  You didn't do that, correct?

17  A    Correct.

18  Q    I asked you a number -- I asked you to review a

19       number of Aurora's written policies.  Did you

20       receive information from anyone at Aurora

21       suggesting that the practice you should follow

22       should be different than what's set forth in the

23       policies?

24  A    No.

25  Q    Are you aware of any policies, other than those

1       we've just talked about?

2   A   No.

3   Q   Other than the policies we've talked about, did

4       you receive any training with regard to lunch

5       periods?

6   A   No.

7   Q   Okay.  Did you receive any training at all, other

8       than being given the policies themselves?

9   A   Three days training with an officer, two with a

10      sergeant, one with a regular officer.

11   Q   Who was the officer?

12   A   He was a part-time officer.  Oh, what was his

13      name?  He's been gone for several months.  I can't

14      think of his name right now.

15   Q   Someone who worked at Lakeland?

16   A   Yes.

17   Q   Which shift?  Do you know?

18   A   Afternoons.  I trained with him on afternoon

19      shift.  Pulling a blank.  Sorry.

20   Q   That's all right.  And you said two days of

21      training with a sergeant?

22   A   Mm-hmm.

23   Q   And who was that?

24   A   Sergeant Ellen Bruenning.

25   Q   And what, if anything, did Sergeant Bruenning tell

1     you regarding meal periods?

2  A  That they wanted us to have a half-hour meal, and

3     if we got called out of it more than twice, then

4     we could punch "no lunch." But if it was just a

5     mediocre thing, then tell them you're on your

6     lunch break and finish your lunch break, and then

7     go do what you had to do.

8  Q  Explain to me what you meant by if you got called

9     out twice?

10  A  Well, if you're in the office eating, which

11     generally happens, and you get paged to go do

12     something, you go to the central service or

13     wherever and do your thing, come back and start

14     eating again, and if you get paged again during

15     that half hour, then -- then you were able to

16     punch "no lunch."

17  Q  But it was your understanding, correct, that

18     the -- if you left -- let's say in that scenario

19     you were having your lunch, you get paid, you go

20     walk away for ten minutes, 15 minutes. You come

21     back, you restart your 30-minute period, correct?

22  A  Yes.

23  Q  And what you're saying is then if you got

24     interrupted again, then you could cancel your

25     lunch, was your understanding?

1  A  Correct.

2  Q  Well, let's talk a little bit about how you

3     typically took meal periods.  Did you tell anyone

4     when you were going on a meal period, or taking a

5     meal break?

6  A  No.

7  Q  Never?

8  A  I don't believe so, no.

9  Q  You previously testified, I believe, but correct

10    me if I'm wrong, that there were maybe an occasion

11    or two where you documented --

12 A  Mm-hmm.

13 Q  -- when you took or did not take a lunch period?

14 A  Correct.

15 Q  And that would have been either in the activity

16    log or the ActTrack?

17 A  Yes.

18 Q  Any other, other than the activity log or

19    ActTrack, did you otherwise document lunch breaks

20    you took or missed?

21 A  No.  The only time I actually logged in lunches is

22    if I -- I think on the day that I punched "no

23    lunch" is when I log them in, just to show that

24    when I was trying to take my lunch and I was

25    interrupted.

1    Q    Okay.

2    A    And I can't remember what days those were, so --

3    Q    Presumably those reflected in your activity logs?

4    A    Mm-hmm.

5              THE REPORTER:  Is that yes?

6              THE WITNESS:  Yes.

7    BY MR. SCULLEN:

8    Q    Where did you typically take your lunch break?

9    A    In our office.

10   Q    Was the cafeteria still open during second shift?

11   A    It's open till 7 p.m.

12   Q    And did you typically take your meal break after

13        7 p.m.?

14   A    A lot of times I do.

15   Q    Okay.  You were free to take your meal break in

16        the cafeteria if you wanted, correct?

17   A    Yeah.  But I didn't like doing that.  Now, I bring

18        my lunch.  I used to buy my lunch in the

19        cafeteria, but I got tired of buying a lunch and

20        not being able to eat it.  So now I bring my

21        lunch, and we have a small fridge and a microwave

22        in our office, and that's where I always eat.

23   Q    Okay.  But that's your choice?

24   A    Correct.  I didn't want my meal sitting out in the

25        cafeteria where somebody could mess with it, and

1    then I come back to get it again, you know,

2    it's --

3 Q  Did you ever take your meal period off premises?

4 A  Never.  I have never left the property unless I

5    was off duty at the end of my shift.

6 Q  Why not?

7 A  Because I felt that if I left the property, I'd be

8    paged or called for some reason and have to go

9    right back anyhow.

10 Q  Did you --

11 A  That's my personal feeling.

12 Q  Okay.  You understood that wasn't Aurora's policy

13    -- you understood under Aurora's policy you were

14    free to leave the premises?

15 A  I understand that we can punch out for a half

16    hour, leave the property, and go wherever we want

17    to, but they say we have to carry our radio and

18    our phone with us in case we have to come back for

19    an emergency call.

20 Q  Okay.  Did you typically bring your meal with you?

21 A  I always bring my meal with me after the first,

22    I'd say six months of working there.

23 Q  Okay.  Are you a smoker?

24 A  I am not.  Four years, November.

25 Q  Good for you.  During your meal periods or break

1       periods -- during your meal periods, in addition

2       to eating, what else would you do on break?  Would

3       you read the newspaper?

4   A   No.

5   Q   Did you ever bring other reading materials?

6   A   Generally don't have it.

7   Q   It's my --

8   A   Generally, I try and break up my lunches.  I'll

9       eat my vegetables first.  I'll heat those up.  It

10      takes five minutes to warm up, and I'll have

11      those.  So I might have a 15-minute break.  Then

12      I'll wait a little later to have my meal.

13  Q   And why do you do that?

14  A   I don't know.  Because I'm dieting, and that's the

15      way I'm supposed to do it.

16  Q   Is there -- on those times where you take your

17      lunch in the office, is there -- you mentioned

18      that there were TVs.  Are they closed-circuit TVs,

19      or is there --

20  A   Cameras, yes.

21  Q   Right, but is it all closed-circuit or --

22  A   Yes.

23  Q   Okay.  There's no outside feed?

24  A   No.

25  Q   All right.

 1  A    There is no TV in our room.

 2  Q    Other than eating, what -- was there anything else

 3       you did that you would typically do or that you

 4       ever do on your break periods?  Do you make

 5       personal phone calls?

 6  A    I might call my wife every once in a while.  Not

 7       very long.  I wouldn't say they last over three

 8       minutes.

 9  Q    Do you listen to the radio or music?

10  A    Occasionally, I do.

11  Q    There's some sort of radio or stereo in the --

12  A    There's a radio in there, picks up like three

13       channels.  Our office is located in the basement

14       of the hospital, so --

15  Q    I thought you were just going to say "Lakeland,"

16       and that would have been enough.

17  A    Yeah, right.  It's out in Lakeland, out in Never

18       Neverland.  Occasionally, I'll listen to --

19  Q    I assume one of those three is country music?

20  A    Right, right.

21            MS. NOVOTNAK:  At least one.

22            THE WITNESS:  Three out of three is

23       country, pretty much.  Occasionally I'll listen to

24       the Walworth County Sheriff's Office on a scanner,

25       to see what's going on there.

1   BY MR. SCULLEN:

2   Q   For -- I take it for personal reasons, being a

3       former police officer, might have --

4   A   Well, generally all their stuff comes to our

5       hospital.

6   Q   Anything else that you do on breaks?  Do you have

7       access to computers?

8   A   We have our computers in there, yes.

9   Q   Okay.  Do you ever --

10  A   I have gone on there to look for houses for sale.

11  Q   I assume you're finding plenty of those at the

12      moment?

13  A   Oh, yeah.  Not the right one, though.  We plan on

14      moving up to -- I live in Illinois, of course, you

15      know that.  We plan on moving up here because my

16      wife works in Waukesha.  So somewhere between

17      Elkhorn and Waukesha.

18  Q   Okay.  Have you looked at other things on the

19      internet?

20  A   No.

21  Q   Personal email?

22  A   No.

23  Q   Am I correct in understanding that the basis for

24      your claim as to the compensability of your lunch

25      periods is premised on the fact that you have to

 1      carry a device to which you may have to respond?

 2   A  Four devices, yes.

 3   Q  Okay.

 4   A  And there is nobody else there to do it.

 5   Q  There are -- you would agree that there are many

 6      times where you're able to take a 30-minute meal

 7      period where you're not interrupted, correct?

 8   A  Correct.

 9   Q  And many times when you have done so?

10   A  Correct.

11   Q  Are there times -- are you claiming that there are

12      times when you were interrupted and didn't restart

13      your lunch and get a 30-minute lunch period, where

14      you did not cancel your lunch?

15   A  Plenty of times, yes.

16   Q  Okay.  What dates in particular?

17   A  I can't remember.  Several.

18   Q  How many?

19   A  Well, it's just that I got bothered by the

20      sergeant so much about taking no lunches, even on

21      the ones that I did punch.  I think the first one

22      I punched I got an email back from her saying,

23      "Well, I saw that you didn't take a lunch last

24      night, and I noticed that you didn't have any

25      activity that you could have taken a lunch with no

```
 1        problem, so why didn't you?"

 2                    Well, that was the shift I worked

 3        7 p.m. to 7 a.m., 12-hour shift, and they

 4        generally pay us 11 and a half hours with a half

 5        hour deducted for lunch.  And I didn't take a

 6        lunch that night is because I ate dinner with my

 7        wife before I came to work at 7 p.m., and I ate

 8        breakfast at eight o'clock when I got home in the

 9        morning.  So am I supposed to sit there and

10        twiddle my thumbs for a half hour?

11   Q    Well, yes, right?

12   A    I guess.

13   Q    I mean, you understood that was --

14   A    But I punched "no lunch," because it was not my

15        normal lunch time.

16   Q    Okay.  Well, you didn't take a lunch?

17   A    Correct.

18   Q    But you understood that that was not Aurora's

19        expectation.  Aurora's expectation was that you

20        would take a half-hour lunch regardless of whether

21        you --

22   A    Correct.

23   Q    -- ate?

24   A    Correct.

25   Q    Okay.  Were you ultimately paid for that lunch?
```

1    A    I was.

2    Q    Okay.  And was that the occasion on July 11th?

3    A    I handed you the sheet.  I can't remember the

4         date.

5    Q    Here.  I'll -- why don't we mark it as an exhibit.

6    A    Right, 7/11, correct.  I think it's already

7         marked, isn't it?

8    Q    No.

9              MS. NOVOTNAK:  Let him give you the one

10        that he's going to have marked as an exhibit.

11             MR. SCULLEN:  Okay.  Let's go off the

12        record for a second.

13             (A discussion was held off the record.)

14             (Exhibit No. 11 was marked for

15        identification.)

16   BY MR. SCULLEN:

17   Q    Okay.  Showing you what's been marked as Exhibit

18        11.  And Exhibit 11 is the email you just

19        testified to?

20   A    Correct.

21   Q    All right.  And this is the day where you chose

22        not to take a lunch, correct?

23   A    Correct.

24   Q    And as a result -- and I assume Ms. Bruenning was

25        correct, that there were periods where you could

1      have taken a 30-minute uninterrupted lunch based

2      on your schedule that day?

3   A  Correct.

4   Q  Okay.  But nevertheless, you were granted the paid

5      lunch since you didn't take it?

6   A  Correct.

7   Q  Now, I believe you also testified that this was

8      the first time you canceled a lunch?

9   A  Yes.

10  Q  Okay.  And so my understanding from your prior

11     testimony was that there would not have been an

12     occasion, prior to this date at least, where you

13     were unable to take a 30-minute uninterrupted

14     lunch, because you would have canceled that.  Your

15     testimony was that you stopped canceling lunches

16     because Ms. Bruenning questioned it when you did,

17     is that correct?

18  A  Correct.

19  Q  Okay.  So then from the time you started in

20     November of 2009, through July of 2010, we can

21     assume that for that period there were no dates in

22     which you didn't have a 30-minute uninterrupted

23     lunch, correct?

24  A  No.  I had plenty of them uninterrupted, but I

25     just never punched "no lunch," because I was able

```
1           to come back and have my lunch and finish it.
2    Q      That's what I mean.  You were able to restart and
3           have a 30-minute period, even though it was
4           interrupted initially?
5    A      Yes.
6    Q      Okay.  So then -- and by that, I mean 30 minutes
7           continuous.  You could have taken 30 minute -- you
8           either did or could have taken 30 minutes
9           continuously when you returned?
10   A      Yeah, but probably didn't.
11   Q      But you don't know --
12   A      Just probably finished eating, and that was it.
13   Q      But you don't know?
14   A      No.  I didn't go by the clock.  I didn't -- never
15          punched out, so I don't know.
16   Q      Okay.  Well, I mean, the problem is -- and I'm
17          just trying to be -- I'm just trying to
18          understand, because what I want to be clear about
19          is, you know, I don't know either, and so I just
20          want to be sure that there's not some point at
21          which you're going to come back and say, for
22          instance, I know on these dates my lunch was
23          interrupted, and I didn't take 30 minutes.  My
24          understanding of your testimony as you sit here
25          today is many dates I had the ability and did take
```

1      a 30-minute uninterrupted lunch period, correct?

2  A  Mm-hmm, yes.

3  Q  And for those dates where I didn't, I can't tell

4      what dates those were?

5  A  Correct.

6  Q  Okay.  And that's true not only through July 10th

7      of 2010, but that's through today's date, correct?

8  A  Correct.

9  Q  And in some cases, on those dates where you didn't

10     take a full 30 minutes, it was because you chose

11     for your own convenience that you didn't want to

12     take the full 30 minutes, is that correct?

13  A  Well, I probably didn't have that much to eat, and

14     that's why I don't write my lunches down.  I take

15     them when I can, and come back to them if I have

16     to.

17  Q  Okay.  But again, that -- a little different than

18     my question.  My question was, there was nothing

19     precluding you from taking the full 30 minutes?

20     You decided that my lunch is done, so I'm going to

21     go back to work?

22  A  Well, I consider myself working all the time.

23  Q  Because you have to carry the pager and phone and

24     cell phone, correct?

25  A  Yeah, because I'm never totally relieved from duty

1      to take a lunch.

2  Q   Understood -- I understand that.  But putting that

3      aside, again, on many occasions you did take 30

4      minutes consecutively uninterrupted, and to the

5      extent that you didn't have 30 minutes

6      uninterrupted, you can't recall which, if any,

7      specific dates that occurred on --

8  A   Correct.

9  Q   -- correct?  And further, with regard to those

10     latter dates, in many cases it wasn't some

11     pressing need of work that precluded you from

12     taking the full 30 minutes?  You decided on your

13     own to resume work, correct?

14           MS. NOVOTNAK:  I'm going to object to

15     the characterization of the testimony.  You can go

16     ahead and answer.

17           THE WITNESS:  There's been several times

18     that I've stopped eating and answered the call to

19     where they need something up on a floor, and I

20     would go get it for them, yes, and then I'd come

21     back to lunch.

22  BY MR. SCULLEN:

23  Q   Okay.  I understand that.  And on those occasions,

24     you could have -- when you came back, to the

25     extent you didn't, you could have continued for

1   another 30 minutes uninterrupted from the time you
2   got back, correct?
3 A Yes.
4 Q All right.  And you understood that was Aurora's
5   expectation?
6 A Right, yes.
7 Q Okay.  And there's nothing that would allow you at
8   this point to go back and determine which, if any,
9   dates you didn't get 30 minutes uninterrupted, to
10  the extent there were such dates, correct?
11 A Correct.
12 Q Because, in fact, as I look, for instance, at your
13  activity logs, it appears to me that on every day
14  that I have seen, there are periods of at least,
15  you know, two hours, or at least a half hour, if
16  not more than two hours, where, for instance,
17  you're simply performing rounds where you're
18  uninterrupted, during which period you could have
19  taken a 30-minute uninterrupted break, correct?
20 A Correct.
21 Q Now, I believe you said that there was another --
22  well, strike that.  Let me ask it a different way.
23  Was there another occasion, other than
24  July 10th -- or July 12th of 2010, when you
25  canceled your lunch and had a discussion with

1       Ms. Bruenning about it?

2   A   No.  There was an occasion this last month that I

3       had to spend my eight-and-a-half-hour shift in the

4       emergency room standing by with three different

5       patients at the same time.  And I had no lunch, so

6       that's -- I punched "no lunch" that evening also.

7   Q   And did Ms. Bruenning question that?

8   A   No.  She wasn't there at the time.  Nobody

9       questioned it.

10  Q   And you didn't have to seek supervisory approval

11      before you canceled your lunch, correct?

12  A   No.  I wasn't going to call Jim Sagan at 11:30 at

13      night to ask him.

14  Q   Well, you understand that you don't have to

15      receive supervisory approval before canceling,

16      correct?

17  A   Correct.

18  Q   On the two occasions where you --

19  A   Because if they have a question about it, they

20      will contact me the next day.  I do know that.

21  Q   Right.  I mean, on both occasions where you've

22      canceled lunch, you've done it without

23      pre-approval from a supervisor, correct?

24  A   Correct.

25  Q   And on one occasion you were questioned, and it

1      was still approved, correct?

2  A   Correct.

3  Q   And the other occasion it wasn't questioned?

4  A   Correct.

5  Q   Other than the discussion with Ms. Bruenning in

6      July and at the time she trained you, have you had

7      any other discussions with her about meal breaks?

8  A   Only at the officer meetings that we've had.

9  Q   And what do you recall about those discussions?

10 A   The typical, that they want us to take our

11     half-hour breaks, and if we get interrupted, come

12     back and take your 30 minutes, you know, and

13     they're pretty set on that, but --

14 Q   Have -- has there been any discussion at those

15     meetings, or any other discussion otherwise, about

16     notifying people that you're going on break?

17 A   No.  I've only heard that like once that I can

18     remember.

19 Q   And where did you hear that?

20 A   At a meeting, at the officer meeting.

21 Q   Do you remember when that was?

22 A   No.  It was this last year, I know.

23 Q   And by that do you mean sometime in 2010?

24 A   Correct.

25 Q   Okay.  Would it have been early in 2010, given

1      that you're having trouble recalling it or --

2  A   I would have to look at the dates we had the

3      meetings.  I can't remember what dates we had

4      them.

5  Q   And when you refer to the officer meetings, would

6      these meetings occur monthly or semi-yearly?

7  A   Semi-yearly.

8              MR. SCULLEN:  Okay.  All right.  Why

9      don't we take a break.

10             (A recess was taken from 11:08 a.m. to

11     11:18 a.m.)

12 BY MR. SCULLEN:

13 Q   I just want to be sure I've -- that you've told me

14     all of the discussions you've had with anyone in

15     Aurora management about meal and break periods.  I

16     believe you testified when you were trained with

17     Ms. Bruenning, you had some discussion about meal

18     periods.  You testified about the discussion or

19     communication you had with Ms. Bruenning

20     concerning your canceled lunch on July 2010.  I

21     believe you testified with regard to discussions

22     at an officer meeting, the semi-annual officer

23     meeting.

24                 Anything else, either about those

25     discussions or communications that you haven't

1      told me, or any other discussions or

2      communications with Aurora management regarding

3      lunch or meal periods that you recall?

4  A   Not that I can recall, no.

5                    (Exhibit No. 12 was marked for

6      identification.)

7  BY MR. SCULLEN:

8  Q   Showing you what's been marked as Exhibit 12.  Do

9      you recognize that document?

10 A   Yes.

11 Q   And what is it?

12 A   A Declaration of Pat Lowery versus -- let's see,

13     Jerry Brabazon.  It's the suit that Jerry placed

14     against Aurora.

15 Q   Well, actually it's Jerry Brabazon versus Aurora

16     Health Care --

17 A   Okay --

18 Q   -- right?

19 A   -- correct.

20 Q   This is the lawsuit -- this is a declaration you

21     filed --

22 A   Correct.

23 Q   -- in this lawsuit?  Correct?

24 A   Correct.

25 Q   All right.  Did you draft this document?

1    A    I did not.

2    Q    Okay.  Did you review it before you signed it?

3    A    I did.

4    Q    Did you make any modifications?

5    A    I don't believe so.

6    Q    All right.  I'd like you to turn to the second

7         page.  Let's talk about beginning at paragraph 8.

8         That second sentence is not true, at least as --

9         may have been true at the time you signed this

10        document?  Just looking at the first two sentences

11        of paragraph 8.

12   A    Correct.

13   Q    That may have been true at the time you signed

14        this document, but it's not accurate now, correct?

15        You followed the procedure more than once?

16        Correct?

17   A    Correct.

18   Q    The next sentence, that's not accurate, is it?

19        Your supervisors haven't discouraged you from

20        taking a meal break, have they?

21   A    My sergeant did, yes.

22   Q    When was that?

23   A    Well, during discussions about it.

24   Q    Well, I thought you told me all the discussions

25        that you'd had with your sergeant, and what you

1    told me was the discussions that you had were in

2    training where she told you you were expected to

3    take a meal break and then --

4  A  Right.

5  Q  -- the discussion where she questioned you as to

6    why you took a meal break when you worked a

7    12-hour shift.  And it didn't appear that there

8    was any reason you couldn't, and it wasn't that

9    you couldn't, but you simply chose not to because

10   you had eaten before and after your meal period

11   started?

12 A  Right.

13 Q  And you'd said that those were the only

14   discussions you had had with her?

15 A  And that was about that discussion there.

16 Q  Okay.  Well, but that wasn't a discussion about

17   discouraging you from taking your meal break.

18 A  That was the next day after I got that email.

19 Q  Right.  But she wasn't discouraging you from

20   taking a meal break.  She was questioning you as

21   to why you didn't take one, given that there was

22   no reason you couldn't on that shift, correct?

23 A  Yeah.  She wanted to know why I didn't take one

24   during that 12-hour period because of my hours,

25   and discussed with me also about -- frowning upon

1      us not taking a lunch.

2  Q   Right.  That's the opposite of discouraging you

3      from taking a meal period, correct?

4  A   No.  They -- she pretty much said she wants us to

5      take the half-hour lunch no matter what, if we

6      have to come back to it or what.

7  Q   Exactly.  So this statement is not correct.  This

8      statement says my supervisors discouraged me

9      taking paid meal periods, and I've discussed the

10     matter with Sergeant Bruenning.  So you're saying

11     she encouraged you to take a meal period but that

12     it would be unpaid.  Is that the distinction?

13  A  Yes.

14  Q  Okay.  As we sit here today, the next sentence is

15     incorrect only because you've taken a second, at

16     least one other paid meal break, and weren't

17     questioned about it, correct?

18  A  Yes.

19  Q  And you weren't questioned if you ever take a paid

20     meal break, because on the other occasion where

21     you most -- more recently took a meal period, you

22     weren't questioned, is that correct?

23  A  That's correct.

24  Q  The basis for the statement in the next sentence

25     that you're on duty is again related to your

1    belief that simply carrying the pager, walkie

2    talkie and/or cell phone makes you on duty,

3    correct?

4  A  Correct.

5  Q  That is true as well if we move to paragraph 9?

6    Your statement that you not being free from work

7    is again related solely to the requirement that

8    you carry the pager, walkie talkie and/or cell

9    phone, correct?

10 A  Hang on just a second.  Let me read this.

11    Paragraph 9 is true.

12 Q  Well, it's true only to the extent that -- to the

13    extent you are saying that you're not provided 30

14    minutes free from work, the work to which you're

15    referring is the requirement that you carry the

16    pager, cell phone and walkie talkie, correct?

17 A  Yes.

18 Q  Because as you previously testified, many times

19    you get 30 minutes where you're uninterrupted and

20    don't have to respond, correct?

21 A  Yes.

22 Q  Okay.  With regard to number -- paragraph No. 10,

23    isn't it true that you frequently have meal

24    periods where you are not interrupted?

25 A  Yes.

1   Q   And on those -- during those meal periods where

2         you are interrupted, you're able to restart your

3         30-minute lunch period, correct?

4   A   Yes.

5   Q   And then lastly I'd like you to turn to the next

6         page, to paragraph 12.  You previous -- we

7         previously discussed your ability to leave the

8         premises, and I believe you previously testified

9         that you -- contrary to the suggestion in this

10        paragraph, you are able to leave the Aurora

11        facility, but you choose not to do so, correct?

12  A   Correct.

13  Q   Is there anything that we haven't discussed during

14        your deposition today that you believe supports

15        your claim related to the compensability of your

16        meal periods?

17  A   Yeah.  The state -- or the federal law governing

18        it.

19  Q   And what about the federal law?

20  A   It states that you should be fully relieved of

21        duty for your half-hour lunch if you're not paid.

22  Q   Anything else?

23  A   I believe it says something in there, too, about

24        sitting at your desk does not relieve you from

25        duty and having a meal.

1    Q    Yeah, but you're --

2    A    That is considered work.

3    Q    But you're not required to sit at your desk,

4         correct?  You previously testified as we discussed

5         you could take your meal period in the cafeteria?

6    A    Correct.

7    Q    Okay.  Anything else?

8    A    That's pretty much it.

9              MR. SCULLEN:  I don't have anything

10        further.

11             MS. NOVOTNAK:  I have a few

12        clarification questions.

13             MR. SCULLEN:  Sure.

14                      EXAMINATION

15   BY MS. NOVOTNAK:

16   Q    Mr. Lowery, I'm going to show you -- or I would

17        like you to find in that stack of exhibits in

18        front of you, Exhibit No. 10., which is the log,

19        the log of --

20   A    Okay.

21   Q    -- activities.  I want to clarify your testimony.

22        Can you identify in this document what record

23        would constitute the -- a more typical day for you

24        at work?

25   A    More typical day is -- would be June 9th, where

1      I'm pretty busy on afternoon shift.

2  Q    Okay.

3  A    Just for record, may I say something?

4  Q    Yes.  Go ahead, if you have --

5           MR. SCULLEN:  Well, I'm going to object

6      as nonresponsive.

7  BY MS. NOVOTNAK:

8  Q    Is it responsive to what I -- to my question?  Why

9      is this a more typical day?

10 A    More typical day, I always carry -- because I'm on

11     a weight loss program, I always carry a meter on

12     me showing me how many steps I take.  And I

13     average two to five miles a day in this hospital,

14     which is 110-bed hospital.  It's not really that

15     large, but that's what I typically walk.

16 Q    And are those miles that you log or record on your

17     pedometer, are those miles that you engage in on

18     duty?

19 A    Yes.

20 Q    All right.  You testified in response to a

21     question involving whether you believe that Aurora

22     expects you to use your judgment about responding

23     to pages or calls or the radio.  You testified

24     that -- I believe that you -- that, yes, you

25     understand that Aurora expects you to use your

1          judgment?

2    A     Yes.

3    Q     Is it your testimony that you have discretion as

4          to whether or not to respond to a page or a call

5          or a radio call?

6    A     I always respond one way or the other.  Either I

7          go on the call, or I call them up and tell them

8          I'm tied up, or I am having lunch, can it wait?

9    Q     Is it an option not to respond at all?

10   A     No.

11   Q     Why not?

12   A     All the calls have to be responded to in my book.

13         I'm sure Aurora agrees with that, also.

14   Q     Look please at Exhibit No. 5, which is --

15   A     That would be it.

16   Q     Yes, the loss prevention news.  I'm sorry, Exhibit

17         No. 4, which is the policy, Nonexempt and Exempt

18         Employee Policy.

19   A     Okay.

20   Q     Look at the second page, page 2 of 6, Section 5,

21         subparagraph B.  The first -- how do you

22         understand the first sentence of that paragraph?

23   A     Educational sections -- or sessions and department

24         meetings should not be combined --

25   Q     No, I'm sorry.  Look at section -- paragraph 5 --

```
 1        Section 5, paragraph B.

 2   A    B, okay.

 3   Q    How do you understand the first sentence of that

 4        paragraph?

 5   A    We're required to take 30-minute uninterrupted

 6        meals.

 7   Q    And what's the last clause of that sentence?

 8   A    Unless they receive approval from their

 9        supervisor.

10   Q    All right.  How do you understand that paragraph

11        -- that sentence?

12   A    That's impossible.

13   Q    Why?

14   A    Because we don't have a supervisor there.  Unless

15        we call him up at night every night.

16   Q    And have you ever done that?

17   A    I have not.

18   Q    You were asked a question about calling the people

19        in the hospital who most typically would try to

20        reach you during your lunch break, and telling

21        them that you were on lunch break.  Have you ever

22        done that?

23   A    I have not.

24   Q    Why not?

25   A    It's too much of a hassle.
```

1   Q   And why would it be a hassle?

2   A   I -- by the time I call them and get everything

3       cleared by them, something could happen, a fire

4       alarm or duress alarm, to where I'd have to

5       respond anyhow.

6                       And by that time, I figure I take

7       my -- I have been taking my chances and cooking my

8       meals and eating them, you know, hoping that I can

9       get my break in without -- without a call.  So I

10      don't bother them.  I know they're really busy,

11      and I'm kind of hoping they don't bother me.

12  Q   When -- when you've been called and have responded

13      that you were on lunch break, I believe it's your

14      testimony that that has happened?

15  A   Yes.  That --

16  Q   How --

17  A   On some occasion I have called them -- depends on

18      the call.  If they ask me to get something from

19      central supply or lunch box, I would call the

20      floor and ask, "I've just started eating my

21      dinner, would it be okay if I finish and then get

22      it?"  And they would say, "Sure."

23  Q   Okay.  How many times has that happened?

24  A   A dozen times, probably.

25  Q   Okay.

1   A   Since I've been there.

2   Q   Is that an option if the call or the page or the

3       radio transmission was of an urgent nature?

4   A   No.  If it was urgent, I would have to go.  I'd

5       have to respond to it.

6   Q   Have you ever on your lunch break taken a nap?

7   A   No.

8   Q   Have you ever gone out to your car and sat in your

9       car for half an hour?

10  A   No.

11  Q   Why not?

12  A   Because that's not part of my job.

13  Q   Okay.  And if you did that, would you be required

14      to carry your -- the devices that you --

15      communication devices that you have?

16  A   Yes.

17  Q   All right.

18  A   I have nobody to turn over my devices to.

19  Q   And if -- strike that.  Have there ever been

20      occasions where -- in which you began a lunch

21      break, were interrupted, came back, began again,

22      and were interrupted again within the half -- the

23      next half-hour period?

24  A   Yes, it's happened.

25  Q   All right.  Do you have any sense of how

1     frequently that has happened?

2  A  Since I've been there, I would say maybe three or

3     four times.

4  Q  Okay.  And on those three or four occasions, did

5     you clock out "no lunch"?

6  A  No.

7  Q  During a one-month period, do you have an estimate

8     of how frequently you're interrupted when you are

9     taking a meal break?

10 A  Once or twice a week.

11 Q  Do you have the discretion to choose whether you

12    carry the communication devices when you're on

13    meal break?

14 A  No.  We have to carry them while we're there

15    working.

16 Q  And have you been told that by any supervisor?

17 A  Yes.

18              MS. NOVOTNAK:  Okay.  I don't have any

19    other questions.

20                     EXAMINATION

21 BY MR. SCULLEN:

22 Q  You were asked questions about June 9th being a

23    typical day, and that's -- was Exhibit 10.  You

24    would agree, though, that even on June 9th, which

25    is a typical day, there were periods, for

```
1        instance, beginning at, you know, from 7:10

2        through eight o'clock where you had 30-minute

3        periods that were uninterrupted that you could

4        have or even may have taken your lunch period

5        during that time, correct?

6   A    Yes.

7   Q    I'd like you to refer to -- back to Exhibit 4.

8        You were asked questions about Section 5-B.  You

9        understand that as applied to you, you don't have

10       to get supervisory approval before you work

11       through your lunch, correct?

12  A    Correct.

13  Q    Okay.  This policy statement has never kept you

14       from working through your lunch, and it didn't

15       keep you from canceling your lunch most recently,

16       correct?

17  A    Correct.

18  Q    On an occasion where you didn't have prior

19       supervisory approval, correct?

20  A    Correct.

21  Q    You understand that this policy reflects Aurora's

22       general requirement, which you've previously

23       testified to that they do expect you to typically

24       take a 30-minute unpaid lunch absent supervisory

25       approval telling you you don't need to follow the
```

1      normal policy, that you take a 30-minute unpaid --

2      or 30-minute unpaid uninterrupted lunch, correct?

3  A   Yes.  I'm on the understanding, too, that most all

4      Aurora sites have at least two people on,

5      including a sergeant, to where they can ask

6      permission, you know, to take a 30-minute lunch or

7      whatever, no lunch --

8  Q   Okay.  So your --

9  A   -- versus Aurora, Kenosha -- well, Kenosha has two

10     people, and Burlington.  Burlington has one

11     officer on at a time.

12 Q   Okay.  So your understanding is that Burlington

13     and Lakeland are different than other facilities?

14 A   Correct.

15 Q   As it applies at least to the security officers?

16 A   Yes.

17 Q   Okay.  Even though --

18 A   I have no idea how the others run, because I've

19     never been there.

20 Q   Okay.  That was my next question.  But I do -- I

21     do want to clarify this, even with regard to your

22     -- I just want to be sure I understand your

23     testimony about your understanding of 5-B.  It

24     merely reflects Aurora's expectation, as you

25     previously testified you understood, that you are

```
 1        supposed to take a 30-minute uninterrupted meal
 2        period unless your supervisor, not necessarily has
 3        given you pre-approval, but has given you approval
 4        generally not to take a 30-minute unpaid meal
 5        period, correct?
 6   A    I understand that, yes.
 7   Q    During your meal periods, have you gone out to
 8        your car to retrieve things?
 9   A    I have a couple times.  Flashlight, bottle of
10        water.
11   Q    Now, you testified -- you were asked questions
12        about occasions when you said in -- through the
13        course of your employment there may have been
14        three or four times where you were interrupted
15        more than once?
16   A    Mm-hmm.
17   Q    And I believe you previously testified that you
18        were instructed in those occasions to cancel your
19        lunch by Ms. Bruenning, correct?
20   A    Yes.
21   Q    Okay.  And here you didn't do so.  Is that because
22        when you returned the second time, you then took
23        30 minutes continuous that was uninterrupted, or
24        don't you recall?
25   A    I don't recall.
```

1  Q   That may have been why you didn't --

2  A   I might have finished my lunch and that didn't

3      take a half hour.

4  Q   Or you might have taken the 30 minutes after the

5      second interruption -- after you returned from the

6      second interruption uninterrupted, correct?

7  A   Yeah, I just -- whatever.  If I get a 15,

8      20-minute lunch break, I'm happy.  I don't look at

9      the clock and say "Go," for 30 minutes.

10 Q   I understand.  But you don't know as you sit here

11     today?  Either is possible?

12 A   Right.

13 Q   You were asked about how frequently you were

14     interrupted, and I believe you already testified

15     to this, but let me clarify.  Do you -- you don't

16     take your meal period on -- at a set time every

17     day?

18 A   No.

19 Q   You fit it in in the flow of the day, based on the

20     activities you need to perform and the calls as

21     they come up, is that correct?

22 A   Correct.  By checking the flow of patients in and

23     out of the emergency room, that's one.  The

24     different calls I get previous to whenever I get

25     hungry.  I have no set lunch hour.

1   Q   And you didn't -- never record -- because you

2        never recorded when you took meal periods, we

3        don't know when you received calls during your

4        lunch periods, and I assume from your testimony

5        giving your estimates, it's possible that there

6        are weeks in which you were not interrupted during

7        your lunch period, correct?

8   A   Correct.

9               MR. SCULLEN: I don't have any further

10       questions.

11                   EXAMINATION

12   BY MS. NOVOTNAK:

13   Q   I have one more question about policy. I want to

14       make sure I understand your testimony that you

15       understand, as I understand your testimony, that

16       Aurora policy is that interrupted 30-minute lunch

17       periods that are paid must specifically be

18       authorized by a responsible manager supervisor,

19       but that that policy doesn't apply to you?

20   A   Well, I imagine it does apply to me, but there is

21       no supervisor immediately there to get a hold of

22       to ask if we can have it, you know, a lunch hour

23       nonpaid -- or paid, I mean.

24   Q   Did any supervisor or manager ever tell you this

25       policy doesn't apply to you?

1   A   No.  But that's the reason I had that email from

2       Ellen Bruenning showing that they do check our

3       records, they do check on us, and they see what

4       we're doing, and if we so-call take a lunch break,

5       they do get back with us.

6              MS. NOVOTNAK:  Okay.  I don't have any

7       other questions.

8                          EXAMINATION

9   BY MR. SCULLEN:

10  Q   Well, now I'm confused about your testimony in

11      that regard.  You're not saying that you

12      understand this policy to mean that you can't take

13      -- you can't work through your lunch period

14      without pre-approval, correct?

15  A   I'm on the understanding that I can work through

16      my lunch and then punch "no lunch" --

17  Q   Without pre-approval?

18  A   -- without pre-approval from a sergeant or higher,

19      yes.  That's what I understand.

20  Q   All right.  You understand -- just to clarify,

21      that you can work through your lunch and punch out

22      without pre-approval from any manager, correct?

23  A   Correct.

24  Q   And, in fact, you've done that?

25  A   Correct.

1          MR. SCULLEN:  I don't have anything

2     further.

3          MS. NOVOTNAK:  I don't either.

4          MR. SCULLEN:  Thank you.

5          (Deposition concluded at 11:49 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     STATE OF WISCONSIN )
                        ) SS:

2     MILWAUKEE COUNTY   )

3           I, Loretta Stoeckmann, RPR and Notary

4     Public in and for the State of Wisconsin, do

5     hereby certify that the preceding deposition was

6     recorded by me and reduced to writing under my

7     personal direction.

8           I further certify that said deposition

9     was taken at QUARLES & BRADY LLP, 411 East

10    Wisconsin Avenue, Milwaukee, Wisconsin, on the

11    22nd day of March, 2011, commencing at 9:06 a.m.

12          I further certify that I am not a

13    relative or employee or attorney or counsel of

14    any of the parties, or a relative or employee of

15    such attorney or counsel, or financially

16    interested, directly or indirectly, in this

17    action.

18          In witness whereof, I have hereunto set

19    my hand and affixed my seal of office on this

20    24th day of March, 2011.

21

22              _____

                LORETTA STOECKMANN, RPR

23                Notary Public

24   My commission expires August 18th, 2013.

25

Exhibit 5

Deposition Transcript of Kyle Stoxen

Rough Stoxen 3 31.txt

Rough Draft of Kyle Stoxen, 3/31/11                1

```
 1                (This is a Rough Draft Translation of
 2            the proceedings provided by the Court Reporter
 3            for the benefit of counsel and parties.  Please
 4            remember it is not a certified, final-form
 5            transcript.)
 6      Q    Can you state and spell your name for the record,
 7            please?
 8      A    Kyle Stoxen, K-Y-L-E, S-T-O-X-E-N.
 9      Q    Mr. Stoxen, have you been deposed before?
10      A    No.
11      Q    Okay.  Have you ever previously been party to a
12            lawsuit?
13      A    No.
14      Q    Well, let me just briefly explain the deposition
15            procedure.  I'm going to ask you questions.  Your
16            answers are being recorded by a court reporter.
17            They're under oath.
18                        I'll assume, unless you tell me
19            otherwise, that you understand a question that I
20            pose to you if you answer it.  If you don't, let
21            me know, and I'll try to rephrase it so that you
22            do.
23                        If at any time during your
24            deposition, which will probably last a couple of
25            hours, you need a break, we can take a break.
```

Rough Draft of Kyle Stoxen, 3/31/11                2

```
 1            Just let me know.  I would just ask that you not
 2            take a break when a question is pending.
```

Page 1

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 568 of 867   Document 49-1

```
3    A    Okay.

4    Q    So just answer a question, then we'll take a break

5         any time you need one of them.  I'm sure I'll need

6         to take a break or two during the deposition.

7                   Try to be sure to verbalize your

8         responses so that the court reporter can record

9         them.  We often have the tendency when we're

10        talking to say mm-hmm or mm-mmm or nod.  She needs

11        you to give a verbal yes or no, if you would, and

12        I'll try to remind you if you do that, as will

13        she, I'm sure.

14                  Is there any reason such as

15        medication or drugs or otherwise that you would --

16        you've taken, that you would be unable to

17        understand and answer my questions this morning?

18   A    No.

19   Q    Okay.  Any questions about the process before we

20        get started?

21   A    No, I don't believe so.

22   Q    All right.  Did you review any documents in

23        preparation for your deposition this morning?

24   A    Did I?  No.

25   Q    Okay.  Did you communicate with anyone other than
```

```
1         your attorneys in preparation for the deposition?

2    A    I've talked with people that I work with that have

3         gone through it.  Like, I've talked with

4         Lisa Schultz.  I talked with Pat Lowery a little

5         bit about it, but that's it.

6    Q    Okay.  And what was your discussion with

7         Lisa Schultz?
```

```
 8    A    Basically, she just told me how to get here.
 9    Q    Okay.
10    A    That was about as far as that conversation went.
11    Q    All right.  Anything about the substance of her
12         deposition?
13    A    She told me that she thought it went pretty good,
14         and that was -- that was it for that.
15    Q    Okay.
16    A    We never got into details about questions,
17         answers, or anything like that.
18    Q    All right.  And what about your communication with
19         Mr. Lowery?
20    A    He just told me that it took -- his took, like,
21         three hours or three and a half hours, and he told
22         me one way to get here.  I didn't -- I haven't
23         talked -- like, I see him usually quite a bit, but
24         our -- the amount of our talk is usually about,
25         like, what's going on at the hospital, like
```

Rough Draft of Kyle Stoxen, 3/31/11            4

```
 1         pass-on.
 2    Q    Okay.  Well, I assume with those multiple
 3         directions, you didn't have any problem getting
 4         here this morning?
 5    A    No, not too much, actually.
 6    Q    All right.  Any other communications with anyone
 7         else?
 8    A    No.
 9    Q    All right.  Please state your date of birth?
10    A    August 8th, 1987.
11    Q    And your current address?
```

Page 3

```
12   A   416 South Cogswell Drive.  It's lot 18 in Silver
13       Lake, Wisconsin.
14   Q   Beginning with high school, can you give me your
15       educational background?
16   A   I went to Catholic Central High School in
17       Burlington, Wisconsin.  From there I went to --
18   Q   And when did you graduate?
19   A   2006.  From there I went to Milwaukee Area
20       Technical College.  I went to the Oak Creek
21       campus.  And I studied -- Fire Protection
22       Technician was my degree.  I graduated from there
23       in 2009, I want to say.  From there I went to
24       Gateway Technical College, and I studied criminal
25       justice.  And I took a semester of criminal
```

```
1        justice.  I went through the police academy, and
2        then I went through another semester of criminal
3        justice.
4    Q   All right.  Did you receive a degree from MATC?
5    A   I did, in Fire Protection Technician.
6    Q   And was that in 2009?
7    A   Correct.
8    Q   All right.  And what about from Gateway?
9    A   I have not received my associate degree in
10       criminal justice.  I just received my
11       certification as a law enforcement officer.
12   Q   All right.  And did you complete the police
13       academy?
14   A   I did.
15   Q   And when was that?
16   A   Last May, will be a year that I graduated from it.
```

Page 4

```
17    Q    All right.  So May 2010?
18    A    I believe so, yeah.
19    Q    Any other formal education or training?
20    A    When I was in high school, I took -- I took
21         Firefighter 1, but that was it.  I mean, otherwise
22         I've had training, like, when I worked at the
23         Aurora Wellness center in Burlington, I had
24         training as a lifeguard and in CPR, but never
25         actual, like, school, school training, I guess,
```

```
 1         besides the colleges.
 2    Q    Similarly, if you would, beginning since high
 3         school, list your employment history, or go
 4         through your employment history.
 5    A    My junior year of high school I got hired at the
 6         Aurora Wellness Center as a lifeguard.
 7    Q    And that would have been in 2005?
 8    A    I would believe so.  Yeah, it was 2005.  It was
 9         January of 2005, because January of 2011, was six
10         years.  So I was a lifeguard.  My senior year of
11         high school I started with the -- a volunteer fire
12         department in Silver Lake as a volunteer
13         firefighter.
14                   After becoming -- after being a
15         lifeguard for a couple of years, I started working
16         at the front service desk as well, which was still
17         at the wellness center.  I just did both jobs
18         there.
19                   From there I got hired at Aurora
20         Lakeland Medical Center in Elkhorn as a third
```

Page 5

21      shift security guard on Fridays and Saturdays.

22   Q   When was that?

23   A   That would have been last -- September of 2009, I

24       believe.  So when I got hired at Lakeland Medical

25       Center, I left the wellness center, and I was

1       working at, just at Lakeland on -- for my two days

2       a week, which was -- which I picked up shifts.

3       But from there in May of 2010, I got hired on at

4       the Town of Salem Public Safety Department, where

5       I was a -- where I'm a part-time public safety

6       officer.

7                       And then in July of 2010, I got

8       hired at the Silver Lake Police Department, where

9       I am a part-time police officer.  In December of

10      2010, I was officially moved into the full-time

11      third shift security officer slot at Lakeland, and

12      that's where we are now.

13   Q   Since moving to full-time on third shift at

14      Lakeland, have you maintained other employment?

15   A   I have.

16   Q   As both a part-time police officer and a safe --

17      public safety, or no?

18   A   Yes.

19   Q   In either your employment as a public safety

20      officer or as part-time -- or as a police officer

21      for Silver Lake, do you receive unpaid meal

22      periods?

23   A   We just work a straight eight hours, and we get

24      paid for the eight hours.

25   Q   All right.  So let's go back to when you were

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 573 of 867   Document 49-1

1          hired as a part-time third shift security officer
2          at Lakeland.   Did you say that that was in two
3          thousand -- September of 2009?
4    A     I believe so, yes.
5    Q     All right.   And you worked Thursdays -- or I'm
6          sorry, Fridays and Saturdays, is that correct?
7    A     Yes.   I worked Jerry Brabazon's day off -- days
8          off.
9    Q     Between that time in December of 2010, when you
10         moved to full-time, did you pick up additional
11         shifts?
12   A     Yes.
13   Q     How frequently?
14   A     Quite a bit, because there's always open shifts.
15         Somebody's always taking off, or -- we've -- we
16         haven't been at full staff since I started, where
17         every single slot that we have is filled, so
18         there's always some kind of an open shift
19         somewhere.
20   Q     Okay.   And did you work shifts other than third
21         shift?
22   A     I worked a few second and a few first, yeah.
23   Q     But primarily additional third shifts?
24   A     Primarily, I've been third, yeah.
25   Q     Have you ever worked as a security officer for

Rough Draft of Kyle Stoxen, 3/31/11                9

1          Aurora at a location other than Lakeland?
2    A     No.

```
 3   Q   What is third shift at Lakeland?  What hours?
 4   A   Eleven to 7:30.  11 p.m. to 7:30 a.m.
 5   Q   And has that changed during your employment with
 6       Aurora?
 7   A   No.
 8   Q   Once you moved to full-time, what has been your
 9       schedule in terms of the days per week that you
10       work?
11   A   I work Sunday night till, when I get off at Friday
12       morning at 7:30, are my five nights a week.
13       Sunday night, Monday night, Tuesday night,
14       Wednesday night, Thursday night.
15   Q   Tell me, since you were originally hired by Aurora
16       as a security officer on a part-time basis and
17       through today, to whom you have reported.
18   A   Up till recently, I reported to my sergeant, which
19       was Ellen Bruenning, but that -- that ended --
20       well, she was on medical leave for quite a while,
21       and then she was -- whatever happened, I don't
22       know, but she no longer works there.
23   Q   Okay.  And since her departure from Aurora, who
24       have you reported to?
25   A   Either Jim May, who's a sergeant at Burlington, or
```

```
 1       James Sagan, who's the regional supervisor.
 2   Q   Has Mr. Sagan been the regional supervisor
 3       throughout your employment with Aurora?
 4   A   Yes.
 5   Q   And how much interaction have you had with him?
 6   A   I don't have much interaction with him, because
 7       I'm on third shift, so --
```

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 575 of 867   Document 49-1

```
8    Q    Have you had any interaction with other
9         supervisors?
10   A    Jim May, now, because he's been picking up a
11        couple of first shifts to try and help us out, but
12        other than that, no.
13   Q    All right.  Do you know who's above Mr. Sagan?
14   A    Clint Schaeffer, I believe.  He's the regional, or
15        I believe he's -- I don't know if he's a regional
16        manager or just the manager in general.
17   Q    Okay.  And is there anyone above Mr. Schaeffer?
18   A    That I know of, the next person above him is
19        Mike Cummings.
20   Q    And how much interaction, if any, have you had
21        with either Mr. Schaeffer or Mr. Cummings?
22   A    I see Mr. Schaeffer maybe, maybe once a month, but
23        usually it's once every couple months.  If I'm
24        lucky I'll see him once a month when he'll pop in
25        in the morning.
```

```
1              And Mr. Cummings, I -- I never see.
2         If I see him, it's at a meeting.  But he never --
3         he never stops in or anything else, so I would
4         imagine he's probably very busy.
5    Q    If you would, walk me through your typical day as
6         a security officer, and tell me all the types of
7         tasks that you perform as a security officer for
8         Aurora.
9    A    Well, I start at eleven, and from eleven to 11:30
10        is shift change.  So from eleven to 11:30, I'll
11        talk with the second shifter.  Basically, about
```

Page 9

Rough Stoxen 3 31.txt
12      what's -- what he encountered during his shift.
13      Any rooms that we need to keep an eye on, how busy
14      it's been, anything like that.
15              Once he leaves, I'll -- I'll make
16      rounds, I'll wander around outside, I'll check
17      other buildings, I'll check doors.  And in the
18      meantime, I'll get pages for -- I'll make
19      deliveries for central supplies, so, like, medical
20      supplies I'll have to take to individual rooms.
21              I'll get paged for meals, so I'll
22      have to go to the cafeteria and get food for
23      individual rooms or soda for individual rooms, any
24      kind of supplies.
25              I'll get paged for linens.  I'll

Rough Draft of Kyle Stoxen, 3/31/11          12

1       get paged to go to a certain room, because a
2       certain patient is acting up, or a certain patient
3       is confused.  And, I mean, there are sometimes
4       when I'll get paged, because an individual woke
5       up, and he feels that when he wakes up and he sees
6       the nurse, he thinks it's somebody breaking in, so
7       he'll want to talk to an officer of some kind.  So
8       I'll go up and talk to him and try to assure him
9       that everything's okay, that everybody is there to
10      help.
11              I will -- I'll take people from the
12      floors to the morgue if they pass away.  Or I'll
13      take them from the floors to -- I'll assist them
14      with taking them to a funeral home that's there to
15      pick up the body.  If a body comes in from
16      outside, I'll meet the funeral home at the door,
                        Page 10

17      because the doors are locked, and I'll escort them

18      to the morgue where I'll unlock the door and

19      assist them in.

20              Some mornings I'll have to assist

21      autopsy.  Every once in a while I have to assist

22      autopsy if it's a bigger body, with trying to move

23      them over to the autopsy table.

24              Let's see.  I'll sit in the ER.

25      I'll do standbys in the ER on EDs, PCs.  I'll

1       assist law enforcement with JCs, so I spend a lot

2       of time in the ER with different things.

3               And then in the meantime, I check

4       my email, I keep checking doors, I walk around

5       outside.  I make sure everything's okay.  I'll

6       wander through the parking lot, make sure there

7       aren't any lights on on vehicles.

8               I'll have to land flight -- if

9       Flight For Life comes.  I will have to be outside

10      from the time they get there until the time they

11      leave, just making sure nobody plays with the

12      helicopter, obviously.  Basically, I do a little

13      bit of everything, because it's third shift.

14              Any kind of alarms, I go to,

15      whether it's a gas detecter alarm or any kind of

16      alarm that they have, I have to go check on.  If

17      it's a fire alarm, I have to take care of it.  So

18      they'll call me.

19              Sometimes the floors will call me

20      for a maintenance issue.  If they smell smoke,

Page 11

21          they'll call me.  If they need a plunger, they'll

22          call me.  Pretty much, I deal with a little bit of

23          everything, because it's third shift, and there's

24          not -- plan ops isn't there, the kitchen staff

25          isn't there, central service isn't there.  It's

1           kind of like a skeleton crew, I guess, so --

2      Q    In terms of patrolling, I don't think I asked you

3           this.  Lakeland is a medical center/small

4           hospital, correct?

5      A    Correct.

6      Q    Do you have responsibility in your role as a

7           security officer at Lakeland for any other

8           physical facility, other than the Lakeland

9           facility?

10     A    There's a garage, a maintenance garage.  There's a

11          annex, and there's a boiler room that I check.

12          That I wander through, check doors, make sure

13          lights are off.

14               Sometimes I'll get a call from a

15          plan ops employee who says there's an alarm in the

16          boiler room that I have to go check on, and let

17          him know if -- I'll look at the screen on the

18          boiler and let him know if it's something that he

19          needs to come in for or not.

20               But other than those, the hospital,

21          the maintenance garage, the boiler room and the

22          annex, those are the four buildings that we have.

23     Q    And where are -- where is the maintenance garage

24          in relationship to the physical hospital building?

25     A    Well, the annex is -- it's kind of -- the annex

Page 12

```
 1          is, like, across the road from -- if the hospital
 2          is here, the annex is here, and then the
 3          maintenance garage is here, and then the boiler is
 4          way at the end.  Kind of like at the end of the
 5          property.
 6   Q      Okay.  I saw the indication you were making, but
 7          it's hard to record that for --
 8   A      Right.
 9   Q      -- the transcript.  So let me see if I can --
10   A      Diagonally.
11   Q      How far -- how many feet?  Is it --
12   A      Oh, geez.
13   Q      Is it on the same -- is it on the same -- is the
14          maintenance garage on the same premises as the
15          hospital?
16   A      It's all on one -- it's all on the same premise --
17   Q      Okay.
18   A      -- but there's, like, little roadways in between,
19          obviously, for travel.
20   Q      Okay.  Internal roadways?
21   A      Yes.
22   Q      Okay.  So all of those four facilities are on the
23          same multi-acre parcel?
24   A      Correct.
25   Q      What's the longest distance between the furthest
```

```
 1          building and the hospital, in your estimation?
 2   A      Oh, I don't know.  Depends on where at the
```

Page 13

```
3            hospital you're talking, I guess.  I mean, are you
4            talking from the side closest to it, or are you
5            talking --
6       Q    Well, let's say the furthest --
7       A    The furthest --
8       Q    -- the side --
9       A    -- point?
10      Q    Yeah.
11      A    Oh, geez.  I'd probably say at least a couple
12           football fields.
13      Q    Okay.  What is -- what is in the annex, or what
14           does the annex consist of?
15      A    Offices.
16      Q    Okay.  I believe you testified that the first
17           thing you do when you show up is have a shift
18           change meeting?
19      A    Mm-hmm.
20      Q    All right.  And what does that entail?
21      A    Basically, the second shift officer tells me,
22           like, if he's in the office, he'll tell me how
23           busy he's been, or what he's done all night.  If
24           there is a certain -- like, the other night there
25           was a certain person that we were supposed to
```

```
1            watch for, because there was worry that he might
2            try to go up to our OB floor.  So he'll tell me
3            things like that.  He'll describe him, he'll give
4            me the guy's description if there is -- if he has
5            one.
6                      Or he'll tell me there is a body
7            in, say a certain room.  In a little while, you're
```

8          going to have to bring the body to the morgue.  Or
9          he'll -- just basically anything that he did that
10         is relevant to what I need to know.
11                   Or if there's nothing relevant,
12         he'll tell me, hey, you know, it's been really
13         busy tonight, I've had a lot of CS calls, or I've
14         had a lot of food service calls, or there's no
15         lunch boxes left, so if you need a lunch you're
16         going to have to make a lunch.
17                   MR. PARSONS:  Kyle, can I just stop
18         you -- what's a CS call?
19                   THE WITNESS:  Central service.  We'll go
20         down to central service, get a medical supply.
21    BY MR. SCULLEN:
22    Q    Do you record your time when you come in and leave
23         for the day?
24    A    Yes.
25    Q    And how do you do that?

1     A    On our ActTrack.  I record, like, 2300 for the
2          start, and then usually, like my last line will be
3          office/rounds, I guess, but I don't usually put
4          till 7:30 on there, because once first shift comes
5          in, they're pretty much on the clock, or they
6          pretty much take the calls for the most part.  But
7          I'll usually help them out, because --
8     Q    And I was really asking about whether there's a
9          manner in which you record your time for payroll
10         purposes.  Is that different from ActTrack?
11    A    Oh, I swipe in.  I use our ID badge, and I swipe

Page 15

```
12          in at a Kronos machine.
13   Q      Okay.  Kronos is the timekeeping machine?
14   A      Correct.
15   Q      And when you swipe, it automatically records a
16          start time?
17   A      Correct.
18   Q      And I take it then you swipe out at the end of the
19          day?
20   A      Correct.
21   Q      You referenced in your testimony being paged.  Do
22          you carry a pager with you?
23   A      Yes, I do.
24   Q      All right.  Do you carry any other communication
25          devices?
```

```
1    A      I carry a radio, and I carry a department cell
2           phone.
3    Q      All right.  What's the procedure for obtaining
4           those devices?  Is there a check out?
5    A      Second shift comes in, and when I come in, second
6           shift will pass them over, set them on the desk,
7           and I'll grab them.
8    Q      All right.
9    A      And usually before second shift leaves, or just
10          like when I leave in the morning, I usually check
11          all my pockets, make sure I gave everything away,
12          because it's happened a few times where I took one
13          of the radios home on accident, so --
14   Q      How do you determine which assignments you're
15          going to perform and in which order on any given
16          shift?
```

Page 16

17    A    I guess severity of it, I'd say.

18    Q    Okay.

19    A    Like --

20    Q    Is it largely your discretion?

21    A    Yes.

22    Q    And you're expected to use your judgment --

23    A    Yes.

24    Q    -- to determine how to order those assignments?

25    A    Mm-hmm.

Rough Draft of Kyle Stoxen, 3/31/11          20

1    Q    Okay.  Yes?

2    A    Yes, sorry.

3    Q    Who has the authority to give you assignments?

4    A    Everybody.  I get paged by everybody.

5    Q    And do you have the authority to reject certain

6         assignments?

7    A    If I am busy in the ER on something that I can't

8         leave, then I can -- then what I'll do is I'll

9         call them, and I'll ask them if it's something

10        that can wait.  Because if it's not something that

11        can wait, if it's something that they need

12        relatively soon, then I'll tell them to page the

13        house supervisor and have the house supervisor do

14        it.

15    Q   And again, that relates to the urgency of the --

16    A   Correct.

17    Q   -- assignment -- of the assignment?

18    A   Correct.  If it's something that can wait, that

19        they don't need right this second, then I'll tell

20        them, okay, it's going to be a while; I'm tied up

Page 17

```
21         at the moment.
22    Q    Going back to your testimony about the manner in
23         which you record your activities, you testified
24         with regard to ActTrack?
25    A    Mm-hmm.
```

```
 1    Q    What is ActTrack?
 2    A    I guess I misspoke.  ActTrack is the program we
 3         put our activities into on the computer.  We
 4         actually just have an activity log.  It's just a
 5         piece of paper that I record everything I do on.
 6    Q    Okay.  So if I understand your testimony, the
 7         activity log is a record of all of your
 8         activities --
 9    A    Correct, and --
10    Q    -- that you write out?
11    A    Yes.
12    Q    Then what gets put into ActTrack?
13    A    Basically, the things that I do.  Deliveries,
14         morgue escorts, delivery via CS, food service,
15         morgue escorts, standbys, JCs, PCs -- anything
16         that I do really.  Unlocking a door, putting AV
17         out for sessions.
18    Q    And all of that would be on your activity logs as
19         well?
20    A    Yes.
21    Q    Okay.  But certain things don't go into ActTrack,
22         is that my understanding?
23    A    Certain things there isn't a spot for.  There
24         isn't, like, a section for on ActTrack.  So if I
25         just -- trying to think of one.
```

Page 18

1    Q    Well, rounds is one example, correct?

2    A    Correct.

3    Q    You would record that on your activity log, but

4         you would not enter it into ActTrack?

5    A    Right.

6    Q    All right.

7              (Exhibit No. 26 was marked for

8         identification.)

9    BY MR. PARSONS:

10   Q    I'm showing you what's been marked as Exhibit 26,

11        and ask you once you've had a chance to review

12        Exhibit 26, to identify what Exhibit 26 contains?

13   A    Just one of our activity logs.

14   Q    Okay.  And, in fact, these are, if you page

15        through it, they are multiple day's activity logs

16        on which you worked, correct?

17   A    Correct.

18   Q    And consistent with your testimony then, where it

19        says "officer" and "K Stoxen," that would indicate

20        your record of activity for your shift, and those

21        would have been entries completed by you?

22   A    Right.

23   Q    So why don't we start with the first page of

24        Exhibit 26.

25   A    Okay.

1    Q    If I'm reading that correctly, it says that from

2         eleven to 12:05, you were in the office or

Page 19

3       performing rounds?

4    A  Yes.

5    Q  Okay.  Then there's an entry from 12:05 to 12:13.

6       It says activity "Del - CS."  What does that

7       reflect.

8    A  Delivery CS, so central supply, central service.

9    Q  Okay.  Then there's another entry for rounds.

10      What is the next entry?

11   A  Disruptive.  Disruptive subject, so we're standby.

12   Q  Okay.  Then the next entry?

13   A  Patient assist.

14   Q  The next entry after that?

15   A  Delivery for food service.  So a lunch box, a

16      meal.

17   Q  Then the next entry after that?

18   A  Office rounds, or the next one after that was an

19      escort.

20   Q  All right.  And then looks like you ended your

21      shift by performing office rounds?

22   A  It looks like I didn't get a chance to put unlock,

23      because I usually unlock at 4:45 in the morning I

24      unlock.

25   Q  Okay.

1    A  So it looks like I didn't get a chance to put

2       unlock in there, but --

3    Q  It is reflected in the comments, correct?

4    A  Yes.  In the comments it says that I unlocked, but

5       there is an actual category and subcategory for

6       unlock, which you should see on, I'm thinking on

7       some of the other ones.

                         Page 20

8    Q    All right.  Why don't you look through them.  I

9         didn't see that on any of them, actually.  Well, I

10        take that back.  I see it on one, but not on most

11        of the others.

12   A    If you look on May 21st, 2010, from 0445 to 0500,

13        is unlock, and then in comments, unlock the

14        entrances.

15   Q    I'm sorry, what date?

16   A    May 21st.  5/21, it says at the top.

17             MR. PARSONS:  It's 694, is the Bates

18        stamp number, Sean.

19   BY MR. SCULLEN:

20   Q    I see.  So if we look at December 12th, which is

21        another third shift, December 12th of '09?

22   A    Okay.

23   Q    That's not reflected on the activity log, but

24        that's something you likely did, but just didn't

25        record, is that right?

1    A    Right, because I unlock -- every morning I unlock

2         at -- whatever day I work, I unlock at 4:45 in the

3         morning.

4    Q    Okay.

5    A    Usually.  Unless I'm tied up at the moment, then I

6         unlock usually after -- as soon as I can

7         afterwards.

8    Q    All right.  So while we're on December 12th of

9         2009, most of the entries are similar to ones

10        you've previously testified to.  At 2:54, there's

11        an entry for "code."  What would that refer to?

12    A    Probably a code 4, so a pulse is non-breather.

13    Q    At 4:47, there's an entry for "gotcha"?

14    A    Gotcha is something that we do of finding open

15         doors.  So we have a gotcha card, it's called,

16         or -- and it just -- we put a little card -- I

17         have one in my pocket, that just -- we just put in

18         the door.  It says, "While I was making my rounds,

19         I saw your door was unlocked."

20    Q    The entry before that, which is -- involves office

21         rounds, in the comments it refers to "fire watch"?

22    A    We had -- we were doing fire watches at the time,

23         so we'd have to go up to a certain floor, a

24         certain area, because it was under construction,

25         so the alarms weren't activated in that area and

♀

1          just make sure there wasn't a fire.

2     Q    Okay.  So the next -- it looks like those pages

3          are actually reversed, right, if --

4               MR. PARSONS:  Sean, you're talking about

5          409 and 410?

6               MR. SCULLEN:  Right.  Even though the

7          log says page A, and the second page says page B,

8          in fact, page B was the start of your shift on

9          December 12th of '09, is that right?  Am I reading

10         that correctly?

11              MR. PARSONS:  No I don't think so, Sean.

12              MR. SCULLEN:  Well, why don't you let

13         him -- let him explain it to me.

14              THE WITNESS:  It may have been.

15    BY MR. SCULLEN:

16    Q    Okay.

                        Page 22

17    A    I mean, there's --
18    Q    As I read this, it looks to me like the second
19         page just --
20    A    No, I don't -- I don't know, because if you look
21         at the last entry on -- on page B --
22    Q    Yeah.
23    A    -- the end time is 1:10 in the morning.
24    Q    Yeah.
25    A    But if you look at the first entry on page A, it's

Rough Draft of Kyle Stoxen, 3/31/11                27

1         12:12 in the morning, if I'm looking at it
2         correctly.  So -- so, I mean, it says 12:12 at the
3         top --
4    Q    Yeah.  Right.
5    A    -- but it just means when I -- when whoever
6         flipped the page, it was still December 12th when
7         they started on -- went on side B.
8    Q    Okay.  So, in fact, what -- is it possible -- is
9         what likely happened, so I understand this, the
10        12/12/09, you would have actually started on 12/11
11        at eleven o'clock on December 11th, is that what
12        likely --
13   A    What's that?  I'm sorry.
14   Q    Well, if we look at the log on -- that's page A --
15   A    Okay.
16   Q    -- and it's dated 12/12 of '09?
17   A    Right.
18   Q    That first entry wouldn't have been your first
19        entry for the shift, correct?
20   A    Correct.

Page 23

21    Q    Is it likely that you would have started that

22         shift on December 11th at eleven o'clock?

23    A    Most likely, yes.

24    Q    Okay.  And then when we go to page B, that's

25         actually the beginning of your shift the following

Rough Draft of Kyle Stoxen, 3/31/11          28

1          day?

2     A    It looks like it, yes.

3     Q    Okay.  So let's then go to May 21st.

4     A    A or B?

5     Q    Well, let's start with A.

6     A    Okay.

7     Q    Because I think here, we are sequentially going

8          over -- A and B cover the same shift, right?

9     A    Right.  Looks like it.

10    Q    Yeah.  Page A, I believe you've testified with

11         regard to the explanation of the activities.  At

12         2359, you have an entry that refers to "ILSM."

13         What does that refer to?

14    A    That was a fire watch.

15    Q    And that would just again refer to what?

16         Patrolling that -- reviewing that area?

17    A    It -- because of the amount of time it took, that

18         is probably when we were doing a fire watch of the

19         whole hospital, so we'd walk the whole hospital,

20         every floor.

21    Q    All right.  And then the next entry, it looks like

22         you spent roughly three hours doing office --

23    A    And rounds.

24    Q    -- and rounds?  And then after that, you have an

25         entry for patrol.

Page 24

```
 1    A    Mm-hmm.
 2    Q    I didn't see many other entries for patrol.  At
 3         times when you put office rounds, would it include
 4         patrol?
 5    A    Yeah.  Some nights I write patrol, other nights I
 6         just completely forget.  So I'll just -- I still
 7         go outside every night, mainly to get fresh air.
 8         So I go outside every night, and I go through
 9         every building.  Just some nights I don't write
10         patrol.
11    Q    So then if we move to August 26th, you have an
12         entry at the beginning of your shift for
13         valuables?
14    A    Yep.
15    Q    What does that refer to?
16    A    If a patient has cash or rings or something that
17         they don't want to hold onto that they'd feel
18         safer if it were locked up, that's valuables.
19         I'll go pick up their valuables.  I'll lock them
20         up in -- they'll be kind of, like, locked away in
21         a bag and then locked in the office -- in our
22         office.
23    Q    Okay.  At 2:43, you have an entry for -- what's
24         that activity?
25    A    A possible disruptive.  Just means I was called up
```

```
 1         there for someone that -- for something that
 2         they're worried is going to be a problem, and
```

Page 25

3        after I spent some time up there, I decided that
4        they were going to be fine.
5    Q   And based on the comments up there, it would refer
6        to the ER department?
7    A   Yes.  ER, room 7.
8    Q   At 4:49, there's a entry for "STAT team"?
9    A   It's -- that's just kind of like a code.  There's
10       a STAT team -- there's neuro alert, STAT team,
11       code.  It's just something -- like, a STAT team is
12       where a bunch of people go, but the doctor
13       doesn't.  So if a patient falls, and they need
14       help with that, or I mean, something similar to
15       that.
16   Q   Okay.  Then if we move to the last shift, which
17       is -- begins on September 8th of 2010.  And again,
18       A and B would be covering the same -- reflecting
19       your activities in the same shift, correct?
20   A   Yes, it looks like it.
21   Q   Okay.  And with regard to your activities on that
22       date, for the unlock, I see sometimes it -- you
23       make an entry that unlock occurred at 4:45 to
24       five, other times at 4:30 to 4:45?
25   A   Yeah, I mean, it always depends on, I guess the

1        day, basically.  We're just supposed to have the
2        doors unlocked.  I was told when I was trained to
3        make sure the doors are unlocked by five.
4    Q   Does this sampling of activity logs reflect a
5        representative sample of your typical duties on a
6        shift as a security guard?
7    A   Yeah, it looks like it.  I mean, there's a little
                    Page 26

```
 8              bit of everything in here, so -- which is usually
 9              what my night consists of.
10                       MR. PARSONS:  Can I get that question
11              read back again?
12                       (The previous question was read by the
13              reporter.)
14                       MR. PARSONS:  His typical duties?
15                       MR. SCULLEN:  Right.
16      BY MR. SCULLEN:
17      Q    I mean, in other words, all I'm asking is these
18              don't stand out as days which are somehow
19              different than what your typical day as a security
20              officer would be at Aurora?
21      A    Not really, no.  If I'm -- I mean, can I kind of
22              try to understand the question here?
23      Q    Sure.
24      A    You're basically asking if this is kind of like
25              what a normal shift is like for me?
```

Rough Draft of Kyle Stoxen, 3/31/11          32

```
 1      Q    Right.
 2      A    Yeah.  I mean, I have deliveries, I have escorts,
 3              I have unlock, so I have a little bit of
 4              everything in my shift.
 5      Q    Okay.  Do you record your meal break on your
 6              activity logs?
 7      A    No.
 8      Q    On third shift -- well, strike that.  At Lakeland,
 9              are you the only security officer on duty, other
10              than those periods where there's overlap between
11              the shifts?
```

Page 27

12    A    Yes.

13              MR. SCULLEN:   This is probably -- I need

14         to take a quick break.

15              MR. PARSONS:   Sounds good.

16              (A recess was taken from 9:45 a.m. to

17         9:54 a.m.)

18    BY MR. SCULLEN:

19    Q    Back on the record.  So, referring to your logs,

20         it appears that on every day at least that I see,

21         there are periods of -- of several hours where you

22         have as an entry, office/rounds.  And if I

23         understand correctly, what that means is you

24         weren't -- you didn't receive a call during that

25         period, because otherwise you would have responded

⚲

Rough Draft of Kyle Stoxen, 3/31/11          33

1          to that call if all you were doing was office

2          rounds, is that right?  Is that a fair statement?

3     A    Yes.

4     Q    Okay.  Did you record on your activity logs if you

5          had an interrupted lunch?

6     A    Did I?  Not all the time.

7     Q    Okay.  Sometimes did you?

8     A    Sometimes I did.

9     Q    Okay.  You told me about the communication devices

10         that you carry, and I want to ask you a couple of

11         questions about those.  The radio, what type of

12         radio is it?  Is it a two-way radio?

13    A    Yeah.  It's just, like, something like cops carry,

14         whatever.  It has multiple channels.  So kind of

15         like a two-way radio, yeah.

16    Q    Okay.  Who else -- who has access to handsets on

                        Page 28

17          the other side?

18    A     ER admitting.

19    Q     All right.  So there's one other individual during

20          your shift that would communicate with you via the

21          radio, is that right?

22    A     Via the radio, yes.

23    Q     And so if I understand correctly, the only time

24          that the radio would go off is if the person from

25          ER admitting is trying to contact you?

1     A     The only time she is trying to contact me, yes,

2           but there -- like, she'll contact me for somebody

3           else.

4     Q     Right.  Understood.  But again, it's her

5           contacting you?

6     A     Yes.

7     Q     Either on her own behalf or on someone else's

8           behalf?

9     A     Yes.

10    Q     In other words, it's not as though the radio is

11          going off because ER admitting is communicating

12          with someone else other than you, and you're

13          listening to that even though you don't have to

14          respond to it, is that right?

15    A     Correct.  It's only me and her -- me and them that

16          have it.

17    Q     Okay.  What about the pager?  Who has the ability

18          to contact you via the pager?

19    A     Everybody.  You can page me with a computer or a

20          phone.

                        Page 29

21    Q    Okay.  Well, I assume that -- well, maybe -- I

22         don't know.  How many people on third shift

23         typically contact you via the pager?

24    A    Every floor.  I don't know.  Like, I don't know

25         who necessarily at the nurses station contacts me,

1         but every floor can page me.

2     Q    And is that typically some -- one individual on

3         each floor?

4     A    It could be anybody.  It could be any nurse.  If

5         they don't have a HUC, then it's just any nurse.

6     Q    All right.  And what's a HUC?

7     A    Health unit coordinator.  They're kind of like the

8         secretary of the floor, is kind of the way I see

9         them.

10    Q    All right.  And what about the phone?  Who

11        contacts you via the phone?

12    A    Mainly ER.  Mainly the emergency room or

13        contractors have that number.  Other -- other loss

14        prevention department, like, offices, so like

15        Burlington.  Other hospitals have that number.

16        Funeral homes have that number.  The coroner has

17        that number.  Other security guards have that

18        number.  The floors have that number, but they

19        just don't use that.  They usually -- they've been

20        told to only use the phone for emergencies, so --

21    Q    How are you most frequently contacted?

22    A    Pager.

23    Q    And when you are contacted by the pager, does it

24        typically involve a text message?

25    A    It's -- it's typically -- well, it could be them

                            Page 30

```
 1              saying what they need, or it could just be the
 2              number for me to contact them at.
 3      Q       And if, for instance -- well, give me an example
 4              of a text message that would be non-urgent in your
 5              view?
 6      A       If it says "whenever you have a chance."
 7      Q       Okay.  Are there certain tasks that are typically
 8              non-urgent?
 9      A       Handing AV out.  Handing AV out is something that
10              doesn't have to be done right at that moment, for
11              the most part.  AV is just, like, the computers,
12              laptops, things that have to go to certain rooms,
13              a speaker phone, conference phone, whatever.
14      Q       Anything else?
15      A       That's the only thing I know off the top of my
16              head that is a non-urgent thing, unless the page
17              says "it can wait" or "whenever you have a
18              chance."  Otherwise I have no way of knowing if
19              it's urgent or not.
20      Q       Okay.  And you previously testified that when you
21              received that type of call for something -- and I
22              assume you would put things in two categories.
23              One would be calls or pages that you know are
24              urgent or emergency, like a code 4?
25      A       Mm-hmm.
```

```
 1      Q       Or in other cases where you don't know how urgent
 2              it is, you would contact them and ask them, if you
```

Page 31

```
 3              were tied up with something else, whether it was
 4              urgent, it could wait till you were finished with
 5              the task you were --
 6     A        Yes.
 7     Q        -- performing?
 8     A        Yes.
 9     Q        Did you receive training as to how to prioritize
10              tasks -- certain tasks?
11     A        No.
12     Q        All right.  What's your understanding of how
13              quickly you are supposed to respond to calls?
14     A        As soon as I get them.
15     Q        Did you receive any training, or are you aware of
16              any policy with regard to how quickly you are
17              supposed to respond?
18     A        The way I was told when I started was walk as fast
19              as you can, but don't run.
20     Q        Okay.  Although that's once you know that it's an
21              urgent matter, correct?
22     A        Yeah, I suppose.
23     Q        Because when you first receive a call, you may
24              call to determine whether it's something that
25              needs urgent -- needs your urgent response or not?
```

```
 1     A        I could, if I'm unaware, yeah.  The problem, if I
 2              may put -- throw something in.  What the floors on
 3              third shift when CS isn't there, they -- the
 4              floors are told not to contact me unless they need
 5              it -- unless they need it, and it cannot wait.
 6              But that's when the floors are told to contact me
 7              is when they need it now, is -- when I was
```
                              Page 32

```
8              trained, that's what I was told, is the floors
9              will contact you when they need it now, because
10             otherwise if it can wait till seven o'clock in the
11             morning, that's when CS comes in.
12      Q      All right.  And that would be for what types of
13             things?
14      A      Deliveries.
15      Q      And would deliveries include meals?
16      A      Yes.
17      Q      And equipment deliveries?
18      A      Yes.
19      Q      And again, those are reflected on your activity
20             logs when you get that type of call, correct?
21      A      Yes.
22      Q      And am I correct in understanding, based on your
23             prior testimony, that it's possible to tell the
24             frequency with which you get calls, whether it be
25             on the pager, radio or cell, by looking at your
```

```
1              activity logs, because when you get a call, it's
2              to perform an activity which would then be
3              recorded on the activity log?
4       A      I'm not understanding the question.
5       Q      Okay.  Let's see if I can rephrase it.  Am i
6              correct in understanding that we can tell how
7              often you get called during a particular shift if
8              we take the first example, which is page 1 of
9              Exhibit 26, by looking at the number of times that
10             you performed -- that you entered a delivery or
11             patient assist or escort or some activity?
```

Page 33

12    Because I believe you previously testified that
13    when you get a call, it results in an activity
14    which you then record on the activity log?
15              MR. PARSONS:  Objection.  Multiple.
16              MR. SCULLEN:  Correct?
17              THE WITNESS:  Are you asking -- can I
18    try and --
19              MR. SCULLEN:  Sure.
20              THE WITNESS:  -- clarify?  Are you
21    asking that you can tell how busy I am via my
22    activity log?
23    BY MR. SCULLEN:
24    Q    Well, by busy, that's a little bit general.  I'm
25         asking more specifically.

1     A    By how many calls I get?
2     Q    Right.
3     A    Yes.
4     Q    In terms of your lunch breaks, how do you
5          determine when to take a lunch break?
6     A    Whenever I get hungry.
7     Q    You don't have a set time?
8     A    No.
9     Q    Do you tell anyone when you're taking a lunch
10         break?
11    A    No.
12    Q    I believe you previously testified that you don't
13         record when you take a lunch break, and you don't
14         always record when you have an interrupted lunch
15         break, but sometimes you do on the activity log,
16         is that correct?

Page 34

17    A    Yes.

18    Q    Where do you typically take your lunch break?

19    A    In my office.

20    Q    You're not required to take it in the office,

21         correct?

22    A    I don't believe so, no.

23    Q    Do you ever take your lunch break off the

24         premises?

25    A    No.

Rough Draft of Kyle Stoxen, 3/31/11        41

1     Q    Why not?

2     A    Simply because there's too big of a risk that --

3          that if I get called for something that they need

4          now, and I'm not there, then I get disciplined.

5     Q    You understand that you're permitted to leave the

6          premises during your break?

7     A    Yes.

8     Q    Do you typically bring your lunch -- lunch or meal

9          with you?

10    A    Yes.

11    Q    Do you smoke?

12    A    No.

13    Q    Are you aware of other officers who smoke?

14    A    I don't know of any that I work with.

15    Q    Are you required to punch out during your lunch

16         period?

17    A    No.

18    Q    Tell me about the types of things you do on your

19         lunch break.  I assume you eat?

20    A    I eat lunch.

Page 35

21    Q    Okay.  Is there a TV where you take your -- is
22         there a TV in any of the places where you take
23         your meal break?
24    A    I always eat my lunch in my office, and there's no
25         TV in there.

 1    Q    There's only closed-circuit TV, right?
 2    A    There's our computer.
 3    Q    I thought there were monitor -- closed-circuit
 4         monitors, or is that incorrect?
 5    A    We can watch the cameras on our computer.
 6    Q    So you're watching those actually on your
 7         computer, not on separate monitors?
 8    A    Yeah it's on my computer screen.
 9    Q    Do you ever read books or magazines?
10    A    If I have one, yeah.
11    Q    Do you ever make personal calls?
12    A    No.  Everybody I know is sleeping when I'm
13         working, so --
14    Q    Do you listen to the radio?
15    A    No.
16    Q    Do you check personal emails?
17    A    I may if I'm -- if I'm bored, I guess.
18    Q    You have internet access in the office, is that
19         correct?
20    A    Yes.
21    Q    All right.  Do you go on the internet and look at,
22         you know, non work-related internet sites?
23    A    Yes.
24    Q    I'm showing you what's been marked as Exhibit 2.
25         Are you familiar with Aurora's Employee Handbook?
                        Page 36

Rough Stoxen 3 31.txt

```
 1    A    To a certain extent, yes.
 2    Q    All right.  It's maintained online, is that
 3         correct?
 4    A    Yes.
 5    Q    All right.  And you would have signed an
 6         acknowledgment, either paper or electronic --
 7         electronically acknowledging your receipt of
 8         access to the handbook?
 9    A    I would imagine I did.  I've signed so many things
10         that --
11    Q    Okay.  Fair enough.  I'd like you to take a look
12         at the second page of Exhibit 2, which is the rest
13         and meal period policy contained in the employee
14         handbook.  Have you reviewed that policy previous
15         to today?
16    A    Not -- not in a long time, no.
17    Q    All right.  So does that mean it's possible you
18         reviewed it a long time ago?
19    A    It's possible I looked at it before.
20    Q    All right.  Take a look at it, and once you've
21         reviewed it, my question is whether it's
22         consistent with your understanding of Aurora's
23         meal period policy as it applied to you.
24    A    I have a couple problems with it.
25    Q    Okay.  What are those?
```

```
 1    A    My supervisor does not schedule my rest period.
 2    Q    Okay am.  You previously testified that contrary
```

Page 37

```
 3              to what this suggests, you have the discretion to
 4              schedule your meal period --
 5       A      Correct.
 6       Q      -- at your discretion?
 7       A      So she doesn't -- or my supervisor, whoever it may
 8              be, doesn't call and tell me to take my lunch at a
 9              certain time.  And I was told, when I was trained,
10              not to contact my supervisor about canceling a
11              meal period, because I work third shift, so not
12              many people like to be woken up at whatever time
13              in the early morning.
14       Q      Okay.  Let's talk about that for a second.  You
15              understand that you have the ability to cancel
16              your lunch if you don't get 30 minutes of
17              uninterrupted lunch, correct?
18       A      Yes.
19       Q      All right.  And you've done that in the past --
20       A      Yes.
21       Q      -- correct?  And contrary to this policy, you
22              don't have to get supervisory approval before you
23              cancel your lunch, correct?
24       A      I was told I didn't have to.
25       Q      Okay.  Anything else?
```

Rough Draft of Kyle Stoxen, 3/31/11            45

```
 1       A      That's all I see at this point in time.
 2       Q      All right.  I'm showing you what's been marked as
 3              Exhibit 3.  Are you familiar with the Aurora
 4              Administrative Manual?
 5       A      The Administrative Manual?
 6       Q      Right.
 7       A      I don't believe so.  I don't know.  Like I said,
```
                              Page 38

```
 8          I've signed so many things.  I don't know that
 9          I've ever gotten, like, the Administrative Manual.
10    Q     Okay.  And if I told you it's online, and -- like
11          the employee handbook is available to employees,
12          is your testimony that you don't recall whether
13          you've ever accessed or were aware of the manual?
14    A     Yeah.
15    Q     Okay.  Similar to my question to you regarding the
16          meal period policy in the handbook, I'd like you
17          to review Section 2 of Exhibit 3, and tell me
18          whether it's consistent with your understanding of
19          Aurora's policy concerning meal periods, and
20          whether there are any differences in your
21          understanding, other than those you already
22          identified in connection with Exhibit 2.
23    A     I have the same problems I had with the last one,
24          where my supervisor doesn't schedule my meal
25          periods, and that I don't call to inform a
```

```
 1          supervisor or get their approval.
 2    Q     Right.  Other than the same issues that you
 3          mentioned in connection with Exhibit 2, any other
 4          differences between what's stated in Exhibit 3, in
 5          your understanding of Aurora's policy as applied
 6          to you?
 7    A     This is -- this kind of seems a little vague to
 8          me, because when I was trained, my sergeant at the
 9          time, who was Ellen Bruenning, told me that in
10          order for me to swipe -- the way she wanted to see
11          it done was in order for me to swipe "no lunch,"
```

Page 39

12      so to get paid for my lunch break, I had to be

13      interrupted three times.  I had to get three

14      different calls during that -- during that time

15      when I was eating in order to swipe "no lunch."

16  Q   All right.  Anything else?

17  A   And what do you consider being interrupted?

18  Q   Well, you tell me.

19  A   I will get a page, which is just simply a

20      question.  I will get a phone call to just ask me

21      a question.  I'll get a phone call to just tell me

22      that -- let's see.  I'll get a phone call just to

23      tell me that, say a police department is taking

24      somebody to the lab for a legal blood draw.

25                  It's something that I'm not

1       required to -- to go to, but I will get a page or

2       I will get called to tell me that, hey, just so

3       you know, this is going on.  So they will

4       interrupt me, but it's -- it could just -- it

5       could be something as simple as a question.

6   Q   And how frequently does that happen?

7   A   Where it's just a question?

8   Q   Right.

9   A   Can I try to kind of clarify?

10  Q   Sure.

11  A   So how frequently does it happen where I will get

12      called with a question, or called with something

13      that I don't have to tend -- go to, I should say,

14      or is it both?

15  Q   I'm asking about both.

16                  MR. PARSONS:  Objection as to the time

17      period we're talking about.  Are we talking during

18      his lunches or at any time --

19              MR. SCULLEN:  Yeah.

20              MR. PARSONS:  -- during his shift?

21  BY MR. SCULLEN:

22  Q   I'm asking during your lunches.

23  A   Not that much.  Maybe once a week.

24  Q   All right.  And after -- if you get an

25      interruption like that, is it your understanding

1       that you're able to restart your 30-minute lunch

2       period?

3   A   I just continue with my lunch, yeah.  I don't

4       actually sit and look at the clock and say, "It's

5       been five minutes, I'm going to start it back at

6       zero."  I just -- when my lunch is done, I'm done.

7   Q   Okay.  You understand you have the ability to do

8       so, though, correct?

9   A   Correct.

10  Q   All right.  Anything else on Exhibit 3?

11  A   I don't think so.

12  Q   All right.  Showing you what's been marked as

13      Exhibit 4, which is another portion of the

14      Administrative Manual.  And I'll direct your

15      attention to the second page, in particular,

16      Section 5.  And I'll ask you the same question --

17      or I have the same question that I asked you with

18      regard to Exhibit 3.

19              And again, here I'm cumulatively

20      asking you once you've reviewed it, to tell me

Page 41

21      anything that's different with regard to your

22      understanding of Aurora's policy as applied to

23      you, from what's stated in Section 5, other than

24      what you've already testified to in connection

25      with the other policy statements.

1    A    I guess Section E doesn't really apply to me,

2         because I don't leave.  And if I were to leave,

3         who is my -- I don't -- I don't have a supervisor

4         -- I'm not going to call my supervisor in the

5         middle of the night to tell him I'm leaving.

6                   But in Section C, it says that I

7         must be completely relieved of my work duties for

8         the entire meal period.  I don't know that I am

9         ever completely relieved of my work duties.

10   Q    Okay.  And in what way are you not completely

11        relieved?

12   A    Because I still have to carry the cell phone, the

13        pager and the radio.  Those have to be on my whole

14        shift.  I cannot shut them off at all.

15   Q    And is that the basis of your claim in this

16        lawsuit for compensability regarding your lunch

17        period?

18                  MR. PARSONS:  Objection.  Mr. Stoxen is

19        not here to testify as to the basis of the claim

20        on behalf of the class.

21                  MR. SCULLEN:  I'm asking about his claim

22        as a class member or potential class member.

23                  MR. PARSONS:  Mr. Stoxen doesn't have a

24        individual claim.

25

Page 42

Rough Stoxen 3 31.txt

1     BY MR. SCULLEN:

2     Q     You can testify -- you understand that you are --

3           you have attempted or have joined a lawsuit in

4           which you are alleging that your lunch periods are

5           compensable, correct.

6     A     Define "compensable."

7     Q     Meaning that they should be paid.

8     A     I -- see, according to the way I see it, according

9           to Section C, since I am never completely relieved

10          of my work duties, it says that I should be -- and

11          should be paid.  If I'm reading Section C correct.

12    Q     Well, let me be fair.  Do you know the basis of

13          this lawsuit?

14    A     I think I have the general idea of it, which is

15          since we are never actually unreachable, is the

16          way I see it, is the whole point of the lawsuit.

17                  MR. PARSONS:   Objection to the question.

18          That calls for legal conclusion.

19                  MR. SCULLEN:   You can answer.

20                  THE WITNESS:   That's my understanding.

21          Is because we are never -- never in my -- in any

22          of my shifts have I -- have I ever been completely

23          unreachable.

24    BY MR. SCULLEN:

25    Q     Okay.  And by unreachable, that relates to your

Rough Draft of Kyle Stoxen, 3/31/11          51

1           having to carry the pager, radio and/or cell

2           phone, correct?

Page 43

Rough Stoxen 3 31.txt

```
 3    A    Correct.
 4              MR. PARSONS:  Objection.  Asking for
 5         legal conclusion.
 6    BY MR. SCULLEN:
 7    Q    With regard to E, I think you previously testified
 8         as -- on third shift you don't have a supervisor
 9         who's working on third shift, correct?
10    A    I don't, no.
11    Q    All right.  And so if you were to leave the
12         premises, is it your understanding you could do so
13         without notifying your supervisor?
14    A    I would notify somebody.
15    Q    Okay.  Who would you notify?
16    A    The house supervisor.
17    Q    Who is the house supervisor?
18    A    It's a nurse.  She is the supervisor of the
19         nurses, the -- basically, the supervisor of the
20         hospital at night, as far as like the patients and
21         the nurses are.
22    Q    Is that a different person than the health unit
23         coordinator?
24    A    Yes.
25    Q    Okay.  And so as applied to you, your
```

Rough Draft of Kyle Stoxen, 3/31/11          52

```
 1         understanding is that you -- if you -- that you
 2         were permitted to leave the premises, and if you
 3         were to do so, you did not have to first notify
 4         your supervisor -- your supervisor, because no
 5         supervisor was working third shift, but you would
 6         notify the house supervisor instead?
 7    A    Correct.
```

Page 44

Case 2:10-cv-00714-JPS  Filed 04/01/11  Page 611 of 867  Document 49-1

8    Q    I'm showing you what's been marked as Exhibit 5,

9         which contains two loss prevention news -- or two

10        documents entitled "Loss Prevention News."  One

11        from January/February 2003, and the second from

12        January/February of 2010.

13                   I want to ask you about the first

14        newsletter, and you obviously weren't employed in

15        2003, but have you seen the newsletter, which is

16        the first newsletter, which is dated

17        January/February 2003?

18   A    I never saw that one.

19   Q    Okay.  If you would, on the second page, review

20        the section of the newsletter "Interrupted Lunch

21        Question Raised," and let me know once you've

22        reviewed that.

23   A    In the first paragraph, it says "to respond to an

24        emergency."  Where is emergency defined?  I mean,

25        my question is, what is -- what is defined as

1         emergency in this paragraph?

2    Q    Well, my question for you was having reviewed it,

3         is it consistent with your understanding of

4         Aurora's policy as applied to you?

5    A    With the exception of the emergency thing, I was

6         told if I was interrupted, not if I was somebody

7         called and said emergency or something that I

8         declared an emergency, like the building is on

9         fire.

10   Q    Okay.  So it wasn't limited -- your understanding

11        of the policy is it's not limited to interruptions

Page 45

12        that constitute emergencies, correct?

13    A   Correct.

14    Q   All right.  What about the second newsletter?  Did

15        you receive a copy of that newsletter?

16    A   I believe I did in an email.  That's how we get

17        the newsletters.

18    Q   All right.  And if you would, turn to the last

19        page and review the "Reminder On No Lunch Policy"

20        section.

21    A   I was -- I don't have a -- I don't have -- I mean,

22        there's a switchboard, but I don't have a

23        switchboard that pages me for each person in the

24        hospital.  Whatever floor needs me, pages me

25        individually.  They don't call the switchboard to

1         page me.

2     Q   Okay.  Other than that, is there any other way in

3         which this statement is not consistent with your

4         understanding of Aurora's policy regarding meal

5         breaks as applied to you?

6     A   Other than the fact that I don't have somebody to

7         advise, yeah.

8             MR. PARSONS:  Sean, I'm assuming your

9         question incorporated the issues that Mr. Stoxen

10        had raised with regard to the first newsletter?

11            MR. SCULLEN:  Well, I'm just asking him

12        about the statements in this newsletter, which are

13        different, not necessarily exactly the same.

14            THE WITNESS:  They're still the

15        emergency part thrown in there --

16            MR. SCULLEN:  Right.

Page 46

17                    THE WITNESS:  -- for emergency calls,
18          there's still that thrown in there.
19   BY MR. SCULLEN:
20   Q    Right.  And so, again, consistent with your
21          understanding, it wasn't limited to emergencies?
22   A    Right.  Because I had never been told what is
23          described as an emergency, what they consider an
24          emergency at night.
25   Q    All right.  And so you don't draw any distinction

1           between any of the interruptions for purposes of
2           these statements, correct?
3    A    Well, I know that if there's a fire alarm going
4           off, that I would consider that in my own mind an
5           emergency, but that's just something I know.  But
6           if they call me for something, I don't know if
7           it's an emergency or not.
8    Q    I'm showing you what's been marked as Exhibit 9,
9           and ask you -- which is a document entitled the
10          Aurora Lakeland Medical Center Loss Prevention
11          Services Orientation and Training.  My question is
12          are you familiar with this document?
13   A    Yes.
14   Q    All right.  You received a copy of the document as
15          part of your training?
16   A    Yes.
17   Q    If you would, refer to page 4.  Review the section
18          about a third of the way down entitled "Lunch."
19   A    This goes against what my sergeant told me when I
20          was training.

Page 47

21    Q    Okay.  In what way?

22    A    She told me that I had to be interrupted three

23         times to punch "no lunch."  This just says if you

24         are -- if it is determined a priority call.

25    Q    Okay.   And did she tell you if you were

1          interrupted three times for any call, you could

2          punch?

3     A    She just said if you are interrupted three times,

4          if you get three calls during my lunch, I can

5          punch "no lunch."  I can swipe out "no lunch."

6     Q    Okay.   And consistent with your prior testimony,

7          is it true that you understood that alternatively

8          you could restart your lunch for the 30-minute

9          period?  Yes?

10    A    Yes, sorry.

11    Q    Other than the policies that I've had you review

12         and other than the communication you had that

13         you've already testified to with regard to

14         Sergeant Bruenning's instructions to you

15         concerning meal periods, are there any other,

16         either written policies or communications you

17         received from anyone at Aurora management

18         regarding your meal periods?

19    A    No.

20    Q    Other than your testimony regarding

21         Ms. Bruenning's instructions to you, do you feel

22         that Aurora or your supervisors placed a different

23         expectation on you than what's contained in the

24         policies we've went through, other than what

25         you've already testified to?

Page 48

```
 1    A    No.
 2    Q    Do you ever advise -- I believe your testimony was
 3         that the person with access to the other handset
 4         would be able to contact you through the radio, is
 5         the ER dispatch?
 6    A    ER admitting.
 7    Q    ER admitting.  Do you notify that individual when
 8         you're taking a meal break?
 9    A    No.
10    Q    Why not?
11    A    I don't talk to her that much.  I mean, I say,
12         "Hi, how are you," stuff like that, but other than
13         that, she doesn't know what I do all night.  She
14         doesn't leave the -- the admitting area, the
15         admitting desk.
16    Q    You're aware that Aurora automatically makes a
17         30-minute lunch deduction unless it's canceled, is
18         that correct?
19    A    Yes.
20    Q    And what's your understanding of that policy as
21         it's applied to you?
22    A    If I work more than six hours, they take a half
23         hour or half hour is deducted.
24    Q    Okay.  And you understand that you're expected, if
25         you can, to take a 30-minute uninterrupted break?
```

```
 1    A    Yes.
 2    Q    You previously testified that you've canceled your
```

Page 49

```
3          lunch?

4     A    Yes.

5     Q    What's the procedure for doing so?

6     A    I will write on my ActTrack -- or I'm sorry, my

7          activity log "no lunch" in the general area as to

8          what kept me away from my lunch, and I'll inform

9          the incoming shift.  And when I go to punch out,

10         I'll punch "F1," and I'll swipe twice.

11    Q    You previously testified since there's no

12         supervisor, you don't need supervisory

13         pre-approval.  Is there any process after you

14         cancel the lunch -- do you have to do anything

15         else in terms of canceling your lunch after the

16         fact in order to get it approved?

17    A    No.  Not that I know of.  I haven't been told of

18         anything.  I may get asked about it.  I've been

19         asked about it before, by -- by, like,

20         Ellen Bruenning at the time.

21    Q    Okay.  And what has she -- what has she asked you?

22    A    She just asked, like, how come I -- I took no

23         lunch, and like if I -- if I -- like, say a

24         delivery was something that couldn't wait, like,

25         she would, I guess -- I kind of took it as
```

Rough Draft of Kyle Stoxen, 3/31/11          59

```
1          questioning what I did.  Like questioned my

2          judgment, I guess, is the way I took it.  Like --

3          like, she would ask -- she would look at it and

4          say, "Well, is this delivery to CS, is that

5          something that could have waited?"  She would ask

6          something like that.

7     Q    Okay.  And was your -- were any of your canceled
```

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 617 of 867   Document 49-1

| | | |
|---|---|---|
| 8 | | lunches ever reversed, or denied? |
| 9 | A | I don't believe so.  I don't -- I was never told |
| 10 | | of it, but I don't pay that much attention to my |
| 11 | | -- to my Kronos time.  I know I punch out, because |
| 12 | | I look at the clock, and I know when I punch out. |
| 13 | Q | Okay.  But you're not aware of any occasion on |
| 14 | | which it was reversed or denied? |
| 15 | A | Not that I know of. |
| 16 | Q | And is it your -- your testimony is she didn't ask |
| 17 | | you every time? |
| 18 | A | No, not every time. |
| 19 | Q | Have you ever been disciplined for canceling a |
| 20 | | lunch? |
| 21 | A | I have not. |
| 22 | Q | Are you aware of anyone else who's been |
| 23 | | disciplined? |
| 24 | A | I know Pat Lowery has been -- has a -- has gotten |
| 25 | | an email questioning why he took no lunch when he |

| | | |
|---|---|---|
| 1 | | did, and it was then sent to the supervisors from |
| 2 | | Ellen -- Ellen sent an email, but she also sent it |
| 3 | | to -- I know she sent it to, like, James Sagan. |
| 4 | | But other than that, I mean -- I |
| 5 | | mean, I don't know if you don't understand, like, |
| 6 | | what we actually talk about in shift change, but |
| 7 | | we don't actually talk about stuff like that.  We |
| 8 | | talk about other stuff, I guess.  Things that are |
| 9 | | happening at that point in time. |
| 10 | Q | Sure.  Just so I understand your testimony, are |
| 11 | | you aware of whether Mr. Lowery was disciplined? |

Page 51

12  A   All I know is he received an email about it.

13  Q   An email that questioned why he canceled his

14      lunch?

15  A   I believe that's all it was.  He -- I didn't read

16      it, so he just kind of went through it real quick

17      and told me, you know, this is what she did and --

18  Q   All right.  So you don't have any firsthand

19      knowledge of what occurred?

20  A   No.  I just know what he told me.

21  Q   What did he tell you as to the reason he had

22      canceled his lunch?

23  A   If I remember correctly, it -- he was on a shift.

24      It was seven at night till seven in the morning,

25      and his reasoning was he eats his -- he eats

1   dinner before 7 p.m., because of his diet.  He was

2   on a diet at the time.  I don't know if he still

3   is now or not, but that's nothing to do with this.

4   But he would eat his dinner before 7 p.m., and he

5   wouldn't -- he doesn't eat breakfast until after

6   7 a.m.  His reasoning, I believe that's what he

7   told me, is it had to do with his diet.

8   Q   And by "diet," we mean a weight loss regime as

9       opposed to some medically necessary --

10  A   Correct.

11  Q   And do you know whether his lunch was canceled --

12      whether the cancellation of his lunch was

13      reversed?

14  A   That I don't know.

15  Q   Okay.  Do you feel you were discouraged from

16      canceling your lunch?

Page 52

17    A    Yes.

18    Q    Why?

19    A    Because I was told by Ellen Bruenning when I was

20         trained -- when I was training, that it could --

21         like, it could result in discipline and/or

22         termination if I -- if I was using it for -- to

23         lengthen my -- or to shorten my workday, or if it

24         was -- if it was something that could have waited,

25         and I -- and I didn't make it wait, she told me

1          that if I didn't follow this policy, that I could

2          be terminated.

3     Q    Okay.  But the policy allowed you to cancel your

4          lunch, correct?

5     A    Correct.

6     Q    All right.  And you testified that you have done

7          so, correct?

8     A    Correct.

9               (Exhibit No. 27 was marked for

10         identification.)

11    BY MR. SCULLEN:

12    Q    I'm showing you what's been marked as Exhibit 27,

13         and represent to you that this reflects your

14         payroll records for the period beginning June of

15         -- June 1st of 2007.  Now --

16              MR. PARSONS:  Payroll records?

17              MR. SCULLEN:  Right.

18              MR. PARSONS:  Okay.

19    BY MR. SCULLEN:

20    Q    August of 2007, you would have been a -- would you

                          Page 53

```
21          have been wellness -- I mean, would you have been

22          a lifeguard?

23     A    At the wellness center.

24     Q    Okay.  And did you have occasion to cancel your

25          lunch at the wellness center?
```

```
 1     A    If I was at -- working at the front desk.

 2     Q    Okay.  So only on those occasions where you were

 3          required to remain at the front desk you would

 4          cancel your lunch?

 5     A    Correct.

 6     Q    Okay.  At the wellness center, you didn't -- you

 7          weren't required to carry any communication

 8          device?

 9     A    No.

10     Q    All right.  So there were times that you had to

11          work through your lunch, and on those occasions,

12          you canceled your lunch, is that my understanding?

13     A    Yes.

14     Q    So if you turn to September of -- the records

15          beginning in September of 2009 --

16               MR. PARSONS:  What page are we on?

17               MR. SCULLEN:  The one marked 968 at the

18          bottom.

19     BY MR. SCULLEN:

20     Q    And from there going forward, if you look at the

21          last column which has a Y in it, reflecting dates

22          on which you canceled lunch, and if you would look

23          at that, beginning in September of 2009, through

24          the end of the document, is -- does that appear to

25          be an accurate accounting of the frequency with
```

Page 54

1        which you canceled your lunch?

2    A    Yes.

3                (Exhibit No. 28 was marked for

4        identification.)

5    BY MR. SCULLEN:

6    Q    If you compare Exhibit 28 with Exhibit 27, you'll

7        note that these are activity logs for days in

8        which you canceled your lunch break?

9    A    It appears that way.

10   Q    Okay.  And so let me just -- I just want to ask

11       you some clarification questions about your

12       activity logs on those dates.  So let's look at

13       the first date, January 9th of 2010.  You

14       previously testified that on those activity logs

15       where you had an interrupted lunch, you typically

16       did record it in the activity log, so that would

17       be reflected on that first activity log that's

18       part of Exhibit 28 at 3:42, is that correct?

19   A    I'm not understanding the question here.

20   Q    Okay.  You previously testified that on those

21       dates when you had an interrupted lunch, that you

22       would typically record it on your activity log.

23       And so if we look at January 9th of 2010, I'm

24       asking you about the entry at 3:42.  Is that

25       what's reflected on that entry?

1    A    Yes.

2    Q    Okay.  Same thing would be true of the activity

Page 55

3      log beginning April 3rd, 2010, at the 2:54 entry,

4      which is the first entry on page four of the

5      exhibit?

6   A   Yes.

7   Q   Same is true on 4/15, third entry down?

8   A   Yes.

9   Q   June 27th, fourth entry down?

10   A   Yes.

11   Q   And then August 20th, the entry at 3:09 -- the

12      entries at 3:09 and 3:21?

13   A   Mm-hmm.

14   Q   Yes?

15   A   Yes.

16   Q   Were there dates, other than those reflected in

17      Exhibit 27, where your lunch was interrupted and

18      you did not restart another 30-minute lunch, but

19      that you did not cancel your lunch?

20   A   Can you clarify?

21   Q   Sure.  Were there dates other than those that you

22      canceled as reflected in Exhibit 27, where your

23      lunch was interrupted and you didn't restart the

24      lunch and thus receive 30 minutes uninterrupted,

25      that aren't reflected on Exhibit 27?

1   A   There's days when I was at -- working at the

2      wellness center that are on here.

3   Q   And I'm only asking about the period that you've

4      been a security officer.  Thanks for that

5      clarification.

6   A   I believe that everything on here is -- would be

7      on here, yes.

Page 56

```
 8    Q    Okay.
 9    A    But let me see if I understand the question again.
10    Q    Sure.
11    A    You're asking that are there -- were there other
12         days where I was interrupted, but I didn't take no
13         lunch?
14    Q    And you didn't have -- right.  And you didn't
15         restart it and have a full 30 minutes
16         uninterrupted?
17    A    Yes.
18    Q    Okay.  What days are those?
19    A    I don't know if they're on here or not.  Like, are
20         you asking for days in here?
21    Q    I'm asking for any -- I'm asking for specific
22         dates since September of 2009.
23    A    In September of 2009?
24    Q    Since September of 2009.
25    A    I don't know the dates off the top of my head, no.
```

```
 1    Q    Okay.  How many days?
 2    A    I couldn't tell you.
 3    Q    Is there any way to recreate and identify those
 4         dates based on any of the records that we've
 5         referred to, or that -- that aren't here, that
 6         you're aware of?
 7    A    If I didn't write it down, then probably not.
 8    Q    Okay.  You would agree that there were many days
 9         where you received 30 minutes uninterrupted by any
10         call, emergency, non-emergency or otherwise, in
11         which you received your lunch period uninterrupted
```

```
12        without any call, correct?

13    A   Yes.

14    Q   Are you able to in any way estimate the number of

15        dates that you claim since September of 2009, that

16        you've been interrupted and didn't receive a full

17        30-minute uninterrupted period, that you didn't

18        cancel?

19    A   I couldn't tell you without -- I mean, I could --

20        I could try to guess, but I have no way of knowing

21        if that's accurate or not.

22    Q   Okay.  What's your best guess?

23    A   I mean, I'd say there's probably -- probably at

24        least once to twice a week where I will receive

25        some kind of phone call or something during my
```

Rough Draft of Kyle Stoxen, 3/31/11              68

```
1         lunch, that I won't actually take no lunch.

2     Q   Okay.

3     A   Does that answer your question?

4     Q   It does.  You previously testified that you didn't

5         leave the premises, but I also understood your

6         testimony to be that you understood you could.

7         Was it your understanding that you were allowed to

8         leave the premises and go at least up to 15

9         minutes away during your lunch period, given that

10        you had to be back -- you couldn't take more than

11        30 minutes, correct?

12    A   Correct.

13    Q   All right.  So presumably, you couldn't go further

14        than 15 minutes away, given that you had to be

15        back within 15 minutes to be within the 30-minute

16        period, correct?
```

Page 58

17    A    Well, it's not giving any time to order a meal or

18         anything, but yeah.

19    Q    True.  But, I mean, that would follow logically --

20    A    Right.

21    Q    -- correct?

22    A    Right.

23    Q    You understood that --

24    A    Yes.

25    Q    -- if you -- if you were going to leave, you

1          couldn't go more than 15 minutes away, correct?

2    A    Yes.

3    Q    And was it your understanding that you had the

4         ability to go at least 15 minutes away?

5    A    I understand that I have the ability to, if I

6         want, but, I mean, there could be repercussions if

7         that were to happen.

8    Q    Did anyone ever tell you that?

9    A    Yes.

10   Q    Who?

11   A    Ellen.

12   Q    And what did she say?

13   A    She told me that -- when I was training, she told

14        me that, say there was a fire alarm that goes off.

15        We have a matter of minutes to -- to get to

16        wherever it is, and -- and -- and, like, clarify

17        whether it's an actual fire or not.  Now, in that

18        couple of minutes, in that minute, couple minute

19        time frame, we have to -- we have to get a hold of

20        the alarm company to inform them if it is an

Page 59

21          actual false alarm or if it is a real fire alarm,

22          if there is an actual emergency there.

23                        If we do not get a hold of them in

24          that time frame, then they will dispatch the

25          appropriate fire departments, who will respond, at

1          which point in time we will get billed.

2                        And Ellen told me straight out

3          there will be repercussions if we get billed,

4          because the hospital doesn't want to get billed

5          for it.  If it's a false alarm and we get a bill,

6          the hospital will be very upset.

7     Q    Okay.  Although, in that hypothetical, given that

8          you had a cell phone, you could, for instance, be

9          at a fast food restaurant 15 minutes away and

10         simply call the fire company, is that correct?

11                       MR. PARSONS:  Objection.  Calls for

12         speculation.

13                       THE WITNESS:  I don't have the fire

14         department's phone number.  There are no phone --

15         there are no fire department phone numbers

16         programmed into the phone.

17    BY MR. SCULLEN:

18    Q    Are you the only person with the ability to call

19         the fire department to cancel an alarm?

20    A    We call the alarm company.

21    Q    Okay.

22    A    We don't call the actual fire department.

23    Q    All right.  Are you the only person with the

24         ability to call the fire --

25    A    The alarm company?

                    Page 60

```
 1    Q    -- the alarm company?
 2    A    On third shift, yes.
 3    Q    How frequently did that happen?
 4    A    It's not that it happened all that frequently.
 5         It's the chance that it could happen.  I don't
 6         want to get -- I don't want to get reprimanded for
 7         going and taking my lunch and for some reason a
 8         fire alarm were to sound or any other kind of
 9         alarm were to sound, a trouble alarm, be a duress
10         alarm were to sound, I mean, I don't want to take
11         that chance.
12    Q    Explain to me what, in the scenario that you just
13         described, if an alarm goes off, what are you
14         supposed to do?
15    A    Go to the area of which the alarm is coming from,
16         and determine whether or not it is an alarm or
17         not.
18    Q    And then if you determined that there was no basis
19         for the alarm, then you would call the alarm
20         company --
21    A    Correct.
22    Q    -- and cancel the alarm?
23    A    Correct.
24    Q    Okay.
25                    MR. SCULLEN:  I think I'm done, but give
```

```
 1         me a couple minutes.
 2                    MR. PARSONS:  Sure.
```

Page 61

3                (A recess was taken from 11:03 a.m. to

4        11:10 a.m.)

5                          EXAMINATION

6    BY MR. PARSONS:

7    Q    Going back on the record.  Just a couple of

8         clarifications here.  Kyle, I'm looking at

9         Exhibits 26 and 28.  These are some of the

10        activity logs from your employment with Aurora, is

11        that right?

12   A    Yes.

13   Q    And you had testified earlier that from time to

14        time you will get a page or a call with just a

15        question that you need to answer, is that right?

16   A    Yes.

17   Q    Would you write down every one of those calls or

18        pages on the activity logs?

19   A    No.

20                 MR. PARSONS:  Okay.  That's all I have.

21                 MR. SCULLEN:  I don't have anything

22        further.

23

24

25

                          Page 62

Exhibit 6

Kronos Time Record of

Brabazon and Opt-in

Plaintiffs

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 8/20/2008 | 2:55 PM | | |
| 8/20/2008 | 11:06 PM | 8:11 | |
| 8/22/2008 | 6:55 AM | | |
| 8/22/2008 | 7:01 PM | 12:06 | |
| 8/24/2008 | 6:55 AM | | |
| 8/24/2008 | 7:26 PM | 12:31 | |
| 8/25/2008 | 6:55 AM | | |
| 8/25/2008 | 7:03 PM | 12:08 | |
| 8/26/2008 | 2:55 PM | | |
| 8/26/2008 | 11:34 PM | 8:39 | |
| 8/27/2008 | 2:55 PM | | |
| 8/27/2008 | 11:15 PM | 8:20 | |
| 8/31/2008 | 6:55 AM | | |
| 8/31/2008 | 7:30 PM | 12:35 | |
| 9/1/2008 | 6:55 AM | | |
| 9/1/2008 | 7:08 PM | 12:13 | |
| 9/2/2008 | 2:55 PM | | |
| 9/2/2008 | 11:08 PM | 8:13 | |
| 9/3/2008 | 2:55 PM | | |
| 9/3/2008 | 11:31 PM | 8:36 | |
| 9/4/2008 | 10:55 PM | | |
| 9/5/2008 | 7:30 AM | 8:35 | |
| 9/7/2008 | 6:55 AM | | |
| 9/7/2008 | 7:30 PM | 12:35 | |
| 9/8/2008 | 6:55 AM | | |
| 9/8/2008 | 7:06 PM | 12:11 | |
| 9/9/2008 | 2:55 PM | | |
| 9/9/2008 | 11:30 PM | 8:35 | |
| 9/10/2008 | 2:55 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 9/10/2008 | 11:04 PM | 8:09 | |
| 9/11/2008 | 10:55 PM | | |
| 9/12/2008 | 7:04 AM | 8:09 | |
| 9/13/2008 | 8:48 AM | | |
| 9/13/2008 | 12:08 PM | 3:20 | |
| 9/14/2008 | 6:55 AM | | |
| 9/14/2008 | 7:32 PM | 12:37 | |
| 9/15/2008 | 6:55 AM | | |
| 9/15/2008 | 7:30 PM | 12:35 | |
| 9/16/2008 | 2:55 PM | | |
| 9/16/2008 | 11:05 PM | 8:10 | |
| 9/17/2008 | 2:55 PM | | |
| 9/17/2008 | 11:30 PM | 8:35 | |
| 9/18/2008 | 10:55 PM | | |
| 9/19/2008 | 7:20 AM | 8:25 | |
| 9/21/2008 | 6:55 AM | | |
| 9/21/2008 | 7:32 PM | 12:37 | |
| 9/22/2008 | 6:55 AM | | |
| 9/22/2008 | 7:03 PM | 12:08 | |
| 9/23/2008 | 12:55 PM | | |
| 9/23/2008 | 11:08 PM | 10:13 | |
| 9/24/2008 | 2:55 PM | | |
| 9/24/2008 | 11:30 PM | 8:35 | |
| 9/26/2008 | 10:54 PM | | |
| 9/27/2008 | 7:15 AM | 8:21 | |
| 9/28/2008 | 6:55 AM | | |
| 9/28/2008 | 7:30 PM | 12:35 | |
| 9/29/2008 | 6:55 AM | | |
| 9/29/2008 | 7:06 PM | 12:11 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 9/30/2008 | 2:55 PM | | |
| 9/30/2008 | 11:05 PM | 8:10 | |
| 10/1/2008 | 2:55 PM | | |
| 10/1/2008 | 11:28 PM | 8:33 | |
| 10/5/2008 | 6:55 AM | | |
| 10/5/2008 | 7:30 PM | 12:35 | |
| 10/6/2008 | 6:55 AM | | |
| 10/6/2008 | 7:01 PM | 12:06 | |
| 10/7/2008 | 2:55 PM | | |
| 10/7/2008 | 11:30 PM | 8:35 | |
| 10/8/2008 | 2:55 PM | | |
| 10/8/2008 | 11:06 PM | 8:11 | |
| 10/12/2008 | 6:55 AM | | |
| 10/12/2008 | 7:30 PM | 12:35 | |
| 10/13/2008 | 6:55 AM | | |
| 10/13/2008 | 7:30 PM | 12:35 | |
| 10/14/2008 | 2:55 PM | | |
| 10/14/2008 | 11:10 PM | 8:15 | |
| 10/15/2008 | 6:55 AM | | |
| 10/15/2008 | 5:24 PM | 10:29 | |
| 10/17/2008 | 6:55 AM | | |
| 10/17/2008 | 7:00 PM | 12:05 | |
| 10/19/2008 | 6:55 AM | | |
| 10/19/2008 | 7:33 PM | 12:38 | |
| 10/20/2008 | 6:55 AM | | |
| 10/20/2008 | 7:02 PM | 12:07 | |
| 10/21/2008 | 2:55 PM | | |
| 10/21/2008 | 11:30 PM | 8:35 | |
| 10/22/2008 | 2:55 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 10/22/2008 | 11:16 PM | 8:21 | |
| 10/26/2008 | 6:55 AM | | |
| 10/26/2008 | 7:31 PM | 12:36 | |
| 10/27/2008 | 6:55 AM | | |
| 10/27/2008 | 7:32 PM | 12:37 | |
| 10/28/2008 | 2:55 PM | | |
| 10/28/2008 | 11:04 PM | 8:09 | |
| 10/29/2008 | 2:55 PM | | |
| 10/29/2008 | 11:30 PM | 8:35 | |
| 11/2/2008 | 6:55 AM | | |
| 11/2/2008 | 7:30 PM | 12:35 | |
| 11/3/2008 | 6:55 AM | | |
| 11/3/2008 | 7:04 PM | 12:09 | |
| 11/4/2008 | 2:55 PM | | |
| 11/4/2008 | 11:31 PM | 8:36 | |
| 11/5/2008 | 2:55 PM | | |
| 11/5/2008 | 11:03 PM | 8:08 | |
| 11/9/2008 | 6:55 AM | | |
| 11/9/2008 | 7:06 PM | 12:11 | |
| 11/10/2008 | 6:55 AM | | |
| 11/10/2008 | 7:30 PM | 12:35 | |
| 11/11/2008 | 2:55 PM | | |
| 11/11/2008 | 11:31 PM | 8:36 | |
| 11/12/2008 | 2:55 PM | | |
| 11/12/2008 | 11:02 PM | 8:07 | |
| 11/15/2008 | 6:55 AM | | |
| 11/15/2008 | 12:07 PM | 5:12 | |
| 11/16/2008 | 6:55 AM | | |
| 11/16/2008 | 7:04 PM | 12:09 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|------|-----------|---------------------|----------|
| 11/17/2008 | 6:55 AM | | |
| 11/17/2008 | 7:31 PM | 12:36 | |
| 11/18/2008 | 2:55 PM | | |
| 11/18/2008 | 11:30 PM | 8:35 | |
| 11/19/2008 | 2:54 PM | | |
| 11/19/2008 | 11:05 PM | 8:11 | |
| 11/23/2008 | 6:55 AM | | |
| 11/23/2008 | 7:34 PM | 12:39 | |
| 11/24/2008 | 6:55 AM | | |
| 11/24/2008 | 7:05 PM | 12:10 | |
| 11/25/2008 | 1:55 PM | | |
| 11/25/2008 | 11:30 PM | 9:35 | |
| 11/26/2008 | 1:55 PM | | |
| 11/26/2008 | 11:05 PM | 9:10 | |
| 11/30/2008 | 6:55 AM | | |
| 11/30/2008 | 7:06 PM | 12:11 | |
| 12/1/2008 | 6:58 AM | | |
| 12/1/2008 | 7:02 PM | 12:04 | |
| 12/2/2008 | 2:55 PM | | |
| 12/2/2008 | 11:31 PM | 8:36 | |
| 12/3/2008 | 2:55 PM | | |
| 12/3/2008 | 11:07 PM | 8:12 | |
| 12/6/2008 | 12:55 AM | | |
| 12/6/2008 | 7:11 AM | 6:16 | |
| 12/7/2008 | 6:55 AM | | |
| 12/7/2008 | 7:30 PM | 12:35 | |
| 12/8/2008 | 6:55 AM | | |
| 12/8/2008 | 7:05 PM | 12:10 | |
| 12/9/2008 | 2:55 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 12/9/2008 | 11:32 PM | 8:37 | |
| 12/10/2008 | 2:55 PM | | |
| 12/10/2008 | 11:04 PM | 8:09 | |
| 12/14/2008 | 6:55 AM | | |
| 12/14/2008 | 7:30 PM | 12:35 | |
| 12/15/2008 | 7:20 PM | | punch in / no punch out |
| 12/16/2008 | 2:55 PM | | |
| 12/16/2008 | 11:09 PM | 8:14 | |
| 12/21/2008 | 6:55 AM | | |
| 12/21/2008 | 7:04 PM | 12:09 | |
| 12/22/2008 | 6:56 AM | | |
| 12/22/2008 | 7:33 PM | 12:37 | |
| 12/23/2008 | 2:55 PM | | |
| 12/23/2008 | 11:32 PM | 8:37 | |
| 12/24/2008 | 2:55 PM | | |
| 12/24/2008 | 11:05 PM | 8:10 | |
| 12/28/2008 | 6:55 AM | | |
| 12/28/2008 | 7:05 PM | 12:10 | |
| 12/29/2008 | 6:55 AM | | |
| 12/29/2008 | 7:30 PM | 12:35 | |
| 12/30/2008 | 2:55 PM | | double punch |
| 12/31/2008 | 2:55 PM | | |
| 12/31/2008 | 11:06 PM | 8:11 | |
| 1/2/2009 | 2:55 PM | | |
| 1/2/2009 | 11:21 PM | 8:26 | |
| 1/4/2009 | 6:55 AM | | |
| 1/4/2009 | 7:13 PM | 12:18 | |
| 1/5/2009 | 6:55 AM | | |
| 1/5/2009 | 7:30 PM | 12:35 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 1/6/2009 | 2:55 PM | | |
| 1/6/2009 | 11:03 PM | 8:08 | |
| 1/7/2009 | 2:55 PM | | |
| 1/7/2009 | 11:32 PM | 8:37 | |
| 1/11/2009 | 6:55 AM | | |
| 1/11/2009 | 7:04 PM | 12:09 | |
| 1/12/2009 | 6:55 AM | | |
| 1/12/2009 | 7:30 PM | 12:35 | |
| 1/13/2009 | 2:55 PM | | |
| 1/13/2009 | 11:08 PM | 8:13 | |
| 1/18/2009 | 6:55 AM | | |
| 1/18/2009 | 7:09 PM | 12:14 | |
| 1/19/2009 | 6:55 AM | | |
| 1/19/2009 | 7:30 PM | 12:35 | |
| 1/20/2009 | 2:55 PM | | |
| 1/20/2009 | 11:30 PM | 8:35 | |
| 1/21/2009 | 2:56 PM | | |
| 1/21/2009 | 11:07 PM | 8:11 | |
| 1/25/2009 | 6:55 AM | | |
| 1/25/2009 | 7:03 PM | 12:08 | |
| 1/27/2009 | 2:55 PM | | |
| 1/27/2009 | 11:07 PM | 8:12 | |
| 1/28/2009 | 2:55 PM | | |
| 1/28/2009 | 11:33 PM | 8:38 | |
| 2/1/2009 | 6:55 AM | | |
| 2/1/2009 | 7:03 PM | 12:08 | |
| 2/2/2009 | 6:55 AM | | |
| 2/2/2009 | 7:31 PM | 12:36 | |
| 2/3/2009 | 2:55 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 2/3/2009 | 11:12 PM | 8:17 | |
| 2/4/2009 | 2:55 PM | | |
| 2/4/2009 | 11:17 PM | 8:22 | |
| 2/6/2009 | 6:55 AM | | |
| 2/6/2009 | 3:09 PM | 8:14 | |
| 2/8/2009 | 6:55 AM | | |
| 2/8/2009 | 7:03 PM | 12:08 | |
| 2/9/2009 | 6:55 AM | | |
| 2/9/2009 | 7:30 PM | 12:35 | |
| 2/10/2009 | 2:55 PM | | |
| 2/10/2009 | 11:31 PM | 8:36 | |
| 2/11/2009 | 2:55 PM | | |
| 2/11/2009 | 11:05 PM | 8:10 | |
| 2/15/2009 | 6:55 AM | | |
| 2/15/2009 | 7:12 PM | 12:17 | |
| 2/16/2009 | 6:55 AM | | |
| 2/16/2009 | 7:32 PM | 12:37 | |
| 2/17/2009 | 2:56 PM | | |
| 2/17/2009 | 11:11 PM | 8:15 | |
| 2/18/2009 | 1:57 PM | | |
| 2/18/2009 | 11:10 PM | 9:13 | |
| 2/22/2009 | 2:55 PM | | |
| 2/22/2009 | 11:04 PM | 8:09 | |
| 2/23/2009 | 6:56 AM | | |
| 2/23/2009 | 7:09 PM | 12:13 | |
| 2/24/2009 | 6:55 AM | | |
| 2/24/2009 | 6:07 PM | 11:12 | |
| 2/25/2009 | 6:56 AM | | |
| 2/25/2009 | 7:02 PM | 12:06 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|------|------------|----------------------|----------|
| 2/27/2009 | 6:56 AM | | |
| 2/27/2009 | 6:49 PM | 11:53 | |
| 3/1/2009 | 6:55 AM | | |
| 3/1/2009 | 7:04 PM | 12:09 | |
| 3/2/2009 | 6:56 AM | | |
| 3/2/2009 | 7:33 PM | 12:37 | |
| 3/3/2009 | 2:56 PM | | |
| 3/3/2009 | 11:05 PM | 8:09 | |
| 3/4/2009 | 2:55 PM | | |
| 3/4/2009 | 11:46 PM | 8:51 | |
| 3/6/2009 | 10:55 PM | | |
| 3/7/2009 | 7:00 AM | 8:05 | |
| 3/8/2009 | 6:55 AM | | |
| 3/8/2009 | 7:05 PM | 12:10 | |
| 3/9/2009 | 6:56 AM | | |
| 3/9/2009 | 7:31 PM | 12:35 | |
| 3/10/2009 | 2:57 PM | | |
| 3/10/2009 | 11:07 PM | 8:10 | |
| 3/11/2009 | 2:56 PM | | |
| 3/11/2009 | 11:27 PM | 8:31 | |
| 3/13/2009 | 10:55 PM | | |
| 3/14/2009 | 7:20 AM | 8:25 | |
| 3/15/2009 | 6:56 AM | | |
| 3/15/2009 | 7:14 PM | 12:18 | |
| 3/16/2009 | 6:56 AM | | |
| 3/16/2009 | 7:04 PM | 12:08 | |
| 3/17/2009 | 2:55 PM | | |
| 3/17/2009 | 11:30 PM | 8:35 | |
| 3/18/2009 | 2:56 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 3/18/2009 | 11:02 PM | 8:06 | |
| 3/22/2009 | 6:55 AM | | |
| 3/22/2009 | 7:07 PM | 12:12 | |
| 3/23/2009 | 6:55 AM | | |
| 3/23/2009 | 7:31 PM | 12:36 | |
| 3/24/2009 | 2:55 PM | | |
| 3/24/2009 | 11:03 PM | 8:08 | |
| 3/25/2009 | 2:56 PM | | |
| 3/25/2009 | 11:30 PM | 8:34 | |
| 3/29/2009 | 6:55 AM | | |
| 3/29/2009 | 7:05 PM | 12:10 | |
| 3/30/2009 | 6:55 AM | | |
| 3/30/2009 | 7:31 PM | 12:36 | |
| 3/31/2009 | 2:55 PM | | |
| 3/31/2009 | 11:06 PM | 8:11 | |
| 4/1/2009 | 2:56 PM | | |
| 4/1/2009 | 11:31 PM | 8:35 | |
| 4/3/2009 | 10:55 PM | | punch in / no punch out |
| 4/5/2009 | 6:55 AM | | |
| 4/5/2009 | 7:07 PM | 12:12 | |
| 4/6/2009 | 6:55 AM | | |
| 4/6/2009 | 7:26 PM | 12:31 | |
| 4/7/2009 | 2:55 PM | | |
| 4/7/2009 | 11:04 PM | 8:09 | |
| 4/8/2009 | 2:55 PM | | |
| 4/8/2009 | 11:31 PM | 8:36 | |
| 4/10/2009 | 10:55 PM | | |
| 4/11/2009 | 7:01 AM | 8:06 | |
| 4/12/2009 | 6:55 AM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|------|-----------|---------------------|----------|
| 4/12/2009 | 7:01 PM | 12:06 | |
| 4/13/2009 | 6:55 AM | | |
| 4/13/2009 | 7:03 PM | 12:08 | |
| 4/14/2009 | 2:55 PM | | |
| 4/14/2009 | 11:30 PM | 8:35 | |
| 4/19/2009 | 6:55 AM | | |
| 4/19/2009 | 7:30 PM | 12:35 | |
| 4/20/2009 | 6:55 AM | | |
| 4/20/2009 | 7:04 PM | 12:09 | |
| 4/21/2009 | 2:55 PM | | |
| 4/21/2009 | 11:33 PM | 8:38 | |
| 4/22/2009 | 2:55 PM | | |
| 4/22/2009 | 11:08 PM | 8:13 | |
| 4/24/2009 | 10:55 PM | | |
| 4/25/2009 | 7:05 AM | 8:10 | |
| 4/26/2009 | 6:55 AM | | |
| 4/26/2009 | 7:27 PM | 12:32 | |
| 4/27/2009 | 6:55 AM | | |
| 4/27/2009 | 7:04 PM | 12:09 | |
| 4/28/2009 | 2:55 PM | | |
| 4/28/2009 | 11:00 PM | 8:05 | |
| 4/29/2009 | 2:55 PM | | |
| 4/29/2009 | 11:30 PM | 8:35 | |
| 5/1/2009 | 11:00 PM | | |
| 5/2/2009 | 7:07 AM | 8:07 | |
| 5/3/2009 | 6:55 AM | | |
| 5/3/2009 | 7:33 PM | 12:38 | |
| 5/4/2009 | 6:55 AM | | |
| 5/4/2009 | 7:05 PM | 12:10 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 5/5/2009 | 2:55 PM | | |
| 5/5/2009 | 11:30 PM | 8:35 | |
| 5/6/2009 | 2:55 PM | | |
| 5/6/2009 | 11:02 PM | 8:07 | |
| 5/10/2009 | 6:55 AM | | |
| 5/10/2009 | 7:04 PM | 12:09 | |
| 5/12/2009 | 2:55 PM | | |
| 5/12/2009 | 11:31 PM | 8:36 | |
| 5/13/2009 | 2:56 PM | | |
| 5/13/2009 | 11:20 PM | 8:24 | |
| 5/14/2009 | 10:56 PM | | |
| 5/15/2009 | 7:01 AM | 8:05 | |
| 5/17/2009 | 10:58 PM | | |
| 5/18/2009 | 7:31 AM | 8:33 | |
| 5/18/2009 | 10:57 PM | | punch in / no punch out |
| 5/19/2009 | 10:55 PM | | |
| 5/20/2009 | 7:30 AM | 8:35 | |
| 5/20/2009 | 10:55 PM | | |
| 5/21/2009 | 7:01 AM | 8:06 | |
| 5/21/2009 | 10:55 PM | | |
| 5/21/2009 | 7:01 AM | | punch in / no punch out |
| 5/22/2009 | 7:30 AM | 8:35 | |
| 5/22/2009 | 10:55 PM | | |
| 5/23/2009 | 7:19 AM | 8:24 | |
| 5/24/2009 | 10:55 PM | | |
| 5/25/2009 | 7:33 AM | 8:38 | |
| 5/25/2009 | 10:56 PM | | |
| 5/26/2009 | 7:30 AM | 8:34 | |
| 5/26/2009 | 10:56 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|------|-----------|---------------------|----------|
| 5/27/2009 | 7:30 AM | 8:34 | |
| 5/27/2009 | 10:55 PM | | |
| 5/28/2009 | 7:30 AM | 8:35 | |
| 5/28/2009 | 10:56 PM | | |
| 5/29/2009 | 7:30 AM | 8:34 | |
| 5/31/2009 | 10:55 PM | | |
| 6/1/2009 | 7:30 AM | 8:35 | |
| 6/1/2009 | 10:56 PM | | |
| 6/2/2009 | 7:30 AM | 8:34 | |
| 6/2/2009 | 10:57 PM | | |
| 6/3/2009 | 7:30 AM | 8:33 | |
| 6/3/2009 | 10:56 PM | | |
| 6/4/2009 | 7:00 AM | 8:04 | |
| 6/4/2009 | 10:56 PM | | |
| 6/5/2009 | 7:30 AM | 8:34 | |
| 6/5/2009 | 10:57 PM | | |
| 6/6/2009 | 7:30 AM | 8:33 | |
| 6/7/2009 | 10:55 PM | | |
| 6/8/2009 | 7:00 AM | 8:05 | |
| 6/8/2009 | 7:55 AM | | |
| 6/8/2009 | 10:05 AM | 2:10 | |
| 6/8/2009 | 10:56 PM | | |
| 6/9/2009 | 7:30 AM | 8:34 | |
| 6/9/2009 | 10:56 PM | | |
| 6/10/2009 | 7:02 AM | 8:06 | |
| 6/10/2009 | 10:55 PM | | |
| 6/11/2009 | 9:00 AM | 10:05 | |
| 6/11/2009 | 10:56 PM | | |
| 6/12/2009 | 7:30 AM | 8:34 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 6/15/2009 | 7:30 AM | | punch in / no punch out |
| 6/15/2009 | 10:56 PM | | |
| 6/16/2009 | 7:30 AM | 8:34 | |
| 6/16/2009 | 11:02 PM | | |
| 6/17/2009 | 7:30 AM | 8:28 | |
| 6/17/2009 | 10:55 PM | | |
| 6/18/2009 | 7:30 AM | 8:35 | |
| 6/18/2009 | 10:55 PM | | |
| 6/19/2009 | 7:30 AM | 8:35 | |
| 6/19/2009 | 10:57 PM | | |
| 6/20/2009 | 7:06 AM | 8:09 | |
| 6/21/2009 | 11:19 PM | | |
| 6/22/2009 | 7:30 AM | 8:11 | |
| 6/22/2009 | 10:55 PM | | |
| 6/23/2009 | 7:30 AM | 8:35 | |
| 6/23/2009 | 10:55 PM | | |
| 6/24/2009 | 7:31 AM | 8:36 | |
| 6/24/2009 | 6:25 PM | | |
| 6/24/2009 | 7:44 PM | 1:19 | |
| 6/24/2009 | 10:56 PM | | |
| 6/25/2009 | 7:33 AM | 8:37 | |
| 6/25/2009 | 10:56 PM | | |
| 6/26/2009 | 7:33 AM | 8:37 | |
| 6/28/2009 | 10:56 PM | | |
| 6/29/2009 | 7:30 AM | 8:34 | |
| 6/29/2009 | 11:01 PM | | |
| 6/30/2009 | 7:30 AM | 8:29 | |
| 6/30/2009 | 10:56 PM | | |
| 7/1/2009 | 7:31 AM | 8:35 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 7/1/2009 | 10:55 PM | | punch in / no punch out |
| 7/2/2009 | 10:56 PM | | |
| 7/3/2009 | 7:31 AM | 8:35 | |
| 7/4/2009 | 10:56 PM | | |
| 7/5/2009 | 7:32 AM | 8:36 | |
| 7/5/2009 | 10:55 PM | | |
| 7/6/2009 | 7:32 AM | 8:37 | |
| 7/6/2009 | 10:55 PM | | |
| 7/7/2009 | 7:30 AM | 8:35 | |
| 7/7/2009 | 10:56 PM | | |
| 7/8/2009 | 7:31 AM | 8:35 | |
| 7/8/2009 | 10:57 PM | | |
| 7/9/2009 | 7:31 AM | 8:34 | |
| 7/9/2009 | 10:55 PM | | |
| 7/10/2009 | 7:30 AM | 8:35 | |
| 7/12/2009 | 10:55 PM | | |
| 7/13/2009 | 7:30 AM | 8:35 | |
| 7/13/2009 | 10:55 PM | | |
| 7/14/2009 | 7:30 AM | 8:35 | |
| 7/14/2009 | 10:55 PM | | |
| 7/15/2009 | 7:30 AM | 8:35 | |
| 7/15/2009 | 10:56 PM | | |
| 7/16/2009 | 7:31 AM | 8:35 | |
| 7/16/2009 | 10:55 PM | | |
| 7/17/2009 | 7:30 AM | 8:35 | |
| 7/17/2009 | 10:55 PM | | |
| 7/18/2009 | 7:00 AM | 8:05 | |
| 7/20/2009 | 7:31 AM | | Punch out / no punch in |
| 7/20/2009 | 10:56 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|------|-----------|---------------------|----------|
| 7/21/2009 | 7:33 AM | 8:37 | |
| 7/21/2009 | 10:55 PM | | |
| **ABAZON, JERRY A.** | | | |
| 7/22/2009 | 7:33 AM | 8:37 | |
| 7/23/2009 | 7:30 AM | | Punch out / no punch in |
| 7/23/2009 | 10:55 PM | | |
| 7/24/2009 | 7:31 AM | 8:36 | |
| 7/26/2009 | 10:55 PM | | |
| 7/27/2009 | 7:31 AM | 8:36 | |
| 7/27/2009 | 10:56 PM | | |
| 7/28/2009 | 7:32 AM | 8:36 | |
| 7/28/2009 | 10:56 PM | | |
| 7/29/2009 | 7:32 AM | 8:36 | |
| 7/29/2009 | 10:56 PM | | |
| 7/30/2009 | 7:30 AM | 8:34 | |
| 7/30/2009 | 10:56 PM | | |
| 7/31/2009 | 7:30 AM | 8:34 | |
| 8/1/2009 | 10:55 PM | | |
| 8/2/2009 | 7:30 AM | 8:35 | |
| 8/2/2009 | 10:56 PM | | |
| 8/3/2009 | 7:30 AM | 8:34 | |
| 8/3/2009 | 10:56 PM | | punch in / no punch out |
| 8/4/2009 | 10:55 PM | | |
| 8/5/2009 | 7:30 AM | 8:35 | |
| 8/5/2009 | 10:57 PM | | |
| 8/6/2009 | 7:30 AM | 8:33 | |
| 8/6/2009 | 10:55 PM | | |
| 8/7/2009 | 7:30 AM | 8:35 | |
| 8/7/2009 | 10:56 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 8/8/2009 | 7:30 AM | 8:34 | |
| 8/9/2009 | 10:55 PM | | |
| 8/10/2009 | 7:31 AM | 8:36 | |
| 8/10/2009 | 10:56 PM | | |
| 8/11/2009 | 7:32 AM | 8:36 | |
| 8/11/2009 | 10:56 PM | | |
| 8/12/2009 | 7:30 AM | 8:34 | |
| 8/12/2009 | 10:55 PM | | |
| 8/13/2009 | 7:30 AM | 8:35 | |
| 8/13/2009 | 10:56 PM | | |
| 8/14/2009 | 7:30 AM | 8:34 | |
| 8/16/2009 | 10:55 PM | | |
| 8/17/2009 | 7:34 AM | 8:39 | |
| 8/17/2009 | 10:55 PM | | |
| 8/18/2009 | 8:24 AM | 9:29 | |
| 8/18/2009 | 10:57 PM | | |
| 8/19/2009 | 7:30 AM | 8:33 | |
| 8/19/2009 | 10:55 PM | | |
| 8/20/2009 | 7:31 AM | 8:36 | |
| 8/20/2009 | 10:55 PM | | |
| 8/21/2009 | 7:30 AM | 8:35 | |
| 8/21/2009 | 10:56 PM | | |
| 8/22/2009 | 7:31 AM | 8:35 | |
| 8/23/2009 | 10:55 PM | | |
| 8/24/2009 | 7:31 AM | 8:36 | |
| 8/24/2009 | 10:57 PM | | |
| 8/25/2009 | 7:31 AM | 8:34 | |
| 8/25/2009 | 10:55 PM | | |
| 8/26/2009 | 7:31 AM | 8:36 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 8/26/2009 | 10:56 PM | | |
| 8/27/2009 | 7:31 AM | 8:35 | |
| 8/27/2009 | 11:03 PM | | |
| 8/28/2009 | 7:07 AM | 8:04 | |
| 8/30/2009 | 11:12 PM | | |
| 8/31/2009 | 7:32 AM | 8:20 | |
| 9/1/2009 | 10:55 PM | | |
| 9/2/2009 | 7:30 AM | 8:35 | |
| 9/3/2009 | 7:34 AM | | Punch out / no punch in |
| 9/3/2009 | 10:55 PM | | |
| 9/4/2009 | 7:31 AM | 8:36 | |
| 9/4/2009 | 10:55 PM | | |
| 9/5/2009 | 7:30 AM | 8:35 | |
| 9/6/2009 | 6:55 PM | | |
| 9/7/2009 | 7:30 AM | 12:35 | |
| 9/7/2009 | 10:55 PM | | |
| 9/8/2009 | 7:31 AM | 8:36 | |
| 9/8/2009 | 10:56 PM | | |
| 9/9/2009 | 7:30 AM | 8:34 | |
| 9/9/2009 | 10:56 PM | | |
| 9/10/2009 | 7:30 AM | 8:34 | |
| 9/10/2009 | 10:57 PM | | |
| 9/11/2009 | 7:04 AM | 8:07 | |
| 9/11/2009 | 10:55 PM | | |
| 9/12/2009 | 7:31 AM | 8:36 | |
| 9/13/2009 | 10:56 PM | | |
| 9/14/2009 | 7:30 AM | 8:34 | |
| 9/14/2009 | 10:55 PM | | |
| 9/15/2009 | 7:30 AM | 8:35 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|------|------------|----------------------|----------|
| 9/15/2009 | 10:55 PM | | |
| 9/16/2009 | 7:30 AM | 8:35 | |
| 9/16/2009 | 10:44 PM | | |
| 9/17/2009 | 7:16 AM | 8:32 | |
| 9/17/2009 | 10:55 PM | | |
| 9/18/2009 | 7:32 AM | 8:37 | |
| 9/19/2009 | 7:54 AM | | |
| 9/19/2009 | 10:30 AM | 2:36 | |
| 9/20/2009 | 8:36 AM | | |
| 9/20/2009 | 2:02 PM | 5:26 | |
| 9/20/2009 | 9:55 PM | | |
| 9/21/2009 | 7:30 AM | 9:35 | |
| 9/21/2009 | 10:55 PM | | |
| 9/22/2009 | 7:31 AM | 8:36 | |
| 9/22/2009 | 10:55 PM | | |
| 9/23/2009 | 7:30 AM | 8:35 | |
| 9/23/2009 | 10:56 PM | | |
| 9/24/2009 | 7:30 AM | 8:34 | |
| 9/24/2009 | 10:55 PM | | |
| 9/25/2009 | 7:31 AM | 8:36 | |
| 9/27/2009 | 10:55 PM | | |
| 9/28/2009 | 7:32 AM | 8:37 | |
| 9/29/2009 | 7:30 AM | | |
| 9/29/2009 | 10:56 PM | 15:26 | |
| 9/30/2009 | 10:56 PM | | |
| 10/1/2009 | 7:31 AM | 8:35 | |
| 10/1/2009 | 10:55 PM | | |
| 10/2/2009 | 7:30 AM | 8:35 | |
| 10/2/2009 | 10:58 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 10/3/2009 | 7:01 AM | 8:03 | |
| 10/4/2009 | 6:56 PM | | |
| 10/5/2009 | 7:07 AM | 12:11 | |
| 10/5/2009 | 10:56 PM | | |
| 10/6/2009 | 7:31 AM | 8:35 | |
| 10/6/2009 | 10:55 PM | | |
| 10/7/2009 | 7:30 AM | 8:35 | |
| 10/7/2009 | 10:57 PM | | |
| 10/8/2009 | 7:30 AM | 8:33 | |
| 10/8/2009 | 10:55 PM | | |
| 10/9/2009 | 7:30 AM | 8:35 | |
| 10/9/2009 | 8:33 PM | | |
| 10/10/2009 | 7:01 AM | 10:28 | |
| 10/11/2009 | 10:55 PM | | |
| 10/12/2009 | 7:33 AM | 8:38 | |
| 10/12/2009 | 10:56 PM | | |
| 10/13/2009 | 7:31 AM | 8:35 | |
| 10/13/2009 | 10:55 PM | | |
| 10/14/2009 | 7:38 AM | 8:43 | |
| 10/14/2009 | 10:55 PM | | |
| 10/15/2009 | 7:30 AM | 8:35 | |
| 10/15/2009 | 10:56 PM | | |
| 10/16/2009 | 7:30 AM | 8:34 | |
| 10/16/2009 | 10:56 PM | | |
| 10/17/2009 | 7:01 AM | 8:05 | |
| 10/18/2009 | 10:55 PM | | |
| 10/19/2009 | 7:03 AM | 8:08 | double punch |
| 10/19/2009 | 10:56 PM | | |
| 10/19/2009 | 7:03 AM | | double punch |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 10/20/2009 | 7:34 AM | 8:38 | |
| 10/20/2009 | 10:55 PM | | |
| 10/21/2009 | 7:30 AM | 8:35 | |
| 10/21/2009 | 10:57 PM | | |
| 10/22/2009 | 7:30 AM | 8:33 | |
| 10/22/2009 | 10:56 PM | | |
| 10/23/2009 | 7:30 AM | 8:34 | |
| 10/25/2009 | 10:56 PM | | |
| 10/26/2009 | 7:33 AM | 8:37 | |
| 10/26/2009 | 11:24 PM | | |
| 10/27/2009 | 7:32 AM | 8:08 | |
| 10/27/2009 | 10:56 PM | | |
| 10/28/2009 | 7:06 AM | 8:10 | double punch |
| 10/28/2009 | 6:56 PM | | |
| 10/28/2009 | 7:06 AM | | double punch |
| 10/29/2009 | 7:14 AM | 12:18 | double punch |
| 10/29/2009 | 10:57 PM | | |
| 10/29/2009 | 7:14 AM | | double punch |
| 10/30/2009 | 7:31 AM | 8:34 | |
| 11/1/2009 | 10:36 PM | | |
| 11/2/2009 | 7:31 AM | 8:55 | |
| 11/2/2009 | 10:55 PM | | |
| 11/3/2009 | 7:31 AM | 8:36 | |
| 11/3/2009 | 6:56 PM | | |
| 11/4/2009 | 7:02 AM | 12:06 | double punch |
| 11/4/2009 | 10:57 PM | | |
| 11/4/2009 | 7:02 AM | | double punch |
| 11/5/2009 | 7:32 AM | 8:35 | |
| 11/5/2009 | 5:20 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 11/5/2009 | 6:53 PM | 1:33 | |
| 11/5/2009 | 10:56 PM | | |
| 11/6/2009 | 7:30 AM | 8:34 | |
| 11/8/2009 | 6:56 PM | | |
| 11/9/2009 | 7:03 AM | 12:07 | double punch |
| 11/9/2009 | 10:55 PM | | |
| 11/9/2009 | 7:03 AM | | double punch |
| 11/10/2009 | 7:32 AM | 8:37 | |
| 11/10/2009 | 10:56 PM | | |
| 11/11/2009 | 7:31 AM | 8:35 | |
| 11/11/2009 | 10:58 PM | | |
| 11/12/2009 | 7:32 AM | 8:34 | |
| 11/12/2009 | 6:55 PM | | |
| 11/13/2009 | 7:04 AM | 12:09 | |
| 11/16/2009 | 10:55 PM | | |
| 11/17/2009 | 7:32 AM | 8:37 | |
| 11/17/2009 | 10:57 PM | | |
| 11/18/2009 | 7:32 AM | 8:35 | |
| 11/18/2009 | 10:56 PM | | |
| 11/19/2009 | 7:31 AM | 8:35 | |
| 11/19/2009 | 11:07 PM | | |
| 11/20/2009 | 7:30 AM | 8:23 | |
| 11/23/2009 | 10:55 PM | | |
| 11/24/2009 | 7:31 AM | 8:36 | |
| 11/24/2009 | 10:55 PM | | |
| 11/25/2009 | 7:31 AM | 8:36 | |
| 11/25/2009 | 10:32 PM | | |
| 11/26/2009 | 7:05 AM | 8:33 | |
| 11/26/2009 | 10:55 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 11/27/2009 | 7:31 AM | 8:36 | |
| 11/30/2009 | 10:29 PM | | |
| 12/1/2009 | 7:01 AM | 8:32 | |
| 12/1/2009 | 10:56 PM | | |
| 12/2/2009 | 9:37 AM | 10:41 | |
| 12/2/2009 | 10:56 PM | | |
| 12/3/2009 | 7:31 AM | 8:35 | |
| 12/3/2009 | 10:55 PM | | |
| 12/4/2009 | 7:52 AM | 8:57 | |
| 12/7/2009 | 10:56 PM | | |
| 12/8/2009 | 7:30 AM | 8:34 | |
| 12/8/2009 | 11:06 PM | | |
| 12/9/2009 | 7:32 AM | 8:26 | |
| 12/9/2009 | 10:57 PM | | |
| 12/10/2009 | 7:31 AM | 8:34 | |
| 12/10/2009 | 10:57 PM | | |
| 12/11/2009 | 7:32 AM | 8:35 | |
| 12/14/2009 | 10:58 PM | | |
| 12/15/2009 | 7:32 AM | 8:34 | |
| 12/15/2009 | 10:57 PM | | |
| 12/16/2009 | 7:33 AM | 8:36 | |
| 12/16/2009 | 10:57 PM | | |
| 12/17/2009 | 7:31 AM | 8:34 | |
| 12/17/2009 | 10:57 PM | | |
| 12/18/2009 | 7:30 AM | 8:33 | |
| 12/21/2009 | 10:57 PM | | |
| 12/22/2009 | 7:35 AM | 8:38 | |
| 12/22/2009 | 10:56 PM | | |
| 12/23/2009 | 7:31 AM | 8:35 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 12/23/2009 | 10:57 PM | | |
| 12/24/2009 | 7:05 AM | 8:08 | double punch |
| 12/24/2009 | 10:58 PM | | |
| 12/24/2009 | 7:05 AM | | double punch |
| 12/25/2009 | 7:31 AM | 8:33 | |
| 12/28/2009 | 10:57 PM | | |
| 12/29/2009 | 7:31 AM | 8:34 | |
| 12/29/2009 | 10:57 PM | | |
| 12/30/2009 | 7:32 AM | 8:35 | |
| 12/30/2009 | 10:57 PM | | |
| 12/31/2009 | 7:30 AM | 8:33 | |
| 12/31/2009 | 10:57 PM | | |
| 1/1/2010 | 7:32 AM | 8:35 | |
| 1/4/2010 | 10:57 PM | | |
| 1/5/2010 | 7:30 AM | 8:33 | |
| 1/5/2010 | 10:57 PM | | |
| 1/6/2010 | 7:31 AM | 8:34 | |
| 1/6/2010 | 10:57 PM | | |
| 1/7/2010 | 7:30 AM | 8:33 | |
| 1/7/2010 | 8:56 PM | | |
| 1/8/2010 | 7:30 AM | 10:34 | |
| 1/11/2010 | 10:58 PM | | |
| 1/12/2010 | 7:30 AM | 8:32 | |
| 1/12/2010 | 10:57 PM | | |
| 1/13/2010 | 7:30 AM | 8:33 | |
| 1/13/2010 | 10:57 PM | | |
| 1/14/2010 | 7:30 AM | 8:33 | |
| 1/14/2010 | 10:55 PM | | |
| 1/15/2010 | 7:30 AM | 8:35 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|------|-----------|---------------------|----------|
| 1/18/2010 | 10:57 PM | | |
| 1/19/2010 | 7:31 AM | 8:34 | |
| 1/19/2010 | 10:57 PM | | |
| 1/20/2010 | 7:31 AM | 8:34 | |
| 1/20/2010 | 10:57 PM | | |
| 1/21/2010 | 7:30 AM | 8:33 | |
| 1/21/2010 | 10:57 PM | | |
| 1/22/2010 | 7:32 AM | 8:35 | |
| 1/25/2010 | 10:57 PM | | |
| 1/26/2010 | 7:30 AM | 8:33 | |
| 1/26/2010 | 10:57 PM | | |
| 1/27/2010 | 7:30 AM | 8:33 | |
| 1/27/2010 | 10:57 PM | | |
| 1/28/2010 | 7:31 AM | 8:34 | |
| 1/28/2010 | 10:57 PM | | |
| 1/29/2010 | 7:32 AM | 8:35 | |
| 2/1/2010 | 10:58 PM | | |
| 2/2/2010 | 7:30 AM | 8:32 | |
| 2/2/2010 | 10:57 PM | | |
| 2/3/2010 | 7:31 AM | 8:34 | |
| 2/3/2010 | 10:58 PM | | |
| 2/4/2010 | 7:31 AM | 8:33 | |
| 2/4/2010 | 10:58 PM | | |
| 2/5/2010 | 7:30 AM | 8:32 | |
| 2/7/2010 | 10:57 PM | | |
| 2/8/2010 | 7:01 AM | 8:04 | |
| 2/8/2010 | 2:58 PM | | |
| 2/8/2010 | 11:31 PM | 8:33 | |
| 2/8/2010 | 7:01 AM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 2/9/2010 | 2:54 PM | | |
| 2/9/2010 | 11:30 PM | 8:36 | |
| 2/10/2010 | 10:56 PM | | |
| 2/11/2010 | 7:30 AM | 8:34 | |
| 2/11/2010 | 10:58 PM | | |
| 2/12/2010 | 7:32 AM | 8:34 | |
| 2/15/2010 | 10:57 PM | | |
| 2/16/2010 | 7:32 AM | 8:35 | |
| 2/16/2010 | 10:58 PM | | |
| 2/17/2010 | 7:31 AM | 8:33 | |
| 2/17/2010 | 10:57 PM | | |
| 2/18/2010 | 7:31 AM | 8:34 | |
| 2/18/2010 | 10:57 PM | | |
| 2/19/2010 | 7:30 AM | 8:33 | |
| 2/20/2010 | 1:29 AM | | |
| 2/20/2010 | 7:09 AM | 5:40 | |
| 2/22/2010 | 10:57 PM | | |
| 2/23/2010 | 7:30 AM | 8:33 | |
| 2/23/2010 | 10:57 PM | | |
| 2/24/2010 | 7:30 AM | 8:33 | |
| 2/24/2010 | 10:57 PM | | |
| 2/25/2010 | 7:33 AM | 8:36 | |
| 2/25/2010 | 10:57 PM | | |
| 2/26/2010 | 7:31 AM | 8:34 | |
| 3/1/2010 | 10:56 PM | | |
| 3/2/2010 | 7:31 AM | 8:35 | |
| 3/2/2010 | 10:58 PM | | |
| 3/3/2010 | 7:30 AM | 8:32 | |
| 3/3/2010 | 10:57 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|------|-----------|---------------------|----------|
| 3/4/2010 | 7:31 AM | 8:34 | |
| 3/4/2010 | 10:58 PM | | |
| 3/5/2010 | 7:32 AM | 8:34 | |
| 3/7/2010 | 10:57 PM | | |
| 3/8/2010 | 7:31 AM | 8:34 | |
| 3/9/2010 | 10:57 PM | | |
| 3/10/2010 | 7:30 AM | 8:33 | |
| 3/10/2010 | 10:56 PM | | |
| 3/11/2010 | 7:31 AM | 8:35 | |
| 3/11/2010 | 10:57 PM | | |
| 3/12/2010 | 7:33 AM | 8:36 | |
| 3/14/2010 | 10:57 PM | | |
| 3/15/2010 | 7:30 AM | 8:33 | |
| 3/15/2010 | 10:57 PM | | |
| 3/16/2010 | 7:33 AM | 8:36 | |
| 3/16/2010 | 10:57 PM | | |
| 3/17/2010 | 7:30 AM | 8:33 | |
| 3/17/2010 | 10:57 PM | | |
| 3/18/2010 | 7:30 AM | 8:33 | |
| 3/18/2010 | 10:25 PM | | |
| 3/19/2010 | 7:03 AM | 8:38 | |
| 3/21/2010 | 10:57 PM | | |
| 3/22/2010 | 7:31 AM | 8:34 | |
| 3/22/2010 | 10:58 PM | | |
| 3/23/2010 | 7:30 AM | 8:32 | |
| 3/23/2010 | 10:58 PM | | |
| 3/24/2010 | 7:31 AM | 8:33 | |
| 3/24/2010 | 10:57 PM | | |
| 3/25/2010 | 7:30 AM | 8:33 | |

## BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 3/25/2010 | 10:57 PM | | |
| 3/26/2010 | 7:30 AM | 8:33 | |
| 3/29/2010 | 10:57 PM | | |
| 3/30/2010 | 7:31 AM | 8:34 | |
| 3/30/2010 | 10:57 PM | | |
| 3/31/2010 | 7:30 AM | 8:33 | |
| 3/31/2010 | 10:58 PM | | |
| 4/1/2010 | 7:30 AM | 8:32 | |
| 4/4/2010 | 10:57 PM | | |
| 4/5/2010 | 7:30 AM | 8:33 | |
| 4/5/2010 | 10:57 PM | | |
| 4/6/2010 | 7:30 AM | 8:33 | |
| 4/6/2010 | 10:57 PM | | |
| 4/7/2010 | 7:35 AM | 8:38 | |
| 4/7/2010 | 10:57 PM | | |
| 4/8/2010 | 7:30 AM | 8:33 | |
| 4/8/2010 | 9:18 PM | | |
| 4/9/2010 | 7:11 AM | 9:53 | |
| 4/11/2010 | 10:56 PM | | |
| 4/12/2010 | 7:30 AM | 8:34 | |
| 4/12/2010 | 10:58 PM | | |
| 4/13/2010 | 7:30 AM | 8:32 | |
| 4/13/2010 | 10:57 PM | | |
| 4/14/2010 | 7:30 AM | 8:33 | |
| 4/14/2010 | 10:12 PM | | |
| 4/15/2010 | 7:11 AM | 8:59 | |
| 4/15/2010 | 8:53 PM | | |
| 4/16/2010 | 7:23 AM | 10:30 | |
| 4/18/2010 | 10:57 PM | | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 4/19/2010 | 7:30 AM | 8:33 | |
| 4/19/2010 | 10:57 PM | | |
| 4/20/2010 | 7:30 AM | 8:33 | |
| 4/20/2010 | 10:57 PM | | |
| 4/21/2010 | 7:30 AM | 8:33 | |
| 4/21/2010 | 10:58 PM | | |
| 4/22/2010 | 7:30 AM | 8:32 | |
| 4/22/2010 | 10:57 PM | | |
| 4/23/2010 | 7:30 AM | 8:33 | |
| 4/25/2010 | 10:56 PM | | |
| 4/26/2010 | 7:30 AM | 8:34 | |
| 4/26/2010 | 10:57 PM | | |
| 4/27/2010 | 7:30 AM | 8:33 | |
| 4/27/2010 | 10:57 PM | | |
| 4/28/2010 | 7:30 AM | 8:33 | |
| 4/28/2010 | 10:57 PM | | |
| 4/29/2010 | 7:30 AM | 8:33 | |
| 4/29/2010 | 10:57 PM | | |
| 4/30/2010 | 7:30 AM | 8:33 | |
| 5/2/2010 | 10:57 PM | | |
| 5/3/2010 | 7:30 AM | 8:33 | |
| 5/3/2010 | 10:57 PM | | |
| 5/4/2010 | 7:30 AM | 8:33 | |
| 5/4/2010 | 10:58 PM | | |
| 5/5/2010 | 7:31 AM | 8:33 | |
| 5/5/2010 | 10:57 PM | | |
| 5/6/2010 | 7:30 AM | 8:33 | |
| 5/7/2010 | 10:56 PM | | |
| 5/8/2010 | 7:30 AM | 8:34 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|------|------------|----------------------|----------|
| 5/9/2010 | 10:57 PM | | |
| 5/10/2010 | 7:48 AM | 8:51 | |
| 5/10/2010 | 10:58 PM | | |
| 5/11/2010 | 7:32 AM | 8:34 | |
| 5/11/2010 | 10:58 PM | | |
| 5/12/2010 | 7:30 AM | 8:32 | |
| 5/12/2010 | 10:57 PM | | |
| 5/13/2010 | 7:02 AM | 8:05 | |
| 5/13/2010 | 6:56 PM | | |
| 5/13/2010 | 11:32 PM | 4:36 | |
| 5/13/2010 | 7:02 AM | | |
| 5/16/2010 | 10:56 PM | | |
| 5/17/2010 | 7:31 AM | 8:35 | |
| 5/17/2010 | 10:56 PM | | |
| 5/18/2010 | 11:02 AM | 12:06 | |
| 5/18/2010 | 10:56 PM | | |
| 5/19/2010 | 7:30 AM | 8:34 | |
| 5/19/2010 | 10:56 PM | | |
| 5/20/2010 | 7:30 AM | 8:34 | |
| 5/20/2010 | 11:00 PM | | |
| 5/21/2010 | 7:30 AM | 8:30 | |
| 5/23/2010 | 10:56 PM | | |
| 5/24/2010 | 7:30 AM | 8:34 | |
| 5/24/2010 | 10:56 PM | | |
| 5/25/2010 | 7:33 AM | 8:37 | |
| 5/25/2010 | 10:56 PM | | |
| 5/26/2010 | 7:30 AM | 8:34 | |
| 5/26/2010 | 10:57 PM | | |
| 5/27/2010 | 7:30 AM | 8:33 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 5/27/2010 | 10:56 PM | | |
| 5/28/2010 | 7:30 AM | 8:34 | |
| 5/30/2010 | 10:57 PM | | punch in / no punch out |
| 5/31/2010 | 10:59 PM | | |
| 6/1/2010 | 7:30 AM | 8:31 | |
| 6/1/2010 | 10:56 PM | | |
| 6/2/2010 | 7:30 AM | 8:34 | |
| 6/2/2010 | 10:56 PM | | |
| 6/3/2010 | 7:30 AM | 8:34 | |
| 6/3/2010 | 10:56 PM | | |
| 6/4/2010 | 7:30 AM | 8:34 | |
| 6/6/2010 | 10:56 PM | | |
| 6/7/2010 | 7:30 AM | 8:34 | |
| 6/7/2010 | 10:56 PM | | |
| 6/8/2010 | 7:34 AM | 8:38 | |
| 6/8/2010 | 10:56 PM | | |
| 6/9/2010 | 7:30 AM | 8:34 | |
| 6/9/2010 | 10:56 PM | | |
| 6/10/2010 | 7:30 AM | 8:34 | |
| 6/11/2010 | 7:32 AM | | Punch out / no punch in |
| 6/13/2010 | 10:55 PM | | |
| 6/14/2010 | 7:30 AM | 8:35 | |
| 6/14/2010 | 10:56 PM | | |
| 6/15/2010 | 7:30 AM | 8:34 | |
| 6/16/2010 | 7:30 AM | | Punch out / no punch in |
| 6/16/2010 | 10:57 PM | | |
| 6/17/2010 | 7:30 AM | 8:33 | |
| 6/20/2010 | 10:56 PM | | |
| 6/21/2010 | 7:30 AM | 8:34 | |

# BRABAZON, JERRY A.

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 6/21/2010 | 10:56 PM | | |
| 6/22/2010 | 7:30 AM | 8:34 | |
| 6/22/2010 | 10:57 PM | | |
| 6/23/2010 | 7:30 AM | 8:33 | |
| 6/23/2010 | 10:57 PM | | |
| 6/24/2010 | 7:30 AM | 8:33 | |
| 6/24/2010 | 10:26 PM | | |
| 6/25/2010 | 7:18 AM | 8:52 | |
| 6/27/2010 | 10:56 PM | | |
| 6/28/2010 | 7:30 AM | 8:34 | |
| 6/28/2010 | 10:56 PM | | |
| 6/29/2010 | 7:30 AM | 8:34 | |
| 6/29/2010 | 10:56 PM | | |
| 6/30/2010 | 7:30 AM | 8:34 | |
| 6/30/2010 | 10:57 PM | | |
| 7/1/2010 | 7:30 AM | 8:33 | |
| 7/2/2010 | 10:57 PM | | |
| 7/3/2010 | 7:30 AM | 8:33 | |
| 7/4/2010 | 10:57 PM | | |
| 7/5/2010 | 7:04 AM | 8:07 | |

# Lucas Binter

# Records

| BINTER, LUCAS | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 10/25/2009 | 6:56 PM | | |
| 10/26/2009 | 7:30 AM | 12:34 | |
| 11/8/2009 | 6:59 PM | | |
| 11/9/2009 | 7:34 AM | 12:35 | |
| 11/15/2009 | 7:01 PM | | |
| 11/16/2009 | 7:30 AM | 12:29 | |
| 11/22/2009 | 6:55 PM | | |
| 11/23/2009 | 7:36 AM | 12:41 | |
| 11/29/2009 | 6:55 PM | | |
| 11/30/2009 | 7:31 AM | 12:36 | |
| 12/6/2009 | 6:55 PM | | |
| 12/7/2009 | 7:30 AM | 12:35 | |
| 12/10/2009 | 8:25 AM | | |
| 12/10/2009 | 3:02 PM | 6:37 | |
| 12/11/2009 | 2:55 PM | | |
| 12/11/2009 | 11:00 PM | 8:05 | |
| 12/13/2009 | 6:56 PM | | |
| 12/14/2009 | 7:31 AM | 12:35 | |
| 12/15/2009 | 2:56 PM | | |
| 12/15/2009 | 11:30 PM | 8:34 | |
| 12/16/2009 | 2:57 PM | | |
| 12/16/2009 | 11:31 PM | 8:34 | |
| 12/17/2009 | 10:55 AM | | |
| 12/17/2009 | 8:31 PM | 9:36 | |
| 12/20/2009 | 6:57 PM | | |
| 12/21/2009 | 8:13 AM | 13:16 | |
| 12/22/2009 | 6:56 AM | | |
| 12/22/2009 | 3:28 PM | 8:32 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| | **BINTER, LUCAS** | | |
| 12/23/2009 | 3:04 PM | | |
| 12/23/2009 | 11:32 PM | 8:28 | |
| 12/25/2009 | 6:56 AM | | Punch out / no punch in |
| 12/25/2009 | 2:55 PM | | |
| 12/25/2009 | 11:30 PM | 8:35 | |
| 12/26/2009 | 6:57 PM | | |
| 12/27/2009 | 7:32 AM | 12:35 | |
| 12/27/2009 | 6:57 PM | | |
| 12/28/2009 | 7:33 AM | 12:36 | |
| 12/31/2009 | 2:55 PM | | |
| 12/31/2009 | 11:30 PM | 8:35 | |
| 1/3/2010 | 6:55 PM | | |
| 1/4/2010 | 7:36 AM | 12:41 | |
| 1/8/2010 | 2:55 PM | | |
| 1/8/2010 | 11:31 PM | 8:36 | |
| 1/10/2010 | 6:57 PM | | |
| 1/11/2010 | 7:33 AM | 12:36 | |
| 1/14/2010 | 6:55 AM | | |
| 1/14/2010 | 7:02 PM | 12:07 | |
| 1/15/2010 | 8:56 AM | | |
| 1/15/2010 | 11:37 AM | 2:41 | Short shift? |
| 1/15/2010 | 6:56 PM | | |
| 1/16/2010 | 7:33 AM | 12:37 | |
| 1/16/2010 | 10:55 PM | | |
| 1/17/2010 | 7:32 AM | 8:37 | |
| 1/17/2010 | 6:57 PM | | |
| 1/18/2010 | 7:35 AM | 12:38 | |
| 1/20/2010 | 2:56 PM | | |

# BINTER, LUCAS

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 1/20/2010 | 11:31 PM | 8:35 | |
| 1/22/2010 | 2:55 PM | | |
| 1/22/2010 | 11:30 PM | 8:35 | |
| 1/24/2010 | 6:55 PM | | |
| 1/25/2010 | 7:33 AM | 12:38 | |
| 1/29/2010 | 2:52 PM | | |
| 1/29/2010 | 11:31 PM | 8:39 | |
| 1/31/2010 | 6:55 PM | | |
| 2/1/2010 | 7:34 AM | 12:39 | |
| 2/5/2010 | 2:56 PM | | |
| 2/5/2010 | 11:32 PM | 8:36 | |
| 2/6/2010 | 10:57 PM | | |
| 2/7/2010 | 7:30 AM | 8:33 | |
| 2/8/2010 | 7:04 AM | | Punch out / no punch in |
| 2/9/2010 | 2:56 PM | | |
| 2/9/2010 | 11:36 PM | 8:40 | |
| 2/10/2010 | 6:58 AM | | |
| 2/10/2010 | 3:33 PM | 8:35 | |
| 2/12/2010 | 6:57 AM | | |
| 2/12/2010 | 3:34 PM | 8:37 | |
| 2/14/2010 | 6:55 PM | | |
| 2/15/2010 | 7:43 AM | 12:48 | |
| 2/19/2010 | 2:56 PM | | |
| 2/19/2010 | 11:31 PM | 8:35 | |
| 2/20/2010 | 10:57 PM | | |
| 2/21/2010 | 7:32 AM | 8:35 | |
| 2/21/2010 | 6:56 PM | | |
| 2/22/2010 | 7:37 AM | 12:41 | |

| BINTER, LUCAS | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 2/28/2010 | 6:55 PM | | |
| 3/1/2010 | 7:36 AM | 12:41 | |
| 3/5/2010 | 2:56 PM | | |
| 3/5/2010 | 11:31 PM | 8:35 | |
| 3/7/2010 | 6:59 PM | | |
| 3/8/2010 | 7:35 AM | 12:36 | |
| 3/12/2010 | 6:55 AM | | |
| 3/12/2010 | 3:34 PM | 8:39 | |
| 3/14/2010 | 6:55 PM | | |
| 3/15/2010 | 7:39 AM | 12:44 | |
| 3/19/2010 | 2:55 PM | | |
| 3/20/2010 | 12:06 AM | 9:11 | |
| 3/20/2010 | 8:56 AM | | |
| 3/20/2010 | 11:38 AM | 2:42 | |
| 3/20/2010 | 6:56 PM | | |
| 3/21/2010 | 7:43 AM | 12:47 | |
| 3/21/2010 | 6:57 PM | | |
| 3/22/2010 | 7:34 AM | 12:37 | |
| 3/27/2010 | 11:55 AM | | |
| 3/27/2010 | 8:03 PM | 8:08 | |
| 3/28/2010 | 6:56 PM | | |
| 3/29/2010 | 7:03 AM | 12:07 | |
| 4/2/2010 | 2:56 PM | | |
| 4/2/2010 | 11:31 PM | 8:35 | |
| 4/4/2010 | 6:56 PM | | |
| 4/5/2010 | 7:32 AM | 12:36 | |
| 4/7/2010 | 6:56 AM | | |
| 4/7/2010 | 3:30 PM | 8:34 | |

| BINTER, LUCAS | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 4/11/2010 | 6:55 PM | | |
| 4/12/2010 | 7:32 AM | 12:37 | |
| 4/16/2010 | 2:55 PM | | |
| 4/16/2010 | 11:31 PM | 8:36 | |
| 4/18/2010 | 6:55 PM | | |
| 4/19/2010 | 7:31 AM | 12:36 | |
| 4/23/2010 | 10:56 PM | | |
| 4/24/2010 | 7:30 AM | 8:34 | |
| 4/24/2010 | 10:55 PM | | |
| 4/25/2010 | 7:31 AM | 8:36 | |
| 4/25/2010 | 6:55 PM | | |
| 4/26/2010 | 8:34 AM | 13:39 | |
| 4/30/2010 | 2:55 PM | | |
| 4/30/2010 | 11:30 PM | 8:35 | |
| 5/2/2010 | 6:55 PM | | |
| 5/3/2010 | 7:33 AM | 12:38 | |
| 5/9/2010 | 6:55 PM | | |
| 5/10/2010 | 7:33 AM | 12:38 | |
| 5/14/2010 | 2:53 PM | | |
| 5/14/2010 | 11:31 PM | 8:38 | |
| 5/16/2010 | 6:56 PM | | |
| 5/17/2010 | 7:33 AM | 12:37 | |
| 5/20/2010 | 6:55 AM | | |
| 5/20/2010 | 3:32 PM | 8:37 | |
| 5/21/2010 | 2:55 PM | | |
| 5/21/2010 | 11:32 PM | 8:37 | |
| 5/28/2010 | 3:04 PM | | |
| 5/28/2010 | 11:33 PM | 8:29 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| BINTER, LUCAS | | | |
| 5/30/2010 | 6:56 PM | | |
| 5/31/2010 | 7:35 AM | 12:39 | |
| 6/3/2010 | 6:55 AM | | |
| 6/3/2010 | 3:30 PM | 8:35 | |
| 6/4/2010 | 6:59 PM | | |
| 6/5/2010 | 7:00 AM | 12:01 | |
| 6/5/2010 | 6:57 PM | | |
| 6/6/2010 | 7:34 AM | 12:37 | |
| 6/6/2010 | 6:56 PM | | |
| 6/7/2010 | 7:33 AM | 12:37 | |
| 6/10/2010 | 2:56 PM | | |
| 6/10/2010 | 11:30 PM | 8:34 | |
| 6/11/2010 | 2:55 PM | | |
| 6/11/2010 | 11:00 PM | 8:05 | |
| 6/13/2010 | 6:57 PM | | |
| 6/14/2010 | 7:40 AM | 12:43 | |
| 6/20/2010 | 6:55 PM | | |
| 6/21/2010 | 7:34 AM | 12:39 | |
| 6/24/2010 | 1:46 PM | | |
| 6/24/2010 | 11:31 PM | 9:45 | |
| 6/25/2010 | 2:55 PM | | |
| 6/25/2010 | 11:33 PM | 8:38 | |
| 6/27/2010 | 6:57 PM | | |
| 6/28/2010 | 7:41 AM | 12:44 | |
| 6/30/2010 | 2:56 PM | | |
| 6/30/2010 | 11:31 PM | 8:35 | |
| 7/4/2010 | 6:55 PM | | |
| 7/5/2010 | 7:32 AM | 12:37 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **BINTER, LUCAS** | | | |
| 7/5/2010 | 6:56 PM | | |
| 7/6/2010 | 7:40 AM | 12:44 | |
| 7/6/2010 | 10:55 PM | | |
| 7/7/2010 | 8:22 AM | 9:27 | |
| 7/7/2010 | 10:55 PM | | |
| 7/8/2010 | 7:31 AM | 8:36 | |
| 7/8/2010 | 10:55 PM | | |
| 7/9/2010 | 7:30 AM | 8:35 | |
| 7/9/2010 | 10:55 PM | | |
| 7/10/2010 | 7:00 AM | 8:05 | |
| 7/11/2010 | 6:56 PM | | |
| 7/12/2010 | 7:37 AM | 12:41 | |
| 7/12/2010 | 10:56 PM | | |
| 7/13/2010 | 7:32 AM | 8:36 | |
| 7/13/2010 | 10:55 PM | | |
| 7/14/2010 | 7:30 AM | 8:35 | |
| 7/14/2010 | 10:56 PM | | |
| 7/15/2010 | 7:30 AM | 8:34 | |
| 7/18/2010 | 6:56 PM | | |
| 7/19/2010 | 7:32 AM | 12:36 | |
| 7/19/2010 | 10:55 PM | | |
| 7/20/2010 | 7:31 AM | 8:36 | |
| 7/21/2010 | 10:58 PM | | |
| 7/22/2010 | 7:34 AM | 8:36 | |
| 7/23/2010 | 6:56 PM | | |
| 7/24/2010 | 7:35 AM | 12:39 | |
| 7/25/2010 | 6:56 PM | | |
| 7/26/2010 | 7:33 AM | 12:37 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|------|-----------|---------------------|----------|
| **BINTER, LUCAS** | | | |
| 8/1/2010 | 6:56 PM | | |
| 8/2/2010 | 7:40 AM | 12:44 | |
| 8/2/2010 | 10:56 PM | | |
| 8/3/2010 | 7:32 AM | 8:36 | |
| 8/3/2010 | 10:55 PM | | |
| 8/4/2010 | 7:32 AM | 8:37 | |
| 8/4/2010 | 10:56 PM | | |
| 8/5/2010 | 2:45 AM | 3:49 | |
| 8/16/2010 | 10:56 PM | | |
| 8/17/2010 | 7:31 AM | 8:35 | |
| 8/17/2010 | 10:56 PM | | |
| 8/18/2010 | 7:33 AM | 8:37 | |
| 8/18/2010 | 10:56 PM | | |
| 8/19/2010 | 7:37 AM | 8:41 | |
| 8/19/2010 | 10:56 PM | | |
| 8/20/2010 | 7:35 AM | 8:39 | |
| 8/22/2010 | 6:56 PM | | |
| 8/23/2010 | 7:33 AM | 12:37 | |
| 8/23/2010 | 10:57 PM | | |
| 8/24/2010 | 7:32 AM | 8:35 | |
| 8/24/2010 | 10:55 PM | | |
| 8/25/2010 | 7:34 AM | 8:39 | |
| 8/25/2010 | 10:57 PM | | |
| 8/26/2010 | 7:32 AM | 8:35 | |
| 8/29/2010 | 6:55 PM | | |
| 8/30/2010 | 7:30 AM | 12:35 | |
| 8/30/2010 | 10:56 PM | | |
| 8/31/2010 | 7:33 AM | 8:37 | |

| | BINTER, LUCAS | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 9/1/2010 | 10:55 PM | | |
| 9/2/2010 | 7:06 AM | 8:11 | |
| 9/2/2010 | 2:55 PM | | |
| 9/2/2010 | 11:31 PM | 8:36 | |
| 9/5/2010 | 6:57 PM | | |
| 9/6/2010 | 7:35 AM | 12:38 | |
| 9/13/2010 | 6:55 AM | | |
| 9/13/2010 | 3:33 PM | 8:38 | |
| 9/14/2010 | 6:50 AM | | |
| 9/14/2010 | 3:30 PM | 8:40 | |
| 9/16/2010 | 6:48 AM | | |
| 9/16/2010 | 6:05 PM | 11:17 | |
| 9/19/2010 | 6:56 PM | | |
| 9/20/2010 | 7:33 AM | 12:37 | |
| 9/21/2010 | 6:56 AM | | |
| 9/21/2010 | 3:36 PM | 8:40 | |
| 9/23/2010 | 6:56 AM | | |
| 9/23/2010 | 3:33 PM | 8:37 | |
| 9/24/2010 | 6:55 AM | | |
| 9/24/2010 | 3:47 PM | 8:52 | |
| 9/26/2010 | 6:58 PM | | |
| 9/27/2010 | 7:36 AM | 12:38 | |
| 9/28/2010 | 2:55 PM | | |
| 9/28/2010 | 11:31 PM | 8:36 | |
| 10/2/2010 | 6:55 PM | | |
| 10/3/2010 | 7:31 AM | 12:36 | |
| 10/3/2010 | 6:55 PM | | |
| 10/4/2010 | 7:30 AM | 12:35 | |

# Michael Emmerich

# Records

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| | **EMMERICH, MICHAEL D.** | | |
| 8/30/2008 | 7:00 AM | | |
| 8/30/2008 | 3:36 PM | 8:36 | |
| 8/31/2008 | 3:37 PM | | Punch out / no punch in |
| 9/13/2008 | 5:03 AM | | |
| 9/13/2008 | 1:04 PM | 8:01 | |
| 9/19/2008 | 6:55 AM | | |
| 9/19/2008 | 3:29 PM | 8:34 | |
| 9/27/2008 | 7:02 AM | | |
| 9/27/2008 | 3:34 PM | 8:32 | |
| 10/3/2008 | 6:53 AM | | |
| 10/3/2008 | 3:36 PM | 8:43 | |
| 10/11/2008 | 6:56 AM | | |
| 10/11/2008 | 3:34 PM | 8:38 | |
| 10/17/2008 | 6:54 AM | | |
| 10/17/2008 | 3:31 PM | 8:37 | |
| 10/21/2008 | 7:04 PM | | |
| 10/21/2008 | 11:01 PM | 3:57 | |
| 10/31/2008 | 6:55 AM | | |
| 10/31/2008 | 3:32 PM | 8:37 | |
| 11/8/2008 | 7:00 AM | | |
| 11/8/2008 | 3:36 PM | 8:36 | |
| 11/14/2008 | 6:55 AM | | |
| 11/14/2008 | 3:25 PM | 8:30 | |
| 11/22/2008 | 6:57 AM | | |
| 11/22/2008 | 4:00 PM | 9:03 | |
| 11/23/2008 | 6:59 AM | | |
| 11/23/2008 | 3:29 PM | 8:30 | |
| 12/6/2008 | 3:07 AM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **EMMERICH, MICHAEL D.** | | | |
| | | | |
| 12/6/2008 | 3:34 PM | 12:27 | |
| 12/7/2008 | 7:03 AM | | |
| 12/7/2008 | 3:31 PM | 8:28 | |
| 12/20/2008 | 7:00 AM | | |
| 12/20/2008 | 3:36 PM | 8:36 | |
| 12/21/2008 | 5:05 AM | | |
| 12/21/2008 | 3:33 PM | 10:28 | |
| 12/25/2008 | 6:53 AM | | |
| 12/25/2008 | 3:23 PM | 8:30 | |
| 1/3/2009 | 6:59 AM | | |
| 1/3/2009 | 3:43 PM | 8:44 | |
| 1/4/2009 | 7:04 AM | | |
| 1/4/2009 | 3:39 PM | 8:35 | |
| 1/17/2009 | 6:58 AM | | |
| 1/17/2009 | 3:40 PM | 8:42 | |
| 1/23/2009 | 6:55 AM | | |
| 1/23/2009 | 6:42 PM | 11:47 | |
| 1/31/2009 | 7:03 AM | | |
| 1/31/2009 | 3:39 PM | 8:36 | |
| 2/1/2009 | 6:56 AM | | |
| 2/1/2009 | 3:30 PM | 8:34 | |
| 2/14/2009 | 7:03 AM | | |
| 2/14/2009 | 3:30 PM | 8:27 | |
| 2/19/2009 | 10:24 PM | | |
| 2/20/2009 | 6:49 AM | 8:25 | |
| 2/28/2009 | 6:59 AM | | |
| 2/28/2009 | 3:45 PM | 8:46 | |
| 2/28/2009 | 10:57 PM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **EMMERICH, MICHAEL D.** | | | |
| 3/1/2009 | 7:06 AM | 8:09 | |
| 3/14/2009 | 6:55 AM | | |
| 3/14/2009 | 3:58 PM | 9:03 | |
| 3/20/2009 | 6:56 AM | | |
| 3/20/2009 | 3:25 PM | 8:29 | |
| 3/21/2009 | 8:05 AM | | |
| 3/21/2009 | 11:20 AM | 3:15 | Short shift? |
| 3/28/2009 | 6:57 AM | | |
| 3/28/2009 | 3:35 PM | 8:38 | |
| 4/3/2009 | 6:56 AM | | |
| 4/3/2009 | 3:36 PM | 8:40 | |
| 4/11/2009 | 6:54 AM | | |
| 4/11/2009 | 3:57 PM | 9:03 | |
| 4/12/2009 | 6:55 AM | | |
| 4/12/2009 | 3:25 PM | 8:30 | |
| 4/25/2009 | 6:55 AM | | |
| 4/25/2009 | 3:33 PM | 8:38 | |
| 5/1/2009 | 6:55 AM | | |
| 5/1/2009 | 4:05 PM | 9:10 | |
| 5/9/2009 | 6:55 AM | | |
| 5/9/2009 | 3:45 PM | 8:50 | |
| 5/10/2009 | 6:55 AM | | |
| 5/10/2009 | 3:31 PM | 8:36 | |
| 5/23/2009 | 6:58 AM | | |
| 5/23/2009 | 4:47 PM | 9:49 | |
| 5/24/2009 | 6:59 AM | | |
| 5/24/2009 | 3:38 PM | 8:39 | |
| 6/6/2009 | 6:51 AM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **EMMERICH, MICHAEL D.** | | | |
| 6/6/2009 | 3:35 PM | 8:44 | |
| 6/7/2009 | 6:58 AM | | |
| 6/7/2009 | 3:31 PM | 8:33 | |
| 6/8/2009 | 7:51 AM | | |
| 6/8/2009 | 10:05 AM | 2:14 | Short shift? |
| 6/20/2009 | 7:03 AM | | |
| 6/20/2009 | 3:38 PM | 8:35 | |
| 6/21/2009 | 7:06 AM | | |
| 6/21/2009 | 3:33 PM | 8:27 | |
| 6/24/2009 | 6:30 PM | | |
| 6/24/2009 | 7:48 PM | 1:18 | Short shift? |
| 7/4/2009 | 7:04 AM | | |
| 7/4/2009 | 3:46 PM | 8:42 | |
| 7/5/2009 | 7:01 AM | | |
| 7/5/2009 | 4:31 PM | 9:30 | |
| 7/24/2009 | 6:54 AM | | |
| 7/24/2009 | 3:34 PM | 8:40 | |
| 8/1/2009 | 6:54 AM | | |
| 8/1/2009 | 3:32 PM | 8:38 | |
| 8/5/2009 | 6:51 AM | | |
| 8/5/2009 | 3:33 PM | 8:42 | |
| 8/15/2009 | 6:53 AM | | |
| 8/15/2009 | 3:39 PM | 8:46 | |
| 8/16/2009 | 6:59 AM | | Punch in / no punch out |
| 8/22/2009 | 7:59 AM | | |
| 8/22/2009 | 11:29 AM | 3:30 | Short shift? |
| 8/28/2009 | 7:01 AM | | |
| 8/28/2009 | 6:42 PM | 11:41 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|------|-----------|----------------------|----------|
| **EMMERICH, MICHAEL D.** | | | |
| 8/29/2009 | 6:58 AM | | |
| 8/29/2009 | 3:51 PM | 8:53 | |
| 8/30/2009 | 3:30 PM | | Punch out / no punch in |
| 9/4/2009 | 6:59 AM | | |
| 9/4/2009 | 3:36 PM | 8:37 | |
| 9/12/2009 | 6:57 AM | | |
| 9/12/2009 | 3:36 PM | 8:39 | |
| 9/18/2009 | 6:56 AM | | |
| 9/18/2009 | 3:30 PM | 8:34 | |
| 9/26/2009 | 6:58 AM | | |
| 9/26/2009 | 3:42 PM | 8:44 | |
| 10/2/2009 | 7:29 AM | | |
| 10/2/2009 | 3:32 PM | 8:03 | |
| 10/10/2009 | 7:00 AM | | |
| 10/10/2009 | 3:32 PM | 8:32 | |
| 10/10/2009 | 11:05 PM | | |
| 10/11/2009 | 11:07 AM | 12:02 | |
| 10/12/2009 | 7:04 AM | | |
| 10/12/2009 | 3:37 PM | 8:33 | |
| 10/24/2009 | 7:04 AM | | |
| 10/24/2009 | 7:06 PM | 12:02 | |
| 10/29/2009 | 7:04 AM | | |
| 10/29/2009 | 3:33 PM | 8:29 | |
| 11/7/2009 | 7:02 AM | | |
| 11/7/2009 | 3:30 PM | 8:28 | |
| 11/13/2009 | 6:56 AM | | |
| 11/13/2009 | 3:32 PM | 8:36 | |
| 11/21/2009 | 6:57 AM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| | **EMMERICH, MICHAEL D.** | | |
| 11/21/2009 | 3:30 PM | 8:33 | |
| 11/22/2009 | 7:01 AM | | |
| 11/22/2009 | 3:34 PM | 8:33 | |
| 11/27/2009 | 7:03 AM | | |
| 11/27/2009 | 3:30 PM | 8:27 | |
| 12/5/2009 | 7:03 AM | | |
| 12/5/2009 | 7:06 PM | 12:03 | |
| 12/11/2009 | 7:00 AM | | |
| 12/11/2009 | 3:36 PM | 8:36 | |
| 12/19/2009 | 6:52 AM | | |
| 12/19/2009 | 3:31 PM | 8:39 | |
| 12/20/2009 | 7:03 AM | | |
| 12/20/2009 | 3:31 PM | 8:28 | |
| 12/25/2009 | 7:06 AM | | |
| 12/25/2009 | 3:31 PM | 8:25 | |
| 1/2/2010 | 7:00 AM | | |
| 1/2/2010 | 3:32 PM | 8:32 | |
| 1/3/2010 | 7:05 AM | | |
| 1/3/2010 | 3:33 PM | 8:28 | |
| 1/16/2010 | 6:55 AM | | |
| 1/16/2010 | 3:32 PM | 8:37 | |
| 1/17/2010 | 7:01 AM | | |
| 1/17/2010 | 3:33 PM | 8:32 | |
| 1/30/2010 | 7:04 AM | | |
| 1/30/2010 | 3:34 PM | 8:30 | |
| 1/31/2010 | 6:59 AM | | |
| 1/31/2010 | 3:30 PM | 8:31 | |
| 2/13/2010 | 7:02 AM | | |

| EMMERICH, MICHAEL D. | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 2/13/2010 | 3:32 PM | 8:30 | |
| 2/14/2010 | 7:01 AM | | |
| 2/14/2010 | 3:30 PM | 8:29 | |
| 2/27/2010 | 7:00 AM | | |
| 2/27/2010 | 3:32 PM | 8:32 | |
| 3/5/2010 | 7:03 AM | | |
| 3/5/2010 | 3:37 PM | 8:34 | |
| 3/13/2010 | 6:55 AM | | |
| 3/13/2010 | 3:33 PM | 8:38 | |
| 3/19/2010 | 6:59 AM | | |
| 3/19/2010 | 3:30 PM | 8:31 | |
| 3/27/2010 | 6:56 AM | | |
| 3/27/2010 | 3:29 PM | 8:33 | |
| 4/1/2010 | 6:58 AM | | |
| 4/1/2010 | 12:45 PM | 5:47 | |
| 4/1/2010 | 1:16 PM | | |
| 4/1/2010 | 7:01 PM | 5:45 | |
| 4/10/2010 | 7:05 AM | | |
| 4/10/2010 | 3:30 PM | 8:25 | |
| 4/11/2010 | 6:55 AM | | |
| 4/11/2010 | 3:30 PM | 8:35 | |
| 4/24/2010 | 6:58 AM | | |
| 4/24/2010 | 3:30 PM | 8:32 | |
| 4/25/2010 | 7:00 AM | | |
| 4/25/2010 | 3:31 PM | 8:31 | |
| 5/8/2010 | 6:56 AM | | |
| 5/8/2010 | 3:30 PM | 8:34 | |
| 5/9/2010 | 6:58 AM | | |

| | EMMERICH, MICHAEL D. | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 5/9/2010 | 3:31 PM | 8:33 | |
| 5/14/2010 | 8:44 AM | | |
| 5/14/2010 | 9:54 AM | 1:10 | Short shift? |
| 5/22/2010 | 6:57 AM | | |
| 5/22/2010 | 3:32 PM | 8:35 | |
| 5/27/2010 | 6:58 AM | | |
| 5/27/2010 | 3:31 PM | 8:33 | |
| 6/5/2010 | 6:56 AM | | |
| 6/5/2010 | 3:38 PM | 8:42 | |
| 6/11/2010 | 6:55 AM | | |
| 6/11/2010 | 3:36 PM | 8:41 | |
| 6/19/2010 | 6:55 AM | | |
| 6/19/2010 | 3:31 PM | 8:36 | |
| 6/20/2010 | 6:57 AM | | |
| 6/20/2010 | 3:46 PM | 8:49 | |
| 7/3/2010 | 6:54 AM | | |
| 7/3/2010 | 3:30 PM | 8:36 | |
| 7/4/2010 | 6:56 AM | | |
| 7/4/2010 | 3:30 PM | 8:34 | |
| 7/17/2010 | 6:51 AM | | |
| 7/17/2010 | 7:03 PM | 12:12 | |
| 7/23/2010 | 6:56 AM | | |
| 7/23/2010 | 3:36 PM | 8:40 | |
| 7/31/2010 | 7:01 AM | | |
| 7/31/2010 | 3:30 PM | 8:29 | |
| 8/1/2010 | 2:57 AM | | |
| 8/1/2010 | 3:06 PM | 12:09 | |
| 8/12/2010 | 5:00 PM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| | **EMMERICH, MICHAEL D.** | | |
| 8/12/2010 | 6:40 PM | 1:40 | Short shift? |
| 8/28/2010 | 6:55 AM | | |
| 8/28/2010 | 3:33 PM | 8:38 | |
| 9/3/2010 | 6:55 AM | | |
| 9/3/2010 | 3:37 PM | 8:42 | |
| 9/11/2010 | 6:55 AM | | |
| 9/11/2010 | 3:32 PM | 8:37 | |
| 9/12/2010 | 2:53 AM | | |
| 9/12/2010 | 3:07 PM | 12:14 | |
| 9/17/2010 | 6:54 PM | | |
| 9/18/2010 | 3:25 AM | 8:31 | |
| 9/25/2010 | 2:58 AM | | |
| 9/25/2010 | 3:07 PM | 12:09 | |
| 10/1/2010 | 6:57 AM | | |
| 10/1/2010 | 6:11 PM | 11:14 | |

Patrick Lowery

Records

| LOWERY, PATRICK R. | | | |
|---|---|---|---|
| | | | |
| **TIME** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 11/10/2009 | 3:46 PM | | |
| 11/10/2009 | 11:44 PM | 7:58 | |
| 11/14/2009 | 2:56 PM | | |
| 11/14/2009 | 11:30 PM | 8:34 | |
| 11/15/2009 | 2:55 PM | | Punch in / no punch out |
| 11/16/2009 | 2:55 PM | | |
| 11/16/2009 | 11:31 PM | 8:36 | |
| 11/17/2009 | 2:55 PM | | |
| 11/17/2009 | 11:31 PM | 8:36 | |
| 11/18/2009 | 2:56 PM | | |
| 11/18/2009 | 11:30 PM | 8:34 | |
| 11/21/2009 | 2:57 PM | | |
| 11/21/2009 | 11:31 PM | 8:34 | |
| 11/22/2009 | 3:00 PM | | |
| 11/22/2009 | 11:31 PM | 8:31 | |
| 11/23/2009 | 3:00 PM | | |
| 11/23/2009 | 11:33 PM | 8:33 | |
| 11/24/2009 | 2:56 PM | | |
| 11/24/2009 | 11:31 PM | 8:35 | |
| 11/25/2009 | 2:55 PM | | |
| 11/25/2009 | 11:30 PM | 8:35 | |
| 11/28/2009 | 3:16 PM | | |
| 11/28/2009 | 11:32 PM | 8:16 | |
| 11/29/2009 | 2:56 PM | | |
| 11/29/2009 | 11:30 PM | 8:34 | |
| 11/30/2009 | 2:55 PM | | |
| 11/30/2009 | 11:30 PM | 8:35 | |
| 12/1/2009 | 2:55 PM | | |

| LOWERY, PATRICK R. | | | |
|---|---|---|---|
| | | | |
| **TIME** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 12/1/2009 | 11:31 PM | 8:36 | |
| 12/2/2009 | 2:55 PM | | |
| 12/2/2009 | 11:30 PM | 8:35 | |
| 12/6/2009 | 2:52 PM | | |
| 12/6/2009 | 11:30 PM | 8:38 | |
| 12/7/2009 | 2:55 PM | | |
| 12/7/2009 | 11:30 PM | 8:35 | |
| 12/8/2009 | 2:55 PM | | |
| 12/8/2009 | 11:31 PM | 8:36 | |
| 12/9/2009 | 2:56 PM | | |
| 12/9/2009 | 11:31 PM | 8:35 | |
| 12/10/2009 | 2:55 PM | | |
| 12/10/2009 | 11:31 PM | 8:36 | |
| 12/12/2009 | 2:56 PM | | |
| 12/12/2009 | 11:30 PM | 8:34 | |
| 12/13/2009 | 2:56 PM | | |
| 12/13/2009 | 11:30 PM | 8:34 | |
| 12/14/2009 | 2:56 PM | | |
| 12/14/2009 | 11:31 PM | 8:35 | |
| 12/15/2009 | 2:56 PM | | |
| 12/15/2009 | 11:30 PM | 8:34 | |
| 12/16/2009 | 2:56 PM | | |
| 12/16/2009 | 11:30 PM | 8:34 | |
| 12/19/2009 | 2:58 PM | | |
| 12/19/2009 | 11:31 PM | 8:33 | |
| 12/20/2009 | 2:56 PM | | |
| 12/20/2009 | 11:33 PM | 8:37 | |
| 12/21/2009 | 2:56 PM | | |

| | | | |
|---|---|---|---|
| **LOWERY, PATRICK R.** | | | |
| | | | |
| **TIME** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 12/21/2009 | 11:30 PM | 8:34 | |
| 12/22/2009 | 2:56 PM | | |
| 12/22/2009 | 11:31 PM | 8:35 | |
| 12/23/2009 | 2:56 PM | | |
| 12/23/2009 | 11:31 PM | 8:35 | |
| 12/24/2009 | 2:56 PM | | |
| 12/24/2009 | 11:30 PM | 8:34 | |
| 12/26/2009 | 2:56 PM | | |
| 12/26/2009 | 11:31 PM | 8:35 | |
| 12/27/2009 | 2:56 PM | | |
| 12/27/2009 | 11:32 PM | 8:36 | |
| 12/28/2009 | 2:55 PM | | |
| 12/28/2009 | 11:31 PM | 8:36 | |
| 12/29/2009 | 2:56 PM | | |
| 12/29/2009 | 11:30 PM | 8:34 | |
| 12/30/2009 | 2:56 PM | | |
| 12/30/2009 | 11:31 PM | 8:35 | |
| 1/2/2010 | 2:56 PM | | |
| 1/2/2010 | 11:30 PM | 8:34 | |
| 1/3/2010 | 2:56 PM | | |
| 1/3/2010 | 11:30 PM | 8:34 | |
| 1/4/2010 | 2:55 PM | | |
| 1/4/2010 | 11:30 PM | 8:35 | |
| 1/5/2010 | 2:55 PM | | |
| 1/5/2010 | 11:30 PM | 8:35 | |
| 1/6/2010 | 2:56 PM | | |
| 1/6/2010 | 11:31 PM | 8:35 | |
| 1/9/2010 | 2:56 PM | | |

| LOWERY, PATRICK R. | | | |
|---|---|---|---|
| | | | |
| **TIME** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 1/9/2010 | 11:30 PM | 8:34 | |
| 1/10/2010 | 2:56 PM | | |
| 1/10/2010 | 11:31 PM | 8:35 | |
| 1/11/2010 | 2:55 PM | | |
| 1/11/2010 | 11:31 PM | 8:36 | |
| 1/12/2010 | 2:56 PM | | |
| 1/12/2010 | 11:30 PM | 8:34 | |
| 1/13/2010 | 2:56 PM | | |
| 1/13/2010 | 11:30 PM | 8:34 | |
| 1/16/2010 | 2:56 PM | | |
| 1/16/2010 | 11:32 PM | 8:36 | |
| 1/17/2010 | 2:56 PM | | |
| 1/17/2010 | 11:30 PM | 8:34 | |
| 1/18/2010 | 2:56 PM | | |
| 1/18/2010 | 11:30 PM | 8:34 | |
| 1/19/2010 | 2:56 PM | | |
| 1/19/2010 | 11:30 PM | 8:34 | |
| 1/20/2010 | 2:56 PM | | |
| 1/20/2010 | 11:30 PM | 8:34 | |
| 1/23/2010 | 2:56 PM | | |
| 1/23/2010 | 11:31 PM | 8:35 | |
| 1/24/2010 | 2:56 PM | | |
| 1/24/2010 | 11:30 PM | 8:34 | |
| 1/25/2010 | 2:55 PM | | |
| 1/25/2010 | 11:30 PM | 8:35 | |
| 1/26/2010 | 2:56 PM | | |
| 1/26/2010 | 11:30 PM | 8:34 | |
| 1/27/2010 | 2:56 PM | | |

| LOWERY, PATRICK R. | | | |
|---|---|---|---|
| | | | |
| **TIME** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 1/27/2010 | 11:30 PM | 8:34 | |
| 1/28/2010 | 2:50 PM | | |
| 1/28/2010 | 11:31 PM | 8:41 | |
| 1/30/2010 | 2:58 PM | | |
| 1/30/2010 | 11:30 PM | 8:32 | |
| 1/31/2010 | 2:56 PM | | |
| 1/31/2010 | 11:30 PM | 8:34 | |
| 2/1/2010 | 1:56 PM | | |
| 2/1/2010 | 11:30 PM | 9:34 | |
| 2/2/2010 | 2:56 PM | | |
| 2/2/2010 | 11:30 PM | 8:34 | |
| 2/3/2010 | 2:55 PM | | |
| 2/3/2010 | 11:30 PM | 8:35 | |
| 2/4/2010 | 2:55 PM | | |
| 2/4/2010 | 11:31 PM | 8:36 | |
| 2/6/2010 | 2:56 PM | | |
| 2/6/2010 | 11:30 PM | 8:34 | |
| 2/7/2010 | 2:57 PM | | |
| 2/7/2010 | 11:30 PM | 8:33 | |
| 2/13/2010 | 2:56 PM | | |
| 2/13/2010 | 11:30 PM | 8:34 | |
| 2/14/2010 | 2:56 PM | | |
| 2/14/2010 | 11:30 PM | 8:34 | |
| 2/15/2010 | 2:30 PM | | |
| 2/15/2010 | 11:30 PM | 9:00 | |
| 2/16/2010 | 2:56 PM | | |
| 2/16/2010 | 11:32 PM | 8:36 | |
| 2/17/2010 | 3:08 PM | | |

| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| | **LOWERY, PATRICK R.** | | |
| | | | |
| 2/17/2010 | 11:30 PM | 8:22 | |
| 2/20/2010 | 2:55 PM | | |
| 2/20/2010 | 11:30 PM | 8:35 | |
| 2/21/2010 | 2:55 PM | | |
| 2/21/2010 | 11:30 PM | 8:35 | |
| 2/22/2010 | 2:55 PM | | |
| 2/22/2010 | 11:31 PM | 8:36 | |
| 2/23/2010 | 2:57 PM | | |
| 2/23/2010 | 11:30 PM | 8:33 | |
| 2/24/2010 | 3:21 PM | | |
| 2/24/2010 | 11:30 PM | 8:09 | |
| 2/27/2010 | 2:55 PM | | |
| 2/27/2010 | 11:30 PM | 8:35 | |
| 2/28/2010 | 2:54 PM | | |
| 2/28/2010 | 11:31 PM | 8:37 | |
| 3/1/2010 | 2:55 PM | | |
| 3/1/2010 | 11:30 PM | 8:35 | |
| 3/2/2010 | 2:55 PM | | |
| 3/2/2010 | 11:30 PM | 8:35 | |
| 3/3/2010 | 2:55 PM | | |
| 3/3/2010 | 11:30 PM | 8:35 | |
| 3/6/2010 | 2:56 PM | | |
| 3/6/2010 | 11:30 PM | 8:34 | |
| 3/7/2010 | 2:55 PM | | |
| 3/7/2010 | 11:30 PM | 8:35 | |
| 3/8/2010 | 2:59 PM | | |
| 3/8/2010 | 11:30 PM | 8:31 | |
| 3/9/2010 | 2:55 PM | | |

| LOWERY, PATRICK R. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 3/9/2010 | 11:29 PM | 8:34 | |
| 3/10/2010 | 2:56 PM | | |
| 3/10/2010 | 11:31 PM | 8:35 | |
| 3/13/2010 | 2:55 PM | | |
| 3/13/2010 | 11:30 PM | 8:35 | |
| 3/14/2010 | 2:55 PM | | |
| 3/14/2010 | 11:30 PM | 8:35 | |
| 3/15/2010 | 2:55 PM | | |
| 3/15/2010 | 11:30 PM | 8:35 | |
| 3/16/2010 | 2:55 PM | | |
| 3/16/2010 | 11:30 PM | 8:35 | |
| 3/17/2010 | 2:55 PM | | |
| 3/17/2010 | 11:31 PM | 8:36 | |
| 3/20/2010 | 2:55 PM | | |
| 3/20/2010 | 11:29 PM | 8:34 | |
| 3/21/2010 | 2:55 PM | | |
| 3/21/2010 | 11:31 PM | 8:36 | |
| 3/22/2010 | 3:05 PM | | |
| 3/22/2010 | 11:30 PM | 8:25 | |
| 3/23/2010 | 2:55 PM | | |
| 3/24/2010 | 2:55 PM | 24:00:00 | |
| 3/27/2010 | 2:55 PM | | |
| 3/27/2010 | 11:30 PM | 8:35 | |
| 3/28/2010 | 2:55 PM | | |
| 3/28/2010 | 11:30 PM | 8:35 | |
| 3/29/2010 | 2:55 PM | | |
| 3/29/2010 | 11:30 PM | 8:35 | |
| 3/30/2010 | 2:55 PM | | |

| | LOWERY, PATRICK R. | | |
|---|---|---|---|
| | | | |
| **TIME** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 3/30/2010 | 11:30 PM | 8:35 | |
| 3/31/2010 | 2:55 PM | | |
| 3/31/2010 | 11:30 PM | 8:35 | |
| 4/3/2010 | 2:55 PM | | |
| 4/3/2010 | 11:30 PM | 8:35 | |
| 4/4/2010 | 2:56 PM | | |
| 4/4/2010 | 11:30 PM | 8:34 | |
| 4/5/2010 | 2:55 PM | | |
| 4/5/2010 | 11:30 PM | 8:35 | |
| 4/6/2010 | 2:55 PM | | |
| 4/6/2010 | 11:30 PM | 8:35 | |
| 4/7/2010 | 2:55 PM | | |
| 4/7/2010 | 11:30 PM | 8:35 | |
| 4/10/2010 | 2:55 PM | | |
| 4/10/2010 | 11:30 PM | 8:35 | |
| 4/11/2010 | 2:55 PM | | |
| 4/11/2010 | 11:30 PM | 8:35 | |
| 4/12/2010 | 2:55 PM | | |
| 4/12/2010 | 11:30 PM | 8:35 | |
| 4/13/2010 | 2:55 PM | | |
| 4/13/2010 | 11:30 PM | 8:35 | |
| 4/17/2010 | 2:55 PM | | |
| 4/17/2010 | 11:30 PM | 8:35 | |
| 4/18/2010 | 2:55 PM | | |
| 4/18/2010 | 11:30 PM | 8:35 | |
| 4/19/2010 | 2:55 PM | | |
| 4/19/2010 | 11:30 PM | 8:35 | |
| 4/20/2010 | 2:55 PM | | |

| LOWERY, PATRICK R. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 4/20/2010 | 11:30 PM | 8:35 | |
| 4/21/2010 | 2:56 PM | | |
| 4/21/2010 | 11:30 PM | 8:34 | |
| 4/24/2010 | 2:55 PM | | |
| 4/24/2010 | 11:31 PM | 8:36 | |
| 4/25/2010 | 2:55 PM | | |
| 4/25/2010 | 11:30 PM | 8:35 | |
| 4/26/2010 | 2:56 PM | | |
| 4/26/2010 | 11:30 PM | 8:34 | |
| 4/27/2010 | 2:55 PM | | |
| 4/27/2010 | 11:30 PM | 8:35 | |
| 4/28/2010 | 2:55 PM | | |
| 4/28/2010 | 11:30 PM | 8:35 | |
| 5/1/2010 | 2:55 PM | | |
| 5/1/2010 | 11:30 PM | 8:35 | |
| 5/2/2010 | 2:55 PM | | |
| 5/2/2010 | 11:31 PM | 8:36 | |
| 5/3/2010 | 2:55 PM | | |
| 5/3/2010 | 11:31 PM | 8:36 | |
| 5/4/2010 | 2:55 PM | | |
| 5/4/2010 | 11:30 PM | 8:35 | |
| 5/5/2010 | 2:55 PM | | |
| 5/5/2010 | 11:30 PM | 8:35 | |
| 5/8/2010 | 2:55 PM | | |
| 5/8/2010 | 11:30 PM | 8:35 | |
| 5/9/2010 | 2:55 PM | | |
| 5/9/2010 | 11:30 PM | 8:35 | |
| 5/10/2010 | 2:55 PM | | |

| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| | **LOWERY, PATRICK R.** | | |
| | | | |
| 5/10/2010 | 11:30 PM | 8:35 | |
| 5/11/2010 | 2:45 PM | | |
| 5/11/2010 | 11:15 PM | 8:30 | |
| 5/12/2010 | 1:55 PM | | |
| 5/12/2010 | 11:30 PM | 9:35 | |
| 5/15/2010 | 2:55 PM | | |
| 5/15/2010 | 11:30 PM | 8:35 | |
| 5/16/2010 | 2:55 PM | | |
| 5/16/2010 | 11:30 PM | 8:35 | |
| 5/17/2010 | 2:55 PM | | |
| 5/17/2010 | 11:30 PM | 8:35 | |
| 5/18/2010 | 10:55 AM | | |
| 5/18/2010 | 11:04 PM | 12:09 | |
| 5/19/2010 | 2:55 PM | | |
| 5/19/2010 | 11:30 PM | 8:35 | |
| 5/22/2010 | 2:55 PM | | |
| 5/22/2010 | 11:30 PM | 8:35 | |
| 5/23/2010 | 2:55 PM | | |
| 5/23/2010 | 11:30 PM | 8:35 | |
| 5/24/2010 | 2:55 PM | | |
| 5/24/2010 | 11:30 PM | 8:35 | |
| 5/25/2010 | 2:55 PM | | |
| 5/25/2010 | 11:30 PM | 8:35 | |
| 5/26/2010 | 2:02 PM | | |
| 5/26/2010 | 11:07 PM | 9:05 | |
| 5/29/2010 | 2:55 PM | | |
| 5/29/2010 | 11:30 PM | 8:35 | |
| 5/30/2010 | 2:55 PM | | |

| LOWERY, PATRICK R. | | | |
|---|---|---|---|
| | | | |
| **TIME** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 5/30/2010 | 11:30 PM | 8:35 | |
| 5/31/2010 | 2:55 PM | | |
| 5/31/2010 | 11:30 PM | 8:35 | |
| 6/1/2010 | 2:57 PM | | |
| 6/1/2010 | 11:30 PM | 8:33 | |
| 6/2/2010 | 2:55 PM | | |
| 6/2/2010 | 11:30 PM | 8:35 | |
| 6/4/2010 | 6:56 AM | | |
| 6/4/2010 | 3:00 PM | 8:04 | |
| 6/5/2010 | 2:55 PM | | |
| 6/5/2010 | 11:30 PM | 8:35 | |
| 6/6/2010 | 2:55 PM | | |
| 6/6/2010 | 11:30 PM | 8:35 | |
| 6/7/2010 | 2:55 PM | | |
| 6/7/2010 | 11:30 PM | 8:35 | |
| 6/8/2010 | 2:55 PM | | |
| 6/8/2010 | 11:30 PM | 8:35 | |
| 6/9/2010 | 2:55 PM | | |
| 6/9/2010 | 11:30 PM | 8:35 | |
| 6/12/2010 | 2:55 PM | | |
| 6/12/2010 | 11:30 PM | 8:35 | |
| 6/13/2010 | 2:55 PM | | |
| 6/13/2010 | 11:30 PM | 8:35 | |
| 6/14/2010 | 2:55 PM | | |
| 6/14/2010 | 11:32 PM | 8:37 | |
| 6/15/2010 | 2:56 PM | | |
| 6/15/2010 | 11:30 PM | 8:34 | |
| 6/16/2010 | 2:55 PM | | |

| | LOWERY, PATRICK R. | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 6/16/2010 | 11:30 PM | 8:35 | |
| 6/19/2010 | 2:55 PM | | |
| 6/19/2010 | 11:30 PM | 8:35 | |
| 6/20/2010 | 2:55 PM | | |
| 6/20/2010 | 11:30 PM | 8:35 | |
| 6/21/2010 | 2:55 PM | | |
| 6/21/2010 | 11:30 PM | 8:35 | |
| 6/22/2010 | 2:55 PM | | |
| 6/22/2010 | 11:30 PM | 8:35 | |
| 6/23/2010 | 2:55 PM | | |
| 6/23/2010 | 11:30 PM | 8:35 | |
| 6/26/2010 | 2:55 PM | | |
| 6/26/2010 | 11:30 PM | 8:35 | |
| 6/27/2010 | 2:55 PM | | |
| 6/27/2010 | 11:30 PM | 8:35 | |
| 6/28/2010 | 2:55 PM | | |
| 6/28/2010 | 11:30 PM | 8:35 | |
| 6/29/2010 | 2:55 PM | | |
| 6/29/2010 | 11:30 PM | 8:35 | |
| 6/30/2010 | 2:55 PM | | |
| 6/30/2010 | 11:30 PM | 8:35 | |
| 7/3/2010 | 2:55 PM | | |
| 7/3/2010 | 11:30 PM | 8:35 | |
| 7/4/2010 | 2:55 PM | | |
| 7/4/2010 | 11:30 PM | 8:35 | |
| 7/5/2010 | 2:55 PM | | |
| 7/6/2010 | 3:01 AM | 12:06 | |
| 7/6/2010 | 2:55 PM | | |

| LOWERY, PATRICK R. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 7/6/2010 | 11:30 PM | 8:35 | |
| 7/7/2010 | 2:55 PM | | |
| 7/7/2010 | 11:30 PM | 8:35 | |
| 7/10/2010 | 2:55 PM | | |
| 7/10/2010 | 11:30 PM | 8:35 | |
| 7/11/2010 | 6:55 PM | | |
| 7/12/2010 | 6:44 AM | 11:49 | |
| 7/12/2010 | 2:55 PM | | |
| 7/12/2010 | 11:30 PM | 8:35 | |
| 7/13/2010 | 2:55 PM | | |
| 7/13/2010 | 11:30 PM | 8:35 | |
| 7/14/2010 | 2:55 PM | | |
| 7/14/2010 | 11:30 PM | 8:35 | |
| 7/18/2010 | 2:55 PM | | |
| 7/18/2010 | 11:30 PM | 8:35 | |
| 7/19/2010 | 2:55 PM | | |
| 7/19/2010 | 11:30 PM | 8:35 | |
| 7/20/2010 | 2:55 PM | | |
| 7/20/2010 | 11:30 PM | 8:35 | |
| 7/21/2010 | 2:55 PM | | |
| 7/21/2010 | 11:30 PM | 8:35 | |
| 7/24/2010 | 6:55 PM | | |
| 7/25/2010 | 7:00 AM | 12:05 | |
| 7/25/2010 | 6:55 PM | | |
| 7/26/2010 | 7:02 AM | 12:07 | |
| 7/26/2010 | 6:55 PM | | |
| 7/27/2010 | 7:00 AM | 12:05 | |
| 7/27/2010 | 2:55 PM | | |

| | LOWERY, PATRICK R. | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 7/27/2010 | 11:30 PM | 8:35 | |
| 7/31/2010 | 2:55 PM | | |
| 8/1/2010 | 3:00 AM | 12:05 | |
| 8/1/2010 | 2:56 PM | | |
| 8/2/2010 | 3:00 AM | 12:04 | |
| 8/2/2010 | 2:55 PM | | |
| 8/2/2010 | 11:30 PM | 8:35 | |
| 8/3/2010 | 2:55 PM | | |
| 8/3/2010 | 11:30 PM | 8:35 | |
| 8/6/2010 | 2:56 PM | | |
| 8/6/2010 | 11:30 PM | 8:34 | |
| 8/7/2010 | 6:55 PM | | |
| 8/8/2010 | 7:01 AM | 12:06 | |
| 8/8/2010 | 6:55 PM | | |
| 8/9/2010 | 7:00 AM | 12:05 | |
| 8/9/2010 | 2:55 PM | | |
| 8/10/2010 | 3:00 AM | 12:05 | |
| 8/10/2010 | 2:55 PM | | |
| 8/10/2010 | 11:30 PM | 8:35 | |
| 8/11/2010 | 2:56 PM | | |
| 8/11/2010 | 6:30 PM | 3:34 | |
| 8/20/2010 | 6:55 AM | | |
| 8/20/2010 | 3:31 PM | 8:36 | |
| 8/21/2010 | 2:55 PM | | |
| 8/22/2010 | 3:03 AM | 12:08 | |
| 8/22/2010 | 2:55 PM | | |
| 8/23/2010 | 3:00 AM | 12:05 | |
| 8/23/2010 | 2:55 PM | | |

| LOWERY, PATRICK R. | | | |
|---|---|---|---|
| | | | |
| **TIME** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 8/23/2010 | 11:30 PM | 8:35 | |
| 8/24/2010 | 2:56 PM | | |
| 8/24/2010 | 11:30 PM | 8:34 | |
| 8/25/2010 | 2:55 PM | | |
| 8/25/2010 | 11:30 PM | 8:35 | |
| 8/28/2010 | 2:55 PM | | |
| 8/28/2010 | 11:30 PM | 8:35 | |
| 8/29/2010 | 2:56 PM | | |
| 8/30/2010 | 3:00 AM | 12:04 | |
| 8/30/2010 | 2:56 PM | | |
| 8/30/2010 | 11:30 PM | 8:34 | |
| 8/31/2010 | 2:55 PM | | |
| 8/31/2010 | 11:30 PM | 8:35 | |
| 9/1/2010 | 2:55 PM | | |
| 9/1/2010 | 11:30 PM | 8:35 | |
| 9/4/2010 | 6:55 PM | | |
| 9/5/2010 | 7:00 AM | 12:05 | |
| 9/5/2010 | 6:56 PM | | |
| 9/6/2010 | 7:01 AM | 12:05 | |
| 9/6/2010 | 2:55 PM | | |
| 9/6/2010 | 11:30 PM | 8:35 | |
| 9/7/2010 | 2:55 PM | | |
| 9/7/2010 | 11:30 PM | 8:35 | |
| 9/8/2010 | 2:55 PM | | |
| 9/8/2010 | 11:30 PM | 8:35 | |
| 9/11/2010 | 2:55 PM | | |
| 9/12/2010 | 3:01 AM | 12:06 | |
| 9/12/2010 | 2:55 PM | | |

| LOWERY, PATRICK R. | | | |
|---|---|---|---|
| | | | |
| **TIME** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 9/12/2010 | 11:30 PM | 8:35 | |
| 9/13/2010 | 2:55 PM | | |
| 9/13/2010 | 11:30 PM | 8:35 | |
| 9/14/2010 | 2:55 PM | | |
| 9/14/2010 | 11:30 PM | 8:35 | |
| 9/15/2010 | 2:55 PM | | |
| 9/15/2010 | 11:30 PM | 8:35 | |
| 9/18/2010 | 2:55 PM | | |
| 9/19/2010 | 3:02 AM | 12:07 | |
| 9/19/2010 | 2:55 PM | | |
| 9/19/2010 | 11:30 PM | 8:35 | |
| 9/20/2010 | 2:55 PM | | |
| 9/20/2010 | 11:30 PM | 8:35 | |
| 9/21/2010 | 2:55 PM | | |
| 9/21/2010 | 11:30 PM | 8:35 | |
| 9/22/2010 | 2:56 PM | | |
| 9/22/2010 | 11:30 PM | 8:34 | |
| 9/25/2010 | 2:55 PM | | |
| 9/26/2010 | 3:00 AM | 12:05 | |
| 9/26/2010 | 2:56 PM | | |
| 9/26/2010 | 11:30 PM | 8:34 | |
| 9/27/2010 | 2:55 PM | | |
| 9/27/2010 | 11:30 PM | 8:35 | |
| 9/28/2010 | 2:55 PM | | |
| 9/28/2010 | 11:30 PM | 8:35 | |
| 9/29/2010 | 2:55 PM | | |
| 9/29/2010 | 11:30 PM | 8:35 | |

Lisa Schultz

Records

| | SCHULTZ, LISA A. | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 3/28/2009 | 7:09 AM | | Punch out / no punch in |
| 3/28/2009 | 6:57 PM | | |
| 3/29/2009 | 7:04 AM | 12:07 | |
| 4/3/2009 | 6:54 PM | | |
| 4/4/2009 | 7:09 AM | 12:15 | |
| 4/4/2009 | 6:53 PM | | |
| 4/5/2009 | 7:14 AM | 12:21 | |
| 4/10/2009 | 6:58 PM | | |
| 4/11/2009 | 7:06 AM | 12:08 | |
| 4/11/2009 | 6:45 PM | | |
| 4/12/2009 | 7:15 AM | 12:30 | |
| 4/15/2009 | 2:53 PM | | |
| 4/15/2009 | 11:30 PM | 8:37 | |
| 4/17/2009 | 6:45 PM | | |
| 4/18/2009 | 7:17 AM | 12:32 | |
| 4/18/2009 | 6:56 PM | | |
| 4/19/2009 | 7:10 AM | 12:14 | |
| 4/19/2009 | 10:54 PM | | |
| 4/20/2009 | 7:01 AM | 8:07 | |
| 4/24/2009 | 6:59 PM | | |
| 4/25/2009 | 7:20 AM | 12:21 | |
| 4/25/2009 | 6:56 PM | | |
| 4/26/2009 | 7:22 AM | 12:26 | |
| 5/1/2009 | 6:55 PM | | |
| 5/2/2009 | 7:31 AM | 12:36 | |
| 5/2/2009 | 6:55 PM | | |
| 5/3/2009 | 7:42 AM | 12:47 | |
| 5/6/2009 | 2:48 PM | | |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 5/6/2009 | 11:31 PM | 8:43 | |
| 5/8/2009 | 6:56 PM | | |
| 5/9/2009 | 7:07 AM | 12:11 | |
| 5/9/2009 | 7:01 PM | | |
| 5/10/2009 | 7:05 AM | 12:04 | |
| 5/13/2009 | 10:47 PM | | |
| 5/14/2009 | 7:44 AM | 8:57 | |
| 5/14/2009 | 8:54 PM | | |
| 5/15/2009 | 7:08 AM | 10:14 | |
| 5/15/2009 | 6:54 PM | | |
| 5/16/2009 | 7:12 AM | 12:18 | |
| 5/16/2009 | 6:52 PM | | |
| 5/17/2009 | 7:08 AM | 12:16 | |
| 5/17/2009 | 6:53 PM | | |
| 5/18/2009 | 7:27 AM | 12:34 | |
| 5/19/2009 | 6:56 AM | | |
| 5/19/2009 | 3:27 PM | 8:31 | |
| 5/22/2009 | 6:56 PM | | |
| 5/23/2009 | 7:10 AM | 12:14 | |
| 5/23/2009 | 6:57 PM | | |
| 5/24/2009 | 7:07 AM | 12:10 | |
| 5/24/2009 | 6:42 PM | | |
| 5/25/2009 | 7:13 AM | 12:31 | |
| 5/26/2009 | 6:50 AM | | |
| 5/26/2009 | 3:12 PM | 8:22 | |
| 5/29/2009 | 6:57 PM | | |
| 5/30/2009 | 7:32 AM | 12:35 | |
| 5/30/2009 | 6:56 PM | | |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| **TIME** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 5/31/2009 | 7:04 AM | 12:08 | |
| 6/5/2009 | 6:55 PM | | |
| 6/6/2009 | 7:32 AM | 12:37 | |
| 6/6/2009 | 6:55 PM | | |
| 6/7/2009 | 7:30 AM | 12:35 | |
| 6/7/2009 | 6:55 PM | | |
| 6/8/2009 | 7:33 AM | 12:38 | |
| 6/12/2009 | 6:58 PM | | |
| 6/13/2009 | 7:40 AM | 12:42 | |
| 6/14/2009 | 6:57 PM | | |
| 6/15/2009 | 7:33 AM | 12:36 | |
| 6/17/2009 | 4:27 PM | | |
| 6/17/2009 | 11:07 PM | 6:40 | |
| 6/19/2009 | 8:37 PM | | |
| 6/20/2009 | 7:08 AM | 10:31 | |
| 6/20/2009 | 6:55 PM | | |
| 6/21/2009 | 7:18 AM | 12:23 | |
| 6/21/2009 | 6:55 PM | | |
| 6/22/2009 | 7:32 AM | 12:37 | |
| 6/26/2009 | 6:55 PM | | |
| 6/27/2009 | 7:31 AM | 12:36 | |
| 6/27/2009 | 6:55 PM | | |
| 6/28/2009 | 7:30 AM | 12:35 | |
| 6/28/2009 | 6:55 PM | | |
| 6/29/2009 | 7:18 AM | 12:23 | |
| 7/3/2009 | 6:56 PM | | |
| 7/4/2009 | 7:40 AM | 12:44 | |
| 7/4/2009 | 6:55 PM | | |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 7/5/2009 | 7:30 AM | 12:35 | |
| 7/5/2009 | 6:55 PM | | |
| 7/6/2009 | 7:17 AM | 12:22 | |
| 7/7/2009 | 6:55 AM | | |
| 7/7/2009 | 3:32 PM | 8:37 | |
| 7/8/2009 | 6:55 AM | | |
| 7/8/2009 | 12:04 PM | 5:09 | |
| 7/10/2009 | 6:56 PM | | |
| 7/11/2009 | 7:03 AM | 12:07 | |
| 7/11/2009 | 6:55 PM | | |
| 7/12/2009 | 7:03 AM | 12:08 | |
| 7/12/2009 | 6:55 PM | | |
| 7/13/2009 | 7:31 AM | 12:36 | |
| 7/14/2009 | 6:58 AM | | |
| 7/14/2009 | 3:41 PM | 8:43 | |
| 7/15/2009 | 10:56 PM | | |
| 7/16/2009 | 7:08 AM | 8:12 | |
| 7/17/2009 | 6:55 PM | | |
| 7/18/2009 | 7:31 AM | 12:36 | |
| 7/18/2009 | 6:55 PM | | |
| 7/19/2009 | 7:30 AM | 12:35 | |
| 7/19/2009 | 6:56 PM | | |
| 7/20/2009 | 7:32 AM | 12:36 | |
| 7/21/2009 | 6:55 AM | | |
| 7/21/2009 | 3:11 PM | 8:16 | |
| 7/22/2009 | 6:57 AM | | |
| 7/22/2009 | 11:07 AM | 4:10 | |
| 7/24/2009 | 6:55 PM | | |

| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 7/25/2009 | 7:38 AM | 12:43 | |
| 7/25/2009 | 6:55 PM | | |
| 7/26/2009 | 7:32 AM | 12:37 | |
| 7/26/2009 | 6:55 PM | | |
| 7/27/2009 | 7:05 AM | 12:10 | |
| 7/29/2009 | 6:56 AM | | |
| 7/29/2009 | 11:03 AM | 4:07 | Short shift? |
| 7/31/2009 | 6:55 PM | | |
| 8/1/2009 | 7:05 AM | 12:10 | |
| 8/1/2009 | 6:55 PM | | |
| 8/2/2009 | 7:07 AM | 12:12 | |
| 8/2/2009 | 6:55 PM | | |
| 8/3/2009 | 7:02 AM | 12:07 | |
| 8/4/2009 | 6:55 AM | | |
| 8/4/2009 | 3:30 PM | 8:35 | |
| 8/5/2009 | 6:55 AM | | |
| 8/5/2009 | 11:22 AM | 4:27 | Short shift? |
| 8/6/2009 | 6:57 AM | | |
| 8/6/2009 | 3:04 PM | 8:07 | |
| 8/7/2009 | 6:55 AM | | |
| 8/7/2009 | 7:06 PM | 12:11 | |
| 8/8/2009 | 9:55 PM | | |
| 8/9/2009 | 7:07 AM | 9:12 | |
| 8/9/2009 | 6:56 PM | | |
| 8/10/2009 | 7:01 AM | 12:05 | |
| 8/10/2009 | 10:55 PM | | |
| 8/11/2009 | 7:10 AM | 8:15 | |
| 8/11/2009 | 10:55 PM | | |

| | SCHULTZ, LISA A. | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 8/12/2009 | 7:02 AM | 8:07 | |
| 8/12/2009 | 10:55 PM | | |
| 8/13/2009 | 7:05 AM | 8:10 | |
| 8/13/2009 | 8:54 PM | | |
| 8/14/2009 | 7:12 AM | 10:18 | |
| 8/14/2009 | 6:56 PM | | |
| 8/15/2009 | 7:02 AM | 12:06 | |
| 8/15/2009 | 10:55 PM | | |
| 8/16/2009 | 7:34 AM | 8:39 | |
| 8/16/2009 | 6:55 PM | | |
| 8/17/2009 | 7:03 AM | 12:08 | |
| 8/21/2009 | 6:55 PM | | Punch in / no punch out |
| 8/22/2009 | 9:05 PM | | |
| 8/23/2009 | 7:30 AM | 10:25 | |
| 8/23/2009 | 6:55 PM | | |
| 8/24/2009 | 7:03 AM | 12:08 | |
| 8/28/2009 | 6:55 PM | | |
| 8/29/2009 | 7:30 AM | 12:35 | |
| 8/29/2009 | 10:55 PM | | |
| 8/30/2009 | 7:33 AM | 8:38 | |
| 8/30/2009 | 6:56 PM | | |
| 8/31/2009 | 7:05 AM | 12:09 | |
| 9/4/2009 | 6:55 PM | | |
| 9/5/2009 | 7:13 AM | 12:18 | |
| 9/5/2009 | 6:55 PM | | |
| 9/6/2009 | 7:00 AM | 12:05 | |
| 9/6/2009 | 6:55 PM | | |
| 9/7/2009 | 7:47 AM | 12:52 | |

| | SCHULTZ, LISA A. | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 9/9/2009 | 6:55 AM | | |
| 9/9/2009 | 3:12 PM | 8:17 | |
| 9/11/2009 | 6:55 PM | | |
| 9/12/2009 | 7:31 AM | 12:36 | |
| 9/12/2009 | 6:55 PM | | |
| 9/13/2009 | 7:30 AM | 12:35 | |
| 9/13/2009 | 6:55 PM | | |
| 9/14/2009 | 7:02 AM | 12:07 | |
| 9/18/2009 | 6:57 PM | | |
| 9/19/2009 | 7:02 AM | 12:05 | |
| 9/19/2009 | 9:22 PM | | |
| 9/20/2009 | 7:03 AM | 9:41 | |
| 9/20/2009 | 6:55 PM | | |
| 9/21/2009 | 7:02 AM | 12:07 | |
| 9/25/2009 | 6:57 PM | | |
| 9/26/2009 | 7:31 AM | 12:34 | |
| 9/26/2009 | 6:55 PM | | |
| 9/27/2009 | 7:42 AM | 12:47 | |
| 9/27/2009 | 6:55 PM | | |
| 9/28/2009 | 7:30 AM | 12:35 | |
| 10/1/2009 | 10:55 PM | | |
| 10/2/2009 | 7:10 AM | 8:15 | |
| 10/2/2009 | 6:57 PM | | |
| 10/3/2009 | 7:32 AM | 12:35 | |
| 10/3/2009 | 4:51 PM | | |
| 10/3/2009 | 11:51 PM | 7:00 | |
| 10/4/2009 | 6:55 PM | | |
| 10/5/2009 | 7:30 AM | 12:35 | |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 10/10/2009 | 6:55 PM | | |
| 10/11/2009 | 7:32 AM | 12:37 | |
| 10/11/2009 | 6:55 PM | | |
| 10/12/2009 | 7:32 AM | 12:37 | |
| 10/14/2009 | 9:14 PM | | |
| 10/15/2009 | 7:03 AM | 9:49 | |
| 10/15/2009 | 9:28 PM | | |
| 10/16/2009 | 7:02 AM | 9:34 | |
| 10/16/2009 | 6:55 PM | | |
| 10/17/2009 | 7:30 AM | 12:35 | |
| 10/17/2009 | 6:56 PM | | |
| 10/18/2009 | 7:37 AM | 12:41 | |
| 10/18/2009 | 6:55 PM | | |
| 10/19/2009 | 7:32 AM | 12:37 | |
| 10/19/2009 | 10:55 PM | | |
| 10/20/2009 | 7:02 AM | 8:07 | |
| 10/23/2009 | 6:57 PM | | |
| 10/24/2009 | 7:30 AM | 12:33 | |
| 10/24/2009 | 6:55 PM | | |
| 10/25/2009 | 7:33 AM | 12:38 | |
| 10/25/2009 | 6:55 PM | | |
| 10/26/2009 | 7:30 AM | 12:35 | |
| 10/26/2009 | 11:24 PM | | |
| 10/27/2009 | 7:02 AM | 7:38 | |
| 10/27/2009 | 10:56 PM | | |
| 10/28/2009 | 7:00 AM | 8:04 | |
| 10/30/2009 | 6:55 PM | | |
| 10/31/2009 | 7:13 AM | 12:18 | |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 11/1/2009 | 12:31 AM | | |
| 11/1/2009 | 7:59 AM | 7:28 | |
| 11/1/2009 | 6:55 PM | | |
| 11/2/2009 | 7:33 AM | 12:38 | |
| 11/6/2009 | 6:55 PM | | |
| 11/7/2009 | 7:08 AM | 12:13 | |
| 11/7/2009 | 6:55 PM | | |
| 11/8/2009 | 7:33 AM | 12:38 | |
| 11/8/2009 | 10:56 PM | | |
| 11/9/2009 | 7:26 AM | 8:30 | |
| 11/13/2009 | 6:55 PM | | |
| 11/14/2009 | 7:32 AM | 12:37 | |
| 11/14/2009 | 6:55 PM | | |
| 11/15/2009 | 7:45 AM | 12:50 | |
| 11/15/2009 | 10:56 PM | | |
| 11/16/2009 | 7:34 AM | 8:38 | |
| 11/16/2009 | 10:56 PM | | |
| 11/17/2009 | 7:31 AM | 8:35 | |
| 11/18/2009 | 6:55 AM | | |
| 11/18/2009 | 10:05 AM | 3:10 | |
| 11/20/2009 | 6:55 PM | | |
| 11/21/2009 | 7:31 AM | 12:36 | |
| 11/21/2009 | 6:56 PM | | |
| 11/22/2009 | 7:02 AM | 12:06 | |
| 11/22/2009 | 10:59 PM | | |
| 11/23/2009 | 7:33 AM | 8:34 | |
| 11/24/2009 | 10:56 PM | | |
| 11/25/2009 | 3:03 AM | 4:07 | Short shift? |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 11/27/2009 | 6:55 PM | | |
| 11/28/2009 | 7:34 AM | 12:39 | |
| 11/28/2009 | 6:55 PM | | |
| 11/29/2009 | 7:04 AM | 12:09 | |
| 11/29/2009 | 10:55 PM | | |
| 11/30/2009 | 7:36 AM | 8:41 | |
| 12/4/2009 | 6:55 PM | | |
| 12/5/2009 | 7:01 AM | 12:06 | |
| 12/5/2009 | 6:56 PM | | |
| 12/6/2009 | 7:38 AM | 12:42 | |
| 12/6/2009 | 10:58 PM | | |
| 12/7/2009 | 7:03 AM | 8:05 | |
| 12/11/2009 | 6:55 PM | | |
| 12/12/2009 | 7:33 AM | 12:38 | |
| 12/12/2009 | 6:55 PM | | |
| 12/13/2009 | 7:32 AM | 12:37 | |
| 12/13/2009 | 10:55 PM | | |
| 12/14/2009 | 7:02 AM | 8:07 | |
| 12/18/2009 | 6:55 PM | | |
| 12/19/2009 | 7:32 AM | 12:37 | |
| 12/19/2009 | 6:55 PM | | |
| 12/20/2009 | 7:02 AM | 12:07 | |
| 12/20/2009 | 10:56 PM | | |
| 12/21/2009 | 7:32 AM | 8:36 | |
| 12/25/2009 | 6:59 PM | | |
| 12/26/2009 | 7:05 AM | 12:06 | |
| 12/27/2009 | 10:55 PM | | |
| 12/28/2009 | 7:08 AM | 8:13 | |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 1/1/2010 | 6:58 PM | | |
| 1/2/2010 | 7:34 AM | 12:36 | |
| 1/2/2010 | 6:55 PM | | |
| 1/3/2010 | 7:31 AM | 12:36 | |
| 1/3/2010 | 10:55 PM | | |
| 1/4/2010 | 7:07 AM | 8:12 | |
| 1/8/2010 | 6:51 PM | | |
| 1/9/2010 | 7:04 AM | 12:13 | |
| 1/9/2010 | 6:55 PM | | |
| 1/10/2010 | 7:04 AM | 12:09 | |
| 1/11/2010 | 12:26 AM | | |
| 1/11/2010 | 7:30 AM | 7:04 | |
| 1/16/2010 | 6:55 PM | | |
| 1/17/2010 | 7:02 AM | 12:07 | |
| 1/17/2010 | 10:55 PM | | |
| 1/18/2010 | 7:30 AM | 8:35 | |
| 1/22/2010 | 10:55 PM | | |
| 1/23/2010 | 7:34 AM | 8:39 | |
| 1/23/2010 | 6:56 PM | | |
| 1/24/2010 | 7:33 AM | 12:37 | |
| 1/24/2010 | 10:55 PM | | |
| 1/25/2010 | 7:00 AM | 8:05 | |
| 1/29/2010 | 6:56 PM | | |
| 1/30/2010 | 7:33 AM | 12:37 | |
| 1/30/2010 | 6:55 PM | | |
| 1/31/2010 | 7:13 AM | 12:18 | |
| 1/31/2010 | 10:55 PM | | |
| 2/1/2010 | 7:01 AM | 8:06 | |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 2/5/2010 | 6:55 PM | | |
| 2/6/2010 | 7:31 AM | 12:36 | |
| 2/6/2010 | 7:00 PM | | |
| 2/7/2010 | 7:32 AM | 12:32 | |
| 2/8/2010 | 10:56 PM | | |
| 2/9/2010 | 7:05 AM | 8:09 | |
| 2/9/2010 | 10:55 PM | | |
| 2/10/2010 | 7:04 AM | 8:09 | |
| 2/12/2010 | 6:55 PM | | |
| 2/13/2010 | 7:32 AM | 12:37 | |
| 2/13/2010 | 6:55 PM | | |
| 2/14/2010 | 7:30 AM | 12:35 | |
| 2/14/2010 | 10:55 PM | | |
| 2/15/2010 | 7:01 AM | 8:06 | |
| 2/19/2010 | 6:57 PM | | |
| 2/20/2010 | 1:45 AM | 6:48 | |
| 2/20/2010 | 6:56 PM | | |
| 2/21/2010 | 7:08 AM | 12:12 | |
| 2/21/2010 | 10:55 PM | | |
| 2/22/2010 | 7:00 AM | 8:05 | |
| 2/26/2010 | 6:55 PM | | |
| 2/27/2010 | 7:34 AM | 12:39 | |
| 2/27/2010 | 6:55 PM | | |
| 2/28/2010 | 7:34 AM | 12:39 | |
| 2/28/2010 | 10:56 PM | | |
| 3/1/2010 | 7:02 AM | 8:06 | |
| 3/5/2010 | 6:55 PM | | |
| 3/6/2010 | 7:12 AM | 12:17 | |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| **TIME** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 3/6/2010 | 6:55 PM | | |
| 3/7/2010 | 7:04 AM | 12:09 | |
| 3/8/2010 | 10:55 PM | | |
| 3/9/2010 | 7:03 AM | 8:08 | |
| 3/12/2010 | 6:55 PM | | |
| 3/13/2010 | 7:33 AM | 12:38 | |
| 3/13/2010 | 6:55 PM | | |
| 3/14/2010 | 6:30 AM | 11:35 | |
| 3/19/2010 | 6:55 PM | | |
| 3/20/2010 | 7:06 AM | 12:11 | |
| 3/26/2010 | 6:27 PM | | |
| 3/27/2010 | 7:13 AM | 12:46 | |
| 3/27/2010 | 6:55 PM | | |
| 3/28/2010 | 7:32 AM | 12:37 | |
| 3/28/2010 | 10:55 PM | | |
| 3/29/2010 | 7:24 AM | 8:29 | |
| 4/1/2010 | 10:56 PM | | |
| 4/2/2010 | 7:00 AM | 8:04 | |
| 4/2/2010 | 6:55 PM | | |
| 4/3/2010 | 7:31 AM | 12:36 | |
| 4/3/2010 | 6:55 PM | | |
| 4/4/2010 | 7:01 AM | 12:06 | |
| 4/9/2010 | 6:56 PM | | |
| 4/10/2010 | 7:33 AM | 12:37 | |
| 4/10/2010 | 6:55 PM | | |
| 4/11/2010 | 7:01 AM | 12:06 | |
| 4/16/2010 | 6:55 PM | | |
| 4/17/2010 | 7:35 AM | 12:40 | |

| | SCHULTZ, LISA A. | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 4/17/2010 | 6:55 PM | | |
| 4/18/2010 | 7:06 AM | 12:11 | |
| 4/23/2010 | 6:55 PM | | |
| 4/24/2010 | 7:32 AM | 12:37 | |
| 4/24/2010 | 6:57 PM | | |
| 4/25/2010 | 7:01 AM | 12:04 | |
| 4/30/2010 | 6:57 PM | | |
| 5/1/2010 | 7:35 AM | 12:38 | |
| 5/1/2010 | 10:25 PM | | |
| 5/2/2010 | 7:00 AM | 8:35 | |
| 5/7/2010 | 6:55 PM | | |
| 5/8/2010 | 7:01 AM | 12:06 | |
| 5/13/2010 | 10:55 PM | | |
| 5/14/2010 | 7:27 AM | 8:32 | |
| 5/14/2010 | 6:56 PM | | |
| 5/15/2010 | 7:48 AM | 12:52 | |
| 5/15/2010 | 6:55 PM | | |
| 5/16/2010 | 7:04 AM | 12:09 | |
| 5/19/2010 | 10:55 PM | | |
| 5/20/2010 | 7:36 AM | 8:41 | |
| 5/20/2010 | 10:55 PM | | |
| 5/21/2010 | 7:04 AM | 8:09 | |
| 5/21/2010 | 6:55 PM | | |
| 5/22/2010 | 3:10 AM | 8:15 | |
| 5/28/2010 | 6:57 PM | | |
| 5/29/2010 | 7:00 AM | 12:03 | |
| 5/29/2010 | 5:55 PM | | |
| 5/30/2010 | 7:12 AM | 13:17 | |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 6/11/2010 | 6:55 PM | | |
| 6/12/2010 | 7:32 AM | 12:37 | |
| 6/12/2010 | 5:55 PM | | |
| 6/13/2010 | 7:14 AM | 13:19 | |
| 6/18/2010 | 6:56 PM | | |
| 6/19/2010 | 7:31 AM | 12:35 | |
| 6/19/2010 | 6:55 PM | | |
| 6/20/2010 | 7:01 AM | 12:06 | |
| 6/25/2010 | 7:05 PM | | |
| 6/26/2010 | 7:32 AM | 12:27 | |
| 6/26/2010 | 6:55 PM | | |
| 6/27/2010 | 7:25 AM | 12:30 | |
| 7/2/2010 | 6:58 PM | | |
| 7/3/2010 | 7:09 AM | 12:11 | |
| 7/3/2010 | 6:55 PM | | |
| 7/4/2010 | 7:01 AM | 12:06 | |
| 7/9/2010 | 6:55 PM | | |
| 7/10/2010 | 7:05 AM | 12:10 | |
| 7/10/2010 | 6:55 PM | | |
| 7/11/2010 | 7:02 AM | 12:07 | |
| 7/16/2010 | 6:55 PM | | |
| 7/17/2010 | 7:11 AM | 12:16 | |
| 7/17/2010 | 6:56 PM | | |
| 7/18/2010 | 7:10 AM | 12:14 | |
| 7/24/2010 | 5:46 PM | | |
| 7/25/2010 | 7:03 AM | 13:17 | |
| 7/30/2010 | 6:59 PM | | |
| 7/31/2010 | 7:31 AM | 12:32 | |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 7/31/2010 | 6:56 PM | | |
| 8/1/2010 | 7:08 AM | 12:12 | |
| 8/3/2010 | 12:56 AM | | |
| 8/3/2010 | 6:00 AM | 5:04 | |
| 8/6/2010 | 12:55 AM | | |
| 8/6/2010 | 7:02 AM | 6:07 | |
| 8/6/2010 | 6:55 PM | | |
| 8/7/2010 | 7:30 AM | 12:35 | |
| 8/7/2010 | 5:54 PM | | |
| 8/8/2010 | 7:00 AM | 13:06 | |
| 8/13/2010 | 6:55 PM | | |
| 8/14/2010 | 7:09 AM | 12:14 | |
| 8/14/2010 | 6:55 PM | | |
| 8/15/2010 | 7:03 AM | 12:08 | |
| 8/20/2010 | 6:57 PM | | |
| 8/21/2010 | 7:31 AM | 12:34 | |
| 8/21/2010 | 5:54 PM | | |
| 8/22/2010 | 7:30 AM | 13:36 | |
| 8/27/2010 | 6:55 PM | | |
| 8/28/2010 | 7:32 AM | 12:37 | |
| 8/28/2010 | 6:55 PM | | |
| 8/29/2010 | 7:30 AM | 12:35 | |
| 9/3/2010 | 6:56 PM | | |
| 9/4/2010 | 7:31 AM | 12:35 | |
| 9/4/2010 | 5:56 PM | | |
| 9/5/2010 | 7:30 AM | 13:34 | |
| 9/10/2010 | 8:53 PM | | |
| 9/11/2010 | 7:30 AM | 10:37 | |

| SCHULTZ, LISA A. | | | |
|---|---|---|---|
| | | | |
| TIME | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 9/11/2010 | 6:55 PM | | |
| 9/12/2010 | 7:31 AM | 12:36 | |
| 9/17/2010 | 6:55 PM | | |
| 9/18/2010 | 7:31 AM | 12:36 | |
| 9/18/2010 | 6:55 PM | | |
| 9/19/2010 | 7:30 AM | 12:35 | |
| 9/24/2010 | 6:55 PM | | |
| 9/25/2010 | 7:30 AM | 12:35 | |
| 9/25/2010 | 6:55 PM | | |
| 9/26/2010 | 7:30 AM | 12:35 | |
| 10/1/2010 | 10:56 PM | | |
| 10/2/2010 | 7:30 AM | 8:34 | |
| 10/2/2010 | 6:55 PM | | |
| 10/3/2010 | 7:31 AM | 12:36 | |

Steve Slutsky

Records

| SLUTSKY, STEVE | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 8/20/2008 | 10:58 AM | | |
| 8/20/2008 | 11:04 PM | 12:06 | |
| 8/21/2008 | 2:56 PM | | |
| 8/21/2008 | 11:31 PM | 8:35 | |
| 8/23/2008 | 2:57 PM | | |
| 8/23/2008 | 11:30 PM | 8:33 | |
| 8/24/2008 | 2:56 PM | | |
| 8/24/2008 | 11:30 PM | 8:34 | |
| 8/26/2008 | 10:56 AM | | |
| 8/26/2008 | 11:04 PM | 12:08 | |
| 8/27/2008 | 10:56 AM | | |
| 8/27/2008 | 11:02 PM | 12:06 | |
| 8/28/2008 | 2:55 PM | | |
| 8/28/2008 | 11:30 PM | 8:35 | |
| 8/29/2008 | 2:57 PM | | |
| 8/29/2008 | 11:30 PM | 8:33 | |
| 9/1/2008 | 2:57 PM | | |
| 9/1/2008 | 11:30 PM | 8:33 | |
| 9/2/2008 | 2:56 PM | | |
| 9/2/2008 | 11:30 PM | 8:34 | |
| 9/3/2008 | 2:56 PM | | |
| 9/3/2008 | 11:31 PM | 8:35 | |
| 9/4/2008 | 10:56 AM | | |
| 9/4/2008 | 6:00 PM | 7:04 | |
| 9/4/2008 | 6:30 PM | | |
| 9/4/2008 | 11:02 PM | 4:32 | |
| 9/6/2008 | 2:56 PM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **SLUTSKY, STEVE** | | | |
| 9/6/2008 | 5:59 PM | 3:03 | |
| 9/6/2008 | 6:29 PM | | |
| 9/6/2008 | 11:30 PM | 5:01 | |
| 9/9/2008 | 2:55 PM | | |
| 9/9/2008 | 11:30 PM | 8:35 | |
| 9/10/2008 | 10:55 AM | | |
| 9/10/2008 | 5:00 PM | 6:05 | |
| 9/10/2008 | 5:30 PM | | |
| 9/10/2008 | 11:10 PM | 5:40 | |
| 9/11/2008 | 2:56 PM | | |
| 9/11/2008 | 11:31 PM | 8:35 | |
| 9/12/2008 | 2:55 PM | | |
| 9/12/2008 | 11:30 PM | 8:35 | |
| 9/13/2008 | 10:55 PM | | |
| 9/14/2008 | 7:00 AM | 8:05 | |
| 9/15/2008 | 2:55 PM | | |
| 9/15/2008 | 11:30 PM | 8:35 | |
| 9/16/2008 | 2:55 PM | | |
| 9/16/2008 | 5:50 PM | 2:55 | |
| 9/16/2008 | 6:20 PM | | |
| 9/16/2008 | 11:30 PM | 5:10 | |
| 9/17/2008 | 2:56 PM | | |
| 9/17/2008 | 11:30 PM | 8:34 | |
| 9/18/2008 | 2:57 PM | | |
| 9/18/2008 | 11:30 PM | 8:33 | |
| 9/20/2008 | 2:57 PM | | |
| 9/20/2008 | 11:32 PM | 8:35 | |

| | SLUTSKY, STEVE | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 9/21/2008 | 2:56 PM | | |
| 9/21/2008 | 11:31 PM | 8:35 | |
| 9/23/2008 | 12:55 PM | | |
| 9/23/2008 | 11:14 PM | 10:19 | |
| 9/24/2008 | 2:55 PM | | |
| 9/24/2008 | 11:30 PM | 8:35 | |
| 9/25/2008 | 2:57 PM | | |
| 9/25/2008 | 11:31 PM | 8:34 | |
| 9/29/2008 | 2:56 PM | | |
| 9/29/2008 | 11:30 PM | 8:34 | |
| 9/30/2008 | 2:55 PM | | |
| 9/30/2008 | 11:32 PM | 8:37 | |
| 10/1/2008 | 2:56 PM | | |
| 10/1/2008 | 11:31 PM | 8:35 | |
| 10/2/2008 | 2:55 PM | | |
| 10/2/2008 | 11:30 PM | 8:35 | |
| 10/4/2008 | 2:55 PM | | |
| 10/4/2008 | 11:33 PM | 8:38 | |
| 10/5/2008 | 2:56 PM | | |
| 10/5/2008 | 11:30 PM | 8:34 | |
| 10/7/2008 | 2:55 PM | | |
| 10/7/2008 | 11:30 PM | 8:35 | |
| 10/8/2008 | 2:55 PM | | |
| 10/8/2008 | 11:30 PM | 8:35 | |
| 10/9/2008 | 2:55 PM | | |
| 10/9/2008 | 11:30 PM | 8:35 | |
| 10/10/2008 | 2:58 PM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **SLUTSKY, STEVE** | | | |
| 10/10/2008 | 11:31 PM | 8:33 | |
| 10/13/2008 | 2:57 PM | | |
| 10/13/2008 | 11:32 PM | 8:35 | |
| 10/14/2008 | 2:56 PM | | |
| 10/14/2008 | 11:30 PM | 8:34 | |
| 10/15/2008 | 2:56 PM | | |
| 10/15/2008 | 11:30 PM | 8:34 | |
| 10/16/2008 | 2:55 PM | | |
| 10/16/2008 | 11:30 PM | 8:35 | |
| 10/18/2008 | 2:55 PM | | |
| 10/18/2008 | 11:30 PM | 8:35 | |
| 10/19/2008 | 10:58 AM | | |
| 10/19/2008 | 11:30 PM | 12:32 | |
| 10/21/2008 | 2:56 PM | | |
| 10/21/2008 | 11:30 PM | 8:34 | |
| 10/22/2008 | 12:55 PM | | |
| 10/22/2008 | 11:07 PM | 10:12 | |
| 10/23/2008 | 2:55 PM | | |
| 10/23/2008 | 11:30 PM | 8:35 | |
| 10/24/2008 | 10:56 AM | | |
| 10/24/2008 | 3:46 PM | 4:50 | |
| 10/24/2008 | 4:14 PM | | |
| 10/24/2008 | 11:01 PM | 6:47 | |
| 10/27/2008 | 2:55 PM | | |
| 10/27/2008 | 11:30 PM | 8:35 | |
| 10/28/2008 | 2:56 PM | | |
| 10/28/2008 | 11:30 PM | 8:34 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **SLUTSKY, STEVE** | | | |
| | | | |
| 10/29/2008 | 2:57 PM | | |
| 10/29/2008 | 11:30 PM | 8:33 | |
| 10/30/2008 | 2:57 PM | | |
| 10/30/2008 | 11:30 PM | 8:33 | |
| 11/1/2008 | 2:57 PM | | |
| 11/1/2008 | 11:30 PM | 8:33 | |
| 11/2/2008 | 2:58 PM | | |
| 11/2/2008 | 11:31 PM | 8:33 | |
| 11/4/2008 | 2:55 PM | | |
| 11/4/2008 | 11:30 PM | 8:35 | |
| 11/5/2008 | 2:55 PM | | |
| 11/5/2008 | 11:31 PM | 8:36 | |
| 11/6/2008 | 2:56 PM | | Punch in / punch out |
| 11/7/2008 | 2:55 PM | | |
| 11/7/2008 | 11:30 PM | 8:35 | |
| 11/11/2008 | 2:57 PM | | |
| 11/11/2008 | 11:30 PM | 8:33 | |
| 11/12/2008 | 2:57 PM | | |
| 11/12/2008 | 11:30 PM | 8:33 | |
| 11/13/2008 | 2:56 PM | | |
| 11/13/2008 | 11:30 PM | 8:34 | |
| 11/15/2008 | 2:57 PM | | |
| 11/15/2008 | 11:30 PM | 8:33 | |
| 11/16/2008 | 2:56 PM | | |
| 11/16/2008 | 11:30 PM | 8:34 | |
| 11/18/2008 | 2:55 PM | | |
| 11/18/2008 | 11:30 PM | 8:35 | |

| SLUTSKY, STEVE | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 11/19/2008 | 2:55 PM | | |
| 11/19/2008 | 11:30 PM | 8:35 | |
| 11/20/2008 | 2:56 PM | | |
| 11/20/2008 | 11:30 PM | 8:34 | |
| 11/21/2008 | 2:57 PM | | |
| 11/21/2008 | 11:30 PM | 8:33 | |
| 11/24/2008 | 2:55 PM | | |
| 11/24/2008 | 11:30 PM | 8:35 | |
| 11/25/2008 | 2:55 PM | | |
| 11/25/2008 | 11:30 PM | 8:35 | |
| 11/26/2008 | 2:55 PM | | |
| 11/26/2008 | 11:30 PM | 8:35 | |
| 11/27/2008 | 2:55 PM | | |
| 11/27/2008 | 11:30 PM | 8:35 | |
| 11/29/2008 | 2:57 PM | | |
| 11/29/2008 | 11:30 PM | 8:33 | |
| 11/30/2008 | 2:58 PM | | |
| 11/30/2008 | 11:30 PM | 8:32 | |
| 12/2/2008 | 2:57 PM | | |
| 12/2/2008 | 11:30 PM | 8:33 | |
| 12/3/2008 | 2:58 PM | | |
| 12/3/2008 | 11:30 PM | 8:32 | |
| 12/4/2008 | 2:58 PM | | |
| 12/5/2008 | 3:05 AM | 12:07 | |
| 12/5/2008 | 4:26 PM | | |
| 12/6/2008 | 3:15 AM | 10:49 | |
| 12/8/2008 | 2:55 PM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **SLUTSKY, STEVE** | | | |
| | | | |
| 12/8/2008 | 11:30 PM | 8:35 | |
| 12/9/2008 | 2:57 PM | | |
| 12/9/2008 | 11:30 PM | 8:33 | |
| 12/11/2008 | 11:32 PM | | Punch out / no punch in |
| 12/13/2008 | 2:57 PM | | |
| 12/13/2008 | 11:30 PM | 8:33 | |
| 12/14/2008 | 2:57 PM | | |
| 12/14/2008 | 11:30 PM | 8:33 | |
| 12/16/2008 | 3:01 PM | | |
| 12/16/2008 | 11:30 PM | 8:29 | |
| 12/17/2008 | 1:56 PM | | |
| 12/17/2008 | 11:30 PM | 9:34 | |
| 12/18/2008 | 2:56 PM | | Punch in / no punch out |

Frank Smith

Records

Case 2:10-cv-00714-JPS   Filed 04/01/11   Page 726 of 867   Document 49-1

# SMITH, FRANK

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 8/23/2008 | 7:28 AM | 8:34 | |
| 8/24/2008 | 2:51 PM | | |
| 8/24/2008 | 11:33 PM | 8:42 | |
| 8/24/2008 | 2:54 PM | | |
| 9/6/2008 | 11:35 PM | 8:41 | |
| 9/6/2008 | 2:56 PM | | |
| 9/7/2008 | 11:43 PM | 8:47 | |
| 9/7/2008 | 3:00 PM | | |
| 9/20/2008 | 11:32 PM | 8:32 | |
| 9/20/2008 | 2:58 PM | | |
| 9/21/2008 | 11:33 PM | 8:35 | |
| 9/21/2008 | 2:59 PM | | |
| 10/4/2008 | 11:32 PM | 8:33 | |
| 10/4/2008 | 2:58 PM | | |
| 10/18/2008 | 1:12 AM | 10:14 | |
| 10/19/2008 | 2:54 PM | | |
| 10/19/2008 | 11:32 PM | 8:38 | |
| 10/19/2008 | 3:00 PM | | |
| 11/1/2008 | 11:36 PM | 8:36 | |
| 11/1/2008 | 2:56 PM | | |
| 11/2/2008 | 11:35 PM | 8:39 | |
| 11/2/2008 | 2:54 PM | | |
| 11/15/2008 | 11:34 PM | 8:40 | |
| 11/15/2008 | 2:55 PM | | |
| 11/16/2008 | 12:03 AM | 9:08 | |
| 11/17/2008 | 2:53 PM | | |
| 11/30/2008 | 11:33 PM | 8:40 | |
| 11/30/2008 | 2:55 PM | | |
| 12/6/2008 | 11:30 PM | 8:35 | |

| | | | |
|---|---|---|---|
| **SMITH, FRANK** | | | |
| | | | |
| **DATE** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 12/6/2008 | 8:28 AM | | |
| 12/11/2008 | 1:50 PM | 5:22 | |
| 12/11/2008 | 2:55 PM | | |
| 12/13/2008 | 11:31 PM | 8:36 | |
| 12/13/2008 | 2:54 PM | | |
| 12/14/2008 | 11:30 PM | 8:36 | |
| 12/14/2008 | 2:55 PM | | |
| 12/27/2008 | 11:31 PM | 8:36 | |
| 12/27/2008 | 2:55 PM | | |
| 12/28/2008 | 11:33 PM | 8:38 | |
| 12/28/2008 | 2:57 PM | | |
| 1/10/2009 | 11:30 PM | 8:33 | |
| 1/10/2009 | 2:55 PM | | |
| 1/11/2009 | 11:30 PM | 8:35 | |
| 1/11/2009 | 7:18 AM | | |
| 1/21/2009 | 8:57 AM | 1:39 | |
| 1/21/2009 | 2:55 PM | | |
| 1/24/2009 | 11:30 PM | 8:35 | |
| 1/24/2009 | 2:54 PM | | |
| 1/25/2009 | 11:30 PM | 8:36 | |
| 1/25/2009 | 2:56 PM | | |
| 2/7/2009 | 11:30 PM | 8:34 | |
| 2/7/2009 | 2:53 PM | | |
| 2/8/2009 | 11:30 PM | 8:37 | |
| 2/8/2009 | 2:54 PM | | |
| 2/21/2009 | 11:31 PM | 8:37 | |
| 2/21/2009 | 2:55 PM | | |
| 2/22/2009 | 11:30 PM | 8:35 | |
| 2/22/2009 | 3:13 PM | | |

# SMITH, FRANK

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| 2/27/2009 | 4:30 PM | 1:17 | |
| 2/27/2009 | 6:55 AM | | |
| 2/28/2009 | 3:33 PM | 8:38 | |
| 2/28/2009 | 6:55 AM | | |
| 3/1/2009 | 3:35 PM | 8:40 | |
| 3/1/2009 | 2:55 PM | | |
| 3/7/2009 | 1:05 AM | 10:10 | |
| 3/8/2009 | 2:57 PM | | |
| 3/8/2009 | 11:30 PM | 8:33 | |
| 3/8/2009 | 6:54 AM | | |
| 3/29/2009 | 3:30 PM | 8:36 | |
| 3/29/2009 | 2:56 PM | | |
| 4/11/2009 | 11:30 PM | 8:34 | |
| 4/11/2009 | 6:55 AM | | |
| 4/12/2009 | 3:30 PM | 8:35 | |
| 4/12/2009 | 2:56 PM | | |
| 4/25/2009 | 11:30 PM | 8:34 | |
| 4/25/2009 | 6:55 AM | | |
| 4/26/2009 | 3:30 PM | 8:35 | |
| 4/26/2009 | 2:55 PM | | |
| 5/9/2009 | 11:30 PM | 8:35 | |
| 5/9/2009 | 6:54 AM | | |
| 5/10/2009 | 3:30 PM | 8:36 | |
| 5/10/2009 | 2:55 PM | | |
| 5/23/2009 | 11:30 PM | 8:35 | |
| 5/23/2009 | 6:56 AM | | |
| 5/24/2009 | 3:30 PM | 8:34 | |
| 5/24/2009 | 2:56 PM | | |
| 6/6/2009 | 11:34 PM | 8:38 | |

| SMITH, FRANK | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 6/6/2009 | 6:56 AM | | |
| 6/7/2009 | 3:30 PM | 8:34 | |
| 6/7/2009 | 2:54 PM | | |
| 6/20/2009 | 11:31 PM | 8:37 | |
| 6/20/2009 | 6:55 AM | | |
| 6/21/2009 | 3:30 PM | 8:35 | |
| 6/21/2009 | 2:55 PM | | |
| 7/4/2009 | 11:30 PM | 8:35 | |
| 7/4/2009 | 2:56 PM | | |
| 7/5/2009 | 11:00 PM | 8:04 | |

# Lonnie Ward

# Records

| WARD, LONNIE | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 8/23/2008 | 2:58 PM | | |
| 8/23/2008 | 7:00 PM | 4:02 | Short shift? |
| 8/28/2008 | 6:55 AM | | |
| 8/28/2008 | 3:31 PM | 8:36 | |
| 8/30/2008 | 6:55 AM | | |
| 8/30/2008 | 3:30 PM | 8:35 | |
| 8/31/2008 | 6:57 AM | | |
| 8/31/2008 | 3:30 PM | 8:33 | |
| 9/2/2008 | 6:55 AM | | |
| 9/2/2008 | 3:30 PM | 8:35 | |
| 9/13/2008 | 6:56 AM | | |
| 9/13/2008 | 3:30 PM | 8:34 | |
| 9/14/2008 | 6:55 AM | | |
| 9/14/2008 | 3:30 PM | 8:35 | |
| 9/16/2008 | 6:55 AM | | |
| 9/16/2008 | 3:30 PM | 8:35 | |
| 9/19/2008 | 6:55 AM | | |
| 9/19/2008 | 11:06 AM | 4:11 | Short shift? |
| 9/22/2008 | 6:56 AM | | |
| 9/22/2008 | 3:30 PM | 8:34 | |
| 9/23/2008 | 6:55 AM | | |
| 9/23/2008 | 3:30 PM | 8:35 | |
| 9/24/2008 | 6:57 AM | | |
| 9/24/2008 | 3:30 PM | 8:33 | |
| 9/25/2008 | 6:48 AM | | |
| 9/25/2008 | 3:31 PM | 8:43 | |
| 9/26/2008 | 6:55 AM | | |
| 9/26/2008 | 3:30 PM | 8:35 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| WARD, LONNIE | | | |
| 9/30/2008 | 6:57 AM | | |
| 9/30/2008 | 3:30 PM | 8:33 | |
| 10/9/2008 | 6:55 AM | | |
| 10/9/2008 | 3:31 PM | 8:36 | |
| 10/11/2008 | 6:57 AM | | |
| 10/11/2008 | 3:31 PM | 8:34 | |
| 10/12/2008 | 6:55 AM | | |
| 10/12/2008 | 3:30 PM | 8:35 | |
| 10/14/2008 | 6:56 AM | | |
| 10/14/2008 | 3:30 PM | 8:34 | |
| 10/17/2008 | 6:55 AM | | |
| 10/17/2008 | 3:31 PM | 8:36 | |
| 10/23/2008 | 6:56 AM | | |
| 10/23/2008 | 3:31 PM | 8:35 | |
| 10/25/2008 | 6:54 AM | | |
| 10/25/2008 | 3:31 PM | 8:37 | |
| 10/26/2008 | 6:55 AM | | |
| 10/26/2008 | 3:31 PM | 8:36 | |
| 10/28/2008 | 6:55 AM | | |
| 10/28/2008 | 3:30 PM | 8:35 | |
| 11/6/2008 | 6:54 AM | | |
| 11/6/2008 | 3:29 PM | 8:35 | |
| 11/8/2008 | 6:54 AM | | |
| 11/8/2008 | 3:30 PM | 8:36 | |
| 11/9/2008 | 6:59 AM | | |
| 11/9/2008 | 3:30 PM | 8:31 | |
| 11/11/2008 | 6:55 AM | | |
| 11/11/2008 | 3:30 PM | 8:35 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **WARD, LONNIE** | | | |
| 11/20/2008 | 3:30 PM | | Punch out / no punch in |
| 11/22/2008 | 6:55 AM | | |
| 11/22/2008 | 3:30 PM | 8:35 | |
| 11/23/2008 | 6:55 AM | | |
| 11/23/2008 | 3:30 PM | 8:35 | |
| 11/25/2008 | 6:53 AM | | |
| 11/25/2008 | 3:30 PM | 8:37 | |
| 11/26/2008 | 6:53 AM | | |
| 11/26/2008 | 3:42 PM | 8:49 | |
| 12/4/2008 | 6:55 AM | | |
| 12/4/2008 | 5:13 PM | 10:18 | |
| 12/6/2008 | 6:52 AM | | |
| 12/6/2008 | 3:57 PM | 9:05 | |
| 12/7/2008 | 6:55 AM | | |
| 12/7/2008 | 3:32 PM | 8:37 | |
| 12/9/2008 | 6:54 AM | | |
| 12/9/2008 | 3:30 PM | 8:36 | |
| 12/18/2008 | 6:55 AM | | |
| 12/18/2008 | 3:30 PM | 8:35 | |
| 12/20/2008 | 6:57 AM | | |
| 12/20/2008 | 3:30 PM | 8:33 | |
| 12/21/2008 | 6:54 AM | | |
| 12/21/2008 | 3:32 PM | 8:38 | |
| 12/23/2008 | 6:55 AM | | |
| 12/23/2008 | 3:31 PM | 8:36 | |
| 12/24/2008 | 6:54 AM | | |
| 12/24/2008 | 3:30 PM | 8:36 | |
| 12/25/2008 | 6:59 AM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **WARD, LONNIE** | | | |
| | | | |
| 12/25/2008 | 3:31 PM | 8:32 | |
| 12/26/2008 | 9:32 AM | | |
| 12/26/2008 | 6:20 PM | 8:48 | |
| 1/1/2009 | 6:57 AM | | |
| 1/1/2009 | 3:30 PM | 8:33 | |
| 1/3/2009 | 6:55 AM | | |
| 1/3/2009 | 3:30 PM | 8:35 | |
| 1/4/2009 | 6:56 AM | | |
| 1/4/2009 | 3:30 PM | 8:34 | |
| 1/6/2009 | 6:58 AM | | |
| 1/6/2009 | 3:30 PM | 8:32 | |
| 1/15/2009 | 6:57 AM | | |
| 1/15/2009 | 3:30 PM | 8:33 | |
| 1/17/2009 | 6:56 AM | | |
| 1/17/2009 | 3:30 PM | 8:34 | |
| 1/18/2009 | 6:54 AM | | |
| 1/18/2009 | 3:30 PM | 8:36 | |
| 1/19/2009 | 7:00 AM | | |
| 1/19/2009 | 3:30 PM | 8:30 | |
| 1/20/2009 | 6:55 AM | | |
| 1/20/2009 | 3:30 PM | 8:35 | |
| 1/29/2009 | 6:57 AM | | |
| 1/29/2009 | 3:30 PM | 8:33 | |
| 1/31/2009 | 6:55 AM | | |
| 1/31/2009 | 3:30 PM | 8:35 | |
| 2/1/2009 | 6:55 AM | | |
| 2/1/2009 | 3:30 PM | 8:35 | |
| 2/3/2009 | 6:59 AM | | |

| WARD, LONNIE | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 2/3/2009 | 3:30 PM | 8:31 | |
| 2/12/2009 | 6:55 AM | | |
| 2/12/2009 | 3:30 PM | 8:35 | |
| 2/14/2009 | 6:56 AM | | |
| 2/14/2009 | 3:31 PM | 8:35 | |
| 2/15/2009 | 6:57 AM | | |
| 2/15/2009 | 3:30 PM | 8:33 | |
| 2/17/2009 | 3:30 PM | | Punch out / no punch in |
| 2/26/2009 | 6:52 AM | | |
| 2/26/2009 | 3:30 PM | 8:38 | |
| 2/28/2009 | 6:53 AM | | |
| 2/28/2009 | 3:30 PM | 8:37 | |
| 3/1/2009 | 6:55 AM | | |
| 3/1/2009 | 3:30 PM | 8:35 | |
| 3/3/2009 | 6:54 AM | | |
| 3/3/2009 | 3:30 PM | 8:36 | |
| 3/6/2009 | 10:46 AM | | |
| 3/6/2009 | 3:00 PM | 4:14 | Short shift? |
| 3/12/2009 | 6:56 AM | | |
| 3/12/2009 | 3:32 PM | 8:36 | |
| 3/14/2009 | 6:57 AM | | |
| 3/14/2009 | 3:32 PM | 8:35 | |
| 3/15/2009 | 6:55 AM | | |
| 3/15/2009 | 3:30 PM | 8:35 | |
| 3/17/2009 | 3:30 PM | | Punch out / no punch in |
| 3/26/2009 | 6:55 AM | | |
| 3/26/2009 | 3:31 PM | 8:36 | |
| 3/28/2009 | 6:55 AM | | |

| WARD, LONNIE | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 3/28/2009 | 3:30 PM | 8:35 | |
| 3/29/2009 | 6:56 AM | | |
| 3/29/2009 | 3:31 PM | 8:35 | |
| 3/31/2009 | 6:55 AM | | |
| 3/31/2009 | 3:31 PM | 8:36 | |
| 4/9/2009 | 6:56 AM | | |
| 4/9/2009 | 3:30 PM | 8:34 | |
| 4/11/2009 | 6:56 AM | | |
| 4/11/2009 | 3:32 PM | 8:36 | |
| 4/12/2009 | 6:56 AM | | |
| 4/12/2009 | 3:30 PM | 8:34 | |
| 4/14/2009 | 3:30 PM | | Punch out / no punch in |
| 4/23/2009 | 6:55 AM | | |
| 4/23/2009 | 3:33 PM | 8:38 | |
| 4/25/2009 | 6:55 AM | | |
| 4/25/2009 | 3:30 PM | 8:35 | |
| 4/26/2009 | 6:55 AM | | |
| 4/26/2009 | 3:31 PM | 8:36 | |
| 4/28/2009 | 6:54 AM | | |
| 4/28/2009 | 3:32 PM | 8:38 | |
| 5/7/2009 | 6:55 AM | | |
| 5/7/2009 | 3:31 PM | 8:36 | |
| 5/9/2009 | 6:57 AM | | |
| 5/9/2009 | 3:31 PM | 8:34 | |
| 5/11/2009 | 6:55 AM | | |
| 5/11/2009 | 3:30 PM | 8:35 | |
| 5/12/2009 | 6:56 AM | | |
| 5/12/2009 | 3:31 PM | 8:35 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **WARD, LONNIE** | | | |
| 5/13/2009 | 6:54 AM | | |
| 5/13/2009 | 3:31 PM | 8:37 | |
| 5/14/2009 | 6:56 AM | | |
| 5/14/2009 | 3:32 PM | 8:36 | |
| 5/15/2009 | 6:56 AM | | |
| 5/15/2009 | 3:31 PM | 8:35 | |
| 5/21/2009 | 6:55 AM | | |
| 5/21/2009 | 3:32 PM | 8:37 | |
| 5/23/2009 | 6:54 AM | | |
| 5/23/2009 | 3:30 PM | 8:36 | |
| 5/24/2009 | 6:56 AM | | |
| 5/24/2009 | 3:30 PM | 8:34 | |
| 5/26/2009 | 6:54 AM | | |
| 5/26/2009 | 3:30 PM | 8:36 | |
| 6/1/2009 | 6:55 AM | | |
| 6/1/2009 | 3:32 PM | 8:37 | |
| 6/4/2009 | 6:57 AM | | |
| 6/4/2009 | 3:31 PM | 8:34 | |
| 6/5/2009 | 6:55 AM | | |
| 6/5/2009 | 3:33 PM | 8:38 | |
| 6/7/2009 | 6:55 AM | | |
| 6/7/2009 | 3:31 PM | 8:36 | |
| 6/9/2009 | 6:53 AM | | |
| 6/9/2009 | 3:32 PM | 8:39 | |
| 6/15/2009 | 6:55 AM | | |
| 6/15/2009 | 3:31 PM | 8:36 | |
| 6/18/2009 | 6:55 AM | | |
| 6/18/2009 | 3:31 PM | 8:36 | |

| | WARD, LONNIE | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 6/20/2009 | 6:55 AM | | |
| 6/20/2009 | 3:31 PM | 8:36 | |
| 6/21/2009 | 6:57 AM | | |
| 6/21/2009 | 3:31 PM | 8:34 | |
| 6/23/2009 | 6:56 AM | | |
| 6/23/2009 | 3:58 PM | 9:02 | |
| 7/2/2009 | 6:57 AM | | |
| 7/2/2009 | 3:31 PM | 8:34 | |
| 7/4/2009 | 6:57 AM | | |
| 7/4/2009 | 3:32 PM | 8:35 | |
| 7/5/2009 | 6:55 AM | | |
| 7/5/2009 | 3:31 PM | 8:36 | |
| 9/1/2009 | 6:56 AM | | |
| 9/1/2009 | 3:33 PM | 8:37 | |
| 9/7/2009 | 10:09 AM | | Punch in / no punch out |
| 9/10/2009 | 6:55 AM | | |
| 9/10/2009 | 3:31 PM | 8:36 | |
| 9/12/2009 | 6:55 AM | | |
| 9/12/2009 | 3:30 PM | 8:35 | |
| 9/13/2009 | 6:55 AM | | |
| 9/13/2009 | 3:31 PM | 8:36 | |
| 9/15/2009 | 6:57 AM | | |
| 9/15/2009 | 3:31 PM | 8:34 | |
| 9/19/2009 | 11:53 AM | | Punch in / no punch out |
| 9/21/2009 | 6:55 AM | | |
| 9/21/2009 | 3:33 PM | 8:38 | |
| 9/22/2009 | 6:55 AM | | |
| 9/22/2009 | 3:30 PM | 8:35 | |

| WARD, LONNIE | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 9/23/2009 | 6:55 AM | | |
| 9/23/2009 | 3:32 PM | 8:37 | |
| 9/24/2009 | 6:55 AM | | |
| 9/24/2009 | 3:31 PM | 8:36 | |
| 9/27/2009 | 6:58 AM | | |
| 9/27/2009 | 3:30 PM | 8:32 | |
| 9/29/2009 | 6:55 AM | | |
| 9/29/2009 | 3:30 PM | 8:35 | |
| 10/5/2009 | 6:55 AM | | |
| 10/5/2009 | 3:32 PM | 8:37 | |
| 10/8/2009 | 6:55 AM | | |
| 10/8/2009 | 3:30 PM | 8:35 | |
| 10/10/2009 | 6:55 AM | | |
| 10/10/2009 | 3:30 PM | 8:35 | |
| 10/11/2009 | 6:55 AM | | |
| 10/11/2009 | 3:34 PM | 8:39 | |
| 10/13/2009 | 6:55 AM | | |
| 10/13/2009 | 3:31 PM | 8:36 | |
| 10/24/2009 | 6:55 AM | | |
| 10/24/2009 | 3:32 PM | 8:37 | |
| 10/25/2009 | 6:51 AM | | |
| 10/25/2009 | 3:31 PM | 8:40 | |
| 10/27/2009 | 6:58 AM | | |
| 10/27/2009 | 3:31 PM | 8:33 | |
| 11/4/2009 | 6:55 AM | | |
| 11/4/2009 | 3:31 PM | 8:36 | |
| 11/5/2009 | 6:55 AM | | |
| 11/5/2009 | 3:33 PM | 8:38 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **WARD, LONNIE** | | | |
| 11/7/2009 | 6:56 AM | | |
| 11/7/2009 | 3:30 PM | 8:34 | |
| 11/8/2009 | 6:55 AM | | |
| 11/8/2009 | 3:31 PM | 8:36 | |
| 11/10/2009 | 6:53 AM | | |
| 11/10/2009 | 3:30 PM | 8:37 | |
| 11/19/2009 | 6:56 AM | | |
| 11/19/2009 | 3:31 PM | 8:35 | |
| 11/21/2009 | 6:56 AM | | |
| 11/21/2009 | 3:31 PM | 8:35 | |
| 11/22/2009 | 6:56 AM | | |
| 11/22/2009 | 3:30 PM | 8:34 | |
| 11/24/2009 | 6:55 AM | | Punch in / no punch out |
| 1/14/2010 | 6:55 AM | | Punch in / no punch out |
| 1/16/2010 | 6:56 AM | | |
| 1/16/2010 | 3:44 PM | 8:48 | |
| 1/17/2010 | 6:55 AM | | |
| 1/17/2010 | 3:31 PM | 8:36 | |
| 1/19/2010 | 6:56 AM | | Punch in / no punch out |
| 1/28/2010 | 6:56 AM | | |
| 1/28/2010 | 3:31 PM | 8:35 | |
| 1/30/2010 | 3:30 PM | | Punch out / no punch in |
| 1/31/2010 | 6:56 AM | | |
| 1/31/2010 | 3:31 PM | 8:35 | |
| 2/2/2010 | 6:58 AM | | |
| 2/2/2010 | 3:31 PM | 8:33 | |
| 2/11/2010 | 6:55 AM | | |
| 2/11/2010 | 3:32 PM | 8:37 | |

| | WARD, LONNIE | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 2/13/2010 | 6:59 AM | | |
| 2/13/2010 | 3:31 PM | 8:32 | |
| 2/14/2010 | 6:58 AM | | |
| 2/14/2010 | 3:31 PM | 8:33 | |
| 2/16/2010 | 6:56 AM | | |
| 2/16/2010 | 5:00 PM | 10:04 | |
| 2/25/2010 | 6:53 AM | | |
| 2/25/2010 | 3:31 PM | 8:38 | |
| 2/27/2010 | 6:57 AM | | |
| 2/27/2010 | 3:31 PM | 8:34 | |
| 2/28/2010 | 6:55 AM | | |
| 2/28/2010 | 3:31 PM | 8:36 | |
| 3/2/2010 | 6:56 AM | | |
| 3/2/2010 | 3:31 PM | 8:35 | |
| 3/9/2010 | 6:56 AM | | |
| 3/9/2010 | 3:30 PM | 8:34 | |
| 3/11/2010 | 6:56 AM | | |
| 3/11/2010 | 3:31 PM | 8:35 | |
| 3/13/2010 | 6:59 AM | | |
| 3/13/2010 | 3:32 PM | 8:33 | |
| 3/14/2010 | 6:57 AM | | |
| 3/14/2010 | 3:34 PM | 8:37 | |
| 3/16/2010 | 6:56 AM | | Punch in / no punch out |
| 3/19/2010 | 6:55 AM | | |
| 3/19/2010 | 3:31 PM | 8:36 | |
| 3/25/2010 | 6:57 AM | | |
| 3/25/2010 | 3:30 PM | 8:33 | |
| 3/27/2010 | 6:56 AM | | |

| | WARD, LONNIE | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 3/27/2010 | 3:30 PM | 8:34 | |
| 3/28/2010 | 6:54 AM | | |
| 3/28/2010 | 3:30 PM | 8:36 | |
| 3/30/2010 | 6:55 AM | | |
| 3/30/2010 | 3:30 PM | 8:35 | |
| 4/2/2010 | 3:30 PM | | Punch out / no punch in |
| 4/8/2010 | 6:55 AM | | |
| 4/8/2010 | 3:30 PM | 8:35 | |
| 4/10/2010 | 6:55 AM | | |
| 4/10/2010 | 3:30 PM | 8:35 | |
| 4/11/2010 | 6:57 AM | | |
| 4/11/2010 | 3:30 PM | 8:33 | |
| 4/13/2010 | 6:55 AM | | |
| 4/13/2010 | 3:30 PM | 8:35 | |
| 4/22/2010 | 6:55 AM | | |
| 4/22/2010 | 3:31 PM | 8:36 | |
| 4/24/2010 | 6:55 AM | | |
| 4/24/2010 | 3:31 PM | 8:36 | |
| 4/25/2010 | 6:55 AM | | |
| 4/25/2010 | 3:30 PM | 8:35 | |
| 4/27/2010 | 6:53 AM | | |
| 4/27/2010 | 3:31 PM | 8:38 | |
| 5/6/2010 | 6:56 AM | | Punch in / no punch out |
| 5/8/2010 | 6:53 AM | | |
| 5/8/2010 | 3:30 PM | 8:37 | |
| 5/9/2010 | 6:57 AM | | |
| 5/9/2010 | 3:30 PM | 8:33 | |
| 5/11/2010 | 6:53 AM | | |

| WARD, LONNIE | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 5/11/2010 | 3:31 PM | 8:38 | |
| 5/20/2010 | 6:55 AM | | |
| 5/20/2010 | 3:30 PM | 8:35 | |
| 5/22/2010 | 6:56 AM | | |
| 5/22/2010 | 3:30 PM | 8:34 | |
| 5/23/2010 | 6:55 AM | | |
| 5/23/2010 | 3:30 PM | 8:35 | |
| 6/3/2010 | 6:55 AM | | |
| 6/3/2010 | 3:30 PM | 8:35 | |
| 6/5/2010 | 6:54 AM | | |
| 6/5/2010 | 3:30 PM | 8:36 | |
| 6/6/2010 | 6:55 AM | | |
| 6/6/2010 | 3:31 PM | 8:36 | |
| 6/8/2010 | 6:53 AM | | |
| 6/8/2010 | 3:30 PM | 8:37 | |
| 6/17/2010 | 6:54 AM | | Punch in / no punch out |
| 6/19/2010 | 6:55 AM | | |
| 6/19/2010 | 3:30 PM | 8:35 | |
| 6/20/2010 | 6:56 AM | | |
| 6/20/2010 | 3:30 PM | 8:34 | |
| 7/3/2010 | 6:57 AM | | |
| 7/3/2010 | 3:31 PM | 8:34 | |
| 7/4/2010 | 6:53 AM | | |
| 7/4/2010 | 3:30 PM | 8:37 | |
| 7/6/2010 | 6:49 AM | | |
| 7/6/2010 | 3:30 PM | 8:41 | |
| 7/20/2010 | 6:56 AM | | |
| 7/20/2010 | 3:30 PM | 8:34 | |

| | WARD, LONNIE | | |
|---|---|---|---|
| | | | |
| **DATE** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 7/29/2010 | 6:57 AM | | |
| 7/29/2010 | 3:33 PM | 8:36 | |
| 7/31/2010 | 6:54 AM | | |
| 7/31/2010 | 3:30 PM | 8:36 | |
| 8/1/2010 | 6:55 AM | | |
| 8/1/2010 | 3:31 PM | 8:36 | |
| 8/3/2010 | 6:52 AM | | |
| 8/3/2010 | 3:30 PM | 8:38 | |
| 8/26/2010 | 6:54 AM | | |
| 8/26/2010 | 3:31 PM | 8:37 | |
| 8/28/2010 | 6:57 AM | | |
| 8/28/2010 | 3:31 PM | 8:34 | |
| 8/29/2010 | 6:55 AM | | |
| 8/29/2010 | 3:31 PM | 8:36 | |
| 8/31/2010 | 6:55 AM | | |
| 8/31/2010 | 3:31 PM | 8:36 | |
| 9/11/2010 | 6:55 AM | | |
| 9/11/2010 | 3:31 PM | 8:36 | |
| 9/12/2010 | 6:50 AM | | |
| 9/12/2010 | 3:30 PM | 8:40 | |
| 9/14/2010 | 6:51 AM | | |
| 9/14/2010 | 2:58 PM | 8:07 | |
| 9/23/2010 | 6:56 AM | | |
| 9/23/2010 | 3:33 PM | 8:37 | |
| 9/25/2010 | 6:50 AM | | |
| 9/25/2010 | 3:32 PM | 8:42 | |
| 9/26/2010 | 6:54 AM | | |
| 9/26/2010 | 3:32 PM | 8:38 | |

| WARD, LONNIE | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 9/28/2010 | 6:55 AM | | |
| 9/28/2010 | 3:30 PM | 8:35 | |

# Tammy Witt

# Records

| | WITT,TAMMY | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 8/20/2008 | 6:57 AM | | |
| 8/20/2008 | 9:12 PM | 14:15 | |
| 8/21/2008 | 6:57 AM | | |
| 8/21/2008 | 3:05 PM | 8:08 | |
| 8/24/2008 | 6:57 AM | | |
| 8/24/2008 | 3:32 PM | 8:35 | |
| 8/26/2008 | 6:56 AM | | |
| 8/26/2008 | 11:02 PM | 16:06 | |
| 8/27/2008 | 6:57 AM | | |
| 8/27/2008 | 3:03 PM | 8:06 | |
| 8/28/2008 | 6:58 AM | | |
| 8/28/2008 | 3:32 PM | 8:34 | |
| 8/29/2008 | 6:57 AM | | |
| 8/29/2008 | 6:04 PM | 11:07 | |
| 9/1/2008 | 6:56 AM | | |
| 9/1/2008 | 3:32 PM | 8:36 | |
| 9/2/2008 | 6:59 AM | | |
| 9/2/2008 | 3:38 PM | 8:39 | |
| 9/3/2008 | 6:59 AM | | |
| 9/3/2008 | 3:37 PM | 8:38 | |
| 9/4/2008 | 7:00 AM | | Punch in / no punch out |
| 9/6/2008 | 7:00 AM | | |
| 9/6/2008 | 3:34 PM | 8:34 | |
| 9/7/2008 | 6:55 AM | | |
| 9/7/2008 | 3:31 PM | 8:36 | |
| 9/9/2008 | 6:58 AM | | |
| 9/9/2008 | 4:06 PM | 9:08 | |

| | WITT,TAMMY | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 9/10/2008 | 7:04 AM | | |
| 9/10/2008 | 3:31 PM | 8:27 | |
| 9/12/2008 | 6:58 AM | | |
| 9/12/2008 | 3:33 PM | 8:35 | |
| 9/13/2008 | 6:57 AM | | |
| 9/13/2008 | 3:41 PM | 8:44 | |
| 9/15/2008 | 6:59 AM | | |
| 9/15/2008 | 3:33 PM | 8:34 | |
| 9/16/2008 | 6:58 AM | | |
| 9/16/2008 | 3:33 PM | 8:35 | |
| 9/17/2008 | 7:01 AM | | |
| 9/17/2008 | 3:36 PM | 8:35 | |
| 9/18/2008 | 6:59 AM | | |
| 9/18/2008 | 3:32 PM | 8:33 | |
| 9/20/2008 | 6:57 AM | | |
| 9/20/2008 | 3:33 PM | 8:36 | |
| 9/21/2008 | 6:55 AM | | |
| 9/21/2008 | 3:33 PM | 8:38 | |
| 9/23/2008 | 6:57 AM | | |
| 9/23/2008 | 3:32 PM | 8:35 | |
| 9/24/2008 | 6:58 AM | | |
| 9/24/2008 | 3:43 PM | 8:45 | |
| 9/25/2008 | 6:56 AM | | |
| 9/25/2008 | 3:30 PM | 8:34 | |
| 9/26/2008 | 6:57 AM | | Punch in / no punch out |
| 9/29/2008 | 6:57 AM | | |
| 9/29/2008 | 3:30 PM | 8:33 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **WITT,TAMMY** | | | |
| | | | |
| 9/30/2008 | 6:57 AM | | |
| 9/30/2008 | 3:30 PM | 8:33 | |
| 10/1/2008 | 3:30 PM | | Punch out / no punch in |
| 10/2/2008 | 6:54 AM | | |
| 10/2/2008 | 3:30 PM | 8:36 | |
| 10/3/2008 | 6:55 AM | | |
| 10/3/2008 | 3:31 PM | 8:36 | |
| 10/13/2008 | 6:57 AM | | |
| 10/13/2008 | 3:55 PM | 8:58 | |
| 10/14/2008 | 6:55 AM | | |
| 10/14/2008 | 3:45 PM | 8:50 | |
| 10/15/2008 | 6:56 AM | | |
| 10/15/2008 | 6:00 PM | 11:04 | |
| 10/16/2008 | 6:58 AM | | |
| 10/16/2008 | 3:02 PM | 8:04 | |
| 10/18/2008 | 6:55 AM | | |
| 10/18/2008 | 3:32 PM | 8:37 | |
| 10/19/2008 | 6:55 AM | | |
| 10/19/2008 | 3:31 PM | 8:36 | |
| 10/21/2008 | 6:57 AM | | |
| 10/21/2008 | 3:37 PM | 8:40 | |
| 10/22/2008 | 6:55 AM | | |
| 10/22/2008 | 3:32 PM | 8:37 | |
| 10/23/2008 | 6:57 AM | | |
| 10/23/2008 | 9:38 PM | 14:41 | |
| 10/24/2008 | 7:08 AM | | |
| 10/24/2008 | 3:06 PM | 7:58 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| | **WITT,TAMMY** | | |
| 10/27/2008 | 6:58 AM | | |
| 10/27/2008 | 3:33 PM | 8:35 | |
| 10/28/2008 | 6:57 AM | | |
| 10/28/2008 | 3:31 PM | 8:34 | |
| 10/29/2008 | 6:59 AM | | |
| 10/29/2008 | 3:34 PM | 8:35 | |
| 10/30/2008 | 6:56 AM | | |
| 10/30/2008 | 3:37 PM | 8:41 | |
| 11/2/2008 | 6:56 AM | | |
| 11/2/2008 | 3:43 PM | 8:47 | |
| 11/4/2008 | 6:55 AM | | |
| 11/4/2008 | 3:37 PM | 8:42 | |
| 11/5/2008 | 6:57 AM | | |
| 11/5/2008 | 3:37 PM | 8:40 | |
| 11/6/2008 | 6:56 AM | | |
| 11/6/2008 | 3:31 PM | 8:35 | |
| 11/7/2008 | 6:55 AM | | |
| 11/7/2008 | 3:30 PM | 8:35 | |
| 11/10/2008 | 6:57 AM | | |
| 11/10/2008 | 3:32 PM | 8:35 | |
| 11/11/2008 | 6:57 AM | | |
| 11/11/2008 | 3:32 PM | 8:35 | |
| 11/12/2008 | 6:58 AM | | |
| 11/12/2008 | 3:35 PM | 8:37 | |
| 11/13/2008 | 6:56 AM | | |
| 11/13/2008 | 3:34 PM | 8:38 | |
| 11/14/2008 | 6:55 AM | | |

| | WITT,TAMMY | | |
|---|---|---|---|
| | | | |
| **DATE** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 11/14/2008 | 3:33 PM | 8:38 | |
| 11/15/2008 | 6:57 AM | | |
| 11/15/2008 | 3:06 PM | 8:09 | |
| 11/19/2008 | 6:58 AM | | |
| 11/19/2008 | 3:34 PM | 8:36 | |
| 11/20/2008 | 6:58 AM | | |
| 11/20/2008 | 3:35 PM | 8:37 | |
| 11/21/2008 | 6:59 AM | | |
| 11/21/2008 | 7:12 PM | 12:13 | |
| 11/24/2008 | 6:58 AM | | |
| 11/24/2008 | 3:40 PM | 8:42 | |
| 11/25/2008 | 6:56 AM | | |
| 11/25/2008 | 3:33 PM | 8:37 | |
| 11/26/2008 | 6:56 AM | | |
| 11/26/2008 | 7:02 PM | 12:06 | |
| 11/27/2008 | 6:59 AM | | |
| 11/27/2008 | 3:35 PM | 8:36 | |
| 11/29/2008 | 6:57 AM | | |
| 11/29/2008 | 10:17 PM | 15:20 | |
| 11/30/2008 | 6:57 AM | | |
| 11/30/2008 | 3:33 PM | 8:36 | |
| 12/2/2008 | 6:58 AM | | |
| 12/2/2008 | 3:31 PM | 8:33 | |
| 12/3/2008 | 6:58 AM | | |
| 12/3/2008 | 3:31 PM | 8:33 | |
| 12/4/2008 | 6:55 AM | | |
| 12/4/2008 | 3:32 PM | 8:37 | |

| | WITT,TAMMY | | |
|---|---|---|---|
| | | | |
| **DATE** | **PUNCH TIME** | **TIME BETWEEN PUNCHES** | **COMMENTS** |
| 12/5/2008 | 7:00 AM | | |
| 12/5/2008 | 7:04 PM | 12:04 | |
| 12/8/2008 | 2:56 AM | | |
| 12/8/2008 | 3:31 PM | 12:35 | |
| 12/9/2008 | 6:56 AM | | |
| 12/9/2008 | 3:30 PM | 8:34 | |
| 12/10/2008 | 6:56 AM | | |
| 12/10/2008 | 3:30 PM | 8:34 | |
| 12/11/2008 | 6:55 AM | | |
| 12/11/2008 | 3:30 PM | 8:35 | |
| 12/13/2008 | 6:58 AM | | |
| 12/13/2008 | 3:37 PM | 8:39 | |
| 12/14/2008 | 2:58 AM | | |
| 12/14/2008 | 7:01 PM | 16:03 | |
| 12/18/2008 | 6:55 AM | | |
| 12/18/2008 | 3:30 PM | 8:35 | |
| 12/19/2008 | 6:55 AM | | |
| 12/19/2008 | 3:30 PM | 8:35 | |
| 12/22/2008 | 7:01 AM | | |
| 12/22/2008 | 3:30 PM | 8:29 | |
| 12/23/2008 | 6:56 AM | | |
| 12/23/2008 | 3:30 PM | 8:34 | |
| 12/24/2008 | 6:57 AM | | |
| 12/24/2008 | 7:14 PM | 12:17 | |
| 12/27/2008 | 6:58 AM | | |
| 12/27/2008 | 3:30 PM | 8:32 | |
| 12/28/2008 | 6:55 AM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| | **WITT,TAMMY** | | |
| 12/28/2008 | 7:03 PM | 12:08 | |
| 12/30/2008 | 6:57 AM | | |
| 12/30/2008 | 3:34 PM | 8:37 | |
| 12/31/2008 | 6:59 AM | | |
| 12/31/2008 | 7:02 PM | 12:03 | |
| 1/1/2009 | 6:56 AM | | |
| 1/1/2009 | 11:02 PM | 16:06 | |
| 1/2/2009 | 6:57 AM | | |
| 1/2/2009 | 3:33 PM | 8:36 | |
| 1/6/2009 | 6:55 AM | | |
| 1/6/2009 | 3:31 PM | 8:36 | |
| 1/7/2009 | 6:55 AM | | |
| 1/7/2009 | 3:32 PM | 8:37 | |
| 1/8/2009 | 6:55 AM | | |
| 1/8/2009 | 3:34 PM | 8:39 | |
| 1/10/2009 | 6:55 AM | | |
| 1/10/2009 | 7:01 PM | 12:06 | |
| 1/11/2009 | 6:57 AM | | |
| 1/11/2009 | 3:58 PM | 9:01 | |
| 1/13/2009 | 6:57 AM | | |
| 1/13/2009 | 3:32 PM | 8:35 | |
| 1/14/2009 | 7:02 AM | | |
| 1/14/2009 | 3:30 PM | 8:28 | |
| 1/15/2009 | 6:55 AM | | |
| 1/15/2009 | 5:02 PM | 10:07 | |
| 1/16/2009 | 6:55 AM | | |
| 1/16/2009 | 3:32 PM | 8:37 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| WITT,TAMMY | | | |
| 1/19/2009 | 2:57 AM | | |
| 1/19/2009 | 3:30 PM | 12:33 | |
| 1/20/2009 | 6:55 AM | | |
| 1/20/2009 | 3:32 PM | 8:37 | |
| 1/21/2009 | 6:56 AM | | |
| 1/21/2009 | 3:32 PM | 8:36 | |
| 1/22/2009 | 6:55 AM | | |
| 1/22/2009 | 3:30 PM | 8:35 | |
| 1/24/2009 | 6:58 AM | | |
| 1/24/2009 | 3:32 PM | 8:34 | |
| 1/25/2009 | 6:58 AM | | |
| 1/25/2009 | 3:34 PM | 8:36 | |
| 1/27/2009 | 6:59 AM | | |
| 1/27/2009 | 3:33 PM | 8:34 | |
| 1/28/2009 | 6:55 AM | | |
| 1/28/2009 | 3:32 PM | 8:37 | |
| 1/29/2009 | 6:56 AM | | |
| 1/29/2009 | 5:01 PM | 10:05 | |
| 1/30/2009 | 6:59 AM | | |
| 1/30/2009 | 3:30 PM | 8:31 | |
| 2/2/2009 | 6:55 AM | | |
| 2/2/2009 | 3:31 PM | 8:36 | |
| 2/3/2009 | 7:00 AM | | |
| 2/3/2009 | 3:30 PM | 8:30 | |
| 2/4/2009 | 6:55 AM | | |
| 2/4/2009 | 3:32 PM | 8:37 | |
| 2/5/2009 | 6:59 AM | | |

| WITT,TAMMY | | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 2/5/2009 | 3:37 PM | 8:38 | |
| 2/7/2009 | 6:57 AM | | |
| 2/7/2009 | 3:39 PM | 8:42 | |
| 2/8/2009 | 6:55 AM | | |
| 2/8/2009 | 7:00 PM | 12:05 | |
| 2/10/2009 | 6:56 AM | | |
| 2/10/2009 | 3:34 PM | 8:38 | |
| 2/11/2009 | 6:56 AM | | |
| 2/11/2009 | 3:32 PM | 8:36 | |
| 2/12/2009 | 6:56 AM | | |
| 2/12/2009 | 3:35 PM | 8:39 | |
| 2/13/2009 | 6:57 AM | | |
| 2/13/2009 | 3:33 PM | 8:36 | |
| 2/16/2009 | 6:55 AM | | |
| 2/16/2009 | 3:30 PM | 8:35 | |
| 2/17/2009 | 6:58 AM | | |
| 2/17/2009 | 3:32 PM | 8:34 | |
| 2/18/2009 | 6:58 AM | | |
| 2/18/2009 | 3:34 PM | 8:36 | |
| 2/19/2009 | 6:57 AM | | |
| 2/19/2009 | 3:30 PM | 8:33 | |
| 2/21/2009 | 6:56 AM | | |
| 2/21/2009 | 3:07 PM | 8:11 | |
| 2/22/2009 | 2:57 AM | | |
| 2/22/2009 | 3:00 PM | 12:03 | |
| 2/24/2009 | 7:01 AM | | |
| 2/24/2009 | 3:31 PM | 8:30 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| WITT,TAMMY | | | |
| | | | |
| 2/25/2009 | 6:57 AM | | |
| 2/25/2009 | 3:33 PM | 8:36 | |
| 2/26/2009 | 6:55 AM | | |
| 2/26/2009 | 3:32 PM | 8:37 | |
| 2/27/2009 | 6:55 AM | | |
| 2/27/2009 | 3:32 PM | 8:37 | |
| 3/2/2009 | 6:55 AM | | |
| 3/2/2009 | 3:50 PM | 8:55 | |
| 3/3/2009 | 6:55 AM | | |
| 3/3/2009 | 3:31 PM | 8:36 | |
| 3/5/2009 | 6:56 AM | | |
| 3/5/2009 | 3:32 PM | 8:36 | |
| 3/7/2009 | 6:55 AM | | |
| 3/7/2009 | 3:32 PM | 8:37 | |
| 3/8/2009 | 6:55 AM | | |
| 3/8/2009 | 3:30 PM | 8:35 | |
| 3/10/2009 | 6:57 AM | | |
| 3/10/2009 | 3:31 PM | 8:34 | |
| 3/11/2009 | 6:58 AM | | |
| 3/11/2009 | 3:30 PM | 8:32 | |
| 3/12/2009 | 6:58 AM | | |
| 3/12/2009 | 4:16 PM | 9:18 | |
| 3/13/2009 | 6:56 AM | | |
| 3/13/2009 | 3:30 PM | 8:34 | |
| 3/17/2009 | 6:55 AM | | |
| 3/17/2009 | 3:31 PM | 8:36 | |
| 3/18/2009 | 6:56 AM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| **WITT,TAMMY** | | | |
| 3/18/2009 | 3:34 PM | 8:38 | |
| 3/19/2009 | 6:55 AM | | |
| 3/19/2009 | 3:38 PM | 8:43 | |
| 3/22/2009 | 6:56 AM | | |
| 3/22/2009 | 3:40 PM | 8:44 | |
| 3/24/2009 | 6:56 AM | | |
| 3/24/2009 | 3:30 PM | 8:34 | |
| 3/26/2009 | 6:59 AM | | |
| 3/26/2009 | 4:28 PM | 9:29 | |
| 3/27/2009 | 6:58 AM | | |
| 3/27/2009 | 3:30 PM | 8:32 | |
| 3/30/2009 | 6:55 AM | | |
| 3/30/2009 | 3:33 PM | 8:38 | |
| 3/31/2009 | 6:55 AM | | |
| 3/31/2009 | 3:30 PM | 8:35 | |
| 4/1/2009 | 7:01 AM | | |
| 4/1/2009 | 3:31 PM | 8:30 | |
| 4/2/2009 | 6:55 AM | | |
| 4/2/2009 | 3:31 PM | 8:36 | |
| 4/4/2009 | 6:56 AM | | |
| 4/4/2009 | 3:30 PM | 8:34 | |
| 4/5/2009 | 3:35 PM | | Punch out / no punch in |
| 4/7/2009 | 6:55 AM | | |
| 4/7/2009 | 3:32 PM | 8:37 | |
| 4/8/2009 | 6:55 AM | | |
| 4/8/2009 | 3:35 PM | 8:40 | |
| 4/9/2009 | 6:55 AM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| WITT,TAMMY | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 4/9/2009 | 3:36 PM | 8:41 | |
| 4/10/2009 | 6:59 AM | | |
| 4/10/2009 | 3:31 PM | 8:32 | |
| 4/13/2009 | 6:56 AM | | |
| 4/13/2009 | 3:33 PM | 8:37 | |
| 4/14/2009 | 3:32 PM | | Punch out / no punch in |
| 4/15/2009 | 6:57 AM | | |
| 4/15/2009 | 3:34 PM | 8:37 | |
| 4/16/2009 | 6:56 AM | | |
| 4/16/2009 | 4:46 PM | 9:50 | |
| 4/18/2009 | 3:30 PM | | Punch out / no punch in |
| 4/19/2009 | 6:55 AM | | |
| 4/19/2009 | 3:34 PM | 8:39 | |
| 4/21/2009 | 6:57 AM | | Punch in / no punch out |
| 4/23/2009 | 6:56 AM | | |
| 4/23/2009 | 3:00 PM | 8:04 | |
| 4/24/2009 | 3:31 PM | | Punch out / no punch in |
| 4/27/2009 | 6:55 AM | | |
| 4/27/2009 | 3:30 PM | 8:35 | |
| 4/28/2009 | 6:56 AM | | |
| 4/28/2009 | 3:30 PM | 8:34 | |
| 4/29/2009 | 6:56 AM | | |
| 4/29/2009 | 3:37 PM | 8:41 | |
| 4/30/2009 | 6:58 AM | | |
| 4/30/2009 | 3:30 PM | 8:32 | |
| 5/2/2009 | 6:59 AM | | |
| 5/2/2009 | 3:32 PM | 8:33 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| WITT,TAMMY | | | |
| 5/3/2009 | 6:55 AM | | |
| 5/3/2009 | 3:31 PM | 8:36 | |
| 5/5/2009 | 6:58 AM | | |
| 5/5/2009 | 3:31 PM | 8:33 | |
| 5/6/2009 | 6:57 AM | | |
| 5/6/2009 | 3:31 PM | 8:34 | |
| 5/7/2009 | 6:55 AM | | |
| 5/7/2009 | 3:31 PM | 8:36 | |
| 5/8/2009 | 6:57 AM | | |
| 5/8/2009 | 3:00 PM | 8:03 | |
| 5/10/2009 | 6:55 AM | | |
| 5/10/2009 | 3:35 PM | 8:40 | |
| 5/11/2009 | 6:56 AM | | |
| 5/11/2009 | 3:30 PM | 8:34 | |
| 5/12/2009 | 6:59 AM | | |
| 5/12/2009 | 3:33 PM | 8:34 | |
| 5/13/2009 | 6:59 AM | | |
| 5/13/2009 | 3:31 PM | 8:32 | |
| 5/19/2009 | 6:55 AM | | |
| 5/19/2009 | 3:39 PM | 8:44 | |
| 5/20/2009 | 6:58 AM | | |
| 5/20/2009 | 3:30 PM | 8:32 | |
| 5/21/2009 | 6:55 AM | | |
| 5/21/2009 | 3:31 PM | 8:36 | |
| 5/22/2009 | 6:55 AM | | |
| 5/22/2009 | 3:35 PM | 8:40 | |
| 5/25/2009 | 6:57 AM | | |

| | WITT,TAMMY | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 5/25/2009 | 3:31 PM | 8:34 | |
| 5/27/2009 | 6:58 AM | | |
| 5/27/2009 | 3:30 PM | 8:32 | |
| 5/28/2009 | 6:56 AM | | |
| 5/28/2009 | 3:32 PM | 8:36 | |
| 5/30/2009 | 6:58 AM | | |
| 5/30/2009 | 3:32 PM | 8:34 | |
| 5/31/2009 | 6:58 AM | | |
| 5/31/2009 | 3:29 PM | 8:31 | |
| 6/2/2009 | 6:56 AM | | |
| 6/2/2009 | 3:30 PM | 8:34 | |
| 6/3/2009 | 6:55 AM | | |
| 6/3/2009 | 3:32 PM | 8:37 | |
| 6/5/2009 | 6:57 AM | | |
| 6/5/2009 | 3:30 PM | 8:33 | |
| 6/8/2009 | 6:56 AM | | |
| 6/8/2009 | 3:32 PM | 8:36 | |
| 6/9/2009 | 6:55 AM | | |
| 6/9/2009 | 3:33 PM | 8:38 | |
| 6/10/2009 | 3:31 PM | | |
| 6/10/2009 | 6:55 AM | 8:36 | |
| 6/11/2009 | 6:55 AM | | |
| 6/11/2009 | 3:31 PM | 8:36 | |
| 6/13/2009 | 6:55 AM | | |
| 6/13/2009 | 3:31 PM | 8:36 | |
| 6/14/2009 | 6:57 AM | | |
| 6/14/2009 | 3:31 PM | 8:34 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| | **WITT,TAMMY** | | |
| 6/16/2009 | 6:56 AM | | |
| 6/16/2009 | 3:31 PM | 8:35 | |
| 6/17/2009 | 6:55 AM | | |
| 6/17/2009 | 3:32 PM | 8:37 | |
| 6/18/2009 | 6:56 AM | | |
| 6/18/2009 | 3:33 PM | 8:37 | |
| 6/19/2009 | 7:00 AM | | |
| 6/19/2009 | 3:31 PM | 8:31 | |
| 6/22/2009 | 2:00 PM | | |
| 6/22/2009 | 11:30 PM | 9:30 | |
| 6/23/2009 | 2:55 PM | | |
| 6/23/2009 | 11:36 PM | 8:41 | |
| 6/24/2009 | 2:55 PM | | |
| 6/24/2009 | 11:32 PM | 8:37 | |
| 6/25/2009 | 2:55 PM | | |
| 6/25/2009 | 11:30 PM | 8:35 | |
| 6/27/2009 | 2:56 PM | | |
| 6/27/2009 | 11:30 PM | 8:34 | |
| 6/28/2009 | 2:55 PM | | |
| 6/28/2009 | 11:30 PM | 8:35 | |
| 6/30/2009 | 2:56 PM | | |
| 6/30/2009 | 11:30 PM | 8:34 | |
| 7/1/2009 | 2:57 PM | | |
| 7/1/2009 | 11:30 PM | 8:33 | |
| 7/2/2009 | 2:55 PM | | |
| 7/2/2009 | 11:31 PM | 8:36 | |
| 7/6/2009 | 2:56 PM | | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| WITT,TAMMY | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 7/6/2009 | 11:30 PM | 8:34 | |
| 7/7/2009 | 2:55 PM | | |
| 7/7/2009 | 11:30 PM | 8:35 | |
| 7/8/2009 | 2:55 PM | | |
| 7/8/2009 | 11:32 PM | 8:37 | |
| 7/9/2009 | 2:55 PM | | |
| 7/9/2009 | 11:32 PM | 8:37 | |
| 7/11/2009 | 2:58 PM | | |
| 7/11/2009 | 11:31 PM | 8:33 | |
| 7/12/2009 | 2:58 PM | | |
| 7/12/2009 | 11:31 PM | 8:33 | |
| 7/14/2009 | 2:57 PM | | |
| 7/14/2009 | 11:31 PM | 8:34 | |
| 7/15/2009 | 2:56 PM | | |
| 7/15/2009 | 11:38 PM | 8:42 | |
| 7/16/2009 | 2:58 PM | | |
| 7/16/2009 | 11:34 PM | 8:36 | |
| 7/17/2009 | 2:57 PM | | |
| 7/17/2009 | 11:30 PM | 8:33 | |
| 7/20/2009 | 2:55 PM | | |
| 7/20/2009 | 11:35 PM | 8:40 | |
| 7/21/2009 | 2:59 PM | | |
| 7/21/2009 | 11:31 PM | 8:32 | |
| 7/22/2009 | 2:55 PM | | |
| 7/22/2009 | 11:30 PM | 8:35 | |
| 7/23/2009 | 2:56 PM | | |
| 7/23/2009 | 11:31 PM | 8:35 | |

| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
|---|---|---|---|
| WITT,TAMMY | | | |
| 7/25/2009 | 2:56 PM | | |
| 7/25/2009 | 11:34 PM | 8:38 | |
| 7/28/2009 | 2:57 PM | | |
| 7/28/2009 | 11:36 PM | 8:39 | |
| 7/29/2009 | 2:56 PM | | |
| 7/29/2009 | 11:33 PM | 8:37 | |
| 7/30/2009 | 2:58 PM | | |
| 7/30/2009 | 11:32 PM | 8:34 | |
| 7/31/2009 | 2:58 PM | | |
| 7/31/2009 | 11:31 PM | 8:33 | |
| 8/9/2009 | 2:58 PM | | |
| 8/9/2009 | 11:33 PM | 8:35 | |
| 8/11/2009 | 2:56 PM | | |
| 8/11/2009 | 11:33 PM | 8:37 | |
| 8/12/2009 | 3:03 PM | | |
| 8/12/2009 | 11:31 PM | 8:28 | |
| 8/13/2009 | 10:56 AM | | |
| 8/13/2009 | 11:32 PM | 12:36 | |
| 8/14/2009 | 2:56 PM | | |
| 8/14/2009 | 11:37 PM | 8:41 | |
| 8/17/2009 | 2:55 PM | | |
| 8/17/2009 | 11:31 PM | 8:36 | |
| 8/18/2009 | 2:56 PM | | |
| 8/18/2009 | 11:30 PM | 8:34 | |
| 8/19/2009 | 2:09 PM | | |
| 8/19/2009 | 11:32 PM | 9:23 | |
| 8/20/2009 | 2:56 PM | | |

| | WITT,TAMMY | | |
|---|---|---|---|
| | | | |
| DATE | PUNCH TIME | TIME BETWEEN PUNCHES | COMMENTS |
| 8/20/2009 | 11:38 PM | 8:42 | |
| 8/22/2009 | 2:57 PM | | |
| 8/22/2009 | 11:36 PM | 8:39 | |
| 8/23/2009 | 2:57 PM | | |
| 8/23/2009 | 11:31 PM | 8:34 | |
| 8/25/2009 | 2:56 PM | | |
| 8/25/2009 | 11:31 PM | 8:35 | |
| 8/26/2009 | 3:00 PM | | |
| 8/26/2009 | 11:32 PM | 8:32 | |
| 8/27/2009 | 2:58 PM | | |
| 8/28/2009 | 12:31 AM | 9:33 | |
| 8/28/2009 | 2:58 PM | | |
| 8/28/2009 | 11:32 PM | 8:34 | |
| 9/1/2009 | 2:58 PM | | |
| 9/1/2009 | 11:30 PM | 8:32 | |
| 9/2/2009 | 2:59 PM | | |
| 9/2/2009 | 11:35 PM | 8:36 | |
| 9/3/2009 | 2:58 PM | | Punch in / no punch out |

Exhibit 7

Proposed Class Notice

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

JERRY A. BRABAZON
individually and on behalf
of all others similarly situated,

                                           Civil Action No. 710

                      Plaintiff,          Case No:  10-C-0714
          vs.                                Jury Trial Demanded

AURORA  HEALTH CARE, INC.

                     Defendant.

## NOTICE OF CLASS ACTION LAWSUIT

The purpose of this Notice is to inform you of a pending Rule 23 class action lawsuit brought against Aurora  Healthcare, Inc. ("Defendant"), and to notify you of your rights and obligations as a class member.

### I.      Definition Of The Certified Class.

You are receiving this Notice because you have been identified as a member of the class, which has been certified by the Court. The class is defined as:

> All persons who have been or are employed by Aurora as
> security officers and were denied wages for on-duty meal
> periods at any time from August 20, 2008 to the present.

### II.      Nature Of The Action.

This action includes the named Plaintiffs and all other individuals who meet the class definition above. The Plaintiff alleges that the Defendant violated Wisconsin state law by denying class members compensation for on-duty meal periods.

### III.    Class Claims, Issues, And Defenses.

In particular, the Plaintiff alleges that between August 20, 2008 and the present Defendant violated Wisconsin law by failing to pay workers their earned wages within 31 days. These wages include regular and overtime compensation for time spent working during unpaid meal periods. Plaintiff alleges that Defendant's policy of requiring its security officer to carry and monitor communication devices and to be ready and available to immediately respond to emergency situations during unpaid meal periods violated Wisconsin law. Defendant claims that this policy does not violate Wisconsin law, and that Plaintiff's meal breaks were duty-free.

The above descriptions of allegations, the Court findings, and other matters in this lawsuit are only summaries and do not fully describe all aspects of the case. The pleadings and other papers filed in this action are public records and are available for inspection.

### IV.    Your Right To Utilize Class Counsel Or Enter An Appearance Through An Attorney.

Although the Court has appointed Class Counsel, you may choose instead to enter an appearance through an attorney if you so desire.  If you do not timely opt-out of this lawsuit, and you do not enter an appearance through an attorney, the Court-appointed Class Counsel will represent you as a member of the class.

### V.    Your Right To Participate In This Lawsuit Or Opt-Out.

The Court will exclude from the class any member who requests exclusion by opting-out of this lawsuit.  If you take no action by [date 30 days after Notice is mailed to last-known address], then you will be included in this lawsuit and will be bound by any judgment of the Court.

### VI.    Time And Manner For Requesting Exclusion.

You can choose not to join this lawsuit by sending notice clearly stating your intention to opt-out of this suit, postmarked or date-stamped on or before [date 30 days after Notice is mailed to last-known address], to Plaintiffs' Counsel at the following address:

Hawks Quindel, SC
222 West Washington Avenue, Suite 450
P.O. Box 2155
Madison, Wisconsin 53701-2155

If you opt-out, you have the right to pursue any claims against Defendant independently, or with such private counsel as you may wish to retain.

## VII.  Binding Effect Of A Class Judgment On Members Of The Class.

If you do not timely opt-out of this lawsuit, you will be bound by any future ruling, judgment, award, or settlement, entered in this case, favorable or unfavorable. If you opt-out of this action, you will not receive any relief from this case, and you are free to take action on your own.

THIS NOTICE AND ITS CONTENT  HAS BEEN AUTHORIZED BY THE UNITED STATES DISTRICT COURT  FOR THE EASTERN DISTRICT OF WISCONSIN, THE HONORABLE J.P. STADTMUELLER, UNITED STATES DISTRICT COURT JUDGE.

_____
The Honorable J.P. Stadtmueller
United States District Judge

Exhibit 8

Unreported Cases

Slip Copy, 2009 WL 1505120 (E.D.Wis.), 47 Employee Benefits Cas. 1877
**(Cite as: 2009 WL 1505120 (E.D.Wis.))**



Only the Westlaw citation is currently available.

United States District Court,
E.D. Wisconsin.
Thomas TEMME and Shirley Temme, individually
and as a class of persons similarly situated,
Plaintiffs,
v.
BEMIS COMPANY, INC., Defendant.

No. 08-CV-090.
May 28, 2009.

West KeySummary**Federal Civil Procedure 170A**
**☞184.5**

170A Federal Civil Procedure
   170AII Parties
     170AII(D) Class Actions
       170AII(D)3 Particular Classes Represented
         170Ak184 Employees
           170Ak184.5 k. In General. Most
Cited Cases

   Commonality factor for class certification was satisfied in Employee Retirement Income Security Act suit by class members who alleged employer failed to provide life-time retiree health benefit coverage at the levels promised in a plant closing agreement. The claims all arose from a common nucleus of fact. The common nucleus was that employer previously provided the same health coverage to each putative class member, employer instituted the same unilateral changes to potential members' coverage at the same time, and the changes resulted in increased deductibles, co-pays and premiums for all potential class members.
Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.Employee Retirement Income Security Act (ERISA).

George F. Graf, Sandra Graf Radtke, Gillick Wicht Gillick & Graf, Milwaukee, WI, for Plaintiffs.

Kevin J. Kinney, Krukowski & Costello SC, Mil-
waukee, WI, for Defendant.

**ORDER**

J.P. STADTMUELLER, District Judge.

   ***1** Plaintiffs Thomas Temme and Shirley Temme ("the Temmes") filed a class action lawsuit against defendant Bemis Company, Inc. ("Bemis") arising from Bemis's alleged failure to provide life-time retiree health benefit coverage at the levels promised in a 1985 Plant Closing Agreement ("the Agreement"). The Temmes purport to represent a class of retirees, spouses, surviving spouses and dependents receiving health benefits from Bemis under the Agreement. The Temmes now move the court for certification of the proposed class. Based on the analysis set forth below, the court will grant the motion for class certification.

**BACKGROUND**

   The proposed class members are former employees of the Hayssen Manufacturing Company ("Hayssen") plant in Sheboygan, Wisconsin, and their spouses, surviving spouses and dependents. Hayssen is a subsidiary of the defendant, Bemis, and closed its Sheboygan plant in 1985. At that time, the bargaining unit employees of the plant were represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and its Local 1423. The union entered into a plant closing agreement with Hayssen in November 1985. Bemis has provided health benefits under the agreement to covered retirees and their spouses and dependents ever since. Bemis transferred health coverage for these individuals from a Blue Cross/Blue Shield plan to a CIGNA health plan effective January 1, 2005. The switch in health plans resulted in increased deductibles and prescription drug co-pays for participants. Two years later, on January 1, 2007, Bemis made additional changes by eliminating prescription drug coverage. The Temmes assert that the changes constitute reductions in benefits, thereby breaching the Plant Closing Agreement and violating the Employ-

ee Retirement Income Security Act (ERISA) and the Labor Management Relations Act (LMRA).

The Temmes filed a motion for class certification in conjunction with their lawsuit. In their motion, the Temmes propose a class consisting of all persons who, as of December 31, 2004,[FN1] were receiving health benefits from Bemis pursuant to the November 5, 1985 closing agreement covering production and maintenance employees at Hayssen's Sheboygan facility. The Temmes' motion for class certification is now before the court.

> FN1. The plaintiffs' motion for class certification states that they seek certification of a class "consisting of all persons who as of December 31, **2004** were receiving health benefits from Bemis ..." (Pls.' Mot. Class Cert. 1) (emphasis added). However, the plaintiffs' complaint specifies that the proposed class "consists of all persons who as of December 31, **2006** were receiving health benefits from Bemis pursuant to the closing agreements ..." (Pls.' Compl. ¶ 21) (emphasis added). The court considers the class proposed in the motion for class certification as the plaintiffs' putative class.

## ANALYSIS

Federal Rule of Civil Procedure 23 governs class action lawsuits. The court conducts a two-step analysis under the rule to determine whether class certification is appropriate. The plaintiff must first satisfy the four prerequisites established in Rule 23(a), which include: 1) numerosity; 2) commonality; 3) typicality; and 4) adequacy of representation. Oshana v. Coca-Cola Co., 472 F.3d 506, 513 (7th Cir.2006); See also Fed.R.Civ.P. 23. Failure to meet any of the prerequisites of the rule precludes class certification. Arreola v. Godinez, 546 F.3d 788, 794 (7th Cir.2008). In addition, the plaintiff must also satisfy one of the conditions of Rule 23(b). Alliance to End Repression v. Rochford, 565 F.2d 975, 977 (7th Cir.1977). The court will address each of the requirements in turn.

## I. Numerosity

**\*2** Numerosity, pursuant to Rule 23, requires the class to be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). In determining whether joinder is impractical, the court considers the potential size of the class, the geographic disbursement of potential members, the type of relief sought, and the "practicality of relitigating the central issues of the controversy." Quiroz v. Revenue Prod. Mgmt., Inc., 252 F.R.D. 438, 441 (N.D.Ill.2008). The determination is not a mere numerical threshold; as few as 40 members can render joinder impractical under particular circumstances. See id.

The Temmes assert that there are approximately 50-53 members of the putative class. However, Bemis contests the approximation and asserts that the actual number of class members is 25, representing only 16 households. Bemis arrives at this alternative number by arguing that certain potential class members are not covered by the Plant Closing Agreement because they retired prior to the Agreement's effective date. Thus, Bemis concludes, these retirees cannot claim a breach of the Agreement and cannot constitute putative class members. Bemis further argues that the plaintiffs fail to explain why joinder of these individuals would be impractical.

If this court accepts Bemis' argument regarding applicability of the Agreement to only 25 potential class members, then the number of potential members likely does not constitute the "numerosity" required under Rule 23. However, this court does not read the Plant Closing Agreement so narrowly. Instead, the court finds that, for purposes of class certification, the Plant Closing Agreement and its health benefits provisions apply to all the Hayssen Sheboygan plant retirees, spouses, surviving spouses and dependents currently receiving health benefits from Bemis, regardless of whether the underlying retirement occurred before or after November 1985.

To resolve the applicability of the Agreement

to all putative class members, the court first looks to the language of the Plant Closing Agreement. The language does not explicitly state whether or not the Agreement incorporates health benefit guarantees made to pre-Agreement retirees under previous collective bargaining agreements. Instead, the language guarantees the eligibility of certain individuals for retiree health benefits. The Agreement reads in relevant part:

*Retired Employee Medical Benefit*

Individuals who attain age 60 and have at least six years of continuous service by 12-31-85, and who elect to commence their retirement benefits by 12-31-85, will be eligible for the retired employee medical benefit. Individuals who attain age 58 or 59 by 12-31-85 and who indicate by 12-31-85, their intent to commence retirement benefits at age 60 will be eligible for the retired employee medical benefit.

(Plant Closing Agreement, Docket # 16, Attachment 2, p. 5). The language guarantees only the eligibility of individuals and does not state outright that the Agreement guarantees the "Retired Employee Medical Benefit" itself. However, a commonsense interpretation of the Agreement and Bemis's treatment of retirees tell us that such a guarantee was intended.

**\*3** The Plant Closing Agreement does not define "retired employee medical benefit" or what this benefit entails anywhere in its language. Thus, in order for the "Retired Employee Medical Benefit" section of the Plant Closing Agreement to be given effect, it must incorporate a "Retired Employee Medical Benefit" provision from a separate document, such as the previous collective bargaining agreement. If not, the Agreement language ensuring "eligibility" would be meaningless because it would merely provide retiree eligibility for an undefined and unguaranteed benefit. Thus, logic requires that the Agreement incorporate a previous retiree health benefit guarantee not appearing within the five page Agreement.

Indeed, the plaintiffs provide evidence that the Plant Closing Agreement intends such an incorporation of previously guaranteed health benefits. The plaintiffs provide the affidavit of Charles Conrardy ("Conrardy"), a former UAW International Representative who represented the employees at the Hayssen plant in Sheboygan. (Conrardy Aff. ¶¶ 2-3, Docket # 16, Attachment # 1). Conrardy negotiated both the 1985 Plant Closing Agreement and the 1982 Collective Bargaining Agreement between Hayssen and the UAW. (*Id.* at ¶¶ 2-4, 10). Conrardy affirms that the 1982 Collective Bargaining Agreement includes Section 9.02, "Retired Employee Medical Benefit," which guarantees medical benefits to retirees as defined in Section 9.01 of that agreement. (*Id.* at ¶ 8). He attests that the 1985 Plant Closing Agreement incorporated these sections, as modified by the Sec. 4d eligibility language of the Plant Closing Agreement quoted above. (*Id.* at ¶ 14, 17). The court may consider this affidavit as part of its evaluation of class certification. *See Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 676 (7th Cir.2001) (stating that a judge may receive evidence, including by affidavit, to resolve disputes related to class certification).

Further, Bemis's actions suggest that the Plant Closing Agreement provides health benefit guarantees to pre-Agreement retirees. Bemis made no distinction between pre-Agreement and post-Agreement retirees in providing health benefits. All individuals receiving coverage from Bemis based on previous employment at the Hayssen Sheboygan plant, regardless of retirement date, receive the same Bemis retiree medical plan. (Def.'s Mot. Opp. Class Cert. 3; Haberman Aff. ¶ 8). Bemis treats all retirees the same, suggesting that the same guarantee of health benefits applies.

Based on the aforementioned, the court declines to distinguish between those individuals retiring prior to November 5, 1985, and those retiring after. As a result, the court concludes that the plaintiff's figure of 50-53 [FN2] class members is the appropriate starting point for its class certification

determination.

> FN2. In their initial motion for class certification, Plaintiffs cite 50-53 as the number of potential class members. However, in their reply brief, the plaintiffs agree with representations made in the Haberman affidavit, submitted by Bemis, that the actual number of Hayssen retirees receiving coverage (and presumably constituting potential class members) is 62. (Pls.' Reply Br. 2).

The court now proceeds with its consideration of the Rule 23 requirements, beginning with "numerosity." The court finds that the putative class is sufficiently numerous when considered alongside the impracticality of joining suits of the individual members. The class members include individuals made eligible by employment at, and subsequent retirement from, a plant which closed in 1985. These health benefit recipients are elderly, having been born primarily in the 1910's and 1920's. (Haberman Aff., Docket # 21, Ex. 1). Requiring individuals who are in their eighties and nineties to litigate separate cases arising from changes in their health benefits seems intuitively impractical. Separate litigation appears even more impractical when noting that the cases arise from the same modifications to their coverage, effected simultaneously by the same company, in alleged violation of the same 1985 Plant Closing Agreement. In addition, the number of participants is reasonably numerous because it totals more than forty. *Pope v. Harvard Bancshares, Inc.,* 240 F.R.D. 383, 387 (N.D.Ill.2006) ("Generally, where the membership of the proposed class is at least 40, joinder is impracticable and the numerosity requirement is met"). The court finds that the plaintiffs meet the Rule 23 "numerosity" requirement.

## II. Commonality

**\*4** Commonality pursuant to Rule 23 requires that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The commonality requirement is generally satisfied by a common

nucleus of operative fact. *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998). Common nuclei of fact typically manifest where the defendant has engaged in standardized conduct towards putative class members. *See id.*

Bemis argues that the plaintiffs cannot establish commonality because the proof supporting liability and damages for the named plaintiffs does not support those of other class members. Specifically, Bemis asserts that the Agreement does not apply to certain putative class members and that different circumstances surround individual class members' eligibility for benefits and their damages calculations. Bemis also relies on *Sprague v. General Motors,* a 6th Circuit case, to argue that commonality does not exist in the instant case because retirees had to sign individual releases of "any and all claims."

However, despite Bemis's painfully deliberate distinctions, the court concludes that the requisite commonality exists. The claims of putative class members arise from standardized conduct-Bemis's reduction of members' health benefits in 2005 and 2007. Thus, the claims all arise from a "common nucleus of fact." The common nucleus is that Bemis previously provided the same health coverage to each putative class member, Bemis instituted the same unilateral changes to potential members' coverage at the same time, and the changes resulted in increased deductibles, co-pays and premiums for all potential class members.

Bemis's reliance on *Sprague* does not impact the court's analysis because the case is distinguishable. In *Sprague,* the district court certified a class of 50,000 General Motors early retirees and divided them into four subclasses based on the type, if any, of acceptance of early retirement forms they signed. 133 F.3d at 396-97. The court found that the claims lacked commonality because of the "myriad variations" of GM's statements to early retirees regarding benefits based on the different individuals making the representation, the particular special early retirement program that applied, the different GM

facility involved, and the different time periods involved. *Id.* at 398. No such "myriad variations" arise in the instant case. Instead, the same health care benefits coverage applied to all putative class members prior to 2005, and the same modifications were instituted in 2005 and 2007.

As stated previously, this court makes no distinction between those members retiring before the effective date of the Agreement and those retiring after. Therefore, the time of retirement and an individual "showing" of eligibility under the Agreement cannot undermine commonality. Bemis does not contest that each of the putative class members are currently receiving health benefits related to past employment at its Hayssen plant. Thus, no "eligibility" showing is required by individual participants because Bemis has effectively deemed everyone eligible for health benefits coverage. Contrary to Bemis' argument, the date on which the class members became eligible is immaterial. All members were covered at the time of the relevant conduct, the 2005 and 2007 reductions in benefits.

**\*5** Finally, courts in this district have recognized that alleged violations of ERISA and LMRA resulting from reductions in promised retiree health benefits is an appropriate subject for class action treatment. *See Leannah v. Alliant Energy Corp.,* 607 F.Supp.2d 946, 2009 WL 497128, at *1 (E.D.Wis. Feb.26, 2009); *Senn v. United Dominion Indus.,* 951 F.2d 806, 811 (7th Cir.1992), *rehearing en banc denied,* 962 F.2d 655 (7th Cir.1992). As in other cases, class action certification is appropriate here because the legal issue raised in the complaint, whether Bemis's reduction of retiree health benefits breaches the Plant Closing Agreement, is common to the proposed class and fulfills the commonality requirement of Rule 23.

### III. Typicality

Typicality pursuant to Rule 23 requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Typicality exists when a plaintiff's claim arises from the "same event or

practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). This evaluation is closely related to commonality. *Id.*

Bemis's argument against typicality of the claims hinges, once again, on this court accepting its assertion that not all individuals currently covered by its health benefits plan are appropriate class members because they are not all covered by the 1985 Plant Closing Agreement. If the court does not distinguish between the putative class members in this way, which it does not, the class claims easily meet the typicality requirement. The class claims arise from the same conduct, Bemis' reduction in benefits in 2005 and 2007, and are based on the same legal theory, a breach of the Agreement. Contrary to Bemis's claims, the interests of the entire class would be advanced if the plaintiffs prevail on their own claim. For the plaintiffs to prevail, the court must determine that Bemis breached the Agreement in reducing their benefits, simultaneously establishing that Bemis breached the Agreement with regards to other class members.

### IV. Adequacy

Adequacy, pursuant to Rule 23, requires that the "representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). To establish adequate representation, the court considers whether the plaintiff's attorney is qualified, experienced and generally able to conduct the proposed litigation. *Susman v. Lincoln American Corp.,* 561 F.2d 86, 90 (7th Cir.1977). The court also considers whether the plaintiff has interests antagonistic to those of the class. *Id.* "Antagonistic or conflicting claims" between class members preclude fair and adequate representation by the class representatives. *Rosario,* 963 F.2d at 1018. Bemis presents only a brief argument against adequacy, asserting a conflict of interest between pre-Agreement retirees and post-Agreement retirees. However, the court does not distinguish the class members in this way and Be-

mis provides no explanation of why the interests of pre- and post-Agreement retirees conflict. Therefore, the court finds that no antagonistic claims exist which would preclude the plaintiffs from adequately representing the interests of the class as a whole. Further, the plaintiffs assert that counsel has extensive labor law experience and has prosecuted a similar case. This court has no reason to doubt the qualifications or competence of the plaintiffs' attorneys.

**\*6** Thus, the plaintiffs meet all requirements of Rule 23(a) by establishing numerosity, commonality, typicality, and adequacy. The court now proceeds to an analysis under Rule 23(b).

## V. Requirements of Rule 23(b)

To merit class certification, the plaintiffs must meet the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a). However, once these four requirements are established, the plaintiffs must also satisfy one of the conditions listed in Rule 23(b). The plaintiffs argue that they satisfy the requirements and should be certified as a class under either 23(b)(1) or 23(b)(2).

Rule 23(b)(1) provides for certification when 23(a) is satisfied and when prosecution of separate actions by individuals would create a risk of either:

A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing that class, or

B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Fed.R.Civ.P. 23(b)(1). The plaintiffs assert that certification under this subsection is appropriate because individual lawsuits filed by the more than 50 putative class members may result in different court

decisions on benefits, contrary to ERISA's prohibition on treating retirees differently from one another. Bemis responds by making a brief argument asserting the opposite. Bemis argues that certification of the class may result in conflicting court orders for coverage because the Plant Closing Agreement does not guarantee health benefits to the pre-Agreement retirees (presuming the court agrees with this conclusion). Therefore, if post-Agreement retirees like plaintiffs prevail, they would receive an order for coverage while the pre-Agreement retirees would not receive such an order.

Bemis's oft-repeated argument regarding applicability of the Agreement requires an oft-repeated response from the court. For class certification, the court does not distinguish between potential class member retirees currently receiving health benefits from Bemis based on whether they retired pre- or post-Agreement. As a result, Bemis's single argument against application of Rule 23(b)(1) certification fails. Class certification pursuant to Rule 23(b)(1) is appropriate because Bemis may win in some cases and lose in others, generating contradictory obligations with regard to required coverage. Thus, the court finds that the plaintiffs satisfy 23(b)(1) because different outcomes may result if each retiree separately adjudicates his or her claim to challenge Bemis's reduction of health benefits. *See Witmer v. Acument Global Techs., Inc.,* Case No. 08-12795, 2009 WL 174916, at \*5 (E.D.Mich. Jan.26, 2009) (granting Rule 23(b)(1) certification to class of former employees and spouses claiming violation of CBAs and plant closing agreements arising from defendant termination of health coverage); *Cates v. Cooper Tire & Rubber Co.,* 253 F.R.D. 422, 431 (N.D.Ohio 2008) (granting Rule 23(b)(1) certification for class of former employees, spouses, and dependents seeking to enjoin defendant employer from imposing cap on or requiring additional costs for retiree medical benefits); *Reese v. CNH Am. LLC,* 227 F.R.D. 483, 489 (E.D.Mich.2005) (certifying Rule 23(b)(1) class of retirees and surviving spouses claiming continuing health care benefits under CBAs). Therefore, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

court will certify the class under Rule 23(b)(1).

**\*7** In addition, certification of the class under Rule 23(b)(2) is also appropriate. The rule states that a class action may be maintained if Rule 23(a) is satisfied and if:

> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole;

Fed.R.Civ.P. 23(b)(2). The plaintiffs allege that Bemis acted on grounds "generally applicable to the class" by instituting the same reductions in putative class members' health insurance benefits. Further, the plaintiffs seek injunctive relief from these changes. Based on these facts alone, Rule 23(b)(2) treatment would seem very appropriate. The difficulty arises, however, when the court considers that injunctive relief is just one of the three remedies requested by the plaintiffs. In addition to injunctive relief ordering Bemis to resume the previous health coverage, the plaintiffs also seek damages for the putative members' personal expenses resulting from the changes in coverage, as well as damages for mental distress and anguish. (Pls.' Compl. 8).

The monetary damages add a complicating layer to the analysis because Rule 23(b)(2) certification is only appropriate for a class requesting both injunctive relief and monetary damages when the monetary damages "flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Lemon v. Operating Engineers Local 139,* 216 F.3d 577, 581 (7th Cir.2000) (quoting *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 415 (5th Cir.1998)). Rule 23(b)(2) certification is impermissible unless the monetary damages sought are "incidental" to the injunctive relief sought. *Id.* Damages are "incidental" when the damage calculation is mechanical and does not require individual calculation such that separate damages suits would be a waste of re-

sources. *In re Allstate Ins. Co.,* 400 F.3d 505, 507 (7th Cir.2005). In *Leannah,* a similar case this court recently addressed, the court determined that Rule 23(b)(2) treatment was appropriate for a class made up of early retiree participants in the defendant's health benefits plan whose premiums were raised by the defendant, despite the fact that the members sought monetary damages for out-of-pocket expenses caused by the health plan changes, because the damages were "incidental" to the requested injunctive relief. *See Leannah v. Alliant Energy Corp,* 09-CV-169, Class Certif. Order, Docket # 33, Oct. 30, 2007. Therefore, if the plaintiffs sought only out-of-pocket expenses, no question would exist because this court already deemed such monetary damages to be "incidental." However, in the instant case, the plaintiffs also seek damages for mental distress and anguish. Thus, the court must determine whether the addition of these monetary damages renders the requested damages more than merely "incidental" and precludes Rule 23(b)(2) certification.

**\*8** Though a close call, the court concludes that the monetary damages sought remain "incidental," despite the addition of damages for mental distress and anguish. Denying Rule 23(b)(2) class certification on the basis of seemingly minor damages for "mental anguish" caused by increased co-pays and decreased prescription drug coverage underestimates the importance of the injunctive relief the plaintiffs seek. Though damages for "distress" and "anguish" are linked to individual circumstances, the court does not believe that determination of such damages requires "complex individualized determinations" which preclude 23(b)(2) certification. *See Allison,* 151 F.3d at 415. Therefore, the court will certify the class under Rule 23(b)(1) and (b)(2).

Accordingly,

**IT IS ORDERED** that plaintiffs' motion to certify this case as a class action (Docket # 12) be and the same is hereby **GRANTED;**

Slip Copy, 2009 WL 1505120 (E.D.Wis.), 47 Employee Benefits Cas. 1877
**(Cite as: 2009 WL 1505120 (E.D.Wis.))**

**IT IS FURTHER ORDERED** that the following plaintiff class be and the same is hereby **CERTIFIED:**

All persons who, as of December 31, 2004, were receiving health benefits from Bemis pursuant to the November 5, 1985 Hayssen/UAW Local 1423 and its closing agreement covering production and maintenance employees at Hayssen's Sheboygan facility.

**IT IS FURTHER ORDERED** that the named plaintiffs, Thomas Temme and Shirley Temme, shall be the class representatives, and plaintiffs' counsel, George F. Graf and Sandra Graf Radtke of Gillick Wicht Gillick & Graf, S.C., are appointed as counsel for the class under Fed.R.Civ.P. 23(g).

E.D.Wis.,2009.
Temme v. Bemis Co., Inc.
Slip Copy, 2009 WL 1505120 (E.D.Wis.), 47 Employee Benefits Cas. 1877

END OF DOCUMENT


C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Eric ELDRED, Jr., Richard Borden, Matthew
Caezza, Brian Frank, and Mark Maclaury on behalf
of themselves and those similarly situated,
Plaintiffs,
v.
COMFORCE CORP., d/b/a Comforce Telecom,
Inc., Comforce Information Technologies, Inc.,
Comforce Technical Services, Inc., Comforce
Technical, LLC, Comforce Operating, Inc., Sumtec
Corp., and Prestige-Comforce Professional Ser-
vices; John Fanning, individually and in his capa-
city as Chairman and Chief Executive Officer of
Comforce Corp., Comforce Information Tech., Inc.,
and Comforce Operating; Harry Maccarrone, indi-
vidually and in his capacity as Chairman and Chief
Executive Officer of Comforce Telecom, Inc.,
Comforce Technical Services, Inc., and Sumtec
Corp.; Peter Petix, individually and in his capacity
as Vice President and General Manager of Com-
force Telecom, Inc.; The Communication Workers
of America; Andy Milburn, individually and in his
capacity as Vice President of CWA District 6;
Richard Kneupper, individually and in his capacity
as Assistant to District Vice-President of CWA Dis-
trict 6; Donna Bentley, individually and in her ca-
pacity as CWA Staff Representative in District 6;
CWA Local 6171; Alan Whittaker, individually and
in his capacity as President of CWA Local 6171;
Mike Simmons, individually and in his past capa-
city as President of CWA Local 6171; and Linda
James, individually and in her capacity as Execut-
ive Vice President of CWA Local 6171, Defend-
ants.

No. 3:08-CV-1171 (LEK/DEP).
March 2, 2010.

West KeySummary**Federal Civil Procedure 170A**
**⚷636**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(A) Pleadings in General
       170Ak633 Certainty, Definiteness and
Particularity
        170Ak636 k. Fraud, Mistake and Con-
dition of Mind. Most Cited Cases

   Union members failed to sufficiently plead a
Racketeer Influenced and Corrupt Organizations
Act (RICO) claim against a union and an employer.
Members based portions of their claim on viola-
tions of New York law including larceny by false
promise and scheme to defraud. Members failed to
isolate any particular act or representation made by
specific employer personnel to any member on any
particular date that constituted fraud. Fed.Rules
Civ.Proc.Rule 9(b), 28 U.S.C.A.; 18 U.S.C.A. §
1961(1)(A).

Frank S. Gattuso, Dennis G. O'Hara, O'Hara,
O'Connell Law Firm, Fayetteville, NY, for
Plaintiffs.

James M. Wicks, Lucia D. Bauknight, Farrell, Fritz
Law Firm, Uniondale, NY, for Defendants.

**DECISION AND ORDER**

LAWRENCE E. KAHN, District Judge.

   **\*1** Plaintiffs Eric J. Eldred ("Eldred"), Richard
Borden, Matthew Caezza, Brian Fink, and Mark
MacLaury (collectively, "Plaintiffs") commenced
this action on behalf of themselves and those simil-
arly situated seeking class certification pursuant to
§ 216 of the Fair Labor Standards Act ("FLSA")
and Rule 23 of the Federal Rules of Civil Procedure
. Plaintiffs allege violations of the FLSA, the Labor
Management Relations Act ("LMRA"), the Nation-
al Labor Relations Act ("NLRA"), the Davis Bacon
Act; the Racketeer Influenced and Corrupt Organiz-
ations Act ("RICO"), New York Labor Law
("NYLL"), as well as breach of contract, unjust en-
richment, fraud, and conversion. Plaintiffs claim
that Defendants Comforce Corporation and its vari-

ous subsidiaries ("Comforce"), John Fanning ("Fanning"), Harry Maccarrone ("Maccarrone"), Peter Petix ("Petix"), Communication Workers of America, AFL-CIO ("CWA" or "the Union"), Andy Milburn ("Milburn"), Richard Kneupper ("Kneupper"), Donna Bentley ("Bentley"), CWA Local 6171("Local 6171"), Alan Whittaker ("Whittaker"), Mike Simmons ("Simmons"), and Linda James ("James") (collectively, "Defendants"),exploitedthetraditionalemployer/union relationship in unlawfully failing to pay Plaintiffs and members of the proposed class regular and overtime wages; making unauthorized deductions from their wages; failing to provide meaningful representation; making fraudulent misrepresentations regarding the true nature of the Comforce/CWA relationship; and engaging in a pattern of illegal racketeering. Compl. (Dkt. No. 1) at ¶¶ 9-13, 35. Currently before the Court is Plaintiffs' Motion for class certification (Dkt. No. 15) as amended (Dkt. No. 37-1); Defendants Fanning, Maccarrone, and Petix's Motion to dismiss Plaintiffs' Motion to proceed as a collective action and for class certification Motions to dismiss (Dkt. No. 43) and their separate Motion to dismiss (Dkt. No. 46); Defendant Comforce's Motion to dismiss (Dkt. No. 47); and Defendants CWA, Local 6171, Milburn, Kneupper, Bentley, Whittaker, James, and Simmons' Motion to dismiss (Dkt. No. 50).

## I. BACKGROUND

Plaintiffs commenced the instant action on October 31, 2008, by filing their Complaint (Dkt. No. 1), which they amended on December 8, 2008 (Dkt. No. 24), and again January 30, 2009. (Dkt. No. 37) ("Second Amended Complaint"). Plaintiffs' Second Amended Complaint asserts fifteen claims for relief and court certification of three classes of plaintiffs. The claims relate to Plaintiffs' employment with Defendant Comforce from the mid-1990's to the present and the allegedly corrupt practices committed in concert by Comforce and CWA. Second Am. Compl.¶ 2, 4.

Comforce, headquartered in Woodbury, New York, is engaged in several businesses including the installation of telecommunication equipment. *Id.* ¶ 3. Defendant Fanning is the Chairman of the parent company, Comforce Corp.; Maccarrone is the Chairman of at least three of its principle subsidiaries; and Petix is the Vice President and General Manager of Comforce Telecom, Inc. *Id.* ¶ 44-49. All have offices in New York. *Id.*

**\*2** Comforce would instruct Plaintiffs to report to various job sites, to which they would travel, often staying away from home overnight. Plaintiffs' assert that many of these jobs involved projects partially funded with public funds. Once at the job site, they were often told that it was a union project. Plaintiffs allege that they were told that they were in a "pay to play" system under which they had to be union members and pay union dues. *Id.* ¶ 6.

Plaintiffs paid dues to CWA, a union headquartered in Washington, D.C. that represents individuals employed primarily in the telecommunications industry, and its affiliate Local 6171, based in Krum, Texas. *Id.* ¶¶ 24, 39. Milburn is the Vice-President of CWA District 6, the District responsible for locals situated in Texas; Kneupper is the Assistant to District Vice President of CWA District 6; and Bentley is a District 6 Staff Representative. *Id.* ¶¶ 66-76. All work out of offices in Texas. *Id.* Whittaker is the current President of Local 6171; Simmons was the previous President; James was the previous Executive Vice-President; collectively, they are responsible for the actions conducted in the name of Local 6171 during the relevant period. *Id.* ¶¶ 81-85.

Local 6171 provided Plaintiffs with temporary union cards whenever they were working on job sites that requested employees have these cards. *Id.* ¶ 92. Comforce would, accordingly, deduct dues from Plaintiffs' wages. *Id.* ¶ 6. Plaintiffs, allegedly, never authorized the deductions. *Id.*

CWA and Comforce entered into various collective bargaining agreements under which the terms and conditions of employment were docu-

Page 3

mented. *See, e.g.,* Contract Agreement between Sumtec and CWA (Dkt. No. 1-2) ("the CBA"). The CBA, signed on behalf of Comforce by Petix and on behalf of CWA by Bentley, recognized the Union as the "exclusive collective bargaining representative for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment, for all of its employees in the collective bargaining unit." *Id.* Art. I. The CBA provides that "[t]he parties hereto agree to meet at the request of either party ... for the purpose of negotiating with respect to wages, working conditions and other conditions of employment not covered by this initial Agreement." *Id.* Art VIII. It also contains provisions regarding discipline, including discharge of union employees and lays out grievance procedures. *Id.* Art. V. Plaintiffs never availed themselves of these procedures. Plaintiffs assert that they had knowledge of the CBA, but never saw a copy despite their requests, until one was provided by Bentley on February 23, 2006. Second Am. Compl. ¶ 98. Plaintiffs also allege that despite the CBA's guarantee that the Union would negotiate their employment contracts, in practice, employees had to negotiate these individually.

**\*3** Plaintiffs allege that the whole arrangement between Comforce and the Union was "an enterprise designed to extract money from the plaintiffs and other similarly situated employees of Comforce for the benefit of the CWA." *Id.* ¶ 8. Essentially, Plaintiffs claim that Comforce unlawfully deducted wages, which they paid to the Union. CWA, meanwhile, provided no meaningful benefit to Plaintiffs and those similarly situated, but rather, in exchange for the dues paid to them by Comforce, "look[ed] the other way ... while Comforce violated numerous federal and state laws that resulted in substantial economic loss to the plaintiffs." *Id.* Specifically, Plaintiffs allege that Comforce unlawfully deducted dues from its employees' wages and failed to pay them prevailing wages, proper per diem, travel expenses, and wages for travel time as required by state and federal law. CWA, meanwhile, is alleged

to have failed to address these actions by Comforce or otherwise bargain on behalf of the employees it ostensibly represented.

Plaintiffs particularly emphasize the allegedly unilateral changes made by Comforce to its travel-time compensation policy. Plaintiffs assert that this policy had previously guaranteed payment for all work-related travel time. *Id.* ¶ 189. Allegedly, in 2002, Comforce unilaterally changed this policy, adopting a four hour maximum for compensable travel time. In 2004, Comforce adopted this policy in writing. *Id.* ¶¶ 192-94.

Plaintiffs allege, moreover, that they and others similarly situated, often worked, either including or excluding travel time, in excess of forty hours per week. Such work was to be paid at one and a half times the regular rate of pay pursuant to state and federal law. In such instances, however, Plaintiffs and those similarly situated were allegedly instructed that if their time sheets indicated they worked over forty hours in a given week, those sheets would be rejected. *Id.* at 208-13. Plaintiffs thus allege that Comforce failed to fully compensate them. *Id.* Plaintiffs further allege that they and others similarly situated performed numerous activities directly related to their primary employment duties for which they received no compensation. *Id.* ¶¶ 186-88. Plaintiffs also allege that many of the projects that they worked on were partially funded with public money, yet Comforce failed to pay them the prevailing wage as required by law. *Id.* ¶¶ 215-22.

Plaintiffs allege that Comforce would often adjust downwards the per diem rate that they were to receive and would inform Plaintiffs of this reduction only after they had accepted a job and often after they arrived at the job site. One such instance allegedly occurred in October 2005, when Eldred accepted a job in Philadelphia to be paid at $27.50 per hour with a $120 a day per diem. *Id.* ¶ 118. Eldred allegedly negotiated this rate of pay personally, receiving no assistance from CWA. *Id.* On the day he was to leave for Philadelphia, he was in-

formed that the per diem would be reduced to $90 per day. He objected, stating that this was not enough to cover his lodging, and Comforce asked for a day to rectify the problem. Eldred went to Philadelphia, allegedly believing he would receive a $120 per day reimbursement. Once there, he was told the per diem would be $90 or $95 per day. Eldred told Comforce that this was not acceptable. Comforce allegedly responded, "do what you have to do" and Eldred returned to New York. *Id.* ¶ 122. Eldred never received a work offer again from Comforce and objected when Eldred filed for unemployment benefits by filing an appeal with the New York State Unemployment Appeals Board. Eldred received no representation from CWA or Local 6171 during this appeal, which ended in the Board's determination that he was fired for cause. *Id.* ¶¶ 125-27.

## II. DISCUSSION

### A. Defendants' Motions to Dismiss

### 1. *Standard of Review*

**\*4** When considering a motion to dismiss under 12(b)(6), a district court must accept the factual allegations made by the non-moving party as true and "draw all inferences in the light most favorable" to the non-moving party. *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007). "The movant's burden is very substantial, as 'the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (internal quotation and citations omitted)). In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* --- U.S. ----, 29 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A court

should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Next, if plaintiff provides well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

### 2. *Preemption Under the LMRA*

Section 301 of the LMRA (" § 301") provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties...." 29 U.S.C. § 185(a). The section is accorded "unusual preemptive power." *Livadas v. Bradshaw,* 512 U.S. 107, 122 n. 16, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); *Vera v. Saks & Co.,* 335 F.3d 109, 114 (2d Cir.2003); *Wynn v. AC Rochester,* 273 F.3d 153 (2d Cir.2001). Section 301 "governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.' " *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) (quoting *Electrical Workers v. Hechler,* 481 U.S. 851, 859 n. 3, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987). Thus, "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim ... or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). This rule has been applied to pre-empt claims brought under common law tort, contract, as well as under the NYLL where the claims required interpretation of a CBA. *See Id.* at 211; *Sheehan v. United States Postal Service,* 6 F.Supp.2d, 141, 147-48 (N.D.N.Y.1997) (Kahn, J.); *Vera,* 335 F.3d 109. It is not the case, however, that "every state-law suit asserting a right that relates in some way to a provision in a collective-bargaining agreement, or more generally to the parties to such

an agreement, necessarily is pre-empted by § 301." *Allis-Chalmers,* 471 U.S. at 220; *see also Wynn,* 273 F.3d at 157. Rather, "when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas,* 512 U.S. at 124.

**\*5** Where a claim is preempted, the LMRA requires that the plaintiff exhaust any grievance or arbitration procedures established under the CBA prior to bringing a suit under § 301(a). *Clayton v. Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of America,* 451 U.S. 679, 681, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981). For "hybrid actions," that is, actions alleging both violation of the CBA under § 301 by the employer and violation by the union of the duty of fair representation ("DFR"), the six-month statute of limitations provided for in § 10(b) of the NLRA applies. *See DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Cohen v. Flushing Hosp. and Med. Ctr.,* 68 F.3d 64 (2d Cir.1995); *Sheehan,* 6 F.Supp.2d at 145.

**3.** *Plaintiffs' Causes of Action*

*a. Plaintiffs Fail to Make Allegations Against Certain Defendants*

Although naming them as Defendants, Plaintiffs fail to make any allegations against Comforce subsidiaries Comforce Information Technologies, Inc., Comforce Technical, LLC, and Comforce Operating, Inc. Plaintiffs note that these Defendants are subsidiaries of Comforce and assert that all references in their Second Amended Complaint to "Comforce" include the named subsidiaries. Second Am. Compl. ¶ 2. However, Plaintiffs fail to allege or otherwise provide any evidence of acts attributable to these Defendants. Thus, all claims against Defendants Comforce Information Technologies, Inc ., Comforce Technical, LLC, and Comforce Operating, Inc. are dismissed.

*b. Claims Under the Fair Labor Standards Act*

Plaintiffs' First and Second Causes of Action allege violations of the FLSA. In their first claim, Plaintiffs allege that Defendants Comforce, Fanning, Maccarrone, and Petix willfully failed to pay Plaintiffs for normal and overtime work performed, including travel time covered under the wage orders issued at 29 C.F.R. § 785.39,[FN1] in excess of forty hours per week. Plaintiffs' Second Cause of Action alleges that Comforce's unilateral change in policy regarding the reduction of compensable travel time is void because the change violated the CBA and further violated Plaintiffs' right to compensation for all travel-time covered under the FLSA, as well as time spent performing activities closely related to their primary employment.

FN1. 29 C.F.R. § 785.39 applies to travel that keeps an employee away from home overnight and designates such travel as compensable work time.

Plaintiffs first claim requires no interpretation of the CBA. The rights it alleges to have been violated have an independent statutory basis in sections 206 and 207 of the FLSA, which provide, *inter alia,* that employers shall compensate employees at their regular wage for all hours worked up to 40 hours per week, and one and one-half times that wage for hours in excess of 40 per week. *See* 29 U.S.C. §§ 206, 207. The right to this compensation does not spring from the CBA, nor does the CBA, which is utterly silent as to the rate of pay, provide any basis for the Court's inquiry into the validity of the claim raised.[FN2] Plaintiffs' claim, therefore, is not preempted by § 301 and the simple fact that a CBA exists does not void Plaintiffs' rights under the FLSA.

FN2. Such a situation is markedly different from one which demands inquiry into what rate of pay contained in a collective bargaining agreement applies to a particular case. *See Valdino v. A. Valley Eng'rs,* 903 F.2d 253 (3rd Cir.1990).

**\*6** 29 U.S.C. § 255(a) sets the statute of limitations on FLSA claims at two years, or three where the violation is willful. Finding that Plaintiffs have sufficiently alleged a willful violation, the Court dismisses all claims under Plaintiffs First Cause of Action insofar as they arise prior to October 31, 2005. *See McLaughlin v. Richland Shoe Co.,* 486 U.S. 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988).

Plaintiffs' second claim, turns on whether Comforce made unilateral changes to "working conditions" when it adopted the 2002 and 2004 policies affecting travel-time compensation. This claim explicitly notes the importance of the CBA, and asks the Court to interpret the CBA's requirement that Comforce negotiate all changes to working conditions. Second Am. Compl. ¶¶ 190-95. As such, it is preempted by the LMRA. Plaintiffs did not follow the grievance procedures detailed in the CBA or meet the LMRA's six-month statute of limitations. Their claim is dismissed.

*c. Claims Under New York Labor Law*

Plaintiffs' Third and Fourth Causes of Action allege that Comforce, Fanning, Maccarrone, and Petix violated state labor law. Their third claim alleges that these Defendants deducted wages from Plaintiffs' pay without authorization in violation of NYLL § 193. That section provides, in part, that "No employer shall make any deduction from the wages of an employee, except deductions which ... are expressly authorized in writing by the employee and are for the benefit of the employee." N.Y. LABOR LAW § 193(1)(b).

The CBA includes an authorization form that employees are to sign prior to Comforce's withholding of wages. CBA Art III. The inclusion of that template, however, does not mean that Plaintiffs' rights to receive all wages not authorized to be withheld originate in the CBA. State law creates this right, and no interpretation of the CBA is required for Plaintiffs' allegation that these rights were violated. N.Y. LABOR LAW § 193(1)(b). The claim is not pre-empted by § 301. It is, however,

subject to a six-year statute of limitations and dismissed insofar as the violations alleged predate October 31, 2002. *See* N.Y. LABOR LAW § 198(3).

Plaintiffs' fourth claim alleges violations of the NYLL resulting from the relevant Defendants' nonpayment of wages and overtime pay. For the reasons noted in the discussion of their first claim, the Court is not required to interpret anything in the CBA in order to decide these claims. The claim is not pre-empted, but is also subject to a six-year statute of limitations. N.Y. LABOR LAW § 198(3).

*d. Third-Party Beneficiary and Unjust Enrichment Claims*

Plaintiffs assert in their fifth claim, that Comforce, Fanning, Maccarrone, and Petix were unjustly enriched by their failure to pay prevailing wage, per diem, and mileage reimbursement to Plaintiffs and those similarly situated on contracts funded, at least in part, with public funds. They claim breach of contract, allegedly as third-party beneficiaries to these public contracts. Plaintiffs bring these claims pursuant to federal and state law and seek judgement under NYLL § 198.

**\*7** Plaintiffs' claim, insofar as it is alleged pursuant to federal law, is untenable. Though not mentioned in the Cause of Action, Plaintiffs' claim is based on the Davis Bacon Act. *See* Second Am. Compl. ¶¶ 10, 132; *see also* Pls.' Am. Mot. for Certification of Class Action (Dkt. No. 37-1) ("Pls.' Mot. for Certification") ¶ 4. The Second Circuit has held that no private right of action exists under that Act. *See Chan v. City of New York,* 1 F.3d 96, 102 (2d Cir.1993). Next, to the extent that Plaintiffs' seek to use state law remedies to recover wages for federally funded projects, that too is precluded. *See Grochowski v. Phoenix Constr.,* 318 F.3d 96, 86 (2d Cir.2003). ("To allow a third-party private contract action aimed at enforcing wage schedules [in a federally funded project] would be inconsistent with the underlying purpose of the legislative scheme and would interfere with the implementation of that scheme to the same extent as would a cause of action directly under the statute.")

Slip Copy, 2010 WL 812698 (N.D.N.Y.)
**(Cite as: 2010 WL 812698 (N.D.N.Y.))**

(internal quotations omitted); *see also Sobczak v. AWL Indus., Inc.,* 540 F.Supp.2d 354, 360 (E.D.N.Y.2007) ("to the extent that plaintiffs' claims arise under state funded contracts, to which state prevailing wage standards apply, *Grochowski* has no application").

New York Labor Law provides a similar statutory scheme for the administrative resolution of prevailing wage claims as does the Davis Bacon Act. *See* N.Y. LAB. LAW § 220(3). Under New York law, however, employees are permitted to pursue their claims under the administrative procedures provided therein *or* as third-party beneficiaries to the state funded contracts. *Wright v. Herb Wright Stucco, Inc.,* 50 N.Y.2d 837, 430 N.Y.S.2d 52, 407 N.E.2d 1348 (N.Y.1980); *Fata v. S.A. Healy Co.,* 289 N.Y. 401, 46 N.E.2d 339, 341 (N.Y.1943); *Sobczak,* 540 F.Supp.2d at 360-61. In this action, Plaintiffs bring their claim as third-party beneficiaries, thus obviating the need to comply with the procedures or statute of limitations under NYLL § 220. The relevant statute of limitations is six years. *See* N.Y. C.P.L.R. 213(2). Plaintiffs' contract claims, insofar as it relates to state-funded public contracts and arise no earlier than October 31, 2002, may proceed.

*e. Claims Under the CBA and LMRA*

Plaintiffs' Sixth and Seventh Causes of Action allege that Comforce, CWA, and Local 6171, breached the CBA and violated the LMRA respectively. Plaintiffs concede these claims arise under the CBA, are pre-empted by § 301, and are time-barred. Pls.' Mem. of Law in Opp'n to Def. Comforce and Individual Defs.' Mot. to Dismiss (Dkt. No. 56) ("Pls. Mem. Opp'n to Comforce") at 25. They are dismissed.

*f. Claims that CWA and Local 6171 Violated the Duty of Fair Representation*

Plaintiffs' Eighth Cause of Action alleges that CWA and Local 6171 breached their DFR by entering a CBA and receiving dues paid by Plaintiffs and those similarly situated but failing to provide any true or meaningful representation. As an initial mat-

ter, the CBA clearly states that CWA is the "exclusive collective bargaining representative." CBA Preamble; Art. I. Local 6171 is not a party to the CBA and cannot be held to have violated its DFR under that agreement.

**\*8** DFR claims are subject to a six-month statute of limitations. *DelCostello,* 462 U.S. at 169-70. "The general rule in this circuit is that a cause of action accrues when 'the plaintiff could first have successfully maintained a suit based on that cause of action.' " *King v. New York Tel. Co., Inc.,* 785 F.2d 31, 33 (2d Cir.1986) (quoting *Santos v. Dist. Council,* 619 F.2d 963, 968-69 (2d Cir.1984). In hybrid actions, plaintiffs' claims against the employer and the union accrues "no later than the time plaintiffs knew or reasonably should have known such a breach had occurred, even if some possibility of nonjudicial enforcement remained." *Santos,* 619 F.2d at 969.

Plaintiffs began paying union dues upon being hired. Second Am. Compl. ¶ 6. They were also provided with union cards when on a union job. *Id.* ¶ 7. Plaintiffs were aware they were members of a union throughout their employment and that at various times attempted to call or otherwise inquire with the union about various work-related conditions. *Id.* ¶ 255. Plaintiffs knew that Comforce had unilaterally altered its travel time compensation policy by 2004. *Id.* ¶ 194. Nevertheless, Plaintiffs negotiated their own contracts, accepted the lack of union presence on job sites, and eventually, at least by February 23, 2006, received a copy of the CBA. *Id.* ¶ 76. Plaintiffs, therefore, reasonably should have known that CWA was not fulfilling its DFR prior to the six-month period before filing their Complaint. Their claim is time-barred and dismissed.

*g. Plaintiffs' Other Common Law Claims*

Plaintiffs' Ninth, Fourteenth, and Fifteenth Causes of Action allege common law breaches. Their ninth claim alleges that CWA and Local 6171 have been unjustly enriched by their receiving dues without providing true or meaningful representa-

tion. This claim essentially mirrors Plaintiffs' claim that the Union breached its DFR. State law claims are pre-empted where they are based on virtually the same underlying conduct forming the basis of a federal claim for breach of the DFR. *See San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *Peterson v. Air Line Pilots Ass'n, Int'l,* 759 F.2d 1161, 1170 (2d Cir.1985); *Cooper v. TWA Airlines, LLC,* 274 F.Supp.2d 231, 249 (E.D.N.Y.2003). Plaintiffs' allegations against the Union and Local 6171 is predicated on the identical conduct underlying their DFR claim, namely that these Defendants provided no representation in exchange for their dues. Having failed to identify independent conduct sufficient to distinguish the state claim from the federal cause of action, Plaintiffs' ninth claim against the Union and Local 6171 is preempted.

Plaintiffs' Fourteenth Claim for Relief alleges conversion by Comforce, CWA, and Local 6171 insofar as these Defendant willfully and maliciously withheld funds owed to Plaintiffs on the pretext that these would secure union representation. As to the Union and Local 6171, this claim is pre-empted for the reasons stated above with regard to Plaintiffs' ninth claim.

**\*9** Plaintiffs allege that Comforce is liable for conversion insofar as it "sometimes" withdrew funds from employees' for its own financial gain, rather than sending it to the Union. Second Am. Compl. ¶ 245. Under New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Vigilant Ins. Co. of America v. Hous. Auth. of City of El Paso, Texas,* 87 N.Y.2d 36, 43, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (N.Y.1995). "To establish conversion the plaintiff 'must demonstrate legal ownership or an immediate superior right of possession to a specific identifiable thing' and that the defendant exercised an unauthorized dominion over that property, which can be specific money, to the exclusion of the plaintiff's rights.' " *Meese v. Miller,* 436

N.Y.S.2d 237, 242-43 (4th Dept.1981) (citations omitted).

Again, the fact that the CBA includes a template exemplifying the authorization employees must provide before Comforce could withhold their wages does not necessitate interpretation of the CBA to decide whether Comforce acted lawfully. The pre-emptive effect of § 301 is not implicated by the inclusion of the authorization form in the CBA. Plaintiffs' have a right to their wages without any withholdings not authorized. N.Y. LAB. LAW § 193. Plaintiffs have alleged facts supporting the conclusion that they have a superior right to their wages and that Comforce, nevertheless, sometimes used those wages for its own gain to the exclusion of Plaintiffs' rights. They may proceed with their Fourteenth Cause of Action against Comforce. It is, however, subject to a three-year statute of limitations, which accrues at the time of conversion, not discovery. *See* N.Y. C.P.L.R. § 214(3); *Sporn v. MCA Records, Inc.,* 58 N.Y.2d 482, 488, 462 N.Y.S.2d 413, 448 N.E.2d 1324 (N.Y.1983); *Vigilant Ins. Co. of America,* 87 N.Y.2d at 44-45, 637 N.Y.S.2d 342, 660 N.E.2d 1121. "In the event of multiple conversions, the date of the latest conversion is applicable in determining a claim that the complaint is barred by the three-year Statute of Limitations." *Stanley v. Morgan Guar. Trust Co. of New York,* 173 A.D.2d 390, 570 N.Y.S.2d 22 (N.Y.App.Div.1991). Accordingly, any alleged conversion occurring prior to October 31, 2005 is dismissed.

Plaintiffs' Fifteenth Claim for Relief alleges fraud against Comforce, CWA, and Local 6171 based on the false representation that these Defendants made regarding the benefits they were to receive as union members. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). Plaintiffs, however, provide scant information to support their fraud allegation against any of the Defendants. Plaintiffs claim that they and others similarly situated inquired "on numerous

occasions" into the benefits they would receive as members of CWA; that Comforce "repeatedly and falsely represented" the facts of the situation; that they called Local 6171 on various occasions but were forwarded back to Comforce's Human Resources Department. Second Am. Compl. ¶¶ 250-65. Other than describing one phone call where Eldred was so directed to Comforce's Human Resources, Plaintiffs fail to provide any information on who made the calls, who made the false misrepresentations, when they were made, or other specific facts vital to their claim. Given the lack of specificity, Plaintiffs' fifteenth claim fails to meet the standard required by Rule 9 and is dismissed without prejudice.

### h. Plaintiffs' RICO Claims

**\*10** Plaintiffs' Twelfth Cause of Action against Comforce, Maccarrone, Fanning, and Petix alleges civil RICO violations comprising extortion, larceny by false promise, scheme to defraud, and mail and wire fraud stemming from the issuance of union cards, withholding of union dues, and failure to pay prevailing wages, overtime, and work-related travel-time. Second Am. Compl. ¶ 229-32. Plaintiffs base portions of their RICO claim on violations of New York State Penal Law including larceny by false promise and scheme to defraud. RICO, however, limits the state law offenses qualifying as "racketeering activity" to: "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical ... which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A). Larceny by false promise and scheme to defraud are not RICO predicate offenses. *See id.; Weizmann Inst. of Sci. v. Neschis,* 229 F.Supp.2d 234, 255 (S.D.N.Y.2002); *Calabrese v. CSC Holdings, Inc.,* 283 F.Supp.2d 797 (E.D.N.Y.2003).

Moreover, much of what Plaintiffs allege is duplicative of their claims under the FLSA. For example, in explaining their alleged injury to their

persons and property, a required element of the RICO claim, Plaintiffs complain of "sustain [ing] other loss of earnings in the form of unpaid wages, unpaid prevailing wages, unpaid overtime, unpaid prevailing per diem and mileage reimbursement." *Id.* ¶ 232. Several circuits, including the Second, have found that where a statute provides an exclusive remedy, concurrent RICO claims based on the same conduct should be dismissed. *See Norman v. Niagra Mohawk Power Corp.,* 873 F.2d 634 (2d Cir.1989) (affirming dismissal of RICO claims where the Energy Reorganization Act provided the exclusive remedy for the acts underlying the RICO claim). Following this approach, and finding the FLSA "provides a sufficiently punitive scheme," one court has held that where a plaintiff's "RICO Claims [are] brought along side other statutes which, like the FLSA, provide comprehensive remedies ... Plaintiffs' RICO claims [should be] precluded." *Choimbol v. Fairfield Resorts, Inc.,* No. 2:05-CV-463, 2006 WL 2631791 at \*7 (E.D.Va. Sept.11, 2006) (citing *Norman,* 873 F.2d at 637-38). This approach ensures that the "[a]rtful invocation of controversial civil RICO, particularly when inadequately pleaded" does not endanger the uniform administration of core concerns of the primary enforcement scheme. *Norman,* 873 F.2d at 637.

Finally, Plaintiffs' RICO claim is inadequately pleaded insofar as it alleges fraud. As noted above, Plaintiffs must plead fraud with particularity. FED. R. CIV. P. 9(b). In the civil RICO context, this requires:

> the complaint to 'specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.' The plaintiffs must also 'identify the purpose of the mailing within the defendant's fraudulent scheme.' In addition, the plaintiffs must 'allege facts that give rise to a strong inference of fraudulent intent.'

**\*11** *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 173 (2d Cir.1999) (internal citations omitted). Plaintiffs fail to meet this standard. Plaintiffs allege that Eldred paid union dues and spoke with Whittaker, the President of Local 6171 and not an employee of Comforce, about the cards. They allege that "Comforce project managers and others" "repeatedly" made "numerous" and "various" statements "to many if not all of the class plaintiffs" "over the course of many years." Pls. Mem. Opp'n to Comforce at 33. They fail, however, to isolate any particular act or representation made by specific Comforce personnel to any individual class plaintiff on any particular date. Plaintiffs seem to admit to this deficit by noting that Comforce is in possession of the particulars, but these "will be subject to discovery." Failing to meet the requirements of Rule 9(b) and admitting at their inability to do so absent discovery, Plaintiffs' Twelfth Cause of Action is dismissed with prejudice.

Plaintiffs' Thirteenth Cause of Action levels a similar RICO claim against CWA, Local 6171, Milburn, Kneupper, Bentley, Whittaker, Simmons, and James. As an initial matter, the Court finds that it lacks jurisdiction over Milburn, Kneupper, Bentley, Whittaker, Simmons, and James (collectively, "the six union officers") and dismisses all claims against them.

Plaintiffs bear the burden of establishing the Court's jurisdiction. *See Bank Brussels Lambert v. Fuddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir.1999); *Stein Fibers, Ltd. v. Bondex Telas Sin Tejar,* No. 1:08-CV-210, 2009 WL 385412 at \*2 (N.D.N.Y. Feb. 10, 2009) (Kahn, J.). To meet this burden, Plaintiffs must show that personal jurisdiction is proper under New York's general jurisdiction provision, N.Y. C.P.L.R. § 301, or its long-arm statute, N.Y. C.P.L.R. § 302, and comports with due process. *Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194 (2d Cir.1990); *Stein Fibers,* 2009 WL 385412 at \*2.

Plaintiffs concede that § 301 has no application against the six union officers. Dkt. No. 58 at 6. Section 302 of the C.P.L.R. allows for jurisdiction over nondomiciliaries where they are engaged in some purposeful activity within the State and there is a substantial relationship between that activity and the plaintiff's cause of action. *See Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40, 43 (N.Y.1988); *Armouth Int'l v. Haband Co.,* 277 A.D.2d 189, 715 N.Y.S.2d 438, 439 (2nd Dept.2000). Plaintiffs, state that "discovery is likely to establish that the court has personal jurisdiction" under § 302. Plaintiffs appear to recognize the inadequacy of relying on later discovery to reveal information that they are required to provide in order to survive dismissal when they rest their jurisdictional claim instead pursuant to 18 U.S.C. § 1965. Pls.' Mem Opp'n to FRCP 12(b)(6) Mot. to Dismiss by CWA, Local 6171, and Individual Union Defs. (Dkt. No. 58) ("Pls. Mem. Opp'n FRCP 12(b) (6) Mot.") at 8.

**\*12** Plaintiffs bring their claim under 18 U.S.C. § 1964, which establishes civil remedies for RICO violations and grants district courts "jurisdiction to prevent violations" of RICO. 18 U.S.C. § 1965(a) provides, "Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." Subsection (b) allows nationwide service for actions brought under § 1964 where "it is shown that the ends of justice require that other parties residing in any other district be brought before the court." Plaintiffs fail to meet these criteria.

The Second Circuit recognizes that § 1965 "does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found." *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.,* 138 F.3d 65, 71 (2d Cir.1998). Rather, under § 1965(a) "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant" *Id* . Where nationwide jurisdiction is

sought under § 1965(b), "jurisdiction is not automatic but requires a showing that the 'ends of justice' so require." *Id.* The requirements of the "ends of justice" is generally considered to be met where no district could exercise jurisdiction over all of the defendants. *Id.* at 72 n. 5; *Daly v. Castro Llanes,* 30 F.Supp.2d 407, 413 (S.D.N.Y.1998); *see also Butcher's Union Local No. 498 v. SDC Inv., Inc.,* 788 F.2d 535, 538-39 (9th Cir.1986).

Plaintiffs concede that "it is unknown whether plaintiff can also rely on § 1965(a) for jurisdiction over the individual Union defendants." Pls. Mem. Opp'n FRCP 12(b)(6) Mot. at 9. But, they assert that jurisdiction under § 1965(b) is proper, claiming that, given the presence of Comforce and New York residence of the named Comforce officers, there is no district court that would have personal jurisdiction over all parties to the litigation. Plaintiffs, however, level RICO allegations against the Comforce Defendants in an entirely separate claim from their Thirteenth Cause of Action leveled against CWA, Local 6171, and the six union officers. That thirteenth claim involves parties who are all subject to jurisdiction in a Texas district court. Plaintiffs have failed to prove that the six union officers are subject to the jurisdiction of this Court and their claim against these officers is dismissed.

As to CWA and Local 6171, Plaintiffs' claim suffers from the identical deficiencies that formed the basis of the Court's dismissal of their Twelfth Cause of Action. It relies on predicate acts not provided for under RICO, alleges fraud without the particularity required under Rule 9(b). It also fails to state a valid RICO claim against CWA or Local 6171.

Plaintiffs allege that CWA and Local 6171 are an "enterprise" for RICO purposes. Second Am. Compl. ¶ 235. They further allege that the six union officers are "persons" under RICO. *Id.* ¶ 236. They thus acknowledge that 18 U.S.C. § 1962(c)<sup>FN3</sup> "foresees two separate entities, a 'person' and a distinct 'enterprise.' " *Cedric Kushner Promotions v.*

King, 533 U.S. 158, 160, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001). Enterprises, however, may not be liable under RICO, as only "persons" can be sued for violating RICO § 1962(c). *See* 18 U.S.C. § 1962(c); *Petro-Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349 (3rd Cir.1987). For purposes of 18 U.S.C. § 1962(c) a "person" engaged in the "enterprise" must be distinct from it. *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir.1994); *see also Bennet v. U.S. Trust Co. of New York,* 770 F.2d 308 (2d Cir.1985) ("[R]equiring a distinction between the enterprise and the person comports with legislative intent and policy. Such a distinction focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity"). Plaintiffs have alleged only the CWA and Local 6171 are "enterprises." As such, they cannot be held liable, and Plaintiffs' RICO claim against them must be dismissed.

> FN3. 18 U.S.C. § 1962(c) provides, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

*i. Plaintiff Eldred's Individual Claims*

**\*13** Plaintiffs' Tenth and Eleventh Causes of Action relate to Plaintiff Eldred's allegedly wrongful discharge. Their tenth claim alleges violations by Comforce of NYLL § 215, which provides in part, "No employer ... shall discharge, penalize, or in any other manner discriminate or retaliate against any employee (I) because such employee has made a complaint to his or her employer ... that the employer has violated any provision of this chapter, or (ii) because such employee has caused to be instituted a proceeding under or related to this chapter." N.Y. LAB. LAW § 215(1)(a).

Plaintiffs' claim is time-barred. *See* N.Y. LAB. LAW § 215(2) (establishing a two-year statute of limitations). The latest of the alleged violations involved Plaintiff Eldred's discharge. Plaintiffs acknowledge that the New York State Unemployment Appeals Board found he was terminated for cause when he left the job site in November 2005. Second Am. Compl. ¶ 126. Thus, Plaintiffs failed to assert their claim within the two-year period allowed under NYLL § 215(2).

Plaintiff's eleventh claim for wrongful termination is clearly dependent upon the terms of the CBA. Plaintiffs allege, for example, "Comforce deprived Eldred of his contractual rights and protections *by not complying with the requirements of the collective bargaining agreement ...*" Second Am. Compl. ¶ 252 (emphasis added). The allegation continues, claiming, "Comforce thereby wrongfully terminated Eldred's employment *in violation of Article VI, Sections 1,2,4 of the collective bargaining agreement.*"[FN4] *Id.* ¶ 253 (emphasis added). State law claims, such as Plaintiffs' Eleventh Cause of Action, the adjudication of which depends upon extensive interpretation of the CBA are pre-empted under the LMRA. *See* Allis-Chalmers, 471 U.S. 202, 209-21, 105 S.Ct. 1904, 85 L.Ed.2d 206; *Sheehan*, 6 F.Supp.2d 141; *Heaning v. Nynex-New York*, 945 F.Supp. 640, 645 (S.D.N.Y.1996).

> FN4. Article VI of the CBA outlines the rules governing discipline of employees. It announces procedures that must be followed prior to discharge including the determination of whether "just cause" exists.

**B. Plaintiffs' Motion for Certification of Class Action**

Plaintiffs seek class certification pursuant to the collective action provision of the FLSA, *see* 29 U.S.C. § 216, and Rule 23(b)(1), (2), or (3) of the Federal Rules of Civil Procedure. Mem. of Law in Supp. of Am. Mot. for Certification of Class Action (Dkt. No. 37-1) ("Pls.' Class Certification Mem"). The Court will review Plaintiffs' Motion for class certification only with regard to those claims not

dismissed per the above discussion.

**1. *Plaintiffs Proposed Classes***

Plaintiffs' Second Amended Complaint proposes three classes. The first class, which Plaintiffs' bring under the FLSA's collective action provision, 29 U.S.C. § 216(b), relates to their First Cause of Action and consists of:

> all persons who at times relevant hereto were employed by Comforce as non-exempt telecommunications installers and:

> a) (First Claim)-where those employees were not paid regular and/or overtime compensation for their travel time that kept them away from home overnight, the travel occurred during the hours of the day which they normally worked, and such travel was clearly compensable work time under the FLSA, in particular 29 C.F.R. 785.39; and

> **\*14** Pls.' Mot. for Certification ¶ 2.

Plaintiffs seek certification of two additional classes under Federal Rule of Procedure 23. Proposed Class II governs Plaintiffs Third, Fourth, and Fifth claims and comprises "all persons who at times relevant hereto were employed by Comforce as non-exempt telecommunications installers" and is further broken down into subclasses "A", "B", and "C" based on Plaintiffs' claims with:

> a) "Class II-A"-Third Claim for the named plaintiffs and similarly situated employees who had wages withheld from their pay checks for, but not necessarily limited to, union dues without having provided a signed authorization for Comforce to withhold wages in violation of New York Labor Law; and/or

> b) "Class II-B"-Fourth Claim for the named plaintiffs and similarly situated employees who were not paid wages for all hours worked, including hours spent traveling that are deemed work hours pursuant to 29 C.F.R. 785.39 and compensable under New York Labor Law and failure to pay for overtime for all hours worked in excess

of 40 hours per week under New York Labor Law; and/or

c) "Class II-C"-Fifth Claim for the named plaintiffs and similarly situated employees who worked for Comforce on projects that were [state] funded and did not receive prevailing wages, prevailing per diem, or prevailing mileage reimbursement as required by New York State Law.

Pls.' Mot. for Certification ¶ 4.

Plaintiffs' proposed Class III relates to the Fourth, and Fourteenth Claims for Relief. This proposed class covers:

all persons who at times relevant hereto were employed by Comforce as non-exempt telecommunications installers *and* were members of CWA who,

a) Paid union dues;

b) Had union membership cards issued in their name;

c) Were employed by Comforce; and

d) Received no true or meaningful representation in exchange for the union dues incurring the economic harm as set forth in the ... Third Claim[ ] for Relief.

Pls.' Mot. for Certification ¶ 6.

**2. *Collective Action Certification Under FLSA § 216***

Section 216(b) of the FLSA allows for any employee to bring an action on behalf of himself or others "similarly situated" provided any employee willing to join such an action gives his consent in writing and files that consent with the court in which the action is brought. 29 U.S.C. § 216(b). District courts have discretion to authorize sending opt-in notice to potential plaintiffs in a collective action. *See Braunstein v. Eastern Photographic Labs., Inc.,* 600 F.2d 335, 336 (2d Cir.1979). The requirements of Federal Rule of Civil Procedure 23, discussed below, do not apply to a court's approval of a collective action under the FLSA. *See Abrams v. General Elec. Co.,* No. 95-CV-1734, 1996 WL 663889 at *1 (N.D.N.Y. Nov. 4, 1996). Under 29 U.S.C. § 216(b), Plaintiffs need not show numerosity, typicality, commonality, and adequate representation, but rather, need only show they and the proposed class members are "similarly situated". *Id.; see also, Schwed v. General Elec. Co.,* 159 F.R.D. 373, 375 (N.D.N.Y.1995); *Sobczak,* 540 F.Supp.2d at 362. This requires only " 'a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law.' " *Sobczak,* 540 F.Supp.2d at 362 (quoting *Hoffman v. Sbarro, Inc.,* 982 F.Supp. 249, 261 (S.D.N.Y.1997).

**\*15** Plaintiffs easily meet the requirements for collective action under FLSA § 216(b). Most notably, in alleging their claims under the FLSA, Plaintiffs point to Comforce's adoption of a travel-time compensation policy 2002 and 2004 that allegedly violates the FLSA. Plaintiffs' submissions, including the presentation of this travel policy (Dkt. No. 1-4) which applies to all members of the proposed class are sufficient for conditional certification under FSLA § 216(b).

**3. *FRCP 23(a) Prerequisites***

Before a class can be certified under any provision of Rule 23(b), Plaintiffs must satisfy the prerequisites of Rule 23(a). *See* FED. R. CIV. P. 23(a) & (b). Rule 23(a) lists four prerequisites for class certification: "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Amchem Prods. v. Windsor,* 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (quoting FED. R. CIV. P. 23(a)). Plaintiffs bear the

burden of demonstrating that the prerequisites are met. *See Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999). While the Court will undertake a rigorous analysis to determine if the prerequisites have been satisfied, a motion for class certification does not require the Court to consider the merits of the case. *Id .*

*a. Numerosity*

Rule 23(a)(1) requires the prospective class be so large that joinder of all members is "impracticable," though not necessarily impossible. *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993). In the Second Circuit, "numerosity is presumed at a level of 40 members," *Consol. Rail Corp. v. Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995) . Plaintiffs need not determine the precise number or identity of potential class members to meet the numerosity requirement. *Robidoux,* 987 F.2d at 935. Plaintiffs, however, must offer some evidence supporting a reasonable estimate of the number of potential class members. *Id.*

Plaintiffs' submissions satisfy this element, alleging that at least 187 members of the class residing in New York and upon information and belief as many as one thousand across the country. Second Am. Compl. ¶ 28; Aff. Eric Eldred. *See Ruggles v. Wellpoint,* 253 F.R.D. 61, 66 (N.D.N.Y.2008) (Kahn, J.). The affidavit and verified Second Amended Complaint show a class meeting the numerical presumption and indicate the presence of other considerations relevant to the practicability inquiry, particularly the geographic dispersion of proposed class members. *Robidoux,* 987 F.2d at 936; *Marcera v. Chinlund,* 91 F.R.D. 579, 583 (W.D.N.Y.1981).

*b. Commonality and Typicality*

The commonality and typicality requirements tend to merge into one another as both seek to ensure that the named plaintiffs' claims are closely interrelated to those of the class. *Marisol A. by Forbes v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997). Commonality exists if Plaintiffs claim shares a common question of fact or law with those of the

class. *Id.* The typicality requirement, on the other hand, is satisfied when each class member's claim arises from the same course of events, and each class member will make similar arguments to prove a defendant's liability. *Id.* The claims of the named plaintiffs, however, do not need to be identical with those of each class member. *Marriott v. County of Montgomery,* 227 F.R.D. 159, 172 (N.D.N.Y.2005).

**\*16** Plaintiffs allege commonality with respect to both questions fact and law. Pls.' Mem. of Law in Supp. of Am. Mot. for Certification of Class Action (Dkt. No. 37-2) ("Pls.' Mem. Supp. Certification"). Plaintiffs allege that class members share identical relationships with Defendants and suffered similar harm with a difference only in degree based on the length of employment and jobs worked. Plaintiffs, relying on the Affidavit of Eric Eldred (Dkt. No. 15-1) and verification by Richard Borden, Mathew Caezza, Brian Fink, and Mark MacLaury of the allegations in the Second Amended Complaint, note the named Plaintiffs' years of substantially identical employment to at least 187 other proposed members and similar to that of hundreds more. Plaintiffs also allege that class members claims share common questions of law by virtue of these claims all being based on federal law or the laws of New York, to which Comforce is subject based on its residence and the individual employment agreements between Comforce and the Plaintiffs and those similarly situated. Pls.' Mem. Supp. Certification at 8-9. Plaintiffs point to Comforce's travel and per diem policy as evidence of a common unlawful policy in contradiction to 29 C.F.R. 785.39 to which all class members were subject as satisfying the typicality requirement. Taken together, Plaintiffs' affidavits, pleadings, and presentation of Comforce's travel and per diem policy sufficiently meets the commonality and typicality requirements.

*c. Adequacy of Representation*

Rule 23(a)(4) requires that Plaintiffs demonstrate that the proposed action "will fairly and adequately protect the interests of the class." FED. R.

CIV. P. 23(a)(4). To determine whether class representatives meet this standard, courts consider several factors, including: (1) the representatives' understanding and involvement in the lawsuit; (2) their willingness to pursue the litigation; and (3) any conflict of interest between the representatives and other members of the class. *See Parker v. Time Warner Entm't Co., L.P.,* 239 F.R.D. 318, 38 (E.D.N.Y.2007); *Marisol A.,* 126 F.3d at 378.

Defendants assert the Plaintiffs fail to show they adequately protect the interests of the proposed class, alleging (I) conflict of interest between the named Plaintiffs, all of whom are union members, and non-union members in the proposed class; (ii) Plaintiff Eldred's insufficiently moral character; and (iii) potentially incompetent counsel.[FN5]

> FN5. After the 2003 Amendments to Rule 23, the adequacy of class counsel is most properly considered under Rule 23(g). *See Hilton v. Wright,* 235 F.R.D. 40, 54 (N.D.N.Y.2006).

The Court finds that Plaintiffs adequately represent the interests of the class. Eldred's Affidavit exhibits sufficient knowledge concerning the Plaintiffs' claims to meet the knowledge requirement under Rule 23(a). The other named Plaintiffs, all of whom have signed and verified the Second Amended Complaint display similarly sufficient knowledge. From their submissions, all appear to understand their role as class representatives. *See Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 201 (S.D.N.Y.1992); *see also Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 102 (S.D.N.Y.1981); In re Playmobil Antitrust Litig., 35 F.Supp.2d 231, 243 (E.D.N.Y.1998); *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 62 (2d Cir.2000).

**\*17** The Court rejects Defendants' assertion that Plaintiffs' have conflict of interests sufficient to deny class certification. Union membership could, in certain cases, be a fatal to certification of a class containing both union and non-union employees. In the instant case, however, Plaintiffs' proposed subclasses rectify any potential conflicts which might arise. The one exception to this finding is subclass A of proposed Class II, which includes both union and non-union employees, and "who had wages withheld from their pay checks for, but not necessarily limited to, union dues without having provided a signed authorization." Given the named Plaintiffs' status as union members, the Court is not satisfied that their representation of non-union members included in this subclass would be free of significant conflicts. Thus, the Court declines, at this time, to certify Plaintiffs as representatives of Class II, subclass A, but finds them to be adequate representatives with regard to all other proposed classes and subclasses.

The Court rejects Defendants' assertion that Eldred lacks proper moral character and credibility required to qualify as class representative. Nothing suggests that a former employee's refusal to continue working at a rate he found unacceptable implicates that employee's honesty or trustworthiness, or otherwise makes him an inadequate representative.

Finally, the Court must ensure Plaintiffs' counsel "fairly and adequately represent the interests of the class" and meet the requirements of Rule 23(g)(1), *which state, inter alia, that a court must consider (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources counsel will commit to representing the class." FED. R. CIV. P. 23(g) (1). After review of the submissions made to the Court and given Plaintiffs' counsel's thirty years of experience, including complex litigation in state and federal courts, the Court finds the requirements of Rule 23(g) are met.*

Except as to subclass II-A, Plaintiffs have satisfied the prerequisites of Rule 23(a). For certification to be proper, Plaintiffs must also meet the re-

quirements under Rule 23(b).

**5. *FRCP 23(b) Requirements***

Plaintiffs seek certification under any one of the categories set forth in Rule 23(b). Pls.' Class Certification Mem. at 11. Plaintiffs need only qualify under a single category for certification to be proper. FED. R. CIV. P. 23(b); *In re Simon II Litig.,* 407 F.3d 125, 132 (2d Cir.2005). The appropriateness of each of the categories depends upon the relief sought.

The (b)(1) class action encompasses cases in which the defendant is obliged to treat class members alike or where class members are making claims against a fund insufficient to satisfy all of the claims. The (b)(2) class action ... was intended to focus on cases where broad, class-wide injunctive or declaratory relief is necessary. Finally, the (b)(3) class action was intended to dispose of all other cases in which a class action would be "convenient and desirable," including those involving large-scale, complex litigation for money damages.

**\*18** *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 412 (5th Cir.1998) (internal citations omitted). Where a class is certified under Rule 23(b)(1) or (b)(2), no notification is required for absent class members; such notice is required if certification occurs under subsection (b)(3). FED. R. CIV. P. 23(c)(2).

**a. *FRCP 23(b)(1)***

Rule 23(b) (1)(B) allows class certification if:

1) prosecuting separate actions by or against individual class members would create a risk of:

\* \* \*

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests

Plaintiffs assert that the action qualifies for certification under Rule 23(b)(1)(B) because any adjudication with respect to Eldred individually could be dispositive of other class members' interests and might substantially impair or impede the ability of those members to protect their interests. Mot. for Certification of Class Action (Dkt. No. 15) ¶ 11.

Defendants rightly note that class certification under Rule 23(b) (1)(B) are typically based on a limited fund theory. *Ortiz v. Fireboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); *Hilton v. Wright,* 235 F.R.D. 40, 53. In *Ortiz,* the Supreme Court identified "presumptively necessary" conditions for certification in limited fund cases. *Ortiz,* 527 U.S. at 842. These conditions are "a 'fund' with a definitely ascertained limit, all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution." *Id.* at 841. Where the presumptively necessary conditions are absent, "the burden of justification rests on the proponent of any departure from the traditional norm." *Id.* In the instant case, Plaintiffs have failed to identify or indicate the insufficiency of any posited fund such that the individual plaintiffs would be substantially impaired or impeded from protecting their interests through separate actions without being represented in this suit. In such cases, certification under Rule 23(b)(1)(B) is improper. *See In re Simon II Litig.,* 407 F.3d at 137 (2d Cir.2005).

**b. *FRCP 23(b)(2) Injunctive Class***

Rule 23(b)(2) allows class certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). This type of class action is "intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147, 162 (2d Cir.2001). When plaintiffs seek certification under Rule 23(b)(2) and money damages, a

court must assess the relative importance of the remedies sought and grant certification if the value of the injunctive or declaratory relief is predominant and class treatment is efficient. *Id.* at 164.

**\*19** Defendants argue that certification under Rule 23(b)(2) is inappropriate because Plaintiffs primarily seek money damages, not injunctive relief, pointing to the fact that every claim raised in Plaintiffs' Complaint seeks monetary damage. Defs. Mem. in Opp'n to Pls.' Mot. to Proceed as a Collective Action Under the FLSA and for Class Certification (Dkt. No 45) at 22. While this fact is not dispositive of monetary relief predominating, the Court finds Plaintiffs have failed to show that "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Robinson,* 267 F.3d at 164. Thus, certification under Rule 23(b)(2) is inappropriate.

c. *Rule 23(b)(3) Money Damages Class*

For certification under Rule 23(b)(3), Plaintiffs must establish that: (1) common questions predominate over questions affecting individual plaintiffs; and (2) class resolution is the best means of adjudicating the case. *Amchem,* 521 U.S. at 615. The predominance requirement is more demanding than the commonality requirement in Rule 23(a): Plaintiffs must show that the case is subject to generalized proof applicable to the class as a whole. *Wal-Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check/Mastermoney Antitrust Litig.),* 280 F.3d 124, 136 (2d Cir.2001). In order to determine whether general proof predominates, courts must determine that the issues subject to generalized proof outweigh those issues that are subject to individualized proof. *See Augustin v. Jablonsky ( In re Nassau County Strip Search Cases),* 461 F.3d 219, 227-28 (2d Cir.2006) (quoting *Heerwagen v. Clear Channel Commc'ns,* 435 F.3d 219, 226 (2d Cir.2006)).

Plaintiffs have met their burden. The class

definitions at issue in Class II include all Comforce employees who allegedly had wages deducted without authorization, or were deprived of their full compensation, or were not paid prevailing wage on state-funded contracts, all of which resulted from the implementation of allegedly unlawful policies by their common employer. The predominant question raised is whether such a policy existed, and not whether any individual suffered its consequences on a particular job. Similarly, for the subclasses comprising Class III, the definition includes all union employees who were not fully compensated for their time spent working, including travel-time or whose wages were converted by Comforce. The predominant question with regard to these subclasses is, again, the common policy of their employer, and, in the case of conversion, whether Comforce had a policy of not obtaining authorization before withholding its employees' wages, whether proposed members had a superior right to those wages, and whether Comforce ever used these deducted wages for its own gain. While each of these claims may entail individual issues of proof, the issues subject to generalized proof predominates.[FN6]

> FN6. The determination of damages for individual plaintiffs should not be the sole reason for denying class certification. *See Visa Check,* 280 F.3d at 140.

**\*20** For reasons related to the above, the Court also finds that a class resolution is the best means of adjudicating the case. The purpose of Rule 23 is to achieve "greater efficiency via collective adjudication and, relatedly, greater uniformity of decision as to similarly situated parties .... [w]hen plaintiffs are 'allegedly aggrieved by a single policy of defendants,' such as [a] blanket policy ... the case presents 'precisely the type of situation for which the class action device is suited' since many nearly identical litigations can be adjudicated in unison." *Augustin,* 461 F.3d at 28 (internal citations omitted). Plaintiffs assert the presence of such policies, most notably the travel-time compensation

policy, but also Comforce's failure to get written authorization prior to withholding wages, and failure to pay prevailing wages on state-funded projects. Thus, a class action is the most efficient manner in which to proceed and certification of the proposed classes is appropriate under Rule 23(b)(3).

*d. Plaintiffs' Proposed Opt-In Notice*

The Court rejects to Plaintiffs' proposed opt-in notice. Plaintiffs shall refine their "Introduction" and "Description of the Lawsuit," removing all parties against whom this action is dismissed and all reference to claims dismissed consistent with this opinion. Plaintiffs shall explicitly state that the class is certified solely for the purpose of adjudicating those claims against the remaining Defendants. Plaintiffs shall also remove section 7 "No Retaliation Permitted" as there is no evidence that Defendants have or will initiate such retaliation as described therein. Plaintiffs shall note that the notice and its contents have been authorized by the Federal District Court, Northern District of New York, Honorable Lawrence E. Kahn. Plaintiffs shall submit a copy of the proposed notice to Defendants for comment on the content and form of the notice within 30 days of this Decision and Order. The parties shall meet and confer regarding any objections raised by Defendants and submit to the Court a mutually agreed upon notice within 60 days of this Decision and Order. Parties may submit supplemental briefings on this issue if they are unable to agree on the notice.

The Court further directs Defendants to produce the names and addresses of the employees covered under the classes as conditionally certified in this opinion. [FN7] Plaintiffs will bear the cost of notice. *See Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

> FN7. Defendants may seek decertification of parties who opt-in but arguably fail to meet the class criteria. *See Gjurovich v. Emmanuel's Marketplace, Inc.,* 282

F.Supp.2d 91, 96 (S.D.N.Y.2003).

## III. CONCLUSION

Accordingly, it is hereby

**ORDERED,** that Plaintiffs' Motion for class certification (Dkt. No. 15) as amended (Dkt. No. 37-1) is **GRANTED** in part, consistent with this Decision and Order; and it is further

**ORDERED,** that Defendants Fanning, Maccarrone, and Petix's Motion to dismiss Plaintiffs' Motion to proceed as a collective action and for class certification (Dkt. No. 43) is **DENIED;** and it is further

**\*21 ORDERED,** that Defendants Fanning, Maccarrone, and Petix's Motion to dismiss (Dkt. No. 46) is **GRANTED** in part and **DENIED** in part consistent with this Decision and Order; and it is further

**ORDERED,** that Defendant Comforce's Motion to dismiss (Dkt. No. 47) is **GRANTED** in part and **DENIED** in part consistent with this Decision and Order; and it is further

**ORDERED,** that Plaintiffs' second, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, and thirteenth claims are **DISMISSED** in their entirety; and it is further

**ORDERED,** that Plaintiffs' fifteenth claim is **DISMISSED** without prejudice; and it is further

**ORDERED,** that Plaintiffs' action is **DISMISSED** in its entirety as to Defendants Comforce Information Technologies, Inc.; Comforce Technical, LLC; and Comforce Operating, Inc.; and it is further

**ORDERED,** that Defendants Communication Workers of America; Local 6171; Milburn; Kneupper; Bentley; Whittaker; Simmons; and James' Motion to dismiss (Dkt. No. 50) is **GRANTED** in its entirety and Plaintiffs' action is **DISMISSED** in its entirety as to these Defendants; and it is further

**ORDERED,** that Plaintiffs shall submit a proposed notice to Defendants for comment on the content and form of the notice within 30 days of this Decision and Order. The parties shall confer and submit to the Court a mutually agreed upon notice within 30 days thereafter; and it is further

**ORDERED,** that the Clerk of the Court shall serve a copies of this Decision and Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.
Eldred v. Comforce Corp.
Slip Copy, 2010 WL 812698 (N.D.N.Y.)

END OF DOCUMENT


Not Reported in F.Supp.2d, 2007 WL 2501698 (N.D.Cal.), 154 Lab.Cas. P 35,344, 12 Wage & Hour Cas.2d (BNA) 1770
**(Cite as: 2007 WL 2501698 (N.D.Cal.))**



United States District Court,
N.D. California.
Eiji KURIHARA, individually, and on behalf of all
others similarly situated, Plaintiff,
v.
BEST BUY CO., INC., Defendant.

No. C 06-01884 MHP.
Aug. 30, 2007.

Matthew Roland Bainer, Scott Edward Cole, Scott Cole & Associates, APC, Kevin Robert Allen, Oakland, CA, for Plaintiff.

Thomas Allen Miller, Hernaldo Jose Baltodano, Robins, Kaplan, Miller & Ciresi L.L.P., Los Angeles, CA, for Defendant.

### MEMORANDUM & ORDER
### Re: Motion for Class Certification

MARILYN HALL PATEL, United States District Court Judge.

**\*1** Plaintiff Eiji Kurihara ("plaintiff"), a former employee of defendant Best Buy Co., Inc. ("Best Buy" or "defendant") has brought a putative class action seeking unpaid wages, liquidated damages and other penalties, injunctive and other equitable relief, and attorneys' fees and costs. Plaintiff's complaint asserts causes of action pursuant to Sections 6 and 7 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. sections 206 and 207, California Code of Civil Procedure sections 382 and 1021.5, various provisions of the California Labor Code, and California Business & Professions Code section 17200. Plaintiff alleges that Best Buy subjects retail employees to inspections in order to prevent inventory loss without compensating these employees for the time spent undergoing these security checks. Plaintiff seeks certification of a class consisting of "All persons who are/were employed by Best Buy Co., Inc., in one or more of its California retail stores at any time between March 10, 2002 and the

present." Now before the court is plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23 as to plaintiff's state law claims. After considering the parties' arguments and submissions and for the reasons set forth below, the court rules as follows.

*BACKGROUND*

I. *Best Buy's Employee Inspection Policies*

Best Buy is one of the leading retailers of consumer electronics, home office products, entertainment software, appliances and related services. Cole Dec., Exh. B, Exh. I at 4. There are at least 742 Best Buy locations throughout the United States, including at least 80 in California. Cole Dec., Exh. D. Each store employs between 80 and 150 retail workers at any given time. Cole Dec., Exh. A, Buttlar Dep. at 27:11-23 (hereinafter "Buttlar Dep."); Cole Dec., Exh. E, Holznagel Dep. at 20:12-14 (hereinafter "Holznagel Dep."). Plaintiff alleges that all employees are subject to identical or nearly-identical policies and procedures related to employee inspections.

Plaintiff asserts that Best Buy maintains a highly standardized human resources and management structure. Best Buy's company-wide policies are developed at the company's headquarters in Minneapolis, Minnesota, and communicated down to the retail store level. Holznagel Dep. at 60:10-22. Among these communications are Best Buy's Standard Operating Procedures ("SOPs"), Cole Dec., Exhs. F-H, and its Employee Handbook, Cole Dec., Exhs. I & J. These documents are available electronically via computer terminals located throughout Best Buy stores, and are printable. Buttlar Dep. at 30:13-31:13, 33:16-34:3.

All Best Buy retail employees and in-store managers receive a copy of the Employee Handbook and must comply with all company policies and rules contained in the handbook. Buttlar Dep.

Not Reported in F.Supp.2d, 2007 WL 2501698 (N.D.Cal.), 154 Lab.Cas. P 35,344, 12 Wage & Hour Cas.2d (BNA) 1770
(Cite as: 2007 WL 2501698 (N.D.Cal.))

at 48:2-8; Cole Dec., Exh. J. Violations of the provisions in the handbook are grounds for discipline, including termination. Buttlar Dep. at 98:1-5; Holznagel Dep. at 61:2-14, 62:12-21. Plaintiff asserts that Best Buy employees do not know which violations may lead to discipline, or what type of discipline may follow any particular violation. Buttlar Dep. at 95:20-96:14, 98:1-99:10, 102:1-21; Holznagel Dep. at 78:11-18. However, plaintiff acknowledges that violation of Best Buy's policies related to attendance and punctuality is grounds for termination. Cole Dec., Exh. I at 32-33. According to plaintiff, this forces employees to arrive at work early so that the employee inspections will not cause them to fail to report to their work area on time.

*2 Additionally, the handbook states that helping to prevent "shrink," meaning the loss of inventory, cash or other company property, is the "responsibility of every employee." *Id.* at 30-31; Buttlar Dep. at 78:2-5; Holznagel Dep. at 75:3-8. Best Buy's methods of preventing theft, including employee inspections, are taught to Best Buy's retail managers through "ongoing employee training, specific policies and procedures and employee awards programs." Cole Dec., Exh. I at 30.

Best Buy's employee inspection policy is one of the company's "Standard Procedures." Cole Dec., Exh. F. The policy provides instructions for managers, who have the authority to conduct the inspections, as well as Loss Prevention Customer Specialists ("LPCS's"), who are posted at every location. Cole Dec., Exh. G; Buttlar Dep. at 65:2-19, 89:10-23, 91:12-18, 92:2-8; Holznagel Dep. at 75:18-25. Plaintiff claims that, because LPCS's are given a variety of security and customer service-related duties, employee inspections must wait until the LPCS's have finished any pending customer service-related duties. Cole Dec., Exh. F, Buttlar Dep. at 104:23-105:6. This, according to plaintiff, creates additional delay in the employee inspection process.

Plaintiff claims that these standards have cre-

ated a uniform employee inspection policy for Best Buy's California retail employees. Specifically, LPCS's are charged with performing "Inbound Employee Inspections" and "Outbound Employee Inspections" on "all employees entering and exiting the store," including employees leaving the store to take meal breaks. Buttlar Dep. at 112:10-16, Cole Dec., Exhs. F-H. Plaintiffs assert that there are no inconsistencies in the application of the various iterations of this policy. Buttlar Dep. at 94:6-21, 108:4-109:18. In support of this claim of consistency, plaintiff points to a number of sources. Plaintiff primarily relies on the black letter policies set forth in the Employee Handbook and SOPs. Additionally, Best Buy has an "anti-shrink culture," in which every employee has a responsibility to prevent employee theft and employees are given incentives to prevent shrink. Cole Dec., Exh. I at 31. Additionally, Best Buy's Director of Loss Prevention Field Support testified that Best Buy has never directed workers not to conduct employee inspections. Buttlar Dep. at 53:23-54:9, 102:14-21. Best Buy's policies also require that an LPCS or store manager be posted at the store entrance at all times. Cole Dec., Exh. G; Buttlar Dep. at 68-69. Finally, plaintiff asserts that Best Buy's incentives for employee assistance in loss prevention ensure that such policies are consistently applied. *Id.* at 56:5-12; Holznagel Dep. at 70:22-71:3.

II. *Evidence Related to Actual Employee Inspection Practices*

Contrary to plaintiff's assertions regarding the uniformity of employee inspections, defendants assert that variations among employee experiences preclude class certification. To begin with, the nature of the inspection depends in part on whether an employee is wearing a jacket or carrying a backpack, purse or other container. Additionally, although the guidelines state that inspections are to be performed on all employees entering and exiting the store, defendant has submitted declarations from several employees stating that they are not inspected when they enter the store. Opp. at 3 n. 4. Some outbound employees are only inspected when

carrying particular items. Boldin Dec. ¶ 5; Tisher Dec. ¶ 5. Furthermore, the nature of the inspection appears to vary depending on who is performing the inspection. Although the policies state that LPCS's are not to handle the contents inside employee containers, LPCS's sometimes do handle these contents. Lewis Dec. ¶ 5; Castellanoz Dec. ¶ 3. This, according to defendant, establishes that the written policies are not a reliable indicator of the realities concerning employee inspections, since the written policies themselves are not uniformly followed.

**\*3** Furthermore, defendant has submitted evidence indicating that the inspections vary widely in duration and frequency. Declarations from several LPCS's reveal a wide range of percentages of employees not inspected depending on each declarant, ranging from 25% not inspected to 75% not inspected. Opp. at 4 n. 10. Further, plaintiff acknowledged that his own experience was that outbound employees were only inspected at the store where he worked if they had jackets, sweaters, coats, backpacks, purses, bags or lunch boxes. Baltodano Dec., Exh. 1, Kurihara Dep. at 29:20-23, 50:15-21, 51:6-11, 53:13-15, 53:21-54:3 (hereinafter "Kurihara Dep.").

Defendant further claims that inspections fluctuate from day to day depending on whether the management at a particular store decides to focus on servicing customers rather than security. Two declarants have stated that, in the interest of prioritizing customer service, they would often spend only a few seconds inspecting employees. Norell Dec. ¶ 5; Santos Dec. ¶ 3. Defendant asserts that the need for LPCS's to service customers results in them waiving employees through uninspected rather than making them wait. Tisher Dec. ¶ 5.

Additionally, because inspection rates depend on apparel and whether employees are carrying particular items, the frequency of inspections varies based on weather and climate, and depends on how many employees carry the pertinent items. Further, apparently contrary to the written policies, there are times when the LPCS desk is left unattended and no

inspections take place at all. Buttlar Dep. at 68:23-69:3; Herrera Dec. ¶ 7. At some stores, meanwhile, inspections are so routine that most employees approach the LPCS desk ready for inspection, thereby decreasing the amount of time spent on each inspection. Brunner Dec. ¶ 6; Jimenez Dec. ¶ 6; Meyerhoff Dec. ¶ 5; Santos Dec. ¶ 3; Satterthwaite Dec. ¶ 5.

Defendant therefore asserts that it is impossible to determine whether, how frequently, and for what length of time any employee is subject to inspection without examining the employee's individual circumstances and considering a host of factors unique to each employee. Plaintiff has admitted that the duration of employee inspections depends on the circumstances, and that in some instances the inspection of his backpack took "no time" at all. Kurihara Dep. at 48:25-50:10, 52:5-10, 37:2-6. Plaintiff also acknowledged that the inspections took longer when performed by personnel other than an LPCS. *Id.* at 44:11-25.

Further, defendant claims that there is no evidence that employees are disciplined for refusing to submit to inspections. While plaintiff relies on the written policies, there is nothing specific in the policies that supports plaintiff's contention that the inspection policies are tied to an increased threat of discipline. Defendant also denies that uncertainty as to whether a particular violation warrants discipline necessarily leads employees to exercise caution with regard to all policies and procedures. Additionally, defendant asserts that if there were evidence of any employee having been disciplined for failing to submit to an inspection, the discipline would depend on the circumstances of each case. Holznagel Dep. at 61:15-62:2.

**\*4** Finally, defendant asserts that Best Buy prohibits "off-the-clock" work, and affords employees an opportunity to document missing or incorrect time-keeping. Holznagel Dec., Exhs. A-C. These "time-edit sheets" are available to all employees, and it is up to each individual employee to have these sheets signed by a manager. Kurihara Dep. at

Page 4

Not Reported in F.Supp.2d, 2007 WL 2501698 (N.D.Cal.), 154 Lab.Cas. P 35,344, 12 Wage & Hour Cas.2d (BNA) 1770
**(Cite as: 2007 WL 2501698 (N.D.Cal.))**

32:4-7, 88:7-18, 91:5-9.

In sum, defendant claims that, notwithstanding the clarity of its written policies regarding employee inspections, the implementation of those policies (or lack thereof) varies substantially among stores and employees and therefore class certification is not appropriate.

*LEGAL STANDARD*

I. *Motion for Class Certification*

A party seeking to certify a class must satisfy the four prerequisites enumerated in Rule 23(a), as well as at least one of the requirements of Rule 23(b). Under Rule 23(a), the party seeking class certification must establish: (1) that the class is so large that joinder of all members is impracticable (i.e., numerosity); (2) that there are one or more questions of law or fact common to the class (i.e., commonality); (3) that the named parties' claims are typical of the class (i.e., typicality); and (4) that the class representatives will fairly and adequately protect the interests of other members of the class (i.e., adequacy of representation). Fed.R.Civ.P. 23(a). In addition to satisfying these prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2) or (3). *See* Rule 23(b); *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Rule 23(b)(2) permits class actions for declaratory or injunctive relief where the party opposing the class "has acted or refused to act on grounds generally applicable to the class."

The party seeking class certification bears the burden of establishing that the requirements of Rules 23(a) and 23(b) have been met. *See Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1188 (9th Cir.2001); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992). However, in adjudicating a motion for class certification, the court accepts the allegations in the complaint as true so long as those allegations are sufficiently specific to permit an in-

formed assessment as to whether the requirements of Rule 23 have been satisfied. *See Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975). The merits of the class members' substantive claims are generally irrelevant to this inquiry. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 480 (9th Cir.1983). However, courts are "at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case," and a court may only certify a class after a "rigorous analysis" as to whether the requirements have been satisfied. *Hanon,* 976 F.2d at 509 (internal quotations omitted).

II. *Motion to Strike*

**\*5** Plaintiff has moved to strike defendant's expert declarations. Though a "rigorous examination" of 23(a) factors is required for class certification, *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), the district court is not to inquire into the merits of the suit during the certification process. *Eisen,* 417 U.S. at 177. An evidentiary hearing on class certification is not required, *Bouman v. Block,* 940 F.2d 1211, 1232 (9th Cir.1991), and the court should not weigh conflicting expert evidence. *See, e.g. Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 292-93 (2d Cir.1999). At this early stage, robust gatekeeping of expert evidence is not required; rather, the court must query only whether expert evidence is "useful in evaluating whether class certification requirements have been met." *Dukes v. Wal-Mart, Inc.,* 222 F.R.D. 189, 191 (N.D.Cal.2004) (Jenkins, J.). The requirements of relevance and reliability set forth in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), serve as useful guideposts but the court retains discretion in determining how to test reliability as well as which expert's testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). If "the basis of the expert opinion is ... so flawed that it

Not Reported in F.Supp.2d, 2007 WL 2501698 (N.D.Cal.), 154 Lab.Cas. P 35,344, 12 Wage & Hour Cas.2d (BNA) 1770
(Cite as: 2007 WL 2501698 (N.D.Cal.))

would be inadmissible as a matter of law[,]" then it should not be considered in determining whether the requirements for class certification have been met. *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 135 (2d Cir.2001).

### DISCUSSION

Plaintiff seeks certification of a class consisting of all persons who are/were employed by Best Buy Co., Inc. in one or more of its California retail stores at any time between March 10, 2002 and the present. The court notes that, in fact, plaintiff more particularly defined the class in his complaint as all such persons *who were subjected to uncompensated security checks.* Plaintiff seeks certification pursuant to Rules 23(b)(2) and 23(b)(3). Under either provision, plaintiff must first satisfy the requirements of Rule 23(a).

### I. *Rule 23(a) Requirements*

A party seeking class certification must establish that the numerosity, commonality, typicality and adequacy of representation requirements of Rule 23(a) have been met. The court addresses each of these requirements below. As a threshold matter, the party must also demonstrate that an ascertainable class exists.

### A. *Certainty*

Apart from the explicit requirements of Rule 23(a), "[a]n implied prerequisite to certification is that the class must be sufficiently definite." *Whiteway v. FedEx Kinko's Office & Print Servs., Inc.,* No. C 05-2320 SBA, 2006 WL 2642528, at *3 (N.D.Cal. Sep.14, 2006)* (Armstrong, J.). "A class definition should be 'precise, objective, and presently ascertainable,' " though "the class need not be 'so ascertainable that every potential member can be identified at the commencement of the action.' " *O'Connor v. Boeing N. Am., Inc.,* 184 F.R.D. 311, 319 (C.D.Cal.1998) (internal quotations omitted). Defendant asserts that plaintiff has failed to establish a sufficiently definite class to warrant class certification. Specifically, defendant claims that the class is overbroad in that it includes employees that have not been aggrieved under the

law. *See Simon v. Am. Tel. & Tel. Corp.,* No. CV 99-11641 RSWL, 2001 WL 34135273, at *3 (C.D.Cal. Jan.26, 2001)* (holding that class certification under Rules 23(b)(2) and 23(b) (3) was inappropriate because the proposed class definitions included persons who had not yet been aggrieved). When rejecting class certification based on overbreadth, however, the problem lies in the court's ability to ascertain the class, not whether the putative classmembers have been aggrieved. *See Mateo v. M/S Kiso,* 805 F.Supp. 761, 773 (N.D.Cal.1992) (Jensen, J.) (holding that a class defined by a "radically overbroad" class definition was "so broad as to be unascertainable, and, on that basis alone, un-certifiable"). Plaintiff's proposed class is defined as employees of a particular company within a definite time period. This class is sufficiently ascertainable.

### B. *Numerosity*

**\*6** Pursuant to Rule 23, the class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Plaintiff alleges that the purported class includes at least 16,000 individuals. Defendant does not directly attack the numerosity of the proposed class, except to argue that the class is insufficiently definite. Accordingly, plaintiff has satisfied the numerosity requirement.

### C. *Commonality*

To fulfill the commonality prerequisite of Rule 23(a)(2), plaintiff must establish that there are questions of law or fact common to the class as a whole. Rule 23(a)(2) does not mandate that each member of the class be identically situated, but only that there be substantial questions of law or fact common to all. *See Harris v. Palm Spring Alpine Estates, Inc.,* 329 F.2d 909, 914 (9th Cir.1964). Individual variation among plaintiffs does not defeat underlying legal commonality, because "the existence of shared legal issues with divergent factual predicates is sufficient" to satisfy Rule 23. *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998).

Plaintiff claims that this standard has been met

Not Reported in F.Supp.2d, 2007 WL 2501698 (N.D.Cal.), 154 Lab.Cas. P 35,344, 12 Wage & Hour Cas.2d (BNA) 1770
(Cite as: 2007 WL 2501698 (N.D.Cal.))

in that the common question of liability-whether Best Buy's employee inspection policy was unlawful and/or interfered with its employees' entitlement to meal and rest periods-is the "dominant issue" in the case. Additionally, plaintiff asserts that questions of damages, penalties, restitution and injunctive relief can be resolved on a class-wide basis. Defendant does not appear to specifically dispute the contention that common questions exist. Rather, defendant claims that individual questions predominate, a separate inquiry that the court addresses below. Accordingly, the existence of a formal, company-wide policy related to employee inspections that is allegedly applicable and applied to all employees is sufficient to raise common issues of law and fact.

D. *Typicality*

Under Rule 23(a)(3), the claims of the representative plaintiff must be typical of the claims of the class. To be considered typical for purposes of class certification, the named plaintiff need not have suffered an identical wrong. *See Hanlon,* 150 F.3d at 1020. Rather, the claims of the putative class must be "fairly encompassed by the named plaintiff's claims." *General Tel. Co.,* 457 U.S. at 156 (internal quotation omitted). In other words, plaintiff must "bridge [the] gap" between his own claims as an individual and "existence of a class of persons who have suffered the same injury as that individual," by demonstrating that the experience of being a Best Buy employee has more than a tenuous connection to being injured in a legally cognizable manner. *Id.* at 157-58. *See also Midpeninsula Citizens for Fair Housing v. ACCO Mgmt. Co.,* 168 F.R.D. 647, 648-49 (N.D.Cal.1996) (Whyte, J.) (denying class certification where class definition necessarily included persons with substantially different experiences from that of the named plaintiff).

\*7 Defendant points to a number of purported defects in plaintiff's proposed class definition that, according to defendant, renders the definition impermissibly overbroad. Because the definition includes *all* California employees of Best Buy, it necessarily includes "salaried-exempt" employees who would not be entitled to relief under the applicable labor laws. The definition additionally includes employees who have never been inspected at all, employees who have not been inspected during statutory breaks, employees who are not entitled to statutory breaks based on the number of hours worked, employees inspected for a non-compensable *de minimis* amount of time, and employees who have recovered their missing time through the means made available by Best Buy. Defendant cites data from its expert indicating that 50.3% of employees took lunch breaks of 32 minutes or more, and that 11.8% took 31 minutes. Ward Dec. ¶ 18 & Table 2. Defendant's expert also concluded that 53% of employees exited without being inspected, and that 22% experienced outbound inspections lasting less than ten seconds. *Id.* ¶ 25 & Table 3.

Defendant's evidentiary arguments regarding the actual experiences of Best Buy employees are best directed toward the Rule 23(b)(3) inquiry as to whether common questions predominate over individualized issues. For the purposes of the typicality requirement, it is sufficient that plaintiff, a former Best Buy employee, has asserted that all Best Buy employees are subject to the challenged practice and procedure. Accordingly, plaintiff has satisfied the typicality requirement.

E. *Adequacy*

Defendant does not address plaintiff's adequacy specifically, except to argue that the experiences of Best Buy employees are varied as a general matter. Accordingly, to the extent that the other class certification requirements are met, the court finds that plaintiff is an adequate representative.

II. *Rule 23(b)(2) Requirements*

In addition to meeting the conditions imposed by Rule 23(a), a party seeking certification of a class under Rule 23(b)(2) also bears the burden of establishing that "the party opposing the class has acted or refused to act on grounds generally applic-

Page 7

Not Reported in F.Supp.2d, 2007 WL 2501698 (N.D.Cal.), 154 Lab.Cas. P 35,344, 12 Wage & Hour Cas.2d (BNA) 1770
(Cite as: 2007 WL 2501698 (N.D.Cal.))

able to the class, thereby making" injunctive relief appropriate. Fed.R.Civ.P. 23(b)(2). Class actions certified under Rule 23(b)(2) are "not limited to actions requesting only injunctive or declaratory relief, but may include cases that also seek monetary damages" where the claim for injunctive relief is the primary claim. *Probe v. State Teachers' Ret. Sys.,* 780 F.2d 776, 780 (9th Cir.1986). Rule 23(b)(2) certification of a class seeking both injunctive relief and damages is proper only where the claim for injunctive relief is the predominant form of relief sought by the class. *See Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 450-51 (N.D.Cal.1994) (Henderson, J.). To determine whether the claim for injunctive relief predominates, the court must look to the language of Rule 23(b)(2) in light of the individual circumstances presented in the case as well as the intent of the plaintiff in bringing the suit. *See Molski v. Gleich,* 318 F.3d 937, 950 (9th Cir.2003).

**\*8** Plaintiff claims that the "long-standing future impact" of the injunctive relief sought overshadows the claim for monetary damages. In light of the applicable statute of limitations, the back pay claim would be limited to four years. Additionally, class certification under Rule 23(b)(2) is available in certain actions seeking punitive damages. *Barefield v. Chevron, U.S.A., Inc.,* No. C 86-2427 THE, 1988 WL 188433, at \*3 (N.D.Cal. Dec.6, 1988) (Henderson, J.).

In response, defendant claims that certification pursuant to Rule 23(b)(2) is inappropriate for two reasons. First, defendant claims that Best Buy prohibits "off the clock" work as a matter of policy, and therefore injunctive relief is unavailable altogether. This is an argument directed toward the merits of the action which has no place in the class certification inquiry. Second, defendant claims that, because plaintiff is a former employee, plaintiff's claim for injunctive relief is incidental to his claim for monetary damages.

In the employment context, courts routinely deny class certification under Rule 23(b)(2) where

the named plaintiff is a former employee and therefore will not benefit from the requested injunctive relief. *See, e.g., Jimenez v. Domino's Pizza, Inc.,* 238 F.R.D. 241, 250 (C.D.Cal.2006) (holding that claims for monetary relief predominated where plaintiffs were "former employees and thus an injunction as to Domino's behavior to current employees cannot be Plaintiffs' primary concern"); *Lanzarone v. Guardsmark Holdings, Inc.,* No. CV06-1136 RPLAX, 2006 WL 4393465, at \*3 (C.D.Cal.2006) (holding that "certification cannot be granted under Rule 23(b)(2) because Plaintiff, a former employee, lacks standing to pursue injunctive relief"); *Sepulveda v. Wal-Mart Stores, Inc.,* 237 F.R.D. 229, 245 (C.D.Cal.2006) (holding that certification under Rule 23(b)(2) was not available where approximately 1,200 out of roughly 2,750 class members, as well as the named plaintiff, were former employees who would "derive no benefit from the injunction"). Here, plaintiff is a former employee, and the proposed class definition explicitly envisions a certain proportion of former employees. Accordingly, the predominant claims in this action are monetary, and certification under Rule 23(b)(2) is not available.

III. *Rule 23(b)(3) Requirements*

Class certification pursuant to Rule 23(b)(3) requires the plaintiff to establish that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The court will address each of these two requirements separately.

A. *Predominance*

Plaintiff asserts that common factual issues outweigh individual issues, and that there are no individual legal issues whatsoever. To the extent that individual factual issues exist, plaintiff argues they are limited to questions of damages which may be addressed at trial through the use of trial management tools. Plaintiff has formulated a lengthy list of illustrative common factual and legal issues, many

Not Reported in F.Supp.2d, 2007 WL 2501698 (N.D.Cal.), 154 Lab.Cas. P 35,344, 12 Wage & Hour Cas.2d (BNA) 1770
(Cite as: 2007 WL 2501698 (N.D.Cal.))

of which focus on Best Buy's policies and practices rather than on the experiences of employees. Mot. at 19.

**\*9** Defendant asserts that individualized questions predominate in two respects. Defendant's principal argument is that individualized inquiries will be necessary to determine whether the time spent by each employee undergoing inspections was *de minimis* and therefore not compensable. Additionally, defendant claims that individual inquiries are required to determine whether employees who spent compensable amounts of time undergoing inspections recovered their due compensation by submitting time-edit sheets.

Where a plaintiff fails to "present sufficient evidence of a class-wide practice that gives rise to liability," class certification is unavailable. *Cornn v. United Parcel Serv.,* No. C03-2001 THE, 2005 WL 2072091, at *2 (N.D.Cal. Aug.26, 2005) (Henderson, J.). In the context of an unpaid compensation claim, plaintiff must establish that class-members worked compensable time, i.e., that the time at issue was not *de minimis.* In determining whether otherwise compensable time is *de minimis,* courts "consider (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Lindow v. United States,* 738 F.2d 1057, 1063 (9th Cir.1984). With regard to the third factor, "the uncertainty of how often employees performed the tasks and of how long a period was required for their performance are ... relevant" *Id.*

Plaintiff acknowledges the need to explore the issue of *de minimis* time but invites the court to focus instead on the average length of time taken up by an employee inspection as evidence of the class-wide practice. Furthermore, plaintiff suggests that *de miminis* time would be compensable so long as the time is spent "subject to the control of the employer." Plaintiff also disputes that the *de minimis* standard is still a viable legal doctrine in employment cases at all, an argument which plaintiff

claims will be fully developed at the summary judgment or trial stage of the litigation.

Reviewing the numerous cases that the parties have cited in their fierce battle of footnotes,[FN1] two key themes emerge. First, courts are comfortable with individualized inquires as to damages, but are decidedly less willing to certify classes where individualized inquiries are necessary to determine liability. *See, e.g., Jimenez,* 238 F.R.D. at 253 (certification inappropriate where "the variability goes to whether an individual class member has any claim at all" rather than "individual damage determinations based on the number of hours worked"); *Sepulveda,* 237 F.R.D. at 249 (where defendant was entitled to raise a particular fact-based defense as to each individual class member, "highly individualized" questions of proof predominated); *Whiteway,* 2006 WL 2642528 at *10 ("class certification is not defeated merely because individualized damage issues may remain"); *Wang v. Chinese Daily News, Inc.,* 231 F.R.D. 602, 613 (C.D.Cal.2005) ("the amount of damages is invariably an individual question and does not defeat class action treatment") (quoting *Blackie,* 524 F.2d at 905); *Gutierrez v. Kovacevich "5" Farms,* No. CIV-F-04-5515OWWDLB, 2004 WL 3745224, at *9 (E.D.Cal. Dec.2, 2004) ("courts routinely find Rule 23(b)(3)'s predominance requirement satisfied despite the need for individualized damage determinations when the fact of injury is common") (internal quotation omitted); *In re Paxil Litig.,* 212 F.R.D. 539, 551 (C.D.Cal.2003) (Rule 23(b)(3) certification inappropriate in products liability action where individualized issues predominated as to causation); *Rodriguez v. Gates,* No. CV99-13190GAF(AJWX), 2002 WL 1162675, at *11 (C.D.Cal. May 30, 2002) (common questions did not predominate where "there is no way to adjudicate the class members' claims on a classwide basis not because damages are individual to each case, but because liability and causation are"). However, the mere existence of individualized liability issues is not sufficient to warrant denial of class certification. *See Dunbar v. Albertson's, Inc.,*

Page 9

Not Reported in F.Supp.2d, 2007 WL 2501698 (N.D.Cal.), 154 Lab.Cas. P 35,344, 12 Wage & Hour Cas.2d (BNA) 1770
(Cite as: 2007 WL 2501698 (N.D.Cal.))

141 Cal.App.4th 1422, 1432, 47 Cal.Rptr.3d 83 (2006) (upholding denial of class certification where "the court's decision was not based on the mere presence of individual liability issues," but "on the *nature* of those issues as shown by defendant's evidence") (emphasis in original).

> FN1. In addition to a mountain of exemplary federal cases addressing the requirements of Rule 23 and California authorities discussing class certification in the employment context, the parties have inexplicably cited numerous federal cases which do not involve Rule 23 at all, as well as class action cases from state courts other than California's. While this court has enjoyed enriching itself as to the varying approaches employed by our neighboring states, the body of case law dealing with the well-constructed framework of Rule 23 is sufficiently robust that the court is comfortable ignoring much of this authority for the purposes of the instant controversy.

*10 Second, courts' discomfort with individualized liability issues is assuaged in large part where the plaintiff points to a specific company-wide policy or practice that allegedly gives rise to consistent liability. *See, e.g., Lanzarone,* 2006 WL 4393465 at *4 (certification inappropriate where "the direct evidence and declarations submitted compel the conclusion that Guardsmark has no policy that violates the law," and therefore "the bulk of the issues that are truly in dispute in this matter are inherently individualized"); *Sepulveda,* 237 F.R.D. at 247 ("broad employer policies can impact many workers at once and thus suggest a need for class treatment"); *Wang* 231 F.R.D. at 613 (common questions predominated where plaintiffs were "challenging Defendant's *policy* of classifying all reporters and account executives as 'exempt' ") (emphasis in original); *Sav-on Drug Stores, Inc. v. Superior Court,* 34 Cal.4th 319, 330, 17 Cal.Rptr.3d 906, 96 P.3d 194 (2004) (class certific-

ation appropriate where plaintiff alleged a uniform policy under standardized conditions). Again, however, a mere allegation of a company-wide policy does not compel class certification. *Dunbar,* 141 Cal.App.4th at 1427, 47 Cal.Rptr.3d 83 ("although the evidence of a standardized or uniform policy or practice can support class certification [,] it does not compel class certification").

Here, plaintiff has provided substantial evidence of the existence of a company-wide policy whereby employees are subject to inspections, and not compensated for the time spent on those inspections. This policy forms the bases of the alleged injuries at the center of this action. Although plaintiff has submitted little or no evidence as to the implementation of that policy, the detailed nature of the policy itself, and the reasonable inferences which can be drawn from them, constitute sufficient evidence to satisfy plaintiff's burden as to the predominance of common questions.

Defendant's efforts to undercut Best Buy's inspection policy by peeking at the merits are unpersuasive. First, defendant's "litigation-driven," selective sampling of employees and other data are insufficient to inject fatal uncertainty into the question of liability. *See Tierno v. Rite Aide Corp.,* No. C 05-02520 THE, 2006 WL 2535056, at *8 (N.D.Cal. Aug.31, 2006). Reviewing the employee declarations, there are striking similarities in the way they are worded. Indeed, the assertions are practically boilerplate. The court does not doubt that substantial legal and factual issues exist as to the nature and implementation of Best Buy's inspection policies and practices. The overarching question of whether this policy results in unlawful undercompensation, however, is common and predominant.

Furthermore, defendant's assertions regarding the failure of its employees to properly implement the company's standard policies do not convince the court that substantial variations exist. Where a plaintiff challenges a well-established company policy, a defendant cannot cite poor management to

Not Reported in F.Supp.2d, 2007 WL 2501698 (N.D.Cal.), 154 Lab.Cas. P 35,344, 12 Wage & Hour Cas.2d (BNA) 1770
(Cite as: 2007 WL 2501698 (N.D.Cal.))

defend against class certification.

**\*11** Finally, defendant's focus on its asserted *de minimis* defense is a matter of degree rather than kind. At the bottom of the multi-factor *de minimis* inquiry is the simple question of how many hours were worked. This is an issue that defendants would be forced to litigate individually regardless of whether common questions of liability predominated.

In sum, the individualized inquiries are directed principally toward damages rather than liability. Defendant's due process interests will be preserved by affording it an opportunity to defend the nature and legality of its company-wide policy, and through individualized analysis related to damages.

B. *Superiority*

The final prerequisite for certification of a class under Rule 23(b)(3) requires the plaintiff to show that a class action is superior to other methods available for the adjudication of the parties' dispute. "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996). In considering whether class action is superior, the court must focus on whether the interests of "efficiency and economy" would be advanced by class treatment. *Zinser,* 253 F.3d at 1189 (internal quotations omitted).

Plaintiff claims that a class action would be superior to the alternative means, i.e. over 16,000 individual actions. Defendant responds that a class action is not superior because, in light of the purported indefiniteness of the class, individualized determinations of liability would be necessary in any event. As discussed above, however, individual questions of liability do not predominate. As to the individualized issues of damages, courts have developed numerous efficient means to resolve such issues, including questionnaires, surveys, representative testimony, and other aggregate analysis. *See*

*Whiteway,* 2006 WL 2642528 at *10. The court finds that this type of approach is superior given the alleged existence of a company-wide policy, the size of the class, and the relatively small amount of each individual claim. *See Gutierrez,* 2004 WL 3745224 at *9.

In addition to the general superiority inquiry, the parties discuss the availability of alternative administrative remedies. Plaintiff further claims that a representative action under FLSA § 16(b) or wage claims through the Department of Labor Standards Enforcement are inferior to a class action in this context. With respect to DLSE actions, plaintiff further notes that such an action would impose a three-year statute of limitations rather than the four-year statute of limitations applicable in a civil action. Defendant counters that the statute of limitations issue is irrelevant, as the class must be limited to claims arising after August 24, 2004 as discussed below. Courts have come down on either side of this issue. *Compare Jimenez,* 238 F.R.D. at 253-54 (stating that a DLSE hearing "can be a quick procedure ... and does present a viable alternative" despite "disadvantages inherent" in the proceeding); *with Wang,* 231 F.R.D. at 614 (rejecting the claim that administrative hearings would be superior to class actions). The availability of administrative hearings for the relatively small amounts at issue on behalf of each individual class member does not dissuade this court from determining that a class action is superior overall to other forms of relief.

IV. *Class Period*

**\*12** Defendant asserts that, in the event the court grants plaintiff's motion for class certification, the class period should be limited to after August 24, 2004, the effective date of the settlement in a previous lawsuit against Best Buy involving breaks and wages. *McKinnon v. Best Buy,* Alameda County Case No. RG 03082294. Defendant asserts that the judgment entered by the Alameda Superior Court on May 8, 2006 is res judicata for the purposes of plaintiff's claims prior to August 24, 2004. Plaintiff does not appear to contest this assertion.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2501698 (N.D.Cal.), 154 Lab.Cas. P 35,344, 12 Wage & Hour Cas.2d (BNA) 1770
**(Cite as: 2007 WL 2501698 (N.D.Cal.))**

V. *Motion to Strike*

Since the expert declarations which plaintiff moves to strike have not been used to defeat class certification, the court finds it unnecessary to rule upon the motion and deems it moot..

*CONCLUSION*

For the foregoing reasons, plaintiff's motion for class certification is GRANTED IN PART and DENIED IN PART. Plaintiff's motion to certify pursuant to Rule 23(b)(2) is DENIED. Plaintiff's motion to certify pursuant to Rule 23(b)(3) is GRANTED. The class certified herein is defined as follows: **All persons who are/were employed by Best Buy Co., Inc., in one or more of its California retail stores at any time between August 25, 2004 and the present, and who were subjected to uncompensated security checks.**

IT IS SO ORDERED.

N.D.Cal.,2007.
Kurihara v. Best Buy Co., Inc.
Not Reported in F.Supp.2d, 2007 WL 2501698 (N.D.Cal.), 154 Lab.Cas. P 35,344, 12 Wage & Hour Cas.2d (BNA) 1770

END OF DOCUMENT


Not Reported in F.Supp.2d, 2006 WL 2642528 (N.D.Cal.), 153 Lab.Cas. P 35,194, 11 Wage & Hour Cas.2d (BNA) 1518
**(Cite as: 2006 WL 2642528 (N.D.Cal.))**



United States District Court,
N.D. California.
Stephen WHITEWAY, individually and on behalf
of all others similarly situated, Plaintiffs,
v.
FEDEX KINKO'S OFFICE AND PRINT SER-
VICES, INC., and Does 1 through 25, inclusive,
Defendants.

No. C 05-2320 SBA.
Sept. 14, 2006.

Matthew Roland Bainer, Scott Edward Cole, Clyde Hobbs Charlton, Scott Cole & Associates, APC, Oakland, CA, for Plaintiffs.

Jonathan M. Cohen, Krista M. Enns, Winston & Strawn LLP, San Francisco, CA, for Defendants.

**ORDER**

SAUNDRA BROWN ARMSTRONG, District Judge.

**\*1** This matter comes before the Court on Plaintiff's Motion for Class Certification [Docket No. 59]. The Court has considered the parties' filings and statements made at oral argument on this Motion, which was held on September 12, 2005.

**BACKGROUND**

Plaintiff Stephen Whiteway works as a Center Manager ("CM") for a California retail location of Defendant FedEx Kinko's Office and Print Services, Inc. On May 19, 2005, Plaintiff filed a complaint against FedEx Kinko's in the Superior Court of the State of California. Plaintiff alleged that Fed-Ex Kinko's improperly exempts CMs from certain employment benefits, particularly overtime compensation, by categorizing the group as "executive exempt." FN1 Compl. at ¶ 12. Plaintiff claims that Defendant's classification of CMs as executive exempt, and failure to investigate the propriety of that classification, violates California Labor Code §§

201, 202, 203, 218.5, 226, 226.7, 510, 512, 1174, 1194, 1198 and 1199; and California Business & Professions Code §§ 17200-17208. Plaintiff seeks injunctive relief, back pay, and punitive damages.

> FN1. The executive exemption is set out in California Labor Code section 515, which states:

> (a) The Industrial Welfare Commission may establish exemptions from the requirement that an overtime rate of compensation be paid pursuant to Sections 510 and 511 for executive, administrative, and professional employees, provided that the employee is primarily engaged in the duties that meet the test of the exemption, customarily and regularly exercises discretion and independent judgment in performing those duties, and earns a monthly salary equivalent to no less than two times the state minimum wage for full-time employment. The commission shall conduct a review of the duties that meet the test of the exemption. The commission may, based upon this review, convene a public hearing to adopt or modify regulations at that hearing pertaining to duties that meet the test of the exemption without convening wage boards....

> (e) For the purpose of this section, "primarily" means more than one-half of the employee's work time.

On June 8, 2005, Defendant removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1332. Defendant answered the complaint and filed a counterclaim for declaratory judgment on November 30, 2005.

On May 12, 2006, Plaintiff filed the instant Motion for Class Certification. The proposed class

Not Reported in F.Supp.2d, 2006 WL 2642528 (N.D.Cal.), 153 Lab.Cas. P 35,194, 11 Wage & Hour Cas.2d (BNA) 1518
**(Cite as: 2006 WL 2642528 (N.D.Cal.))**

consists of "all members who are/were employed as salaried Store Managers of Kinko's, and were classified thereby as overtime-exempt employees at any time between the commencement of the pay period including May 19, 2001 and the present." Compl. at ¶ 14.

## A. Facts

FedEx Kinko's operates about 200 Centers in California. The state is divided into two regions, Southern California and the West Area. These regions are further divided into districts, which are run by District Managers who report to the Regional Vice-President of the given region. The Southern California region has eight districts and the West Area region, which covers northern California, has six districts. Each district contains multiple centers or retail stores. The West Area region contains about eighty-eight centers and the Southern California region contains about 112-120 centers.

Each of these centers is run by a Center Manager. Each CM oversees an Assistant Manager (Retail) and Assistant Manager (Production). Along with overseeing these two hourly managers, some CMs also manage a Senior Customer Consultant and/or a Senior Technology Consultant. The Assistant Managers manage the 12 to 18 entry-level employees in these centers, which include Associate Retail Consultants, Retail Consultants, Couriers, Associate Production Operators, and Production Operators. Since 2003, FedEx Kinko's has trained CMs in Dallas, Texas. The training materials used in this eight week program are uniform for each center.

FedEx Kinko's has five different types of centers: (1) Hub Centers, (2) Spoke Centers, (3) Standalone Centers, (4) Ship Centers, and (5) Commercial Processing Centers ("CPCs").

*2 Hub Centers are 24-hour, full-service retail and commercial stores. Generally, Hubs are larger than Spokes in terms of sales volume, headcount, machine capacity and capabilities. Hub CMs are known as Senior Center Managers. They are "primarily responsible for managing the overall operations of branches within the assigned local branch network, including supervision of Branch Mangers (Spoke) ["Spoke CMs"] and the administration of branch sales performance and profitability objectives." Cole Decl., Ex G. at 31. Along with other duties, Hub CMs hire, promote, discipline, and discharge employees at their own Hub Center as well as at the Spoke Center.

Spoke Centers are connected with a Hub branch, which oversees the Spoke Center's operations. The Hub Center coordinates with the Spoke Center for overnight customer coverage. Spokes vary by size, revenue, and number of employees.

Standalone Centers are not connected to a Hub because of their geographic remoteness. They can have a structure that is similar to either a Hub or a Spoke in terms of the commercial/retail mix, revenue, and number of employees. Standalone are generally open 24 hours, but can close during certain hours based on customer traffic and needs. Standalone CMs are "primarily responsible for managing the overall branch operation, including supervision of team members and the administration of branch sales performance and profitability objectives." Cole Decl., Ex. G at 35. The Standalone CMs' job responsibilities are similar to those of Spoke CMs.

Ship Centers are primarily shipping facilities, and are are typically smaller than other centers. CPC Centers service other FedEx Kinko's Centers, rather than the general public. CPC centers are primarily responsible for large print jobs or print jobs needing a quick turnaround.

Hub, Spoke, and Standalone CMs are required to achieve the company's sales and profit objectives, supervise employees, hire employees, train employees, evaluate workers, recommend wage increases, recommend promotions, initiate disciplinary proceedings, terminate employees, maintain the Defendant's fiscal reporting procedures, supervise marketing initiatives, manage inventory, manage

Page 3

Not Reported in F.Supp.2d, 2006 WL 2642528 (N.D.Cal.), 153 Lab.Cas. P 35,194, 11 Wage & Hour Cas.2d (BNA) 1518
**(Cite as: 2006 WL 2642528 (N.D.Cal.))**

machinery, comply with Federal/State law safety requirements, and ensure subordinate employees are consistently applying Kinko's Policies and Procedures. Cole Decl. Ex G. at 31-35 (FedEx Kinko's Standard Roles & Job Descriptions: Implementation Guide February 2002). District Managers evaluate CMs' performance based on leadership skills and business results. Cole Decl., Ex. K (FedEx Kinko's Performance Appraisal for Center Managers).

### LEGAL STANDARD
**I. Class Certification**

Class certification is governed by Federal Rule of Civil Procedure 23, which sets forth a two-step procedure. First, the Court must determine that the following four requirements of Rule 23(a) have been satisfied: (1) numerosity; (2) common questions of law and fact; (3) typicality; and (4) fair and adequate representation. Fed.R.Civ.P. 23(a). Once these requirements are met, the plaintiff must also show that the lawsuit qualifies for class action status under one of the criteria found in Rule 23(b). See Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1186 (9th Cir.2001), amended and superceded on denial of rehearing by Zinser v. Accufix Research Institute, Inc., 273 F.3d 1266 (9th Cir.2001) (noting that Plaintiff "bears the burden of demonstrating that [he] has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)").

**\*3** Rule 23(b) requires that the plaintiff establish that either: (1) there is a risk of inconsistent adjudication, or adjudication of individual class member's claims would substantially impair non-party members' ability to protect their interests; (2) the defendant acted on grounds generally applicable to the class; or (3) common questions of law or fact predominate and class resolution is superior to other available methods. Fed.R.Civ.P. 23(b).

The plaintiff bears the burden of proving that certification is appropriate. See Hawkins v. Comparet-Cassani, 251 F.3d 1230, 1238 (9th Cir.2001). The Court maintains great discretion in certifying a

class action. Vizena v. Union Pac. R.R. Co., 360 F.3d 496, 502 (5th Cir.2004). The Court must rigorously analyze whether the class action allegations meet the requirements of Rule 23. See General Telephone Co. Of the Southwest v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). However, "[b]ecause the early resolution of the class certification question requires some degree of speculation ... all that is required is that the Court form a 'reasonable judgment' on each certification requirement." In re Citric Acid Antitrust Litig., 1996 WL 655791 *2 (N.D.Cal.1996). "In formulating this judgment, the Court may properly consider both the allegations of the class action complaint and the supplemental evidentiary submissions of the parties." Id. at * 2. The Court may also consider how the plaintiffs' claims will be tried. Castano v. Am. Tabacco Co., 84 F.3d 734, 744 (5th Cir.1996).

### ANALYSIS
**A. Class Period**

California CMs sued Defendant's predecessor Kinko's in California Superior Court on March 14, 2000, for failure to pay overtime to nonexempt employees who had been misclassified as exempt employees. See Sanders v. Kinko's, Case No. 00CC03304. Kinko's settled this case and certified the CMs as a class for settlement purposes only. Counterclaim at ¶ 14.[FN2] The parties agreed at oral argument that April 18, 2002, the effective date of the Sanders settlement, is the cut-off date for this class.

> FN2. The settlement class included: "All current and former employees of Defendant who worked in the position of [Center] Manager within the State of California between March 14, 1996 and the Effective Date (as defined in the Agreement)(the "Class Period")." The "Effective Date" was defined as "the date upon which the Judgement becomes Final." Counterclaim, Ex. B at 3. The Superior Court signed the Final Judgement and Order of Dismissal

Not Reported in F.Supp.2d, 2006 WL 2642528 (N.D.Cal.), 153 Lab.Cas. P 35,194, 11 Wage & Hour Cas.2d (BNA) 1518
(Cite as: 2006 WL 2642528 (N.D.Cal.))

on April 18, 2002. Defendants request that this Court take judicial notice of the *Sanders* settlement. That request is granted. Judicial notice may be taken of facts "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). The existence of the *Sanders* settlement is not disputed by the parties, and it is readily verifiable through examination of the court file in that case.

## I. Ascertainability

An implied prerequisite to certification is that the class must be sufficiently definite. *See DeBremaeker v. Short,* 433 F.2d 733, 734 (5th Cir.1970). An identifiable class exists if its members can be ascertained by reference to objective criteria. *See id.* at 734-35 (declining to certify a class made up of Texas residents "active in the peace movement" because identification of members was dependent on their subjective states of mind). *See also Lukovsky v. City and County of San Francisco,* 2006 WL 140574 at *2 (Jan. 17, 2006). The Court must be able to determine class members without having to answer numerous fact-intensive questions. *Daniels v. City of New York,* 198 F.R.D. 409, 414 (S.D.N.Y.2001).

Plaintiff plans to determine class membership by analyzing employee, payroll, and other records maintained by Defendant. Compl. at ¶ 23(a). This is a reasonable, objective method of ascertaining those individuals Defendant employed as CMs in a California retail location at any point between April 18, 2002 and the present. Accordingly, Plaintiff has satisfied the ascertainability requirement for class certification.

## II. Federal Rule 23(a) Requirements

### A. Numerosity

**\*4** Rule 23(a)'s first requirement is that the proposed class must be so numerous that joinder of all members is "impracticable." Fed.R.Civ.P. 23(a)(1). "Impracticable" does not mean "impossible," and a plaintiff only need establish the difficulty or inconvenience of joining all members of the class to meet the numerosity requirement. *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913-14 (9th Cir.1964). There is no set numerical cutoff; a court must examine the specific facts of each case to determine whether numerosity has been satisfied. *General Tel. Co.,* 446 U.S. at 329-30. Moreover, a plaintiff need not allege the precise number of class members, "but may instead [make a reasonable] estimate on the basis of the size of a disputed offering." *Brosious v. Children's Place Retail Stores,* 189 F.R.D. 138, 145 (D.N.J.1999).

Given the parameters of the proposed class, the parties agree that it will include several hundred individuals. This is sufficient to meet the numerosity requirement.[FN3]

> **FN3.** Although neither Rule 23(a) nor the courts have imposed an absolute "magic number," some courts have held that numerosity may be *presumed* at a level of forty members. *See, e.g., Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995). On the other hand, classes of fifteen or fewer people have frequently been rejected as too small for certification. *See, e.g., General Tel. Co. v. EEOC,* 446 U.S. 318, 329-30, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) (fifteen affected employees "would be too small to meet the numerosity requirement"); *Harik v. Cal. Teachers Ass'n,* 298 F.3d 863, 872 (9th Cir.2002) (certification of classes of seven, nine, and ten members vacated on numerosity grounds).

### B. Commonality

To prevail on his Motion for Class Certification, Plaintiff must establish that there are "questions of law or fact common to the class."

Not Reported in F.Supp.2d, 2006 WL 2642528 (N.D.Cal.), 153 Lab.Cas. P 35,194, 11 Wage & Hour Cas.2d (BNA) 1518
(Cite as: 2006 WL 2642528 (N.D.Cal.))

Fed.R.Civ.P. 23(a)(2). As the Ninth Circuit stated in *Hanlon v. Chrysler Corporation,* 150 F.3d 1011, 1019 (9th Cir.1998), the commonality requirements of Rule 23(a) are less rigorous than the companion requirements of Rule 23(b)(3). All questions of fact and law need not be common to satisfy the rule. *Id.* The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class. *Id.; see also Staton v. Boeing Co.,* 327 F.3d 938, 953 (9th Cir.2003) (" Rule 23(a)(2) has been construed permissively."). Factual variations or individual differences concerning damages, for example, will generally not defeat commonality. *See, e.g., Blackie v. Barrack,* 524 F.2d 891, 905 (9th Cir.1975) (noting that differences in individual damage calculations are insufficient to defeat commonality).

Plaintiff asserts that commonality is established because the central question in this case-whether CMs' duties and responsibilities qualify as executive exempt-will require the Court to determine what tasks CMs, as a group, perform and the amount of time they spend on non-exempt tasks. In essence, Plaintiff's argument is that because CMs have similar job descriptions, and Defendant applies the executive exemption to all CMs, the "minimal" showing necessary to establish commonality is met. *See Hanlon,* 150 F.3d at 1020. Further, Plaintiff identifies the following common questions of law:

i. whether defendant Kinko's violated IWC Wage Orders and/or Labor Code § 510 by failing to pay overtime compensation to Store Managers who worked in excess of forty hours per week and/or eight hours per day.

ii whether defendant Kinko's violated Business and Professions Code § 17200 by failing to pay overtime compensation to Store Managers who worked in excess of forty hours per week and/or eight hours per day.

**\*5** iii. whether defendant Kinko's violated Labor Code §§ 226.7 and/or 512 by failing to consist-

ently provide meal and rest periods to its Store Managers.

iv. whether defendant Kinko's violated Labor Code § 1174 by failing to keep accurate records of employees' hours of work.

v. whether defendant Kinko's violated Labor Code §§ 201-203 by failing to pay overtime wages due and owing at the time that certain Class Members' employment with Defendant terminated.

vi. whether defendant Kinko's violated Labor Code § 226 by failing to provide the semimonthly itemized statements to Class Members of total hours worked by each and all applicable hourly rates in effect during the pay period.

vii. whether Representative Plaintiff and the Class are entitled to "waiting time" penalties, pursuant to Labor Code § 203.

Compl. at ¶ 23.

The Court agrees that CMs share similar job duties and responsibilities regardless of center type. Even assuming there are some variations among the daily tasks performed by CMs, as Defendant alleges, the similarities create common questions as to whether CMs are properly classified as executive exempt.

Defendant contends that in light of *General Telephone Company v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), Plaintiff's reliance on uniform employment policies for all CMs does not satisfy commonality. In *Falcon,* the plaintiff alleged that he was discriminated against on the basis of race, and sought to certify a class composed of all Mexican-Americans employed by his employer. The Supreme Court overturned the lower's court's decision to certify the class, because there was no common question of law or fact. In the Court's view, "there is a wide gap between [ ] an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2006 WL 2642528 (N.D.Cal.), 153 Lab.Cas. P 35,194, 11 Wage & Hour Cas.2d (BNA) 1518
**(Cite as: 2006 WL 2642528 (N.D.Cal.))**

unsupported allegation that the company has a policy of discrimination." *Falcon,* 457 U.S. at 157. In order to find a common question, the Court would need to infer:

> (1) that this discriminatory treatment is typical of petitioner's promotion practices, (2) that petitioner's promotion practices are motivated by a policy of ethnic discrimination that pervades petitioner's Irving division, or (3) that this policy of ethnic discrimination is reflected in petitioner's other employment practices, such as hiring, in the same way it is manifested in the promotion practices.

*Falcon,* 457 U.S. at 157-158. The *Falcon* Court rejected claimant's "across-the-board" allegation that, as a member of a racial class, his personal experience with racial discrimination automatically evidenced company-wide discrimination. Plaintiff, however, does not ask the Court to infer that Defendants' allegedly illegal actions toward him translated into a company-wide policy of illegal action for those sharing common characteristics. Rather, Plaintiff directly challenges FedEx Kinko's undisputed company-wide policy of categorizing all CMs as exempt employees.

**\*6** Defendant insists that simply because CMs are subject to common policies does not mean that they have identical job duties. According to Defendant, commonality is destroyed by the fact that different CMs supervise different numbers of employees and have different business volume and mix depending on which type of center they work at. Defendant asserts that "[t]here is no single "CM" job."

As discussed, differences between Hub, Spoke, and Standalone CMs' job duties and responsibilities appear to be minimal, according to FedEx Kinko's own manual. Further, commonality is not defeated simply because CMs' job duties vary to some extent. In *Wang v. Chinese Daily News,* 231 F.R.D. 602, 605, 613 (C.D.Cal.2005), the court certified a class consisting of employees with various job descriptions, and held that

Defendant cannot, on the one hand, argue that all reporters and account executives are exempt from overtime wages and, on the other hand, argue that the Court must inquire into the job duties of each reporter and account executive in order to determine whether that individual is "exempt." Moreover, Defendant's argument ignores the fact that Plaintiffs are challenging Defendant's *policy* of classifying all reporters and account executives as "exempt."

Defendant further argues that commonality is defeated because some, but not all, CMs signed arbitration agreements. However, Defendant stated at oral argument that nearly all CMs signed arbitration agreements, and that the agreements are substantially similar. As such, commonality is not defeated by the arbitration agreements.

Plaintiff has met his burden of establishing commonality.

**C. Typicality**

The third requirement of Rule 23(a) is typicality. The typicality requirement focuses on the similarity between the lead plaintiff's legal theories and those of the people he or she purports to represent. *Lightbourn v. County of El Paso,* 118 F.3d 421, 426 (5th Cir.1998). As such, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon,* 457 U.S. at 158 n. 13. However, "[t]ypicality refers to the nature of the claim ... of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992).

Defendant presents several arguments in support of its position that Plaintiff's claims are not typical: (1) Whiteway did not follow the "2 Assistant Manager" policy and did not receive extensive training; (2) Whiteway was a CM at a Standalone Center; (3) Whiteway was a CM from November 2001 to the present and, as such, not a CM during the entire proposed class period; (4) Whiteway lacks standing for some of the claims.

Not Reported in F.Supp.2d, 2006 WL 2642528 (N.D.Cal.), 153 Lab.Cas. P 35,194, 11 Wage & Hour Cas.2d (BNA) 1518
(Cite as: 2006 WL 2642528 (N.D.Cal.))

Whiteway has been a CM in a California retail location of FedEx Kinko's since November 2001. Because the alleged injury is based on a misclassification of CMs as executive exempt, he has suffered the same injuries and has the same interests as other CMs that FedEx Kinko's classified as executive exempt at any point during the proposed class period. Thus, it is irrelevant whether he followed the "2 Assistant Manager" policy and did not receive extensive training, as long as his job duties were similar to those of other CMs. As discussed, the duties of Standalone CMs are substantially similar to those of other CMs, so Whiteway's position as a Standalone Center CM is also irrelevant. Whiteway does not have to have been a CM for the entire class period, as the class covers those individuals who were CMs at any time during the class period.

**\*7** This Court also rejects Defendant's argument that Plaintiff lacks standing to sue on behalf of former CMs. Defendant is correct that because Plaintiff is currently employed as a CM, he cannot recover under California Labor Code sections 201 to 203, which deal with an employer's "willful [failure] to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits." However, the fact that Plaintiff is ineligible for one of several damage remedies sought does not defeat the typicality requirement. A "representative's claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon,* 150 F.3d at 1020. Plaintiff and ex-CMs are eligible to recover under California Labor Code sections 510, 226, 226.7, and 512, as well as under California Business & Professions Code sections 17200-17208. Those statutes do not require that the employee terminate employment with the company. Further, Defendant's argument is based on a mischaracterization of the California Court of Appeals' decision in *Pfizer v. Superior Court,* 141 Cal.App.4th 290, 45 Cal.Rptr.3d 840 (2006). In *Pfizer,* the Court held that a plaintiff bringing a class

action for relief under the amended California Business & Professions Code section 17204 must have "suffered injury and lost money or property" as a result of the violation of the Unfair Competition Law in order to meet the statute's requirement of standing. *Id.* at 300. *Pfizer* did not hold that the named plaintiff in a class action suit must be able to recover under every statute alleged to have been violated by the defendant.

Further, this Court is bound to follow the Supreme Court's statement that, "to have standing to sue as a class representative it is essential that a plaintiff must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216 (1974). The Court declines to impose additional requirements. Whiteway and ex-CMs have suffered similar injuries if misclassified as executive exempt employees during the class period. They have a similar interest in recovering overtime pay and other damages. Accordingly, the Court finds that the typicality requirement is met.

**D. Adequacy of Representation**

The final requirement of Rule 23(a) is that Whiteway must be able to "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Adequacy of representation assures due process of law to all unnamed class members; if a person is to be conclusively bound by a judgment prosecuted by a representative, he must have received adequate representation. *Hansberry v. Lee,* 311 U.S. 32, 42-43, 61 S.Ct. 115, 85 L.Ed. 22 (1940). To establish adequacy of representation, Whiteway must show: (1) that his interests are common with, and not antagonistic to, the classes' interests; and (2) that he is "able to prosecute the action vigorously through qualified counsel." *Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir.1978).

**\*8** Plaintiff has established adequacy of representation. There is no evidence that Whiteway has any conflicts of interest with other CMs in the

Not Reported in F.Supp.2d, 2006 WL 2642528 (N.D.Cal.), 153 Lab.Cas. P 35,194, 11 Wage & Hour Cas.2d (BNA) 1518
(Cite as: 2006 WL 2642528 (N.D.Cal.))

class. Plaintiff's counsel has already investigated the claims of the class through depositions, discovery, and interviews. Thus, Plaintiff can adequately represent the interests of his fellow class members.

### III. Rule 23(b) Requirements

After satisfying the requirements of Rule 23(a), Whiteway must also show that at least one of the three requirements of Rule 23(b) is satisfied before the Court can certify the class. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614-15, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Plaintiff asserts that the Court could certify the class pursuant to any of the three requirements..

### A. Rule 23(b)(1)

Rule 23(b)(1) allows a court to certify a class when the party requesting certification meets the requirements of Rule 23(a) and either (A) if trying each case separately, would create a risk of "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class," or (B) adjudication of individual member's claims would substantially impair or impede non-party members' ability to protect their interests. Fed.R.Civ.P. 23(b)(1).

According to Plaintiff, the class should be certified under Rule 23(b)(1)(A), because there is a risk of inconsistent results if individual CMs' claims as to the validity of their exempt status are resolved separately. FedEx Kinko's has categorized CMs as a group as executive exempt, and a decision about such categorization would impact each individual CM. If the Court were to order Defendant to reclassify an individual as nonexempt, granting that CM overtime, meal breaks, and rest breaks, then that CM would be treated differently than her fellow CMs, and FedEx Kinko's would have incompatible standards of conduct toward each CM. Although there is some force to this argument, the Ninth Circuit has held, as noted by Defendant, that "[c]ertification under Rule 23(b)(1)(A) is ... not appropriate in an action for damages." *Zinser,* 253 F.3d at 1193. As discussed below, although

Plaintiff also seeks injunctive relief, this case is best characterized as primarily a suit for money damages. Thus, the Court declines to certify the class pursuant to Rule 23(b)(1)(A).

Plaintiff contends that Rule 23(b)(1)(B) also applies, because class members may pursue punitive damages, and there is a limited fund from which individual class members would be able to recover. Punitive damage awards for individual members could deplete the corporation's resources to the point where it could not satisfy judgments against it, and later plaintiffs would be unable to recover. Defendant contends that Plaintiff has not brought a claim for which the Court could award punitive damages. Plaintiff responds that the facts alleged in the Complaint show intentional violations of law, which give rise to a claim for punitive damages. Assuming arguendo that punitive damages are available, the *Zinser* court identified a test for determining whether the existence of a "limited fund" justifies certification under Rule 23(b)(1)(B):

**\*9** The Supreme Court has held that certain characteristics are "presumptively necessary, and not merely sufficient, to satisfy the limited fund rationale" *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 842, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). Thus, to satisfy Rule 23(b)(1)(B), a class action plaintiff must demonstrate that the case involves a " 'fund' with a definitely ascertained limit, all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution." *Id.* at 841.

*Zinser,* 253 F.3d at 1197. Plaintiff has not satisfied this test. He has identified no ascertainable limit on any potential fund for payment of damages, punitive or otherwise, aside from pointing out that there are due process limits on the size of punitive damage awards. In the absence of a more complete showing, the Court rejects Plaintiff's argument that the class should be certified under Rule 23(b)(1)(B) .

Not Reported in F.Supp.2d, 2006 WL 2642528 (N.D.Cal.), 153 Lab.Cas. P 35,194, 11 Wage & Hour Cas.2d (BNA) 1518
**(Cite as: 2006 WL 2642528 (N.D.Cal.))**

**B. Rule 23(b)(2)**

Rule 23(b)(2) allows a class action to be certified where Rule 23(a) is met and "the party opposing the class has acted or refused to act on grounds generally applicable to the class," making it appropriate to grant relief sought to the class as a whole. Fed.R.Civ.P. 23(b)(2). This subsection primarily applies to suits injunctive relief, but the Court can certify a class seeking money damages if "the claim for monetary damages [is] secondary to the primary claim for injunctive or declaratory relief." *Molski v. Gleich,* 318 F.3d 937, 947 (9th Cir.2003).

Plaintiff contends that this subsection applies, because many of the class members are current employees who would benefit from injunctive relief. Plaintiff has not shown that monetary relief is secondary to the injunctive relief sought. Thus, the Court will not certify the class under Rule 23(b)(2).

**C. Rule 23(b)(3)**

Under Rule 23(b)(3), the Court must find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3). The matters pertinent to a finding under Rule 23(b)(3) include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action. *Id.*

The objective behind the two requirements of Rule 23(b)(3) is the promotion of economy and efficiency in actions that primarily involve monetary damages. *See* Fed.R.Civ.P. 23(b)(3) advisory committee notes. When common issues predominate, true economy may be achieved through the class action device, as time, effort and expense can be saved as compared to individual suits, and the confusion over differing outcomes can be avoided. *Id.*

**\*10** The Court agrees with Plaintiff that common questions of law and fact predominate. "Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issues involved." *Romero v. Producers Dairy Foods, Inc.,* 235 F.R.D. 474, 489 (E.D.Cal.2006). The Court can more efficiently answer the question of whether Defendant's exemption of all CMs is correct through a class action than through case-by-case adjudication.

A recently-decided case, *Tierno v. Rite Aid Corp.,* No. 05-02520 (N.D. Cal Aug. 31, 2006), lends support to the Court's holding on Rule 23(b)(3). In *Tierno,* a group of Rite Aid store managers claimed that their classification as exempt employees violates California labor laws, and moved for class certification. Judge Henderson granted the motion under Rule 23(b)(3), holding that "significant aspects" of the case could be resolved on a class basis including "the actual requirements of the job, the realistic expectations of the employer, the proper classification of Store Manager tasks as exempt or non-exempt, and Rite Aid's state of mind, knowledge, historical actions, and policies with respect to its classification and treatment of Store Managers." *Id.* at 16. *Tierno* relied on *SavOn Drug Stores v. Superior Court,* 34 Cal.4th 319, 336, 17 Cal.Rptr.3d 906, 96 P.3d 194 (2004) (holding that common questions predominated in overtime case brought by chain store managers). This case presents very similar issues to *Tierno* and *Sav-On.*

Defendants argue that Plaintiff has not and cannot establish common questions of law or fact, and as such, no common questions of law or fact could predominate. That argument has been discussed and rejected. Next, Defendant contends the varying characteristics of the class would render the class unmanageable. Again, the class has similar characteristics except, perhaps, with respect to damages.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2642528 (N.D.Cal.), 153 Lab.Cas. P 35,194, 11 Wage & Hour Cas.2d (BNA) 1518
(Cite as: 2006 WL 2642528 (N.D.Cal.))

While Defendant argues that this Court should not certify this case as a class action because it may have to "conduct a particularized assessment of damages for each putative class member," class certification is not defeated merely because individualized damage issues may remain. *See Smilo v. South Western Bell Mobil Systems,* 323 F.3d 32, 40 (1 st Cir.2003) ("Where ... common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.").

Once liability issues have been determined, there are various methods available in a class action lawsuit that the Court may effectively use to resolve the damages issues. Plaintiff proposes dealing with liability and damages in separate stages, and calculating damages on a collective basis through questionnaires, surveys, exemplar plaintiffs, a Special Master or some other "innovative procedural tool." *See Tierno* at 18 (noting that "courts in overtime cases such as this may properly couple uniform findings on common issues regarding the proper classification of the position at issue with innovative procedural tools that can efficiently resolve individual questions regarding eligibility and damages," and identifying several such tools).

**\*11** A class action is superior to multiple individual lawsuits. The needless expenditure of additional time, effort and money that would be attendant to numerous individual suits is greatly reduced, and the potential for differing outcomes is avoided as well. *See Tierno* at 19.

Whiteway has satisfied the criteria of Rule 23(a) and Rule 23(b)(3). Class certification is appropriate.

### *CONCLUSION*

Plaintiff's Motion for Class Certification is GRANTED. The Court certifies the class of current and former FedEx Kinko's CMs who were classified as exempt employees at any time between April 18, 2002, and the present. Plaintiff's counsel is directed to publish notice of the class action in a newspaper of general circulation twice weekly for two weeks within forty-five days of the Court's Order.

IT IS SO ORDERED.

N.D.Cal.,2006.
Whiteway v. FedEx Kinko's Office and Print Services, Inc.
Not Reported in F.Supp.2d, 2006 WL 2642528 (N.D.Cal.), 153 Lab.Cas. P 35,194, 11 Wage & Hour Cas.2d (BNA) 1518

END OF DOCUMENT



Not Reported in F.Supp.2d, 2003 WL 23669376 (D.Or.)
**(Cite as: 2003 WL 23669376 (D.Or.))**

H

Only the Westlaw citation is currently available.

United States District Court,
D. Oregon.
In re: FARMERS INSURANCE EXCHANGE CLAIMS
REPRESENTATIVES' OVERTIME PAY LITIGA-
TION

No. MDL 1439.
May 19, 2003.

N. Robert Stoll, Timothy S. DeJong, Jennifer A. Sam-
mon,, Portland, OR, for Plaintiffs' Liaison Counsel.

ORDER AND FINDINGS CERTIFYING STATE LAW
CLASSES

JONES, J.

**\*1** This Document Relates to: All Actions

I. *INTRODUCTION*

Plaintiffs bring this Fair Labor Standards Act
("FLSA") collective action and state law class actions
under seven states' laws on behalf of personal lines in-
surance claims representatives ("CRs") employed by
defendant Farmers Insurance Exchange ("FIE"), al-
leging that FIE unlawfully classifies them as exempt
from federal and state overtime laws and refuses to pay
them overtime compensation as mandated by those
laws.<sup></sup>FN1 In September 2002, this Court conditionally
certified the FLSA claims in this action to proceed as a
collective action and permitted notice and an opportun-
ity to consent to join or "opt-in" this case for all of De-
fendant FIE's CRs across the country. Approximately
1170 current and former CRs timely opted in. Plaintiffs
now seek class certification of seven classes to assert
their overtime claims under the laws of Colorado,
Illinois, Michigan, Minnesota, New Mexico, Oregon,
and Washington for CRs who worked in each of those
states during certain periods.

> FN1. Plaintiffs also asserted two claims for re-
> lief under the Employee Retirement Income Se-
> curity Act ("ERISA") in the Fourth Amended

Complaint ("4AC"). In the First Claim for Re-
lief, plaintiffs alleged that FIE failed to main-
tain records adequate to determine plaintiffs'
rights under ERISA-governed employee benefit
plans. 4AC at ¶¶ 69-76. In the Second Claim
for Relief, plaintiffs alleged that Farmers
Group Inc. ("FGI"), the Plan Administrator of
the Farmers Group Inc. Profit Sharing Savings
Plan Trust and the Plan Administrator of the
Farmers Group Inc. Employees' Pension Plan
violated ERISA by failing to credit as hours of
service all hours that plaintiffs worked. 4AC at
¶¶ 69-76. Defendants moved to dismiss those
claims. Pursuant to the "Stipulation Regarding
Waiver of Right to Jury Trial Certification of
Class Action Claims, Dismissal of ERISA
Claims and Other Matters," approved by this
Court on April 18, 2003, Docket Nos. 422-423,
the ERISA claims of the named plaintiffs were
dismissed with prejudice, and FGI and both
Plan Administrators were dismissed with preju-
dice as defendants. Accordingly, certification
of those claims is not before the Court.

After Plaintiffs' class certification motion was fully
briefed, but before the hearing, the parties stipulated to
a bench trial before this Court of all overtime claims in
all the pending cases comprising this Multi-district Lit-
igation (MDL) action. *See In re: Carbon Dioxide In-
dust. Antitrust Lit.,* 229 F.3d 1321, 1326 (11th Cir.2000)
(holding that parties may consent to MDL court's reten-
tion or transfer of cases to itself for trial). The parties
also waived their right to a jury trial as to both liability
and damages. The parties also stipulated to class certi-
fication of the state overtime claims as defined herein
and that the FLSA claims could proceed to trial as a col-
lective action. The parties also have stipulated that the
proposed state classes and claims of the FLSA opt-in
plaintiffs do not include any claims for unpaid overtime
arising out of any periods of employment for CRs (1) in
any position other than as personal lines claims repres-
entative (FIE job codes CL52, CL03, CL65, CLA5,
CLA6 and CLA7 according to FIE); (2) during which

the CR's primary job assignment and duties were acting as a supervisor (temporary, acting or otherwise); and (3) during which the CR was assigned primary duties other than the adjustment, handling, or processing of claims. Defendant concedes that some of the class members worked more than the requisite number of hours in some work weeks to qualify for overtime, if they are found to be non-exempt employees. As a result, the primary issue at the liability phase trial will be whether FIE properly categorized its CRs as exempt administrative employees under the FLSA and the seven states' wage and hour laws and the applicability of any other defenses set forth in FIE's Fourth Amended Complaint.

Having carefully considered the facts and legal authorities submitted by the parties in their briefs, and in light of their stipulations and the facts and circumstances of this case, the Court hereby finds that the state law classes, as defined below, meet the requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3), and should be certified. To ensure that due process rights of all class members are fully protected and that potential class members are fully apprised of their rights and the effects of this action on their rights, the Court orders that Plaintiffs shall send via first class mail the attached approved notice to each individual class member who can be identified through reasonable effort. The Court finds that this notice is the best notice practicable under the circumstances and that it comports with Rule 23(c)(2)(A)-(C).

## II. JURISDICTION

**\*2** This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over opt-in Plaintiffs' FLSA claims. The Court has supplemental jurisdiction over opt-in Plaintiffs' state overtime claims pursuant to 28 U.S.C. § 1367, because the state overtime claims and the FLSA claims arise out of the same common nucleus of operative fact under the circumstances of this case. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Where "the same acts violate parallel federal and state laws, the common nucleus of operative facts is obvious and federal courts routinely exercise supplemental jurisdiction over the state law claims." *De Asencio v. Tyson,* 8 WH Cas.2d

(BNA) 190, 2002 U.S. Dist. LEXIS 13038 (E.D.Penn.2002), *quoting Lyon v. Whisman,* 45 F.3d 758, 761 (3d Cir.1995) (in FLSA case, exercising supplemental jurisdiction over pendent state law wage and hour claims of absent class members who did not join the FLSA collective action). Other courts have also exercised supplemental jurisdiction over FLSA collective action claims and state wage and hour law claims of plaintiffs who do not opt in to the FLSA collective action. *See, e.g., Scott v. Aetna Services, Inc.,* 210 F.R.D. 261 (D.Conn.2002) (exercising supplemental jurisdiction over state law overtime claims of non-opt-in plaintiffs in misclassification case); *Ansoumana v. Gristede's Operating Corp.,* 201 F.R.D. 81 (S.D.N.Y.2001) ("The federal FLSA claim confers supplemental jurisdiction over the [state] Minimum Wage Act claim").

Here, the FLSA claims of 1170 opt-in plaintiffs and the pendent state law claims arise out of a common nucleus of fact and substantially similar state and federal laws. Hence, the exercise of supplemental jurisdiction over the state law claims of opt-ins and non-opt-ins is proper under the circumstances in this case. *See Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163, 1173-74 (9th Cir.2002) (holding that adding pendant-party defendant is authorized by the supplemental jurisdiction statute where the claim against the pendant-party defendant forms part of the same case or controversy under Article III).

## III. CERTIFICATION OF THE STATE LAW CLASSES IS APPROPRIATE PURSUANT TO RULE 23

### A. The Standard for Class Certification.

The party seeking class certification must show that the proposed class satisfies each of the four mandatory requirements set forth in Rule 23(a) and at least one of the categories enumerated in Rule 23(b). *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613-14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

While "it may be necessary for the court to probe behind the pleadings before coming to rest on the certi-

fication question," *General Tel.,* 457 U.S. at 160, the court has no "authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Nonetheless, once the moving party has submitted her arguments, the trial court must conduct a "rigorous analysis" to determine whether she has met her burden. *Amchem,* 521 U.S. at 613-14.

**\*3** The decision whether to certify a class is committed to the district court's discretion. *Six (6) Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1304 (9th Cir.1990). In light of the circumstances of this case, including the fact that the parties have waived their right to a jury trial for purposes of liability and damages, and after conducting a rigorous analysis, this Court finds that all requirements of Rule 23(a) are met and that certification of the state law classes is appropriate under Rule 23(b)(3). This Court is mindful that it must continue to assess the ability of this case to proceed as a class action at all stages of the litigation and will continue to do so. *See* Rule 23(d).

B. *The State Law Classes Are So Numerous That Joinder Of All Members Is Impracticable.*

Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all class members is impracticable. The numerosity question "depends on the particular facts of each case and no arbitrary rules regarding the size of the classes have been established by the courts." Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1762. Here, the state wage classes are each large enough to make joinder impracticable. There are well over one hundred CRs in each proposed state class, and the majority of state classes exceed three hundred CRs.

C. *There Are Questions Of Law And Fact Common To The Classes.*

Under Rule 23(a)(2), Plaintiffs must show one or more questions of law or fact common to the class. As stated by the Ninth Circuit, Plaintiffs may satisfy the commonality requirement by demonstrating either a single common legal issue with divergent factual predicates or a common nucleus of facts with divergent

legal remedies:

All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998); *see also Staton v. Boeing,* 2002 WL 316656586 --- F.3d ---- (9th Cir.2002).

In this case, upon the evidence submitted to date, the requirement of a common question of law or fact is met. All class members share common questions of law and/or fact, including:

• Whether CRs are non-exempt employees under the overtime laws of the respective states;

• Whether FIE's policy and practice of classifying as exempt from overtime and FIE's policy and practice of failing to pay overtime to CRs violates applicable provisions of state law;

• Whether FIE's conduct was willful for purposes of determining whether FIE is liable for waiting time penalties and/or other remedies under the applicable laws of certain states;

• Whether FIE has a good faith defense to liability and/or the imposition of liquidated damages.

D. *The Claims Of The Representative Plaintiffs Are Typical Of The Claims Of The Classes.*

**\*4** The "claims ... of the representative parties [must be] typical of the claims ... of the class." Fed.R.Civ.P. 23(a)(3). The typicality requirement generally focuses on the similarity between the legal theories of the proposed class representatives and the legal theories of class members whom they seek to represent. *Staton,* 2002 WL 31656586 at 13; *Hanlon,* 150 F.3d at 1020.

Under the rule's standards, representative claims are "typical" if they are reasonably coextensive with those of absent class members; they need not be identical.

*Hanlon,* 150 F.3d at 1020. The test for typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992) (citations omitted); *accord, Freedman,* 922 F.Supp. at 399.

In this case, the claims of the representative plaintiffs are typical of the claims of the state classes they represent, because they all arise out of FIE's uniform policy of classifying CRs as exempt and not paying CRs overtime compensation for overtime hours worked. Similarly, all Plaintiffs' claims are based on the same legal theory: that they are not exempt from the overtime pay requirements of their respective states' law. Finally, the representative plaintiffs allege that they have suffered typical injuries because neither they nor class members have been compensated for any overtime hours worked. Further, the parties have stipulated that the claims of the proposed state classes do not include claims for unpaid overtime arising out of any periods of employment for CRs (1) in any position other than that of personal lines claim representative (FIE job codes CL52, CL03, CL65, CLA5, CLA6, and CLA7 according to FIE's representation that all of the personal lines claims representatives were included in such FIE job codes); (2) during which CRs primary job assignments and duties were acting in a supervisory (temporary acting or otherwise); or (3) during which the CR was assigned primary duties other than adjustment, handling, or processing of claims.

E. *The Representative Plaintiffs And Their Counsel Will Fairly And Adequately Protect The Interests Of The Classes.*

The fourth and final requirement of Rule 23(a) is that a proposed class representative must be able to "fairly and adequately protect the interests of the class." Rule 23(a)(4)'s adequacy requirement involves the satisfaction of two factors: "(1) that the representative party's attorney be qualified, experienced and generally able to conduct the litigation; and (2) that the suit not be collusive and plaintiff's interests not be antagonistic to

those of the remainder of the class." *Freedman,* 922 F.Supp. at 399 (citations omitted); *Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152, 1162 (9th Cir.2001); *Hanlon,* 150 F.3d at 1020. Both elements of the test are satisfied here.

**\*5** First, the class representatives have retained counsel who are qualified and experienced in the issues raised in this litigation. Lead counsel Steven G. Zieff prosecuted a similar class action lawsuit against FIE under the state law of California. All other members of the Steering Committee have extensive experience litigating complex class action and state and federal overtime or ERISA claims.

The second element of this test is satisfied as well. There is no suggestion of any collusion in this case and nothing to indicate that any individual plaintiff has any interest antagonistic to the interests of the state law classes. Rather, the interests of the representative plaintiffs are coextensive with those of the class members. The representative plaintiffs and class members share a common interest in challenging FIE's actions in classifying CRs as exempt from overtime laws.

F. *Certification Of The State Law Overtime Classes Is Proper Under Rule 23(b)(3).*

The Court finds that certification of the state law classes is appropriate under Rule 23(b)(3). Certification of a class under Rule 23(b)(3) is appropriate where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and ... a class action is superior to other available methods" to resolve the case.

1. *Common Questions Predominate.*

"The first requirement of Rule 23(b)(3) is predominance of common questions over individual ones." *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996). The predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy." *Amchem,* 521 U.S. at 623. "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy."

*Valentino,* 97 F.3d at 1234.

The question posed by the predominance inquiry is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon,* 150 F.3d at 1022. "The common questions need not be dispositive of the entire action. In other words, 'predominate' should not be automatically equated with 'determinative' or 'significant.' " *Wright, Miller & Kane, Civil 2d,* § 1778 at 528-29. Likewise, differences in how damages are calculated with regard to what wages were lost by class members, or some "potential difficulty in proof" regarding damages, does not defeat predominance. *Las Vegas Sands,* 244 F.3d at 1163.

Here, the Court finds that common factual and legal questions predominate. The crux of this case is whether FIE's CRs are exempt administrative employees under the FLSA and/or the corresponding state overtime laws of the seven states at issue in this case. In order to prove that Plaintiffs are exempt as administrative employees under federal law, FIE must meet the federal administrative "short test." At issue under that test is: (1) whether CRs are paid on a "salary basis;" (2) whether CRs' primary duty consists of performing office work or non-manual work directly related to management policies or the general business operations of the employer or his employer's customers; and (3) whether CRs' duties require the exercise of discretion and independent judgment. 29 C.F.R. § 541.2.

**\*6** The administrative exemption test under the laws of the seven states at issue in this case (Colorado, Illinois, Michigan, Minnesota, New Mexico, Oregon, and Washington) is substantially similar to (if not identical to in some instances) the federal test. See Labor Standards Booklet for Employers Supervisors and Human Resources Personnel (Colorado Department of Labor 2001) (federal and Colorado state law follow the same exemptions); 820 Ill. Comp. Stat. § 105/4a(2)(E) (Illinois law does not apply to administrative employees "as defined or covered by the federal Fair Labor Standards Act of 1938, as now or hereafter amended"); *Condo v. Sysco Corporation,* 1 F.3d 599, n. 3 (7th Cir.1993), cert. denied 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994) (exemptions same under

FLSA and Illinois state law); *Carpenter v. Werth Laundry, Inc.,* 1999 WL 33441201, \*3 (Mich.App. June 18, 1999) ("Michigan law obviously parallels the federal law" with respect to the administrative exemption); *Becker v. F & H Restaurant Group, Inc.,* 413 N.W.2d 202, 205 (Minn.App.1987) (referring to "similar provisions of analogous federal law" in describing the Minnesota administrative exemption); *Rowe v. Laidlaw Transportation,* 2000 WL 33374985 (D.Or. Jan.28, 2000) (Oregon administrative exemption follows the FLSA's "long test"); *Valentine v. Bank of Albuquerque,* 697 P.2d 489, 490, 102 N.M. 489 (N.M.Sup.Ct.1985) (noting that the administrative exemption test is undefined by New Mexico law but looking to FLSA for guidance); Wash. Admin. Code § 296-128-520 (Washington regulations defining the administrative exemption mirror federal regulations). Thus, to determine whether FIE has properly classified its CRs as exempt from state overtime requirements, the Court as the trier of fact must look at the same basic facts.

This Court already has preliminarily found that Plaintiffs could proceed on a collective action basis with respect to their FLSA claims because CRs are "similarly situated" with respect to the facts necessary to determine their exempt or non-exempt status. The evidence shows that all class members are subject to the same payroll practices at FIE and generally have similar job duties. Because all issues of liability can be determined for all class members at once, this case satisfies the predominance requirement for each of the seven state law classes.

2. *A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of This Controversy.*

The class action device is also the superior method for resolving Plaintiffs' claims in this MDL action. This case provides a single forum to protect the rights of class members in seven states. The class litigation will remain manageable, in large part, due to the stipulations of the parties. Not certifying the state law class actions in the circumstances of this case would be inefficient, could lead to conflicting legal and factual findings by a panoply of juries, and might result in harm to the in-

terests of the class members.

**\*7** As the Ninth Circuit has stated, "[t]he superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case. This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon,* 150 F.3d at 1023. In general, class actions have been found superior where there is a large volume of individual claims and there would be a great strain on judicial resources if individual claims were separately adjudicated. *See Las Vegas Sands,* 244 F.3d at 1163; *Hanlon,* 150 F.3d at 1023. Those factors indicate that a class action would be superior here. First, there would have to be thousands of actions in order to cover the CRs who would be encompassed in each state overtime class. Second, there would be a great strain on judicial resources if thousands of claims were adjudicated individually, especially given the identical issues in this case.

A class action will be manageable in this case because of the stipulations of the parties and the procedural posture of this MDL action. As indicated above, common factual issues predominate. Further, as noted above, each state class presents identical or substantially similar issues of law such that a small group of legal issues predominate.

Finally, the existence of state court class actions asserting similar claims against FIE in Colorado, Michigan, Minnesota, New Mexico, and Washington does not defeat the superiority requirement. First, the existence of the state court class actions does not preclude this Court from certifying a class encompassing plaintiffs in those states. *See Hanlon,* 150 F.3d at 1023-25 (9th Cir.1998) (district court properly certified nationwide class for settlement purposes and enjoined pending state court class action); *In re Lease Oil Antitrust Litigation,* 186 F.R.D. 403, 438-440 (S.D.Tex.1999) (district court certified class for settlement purposes despite pendency of certified state court class). Instead, where there are two class action lawsuits, individual class members should be able to decide for themselves to which of the two classes they wish to

belong. *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 412 (2d Cir.1975). Second, all claims concerning FIE's classification of its CRs representatives as exempt from overtime-including relevant state law claims-are already before this Court because approximately 1170 FLSA opt-in claimants have asserted federal claims and likely will wish to assert their state law claims here as well. Considering the very same state law claims raised by the FLSA opt-in plaintiffs for absent class members makes sense in the circumstances of this case. Moreover, the present case will resolve all pending overtime issues with respect to FIE's CRs under the FLSA and the state overtime laws of seven states, whereas the state court class actions do not include FLSA claims. Indeed, if the state law classes are not certified, there is a risk of inconsistent decisions and judgments. Finally, it appears that this case can be resolved before any of the state court cases. The parties have stipulated to a trial to the Court in September 2003 to determine whether the CRs are entitled to overtime or are *bona fide* exempt employees under the FLSA and/or under the laws of the seven states at issue here. The Colorado trial is set for early 2004; and the Minnesota, and Washington trials are set for December 2003. No trial date is set in New Mexico. No class has yet been certified in Michigan. It will best serve judicial economy for one trier of fact to decide once and for all, under the FLSA and the state overtime laws, whether or not FIE has properly classified its CRs as exempt from overtime requirements.

IV. *CONCLUSION*

**\*8** Pursuant to the stipulation of the parties, and this Court's independent, rigorous examination of the Fed. R. Civ. Proc. 23 prerequisites, the Court concludes that Plaintiffs have satisfied the requirements for class certification of the state overtime claims. Accordingly, the Court ORDERS as follows:

1. Pursuant to Rule 23(a) and 23(b)(3), the following opt-out state overtime classes are certified for purposes of litigation and trial:

*Colorado Class*

All personal lines Claims Representatives, Senior Claims Representatives, and/or Special Claims Repres-

entatives (job codes CL52, CL03, CL65, CLA5, CLA6 and CLA7) employed by FIE in the state of Colorado at any time since August 29, 1998 whom FIE did not compensate for work performed in excess of 40 hours per week, or 12 hours per day.

*Illinois Class*

All personal lines Claims Representatives, Senior Claims Representatives, and/or Special Claims Representatives (job codes CL52, CL03, CL65, CLA5, CLA6 and CLA7) employed by FIE in the state of Illinois at any time since December 18, 1999 whom FIE did not compensate for work performed in excess of 40 hours per week.

*Michigan Class*

All personal lines Claims Representatives, Senior Claims Representatives, and/or Special Claims Representatives (job codes CL52, CL03, CL65, CLA5, CLA6 and CLA7) employed by FIE in the state of Michigan at any time since October 22, 1998 whom FIE did not compensate for overtime work performed in excess of 40 hours per week.

*Minnesota Class*

All personal lines Claims Representatives, Senior Claims Representatives, and/or Special Claims Representatives (job codes CL52, CL03, CL65, CLA5, CLA6 and CLA7) employed by FIE in the state of Minnesota at any time since October 3, 1998 whom FIE did not compensate for work performed in excess of 48 hours per week.

*New Mexico Class*

All personal lines Claims Representatives, Senior Claims Representatives, and/or Special Claims Representatives (job codes CL52, CL03, CL65, CLA5, CLA6 and CLA7) employed by FIE in the state of New Mexico at any time since September 17, 2000 whom FIE did not compensate for work performed in excess of 40 hours per week.

*Oregon Class*

All personal lines Claims Representatives, Senior Claims Representatives, and/or Special Claims Representatives (job codes CL52, CL03, CL65, CLA5, CLA6

and CLA7) employed by FIE in the state of Oregon at any time since July 19, 1999 whom FIE did not compensate for work performed in excess of 40 hours per week.

*Washington Class*

All personal lines Claims Representatives, Senior Claims Representatives, and/or Special Claims Representatives (job codes CL52, CL03, CL65, CLA5, CLA6 and CLA7) employed by FIE in the state of Washington at any time since August 3, 1998 whom FIE did not compensate for work performed in excess of 40 hours per week.

The claims of the aforementioned state classes do not include any claims for unpaid overtime arising out of any periods of employment (1) in any position other than as personal lines claims representative (job codes CL52, CL03, CL65, CLA5, CLA6 and CLA7); (2) during which the claims representative's primary job assignment and duties were acting as a supervisor (temporary, acting or otherwise); (3) during which the claims representative was assigned primary duties other than the adjustment, handling, or processing of claims; (4) within the State of California, and/or (5) that were the subject of *Bell v. Farmers Insurance Exchange,* Case No. 774013-0, in Alameda County Superior Court.

**\*9** The certification of the above classes does not preclude FIE from asserting any statute of limitations defense. For example, if this Court finds that FIE did not act willfully, then the statute of limitations may be shorter for certain state law claims. By stipulating to the above class definitions, FIE does not waive any argument relating to its statute of limitation defenses, including that the statute of limitations for each class may be shorter than defined herein and/or that certain class members' claims may be time-barred.

2. Plaintiff Michael Snyder is designated and appointed as representative of the Colorado Class.

3. Plaintiff Heather Tan is designated and appointed as representative of the Illinois Class.

4. Plaintiff Mike Sterner is designated and appoin-

Not Reported in F.Supp.2d, 2003 WL 23669376 (D.Or.)
**(Cite as: 2003 WL 23669376 (D.Or.))**

ted as representative of the Michigan Class.

5. Plaintiff Dave Miller is designated and appointed as representative of the Minnesota Class.

6. Plaintiff John Masterson is designated and appointed as representative of the New Mexico Class.

7. Plaintiffs Darwin Hemmingson and Deborah A. Wilson are designated and appointed as representatives

of the Oregon Class.

8. Plaintiff Jesse E. Corralez is designated and appointed as representative of the Washington Class.

9. The following law firms are designated and appointed as Plaintiffs' Class Counsel:

Steven G. Zieff, CSB No. 84222

Kenneth J. Sugarman, CSB No. 195059

RUDY, EXELROD & ZIEFF, LLP

351 California Street, Suite 700

San Francisco, California 94104

Telephone: (415) 434-9800

Facsimile: (415) 434-0513

E-Mail: sgz@reztlaw.com

Plaintiffs' Lead Counsel

N. Robert Stoll, OSB No. 69165

Timothy S. DeJong, OSB No. 94066

Jennifer A. Sammon, OSB No. 02447

STOLL STOLL BERNE LOKTING & SCHLACHTER P.C.

209 S.W. Oak Street, Fifth Floor

Portland, Oregon 97204

Telephone: (503) 227-1600

Facsimile: (503) 227-6840

E-Mail: rstoll@ssbls.com

Plaintiffs' Liaison Counsel

James M. Finberg, CSB No. 114850

Eve H. Cervantez, CSB No. 164709

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

Embarcadero Center West

275 Battery Street, 30th Floor

San Francisco, California 94111-3339

Telephone: (415) 956-1000

Facsimile: (415) 956-1008

E-Mail: jfinberg@lchb.com

Jeffrey Lewis, CSB No. 665587

Todd Jackson, CSB No. 202598

LEWIS & FEINBERG, PC

436-14th Street, Suite 1505

Oakland, California 94612-2703

Telephone: (510) 839-6824

Facsimile: (510) 839-7839

E-Mail: jlewis@lewisfeinberg.com

10. Class Counsel will send the Notice, in the form appended as Exhibit 1 hereto, at Plaintiffs' expense, via first class U.S. mail to the last known address of all claims representatives identified by Defendants as falling into one of the classes defined above. Within 10 business days of entry of this Order, FIE shall provide to Class-Counsel, in computer-readable form, the names and current addresses of the members of the state classes. Notice shall be mailed by Class Counsel within 20 days from the date of this Order.

**\*10** IT IS SO ORDERED.

D.Or.,2003.
In re Farmers Ins. Exchange Claims Representatives' Overtime Pay Litigation
Not Reported in F.Supp.2d, 2003 WL 23669376 (D.Or.)

END OF DOCUMENT



H
Only the Westlaw citation is currently available.

United States District Court,
D. Oregon.
Carolyn THIEBES and Betty Alderson, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
WAL-MART STORES, INC., a Delaware Corporation, Defendant.

No. Civ. 98-802-KI.
July 26, 2004.

Sean Donahue, Donahue & Associates, Portland, Oregon, James M. Piotrowski, Nevin, Herzfeld & Benjamin, Boise, ID, William Rutzick, Rebecca J. Roe, Schroeter, Goldmark and Bender, Seattle, Washington, for Plaintiffs.

David G. Hosenpud, Rudy A. Englund, Leah C. Lively, Lane Powell Spears Lubersky, LLP, Portland, Oregon, Gregory S. Muzingo, Wal-Mart Stores, Inc., Bentonville, Arkansas, for Defendant.

OPINION

KING, J.

***1** This case arises out of plaintiffs' employment with defendant Wal-Mart Stores, Inc. ("Wal-Mart"). Before the court are defendant's Renewed Motion for Judgment as a Matter of Law (# 756) and plaintiffs' Motion Regarding Penalties and Interest for 74 of the 82 Plaintiffs Whom the Jury Found to Have Worked Off-The-Clock (# 746). For the following reasons, I deny defendant's motion and I grant plaintiffs' motion in part.

FACTUAL AND PROCEDURAL BACKGROUND

Carolyn Thiebes and Betty Alderson brought this action on behalf of themselves and other current and former hourly Wal-Mart associates, alleging that Wal-Mart "suffered or permitted" its employees to work off-the-clock without pay in a variety of ways in Oregon in violation of the Fair Labor Standards Act ("FLSA") and state law.

Through various rulings before and during 2002, I denied plaintiffs' requests for class certification but allowed plaintiffs' FLSA claims to proceed as a collective action with an opt-in procedure for additional claimants. I accepted supplemental jurisdiction over certain state statutory wage and hour claims, but I dismissed others and dismissed plaintiffs' common law claims. Plaintiffs' claims were narrowed to include only those claims involving their work experiences in eighteen Wal-Mart stores in Oregon: Bend, Coos Bay, Dallas, Eugene, Grants Pass, Hermiston, Hood River, Klamath Falls, La Grande, Lebanon, McMinnville, Medford, North Salem, Ontario, Pendleton, Portland, South Salem, and Woodburn. The scope of plaintiffs' claims was further narrowed to the time period of 1994 through 1999.

In November 2002, with more than 400 plaintiffs having opted into the case, I decided to bifurcate the case for separate trials on liability and damages. I ruled that plaintiffs would be allowed to present "representative" testimony regarding Wal-Mart's alleged pattern or practice of suffering or permitting off-the-clock work.

In December 2002, after a three-week trial and four days of deliberations, a jury returned a verdict finding that Wal-Mart engaged in a pattern or practice of suffering or permitting its employees to work off-the-clock without compensation in eighteen Wal-Mart stores in Oregon in each of the years 1994 through 1999. The jury also found that Wal-Mart acted willfully with respect to the pattern or practice.

During the year that followed, the parties filed and I ruled on numerous post-trial motions, and the parties prepared for the second trial on damages. Individual plaintiffs were asked to complete and re-

Not Reported in F.Supp.2d, 2004 WL 1688544 (D.Or.)
**(Cite as: 2004 WL 1688544 (D.Or.))**

turn "claim forms" to be used as a means to assess the basis for their claims and the number of hours they alleged to have worked. After claim forms were returned and various motions to dismiss individual plaintiffs were granted, 134 claimants remained in the case at the start of the second trial. Through additional motions and rulings, a total of 108 plaintiffs' claims ultimately went to the jury.

The first jury having determined that Wal-Mart had the requisite actual or constructive knowledge of off-the-clock work in its Oregon stores, a second jury was impaneled in January 2004 to determine the underlying facts necessary for damages awards. The second jury was asked to determine whether each individual plaintiff worked unpaid hours off-the-clock, and if so, how many unpaid hours each plaintiff worked off-the-clock for each workweek worked. After a full week of deliberations, the second jury returned 108 verdict forms with findings regarding the number of hours worked off-the-clock by each plaintiff. The jury's findings varied from plaintiff to plaintiff, ranging from specific workweek-by-workweek findings regarding hours worked off-the-clock, to finding that a number of plaintiffs performed no off-the-clock work. A total of 83 plaintiffs received an hourly award from the jury.

DISCUSSION

I. *Wal-Mart's Renewed Motion for Judgment as a Matter of Law*

**\*2** Wal-Mart moves for judgment as a matter of law, contending that the 2002 and 2004 juries lacked sufficient evidence to find in plaintiffs' favor.

In a jury trial, a party may request that the court grant judgment as a matter of law in its favor on an issue when there is "no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). If the court denies a motion for judgment as a matter of law made at the close of evidence, the party may renew that motion after a verdict is returned. Fed.R.Civ.P. 50(b).

A motion for judgment as a matter of law must be denied, and a jury's verdict must be upheld, if the verdict is supported by substantial evidence. *Johnson v. Paradise Valley Unified School District,* 251 F.3d 1222, 1227 (9th Cir.2001). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Id.* The court must draw all reasonable inferences in favor of the nonmoving party. *Id.* The court may not substitute its view of the evidence for the jury's, may not make credibility determinations, and may not weigh the evidence. *Id.*

To the extent Wal-Mart's motion is based on the reasons it has raised in prior motions and renewed motions for judgment as a matter of law, this motion is denied for the reasons I have previously stated. I will address the specific issues Wal-Mart raises as new and additional reasons to grant judgment as a matter of law in its favor, though most of these reasons have been previously raised and rejected by the court as well.

A. *Specificity and Adequacy of Plaintiffs' Proof*

In *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946), the Supreme Court ruled that where an employer fails to keep proper or accurate records, an employee may prove the "amount and extent" of hours suffered by the employer "as a matter of just and reasonable inference." The burden then shifts to the employer to rebut the number of hours worked by presenting specific evidence disproving those hours. *Id.* at 687.

Throughout this litigation, Wal-Mart has objected to my decision to allow plaintiffs to prove the number of hours they worked under the "just and reasonable inference" standard set forth in *Mt. Clemens.* Because Wal-Mart believes plaintiffs did not prove record-keeping violations, plaintiffs are not entitled to the burden-shifting procedures set forth in *Mt. Clemens.* To the extent that Wal-Mart believes *Mt. Clemens* requires plaintiffs to first have *prevailed on a claim* for record-keeping violations, I reject this argument, as I have before.

Not Reported in F.Supp.2d, 2004 WL 1688544 (D.Or.)
**(Cite as: 2004 WL 1688544 (D.Or.))**

Wal-Mart nonetheless maintains that it has shown the detailed hourly employment records it keeps, and therefore plaintiffs should not have been given the benefit of the *Mt. Clemens* standard of proof. Because Wal-Mart does not believe plaintiffs should have been able to prove their hours by a just and reasonable inference, it argues that their proof fell well short of what was needed to prevail under the plaintiffs' traditional burden. Finally, Wal-Mart argues that even if plaintiffs were properly allowed to meet their burden by proving the amount of off-the-clock work by just and reasonable inference, plaintiffs fell short of meeting even this more relaxed standard. According to Wal-Mart, all of the plaintiffs provided " 'guesses' or 'guesstimates' of unpaid hours worked without being able to provide any foundation for those estimates." Wal-Mart Memo. at 9. In Wal-Mart's view, the estimates were also "applied with broad brushstrokes to each and every week worked within a monthly, yearly, or even career-long period of time." *Id* .

**\*3** There is no question that Wal-Mart's evidence showed detailed records generated from Wal-Mart's timekeeping system. I disagree with Wal-Mart, however, that this evidence directs the conclusion that these timekeeping systems accurately reflect all of the hours worked by plaintiffs. The very theory of plaintiffs' case is that they were not paid for all of the hours they actually worked because they were not reflected on their time records. Plaintiffs testified that, for example, they were told to "clock out" and continue working or their supervisors, and even some of the claimants in this lawsuit, actually edited or deleted hours from the system. Wal-Mart believes that by allowing plaintiffs to have the benefit of the *Mt. Clemens* relaxed standard of proof simply because this is an "off-the-clock" case, I am allowing the exception to swallow the rule. On the other hand, if the production of timekeeping system-generated records from an entity like Wal-Mart were always sufficient, no plaintiffs could ever have a claim under the *Mt. Clemens* standards for any off-the-clock work. In this case, I believe there was sufficient evidence

that Wal-Mart's records were incomplete or inaccurate to meet the *Mt. Clemens* standards.

With respect to the specificity of plaintiffs' testimony regarding the number of hours worked, I find that the evidence was less than perfect but sufficient. With 110 plaintiffs testifying in the second trial, the testimony certainly varied from plaintiff to plaintiff. Thus, I reject Wal-Mart's characterization that *all* of the plaintiffs could provide nothing more than guesstimates. However, as I expressed several times in both trials, I believe plaintiffs put on a skinny case. The question, though, is not whether Wal-Mart or the court would have come to different conclusions as to certain plaintiffs' credibility or awards. The question is whether the evidence was sufficient to support the jury's findings. Although most plaintiffs were unable to testify as to the exact dates, hours and minutes they allegedly worked off-the-clock, most were able to make approximations tied to specific time periods. This was sufficient to submit to the jury with the instruction that plaintiffs were entitled to prove the amount and extent of hours suffered by the employer "as a matter of just and reasonable inference." Compared to the number of hours sought by the plaintiffs, the jury returned a somewhat minimal award, which I submit in many cases accurately reflects the testimony received.

B. *Deposition Testimony*
A total of 27 plaintiffs testified at the 2004 trial by way of deposition testimony. Of the 27 plaintiffs who testified by way of deposition, 22 were awarded hours by the jury.

Wal-Mart argues that none of the depositions of those 22 plaintiffs contained sufficient detail to prove plaintiffs' claims as the sole evidence in support thereof. Upon request, Wal-Mart produced for the court the trial transcript of the 22 depositions. I have carefully reviewed the transcripts and I agree with Wal-Mart that this testimony could be considered even less specific than the live testimony given by many of the plaintiffs. However, each of the 22 individuals gave at least some basis for the jury's award-whether that was a percentage of shifts

on which they believed they worked off-the-clock, or an approximation of the number of times it happened and for how long-that combined with the other evidence regarding each plaintiff's period of employment, could have allowed the jury to find as it did. Again, the jury's finding for most individuals was in the range of one to only a few hours of total work off-the-clock, which may reflect the jury's determination that these individuals did not meet their burden as to other hours claimed. Although Wal-Mart argues that the fact that the depositions were read into the record means the jury was unable to assess any given plaintiff/deponent's credibility, I note that Wal-Mart was given the opportunity to cross-examine this small sub-set of plaintiffs via telephone during trial, and with few exceptions it chose not to. I believe this is a close call, but drawing all inferences in favor of plaintiffs, I will uphold the jury's verdicts as to the 22 individuals at issue.

C. *Causation*

**\*4** Wal-Mart also argues it is entitled to judgment in its favor as a matter of law because plaintiffs failed to establish that each of the individual 83 plaintiffs whom the jury awarded hours was subject to the willful pattern or practice found to exist in the stores at issue. Wal-Mart believes that plaintiffs needed to affirmatively prove that any alleged off-the-clock work was *caused by or performed because of* the willful pattern or practice found to exist.

Although Wal-Mart repeats this point, no one disputes that each plaintiff was required to prove that Wal-Mart suffered the work at issue. The question is the method for proving it. Of the 83 plaintiffs who received hourly awards from the 2004 jury, 55 plaintiffs testified for the first time in the 2004 proceedings. Wal-Mart notes that under my prior ruling that the 2002 verdict was binding on all plaintiffs, even those who had not testified in the 2002 trial, those 55 plaintiffs relied upon the evidence presented in the 2002 trial to provide an evidentiary foundation for their claims. According

to Wal-Mart, this means that they did not present any evidence as to whether Wal-Mart suffered or permitted them to work off-the-clock in the 2004 trial. Wal-Mart then questions the validity of the second jury's findings. Wal-Mart's causation arguments, therefore, go back to its objections to my decisions to bifurcate the case, allow representative testimony, and allow plaintiffs to prove a pattern or practice of violations.

All of these decisions were well-supported by case law, and the first jury was given detailed instructions based on these cases. Of the twenty-four instructions the first jury was given, the following four are worth highlighting. First, the jury was carefully instructed on how to determine if Wal-Mart suffered or permitted the work at issue. Jury Instruction No. 16 provided:

Plaintiffs must prove that they were "employed" for the off-the-clock work alleged. "Employed" in the context of this case has a special meaning. In this context, "employed" means that defendant "suffered" or "permitted" plaintiffs to work the hours for which plaintiffs claim they were not paid.

The words "suffer" or "permit" mean "with the knowledge of the employer." For purposes of that knowledge in this case, an "employer" is defined as any person acting directly or indirectly in the interest of Wal-Mart with Wal-Mart's knowledge and consent. Individuals of sufficient supervisory and managerial authority must possess that knowledge. For the knowledge of a supervisor to be imputed to the company, that supervisor must be at a sufficiently high level in the hierarchy of a company or must be charged with substantial responsibility for relaying employee complaints to management. Knowledge by salaried assistant managers or managers who possess supervisory authority over individual plaintiffs may be imputed to Wal-Mart. Knowledge by hourly department managers will not be imputed to Wal-Mart unless such persons had specific and official duties to act as a conduit to upper level management for complaints about work

conditions, or unless such persons were primarily responsible for employees' failing to report all hours worked.

**\*5** The jury was then further instructed on how to determine if Wal-Mart had actual or constructive knowledge of the work at issue. Instruction No. 17 provided:

An employer must compensate its employees for unauthorized work that, even if prohibited, is performed with the actual or constructive knowledge of the employer. In determining whether Wal-Mart had constructive knowledge you should consider all of the evidence, including:

(1) whether the employer was in a position to see the employees work;

(2) whether there was too much work performed for the regular working hours allotted;

(3) whether there were repeated and numerous occasions of extra work being performed;

(4) whether there was a pattern or practice of employer acquiescence to the work;

(5) any other facts from which knowledge can be inferred.

An employer is not required to pay for time worked when the employer truly did not know, and had no reason to know, that the work was being performed.

The jury was also instructed on the role of representative testimony. Instruction No. 18 provided:

To establish Wal-Mart's knowledge of the alleged off-the-clock work, plaintiffs have put on testimony alleged to be representative of all of the plaintiffs in this case, to establish a pattern or practice of violations. In determining whether evidence of testifying plaintiffs is fairly representative, you should decide whether their experiences also happened to non-testifying plaintiffs. You should

also decide if the witnesses that testified had the opportunity or ability to observe non-testifying plaintiffs and you should consider what the testifying witnesses observed.

You may consider such factors as the nature of the work involved, the working conditions, the relationships between employees and managers, and the detail and credibility of the testimony. While no exact number or percentage of the plaintiffs is required to testify, plaintiffs must present a sufficient number of representatives, which, when considered together with all of the other evidence presented in this case, establishes a pattern or practice.

Finally, the jury was instructed on the meaning of "pattern or practice." Instruction No. 19 provided:

In order for you to find a pattern or practice of violations, you must find that the alleged conduct involved widespread violations in the eighteen Wal-Mart stores at issue in the state of Oregon, during the relevant time period. A pattern is a regular mainly unvarying way of acting or doing. A practice is a frequent or usual action. Events which are isolated, sporadic or infrequent do not comprise a pattern or practice.

It is plaintiffs' burden to prove that the alleged violations occurred and that such violations were widespread. If you find that plaintiffs' evidence supports a reasonable inference that the alleged violations were widespread, you must consider whether Wal-Mart has rebutted that inference by producing evidence tending to negate the conclusion that any such violations occurred on a widespread basis. You must find that plaintiffs' evidence supports an inference that any such violations at issue occurred on a widespread basis and that Wal-Mart has failed to rebut that inference, in order to find that a pattern or practice is established.

**\*6** These instructions taken together support the validity of the first jury's findings and show that no additional element of "causation" is needed to

support the second jury's individual findings regarding the number of hours worked. The first jury returned its verdict after having been properly instructed regarding the appropriate level of management needed to impute knowledge to Wal-Mart, factors to consider in determining whether Wal-Mart had constructive knowledge, and how to determine if the testimony was representative. The jury determined that there was a pattern or practice of suffering or permitting off-the-clock work in the eighteen stores at issue during the relevant time period. This conclusion was supported by the evidence adduced at the first trial. To hold now that plaintiffs failed in their burden of proof in the second trial because each one of the plaintiffs did not show that the pattern or practice found "caused" his or her off-the-clock work would render the first trial meaningless. And to hold that such an element is necessary for proving FLSA violations in a collective action would result in few, if any, cases in which representative testimony could be used or an employer's knowledge shown by a pattern or practice. I deny Wal-Mart's motion for judgment as a matter of law based on a failure to prove causation.

II. *Plaintiffs' Motion Regarding Penalties*

Plaintiffs seek statutory penalties under Oregon wage and hour law based on the 2004 jury's finding that 83 out of the 108 claimants performed off-the-clock work while employed at Wal-Mart between 1994 and 1999. As discussed below, there are three main issues raised by plaintiffs' motion: 1) the applicable penalties for failure to pay wages upon termination, 2) the applicable penalties for failure to pay overtime, and 3) pre-judgment interest.

A. *Termination Penalties*

1. *Plaintiffs Who Left On or Before December 31, 1999*

Of the 83 [FN1] plaintiffs at issue, 62 left Wal-Mart on or before December 31, 1999, and are therefore eligible pursuant to ORS 652.150 for a penalty based on Wal-Mart's failure to timely pay

wages upon termination, in violation of ORS 652.140. Although Wal-Mart had originally taken the position that the amended 2002 ORS provision applies, which imposes notice requirements on the plaintiffs, Wal-Mart now concedes that the older version of the statute applies. Therefore, Wal-Mart concedes that the 62 claimants who left Wal-Mart's employ on or before December 31, 1999, are eligible for penalties. Under the statute, and as both parties appear to agree, penalty damages are capped at 30 days' wages.

FN1. Although plaintiffs' motion refers to 82 plaintiffs, the correct number of plaintiffs whom the jury found to have worked off-the-clock is 83.

Plaintiffs advance, and Wal-Mart does not oppose, the approach that where the jury failed to award specific hours in specific workweeks attached to the verdict forms (i.e., the hours awarded were "Other or Additional Hours"), the lowest applicable wage rate should apply. Additionally, where the jury found that a plaintiff performed off-the-clock work during both the combined federal and state law time period and the separate state law time period, and awarded those hours in the "Other or Additional Hours" category, the hours should be divided equally and the lowest wage rate in each of the relevant time periods should be used.

**\*7** The only area of disagreement is what wage rate should be used in calculating any penalty awarded pursuant to ORS 652.150. Plaintiffs argue that the applicable wage rate is the employee's rate at the time of his or her termination. Wal-Mart argues that the wage rate to be used in the penalty calculation is the employee's hourly rate at the time the employee earned the wages.

The statute provides that "if an employer willfully fails to pay any wages or compensation of any employee whose employment ceases, ... as a penalty for such non-payment, the wages or compensation of such employee shall continue from the due date thereof at the same hourly rate...." ORS

Not Reported in F.Supp.2d, 2004 WL 1688544 (D.Or.)
**(Cite as: 2004 WL 1688544 (D.Or.))**

652.150(1). The statute goes on to provide that "in no case shall such wages or compensation continue for more than 30 days from the due date." *Id.* It is this latter provision that I find supports plaintiffs' interpretation of the statute. The legislature's reference to "30 days from the due date" suggests that the due date is the date of termination. Therefore, the earlier requirement that the wages continue "from the due date thereof at the same hourly rate" means the hourly rate at the time of termination. If the legislature had intended the due date to refer to the date on which the wages were earned, this would suggest a penalty is in order for each time a plaintiff worked off-the-clock without pay throughout his or her employment, which is certainly not the theory Wal-Mart advances. The statute is by no means clear as it relates to off-the-clock work, but I find the best interpretation is that the rate each employee earned at the time of his or her termination must be used for the penalty calculation.

2. *Plaintiffs Who Left After December 31, 1999*

Plaintiffs seek termination penalties for a subset of ten claimants who were employed by Wal-Mart after December 31, 1999, but who left Wal-Mart's employ prior to filing a consent to join form. FN2 Wal-Mart argues that because the jury verdicts and the finding of willfulness in this case were limited to the time period of 1994 to 1999, Wal-Mart cannot be held liable for conduct that occurred after 1999, therefore it cannot be liable for termination penalties after 1999.

> FN2. Plaintiffs are not seeking penalties based on termination for employees who had not left Wal-Mart's employ by the time they filed a consent to join this litigation.

ORS 652.140 requires employers to pay "[a]ll wages earned and unpaid at the time of discharge or termination" within the time period specified in the statute. As note above, ORS 652.150 provides a penalty only "[i]f an employer willfully fails to pay any wages or compensation of any employee whose employment ceases, as provided in ORS 652.140

...." According to Wal-Mart, willfulness for purposes of ORS 652.150 refers to whether an employer willfully fails to pay wages when they become due upon an employee's termination. Wal-Mart notes that the court decided to limit the time period at issue to the years 1994 through 1999, as reflected in the 2002 jury's verdict. Because no willfulness finding exists for any time period during which these ten plaintiffs' employment actually ceased, Wal-Mart argues it cannot be liable for termination penalties for these individuals.

**\*8** Plaintiffs argue that a plain reading of the statute does not require the willfulness to be temporally tied to the cessation of employment. Plaintiffs argue that ORS 652.150 merely uses its reference to ORS 652.140 to define the class of employees who might become entitled to a penalty. Thus, it states that a penalty will be owed whenever "an employer wilfully fails to pay," then it defines the class of protected employees as those "whose employment ceases." Plaintiffs argue that when read together the two jury verdicts conclude that these ten plaintiffs were not paid for all of their work and that Wal-Mart willfully failed to pay them for that work. It is these same wages, first earned from 1994 through 1999, that Wal-Mart failed to pay upon termination. According to plaintiffs, it would be illogical to conclude that a willful failure to pay wages when they first became due in 1998 or 1999, could still somehow end in a non-willful failure to pay when the employment terminated in a later year.

I agree with plaintiffs' interpretation of the statute and find that the willfulness requirement refers to the failure to pay and is not tied with the cessation of employment. I further note that in limiting the scope of the jury's findings for purposes of the verdict form, I was not addressing the issue that is presently before me. I conclude that the ten plaintiffs who left after December 31, 1999, are entitled to penalties.

B. *Overtime Penalties*

Plaintiffs seek penalties for plaintiffs for whom

© 2004 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1688544 (D.Or.)
**(Cite as: 2004 WL 1688544 (D.Or.))**

the jury found that Wal-Mart had not paid overtime in a given week within the state statute of limitations. ORS 653.261 requires employers to pay employees overtime wage rates of one and one-half times the regular rate of pay for hours worked in excess of 40 in a given workweek. ORS 653.055 provides in pertinent part that any employer who pays an employee less than the wages to which the employee is entitled under ORS 653.261 is liable for civil penalties provided in ORS 652.150.

The parties disagree on several issues related to this category of penalties. First, Wal-Mart argues that plaintiffs have not pleaded or otherwise stated a claim for overtime penalties under state law. Claim two of the pre-trial order ("PTO") states: "Wal-Mart has failed to pay for all of the time worked by Plaintiffs, including time-and-one-half for hours in excess of forty per week, in violation of Oregon statutory and regulatory law." PTO at 5. Although the claim alleges violations of the overtime laws, because it does not make reference to penalties for failure to pay overtime, Wal-Mart contends plaintiffs cannot now seek the penalties.

In response, plaintiffs note that the prayer for relief in their complaint requests civil penalties for violation of state laws, and they contend that the PTO at least implicitly raises a claim for penalties for this particular violation. Plaintiffs note that claim two in the PTO does not request *any* specific relief. Thus, plaintiffs believe that Wal-Mart cannot seriously contend that it did not understand plaintiffs were seeking *some* relief. Plaintiffs also note that Wal-Mart's defenses in the PTO include defenses on the issue of willfulness. Plaintiffs contend this shows the understanding that plaintiffs were seeking these penalties, as wilfulness would not otherwise be relevant. I conclude that plaintiffs have properly pleaded a request for overtime penalties.

**\*9** The second area of disagreement between the parties relates to the statute of limitations. Of the plaintiffs for whom the jury found unpaid overtime hours, certain plaintiffs' claims would not be

within the applicable two year statute of limitations. Plaintiffs contend that they are nevertheless entitled to overtime penalties because the statute of limitations was tolled from the time the suit was filed as a proposed class (June 30, 1998) to the time class certification was denied (December 1, 1999). *See American Pipe and Construction Co. v. Utah,* 414 U.S. 538 (1974) (putative class members were permitted to intervene after class certification was denied; for purposes of statute of limitations, the Court excluded the time between when the case was filed and when certification was denied). If that time is excluded in this case, plaintiffs contend these plaintiffs fall within the applicable time period and are entitled to penalties for failure to pay overtime.

Wal-Mart argues that under the law of the case doctrine, the statute of limitations should not be tolled for these individuals. Wal-Mart relies on my 2002 pre-trial ruling that the 6-year statute of limitations for the straight time claims in this action will be measured from the date of filing of the consent to join form. I made the ruling prior to the first trial because of the case law establishing that the consent to join form was the appropriate measuring date for statute of limitations purposes. *See e.g., Songu-Mbriwa v. Davis Memorial Goodwill Indus.,* 144 F.R.D. 1, 2 (D.D.C.1992). I acknowledge the pre-trial conference record excerpt cited by Wal-Mart wherein I stated that the consent to join form would be the statute of limitations date "for all claims." However, the statue of limitations issue as it related to excluding the tolling period for state law claims for which plaintiffs sought class certification was not directly before me at the time. To the extent that I made statements suggesting a broader ruling, I reverse my prior conclusion, as I believe this is the proper and fair result. Under *American Pipe,* I will toll the statute of limitations for the state law claims and exclude the time period between when the case was filed and when the motion for class certification was denied. Thus, those plaintiffs who would not otherwise be included will have claims for overtime penalties.

Finally, Wal-Mart argues that plaintiffs should not be allowed overtime penalties in addition to termination penalties because it would amount to double recovery. Plaintiffs rely on *Cornier v. Paul Tulacz,* 176 Or.App. 245 (2001), to support the conclusion that both penalties should be recovered. At issue in *Cornier* were both the failure to pay overtime wages and the failure to pay accrued vacation time when the employee's employment ended. The Oregon Court of Appeals held that the plaintiff in that case was entitled to two penalties. When this issue came before me in another case, I rejected the plaintiffs' argument, which was similar to the argument plaintiffs advance in this case. I reasoned as follows:

**\*10** Here, plaintiffs were fully paid at termination except for the disputed overtime wages. There was no separate component of their wages withheld, as in *Cornier.* There was only one type of employer misconduct. Consequently, I conclude that plaintiffs are only entitled to a single state statutory penalty.

*Chaloupka, et al v. SLT/TAG, Inc.,* CV 02-743-KI (lead case), Findings and Conclusions at 7.

Plaintiffs contend that recovering both penalties does not amount to double recovery for the same conduct. In this case, certain plaintiffs at issue were not paid overtime and also were not paid some straight time after the termination of the employment relationship. For all of these individuals, plaintiffs contend these were separate weeks and distinct violations-the failure to pay overtime during a given week gives rise to an overtime penalty, and the failure to make non-overtime payments upon termination gives rise to the termination penalty.

The facts of this case are slightly different than the facts of the *Chaloupka* case cited above. In *Chaloupka,* the only kind of wages withheld were the overtime wages; whereas in this case, the failure to pay overtime and the failure to pay straight time are arguably distinct issues. I believe plaintiffs raise good arguments on this point, but ultimately, I reach the same conclusion I reached in *Chaloupka.*

In *Cornier,* the Oregon Court of Appeals focused in part on when the alleged violation occurred:

[T]his case does not present an instance of double penalties for the same conduct, and we do not address that issue, because here the violation that occurred during employment was underpayment for overtime, while the violation at termination was nonpayment for accrued vacation. Plaintiff has asserted separate violations for separate acts of her employer.

*Cornier,* 176 Or.App. at 250. According to plaintiffs' theory of the case, Wal-Mart did one thing wrong-it suffered or permitted its employees to work off-the-clock without compensation while they were employed. Whether that off-the-clock work occurred during a week in which a plaintiff worked only 20 hours for which she was paid, or whether it occurred during a week in which she worked 40 hours for which she was paid, the bad conduct on Wal-Mart's part was the same. I conclude that plaintiffs are entitled to only one penalty.

Based on the above rulings, I ask the parties to attempt to resolve any remaining disputes as to which plaintiffs are entitled to overtime penalties. The parties shall submit their positions to the court if they cannot reach agreement.

C. *Pre-Judgment Interest*

Plaintiffs seek pre-judgment interest on the penalties at issue. Plaintiffs assert that their right to interest is derived from two sources. First, ORS 82.010(1)(a) provides: "(1) The rate of interest for the following transactions, if the parties have not otherwise agreed to a rate of interest, is nine percent per annum and is payable on: (a) All moneys after they become due...." Second, ORS 652.120 provides: "(1) Every employer shall establish and maintain a regular payday, at which date all em-

Not Reported in F.Supp.2d, 2004 WL 1688544 (D.Or.)
**(Cite as: 2004 WL 1688544 (D.Or.))**

ployees shall be paid the wages due and owing to them." Plaintiffs contend that the first ORS provision establishes that interest must be paid on all moneys after they become due, and the second statute establishes that each of the claimant's payments became due on their regular paydays.

**\*11** Wal-Mart argues that pre-judgment interest is not applicable because the penalty provision at issue here, ORS 652.150, makes no reference to pre-judgment interest. Additionally, Wal-Mart cites Oregon cases that note that ORS 82.010(1)(a) is typically applicable only to breach of contract claims. Plaintiffs correctly note that other Oregon cases, including *Thomas v. Senior and Disabled Services Div.,* 319 Or. 520, 524-29 (1994), allow interest in the context of a statutory, non-contract claim, where the statute in question did not explicitly authorize interest. Therefore, I reject Wal-Mart's arguments that the interest cannot be awarded because this is not a contract dispute or because the statute at issue does not explicitly provide for interest.

Wal-Mart also relies on *Haret v. State Acc. Ins. Fund Corp.,* 72 Or.App. 668 (1985), which held that ORS 82.010 did not apply to the Oregon workers' compensation statute. I find the case to be distinguishable. In contrast to the Oregon Court of Appeals' reasoning that "the Workers Compensation Law is a complete statement of the parties' rights and obligations," *Id.* at 674, the wage and hour statutory provisions at issue here do not require claims to first be processed exclusively within an administrative agency, nor do they provide the only remedy for the employer for overpayment. Additionally, although not binding on the court, I find persuasive the numerous Oregon Bureau of Labor and Industries' findings in which the Commissioner ordered employers to pay interest on all unpaid and earned wages including penalties. I conclude that plaintiffs are entitled to pre-judgment interest on all penalty wages. I direct the parties to confer regarding the calculation of the pre-judgment interest and inform the court if they cannot reach agreement.

CONCLUSION

For the foregoing reasons, plaintiffs' Motion Regarding Penalties and Interest for 74 of the 82 Plaintiffs Whom the Jury Found to Have Worked Off-The-Clock (# 746) is granted in part and defendant's Renewed Motion for Judgment as a Matter of Law (# 756) is denied.

D.Or.,2004.
Thiebes v. Wal-Mart Stores, Inc.
Not Reported in F.Supp.2d, 2004 WL 1688544 (D.Or.)

END OF DOCUMENT


Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106, 35 Cont.Cas.Fed. (CCH) P 75,540

**(Cite as: 1988 WL 125784 (N.D.Ohio))**

c

United States District Court, N.D. Ohio.
NATIONAL ELECTRO-COATINGS, INC. et al.,
Plaintiffs,
v.
William E. BROCK, Secretary of Labor, Defend-
ant.

No. C86-2188.
July 13, 1988.

[*Statement of Case* ]
STREEPY, United States Magistrate.

**\*1** Plaintiffs, National Electro Coatings, Inc., and Electro-Coatings' president, Robert Schneider (referred to collectively as Electro-Coatings), bring this action seeking judicial review of an administrative decision by defendant, the Secretary of Labor (Secretary). The Secretary found Electro-Coatings failed to pay minimum wages and proper fringe benefits required by the Service Contract Act (SCA), 41 U.S.C. § 351, *et seq.,* and failed to pay overtime wages as required by the Contract Work Hours Safety Standards Act (CWHSSA), 40 U.S.C. § 327, *et seq.,* thus was liable for $82,294.33 (sometimes referred to collectively as unpaid back wages). The parties have filed cross-motions for summary judgment.

An administrative action was filed September 5, 1978 for unpaid back wages (certified record on appeal, hereafter CR, at 2-5). A hearing was held before an Administrative Law Judge (ALJ) in April of 1980 (*see,* transcript of April 7, 8, and 9, 1980 hearing, thereafter TH, CR 1328-1900). In April of 1981 the ALJ found violations of both the SCA and the CWHSSA (ALJ decision, hereafter ALJD, CR 216-65). Electro-Coatings appealed to the Administrator of the Wage and Hour Division (Administrator) of the Department of Labor (DOL), who affirmed the ALJ on June 18, 1985 (CR 326-32). The ALJ had also made a determination that no unusual circumstances existed, which meant

Electro-Coatings would be barred from government contracts for three years under the SCA. This debarment could be appealed from the Administrator to the Secretary. Electro-Coatings did so appeal, and the Secretary affirmed on April 17, 1986 (CR 378-85).

Scope of Review
The scope of review in this case is limited. Appeal of administrative proceedings is generally governed by the Administrative Procedure Act (APA), 5 U.S.C. § 706. *Saavedra v. Donovan,* [96 LC ¶ 34,330] 700 F.2d 496, 498 (9th Cir.1983), *cert. denied,* [ 99 LC ¶ 34,445] 464 U.S. 892 (1983) (under SCA); *Glenn Electric Co., Inc. v. Donovan,* 101 Labor Cases (CCH) ¶ 34,571, at 46,342 (W.D.Pa.1984), *aff'd on other grounds,* [ 102 LC ¶ 34,643] 755 F.2d 1078 (3rd Cir.1985) (*per curiam* ) (under CWHSSA). Under the APA the reviewing court may inquire, *inter alia,* whether the agency decision was arbitrary or capricious, whether it was supported by substantial evidence, and whether it was contrary to statutory or constitutional law. 5 U.S.C. § 706; *Harvey v. Nunlist,* 499 F.2d 335 (5th Cir.1974); *Charlton v. United States,* 412 F.2d 390 (3rd Cir.1964), *cert. denied,* 409 U.S. 1027 (1972).

The Sixth Circuit defines substantial evidence under the APA in *Jones v. Priebe,* 489 F.2d 709, 710 (6th Cir.1973):

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 ... (1938), and it must be enough to warrant denial of a motion for a directed verdict in a civil case trial to a jury. *NLRB v. Columbian Enameling & Stamping Co.,* [1 LC ¶ 17,043] 306 U.S. 292, 300, ... (1939)....

**\*2** Under the APA questions of credibility are to be resolved by the administrative hearing officer; it is not the function of the court to reweigh the evidence. *Jaeger v. Stephens,* 346 F.Supp. 1217,

Page 2

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106,
35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

1225 (D.Colo.1971). Merely because two inconsistent conclusions can be drawn from the evidence does not mean that the findings are not supported by substantial evidence. *Fairbank v. Hardin,* 429 F.2d 264, 266-67 (9th Cir.1970), *cert. denied,* 400 U.S. 943 (1970).

In addition, there is a modification of the APA standard under the SCA, which holds that the Secretary's findings are conclusive on the court if supported by a preponderance of the evidence, 41 U.S.C. §§ 39, 353(a); *Saavedra,* 700 F.2d at 498; *American Waste Removal Co. v. Donovan,* 748 F.2d 1406, 1408-09 (10th Cir.1984). The contractor has the burden of proof to show the findings were not supported by a preponderance of the evidence. *American Waste Removal,* 748 F.2d at 1409; *United States v. Powers Building Maintenance Co.,* 336 F.Supp. 819 (D.C.Okla.1972).

The provisions of the SCA must be applied liberally to accomplish its remedial purposes and should be interpreted to be consistent with other federal wage and hour laws, in particular the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.,* provisions on minimum wages and determinations of hours worked and overtime pay. *American Waste Removal,* 748 F.2d at 1410 (10th Cir.1984). The same rule applies to the overtime provisions of the CWHSSA. *Id.; Masters v. Maryland Management Co.,* [73 LC ¶ 33,041] 493 F.2d 1329 (4th Cir.1974).

A. *Electro-Coating's Motion For Summary Judgment*

The motion of Electro-Coatings raises, at first glance, two issues. The first issue alleges (*see* Electro-Coatings brief, hereafter PB, 5):

The Record Of The Administrative Process and Hearing In The Instant Case Is Fraught With Errors, And Omissions Which At Best Fail To Support The Decision Below And At The Worst Amount To A Denial Of Plaintiffs' Right To Due Process Under Law.

The second issue is titled (PB 20): "STATUTE OF LIMITATIONS."

Although couched in terms of two issues, Electro-Coatings appears to have raised nine separate issues under its first argument, many of which are only supported by general principles of law, as opposed to being tailored to the facts of this case. While difficult to define these issues precisely, suffice it to say they not only raise issues of due process and substantial evidence, but also whether certain action was arbitrary and capricious. The two issues noted above will be considered under ten separate issues.

1. Service Contract Act

Electro-Coatings contracted with the General Services Administration of the United States government primarily to paint government furniture in offices throughout the United States. There were a total of twelve contracts, partially overlapping in dates, covering most of the period from March 11, 1975 to February 28, 1979.[FN1]

**\*3** Electro-Coatings contends the Secretary cannot enforce the minimum wage and fringe benefit provisions of the SCA [FN2] because the Secretary failed to follow its own regulations, specifically 29 C.F.R. Part 4.6, in that the contracts "do not contain the mandatory [*sic* ] language found in 29 C.F.R. 4.6 relating to service contracts." (PB 17) This claim misinterprets 29 C.F.R. Part 4.6.

Initially it must be determined which version of part 4.6 is applicable. The general rule is that regulations in effect at the time of entering into the contracts are applicable unless a later regulation has been substituted by a contract modification. *SCM Corp. v. United States,* 645 F.2d 893, 896 n. 6 (Ct.Cl.1981). Since there was no relevant contract modification herein, the version of 29 C.F.R. Part 4.6 in effect from 1975 to 1979 is relevant. It states in pertinent part (Electro-Coatings exhibit, hereafter PX, 3, "WH Publication 1267 [Reissued 1976]," CR 466):

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106, 35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

*§ 4.6 Labor standards clauses for Federal service contracts exceeding $2,500.*

The clauses set forth in the following paragraphs shall be included in every contract (and any bid specification therefor) entered into by the United States of the District of Columbia, in excess of $2,500, the principal purpose of which is to furnish services through the use of service employees:

(a) Service Contract Act of 1965: This contract, to the extent that it is of the character to which the Service Contract Act of 1965 (79 Stat. 1034, 41 U.S.C. 351) applies, is subject to the following provisions and to all other applicable provisions of the Act and regulations of the Secretary of Labor thereunder (this Part 4).

(b)(1) Each service employee employed in the performance of this contract by the contractor or any subcontractor shall be paid not less than the minimum monetary wage and shall be furnished fringe benefits in accordance with the wages and fringe benefits determined by the Secretary of Labor or his authorized representative, as specified in any attachment to this contract.

The clauses set forth in the pertinent paragraphs of Part 4.6 are included in the contracts at issue, albeit not verbatim. The phrase "shall be included" in Part 4.6 permits other than verbatim language.

Paragraph (a) of Part 4.6 merely states what is legally obvious and mandated-that the contract is subject to the provisions of the SCA and the applicable regulations of the Secretary of Labor. This requirement is set forth in each of the contracts through the following clause (*see* ALJD, CR 225):

*INCORPORATION OF FORMS:* The following forms, receipt of which is acknowledged by the offeror, are hereby incorporated by reference and made a part of this Solicitation. Copies of each form, if not enclosed are available upon request from the Issuing Office shown on Page 1 of this Solicitation or from any General Services Administration Business Center

(b) GSA Form 2166, Service Contract Act of 1965, as amended January 1973 Edition.

**\*4** Subparagraph (b)(1) of Part 4.6 also sets forth what is legally obvious and mandated-that Electro-Coatings is subject to the minimum wage and fringe benefit provisions of the SCA. The contracts specifically inform Electro-Coatings of the minimum wage and fringe benefits for each functional category or class of employee to be hired. This information is set forth in the contracts through the wage determination provisions therein. All but two of the contracts (DOL exhibits, hereafter DX, 2 and 4) contained DOL "Register of Wage Determination Under the Service Contract Act" forms. Each wage determination refers to 29 C.F.R. Part 4.6 and sets forth the minimum hourly wage to be paid, and fringe benefits to be provided, to a named class of employees, with provisions that unnamed classes were to be paid at a rate conformable to the rate set forth (*see, e.g.,* DX 3, CR 763, 764; DX 5, CR 836).

Even assuming the relevant clauses of Part 4.6 were not included in the contracts, either verbatim or in equivalent form, it is clear they were incorporated by reference. The previously quoted incorporation clause in the contract, entitled "*INCORPORATION OF FORMS,*" states that the Service Contract Act is incorporated by reference FN3 The language of the SCA, specifically 29 U.S.C. § 351 thereof, promulgates the same requirements found in regulatory form in 29 C.F.R. Part 4.6. Thus, incorporation of the SCA constituted incorporation of Part 4.6.

Incorporation of the relevant provisions of Part 4.6 by reference is permitted under the language "shall be included" found therein. There has not been any judicial interpretation of this phrase in association with Part 4.6; however, similar statutory language found in the Walsh-Healey Act, 41 U.S.C.

Page 4

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106,
35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

§ 35, has been interpreted to permit incorporation by reference. *See United States v. Davison Fuel and Dock Company,* [54 LC ¶ 31,880] 371 F.2d 705, 714 (4th Cir.1967); *see also In the Matter of Michael L. Green,* SCA 993, [Wages-Hours 1978-1981 Transfer Binder] Labor Cases (CCH) ¶ 31,285 (1979) (cited in the ALJD, CR 225).

To summarize, the Secretary did not violate any provisions of the SCA or its own regulations promulgated in relation thereto. The contracts in question clearly informed Electro-Coatings it was subject to the SCA and the minimum wage and fringe benefit provisions of 29 C.F.R. Part 4.6.

2. Contract Work Hours Safety Standards Act

The Secretary found Electro-Coatings liable for overtime payments it failed to make which were required by the CWHSSA. Electro-Coatings argues the Secretary failed to follow its own regulations regarding the CWHSSA overtime provision because the contracts did not contain language referring thereto, as required by 29 C.F.R. Part 5.5(c) FN4 either expressly or by incorporation.

Part 5.5(c) does no more than require payment of the minimum overtime rate required by law in 40 U.S.C. §§ 328-29. FN5

Since the regulation was promulgated pursuant to statutory authority, the overtime requirement set forth therein is binding law, irrespective of whether the regulatory language appears in the contracts. *De Matteo Construction Company v. United States,* 600 F.2d 1384, (Ct.Cl.1979), notes:

**\*5** As such regulations were issued pursuant to statutory authority ..., they have the force and effect of law, and, if they are applicable, they must be deemed terms of the contract even if not specifically set out therein, knowledge of which is charged to the contractor.

*Accord, G.L. Christian & Associates v. United States,* 312 F.2d 418 (Ct.Cl.1963), *rehrg. denied,* 320 F.2d 345 (1963), *cert. denied,* 375 U.S. 954 (1963).

Electro-Coatings is making the argument that it is not bound by the law regarding overtime pay set forth in 40 U.S.C. §§ 328-29 because the contracts do not mention that law. It is not at liberty to pick and choose the laws which shall be applicable. Rather, it is required to obey all laws, including the overtime provisions of 40 U.S.C. §§ 328-29.

Moreover, although Part 5.5 does not appear in the contracts either verbatim or in equivalent language, the overtime pay requirement is noted generally in the SCA, *see* 41 U.S.C. § 355, which is incorporated by reference in the contracts, as discussed *supra.*

In summary, the failure of the contracts to refer to the relevant portions of the CWHSSA did not excuse Electro-Coatings from obeying the legally mandated overtime requirements of that statute.

3. Amendment of the Administrative Complaint

Electro-Coatings argues the ALJ erred in amending the administrative complaint to conform to the proof adduced at the hearing by adding three contracts, DX 2, 3 and 4, and by adding a count for failure to maintain adequate records. Electro-Coatings argues this constituted a failure of notice, rendering it unable to properly defend itself, thus denying it due process.

Due process is a flexible concept and permits such procedural protections as required by the circumstances. *Morrissey v. Brewer,* 408 U.S. 471 (1972). In an administrative hearing the party must receive adequate notice of the nature of the proceedings before the ALJ, such as informing it in detail of the agency investigatory findings. *Glenn Electric Co.,* 101 Labor Cases at 46,343. The complaining party must allege and prove substantial prejudice as a result of any due process violation. *Ka Fung Chan v. I.N.S.,* 634 F.2d 248, 258 (5th Cir.1981); *Glenn Electric Co.,* 101 Labor Cases at 46,342.

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106, 35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

Strict rules of pleadings do not apply to administrative proceedings and pleadings may be amended to conform to proof so long as undue surprise is avoided. Notice of the charges and opportunity to prepare are adequate absent a showing the party was misled. 3 Davis, Administrative Law Treatise, § 14.11 Pleadings and Notice, 46-47 (2nd Ed.1980) (citations omitted). This rule applies even if the proof establishes liability under the SCA in excess of that specified by the Secretary before trial. *Griffith v. Marshall,* 86 Labor Cases (CCH) ¶ 33,822, at 48,862 (S.D.Ohio 1979). There, the employer was not misled nor prejudiced because the Secretary's theory of the case and basis for liability and the employer's defense of improper calculation of hours remained unchanged after the additional evidence was added and the pleadings amended. *Id.* The facts are similar in the case *sub judice.*

*\*6* Mr. Schneider stated at the hearing that two of the contracts proffered, DX 2 and 3, were Electro-Coatings' own copies (TH, CR 1356-57), and that he recognized his signature on the proffered copy of the third contract, DX 4 (TH, CR 1363-64). In December of 1977, Ms. Botos, the DOL compliance officer who investigated Electro-Coatings, gave Electro-Coatings copies of her violation computation sheets, DX 13 and 14, which generally listed and included detailed information regarding violations under the contracts, including DX 2, 3 and 4 (*see, e.g.,* TH, CR 1448-50, 1454-55, 1460-62, 1700, 1707). Thus, Electro-Coatings was informed of violating DX 2, 3 and 4 over two years before the administrative hearing.

Electro-Coatings' relevant defenses remained the same even with the additional contracts. They did not change despite the opportunity of Electro-Coatings to file post-hearing briefs in which it could have raised any new defenses. (*See* ALJD, CR 218).

Finally, Electro-Coatings complains (PB 17), that the record keeping charge was added in a July 28, 1980 order, over three years after the initial contracts of 1975 and 1976, and yet the regulations only require record keeping for three years after the contracts are completed. Ms. Botos had timely informed Electro-Coatings of these violations in 1977 (TH, CR 1460-62, 1700). There was no additional penalty imposed for the violations. Electro-Coatings has not demonstrated it was misled or prejudiced.

4. Discovery by Electro-Coatings

Ms. Botos, the initial DOL investigator, testified as an expert in her field as a compliance officer (TH, CR 1438-39, ALJD, CR 230). Several issues center on her investigation and testimony. She investigated Electro-Coatings in 1977 as to whether it was in compliance with wage and hour laws and regulations. During her investigation she spoke with Electro-Coatings' officers, reviewed Electro-Coatings' records, interviewed employees regarding their wages and hours, and made reports thereof. She concluded there were violations. (*See, e.g.,* TH, CR 1435-58, 1466-67, 1557-58, 1605-16.)

Electro-Coatings argues it was denied discovery needed to effectively cross-examine Ms. Botos, citing three pages of the record, CR 1475, 1478 and 1569 (PB 13-14). This issue was not raised on appeal to the Administrator. In part because the agency should be given the first opportunity to consider any alleged errors, the general rule is that federal court may not consider the issue if not properly raised below. *United States v. Tucker Truck Lines, 344 U.S. 33, 37 (1952); Energy Co-op., Inc. v. U.S. Dept. of Energy, 659 F.2d 146 (Temp.Em.Ct. of App.1981).*

At two of the cited pages (CR 1475, 1569), Electro-Coatings sought copies of Ms. Botos' interview reports during the hearing. The ALJ withheld some reports under a claim of privilege, but did provide Electro-Coatings with interview reports of four workers who had testified at the hearing (ALJD, CR 228; TH, CR 1467-69, 1473-74, 1479, 1558, 1564-65), and was permitted after examining the reports to recall Ms. Botos (ALJD, CR 228; TH, CR 1558). At the other cited page (CR 1478), Electro-Coatings claims its pretrial discovery concern-

Page 6

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106, 35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

ing Ms. Botos was limited by the ALJ. The citation supports the opposite conclusion (TH, CR 1478-79).

**\*7** Electro-Coatings never even sought to take the deposition of Ms. Botos (CR 20-23; TH, CR 1478-79, 1578). It had adequate discovery opportunities to prepare for Ms. Botos' testimony. The claim to the contrary borders on the frivolous.

5. Admission of Contracts and Computation Sheets
Electro-Coatings argues the ALJ erred in admitting Ms. Botos' computation sheets, DX 13 and 14, before two of the contracts (DX 3 and 4) upon which they are based were admitted (PB 7). Electro-Coatings also claims that one contract was improperly admitted even though it was illegible.

The ALJ did not admit two of the relevant contracts into evidence, DX 3 and 4, at the hearing, but did so in a post-hearing order on July 25, 1980 (CR 179-80; ALJD, CR 217). The regulations allow for the admission of evidence at administrative hearings even though inadmissible under the Federal Rules of Evidence. 20 C.F.R. § 404.928. Such evidence may constitute substantial evidence even though inadmissible, *e.g.,* hearsay, at a court trial. *Richardson v. Perales,* 402 U.S. 389 (1971); *Califano v. Boles,* 443 U.S. 282, 285 n. 4 (1979); *Johnson v. United States,* 628 F.2d 187, 190 (D.C.Cir.1980); *Ressegiue v. Secretary of HEW,* 425 F.Supp. 160, 163 (E.D.N.Y.1977); *see generally,* 3 Davis, Administrative Law Treatise, § 16 Evidence. The computation sheets constituted substantial evidence, even though they referred to hearsay evidence not before the ALJ, in view of the extensive testimony regarding the foundation for such by Ms. Botos and the testifying Electro-Coatings workers (*see, e.g.,* TH, CR 1444-46, 1449-55, 1557-58, 1605-06, 1615-16, 1678-79, 1694).

That the computation sheets were admitted before admission of some of the contracts upon which they were based, is of little or no import. The conclusion of an expert witness is routinely admitted

into evidence before the items of evidence upon which it may be based have been admitted, even under the Federal Rules of Evidence. *See, e.g.,* Fed.R.Evid. 703 (expert testimony based on facts not in evidence), 1006 (summaries of voluminous material admissible even though underlying material not itself in evidence); *see also Hodgson v. American Concrete Construction Co., Inc.,* 70 LC (CCH) ¶ 32,833 at 45,763 (6th Cir.1973) (compliance officer's computations of estimated hours worked admissible even though not all employees testified). Electro-Coatings has failed to show it was prejudiced or misled by the later admission of the contracts.

Electro Coatings' other argument is that DX 1 is illegible and the ALJ erred in relying on it. The claim is rejected. Illegibility should not be construed in favor of the contractor where an SCA wage violation would be excused. *Saavedra,* 700 F.2d at 500.

6. Substantial Evidence of Hours Worked
Electro-Coatings argues the ALJ erred in adopting the number of hours worked by each employee found in Ms. Botos' calculations in her summary of unpaid wages because there is not substantial evidence of same. Since Electro-Coatings failed to keep records of actual hours worked (TH, CR 1376, 1392, 1413, 1431, 1546, 1443-44, 1449-50; ALJD, CR 246), Ms. Botos had to approximate the hours worked from employer interviews and such incomplete Electro-Coatings' records as existed ( *see, e.g.,* TH, CR 1453). The general rule in such circumstances is as follows, *American Waste Removal,* 748 F.2d at 1409 (footnote and cites omitted):

**\*8** The employee bears the burden of proving he performed work for which he was not properly compensated. However, employers have a duty to keep accurate records. If employers do not keep accurate records, the employee's burden is extremely difficult. In order to prevent the employee from being penalized by the employer's failure to keep adequate records, the Supreme Court held in *Ander-*

Page 7

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106, 35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

*son* that an employee carries his burden by proving that he has "in fact performed work for which he was improperly compensated and ... [producing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Upon such a showing, the burden shifts to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference drawn from the employee's evidence. If the employer does not rebut the employee's evidence, then damages may be awarded even though the result is only approximate. The employer cannot complain that the damages lack the precision that would have been possible if the employer had kept the records required by law.

*Donovan v. Simmons Petroleum Corp.,* [99 LC ¶ 34,492] 725 F.2d 83, 85-86 (10th Cir.1983) (citations omitted) (*quoting Anderson,* 328 U.S. at 687, 66 S.Ct. at 1192). We have consistently upheld back wage awards based on reasonable approximations made in the absence of employer records.

*Accord, Bueno v. Mattner,* [107 LC ¶ 34,971] 829 F.2d 1380, 1387 (6th Cir.1987); *Hodgson v. American Concrete Co., Inc.,* 70 LC at 45,762-63.

The Secretary brings the wage violation action on behalf of the employees, not all of "whom need testify in order to establish a *prima facie* case [of improper compensation] as a matter of just and reasonable inference." *American Waste Removal,* 748 F.2d 1409 and n. 2; *Donovan v. Simmons Petroleum Corp.,* 725 F.2d 83, 86 (8th Cir.1983); *Donovan v. New Floridian Hotel, Inc.,* [94 LC ¶ 34,194] 676 F.2d 468, 472 (11th Cir.1982); *Donovan v. Burger King Corp.,* [93 LC ¶ 34,150] 672 F.2d 221 (1st Cir.1982); *Brennen v. General Motors Acceptance Corp.,* [71 LC ¶ 32,945] 482 F.2d 825, 829 (5th Cir.1973); *see Hodgson,* 70 LC at 45,761. There is no requirement that there be testimony from workers on each shift for the entire back pay period in order to establish the requisite pattern of violation. *Donovan v. Bel-Loc Diner, Inc.,* [103 LC ¶ 34,724] 780 F.2d 1113, 1116 (4th Cir.1985). Nor is there a requirement of testimony

from workers from each of the places of work. *Burger King,* 672 F.2d at 224-25 (employees from six of 44 restaurants). Courts have consistently allowed, or even required, a small number of employees to testify to establish a pattern of violations for a larger number of workers. *See, e.g., id.* (under count limit, only six of 246 employees testified, with stipulation 20 more could give same testimony); *Beliz v. W.H. McLeod & Sons Packing Co.,* [103 LC ¶ 34,726] 765 F.2d 1317, 1321, 1331 (5th Cir.1985) (three of 45 employees); *Castillo v. Givens,* [97 LC ¶ 34,382] 704 F.2d 181, 195 (5th Cir.1983), *cert. denied,* [ 99 LC ¶ 34,443] 464 U.S. 850 (1983) (13 of 139 employees); *Bueno v. Mattner,* [105 LC ¶ 34,852] 633 F.Supp. 1446 (W.D.Mich.1986), *aff'd,* [ 107 LC ¶ 34,971] 829 F.2d 1380 (6th Cir.1987) (nine of 28 employees); *Donovan v. Kaszychi & Sons Contractors, Inc.,* [102 LC ¶ 34,641] 599 F.Supp. 860, 868 (S.D.N.Y.1984) (40 of over 200 employed). In these cases the evidence typically consisted of testimony from some employees relating to their hours and other workers' hours, testimony from the compliance officer who interviewed these workers and along with other, non-testifying workers, and other documentary evidence, *e.g.,* records, affidavits, and depositions.

**\*9** Here, five workers testified regarding the hours worked by themselves and by 21 other workers, 15 of whom Electro-Coatings admits are identified in the summaries of unpaid wages. (*See* TH, CR 1370-1437, 1541-58; *see also* PB attachments 1 and 2). They testified they worked in three-person crews, thus all with the same basic hours (TH, CR 1373, 1409, 1929, 1543). Electro-Coatings also called a worker who testified on these matters (TH, CR 1670-90). The ALJ found they consistently testified to working 70 to 90 hours per week (ALJD, CR 236; *see also* TH, CR 1376-77, 1431, 1546-47, 1393, 1413, 1679).

The DOL compliance officer, Ms. Botos, testified that she began this investigation in 1977; that she examined the records of Electro-Coatings, find-

Page 8

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106, 35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

ing they paid the employees at a piece rate rather than hourly rate and kept no record of hours worked (TH, CR 1439-44). She testified she found the records did not reflect payment of proper fringe benefits or overtime (TH, CR 1445-46, 1449). This was corroborated by testimony from an Electro-Coatings' representative, Mr. Corl (TH, CR 1671, 1674, 1678-79), and Ms. Hunter (TH, CR 1694).

Ms. Botos testified she had to compute estimates of the hours worked (TH, CR 1448-53, 1605-06), based in part upon her interviews with employees (TH, CR 1444-1453, 1467). She testified she also used such Electro-Coatings' records as were available, such as gross pay figures (TH, CR 1444-46, 1449-51, 1453, 1455). She computed minimum wage violations only from those contracts containing wage determinations, which set forth minimum wage levels (TH, CR 1450, 1451, 1615-16). She testified that in her opinion the estimates of hours were conservative (TH, CR 1475), and Electro-Coatings agreed (TH, CR 1476).

The ALJ found Ms. Botos was an experienced expert in her field as a compliance officer (ALJD, CR 230, *see also* TH, CR 1438-39), and that she was a credible witness whose testimony was entitled to be believed (ALJD, CR at 230). A compliance officer is normally presumed to have properly discharged her duties unless evidence is offered in rebuttal. *Richard E. Wilson Corp. v. United States,* 100 Labor Cases (CCH), ¶ 34,515 (Ct.Cl.1983). Electro-Coatings offered no evidence to contradict Ms. Botos' calculations.

The findings as to numbers of hours worked are supported by substantial evidence.

### 7. Compliance Officer Botos' Method of Computing Overtime Due

Electro-Coatings argues Ms. Botos' method of computing overtime compensation (*see* DX 13, CR 1118; TH, CR 1448-55; *see* example, DOL brief 24-25), and the ALJ's adoption of such, were incorrect. The CWHSSA permits a wide variety of methods to determine rate of pay, such as the piece rate

or percentage rate used by Electro-Coatings; however, it requires payment (with some exceptions not claimed here, *see* 29 C.F.R. Part 4.166) of at least the minimum rate and of a premium of one and one-half the basic rate for work over 40 hours per week. The record reflects Electro-Coatings did not pay overtime (TH, CR 1446; ALJD, CR 246).

**\*10** Ms. Botos calculated the overtime wages due for the contracts in existence during her investigation. The workers were paid bi-weekly. To find a weekly rate, she divided the bi-weekly gross pay in half. She then divided gross pay by hours worked to determine the regular, or basic, hourly rate actually paid. This rate varied by week and may, by regulation, be above the wage determination minimum rate. 29 C.F.R. Part 5.32 (contractors may pay above minimum). Where the actual, basic hourly rate was above the minimum rate, the greater, actual rate was used to calculate overtime. Where it was less, the minimum rate was used as the basic rate for computing overtime. As a practical matter, she calculated overtime due by multiplying hours over 40 by one-half the basic rate, since the straight time hourly rate had already been paid for those hours. (*See* ALJD, CR 234-35; DX 13, CR 1116, 1187, 1449).

Electro-Coatings offers an alternative method of computation (*see* example, PB 15-16). Electro-Coatings argues it was error to assume it ever paid over the minimum rate for the straight time, basic rate, and that instead all pay should be calculated using only the applicable minimum rate as the basic rate. Under Electro-Coatings' method, the basic rate under a given contract would not fluctuate from week to week nor would the overtime premium. The weekly pay owed would be calculated by multiplying the applicable basic or overtime rate by the respective estimated hours worked. Since workers were paid bi-weekly, Electro-Coatings' method would add together these calculated wages due for the two-week period. This method would average the hours worked during the two one-week periods, and thus would effectively treat Electro-Coatings as

Page 9

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106,
35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

having paid a small portion of the overtime rate due-even though Electro-Coatings' records reflect that no overtime was paid (TH, CR 1446). Electro-Coatings argues this would lower its overtime deficit by one-quarter.

[*Actual Base Rate* ]

The Supreme Court, in construing the FLSA, rejected a method analogous to Electro-Coatings' and approved a method analogous to Ms. Botos'. *Overnight Motor Transp. Co. v. Missel,* [5 LC ¶ 51,145] 316 U.S. 572 (1942), and *Walling v. Youngerman-Reynolds Hardwood,* [9 LC ¶ 51,203], 325 U.S. 419 (1945), hold the regular, or basic, rate, from which the overtime premium is calculated, is the rate actually paid to the worker, that is the quotient of the gross pay received divided by the hours worked that week, even though the rate yielded may fluctuate from week to week and may be above the minimum rate required.

This reasoning is equally applicable to the CWHSSA, as the FLSA and CWHSSA are to be construed as mutually supplementary. *See Masters v. Maryland Management Co.,* [73 LC ¶ 33,041] 493 F.2d 1329 (4th Cir.1974) (regular rate computed the same for FLSA, SCA and CWHSSA); *Mitchell v. Empire Gas Engineering Co.,* [35 LC ¶ 71,670] 256 F.2d 781 (5th Cir.1958); *see also American Waste Removal,* 748 F.2d at 1410 n. 3 (FLSA should be construed consistently with the overtime provisions of the SCA-here expanded on by the CWHSSA). The method endorsed by these cases is consistent with that used by Ms. Botos. This is also the method which appears to be in general use, according to examples and explanations in 2 [Wages-Hours] Labor Law Reporter (CCH) Regular Rate-Particular Agreements, ¶ 25,520.34 (editorial explanation of calculation of day rate); ¶ 25,520.22 (editorial explanation of converting semi-monthly pay [24 periods per year] for irregular hours into weekly pay, noting averaging of the weekly hours over the pay period is not allowed, and calculating gross pay in a manner closely analogous to that used here, *i.e.,* biweekly [26 pay peri-

ods per year] ); ¶ 25,520.37 (editorial explanation of calculation of regular rate when pay by piece rate; closely analogous to method here).

**\*11** To summarize, the methods of computation used by Ms. Botos and adopted by the ALJ are neither arbitrary nor capricious and are supported by substantial evidence.

8. Compliance Officer Brushaber's Method of Computing Overtime Due

Electro-Coatings argues compliance officer Brushaber's overtime calculations, and the ALJ's adoption of such, were arbitrary and capricious, and unsupported by substantial evidence. This issue was not raised in the administrative appeal, thus should not be considered in federal court. *See Tucker,* 344 U.S. 33, *supra.*

Moreover, consideration on the merits is not favorable to Electro-Coatings. Subsequent to Ms. Botos' investigation, a follow-up investigation was conducted by another DOL Compliance Officer, Mr. Brushaber, assisted by Ms. Stokriewick. (*See, e.g.,* TH, CR 1504). Mr. Brushaber's resulting calculations of violations were based directly on Electro-Coatings' actual records of actual hours worked, unlike the estimates Ms. Botos previously had to make (TH, Cr 1510-11; *see* ALJD, CR 237). It was not arbitrary or capricious to rely on these records.

Electro-Coatings also argues Mr. Brushaber improperly included as part of gross wages certain alleged bonuses it paid to employees, thus inflating the basic or regular rate. Some types of bonuses, *e.g.,* holiday bonuses, are excludable from wages in calculating overtime pay, but bonuses aimed at increasing an employee's efforts are includable as wages. *See generally,* 2 [Wages-Hours] Labor Law Reporter (CCH), ¶ 25,550, *et seq.* (discussing FSLA provisions). Electro-Coatings does not claim, nor is there evidence to support a claim, that the bonuses in its records were of an excludable type, *i.e.,* not intended to increase employees' efforts.

The ALJ decision (ALJD, CR 238) essentially

Page 10

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106,
35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

adopts the testimony of Mr. Brushaber (TH, CR 1518-22, DX 23, CR 1293), and of Ms. Hunter, an Electro-Coatings' officer (TH, CR 1711, 1722-24, 1727-29), that employee pay was actually based on a percentage of the contract basis in order to provide a production incentive for the workers. This testimony and Electro-Coatings' records reflect that it calculated regular and overtime wages based upon the minimum rate, rather than the actual rate, then added an alleged bonus in whatever amount was needed to bring its minimum rate based figure up to the actual amount to be paid under the percentage of the contract method actually used.

The alleged bonuses, which Electro-Coatings admits were production incentives, were properly includable as wages for purposes of determining the regular or basic rate by Mr. Brushaber and the ALJ. Such method was neither arbitrary nor capricious.

### 9. Contract Number Not in Evidence

Electro-Coatings was assessed a back wages liability of $102.07 on contract number GS-06W-00167 (DX 13, CR 1118), which is not a part of this action. It argues this assessment is a denial of due process, is not supported by substantial evidence, and casts doubt over the entire administrative findings. This issue was not raised at the administrative level in appealing the ALJ's decision (CR 283-89), thus normally could not be considered in federal court. See *Tucker,* 344 U.S. 33, *supra.*

**\*12** Moreover, the computation sheet, DX 13, describes the contract in question as a region IV contract that does not contain a wage determination and relates to violations for the weeks ending May 30, 1976 and November 2 (may be "12"), 1976 (CR 1118). Except for the identification number, all these elements are consistent with those in contract numbered GS-04W-60257 (DX 4, CR at 765-805), an admitted contract in this action. The questioned contract number should logically be a region VI contract since it has "-06W-",[FN6] but the computation sheet (DX 13) states it is a region IV contract, such as DX 4.

The combination of these factors suggest an error was made by Ms. Botos in transcribing the contract number on to the computation sheet. In the absence of bringing this issue to the Secretary's attention, it appears the contract identified as GS-06W-00167 actually refers to DX 4, the contract identified as GS-04W-60257.

### 10. Statute of Limitations

Electro-Coatings argues this action was barred by the statute of limitations found in either (1) the Portal-to-Portal Act (PPA), 29 U.S.C. § 255(a), which provides for a two-year statute for actions brought under, *inter alia,* the Bacon-Davis Act, 40 U.S.C. § 276(a), *et seq.,* or the Walsh-Healey Act, 41 U.S.C. § 35, *et seq.;* or (2) in the general limitations statute in 28 U.S.C. § 2415(a) for suits by the United States on contracts.[FN7]

The ALJ held the SCA and CWHSSA, not the Walsh-Healey Act, are applicable herein and were violated (ALJD, CR at 222-25). The PPA two-year statute of limitations does not apply to either the SCA, *United States v. Deluxe Cleaners and Laundry, Inc.* [76 LC ¶ 33,218] 511 F.2d 926, 928-29 (4th Cir.1975), or the CWHSSA, *Glenn Electric Co.,* 101 Labor Cases (CCH) at 46,341. Rather, both are governed by the limitations period of 28 U.S.C. § 2415. *Deluxe Cleaners,* 511 F.2d at 928; *Glenn Electric,* 101 Labor Cases at 46,341.

The statute of limitations claim was first raised in Electro-Coatings' brief. It was not raised in the answer filed by Electro-Coatings in reply to the DOL counterclaim, as required by Fed.R.Civ.P. 8(c). Generally, such failure waives the defense. 5 Wright & Miller Federal Practice and Procedure § 1278 n. 39; *Colonial Refrigerated Transp., Inc. v. Worsham,* 705 F.2d 821 (6th Cir.1983) (waiver); *Crawford v. Zeiter,* 326 F.2d 119 (6th Cir.1964) (waiver; *but compare Wade v. Lynn,* 181 F.Supp. 361 (N.D.Ohio 1960) (no waiver). Moreover, it was not raised at the administrative level. *See Tucker,* 344 U.S. 33, *supra.*

Even assuming no waiver, section 2415 re-

quires the government to bring an action by the later date of six years from accrual of the cause of action or one year after the final administrative decision. The latter date applies to the case *sub judice.* The Secretary's final decision was rendered on April 17, 1986 (CR at 384-85). The DOL counterclaim was filed in this case on August 11, 1986, well within one year of the final administrative decision.

**\*13** Finally, even assuming section 2415(a) would bar the DOL counterclaim, section 2415(f) provides the limitation provisions of section 2415 are inapplicable to bar a government counterclaim arising out of the same transaction or occurrence as the complaint. *Simmonds Precision Products, Inc. v. United States,* 546 F.2d 886 (Ct.Cl.1976); *Sea-Land Service, Inc. v. United States,* 493 F.2d 1357 (Ct.Cl.1974); *cert. denied,* 419 U.S. 840 (1979); *but compare Mariner v. United States,* 1 Cl.Ct. 430 (1983), *aff'd without publ'd op.,* 727 F.2d 1118 (Fed.Cir.1983) ( section 2415 barred counterclaim). Electro-Coatings' complaint and the DOL counterclaim both go to the liability assessed against Electro-Coatings at the administrative level, thus both arise from the same transaction or occurrence, and subsection (f) would be applicable.

In summary, the limitations period in section 2415(a) does not bar the DOL counterclaim.

#### B. *DOL Motion for Summary Judgment*
The Secretary moves for summary judgment on its counterclaim for unpaid back wages under the SCA, 41 U.S.C. § 354(b), and the CWHSSA, 40 U.S.C. §§ 328(b)(2), 330(a) and (b). The Secretary seeks judgment in the amount of $82,294.33, the amount the ALJ found due (ALJD, CR 248), plus prejudgment interest. Such interest is allowable in employee wage suits where no liquidated damages are awarded. *McClanahan v. Mathews,* [65 LC ¶ 32,479] 440 F.2d 320, 324-26 (6th Cir.1971) (under PPA and FLSA); *Rogers v. Fansteel, Inc.,* 533 F.Supp. 100, 102 (E.D.Mich.1981); *United States v. Powers Building Maintenance Co.,* [67 LC ¶ 32,626] 336 F.Supp. 819 (W.D.Okla.1972) (under

SCA); *Griffith,* 86 Labor Cases at 48,864 (under SCA). Liquidated damages were neither sought nor awarded here. Two issues have been raised by the Secretary, but not addressed by Electro-Coatings.

##### 1. Conformable Rate
The contract wage determinations contained a minimum wage provision for most, but not all, of the classes of workers employed by Electro-Coatings. In some there was no determination for prep workers who prepared furniture for painting. (TH, CR 1447-48) The wage determinations require such workers to be classified in a reasonable relationship with those classes specifically mentioned in a wage determination and to be paid a minimum rate reached by negotiation.FN8

Ms. Botos testified that Electro-Coatings' president, Mr. Schneider, had proposed such a rate, which she thereafter used in her computations (TH, CR 1447-48). The ALJ found this to be a conformable rate and used it in the computation of violations (ALJD, CR 233). This conclusion is supported by substantial evidence.

##### 2. Unusual Circumstances
The SCA, 41 U.S.C. § 354(a) FN9 provides that "[u]nless the Secretary otherwise recommends because of unusual circumstances" violators of the SCA are barred from receiving government contracts for three years. The Secretary affirmed the finding of the ALJ that unusual circumstances did not exist (decision of Secretary, CR 384-85). Electro-Coatings was thereafter placed on the list of persons ineligible to be awarded government contracts (CR 387). This finding is reviewable on appeal as, at least in part, a question of law as well as a question of fact. *Federal Food Service, Inc. v. Donovan,* 658 F.2d 830, 832-33 (D.C.Cir.1981).

**\*14** *Federal Food Service,* at 833, adopted the Secretary's factors in deciding if "unusual circumstances" as found in *Washington Moving and Storage Co.,* No. SCA-168 (March 12, 1974): (1) whether there is a history of repeat violations; (2) the nature, extent and seriousness of the violations;

Page 12

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106, 35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

(3) the willfulness or culpable neglect of the violations; (4) the existence of *bona fide* legal questions of doubtful certainty; (5) the good faith cooperation of Electro-Coatings and intent to comply; and (6) the promptness with which Electro-Coating paid the employees the sums determined to be due them. The ALJ considered the first five factors and found the first four weighed against a finding of no unusual circumstances (ALJD, CR 243-44). The Administrator and Secretary affirmed (CR 329-31, 383-85).

As to the first factor, prior discussion reveals Electro-Coatings had a history of repeat violations under numerous contracts over approximately five years, despite being informed by the first investigator, Ms. Botos, of its improper procedures. As to the second factor, the liability of over $82,000 reflects the serious and extensive nature of the violations. As to the third factor, prior discussion demonstrates Electro-Coatings knew it was subject to laws regulating overtime pay, minimum wages, and fringe benefits. Electro-Coatings ignored the mandates of the contracts and warnings of Ms. Botos. Its actions reflected, at best, culpable neglect. As to the fourth factor, Electro-Coatings has not demonstrated any legal issue was of doubtful certainty. Moreover, merely paying sums found due in an administrative proceeding, and promising future compliance, is insufficient to constitute unusual circumstances. A history of identical, repeat violations, such as here, would bar a finding of unusual circumstances. *Federal Foods Service,* 658 F.2d at 833.

The finding of no unusual circumstances is supported by substantial evidence, is not arbitrary or capricious, and is otherwise in accordance with law.

C. *Conclusion*

The Secretary is granted summary judgment in the amount of $82,294.33 in back wages, plus prejudgment interest, and on the finding that no unusual circumstances exist to excuse Electro-Coatings from debarment. Electro-Coatings' motion for summary judgment is denied.

It Is So Ordered.

FN1. The contracts, which were admitted as DOL exhibits below, are identified by exhibit number and contract number. The DOL introduced the following contracts into evidence: [not reproduced.-CCH.]

FN2. The SCA states, in relevant part, 41 U.S.C. § 351, 352 (emphasis added):

§ 351. *Required contract provisions; minimum wages*

(a) Every contract (and any bid specification therefor) entered into by the United States or the District of Columbia in excess of $2,500, except as provided in section 356 of this title, whether negotiated or advertised, the principal purpose of which is to furnish services in the United States through the use of service employees, *shall contain* the following:

(1) A provision specifying the minimum monetary wages to be paid the various classes of service employees in the performance of the contract or any subcontract thereunder, as determined by the Secretary, or his authorized representative, in accordance with prevailing rates for such employees in the locality.... In no case shall such wages be lower than the minimum specified in subsection (b) of this section.

(2) A provision specifying the fringe benefits to be furnished the various classes of service employees, engaged in the performance of the contract or any subcontract thereunder, as determined by the Secretary or his authorized representative to be prevailing for such employees in the locality.... Such fringe benefits shall include medical or hospital care,

Page 13

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106,
35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, unemployment benefits, life insurance, disability and sickness insurance, accident insurance, vacation and holiday pay, costs of apprenticeship or other similar programs and other bona fide fringe benefits not otherwise required by Federal, State, or local law to be provided by the contractor or subcontractor. The obligation under this subparagraph may be discharged by furnishing any equivalent combinations of fringe benefits or by making equivalent or differential payments in cash under rules and regulations established by the Secretary.

§ 352 Violations

(a) Liability of responsible party; withholding payments due on contract; payment of underpaid employees from withheld payments

Any violation of any of the contract stipulations required by section 351(a)(1) or (2) or of section 351(b) of this title shall render the party responsible therefor liable for a sum equal to the amount of any deductions, rebates, refunds, or underpayment of compensation due to any employee engaged in the performance of such contract. So much of the accrued payment due on the contract or any other contract between the same contractor and the Federal Government may be withheld as is necessary to pay such employees. Such withheld sums shall be held in a deposit fund. On order of the Secretary, any compensation which the head of the Federal agency or the Secretary has found to be due pursuant to this chapter shall be paid directly to the un-

derpaid employees from any accrued payments withheld under this chapter.

FN3. Electro-Coatings complains that GSA Form 2166 was not introduced as an exhibit in the hearing. Introduction of the actual form was not necessary in view of the fact the contract specifically states that "receipt of ... [GSA Form 2166] is acknowledged by ... [Electro-Coatings] ..." and that GSA Form 2166 sets forth the SCA. Form 2166 sets forth by its terms the provisions of the SCA. *See G & H Machinery Co. v. Donovan,* 96 Labor Cases (CCH) ¶ 34,354, at 45, 312, 45, 315 (S.D.Ill.1982) (contracts incorporating Form 2166).

FN4. Electro-Coatings has included the regulation in effect in 1979. (*See* PX 11, "W-H Publication 1244 (Rev.1979)," CR at 561). Part 5.5(c) states in pertinent part:

(c) The Agency Head shall cause or require the following clauses set forth in paragraphs (c)(1), (2), (3) and (4) of this section to be included in full in any contract subject to the Contract Work Hours and Safety Standards Act....

(1) Overtime requirements.... [Time worked over 40 hours must be paid] at a rate not less than one and one-half times the basic rate of pay....

FN5. 40 U.S.C. §§ 328 and 329 read as follows at the time the contracts were made (emphasis added):

§ 328(a) Notwithstanding any other provision of law, the wages of every laborer and mechanic employed by any contractor or subcontractor in his performance of work on any contract of the character specified in section 329 shall be computed on the basis of a standard workday of eight hours and a standard workweek

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106, 35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

of forty house and work in excess of such standard workday or workweek shall be permitted subject to the provisions of this section. For each workweek in which any such laborer or mechanic is so employed, such wages shall include compensation, at a rate not less than one and one-half times the basic rate of pay, for all hours worked in excess of eight hours in any calendar day or in excess of forty hours in the workweek, as the case may be.

(b) The following provisions *shall be a condition of every contract* of the character specified in section 329 and of any obligation of the United States, any territory, or the District of Columbia in connection therewith:

(1) No contractor or subcontractor contracting for any part of the contract work which may require or involve the employment of laborers or mechanics shall require or permit any laborer or mechanic, in any workweek in which he is employed on such work, to work in excess of forty hours in such workweek except in accordance with the provisions of this Act; and

(2) In the event of violation of the provisions of paragraph (1), the contractor and any subcontractor responsible therefor shall be liable to such affected employee for his unpaid wages and shall, in addition, be liable to the United States (or, in the case of work done under contract for the District of Columbia or a territory, to such District or to such territory) for liquidated damages as provided therein....

§ 329(a) The provisions of this Act shall apply, except as otherwise provided, to any contract which may require or involve the employment of laborers or mechanics upon a public work of the United States, of any territory, or of the District of Columbia, and to any other contract which may require or involve the employment of laborers or mechanics if such contract is one (1) to which the United States or any agency or instrumentality thereof, any territory, or the District of Columbia is a party....

FN6. The second set of digits in the contract identification number is used generally to designate the region. *See, e.g.,* DX 8, contract number GS-05W-69086, CR 912, a region V contract, CR 935; DX 11, contract number GS-10W-65323, CR 996, a region 10(X) contract, CR 1078; an DX 5, contract number GS-07W-75029, CR 806, a region 7 (VII) contract, CR 836.

FN7. 28 U.S.C. § 2415 reads:

§ 2415. "Time for commencing actions brought by the United States"

(a) Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later.

FN8. Each wage determination contained the following language:

NOTE: Any class of service employee

Page 15

Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106, 35 Cont.Cas.Fed. (CCH) P 75,540
**(Cite as: 1988 WL 125784 (N.D.Ohio))**

required in the performance of the contract but not listed above shall be classified by the contractor so as to provide a reasonable relationship between such classes and those listed above, and shall be paid such monetary wages as are determined by agreement (evidenced in writing) of the interested parties, who shall be deemed to be the contracting agency, the contractor, and the employees who will perform on the contract or their representatives. In the absence of an agreement the question of proper conformable wage rates is to be submitted to the Department of Labor by the contracting officer for a final determination. (See Section 4.6(b) of Regulations 29 CFR 4)

FN9. 41 U.S.C. § 354(a) states (emphasis added): § 354.

"List of violations; prohibition of contract award to firms appearing on list; actions to recover underpayments; payment of sums recovered"

(a) The Comptroller General is directed to distribute a list to all agencies of the Government giving the names of persons or firms that the Federal agencies or the Secretary have found to have violated this chapter. *Unless the Secretary otherwise recommends because of unusual circumstances,* no contract of the United States shall be awarded to the persons or firms appearing on this list or to any firm, corporation, partnership, or association in which such persons or firms have a substantial interest until three years have elapsed from the date of publication of the list containing the name of such persons or firms. Where the Secretary does not otherwise recommend because of unusual circumstances, he shall, not later than ninety days after a hearing examiner has made a finding of a viola-

tion of this chapter, forward to the Comptroller General the name of the individual or firm found to have violated the provisions of this chapter.

N.D.Ohio,1988.
National Electro-Coatings, Inc. v. Brock
Not Reported in F.Supp., 1988 WL 125784 (N.D.Ohio), 28 Wage & Hour Cas. (BNA) 1289, 109 Lab.Cas. P 35,106, 35 Cont.Cas.Fed. (CCH) P 75,540

END OF DOCUMENT



---



632 F.3d 971, 17 Wage & Hour Cas.2d (BNA) 97
**(Cite as: 632 F.3d 971)**

170BVIII(K) Scope, Standards, and Extent
170BVIII(K)4 Discretion of Lower Court
170Bk817 k. Parties; pleading. Most Cited Cases

Court of Appeals reviews class certification decisions deferentially, in recognition of the fact that class certification rule gives the district courts broad discretion to determine whether certification of a class-action lawsuit is appropriate. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[4] Federal Courts 170B ☞817**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)4 Discretion of Lower Court
170Bk817 k. Parties; pleading. Most Cited Cases

Court of Appeals will reverse district court's class certification decision only when it finds an abuse of discretion. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[5] Federal Courts 170B ☞817**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)4 Discretion of Lower Court
170Bk817 k. Parties; pleading. Most Cited Cases

If the district court applies an incorrect legal rule as part of its class certification decision, then the framework within which it has applied its discretion is flawed, and the decision must be set aside as an abuse. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ☞184.5**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented

170Ak184 Employees
170Ak184.5 k. In general. Most Cited Cases

**Labor and Employment 231H ☞2374**

231H Labor and Employment
231HXIII Wages and Hours
231HXIII(B) Minimum Wages and Overtime Pay
231HXIII(B)6 Actions
231Hk2373 Actions on Behalf of Others in General
231Hk2374 k. In general. Most Cited Cases

District court could certify class action in which former restaurant employees asserted state-law claims under Illinois minimum wage law and Illinois Wage Payment and Collection Act on grounds that class action was superior means of adjudicating dispute in combined action that also included collective action brought pursuant to Fair Labor Standards Act (FLSA), even though FLSA required those wishing to participate to "opt in," while class certification rule required those not wishing to participate to "opt out"; abrogating *Riddle v. National Security Agency, Inc.,* 2007 WL 2746597. Fair Labor Standards Act of 1938, §§ 16(b), 18(a), 29 U.S.C.A. §§ 216(b), 218(a); Fed.Rules Civ.Proc.Rule 23(b)(3), (c)(2)(B), 28 U.S.C.A.; S.H.A. 820 ILCS 105/1 et seq., 115/1 et seq.

**[7] Federal Courts 170B ☞373**

170B Federal Courts
170BVI State Laws as Rules of Decision
170BVI(A) In General
170Bk373 k. Substance or procedure; determinativeness. Most Cited Cases

Once a suit is removed from state court to federal court, it is governed by the federal court's procedures.

**[8] Labor and Employment 231H ☞2222**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime
Pay
         231HXIII(B)1 In General
            231Hk2222 k. Preemption. Most Cited
Cases

**States 360 ⟜18.46**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.45 Labor and Employment
            360k18.46 k. In general. Most Cited
Cases

Savings clause of Fair Labor Standards Act
(FLSA), which indicates that FLSA does not excuse
noncompliance with federal or state law or muni-
cipal ordinance establishing a higher minimum
wage or a shorter maximum work week, has the ef-
fect of preserving state and local regulations. Fair
Labor Standards Act of 1938, § 18(a), 29 U.S.C.A.
§ 218(a).

**[9] Federal Courts 170B ⟜16**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk14 Jurisdiction of Entire Contro-
versy; Pendent Jurisdiction
            170Bk16 k. Labor relations. Most
Cited Cases

State labor-law claims asserted against employ-
er by former restaurant employees were sufficiently
related to former employees' claims in collective
action under Fair Labor Standards Act (FLSA) to
form part of same Article III case or controversy, as
required for exercise of supplemental jurisdiction
over state-law claims. U.S.C.A. Const. Art. 3, § 2,
cl. 1; 28 U.S.C.A. § 1367(a).

**[10] Federal Courts 170B ⟜16**

170B Federal Courts

170BI Jurisdiction and Powers in General
   170BI(A) In General
      170Bk14 Jurisdiction of Entire Contro-
versy; Pendent Jurisdiction
         170Bk16 k. Labor relations. Most
Cited Cases

Opt-in procedures in Fair Labor Standards Act
(FLSA) do not operate to limit, expressly or im-
pliedly, district court's supplemental jurisdiction to
only those state-law claims that also involve opt-in
procedures. Fair Labor Standards Act of 1938, § 16,
29 U.S.C.A. § 216.

**[11] Federal Courts 170B ⟜14.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk14 Jurisdiction of Entire Contro-
versy; Pendent Jurisdiction
            170Bk14.1 k. In general. Most Cited
Cases

Once the requirements of supplemental juris-
diction statute are satisfied, the district court must
consider whether there is some other reason why it
ought to decline to exercise supplemental jurisdic-
tion over state-law claims. 28 U.S.C.A. § 1367(a).

**[12] Federal Courts 170B ⟜16**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk14 Jurisdiction of Entire Contro-
versy; Pendent Jurisdiction
            170Bk16 k. Labor relations. Most
Cited Cases

Conflict between opt-in procedure for collect-
ive actions under Fair Labor Standards Act (FLSA)
and the opt-out procedure under class certification
rule is not a proper reason to decline supplemental
jurisdiction over state-law class claims on grounds
that there are compelling reasons for declining jur-
isdiction. Fair Labor Standards Act of 1938, § 16,
29 U.S.C.A. § 216; 28 U.S.C.A. § 1367(c)(4);
Fed.Rules Civ.Proc.Rule 23(c)(2)(B), 28 U.S.C.A.

632 F.3d 971, 17 Wage & Hour Cas.2d (BNA) 97
**(Cite as: 632 F.3d 971)**

**[13] Federal Courts 170B ☞16**

170B Federal Courts
    170BI Jurisdiction and Powers in General
      170BI(A) In General
        170Bk14 Jurisdiction of Entire Controversy; Pendent Jurisdiction
          170Bk16 k. Labor relations. Most Cited Cases

Class claims asserted under state labor laws in combined action did not substantially predominate over claims under Fair Labor Standards Act (FLSA), due to differences in potential number of state-law class members and those participating in FLSA collective action, as would warrant declining supplemental jurisdiction; state-law claims essentially replicated FLSA claims, and overall numbers involved, with approximately 30 participants in FLSA collective action and potentially 180 to 250 people who might participate in any one of three state-law classes, were low. 28 U.S.C.A. § 1367(c)(2); Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C.A. § 216(b); Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.; S.H.A. 820 ILCS 105/1 et seq., 115/1 et seq.

**\*973** Douglas M. Werman, Attorney, Jamie G. Sypulski, Attorney (argued), Chicago, IL, for Plaintiffs-Appellants.

Jane M. McFetridge, Attorney, Jackson Lewis, Chicago, IL, Paul DeCamp, Attorney (argued), Jackson Lewis, Reston, VA, for Defendant-Appellee.

Kenneth J. Sugarman, Rudy, Exelrod, Zieff & Lowe, LLP, San Francisco, CA, Dean A. Romhilt (argued), Department of Labor, Fair Labor Standards Division, Washington, DC, for Amici Curiae.

Before FLAUM, WOOD, and HAMILTON, Circuit Judges.

WOOD, Circuit Judge.

In this appeal we consider whether employees who institute a collective action against their employer under the terms of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. ("FLSA"), may at the same time litigate supplemental state-law claims as a class action certified according to Federal Rule of Civil Procedure 23(b)(3). The district court thought not; it rejected the plaintiffs' effort to proceed as a class under Rule 23(b)(3) on the ground that there is a "clear incompatibility" between the FLSA proceeding and the proposed class action. The problem, as the court saw it, stems from the fact that the FLSA requires potential plaintiffs to opt *in* to participate in an action, while the plaintiffs in a Rule 23(b)(3) class action are included in the case unless they opt *out*. Trying to use both systems side-by-side would be rife with complications, it concluded; more formally, it held that one could never find the superiority requirement of Rule 23(b)(3) satisfied if the case also involved an FLSA collective action.

The question whether these two distinct types of aggregate litigation may co-exist within one case has divided the trial courts in this circuit and elsewhere. In the Northern District of Illinois alone, compare *Barragan v. Evanger's Dog and Cat Food Co.,* 259 F.R.D. 330 (N.D.Ill.2009), and *Ladegaard v. Hard Rock Concrete Cutters, Inc.,* 2000 WL 1774091 (N.D.Ill.2000), with *Riddle v. National Sec. Agency, Inc.,* 2007 WL 2746597 (N.D.Ill.2007), *McClain v. Leona's Pizzeria, Inc.,* 222 F.R.D. 574 (N.D.Ill.2004), and *Rodriguez v. The Texan, Inc.,* 2001 WL 1829490 (N.D.Ill.2001). As far as we can tell, no court of appeals has yet had occasion to address it. But see *Wang v. Chinese Daily News, Inc.,* 623 F.3d 743, 753-55, 760-62 (9th Cir.2010) (holding that a district court properly certified a Rule 23(b)(2) class along with an FLSA collective action and properly exercised supplemental jurisdiction over the state-law claim); *Lindsay v. Government Employees Ins. Co.,* 448 F.3d 416, 420-25 (D.C.Cir.2006) (concluding, in the context of an appeal under Rule 23(f), that the FLSA does not necessarily preclude an exercise of supplemental jurisdiction over related state-law

claims); *De Asencio v. Tyson Foods, Inc.,* 342 F.3d 301, 307-12 (3d Cir.2003) (concluding that a district court presiding over an FLSA collective action should not have exercised supplemental jurisdiction over parallel state-law claims).

We conclude that there is no categorical rule against certifying a Rule 23(b)(3) **\*974** state-law class action in a proceeding that also includes a collective action brought under the FLSA. We refer to these as "combined" actions, rather than "hybrid" actions, to avoid confusion with other uses of the term "hybrid"-*e.g.,* for cases certified under more than one subsection of Rule 23(b).) In combined actions, the question whether a class should be certified under Rule 23(b)(3) will turn-as it always does-on the application of the criteria set forth in the rule; there is no insurmountable tension between the FLSA and Rule 23(b)(3). Nothing in the text of the FLSA or the procedures established by the statute suggests either that the FLSA was intended generally to oust other procedures used in federal court or that class actions in particular could not be combined with an FLSA proceeding. We reverse the district court's class-certification determination and remand for further consideration in accordance with this opinion.

# I

The plaintiffs are former employees of an Outback Steakhouse in Calumet City, Illinois. The restaurant is owned and operated by the defendant, OS Restaurant Services, Inc.; we refer to the defendant as "Outback" throughout this opinion. The employees sued Outback on behalf of themselves and all others who had previously worked or were currently employed at the restaurant as hourly or tipped employees. (A tipped employee, like a waiter or bartender, is paid a tip-credit wage, which is less than the minimum wage; the expectation is that her earnings for each pay period, including both the base wage and tips, will equal or exceed the minimum wage.)

The complaint alleges that Outback's employee policies run afoul of the FLSA, the Illinois Minim-

um Wage Law, 820 ILCS 105/1 *et seq.* ("IMWL"), and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* ("IWPCA"). Specifically, the plaintiffs argue that Outback violated the minimum wage and maximum hour provisions of both the FLSA and the IMWL in three ways: (1) by requiring tipped employees to perform tasks during which they could not earn tips; (2) by using money that tipped employees were required to deposit in a "tip pool" to make up for shortages in restaurant cash registers; and (3) by demanding that the tipped employees contribute an excessive amount of their tips to the tip pool. The plaintiffs' state-law claim under the IWPCA is based on their allegation that Outback altered entries in its timekeeping system to reflect fewer hours for each person, thereby enabling it to pay its employees for less time than they actually worked.

The plaintiffs moved for conditional approval of a federal collective action under section 16(b) of the FLSA, 29 U.S.C. § 216(b), which authorizes employees to act together to seek redress for violations of the statute's minimum wage and maximum hour provisions, see 29 U.S.C. §§ 206 and 207. The conditional approval process is a mechanism used by district courts to establish whether potential plaintiffs in the FLSA collective action should be sent a notice of their eligibility to participate and given the opportunity to opt in to the collective action. See, *e.g., Myers v. Hertz Corp.,* 624 F.3d 537, 554-55 (2d Cir.2010). The plaintiffs proposed that notice be given to anyone who had worked as a tipped employee at Outback since 2005. At the same time, they sought certification under Rule 23(b)(3) of three different classes alleging state-law claims: (1) all tipped employees who earned less than minimum wage, in violation of the IMWL; (2) all tipped employees who worked more than 40 hours per week but were not paid overtime,**\*975** in violation of the IMWL; and (3) all employees who by virtue of Outback's incorrect timekeeping were not paid for some of the time that they worked, in violation of the IWPCA.

A magistrate judge recommended that the district court permit the federal collective action to proceed but deny without prejudice certification of the Rule 23(b)(3) state-law classes. While the judge was satisfied that the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) had been met, he had one minor reservation and one major concern about the predominance and superiority requirements for a(b)(3) class. The minor point related to the predominance requirement: the plaintiffs could show, he thought, that common questions predominated with respect to their IWPCA theory and two of their three IMWL theories, but not for the claim that Outback forced tipped employees to perform non-tip duties. The more important stumbling block was the requirement "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED.R.CIV.P. 23(b)(3). The judge decided that a Rule 23(b)(3) class will never be superior when another part of the case is proceeding under FLSA section 16(b), because of what he saw as the conflict between the two different forms of aggregate litigation.

The district court adopted the magistrate judge's recommendation. It refused to certify the class because there was "clear incompatibility between the 'opt out' nature of a Rule 23 action and the 'opt in' nature of a Section 216 action." Without elaborating why it thought that this was such a severe problem, the court concluded that this conflict automatically meant that the class action device was not a superior mechanism for resolving the plaintiffs' state-law claims. It accordingly denied class certification of those theories and permitted the plaintiffs to move forward with their FLSA collective action. We granted the plaintiffs' petition under Rule 23(f) for an immediate appeal of the order denying class certification.

## II

Outback rests its case for affirming the district court's class-certification decision exclusively on the argument that the plaintiffs cannot satisfy the requirements set out in Federal Rule of Civil Procedure 23(b)(3). There are a number of issues that are thus not before us. Outback does not complain about the district court's decision to permit the plaintiffs to proceed with their FLSA collective action; nor does it argue that the FLSA in any way preempts the state laws that the plaintiffs have invoked; nor has it suggested that the district court should have declined to exercise supplemental jurisdiction over the state-law claims (though the district court alluded to this question, and we return briefly to it later). In addition, no one questions whether the plaintiffs have satisfied the four requirements of Rule 23(a). This leaves us with the question whether the district court correctly ruled that the requirements of Rule 23(b)(3) could not be satisfied.

[1][2] In fact, we can be more specific than that. Outback argues that even if we were inclined to reverse the district court's determination that class treatment is not a superior mechanism here, we could still affirm on the ground that individual issues predominate over class issues with respect to each of the plaintiffs' state-law claims. Although appellees are normally entitled to advance any argument that was presented before the district court in support of the order on appeal, see, *e.g., Newsome v. McCabe,* 256 F.3d 747, 753 (7th Cir.2001), this case is not a good candidate for **\*976** that approach. While the predominance question was explored before the magistrate judge (who was largely persuaded by the plaintiffs' position), it is unclear what the district court thought about it. At one point, the court remarked that it was adopting the magistrate's recommendation "in full." Standing alone, that sounds as if the district court was endorsing the magistrate judge's predominance analysis. But later, the court said, "Because the Court holds that plaintiffs cannot meet the superiority requirements with regard to the state law claims, it need not address whether common issues of fact or law predominate...." This is not a clear enough ruling from the district court to support affirmance on an alternate ground. As a result, our job in this ap-

peal is further simplified: we need address only whether the district court correctly ruled that incompatibility between section 16(b) of the FLSA and Rule 23(b)(3) means that plaintiffs trying to pursue both options in a single proceeding will never be able to demonstrate the superiority required by Rule 23(b)(3).

[3][4][5] We review class-certification decisions deferentially, in recognition of the fact that Rule 23 gives the district courts "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Chavez v. Illinois State Police,* 251 F.3d 612, 629 (7th Cir.2001) (internal quotation marks omitted). We will reverse the class-certification decision only when we find an abuse of discretion. *Arreola v. Godinez,* 546 F.3d 788, 794 (7th Cir.2008). If, however, the district court applies an incorrect legal rule as part of its decision, then the framework within which it has applied its discretion is flawed, and the decision must be set aside as an abuse. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 402, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

### III

[6] This appeal requires us to delve into the differences between an FLSA collective action and a Rule 23 class action-in particular, a class action arising under state laws governing such topics as wages and overtime. Section 16(b) of the FLSA permits an employee to participate in a collective action only if that employee consents in writing to be a plaintiff in the action. See 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought...."); see also *Harkins v. Riverboat Services, Inc.,* 385 F.3d 1099, 1101 (7th Cir.2004). In contrast, potential members of a Rule 23(b)(3) class must be given only the opportunity to opt out of the class action; they will automatically be included in the class if they do not speak up. See FED.R.CIV.P. 23(c)(2)(B); *Berger v. Xerox Corp. Retirement Income Guarantee Plan,*

338 F.3d 755, 763 (7th Cir.2003).

As far as the district court was concerned, this distinction, and this distinction alone, rules out any chance of finding that class treatment under Rule 23(b)(3) of the state-law claims is a superior way to structure the case. This was not the first time the district court had expressed its view on this subject. See *Riddle v. National Security Agency, Inc.,* 2007 WL 2746597, at *7-10 (N.D.Ill.2007). In both *Riddle* and the present case, the court signaled that it had reached this conclusion as a matter of the interpretation of federal statutes and rules, and not merely an exercise of discretion applicable to any particular proposed class.

[7] Before examining the district court's class-certification analysis in greater detail, we pause briefly to address what appears to be an exception that the district **\*977** court recognized to its belief that combined actions are impossible. The district court suggested that it might treat combined actions that are first filed in a state court and then removed to federal court differently from comparable cases that originate in federal court. See also *id.* at *7-9. There is no reason for any such distinction, however. An original filing and a proper removal are each appropriate ways to reach federal court. Once a suit is removed from state court to federal court, it is governed by the federal court's procedures, *Claiborne v. Wisdom,* 414 F.3d 715, 720 (7th Cir.2005); there is no exclusion for Rule 23 or for any other rule. If there is a problem with combined actions, as the district court suggested, then the problem exists for all cases within the federal court's jurisdiction.

The district court was concerned that the collective action authorized by the FLSA would be undermined if supplemental state-law class actions were being pursued in the same case at the same time. By requiring people to opt in to the federal action, Congress limited the collective action under the FLSA to those who actively sought to assert their federal rights. As we have mentioned, however, Rule 23(b)(3) uses a default rule of inclu-

sion and demands affirmative action to stay out of the case. The court thus correctly recognized that some of the people included as part of the state-law classes (those who did nothing) would be excluded from the FLSA collective action. The district court thought that this outcome would undermine the intention of Congress expressed in the FLSA.

[8] In our view, the court jumped too quickly to congressional intent. Before taking that step, we must examine the text of the FLSA itself. Nothing we find suggests that the FLSA is not amenable to state-law claims for related relief in the same federal proceeding. Section 16(b) of the FLSA allows employees to bring collective actions to supplement the enforcement powers of the Secretary of Labor under the statute. See 29 U.S.C. § 216(b) (providing that an employee's rights under the subsection "terminate upon the filing of a complaint by the Secretary of Labor"); see also *Kendall v. City of Chesapeake,* 174 F.3d 437, 443 (4th Cir.1999). That provision providing that employees may bring actions against their employers makes no mention of state wage and labor laws. In addition, the FLSA includes an express savings clause, which provides: "No provision of this chapter ... shall excuse noncompliance with any Federal or State law or municipal ordinance establishing [a higher minimum wage or a shorter maximum work week.]" 29 U.S.C. § 218(a). We agree with the *amici* who have filed briefs in this case that this language has the effect of preserving state and local regulations. We expect that it would normally be the case that a claim under any such state regulations would be part of the same constitutional "case" as the FLSA claim, and thus that any such state claims would fall within the district court's supplemental jurisdiction. See 28 U.S.C. § 1367(a).

There is ample evidence that a combined action is consistent with the regime Congress has established in the FLSA. The Supreme Court's early decisions interpreting the FLSA led to a great rush of litigation under the statute. See generally *Hoffmann-La Roche Inc. v. Sperling,* 493 U.S. 165, 173,

110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Congress responded in the Portal-to-Portal Act of 1947, 61 Stat. 84, as amended, 29 U.S.C. §§ 251-262, by both eliminating "representative" actions (where employees would designate another to sue on their behalf) and by adding the opt-in provision to the statute for collective **\*978** actions brought by employees. The effect was to "limit[ ] private FLSA plaintiffs to employees who asserted claims in their own right and free [ ] employers of the burden of representative actions." *Hoffmann-La Roche Inc.,* 493 U.S. at 173, 110 S.Ct. 482. This action was designed to eliminate lawsuits initiated by third parties (typically union leaders) on behalf of a disinterested employee (in other words, someone who would not otherwise have participated in the federal lawsuit).

Outback complains that permitting a plaintiff who ends up in only the Rule 23(b)(3) class (because she neither opted out of that class nor opted in to the FLSA collective action) to proceed as part of the state-law class is in tension with the idea that disinterested parties were not supposed to take advantage of the FLSA. But such a plaintiff is doing no such thing. She will not be entitled to a single FLSA remedy, because she is not part of the FLSA litigating group. The most that one can say is that her state claim has found its way into federal court under the court's supplemental jurisdiction. But that is a complaint that could be brought in almost every claim that rests on section 1367 jurisdiction. In the case before us, the Rule 23(b)(3) class and the federal collective action are each comprised of a set of employees asserting injuries under either state or federal law. Should either or both groups prevail on the merits, each group member will receive only the relief that is prescribed under the law governing her part of the case. Some may be part of both the FLSA group and the Rule 23 class; some may be in one but not the other. We conclude that there is nothing in the FLSA that forecloses these possibilities.

With commendable concern for its employees'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

interests, Outback also urges that a combined action carries too high a potential for confusing notice to potential group members. It notes that the notice sent for purposes of the FLSA must inform recipients that they are required to opt in to the action if they wish to be included, but the notice sent for the Rule 23(b)(3) state-law claims must inform recipients that they will be part of the group unless they opt out. This is not a frivolous point, but we think that Outback has exaggerated the intractability of the problem it has identified. Although the potential for confusion created by a notice is a valid case-management consideration under Rule 23(b)(3)(D), there is no indication that the problem is any worse than countless others that district courts face with class actions.

It does not seem like too much to require potential participants to make two binary choices: (1) decide whether to opt in and participate in the federal action; (2) decide whether to opt out and *not* participate in the state-law claims. Other courts in this circuit appear to have had little trouble working out an adequate notice in this type of case. See, e.g., *O'Brien v. Encotech Const. Servs., Inc.,* 203 F.R.D. 346, 352 (N.D.Ill.2001); *Ladegaard,* 2000 WL 1774091, at *7. When we asked at oral argument whether Outback's lawyers could provide any concrete examples of confusion resulting from this type of notification, they were unable to point to a single instance. Finally, if these actions were to proceed separately-the FLSA in federal court and the state-law class action in state court-an entirely different and potentially worse problem of confusion would arise, with uncoordinated notices from separate courts peppering the employees. As a general rule, it will usually be preferable if the notice comes from a single court, in a unified proceeding, where the court and lawyers alike are paying close attention to the overall message the participants will receive.

**\*979** Because the district court ruled as a matter of law that these two actions could not proceed simultaneously, there is little in the record that

throws light on whether there is anything about this particular case that would stand in the way of the combined actions the plaintiffs are seeking to pursue. Rather than addressing that here, we think it best to allow the district court to take the first look at the superiority issue from that perspective, taking into account the usual requirements spelled out in Rule 23(b)(3).

**IV**

Before concluding, we need to return to the subject of supplemental jurisdiction. The district court did not dispose of the plaintiffs' state-law claims by declining to exercise supplemental jurisdiction, but it did refer to supplemental jurisdiction as part of its Rule 23 analysis. It thought that because the set of state-law plaintiffs in the case was potentially larger than the set of FLSA plaintiffs, it made less sense to exercise supplemental jurisdiction over the state-law claims. This was yet another reason why, in its view, the proposed Rule 23(b)(3) class failed the superiority requirement. Because the district court will be revisiting the class-certification issue on remand, a few words on this point from us are in order.

As we have implied, supplemental jurisdiction was the only basis for the district court's authority over these particular state-law claims; it appears that diversity jurisdiction, which in other cases might also have been an option, was not available to these plaintiffs. While there is diversity of citizenship between the parties in this case-the defendant is a Delaware corporation with its principal place of business in Florida, see *Hertz Corp. v. Friend,* --- U.S. ----, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010), and the plaintiffs are citizens of Illinois-it is exceedingly unlikely that any one plaintiff satisfies the amount-in-controversy requirement, see 28 U.S.C. § 1332(a). We therefore proceed on the assumption that diversity jurisdiction is out of the picture.

[9][10] Section 1367(a) grants the district courts supplemental jurisdiction to hear all other claims that are so related to the claims over which

they have original jurisdiction that they form part of the same Article III case or controversy "[e]xcept ... as expressly provided otherwise by Federal statute...." 28 U.S.C. § 1367(a). We agree with those of our sister circuits who have concluded that the requirements of section 1367(a) are satisfied in cases like this one, where state-law labor claims are closely related to an FLSA collective action. See *Wang,* 623 F.3d at 761-62; *Lindsay,* 448 F.3d at 420-24. We have little to add to the D.C. Circuit's detailed discussion in *Lindsay* of section 1367(a), but it is important to emphasize that the FLSA is not a statute that "expressly provide [s]" some limit to supplemental jurisdiction, as section 1367(a) contemplates that some federal statutes might. See *Lindsay,* 448 F.3d at 421-22. For the reasons we have already given, the opt-in procedures in the FLSA do not operate to limit-expressly or impliedly-a district court's supplemental jurisdiction to only those state-law claims that also involve opt-in procedures.

[11][12] Once the requirements of section 1367(a) are satisfied, the district court must consider whether there is some other reason why it ought to decline to exercise supplemental jurisdiction over state-law claims. The statute explains that a district court can decline to exercise supplemental jurisdiction in the event that

(1) the claim raises a novel or complex issue of State law,

**\*980** (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The plaintiffs' claims against Outback under the IMWL and the IWPCA do not present any complex state-law issues, and so

subsection (c)(1) should not be a problem. Compare *De Asencio,* 342 F.3d at 312 (concluding that supplemental jurisdiction should not have been exercised over parallel state-law claims based in part on the conclusion that the case raised novel issues of state law that would require greater factual development than the federal issues); see also *Wang,* 623 F.3d at 761 (discussing the unique circumstances of *De Asencio*). Nor is subsection (c)(3) implicated here. Moreover, while there may in some cases be exceptional circumstances or compelling reasons for declining jurisdiction, the "conflict" between the opt-in procedure under the FLSA and the opt-out procedure under Rule 23 is not a proper reason to decline jurisdiction under section 1367(c)(4). See *Lindsay,* 448 F.3d at 424 ("[W]e doubt that a mere *procedural* difference can curtail section 1367's *jurisdictional* sweep.").

[13] That leaves subsection (c)(2), which permits a court to decline supplemental jurisdiction if the state-law claims "substantially predominate" over the federal action. The district court concluded that the difference in size between the larger state-law class and the smaller FLSA collective action made a difference in the supplemental jurisdiction analysis. If all it meant by this was that the need to include additional parties was disfavored, then its decision was in conflict with the statute. Section 1367(a) expressly states that "[s]uch supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a). Inclusion of additional litigants as unnamed members of a class is of no more jurisdictional significance than joinder or intervention, and so we understand that final sentence as one that covers class actions as well.

There are other problems with the district court's approach to predominance as well. A simple disparity in numbers should not lead a court to the conclusion that a state claim "substantially predominates" over the FLSA action, as section 1367(c) uses that phrase. As the Third Circuit recognized in *De Asencio,* "[p]redomination under section 1367

generally goes to the type of claim, not the number of parties involved." 342 F.3d at 311; see also *Wang,* 623 F.3d at 762; *Lindsay,* 448 F.3d at 425. Here, as was the case in *Lindsay,* "the state law claims essentially replicate the FLSA claims-they plainly do not predominate." 448 F.3d at 425. As long as the claims are similar between the state plaintiffs and the federal action, it makes no real difference whether the numbers vary.

It is true that the Third Circuit concluded in *De Asencio* that the number of state-law plaintiffs might-and did in the case before it-so far outnumber those engaged in the FLSA collective action that "the federal action [was] an appendage to the more comprehensive state action." 342 F.3d at 312. That was part of the reason that it held that supplemental jurisdiction should not have been exercised in that case. Without taking a position on whether a state-law class might ever so dwarf a federal FLSA action that supplemental jurisdiction becomes too thin a reed on which to ferry the state claims into federal court, we can say conclusively that in the **\*981** present case the disparity between the number of FLSA plaintiffs and the number of state-law plaintiffs is not enough to affect the supplemental jurisdiction analysis. In the majority of cases, it would undermine the efficiency rationale of supplemental jurisdiction if two separate forums were required to adjudicate precisely the same issues because there was a different number of plaintiffs participating in each claim. See *Williams Electronics Games, Inc. v. Garrity,* 479 F.3d 904, 906 (7th Cir.2007) ("The rationale of the supplemental jurisdiction is economy in litigation, and so a relinquishment of it that clearly disserved economy would be a candidate for reversal."). In this case, there are approximately 30 participants in the FLSA collective action and potentially 180 to 250 people who might participate in any of the three Rule 23 classes. Although that is a greater disparity than the D.C. Circuit considered in *Lindsay,* where there were 228 people in the state-law class and 204 proceeding under the FLSA, see 448 F.3d at 425 n. 12, the overall numbers are still low. Our case is quite

unlike *De Asencio,* where the Third Circuit was confronted with an FLSA collective action involving 447 people and a 23(b)(3) class of 4,100 plaintiffs. See 342 F.3d at 305.

We agree with the D.C. Circuit in *Lindsay* and the Ninth Circuit in *Wang* that the Third Circuit decision in *De Asencio* represents only a fact-specific application of well-established rules, not a rigid rule about the use of supplemental jurisdiction in cases combining an FLSA count with a state-law class action. In our case, the record reflects no reason to doubt that it is sensible to litigate all theories in a single federal proceeding. The identity of the issues, the convenience to both plaintiffs and defendants of not having to litigate in multiple forums, and the economy of resolving all claims at once suggests that an exercise of supplemental jurisdiction will normally be appropriate. In all but the most unusual cases, there will be little cause for concern about fairness or comity.

\* \* \*

We conclude that the district court's decision denying certification of plaintiffs' proposed classes under Rule 23 amounted to an abuse of discretion. We REVERSE the district court's denial of class certification, and we REMAND for further proceedings consistent with this opinion.

C.A.7 (Ill.),2011.
Ervin v. OS Restaurant Services, Inc.
632 F.3d 971, 17 Wage & Hour Cas.2d (BNA) 97

END OF DOCUMENT

Exhibit 9

Table of Authorities

TABLE OF AUTHORITIES

**Cases**

*Advertising Specialty Nat'l Ass'n v. FTC*, 238 F.2d 108 (1st Cir.1956)……...………………13

*Alliance to End Repression v. Rochford*, 565 F.2d 975(7th Cir. 1977)………………….......11,12

*Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231…..………….................17,19,24

*Anderson v. Ms. Clemens Pottery Co.,* 328 U.S. 680 (1946)……………………………………26

*Blarek v. Encore Receivable Management, Inc.*, 244 F.R.D. 525 (E.D.Wis. 2007)...........13,16-18

*Blihovde v. St. Croix County, Wis.*, 219 F.R.D. 607 (W.D.Wis. 2003)……………………...19, 20

*Bzdawka v. Milwaukee Cnty.*, 238 F.R.D. 469 (E.D.Wis. 2006)……………..………………10,11

*Carnegie v. Household Int'l, Inc.,* 376 F. 3d 656 (7th Cir. 2004)……………….……………...13

*Clark v. Ford Motor Co.*, 220 F.R.D. 568 (E.D.Wis. 2004)…..….……………...............13,14,16

*Eldred v. Comforce Corp.*, 2010 WL 812698 (N.D.N.Y. Mar. 2, 2010)…..…………...............20

*Ervin v. Os Restaurant Services, Inc.*, 632 F. 3d 971, 2011 WL 135708 (7th Cir. 2011)............27

*Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528 (S.D. Tex. 2008)….………...……………...26

*In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.,* 78 F.R.D. 622 (D. Wash. 1978)...…26

*In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litigation*,
    2003 WL 23669376 (D. Or. May 19, 2003)………………………….…………..………...25

*In re Sumitomo Copper Litig. v. Credit Lyonnais Rouse Ltd.*, 262 F.3d 134 (2d Cir. 2001)…….15

*Frazier v. Southeastern Pennsylvania Transp. Authority* 123 F.R.D. 195 (E.D.Pa., 1988)….….25

*General. Tel. Co. v. Falcon*, 457 U.S. 147 (1982)….…………..………………...………...10

*Great Neck Capital Appreciation Investment Partnership, L.P. v.*
    *Pricewaterhouse Coopers, L.L.P.*, 212 F.R.D. 400 (E.D.Wis. 2002)………..…………….13

*Grochowiski v. Phoenix Constru.,* 318 F.3d 80 (2d Cir. 2003)……………………………...26

*Kasten v. Saint-Gobain Perf. Plastics Corp.* 557 F.Supp.2d 941 (W.D.Wis. 2008)………..…...20

i

*Keele v. Wexler*, 149 F.3d 589 (7th Cir. 1998)………………...……...………………………...10,22

*Kurihara v. Best Buy Co., Inc.*, 2007 WL 2501698 (N.D. Cal. Aug. 30, 2007)…………………..21

*Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir.2003)……………………………….19

*Mendez v. Radec Corp.*, 232 F.R.D. 78 (W.D.N.Y. 2005)…..……………...……..…………....21

*Reisch v. Gateway Press,* 137 F.3d 685 (3d Cir. 1994)…………………………………………..26

*Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584(7th Cir. 1993)………………..10,17

*Robinson v. Metro- North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001)…………………...27

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992)….………......………….....................10,14,18

*Ste. Marie v. Eastern R.R. Ass'n*, 72 F.R.D. 443 (S.D.N.Y. 1976)…………………………...…….25

*Swanson v. American Consumer Industries*, 415 F.2d 1326 (7th Cir. 1969)……………………13

*Simmons v. City of Kan. City, Kan.*, 129 F.R.D. 178 (D. Kan. 1989)……………………...............25

*Temme v. Bemis Co. Inc.*, 2009 WL 1505120 (E.D.Wis. 2009)…………………………...…10

*Thiemes v. Wal-Mart Stores, Inc.,* 2004 W.L. 1688544 (N.D.Ohio July 13, 1988)……………..27

*In re Visa Check/Mastermoney Antitrust Litigation*, 280 F.3d 124 (2d Cir. 2001)............26,27,32

*Wagner v. NutraSweet Co.*, 95 F.3d 527 (7th Cir. 1996)…………………………..…………16

*Whiteway v. FedEx Kinko's Office & Print Servs.*
   2006 WL 2642528 (N.D. Cal. Sept. 14, 2006)………………………………………...21

## Statutes and Codes

29 U.S.C. §201 et seq………………………………………………………………………...1

29 U.S.C. §216(b)…………………………………………………………………………..27

Wis. Stat. § 104.02……………………………………………………………………14

Wis. Admin. Code DWD § 272.03……………………………………………………..……14

Wis. Admin. Code DWD § 272.04. et. seq……………………………………………..1,9,14,21

Wis. Admin. Code DWD § 272.12 et. seq. …………………………………………...1,9,14,20,21

**Rules**

Fed. R. Civ. P. 23……………………….…………...……………………………………*passim*

**Other Authorities**

7AA Wright, Miller & Kane, Federal Practice and Procedure, § 1778
      (3d ed. 2008)……………………………………………………………………......19

Alba Conte & Herbert Newberg, Newberg on Class Actions, § 3:10 at 272
      (4th ed. 2002)……………………………………………………………………………15

Edward F. Sherman, Class Actions and Duplicative Litigation,
      62 IND. L.J. 507, 516 (1987)……………………………………………..…………27

Newberg on Class Actions § 4.25, (3d ed.1992)……..…………………….……………...19

Ellen c. Kearns et. al., The Fair Labors Standards Act (1999)…………………………..27